**Steve D. Larson**, OSB No. 863540
**Kevin Michael Flannery**, OSB No. 173457
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:  (503) 227-1600
Facsimile:  (503) 227-6840
Email:      slarson@stollberne.com
            kflannery@stollberne.com

*Attorneys for Plaintiff Karra Crawford*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KARRA CRAWFORD, <br><br> Plaintiff, <br><br> v. <br><br> ADVISER COMPLIANCE ASSOCIATES, LLC dba ACA GROUP, a District of Columbia limited liability company, <br><br> Defendant. | Case No. 3:25-cv-02242-SB <br><br> **PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS** <br><br> Request for Oral Argument |

## TABLE OF CONTENTS

Page

I.    Introduction................................................................................................... 1

II.   Legal Standard ............................................................................................ 2

III.  The Complaint Alleges that ACA Actively Covered Up or Negligently Failed to Detect the Elite Defendants' Securities Law Violations and Oversaw a Complete Compliance Failure ................................................................................... 3

IV.   Overview of Key Principles: RIA Firms Are Fiduciaries that Are Subject to Civil Liability Under State Law, with Duties Imposed by Federal Law ................... 6

V.    ACA Can Be Held Liable for Negligence and Negligent Misrepresentation ..... 9

    A.    Crawford Can Recover Economic Damages from ACA Because CCOs Owe Fiduciary Duties and Special Obligations to RIA Firm Clients .................... 9

        1.    CCOs Are Officers of RIA Firms and Owe "Fiduciary Obligations" to RIA Firm Clients, as S.E.C. Regulations Confirm.......... 10

        2.    CCOs Owe Special Obligations to RIA Firm Clients on Account of Their Duties as CCOs ................................................................. 13

    B.    A Foreseeable Consequence of Negligently Failing to Carry Out CCO Duties Is that Investors Will Lose Money .......................................... 16

VI.   ACA Can Be Held Liable for Fraud and Breach of Duty ............................... 21

    A.    The Complaint Alleges that ACA Acted in Concert with the Elite Defendants' Fraud and Breach of Duty ................................................ 21

        1.    ACA Does Not Argue that the Complaint Failed to State a Claim Against ACA for Acting in Concert with the Elite Defendants' Breach of Duty ................................................................. 21

        2.    ACA Is Jointly Liable for Acting in Concert with the Elite Defendants' Fraud ................................................................. 22

            a.    Oregon Recognizes Joint Liability for Acting in Concert with a Tortfeasor .......................................................... 22

            b.    ACA Acted in Concert with the Elite Defendants........................ 22

    B.    The Complaint Sufficiently Alleges that the Fraud Foreseeably Resulted in Crawford's Damages ................................................................. 24

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

VII.    ACA Can Be Held Liable for Violations of the Unlawful Trade Practices Act ............... 27

    A.    Crawford's UTPA Claim is Not Time-Barred ........................................................ 27

    B.    Investment Advisory Services Are Subject to the UTPA .................................... 29

    C.    ACA Violated the UTPA .................................................................................... 32

VIII.    ACA Can Be Held Liable for Violations of the Oregon Securities Law .......................... 34

IX.    If Any Claim Is Insufficiently Alleged, Leave to Amend Should Be Granted ................. 35

ii

# TABLE OF AUTHORITIES

## Cases

*Bailey v. Lewis Farm, Inc.*
  343 Or. 276 (2007)............................................................................................... 19, 20

*Bodin v. B. & L. Furniture Co.*
  42 Or. App. 731 (1979)............................................................................................ 28

*Buchler v. State By & Through Oregon Corrections Division*
  316 Or. 499 (1993)................................................................................................... 17

*Chapman v. Mayfield*
  358 Or. 196 (2015)............................................................................................. 17, 19

*Clark v. Eddie Bauer LLC*
  371 Or. 177 (2023)................................................................................................... 34

*Conway v. Pacific University*
  324 Or. 231 (1996)................................................................................................... 11

*Covelli v. Avamere Home Health Care LLC*
  No. 3:19-CV-486, 2021 WL 1147144 (D. Or. Mar. 25, 2021)................................ 35

*Cullen v. Investment Strategies, Inc.*
  139 Or. App. 119 (1996)..................................................................................... 31, 32

*Desertrain v. City of Los Angeles*
  754 F.3d 1147 (9th Cir. 2014) ............................................................................... 35

*Domion v. Triquint Semiconductor, Inc.*
  No. 3:16-CV-01852, 2017 WL 7310643 (D. Or. Nov. 2, 2017), *report and recommendation adopted*, No. 3:16-CV-01852, 2018 WL 847240 (D. Or. Feb. 13, 2018) ....................................................................................................................... 16

*Duniway v. Barton*
  193 Or. 69 (1951).................................................................................................... 28

*Fatnani v. JPMorgan Chase Bank, N.A.*
  743 F. Supp. 3d 1253 (D. Or. 2024) ......................................................... 2, 22, 23

*Fazzolari By & Through Fazzolari v. Portland School District No. 1J*
  303 Or. 1 (1987) ....................................................................... 16, 19, 20, 25

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

*Fowler v. Cooley*
239 Or. App. 338 (2010)............................................................................................................ 30

*Granewich v. Harding*
329 Or. 47 (1999)...................................................................................................................... 22

*Haas v. Estate of Carter*
370 Or. 742 (2023).................................................................................................................... 18

*Horton v. Nelson*
252 Or. App. 611 (2012)................................................................................................. 22, 23, 32

*Kehr Packages, Inc. v. Fidelcor, Inc.*
926 F.2d 1406 (3d Cir. 1991)............................................................................................... 21, 24

*Knepper v. Brown*
345 Or. 320 (2008).............................................................................................................. 25, 26

*Maeve v. Centennial School District No. 28J*
No. 3:24-CV-01427, 2025 WL 458826 (D. Or. Feb. 11, 2025) ........................................... 21, 24

*Mathies v. Hoeck*
284 Or. 539 (1978).................................................................................................................... 28

*Matter of Bonome*
314 Or. App. 364 (2021)........................................................................................................... 29

*McCulloch v. Price Waterhouse LLP*
157 Or. App. 237 (1998)...................................................................................................... 27, 28

*Medve v. JP Morgan Chase Bank, N.A.*
No. CV H-15-2277, 2016 WL 393736 (S.D. Tex. Feb. 2, 2016) ............................................... 11

*Melikhov v. Drab*
No. 16 C 9332, 2017 WL 3234808 (N.D. Ill. July 31, 2017) ............................................... 12, 13

*Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*
336 Or. 329 (2004)............................................................................................................ 9, 19, 20

*Patsos* v. *First Albany Corp.*
433 Mass. 323 (2001) ............................................................................................................... 15

*Philibert v. Kluser*
360 Or. 698 (2016).................................................................................................................... 13

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

*Piazza v. Kellim*
    360 Or. 58 (2016)............................................................................................ 19, 20

*Pozez v. Ethanol Capital Management., L.L.C.*
    No. 07-CV-00319-TUCCK, 2009 WL 2176574 (D. Ariz. July 21, 2009) .............................. 13

*Prince v. Brydon*
    307 Or. 146 (1988)................................................................................................ 24

*Roach v. Mead*
    301 Or. 383 (1986)............................................................................................ 30, 31

*S.E.C. v. Capital Gains Research Bureau, Inc.*
    375 U.S. 180 (1963)............................................................................................. 7, 10

*Searle v. Exley Express*
    278 Or. 535 (1977)................................................................................................. 30

*Snead v. Wright*
    No. 3:19-CV-00092, 2025 WL 1906847 (D. Alaska July 10, 2025).......................................... 8

*Stanley v. Schmidt*
    369 F. Supp. 3d 297 (D. Mass. 2019) ..................................................... 10, 14, 15, 16

*Stone v. Witt*
    374 Or. 524 (2025)............................................................................................. 9, 13

*Strawn v. Farmers Insurance Co. of Oregon*
    350 Or. 336, *adhered to on reconsideration*, 350 Or. 521 (2011).......................................... 24

*Terry v. Holden-Dhein Enterprises, Ltd.*
    48 Or. App. 763 (1980)............................................................................................. 33

*Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*
    444 U.S. 11 (1979)................................................................................................. 8

## Statutes

15 U.S.C. § 80b-2(a)(25) ............................................................................................. 7, 12

15 U.S.C. § 80b-11 ..................................................................................................... 7, 30

28 U.S.C. § 1441(a) ....................................................................................................... 3

Or. Laws 2010, ch. 94, § 1................................................................................................ 31

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Or. Laws 2010, ch. 94, § 2 ........................................................................................... 31

Or. Rev. Stat. § 646.605(10) ........................................................................................ 32

Or. Rev. Stat. § 646.605(6)(a) ............................................................................... 27, 29

Or. Rev. Stat. § 646.607(6)(a) ...................................................................................... 31

Or. Rev. Stat. § 646.608 .......................................................................................... 29, 33

Or. Rev. Stat. § 646.608(1) ............................................................................... 29, 33, 34

Or. Rev. Stat. § 646.608(2) ........................................................................................... 33

Or. Rev. Stat. § 646.638(1) ........................................................................................... 29

Or. Rev. Stat. § 646.638(6) ........................................................................................... 27

## Rules

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 2, 21, 35

Fed. R. Civ. P. 15(a)(2) ................................................................................................. 35

## Regulations

17 C.F.R. § 275.204-1(a)(1)(ii) ................................................................................ 8, 18

17 C.F.R. § 275.204A-1 ............................................................................................ 7, 12

17 C.F.R. § 275.204A-1(a)(1) ............................................................................. 7, 10, 12

17 C.F.R. § 275.204A-1(a)(4) ...................................................................................... 13

17 C.F.R. § 275.206(4)-7 ....................................................................................... passim

17 C.F.R. § 275.206(4)-7 (a) .................................................................................. 12, 13

17 C.F.R. § 275.206(4)-7 (b) ....................................................................................... 13

17 C.F.R. § 275.206(4)-7 (c) .................................................................... 10, 12, 13, 23

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600　FAX (503) 227-6840

S.E.C., *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*
84 Fed. Reg. 33669 (2019)* ...................................................................... 7, 10, 14, 30

S.E.C., *Compliance Programs of Investment Companies and Investment Advisers*
68 Fed. Reg. 74714 (2003)* .................................................................................. passim

S.E.C., *Form ADV (Paper Version): UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION & REPORT FORM BY EXEMPT REPORTING ADVISERS* (2024)* ..................................................................................... 12, 18

S.E.C., *Form ADV (Paper Version): UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION & REPORT FORM BY EXEMPT REPORTING ADVISERS: Part 1A* (2024)* ........................................................................... 12

S.E.C., *Form ADV (Paper Version): UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION: PART 2: Uniform Requirements for the Investment Adviser* Brochure *and* Brochure Supplements (2022)* ........................................ 8, 18

S.E.C., *Form CRS Relationship Summary; Amendments to Form ADV*
84 Fed. Reg. 33492 (2019)* ......................................................................... 8, 14, 30

S.E.C., *Investment Adviser Codes of Ethics*
69 Fed. Reg. 41696 (2004)* ......................................................................... 7, 12, 14

## Other Authorities

ACA Group, *Suitable Sanctions Await Advisers Recommending Unsuitable Investments*
(Aug. 15, 2016) ................................................................................................... 14

*Restatement (Second) of Torts* § 876 ......................................................... 22, 23, 24

*Restatement (Third) Of Agency* § 3.15 (2006) ............................................... 11

S.E.C. Staff, *Study on Investment Advisers and Broker-Dealers* (2011)* .................................... 8

————

\* Included in Appendix

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

## I.    Introduction

A chief compliance officer (CCO) for an S.E.C.-registered investment adviser (RIA) firm is required by law to deter, detect, and correct securities law violations and to compel compliance with securities laws, including the RIA firm's non-waivable fiduciary duties to clients. In carrying out those duties, the CCO owes the same non-waivable fiduciary duties to clients that the RIA firm does. And the CCO is certainly not permitted to help the RIA firm—or any of its supervised persons—breach those fiduciary duties or violate other securities laws.

In this case, Defendant Adviser Compliance Associates, LLC dba ACA Group ("ACA") provided outsourced CCO services to two closely related RIA firms, Elite Wealth Management, Inc. ("Elite") and Lattice Capital Management, LLC ("Lattice"), and three of their supervised persons, Fariba Ronnasi ("Ronnasi"), Ronnasi's husband Ali Reza Memaran-Dadgar aka Allan Dadgar ("Dadgar"), and their employee Robert Val Lybbert (collectively, "Elite Defendants"). Given its CCO duties, ACA knew or should have known about numerous red flags that surrounded the Elite Defendants' operations, and ACA knew or should have known about the additional red flags that surfaced as ACA provided the outsourced CCO services. Those red flags included Ronnasi and Dadgar's conflict-ridden client-sharing among their firms, Ronnasi's prior customer complaints, non-diversified investments in Ronnasi and Dadgar's hedge fund, Dadgar's lack of licensure as a securities professional, the creation of a mysterious new entity called the D&R Family Office LLC, and unusual personnel changes at the firms. Additionally, ACA knew or should have known that Ronnasi was criminally charged with First Degree Theft, which, by law, required prompt disclosure to the firms' clients.

In its role as CCO, ACA was required to take action in response to those red flags. Because ACA failed to do so, Plaintiff Karra Crawford ("Crawford") remained unaware that her

Page 1 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

trusted financial adviser had been charged with First Degree Theft, that Dadgar had been handed control of Elite even though he was not a licensed securities professional, and that Ronnasi and Dadgar's hedge fund was a totally unsuitable investment for her. The results were foreseeable: Crawford fell victim to the Elite Defendants' securities law violations and lost most of her retirement savings because she believed that Ronnasi was a person of integrity who was looking out for her best interests.

In moving to dismiss Crawford's claims, ACA variously asserts that Crawford's allegations are not detailed enough or otherwise insufficient and that a firm's CCO cannot be liable for compliance failures that foreseeably resulted in harm to the firm's clients. Because those assertions lack merit, Crawford respectfully requests that the Court deny ACA's motion. Additionally, because ACA's motion does not address Crawford's allegations of ACA's joint liability for the Elite Defendants' breach of duty, Crawford's breach-of-duty claim should move forward regardless of how the Court otherwise rules.

## II.    Legal Standard

"A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief." *Fatnani v. JPMorgan Chase Bank, N.A.*, 743 F. Supp. 3d 1253, 1278 (D. Or. 2024) (citing Ninth Circuit authority). "In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party." *Id.* (citing Ninth Circuit authorities). Accordingly, while the Court may evaluate legal conclusions for itself, the Court must credit the factual allegations in the Complaint and "draw all reasonable inferences from the

Page 2 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

factual allegations in favor of the plaintiff." *Id.* (citing Ninth Circuit authority). Under this standard, ACA's motion should be denied.

### III. The Complaint Alleges that ACA Actively Covered Up or Negligently Failed to Detect the Elite Defendants' Securities Law Violations and Oversaw a Complete Compliance Failure

Crawford is a widow and retiree. *See* Defendant Adviser Compliance Associates, LLC's Notice of Removal of Civil Action Under 28 U.S.C. § 1441(a), Ex. 1 ("Complaint") at ¶ 8, ECF No. 1. During her career, she worked as an ultrasound technician. *Id.* Although Crawford worked hard to be financially secure in her retirement, she "was not sophisticated or knowledgeable with respect to financial markets, investment strategy, or securities-related matters." *Id.* ¶ 21.

So Crawford relied on Ronnasi, her trusted financial adviser and Elite's principal, to advance her conservative investment objectives. *Id.* ¶¶ 19-21, 39, 51. In particular, Crawford followed Ronnasi's recommendation to make a concentrated investment of $1,635,000 in Lattice's Alpha Fund, followed by another $28,800 investment. *Id.* ¶¶ 48, 59, 62-64. Lattice and Elite were closely related entities. *Id.* ¶¶ 25, 101.

But Ronnasi misled Crawford about the Alpha Fund, and Ronnasi breached her fiduciary duties in recommending the extremely risky—and totally unsuitable—hedge fund to Crawford. *Id.* ¶¶ 49-56, 340-46. Crawford did not even meet the eligibility requirements for investing in the fund. *Id.* ¶¶ 55-56. But Ronnasi steered Crawford to the Alpha Fund to increase her and Dadgar's wealth. *Id.* ¶ 30.

Ronnasi was later charged with First Degree Theft—a felony—for defrauding TJ Maxx over an extended period of time, and she contacted ACA to take over as CCO for Elite and Lattice. *Id.* ¶¶ 70-78, 92. ACA is a sophisticated compliance firm that provides outsourced

Page 3 –     PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
             ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

CCO services, which includes training and overseeing RIA firms, advising senior leadership, maintaining and monitoring policies, and managing key filings, including Form ADV. *Id.* ¶¶ 84-86.  Outsourcing the CCO role saves money, but it is not a best practice.  *Id.* ¶¶ 87-90.

ACA learned that Ronnasi had been charged with First Degree Theft.[1]  *Id.* ¶¶ 93-96, 99-100, 104-05.  ACA also learned about the firms' conflict-ridden relationships and Ronnasi's history of customer disputes.  *Id.* ¶¶ 97-98, 101-02.  ACA nonetheless agreed to fulfill CCO duties for the firms and assigned a new employee (with his own prior criminal charges) to the matter.[2]  *Id.* ¶¶ 103, 106-08, 150.  ACA also permitted its name and reputation to be used to cultivate client trust.  *Id.* ¶¶ 157-58.

ACA did not fulfill its CCO duties, and it oversaw a complete compliance failure at Elite and Lattice.  *Id.* ¶ 159.  Despite the red flags, ACA did nothing to investigate Ronnasi's self-serving investment recommendations, and it failed to alert Crawford that her concentrated investment in the Alpha Fund was a mismatch with her conservative investment objectives (which were documented in Elite's records).  *Id.* ¶¶ 109-10.  Additionally, ACA knew that it was required to disclose Ronnasi's First Degree Theft charge, but it did not do so.  *Id.* ¶ 153.  Instead, it advised Ronnasi and Dadgar about the charge and helped them make a series of unusual personnel changes to cover up the criminal matter.  *Id.* ¶¶ 111, 156.

ACA also helped the firms make false and misleading statements about those unusual changes.  ACA and the Elite Defendants told clients that Ronnasi was now the Chief Executive

---

[1]  Alternatively, ACA was negligent in carrying out its CCO duties, still to Crawford's detriment.  *See* Complaint ¶¶ 160-64.

[2]  At all relevant times, ACA's employees who were assigned to carry out CCO duties for Elite and Lattice acted within the scope of their employment with ACA and on behalf of ACA. *See* Complaint ¶¶ 106, 151.  Accordingly, this memorandum refers to those two employees and ACA together as "ACA."

Page 4 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

Officer at the mysterious "D&R Family Office"—which had been formed just two weeks prior—and was moving into a new role at Elite.[3]  *Id.* ¶¶ 114-18, 131-33  They also told clients that Dadgar would be taking over Elite, but they failed to disclose that Dadgar was not licensed, and they lied about the timing of his takeover to avoid arousing concerns.  *Id.* ¶¶ 131-33, 136-41.  Further, in aid of the deception, ACA did not provide an updated Form ADV—which would have disclosed Ronnasi's criminal charge—to the firms' clients.  *Id.* ¶¶ 142-45.

Crawford was previously a victim of the Aequitas-related Ponzi scheme, and integrity is of the utmost importance to her.  *Id.* ¶¶ 40-47, 65-69.  She was grateful when Aequitas' former executives were found guilty.  *Id.* ¶¶ 66-67.  Had Crawford known that Ronnasi had been charged with First Degree Theft, she would have immediately withdrawn her investment in the Alpha Fund and terminated her relationship with the Elite Defendants.  *Id.* ¶ 166.  But she did not know that, and she invested further.  *Id.* ¶¶ 168-78.

Because Crawford did not know about Ronnasi's First Degree Theft charge, she "trusted Ronnasi and believed that Ronnasi had acted and would continue to act in [her] best interest at all times."  *Id.* ¶ 124.  That "gave rise to a foreseeable risk that Ronnasi would continue to commit additional or further acts of fraud against individuals like Crawford who were unaware of Ronnasi's criminal and fraudulent misconduct.  This risk was especially acute for individuals like Crawford who lacked experience and knowledge in financial markets, investment strategy,

---

[3] ACA incorrectly states that the Complaint alleges that "[a]round [July 2023], Ronnasi also became the CEO of Lattice."  Defendant Adviser Compliance Associates, LLC dba ACA Group's Motion to Dismiss ("MTD") at 4, ECF No. 7.  The Complaint actually alleges that Ronnasi "created the role of Chief Operating Officer for herself at Elite to give her a face-saving role and the appearance of importance as she was forced to step down from her other roles."  Complaint ¶¶ 117-18.

Page 5 –  PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

and securities-related matters and who expected and believed that Ronnasi had been acting and would continue to act in their best interests." *Id.* ¶ 154.

That foreseeable risk materialized.  Prioritizing their own financial interest, the Elite Defendants continued to lead Crawford to believe that the Alpha Fund was a suitable investment for her.  *Id.* ¶ 179.  And when the Alpha Fund experienced a loss in value, the Elite Defendants made additional false and misleading statements—in violation of their fiduciary duties and other securities laws—to persuade Crawford to remain invested.  *Id.* ¶¶ 181-203.  Specifically, the Elite Defendants claimed to have restructured the Alpha Fund to withstand and capitalize on extreme volatility events and misleadingly renamed it the Dynamic Absolute Return Fund.  *Id.* ¶ 190.  "Not knowing about Ronnasi's criminal conduct or the sustained efforts to cover it up, and thus not having reason to believe that she was being taken advantage of, Crawford again fell victim to the false and misleading statements and stayed invested in the Absolute Return Fund." *Id.* ¶ 203.

In April 2025, the Absolute Return Fund experienced an 85% loss, a result of "extreme market volatility," according to the Elite Defendants.  *Id.* ¶ 205.  Crawford lost nearly all her retirement savings.  *Id.* ¶ 206.

"Crawford finally learned of Ronnasi's First Degree Theft charge—and, by extension, the failure to previously disclose it—in or around July 2025." *Id.* ¶ 207.  She initiated this action in October 2025, and ACA has now moved to dismiss each of Crawford's claims.

## IV.  <u>Overview of Key Principles: RIA Firms Are Fiduciaries that Are Subject to Civil Liability Under State Law, with Duties Imposed by Federal Law</u>

The issues in this case arise out of securities law violations of RIA firms and their supervised persons, including their CCOs.  The following overview of key legal principles is provided to help frame those issues.

Page 6 –     PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

RIA firms owe fiduciary duties to their clients. *See S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191 (1963). These are significantly greater duties than the duties that often apply in other types of securities cases. In addition to requiring disclosure of all material facts, these non-waivable fiduciary duties require firms to act in their clients' best interests at all times. *See* S.E.C., *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 Fed. Reg. 33669, 33671-72 & n.29 (2019) ("Best Interest Interpretation"), App. 3-4.[4] Additionally, while the firm itself is considered the client's investment adviser, the firm necessarily acts through its "supervised person[s]," who have an obligation to uphold the fiduciary duties owed to the firm's clients. *See* 15 U.S.C. § 80b-2(a)(25); 17 C.F.R. § 275.204A-1(a)(1).

Under the Investment Advisers Act, the S.E.C. bears responsibility for issuing regulations that govern firms and their supervised persons, including their CCOs. *See* 15 U.S.C. § 80b-11. In this case, and as discussed in detail below, two S.E.C. regulations are of particular importance: the Compliance Rule, *see* 17 C.F.R. § 275.206(4)-7, and the Ethics Rule, *see* 17 C.F.R. § 275.204A-1. When the S.E.C. enacted those rules, it explained the intent and purpose of the rules in announcing releases. *See* S.E.C., *Compliance Programs of Investment Companies and Investment Advisers*, 68 Fed. Reg. 74714 (2003) ("Compliance Rule Release"), App. 14; S.E.C., *Investment Adviser Codes of Ethics*, 69 Fed. Reg. 41696 (2004) ("Ethics Rule Release"), App. 31.

The S.E.C.'s suite of regulations and instructions relating to Form ADV are also particularly important. Form ADV is a mandatory registration and disclosure form comprised of

---

[4] Copies of the Best Interest Interpretation, S.E.C. rule-making announcements, Form ADV instructions, and an S.E.C. staff study are included in the appendix to this response.

Page 7 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

several parts, including parts specifically for retail investors.  *See* S.E.C., *Form CRS Relationship Summary; Amendments to Form ADV*, 84 Fed. Reg. 33492 (2019) ("Form ADV Update Release"), App. 45.  Form ADV reinforces firms' fiduciary duties and requires that firms "promptly" update the form whenever certain information—including information relating to its supervised persons' "legal or disciplinary events"— becomes materially inaccurate.  *See* 17 C.F.R. § 275.204-1(a)(1)(ii); S.E.C., *Form ADV (Paper Version): UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION: PART 2: Uniform Requirements for the Investment Adviser* Brochure *and* Brochure Supplements (2022) ("Form ADV Part 2 Instructions"), App. 243-46.

Although the Investment Advisers Act created only a limited federal cause of action to enforce private rights, *see Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979), the Act did not alter otherwise available civil remedies, *see Snead v. Wright*, No. 3:19-CV-00092, 2025 WL 1906847, at *9 n.101 (D. Alaska July 10, 2025) (unpublished). Indeed, there is widespread recognition that harmed advisory clients may bring state-law claims for negligence, breach of fiduciary duty, fraud, and statutory violations to recover damages.  *See* S.E.C. Staff, *Study on Investment Advisers and Broker-Dealers* (2011) at 45-46 & nn.188-93 (collecting cases), App. 307-08.  "State law claims may at times provide for broader liability than federal law provides, such as aiding and abetting liability in cases of fraud."  *Id.* at 46, App. 308. But the duties and obligations imposed by the Investment Advisers Act and S.E.C. regulations may still be relevant to a plaintiff's state-law claims.  *See, e.g.*, *Snead*, 2025 WL 1906847, at *9.

Given that background, and for the reasons that follow, each of ACA's arguments should be rejected, and Crawford should be permitted to litigate her claims.

Page 8 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

## V.    ACA Can Be Held Liable for Negligence and Negligent Misrepresentation

ACA's arguments that Crawford has failed to sufficiently plead claims for negligence and negligent misrepresentation are unavailing.  Notwithstanding the firms' fiduciary duties to Crawford and the investor-protection responsibilities imposed by law on CCOs, ACA contends that it owed no duties to Crawford.  ACA also contends that it cannot be liable for economic damages, but that argument fails because ACA owed fiduciary duties and special obligations to Crawford.  Additionally, ACA's effort to blend together the causation and foreseeability elements of a negligence claim and blame others for Crawford's loss is at odds with Oregon law.  Under Oregon law, multiple causes may contribute to an injury, and foreseeability is nearly always a jury question.  As explained below, the Court should deny ACA's motion to dismiss Crawford's claims for negligence and negligent misrepresentation.

### A.    Crawford Can Recover Economic Damages from ACA Because CCOs Owe Fiduciary Duties and Special Obligations to RIA Firm Clients

As ACA emphasizes, Crawford seeks to recover economic damages.  *See* MTD at 12 (invoking economic-loss doctrine).  But there is nothing unusual or impermissible about that. ACA provided outsourced CCO services to the firms that Crawford entrusted with her retirement savings.  So it is not surprising in the least that ACA's failure to take action in response to numerous red flags would result in economic damages.

Moreover, Oregon law permits plaintiffs to recover economic damages when special obligations exist.  Even without physical injury, "[l]iability [for negligence] may still arise in special cases out of circumstances that create an obligation on the part 'of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm.'"  *Stone v. Witt*, 374 Or. 524, 535 (2025) (quoting *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329, 341 (2004)).  "Those special obligations can flow from sources of

Page 9 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

law like statutes or court orders, or they can arise because of an undertaking or a relationship between the plaintiff and defendant for which the common law recognizes a special obligation." *Id.* at 536.

In this case, ACA owed special obligations to Crawford for two reasons. First, as CCO for Elite and Lattice, ACA was part of Elite and Lattice. It therefore owed "fiduciary obligations" to Crawford, as S.E.C. regulations confirm. 17 C.F.R. § 275.204A-1(a)(1) (requiring the establishment, maintenance, and enforcement of an ethics code that reflects the "fiduciary obligations" of the firm and its supervised persons); 17 C.F.R. § 275.206(4)-7(c) (requiring that a CCO be a supervised person). Second, ACA owed special obligations to Crawford because CCOs have duties imposed by law that are intended to protect investors, particularly unsophisticated retail investors like Crawford. *See, e.g.*, *Stanley v. Schmidt*, 369 F. Supp. 3d 297, 313-17 (D. Mass. 2019) (applying similar principles of Massachusetts law and permitting plaintiffs to proceed with a negligence claim against a CCO, given the CCO's duties).

### 1.     CCOs Are Officers of RIA Firms and Owe "Fiduciary Obligations" to RIA Firm Clients, as S.E.C. Regulations Confirm

ACA can be held liable for Crawford's economic damages because it owed Crawford fiduciary duties. ACA's argument that it did not owe fiduciary duties to Crawford because it did not directly provide investment advice to Crawford is contrary to the Compliance Rule and Ethics Rule that governed its activities as CCO. Whether ACA was an "third-party compliance vendor" is immaterial. MTD at 1.

To start, RIA firms are agents who owe fiduciary duties to their clients. *See Capital Gains*, 375 U.S. at 191; Best Interest Interpretation, 84 Fed. Reg. at 33671-72 & n.29, App. 3-4. Those fiduciary duties would be undermined if the firm's officers and employees (who are

Page 10 –     PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

subagents) were not bound by, and could act inconsistently, with those fiduciary duties. "Moreover, a subagent is a fiduciary, as is any agent." *Restatement (Third) Of Agency* § 3.15 (2006); *see also Medve v. JP Morgan Chase Bank, N.A.*, No. CV H-15-2277, 2016 WL 393736, at *3 (S.D. Tex. Feb. 2, 2016) (unpublished) (applying Texas law and recognizing that an "employee [of a fiduciary firm] owes a fiduciary duty directly as a subagent carrying out the employer's fiduciary functions"). Thus, under ordinary legal principles, ACA owed Crawford fiduciary duties. Additionally, under the specific facts of this case, ACA owed fiduciary duties to Crawford because ACA permitted itself to be held out as protecting the Elite Defendants' clients. *See Conway v. Pacific University*, 324 Or. 231, 236 (1996) (stating that a "heightened duty arises when one party is acting, at least in part, to further the economic interests of the other party").

The Compliance Rule and the Ethics Rule confirm that a CCO is always part of an RIA firm and bound by its fiduciary obligations. The Compliance Rule does not merely require a firm to have a compliance program; it requires a firm to have a "[c]hief compliance officer." 17 C.F.R. § 275.206(4)-7(c). In using that specific term, the S.E.C. sought to convey that the CCO "should have a position of sufficient seniority and authority <u>within the organization</u> to compel others to adhere to the compliance policies and procedures." Compliance Rule Release, 68 Fed. Reg. at 74720, App.20 (emphasis added). Similarly, the S.E.C. intended that a CCO would "be empowered with full responsibility and authority to develop and enforce appropriate policies and procedures for the firm." *Id*. And the S.E.C. continues to treat CCOs as "Management Persons" who are required to be identified on Form ADV.[5]

---

[5] *See* S.E.C., *Form ADV (Paper Version): UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION & REPORT FORM BY EXEMPT REPORTING*

Page 11 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

The Compliance Rule also requires that a CCO be "a supervised person."  17 C.F.R. § 275.206(4)-7(c).  By definition, every supervised person is part of the firm, whether formally or functionally.  *See* 15 U.S.C § 80b-2(a)(25).  Thus, a CCO—"even an outsourced [CCO]— necessarily operates within the organization for which they are serving as [CCO]."  Complaint ¶ 91.  For that reason, the CCO is also necessarily subject to the firm's policies and procedures.  *See* 17 C.F.R. § 275.206(4)-7(a); *cf.* Complaint ¶ 89 (Per ACA, "[r]egulatory expectations remain the same whether the role is internal or outsourced.").

Under the Ethics Rule, those policies and procedures include "a written code of ethics" that makes explicit that supervised persons owe fiduciary duties to the firm's clients.  17 C.F.R. § 275.204A-1(a)(1).  Specifically, a firm's ethics code "must reflect [the firm's] fiduciary obligations and those of [the firm's] supervised persons."  *Id.* (emphasis added); *see also* Ethics Rule Release, 69 Fed. Reg. at 41696-97, App. 31-32 (stating that the rule "was designed to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel").  Because a CCO is necessarily a supervised person and because all supervised persons are necessarily bound by an ethics code that reflects their fiduciary obligations, ACA owed fiduciary obligations to Crawford in its role as CCO for Elite and Lattice.

The cases that ACA relies on do not hold otherwise.  *See* MTD at 9-10 (citing *Melikhov v. Drab*, No. 16 C 9332, 2017 WL 3234808, at *12 (N.D. Ill. July 31, 2017) (unpublished); *Pozez v. Ethanol Capital Management., L.L.C*, No. 07-CV-00319-TUCCK, 2009 WL 2176574,

---

*ADVISERS* (2024) ("Form ADV General Instructions"), App. 488; S.E.C., *Form ADV (Paper Version): UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION & REPORT FORM BY EXEMPT REPORTING ADVISERS: Part 1A* (2024), App. 496.

Page 12 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

at *6 (D. Ariz. July 21, 2009) (unpublished)). Those cases do not address the fiduciary obligations of supervised persons. Instead, they focus on the threshold issue of whether an investment adviser existed at all. *See Melikhov*, 2017 WL 3234808, at **11-12; *Pozez*, 2009 WL 2176574, at **4-6. That threshold issue is not in dispute here because Elite and Lattice were RIA firms that owed Crawford fiduciary duties, *see* Complaint ¶¶ 19, 61, and ACA was their CCO and supervised person, *see id.* ¶ 103; 17 C.F.R. § 275.206(4)-7(c).

> 2.    CCOs Owe Special Obligations to RIA Firm Clients on Account of Their Duties as CCOs

Even if the Compliance Rule and Ethics Rule did not make explicit that CCOs owed fiduciary obligations to clients, ACA still owed special obligations to Crawford as a result of its CCO duties. This vein of Oregon law broadly recognizes that liability for economic damages may be imposed for breach of a duty or obligation "arising from a defendant's particular status or relationships, or from legislation, beyond the generalized standards that the common law of negligence imposes." *Stone*, 374 Or. at 353 (emphasis and quotation marks omitted); *see Philibert v. Kluser*, 360 Or. 698, 706 (2016) (taking an expansive view as to what sources of law can create special obligations).

A CCO has such duties and obligations. *See* Complaint ¶ 83. As noted, a CCO oversees a firm's ethics code, *see* 17 C.F.R. § 275.204A-1(a)(4), and is "responsible for administering the policies and procedures" that an RIA firm must "[a]dopt and implement" "to prevent violation[s]" of securities laws, 17 C.F.R. § 275.206(4)-7(a), (c). These policies and procedures must be adequate and effective. *See* 17 C.F.R. § 275.206(4)-7(b). To be adequate and effective, the policies and procedures must "take into consideration the nature of that firm's operations. Compliance Rule Release, 68 Fed. Reg. at 74716, App. 16. Additionally, the policies and procedures must ensure "[t]he accuracy of disclosures made to investors, clients, and regulators."

Page 13 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

*Id.* Ultimately, "[t]he policies and procedures should be designed to prevent violations from occurring, detect violations that have occurred, and correct promptly any violations that have occurred." *Id.* (footnotes omitted). This responsibility includes detecting "breaches of fiduciary responsibilities." *Id.* at 74716 n.15, App. 16. Unsurprisingly, these key duties "are designed to protect investors" like Crawford. *Id.* at 74714, App. 14; Ethics Rule Release, 69 Fed. Reg. at 41696, App. 31 (stating that the Ethics Rule "was designed to prevent fraud"); Form ADV Update Release, 84 Fed. Reg. at 33493, App. 46 (stating that beefed-up disclosure requirements were "designed to . . . assist retail investors").

ACA itself recognizes that CCOs have duties to investors. Its website states that, "[t]o be successful—and meet regulators' and investors' expectations—an outsourced CCO must have a meaningful presence at the firm, a strong understanding of its operations, and a position of seniority to implement and enforce policies." Complaint ¶ 89 (emphasis added). Elsewhere, ACA has advised that "[d]uring a firm's annual review of its compliance manual, the Chief Compliance Officer ('CCO') should make certain that policies and procedures are designed to ensure that recommendations made to clients are suitable. The CCO should also make certain that policies and procedures are being followed to the letter." ACA Group, *Suitable Sanctions Await Advisers Recommending Unsuitable Investments* (Aug. 15, 2016), https://web.acaglobal.com/blog/suitable-sanctions-await-advisers-recommending-unsuitable-investments (last accessed Jan. 3, 2026). ACA further notes that "[a]nalyzing and documenting suitability is particularly important when RIAs recommend high-risk investments to their clients," as Ronnasi did to Crawford. *Id.*

Applying similar state-law principles, the court in *Stanley* concluded that investors could hold a CCO liable for negligence. *See* 369 F. Supp. 3d at 313-17. In that case, the plaintiffs

Page 14 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
             ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

"allege[d] that [the CCO] had an obligation to supervise [the RIA firm's] employees, . . . ensure that all proper disclosures were made to [the firm's] clients with respect to material conflicts of interest, compensation arrangement, and legal and regulatory events, and ensure that securities traded in client accounts were suitable for those clients and in conformity with their stated investment objectives." *Id.* at 313-14.[6]  The CCO moved for summary judgment on the negligence claim because Massachusetts law—like Oregon law—provides that, "[o]rdinarily, there is no general duty of reasonable care to protect a plaintiff from the actions of third parties absent the existence of a special relationship." *Id.* at 315-16 (internal quotation marks and citation omitted).  But under Massachusetts law, as under Oregon law, a special relationship can exist as a result of legal obligations that a professional has.  *See id.* at 316 (citing cases).

The *Stanley* court rejected the CCO's argument that he owed no duty to the firm's clients. Citing the Compliance Rule and the Ethics Rule, the court recognized that the CCO "was responsible under both federal law and under [the firm's] policies, for adopting and implementing policies and procedures to prevent violations of securities laws and to oversee their implementation." *Id.* at 316 & n.9.  The court therefore held that "[a] reasonable fact-finder could decide that, by virtue of that position, [the CCO had] an affirmative duty to monitor the

---

[6] Although not directly on point here, the *Stanley* court also concluded that, under *Patsos* v. *First Albany Corp.*, 433 Mass. 323 (2001), the CCO in *Stanley* did not owe fiduciary duties to the plaintiffs because he "was not responsible for the client accounts" and "did not place trades on behalf of any of the clients."  369 F. Supp. 3d at 315 (applying *Patsos*).  The *Stanley* court's analysis of that issue is not applicable here because the *Stanley* court viewed itself as bound by the *Patsos* decision.  *See id.*  Moreover, the limited extent of the fiduciary-duties analysis makes plain that the *Stanley* court did not address the arguments presented here—namely, that ACA owed Crawford fiduciary duties on account of its role as a supervised person and subagent for Elite and Lattice, as confirmed by the text of the Compliance Rule and the Ethics Rule.  *See supra* at 10-13.  Accordingly, the *Stanley* court's discussion of fiduciary duties and the Massachusetts Supreme Judicial Court's decision in *Patsos* do not bear on the disposition of the issue of ACA's fiduciary duties, as framed by Crawford's arguments, in this case.

Page 15 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

investment practices and to investigate and report potential violations of federal securities laws." *Id.* at 316.  The court further held that "a reasonable fact-finder could determine that, because [the CCO] was, by law, responsible for implementing policies and procedures to prevent fraud and was responsible, at least in part, for producing the Form ADVs and other disclosure statements on behalf of [the firm], he reasonably knew that the Plaintiffs relied on his statements and owed them a duty to take reasonable care to avoid misrepresentation." *Id.*

The negligent acts and omissions at issue in *Stanley* bear many similarities to the negligent acts and omissions at issue here.  To be sure, the *Stanley* court noted that the CCO in that case had also served as the firm's president for a period of time.  *See id.*  But that factual difference between *Stanley* and this case is not a meaningful basis to distinguish the *Stanley*'s holding.  After all, the investors' negligence claim was predicated on the breach of the CCO's legal duties, and the court focused on those duties in its analysis.  *See id.* at 314-16 & n.9.  Like the *Stanley* court, this Court should recognize that a CCO has special obligations to firm clients.

### B.    A Foreseeable Consequence of Negligently Failing to Carry Out CCO Duties Is that Investors Will Lose Money

ACA's next contention—that Crawford's damages were not a foreseeable result of its negligence—should also be rejected.  Clients losing money is a very foreseeable result of negligently failing to carry out CCO duties.

Under Oregon law, foreseeability is a forward-looking, "fact-intensive inquiry that Oregon courts generally entrust to a jury." *Domion v. Triquint Semiconductor, Inc.*, No. 3:16-CV-01852, 2017 WL 7310643, at *3 (D. Or. Nov. 2, 2017) (unpublished) (discussing *Fazzolari By & Through Fazzolari v. Portland School District No. 1J*, 303 Or. 1, 10 (1987), and other cases), *report and recommendation adopted*, No. 3:16-CV-01852, 2018 WL 847240 (D. Or. Feb. 13, 2018) (unpublished).  When the jury makes that determination, "the question is

Page 16 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

whether a reasonable person considering the potential harms that might result from his or her conduct would 'have reasonably expected the injury to occur.'" *Id.* (quoting *Chapman v. Mayfield*, 358 Or. 196, 206 (2015)). This "standard does not require that the risk of harm be more probable than not." *Id.* (citing *Chapman*, 358 Or. at 206). Additionally, the jury's focus must be on the defendant's conduct as "viewed 'through the lens of the particular factual circumstances of the case—with emphasis on what the defendant knew or should have known about the risk of harm to a particular class of plaintiffs.'" *Id.* (quoting *Chapman*, 358 Or. at 208).

Under that standard, Crawford has more than sufficiently alleged that her losses were a reasonably foreseeable result of ACA's negligence. The Complaint describes how the Elite Defendants were awash in red flags when ACA was engaged and how more red flags developed as Ronnasi began holding herself out as the CEO of the D&R Family Office and handed over control of Elite to Dadgar, even though he was not licensed. The Complaint also points out that, even in the absence of red flags, a new CCO must conduct due diligence and become familiar with the firm that the CCO is overseeing.

The red flags and due diligence obligations should have prompted ACA and its employees to detect the Elite Defendants' problems and compel compliance with their fiduciary obligations. Indeed, given the facts here, ACA "knew" or "had reason to know of the specific danger presented by the" Elite Defendants, *Buchler v. State By & Through Oregon Corrections Division*, 316 Or. 499, 516 (1993), and the Complaint specifically alleges that ACA should have subjected the Elite Defendants to "heightened supervision," Complaint ¶¶ 98, 102. It should come as no surprise that ACA's failure to do so resulted in Crawford losing her retirement savings. After all, the role of a CCO is to enforce "adequate compliance controls, before [the]

failure [to have adequately enforced compliance controls] has a chance to harm clients or investors."  Compliance Rule Release, 68 Fed. Reg. at 74715, App. 15.

Additionally, the Complaint alleges that ACA and its employees failed to disclose Ronnasi's First Degree Theft charge, along with the fact that the charge had prompted the firms' unusual personnel changes.  ACA was responsible for promptly disclosing this information.[7] ACA's failure to disclose the criminal charge at any point while it served as CCO foreseeably resulted in Crawford continuing to trust Ronnasi and Crawford remaining invested in the Alpha Fund, with all its unsuitable risk.

ACA's contention that other forces were responsible for the loss of Crawford's retirement savings is really an argument about causation (not foreseeability) that is foreclosed by Oregon law.  *See* MTD at 12-14 (blaming market volatility and the Elite Defendants' malfeasance). "Most negligence cases include evidence of multiple causal factors[.]"  *Haas v. Estate of Carter*, 370 Or. 742, 757 (2023).  And "[i]f the plaintiff's injury would not have occurred but for the defendant's negligence, then the defendant's negligence is a cause of the injury."  *Id.* at 749. Here, the Complaint alleges that the loss of Crawford's retirement savings would not have occurred but for ACA's negligence.  *See* Complaint ¶¶ 109-110, 165-67.  Accordingly, regardless of what else might have contributed to those losses, ACA's "negligence is a cause of the injury."  *Haas*, 370 Or. at 749.  That is particularly true here, given that Crawford has specifically alleged how she would have avoided the financial losses at issue if ACA had not been negligent.  *See* Complaint ¶¶ 166-67.

---

[7] *See* 17 C.F.R. § 275.204–1(a)(1)(ii); Form ADV Part 2 Instructions, App. 243-46; *cf.* Form ADV General Instructions, App. 459-60.

Page 18 –     PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
              ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

To make its causation argument, ACA relies heavily on *Oregon Steel Mills*, contending that "movements in the financial markets are not foreseeable when the defendant's negligence did not cause the market shift."  MTD at 13 (citing 336 Or. at 345).  But despite the somewhat loose use of the word "cause" in *Oregon Steel Mills*, the court in that case dealt with the foreseeability requirement of a negligence claim, not the causation requirement.  *See Bailey v. Lewis Farm, Inc.*, 343 Or. 276, 289 (2007) ("[T]his court held [in *Oregon Steel Mills*] that the decline in the market price was not a reasonably foreseeable consequence of the accounting firm's negligence.").  As the *Oregon Steel Mills* court put it, "no one could foresee, at the time of defendant's accounting errors in 1994 and early 1995, the risk that plaintiff would suffer a loss because its securities would be sold at market-determined prices on June 13, 1996, rather than on May 2, 1996."  336 Or. at 344.

To the extent that ACA raises an argument about foreseeability (rather than causation), *Oregon Steel Mills* undermines its position.  The key jurisprudential development in *Oregon Steel Mills* was the Oregon Supreme Court's incorporation of *Fazzolari*'s foreseeability requirement into negligence claims that arise out of a special relationship.  *See* 336 Or. at 340-42.  Throughout the development of Oregon's negligence law, two features of *Fazzolari*'s approach to foreseeability stand out.  First, *Fazzolari* puts the focus on the defendant's conduct, as "view[ed] . . . through the lens of the particular factual circumstances of the case—with emphasis on what the defendant knew or should have known about the risk of harm to a particular class of plaintiffs."  *Chapman*, 358 Or. at 208.  So the focus here is ACA's failure to carry out its CCO duties—not the accounting errors at issue in *Oregon Steel Mills*.  Second, "in assessing foreseeability, 'we focus on generalized risks of harm.'"  *Piazza v. Kellim*, 360 Or. 58, 88 (2016) (quoting *Chapman*, 358 Or. at 100).  "A 'generalized' risk of harm inherently

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

connotes an assessment at a relatively broad level of generality." *Id.* So the question is simply whether it is foreseeable that negligently carrying out CCO duties could result in securities law violations and clients losing money. The answer to that question is a resounding yes.

ACA disregards those essential, and repeatedly upheld, features of *Fazzolari*'s approach to foreseeability when it attempts to use *Oregon Steel Mills* to devise an inflexible rule that would artificially limit recovery for investment-related losses. As the Oregon Supreme Court emphasized, "[i]n *Fazzolari*, this court cautioned against turning fact-specific decisions on foreseeability into rules of law." *Bailey*, 343 Or. at 289. Thus, while it may be true that the pricing-related impacts of the stock market on a public offering are not the foreseeable result of negligent accounting errors, it does not follow that Crawford's losses are not the foreseeable result of ACA's negligence. *See Piazza*, 360 Or. at 93 n.21 ("As we later explained, *Oregon Steel Mills* turned on the specific facts before the court.") (internal quotation marks and citation omitted). Moreover, Oregon courts reserve the question of foreseeability to the jury in all but "extreme cases." *Id*. at 79-80.

This broad, generalized, and flexible approach to foreseeability squarely places the foreseeability question here into the jury's province. This case does not concern damages arising from the conduct of an unknown criminal (which, even then, can give rise to a jury question, *see Fazzolari*, 303 Or. at 20-21; *Piazza*, 360 Or. at 70-85). Rather, ACA's whole job was to deter, detect, and correct the Elite Defendants' numerous securities law violations. Crawford's losses were an entirely foreseeable result of its negligence in carrying out that job. *See Fazzolari*, 303 Or. at 20 ("The scope of [the defendant's] obligation does not exclude precautions against risks of crime or torts merely because a third person inflicts the injury."). Accordingly, ACA's

Page 20 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

arguments should be rejected, and Crawford should be permitted to litigate her negligence and negligent misrepresentation claims.

## VI.    ACA Can Be Held Liable for Fraud and Breach of Duty

ACA also seeks dismissal of Crawford's fraud and breach-of-duty claims.  To the extent that ACA relies on its assertion that it owed no duties to Crawford, *see* MTD at 9-12 (breach of duty), 16-17 (fraud), the foregoing discussion resolves that issue, *see supra* at 9-16. Additionally, regardless of what duties a CCO owes to the firm's clients, ACA may still be held liable for acting in concert with the Elite Defendants as they breached their duties and defrauded Crawford.  And ACA's remaining argument that Crawford's fraud claim is not pleaded with sufficient particularity is at odds with the detailed allegations in the Complaint.

### A.    The Complaint Alleges that ACA Acted in Concert with the Elite Defendants' Fraud and Breach of Duty

#### 1.    ACA Does Not Argue that the Complaint Failed to State a Claim Against ACA for Acting in Concert with the Elite Defendants' Breach of Duty

While ACA argues that Crawford's joint liability allegations are insufficiently pleaded with respect to the fraud claim, *see* MTD at 17-20, ACA does not address the allegations of joint liability for acting in concert with the Elite Defendants' breach of duty, *see* MTD at 9-12 (seeking dismissal of the breach-of-duty claim but not addressing joint liability).  Because ACA has not addressed each of the theories underlying the breach-of-duty claim, that claim should not be dismissed, regardless of how the Court otherwise rules.  *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991) (stating that "under Rule 12(b)(6) the defendant has the burden of showing no claim has been stated"); *see also Maeve v. Centennial School District No. 28J*, No. 3:24-CV-01427, 2025 WL 458826, at *25 (D. Or. Feb. 11, 2025) (unpublished) (citing cases that recite similar rules).

Page 21 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

2.    ACA Is Jointly Liable for Acting in Concert with the Elite Defendants'
Fraud

a.    *Oregon Recognizes Joint Liability for Acting in Concert with a
Tortfeasor*

As to the fraud claim, ACA's joint liability is properly alleged.  "Generally, Oregon recognizes joint tort liability for multiple tortfeasors who act in concert with one another or who have a common plan or design."  *Horton v. Nelson*, 252 Or. App. 611, 617 (2012) (citing *Granewich v. Harding,* 329 Or. 47, 53 (1999)).  That joint liability can exist under any of these provisions:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Id.* (quoting *Restatement (Second) of Torts* § 876).  This form of liability is well-established, and even ordinary service providers such as depository banks can be held liable for acting in concert with tortfeasors.  *See Fatnani*, 743 F. Supp. 3d at 1283-85.

b.    *ACA Acted in Concert with the Elite Defendants*

Given that broad scope of potential liability, the Complaint sufficiently alleges ACA's joint liability.  ACA "is a sophisticated securities compliance firm." Complaint ¶ 3.  It learned that Ronnasi had been charged with First Degree Theft in conjunction with vetting the Elite Defendants.  *Id.* ¶¶ 92, 99, 111.  Even so, ACA agreed to supply CCO services (which the firms

Page 22 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

could not operate without, *see* 17 C.F.R. § 275.206(4)-7(c)) and permitted the firms to use its name and reputation to cultivate client trust. *See* Complaint ¶¶ 79, 103 157-58.

ACA also knew about the Elite Defendants' fraudulent activities. ACA knew that Ronnasi's newly created role at the newly created D&R Family Office was a misleading front, *id.* ¶¶ 114-16; that Ronnasi's newly created position at Elite was a misleading front, *id.* ¶¶ 117-18; and that the communications regarding the timing of Dadgar taking over Elite were false and misleading, *id.* ¶¶ 136-41. With that knowledge, ACA advised the Elite Defendants, helped them effectuate the firms' unusual personnel changes, drafted or reviewed the false and misleading private placement memorandum, and withheld Form ADV disclosures. *Id.* ¶¶ 111-13, 123-24, 133, 142-45, 156. Notwithstanding ACA's argument to the contrary, *see* MTD at 18-19, those are particularized allegations that do not impermissibly lump the defendants together.

Additionally, that conduct constitutes knowing and substantial assistance and therefore gives rise to joint liability under both subsections (a) and (b) of § 876 of the *Restatement*. *See Horton*, 252 Or. App. at 617-19 (concluding that a plaintiff stated a claim for joint liability for fraud even though the plaintiff never spoke with one of the defendants). With respect to subsection (a) liability, "[t]he agreement"—in this case, to cover up Ronnasi's criminal conduct and the reason for the firms' unusual personnel changes, *see* Complaint ¶ 165— "need not be expressed in words and may be implied and understood to exist from the conduct itself." *Restatement (Second) of Torts* § 876, Comment on Clause (a). And with respect to subsection (b) liability, that assistance is far more substantial than the "'normal' banking activities of depository institutions" that the court concluded were sufficient to state a claim in *Fatnani*. *See* 743 F. Supp. at 1283-85. And it is the type of assistance that the Oregon Supreme

Page 23 –     PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

Court has deemed "material" in a related context.  *See Prince v. Brydon*, 307 Or. 146 (1988) (concluding that a lawyer who helped prepare a prospectus materially aided the sale of securities).

Additionally, ACA has liability under subsection (c) of § 876 as a result of its CCO duties and special obligations to the firms' clients.  That is, even if ACA merely acted negligently—rather than knowingly—it can still be jointly liable for the Elite Defendants' fraud because ACA provided substantial assistance to the Elite Defendants' cover-up and because, as explained above, ACA's own conduct was a breach of its duties to Crawford and the rest of the firms' clients.  *See Restatement (Second) of Torts* § 876, Comment on Clause (c) ("When one personally participates in causing a particular result in accordance with an agreement with another, he is responsible for the result of the united effort if his act, considered by itself, constitutes a breach of duty and is a substantial factor in causing the result, irrespective of his knowledge that his act or the act of the other is tortious.").

For all these reasons, ACA's arguments that the Complaint does not sufficiently allege joint liability for fraud should be rejected.

### B.     The Complaint Sufficiently Alleges that the Fraud Foreseeably Resulted in Crawford's Damages

ACA's other argument is that the Complaint does not sufficiently allege that the fraudulent cover-up of Ronnasi's criminal charge caused her financial losses.  *See* MTD at 20-21.  That argument should also be rejected.[8]

---

[8] ACA states that fraud has nine elements.  *See* MTD at 15.  But modern cases generally identify five elements.  *See, e.g.*, *Strawn v. Farmers Insurance Co. of Oregon*, 350 Or. 336, 351, *adhered to on reconsideration*, 350 Or. 521 (2011).  Regardless, ACA focuses solely on loss causation, *see* MTD at 20-21, so that is all that need be addressed, *see Kehr Packages*, 926 F.2d at 1409; *Maeve*, 2025 WL 458826, at *25.

Page 24 –     PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Oregon's leading case on "causation" in the fraud context is *Knepper v. Brown*, 345 Or. 320 (2008). In that case, the Oregon Supreme Court held that the loss-causation or "proximate injury" element of common-law fraud is controlled by *Fazzolari*'s approach to foreseeability. *Id.* at 329-30. Thus, because ACA's argument about loss causation is, as above, controlled by *Fazzolari*, it should be rejected for all the reasons indicated above. *See supra* at 16-21.

The facts in *Knepper* also make clear that Crawford has stated a claim for fraud. In that case, a plaintiff sued the publisher of the Yellow Pages after suffering "pain and physical deformities resulting from a botched liposuction procedure." *Id.* at 323. Before obtaining the surgery, the plaintiff had seen an advertisement in Yellow Pages under the "Surgery, Plastic and Reconstructive" heading that identified the doctor who ultimately committed the botched liposuction as "board certified." *See id.* at 324. But as the publisher of Yellow Pages knew when it helped create the advertisement, the doctor was board certified in dermatology, not plastic surgery. *See id.*

That was the extent of the publisher's involvement, and the plaintiff did not even take action after initially seeing the advertisement. Instead:

> Some months later, [the plaintiff] attended a Women's Show and stopped at a booth offering information about [the doctor's] cosmetic surgery practice. [The plaintiff] recognized [the doctor's] name from her list of potential plastic surgeons. She picked up a brochure, which stated that [the doctor] was board certified in, among other things, "Dermatologic Surgery." One of [the doctor's] employees, who was manning the booth, told [the plaintiff] that [the doctor] was a board-certified plastic surgeon. [The plaintiff] thereafter made an appointment to discuss liposuction with Brown. At the consultation, [the doctor] also told [the plaintiff] that he was board certified in plastic surgery.

*Id.* at 324-25. The plaintiff then underwent the botched procedure. *See id.* at 325.

The Oregon Supreme Court held that the plaintiff's damages for medical malpractice—a wholly separate tort—were a foreseeable result of the publisher's involvement in creating the

Page 25 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

misleading Yellow Pages advertisement.  *See id.* at 328-33.  The court observed that "[a]n advertisement that misrepresents a medical provider's qualifications self-evidently creates a risk that a consumer who seeks treatment from the provider in reliance on that misrepresentation will suffer an adverse result that would not have occurred if the provider's qualifications had been as represented."  *Id.* at 331.  Thus, the publisher was held liable for medical malpractice damages—through a fraud claim—notwithstanding (1) that the advertisement was apparently not enough on its own to prompt the plaintiff to call the doctor, (2) that a significant amount of time passed between the plaintiff's viewing the advertisement and selecting the doctor to do the procedure, (3) that the misleading representations made by the doctor and his staff could be viewed as having more directly led to the plaintiff's decision to hire the doctor, and (4) that the doctor (not the Yellow Pages publisher) actually committed the malpractice.

That holding defeats ACA's argument that the Complaint fails to sufficiently plead "loss causation" (really, foreseeability) in connection with her fraud claim.  As in *Knepper*, the fraud here concerned a professional's qualifications.  ACA and the Elite Defendants knowingly withheld from Crawford the fact of Ronnasi's First Degree Theft charge and communicated false and misleading information about the unusual personnel changes to hide Ronnasi's charge.  And they did so because they knew that clients would terminate their relationship with the Elite Defendants once they learned that Ronnasi was a crook.  That "self-evidently create[d] a risk" that Crawford would continue to trust Ronnasi and lose her retirement savings as a result of the Elite Defendants' crooked behavior.  *Id.* at 331.  And unlike *Knepper*, ACA was not the publisher of a phone book.  Rather, ACA was the CCO of highly regulated RIA firms, and its job was to deter, detect, and correct the very fraud that it helped perpetuate.  ACA's argument that the Complaint insufficiently alleges fraud should be rejected.

Page 26 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
             ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

## VII.    ACA Can Be Held Liable for Violations of the Unlawful Trade Practices Act

The Court should also reject ACA's arguments about Crawford's Unlawful Trade Practices Act (UTPA) claim. *See* MTD at 24-31. ACA first argues that Crawford's claim is untimely, but that argument fails to credit the allegations in the Complaint. ACA's second argument—that investment advisory services can never be "obtained primarily for personal, family or household purposes"—contradicts common sense, the Investment Advisers Act, and a host of S.E.C. regulations designed to protect retail investors. ORS 646.605(6)(a). And ACA's third argument—that its participation in the cover-up of Ronnasi's criminal charge and failure to make legally required disclosures—could not constitute an unlawful trade practice is another improper attempt to remove fact questions from the jury's consideration.

### A.    Crawford's UTPA Claim is Not Time-Barred

Crawford's claim is timely. A UTPA claim "must be commenced within one year after the discovery of the unlawful method, act or practice." ORS 646.638(6). Under this rule, "[t]he period of limitation begins to run when the plaintiff knows or should have known of the alleged misrepresentations." *McCulloch v. Price Waterhouse LLP*, 157 Or. App. 237, 247-48 (1998). Here, Crawford's UTPA claim arises out of ACA and the Elite Defendants making false and misleading statements and causing a likelihood of confusion or misunderstanding as they hid Ronnasi's First Degree Theft charge from Crawford. *See* Complaint ¶¶ 365-80. Because Crawford "learned of Ronnasi's First Degree Theft charge—and, by extension, the failure to previously disclose it—in or around July 2025," she did not know of the UTPA violations until that time, and her claim—filed in October 2025—is timely. *Id.* at ¶ 207.

ACA's argument that Crawford should have known about Ronnasi's First Degree Theft charge in August 2024 improperly calls for the Court to resolve a factual dispute that belongs to

Page 27 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

the jury.  As the Oregon Court of Appeals explained in *McCulloch*, a "two-step analysis" is used "to determine whether plaintiff should have known" of UTPA violations.  157 Or. App. at 248.  "First, it must appear that plaintiff had sufficient knowledge to excite attention and put a party upon his guard or call for an inquiry.  Second, if plaintiff had such knowledge, it must also appear that a reasonably diligent inquiry would disclose the fraud."  *Id.* (quoting *Mathies v. Hoeck*, 284 Or. 539, 543 (1978)) (cleaned up).  Unless the Court concludes that timeliness can be decided as a matter of law, the jury decides the issue.  *See id.* at 249; *Bodin v. B. & L. Furniture Co.*, 42 Or. App. 731, 735 (1979).

ACA's effort to remove these questions from the jury is particularly problematic at the pleadings stage.  First, ACA fails to account for the firms' fiduciary obligations to Crawford (as well as the Elite Defendants' superior market knowledge) when it posits that Crawford should have disregarded the Elite Defendants' explanations about the August 2024 losses.  *See McCulloch*, 157 Or. App. at 249 (taking into account "that [the parties'] relationship required plaintiff to rely on defendants' expertise and their representations"); *Duniway v. Barton*, 193 Or. 69, 85 (1951) (concluding that "continuing fraud, misrepresentations and promises excused [the plaintiff's] failure to learn the facts").  Second, ACA blames Crawford—a retiree—for not searching the King County Superior Court's criminal docket and other Internet locations to determine if her trusted financial adviser had been criminally charged.  *See* MTD at 26.  That goes far beyond what any reasonably diligent inquiry would call for, and it is especially ironic that ACA blames Crawford for falling victim to the Elite Defendants' securities law violations when ACA itself claims that the Elite Defendants successfully hid Ronnasi's criminal charge from it.  *Compare* MTD at 26, *with* Complaint ¶¶ 95-96, 99, 160-62.  Third, and most importantly, ACA asks the Court to accept a disputed version of the facts that is not even in the

Page 28 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

record. *See* MTD at 25-26 (speculating about what occurred and opining as to what should have been done). The Court cannot do that, especially given that ACA bears the burden of proving a statute-of-limitations defense. *See Matter of Bonome*, 314 Or. App. 364, 370 (2021). ACA's argument should be rejected.

### B.    Investment Advisory Services Are Subject to the UTPA

ACA next argues that the investment advisory services that Elite and Lattice offered are, by definition, outside the UTPA's scope because they cannot have been obtained primarily for personal, family, or household purposes. But the "personal, family, or household purposes" requirement that ACA relies on does not even apply to two of the UTPA violations that Crawford has alleged. ACA's interpretation of the UTPA is wrong, too.

ACA focuses on the definition of "[r]eal estate, goods or services," which includes goods or services "that are or may be obtained primarily for personal, family or household purposes." ORS 646.605(6)(a); *see* MTD at 26-28. ACA then contends that investment advisory services are not, as a matter of law, "obtained primarily for personal, family or household purposes." ORS 646.605(6)(a).

Crawford's claim, however, is not limited to unlawful trade practices that involve "real estate, goods or services." A claim arises under the UTPA when a person has "suffer[ed] an ascertainable loss of money or property, real or personal, as a result of another person's willful use or employment of a method, act or practice declared unlawful under ORS 646.608." ORS 646.638(1). Not all practices "declared unlawful" require the involvement of "real estate, goods or services." *Id.*; *see* ORS 646.608(1). Here, Crawford has alleged two UTPA violations that do not have that requirement. *Compare* Complaint ¶ 374.ii-iii, *with* ORS 646.608(1)(c), (k). So ACA's argument does not provide the Court with a basis to dismiss Crawford's claim.

Page 29 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

Moreover, ACA is incorrect. To begin, Crawford alleges that both she and other individuals obtain investment advisory services for personal, family, or household purposes. *See* Complaint ¶¶ 366-70. This comports with the common-sense understanding that ordinary Oregonians engage financial advisors to help them protect their financial future for personal—not commercial—purposes. Moreover, despite ACA's effort to minimize those allegations, *see* MTD at 26-27, ACA does not contend that they are implausible (nor could it), and the allegations satisfy the UTPA. *See Fowler v. Cooley*, 239 Or. App. 338, 344 (2010) ("Thus, *Searle* [*v. Exley Express*, 278 Or. 535 (1977),] embodies a two-part test: Is the real estate, good, or service at issue customarily purchased by a substantial number of people for personal, family, or household use (the objective component) and was it, in fact, purchased by the plaintiff for personal, family, or household use, rather than for commercial use or resale (the subjective component)."). Additionally, many of the S.E.C.'s consumer protection requirements would not make sense if ordinary consumers—that is, retail investors—did not obtain investment advisory services primarily for personal, family, or household purposes.[9] And the Investment Advisers Act explicitly recognizes that retail investors obtain advisory services "primarily for personal, family, or household purposes." 15 U.S.C. § 80b-11(g)(1)-(2).

ACA's counterintuitive position depends upon an overreading of *Roach v. Mead*, 301 Or. 383 (1986). *See* MTD at 27-28. *Roach* involved an odd fact pattern in which the plaintiff had

---

[9] *See, e.g.*, Form ADV Update Release, 84 Fed. Reg at 33493, App. 46 ("Research continues to show that retail investors are confused about the services, fees, conflicts of interest, and the required standard of conduct for particular firms, and the differences between broker-dealers and investment advisers. We are adopting a new set of disclosure requirements designed to reduce retail investor confusion in the marketplace for brokerage and investment advisory services and to assist retail investors with the process of deciding whether to engage, or to continue to engage, a particular firm or financial professional and whether to establish, or to continue to maintain, an investment advisory or brokerage relationship.").

Page 30 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

asked for his attorney's advice regarding the proceeds of a business sale, and—in what the plaintiff considered legal advice—the attorney then suggested that the plaintiff lend the money to the attorney. *See id.* at 386. Based on the trial record (that is, not the pleadings), the court held that there was insufficient evidence to support the UTPA claim. *See id.* at 392. Thus, the reach of *Roach*'s holding is that, under the highly unusual facts of that case, there was insufficient evidence to support the UTPA claim. *Roach* did not create a bar that categorically prevents plaintiffs from pleading and proving UTPA claims in connection with financial services.

The other case that ACA relies on— *Cullen v. Investment Strategies, Inc.*, 139 Or. App. 119, 126 (1996)—is mostly bad law. In *Cullen*, the Oregon Court of Appeals built its analysis on the premise that loans are not within the scope of "real estate, goods or services." *See id.* at 123-28. The court therefore stated that "a lender's material nondisclosures or misrepresentations to a borrower concerning the terms of a loan are not actionable under the UTPA," and it "conclude[d] that a non-lender's material nondisclosures or misrepresentations of a loan's attributes are not actionable under the UTPA." *Id.* at 127-28.

Notably, that portion of *Cullen* does not even apply to Crawford's claim, which concerns investment advisory services, not lending services. *See* Complaint ¶¶ 365-73. But the other problem with *Cullen* is that its foundational premise is no longer good law. The Oregon Legislature overrode *Cullen*'s restrictive understanding of "real estates, goods and services" when it specified that loans were in fact encompassed within that definition. *See* Or. Laws 2010, ch. 94, §§ 1-2; ORS 646.607(6)(a).

Today, the only portions of *Cullen* that remain good law support Crawford's claim against ACA. While adhering to prior decisions that placed loans outside the scope of the UTPA, the *Cullen* court still held that the UTPA applies to other professional services in the

Page 31 –     PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
              ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

financial industry. *See* 139 Or. App. at 127. Specifically, "material nondisclosures or misrepresentations regarding the character, quality, or cost of such services are actionable under the UTPA." *Id.* Under that rule, as well as the plain text of the statute, Crawford's UTPA claim against ACA is actionable.

### C.    ACA Violated the UTPA

ACA next argues that the Complaint fails to allege UTPA violations. *See* MTD at 28-31. But that argument fails to credit and afford reasonable inferences to the allegations in the Complaint.

The Complaint alleges that ACA's UTPA violations include:

    i. causing likelihood of confusion or misunderstanding as to the sources, sponsorship, approval, or certification of real estate, goods or services;

    ii. causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

    iii. making false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred; and/or

    iv. making false or misleading representations of fact concerning the offering price of, or the person's cost for real estate, goods or services.

Complaint ¶ 374; *see* ORS 646.605(10) ("A willful violation occurs when the person committing the violation knew or should have known that the conduct of the person was a violation."). The Complaint also alleges that ACA is jointly liable for acting in concert with the Elite Defendants' UTPA violations. *See* Complaint ¶ 376; *see also Horton*, 252 Or. App. at 619-21 (2012) (reversing dismissal of a plaintiff's UTPA claim premised on joint liability).

ACA was obligated to promptly inform Crawford—directly and in plain English—that Ronnasi had been charged with First Degree Theft and that the unusual personnel changes at Elite and Lattice were a consequence of Ronnasi having been charged. *See supra* at 18 n.7. But

Page 32 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
               ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

ACA did not do so. In fact, ACA took affirmative action intended to prevent Crawford from learning that Ronnasi had been criminally charged. ACA even helped Dadgar take over Elite—even though Dadgar was unlicensed—while clients like Crawford still believed that Ronnasi was in control.

The failure to disclose that information "[c]aus[ed] likelihood of confusion or of misunderstanding" both as to Ronnasi's and Dadgar's respective "affiliation, connection, or association with" Elite and Lattice and as to the "sources" of the firms' services. ORS 646.608(1)(b)-(c); Complaint ¶ 374.i-ii. It also "caus[ed] likelihood of confusion or of misunderstanding" as to Ronnasi's "certification by" securities regulators and whether the firms' services still had regulator "approval" or "certification." ORS 646.608(1)(b)-(c); Complaint ¶ 374.i-ii. Under the plain text of either ORS 646.608(1)(b) or ORS 646.608(1)(c), and as Oregon precedent confirms, that was an unlawful trade practice. *See Terry v. Holden-Dhein Enterprises, Ltd.*, 48 Or. App. 763, 765-68 (1980) (concluding that the failure to provide a "warning or explanation" about professional qualifications or licensure constituted an unlawful trade practice when the consumer perceived the professional at issue as having qualifications or licensure that the professional did not have but was required to have).

By failing to disclose Ronnasi's First Degree Theft charge, ACA and the Elite Defendants also "[made] false or misleading representations concerning . . . the nature of the transaction" and the costs of Lattice's services when they asked Crawford to stay on as a client as Lattice began imposing a 50% higher management fee. ORS 646.608 (1)(k), (s); Complaint ¶ 374.iii-iv; *see also* ORS 646.608 (2) (providing that non-disclosure of a fact may constitute a false or misleading representation). In its motion, ACA essentially attempts to limit the reach of ORS 646.608 (1)(k) and focuses only on one side of a "transaction" by pointing out that ACA

Page 33 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

and the Elite Defendants disclosed Lattice's 50% fee increase.  *See* MTD at 30-31.  While it is true that Lattice disclosed the fee increase, a "transaction" is, by definition, a two-way exchange. And in this case, the "transaction" at issue was that (1) the Elite Defendants would continue to provide investment advisory services (as described in a false and misleading private placement memorandum) in exchange for (2) a 50% increase in Lattice's fees.  *See* Complaint ¶¶ 128-32 (describing transaction-related formalities).  Ronnasi's undisclosed First Degree Theft charge was a material fact relating to the investment advisory services that would be provided—and thus "concern[ed] the nature of the transaction" that Crawford was entering.  ORS 646.608 (1)(k).

Ultimately, ACA's arguments run counter not only to the plain text of the statute, but also to the Oregon "legislature's intent that courts interpret the UTPA liberally to protect consumers." *Clark v. Eddie Bauer LLC*, 371 Or. 177, 186 (2023).  Crawford should be permitted to litigate her UTPA claim.

**VIII.    ACA Can Be Held Liable for Violations of the Oregon Securities Law**

ACA also seeks dismissal of Crawford's Oregon Securities Law claim, contending that the claim fails because some of the allegations include "upon information and belief" language. *See* MTD at 21-24.  But ACA incorrectly conflates allegations made upon information and belief with conclusory allegations.  Additionally, many of the relevant allegations were not made upon information and belief.

ACA's argument depends upon the proposition that the allegations in the Complaint are conclusory.  The test that it relies on states:  "Factual allegations on information and belief that are not peculiarly within the possession and control of the defendant <u>and are merely conclusory or are naked assertions devoid of further factual enhancement</u> contribute nothing to the sufficiency of the complaint, however, and the Court need not accept them as true."  *See* MTD

Page 34 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

at 23 (quoting *Covelli v. Avamere Home Health Care LLC*, No. 3:19-CV-486, 2021 WL 1147144, at *4 (D. Or. Mar. 25, 2021) (unpublished) (emphasis added; internal quotation marks and citation omitted)).

Crawford's allegations are not conclusory.  Rather, the Complaint identifies the specific date on which the false and misleading private placement memorandum was issued, the specific ways in which that memorandum was false and misleading, and the specific way that ACA participated and materially aided in subsequent sales.  *See* Complaint ¶¶ 114-18, 125-33, 136-48. The Complaint also specifies the precise dollar amounts and effective dates of the subsequent sales to Crawford.  *Id.* ¶¶ 168, 176.  These are not bare allegations that ACA violated the Oregon Securities Law without "further factual enhancement."  *Covelli*, 2021 WL 1147144, at *4. Rather, they clearly explain the claim and facts that Crawford expects to prove to support her theory of liability, especially with the aid of records maintained by the Elite Defendants that will be available through discovery.  *See* Complaint ¶¶ 226-42.  Moreover, many of the allegations in the Complaint do not bear the "upon information and belief" language to which ACA objects. Crawford's Oregon Securities Law claim should not be dismissed.

**IX.**    <u>**If Any Claim Is Insufficiently Alleged, Leave to Amend Should Be Granted**</u>

Crawford respectfully requests that the Court deny ACA's motion in its entirety.  But if the Court nonetheless concludes that any claim is subject to dismissal under Rule 12(b)(6), Crawford requests that the Court grant leave to amend.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014) (stating that "this policy is to be applied with extreme liberality") (internal quotation marks and citation omitted).

Page 35 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS

DATED this 14th day of January, 2026.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.


By:    *Kevin Michael Flannery*
       **Steve D. Larson**, OSB No. 863540
       **Kevin Michael Flannery**, OSB No. 173457

209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:        (503) 227-1600
Facsimile:        (503) 227-6840
Email:            slarson@stollberne.com
                  kflannery@stollberne.com

Attorneys for Plaintiff Karra Crawford

Page 36 –    PLAINTIFF'S RESPONSE TO DEFENDANT ADVISER COMPLIANCE
             ASSOCIATES, LLC dba ACA GROUP'S MOTION TO DISMISS