**Steve D. Larson**, OSB No. 863540
**Kevin Michael Flannery**, OSB No. 173457
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840
Email:      slarson@stollberne.com
            kflannery@stollberne.com

*Attorneys for Plaintiff Karra Crawford*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KARRA CRAWFORD, <br><br> Plaintiff, <br><br> v. <br><br> ADVISER COMPLIANCE ASSOCIATES, LLC dba ACA GROUP, a District of Columbia limited liability company, <br><br> Defendant. | Case No. 3:25-cv-02242-SB <br><br> **PLAINTIFF'S APPENDIX OF SUPPORTING S.E.C. MATERIALS** |

Plaintiff Karra Crawford provides the following materials in support of her Response to

Defendant's Adviser Compliance Associates, LLC dba ACA Group's Motion to Dismiss:

Page 1 – PLAINTIFF'S APPENDIX OF SUPPORTING S.E.C. MATERIALS

## TABLE OF CONTENTS

|  |  | Pages |
|---|---|---|
| 1. | S.E.C., *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 Fed. Reg. 33669 (2019) ("Best Interest Interpretation") | 1-13 |
| 2. | S.E.C., *Compliance Programs of Investment Companies and Investment Advisers*, 68 Fed. Reg. 74714 (2003) ("Compliance Rule Release") | 14-30 |
| 3. | S.E.C., *Investment Adviser Codes of Ethics*, 69 Fed. Reg. 41696 (2004) ("Ethics Rule Release") | 31-44 |
| 4. | S.E.C., *Form CRS Relationship Summary; Amendments to Form ADV*, 84 Fed. Reg. 33492 (2019) ("Form ADV Update Release") | 45-222 |
| 5. | S.E.C., *Form ADV (Paper Version): UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION: PART 2: Uniform Requirements for the Investment Adviser* Brochure *and* Brochure Supplements (2022) ("Form ADV Part 2 Instructions") | 223 |
|  | *- General Instructions for Part 2 of Form ADV* | 223 |
|  | *- Instructions for Part 2A of Form ADV: Preparing Your Firm* Brochure | 225-227 |
|  | *- Part 2A of Form ADV: Firm* Brochure | 228-237 |
|  | *- Instructions for Part 2A Appendix 1 of Form ADV: Preparing Your* Wrap Fee Program Brochure | 238-239 |
|  | *- Part 2A Appendix 1 of Form ADV:* Wrap Fee Program Brochure | 240-242 |
|  | *- Instructions for Part 2B of Form ADV: Preparing a* Brochure Supplement | 243-244 |
|  | *- Part 2B of Form ADV:* Brochure Supplement | 245-248 |
| 6. | S.E.C. Staff, *Study on Investment Advisers and Broker-Dealers* (2011) | 249-456 |

Page 2 – PLAINTIFF'S APPENDIX OF SUPPORTING S.E.C. MATERIALS

| 7. | S.E.C., *Form ADV (Paper Version): UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION & REPORT FORM BY EXEMPT REPORTING ADVISERS* (2024) ("Form ADV General Instructions") | 457 |
|---|---|---|
| | - *Form ADV: General Instructions* | 457-469 |
| | - *Form ADV: Instructions for Part 1A* | 470-481 |
| | - *GLOSSARY OF TERMS* | 482-492 |
| 8. | S.E.C., *Form ADV (Paper Version): UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION & REPORT FORM BY EXEMPT REPORTING ADVISERS: Part 1A* (2024) | 493-578 |

DATED this 14th day of January, 2026.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.


By:    s/ Kevin Flannery
    **Steve D. Larson**, OSB No. 863540
    **Kevin Flannery**, OSB No. 173457

209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840
Email:    slarson@stollberne.com
    kflannery@stollberne.com

*Attorneys for Plaintiff Karra Crawford*

Page 3 – PLAINTIFF'S APPENDIX OF SUPPORTING S.E.C. MATERIALS

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations **33669**

162944.pdf ("Parsons Feedback Form"); David Schreiner, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899390-162946.pdf ("Schreiner Feedback Form"); Ron Seits, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899580-162956.pdf ("Seits Feedback Form"); Mark Shaffer, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899570-162954.pdf ("Shaffer Feedback Form"); Malia Starmer, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899562-162953.pdf ("Starmer1 Feedback Form"); Jason Starmer, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899436-162949.pdf ("Starmer2 Feedback Form").

[FR Doc. 2019–12376 Filed 7–11–19; 8:45 am]
**BILLING CODE 8011–01–C**

---

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Part 276**

**[Release No. IA–5248; File No. S7–07–18]**

**RIN 3235–AM36**

### Commission Interpretation Regarding Standard of Conduct for Investment Advisers

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Interpretation.

**SUMMARY:** The Securities and Exchange Commission (the ''SEC'' or the ''Commission'') is publishing an interpretation of the standard of conduct for investment advisers under the Investment Advisers Act of 1940 (the ''Advisers Act'' or the ''Act'').

**DATES:** Effective July 12, 2019.

**FOR FURTHER INFORMATION CONTACT:** Olawalé Oriola, Senior Counsel; Matthew Cook, Senior Counsel; or Jennifer Songer, Branch Chief, at (202) 551–6787 or *IArules@sec.gov,* Investment Adviser Regulation Office, Division of Investment Management, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–8549.

**SUPPLEMENTARY INFORMATION:** The Commission is publishing an interpretation of the standard of conduct for investment advisers under the Advisers Act [15 U.S.C. 80b].[1]

### Table of Contents

I. Introduction
  A. Overview of Comments

II. Investment Advisers' Fiduciary Duty
  A. Application of Duty Determined by Scope of Relationship
  B. Duty of Care
  1. Duty To Provide Advice That Is in the Best Interest of the Client
  2. Duty To Seek Best Execution
  3. Duty To Provide Advice and Monitoring Over the Course of the Relationship
  C. Duty of Loyalty
III. Economic Considerations
  A. Background
  B. Potential Economic Effects

### I. Introduction

Under federal law, an investment adviser is a fiduciary.[2] The fiduciary duty an investment adviser owes to its client under the Advisers Act, which comprises a duty of care and a duty of loyalty, is important to the Commission's investor protection efforts. Also important to the Commission's investor protection efforts is the standard of conduct that a broker-dealer owes to a retail customer when it makes a recommendation of any securities transaction or investment strategy involving securities.[3] Both investment advisers and broker-dealers play an important role in our capital markets and our economy more broadly. Investment advisers and broker-dealers have different types of relationships with investors, offer different services, and have different compensation models. This variety is important because it presents investors with choices regarding the types of relationships they can have, the services they can receive, and how they can pay for those services.

On April 18, 2018, the Commission proposed rules and forms intended to enhance the required standard of conduct for broker-dealers[4] and provide retail investors with clear and succinct information regarding the key aspects of their brokerage and advisory relationships.[5] In connection with the publication of these proposals, the Commission published for comment a separate proposed interpretation regarding the standard of conduct for investment advisers under the Advisers Act ("Proposed Interpretation").[6] We stated in the Proposed Interpretation, and we continue to believe, that it is appropriate and beneficial to address in one release and reaffirm—and in some cases clarify—certain aspects of the fiduciary duty that an investment adviser owes to its clients under section 206 of the Advisers Act.[7] After

---

[1] 15 U.S.C. 80b. Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified, and when we refer to rules under the Advisers Act, or any paragraph of these rules, we are referring to title 17, part 275 of the Code of Federal Regulations [17 CFR 275], in which these rules are published.

[2] *SEC* v. *Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963) ("SEC v. Capital Gains"); *see also infra* footnotes 34–44 and accompanying text; Investment Adviser Codes of Ethics, Investment Advisers Act Release No. 2256 (July 2, 2004); Compliance Programs of Investment Companies and Investment Advisers, Investment Advisers Act Release No. 2204 (Dec. 17, 2003); Electronic Filing by Investment Advisers; Proposed Amendments to Form ADV, Investment Advisers Act Release No. 1862 (Apr. 5, 2000). Investment advisers also have antifraud liability with respect to prospective clients under section 206 of the Advisers Act.

[3] *See* Regulation Best Interest, Exchange Act Release No. 34–86031 (June 5, 2019) ("Reg. BI Adoption"). This final interpretation regarding the standard of conduct for investment advisers under the Advisers Act ("Final Interpretation") interprets section 206 of the Advisers Act, which is applicable to both SEC- and state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act. This Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty. It is not, however, intended to be the exclusive resource for understanding these principles. Separately, in various circumstances, case law, statutes (such as the Employee Retirement Income Security Act of 1974 ("ERISA")), and state law impose obligations on investment advisers. In some cases, these standards may differ from the standard enforced by the Commission.

[4] Regulation Best Interest, Exchange Act Release No. 83062 (Apr. 18, 2018) ("Reg. BI Proposal").

[5] Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 4888 (Apr. 18, 2018) ("Relationship Summary Proposal").

[6] Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation, Investment Advisers Act Release No. 4889 (Apr. 18, 2018).

[7] Further, the Commission recognizes that many advisers provide impersonal investment advice. *See, e.g.,* Advisers Act rule 203A–3 (defining ''impersonal investment advice'' in the context of defining ''investment adviser representative'' as ''investment advisory services provided by means of written material or oral statements that do not purport to meet the objectives or needs of specific individuals or accounts''). This Final Interpretation
Continued

considering the comments received, we are publishing this Final Interpretation with some clarifications to address comments.[8]

### A. Overview of Comments

We received over 150 comment letters on our Proposed Interpretation from individuals, investment advisers, trade or professional organizations, law firms, consumer advocacy groups, and bar associations.[9] Although many commenters generally agreed that the Proposed Interpretation was useful,[10] some noted the challenges inherent in a Commission interpretation covering the broad scope of the fiduciary duty that an investment adviser owes to its clients under the Advisers Act.[11] Some of these commenters suggested modifications to or withdrawal of the Proposed Interpretation.[12] Although most

---

does not address the extent to which the Advisers Act applies to different types of impersonal investment advice.

[8] In the Proposed Interpretation, the Commission also requested comment on: Licensing and continuing education requirements for personnel of SEC-registered investment advisers; delivery of account statements to clients with investment advisory accounts; and financial responsibility requirements for SEC-registered investment advisers, including fidelity bonds. We are continuing to evaluate the comments received in response.

[9] Comment letters submitted in File No. S7–09–18 are available on the Commission's website at *https://www.sec.gov/comments/s7-09-18/s70918.htm.* We also considered those comments submitted in File No. S7–08–18 (Comments on Relationship Summary Proposal) and File No. S7–07–18 (Comments on Reg. BI Proposal). Those comments are available on the Commission's website at *https://www.sec.gov/comments/s7-08-18/s70818.htm* and *https://www.sec.gov/comments/s7-07-18/s70718.htm.*

[10] *See, e.g.,* Comment Letter of North American Securities Administrators Association (Aug. 23, 2018) ("NASAA Letter") (stating that the Proposed Interpretation is a "useful resource"); Comment Letter of Invesco (Aug. 7, 2018) ("Invesco Letter") (agreeing that "there are benefits to having a clear statement regarding the fiduciary duty that applies to an investment adviser").

[11] *See, e.g.,* Comment Letter of Pickard Djinis and Pisarri LLP (Aug. 7, 2018) ("Pickard Letter") (noting the Commission's "efforts to synthesize case law, legislative history, academic literature, prior Commission releases and other sources to produce a comprehensive explanation of the fiduciary standard of conduct"); Comment Letter of Dechert LLP (Aug. 7, 2018) ("Dechert Letter") ("It is crucial that any universal interpretation of an adviser's fiduciary duty be based on sound and time-tested principles. Given the difficulty of defining and encompassing all of an adviser's responsibilities to its clients, while also accommodating the diversity of advisory arrangements, interpretive issues will arise in the future."); Comment Letter of the Hedge Funds Subcommittee of the Federal Regulation of Securities Committee of the Business Law Section of the American Bar Association (Aug. 24, 2018) ("ABA Letter") ("We note at the outset that it is difficult to capture the nature of an investment adviser's fiduciary duty in a broad statement that has universal applicability.").

[12] *See, e.g.,* Comment Letter of L.A. Schnase (Jul. 30, 2018) (urging the Commission not to issue the

commenters agreed that an investment adviser's fiduciary duty comprises a duty of care and a duty of loyalty, as described in the Proposed Interpretation, they had differing views on aspects of the fiduciary duty and in some cases sought clarification on its application.[13]

Some commenters requested that we adopt rule text instead.[14] The relationship between an investment adviser and its client has long been based on fiduciary principles not generally set forth in specific statute or rule text. We believe that this principles-based approach should continue as it expresses broadly the standard to which investment advisers are held while allowing them flexibility to meet that standard in the context of their specific services. In our view, adopting rule text is not necessary to achieve our goal in this Final Interpretation of reaffirming and in some cases clarifying certain aspects of the fiduciary duty.

### II. Investment Advisers' Fiduciary Duty

The Advisers Act establishes a federal fiduciary duty for investment advisers.[15] This fiduciary duty is based

---

Proposed Interpretation in final form, or at least not without substantial rewriting or reshaping); Comment Letter of Money Management Institute (Aug. 7, 2018) ("MMI Letter") (urging the Commission to "revise the interpretation so that it reflects the common law principles in which an investment adviser's fiduciary duty is grounded"); Dechert Letter (recommending that we withdraw the Proposed Interpretation and instead rely on existing authority and sources of law, as well as existing Commission practices for providing interpretive guidance, in order to define the source and scope of an investment adviser's fiduciary duty).

[13] *See, e.g.,* Comment Letter of Cambridge Investment Research Inc. (Aug. 7, 2018) ("Cambridge Letter") (stating that "greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability to craft such policies and procedures, as well as support the elimination of confusion for retail clients and investment professionals"); Comment Letter of Institutional Limited Partners Association (Aug. 6, 2018) ("ILPA Letter 1") ("Interpretation will provide more certainty regarding the fiduciary duties owed by private fund advisers to their clients."); Comment Letter of New York City Bar Association (Jun. 26, 2018) ("NY City Bar Letter") (stating that the uniform interpretation of an investment adviser's fiduciary duty is necessary).

[14] Some commenters suggested that we codify the Proposed Interpretation. *See, e.g.,* Comment Letter of Roy Tanga (Apr. 25, 2018); Comment Letter of Financial Engines (Aug. 6, 2018) ("Financial Engines Letter"); ILPA Letter 1; Comment Letter of AARP (Aug. 7, 2018) ("AARP Letter"); Comment Letter of Gordon Donohue (Aug. 6, 2018); Comment Letter of Financial Planning Coalition (Aug. 7, 2018) ("FPC Letter").

[15] *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U.S. 11, 17 (1979) ("*Transamerica Mortgage* v. *Lewis*") ("§ 206 establishes federal fiduciary standards to govern the conduct of investment advisers.") (quotation marks omitted); *Santa Fe Industries, Inc.* v. *Green,* 430 U.S. 462, 471, n.11

on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act.[16] The investment adviser's fiduciary duty is broad and applies to the entire adviser-client relationship.[17] The fiduciary duty to which advisers are subject is not specifically defined in the Advisers Act or in Commission rules, but reflects a Congressional recognition "of the delicate fiduciary nature of an investment advisory relationship" as well as a Congressional intent to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." [18] An adviser's fiduciary duty is imposed under the Advisers Act in recognition of the nature of the relationship between an investment adviser and a client and the desire "so far as is presently practicable

---

(1977) (in discussing *SEC* v. *Capital Gains,* stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"); *SEC* v. *Capital Gains, supra* footnote 2; Amendments to Form ADV, Investment Advisers Act Release No. 3060 (July 28, 2010) ("Investment Advisers Act Release 3060") ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003) ("Investment Advisers Act Release 2106")).

[16] *See SEC* v. *Capital Gains, supra* footnote 2 (discussing the history of the Advisers Act, and how equitable principles influenced the common law of fraud and changed the suits brought against a fiduciary, "which Congress recognized the investment adviser to be").

[17] The Commission has previously recognized the broad scope of section 206 of the Advisers Act in a variety of contexts. *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15; Timbervest, LLC, et al., Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) (" [O]nce an investment advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the advisory relationship."); *see also SEC* v. *Lauer,* 2008 WL 4372896, at 24 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.' "); Thomas P. Lemke & Gerald T. Lins, Regulation of Investment Advisers (2013 ed.), at § 2:30 ("[T]he SEC has . . . applied [sections 206(1) and 206(2)] where fraud arose from an investment advisory relationship, even though the wrongdoing did not specifically involve securities.").

[18] *See SEC* v. *Capital Gains, supra* footnote 2; *see also* In the Matter of Arleen W. Hughes, Exchange Act Release No. 4048 (Feb. 18, 1948) ("Arleen Hughes") (Commission Opinion) (discussing the relationship of trust and confidence between the client and a dual registrant and stating that the registrant was a fiduciary and subject to liability under the antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934).

App 2

to eliminate the abuses'' that led to the enactment of the Advisers Act.[19] It is made enforceable by the antifraud provisions of the Advisers Act.[20]

An investment adviser's fiduciary duty under the Advisers Act comprises a duty of care and a duty of loyalty.[21] This fiduciary duty requires an adviser ''to adopt the principal's goals, objectives, or ends.'' [22] This means the

adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client. This combination of care and loyalty obligations has been characterized as requiring the investment adviser to act in the ''best interest'' of its client at all times.[23] In our view, an investment adviser's obligation to act in the best interest of its client is an overarching principle that encompasses both the duty of care and the duty of loyalty. As discussed in more detail below, in our view, the duty of care requires an investment adviser to provide investment advice in the best interest of its client, based on the client's objectives. Under its duty of loyalty, an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict.[24] We believe this is another part of an investment adviser's obligation to act in the best interest of its client.

*A. Application of Duty Determined by Scope of Relationship*

An adviser's fiduciary duty is imposed under the Advisers Act in recognition of the nature of the relationship between an adviser and its client—a relationship of trust and

confidence.[25] The adviser's fiduciary duty is principles-based and applies to the entire relationship between the adviser and its client. The fiduciary duty follows the contours of the relationship between the adviser and its client, and the adviser and its client may shape that relationship by agreement, provided that there is full and fair disclosure and informed consent.[26] With regard to the scope of the adviser-client relationship, we recognize that investment advisers provide a wide range of services, from a single financial plan for which a client may pay a one-time fee, to ongoing portfolio management for which a client may pay a periodic fee based on the value of assets in the portfolio. Investment advisers also serve a large variety of clients, from retail clients with limited assets and investment knowledge and experience to institutional clients with very large portfolios and substantial knowledge, experience, and analytical resources.[27] In our experience, the principles-based fiduciary duty imposed by the Advisers Act has provided sufficient flexibility to serve as an effective standard of conduct for investment advisers, regardless of the services they provide or the types of clients they serve.

Although all investment advisers owe each of their clients a fiduciary duty under the Advisers Act, that fiduciary duty must be viewed in the context of the agreed-upon scope of the relationship between the adviser and the client. In particular, the specific obligations that flow from the adviser's fiduciary duty depend upon what functions the adviser, as agent, has agreed to assume for the client, its principal. For example, the obligations

---

[19] *See SEC* v. *Capital Gains, supra* footnote 2 (noting that the ''declaration of policy'' in the original bill, which became the Advisers Act, declared that ''the national public interest and the interest of investors are adversely affected . . . when the business of investment advisers is so conducted as to defraud or mislead investors, or to enable such advisers to relieve themselves of their fiduciary obligations to their clients. It is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, *are to mitigate and, so far as is presently practicable to eliminate* the abuses enumerated in this section'') (citing S. 3580, 76th Cong., 3d Sess., § 202 and Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28) (emphasis added).

[20] *Id.; Transamerica Mortgage* v. *Lewis, supra* footnote 15 (''[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations.''). Some commenters questioned the standard to which the Advisers Act holds investment advisers. *See, e.g.,* Comment Letter of Stark & Stark, PC (undated) (''The duty of care at common law and under the Advisers Act only requires that advisers not be negligent in performing their duties.'') (internal citation omitted); Comment Letter of Institutional Limited Partners Association (Nov. 21, 2018) (''ILPA Letter 2'') (''The Advisers Act standard is a lower simple 'negligence' standard.''). Claims arising under Advisers Act section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence. *Robare Group, Ltd., et al.* v. *SEC,* 922 F.3d 468, 472 (D.C. Cir. 2019) (''*Robare* v. *SEC*''); *SEC* v. *Steadman,* 967 F.2d 636, 643, n.5 (D.C. Cir. 1992) (citing *SEC* v. *Capital Gains, supra* footnote 2) (''[A] violation of § 206(2) of the Investment Advisers Act may rest on a finding of simple negligence.''); *SEC* v. *DiBella,* 587 F.3d 553, 567 (2d Cir. 2009) (''the government need not show intent to make out a section 206(2) violation''); *SEC* v. *Gruss,* 859 F. Supp. 2d 653, 669 (S.D.N.Y. 2012) (''Claims arising under Section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence.''). However, claims arising under Advisers Act section 206(1) require scienter. *See, e.g., Robare* v. *SEC; SEC* v. *Moran,* 922 F. Supp. 867, 896 (S.D.N.Y. 1996); *Carroll* v. *Bear, Stearns & Co.,* 416 F. Supp. 998, 1001 (S.D.N.Y. 1976).

[21] *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15. These duties were generally recognized by commenters. *See, e.g.,* Comment Letter of Consumer Federation of America (Aug. 7, 2018) (''CFA Letter''); Comment Letter of the Investment Adviser Association (Aug. 6, 2018) (''IAA Letter''); Comment Letter of Investments & Wealth Institute (Aug. 6, 2018); Comment Letter of Raymond James (Aug. 7, 2018); FPC Comment Letter. *But see* Dechert Letter (questioning the sufficiency of support for a duty of care).

[22] Arthur B. Laby, *The Fiduciary Obligations as the Adoption of Ends,* 56 Buffalo Law Review 99 (2008); *see also* Restatement (Third) of Agency,

§ 2.02 Scope of Actual Authority (2006) (describing a fiduciary's authority in terms of the fiduciary's reasonable understanding of the principal's manifestations and objectives).

[23] Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that ''under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own,'' citing Investment Advisers Act Release 2106, *supra* footnote 15). *See SEC* v. *Tambone,* 550 F.3d 106, 146 (1st Cir. 2008) (''*SEC* v. *Tambone*'') (''Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . .''); *SEC* v. *Moran,* 944 F. Supp. 286, 297 (S.D.N.Y 1996) (''*SEC* v. *Moran*'') (''Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.''). Although most commenters agreed that an adviser has an obligation to act in its client's best interest, some questioned whether the Proposed Interpretation appropriately considered the best interest obligation as part of the duty of care, or whether it instead should be considered part of the duty of loyalty. *See, e.g.,* MMI Letter; Comment Letter of Investment Company Institute (Aug. 7, 2018) (''ICI Letter'').

[24] *See infra* footnotes 67–70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

[25] *See, e.g.,* Hearings on S. 3580 before Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess. (leading investment advisers emphasized their relationship of ''trust and confidence'' with their clients); *SEC* v. *Capital Gains, supra* footnote 2 (citing same).

[26] Several commenters asked that we clarify that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies through contract. *See, e.g.,* MMI Letter; Financial Engines Letter; ABA Letter.

[27] This Final Interpretation also applies to automated advisers, which are often colloquially referred to as ''robo-advisers.'' Automated advisers, like all SEC-registered investment advisers, are subject to all of the requirements of the Advisers Act, including the requirement that they provide advice consistent with the fiduciary duty they owe to their clients. *See* Division of Investment Management, Robo Advisers, IM Guidance Update No. 2017–02 (Feb. 2017), *available at https:// www.sec.gov/investment/im-guidance-2017-02.pdf* (describing Commission staff's guidance as to three distinct areas under the Advisers Act that automated advisers should consider, due to the nature of their business model, in seeking to comply with their obligations under the Advisers Act).

of an adviser providing comprehensive, discretionary advice in an ongoing relationship with a retail client (*e.g.,* monitoring and periodically adjusting a portfolio of equity and fixed income investments with limited restrictions on allocation) will be significantly different from the obligations of an adviser to a registered investment company or private fund where the contract defines the scope of the adviser's services and limitations on its authority with substantial specificity (*e.g.,* a mandate to manage a fixed income portfolio subject to specified parameters, including concentration limits and credit quality and maturity ranges).[28]

While the application of the investment adviser's fiduciary duty will vary with the scope of the relationship, the relationship in all cases remains that of a fiduciary to the client. In other words, an adviser's federal fiduciary duty may not be waived, though it will apply in a manner that reflects the agreed-upon scope of the relationship.[29] A contract provision purporting to waive the adviser's federal fiduciary duty generally, such as (i) a statement that the adviser will not act as a fiduciary, (ii) a blanket waiver of all conflicts of interest, or (iii) a waiver of any specific obligation under the Advisers Act, would be inconsistent

---

[28] *See, e.g., infra* text following footnote 35.

[29] Because an adviser's federal fiduciary obligations are enforceable through section 206 of the Advisers Act, we would view a waiver of enforcement of section 206 as implicating section 215(a) of the Advisers Act, which provides that "any condition, stipulation or provision binding any person to waive compliance with any provision of this title . . . shall be void." *See also* Restatement (Third) of Agency, § 8.06 Principal's Consent (2006) ("[T]he law applicable to relationships of agency as defined in § 1.01 imposes mandatory limits on the circumstances under which an agent may be empowered to take disloyal action. These limits serve protective and cautionary purposes. Thus, an agreement that contains general or broad language purporting to release an agent in advance from the agent's general fiduciary obligation to the principal is not likely to be enforceable. This is because a broadly sweeping release of an agent's fiduciary duty may not reflect an adequately informed judgment on the part of the principal; if effective, the release would expose the principal to the risk that the agent will exploit the agent's position in ways not foreseeable by the principal at the time the principal agreed to the release. In contrast, when a principal consents to specific transactions or to specified types of conduct by the agent, the principal has a focused opportunity to assess risks that are more readily identifiable.").

with the Advisers Act,[30] regardless of the sophistication of the client.[31]

---

[30] *See* sections 206 and 215(a). Commenters generally agreed that a client cannot waive an investment adviser's fiduciary duty through agreement. *See* Dechert Letter; Comment Letter of Ropes & Gray LLP (Aug. 7, 2018) ("Ropes & Gray Letter"), at n.20; *see also supra* footnote 29. In the Proposed Interpretation, we stated that "the investment adviser cannot disclose or negotiate away, and the investor cannot waive, the federal fiduciary duty." One commenter disputed this broad statement, believing that it called into question "the ability of an investment adviser and client to define the scope of the adviser's services and duties." ABA Letter; *see also* Financial Engines Letter. We have modified this statement to clarify that a general waiver of the fiduciary duty would violate that duty and to provide examples of such a general waiver.

[31] Some commenters mentioned a 2007 No-Action Letter in which staff indicated that whether a clause in an advisory agreement that purports to limit an adviser's liability under that agreement (a so-called "hedge clause") would violate sections 206(1) and 206(2) of the Advisers Act depends on all of the surrounding facts and circumstances. Heitman Capital Management, LLC, SEC Staff No-Action Letter (Feb. 12, 2007) ("Heitman Letter"). A few commenters indicated that the Heitman Letter expanded the ability of investment advisers to private funds, and potentially other sophisticated clients, to disclaim their fiduciary duties under state law in an advisory agreement. *See, e.g.,* ILPA Letter 1; ILPA Letter 2. The commenters' descriptions of the Heitman Letter suggest that it may have been applied incorrectly. The Heitman Letter does not address the scope or substance of an adviser's federal fiduciary duty; rather, it addresses the extent to which hedge clauses may be misleading in violation of the Advisers Act's antifraud provisions. Another commenter agreed with this reading of the Heitman Letter. *See* Comment Letter of American Investment Council (Feb. 25, 2019). In response to these comments, we express below the Commission's views about an adviser's obligations under sections 206(1) and 206(2) of the Advisers Act with respect to the use of hedge clauses. Accordingly, because we are expressing our views in this Final Interpretation, the Heitman Letter is withdrawn.

This Final Interpretation makes clear that an adviser's federal fiduciary duty may not be waived, though its application may be shaped by agreement. This Final Interpretation does not take a position on the scope or substance of any fiduciary duty that applies to an adviser under applicable state law. *See supra* footnote 3. The question of whether a hedge clause violates the Advisers Act's antifraud provisions depends on all of the surrounding facts and circumstances, including the particular circumstances of the client (*e.g.,* sophistication). In our view, however, there are few (if any) circumstances in which a hedge clause in an agreement with a retail client would be consistent with those antifraud provisions, where the hedge clause purports to relieve the adviser from liability for conduct as to which the client has a non-waivable cause of action against the adviser provided by state or federal law. Such a hedge clause generally is likely to mislead those retail clients into not exercising their legal rights, in violation of the antifraud provisions, even where the agreement otherwise specifies that the client may continue to retain its non-waivable rights. Whether a hedge clause in an agreement with an institutional client would violate the Advisers Act's antifraud provisions will be determined based on the particular facts and circumstances. To the extent that a hedge clause creates a conflict of interest between an adviser and its client, the adviser must address the conflict as required by its duty of loyalty.

*B. Duty of Care*

As fiduciaries, investment advisers owe their clients a duty of care.[32] The Commission has discussed the duty of care and its components in a number of contexts.[33] The duty of care includes, among other things: (i) The duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship.

1. Duty To Provide Advice That Is in the Best Interest of the Client

The duty of care includes a duty to provide investment advice that is in the best interest of the client, including a duty to provide advice that is suitable for the client.[34] In order to provide such

---

[32] *See* Investment Advisers Act Release 2106, *supra* footnote 15 (stating that under the Advisers Act, "an adviser is a fiduciary that owes each of its clients duties of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting," which is the subject of the release, and citing *SEC* v. *Capital Gains supra* footnote 2, to support this point). This Final Interpretation does not address the specifics of how an investment adviser might satisfy its fiduciary duty when voting proxies. *See also* Restatement (Third) of Agency, § 8.08 (discussing the duty of care that an agent owes its principal as a matter of common law); Tamar Frankel & Arthur B. Laby, The Regulation of Money Managers (updated 2017) ("Advice can be divided into three stages. The first determines the needs of the particular client. The second determines the portfolio strategy that would lead to meeting the client's needs. The third relates to the choice of securities that the portfolio would contain. The duty of care relates to each of the stages and depends on the depth or extent of the advisers' obligation towards their clients.").

[33] *See, e.g.,* Suitability of Investment Advice Provided by Investment Advisers; Custodial Account Statements for Certain Advisory Clients, Investment Advisers Act Release No. 1406 (Mar. 16, 1994) ("Investment Advisers Act Release 1406") (stating that advisers have a duty of care and discussing advisers' suitability obligations); Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, Exchange Act Release No. 23170 (Apr. 28, 1986) ("Exchange Act Release 23170") ("an adviser, as a fiduciary, owes its clients a duty of obtaining the best execution on securities transactions"). We highlight certain contexts, but not all, in which the Commission has addressed the duty of care. *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15.

[34] In 1994, the Commission proposed a rule that would have made express the fiduciary obligation of investment advisers to make only suitable recommendations to a client. Investment Advisers Act Release 1406, *supra* footnote 33. Although never adopted, the rule was designed, among other things, to reflect the Commission's interpretation of an adviser's *existing* suitability obligation under the Advisers Act. In addition, we do not cite Investment Advisers Act Release 1406 as the source of authority for the view we express here, which at least one comment letter suggested, but cite it merely to show that the Commission has long held this view. *See* Comment Letter of the Managed Funds Association and the Alternative Investment

advice, an adviser must have a reasonable understanding of the client's objectives. The basis for such a reasonable understanding generally would include, for retail clients, an understanding of the investment profile, or for institutional clients, an understanding of the investment mandate.[35] The duty to provide advice that is in the best interest of the client based on a reasonable understanding of the client's objectives is a critical component of the duty of care.

Reasonable Inquiry Into Client's Objectives

How an adviser develops a reasonable understanding will vary based on the specific facts and circumstances, including the nature of the client, the scope of the adviser-client relationship, and the nature and complexity of the anticipated investment advice.

In order to develop a reasonable understanding of a retail client's objectives, an adviser should, at a minimum, make a reasonable inquiry into the client's financial situation, level of financial sophistication, investment experience, and financial goals (which we refer to collectively as the retail client's ''investment profile''). For example, an adviser undertaking to formulate a comprehensive financial plan for a retail client would generally need to obtain a range of personal and financial information about the client such as current income, investments, assets and debts, marital status, tax

status, insurance policies, and financial goals.[36]

In addition, it will generally be necessary for an adviser to a retail client to update the client's investment profile in order to maintain a reasonable understanding of the client's objectives and adjust the advice to reflect any changed circumstances.[37] The frequency with which the adviser must update the client's investment profile in order to consider changes to any advice the adviser provides would itself turn on the facts and circumstances, including whether the adviser is aware of events that have occurred that could render inaccurate or incomplete the investment profile on which the adviser currently bases its advice. For instance, in the case of a financial plan where the investment adviser also provides advice on an ongoing basis, a change in the relevant tax law or knowledge that the client has retired or experienced a change in marital status could trigger an obligation to make a new inquiry.

By contrast, in providing investment advice to institutional clients, the nature and extent of the reasonable inquiry into the client's objectives generally is shaped by the specific investment mandates from those clients. For example, an investment adviser engaged to advise on an institutional client's investment grade bond portfolio would need to gain a reasonable understanding of the client's objectives within that bond portfolio, but not the client's objectives within its entire investment portfolio. Similarly, an investment adviser whose client is a registered investment company or a private fund would need to have a reasonable understanding of the fund's investment guidelines and objectives. For advisers acting on specific investment mandates for institutional clients, particularly funds, we believe that the obligation to update the client's objectives would not

be applicable except as may be set forth in the advisory agreement.

Reasonable Belief That Advice Is in the Best Interest of the Client

An investment adviser must have a reasonable belief that the advice it provides is in the best interest of the client based on the client's objectives. The formation of a reasonable belief would involve considering, for example, whether investments are recommended only to those clients who can and are willing to tolerate the risks of those investments and for whom the potential benefits may justify the risks.[38] Whether the advice is in a client's best interest must be evaluated in the context of the portfolio that the adviser manages for the client and the client's objectives.

For example, when an adviser is advising a retail client with a conservative investment objective, investing in certain derivatives may be in the client's best interest when they are used to hedge interest rate risk or other risks in the client's portfolio, whereas investing in certain directionally speculative derivatives on their own may not. For that same client, investing in a particular security on margin may not be in the client's best interest, even if investing in that same security without the use of margin may be in the client's best interest. However, for example, when advising a financially sophisticated client, such as a fund or other sophisticated client that has an appropriate risk tolerance, it may be in the best interest of the client to invest in such derivatives or in securities on margin, or to invest in other complex instruments or other products that may have limited liquidity.

Similarly, when an adviser is assessing whether high risk products—such as penny stocks or other thinly-traded securities—are in a retail client's best interest, the adviser should generally apply heightened scrutiny to whether such investments fall within the retail client's risk tolerance and objectives. As another example,

---

Management Association (Aug. 7, 2018) (indicating that the Commission's failure to adopt the proposed suitability rule means ''investment advisers are not subject to an express 'suitability' standard under existing regulation''). We believe that this obligation to make only suitable recommendations to a client is part of an adviser's fiduciary duty to act in the best interest of its client. Accordingly, an adviser must provide investment advice that is suitable for its client in providing advice that is in the best interest of its client. *See SEC* v. *Tambone, supra* footnote 23 (''Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund. . . .''); SEC v. Moran, *supra* footnote 23 (''Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.'').

[35] Several commenters stated that the duty to make a reasonable inquiry into a client's investment profile may not apply in the institutional client context. *See, e.g.,* Comment Letter of BlackRock, Inc. (Aug. 7, 2018); Comment Letter of Teachers Insurance and Annuity Association of America (Aug. 7, 2018); Comment Letter of Allianz Global Investors U.S. LLC (Aug. 7, 2018) (''Allianz Letter''); Comment Letter of John Hancock Life Insurance Company (U.S.A.) (Aug. 3, 2018). Accordingly, we are describing the duty as a duty to have a reasonable understanding of the client's objectives. While not every client will have an investment profile, every client will have objectives. For example, an institutional client's objectives may be ascertained through its investment mandate.

[36] Investment Advisers Act Release 1406, *supra* footnote 33. After making a reasonable inquiry into the client's investment profile, it generally would be reasonable for an adviser to rely on information provided by the client (or the client's agent) regarding the client's financial circumstances, and an adviser should not be held to have given advice not in its client's best interest if it is later shown that the client had misled the adviser concerning the information on which the advice was based.

[37] Such updating would not be needed with one-time investment advice. In the Proposed Interpretation, we stated that an adviser ''must'' update a client's investment profile in order to adjust the advice to reflect any changed circumstances. We believe that any obligation to update a client's investment profile, like the nature and extent of the reasonable inquiry into a retail client's objectives, turns on what is reasonable under the circumstances. Accordingly, we have revised the wording of this statement in this Final Interpretation.

[38] Item 8 of Part 2A of Form ADV requires an investment adviser to describe its methods of analysis and investment strategies and disclose that investing in securities involves risk of loss which clients should be prepared to bear. This item also requires that an adviser explain the material risks involved for each significant investment strategy or method of analysis it uses and particular type of security it recommends, with more detail if those risks are significant or unusual. Accordingly, investment advisers are required to identify and explain certain risks involved in their investment strategies and the types of securities they recommend. An investment adviser needs to consider those same risks in determining the clients to which the adviser recommends those investments.

complex products such as inverse or leveraged exchange-traded products that are designed primarily as short-term trading tools for sophisticated investors may not be in the best interest of a retail client absent an identified, short-term, client-specific trading objective and, to the extent that such products are in the best interest of a retail client initially, they would require daily monitoring by the adviser.[39]

A reasonable belief that investment advice is in the best interest of a client also requires that an adviser conduct a reasonable investigation into the investment sufficient not to base its advice on materially inaccurate or incomplete information.[40] We have taken enforcement action where an investment adviser did not independently or reasonably investigate securities before recommending them to clients.[41]

The cost (including fees and compensation) associated with investment advice would generally be one of many important factors—such as an investment product's or strategy's investment objectives, characteristics (including any special or unusual features), liquidity, risks and potential benefits, volatility, likely performance in a variety of market and economic conditions, time horizon, and cost of exit—to consider when determining whether a security or investment strategy involving a security or securities is in the best interest of the client. When considering similar investment products or strategies, the fiduciary duty does not necessarily require an adviser to recommend the lowest cost investment product or strategy.

Moreover, an adviser would not satisfy its fiduciary duty to provide advice that is in the client's best interest by simply advising its client to invest in the lowest cost (to the client) or least remunerative (to the investment adviser) investment product or strategy without any further analysis of other factors in the context of the portfolio that the adviser manages for the client and the client's objective. Rather, the adviser could recommend a higher-cost investment or strategy if the adviser reasonably concludes that there are other factors about the investment or strategy that outweigh cost and make the investment or strategy in the best interest of the client, in light of that client's objectives. For example, it might be consistent with an adviser's fiduciary duty to advise a client with a high risk tolerance and significant investment experience to invest in a private equity fund with relatively higher fees and significantly less liquidity as compared with a fund that invests in publicly-traded companies if the private equity fund was in the client's best interest because it provided exposure to an asset class that was appropriate in the context of the client's overall portfolio.

An adviser's fiduciary duty applies to all investment advice the investment adviser provides to clients, including advice about investment strategy, engaging a sub-adviser, and account type.[42] Advice about account type includes advice about whether to open or invest through a certain type of account (*e.g.,* a commission-based brokerage account or a fee-based advisory account) and advice about whether to roll over assets from one account (*e.g.,* a retirement account) into a new or existing account that the adviser or an affiliate of the adviser manages.[43] In providing advice about account type, an adviser should consider all types of accounts offered by the adviser and acknowledge to a client when the account types the adviser offers are not in the client's best interest.[44]

2. Duty To Seek Best Execution

An investment adviser's duty of care includes a duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades (typically in the case of discretionary accounts).[45] In meeting this obligation, an adviser must seek to obtain the execution of transactions for each of its clients such that the client's total cost or proceeds in each transaction are the most favorable under the circumstances. An adviser fulfills this duty by seeking to obtain the execution of securities transactions on behalf of a client with

---

[39] *See* Exchange-Traded Funds, Securities Act Release No. 10515 (June 28, 2018); SEC staff and FINRA, Investor Alert, Leveraged and Inverse ETFs: Specialized Products with Extra Risks for Buy-and-Hold Investors (Aug. 1, 2009); SEC Office of Investor Education and Advocacy, Investor Bulletin: Exchange-Traded Funds (ETFs) (Aug. 2012); *see also* FINRA Regulatory Notice 09–31, Non-Traditional ETFs—FINRA Reminds Firms of Sales Practice Obligations Relating to Leveraged and Inverse Exchange-Traded Funds (June 2009).

[40] *See, e.g.,* Concept Release on the U.S. Proxy System, Investment Advisers Act Release No. 3052 (July 14, 2010) (indicating that a fiduciary "has a duty of care requiring it to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information").

[41] *See, e.g.,* In the Matter of Larry C. Grossman, Investment Advisers Act Release No. 4543 (Sept. 30, 2016) (Commission Opinion) ("*In re* Grossman") (in connection with imposing liability on a principal of a registered investment adviser for recommending offshore private investment funds to clients), *stayed in part,* Investment Advisers Act No. 4563 (Nov. 1, 2016), *response to remand,* Investment Advisers Act Release No. 4871 (Mar. 29, 2018) (reinstating the Sept. 30, 2016 opinion and order, except with respect to the disgorgement and prejudgment interest in light of the Supreme Court's decision in *Kokesh* v. *SEC,* 137 S. Ct. 1635 (2017)).

[42] In addition, with respect to prospective clients, investment advisers have antifraud liability under section 206 of the Advisers Act, which, among other things, applies to transactions, practices, or courses of business which operate as a fraud or deceit upon prospective clients, including those regarding investment strategy, engaging a sub-adviser, and account type. We believe that, in order to avoid liability under this antifraud provision, an investment adviser should have sufficient information about the prospective client and its objectives to form a reasonable basis for advice before providing any advice about these matters. At the point in time at which the prospective client becomes a client of the investment adviser (*e.g.,* at account opening), the fiduciary duty applies. Accordingly, while advice to prospective clients about these matters must comply with the antifraud provisions under section 206 of the Advisers Act, the adviser must also satisfy its fiduciary duty with respect to any such advice (*e.g.,* regarding account type) when a prospective client becomes a client.

[43] We consider advice about "rollovers" to include advice about account type, in addition to any advice regarding the investments or investment strategy with respect to the assets to be rolled over, as the advice necessarily includes the advice about the account type into which assets are to be rolled over. As noted below, as a general matter, an adviser's duty to monitor extends to all personalized advice it provides to the client, including, for example, in an ongoing relationship, an evaluation of whether a client's account or program type (for example, a wrap account) continues to be in the client's best interest. *See infra* text accompanying footnote 52.

[44] Accordingly, in providing advice to a client or customer about account type, a financial professional who is dually licensed (*i.e.,* an associated person of a broker-dealer and a supervised person of an investment adviser (regardless of whether the professional works for a dual registrant, affiliated firms, or unaffiliated firms)) should consider all types of accounts offered (*i.e.,* both brokerage accounts and advisory accounts) when determining whether the advice is in the client's best interest. A financial professional who is only a supervised person of an investment adviser (regardless of whether that advisory firm is a dual registrant or affiliated with a broker-dealer) may only recommend an advisory account the adviser offers when the account is in the client's best interest. If a financial professional who is only a supervised person of an investment adviser chooses to advise a client to consider a non-advisory account (or to speak with other personnel at a dual registrant or affiliate about a non-advisory account), that advice should be in the best interest of the client. This same framework applies in the case of a prospective client, but any advice or recommendation given to a prospective client would be subject to the antifraud provisions of the federal securities laws. *See supra* footnote 42 and Reg. BI Adoption, *supra* footnote 3.

[45] *See* Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934, Exchange Act Release No. 54165 (July 18, 2006) (stating that investment advisers have "best execution obligations"); Investment Advisers Act Release 3060, *supra* footnote 15 (discussing an adviser's best execution obligations in the context of directed brokerage arrangements and disclosure of soft dollar practices); *see also* Advisers Act rule 206(3)–2(c) (referring to adviser's duty of best execution of client transactions).

App 6

the goal of maximizing value for the client under the particular circumstances occurring at the time of the transaction. Maximizing value encompasses more than just minimizing cost. When seeking best execution, an adviser should consider "the full range and quality of a broker's services in placing brokerage including, among other things, the value of research provided as well as execution capability, commission rate, financial responsibility, and responsiveness" to the adviser.[46] In other words, the "determinative factor" is not the lowest possible commission cost, "but whether the transaction represents the best qualitative execution." [47] Further, an investment adviser should "periodically and systematically" evaluate the execution it is receiving for clients.[48]

3. Duty To Provide Advice and Monitoring Over the Course of the Relationship

An investment adviser's duty of care also encompasses the duty to provide advice and monitoring at a frequency that is in the best interest of the client, taking into account the scope of the agreed relationship.[49] For example,

when the adviser has an ongoing relationship with a client and is compensated with a periodic asset-based fee, the adviser's duty to provide advice and monitoring will be relatively extensive as is consistent with the nature of the relationship.[50] Conversely, absent an express agreement regarding the adviser's monitoring obligation, when the adviser and the client have a relationship of limited duration, such as for the provision of a one-time financial plan for a one-time fee, the adviser is unlikely to have a duty to monitor. In other words, in the absence of any agreed limitation or expansion, the scope of the duty to monitor will be indicated by the duration and nature of the agreed advisory arrangement.[51] As a general matter, an adviser's duty to monitor extends to all personalized advice it provides to the client, including, for example, in an ongoing relationship, an evaluation of whether a client's account or program type (for example, a wrap account) continues to be in the client's best interest.[52]

*C. Duty of Loyalty*

The duty of loyalty requires that an adviser not subordinate its clients' interests to its own.[53] In other words, an

investment adviser must not place its own interest ahead of its client's interests.[54] To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship.[55] Material facts relating to the advisory relationship include the capacity in which the firm is acting with respect to the advice provided. This will be particularly relevant for firms or individuals that are dually registered as broker-dealers and investment advisers and who serve the same client in both an advisory and a brokerage capacity. Thus, such firms and individuals generally should provide full and fair disclosure about the circumstances in which they intend to act in their

---

[46] Exchange Act Release 23170, *supra* footnote 33.

[47] *Id.*

[48] *Id.* The Advisers Act does not prohibit advisers from using an affiliated broker to execute client trades. However, the adviser's use of such an affiliate involves a conflict of interest that must be fully and fairly disclosed and the client must provide informed consent to the conflict. *See also* Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1732 (Jul. 17, 1998) (discussing application of section 206(3) of the Advisers Act to certain principal and agency transactions). Two commenters requested that we prescribe specific obligations related to best execution. Comment Letter of the Healthy Markets Association (Aug. 7, 2018); Comment Letter of ICE Data Services (Aug. 7, 2018). However, prescribing specific requirements of how an adviser might satisfy its best execution obligations is outside of the scope of this Final Interpretation.

[49] *Cf. SEC* v. *Capital Gains, supra* footnote 2 (describing advisers' "basic function" as "furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments" (quoting Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28)). *Cf.* Barbara Black, *Brokers and Advisers— What's in a Name?,* 32 Fordham Journal of Corporate and Financial Law XI (2005) ("[W]here the investment adviser's duties include management of the account, [the adviser] is under an obligation to monitor the performance of the account and to make appropriate changes in the portfolio."); Arthur B. Laby, *Fiduciary Obligations of Broker-Dealers and Investment Advisers,* 55 Villanova Law Review 701 (2010) ("Laby Villanova Article") (stating that the scope of an adviser's activity can be altered by contract and that an

adviser's fiduciary duty would be commensurate with the scope of the relationship) (internal citations omitted).

[50] However, an adviser and client may scope the frequency of the adviser's monitoring (*e.g.,* agreement to monitor quarterly or monthly and as appropriate in between based on market events), provided that there is full and fair disclosure and informed consent. We consider the frequency of monitoring, as well as any other material facts relating to the agreed frequency, such as whether there will also be interim monitoring when there are market events relevant to the client's portfolio, to be a material fact relating to the advisory relationship about which an adviser must make full and fair disclosure and obtain informed consent as required by its fiduciary duty.

[51] *See also* Laby Villanova Article, *supra* footnote 49, at 728 (2010) ("If an adviser has agreed to provide continuous supervisory services, the scope of the adviser's fiduciary duty entails a continuous, ongoing duty to supervise the client's account, regardless of whether any trading occurs. This feature of the adviser's duty, even in a non-discretionary account, contrasts sharply with the duty of a broker administering a non-discretionary account, where no duty to monitor is required.") (internal citations omitted).

[52] Investment advisers also may consider whether written policies and procedures relating to monitoring would be appropriate under Advisers Act rule 206(4)–7, which requires any investment adviser registered or required to be registered under the Advisers Act to adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and the rules thereunder by the adviser and its supervised persons.

[53] Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that "[u]nder the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing

Investment Advisers Act Release 2106, *supra* footnote 15). The duty of loyalty applies not just to advice regarding potential investments, but to all advice the investment adviser provides to an existing client, including advice about investment strategy, engaging a sub-adviser, and account type. *See supra* text accompanying footnotes 42–43.

[54] For example, an adviser cannot favor its own interests over those of a client, whether by favoring its own accounts or by favoring certain client accounts that pay higher fee rates to the adviser over other client accounts. The Commission has brought numerous enforcement actions against advisers that allocated trades to their own accounts and allocated less favorable or unprofitable trades to their clients' accounts. *See, e.g., SEC* v. *Strategic Capital Management, LLC and Michael J. Breton,* Litigation Release No. 23867 (June 23, 2017) (partial settlement) (adviser placed trades through a master brokerage account and then allocated profitable trades to adviser's account while placing unprofitable trades into the client accounts in violation of fiduciary duty and contrary to disclosures). In the Proposed Interpretation, we stated that the duty of loyalty requires an adviser to "put its client's interest first." One commenter suggested that the requirement of an adviser to put its client's interest "first" is very different from a requirement not to "subordinate" or "subrogate" clients' interests, and is inconsistent with how the duty of loyalty had been applied in the past. *See* Comment Letter of the Asset Management Group of the Securities Industry and Financial Markets Association (Aug. 7, 2018) ("SIFMA AMG Letter"). Accordingly, we have revised the description of the duty of loyalty in this Final Interpretation to be more consistent with how we have previously described the duty. *See* Investment Advisers Act Release 3060, *supra* footnote 15 ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own.") (citing Investment Advisers Act Release 2106, *supra* footnote 15). In practice, referring to putting a client's interest first is a plain English formulation commonly used by investment advisers to explain their duty of loyalty in a way that may be more understandable to retail clients.

[55] *See SEC* v. *Capital Gains, supra* footnote 2 ("Failure to disclose material facts must be deemed fraud or deceit within its intended meaning."); Investment Advisers Act Release 3060, *supra* footnote 15 ("as a fiduciary, an adviser has an ongoing obligation to inform its clients of any material information that could affect the advisory relationship"); *see also* General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship.").

**33676**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

brokerage capacity and the circumstances in which they intend to act in their advisory capacity. This disclosure may be accomplished through a variety of means, including, among others, written disclosure at the beginning of a relationship that clearly sets forth when the dual registrant would act in an advisory capacity and how it would provide notification of any changes in capacity.[56] Similarly, a dual registrant acting in its advisory capacity should disclose any circumstances under which its advice will be limited to a menu of certain products offered through its affiliated broker-dealer or affiliated investment adviser.

In addition, an adviser must eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.[57] We believe that while

full and fair disclosure of all material facts relating to the advisory relationship or of conflicts of interest and a client's informed consent prevent the presence of those material facts or conflicts themselves from violating the adviser's fiduciary duty, such disclosure and consent do not themselves satisfy the adviser's duty to act in the client's best interest.[58] To illustrate what constitutes full and fair disclosure, we are providing the following guidance on (i) the appropriate level of specificity, including the appropriateness of stating that an adviser "may" have a conflict, and (ii) considerations for disclosure regarding conflicts related to the allocation of investment opportunities among eligible clients.

In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent.[59] For example, it

would be inadequate to disclose that the adviser has "other clients" without describing how the adviser will manage conflicts between clients if and when they arise, or to disclose that the adviser has "conflicts" without further description.

Similarly, disclosure that an adviser "may" have a particular conflict, without more, is not adequate when the conflict actually exists.[60] For example, we would consider the use of "may" inappropriate when the conflict exists with respect to some (but not all) types or classes of clients, advice, or transactions without additional disclosure specifying the types or classes of clients, advice, or transactions with respect to which the conflict exists. In addition, the use of "may" would be inappropriate if it simply precedes a list of all possible or potential conflicts regardless of likelihood and obfuscates

---

[56] *See also* Reg. BI Adoption, *supra* footnote 3, at 99.

[57] In the Proposed Interpretation, we stated that an adviser must seek to avoid conflicts of interest with its clients. Proposed Interpretation, *supra* footnote 6. Some commenters requested clarity on what it means to "seek to avoid" conflicts of interest. *See, e.g.,* Comment Letter of Schulte Roth & Zabel LLP (Aug. 8, 2018); ABA Letter (stating that this wording could be read to require an adviser to first seek to avoid a conflict, before addressing a conflict through disclosure, rather than being able to provide full and fair disclosure of a conflict, and only seek avoidance if the conflict cannot be addressed through disclosure). The Commission first used this phrasing when adopting amendments to the Form ADV Part 2 instructions. *See* Investment Advisers Act Release 3060, *supra* footnote 15 and General Instruction 3 to Part 2 of Form ADV ("As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship."). The release adopting this instruction clarifies the Commission's intent that it capture the fiduciary duty described in *SEC* v. *Capital Gains and Arleen Hughes*. *See* Investment Advisers Act Release 3060, *supra* footnote 15, at n.4 and accompanying text (citing *SEC* v. *Capital Gains, supra* footnote 2, and Arleen Hughes, *supra* footnote 18, as the basis of this language). Both of these cases emphasized that the adviser, as a fiduciary, should seek to avoid conflicts, but at a minimum must make full and fair disclosure of the conflict and obtain the client's informed consent. *See SEC* v. *Capital Gains, supra* footnote 2 ("The Advisers Act thus reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested."); Arleen Hughes, *supra* footnote 18 ("Since loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a fiduciary must not put himself into a position where his own interests may come in conflict with those of his principal" but if a fiduciary "chooses to assume a role in which she is motivated by conflicting interests, . . . she may do so if, but only if, she obtains her client's consent after disclosure . . ."). We believe the Commission's reference to "seek to avoid" conflicts in the Form ADV Part 2 instructions is consistent

with the Final Interpretation's statement that an adviser "must eliminate or at least expose all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested" as well as the substantively identical statements in *SEC* v. *Capital Gains, supra* footnote 2, and Arleen Hughes, *supra* footnote 18. While an adviser may satisfy its duty of loyalty by making full and fair disclosure of conflicts of interest and obtaining the client's informed consent, an adviser is prohibited from overreaching or taking unfair advantage of a client's trust.

[58] As noted above, an investment adviser's obligation to act in the best interest of its client is an overarching principle that encompasses both the duty of care and the duty of loyalty. *See SEC* v. *Tambone, supra* footnote 23 (stating that Advisers Act section 206 "imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . . and *includes* an obligation to provide 'full and fair disclosure of all material facts' ") (emphasis added) (citing *SEC* v. *Capital Gains, supra* footnote 2). We describe above in this Final Interpretation how the application of an investment adviser's fiduciary duty to its client will vary with the scope of the advisory relationship. *See supra* section II.A.

[59] Arleen Hughes, *supra* footnote 18, at 4 and 8 (stating, "[s]ince loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a fiduciary must not put himself into a position where his own interests may come in conflict with those of his principal. To prevent any conflict and the possible subordination of this duty to act solely for the benefit of his principal, a fiduciary at common law is forbidden to deal as an adverse party with his principal. An exception is made, however, where the principal gives his informed consent to such dealings," and adding that, "[r]egistrant has an affirmative obligation to disclose all material facts to her clients in a manner which is clear enough so that a client is fully apprised of the facts and is in a position to give his informed consent."); *see also Hughes* v. *Securities and Exchange Commission,* 174 F.2d 969 (1949) (affirming the SEC decision in Arleen Hughes); General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s],

and can give informed consent to such conflicts or practices or reject them"); Investment Advisers Act Release 3060, *supra* footnote 15; Restatement (Third) of Agency § 8.06 ("Conduct by an agent that would otherwise constitute a breach of duty as stated in §§ 8.01, 8.02, 8.03, 8.04, and 8.05 [referencing the fiduciary duty] does not constitute a breach of duty if the principal consents to the conduct, provided that (a) in obtaining the principal's consent, the agent (i) acts in good faith, (ii) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and (iii) otherwise deals fairly with the principal; and (b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship."). *See infra* footnotes 67–70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

[60] We have brought enforcement actions in such cases. *See, e.g.,* In the Matter of The Robare Group, Ltd., et al., Investment Advisers Act Release No. 4566 (Nov. 7, 2016) (Commission Opinion) (finding, among other things, that adviser's disclosure that it *may* receive a certain type of compensation was inadequate because it did not reveal that the adviser actually had an arrangement pursuant to which it received fees that presented a potential conflict of interest); *aff'd in part and rev'd in part on other grounds Robare* v. *SEC, supra* footnote 20; *In re Grossman, supra* footnote 41 (indicating that "the use of the prospective 'may' in [the relevant Form ADV disclosures] is misleading because it suggested the mere possibility that [the broker] would make a referral and/or be paid 'referral fees' at a later point, when in fact a commission-sharing arrangement was already in place and generating income"). *Cf. Dolphin & Bradbury, Inc.* v. *SEC,* 512 F.3d 634, 640 (D.C. Cir. 2008) ("The Commission noted the critical distinction between disclosing the risk that a future event *might* occur and disclosing actual knowledge the event *will* occur.") (emphasis in original). For Form ADV Part 2 purposes, advisers are instructed that when they have a conflict or engage in a practice with respect to some (but not all) types or classes of clients, advice, or transactions, to indicate as such rather than disclosing that they "may" have the conflict or engage in the practice. General Instruction 2 to Part 2 of Form ADV.

actual conflicts to the point that a client cannot provide informed consent. On the other hand, the word ''may'' could be appropriately used to disclose to a client a potential conflict that does not currently exist but might reasonably present itself in the future.[61]

Whether the disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the material fact or conflict. Full and fair disclosure for an institutional client (including the specificity, level of detail, and explanation of terminology) can differ, in some cases significantly, from full and fair disclosure for a retail client because institutional clients generally have a greater capacity and more resources than retail clients to analyze and understand complex conflicts and their ramifications.[62] Nevertheless, regardless of the nature of the client, the disclosure must be clear and detailed enough for the client to make an informed decision to consent to the conflict of interest or reject it.

When allocating investment opportunities among eligible clients, an adviser may face conflicts of interest either between its own interests and those of a client or among different clients.[63] If so, the adviser must eliminate or at least expose through full and fair disclosure the conflicts associated with its allocation policies, including how the adviser will allocate investment opportunities, such that a client can provide informed consent.[64]

When allocating investment opportunities, an adviser is permitted to consider the nature and objectives of the client and the scope of the relationship.[65] An adviser need not have *pro rata* allocation policies, or any particular method of allocation, but, as with other conflicts and material facts, the adviser's allocation practices must not prevent it from providing advice that is in the best interest of its clients.[66]

While most commenters agreed that informed consent is a component of the fiduciary duty, a few commenters objected to what they saw as subjectivity in the use of the term ''informed'' to describe a client's consent to a disclosed conflict.[67] The fact that disclosure must be full and fair such that a client can provide informed consent does not require advisers to make an affirmative determination that a particular client understood the disclosure and that the client's consent to the conflict of interest was informed. Rather, disclosure should be designed to put a client in a position to be able to understand and provide informed consent to the conflict of interest. A client's informed consent can be either explicit or, depending on the facts and circumstances, implicit.[68] We believe, however, that it would not be consistent with an adviser's fiduciary duty to infer

or accept client consent where the adviser was aware, or reasonably should have been aware, that the client did not understand the nature and import of the conflict.[69] In some cases, conflicts may be of a nature and extent that it would be difficult to provide disclosure to clients that adequately conveys the material facts or the nature, magnitude, and potential effect of the conflict sufficient for a client to consent to or reject it.[70] In other cases, disclosure may not be specific enough for a client to understand whether and how the conflict could affect the advice it receives. For retail clients in particular, it may be difficult to provide disclosure regarding complex or extensive conflicts that is sufficiently specific, but also understandable. In all of these cases where an investment adviser cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent, the adviser should either *eliminate* the conflict or adequately *mitigate* (*i.e.,* modify practices to reduce) the conflict such that full and fair disclosure and informed consent are possible.

Full and fair disclosure of all material facts relating to the advisory relationship, and all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested, can help clients and prospective clients in evaluating and selecting investment advisers. Accordingly, we require advisers to deliver to their clients a ''brochure,'' under Part 2A of Form ADV, which sets

---

[61] We have added this example of a circumstance where ''may'' could be appropriately used in response to the request of some commenters. *See, e.g.,* Pickard Letter; ICI Letter; Ropes & Gray Letter; IAA Letter.

[62] *Arleen Hughes, supra* footnote 18 (the ''method and extent of disclosure depends upon the particular client involved,'' and an unsophisticated client may require ''a more extensive explanation than the informed investor'').

[63] *See* Restatement (Third) of Agency, § 8.01 General Fiduciary Principle (2006) (''Unless the principal consents, the general fiduciary principle, as elaborated by the more specific duties of loyalty stated in §§ 8.02 to 8.05, also requires that an agent refrain from using the agent's position or the principal's property to benefit the agent or a third party.'').

[64] The Commission has brought numerous enforcement actions alleging that advisers unfairly allocated client trades to preferred clients without making full and fair disclosure. *See* Staff of the U.S. Securities and Exchange Commission, *Study on Investment Advisers and Broker-Dealers As Required by Section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act* (Jan. 2011), *available at https://www.sec.gov/news/studies/2011/913studyfinal.pdf,* at 23–24 (citing enforcement actions). This Final Interpretation sets forth the Commission's views regarding what constitutes full and fair disclosure. *See, e.g., supra* text accompanying footnote 59; *see also* Barry Barbash and Jai Massari, *The Investment Advisers Act of 1940; Regulation by Accretion,* 39 Rutgers Law Journal 627 (2008) (stating that under section

206 of the Advisers Act and traditional notions of fiduciary and agency law, an adviser must not give preferential treatment to some clients or systematically exclude eligible clients from participating in specific opportunities without providing the clients with appropriate disclosure regarding the treatment).

[65] An adviser and a client may even agree that certain investment opportunities or categories of investment opportunities will not be allocated or offered to a client.

[66] In the Proposed Interpretation, we stated that ''in allocating investment opportunities among eligible clients, an adviser must treat all clients fairly.'' Some commenters interpreted this statement to mean that it would be impermissible for an adviser to allocate a particular investment to one eligible client instead of a second eligible client, even when the second client had received full and fair disclosure and provided informed consent to such an investment being allocated to the first client. *See, e.g.,* Ropes & Gray Letter; SIFMA AMG Letter. We have removed that sentence from this Final Interpretation and replaced it with this discussion that clarifies our views regarding allocation of investment opportunities.

[67] *See, e.g.,* Comment Letter of LPL Financial LLC (Aug. 7, 2018); Ropes & Gray Letter.

[68] We do not interpret an adviser's fiduciary duty to require that full and fair disclosure or informed consent be achieved in a written advisory contract or otherwise in writing. For example, an adviser could provide a client full and fair disclosure of all material facts relating to the advisory relationship as well as full and fair disclosure of all conflicts of interest which might incline the adviser, consciously or unconsciously, to render advice that was not disinterested, through a combination of Form ADV and other disclosure and the client could implicitly consent by entering into or continuing the investment advisory relationship with the adviser.

[69] *See* Arleen Hughes, *supra* footnote 18 (''Registrant cannot satisfy this duty by executing an agreement with her clients which the record shows some clients do not understand and which, in any event, does not contain the essential facts which she must communicate.''). In the Proposed Interpretation, we stated that inferring or accepting client consent to a conflict would not be consistent with the fiduciary duty where ''the material facts concerning the conflict could not be fully and fairly disclosed.'' Some commenters expressed agreement with this statement. *See, e.g.,* CFA Letter (agreeing that ''advisers should be precluded from inferring or accepting client consent to a conflict'' where material facts concerning the conflict could not be fully and fairly disclosed). Other commenters expressed doubt that such disclosure could be impossible. *See, e.g.,* Allianz Letter (''[W]e have not encountered a situation in which we could not fully and fairly disclose the material facts, including the nature, extent, magnitude and potential effects of the conflict.''). In response to commenters, we have replaced the general statement about an inability to fully and fairly disclose material facts about the conflict with more specific examples of how advisers can make such full and fair disclosure. *See supra* text accompanying footnotes 59–66.

[70] As discussed above, institutional clients generally have a greater capacity and more resources than retail clients to analyze and understand complex conflicts and their ramifications. *See supra* text accompanying footnote 62.

App 9

**33678**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

out minimum disclosure requirements, including disclosure of certain conflicts.[71] Investment advisers are required to deliver the brochure to a prospective client at or before entering into a contract so that the prospective client can use the information contained in the brochure to decide whether or not to enter into the advisory relationship.[72] In a concurrent release, we are requiring all investment advisers to deliver to retail investors, at or before the time the adviser enters into an investment advisory agreement, a relationship summary, which would include, among other things, a plain English summary of certain of the firm's conflicts of interest, and would encourage retail investors to inquire about those conflicts.[73]

## III. Economic Considerations

As noted above, this Final Interpretation is intended to reaffirm, and in some cases clarify, certain aspects of an investment adviser's fiduciary duty under the Advisers Act. The Final Interpretation does not itself create any new legal obligations for advisers. Nonetheless, the Commission recognizes that to the extent an adviser's practices are not consistent with the

Final Interpretation provided above, the Final Interpretation could have potential economic effects. We discuss these potential effects below.

### A. Background

The Commission's interpretation of the standard of conduct for investment advisers under the Advisers Act set forth in this Final Interpretation would affect investment advisers and their associated persons as well as the clients of those investment advisers, and the market for financial advice more broadly.[74] As of December 31, 2018, there were 13,299 investment advisers registered with the Commission with over $84 trillion in assets under management as well as 17,268 investment advisers registered with states with approximately $334 billion in assets under management and 3,911 investment advisers who submit Form ADV as exempt reporting advisers.[75] As of December 31, 2018, there are approximately 41 million client accounts advised by SEC-registered investment advisers.[76]

These investment advisers currently incur ongoing costs related to their compliance with their legal and regulatory obligations, including costs related to understanding the standard of conduct. We believe, based on the Commission's experience, that the interpretations set forth in this Final Interpretation are generally consistent with investment advisers' current understanding of their fiduciary duty under the Advisers Act.[77] However, we recognize that as the scope of the adviser-client relationship varies and in many cases can be broad, there may be certain current circumstances where

investment advisers interpret their fiduciary duty to require something less, and other current circumstances where they interpret their fiduciary duty to require something more, than this Final Interpretation. We lack data to identify which investment advisers currently understand their fiduciary duty to require something different from the standard of conduct articulated in this Final Interpretation. Based on our experience over decades of interacting with the investment management industry as its primary regulator, however, we generally believe that it is not a significant portion of the market.

One commenter suggested that the Proposed Interpretation's discussion of how an adviser fulfills its fiduciary duty appeared to be based in the context of having as a client an individual investor, and not a fund.[78] This commenter indicated its concerns about the ability of a fund manager to infer consent from a client that is a fund, and that issues regarding inferring consent from funds could significantly increase compliance costs for venture capital funds.[79] Our discussion above in this Final Interpretation includes clarifications to address comments, and expressly acknowledges that while all investment advisers owe each of their clients a fiduciary duty, the specific application of the investment adviser's fiduciary duty must be viewed in the context of the agreed-upon scope of the adviser-client relationship.[80] This Final Interpretation, as compared to the Proposed Interpretation, includes significantly more examples of the application of the fiduciary duty to institutional clients, and clarifies the Commission's interpretation of what constitutes full and fair disclosure and informed consent, acknowledging a number of comments on this topic.[81] We believe that these clarifications will help address some of this commenter's concerns with respect to increased compliance costs for venture capital funds, in part by clarifying how the fiduciary duty can apply to institutional clients. We continue to believe, based on our experience with investment advisers to different types of clients, that advisers understand their fiduciary

---

[71] Investment Advisers Act Release 3060, *supra* footnote 15; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them."). *See also Robare* v. *SEC, supra* footnote 20 ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

[72] Investment Advisers Act rule 204–3. *See* Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that, "A client may use this disclosure to select his or her own adviser and evaluate the adviser's business practices and conflicts on an ongoing basis. As a result, the disclosure clients and prospective clients receive is critical to their ability to make an informed decision about whether to engage an adviser and, having engaged the adviser, to manage that relationship."). To the extent that the information required for inclusion in the brochure does not satisfy an adviser's disclosure obligation, the adviser "may have to disclose to clients information not specifically required by Part 2 of Form ADV or in more detail than the brochure items might otherwise require" and this disclosure may be made "in [the] brochure or by some other means." General Instruction 3 to Part 2 of Form ADV.

[73] Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 5247 (June 5, 2019) ("Relationship Summary Adoption").

[74] *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A (discussing the market for financial advice generally).

[75] Data on investment advisers is based on staff analysis of Form ADV, particularly Item 5.F.(2)(c) of Part 1A for Regulatory Assets under Management. Because this Final Interpretation interprets an adviser's fiduciary duty under section 206 of the Advisers Act, this interpretation would be applicable to both SEC- and state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act.

[76] Item 5.F.(2)(f) of Part 1A of Form ADV.

[77] *See supra* section II.B.i. For example, some commenters asked that we clarify from the Proposed Interpretation that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies, through contract. *See, e.g.,* MMI Letter; Financial Engines Letter; ABA Letter. *See supra* footnotes 67–69 and accompanying text, including clarifications addressing these commenters' concerns. More generally, some commenters requested clarifications from the Proposed Interpretation, and we are issuing this Final Interpretation to address those issues raised by commenters, as discussed in more detail above.

[78] *See* Comment Letter of National Venture Capital Association (Aug. 7, 2018) ("NVCA Letter").

[79] *Id.*

[80] *See supra* section II.A.

[81] In particular, this Final Interpretation expressly notes our belief that a client generally may provide its informed consent implicitly "by entering into or continuing the investment advisory relationship with the adviser" after disclosure of a conflict of interest. *See supra* footnote 68.

App 10

duty to be generally consistent with the standards of this Final Interpretation.

### B. Potential Economic Effects

Based on our experience as the long-standing regulator of the investment adviser industry, the Commission's interpretation of the fiduciary duty under section 206 of the Advisers Act described in this Final Interpretation generally reaffirms the current practices of investment advisers. Therefore, we expect there to be no significant economic effects from this Final Interpretation. However, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, we acknowledge that affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them. Further, to the extent certain investment advisers currently understand the practices necessary to comply with their fiduciary duty to be different from those discussed in this Final Interpretation, there could be some economic effects, which we discuss below.

Clients of Investment Advisers

The typical relationship between an investment adviser and a client is a principal-agent relationship, where the principal (the client) hires an agent (the investment adviser) to perform some service (investment advisory services) on the principal's behalf.[82] Because investors and investment advisers are likely to have different preferences and goals, the investment adviser relationship is subject to agency problems, including those resulting from conflicts: That is, investment advisers may take actions that increase their well-being at the expense of investors, thereby imposing agency costs on investors.[83] A fiduciary duty, such as the duty investment advisers owe their clients, can mitigate these agency problems and reduce agency costs by deterring investment advisers

from taking actions that expose them to legal liability.[84]

To the extent this Final Interpretation causes a change in behavior of those investment advisers, if any, who currently interpret their fiduciary duty to require something different from this Final Interpretation, we expect a potential reduction in agency problems and, consequently, a reduction of agency costs to the client.[85] For example, an adviser that, as part of its duty of loyalty, fully and fairly discloses [86] a conflict of interest and receives informed consent from its client with respect to the conflict may reduce agency costs by increasing the client's awareness of the conflict and improving the client's ability to monitor the adviser with respect to this conflict. Alternatively, the client may choose to not consent given the information the adviser discloses about a conflict of interest if the perceived risk associated with the conflict is too significant, and instead try to renegotiate the contract with the adviser or look for an alternative adviser or other financial professional. In addition, the obligation to fully and fairly disclose a current conflict may cause the adviser to take other actions, for example eliminating or adequately mitigating (*i.e.,* modifying practices to reduce) that conflict rather than taking the risk that the client will not provide informed consent or will look for an alternative adviser or other financial professional. The extent to which agency costs would be reduced by such a disclosure is difficult to assess given that we are unable to ascertain the total number of investment advisers that currently interpret their fiduciary duty to require something different from the Commission's interpretation,[87] and

consequently we are not able to estimate the agency costs such advisers currently impose on investors. In addition, we believe that there may be potential benefits for clients of those investment advisers, if any, to the extent this Final Interpretation is effective at strengthening investment advisers' understanding of their obligations to their clients. Further, to the extent that this Final Interpretation enhances the understanding of any investment advisers of their duty of care, it may potentially raise the quality of investment advice and also lead to increased compliance with the duty to monitor, for example whether advice about an account or program type remains in the client's best interest, thereby increasing the likelihood that the advice fits with a client's objectives.

In addition, to the extent that this Final Interpretation causes some investment advisers to properly identify circumstances in which conflicts may be of a nature and extent that it would be difficult to provide disclosure to clients that adequately conveys the material facts or nature, magnitude, and potential effect of the conflict sufficient for clients to consent to it or reject it, or in which the disclosure may not be specific enough for clients to understand whether and how the conflict could affect the advice they receive, this Final Interpretation may lead those investment advisers to take additional steps to improve their disclosures or to determine whether adequately mitigating (*i.e.,* modifying practices to reduce) the conflict may be appropriate such that full and fair disclosure and informed consent are possible. This Final Interpretation may also cause some investment advisers to conclude in some circumstances that they cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent. We would expect that these advisers would either eliminate the conflict or adequately mitigate (*i.e.,* modify practices to reduce) the conflict such that full and fair disclosure and informed consent would be possible. Thus, to the extent this Final Interpretation would cause investment advisers to better understand their obligations and therefore to modify their business practices in ways that (i) reduce the likelihood that conflicts and other agency costs will cause an adviser to place its interests ahead of the interests of the client or (ii) help those advisers to provide full and fair disclosure, it would be expected to ameliorate the agency conflict between investment advisers and their clients. In

---

[82] *See, e.g.,* James A. Brickley, Clifford W. Smith, Jr. & Jerold L. Zimmerman, *Managerial Economics and Organizational Architecture* (2004), at 265 ("An agency relationship consists of an agreement under which one party, the principal, engages another party, the agent, to perform some service on the principal's behalf."); *see also* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure,* 3 Journal of Financial Economics 305–360 (1976) ("Jensen and Meckling").

[83] *See, e.g.,* Jensen and Meckling, *supra* footnote 82.

[84] *See, e.g.,* Frank H. Easterbrook & Daniel R. Fischel, *Contract and Fiduciary Duty,* 36 Journal of Law & Economics 425–46 (1993).

[85] To the extent that this Final Interpretation clarifies the fiduciary duty for investment advisers, one commenter suggested it may then clarify what clients expect of their investment advisers. *See* Cambridge Letter (stating that "greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability to craft such policies and procedures, as well as support the elimination of confusion for retail clients and investment professionals").

[86] As discussed above, whether such a disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the conflict. *See supra* section II.C.

[87] One commenter did not agree that the discussion of fiduciary obligations in the Proposed Interpretation applied to advisers to funds as well as advisers to retail investors. *See* NVCA Letter. As discussed above, this Final Interpretation has clarified the discussion to address this commenter's concerns and acknowledges that the application of the fiduciary duty of an adviser to a retail client would be different from the specific application of the fiduciary duty of an adviser to a registered investment company or private fund.

turn, this may improve the quality of advice that the clients receive and therefore produce higher overall returns for clients and increase the efficiency of portfolio allocation. However, as discussed above, we would generally expect these effects to be minimal because we believe that the interpretations we are setting forth in this Final Interpretation are generally consistent with investment advisers' current understanding of their fiduciary duty under the Advisers Act. Finally, this Final Interpretation would also benefit clients of investment advisers to the extent it assists the Commission in its oversight of investment advisers' compliance with their regulatory obligations.

Investment Advisers and the Market for Investment Advice

In general, we expect this Final Interpretation to affirm investment advisers' understanding of the fiduciary duty they owe their clients under the Advisers Act, reduce uncertainty for advisers, and facilitate their compliance. Further, by addressing in one release certain aspects of the fiduciary duty that an investment adviser owes to its clients under the Advisers Act, this Final Interpretation could reduce investment advisers' costs associated with comprehensively assessing their compliance obligations. We acknowledge that, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them. Moreover, as discussed above, there may be certain investment advisers who currently understand their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation. Those investment advisers would experience an increase in their compliance costs as they change their systems, processes, disclosures, and behavior, and train their supervised persons, to align with this Final Interpretation. However, this increase in costs would be mitigated by potential benefits in efficiency for investment advisers that are able to understand aspects of their fiduciary duty by reference to a single Commission release that reaffirms—and in some cases clarifies—certain aspects of the fiduciary duty.[88] In addition, and as

discussed above, in the case of an investment adviser that believed it owed its clients a lower standard of conduct, there will be client benefits from the ensuing adaptation of a higher standard of conduct and related change in policies and procedures.

Moreover, to the extent any investment advisers that understood their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation change their behavior to align with this Final Interpretation, there could also be some economic effects on the market for investment advice. For example, any improved compliance may not only reduce agency costs in current investment advisory relationships and increase the value of those relationships to current clients, it may also increase trust in the market for investment advice among all investors, which may result in more investors seeking advice from investment advisers. This may, in turn, benefit investors by improving the efficiency of their portfolio allocation. To the extent it is costly or difficult, at least in the short term, to expand the supply of investment advisory services to meet an increase in demand, any such new demand for investment advisory services could put some upward price pressure on fees. At the same time, however, if any such new demand increases the overall profitability of investment advisory services, then we expect it would encourage entry by new investment advisers—or hiring of new representatives by current investment advisers—such that competition would increase over time. Indeed, the recent growth in the investment adviser segment of the market, both in terms of number of firms and number of representatives,[89] may suggest that the costs of expanding the supply of investment advisory services are currently relatively low.

Additionally, we acknowledge that to the extent certain investment advisers recognize, as a result of this Final Interpretation, that their fiduciary duty is stricter than the fiduciary duty as they currently interpret it, it could potentially affect competition. Specifically, this Final Interpretation of certain aspects of the standard of conduct for investment advisers may result in additional compliance costs for investment advisers seeking to meet their fiduciary duty. This increase in compliance costs, in turn, may

discourage competition for client segments that generate lower revenues, such as clients with relatively low levels of financial assets, which could reduce the supply of investment advisory services and raise fees for these client segments. However, the investment advisers who already are complying with the understanding of their fiduciary duty reflected in this Final Interpretation, and who may therefore currently have a comparative cost disadvantage, could find it more profitable to compete for the clients of those investment advisers who would face higher compliance costs as a result of this Final Interpretation, which would mitigate negative effects on the supply of investment advisory services. Further, as noted above, there has been a recent growth trend in the supply of investment advisory services, which is likely to mitigate any potential negative supply effects from this Final Interpretation.[90]

One commenter discussed that, in its view, any statement in the Proposed Interpretation that certain circumstances may require the elimination of material conflicts, rather than full and fair disclosure or the mitigation of such conflicts, could lead to an effect on the market and costs to advisers, if such a requirement would cause advisers who had not shared that interpretation to change their business models or product offerings or the ways in which they interact with clients.[91] We disagree that this Final Interpretation includes a requirement to eliminate conflicts of interest. As discussed in more detail above, elimination of a conflict is one method of addressing that conflict; when appropriate advisers may also address the conflict by providing full and fair disclosure such that a client can provide informed consent to the

---

[88] As noted above, *supra* footnote 3, this Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty. It

is not, however, intended to be the exclusive resource for understanding these principles.

[89] *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A.1.d.

[90] Beyond having an effect on competition in the market for investment adviser services, it is possible that this Final Interpretation could affect competition between investment advisers and other providers of financial advice, such as broker-dealers, banks, and insurance companies. This may be the case if certain investors base their choice between an investment adviser and another provider of financial advice, at least in part, on their perception of the standards of conduct each owes to their customers. To the extent that this Final Interpretation increases investors' trust in investment advisers' overall compliance with their standard of conduct, certain of these investors may become more willing to hire an investment adviser rather than one of their non-investment adviser competitors. As a result, investment advisers as a group may become more competitive compared to that of other types of providers of financial advice. On the other hand, if this Final Interpretation raises costs for investment advisers, they could become less competitive with other financial advice providers.

[91] *See* Dechert Letter.

conflict.[92] Further, we believe that any potential costs or market effects resulting from investment advisers addressing conflicts of interest may be decreased by the flexibility advisers have to meet their federal fiduciary duty in the context of the specific scope of services that they provide to their clients, as discussed in this Final Interpretation.

The commenter also drew particular attention to the question of whether the Commission's discussion of the fiduciary duty in the Proposed Interpretation applied to advisers to institutional clients as well as those to retail clients. The same commenter indicated that failing to accommodate the application of the concepts in the Proposed Interpretation to sophisticated clients could risk changing the marketplace or limiting investment opportunities for sophisticated clients, increasing compliance burdens for advisers to sophisticated clients, or chilling innovation. As explained above, this Final Interpretation, as compared to the Proposed Interpretation, discusses in more detail the ability of investment advisers and different types of clients to shape the scope of the relationship to which the fiduciary duty applies.[93] In particular, this Final Interpretation acknowledges that while advisers owe each of their clients a fiduciary duty, the specific obligations of, for example, an adviser providing comprehensive, discretionary advice in an ongoing

relationship with a retail client will be significantly different from the obligations of an adviser to an institutional client, such as a registered investment company or private fund, where the contract defines the scope of the adviser's services and limitations on its authority with substantial specificity.[94]

Finally, to the extent this Final Interpretation causes some investment advisers to reassess their compliance with their duty of loyalty, it could lead to a reduction in the expected profitability of advice relating to particular investments for which compliance costs would increase following the reassessment.[95] As a result, the number of investment advisers willing to advise a client to make these investments may be reduced. A decline in the supply of investment adviser advice regarding these types of investments could affect efficiency for investors; it could reduce the efficiency of portfolio allocation for those investors who might otherwise benefit from investment adviser advice regarding these types of investments and are no longer able to receive such advice. At the same time, if providing full and fair disclosure and appropriate monitoring for highly complex products (*e.g.,* those with a complex payout structure, such as those that include variable or contingent payments or payments to multiple parties) results in these products becoming less profitable

for investment advisers, investment advisers may be discouraged from supplying advice regarding such products. However, investors may benefit from (1) no longer receiving inadequate disclosure or monitoring for such products, (2) potentially receiving advice regarding other, less complex or expensive products that may be more efficient for the investor, and (3) only receiving recommendations for highly complex or high cost products for which an investment adviser can provide full and fair disclosure regarding its conflicts and appropriate monitoring.

**List of Subjects in 17 CFR Part 276**

Securities.

**Amendments to the Code of Federal Regulations**

For the reasons set out above, the Commission is amending Title 17, chapter II of the Code of Federal Regulations as set forth below:

**PART 276—INTERPRETATIVE RELEASES RELATING TO THE INVESTMENT ADVISERS ACT OF 1940 AND GENERAL RULES AND REGULATIONS THEREUNDER**

■ 1. Part 276 is amended by adding Release No. IA–5428 and the release date of June 5, 2019, to the end of the list of interpretive releases to read as follows''

| Subject | Release No. | Date | FR vol. and page |
|---|---|---|---|
| * * * | * * | * | * * |
| Commission Interpretation Regarding Standard of Conduct for Investment Advisers. | IA–5248 | June 5, 2019 ................ | [Insert FR Volume Number] FR [Insert FR Page Number]. |

By the Commission.

Dated: June 5, 2019.

**Vanessa A. Countryman,**

*Acting Secretary.*

[FR Doc. 2019–12208 Filed 7–11–19; 8:45 am]

**BILLING CODE 8011–01–P**

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Part 276**

**[Release No. IA–5249]**

**Commission Interpretation Regarding the Solely Incidental Prong of the Broker-Dealer Exclusion From the Definition of Investment Adviser**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Interpretation.

**SUMMARY:** The Securities and Exchange Commission (the ''SEC'' or the ''Commission'') is publishing an

interpretation of a section of the Investment Advisers Act of 1940 (the ''Advisers Act'' or the ''Act''), which excludes from the definition of ''investment adviser'' any broker or dealer that provides advisory services when such services are ''solely incidental'' to the conduct of the broker or dealer's business and when such incidental advisory services are provided for no special compensation.

**DATES:** Effective July 12, 2019.

**FOR FURTHER INFORMATION CONTACT:** James McGinnis, Senior Counsel, Investment Adviser Regulation Office, at (202) 551–6787 or *IArules@sec.gov;* and Benjamin Kalish, Attorney-Advisor, or

---

[92] *See supra* section II.C.

[93] *See supra* footnotes 78–81 and accompanying text.

[94] *See supra* section II.A.

[95] For example, such products could include highly complex, high cost products with risk and return characteristics that are hard for retail investors to fully understand, or where the

investment adviser and its representatives receive complicated payments from affiliates that create conflicts of interest that are difficult for retail investors to fully understand.



**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 270, 275, and 279**

[Release Nos. IA–2204; IC–26299; File No. S7–03–03]

**RIN 3235–AI77**

**Compliance Programs of Investment Companies and Investment Advisers**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule; request for comments.

**SUMMARY:** The Securities and Exchange Commission is adopting new rules under the Investment Company Act of 1940 and the Investment Advisers Act of 1940 that require each investment company and investment adviser registered with the Commission to adopt and implement written policies and procedures reasonably designed to prevent violation of the federal securities laws, review those policies and procedures annually for their adequacy and the effectiveness of their implementation, and designate a chief compliance officer to be responsible for administering the policies and procedures. In the case of an investment company, the chief compliance officer will report directly to the fund board. These rules are designed to protect investors by ensuring that all funds and advisers have internal programs to enhance compliance with the federal securities laws.

**DATES:** *Effective Date:* February 5, 2004.
*Comment Date:* Comments requested in section II.F of this release should be received on or before February 5, 2004.
*Compliance Date:* October 5, 2004. Section III of this release contains more information on the compliance date.

**ADDRESSES:** To help us process and review your comments more efficiently, comments may be sent to us in either paper or electronic format. Comments should not be sent by both methods.

Comments in paper format should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0609. Comments in electronic format may be submitted at the following e-mail address: *rule-comments@sec.gov.* All comment letters should refer to File No. S7–03–03; if e-mail is used, this file number should be included on the subject line. Comment letters will be available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, NW., Washington, DC 20549. Electronically

submitted comment letters will also be posted on the Commission's Internet Web site *(http://www.sec.gov).*[1]

**FOR FURTHER INFORMATION CONTACT:** Hester Peirce, Senior Counsel, Office of Regulatory Policy at (202) 942–0690, or Jamey Basham, Special Counsel, Office of Investment Adviser Regulation at (202) 942–0719, Division of Investment Management, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0506.

**SUPPLEMENTARY INFORMATION:** The Securities and Exchange Commission ("SEC" or "Commission") is adopting new rule 38a–1 (17 CFR 270.38a–1) under the Investment Company Act of 1940 (15 U.S.C. 80a) ("Investment Company Act"), new rule 206(4)–7 (17 CFR 275.206(4)–7) under the Investment Advisers Act of 1940 (15 U.S.C. 80b) ("Investment Advisers Act" or "Advisers Act"), and amendments to rule 204–2 (17 CFR 275.204–2) under the Advisers Act, and to Part 1, Schedule A, Item 2(a) of Form ADV (17 CFR 279.1).[2]

**Table of Contents**

I. Background
II. Discussion
  A. Adoption and Implementation of Policies and Procedures
  1. Investment Advisers
  2. Investment Companies
  B. Annual Review
  1. Investment Advisers
  2. Investment Companies
  C. Chief Compliance Officer
  1. Investment Advisers
  2. Investment Companies
  D. Recordkeeping
  E. Private Sector Initiatives
  F. Additional Request for Comment
III. Effective Date
IV. Cost-Benefit Analysis
  A. Benefits
  B. Costs
V. Consideration of Promotion of Efficiency, Competition and Capital Formation
VI. Paperwork Reduction Act
  A. Rule 38a–1
  B. Rule 206(4)–7
  C. Rule 204–2
VII. Summary of Final Regulatory Flexibility Analysis
VIII. Statutory Authority Text of Rules

**I. Background**

Earlier this year the Commission proposed rules that would require investment companies ("funds")[3] and investment advisers to adopt written compliance procedures, review the adequacy of those procedures annually, and designate a chief compliance officer responsible for their administration.[4] We proposed the rules because it is critically important for funds and advisers to have strong systems of controls in place to prevent violations of the Federal securities laws and to protect the interests of shareholders and clients. The proposed rules were designed to foster, among other things, improved compliance by clarifying the compliance obligations of fund management and to strengthen the hand of fund boards and compliance personnel when dealing with them.[5]

In recent months, the Commission and State securities authorities have discovered unlawful conduct involving a number of fund advisers, broker-dealers, and other service providers that confirms the need for these rules. Fund advisory or distributor personnel have engaged in, or actively assisted others in engaging in, inappropriate market timing, late trading of fund shares, and the misuse of material, nonpublic information about fund portfolios.[6]

---

[1] We do not edit personal or identifying information, such as names or e-mail addresses, from electronic submissions. Submit only information you wish to make publicly available.

[2] Unless otherwise noted, when we refer to rule 38a–1 or any paragraph of the rule, we are referring to 17 CFR 270.38a–1 of the Code of Federal Regulations in which the rule is published, as amended by this release; when we refer to rule 206(4)–7 or any paragraph of the rule, we are referring to 17 CFR 275.206(4)–7 of the Code of Federal Regulations in which the rule is published, as amended by this release; and when we refer to rule 204–2 or any paragraph of the rule, we are referring to 17 CFR 275.204–2 of the Code of Federal Regulations in which the rule is published, as amended by this release.

[3] In this release, we use the term "fund" to mean a registered investment company or a business development company, which is an unregistered closed-end investment company. *See* section 2(a)(48) of the Investment Company Act (15 U.S.C. 80a–2(a)(48)). We use the term "mutual fund" to mean a registered investment company that is an open-end management company defined in section 5(a) of the Investment Company Act (15 U.S.C. 80a–5(a)).

[4] Compliance Programs of Investment Companies and Investment Advisers, Investment Company Act Release No. 25925 (Feb. 5, 2003) (68 FR 7038 (Feb. 11, 2003)) ("Proposing Release").

[5] Forty-eight commenters, most of which were investment advisers, fund management companies, and organizations representing those groups, submitted comments in response to the Proposing Release. Commenters generally supported the proposal to require funds and advisers to adopt and implement compliance programs, but many sought changes. The comment letters and a summary of comments prepared by our staff are available for public inspection and copying in the Commission's Public Reference Room, 450 5th Street, NW., Washington, DC (File No. S7–03–03). The comment summary is also available on the Commission's Internet Web site (*http://www.sec.gov/rules/extra/s70303summary.pdf.*)

[6] The Commission has already obtained settlements in a number of actions arising from such violations. *See, e.g.,* In re Putnam Investment Management, Investment Advisers Act Release No. 2192 (Nov. 13, 2003) (finding that an investment adviser failed to disclose potentially self-dealing

These personnel, including in some cases senior executives of fund advisers, have placed their personal interests or the business interests of the fund adviser ahead of the interests of fund shareholders, thus breaching their fiduciary obligations to the funds involved and their shareholders. These individuals have harmed the funds, their management organizations, and the confidence of fund investors.

Our response to these events is twofold. First, we are conducting an intensive investigation of funds, advisers, broker-dealers, and others.[7] We will aggressively pursue and punish

those who have violated the Federal securities laws and breached their fiduciary obligations to clients. When appropriate, we will actively work with other Federal law enforcement authorities and State authorities to see that the full weight of the law is brought to bear against those who have betrayed mutual funds and fund investors. Second, we will review all of our rules to determine what changes may be required to prevent this type of conduct.

We are taking our first regulatory actions designed to curb the abusive practices recently uncovered and to prevent their recurrence. In companion releases, we are proposing to amend our rules regarding mutual fund share pricing and prospectus disclosure.[8] In this release, we are adopting new rules requiring advisers and funds to adopt strong compliance controls administered by a chief compliance officer.

**II. Discussion**

The Commission is adopting new rule 206(4)–7 under the Advisers Act and new rule 38a–1 under the Investment Company Act.[9] The new rules require each registered investment adviser and each fund to adopt and implement compliance programs that conform to the new rules. Failure of an adviser or fund to have adequate compliance policies and procedures in place will constitute a violation of our rules independent of any other securities law violation. The new rules will thus permit the Commission to address the failure of an adviser or fund to have in place adequate compliance controls, before that failure has a chance to harm clients or investors.

*A. Adoption and Implementation of Policies and Procedures*

1. Investment Advisers

Under rule 206(4)–7, it is unlawful for an investment adviser registered with the Commission to provide investment advice unless the adviser has adopted and implemented written policies and procedures reasonably designed to prevent violation of the Advisers Act by the adviser or any of its supervised

persons.[10] The rule requires advisers to consider their fiduciary and regulatory obligations under the Advisers Act and to formalize policies and procedures to address them.[11]

Commenters generally supported these new requirements, but some expressed concerns for how they would be applied to smaller advisers. The Commission is sensitive to the burdens the rule may impose upon smaller advisory firms.[12] The rule requires only that the policies and procedures be *reasonably* designed to prevent violation of the Advisers Act, and thus need only encompass compliance considerations relevant to the operations of the adviser. We would expect smaller advisory firms without conflicting business interests to require much simpler policies and procedures than larger firms that, for example, have multiple potential conflicts as a result of their other lines of business or their affiliations with other financial service firms.[13] The preparation of these simpler policies and procedures and their administration should be much less burdensome.

Rule 206(4)–7 does not enumerate specific elements that advisers must include in their policies and procedures.[14] Commenters agreed with

---

[7] To date, we have brought 10 enforcement actions. *See SEC* v. *Mutuals.com, Inc.,* Civil Action No. 303 CV 2912D (N.D. Tex. Dec. 4, 2003) (alleging that dually registered broker-dealer and investment adviser, three of its executives, and two affiliated broker-dealers assisted institutional brokerage customers and advisory clients in carrying out and concealing thousands of market timing trades and illegal late trades in shares of hundreds of mutual funds); *SEC* v. *Invesco Funds Group,* Civil Action No. 03–N–2421 (PAC) (D. Colo. Dec. 2, 2003) (alleging that investment adviser, with approval of its president and chief executive officer, entered into market timing arrangements with more than 60 broker dealers, hedge funds, and advisers without disclosing these arrangements to the affected mutual funds' independent directors or shareholders); *SEC* v. *Security Trust Company,* Civil Action No. 03–2323 (D. Ariz. Nov. 24, 2003) (alleging that unregistered financial intermediary and three of its senior executives facilitated and participated in late trading and market timing schemes by a group of related hedge funds); *SEC* v. *Pilgrim,* Civil Action No. 03–CV–6341 (E.D. Penn. filed Nov. 20, 2003) (alleging that investment adviser and two senior executives permitted a hedge fund, in which one of the executives had a substantial financial interest, to engage in repeated short-term trading of several mutual funds and that one of the executives provided nonpublic portfolio information to a broker-dealer, which passed it on to its customers); *SEC* v. *Druffner,* Civil Action No. 03–12154–RCL (D. Mass. Nov. 4, 2003) (alleging that five brokers, with the assistance of their branch office manager, evaded attempts to restrict their trading and conducted thousands of market timing trades in numerous mutual funds); *SEC* v. *Scott,* Civil Action No. 03–12082–EFH (D. Mass. filed Oct. 28, 2003) (alleging that two senior investment executives of an investment adviser engaged in repeated short-term trading in their personal accounts of funds over which they had investment decision-making responsibility and about which they had access to nonpublic information); In re Sihpol, Administrative Proceeding No. 3–11261 (Sept. 16, 2003) (charging former broker with playing a key role in enabling certain hedge fund customers to engage in late trading in shares of funds). See also supra note . A number of State actions are also pending.

securities trading by several of its employees, failed to have reasonable procedures to prevent misuse of material nonpublic information, and failed to reasonably supervise the employees who committed violations); In re Connelly, Securities Act Release No. 8304 (Oct. 16, 2003) (finding that a former executive of an investment adviser to a fund complex, in contravention of fund disclosures, approved agreements that permitted select investors to time certain funds in the complex); In re Markovitz, Securities Act Release No. 8298 (Oct. 2, 2003) (finding that a former hedge fund trader violated the Federal securities laws and defrauded investors by engaging in late trading of mutual fund shares).

[8] Amendments to Rules Governing Pricing of Mutual Fund Shares, Investment Company Act Release No. 26288 (Dec. 11, 2003) (68 FR 70388 (Dec. 17, 2003)) ("Companion Late Trading Release"); Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, Investment Company Act Release No. 26287 (Dec. 11, 2003) (68 FR 70402 (Dec. 17, 2003)) ("Companion Disclosure Release").

[9] We also are adopting related amendments to rule 204–2 under the Advisers Act and a technical amendment to Form ADV.

[10] Rule 206(4)–7(a). *See also* section 202(a)(25) of the Advisers Act (15 U.S.C. 80b–2(a)(25)) (defining "supervised person" as "any partner, officer, director (or other person occupying a similar status or performing similar functions), or employee of an investment adviser, or other person who provides investment advice on behalf of the investment adviser and is subject to the supervision and control of the investment adviser").

[11] In response to several comments, we revised the text of the rule so that a violation of the rule would be deemed to be "unlawful" rather than "a fraudulent, deceptive, or manipulative act, practice or course of business." This change, which responds to commenters' concerns regarding the optics of the rule, does not change its substance; failure to comply with its terms will result in a violation of section 206(4) of the Act.

[12] In the Proposing Release, we requested comment on whether we should except a subset of investment advisers or funds from the requirements of the rules. Some commenters suggested that we except small advisers, but we believe that the flexibility of the rules obviates the need for this exception.

[13] Even small advisers may have arrangements, such as soft dollar agreements, that create conflicts. Advisers of all sizes, in designing and updating their compliance programs, must identify these arrangements and provide for the effective control of the resulting conflicts.

[14] Advisers already are subject to requirements to maintain written compliance policies and procedures in certain areas. The new rules do not alter those requirements. *See, e.g.,* Investment Company Act rule 17j–1(c)(1) (17 CFR 270.17j–1(c)(1)) (requiring each investment adviser and principal underwriter of a fund to "adopt a written code of ethics containing provisions reasonably necessary to prevent" certain persons affiliated with the fund, its investment adviser or its principal underwriter from engaging in certain fraudulent,

Continued

App 15

our assessment that funds and advisers are too varied in their operations for the rules to impose of a single set of universally applicable required elements. Each adviser should adopt policies and procedures that take into consideration the nature of that firm's operations. The policies and procedures should be designed to prevent violations from occurring, detect violations that have occurred,[15] and correct promptly any violations that have occurred.[16]

Each adviser, in designing its policies and procedures, should first identify conflicts and other compliance factors creating risk exposure for the firm and its clients in light of the firm's particular operations, and then design policies and procedures that address those risks. We expect that an adviser's policies and procedures, at a minimum, should address the following issues to the extent that they are relevant to that adviser:

• Portfolio management processes, including allocation of investment opportunities among clients and consistency of portfolios with clients' investment objectives, disclosures by the adviser, and applicable regulatory restrictions;[17]

• Trading practices, including procedures by which the adviser satisfies its best execution obligation, uses client brokerage to obtain research and other services ("soft dollar arrangements"), and allocates aggregated trades among clients;

• Proprietary trading of the adviser and personal trading activities of supervised persons;[18]

• The accuracy of disclosures made to investors, clients, and regulators, including account statements and advertisements;

• Safeguarding of client assets from conversion or inappropriate use by advisory personnel;

• The accurate creation of required records and their maintenance in a manner that secures them from unauthorized alteration or use and protects them from untimely destruction;[19]

• Marketing advisory services, including the use of solicitors;[20]

• Processes to value client holdings and assess fees based on those valuations;

• Safeguards for the privacy protection of client records and information;[21] and

• Business continuity plans.[22]

Rule 206(4)–7 does not require advisers to consolidate all compliance policies and procedures into a single document. Nor does it require advisers to memorialize every action that must be taken in order to remain in compliance with the Advisers Act. In some cases, it may be enough for the compliance policies and procedures to allocate responsibility within the organization for the timely performance of many obligations, such as the filing or updating of required forms.[23]

### 2. Investment Companies

Rule 38a–1 requires fund boards to adopt written policies and procedures reasonably designed to prevent the fund from violating the Federal securities laws.[24] The procedures must provide for the oversight of compliance by the fund's advisers, principal underwriters,[25] administrators,[26] and

---

manipulative, and deceptive actions with respect to the fund); Advisers Act rule 206(4)–6 (17 CFR 275.206(4)–6) (requiring investment advisers to adopt and implement written policies and procedures reasonably designed to ensure that the adviser votes securities in the best interest of clients); Advisers Act section 204A (15 U.S.C. 80b–4a) (requiring each adviser registered with us to have written policies and procedures reasonably designed to prevent the misuse of material nonpublic information by the adviser or persons associated with the adviser); Regulation S-P ("Privacy of Consumer Financial Information") (17 CFR 248.30) (requiring investment advisers to "adopt policies and procedures that address administrative, technical, and physical safeguards for the protection of customer records and information").

[15] Where appropriate, advisers' policies and procedures should employ, among other methods of detection, compliance tests that analyze information over time in order to identify unusual patterns, including, for example, an analysis of the quality of brokerage executions (for the purpose of evaluating the adviser's fulfillment of its duty of best execution), or an analysis of the portfolio turnover rate (to determine whether portfolio managers are overtrading securities), or an analysis of the comparative performance of similarly managed accounts (to detect favoritism, misallocation of investment opportunities, or other breaches of fiduciary responsibilities).

[16] In the Proposing Release, we noted that the compliance policies and procedures should be designed to prevent, detect, and correct promptly any material violation of the federal securities laws (or in the case of advisers, the Advisers Act). A number of commenters suggested that these objectives were unrealistic and recommended that the rules be designed instead to promote compliance with the securities laws. While we understand that compliance policies and procedures will not prevent every violation of the securities laws, we believe that prevention should be a key objective of all firms' compliance policies and procedures.

[17] Rule 206(4)–6 under the Advisers Act (17 CFR 275.206(4)–6) requires registered investment advisers to adopt and implement written policies and procedures that are reasonably designed to ensure that the adviser votes securities in the best interest of clients. Similarly, funds must disclose the policies and procedures that they use to determine how to vote proxies relating to portfolio securities. Form N–1A, Item 13(f) (17 CFR 239.15A; 274.11A); Form N–2, Item 18.16 (17 CFR 239.14; 274.11a–1); Form N–3, Item 20(o) (17 CFR 239.17a; 17 CFR 274.11b); and Form N–CSR, Item 7 (17 CFR 249.331; 17 CFR 274.128).

[18] Section 204A of the Advisers Act (15 U.S.C. 80b–4a) requires registered investment advisers to have written policies and procedures reasonably designed to prevent the misuse of material nonpublic information by the advisers or persons associated with the advisers. Rule 17j–1(c)(1) under the Investment Company Act (17 CFR 270.17j–1(c)(1)) requires funds and each investment adviser and principal underwriter of a fund to "adopt a written code of ethics containing provisions reasonably necessary to prevent" certain persons affiliated with the fund, its investment adviser or its principal underwriter from engaging in certain fraudulent, manipulative, and deceptive actions with respect to the fund.

[19] Rule 204–2(g)(3) under the Advisers Act (17 CFR 275.204–2(g)(3)) and rule 31a–2(f)(3) under the Investment Company Act (17 CFR 270.31a–2(f)(3)) require advisers and funds that maintain records in electronic formats to establish and maintain procedures to safeguard the records.

[20] Rule 206(4)–3 under the Advisers Act (17 CFR 275.206(4)–3) requires written agreements setting forth procedures to govern solicitation activities conducted by certain third parties on behalf of an adviser.

[21] Regulation S–P requires investment advisers to "adopt policies and procedures that address administrative, technical, and physical safeguards for the protection of customer records and

information." Regulation S–P ("Privacy of Consumer Financial Information") (17 CFR 248.30). Regulation S–P also applies to funds.

[22] We believe that an adviser's fiduciary obligation to its clients includes the obligation to take steps to protect the clients' interests from being placed at risk as a result of the adviser's inability to provide advisory services after, for example, a natural disaster or, in the case of some smaller firms, the death of the owner or key personnel. The clients of an adviser that is engaged in the active management of their assets would ordinarily be placed at risk if the adviser ceased operations.

[23] Advisers who are also registered as broker-dealers are not required to segregate their investment adviser compliance policies and procedures from their broker-dealer compliance policies and procedures.

[24] Rule 38a–1(a)(1). For purposes of rule 38a–1, "Federal securities laws" means the Securities Act of 1933 (15 U.S.C. 77a), the Securities Exchange Act of 1934 (15 U.S.C. 78a), the Sarbanes-Oxley Act of 2002 (Pub. L. 107–204, 116 Stat. 745 (2002)), the Investment Company Act, the Advisers Act, Title V of the Gramm-Leach-Bliley Act (15 U.S.C. 6801) (governing disclosure of nonpublic personal information), any rules adopted by the Commission under any of these statutes, the Bank Secrecy Act (31 U.S.C. 5311–5314; 5316–5332) (imposing restrictions designed to prevent financial intermediaries from being used in money laundering activities) as it applies to funds, and any rules adopted thereunder by the Commission or the Department of the Treasury. Rule 38a–1(e)(1).

[25] A "principal underwriter" of a fund (other than a closed-end fund) is "any underwriter who as principal purchases from such company, or pursuant to contract has the right (whether absolute or conditional) from time to time to purchase from such company, any such security for distribution, or who as agent for such company sells or has the right to sell any such security to a dealer or to the public or both, but does not include a dealer who purchases from such company through a principal underwriter acting as agent for such company." Section 2(a)(29) of the Investment Company Act (15 U.S.C. 80a–2(a)(29)).

[26] An "administrator" is "any person who provides significant administrative or business management services to an investment company." Investment Company Act rule 0–1(a)(5) (17 CFR 270.0–1(a)(5)).

**Federal Register** / Vol. 68, No. 247 / Wednesday, December 24, 2003 / Rules and Regulations     **74717**

transfer agents [27] (collectively, ''service providers'') through which the fund conducts its activities.[28]

a. *Service Providers.* Most of the operations of funds are carried out by service providers, which have their own compliance policies and procedures. Commenters pointed out that the proposed rule appeared to require a fund to adopt, as its own, the policies and procedures of its service providers.[29] The final rule requires fund boards to approve the policies and procedures of fund service providers, and requires the fund's policies and procedures to include provisions for the fund to oversee compliance by its service providers.

Rule 38a–1 provides fund complexes with flexibility so that each complex may apply the rule in a manner best suited to its organization.[30] A fund complex could, for example, adopt compliance policies and procedures that encompass the activities of the funds, the adviser and affiliated underwriters and transfer agents, while approving the policies and procedures of other service providers, such as subadvisers, over which it has oversight responsibility under the rule. Another fund complex could adopt policies and procedures that would cover solely activities of the funds, and could approve the policies and procedures of each of its service providers.

b. *Board Approval.* Rule 38a–1 requires a fund's board, including a majority of its independent directors, to approve the policies and procedures of the fund and each of its service

providers.[31] The approval must be based on a finding by the board that the policies and procedures are reasonably designed to prevent violation of the Federal securities laws by the fund and its service providers.[32]

Some commenters expressed concern that the rule would require directors to review lengthy compliance manuals and devote considerable time at each meeting to approving numerous amendments. Directors may satisfy their obligations under the rule by reviewing summaries of compliance programs prepared by the chief compliance officer, legal counsel or other persons familiar with the compliance programs. The summaries should familiarize directors with the salient features of the programs (including programs of service providers) and provide them with a good understanding of how the compliance programs address particularly significant compliance risks.[33]

In considering whether to approve a fund's or service provider's compliance policies and procedures, boards should consider the nature of the fund's exposure to compliance failures. In the case of a money market fund, for example, the board should consider whether the policies and procedures sufficiently address the fund's compliance with rule 2a–7.[34] Boards should also consider the adequacy of the policies and procedures in light of their recent compliance experiences, which may demonstrate weaknesses in the fund or service provider's compliance programs. We urge boards

to also consider best practices used by other fund complexes, and to consult with fund counsel (and independent directors with their counsel), compliance specialists and other experts familiar with compliance practices successfully employed by similar funds or service providers.

The Commission understands that, in some cases, the fund may employ the services of a service provider that is not an affiliated person of the fund, such as a transfer agent or administrator, and that provides similar services to a large number of funds. In such cases, it may be impractical for the fund or its compliance officer to directly review all of the service provider's policies and procedures. In such cases, we will consider a fund's policies and procedures to have satisfied the requirements of this rule if the fund uses a third-party report on the service provider's procedures instead of the procedures themselves when the board is evaluating whether to approve the service provider's compliance program.[35] The third-party report must describe the service provider's compliance program as it relates to the types of services provided to the fund, discuss the types of compliance risks material to the fund, and assess the adequacy of the service provider's compliance controls.[36]

c. *Policies and Procedures.* Funds' or their advisers' policies and procedures should address the issues we identified for investment advisers above.[37] In

[27] Section 3(a)(25) of the Securities Exchange Act of 1934 (15 U.S.C. 78c–(3)(a)(25)) defines a ''transfer agent'' as ''any person who engages on behalf of an issuer of securities or on behalf of itself as an issuer of securities in (A) countersigning such securities upon issuance; (B) monitoring the issuance of such securities with a view to preventing unauthorized issuance, a function commonly performed by a person called a registrar; (C) registering the transfer of such securities; (D) exchanging or converting such securities; or (E) transferring record ownership of securities by bookkeeping entry without physical issuance of securities certificates.''

[28] In this release, we use the term ''service provider'' to refer only to a fund's advisers, principal underwriters, administrators, and transfer agents. By limiting the term in this manner, we are not lessening a fund's obligation to consider compliance as part of its decision to employ other entities, such as pricing services, auditors, and custodians.

[29] Some commenters urged us to permit funds to simply rely on their service providers' policies and procedures. We have not adopted this suggestion because it would permit funds and their boards to absolve themselves of responsibility for compliance activities of the service providers through which funds conduct most of their activities.

[30] In this release, we use the term ''fund complex'' to mean a group of funds that share a compliance program and a common investment adviser and/or distributor.

[31] In this release, we refer to directors who are not ''interested persons'' of the fund as ''independent directors.'' Section 2(a)(19) identifies persons who are ''interested persons'' of a fund. 15 U.S.C. 80a–2(a)(19).

[32] Rule 38a–1(a)(2). In response to comments seeking clarification of the board's responsibilities, we have added language to the rule text explicitly stating the basis for approval. If the policies and procedures of a service provider are included within the policies and procedures adopted by the fund, separate approval by the board is not required. A fund that is approving policies and procedures of service providers is required to make findings only with respect to activities of the service provider that could affect the fund.

[33] Rule 38a–1 does not require fund boards to approve amendments to the policies and procedures of the fund or its service providers. Such a requirement would, as commenters pointed out, inundate fund boards with review of minor changes and detract from their ability to address significant responsibilities committed to them by the Act and our rules. Moreover, such a requirement could delay funds and their service providers from making needed changes. Instead, the rule requires the fund's chief compliance officer to discuss material changes to the compliance policies and procedures in his or her annual report to the fund board. Rule 38(a)–1(a)(4)(iii)(A). As we note below, however, serious compliance issues must be raised with the board immediately. *See infra* note 83.

[34] 17 CFR 270.2a–7.

[35] In these limited circumstances, we would also consider the fund to have satisfied the rule's requirement with regard to annual review of service providers, as discussed in section II.B.2. of this release, *supra,* and with respect to the chief compliance officer's annual report with regard to service providers, as discussed in section II.C.2. of this release, *supra,* if such reviews and reports use such third-party reports provided to the fund no less than annually. If the fund uses such reports for its approval of a service provider's compliance program or the annual review or reporting on the program, the fund must also gather and take into account other relevant information, such as its experience with the service provider.

[36] *See, e.g.,* Codification of Accounting Standards and Procedures, Statement on Auditing Standards No. 70, Reports on Processing of Transactions by Service Organizations (American Inst. of Certified Public Accountants).

[37] *See supra* text accompanying notes 17 through 22. Funds are also subject to requirements to maintain written compliance policies and procedures in certain of our rules. The new rules do not supplant these requirements. *See, e.g.,* Investment Company Act rules 2a–7(c)(7) (17 CFR 270.2a–7(c)(7)) (requiring boards of money market funds to establish written procedures ''reasonably designed * * * to stabilize the money market fund's net asset value per share'') and 17j–1(c)(1) (17 CFR 270.17j–1(c)(1)) (requiring funds to ''adopt a written code of ethics containing provisions reasonably necessary to prevent'' certain persons affiliated with the fund, its investment adviser or

Continued

**74718**    **Federal Register** / Vol. 68, No. 247 / Wednesday, December 24, 2003 / Rules and Regulations

addition, we expect policies and procedures of funds (or fund service providers) to cover certain other critical areas. In light of our recent enforcement actions against a number of fund managers and service providers,[38] we are taking this opportunity to review the application of these policies and procedures to several important areas of compliance with the Federal securities laws by funds and their service providers.

• *Pricing of portfolio securities and fund shares.* The Investment Company Act requires funds to sell and redeem their shares at prices based on their current net asset value, and to pay redemption proceeds promptly.[39] The Investment Company Act requires funds to calculate their net asset values using the market value of their portfolio securities when market quotations for those securities are "readily available," and, when a market quotation for a portfolio security is not readily available, by using the fair value of that security, as determined in good faith by the fund's board.[40] These pricing requirements are critical to ensuring fund shares are purchased and redeemed at fair prices and that shareholder interests are not diluted.

When fund shares are mispriced, short-term traders have an arbitrage opportunity they can use to exploit a fund and disadvantage the fund's long-term investors by extracting value from the fund without assuming any significant investment risk. Mispricing

may occur with respect to portfolio securities traded on a foreign market that closes before the time at which the fund prices its shares.[41] If an event affecting the value of the portfolio securities occurs *after* the foreign market closes but *before* the fund prices its shares, the foreign market closing price for the portfolio security will not reflect the correct current value of those securities when the fund prices its shares. In 1984, we stated that, in these circumstances, a fund "*must*, to the best of its ability, determine the fair value of the securities, as of the time" that the fund prices its shares.[42] We believe that funds that fail to fair value their portfolio securities under such circumstances may violate rule 22c–1 under the Investment Company Act.[43] Fund directors who countenance such practices fail to comply with their statutory valuation obligations [44] and fail to fulfill their fiduciary obligation to protect fund shareholders. Accordingly, rule 38a–1 requires funds to adopt policies and procedures that require the fund to monitor for circumstances that may necessitate the use of fair value prices; establish criteria for determining when market quotations are no longer reliable for a particular portfolio security;[45] provide a methodology or

methodologies by which the fund determines the current fair value of the portfolio security;[46] and regularly review the appropriateness and accuracy of the method used in valuing securities, and make any necessary adjustments.[47]

• *Processing of fund shares.* Our rules require forward pricing of fund shares.[48] An investor submitting a purchase order or redemption request must receive the price next calculated after receipt of the purchase order or redemption request.[49] Accordingly, rule 38a–1 requires that a fund have in place procedures that segregate investor orders received before the fund prices its shares (which will receive that day's price) from those that were received after the fund prices its shares (which will receive the following day's price).[50] Because fund purchase and redemption orders are ultimately transmitted to transfer agents engaged by the fund, we have expanded the service providers covered by the rule to include transfer agents.

Many funds today have contractual provisions with transfer agents and other intermediaries that obligate those

---

its principal underwriter from engaging in certain fraudulent, manipulative, and deceptive actions with respect to the fund); Form N–1A, Item 13(f) (17 CFR 239.15A; 274.11A) (requiring funds to disclose the policies and procedures that they use to determine how to vote proxies relating to portfolio securities); 31 CFR 103.130(c) (requiring funds to develop an anti-money laundering program, which includes the establishment and implementation of "policies, procedures, and internal controls reasonably designed to prevent the mutual fund from being used for money laundering or the financing of terrorist activities and to achieve compliance with the applicable provisions of the Bank Secrecy Act and the implementing regulations thereunder"); Regulation S–P ("Privacy of Consumer Financial Information") (17 CFR 248.30) (requiring funds to "adopt policies and procedures that address administrative, technical, and physical safeguards for the protection of customer records and information").

[38] *See supra* notes 6 and 7 and accompanying text.

[39] Section 22(e) of the Investment Company Act generally prohibits mutual funds from suspending the right of redemption and prohibits funds from postponing the payment of redemption proceeds for more than seven days. 15 U.S.C. 80a–22(e). Rule 22c–1(b) under the Act generally requires that a fund's net asset value be computed at least once daily, Monday through Friday, at a time or times specified by the fund's board of directors. 17 CFR 270.22c–1(b).

[40] Section 2(a)(41) of the Investment Company Act and rule 2a41–1 (17 CFR 270.2a41–1).

[41] Mispricing may also occur when a domestic trading market in a security closes before the time the fund prices its shares, or when market quotations for a security are not reliable because, *e.g.*, sales have been infrequent or there is a thin market in the security. *See* Accounting Series Release No. 118 (Dec. 23, 1970) (35 FR 19986 (Dec. 31, 1970)). Thus, in addition to monitoring for events that may necessitate fair value pricing, funds must pay attention to circumstances that would suggest the need for using fair value pricing.

[42] Pricing of Redeemable Securities for Distribution, Redemption, and Repurchase, Investment Company Act Release No. 14244 (Nov. 21, 1984) (49 FR 46558 (Nov. 21, 1984)), at n. 7 (emphasis added) (proposing amendments to rule 22c–1). Subsequent to the issuance of this release, our staff has reminded funds of their fair valuation obligations. In 1999 and 2001, the Division of Investment Management issued interpretive letters elaborating on funds' obligations under sections 2(a)(41) of the Investment Company Act and rule 22c–1 (17 CFR 270.22c–1) thereunder. Letter from Douglas Scheidt, Associate Director and Chief Counsel, SEC Division of Investment Management, to Craig S. Tyle, General Counsel, Investment Company Institute (Dec. 8, 1999) (*http://www.sec.gov/divisions/investment/guidance/tyle120899.htm*); letter from Douglas Scheidt, Associate Director and Chief Counsel, SEC Division of Investment Management, to Craig S. Tyle, General Counsel, Investment Company Institute (Apr. 30, 2001) (*http://www.sec.gov/divisions/investment/guidance/tyle043001.htm*).

[43] 17 CFR 270.22c–1.

[44] Section 2(a)(41) (15 U.S.C. 80a–2(a)(41)) of the Investment Company Act.

[45] In some cases, funds have adopted policies and procedures requiring the use of fair value pricing in circumstances when prices may be affected by events subsequent to the close of trading, but have established criteria that result in infrequent use of fair value pricing, which provides an opportunity

for price arbitrage. *See, e.g.*, Susan Lee, *The Dismal Science: The Feeling's Not Mutual,* Wall St. J., Nov. 24, 2003, at A15. As we have stated previously, funds must fair value their portfolio securities whenever market quotations become unreliable. *See supra* note 42. The failure of a fund to establish sufficiently sensitive criteria for using fair value pricing should be recognizable in subsequent reviews of the accuracy of the prices used to compute the net asset value of the fund.

[46] In determining fair value, some funds use correlations between the exchange prices of foreign securities and other appropriate instruments or indicators, such as relevant indices, American Depository Receipts, and futures contracts. Software developed by vendors is today available to assist funds to determine the fair value of portfolio securities.

[47] In a companion release, we are proposing to amend funds' disclosure requirements with respect to the use and the effects of fair value pricing. *See* Section II.B of Companion Disclosure Release, *supra* note 8.

[48] Rule 22c–1(a) (17 CFR 270.22c–1(a)).

[49] *Id.* We adopted the forward pricing requirement in 1968 to eliminate so-called "backward pricing" that permitted sales and purchases of fund shares at a stated price. We concluded that backward pricing resulted in dilution of the value of fund shares, and that it disrupted fund management by encouraging short-term trading in funds by speculators seeking to take advantage of fund prices that did not reflect the current value of the fund portfolio. Adoption of Rule 22c–1 under the Investment Company Act of 1940 Prescribing the Time Pricing of Redeemable Securities for Distribution, Redemption, and Repurchase, and Amendment of Rule 17a–3(a)(7) under the Securities Exchange Act of 1934 Requiring Dealers to Time-Stamp Orders, Investment Company Act Release No. 5519 (Oct. 16, 1968) (33 FR 16331 (Nov. 7, 1968)).

[50] Rule 38a–1(a)(1). In most cases, we expect these matters will be addressed by the policies and procedures of fund transfer agents. *See* Companion Late Trading Release, *supra* note 8, for a detailed discussion of how fund share transactions are processed by intermediaries.

App 18

**Federal Register**/Vol. 68, No. 247/Wednesday, December 24, 2003/Rules and Regulations    **74719**

parties to segregate orders received by time of receipt in order to prevent ''late trading'' based on a previously determined price. Reliance on those contractual provisions alone would be insufficient to meet the requirements of the new rule.[51] Funds should not only approve and periodically review the policies and procedures of transfer agents, as required by the rule, but should also take affirmative steps to protect themselves and their shareholders against late trading by obtaining assurances that those policies and procedures are effectively administered.[52]

• *Identification of Affiliated Persons.* To prevent self-dealing and overreaching by persons in a position to take advantage of the fund, the Investment Company Act prohibits funds from entering into certain transactions with affiliated persons.[53] Funds should have policies and procedures in place to identify these persons and to prevent unlawful transactions with them.

• *Protection of Nonpublic Information.* The federal securities laws

prohibit insider trading, and section 204A of the Advisers Act requires advisers (including advisers to funds) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the adviser or any of its associated persons from misusing material, nonpublic information. Fund advisers should incorporate their section 204A policies into the policies required by rule 38a–1. These policies typically include prohibitions against trading portfolio securities on the basis of information acquired by analysts or portfolio managers employed by the investment adviser. A fund's compliance policies and procedures should also address other potential misuses of nonpublic information, including the disclosure to third parties of material information about the fund's portfolio,[54] its trading strategies,[55] or pending transactions, and the purchase or sale of fund shares by advisory personnel based on material, nonpublic information about the fund's portfolio.[56]

• *Compliance with Fund Governance Requirements.* A fund's board plays an important role in overseeing fund activities to ensure that they are being conducted for the benefit of the fund and its shareholders. Fund boards, among other things, are tasked with approving the fund's advisory contracts,[57] underwriting agreements,[58] and distribution plans.[59] The Investment Company Act requires that fund boards of directors be elected by fund shareholders,[60] and that a certain percentage be ''independent directors.''[61] To rely on many of our exemptive rules, independent directors must constitute a majority of the board, must be selected and nominated by other independent directors, and if they hire legal counsel, that counsel must be an independent legal counsel.[62]

The consequences of failing to meet the Investment Company Act's governance requirements are severe.[63] Therefore, a fund's policies and procedures should be designed to guard against, among other things, an

[51] In a companion release, we are proposing amendments to rule 22c–1 under the Investment Company Act that would eliminate the need for funds and their transfer agents to rely on the segregation of orders by fund intermediaries other than a registered transfer agent or clearing agency. *See* Companion Late Trading Release, *supra* note 8.

[52] We discuss methods funds can use to oversee such policies and procedures later in this Adopting Release, in connection with the chief compliance officer's oversight of service providers. *See infra* text accompanying footnote 91.

[53] *See, e.g.*, section 17(a) (15 U.S.C. 80a–17(a)) (prohibiting first and second-tier affiliates of a fund from borrowing money or other property from, or selling or buying securities or other property to or from the fund, or any company that the fund controls); section 17(d) (15 U.S.C. 80a–17(d)) (making it unlawful for first- and second-tier affiliates of a fund, the fund's principal underwriters, and affiliated persons of the fund's principal underwriters, acting as principal, to effect any transaction in which the fund or a company controlled by the fund is a joint or a joint and several participant in contravention of Commission rules); rule 17d–1(a) (270 CFR 270.17d–1(a)) (prohibiting first- and second-tier affiliates of a fund, the fund's principal underwriter, and affiliated persons of the fund's principal underwriter, acting as principal, from participating in or effecting any transaction in connection with any joint enterprise or other joint arrangement or profit-sharing plan in which any such fund or company controlled by a fund is a participant unless an application regarding such enterprise, arrangement or plan has been filed with the Commission and has been granted); section 10(f) (15 U.S.C. 80a–10(f)) (prohibiting a fund from purchasing securities in a primary offering if certain affiliated persons of the fund are members of the underwriting or selling syndicate); section 17(e) (15 U.S.C. 80a–17(e)) (limiting the remuneration that first- and second-tier affiliates of a fund may receive in transactions involving the fund, and companies that the fund controls); and section 12(d)(3) (15 U.S.C. 80a–12(d)(3) and rule 12d3–1 (270 CFR 270.12d3–1) (together prohibiting a fund from acquiring securities issued by, among others, its own investment adviser).

[54] In a companion release, we are proposing to require funds to disclose their policies and procedures with respect to the disclosure of fund portfolio holdings. *See* Section II.C of Companion Disclosure Release, *supra* note 8.

[55] Thus, funds' and investment advisers' policies and procedures should preclude fund or advisory personnel from divulging a fund's portfolio schedule that has not been made generally available to the public. Divulging portfolio holdings to selected third parties is permissible only when the fund has legitimate business purposes for doing so and the recipients are subject to a duty of confidentiality. *See, e.g.*, Selective Disclosure and Insider Trading, Securities Act Release No. 7881 at text accompanying n. 29 (Aug. 15, 2000) (65 FR 51716 (Aug. 24, 2000)) (noting that ''issuers and their officials may properly share material nonpublic information with outsiders, for legitimate business purposes, when the outsiders are subject to duties of confidentiality''). *See also Dirks* v. *SEC,* 463 U.S. 646, 655 at n. 14 (1983) (''Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.'') (citations omitted). We understand that many funds provide portfolio information in response to requests by rating agencies and similar organizations only after receiving written assurances that the information will be kept confidential and that persons with access to the information will not use the information to trade securities.

[56] We urge funds and advisers to require persons who have access to nonpublic information to trade securities of the fund exclusively through identifiable accounts to enable the fund to monitor for excessive, short-term trading. Alternatively, although not required by section 17(j) of the Investment Company Act (15 U.S.C. 80a–17(j)) or rule 17j–1 (17 CFR 270.17j–1), funds and advisers should consider amending their codes of ethics to cover, and thus require reporting of, trades by persons who have access to nonpublic information

about the portfolio, including information about the accuracy of the prices of portfolio securities used to calculate net asset value.

[57] Sections 15(a) and (c) of the Investment Company Act (15 U.S.C. 80a–15(a) and (c)).

[58] Sections 15(b) and (c) of the Investment Company Act (15 U.S.C. 80a–15(b) and (c)).

[59] Section 12(b) of the Investment Company Act (15 U.S.C. 80a–12(b)) and rule 12b–1(b)(2) (17 CFR 270.12b–1(b)(2)).

[60] Section 16(a) of the Investment Company Act (15 U.S.C. 80a–16(a)).

[61] Section 10(a) of the Investment Company Act (15 U.S.C. 80a–10(a)) (prohibiting more than 60 percent of a fund's directors from being interested persons of the fund); section 10(b)(2) of the Investment Company Act (15 U.S.C. 80a–10(b)(2)) (requiring, in effect, that independent directors comprise a majority of a fund's board if the fund's principal underwriter is an affiliate of the fund's investment adviser); section 15(f)(1) of the Investment Company Act (15 U.S.C. 80a–15(f)(1)) (providing a safe harbor for the sale of an advisory business if directors who are not interested persons of the investment adviser constitute at least 75 percent of a fund's board for at least three years following the assignment of the advisory contract). *See also* rule 6e–3(T)(b)(15) (17 CFR 270.6e–3(T)(b)(15)) (exempting certain funds underlying insurance products from various Investment Company Act provisions provided that independent directors constitute a majority of the boards of those funds).

[62] *See* rule 10f–3 (17 CFR 270.10f–3), rule 12b–1 (17 CFR 270.12b–1), rule 15a–4 (17 CFR 270.15a–4), rule 17a–7 (17 CFR 270.17a–7), rule 17d–1(d)(7) (17 CFR 270.17d–1(d)(7)), rule 17e–1 (17 CFR 270.17e–1), rule 17g–1(j) (17 CFR 270.17g–1(j)), rule 18f–3 (17 CFR 270.18f–3), and rule 23c–3 (17 CFR 270.23c–3). *See also* rule 0–1(a)(6) (17 CFR 270.0–1(a)(6)) (defining ''independent legal counsel'').

[63] *See, e.g.*, In re Charles G. Dyer, Investment Company Act Release No. 25107 (Aug. 9, 2001) and SEC v. Centurion Growth Fund, No. 94–8199–CIV–UNGARO–BENAGES, (S.D. Fla. Apr. 22, 1994), Litigation Release No. 14063 (Apr. 28, 1994) (56 SEC Docket 1776).

improperly constituted board,[64] the failure of the board to properly consider matters entrusted to it, and the failure of the board to request and consider information required by the Investment Company Act from the fund adviser and other service providers.[65]

• *Market Timing.* In a companion release today, we are proposing amendments to our mutual fund disclosure rules to require funds to disclose their policies on "market timing," *i.e.*, the excessive short-term trading of mutual fund shares that may be harmful to the fund.[66] Many funds' prospectuses already disclose market timing policies, and failure to adhere to those disclosed policies violates the antifraud provisions of the Federal securities laws.[67] Moreover, a fund adviser that waives or disregards those policies for the benefit of itself or a third party has breached its fiduciary responsibilities to the fund.[68] Thus, under rule 38a–1 a fund must have procedures reasonably designed to

ensure compliance with its disclosed policies regarding market timing. These procedures should provide for monitoring of shareholder trades or flows of money in and out of the funds in order to detect market timing activity, and for consistent enforcement of the fund's policies regarding market timing.[69] If the fund permits any waivers of those policies, the procedures should be reasonably designed to prevent waivers that would harm the fund or its shareholders or subordinate the interests of the fund or its shareholders to those of the adviser or any other affiliated person or associated person of the adviser. In this regard, we strongly urge fund boards to require fund advisers, or other persons authorized to waive market timing policies, to report to the board at least quarterly all waivers granted, so that the board can determine whether the waivers were proper.

*B. Annual Review*

1. Investment Advisers

Rule 206(4)–7 requires each registered adviser to review its policies and procedures annually to determine their adequacy and the effectiveness of their implementation.[70] The review should consider any compliance matters that arose during the previous year, any changes in the business activities of the adviser or its affiliates, and any changes in the Advisers Act or applicable regulations that might suggest a need to revise the policies or procedures. For example, an adviser that is acquired by a broker-dealer or by the corporate parent of a broker-dealer should assess whether its policies and procedures are adequate to guard against the conflicts that arise when the adviser uses that broker-dealer to execute client transactions, or invests client assets in funds or other securities distributed or underwritten by the broker-dealer.

Although the rule requires only annual reviews, advisers should consider the need for interim reviews in response to significant compliance events, changes in business arrangements, and regulatory developments. For example, we expect all registered advisers will begin reviewing their policies and procedures in light of our adoption of these rules.

2. Investment Companies

Similarly, rule 38a–1 requires a fund to review its policies and procedures, as well as those of its service providers, annually.[71] The rule does not require a fund board to conduct the review; the board would, however, have the benefit of the review in the report submitted by the compliance officer. We expect all funds will begin reviewing their compliance policies and procedures currently, not only in light of the adoption of these rules, but also in light of the recent revelations of unlawful practices involving fund market timing, late trading, and improper disclosures and use of nonpublic portfolio information.

*C. Chief Compliance Officer*

1. Investment Advisers

Rule 206(4)–7 requires each adviser registered with the Commission to designate a chief compliance officer to administer its compliance policies and procedures.[72] An adviser's chief compliance officer should be competent and knowledgeable regarding the Advisers Act and should be empowered with full responsibility and authority to develop and enforce appropriate policies and procedures for the firm.[73] Thus, the compliance officer should have a position of sufficient seniority and authority within the organization to compel others to adhere to the compliance policies and procedures.[74]

---

[64] A board lacking a sufficient number of disinterested directors, for example, would be improperly constituted. To avoid this, fund procedures should provide for a process of determining that independent director candidates are not "interested persons" and, after their election, for a periodic reassessment that they continue not to be interested persons. *See* rule 31a–2 (17 CFR 270.31a–2(a)(4)) under the Investment Company Act (requiring the maintenance of "any record of the initial determination that a director is not an interested person of the investment company and each subsequent determination that the director is not an interested person * * * includ[ing] any questionnaire and any other document used to determine that a director is not an interested person of the company").

[65] Section 15(c) requires fund directors "to request and evaluate * * * such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company." A board that fails to acquire sufficient information about the advisory fee and other fund expenses will be unable to negotiate effectively on behalf of the fund. As a result, the fund may pay a higher than necessary advisory fee, fail to benefit from economies of scale as a result of insufficient breakpoints in the advisory fee, or bear too many operating expenses.

[66] *See* Section II.A. of the Companion Disclosure Release, *supra* note 8.

[67] Failure to adhere to statements made in the prospectus may render the prospectus disclosure materially misleading and thus violate provisions of the Federal securities laws that prohibit fraud. *See, e.g.*, section 17(a) of the Securities Act (15 U.S.C. 77q), section 10(b) of the Securities Exchange Act (15 U.S.C. 78j) and rule 10b–5 (17 CFR 240.10b–5) thereunder, and section 34(b) of the Investment Company Act (15 U.S.C. 80a–33(b)).

[68] An investment adviser has a fiduciary duty to act in the best interests of a fund it advises. Section 206 under the Advisers Act (15 U.S.C. 80b–6) and section 36(a) under the Investment Company Act (15 U.S.C. 80a–35(a)). *See also Rosenfeld* v. *Black,* 445 F.2d 1337 (2d Cir. 1971); *Brown* v. *Bullock,* 194 F. Supp. 207, 229, 234 (S.D.N.Y.), aff'd, 294 F.2d 415 (2d Cir. 1961); In re Provident Management Corp., Securities Act Release No. 5115 (Dec. 1, 1970) at text accompanying note 12.

[69] *See, e.g.*, C. Meyrick Payne, *Strengthening the Role of Mutual Fund Directors after the Canary Scandal,* Management Practice Bulletin (Oct. 2003) (*http://www.mfgovern.com/reports/2_canaryscandal.html*) (explaining that "periodic sales and redemption data" are useful for detecting practices such as late trading and market timing).

[70] Rule 206(4)–7(b).

[71] Rule 38a–1(a)(3).

[72] Rule 206(4)–7(c). We are also making a technical amendment to the item related to chief compliance officers on Form ADV, the registration form that advisers use to register with us under the Advisers Act. Form ADV, Part 1, Schedule A, Item 2(a) (17 CFR 279.1). The revision requires each registered adviser and each applicant for registration as an adviser to identify a *single* compliance officer.

[73] Having the title of chief compliance officer does not, in and of itself, carry supervisory responsibilities. Thus, a chief compliance officer appointed in accordance with rule 206(4)–7 (or rule 38a–1) would not necessarily be subject to a sanction by us for failure to supervise other advisory personnel. A compliance officer who does have supervisory responsibilities can continue to rely on the defense provided for in section 203(e)(6) of the Advisers Act (15 U.S.C. 80b–3(e)(6)). Section 203(e)(6) provides that a person shall not be deemed to have failed to reasonably supervise another person if: (i) The adviser had adopted procedures reasonably designed to prevent and detect violations of the federal securities laws; (ii) the adviser had a system in place for applying the procedures; and (iii) the supervising person had reasonably discharged his supervisory responsibilities in accordance with the procedures and had no reason to believe the supervised person was not complying with the procedures.

[74] The rule does not require advisers to hire an additional executive to serve as compliance officer, but rather to designate an individual as the adviser's chief compliance officer. Several commenters who complained of the burdens this proposed requirement would impose on them

**Federal Register** / Vol. 68, No. 247 / Wednesday, December 24, 2003 / Rules and Regulations     **74721**

2. Investment Companies

Rule 38a–1 requires each fund to appoint a chief compliance officer who is responsible for administering the fund's policies and procedures approved by the board under the rule.[75] A fund's chief compliance officer should be competent and knowledgeable regarding the Federal securities laws and should be empowered with full responsibility and authority to develop and enforce appropriate policies and procedures for the fund. The chief compliance officer of a fund, like the chief compliance officer of an investment adviser, should have sufficient seniority and authority to compel others to adhere to the compliance policies and procedures.

The rule contains several provisions, some of which were not included in our proposal, designed to promote the independence of the chief compliance officer from the management of the fund.[76] First, the chief compliance officer will serve in her position at the pleasure of the fund's board of directors, which can remove her if it loses confidence in her effectiveness. The fund board (including a majority of independent directors) must approve the designation of the chief compliance officer, and must approve her compensation (or any changes in her compensation).[77] The board (including a majority of the independent directors) can remove the chief compliance officer from her responsibilities at any time,[78]

and can prevent the adviser or another service provider from doing so.[79]

Second, the chief compliance officer will report directly to the board of directors. She must annually furnish the board with a written report on the operation of the fund's policies and procedures and those of its service providers.[80] The report must address, at a minimum: (i) The operation of the policies and procedures of the fund and each service provider since the last report, (ii) any material changes to the policies and procedures since the last report,[81] (iii) any recommendations for material changes to the policies and procedures as a result of the annual review,[82] and (iv) any material compliance matters since the date of the last report.[83] We have added a definition of the term ''material compliance matter'' to the rule, to clarify that the report should inform the board of those compliance matters about which the fund's board reasonably needs to know in order to oversee fund compliance.[84]

Third, we are requiring that the chief compliance officer meet in executive session with the independent directors at least once each year, without anyone else (such as fund management or interested directors) present.[85] The executive session creates an opportunity for the chief compliance officer and the

independent directors to speak freely about any sensitive compliance issues of concern to any of them, including any reservations about the cooperativeness or compliance practices of fund management.

Fourth, we have added a provision to protect the chief compliance officer from undue influence by fund service providers seeking to conceal their or others' non-compliance with the federal securities laws. Rule 38a–1 prohibits the fund's officers, directors, employees or its adviser, principal underwriter, or any person acting under the direction of these persons, from directly or indirectly taking any action to coerce, manipulate, mislead or fraudulently influence the fund's chief compliance officer in the performance of her responsibilities under the rule.[86]

The appointment of a chief compliance officer with overall responsibility for management of a fund complex's compliance program is a key element of the investor protections we are today adopting. Some commenters representing fund management companies urged us to permit funds to continue to use multiple compliance managers employed by different service providers, rely on the policies of the fund service providers, and omit the requirement that fund boards approve the compliance officer. These commenters would have us maintain funds' current approach to compliance management. Current practices, however, balkanize responsibility for fund compliance and isolate fund boards from compliance personnel, thus impeding boards' abilities to exercise their oversight responsibilities effectively. We decline to accept current practices, which we believe have contributed to the serious compliance lapses that are now the subject of our enforcement actions.

We have observed that executives at service providers have overruled their own compliance personnel because of business considerations. For example, some fund advisers have continued to permit investors with whom they had other business relationships to engage in harmful market timing in fund shares after compliance personnel and portfolio managers brought the market timing activity to their attention. These compliance personnel may not have had access to fund directors or, having been overruled by their own management,

---

[75] Rule 38a–1(a)(4).

[76] In the Proposing Release we requested comment on whether the chief compliance officer should be a senior manager of the fund because such a person would be in a better position to compel compliance with the fund's policies and procedures, and would less likely be intimidated in the performance of her duties. We are not adopting such a requirement because, as several commenters pointed out to us, it is very difficult to ascertain who is a ''senior manager'' in some organizations. Instead, we have described the authority we believe an individual must possess to be designated as a chief compliance officer, and have added a provision to the rule making it unlawful to exert undue influence on the chief compliance officer in the performance of her duties (*see infra* text accompanying note 86).

[77] Rule 38a–1(a)(4)(i). These requirements were not included in proposed rule 38a–1. Compensation would include any bonus. In approving a change in compensation, the board should assure itself that the chief compliance officer is not denied any customary cost of living increase or any full customary bonus and that fund managers are not otherwise retaliating against the chief compliance officer for having informed the board of a compliance failure or for having taken aggressive actions to ensure compliance with the federal securities laws by the fund or service provider.

[78] Rule 38a–1(a)(4)(ii).

[79] In a change from the proposed rule, the chief compliance officer can only be discharged from her responsibilities with the approval of the board. Rule 38a–1(a)(4)(ii).

[80] If the fund is a unit investment trust, the fund's principal underwriter or depositor must approve the chief compliance officer, must receive all annual reports, and must approve the removal of the chief compliance officer from his or her responsibilities. Rule 38a–1(b).

[81] A change would be ''material'' in this context if it is a change that a fund director would reasonably need to know in order to oversee fund compliance.

[82] *Id.* The report should also discuss the fund's particular compliance risks and any changes that were made to the policies and procedures to address newly identified risks.

[83] Rule 38a–1(a)(4)(iii). Our proposal would have required the report to include only compliance matters that resulted in remedial action; our final rule contains no such limitation because we are concerned that a fund or its service providers might abuse the limitation and fail to impose remedial actions in order to avoid having to report a compliance failure to the board.

[84] Rule 38a–1(e)(2). Serious compliance issues must, of course, always be brought to the board's attention promptly, and cannot be delayed until an annual report. In addition, individual compliance matters that, taken in isolation, may not be material may collectively suggest a material compliance matter, such as a material weakness in the compliance programs of the fund or its service providers. *See, e.g.*, Personal Investment Activities of Investment Company Personnel, Investment Company Act Release No. 23958, at n. 25 (Aug. 20, 1999) (64 FR 46821 (Aug. 27, 1999)).

[85] Rule 38a–1(a)(4)(iv). Independent counsel to the independent directors may be present.

[86] Rule 38a–1(c). This prohibition is similar to the prohibition on unduly influencing auditors found in section 303(a) of the Sarbanes-Oxley Act (Pub. L. 107–204, 116 Stat. 745 (2002)) and rule 13b2–2(b)(1) (17 CFR 240.13b2–2(b)(1)) under the Securities Exchange Act.

may have felt they were not in a position to approach the board.

To address these concerns, rule 38a–1 provides fund boards with direct access to a single person with overall compliance responsibility for the fund who answers directly to the board. The rule provides the board with a powerful tool to exercise its oversight responsibilities over fund compliance matters. The new rule also strengthens the hand of compliance personnel by establishing a direct line of reporting to fund boards that is not controlled by management.[87] We have observed that compliance failures have occurred when a fund service provider has denied information to the fund's board, or has been less than forthright, because the service provider viewed full disclosure as detrimental to its own interests. Under the new rule, the chief compliance officer will be responsible for keeping the board apprised of significant compliance events at the fund or its service providers and for advising the board of needed changes in the fund's compliance program.

We expect that a fund's chief compliance officer will often be employed by the fund's investment adviser or administrator.[88] We are not adopting a requirement that the chief compliance officer be employed by only the fund because we believe that such a provision would actually weaken her effectiveness. Funds today typically have no employees, and delegate management and administrative functions, including the compliance function, to one or more service providers. If we were to preclude the chief compliance officer from being an employee of an adviser or any other service provider, she would be divorced from all fund operations.[89] The adviser's chief compliance officer would continue to administer the adviser's compliance programs, and the role of the fund's chief compliance officer would be limited to oversight of the service

providers' compliance policies and providing advice to the board on their operation. As a result, the fund's chief compliance officer would be almost entirely dependent on information filtered through the senior management of the fund's adviser rather than, for example, information received directly from a trading desk. Moreover, fund management would be unlikely to consult with an ''outside'' compliance officer on a prospective business decision to ascertain the compliance implications.

We recognize, however, that a chief compliance officer who is an employee of the fund's investment adviser might be conflicted in her duties, and that the investment adviser's business interests might discourage the adviser from making forthright disclosure to fund directors of its compliance failures. The rule, as adopted, is designed to address these concerns by requiring a fund's chief compliance officer to report directly to the board. The board, and the board alone, can discharge the officer if she fails to live up to the position. Thus, a chief compliance officer who fails to fully inform the board of a material compliance failure, or who fails to aggressively pursue non-compliance within the service provider, would risk her position. She would also risk her career, because it would be unlikely for another board of directors to approve such a person as chief compliance officer.[90]

The chief compliance officer, in exercising her responsibilities under the rule, will oversee the fund's service providers, which will have their own compliance officials. A chief compliance officer should diligently administer this oversight responsibility by taking steps to assure herself that each service provider has implemented effective compliance policies and procedures administered by competent personnel. The chief compliance officer should be familiar with each service provider's operations and understand those aspects of their operations that expose the fund to compliance risks. She should maintain an active working relationship with each service provider's compliance personnel. Arrangements with the service provider should provide the fund's chief compliance officer with direct access to these personnel, and should provide the compliance officer with periodic reports and special reports in the event of compliance problems. In addition, the fund's contracts with its service

providers might also require service providers to certify periodically that they are in compliance with applicable federal securities laws, or could provide for third-party audits arranged by the fund to evaluate the effectiveness of the service provider's compliance controls.[91] The chief compliance officer could conduct (or hire third parties to conduct) statistical analyses of a service provider's performance of its duties to detect potential compliance failures.[92]

*D. Recordkeeping*

New rule 38a–1 (for funds) and amendments to rule 204–2 (for advisers) require firms to maintain copies of all policies and procedures that are in effect or were in effect at any time during the last five years.[93] In addition, new rule 38a–1 will require funds to maintain materials provided to the board of directors in connection with their approval of the fund's and its service providers' policies and procedures and the annual written reports by the fund's chief compliance officer.[94] New rule 38a–1 and amended

---

[87] Rules 38a–1(a)(4)(ii) (providing that the board's approval is required to remove the chief compliance officer) and 38a–1(a)(4)(iii) (requiring the chief compliance officer to provide a written compliance report to the board).

[88] Indeed, she is likely to be the chief compliance officer of that organization inasmuch as the duties of the positions will have significant overlap. Alternatively, the chief compliance officer of the fund may be another member of the adviser or administrator's legal or compliance departments.

[89] Internalizing the compliance function while retaining an externalized management function would also raise a number of practical issues, such as whether the chief compliance officer could use the adviser's office space and other resources, including support staff. In addition, it would be costly for funds, particularly small funds, to hire a chief compliance officer and pay her benefits. Those costs would be borne by investors.

[90] If such a person were approved by another fund, our staff would enhance its scrutiny of the fund accordingly.

[91] Mutual funds already rely on these types of measures in connection with their responsibility to ensure that their service providers carry out anti-money laundering compliance programs. Rules under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107–56 (USA PATRIOT Act) require funds to maintain procedures reasonably designed to prevent them from being used for money laundering or the financing of terrorist activities. *See, e.g.,* Anti-Money Laundering Programs for Mutual Funds, 67 FR 21117, 21119 (Apr. 29, 2002) (mutual fund may contractually delegate functions under 31 CFR 103.130 to a service provider, but must take steps to ensure that the service provider's compliance program is reasonably designed, and to monitor its implementation and ensure its effectiveness).

[92] In the case of an insurance company separate account, the principal service providers typically will be the sponsoring insurance company. Therefore, the chief compliance officer must oversee the insurance company's compliance program with respect to the separate accounts, including the processing of new account applications, premium payments, and exchanges.

[93] Rules 38a–1(d)(1) and 204–2(a)(17)(i). As discussed above, the required policies and procedures do not all need to be contained in a single document. *See supra* text following note 22. We understand many firms issue policies and procedures in loose-leaf form, distributing revised sections periodically within their firms. These firms may comply with the recordkeeping requirements by keeping the current policies and procedures and retaining the superseded section(s) for the requisite period of time, so long as the firm can indicate to our examining staff the version of compliance policies and procedures that were in effect as of a given date.

[94] Rule 38a–1(d)(2). In a change from proposed rule 38a–1, funds will have to maintain materials provided to the board of directors in connection with their approval of service providers' policies and procedures in addition to the annual compliance report. These records must be maintained for at least five years after the end of the fiscal year in which the documents were

App 22

rule 204–2 will require funds and advisers to keep any records documenting their annual review.[95] Our rules permit funds and advisers to maintain these records electronically.[96] These new recordkeeping requirements will assist our examination staff in determining whether the adviser or fund is adhering to the new rules and in identifying weaknesses in the compliance program if violations do occur or are uncorrected.

*E. Private Sector Initiatives*

In the Proposing Release, we requested that commenters consider four additional approaches that we might take to require the private sector to assume greater responsibility for compliance with the Federal securities laws. These possible approaches included: (i) A requirement that funds and advisers undergo third-party compliance reviews; (ii) an expansion of the role of independent public accountants to include the performance of certain compliance reviews; (iii) the formation of one or more self-regulatory organizations for advisers or funds; and (iv) the requirement that certain advisers obtain fidelity bonds from reputable insurance companies.

We appreciate the many comments we received. Although we are not moving forward with any of these approaches at this time, we continue to regard them as viable options should the measures we are taking today fail to adequately strengthen the compliance

---

provided to the board, the first two years in an easily accessible place. Funds already are required to document in the fund board's minute books the board's deliberations in connection with the approval of the compliance policies and procedures and their annual review of the chief compliance officer's report. Board minute books must be maintained pursuant to rule 31a–1(b)(4) under the Investment Company Act (17 CFR 270.31a–1(b)(4)). All reports required by our rules are meant to be made available to the Commission and the Commission staff and, thus, they are not subject to the attorney-client privilege, the work-product doctrine, or other similar protections.

[95] Rules 38a–1(d)(3) and 204–2(a)(17)(ii). In a change from proposed rule 38a–1, funds will have to maintain any records documenting their annual review for at least five years after the end of the fiscal year in which the annual review was conducted, the first two years in an easily accessible place. Advisers will have to maintain any records documenting their annual review in an easily accessible place for at least five years after the end of the fiscal year in which the review was conducted, the first two years in an appropriate office of the investment adviser. Rule 204–2(e)(1).

[96] *See* rules 31a–2(f) (17 CFR 270.31a–2(f)) and 204–2 (17 CFR 275.204–2(g)). Funds and advisers that maintain records electronically must provide those records to our staff in electronic format upon request. Rule 31a–2(f)(2)(ii)(A) under the Investment Company Act (17 CFR 270.31a–2(f)(2)(ii)(A)) and rule 204–2(g)(2)(ii)(A) under the Investment Advisers Act (17 CFR 275.204–2(g)(2)(ii)(A)).

programs of funds and advisers. In particular, we may reconsider whether to propose rules requiring funds and advisers to obtain compliance reviews from third-party compliance experts. Such compliance audits could be a useful supplement to our examination program and would assure the frequent examination of advisers and funds.

**F. Additional Request for Comment**

Rule 38a–1 includes provisions designed to promote the chief compliance officer's independence from fund management while still maintaining her effectiveness. The fund's board of directors must approve the chief compliance officer's designation and compensation, and has the sole power to remove her from her position.[97] The chief compliance officer reports directly to the board, and must meet with the independent directors in executive session at least annually.[98] The rule also protects the chief compliance officer by prohibiting persons from coercing or fraudulently influencing her in the course of her responsibilities.[99] Today, in addition to adopting rule 38a–1, we request comment on these provisions. Are there other measures (or refinements to these provisions) that would further enhance the independence and effectiveness of chief compliance officers under the rule? We also request comment whether our definition of the "material compliance matters" that must be reported to fund boards by chief compliance officers adequately addresses our concern that fund boards receive compliance information they reasonably need to know in order to oversee fund compliance.[100]

**III. Effective Date**

New rules 38a–1 and 206(4)–7 and the amendments to rule 204–2 will be effective on February 5, 2004. The

---

[97] Rule 38a–1(a)(4)(i)–(ii). *See supra* notes 76–79 and accompanying text.

[98] Rule 38a–1(a)(4)(iii)–(iv). *See supra* notes 80–85 and accompanying text.

[99] Rule 38a–1(c) prohibits the fund's officers, directors, employees, or its adviser or principal underwriter or any person acting under the direction of these persons, from directly or indirectly taking any action to coerce, manipulate, mislead, or fraudulently influence the fund's chief compliance officer in the performance of compliance responsibilities under the rule. *See supra* note 86 and accompanying text, and note 76.

[100] Rule 38a–1(e)(2) defines the term "material compliance matter" to mean those compliance matters—including violations of the federal securities laws or compliance policies and procedures by the fund or its service providers, as well as weaknesses in the design or implementation of those policies and procedures—about which the fund's board reasonably needs to know in order to oversee fund compliance. *See supra* note 84 and accompanying text.

compliance date of the new rules and rule amendments is October 5, 2004. On or before the compliance date, all funds and advisers must have designated a chief compliance officer and fund boards must have approved the chief compliance officer. In addition, on or before the compliance date, funds and advisers must adopt compliance policies and procedures that satisfy the requirements in the new rules. In the case of funds, these policies and procedures must have been approved by the board on or before the compliance date. Funds and advisers must complete their first annual review of the compliance policies and procedures no later than 18 months after the adoption or approval of the compliance policies and procedures. The chief compliance officer of a fund must submit the first annual report to the board within 60 calendar days of the completion of the annual review.

Our allowance for a nine month transition period does not reduce the immediacy of the need for all funds, including those that already have compliance policies in place, to undertake a review of their policies and procedures, in light of recent revelations of unlawful practices involving market timing, late trading, and improper disclosures of nonpublic portfolio information.

**IV. Cost-Benefit Analysis**

We are sensitive to the costs and benefits that result from our rules. The new rules require each fund and adviser to adopt and implement policies and procedures reasonably designed to prevent violations of the securities laws, to review these annually, and to designate an individual as chief compliance officer. In the Proposing Release, we identified possible costs and benefits of the rules and requested comment on our analysis.

*A. Benefits*

We expect that fund investors, advisory clients, funds, and advisers will benefit from the new rules. Commenters generally agreed that comprehensive compliance programs are beneficial. Although many funds and advisers already have such programs in place, the new rules will make this standard practice for all funds and advisers. One commenter, a compliance officer, noted that the benefits of the new measures in the form of increased investor protection would far exceed the costs.

Requiring funds and investment advisers to design and implement a comprehensive internal compliance program will serve to reduce the risk

that fund investors and advisory clients (collectively, ''investors'') will be harmed by violations of the securities laws. With limited exception, commenters agreed that comprehensive written compliance programs are the first line of defense in investor protection. Recent allegations of violations related to market timing and late trading confirm the need for strong compliance programs that do not permit compliance objectives to be subordinated to the business objectives of fund advisers or their affiliated persons.

The appointment of a chief compliance officer for each fund will also provide important investor protection benefits. Funds currently rely on multiple compliance personnel working for different service providers. Fund boards do not receive compliance information directly from these compliance officers; it is filtered through the management of the fund's investment adviser or other service providers. We believe these structures have contributed to serious compliance lapses that are now the subject of our enforcement actions. Rule 38a–1, by requiring each fund to have a compliance officer who serves at the pleasure of the fund's board and who is responsible for oversight of these service providers, and who cannot be unduly influenced will strengthen the hand of compliance personnel by giving them a direct line of reporting to the fund board that is not controlled by management.

The rules will also benefit funds and investment advisers by diminishing the likelihood of securities violations, Commission enforcement actions, and private litigation. For a fund or adviser, the potential costs associated with a securities law violation may consist of much more than merely the fines or other penalties levied by the Commission or civil liability. The reputation of a fund or adviser may be significantly tarnished, resulting in redemptions (in the case of an open-end fund) or lost clients. Advisers may be denied eligibility to advise funds.[101] In addition, advisers could be precluded from serving in other capacities.[102]

---

[101] Section 9(a) of the Investment Company Act (15 U.S.C. 80a–9(a)) prohibits a person from serving as an adviser to a fund if, within the past 10 years, the person has been convicted of certain crimes or is subject to an order, judgment, or decree of a court prohibiting the person from serving in certain capacities with a fund, or prohibiting the person from engaging in certain conduct or practice.

[102] See, e.g., 29 U.S.C. 1111(a) (prohibiting a person from acting in various capacities for an employee benefit plan, if within the past 13 years, the person has been convicted of, or has been imprisoned as a result of, any crime described in section 9(a)(1) of the Investment Company Act (15 U.S.C. 80a–9(a)(1)).

The designation of a chief compliance officer also should enhance the efficiency of funds' and advisers' operations by centralizing responsibility for the compliance function. While many commenters agreed that fund and investment adviser compliance benefits from clear allocation of compliance responsibilities, they argued that large firms would benefit little from requiring a single person to be designated. We believe that the designation of a single officer will increase the coordination with which distributed compliance functions are executed.

In addition, because the new rules complement our examination program for investment advisers and for fund complexes, they will enhance our ability to protect investors. The existence of a structured compliance program at funds and investment advisers, together with the designation of a chief compliance officer to serve as a point of contact, will facilitate the examination staff's efforts to conduct each examination in an organized and efficient manner and thus to allocate resources to maximize investor protection. Most commenters noted that the proposed rules would enhance the effectiveness of the Commission's examination program and oversight of funds and advisers.

*B. Costs*

The new rules will result in some additional costs for funds and investment advisers, which, in the case of funds, we expect would be passed on to investors. A number of commenters expressed concern about the costs that the new rules would impose.[103] One commenter, noting that existing compliance mandates place a significant burden on investment advisers, expressed concern that the costs of new compliance obligations might outweigh the benefits. However, because all funds and most investment advisers currently have some written compliance policies and procedures in place, the costs of the new rules in many instances already are reflected in the fees investors currently pay.

We would expect that funds and advisers with substantial commitments to compliance would incur only minimal costs in connection with the adoption of the new rules as they

---

[103] We believe that many of these concerns stemmed from the incorrect perception that the new rules would require the adoption and implementation of one-size-fits-all compliance programs. As discussed above, the new rules require each firm to adopt a compliance program that conforms with the scope and nature of its operations, thus eliminating concerns that the new rules will require duplicative or excessively detailed compliance programs.

reviewed their internal compliance programs for adequacy. Funds and larger advisory firms typically have adopted and implemented comprehensive, written policies and procedures. Many of these funds and advisers also have well-staffed compliance departments. Many conduct periodic reviews of their compliance programs and some hire independent compliance experts to review the adequacy of their compliance programs and the effectiveness of their implementation.

A number of commenters expressed particular concern about the relative cost of the new rules for small investment advisers.[104] This concern is consistent with our experience that investment advisers (as well as small funds) are less likely than their larger counterparts to have comprehensive, written internal compliance programs in place. Based on our examination experience, we estimate that as many as one half of SEC-registered investment advisers do not have comprehensive, written internal compliance programs in place.

However, we expect a number of factors will enable small investment advisers to control and minimize these costs. Because small firms typically engage in a limited number and range of transactions and have one or two employees, their internal compliance programs would be markedly less complex than those of their large firm counterparts.[105] In addition, we anticipate that these firms will turn to a variety of industry representatives, commentators, and organizations that have developed outlines and model programs that these firms can tailor to fit their own situations.[106] If these firms need individualized outside assistance, we expect that the number of independent compliance experts will grow to fill this demand at competitive

---

[104] The Investment Counsel Association of American (''ICAA''), for example, noted that in small firms with few employees, the responsibility for developing a compliance program, if done in-house, would likely be borne by a highly-paid employee.

[105] The ICAA estimated that, depending on an adviser's size and complexity, the adviser could purchase an off-the-shelf compliance manual for under $1,000, but would have to spend time adjusting the manual to correspond to its organizational structure. Alternatively, the ICAA also estimated that the adviser could enlist the assistance of a third-party compliance firm to draft a firm-specific manual for a small to mid-size firm for between $2,500 and $3,500. The ICAA also estimated that a law firm would charge between $10,000 and $120,000 to draft procedures (and an accounting firm would charge between $50,000 and $200,000), depending on the size and complexity of the adviser's operations.

[106] Firms will incur a cost in tailoring these programs to their specific needs.

App 24

prices, as has been the case in comparable situations. Estimates of the cost of developing compliance policies and procedures vary greatly depending on the type of help that an investment adviser seeks.[107]

The requirement that each investment adviser designate a chief compliance officer likely will impose only a minimal cost. Many investment advisers already have large compliance staffs headed by an individual who officially or effectively serves as a chief compliance officer.[108] For other investment advisers, costs associated with designating a chief compliance officer also would be minimized by the fact that the new rules would not require firms to hire an individual exclusively charged with serving in this capacity.[109] One commenter characterized the chief compliance officer requirement as unduly burdensome because it would conflict with the complex and varied organizational structures of investment advisers. As noted above, we believe that it is important for each firm to have one person who coordinates compliance efforts on behalf of the firm, even though that individual may rely heavily on others within and outside the firm for assistance. The cost to funds of appointing a chief compliance officer also should not be significant. Like many investment advisers, many fund complexes already have large compliance staffs headed by an individual who officially or effectively serves as a chief compliance officer. We expect this individual will typically be qualified to serve the fund's board of

directors as the fund's chief compliance officer.[110]

We anticipate that costs associated with the annual review requirement also will be limited. Many large funds and investment advisers with comprehensive compliance programs periodically review portions of their compliance programs. These firms may incur a cost associated with transforming their periodic reviews into a more systematic annual review, but this cost is difficult to quantify. Most of the firms without any review mechanism in place are small. For these firms, the annual review requirement likely will be less extensive and, therefore, less costly than for their larger counterparts. We have determined that requiring more frequent reviews would impose unnecessary costs on funds and advisers.

Several commenters stated that there would be a substantial cost associated with the requirement that fund boards approve the compliance policies and procedures and review the annual report prepared by the chief compliance officer. We have clarified in this release that the new rules do not require the board of directors to read every policy and procedure. The board may make its decisions about the adequacy of the compliance policies and procedures based on summary reports. Similarly, the board's review of the chief compliance officer's annual report should focus on ensuring that the compliance programs of the fund and its service providers are reasonably designed and functioning effectively. In light of these clarifications, we do not believe that funds will incur excessive costs in connection with board oversight of compliance under the new rules.

One commenter, a large fund complex, suggested that there would be substantial recordkeeping costs associated with the new rules, and suggested that firms be required to maintain for five years copies of only those policies and procedures that form the backbone of the firm's compliance program. Because records may be maintained electronically, the cost of maintaining copies of all compliance policies and procedures in place during the past five years will be contained.

## V. Consideration of Promotion of Efficiency, Competition and Capital Formation

Section 2(c) of the Investment Company Act (15 U.S.C. 80a–2(c)) and section 202(c) of the Advisers Act (15 U.S.C. 80b–2(c)) mandate that the Commission, when engaging in rulemaking that requires it to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.

As discussed above, the new rules would require funds and investment advisers to adopt and implement written policies and procedures designed to prevent violations of the Federal securities laws, and review those policies and procedures at least annually. Although we recognize that a compliance program may divert resources from funds' and advisers' primary businesses, we expect that the new rules may indirectly increase efficiency in a number of ways. These compliance programs should increase efficiency by deterring Federal securities law violations, or by facilitating the fund's or adviser's early intervention to decrease the severity of any violations that do occur. In addition, funds and advisers will be required to carry out their internal compliance functions in an organized and systematic manner, which may be more efficient than their current approach to these functions. The existence of an industry-wide compliance program requirement may enhance efficiency further by encouraging third parties to create new informational resources and guidance to which industry participants can refer in establishing and improving their compliance programs.

Since the new rules apply equally to all funds and advisers, we do not anticipate that they will introduce any competitive disadvantages. To the contrary, the new rules may encourage competition on a more level basis than exists in the current environment, in which compliance-oriented industry participants incur greater costs to maintain compliance programs than other firms. Several commenters cautioned, however, that the new rules could have anti-competitive effects on the advisory industry because they would disproportionately burden small advisers and could even force them to merge with their larger, more established counterparts or go out of business. While small advisers will incur the largest relative costs as a result

---

[107] One commenter stated that prohibitive costs may be the reason that some firms, particularly small firms, do not have compliance programs. The Financial Planning Association, however, estimated, based on discussions with a number of compliance vendors, a small adviser (with five employees) would spend $675 to purchase compliance software and customize it in-house. Alternatively, the FPA estimated that such an adviser could purchase a turn-key manual customized for the adviser for $1,500. Finally, the FPA estimated that the adviser could retain an outside consultant to develop a written compliance manual for $3,900.

[108] The ICAA noted that most of its members have employees responsible for compliance and many of these have designated a chief compliance officer.

[109] Several commenters expressed concern about the cost to small firms of hiring a chief compliance officer. The rules that we are adopting do not require funds or investment advisers to hire a separate chief compliance officer, and we expect that many small investment advisers will designate a principal or employee of the firm to serve as chief compliance officer. However, a firm that does not currently have a person qualified to serve as chief compliance officer will incur costs associated with training someone in the firm.

[110] The requirement that fund boards approve the designation and compensation of the chief compliance officer, or take action to remove a chief compliance officer, will impose minimal costs, if any, beyond the current costs incurred to prepare briefing materials for directors and convene board meetings. With rare exception, fund boards should be able to take up these issues during their existing schedule of meetings.

**74726**    **Federal Register** / Vol. 68, No. 247 / Wednesday, December 24, 2003 / Rules and Regulations

of the new rules, the rule's requirements are essential for the protection of small advisers' clients. Moreover, the existence of a strong compliance program may assist small advisers to attract client assets.

We anticipate that the new rules will indirectly foster capital formation by bolstering investor confidence. It has been our experience that funds and advisers with effective compliance programs are less likely to violate the Federal securities laws and harm to investors is less likely to result. To the extent such an environment enhances investor confidence in funds and client confidence in investment advisers, investors and clients are more likely to make assets available through these intermediaries for investment in the capital markets.

**VI. Paperwork Reduction Act**

As we discussed in the Proposing Release, the new rules and amendments would impose "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995.[111] These collections of information are mandatory. Two of the collections of information are new. The titles of these new collections are "Rule 38a–1" and "Rule 206(4)–7." The Commission submitted these new collections to the Office of Management and Budget ("OMB") for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. The other collection of information takes the form of amendments to a currently approved collection titled "Rule 204–2," under OMB control number 3235–0278. The Commission also submitted the amendments to this collection to the OMB for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number.

The collection of information under rule 38a–1 is necessary to ensure that investment companies maintain comprehensive internal programs that promote the companies' compliance with the federal securities laws. This collection of information is mandatory. The respondents are investment companies registered with us and business development companies. Our staff, conducting the Commission's examination and oversight program, will use the information collected to assess funds' compliance programs. Responses provided to the Commission in the context of its examination and

oversight program are generally kept confidential.[112] Rule 38a–1 requires that certain records be retained for at least five years.[113]

The collection of information under rule 206(4)–7 is necessary to ensure that investment advisers maintain comprehensive internal programs that promote the advisers' compliance with the Advisers Act. This collection of information is mandatory. The respondents are investment advisers registered with us. Our staff, conducting the Commission's examination and oversight program, will use the information collected to assess investment advisers' compliance programs. Responses provided to the Commission in the context of its examination and oversight program are generally kept confidential.[114]

The collection of information under rule 204–2 is necessary for the Commission staff to use in its examination and oversight program. This collection of information is mandatory. The respondents are investment advisers registered with us. Responses provided to the Commission in the context of its examination and oversight program are generally kept confidential.[115] The records that an adviser must keep in accordance with the new rules must be retained for at least five years.[116]

*A. Rule 38a–1*

We estimated in the Proposing Release that there are approximately 5,030 registered investment companies and 53 business development companies (or a total of approximately 5,083 funds) that will be subject to rule 38a–1.[117] We estimated that the average annual hour burden for a fund to document the policies and procedures that make up its compliance program as required by rule 38a–1 would be 60 hours.[118] We further estimated that each

fund would spend five hours annually, on average, documenting the conclusions of its annual compliance review for its board of directors as required by rule 38a–1.

We also estimated that each fund would spend 0.5 hours annually, on average, maintaining copies of their compliance policies and procedures and chief compliance officer's annual reports for five years as required by rule 38a–1. In adopting rule 38a–1, we have expanded this recordkeeping requirement to also include copies of briefing materials provided to a fund's board of directors in connection with their approval of the fund and its service providers' compliance programs and board review of the chief compliance officer's annual reports, and to include copies of any records documenting a fund's annual review. Since these changes only require funds to retain copies of a limited number of records they have already created (rather than requiring funds to record any new information), we continue to estimate that the average annual hour burden for each adviser is 0.5 hours.

Most commenters addressing the paperwork burden of rule 38a–1 supported them as reasonable, though one large fund management firm predicted funds would find it burdensome to maintain copies of their compliance policies and procedures for five years as required by the rule. Because of the importance of these copies to our examination and oversight program, we are adopting rule 38a–1 without removing this requirement.

Therefore, our total hour burden estimate for the collections of information under rule 38a–1 remains 332,936.5 burden hours, as we estimated in our proposal.[119]

*B. Rule 206(4)–7*

In the Proposing Release, we estimated the total annual average burden hours for advisers to document the policies and procedures that make up their compliance programs, as required by rule 206(4)–7, would be 623,200 hours, based on 7,790 investment advisers registered with us spending an annual average of 80 hours on such documentation.[120]

---

[111] 44 U.S.C. 3501 to 3520.

[112] *See* section 31(c) of the Investment Company Act (15 U.S.C. 80a–30(c)).

[113] *See* rule 38a–1(c).

[114] *See* section 210(b) of the Advisers Act (15 U.S.C. 80b–10(b)).

[115] *Id.*

[116] *See* rules 204–2(a)(17)(i) and (ii) and rule 204–2(e)(1) (17 CFR 275.204–2(e)(1)).

[117] These numbers are based on Commission filings as of January 2003.

[118] While each fund would be required to maintain written policies and procedures under rule 38a–1, this average estimate took into account that many fund complexes already have written policies and procedures documenting their compliance programs and can draw on a number of outlines and model programs available from a variety of industry representatives, commentators, and organizations to supplement these programs, if necessary. The estimate also took into account that most funds are located within a fund complex, and would be able to draw extensively from the fund complex's "master" compliance program.

[119] 5,083 funds (5,030 registered investment companies + 53 business development companies) × (60 hours for documenting compliance policies and procedures + 5 hours for documenting conclusions of annual compliance review + 0.5 hours for maintaining records) = 332,936.5 burden hours.

[120] 7,790 was the number of investment advisers registered with us on our Investment Adviser Registration Depository System as of January 14, 2003. 7,790 registered investment advisers x 80 annual average burden hours = 623,200 hours.

App 26

This 80 hour average estimate took into account that many advisers would be the primary drafters of compliance policies and procedures for funds under rule 38a–1, and would be able to draw extensively from their fund compliance programs to supplement, as necessary, compliance policies and procedures for the advisory firm. Our estimate also took into account that approximately half of the investment advisers registered with us already have drafted procedures addressing many aspects of their compliance programs, and many investment advisers in this group have drafted comprehensive procedures.

Our 80 hour estimate also took into account that a significant number of smaller registered investment advisers—who typically employ one or a few persons and have complete oversight of their business operations—have not adopted written policies and procedures, but can draw on a number of outlines and model programs, and can develop less complex programs because they often do not participate in arranging or effectuating securities transactions that they recommend to their clients. Comments from a trade association representing many smaller advisers generally supported our underlying assessment in this regard. Comments from another investment adviser trade association noted that it would likely be the owner of (or senior person at) a smaller firm who tailors a model compliance program to suit the firm's particular business, and use of this person's time would be more costly to the firm than the compliance personnel used by larger firms.

We are adopting rule 206(4)–7 without change to its paperwork collection requirements. Accordingly, our estimate of the annual aggregate burden of collection for the amended rule remains 623,200 hours.

### C. Rule 204–2

In the Proposing Release, we estimated that the amendments to rule 204–2 requiring investment advisers to maintain copies of their compliance policies and procedures and copies of any records documenting the adviser's annual review of those policies, as required by rule 206(4)–2, would increase each registered investment adviser's average annual collection burden under rule 204–2 by 0.5 hours to 211.98 hours. We further estimated the amendments would increase the rule's annual aggregate burden by 3,895 hours.[121] One commenter objected that it would be onerous for advisers to

maintain copies of records generated by the adviser's annual compliance review. Because of the importance of these copies to our examination and oversight program, we are adopting the amendments to rule 204–2 without change.[122]

### VII. Summary of Final Regulatory Flexibility Analysis

We have prepared a Final Regulatory Flexibility Analysis ("FRFA") in accordance with 5 U.S.C. 604, related to the new rules and rule amendments that we are adopting today. A summary of the Initial Regulatory Flexibility Analysis ("IRFA"), which was prepared in accordance with 5 U.S.C. 603, was published in the Proposing Release. Copies of the FRFA and the IRFA may be obtained by contacting Hester Peirce, Senior Counsel, Securities and Exchange Commission, 450 5th Street, NW., Washington, DC 20549–0506.

The FRFA summarizes the background of the new rules and rule amendments and discusses why these regulatory changes are needed to enhance compliance with the Federal securities laws by funds and advisers. These issues are addressed above. The FRFA also discusses comments received in response to the IRFA, the effect of the new rules and rule amendments on small entities, and the Commission's efforts at minimizing the effect on small entities. These issues are summarized below.

The FRFA explains that the new rules and rule amendments will govern all registered investment companies, business development companies, and advisers registered with the Commission, including small entities. For purposes of the Regulatory Flexibility Act,[123] a fund is a small entity if the fund, together with other funds in the same group of related funds, has net assets of $50 million or less as of the end of its most recent fiscal year.[124] The staff estimates, based on Commission filings, that there are approximately 186 small open- and closed-end investment companies, 18 small unit investment trusts, and 29

small business development companies.[125]

For purposes of the Regulatory Flexibility Act, an investment adviser generally is a small entity if it: (i) Has assets under management having a total value of less than $25 million; (ii) did not have total assets of $5 million or more on the last day of its most recent fiscal year; and (iii) does not control, is not controlled by, and is not under common control with another investment adviser that has assets under management of $25 million or more, or any person (other than a natural person) that had $5 million or more on the last day of its most recent fiscal year.[126] The Commission estimates that, as of October 14, 2003, there were approximately 571 small investment advisers registered with us.[127]

The FRFA discusses the comments that we received in response to issues raised in the IRFA.[128] Several commenters, including one trade association for investment advisers, cautioned that the new rules would impose significant costs on small advisers. Another trade association for advisers acknowledged that small advisers would bear a higher relative cost than their larger counterparts, but anticipated that the cost to small advisers would be offset by the fact that compliance policies and procedures would not have to cover as broad a range of activities as the policies and procedures of their larger counterparts.[129] A third commenter, however, noted that even though small firms might have less complex policies and procedures, the cost of drafting the basic policies and procedures would be the same as for larger firms and for some small firms the cost would be prohibitive.

Commenters recommended the following accommodations for small

---

[121] 7,790 registered investment advisers x 0.5 hours = 3,895 hours.

[122] Accordingly, our estimate in the Proposing Release of the annual aggregate burden of collection for the amended rule remains 1,651,324.2 hours. This estimate was based on the OMB's approved burden of 1,625,638.5 hours before the amendments (shared by 7,687 investment advisers at an annual average of 211.48 hours per adviser), plus an increase of 21,790.7 hours attributable to an increase in the number of investment advisers registered with us to 7,790 as of January 2003, (each incurring an average annual burden of 211.48 hours) and an increase of 3,895 additional burden hours associated with the amendments to rule 204–2 (7,790 registered investment advisers × 0.5 hours).

[123] 5 U.S.C. 601–612.

[124] 17 CFR 270.0–10.

[125] The number of small entities, which is current as of June 2003, is derived from analyzing information from Form N–SAR and various databases including Lipper. Some or all of these entities may contain multiple series or portfolios. If a registered investment company is a small entity, the portfolios or series it contains are also small entities.

[126] 17 CFR 275.0–7(a).

[127] The number of small investment advisers is derived from the Commission's Investment Adviser Registration Depository.

[128] The comment letters and a summary of comments prepared by our staff are available for public inspection and copying in the Commission's Public Reference Room, 450 5th Street, NW., Washington, DC (File No. S7–03–03). The comment summary is also available on the Commission's Internet Web site (*http://www.sec.gov/rules/extra/ s70303summary.pdf*).

[129] The Financial Planning Association estimated that it would cost a small firm with five employees between $675 and $3,900 to develop a compliance program.

entities: (i) Exempt small firms from the requirement to designate a chief compliance officer, (ii) exempt small advisers from all of the new requirements, (iii) identify procedures that are relevant to small firms, (iv) identify issues that do not apply to small advisers or advisers that do not manage assets and therefore would not have to be addressed in their compliance policies and procedures, (v) create a template that firms could adapt to fit their unique characteristics, or (vi) permit small advisers to maintain records outside their office space in an easily accessible location.

The FRFA explains that the rules do not introduce new reporting requirements, but do introduce new compliance requirements, including new recordkeeping obligations. The FRFA sets forth the requirements of the rule (which are described above in detail) and explains that all funds and advisers, regardless of size, are subject to the compliance requirements. The FRFA also explains that while most firms already have instituted a compliance program and have designated someone charged with implementing it, small advisers are disproportionately represented among the firms that have not taken such steps. The FRFA notes that these firms will bear costs in developing and implementing policies and procedures.[130] The FRFA explains that the new rules and rule amendments are designed to achieve their objectives without imposing undue costs on affected firms.

The FRFA discusses the alternatives considered by the Commission in adopting the new rules and rule amendments that might minimize adverse effects on small advisers, including: (i) The establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (ii) the clarification, consolidation, or simplification of compliance and reporting requirements under the rules for small entities; (iii) the use of performance rather than design standards; and (iv) an exemption from coverage of the rules, or any part thereof, for small entities.

We do not presently believe that the establishment of special compliance requirements or timetables for small

entities is feasible or necessary.[131] Modifying these requirements for small funds or advisers would place their clients at unnecessary risk. The requirement that each fund or adviser implement written policies and procedures reasonably designed to prevent violation of the Federal securities laws, is essential to promote systematic and organized reviews by funds and advisers of their operations and activities. The requirement that funds obtain board approval of their programs and annually report about the programs to their boards is necessary to preserve the crucial oversight role of fund boards of directors.[132] Annual reviews are integral to detecting and correcting any gaps in the program before irrevocable or widespread harm is inflicted upon investors. The required designation of a chief compliance officer is necessary to achieve centralized supervisory authority over all aspects of the compliance program and to reduce the likelihood of gaps in the compliance program. The requirement that funds and advisers keep file copies of their written policies, procedures, reports, and other records for five years, imposes an inconsequential burden on small funds and advisers. The establishment of a special compliance timetable to allow a transition period of more than six months would delay the rules' investor protection benefits without assisting small funds and advisers.

The Commission does not presently believe that clarification, consolidation, or simplification of compliance requirements for small entities is feasible or necessary. The compliance requirements, which are integral to the effectiveness of the rules, are not technical or complex in any sense. The FRFA explains that some commenters requested more specific guidance about the type of compliance policies and procedures that would be required. In the Proposing Release and in this release, we have provided illustration and guidance to firms about the topics that should be addressed by their compliance policies and procedures. Because of the great variety across firms, any template that we could provide would be voluminous and would require extensive tailoring to the unique characteristics of each firm. Thus, it does not appear that Commission templates would effectuate significant burden reduction.

The FRFA explains that the new rules, to the greatest extent possible, embody performance rather than design standards. The rules do not enumerate specific required elements of the policies and procedures, but will allow all firms, including small firms, to tailor their internal compliance programs to the nature and scope of their own business. The FRFA explains that the rules do not set forth a list of attributes that the chief compliance officer must possess and permit firms to designate an existing employee with other responsibilities to fill that role, which the staff anticipates that most small firms will do.

The FRFA explains that we do not believe that the objectives of the rules could be achieved if small entities were exempted from coverage of any part of the proposals. It has been our experience that strong internal compliance programs are essential to investor protection in funds and advisers of all sizes.

**VIII. Statutory Authority**

We are adopting new rule 38a–1 under the Investment Company Act pursuant to the authority set forth in sections 31(a) and 38(a) of the Act (15 U.S.C. 80–30(a) and 80a–37(a)).[133] We are adopting new rule 206(4)–7 pursuant to the authority set forth in sections 206(4) and 211(a) under the Advisers Act (15 U.S.C. 80b–6(4) and 80b–11(a)).[134] We are adopting

---

[130] The staff estimates that approximately half of these firms will develop these policies internally, while the remaining firms will seek outside assistance from compliance consultants, the number of which is expected to rise after the new rules are adopted.

[131] As stated above, the rules impose no reporting requirements.

[132] In the case of investment advisers, for which such governance issues are not present, we have not included comparable requirements.

[133] Section 38(a) authorizes the Commission to ''make * * * such rules and regulations * * * as are necessary or appropriate to the exercise of the functions and powers conferred upon the Commission elsewhere in (the Investment Company Act).'' We are adopting rule 38a–1 as necessary and appropriate to the exercise of the authority specifically conferred on us elsewhere in the Act, including sections 9(b) (authority to prohibit certain persons from serving in certain capacities with respect to investment companies), 31(b) (authority to examine funds), 36(a) (authority to bring actions for the breach of fiduciary duty); and 42 (authority to enforce the provisions of the Investment Company Act) of the Investment Company Act (15 U.S.C. 80a–9(b), 80a–30(b), and 80a–41). Further, requiring the maintenance of internal compliance policies and procedures and an annual compliance report falls under the authority granted to us under section 31(a), which authorizes us to require funds to maintain and preserve records, including memoranda, books, and other documents.

[134] Section 206(4) permits the Commission to define and prescribe rules to prevent conduct that is unlawful under section 206. Rule 206(4)–7 defines an activity that is unlawful under section 206. Further, section 211(a) of the Advisers Act authorizes the Commission to ''make * * * such rules and regulations * * * as are necessary or appropriate to the exercise of the functions and powers conferred upon the Commission elsewhere in (the Act).'' We are adopting rule 206(4)–7 as necessary and appropriate to the exercise of the authority specifically conferred on us elsewhere in the Act, including sections 203(e) (authority to censure, place limitations on, suspend, or revoke the registration of certain investment advisers), 204

App 28

amendments to rule 204–2 pursuant to the authority set forth in sections 204 and 211 of the Advisers Act (15 U.S.C. 80b–4 and 80b–11).

We are amending rule 279.1, Form ADV, under section 19(a) of the Securities Act of 1933 (15 U.S.C. 77s(a)), sections 23(a) and 28(e)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78w(a) and 78bb(e)(2)), section 319(a) of the Trust Indenture Act of 1939 (15 U.S.C. 77sss(a)), section 38(a) of the Investment Company Act of 1940 (15 U.S.C. 78a–37(a)), and sections 203(c)(1), 204, and 211(a) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–3(c)(1), 80b–4, and 80b–11(a)).

**List of Subjects**

*17 CFR Part 270*

Investment companies, Reporting and recordkeeping requirements, Securities.

*17 CFR Parts 275 and 279*

Reporting and recordkeeping requirements, Securities.

**Text of Rules**

■ For reasons set forth in the preamble, title 17, chapter II of the Code of Federal Regulations is amended as follows:

**PART 270—RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940**

■ 1. The authority citation for part 270 continues to read in part as follows:

**Authority:** 15 U.S.C. 80a–1 *et seq.*, 80a–34(d), 80a–37, and 80a–39, unless otherwise noted.

\*    \*    \*    \*    \*

■ 2. Section 270.38a–1 is added to read as follows:

**§ 270.38a–1  Compliance procedures and practices of certain investment companies.**

(a) Each registered investment company and business development company (''fund'') must:

(1) *Policies and procedures.* Adopt and implement written policies and procedures reasonably designed to prevent violation of the Federal Securities Laws by the fund, including policies and procedures that provide for the oversight of compliance by each investment adviser, principal underwriter, administrator, and transfer agent of the fund;

(2) *Board approval.* Obtain the approval of the fund's board of directors, including a majority of

directors who are not interested persons of the fund, of the fund's policies and procedures and those of each investment adviser, principal underwriter, administrator, and transfer agent of the fund, which approval must be based on a finding by the board that the policies and procedures are reasonably designed to prevent violation of the Federal Securities Laws by the fund, and by each investment adviser, principal underwriter, administrator, and transfer agent of the fund;

(3) *Annual review.* Review, no less frequently than annually, the adequacy of the policies and procedures of the fund and of each investment adviser, principal underwriter, administrator, and transfer agent and the effectiveness of their implementation;

(4) *Chief compliance officer.* Designate one individual responsible for administering the fund's policies and procedures adopted under paragraph (a)(1) of this section:

(i) Whose designation and compensation must be approved by the fund's board of directors, including a majority of the directors who are not interested persons of the fund;

(ii) Who may be removed from his or her responsibilities by action of (and only with the approval of) the fund's board of directors, including a majority of the directors who are not interested persons of the fund;

(iii) Who must, no less frequently than annually, provide a written report to the board that, at a minimum, addresses:

(A) The operation of the policies and procedures of the fund and each investment adviser, principal underwriter, administrator, and transfer agent of the fund, any material changes made to those policies and procedures since the date of the last report, and any material changes to the policies and procedures recommended as a result of the annual review conducted pursuant to paragraph (a)(3) of this section; and

(B) Each Material Compliance Matter that occurred since the date of the last report; and

(iv) Who must, no less frequently than annually, meet separately with the fund's independent directors.

(b) *Unit investment trusts.* If the fund is a unit investment trust, the fund's principal underwriter or depositor must approve the fund's policies and procedures and chief compliance officer, must receive all annual reports, and must approve the removal of the chief compliance officer from his or her responsibilities.

(c) *Undue influence prohibited.* No officer, director, or employee of the fund, its investment adviser, or

principal underwriter, or any person acting under such person's direction may directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence the fund's chief compliance officer in the performance of his or her duties under this section.

(d) *Recordkeeping.* The fund must maintain:

(1) A copy of the policies and procedures adopted by the fund under paragraph (a)(1) that are in effect, or at any time within the past five years were in effect, in an easily accessible place; and

(2) Copies of materials provided to the board of directors in connection with their approval under paragraph (a)(2) of this section, and written reports provided to the board of directors pursuant to paragraph (a)(4)(iii) of this section (or, if the fund is a unit investment trust, to the fund's principal underwriter or depositor, pursuant to paragraph (b) of this section) for at least five years after the end of the fiscal year in which the documents were provided, the first two years in an easily accessible place; and

(3) Any records documenting the fund's annual review pursuant to paragraph (a)(3) of this section for at least five years after the end of the fiscal year in which the annual review was conducted, the first two years in an easily accessible place.

(e) *Definitions.* For purposes of this section:

(1) *Federal Securities Laws* means the Securities Act of 1933 (15 U.S.C. 77a–aa), the Securities Exchange Act of 1934 (15 U.S.C. 78a–mm), the Sarbanes-Oxley Act of 2002 (Pub. L. 107–204, 116 Stat. 745 (2002)), the Investment Company Act of 1940 (15 U.S.C. 80a), the Investment Advisers Act of 1940 (15 U.S.C. 80b), Title V of the Gramm-Leach-Bliley Act (Pub. L. No. 106–102, 113 Stat. 1338 (1999)), any rules adopted by the Commission under any of these statutes, the Bank Secrecy Act (31 U.S.C. 5311–5314; 5316–5332) as it applies to funds, and any rules adopted thereunder by the Commission or the Department of the Treasury.

(2) A *Material Compliance Matter* means any compliance matter about which the fund's board of directors would reasonably need to know to oversee fund compliance, and that involves, without limitation:

(i) A violation of the Federal securities laws by the fund, its investment adviser, principal underwriter, administrator or transfer agent (or officers, directors, employees or agents thereof),

(ii) A violation of the policies and procedures of the fund, its investment

_____

(authority to examine advisers), and 209 (authority to enforce the provisions of the Advisers Act) of the Advisers Act (15 U.S.C. 80b–3(e), 80b–4, and 80b–9).

adviser, principal underwriter, administrator or transfer agent, or

(iii) A weakness in the design or implementation of the policies and procedures of the fund, its investment adviser, principal underwriter, administrator or transfer agent.

## PART 275—RULES AND REGULATIONS, INVESTMENT ADVISERS ACT OF 1940

■ 3. The authority citation for part 275 continues to read in part as follows:

**Authority:** 15 U.S.C. 80b–2(a)(11)(F), 80b–2(a)(17), 80b–3, 80b–4, 80b–6(4), 80b–6a, 80b–11, unless otherwise noted.

\*     \*     \*     \*     \*

■ 4. Section 275.204–2 is amended by adding new paragraph (a)(17) and by revising paragraph (e)(1). The additions and revisions read as follows:

### § 275.204–2   Books and records to be maintained by investment advisers.

(a) \* \* \*

(17)(i) A copy of the investment adviser's policies and procedures formulated pursuant to § 275.206(4)–7(a) of this chapter that are in effect, or at any time within the past five years were in effect, and

(ii) Any records documenting the investment adviser's annual review of those policies and procedures conducted pursuant to § 275.206(4)–7(b) of this chapter.

\*     \*     \*     \*     \*

(e)(1) All books and records required to be made under the provisions of paragraphs (a) to (c)(1)(i), inclusive, and (c)(2) of this section (except for books and records required to be made under the provisions of paragraphs (a)(11), (a)(16), and (a)(17)(i) of this section), shall be maintained and preserved in an easily accessible place for a period of not less than five years from the end of the fiscal year during which the last entry was made on such record, the first two years in an appropriate office of the investment adviser.

\*     \*     \*     \*     \*

■ 5. Section 275.206(4)–7 is added to read as follows:

### § 275.206(4)–7   Compliance procedures and practices.

If you are an investment adviser registered or required to be registered under section 203 of the Investment Advisers Act of 1940 (15 U.S.C. 80b–3), it shall be unlawful within the meaning of section 206 of the Act (15 U.S.C. 80b–6) for you to provide investment advice to clients unless you:

(a) *Policies and procedures.* Adopt and implement written policies and procedures reasonably designed to prevent violation, by you and your supervised persons, of the Act and the rules that the Commission has adopted under the Act;

(b) *Annual review.* Review, no less frequently than annually, the adequacy of the policies and procedures established pursuant to this section and the effectiveness of their implementation; and

(c) *Chief compliance officer.* Designate an individual (who is a supervised person) responsible for administering the policies and procedures that you adopt under paragraph (a) of this section.

## PART 279—FORMS PRESCRIBED UNDER THE INVESTMENT ADVISERS ACT OF 1940

■ 6. The authority citation for part 279 continues to read as follows:

**Authority:** The Investment Advisers Act of 1940, 15 U.S.C. 80b–1, *et seq.*

■ 7. Form ADV (referenced in 279.1) is amended by:

In Part 1, Schedule A, revising Item 2(a), to read ''each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer (Chief Compliance Officer is required and cannot be more than one individual), director and any other individuals with similar status or functions;''

Dated: December 17, 2003.

By the Commission.

**Margaret H. McFarland,**
*Deputy Secretary.*

[FR Doc. 03–31544 Filed 12–23–03; 8:45 am]

**BILLING CODE 8010–01–P**

**41696**    **Federal Register**/Vol. 69, No. 131/Friday, July 9, 2004/Rules and Regulations

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Parts 270, 275, and 279**

**[Release Nos. IA–2256, IC–26492; File No. S7–04–04]**

**RIN 3235–AJ08**

**Investment Adviser Codes of Ethics**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** The Securities and Exchange Commission is adopting a new rule and related rule amendments under the Investment Advisers Act of 1940 that require registered advisers to adopt codes of ethics. The codes of ethics must set forth standards of conduct expected of advisory personnel and address conflicts that arise from personal trading by advisory personnel. Among other things, the rule requires advisers' supervised persons to report their personal securities transactions, including transactions in any mutual fund managed by the adviser. The Commission is also adopting amendments to rule 17j–1 to conform certain provisions to the new rule. The rule and rule amendments are designed to promote compliance with fiduciary standards by advisers and their personnel.

**DATES:** *Effective Date:* August 31, 2004. *Compliance Date:* January 7, 2005.

**FOR FURTHER INFORMATION CONTACT:** Robert L. Tuleya, Attorney-Adviser, or Jennifer Sawin, Assistant Director, at (202) 942–0719, Office of Investment Adviser Regulation, Division of Investment Management, Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0506.

**SUPPLEMENTARY INFORMATION:** The Securities and Exchange Commission (''Commission'' or ''SEC'') is adopting (i) rule 204A–1 [17 CFR 275.204A–1] under the Investment Advisers Act of 1940 [15 U.S.C. 80b] (''Advisers Act'' or ''Act''); (ii) amendments to rule 204–2 [17 CFR 275.204–2] and Form ADV [17 CFR 279.1] under the Advisers Act; and (iii) amendments to rule 17j–1 [17 CFR 270.17j–1] under the Investment Company Act of 1940 [15 U.S.C. 80a] (''Company Act'').[1]

---

[1] Unless otherwise noted, when we refer to rule 17j–1 or any paragraph of the rule, we are referring to 17 CFR 270.17j–1 of the Code of Federal Regulations in which the rule is published, and when we refer to rule 204–2 or any paragraph of the rule, we are referring to 17 CFR 275.204–2 of the Code of Federal Regulations in which the rule is published.

### Executive Summary

I. Background
II. Discussion
  A. Standards of Conduct and Compliance with Laws
  B. Protection of Material Nonpublic Information
  C. Personal Securities Trading
  1. Personal Trading Procedures
  2. ''Access Persons'' Subject to the Reporting Requirements
  3. Initial and Annual Holdings Reports
  4. Quarterly Transaction Reports
  5. Exceptions From Reporting Requirements
  6. Reportable Securities
  D. Initial Public Offerings and Private Placements
  E. Reporting Violations
  F. Educating Employees About the Code of Ethics
  G. Adviser Review and Enforcement
  H. Recordkeeping
  I. Amendment to Form ADV
  J. Amendments to Rule 17j–1
III. Effective Date
IV. Cost-Benefit Analysis
V. Effects on Competition, Efficiency and Capital Formation
VI. Paperwork Reduction Act
VII. Final Regulatory Flexibility Analysis
VIII. Statutory Authority
Text of Rules and Form Amendments

### Executive Summary

The Commission is adopting new rule 204A–1 under the Advisers Act to require registered investment advisers to adopt codes of ethics. The rule requires an adviser's code of ethics to set forth standards of conduct and require compliance with Federal securities laws. Codes of ethics must also address personal trading: they must require advisers' personnel to report their personal securities holdings and transactions, including those in affiliated mutual funds, and must require personnel to obtain pre-approval of certain investments. The Commission is amending the Advisers Act recordkeeping rule to require advisers to keep copies of their codes of ethics and records relating to the code. The Commission is also amending the client disclosure requirements under part II of Form ADV to require advisers to describe their codes of ethics to clients.

### I. Background

In January of this year, we proposed to require every adviser registered with us to adopt and enforce a written code of ethics applicable to its supervised persons.[2] Our proposal was designed to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel.

---

[2] *Investment Adviser Codes of Ethics,* Investment Advisers Act Release No. 2209 (Jan. 20, 2004) [69 FR 4040 (Jan. 27, 2004)].

The proposal was part of a package of regulatory initiatives with which we have responded to a number of recent enforcement actions against advisers or their personnel alleging violations of their fiduciary obligations to clients, including mutual fund clients.[3]

Advisers' codes would be required to contain provisions reminding employees of their obligations to clients as well as provisions requiring reporting of personal securities transactions and holdings. In order to ensure that advisers' employees are made aware of their firms' standards, advisers would have to obtain (and keep) a written acknowledgement from each supervised person confirming that he or she received a copy of the code of ethics and any amendments. While the code of

---

[3] *See, e.g., In the Matter of Strong Capital Management, Inc.,* Investment Advisers Act Release No. 2239 (May 20, 2004) (''Strong'') (adviser disclosed material nonpublic information about fund portfolio holdings to hedge fund, and permitted own chairman and hedge fund to engage in undisclosed market timing of funds managed by adviser); *In the Matter of Massachusetts Financial Services Co.,* Investment Advisers Act Release No. 2213 (Feb. 5, 2004) (2 senior executives of adviser permitted undisclosed market timing in certain funds in the complex managed by the adviser); *In the Matter of Alliance Capital Management, L.P.,* Investment Advisers Act Release No. 2205 (Dec. 18, 2003) (''Alliance'') (disclosure of material nonpublic information about certain mutual fund portfolio holdings permitted favored client to profit from market timing); *In the Matter of Robert T. Littell and Wilfred Meckel,* Investment Advisers Act Release No. 2203 (Dec. 15, 2003) (portfolio manager of hedge fund made misrepresentations to investors and potential investors concerning performance, management oversight, and risk management practices); *In the Matter of Zion Capital Management LLC and Ricky A. Lang,* Investment Advisers Act Release No. 2200 (Dec. 11, 2003) (''Zion'') (adviser favored an advisory account in which he had an interest, allocating profitable trades to this account while allocating numerous unprofitable trades to another client); *In the Matter of George F. Fahey,* Investment Advisers Act Release No. 2196 (Nov. 24, 2003) (president of investment adviser made misrepresentations to clients as to risk of investment strategy and value of investments); *In the Matter of Putnam Investment Management LLC,* Investment Advisers Act Release No. 2192 (Nov. 13, 2003) (''Putnam'') (adviser failed to reasonably supervise employees who market timed funds managed by the adviser and failed to disclose their timing activities); *In the Matter of Wendell D. Belden,* Investment Advisers Act Release No. 2191 (Nov. 6, 2003) (associate of adviser defrauded clients by misleading them about their investment options and the security of their invested principal and by investing their money in a manner calculated to enrich himself at their expense); *In the Matter of James Patrick Connelly, Jr.,* Investment Advisers Act Release No. 2183 (Oct. 16, 2003) (adviser's vice chairman permitted more than a dozen clients to market time certain funds in the complex managed by the adviser in exchange for stable investments in other funds in the complex); *In the Matter of Marshall E. Melton and Asset Management & Research, Inc.,* Investment Advisers Act Release No. 2151 (Jul. 25, 2003) (investment adviser made material misrepresentations to its clients to induce them to invest their funds in limited liability companies controlled by adviser's principal).

App 31

ethics would have to contain certain minimum provisions, our proposal left advisers with substantial flexibility to design individualized codes that would best fit the structure, size and nature of their advisory businesses.

We received 44 comment letters in response to our proposal. Most commenters supported requiring advisers to have written codes of ethics, and supported the flexibility that our proposal offered. Today, we are adopting new rule 204A–1 with certain changes that respond to commenters' recommendations.

## II. Discussion

### A. Standards of Conduct and Compliance With Laws

Rule 204A–1 requires each adviser's code of ethics to set forth a standard of business conduct that the adviser requires of all its supervised persons.[4] The rule does not require the adviser to adopt a particular standard, but the standard chosen must reflect the adviser's fiduciary obligations and those of its supervised persons, and must require compliance with the federal securities laws.[5]

This provision, which we are adopting as proposed, establishes only a minimum requirement. Advisers are free to set higher standards for their employees, such as those established by professional or trade groups.[6] Of course, any other code adopted for use must meet the minimum requirements of the rule, or be supplemented to meet the minimum requirements.[7]

We urge advisers to take great care and thought in preparing their codes of ethics, which should be more than a compliance manual. Rather, a code of ethics should set out ideals for ethical conduct premised on fundamental principals of openness, integrity, honesty and trust. A good code of ethics should effectively convey to employees the value the advisory firm places on ethical conduct, and should challenge employees to live up not only to the

letter of the law, but also to the ideals of the organization.[8]

### B. Protection of Material Nonpublic Information

We proposed to require codes of ethics to prevent access to material nonpublic information about the adviser's securities recommendations, and client securities holdings and transactions by individuals who do not need the information to perform their duties.[9] Commenters supported our objective of controlling access to information as a first line of defense against misuse, but noted that it may be impractical to segregate employees, particularly in smaller firms that have limited office space. We are not requiring this provision in the code of ethics, but remind advisers that they must maintain and enforce policies and procedures to prevent the misuse of material nonpublic information,[10] which we believe includes misuse of material nonpublic information about the adviser's securities recommendations, and client securities holdings and transactions.[11] Advisers' duty of care also requires that they safeguard this sensitive information.[12] Advisers should carefully consider how

to control dissemination of sensitive information both within their organizations and outside them.

### C. Personal Securities Trading

Each adviser's code of ethics must require an adviser's "access persons" to periodically report their personal securities transactions and holdings to the adviser's chief compliance officer or other designated persons.[13] The code of ethics must also require the adviser to review those reports.[14] Reviewing these reports will allow advisers as well as the Commission's examination staff to identify improper trades or patterns of trading by access persons. The reports are modeled largely on those required by rule 17j–1 under the Company Act.[15]

### 1. Personal Trading Procedures

As discussed in more detail below, while rule 204A–1 requires advisers' codes of ethics to contain provisions requiring access persons to report securities transactions and holdings, it does not require advisers to adopt many of the detailed prophylactic measures common to many codes.[16] Commenters agreed with this approach, which we took to accommodate the vast differences among advisory firms registered with us and the variety of risks associated with employee securities transactions. Advisory firms that have already adopted codes of ethics, however, commonly include many of the following elements, or address the following issues, which we believe that all advisers should consider in crafting their own procedures for

---

[4] Rule 204A–1(a)(1).

[5] Rule 204A–1(a)(1) and (2).

[6] Many professional and trade organizations, such as the Financial Planning Association, the Association for Investment Management and Research, the Certified Financial Planner Board of Standards, the Investment Counsel Association of America, and the American Institute of Certified Public Accountants, have developed professional codes of ethics or model codes for their members' use.

[7] While advisers are also free to structure their codes as best fits their organizations, an adviser using multi-document codes should ensure that all parts are integrated and understandable, so it is clear to supervised persons that these documents constitute the firm's code of ethics.

[8] *See* joint comment letter from the Ethics Resource Center and Thelen Reid & Priest LLP (Apr. 6, 2004) (available from the Commission's public reference room in File No. S7–04–04).

[9] Proposed rule 204A–1(a)(3).

[10] Section 204A [15 U.S.C. 80b–4a]. Advisers' required procedures under section 204A usually also contain a summary of insider trading law and procedures for determining whether information has become public. These may be distinct from the adviser's section 204A procedures to guard against misuse of material nonpublic information about client recommendations, trading, and holdings. Many advisers may choose to integrate their section 204A procedures into their codes, but they are not required to do so.

[11] *See, e.g., Strong, supra* note (adviser that released nonpublic information about fund portfolio holdings to select market timers violated section 204A); *Alliance, supra* note (adviser that released, to select market timers, material nonpublic information concerning portfolio holdings of fund managed by the adviser violated section 204A); *Putnam, supra* note (adviser whose portfolio manager traded on nonpublic information regarding portfolio holdings and transactions of fund managed by the adviser violated section 204A).

[12] As we noted in our proposing release, the obligation to safeguard sensitive client information would not preclude the adviser from providing necessary information to, for example, persons providing services to the adviser or the account such as brokers, accountants, custodians, and fund transfer agents, or in other circumstances when the client consents. In addition, if the adviser has supervised persons who are also associated persons of a broker-dealer, self-regulatory organization rules may require the broker-dealer to have certain information about the adviser's client accounts. Two commenters noted that, under certain circumstances, NASD rule 3040 requires the broker-dealer to supervise its registered representatives' activities for advisory accounts.

[13] Rule 204A–1(a)(3). We are not suggesting that the chief compliance officer must personally review all reports. In addition, we expect most advisers will designate another individual to review personal securities reports submitted by the chief compliance officer.

[14] Rule 204A–1(a)(3).

[15] Rule 17j–1 requires that fund advisers adopt written codes of ethics and have procedures in place to prevent their personnel from abusing their access to information about the fund's securities trading, and requires "access persons" to submit reports periodically containing information about their personal securities holdings and transactions. Rule 17j–1(c)(1) and (d) under the Investment Company Act. Most funds, and therefore most fund advisers, must have codes of ethics under rule 17j–1. Money market funds and funds that invest only in certain non-covered securities, however, are not required to adopt codes of ethics under rule 17j–1. Rule 17j–1(c)(1)(i). As of May 1, 2004, approximately 1500 advisers, or 18 percent of the firms registered with us, reported that they manage fund portfolios.

[16] For example, pre-clearance of personal securities transactions, *see infra* note and accompanying text, is mandated to some degree in most advisory firms that have adopted a code of ethics.

**41698**    **Federal Register** / Vol. 69, No. 131 / Friday, July 9, 2004 / Rules and Regulations

employees' personal securities trading.[17]

• Prior written approval before access persons can place a personal securities transaction ("pre-clearance").[18]

• Maintenance of lists of issuers of securities that the advisory firm is analyzing or recommending for client transactions, and prohibitions on personal trading in securities of those issuers.

• Maintenance of "restricted lists" of issuers about which the advisory firm has inside information, and prohibitions on any trading (personal or for clients) in securities of those issuers.

• "Blackout periods" when client securities trades are being placed or recommendations are being made and access persons are not permitted to place personal securities transactions.[19]

• Reminders that investment opportunities must be offered first to clients before the adviser or its employees may act on them, and procedures to implement this principle.[20]

• Prohibitions or restrictions on "short-swing" trading and market timing.[21]

• Requirements to trade only through certain brokers, or limitations on the number of brokerage accounts permitted.

• Requirements to provide the adviser with duplicate trade confirmations and account statements.

• Procedures for assigning new securities analyses to employees whose personal holdings do not present apparent conflicts of interest.[22]

2. "Access Persons" Subject to the Reporting Requirements

Under rule 204A–1, the adviser's code must require certain supervised persons, called "access persons," to report their personal securities transactions and holdings.[23] An access person is a supervised person who has access to nonpublic information regarding clients' purchase or sale of securities, is involved in making securities recommendations to clients or who has access to such recommendations that are nonpublic.[24] A supervised person who has access to nonpublic information regarding the portfolio holdings of affiliated mutual funds is also an access person.[25]

We are adopting the definition of "access person" as proposed. Some

commenters suggested that we adopt a narrower definition covering only those employees who actually obtained nonpublic information, the approach rule 17j–1 takes for mutual fund advisers.[26] Others suggested that all advisory employees be covered.[27] Our approach takes the middle course. It treats as access persons employees who are in a position to exploit information about client securities transactions or holdings, and thus provides the adviser with a tool to protect its clients.

Access persons will include portfolio management personnel and, in some organizations, client service representatives who communicate investment advice to clients. These employees have information about investment recommendations whose effect may not yet be felt in the marketplace; as such, they may be in a position to take advantage of their inside knowledge. Administrative, technical, and clerical personnel may also be access persons if their functions or duties give them access to nonpublic information. Organizations in which employees have broad responsibilities, and where information barriers are few, may see a larger percentage of their staff subject to the reporting requirements. In contrast, organizations that keep strict controls on sensitive information may have fewer access persons.[28]

In many advisory firms, directors, officers and partners will also be access persons. Rule 204A–1, as proposed, contains a presumption that, if the firm's primary business is providing investment advice, then all of its directors, officers and partners are access persons.[29] Commenters supported this approach rather than rule 17j–1's special rules and revenue-based test for advisory firms "primarily engaged" in a business other than advising funds or advisory clients.[30]

---

[17] In addition to personal securities transaction procedures, the following is a list of other provisions that many advisers include in codes of ethics, and that advisers should consider when deciding what to include in their own codes: Limitations on acceptance of gifts; limitations on the circumstances under which an access person may serve as a director of a publicly traded company; detailed identification of who is considered an access person within the organization; and procedures for the firm and its compliance personnel to review periodically the code of ethics as well as to review reports made pursuant to it.

[18] In some organizations, all personnel must pre-clear all trades with the firm's compliance personnel. In other firms, only access persons must pre-clear, or only certain types of transactions must be pre-cleared. Some advisers have begun using compliance software to pre-clear personal trades on an automated basis, rather than have compliance personnel process the requests. Pre-clearance procedures may also identify who has authority to approve a trade request, the length of time an approval is valid, and procedures for revoking an approval, as well as procedures for verifying post-trade reports or duplicate confirmations against the log of pre-clearance approvals.

[19] Advisers may use blackout periods to guard against employees trading ahead of clients or on the same day as clients' trades are placed. *See In the Matter of Roger Honour,* Investment Advisers Act Release No. 1527 (Sept. 29, 1995). Prohibiting personal trading at the same time as client trading can also serve as a measure to prevent employees from allocating trades in a manner that defrauds clients. *See, e.g., In the Matter of Nicholas-Applegate Capital Management,* Investment Advisers Act Release No. 1741 (Aug. 12, 1998) (adviser's senior trader placed personal trades alongside trades for employee plan, allocating profitable trades to his personal account and unprofitable ones to the employee plan's account); *SEC* v. *Moran,* 922 F.Supp. 867 (S.D.N.Y. 1996) (advisory principal allocated shares to his family and personal accounts even though additional shares would need to be purchased for client accounts on the following day at higher prices). The Commission has previously indicated its approval of blackout periods for advisory personnel. *See* Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth (1966) ("PPI Report") at 196 (noting with approval that the staff's 1962–63 Special Study of the Securities Markets had concluded that all funds and advisers should have policies precluding certain insiders from buying and selling securities at the same time as a fund they manage).

[20] In several of our enforcement cases involving personal trading, advisory personnel took investment opportunities for themselves (or for an account in which they had an interest) instead of for clients, even where the investment became available only because of the client's other securities purchases. *See In the Matter of Joan Conan,* Investment Advisers Act Release No. 1446 (Sept. 30, 1994); *In the Matter of Kemper Financial Services, Inc.,* Investment Advisers Act Release No. 1494 (June 6, 1995).

[21] Advisers that prohibit short-term trading generally mandate disgorgement of any profits if an employee effects a short-term trade.

[22] Initial and annual holdings reports will facilitate an adviser's assessment of whether an individual's personal securities holdings present a conflict of interest.

[23] Rule 204A–1(a)(3). Section 202(a)(25) of the Advisers Act [15 U.S.C. 80b–2(a)(25)] defines "supervised person." An adviser's supervised persons are its partners, officers, directors (or other persons occupying a similar status or performing similar functions) and employees, as well as any other persons who provide advice on behalf of the adviser and are subject to the adviser's supervision and control.

[24] Rule 204A–1(e)(1).

[25] *Id.* A supervised person would not be an access person solely because he has nonpublic information regarding the portfolio holdings of a client that is not an investment company. The individual is unlikely to be able to exploit that information in any way that would benefit himself.

[26] Rule 17j–1 includes individuals as access persons only if they make, participate in, or *obtain* information regarding, the purchase and sale of the fund's securities, or if their functions relate to the making of any recommendations for such transactions. Rule 17j–1(a)(1)(i), 17j–1(a)(2)(i).

[27] While the definition of "access person" under rule 204A–1 will not require all employees to submit personal securities transaction reports, some firms may elect to require reporting from all personnel. This approach, while not required, offers certainty as to whether reports are required from a given individual.

[28] As proposed, persons who are not "supervised persons" of the adviser would not be access persons. This represents a change from the current adviser recordkeeping rule, rule 204–2(a)(12). Commenters supported the change.

[29] Rule 204A–1(e)(1)(ii).

[30] Rule 17j–1(a)(1)(i)(A) and (B). *See also* current rule 204–2(a)(13)(iii)(D). Today we are also adopting parallel changes to 17j–1 to remove this revenue-based test. *See infra* Section II.J of this Release.

### 3. Initial and Annual Holdings Reports

The code of ethics must require a complete report of each access person's securities holdings, at the time the person becomes an access person and at least once a year thereafter.[31] Commenters supported these reporting requirements, which are similar to those required by rule 17j–1.[32] The holdings reports must be current as of a date not more than 45 days prior to the individual becoming an access person (initial report) or the date the report is submitted (annual report). We had proposed to require initial holdings reports to be current as of the date the individual becomes an access person, and annual reports to be current within 30 days prior to submission, but many commenters told us these requirements were not flexible enough to allow access persons to use brokerage statements as the basis of their reports.[33]

### 4. Quarterly Transaction Reports

The code of ethics must require quarterly reports of all personal securities transactions by access persons, which are due no later than 30 days after the close of the calendar quarter.[34] The code of ethics may excuse access persons from submitting transaction reports that would duplicate information contained in trade confirmations or account statements that the adviser holds in its records,

provided the adviser has received those confirmations or statements not later than 30 days after the close of the calendar quarter in which the transaction takes place.[35]

We have not adopted a requirement we proposed that would have required access persons that had no personal securities transactions during the quarter to submit a report confirming the absence of transactions. Commenters argued that reports confirming absence of transactions were unnecessary and burdensome, particularly when the adviser was relying on transaction records received from the access person's broker-dealer during the course of the quarter.

### 5. Exceptions From Reporting Requirements

Rule 204A–1 permits three exceptions to personal securities reporting. No reports are required:

• With respect to transactions effected pursuant to an automatic investment plan.[36]

• With respect to securities held in accounts over which the access person had no direct or indirect influence or control.[37]

• In the case of an advisory firm that has only one access person, so long as the firm maintains records of the holdings and transactions that rule 204A–1 would otherwise require be reported.[38]

### 6. Reportable Securities

Access persons must submit holdings and transaction reports for ''reportable securities'' in which the access person has, or acquires, any direct or indirect beneficial ownership.[39] An access

person is presumed to be a beneficial owner of securities that are held by his or her immediate family members sharing the access person's household.[40]

Rule 204A–1 treats all securities[41] as reportable securities, with five exceptions designed to exclude securities that appear to present little opportunity for the type of improper trading that the access person reports are designed to uncover:[42]

• Transactions and holdings in direct obligations of the Government of the United States.[43]

• Money market instruments— bankers' acceptances, bank certificates of deposit, commercial paper, repurchase agreements and other high quality short-term debt instruments.[44]

• Shares of money market funds.[45]

• Transactions and holdings in shares of other types of mutual funds, unless the adviser or a control affiliate acts as the investment adviser or principal underwriter for the fund.[46]

• Transactions in units of a unit investment trust if the unit investment trust is invested exclusively in unaffiliated mutual funds.[47]

---

[31] Rule 204A–1(b)(1).

[32] Rule 17j–1(d)(1)(i) and (iii). As under rule 17j–1, an access person can satisfy the initial or annual holdings report requirement by timely filing and dating a copy of a securities account statement listing all their securities holdings, if the statement provides all information required by the rule and the code of ethics. Similarly, if a supervised person has previously provided such statement to the adviser, or has previously been reporting or supplying brokerage confirms for all securities transactions and the adviser has maintained them as a composite record containing all the requisite information, the access person can satisfy the initial or annual holdings report requirement by timely confirming the accuracy of the statement or composite in writing. *See Personal Investment Activities of Investment Company Personnel,* Investment Company Act Release No. 23958 (Aug. 20, 1999) [64 FR 46821 (Aug. 27, 1999)] (''Rule 17j–1 1999 Adopting Release''), at n. 34. The rule would not, however, permit an access person to avoid filing an initial or annual holdings report simply because all information has been provided over a period of time in various transaction reports. One reason for requiring a holdings report is so that the adviser's compliance personnel and our examiners have ready access to a ''snapshot'' of the access person's holdings and are not required to piece the information together from transaction reports.

[33] We modeled our proposal on requirements in rule 17j–1. We are today adopting amendments to these requirements in rule 17j–1 to conform them to rule 204A–1. *See infra* Section II.J of this Release.

[34] Rule 204A–1(b)(2). In response to comments, we extended the deadline from the 10-day deadline we had proposed, and we have made similar changes to rule 17j–1. *See infra* Section II.J of this Release.

[35] The rule does not require all of the information required in a transaction report to appear in the duplicate trade confirmation or account statement. That is, some of the required information could appear in the confirmation or statement, and the remainder could be submitted by access persons in their reports.

[36] Rule 204A–1(b)(3)(ii). However, any transaction that overrides the pre-set schedule or allocations of the automatic investment plan must be included in a quarterly transaction report. We are also adopting a parallel exception under rule 17j–1. *See infra* Section II.J of this Release.

[37] Rule 204A–1(b)(3)(i).

[38] Rule 204A–1(d). We had proposed this exception for firms that have only one supervised person, because that individual would otherwise be required to make reports to himself; commenters suggested that we should extend to firms with one access person, because these are still essentially one-man shops. We agree that a sole proprietor who has a clerical assistant or bookkeeper for his business should still be able to use this exception so long as that employee is not also an access person. These small advisers would still be subject to the other provisions of the rule, including the requirements to adopt a code of ethics and safeguard material nonpublic client information.

[39] Rule 204A–1(b)(1)(i)(A) and (b)(2)(i). Rule 204A–1 provides that beneficial ownership is to be

interpreted in the same manner as for purposes of rule 16a–1(a)(2) under the Securities Exchange Act of 1934 in determining whether a person has beneficial ownership of a security for purposes of section 16 of that Act. Rule 204A–1(e)(3). This is the same as the standard under rule 17j–1. Rule 17j–1 1999 Adopting Release, *supra* note. It is also the standard used under our current adviser recordkeeping rule. *See* rule 204–2(a)(12)(iii)(B). Rule 204A–1, again like rule 17j–1, provides that any required report may contain a disclaimer of beneficial ownership by the person making the report.

[40] Rule 16a–1(a)(2)(ii)(A) [17 CFR 240.16a–1(a)(2)(ii)(A)].

[41] The term ''security'' is defined in section 2(a)(18) of the Act. [15 U.S. 80b–2(a)(18)].

[42] Rule 204A–1(e)(10). No investment adviser is required to take advantage of these exceptions; an adviser is free to require its access persons to report their holdings and transactions in all securities, notwithstanding these exceptions.

[43] Rule 204A–1(e)(10)(i).

[44] Rule 204A–1(e)(10)(ii). We have interpreted ''high quality short-term debt instrument'' to mean any instrument having a maturity at issuance of less than 366 days and which is rated in one of the highest two rating categories by a Nationally Recognized Statistical Rating Organization, or which is unrated but is of comparable quality. *Personal Investment Activities of Investment Company Personnel and Codes of Ethics of Investment Companies and Their Investment Advisers and Principal Underwriters,* Investment Company Act Release No. 21341 (Sept. 8, 1995) [60 FR 47844 (Sept. 14, 1995)] (proposing amendments to rule 17j–1) at n. 66.

[45] Rule 204A–1(e)(10)(iii).

[46] Rule 204A–1(e)(9) and (10)(iv). Transactions and holdings in shares of closed-end investment companies would be reportable regardless of affiliation. The exception extends only to open-end funds registered in the U.S.; therefore, transactions and holdings in offshore funds would also be reportable.

[47] Rule 204A–1(e)(10)(v). This exception is aimed at variable insurance contracts that are funded by

Continued

**41700**    **Federal Register** / Vol. 69, No. 131 / Friday, July 9, 2004 / Rules and Regulations

The rule thus requires access persons to report shares of mutual funds advised by the access person's employer or an affiliate, and is designed to help advisers (and our examiners) identify abusive trading by personnel with access to information about a mutual fund's portfolio.[48]

### D. Initial Public Offerings and Private Placements

The code of ethics must require that access persons obtain the adviser's approval before investing in an initial public offering (''IPO'') or private placement.[49] Most individuals rarely have the opportunity to invest in these types of securities; an access person's IPO or private placement purchase therefore raises questions as to whether the employee is misappropriating an investment opportunity that should first be offered to eligible clients, or whether a portfolio manager is receiving a personal benefit for directing client business or brokerage.[50] Advisory firms with only one access person would not be required to have that access person pre-clear these investments.[51] We are adopting this provision as proposed.[52]

### E. Reporting Violations

Under rule 204A–1, each adviser's code of ethics must require prompt internal reporting of any violations of the code.[53] Violations must be reported to the adviser's chief compliance officer. An investment adviser can choose to have supervised persons report violations to either the chief compliance officer or to other persons designated in the code of ethics. But an advisory firm that designates someone other than the chief compliance officer to receive reports of code violations from supervised persons must have procedures requiring that the chief compliance officer also receives reports periodically of all violations. We caution advisers, however, that it is incumbent on them to create an environment that encourages and protects supervised persons who report violations. Advisers should consider how they can best prevent retaliation against someone who reports a violation; many advisers may choose to permit anonymous reporting, others may decide that retaliation constitutes a further violation of the code, and still others may find other methods to ensure that concerned employees feel safe to speak freely.

We are not, as some commenters suggested, adopting a system of fines or other penalties for violations of a code of ethics, nor are we requiring codes of ethics to include a discussion of penalties. We note, however, that many advisers do so, so that employees have a meaningful understanding of the importance of the code and of the consequences of violating it.[54]

### F. Educating Employees About the Code of Ethics

Under rule 204A–1, an adviser's code of ethics must require the adviser to provide each supervised person with a copy of the code of ethics and any amendments.[55] The code must also require each supervised person to acknowledge, in writing, his receipt of those copies.[56] While some commenters opposed this requirement, most who addressed it were supportive. Some commenters went further, and recommended we mandate that advisers educate employees as to the code of ethics. An investment adviser's

procedures for informing its employees about its code of ethics are critical to obtaining good compliance and avoiding inadvertent violations of the code. Although we do not believe it is necessary to require employee education as an element of codes of ethics, we expect most advisory firms will ensure that their employees have received adequate training on the principles and procedures of their codes. Many firms that have already implemented codes of ethics hold periodic orientation or training sessions with new and existing employees to remind them of their obligations under the code; others may require employees to certify that they have read and understood the code of ethics, and require annual recertification that the employee has re-read, understands and has complied with the code. We are not mandating any of these procedures, but they are among best practices for advisers.

### G. Adviser Review and Enforcement

Rule 204A–1 requires that advisers maintain and enforce their codes of ethics.[57] We expect that the adviser's chief compliance officer, or persons under his authority, will have primary responsibility for enforcing the adviser's code of ethics.[58] Enforcement of the code must include reviewing access persons' personal securities reports.[59] As discussed below, we are not adopting the proposed requirement that records of these reports be maintained in an accessible electronic database. However, we question seriously whether a larger investment advisory firm will be able adequately to review such reports manually or on paper. Review of personal securities holding and transaction reports should include not only an assessment of whether the access person followed any required internal procedures, such as pre-clearance, but should also compare the personal trading to any restricted lists; assess whether the access person is trading for his own account in the same securities he is trading for clients, and

---

insurance company separate accounts organized as unit investment trusts. Such separate accounts typically are divided into subaccounts, each of which invests exclusively in shares of an underlying open-end fund. Commenters suggested that these investments be excepted to the same extent as the underlying open-end funds.

[48] Portfolio managers' short-term trading in fund shares has been an issue in our recent enforcement actions. *See, e.g., Putnam, supra* note 3.

[49] Rule 204A–1(c).

[50] *See, e.g., In the Matter of Monetta Financial Services, Inc., and Robert S. Bacarella, and Richard D. Russo,* Investment Advisers Act Release No. 2136 (Jun. 9, 2003) (investment adviser to mutual funds improperly allocated IPO shares in which funds could have invested to certain access persons of the funds without adequate disclosure or approval); *In the Matter of Ronald V. Speaker and Janus Capital Corporation,* Investment Company Act Release No. 22461 (Jan. 13, 1997) (portfolio manager made a profit on same day purchase and sale of debentures in which fund could have invested, and failed to disclose transactions to the fund or obtain prior consent of the fund); *U.S.* v. *Ostrander,* 999 F.2d 27 (2d Cir. 1993) (affirming conviction of portfolio manager for accepting unlawful compensation where she purchased privately offered warrants of a company whose securities she acquired for the fund).

[51] Rule 204A–1(d). Firms with only one access person are generally one-person operations. It would make little sense to require the individual to pre-clear investments with himself. *See supra* note 38.

[52] Advisers that elect to prohibit their access persons from investing in IPOs and private placements would not have to include this pre-clearance provision.

[53] Rule 204A–1(a)(4). We adopted a similar provision under section 406 of the Sarbanes-Oxley Act. *See* Disclosure Required by Sections 406 and 407 of the Sarbanes-Oxley Act of 2002, Securities Act Release No. 8177 (Jan 23, 2003) [68 FR 5109 (Jan. 31, 2003)].

[54] Our understanding is that penalties for violations vary from one firm to another, and depend on the type of violation involved. Employees may be required to cancel trades, disgorge profits or sell positions at a loss, and may face internal reprimands, fines, or firing.

[55] Rule 204A–1(a)(5).

[56] *Id.* These written acknowledgements may be made electronically.

[57] Rule 204A–1(a). Some firms may, in their code, reserve the right to waive compliance with certain of the code's provisions. Of course, if a code provision is required by new rule 204A–1 (or by rule 17j–1), the advisory firm cannot waive a supervised person's compliance with that provision.

[58] Advisers to investment companies must provide the investment company's board of directors with an annual report describing any issues arising under the code of ethics. *See* rule 17j–1(c)(2)(ii). Such annual report must include a discussion of any material violations of the code and whether any waivers that might be considered important by the board were granted during the period.

[59] Rule 204A–1(a)(3).

if so whether the clients are receiving terms as favorable as the access person takes for himself; periodically analyze the access person's trading for patterns that may indicate abuse, including market timing; investigate any substantial disparities between the quality of performance the access person achieves for his own account and that he achieves for clients; and investigate any substantial disparities between the percentage of trades that are profitable when the access person trades for his own account and the percentage that are profitable when he places trades for clients.

### H. Recordkeeping

We are amending rule 204–2 under the Advisers Act to reflect new rule 204A–1. Because the codes of ethics will already cover personal securities transaction and holdings reports, we have been able to simplify rules 204–2(a)(12) and (13) significantly.[60] As amended, rule 204–2(a)(12) requires advisers to keep copies of their code of ethics, records of violations of the code and actions taken as a result of the violations, and copies of their supervised persons' written acknowledgement of receipt of the code. As discussed earlier, rule 204A–1 requires prompt internal reporting of violations of the code of ethics,[61] but we are not requiring advisers to keep records of these whistleblower reports.[62] Commenters have persuaded us that requiring these records could have a chilling effect on employees' willingness to report violations, particularly in smaller organizations. Rule 204–2(a)(13), as amended, covers records of access persons' personal trading. It requires advisers to keep a record of the names of their access persons, the holdings and transaction reports made by access persons, and records of decisions approving access persons' acquisition of securities in IPOs and limited offerings.

We proposed, but are not requiring, records of access persons' personal securities reports (and duplicate brokerage confirmations or account statements in lieu of those reports) to be maintained electronically in an accessible computer database. Commenters were concerned that the

requirement would be unduly burdensome and would require them to input large quantities of data manually. Although we are not adopting this requirement, as discussed above, we have strong expectations that most advisers will need to maintain these records electronically in order to meet their responsibilities to review these records and monitor compliance with their codes.

The standard retention period required for books and records under rule 204–2 is five years, in an easily accessible place, the first two years in an appropriate office of the investment adviser.[63] Advisers must maintain the records required under amended rule 204–2(a)(12) and (13) for this standard period, subject to special holding requirements for certain categories of records as specified in amended rule 204–2(a)(12) and (13). Codes of ethics must be kept for five years after the last date they were in effect. Supervised person acknowledgements of the code must be kept for five years after the individual ceases to be a supervised person.[64] Similarly, the list of access persons must include every person who was an access person at any time within the past five years, even if some of them are no longer access persons of the adviser.[65]

### I. Amendment to Form ADV

We are amending part II of Form ADV, as proposed, to require advisers to describe their codes of ethics to clients and, upon request, to furnish clients with a copy of the code of ethics.[66] This disclosure will serve two functions: first, it will help clients understand the adviser's ethical culture and standards, how the adviser controls sensitive information and what steps it has taken to prevent employees from misusing their inside positions at clients' expense. Clients will be able to select

advisers whose ethical commitment meets their expectations. Second, disclosure will act as sunlight, encouraging advisers to implement more effective procedures by exposing them to view, and encouraging advisers to adhere strictly to the procedures they disclose.[67]

### J. Amendments to Rule 17j–1

As proposed, we are revising a provision of rule 17j–1 to state that no report would be required under rule 17j–1 "to the extent that" the report would duplicate information required under the Advisers Act recordkeeping rules.[68] Currently, the rule contains an exception only if "all of" the information in the report would duplicate information required to be recorded under Advisers Act rules. The reports we are requiring under the Advisers Act are not identical to those required under rule 17j–1, and this amendment avoids unnecessary duplication.

In the proposing release, we also requested comment whether, to the extent rule 204A–1 as adopted differed from rule 17j–1, we should make conforming changes to rule 17j–1. With limited exception, commenters addressing this issue expressed a desire to keep the rules as parallel as possible and suggested that rule 17j–1 be modified in some respects. We are persuaded that four changes should be made to rule 17j–1. First, rule 17j–1 as amended provides that the information in initial and annual holdings reports must be current as of a date no more than 45 days prior to the individual becoming an access person under the rule (initial holdings report), or submitting the report (annual holdings report).[69] Second, quarterly transaction reports will be due no later than 30 days after the close of the quarter, rather than 10 days as currently provided.[70] Third, quarterly transaction reports need not be submitted with respect to transactions effected pursuant to an automatic investment plan.[71]

Fourth, we are revising the definition of "access person."[72] Under the amended rule, an access person includes an advisory person of a fund or its investment adviser. We are eliminating the revenue-based test for determining whether an investment

---

[60] Currently, these sections lay out fairly complex requirements for the information that an adviser must keep regarding personal securities transactions of "advisory representatives," which include the adviser's personnel, directors, officers and partners.

[61] See supra note 53.

[62] An adviser could, for example, record the facts and circumstances surrounding a violation of the code, but omit mention of the employee who brought the problem to the adviser's attention.

[63] Rule 204–2(e) (retention period of five years from the end of the fiscal year during which the last entry was made on such record).

[64] One commenter suggested that the acknowledgement be kept only for five years after it was made. We are not adopting this suggestion, because it could mean that an adviser would have no records of acknowledgement from long-term employees.

[65] In addition, records supporting decisions to approve access persons' acquisitions of IPOs or private placements must be retained for at least five years after the end of the fiscal year in which the approval is granted.

[66] We are amending Item 9 of Form ADV Part II, which asks whether the adviser or a "related person" (that is, a person that controls the adviser, is controlled by the adviser, or is under common control with the adviser) participates or has an interest in client transactions. In April 2000, we proposed a new version of part 2 that called for a narrative disclosure brochure, and which moved this disclosure topic to Item 10.

[67] An investment adviser that disclosed its policies and procedures but then materially deviated from them may be subject to action under section 206 of the Advisers Act.

[68] Rule 17j–1(d)(2)(iv).

[69] Rule 17j–1(d)(1)(i) and (iii).

[70] Rule 17j–1(d)(1)(ii).

[71] Rule 17j–1(d)(2)(vi).

[72] Rule 17j–1(a)(1)(i).

adviser's primary business is advising funds and other advisory clients. Advisers with other primary businesses used this test to exclude certain of their officers, directors and general partners from being considered access persons under the rule. We are replacing the revenue-based test with the same legal presumption we are adopting in new rule 204A–1—that directors, officers and general partners are presumed to be access persons if the firm's primary business is investment advisory.[73]

### III. Effective Date

The effective date of the new rule and amendments is August 31, 2004. Advisers must comply with the new rule and rule amendments by January 7, 2005. By this compliance date, each adviser must have adopted its code of ethics and be prepared to maintain and enforce it. In addition to fundamentals such as articulating its chosen standards of conduct, each adviser's preparation will necessarily include identifying its access persons, providing a copy of the code of ethics to each supervised person and receiving their acknowledgement. Also by January 7, 2005, each adviser must have an initial holdings report from each access person, and must arrange for the submission of quarterly transaction reports. Access persons' personal securities transaction reports for the calendar quarter ended March 31, 2005 will be due no later than April 30, 2005. Until advisers begin to comply with new rule 204A–1, the amendments to rule 204–2, and the amendments to Form ADV Part II, they must continue to comply with the personal securities transaction recordkeeping requirements of our current rule 204–2(a)(12) and (13).

### IV. Cost-Benefit Analysis

The Commission is sensitive to the costs and benefits resulting from our rules. The new rule we adopt today requires investment advisers to establish, maintain, and enforce codes of ethics for their supervised persons. These codes of ethics must establish standards of business conduct reflecting the fiduciary obligations of the adviser and its personnel and impose personal securities reporting measures designed to prevent access persons from abusing information about clients' securities transactions. We are also adopting related recordkeeping and client disclosure amendments under the

Advisers Act and conforming amendments under the Company Act.[74]

In our Proposing Release, we carefully analyzed the costs and benefits of our proposed rule and amendments and requested comment regarding the costs and benefits. Most commenters supported requiring advisers to have written codes of ethics, although several commenters expressed reservations at the potential costs of the proposed electronic recordkeeping requirement for personal securities transactions. Only one commenter specifically addressed our cost-benefit analysis.

We are adopting the rule and amendments substantially as proposed, with some revisions in response to comments, including elimination of the proposed electronic recordkeeping requirement for personal securities transactions. We believe our original analyses regarding the benefits and costs of the rule and amendments remain accurate. Most of the benefits and costs under the new rule and amendments, however, are not quantifiable.

*A. Benefits*

Codes of ethics under new rule 204A–1 should benefit advisory clients as well as advisory firms. The codes will impress upon advisers' supervised persons the significance of the fiduciary aspects of their professional responsibilities, formulating these into standards of conduct to which their employers will hold these individuals accountable. Codes of ethics will also be an important part of advisers' efforts to prevent fraudulent personal trading by their supervised persons. As a result, these codes increase investor protection by forestalling supervised persons from engaging in misconduct that defrauds clients. In addition, the Form ADV amendments, which require advisers to describe their codes of ethics to clients and to furnish copies to clients upon request, put clients in a better position to evaluate whether their advisers' codes of ethics meet their expectations. If a client is not confident that an advisory firm has taken appropriate measures to prevent its personnel from placing their own interests ahead of their clients' interests, the client will be

able to seek a different adviser whose measures he approves.

Rule 204A–1 will reinforce existing measures that require investment advisers to guard against employee misconduct. It goes beyond section 204A of the Advisers Act, which focuses on policies and procedures to prevent misuse of material nonpublic information by advisory firm personnel. Rule 204A–1 expands advisers' policies to address other situations in which such personnel could potentially benefit at the expense of firm clients. It also goes beyond Company Act rule 17j–1, which focuses on fraud in connection with securities held or to be acquired by an investment company advised by an adviser. Rule 204A–1 expands advisers' policies to address advisory personnel's holdings and transactions in shares of investment companies managed by the adviser. Codes of ethics will also assist advisers in meeting their obligations under Advisers Act rule 206(4)–7 to adopt policies and procedures reasonably designed to prevent their supervised persons from violating the Advisers Act.

Rule 204A–1 will benefit investment advisers by renewing their attention to their fiduciary and other legal obligations, and by increasing their vigilance against inappropriate behavior by employees. This may have the effect of diminishing the likelihood that their firms will be embroiled in securities violations, Commission enforcement actions, and private litigation. For an adviser, the potential costs associated with a securities law violation may consist of much more than merely the fines or other penalties levied by the Commission or civil liability. The reputation of an adviser may be significantly tarnished, resulting in lost clients. Advisers may be denied eligibility to advise funds.[75] In addition, advisers could be precluded from serving in other capacities.[76]

Our revision of advisers' recordkeeping obligations for personal securities transactions will also benefit investment advisers. The amended rules are easier to understand than the

---

[73] In addition, the directors, officers and general partners of a fund are presumed to be access persons of the fund.

[74] We are adopting amendments to rule 204–2, the recordkeeping rule under the Advisers Act, to address documentation of advisers' compliance with rule 204A–1. We are also amending Part II of Form ADV, which specifies certain information investment advisers must disclose to their clients, to require advisers to include a discussion of their codes of ethics and make copies available to clients upon request. We are adopting amendments to rule 17j–1, the code of ethics rule under the Company Act, to conform certain of its provisions to those in new rule 204A–1.

[75] Section 9(a) of the Investment Company Act [15 U.S.C. 80a–9(a)] prohibits a person from serving as an adviser to a fund if, within the past 10 years, the person has been convicted of certain crimes or is subject to an order, judgment, or decree of a court prohibiting the person from serving in certain capacities with a fund, or prohibiting the person from engaging in certain conduct or practice.

[76] *See, e.g.*, 29 U.S.C. 1111(a) (prohibiting a person from acting in various capacities for an employee benefit plan, if within the past 13 years, the person has been convicted of, or has been imprisoned as a result of, any crime described in section 9(a)(1) of the Investment Company Act [15 U.S.C. 80a–9(a)(1)]).

App 37

complex provisions currently contained in Advisers Act rule 204–2(a)(12) and (13). The requirement that advisers maintain information about their access persons' personal securities transactions will enable firms to detect trading patterns that may indicate abuse.[77] In addition, the requirement that each access person provide initial and annual holdings reports allows investment advisers to better monitor conflicts that may arise when an access person participates in investment decisions involving securities the access person holds in his or her portfolio, and to assess whether access persons are filing accurate quarterly transaction reports.

### B. Costs

The new rule and amendments will result in some additional costs for advisers. It is possible that advisers may pass these costs along to their clients in the form of advisory fees.[78] Advisers, however, are already required to maintain various policies and procedures that would constitute core elements of their codes of ethics, and therefore many of these costs are already reflected in fees clients currently pay. Advisers are required, under section 204A of the Advisers Act, to maintain and enforce written policies and procedures reasonably designed to prevent the firm or its employees from misusing material nonpublic information. Also, the approximately 1,500 advisers who advise registered investment companies currently have codes of ethics to prevent their "access persons" from abusing their access to information about the fund's securities trading, pursuant to Company Act rule 17j–1.[79] In addition, advisers are required under Advisers Act rule 206(4)–7 to adopt policies and procedures reasonably designed to prevent their supervised persons from violating the Advisers Act. Accordingly, we believe requiring written codes of ethics will impose few new costs on advisers.

Similarly, our rule to require access persons to report personal securities

transactions should cause only minor cost increases. Advisers are already required to maintain records of their advisory representatives' personal securities transactions on a quarterly basis under Advisers Act rules 204–2(a)(12) and (13). The additional reporting required of access persons under our new rule—an annual report of securities holdings—should impose only minor additional costs.[80] Because most SEC-registered investment advisers have so few employees, we believe the cost of these additional reports will be minor. As of December 2003, 49% of investment advisers registered with us reported that they had five or fewer non-clerical employees, and another 18% reported that they had only six to ten non-clerical employees.[81] The majority of larger SEC-registered advisers are already subject to Company Act rule 17j–1 because they advise investment companies, and consequently obtain annual reports from their "access persons" that contain virtually the same information as would be required under our proposals. These larger firms are also in a position to limit the number of supervised persons subject to the reporting requirements, by imposing stringent controls on who obtains access to client securities information.

Many commenters expressed concern regarding the cost of the proposed requirement that advisers maintain records of personal securities transactions electronically. The Commission is not adopting the proposed electronic recordkeeping requirement.

One commenter stated that significant costs would result from the new rule's requirement that advisers review supervised persons' securities holdings and transaction reports to monitor them for abuses. The Commission recognizes that advisers will experience costs in conducting their review. The benefits to investors and to advisory firms themselves in terms of improved detection and prevention of abuses will, however, justify these costs. Moreover, the incremental cost imposed by the new rule in this regard is diminished to the extent that advisers should already be conducting such a review. An adviser's fiduciary duty of loyalty to its clients may require it to take steps to protect clients from such abuses by the adviser's personnel, and section 204A of the Advisers Act requires the adviser to

enforce its policies and procedures designed to prevent misuse of material nonpublic information.

We expect only minor cost increases from the new requirement that access persons obtain their advisers' approval before investing in an initial public offering or private placements. Our experience administering the same requirement under Company Act rule 17j–1 has been that such proposals are infrequent, even at larger advisory firms. We also believe that our new requirement that advisers describe their codes of ethics to clients in their Form ADV and provide copies on request will impose only minor cost increases. We expect few clients will request a copy of the code, and that the cost to provide it will be minimal.

### V. Effects on Competition, Efficiency and Capital Formation

Section 202(c) of the Advisers Act [15 U.S.C. 80b–2(c)] mandates that the Commission, when engaging in rulemaking that requires it to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.

As discussed above, rule 204A–1 requires investment advisers to adopt codes of ethics applicable to their supervised persons. These codes of ethics must establish standards of business conduct reflecting the fiduciary obligations of the adviser and its personnel and impose personal securities reporting measures designed to prevent access persons from abusing their access to information about clients' securities transactions. We expect that the proposed rule may indirectly increase efficiency by forestalling supervised persons from engaging in misconduct that defrauds clients and harms the advisory firm, or by facilitating the adviser's early intervention to protect its clients. In addition, the existence of an industry-wide code of ethics requirement may enhance efficiency further by encouraging third parties to create new informational resources and guidance to which industry participants can refer in establishing and improving their codes.

Since the rule applies equally to all registered advisers, we do not anticipate that it introduces any competitive disadvantages. We expect that the rule may indirectly foster capital formation by bolstering investor confidence. To the extent that investors know that advisory firms have taken measures designed to prevent their supervised persons from placing their interests

---

[77] Although the Commission is not adopting the proposed requirement that advisers maintain these records electronically, as previously noted we have strong expectations that most advisers will need to maintain these records electronically in order to meet their responsibilities to review these records and monitor compliance with their codes.

[78] We understand, however, that many advisers have already adopted codes of ethics for their firm and their employees. We are unaware whether these firms charge higher advisory fees than firms that have not yet adopted codes of ethics.

[79] Based on our records of information submitted to us by investment advisers in Part 1 of Form ADV through December 10, 2003, approximately 1,500 advisers report that they manage portfolios for investment companies.

[80] The Commission is not adopting its proposal to require quarterly reports indicating that no transactions were effected.

[81] This is based on Form ADV data (under Item 5.A of Part 1A) submitted to us by 8,019 SEC-registered investment advisers through December 9, 2003.

ahead of their clients' interests, clients are more likely to make assets available through advisers for investment in the capital markets.

## VI. Paperwork Reduction Act

As we discussed in the Proposing Release, the new rule and rule and form amendments contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995.[82] These collections of information are mandatory. One of the collections of information is new. The title of this new collection is "Rule 204A–1," which the Commission submitted to the Office of Management and Budget ("OMB") for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. The OMB has approved this collection under control number 3235–0596 (expiring on March 31, 2007). The other collections of information take the form of amendments to currently approved collections titled "Rule 204–2," under OMB control number 3235–0278, and "Form ADV," under OMB control number 3235–0049. The Commission also has submitted the amendments to these collections to the OMB for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. The OMB has approved these collections under control numbers 3235–0278 (expiring on July 31, 2007) and 3235–0049 (expiring on July 31, 2007), respectively. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number.

The collection of information under rule 204A–1 is necessary to establish standards of business conduct for supervised persons of investment advisers and to facilitate investment advisers' efforts to prevent fraudulent personal trading by their supervised persons. The collection of information is mandatory. The respondents are investment advisers registered with us, and certain of their supervised persons who must submit reports of their personal trading activities to their firms. These investment advisers use the information collected to control and assess the personal trading activities of their supervised persons. Responses to the reporting requirements will be kept confidential to the extent each investment adviser provides confidentiality under its particular practices and procedures.

The collection of information under rule 204–2 is necessary for the Commission staff to use in its examination and oversight program. This collection of information is mandatory. The respondents are investment advisers registered with us. Responses provided to the Commission in the context of its examination and oversight program are generally kept confidential.[83] The records that an adviser must keep in accordance with rule 204–2 must generally be retained for not less than five years.[84]

The collection of information under Form ADV is necessary to provide advisory clients and prospective clients with information about an adviser's code of ethics. This collection of information is mandatory. The respondents are investment advisers registered with us. Clients of these investment advisers use the information collected to assess measures the adviser has taken to prevent its supervised persons from placing their own interests ahead of the adviser's clients' interests. Responses to the disclosure requirements are not kept confidential.

### A. Rule 204A–1

Rule 204A–1 requires SEC-registered investment advisers to establish a written code of ethics for their supervised persons.[85] We estimated in the Proposing Release that each adviser would spend six hours annually, on average, documenting its code of ethics, taking into consideration that investment advisers currently maintain policies and procedures that can be the basis for their code of ethics and that advisers to investment companies already have fully developed codes of ethics. Based on our estimate in the Proposing Release that 8,019 advisers would incur the burden, the burden estimate for establishing a written code of ethics was 48,114 hours.[86]

Rule 204A–1 also requires each adviser's code of ethics to include provisions under which the adviser provides each supervised person with a copy of the code of ethics and any amendments, and obtains written acknowledgment of receipt from the supervised person. Based on our estimates that, on average, each investment adviser has 100 supervised persons,[87] will hire 5 new supervised persons each year, and each adviser will amend their codes once every other year, that advisers will have to provide

a copy of their codes of ethics and obtain an acknowledgment of receipt 55 times each year.[88] We further estimated in the Proposing Release that it will take an investment adviser 0.05 hours on average for each iteration, for an annual burden of 2.75 hours per adviser and a total burden of 22,052.25 hours for all advisers related to informing supervised persons of adviser codes of ethics.[89]

Lastly, rule 204A–1 also requires each adviser's code of ethics to include provisions under which the adviser's "access persons" report their personal securities transactions and holdings to the adviser.[90] To estimate the annual paperwork burden stemming from this requirement we relied on the following assumptions: (1) Advisers would treat all their non-clerical employees as access persons; (2) advisers have, on average, 84 non-clerical employees;[91] (3) initial and annual holdings reports will take 0.7 hours on average; and (4) quarterly transaction reports will take 0.6 hours on average annually.[92] Using these assumptions, we estimated in the Proposing Release that the total annual burden hours for all access persons under the proposed would be 875,675 hours.[93]

One significant amendment to rule 204A–1 that addressed commenters concerns materially reduces the paperwork burden on advisers. Because we are no longer requiring access persons to make quarterly reports when they do not have securities transactions, we are thus adopting rule 204A–1 with revised paperwork collection requirements. Accordingly, our estimate of the total annual burden for rule 204A–1 in the Proposing Release of

---

[82] 44 U.S.C. 3501 to 3520.

[83] *See* section 210(b) of the Advisers Act [15 U.S.C. 80b–10(b)].

[84] *See* rule 204–2(e) [17 CFR 275.204–2(e)].

[85] Rule 204A–1(a).

[86] 8,019 advisers × 6 hours = 48,114 total annual hours.

[87] This estimate is based on each adviser having on average 84 non-clerical and 16 clerical employees.

[88] Over any two-year period, 100 copies of amendments in year 1 + 10 copies of complete code for new supervised persons in year 1 through 2 = 110 copies, divided by 2 years = 55 copies.

[89] 0.05 hours per copy × 55 copies per year = 2.75 hours. 2.75 hours × 8,019 investment advisers = 22,052.25 hours total.

[90] Rule 204A–1(a)(3).

[91] This average is based on Form ADV data that asks for the total number of employees. We believe this estimate overstates the typical number of access persons for an adviser, since the data is skewed significantly higher by the largest (in terms of number of employees) 100 advisers.

[92] We estimated in the Proposing Release that quarterly transaction reports would take 0.6 hours per access person. In a change from the proposed rule, the adopted rule does not require quarterly reports for any quarter in which the access person makes no security transactions. In the Proposing Release, we assumed for purposes of estimating access person reporting that access persons would typically file transaction reports indicating no transactions in 3 out of the 4 quarters. Thus we have reduced by half the amount of time allocated for access person transaction reporting, as discussed below.

[93] (0.7 hours holdings report + 0.6 hours transactions report) × (84 access persons × 8,019 investment advisers) = 875,675 hours.

945,841.25 hours is reduced to 743,762.25 hours.[94]

### B. Rule 204–2

In the Proposing Release, we estimated that the amendments to rule 204–2 would result in an approximate 10% net decrease from the currently approved annual aggregate collection of information burden.[95] Eliminating the requirement that advisers retain records relating to the personal securities transactions of advisory representatives reduces the annual average burden of the rule,[96] while the new recordkeeping requirements under the amendments to rule 204–2 add to the burden, as does the increase of 229 advisers registered with us.[97]

Many commenters objected to the proposed requirement to require advisers to maintain access person reports electronically. The amended rule does not include this requirement, but this amendment does not change the information collection burden estimate.[98] Our total hour burden estimate for the collection of information under rule 204–2 remains 1,537,883.8 burden hours, as we estimated in our proposal.[99]

---

[94] Eliminating these quarterly reports decreases the burden of quarterly transaction reporting on access persons from 0.6 hours to 0.3 hours, or a total of 202,079 hours (0.3 hours × 84 access persons × 8,019 advisers = 202,079). Our revised total burden is as follows: 48,114 hours by advisers to record their codes of ethics + 673,596 hours for reporting by access persons + 22,052.25 hours for advisers to deliver copies of codes and amendments = 743,762.25.

[95] Prior to the adoption of the amendments herein, the approved annual aggregate information collection burden was 1,651,324.2 hours (based on 7,790 advisers) or 211.98 hours per firm for rule 204–2.

[96] In the Proposing Release we estimated that the reduction would be 25.2 hours per firm (0.3 hours per access person to record the transactions × 84 access persons per firm). This results in a reduction on a per firm basis to 186.78 hours (211.98 − 25.2).

[97] The new recordkeeping obligations under the rule include the maintenance of access person holding and quarterly transaction reports, retention of the codes of ethics, supervised person acknowledgments, records of the names of the firm's access persons, records of any violation of the codes of ethics and any action taken, and records of any decision under rule 204A–1 to permit an access person to invest in an initial public offering or private placement. In the Proposing Release we estimated that these new collections would add 5 hours on average per adviser to the annual hour burden of the rule. This results in a per firm annual burden estimate of 191.78 hours (186.78 + 5).

[98] In the Proposing Release, we estimated no incremental burden in connection with the proposed requirement for advisers to maintain access person reports electronically. We estimated advisory firms would be able to use their existing computer software, taking transaction data electronically from the same broker-dealers that advisory firms use to obtain electronic information about client transactions.

[99] 191.78 hours per adviser × 8,019 advisers = 1,537,883.8 hours.

### C. Form ADV

In the proposing release, we estimated that the amendments to Form ADV (requiring advisers to describe their codes of ethics and furnish a copy upon request) would increase the annual collection burden under Form ADV by 6.95 hours per adviser.[100] One trade group commenter recommended that we allow web site posting of the code of ethics in lieu of furnishing a copy upon request. We do not believe that web access is universal at this time so we are adopting amendments to Form ADV without change and, accordingly, our total burden hour estimate remains at 102,653 burden hours.[101]

### VII. Final Regulatory Flexibility Analysis

The Commission proposed new rule 204A–1 and amendments to rule 204–2 and Form ADV under the Advisers Act, and amendments to rule 17j–1 under the Company Act, in a release on January 20, 2004 ("proposing release"). An Initial Regulatory Flexibility Analysis ("IRFA") was published in the proposing release. No comments were received specifically on the IRFA. The Commission has prepared the following Final Regulatory Flexibility Analysis ("FRFA") in accordance with 5 U.S.C. 604, regarding rule 204A–1 and amendments to rule 204–2 and Form ADV under the Advisers Act and amendments to rule 17j–1 under the Company Act.

### A. Need for the Rule and Amendments

Sections I and II of this Release describe the background and reasons for the new rule and rule amendments. As we discussed in detail above, the rule and amendments are designed to promote compliance with fiduciary standards by advisers and their personnel.

### B. Significant Issues Raised by Public Comment

The Commission received 44 letters from commenters in response to the proposing release. Commenters supported the proposal. As discussed in section II of this Release, the Commission is adopting the new rule and rule amendments substantially as proposed with some changes to respond to commenters' suggestions. Commenters opposed a proposed

---

[100] 0.25 hours preparing a description of the code of ethics + 6.7 hours responding to requests for copies of the code of ethics (based on a 10% request rate by the 670 average number of clients per adviser and 0.1 hours for delivery).

[101] (0.25 hours + 6.7 hours) × 8,019 advisers = 55,732 hours. 46,921 hours (existing total) + 55,732 hour increase = 102,653 hours.

requirement that advisers keep records of access persons' personal securities reports electronically in an accessible database, and the Commission is not adopting this provision of the proposal. The Commission specifically requested comments with respect to the IRFA, but did not receive any comments specifically concerning the IRFA.

### C. Small Entities Subject to Rule

The new rule and rule amendments under the Advisers Act apply to all advisers registered with the Commission, (and the amendments to rule 17j–1 apply to all investment companies) including small entities. In developing the new rule and amendments, we have considered their potential effect on small entities. Under Commission rules, for purposes of the Regulatory Flexibility Act, an investment adviser generally is a small entity if it: (i) Has assets under management having a total value of less than $25 million; (ii) did not have total assets of $5 million or more on the last day of its most recent fiscal year; and (iii) does not control, is not controlled by, and is not under common control with another investment adviser that has assets under management of $25 million or more, or any person (other than a natural person) that had $5 million or more on the last day of its most recent fiscal year.[102] The Commission estimates that approximately 570 SEC-registered investment advisers are small entities that are affected by the new rules and rule amendments.[103]

For purposes of the Regulatory Flexibility Act, a registered investment company ("fund") is a small business or small organization (collectively, "small entity") if the fund, together with other funds in the same group of related investment companies, has net assets of $50 million or less as of the end of its most recent fiscal year.[104] The Commission estimates that approximately 204 registered investment companies are small entities.[105] As discussed in section II of this Release, the amendments to rule 17j–1 (i) allow advisers to rely on a reporting exception in the rule if the adviser already maintains duplicate

---

[102] 17 CFR 275.0–7(a).

[103] This estimate is based on the information submitted by SEC-registered advisers in part 1A of Form ADV as of May 1, 2004.

[104] 17 CFR 270.0–10.

[105] This estimate, which is current as of December 2003, is derived from analyzing information from Form N–SAR and various databases including Lipper. Some or all of these entities may contain multiple series or portfolios. If a registered investment company is a small entity, the portfolios or series it contains are also small entities.

information under records required by certain Advisers Act rules, (ii) exempt certain transactions from required reporting, and (iii) replace with a legal presumption a revenue-based test for the primary business of the adviser. Whether the amendments to rule 17j–1 affect small entities depends on whether the small entities rely on the reporting exception or use the exemption, and whether the small entity is primarily engaged in the business of advising investment companies or other advisory clients.

### D. Projected Reporting, Recordkeeping, and Other Compliance Requirements

The amendment to Form ADV imposes a new reporting requirement on advisers, requiring that they make an additional disclosure statement in their brochures describing their codes of ethics and noting that copies of the codes are available from the adviser upon request. Although new rule 204A–1 and the other rule amendments under the Advisers Act impose no other new reporting requirements on registered advisers themselves, the new rule requires advisers' codes of ethics to impose a new reporting requirement on advisers' access persons by requiring certain new personal securities holdings and transaction reports. One rule amendment under the Company Act exempts certain personal securities transactions from existing quarterly reporting requirements.

The new rule and rule amendments create certain new recordkeeping and compliance requirements. The rule amendments impose new recordkeeping requirements by requiring that advisers maintain certain records pertaining to their codes of ethics and requirements of such codes (including records of personal securities holdings and transaction reports).[106] The new rule imposes new compliance requirements by requiring that SEC-registered investment advisers adopt codes of ethics, obtain written acknowledgments of their supervised persons' receipt of copies of the code and any amendments, review personal securities holdings and transaction reports filed by their access persons, and pre-approve investments by their access persons in IPOs and limited offerings.

---

[106] These records are: copies of the codes of ethics, records of violations of the codes of ethics, records of personal securities transactions and holdings reports, records of persons subject to reporting under the codes of ethics, records of decisions relating to approvals of investments in IPOs or limited offerings, and records of supervised person acknowledgments of the code of ethics. Advisers are generally required to retain these records for five years.

Small entities registered with the Commission as investment advisers are for the most part subject to these new reporting, recordkeeping and compliance requirements to the same extent as larger advisers. With regard to reporting of securities holdings and transactions and to pre-approvals of certain investments, however, certain small advisers, possibly including some that are small entities, are not subject to the new requirements. Additionally, we anticipate that most advisers will very rarely need to address violations to their codes of ethics and, similarly, should infrequently be asked by an access person to consider pre-approval of an investment in an IPO or limited offering. Small advisers will likely deal with violations or IPO and limited offering pre-approvals on an even more limited scale due to the smaller size of their operations. Furthermore, it is important to note that some of the new reporting, recordkeeping and compliance requirements replace, clarify or simplify existing requirements to which advisers, including those that are small entities, are already subject. To the extent that such requirements clarify or simplify existing requirements, the rule and amendments may actually alleviate reporting, recordkeeping, or compliance burdens on advisers, including those that are small entities.

### E. Agency Action To Minimize Effect on Small Entities

The Regulatory Flexibility Act directs the Commission to consider significant alternatives that would accomplish the stated objective, while minimizing any significant adverse impact on small entities.[107] In connection with the new rule and rule amendments, the Commission considered the following alternatives: (a) The establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (b) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (c) the use of performance rather than design standards; and (d) an exemption from coverage of the rule, or any part thereof, for such small entities.

With respect to the first alternative, the Commission believes that the flexibility built into the rules adequately addresses different compliance and reporting requirements. The Commission is not prescribing uniform codes of ethics, but gives each adviser the flexibility to design its own code in light of the firm's size and operational

---

[107] 5 U.S.C. 603(c).

structure, and the particular types of conflicts encountered by the firm in connection with its business and clients. The amendments to rule 204–2 permit the use of brokerage confirmations and statements in lieu of separate reports, at the firm's option.

With respect to the second alternative, the Commission believes that clarification, consolidation, or simplification of the compliance and recordkeeping requirements under the rule for small entities unacceptably compromises the investor protections of the rule. Rule 204A–1 sets out minimum requirements for advisers' codes of ethics, which are designed to promote compliance with fiduciary standards by advisers and their personnel. Eliminating some or all of these requirements would potentially impede achievement of that objective. Similarly, in establishing the categories of records to be retained under amendments to rule 204–2, the records described by the rule are necessary for the Commission to evaluate advisers' compliance with rule 204A–1 as part of the Commission's inspection program.

With respect to the third alternative, the Commission believes that the compliance and reporting requirements contained in the new rule and rule amendments already appropriately use performance standards instead of design standards. The rule enumerates few elements required for codes of ethics, allowing all firms, including small firms, to tailor the remainder of their codes of ethics to the nature and scope of their business. Rule 204A–1 does not specify what standard of conduct an adviser must require of its supervised persons, but requires only that the adviser articulate a standard in its code of ethics. Similarly, the rule does not specify which supervised persons should have access to nonpublic information about client recommendations, trading and holdings, and does not prohibit or restrict personal securities transactions by access persons, but requires only that access persons report their personal securities trading and holdings to the adviser. Furthermore, the recordkeeping requirements under rule 204–2 do not specify the means by which an adviser must keep records to demonstrate its compliance with the rule.

Finally, with respect to the fourth alternative, the Commission notes that the rule exempts advisers with only one access person from personal securities reporting and pre-clearance of investments in IPOs and private placements. The codes of ethics are designed to promote advisers' fulfillment of their fiduciary duty to

clients and to guard against personal securities trading by advisers' access persons that may be contrary to clients' interests. Because the protections of the Advisers Act are intended to apply equally to clients of both large and small advisory firms, it would be inconsistent with the purposes of the Advisers Act to exempt small entities further from the rule and rule amendments or to specify different requirements for small entities.

### VIII. Statutory Authority

We are adopting amendments to rule 17j–1 pursuant to our authority set forth in sections 17(j) and 38(a) of the Investment Company Act [15 U.S.C. 80a–17(j) and 80a–37(a)] and sections 206(4) and 211(a) of the Advisers Act [15 U.S.C. 80b–4 and 80b–11(a)].

We are adopting amendments to rule 204–2 pursuant to our authority set forth in sections 204 and 206(4) of the Advisers Act [15 U.S.C. 80b–4 and 80b–6(4)].

We are adopting rule 204A–1 pursuant to our authority set forth in sections 202(a)(17), 204A, 206(4) and 211(a) of the Advisers Act [15 U.S.C. 80b–2(a)(17), 80b–4a, 80b–6(4) and 80b–11(a)].

We are adopting amendments to Form ADV under section 19(a) of the Securities Act of 1933 [15 U.S.C. 77s(a)], sections 23(a) and 28(e)(2) of the Securities Exchange Act of 1934 [15 U.S.C. 78w(a) and 78bb(e)(2)], section 319(a) of the Trust Indenture Act of 1939 [15 U.S.C. 77sss(a)], section 38(a) of the Investment Company Act of 1940 [15 U.S.C. 78a–37(a)], and sections 203(c)(1), 204, and 211(a) of the Investment Advisers Act of 1940 [15 U.S.C. 80b–3(c)(1), 80b–4, and 80b–11(a)].

### Text of Rules and Form Amendments

### List of Subjects in 17 CFR Parts 270, 275 and 279

Investment companies, Reporting and recordkeeping requirements, Securities.

■ For reasons set forth in the preamble, title 17, chapter II of the Code of Federal Regulations is amended as follows:

### PART 270—RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940

■ 1. The authority citation for part 270 continues to read in part as follows:

**Authority:** 15 U.S.C. 80a–1 *et seq.*, 80a–34(d), 80a–37, and 80a–39, unless otherwise noted.

\*    \*    \*    \*    \*

■ 2. Section 270.17j–1 is amended by:
■ a. Revising paragraph (a)(1)(i);
■ b. Revising paragraph (a)(2)(i);

■ c. Adding new paragraph (a)(11);
■ d. Revising the introductory text of paragraphs (d)(1)(i), (d)(1)(ii), and (d)(1)(iii);
■ e. Revising paragraph (d)(2)(iv); and
■ f. Adding new paragraph (d)(2)(vi).
The additions and revisions to read as follows:

### § 270.17j–1    Personal investment activities of investment company personnel.

(a) \* \* \*
(1) \* \* \*

(i) Any Advisory Person of a Fund or of a Fund's investment adviser. If an investment adviser's primary business is advising Funds or other advisory clients, all of the investment adviser's directors, officers, and general partners are presumed to be Access Persons of any Fund advised by the investment adviser. All of a Fund's directors, officers, and general partners are presumed to be Access Persons of the Fund.

\*    \*    \*    \*    \*

(2) \* \* \*

(i) Any director, officer, general partner or employee of the Fund or investment adviser (or of any company in a control relationship to the Fund or investment adviser) who, in connection with his or her regular functions or duties, makes, participates in, or obtains information regarding, the purchase or sale of Covered Securities by a Fund, or whose functions relate to the making of any recommendations with respect to such purchases or sales; and

\*    \*    \*    \*    \*

(11) *Automatic Investment Plan* means a program in which regular periodic purchases (or withdrawals) are made automatically in (or from) investment accounts in accordance with a predetermined schedule and allocation. An Automatic Investment Plan includes a dividend reinvestment plan.

\*    \*    \*    \*    \*

(d) \* \* \*
(1) \* \* \*

(i) *Initial Holdings Reports.* No later than 10 days after the person becomes an Access Person (which information must be current as of a date no more than 45 days prior to the date the person becomes an Access Person):

\*    \*    \*    \*    \*

(ii) *Quarterly Transaction Reports.* No later than 30 days after the end of a calendar quarter, the following information:

\*    \*    \*    \*    \*

(iii) *Annual Holdings Reports.* Annually, the following information (which information must be current as

of a date no more than 45 days before the report is submitted):

\*    \*    \*    \*    \*

(2) \* \* \*

(iv) An Access Person to an investment adviser need not make a separate report to the investment adviser under paragraph (d)(1) of this section to the extent the information in the report would duplicate information required to be recorded under § 275.204–2(a)(13) of this chapter.

\*    \*    \*    \*    \*

(vi) An Access Person need not make a quarterly transaction report under paragraph (d)(1)(ii) of this section with respect to transactions effected pursuant to an Automatic Investment Plan.

### PART 275—RULES AND REGULATIONS, INVESTMENT ADVISERS ACT OF 1940

■ 3. The general authority citation for part 275 is revised to read in part as follows:

**Authority:** 15 U.S.C. 80b–2(a)(11)(F), 80b–2(a)(17), 80b–3, 80b–4, 80b–4a, 80b–6(4), 80b–6a, and 80b–11, unless otherwise noted.

\*    \*    \*    \*    \*

■ 4. Section 275.204–2 is amended by revising paragraphs (a)(12), (a)(13), and (e)(1) to read as follows:

### § 275.204–2    Books and records to be maintained by investment advisers.

(a) \* \* \*

(12)(i) A copy of the investment adviser's code of ethics adopted and implemented pursuant to § 275.204A–1 that is in effect, or at any time within the past five years was in effect;

(ii) A record of any violation of the code of ethics, and of any action taken as a result of the violation; and

(iii) A record of all written acknowledgments as required by § 275.204A–1(a)(5) for each person who is currently, or within the past five years was, a supervised person of the investment adviser.

(13)(i) A record of each report made by an access person as required by § 275.204A–1(b), including any information provided under paragraph (b)(3)(iii) of that section in lieu of such reports;

(ii) A record of the names of persons who are currently, or within the past five years were, access persons of the investment adviser; and

(iii) A record of any decision, and the reasons supporting the decision, to approve the acquisition of securities by access persons under § 275.204A–1(c), for at least five years after the end of the

App 42

fiscal year in which the approval is granted.

\*     \*     \*     \*     \*

(e)(1) All books and records required to be made under the provisions of paragraphs (a) to (c)(1)(i), inclusive, and (c)(2) of this section (except for books and records required to be made under the provisions of paragraphs (a)(11), (a)(12)(i), (a)(12)(iii), (a)(13)(ii), (a)(13)(iii), (a)(16), and (a)(17)(i) of this section), shall be maintained and preserved in an easily accessible place for a period of not less than five years from the end of the fiscal year during which the last entry was made on such record, the first two years in an appropriate office of the investment adviser.

\*     \*     \*     \*     \*

■ 5. Section 275.204A–1 is added to read as follows:

### § 275.204A–1   Investment adviser codes of ethics.

(a) *Adoption of code of ethics.* If you are an investment adviser registered or required to be registered under section 203 of the Act (15 U.S.C. 80b–3), you must establish, maintain and enforce a written code of ethics that, at a minimum, includes:

(1) A standard (or standards) of business conduct that you require of your supervised persons, which standard must reflect your fiduciary obligations and those of your supervised persons;

(2) Provisions requiring your supervised persons to comply with applicable Federal securities laws;

(3) Provisions that require all of your access persons to report, and you to review, their personal securities transactions and holdings periodically as provided below;

(4) Provisions requiring supervised persons to report any violations of your code of ethics promptly to your chief compliance officer or, provided your chief compliance officer also receives reports of all violations, to other persons you designate in your code of ethics; and

(5) Provisions requiring you to provide each of your supervised persons with a copy of your code of ethics and any amendments, and requiring your supervised persons to provide you with a written acknowledgment of their receipt of the code and any amendments.

(b) *Reporting requirements.* (1) *Holdings reports.* The code of ethics must require your access persons to submit to your chief compliance officer or other persons you designate in your code of ethics a report of the access person's current securities holdings that meets the following requirements:

(i) *Content of holdings reports.* Each holdings report must contain, at a minimum:

(A) The title and type of security, and as applicable the exchange ticker symbol or CUSIP number, number of shares, and principal amount of each reportable security in which the access person has any direct or indirect beneficial ownership;

(B) The name of any broker, dealer or bank with which the access person maintains an account in which any securities are held for the access person's direct or indirect benefit; and

(C) The date the access person submits the report.

(ii) *Timing of holdings reports.* Your access persons must each submit a holdings report:

(A) No later than 10 days after the person becomes an access person, and the information must be current as of a date no more than 45 days prior to the date the person becomes an access person.

(B) At least once each 12-month period thereafter on a date you select, and the information must be current as of a date no more than 45 days prior to the date the report was submitted.

(2) *Transaction reports.* The code of ethics must require access persons to submit to your chief compliance officer or other persons you designate in your code of ethics quarterly securities transactions reports that meet the following requirements:

(i) *Content of transaction reports.* Each transaction report must contain, at a minimum, the following information about each transaction involving a reportable security in which the access person had, or as a result of the transaction acquired, any direct or indirect beneficial ownership:

(A) The date of the transaction, the title, and as applicable the exchange ticker symbol or CUSIP number, interest rate and maturity date, number of shares, and principal amount of each reportable security involved;

(B) The nature of the transaction (*i.e.*, purchase, sale or any other type of acquisition or disposition);

(C) The price of the security at which the transaction was effected;

(D) The name of the broker, dealer or bank with or through which the transaction was effected; and

(E) The date the access person submits the report.

(ii) *Timing of transaction reports.* Each access person must submit a transaction report no later than 30 days after the end of each calendar quarter, which report must cover, at a minimum, all transactions during the quarter.

(3) *Exceptions from reporting requirements.* Your code of ethics need not require an access person to submit:

(i) Any report with respect to securities held in accounts over which the access person had no direct or indirect influence or control;

(ii) A transaction report with respect to transactions effected pursuant to an automatic investment plan;

(iii) A transaction report if the report would duplicate information contained in broker trade confirmations or account statements that you hold in your records so long as you receive the confirmations or statements no later than 30 days after the end of the applicable calendar quarter.

(c) *Pre-approval of certain investments.* Your code of ethics must require your access persons to obtain your approval before they directly or indirectly acquire beneficial ownership in any security in an initial public offering or in a limited offering.

(d) *Small advisers.* If you have only one access person (*i.e.*, yourself), you are not required to submit reports to yourself or to obtain your own approval for investments in any security in an initial public offering or in a limited offering, if you maintain records of all of your holdings and transactions that this section would otherwise require you to report.

(e) *Definitions.* For the purpose of this section:

(1) *Access person* means:

(i) Any of your supervised persons:

(A) Who has access to nonpublic information regarding any clients' purchase or sale of securities, or nonpublic information regarding the portfolio holdings of any reportable fund, or

(B) Who is involved in making securities recommendations to clients, or who has access to such recommendations that are nonpublic.

(ii) If providing investment advice is your primary business, all of your directors, officers and partners are presumed to be access persons.

(2) *Automatic investment plan* means a program in which regular periodic purchases (or withdrawals) are made automatically in (or from) investment accounts in accordance with a predetermined schedule and allocation. An automatic investment plan includes a dividend reinvestment plan.

(3) *Beneficial ownership* is interpreted in the same manner as it would be under § 240.16a–1(a)(2) of this chapter in determining whether a person has beneficial ownership of a security for purposes of section 16 of the Securities

App 43

Exchange Act of 1934 (15 U.S.C. 78p) and the rules and regulations thereunder. Any report required by paragraph (b) of this section may contain a statement that the report will not be construed as an admission that the person making the report has any direct or indirect beneficial ownership in the security to which the report relates.

(4) *Federal securities laws* means the Securities Act of 1933 (15 U.S.C. 77a–aa), the Securities Exchange Act of 1934 (15 U.S.C. 78a–mm), the Sarbanes-Oxley Act of 2002 (Pub. L. 107–204, 116 Stat. 745 (2002)), the Investment Company Act of 1940 (15 U.S.C. 80a), the Investment Advisers Act of 1940 (15 U.S.C. 80b), title V of the Gramm-Leach-Bliley Act (Pub. L. 106–102, 113 Stat. 1338 (1999), any rules adopted by the Commission under any of these statutes, the Bank Secrecy Act (31 U.S.C. 5311–5314; 5316–5332) as it applies to funds and investment advisers, and any rules adopted thereunder by the Commission or the Department of the Treasury.

(5) *Fund* means an investment company registered under the Investment Company Act.

(6) *Initial public offering* means an offering of securities registered under the Securities Act of 1933 (15 U.S.C. 77a), the issuer of which, immediately before the registration, was not subject to the reporting requirements of sections 13 or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)).

(7) *Limited offering* means an offering that is exempt from registration under the Securities Act of 1933 pursuant to section 4(2) or section 4(6) (15 U.S.C. 77d(2) or 77d(6)) or pursuant to §§ 230.504, 230.505, or 230.506 of this chapter.

(8) *Purchase or sale of a security* includes, among other things, the writing of an option to purchase or sell a security.

(9) *Reportable fund* means:

(i) Any fund for which you serve as an investment adviser as defined in section 2(a)(20) of the Investment Company Act of 1940 (15 U.S.C. 80a–2(a)(20)) (*i.e.*, in most cases you must be approved by the fund's board of directors before you can serve); or

(ii) Any fund whose investment adviser or principal underwriter controls you, is controlled by you, or is under common control with you. For purposes of this section, *control* has the same meaning as it does in section 2(a)(9) of the Investment Company Act of 1940 (15 U.S.C. 80a–2(a)(9)).

(10) *Reportable security* means a security as defined in section 202(a)(18) of the Act (15 U.S.C. 80b–2(a)(18)), except that it does not include:

(i) Direct obligations of the Government of the United States;

(ii) Bankers' acceptances, bank certificates of deposit, commercial paper and high quality short-term debt instruments, including repurchase agreements;

(iii) Shares issued by money market funds;

(iv) Shares issued by open-end funds other than reportable funds; and

(v) Shares issued by unit investment trusts that are invested exclusively in one or more open-end funds, none of which are reportable funds.

## PART 279—FORMS PRESCRIBED UNDER THE INVESTMENT ADVISERS ACT OF 1940

■ 6. The authority citation for Part 279 continues to read as follows:

**Authority:** The Investment Advisers Act of 1940, 15 U.S.C. 80b–1, *et seq.*

■ 7. Form ADV (referenced in § 279.1) is amended by:
■ In part II, at the end of Item 9 add ''Describe, on Schedule F, your code of ethics, and state that you will provide a copy of your code of ethics to any client or prospective client upon request.''

**Note:** The text of Form ADV does not and this amendment will not appear in the Code of Federal Regulations.

Dated: July 2, 2004.

By the Commission.

**Margaret H. McFarland,**

*Deputy Secretary.*

[FR Doc. 04–15585 Filed 7–8–04; 8:45 am]

**BILLING CODE 8010–01–P**



required by paragraph (a)(2)(iii) of this section, the broker or dealer establishes, maintains, and enforces written policies and procedures reasonably designed to achieve compliance with Regulation Best Interest.

(b) *Definitions.* Unless otherwise provided, all terms used in this rule shall have the same meaning as in the Securities Exchange Act of 1934. In addition, the following definitions shall apply for purposes of this section:

(1) *Retail customer* means a natural person, or the legal representative of such natural person, who:

(i) Receives a recommendation of any securities transaction or investment strategy involving securities from a broker, dealer, or a natural person who is an associated person of a broker or dealer; and

(ii) Uses the recommendation primarily for personal, family, or household purposes.

(2) *Retail customer investment profile* includes, but is not limited to, the retail customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the retail customer may disclose to the broker, dealer, or a natural person who is an associated person of a broker or dealer in connection with a recommendation.

(3) *Conflict of interest* means an interest that might incline a broker, dealer, or a natural person who is an associated person of a broker or dealer —consciously or unconsciously—to make a recommendation that is not disinterested.

■ 3. Amend § 240.17a–3 by adding reserved paragraphs (a)(24) through (34) and paragraph (a)(35) to read as follows:

**§ 240.17a–3   Records to be made by certain exchange members, brokers and dealers.**

(a) * * *

(24)–(34) [Reserved].

(35) For each retail customer to whom a recommendation of any securities transaction or investment strategy involving securities is or will be provided:

(i) A record of all information collected from and provided to the retail customer pursuant to § 240.15*l*–1, as well as the identity of each natural person who is an associated person, if any, responsible for the account.

(ii) For purposes of this paragraph (a)(35), the neglect, refusal, or inability of the retail customer to provide or update any information described in paragraph (a)(35)(i) of this section shall excuse the broker, dealer, or associated

person from obtaining that required information.

*    *    *    *    *

■ 4. Amend § 240.17a–4 by revising paragraph (e)(5) to read as follows:

**§ 240.17a–4   Records to be preserved by certain exchange members, brokers and dealers.**

*    *    *    *    *

(e) * * *

(5) All account record information required pursuant to § 240.17a–3(a)(17) and all records required pursuant to § 240.17a–3(a)(35), in each case until at least six years after the earlier of the date the account was closed or the date on which the information was collected, provided, replaced, or updated.

*    *    *    *    *

By the Commission.

Dated: June 5, 2019.

**Vanessa Countryman,**

*Acting Secretary.*

[FR Doc. 2019–12164 Filed 7–11–19; 8:45 am]

**BILLING CODE 8011–01–P**

---

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 200, 240, 249, 275, and 279**

**[Release Nos. 34–86032; IA–5247; File No. S7–08–18]**

**RIN 3235–AL27**

**Form CRS Relationship Summary; Amendments to Form ADV**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

---

**SUMMARY:** The Securities and Exchange Commission (the ''Commission'' or the ''SEC'') is adopting new rules and forms as well as amendments to its rules and forms, under both the Investment Advisers Act of 1940 (''Advisers Act'') and the Securities Exchange Act of 1934 (''Exchange Act'') to require registered investment advisers and registered broker-dealers (together, ''firms'') to provide a brief relationship summary to retail investors. The relationship summary is intended to inform retail investors about: The types of client and customer relationships and services the firm offers; the fees, costs, conflicts of interest, and required standard of conduct associated with those relationships and services; whether the firm and its financial professionals currently have reportable legal or disciplinary history; and how to obtain additional information about the firm. The relationship summary will also

reference *Investor.gov/CRS,* a page on the Commission's investor education website, *Investor.gov,* which offers educational information to investors about investment advisers, broker-dealers, and individual financial professionals and other materials. Retail investors will receive a relationship summary at the beginning of a relationship with a firm, communications of updated information following a material change to the relationship summary, and an updated relationship summary upon certain events. The relationship summary is subject to Commission filing and recordkeeping requirements.

**DATES:**

*Effective dates:* The rules and form are effective September 10, 2019.

*Compliance dates:* The applicable compliance dates are discussed in section II.D.

**FOR FURTHER INFORMATION CONTACT:** : Gena Lai, James McGinnis, Elizabeth Miller, Sirimal R. Mukerjee, Olawalé Oriola, Alexis Palascak, Benjamin Tecmire, Roberta Ufford, Jennifer Porter (Branch Chief), Investment Adviser Regulation Office at (202) 551–6787 or *IArules@sec.gov;* Benjamin Kalish and Parisa Haghshenas (Branch Chief), Chief Counsel's Office at (202) 551–6825 or *IMOCC@sec.gov,* Division of Investment Management; Alicia Goldin, Emily Westerberg Russell, Lourdes Gonzalez (Assistant Chief Counsel), Office of Chief Counsel, Division of Trading and Markets, at (202) 551–5550 or *tradingandmarkets@sec.gov,* Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549.

**SUPPLEMENTARY INFORMATION:** The Commission is adopting new rule 17 CFR 275.204–5 [rule 204–5] under the Investment Advisers Act of 1940 [15 U.S.C. 80b] [1] and is adopting amendments to Form ADV to add a new Part 3: Form CRS [17 CFR 279.1] under the Advisers Act. The Commission is also adopting amendments to rules 17 CFR 275.203–1 [rule 203–1], 17 CFR 275.204–1 [rule 204–1], and 17 CFR 275.204–2 [rule 204–2] under the Advisers Act. The Commission is adopting new rule 17 CFR 240.17a–14 [rule 17a–14] [2] under the Securities

---

[1] 15 U.S.C. 80b. Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b, at which the Advisers Act is codified, and when we refer to rules under the Advisers Act, or any paragraph of these rules, we are referring to Title 17, part 275 of the Code of Federal Regulations [17 CFR 275], in which these rules are published.

[2] 15 U.S.C. 78a. Unless otherwise noted, when we refer to the Exchange Act, or any paragraph of the Exchange Act, we are referring to 15 U.S.C. 78a, at which the Exchange Act is codified, and when we

Exchange Act of 1934 and new Form CRS [17 CFR 249.641] under the Exchange Act. The Commission is also adopting amendments to rules 17 CFR 240.17a–3 [rule 17a–3] and 17 CFR 240.17a–4 [rule 17a–4] under the Exchange Act. The Commission is also adopting amendments to rule 17 CFR 200.800 [rule 800].

## Table of Contents

I. Introduction
II. Form CRS Relationship Summary
  A. Presentation and Format
  1. Limited Prescribed Wording
  2. Standard Question-and-Answer Format and Other Presentation Instructions
  3. Electronic and Graphical Formats, and Layered Disclosure
  4. Conversation Starters
  5. Presentation of Relationship Summaries by Dual Registrants and Affiliated Firms
  B. Items
  1. Introduction
  2. Relationships and Services
  3. Summary of Fees, Costs, Conflicts, and Standard of Conduct
  4. Disciplinary History
  5. Additional Information
  6. Proposed Items Omitted in Final Instructions
  C. Filing, Delivery, and Updating Requirements
  1. Definition of Retail Investor
  2. Filing Requirements
  3. Delivery Requirements
  4. Updating Requirements
  D. Transition Provisions
  E. Recordkeeping Amendments
III. Disclosures About a Firm's Regulatory Status and a Financial Professional's Association
IV. Economic Analysis
  A. Introduction
  B. Baseline
  1. Providers of Financial Services
  2. Investor Perceptions about the Marketplace for Financial Services and Disclosures
  3. Investor Responses to Disclosures About Financial Professionals and Firms
  C. Broad Economic Considerations
  D. Economic Effects of the Relationship Summary
  1. Retail Investors
  2. Broker-Dealers and Investment Advisers (Registrants)
  3. Impact on Efficiency, Competition, and Capital Formation
  4. Alternatives to the Relationship Summary
V. Paperwork Reduction Act Analysis
  A. Form ADV
  1. Respondents: Investment Advisers and Exempt Reporting Advisers
  2. Changes in Average Burden Estimates and New Burden Estimates
  3. Total Revised Burden Estimates for Form ADV
  B. Rule 204–2 Under the Advisers Act
  1. Changes in Burden Estimates and New Burden Estimates
  2. Revised Annual Burden Estimates
  C. Rule 204–5 Under the Advisers Act
  1. Respondents: Investment Advisers
  2. Initial and Annual Burdens
  D. Form CRS and Rule 17a–14 Under the Exchange Act
  1. Respondents: Broker-Dealers
  2. Initial and Annual Burdens
  E. Recordkeeping Obligations Under Exchange Act Rule 17a–3
  F. Record Retention Obligations Under Exchange Act Rule 17a–4
  1. Changes in Burden Estimates and New Burden Estimates
  2. Revised Annual Burden Estimates
VI. Final Regulatory Flexibility Analysis
  A. Need for and Objectives of the Amendments
  B. Significant Issues Raised by Public Comments
  C. Small Entities Subject to the Rule and Rule Amendments
  1. Investment Advisers
  2. Broker-Dealers
  D. Projected Reporting, Recordkeeping, and Other Compliance Requirements
  1. Initial Preparation and Filing of the Relationship Summary
  2. Delivery and Updating Requirements Related to the Relationship Summary
  3. Recordkeeping Requirements Related to the Relationship Summary
  E. Agency Action To Minimize Effect on Small Entities
VII. Statutory Authority
Text of the Rule and Form

## I. Introduction

Individual investors rely on the services of broker-dealers and investment advisers when making and implementing investment decisions. Research continues to show that retail investors are confused about the services, fees, conflicts of interest, and the required standard of conduct for particular firms, and the differences between broker-dealers and investment advisers.[3] We are adopting a new set of disclosure requirements designed to reduce retail investor confusion in the marketplace for brokerage and investment advisory services and to assist retail investors with the process of deciding whether to engage, or to continue to engage, a particular firm[4] or

[3] Brian Scholl, *et al.,* SEC Office of the Investor Advocate and RAND Corporation, *The Retail Market for Investment Advice* (2018), *available at https://www.sec.gov/comments/s7-07-18/s70718-4513005-176009.pdf* (''OIAD/RAND'') (finding that participant understanding of types of financial services and financial professionals continues to be low). The SEC's Office of Investor Advocate and the RAND Corporation prepared this research report regarding the retail market of investment advice prior to, and separate from, our rulemaking proposal. This report was included in the comment file at *https://www.sec.gov/comments/s7-07-18/s70718-4513005-176009.pdf.*

[4] For purposes of this release, the term ''firm'' includes sole proprietorships and other business organizations that are registered as (i) an investment

financial professional and whether to establish, or to continue to maintain, an investment advisory or brokerage relationship.[5] Firms will deliver to retail investors a customer or client relationship summary (''relationship summary'' or ''Form CRS'') that provides succinct information about the relationships and services the firm offers to retail investors, fees and costs that retail investors will pay, specified conflicts of interest and standards of conduct, and disciplinary history, among other things.[6] The relationship summary will also link to *Investor.gov/CRS* on the Commission's investor education website, *Investor.gov*, which offers educational information to investors about investment advisers, broker-dealers, and individual financial professionals and other materials.

We proposed a version of a relationship summary on April 18, 2018.[7] The proposed relationship summary would have required information separated into the following sections: (i) Introduction; (ii) the relationships and services the firm offers to retail investors; (iii) the standard of conduct applicable to those services; (iv) the fees and costs that retail investors will pay; (v) comparisons of brokerage and investment advisory services (for standalone broker-dealers and investment advisers);[8] (vi) conflicts of

adviser under section 203 of the Advisers Act; (ii) a broker-dealer under section 15 of the Exchange Act; or (iii) a broker-dealer under section 15 of the Exchange Act and as an investment adviser under section 203 of the Advisers Act.

[5] The requirements adopted here, with modifications as discussed in this release, were proposed in Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 4888, Exchange Act Release No. 83063 (Apr. 18, 2018) [83 FR 23848 (May 23, 2018)] (''Proposing Release'').

[6] For investment advisers registered with the Commission, a new Form ADV Part 3 will describe the requirements for the relationship summary and it will be required by amended rule 203–1. For broker-dealers, Form CRS will be required by new rule 17a–14 under the Exchange Act. When we refer to Form CRS in this release, we are referring to Form CRS for both broker-dealers and investment advisers registered with the Commission. We are also adopting conforming technical and clarifying amendments to the General Instructions of Form ADV.

[7] *See* Proposing Release, *supra* footnote 5.

[8] We proposed definitions for ''standalone investment adviser'' and ''standalone broker-dealer''. *See* Proposed General Instruction 9.(f) to Form CRS. Given the streamlining and other revisions to the Form CRS instructions relative to the proposal, we believe that these proposed definitions are no longer needed and therefore are not adopting them. We use the terms throughout this release, however, for the avoidance of doubt, to indicate broker-dealers and investment advisers that are not dual registrants. We are adopting the

refer to rules under the Exchange Act, or any paragraph of these rules, we are referring to Title 17, part 240 of the Code of Federal Regulations [17 CFR 240], in which these rules are published.

Continued

interest; (vii) where to find additional information, including whether the firm and its financial professionals currently have reportable legal or disciplinary history and who to contact about complaints; and (viii) key questions for retail investors to ask the firm's financial professional. The proposed instructions required firms to use standardized headings in a prescribed order throughout the disclosure and respond to the required items by using a mix of language prescribed in the instructions as well as their own wording in describing their services and offerings. The proposal limited the relationship summary to four pages or an equivalent length if in electronic format and also included three examples of how the relationship summary might look for a standalone broker-dealer, a standalone investment adviser, and a dual registrant.

To better understand retail investors' views about the disclosures designed for them, the Commission engaged in broad outreach to investors and other market participants. As described further throughout the release, the Commission received substantial feedback on the proposed relationship summary in several forms. We received comment letters in connection with the Proposing Release from a variety of commenters including individual investors, consumer advocacy groups, financial services firms, investment professionals, industry and trade associations, state securities regulators, bar associations, and others.[9] Several of those commenters provided alternative mock-ups to illustrate their suggestions. Additionally, some commenters submitted reports of surveys or studies that they had conducted or engaged third parties to conduct in connection with the proposal. The Commission also received input and recommendations from its Investor Advisory Committee ("IAC") on the proposed relationship summary to improve its effectiveness.[10]

The Commission also solicited comments from individual investors through a number of forums in addition to the traditional requests for comment in the Proposing Release. The Commission used a "feedback form" designed specifically to solicit input from retail investors with a set of questions requesting both structured and narrative responses, and received more than 90 responses from individuals who reviewed and commented on the sample proposed relationship summaries published in the proposal.[11] Seven investor roundtables were held in different locations across the country to solicit further comment from individual investors on the proposed relationship summary, and we received in-person feedback from almost 200 attendees in total.[12]

Further, the Commission's Office of the Investor Advocate engaged the RAND Corporation ("RAND") to conduct investor testing of the proposed relationship summary.[13] RAND conducted a survey of over 1,400 individuals through a nationally representative panel to collect information on the opinions, preferences, attitudes, and level of self-assessed comprehension regarding the sample dual-registrant relationship summary in the proposal. RAND also conducted qualitative interviews of a smaller sample of individuals to ascertain comprehension of the relationship summary and gain feedback from interview participants, which allowed RAND to obtain insights to complement its survey.[14] On November 7, 2018, the Office of the Investor Advocate made the report on that testing available in the comment file to allow the public to consider and comment on the supplemental information.[15] The Commission received several letters in response to the inclusion of the RAND 2018 report in the comment file.[16]

As noted, some commenters submitted reports of surveys and studies to the comment file, and the design and scope of these varied considerably. Two reports described online surveys of

---

proposed definition for "dual registrant" substantially as proposed. We are adding language in the definition of dual registrant in the final instructions to clarify that a dually registered firm is not considered a dual registrant for purposes of Form CRS and the final instructions if the dually registered firm does not provide both investment advisory and brokerage services to retail investors. *See* General Instruction 11.C to Form CRS; *see infra* footnotes 201–202 and accompanying text.

[9] The comment letters are available in the comment file at *https://www.sec.gov/comments/s7-08-18/s70818.htm.*

[10] *See* Investor Advisory Committee, *Recommendation of the Investor as Purchaser Subcommittee Regarding Proposed Regulation Best Interest, Form CRS, and Investment Advisers Act Fiduciary Guidance* (Nov. 7, 2018), *available at https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac110718-investor-as-purchaser-*

*subcommittee-recommendation.pdf.* ("IAC Form CRS Recommendation"). The majority of the IAC recommended that the Commission conduct usability testing of the proposed Form CRS disclosures and, if necessary, revise them to ensure that they enable investors to make an informed choice among different types of providers and accounts. In addition, when considering potential Commission rulemaking under section 913 of the Dodd-Frank Act, the IAC also recommended that the Commission adopt a uniform, plain English disclosure document to be provided to customers and potential customers of broker-dealers and investment advisers at the start of the engagement, and periodically thereafter, that covers basic information about the nature of services offered, fees and compensation, conflicts of interest, and disciplinary record. *See* Investor Advisory Committee, *Recommendation of the Investor Advisory Committee: Broker-Dealer Fiduciary Duty* (Nov. 22, 2013), *available at https://www.sec.gov/spotlight/investor-advisory-committee-2012/fiduciary-duty-recommendation-2013.pdf,* as amended in *https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac112213-minutes.htm* ("IAC Broker-Dealer Fiduciary Duty Recommendations"). We discuss these IAC findings and recommendations in several sections below. Under section 39 of the Exchange Act, the Commission is required to review, assess, and disclose the action, if any, the Commission intends to take with respect to the findings and recommendations of the IAC; however, the Commission is not required to agree or to act upon any such findings or recommendations. *See* 15 U.S.C. 78pp.

[11] The feedback forms are available in the comment file at *https://www.sec.gov/comments/s7-08-18/s70818.htm* ("Feedback Forms"). When we refer to Feedback Form commenters, we include those who completed and submitted a Feedback Form with a relevant response or comment answering at least one of the questions on the form. To simplify discussion of comments received on the Feedback Forms, staff aggregated and summarized these comments in an appendix to this release (*see* Appendix C, the "Feedback Forms Comment Summary"), and references to individual Feedback Forms in this release use short-form names defined in the Feedback Forms Comment Summary.

[12] The transcripts from the seven investor roundtables, which took place in Atlanta ("Atlanta Roundtable"), Baltimore ("Baltimore Roundtable"), Denver ("Denver Roundtable"), Houston ("Houston Roundtable"), Miami ("Miami Roundtable"), Philadelphia ("Philadelphia Roundtable"), and Washington, DC ("Washington, DC Roundtable"), are available in the comment file at *https://*

*www.sec.gov/comments/s7-08-18/s70818.htm#transcripts.*

[13] Angela A. Hung, *et al.,* RAND Corporation, *Investor Testing of Form CRS Relationship Summary* (2018), *available at https://www.sec.gov/about/offices/investorad/investor-testing-form-crs-relationship-summary.pdf* ("RAND 2018").

[14] RAND conducted a total of 31 in-person interviews with investors recruited using guidelines designed to achieve a sample that had a broad range of educational background, racial and ethnic characteristics, gender, age and experience working with financial professionals. In describing the design of qualitative interviews, RAND explains that interviews included some general questions about comprehension and helpfulness of the form, which provided a window into participants' understanding of concepts introduced in the relationship summary, but were not designed to serve as a full assessment of participants' objective understanding of the relationship summary. *See* RAND 2018, *supra* footnote 13.

[15] *See Investor Testing of the Proposed Relationship Summary for Investment Advisers and Broker-Dealers,* Securities and Exchange Commission Press Release 2018–257 (Nov. 7, 2018), *available at https://www.sec.gov/news/press-release/2018-257.*

[16] *See, e.g.,* Comment Letter of Investment Adviser Association (Dec. 4, 2018); Comment Letter of Ron A. Rhodes (Dec. 6, 2018); Comment Letter of AFL–CIO, *et al.* (Dec. 7, 2018) ("AFL–CIO Letter"); Comment Letter of Betterment (Dec. 7, 2018) ("Betterment Letter II"); Comment Letter of Consumer Federation of America (Dec. 7, 2018) ("CFA Letter II"); Comment Letter of Financial Services Institute (Dec. 7, 2018) ("FSI Letter I"); Comment Letter of Public Investors Arbitration Bar Association (Dec. 7, 2018); Comment Letter of Consumer Reports (Feb. 15, 2019) ("Consumer Reports Letter").

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations **33495**

larger sample sizes—one based on the sample proposed dual-registrant relationship summary [17] and another based on the proposed sample standalone investment adviser relationship summary.[18] A group of commenters submitted two reports of usability testing of the sample proposed dual-registrant relationship summary based on a small number of long-form interviews.[19] One of the two surveys, and the two interview-based studies, included questions designed to ascertain comprehension and tested alternate relationship summary designs with changes to some of the proposed prescribed wording and presentation from the proposal.[20] Finally, two different commenters submitted surveys of retail investors' views about disclosure communications provided by firms and their relationships with financial professionals, which did not test any version of the proposed relationship summary.[21]

The Commission appreciates the time and effort of these commenters who submitted surveys and studies. The Commission has carefully considered this input. The varying designs and scope of these surveys and studies limits us from drawing definitive conclusions, and we do not view any one of the surveys and studies submitted by commenters, or the RAND 2018 report, as dispositive. However, these surveys and studies submitted by commenters, together with the results of the RAND 2018 report, input from individual investors at our roundtables and on Feedback Forms, and other information offered by other commenters, have informed our policy choices. Throughout this release we discuss observations reported in the RAND 2018 report and in surveys and studies submitted by commenters, and how these observations informed our policy choices as well as the costs and benefits of such choices.

Overall, we believe that feedback we have received from or on behalf of retail investors through the RAND 2018 report, surveys and studies submitted by commenters, and input received at roundtables and on Feedback Forms, demonstrate that the proposed relationship summary would be useful for retail investors and provide information, *e.g.,* about services, fees and costs, and standard of care, that would help investors to make more informed choices when deciding among firms and account options. For example, among the RAND 2018 survey respondents, nearly 90% said that the relationship summary would help them make more informed decisions about types of accounts and services and more than 80% said it would help them compare accounts offered by different firms.[22] RAND 2018 survey participants rated information about the firm's relationship and services and fees and costs to be among the most informative.[23] In other surveys, large majorities of respondents also reacted positively to the relationship summary and the types of information that would be provided.[24] In the RAND 2018 qualitative interviews, it was observed that participants could learn new information from the proposed relationship summary.[25] Similarly, other surveys and studies that assessed investor comprehension observed that investors learned important information by reviewing the relationship summary.[26] Over 70% of individuals submitting Feedback Forms commented that they found the relationship summary to be "useful," with more than 80% rating the relationship summary sections describing relationships and services, obligations, and fees and costs as "very useful" or "useful." [27] Investor roundtable participants also reacted

[17] Comment Letter of Cetera Financial Group (Nov. 19, 2018) ("Cetera Letter II") (attaching report of Woelfel Research Inc. ("Woelfel")). Woelfel, an independent research firm, conducted internet interviews in June 2018 with a sample of 800 adults aged 25 and over, including individuals that had a current relationship with a financial professional and individuals who did not have a current financial professional relationship. Respondents were asked to read the sample dual-registrant relationship summary included in the proposal and answer a series of questions about the document overall and for specific sections. *Id.*

[18] Comment Letter of Betterment (Aug. 7, 2018) ("Betterment Letter I") (attaching report of Hotspex, Inc. ("Hotspex")). Hotspex, an independent research firm, conducted online surveys with 304 current or potential U.S. investors ages 18 and over in June 2018. The survey tested the standalone investment adviser relationship summary prepared following the instructions and sample design of the proposal (the "SEC Form") and a redesigned version developed by Betterment. *Id.* Respondents reviewed and answered questions about only one version; 154 responded to questions on the SEC Form. *Id.*

[19] Kleimann Communication Group, Inc., *Final Report on Testing of Proposed Customer Relationship Summary Disclosures, Submitted to AARP, Consumer Federation of America, and Financial Planning Coalition* (Sept. 10, 2018), *available at https://www.sec.gov/comments/s7-08-18/s70818-4341455-173259.pdf* ("Kleimann I") (results of 15 90-minute qualitative interviews focusing on how consumers interacted with the sample dual-registrant relationship summary as proposed); Kleimann Communication Group, Inc., *Report on Development and Testing of Model Client Relationship Summary, Presented to AARP and Certified Financial Planner Board of Standards, Inc.* (Dec. 5, 2018), *available at https://www.sec.gov/comments/s7-07-18/s70718-4729850-176771.pdf* ("Kleimann II") (results of testing alternate designs of the proposed dual-registrant relationship summary in 18 one-on-one qualitative interviews).

[20] *See* Betterment Letter I (Hotspex), *supra* footnote 18 (online survey included ten true-false questions designed to test investor comprehension of the standalone investment adviser relationship summary as proposed relative to a version redesigned by Betterment); Kleimann I, *supra* footnote 19 (interview questions designed to elicit responses that could demonstrate two levels of cognitive skills); Kleimann II, *supra* footnote 19.

[21] Comment Letter of Charles Schwab & Co., Inc. (Aug. 6, 2018) ("Schwab Letter I") (attaching report of Koski Research ("Koski")). Koski, an independent research firm, conducted an online survey of a national sample of 1000 investors in June 2018 to measure investor understanding of fiduciary duty and best interest standards for investment advice and obtain input from retail investors on method, frequency and content of disclosure communications. *Id.;* Comment Letter of the Center for Capital Markets Competitiveness of the U.S. Chamber of Commerce (Sept. 5, 2018) ("CCMC Letter") (attaching report of investor polling ("investor polling")). CCMC commissioned online polling of 801 investors in May 2018 to examine investors' perspectives on working with financial professionals and gauge priorities regarding new regulatory requirements. *Id.*

[22] RAND 2018, *supra* footnote 13.

[23] RAND 2018, *supra* footnote 13 (a majority of respondents rated both of the relationships and services section and fees and costs sections of the relationship summary as one of two sections that are "most informative").

[24] Cetera Letter II (Woelfel), *supra* footnote 17 (more than 80% of respondents rated all of the nine topics covered by the relationship summary as "very" or "somewhat" important; 88% rated fees and costs and the firm's obligations as "very" or "somewhat" important; 61% said the relationship summary had provided the necessary information to help decide whether a brokerage relationship or an advisory relationship is best); Betterment Letter I (Hotspex), *supra* footnote 18 (finding that around 90% of survey respondents found the proposed relationship summary "very useful" or "somewhat useful"); *see also* CCMC Letter (investor polling), *supra* footnote 21 (when the concept of the proposed relationship summary was described, 62% of participants said they would be interested in reading the document and 72% agreed that the new document will "boost transparency and help build stronger relationships between me and my financial professional").

[25] RAND 2018, *supra* footnote 13 (concluding from qualitative interviews that "[p]articipants demonstrated evidence of learning new information from the relationship summary" even though interview discussions revealed areas of confusion).

[26] *See* Kleimann I, *supra* footnote 19 (although the authors concluded that, overall, participants had difficulty with "sorting out similarities and differences," the study reports that "nearly all participants easily identified a key difference between Brokerage Accounts and Advisory accounts as the fee structure" and that "most participants understood that both Brokerage Accounts and Advisory Accounts could have financial relationships with other companies that could be potential conflicts with clients' best interests."); *see also* Betterment Letter I (Hotspex), *supra* footnote 18 (83% of respondents correctly identified as "true" a statement that "some investment firms have a conflict of interest because they benefit financially from recommending certain investments" when viewing a version of the standalone adviser relationship summary constructed based on the instructions set forth in the proposal").

[27] *See* Feedback Forms Comment Summary, *supra* footnote 11 (summary of answers to Questions 1 and 2). In addition, more than 70% of commenters on Feedback Forms rated all of the other sections of the proposed relationship summary as "very useful" or "useful." *Id.*

**33496**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

positively and indicated that they found the relationship summary to be useful.[28] A significant percentage of RAND 2018 survey participants agreed that the relationship summary would facilitate conversations between retail investors and their financial professionals, and other surveys and studies reported similar observations.[29] Investor roundtable participants and comments on Feedback Forms also indicated that the relationship summary could facilitate conversations between retail investors and their financial professionals in a beneficial way.[30]

Many other commenters supported the concept of a short disclosure document for retail investors that would serve as part of a layered disclosure regime,[31] and agreed that that the

relationship summary would facilitate conversations between retail investors and their financial professionals in a beneficial way.[32] However, some commenters argued that the relationship summary is duplicative of other disclosures and is unnecessary.[33] Others cautioned against over-reliance on disclosure efforts to address all issues related to the different business models and the applicable standard of conduct for broker-dealers and investment advisers.[34]

Nearly all commenters (including commenters on Feedback Forms) and investors participating in roundtables,

suggested modifications to the proposed relationship summary, as did observations reported in the RAND 2018 report and surveys and studies submitted to the comment file. Suggested changes generally pertained to: Appropriate placement of educational material; length and format; use of prescribed wording; comprehensibility; additional flexibility for firms; and delivery requirements (including electronic delivery). For example, some commenters and observations from the RAND 2018 survey and other surveys and studies indicated that the proposed relationship summary could be difficult to understand, particularly the proposed disclosures on fees, conflicts of interest, and standards of conduct.[35] Many commenters preferred a shorter, one-to-two page document relying more heavily on layered disclosure, such as by using more hyperlinks and other cross-references to more detailed disclosure.[36] Many commenters from both industry and investor groups argued that some of the prescribed wording would not be accurate or applicable in relation to the different services and business models of all firms or could lead to confusing or

---

[28] See e.g., Houston Roundtable, at 19 ("I think your idea of having . . . a short four page . . . is really helpful"), at 27 (reacting positively to the idea of the relationship summary but asking that updated versions indicate the changed content), and at 35 (agreeing that a disclosure such as the relationship summary is needed); Atlanta Roundtable, at 28 (stating that the proposed sample relationship summary is "a very good form" and "concise" and "easy to read and clear" but needs to be in a form that can be compared with other relationship summaries).

[29] RAND 2018, supra footnote 13 (approximately 76% of participants agreed that they would use the relationship summary as the basis for a conversation with an investment professional; in qualitative interviews, participants said they liked all of the questions and they would ask questions in meeting with a financial service provider); see also Kleimann I, supra footnote 19 (many investors responded that they would use key questions when speaking with their brokers); Betterment Letter I (Hotspex), supra footnote 18 (93% of respondents viewing a version of the proposed standalone relationship summary indicated that they were very or somewhat likely to ask the suggested questions.).

[30] Houston Roundtable (several investors responding that key questions would be helpful conversation starters, one commenter remarking that the Key Questions were "very, very good"); Feedback Forms Comment Summary, supra footnote 11 (summary of responses to Question 7) (over 75% of commenters indicated that the Key Questions are useful). Eleven Feedback Forms included specific comments agreeing that the Key Questions would encourage discussions with financial professionals. See, e.g., Hawkins Feedback Form ("Useful information for the investor to have before engaging in a conversation with an investment firm. Giving some examples of types of questions to ask would be beneficial."); Asen Feedback Form ("The Relationship Summary (and not the individual BD or RIA account opening forms) is the opportunity to have that important conversation and "educate" the customer."); Baker Feedback Form ("key questions are very useful as they give words to an unsophisticated client").

[31] See, e.g., Comment Letter of AARP (Aug. 7, 2018) ("AARP Letter"); Comment Letter of Consumers Union (Oct. 19, 2018) ("Consumers Union Letter"); Comment Letter Type B; Comment Letter of the North American Securities Administrators Association, Inc. (Aug. 23, 2018) ("NASAA Letter"); Comment Letter of the Securities Industry and Financial Markets Association (Aug. 7, 2018) ("SIFMA Letter"); Comment Letter of Triad Advisors, LLC (Jul. 26, 2018) ("Triad Letter"); Comment Letter of Investacorp, Inc. (Jul. 26, 2018) ("Investacorp

Letter"); Comment Letter of Ladenburg Thalmann Financial Services Inc. (Jul. 26, 2018) ("Ladenburg Letter"); Comment Letter of KMS Financial Services, Inc. (Jul. 27, 2018) ("KMS Financial Letter"); Comment Letter of Securities America, Inc. (Jul. 27, 2018) ("Securities America Letter").

[32] See, e.g., Comment Letter of Commonwealth Financial Network (Aug 7, 2018) ("CFN Letter") ("Form CRS may also drive conversations that help potential clients and advisors determine which type of relationship (brokerage or advisory) is most appropriate."); CCMC Letter (concluding from investor polling that "[t]he SEC's proposed Form CRS could be a good way to start a conversation with investors."); Comment Letter of the Financial Services Institute (Aug. 7, 2018) ("FSI Letter I") ("The greatest benefit of these disclosures will come in the conversations they facilitate between the client and their financial professionals"); Comment Letter Wells Fargo & Company (Aug. 7, 2018) ("Wells Fargo Letter") ("the basic premise that a brief overview document designed to provide a high-level understanding of important information to clients (with directions to more detailed information) that can be used to prompt more detailed conversations with financial professionals is a good one"). Triad Letter ("The greatest benefit of the CRS will come in the conversations it facilitates between the client and their Financial Professional. . . ."); Ladenburg Letter (same); KMS Financial Letter (same).

[33] Some commenters stated that Form CRS would be duplicative of the Disclosure Obligation required by Regulation Best Interest. See, e.g., Triad Letter; Investacorp Letter; Ladenburg Letter; KMS Financial Letter; Securities America Letter; FSI Letter I; Comment Letter of Securities Service Network, LLC (Aug. 6, 2018); Comment Letter of Cambridge Investment Research, Inc. (Aug. 7, 2018) ("Cambridge Letter"). Others argued that Form CRS is duplicative of other Form ADV disclosures. See, e.g., Comment Letter of MarketCounsel (Aug. 7, 2018) ("MarketCounsel Letter"); Comment Letter of the Investment Adviser Association (Aug. 6, 2018) ("IAA Letter I"); Comment Letter of Gerald Lopatin (Jul. 30, 2018). One commenter expressed concern that because the relationship summary would be duplicative of Form ADV and Form BD, retail customers would be less likely to read the more comprehensive disclosures. See Comment Letter of Financial Engines (Aug. 6, 2018) ("Financial Engines Letter").

[34] See Comment Letter of Integrated Financial Planning Solutions (Jul. 20, 2018) ("IFPS Letter") ("Clients do not have the ability to understand the disclosure material that is still written only by and for lawyers."); Comment Letter of Sen. Elizabeth Warren (Aug. 7, 2018) ("Warren Letter") (arguing that "the [Commission] shouldn't rely on disclosure alone to protect consumers"); Consumers Union Letter ("[W]hile we support simple, understandable disclosures, we caution against placing too much reliance on disclosure to protect investors."); Consumer Reports Letter.

[35] See RAND 2018, supra footnote 13 (among other findings, the percentages of respondents indicating that the fees and costs, conflicts of interest, and standards of conduct sections were either "difficult" or "very difficult" to understand were 35.5%, 33.5%, and 22.9%, respectively); Kleimann I, supra footnote 19 (noting that participants had difficulty "sorting out similarities and differences between Broker-Dealer Services and Investment Adviser Services. Both the formatting and language contributed to the confusion."); Betterment Letter I (Hotspex), supra footnote 18 (showing that survey participants had difficulty understanding differences in standard of care and did not find the section on conflicts in the standalone adviser relationship summary to be useful); see also Comment Letter of John Wahh (Apr. 23, 2018) ("Wahh Letter") (relationship summary is "impenetrable"); Comment Letter of David John Marotta (Apr. 26, 2018) ("Marotta Letter") (disclosures would be too confusing to clients); Comment Letter of John H. Robinson (Aug. 6, 2018) ("Robinson Letter") (expressing concern that relationship summary is too text-heavy for consumers to read and will be ineffective in resolving investor confusion); Comment Letter of CFA Institute (Aug. 7, 2018) ("CFA Institute Letter I") ("[A]s proposed, CRS is too wordy and technically written for the average investor to understand.").

[36] See, e.g., AARP Letter; Comment Letter of Better Markets (Aug. 7, 2018) ("Better Markets Letter"); Comment Letter of the Bank of America (Aug. 7, 2018) ("Bank of America Letter"); Comment Letter of the Committee on Capital Markets Regulation (Jul. 16, 2018) ("CCMR Letter"); Comment Letter of LPL Financial LLC (Aug. 7, 2018) ("LPL Financial Letter"); Schwab Letter I. Cf. RAND 2018, supra footnote 13 (finding at least a plurality of respondents would keep the length of each section "as is"; however, when asked "Is the Relationship Summary too long, too short, or about right?", 56.9% of respondents answered "too long" and only 41.2% responded "about right").

misleading disclosures.[37] Various commenters advocated for more flexibility for firms to use their own wording to describe their services more accurately.[38] Many commenters favored the use of a question-and-answer format, suggesting, for example, that focusing a document on investors' questions helps them to feel that the document is relevant to them and encourages them to read it.[39] Some commenters viewed parts of the relationship summary as educational, such as the sections comparing broker-dealers and investment advisers, describing the applicable standard of conduct, and containing key questions investors should ask, and advocated that the Commission should develop and provide educational material separately from firm-specific disclosures, such as in an additional disclosure layer or on the Commission's website.[40] Several individuals submitting Feedback Forms also were supportive of links to additional educational information.[41]

Although some commenters argued that the relationship summary is duplicative of other disclosures and is unnecessary,[42] we believe that the relationship summary has a distinct purpose and will provide a separate and important benefit relative to other disclosures. The relationship summary is designed to help retail investors select or determine whether to remain with a firm or financial professional by providing better transparency and summarizing in one place selected information about a particular broker-dealer or investment adviser. The format of the relationship summary also allows for comparability among the two different types of firms in a way that is distinct from other required disclosures. Both broker-dealers and investment advisers must provide disclosures on the same topics under standardized headings in a prescribed order to retail investors, which should benefit retail investors by allowing them to more easily compare services by comparing different firms' relationship summaries.[43] We do not believe that existing disclosures provide this level of transparency and comparability across investment advisers, broker-dealers, and dual registrants. The relationship summary also encourages retail investors to ask questions and highlights additional sources of information. All of these features should make it easier for investors to get the facts they need when deciding among investment firms or financial professionals and the accounts and services available to them. As noted above, the relationship summary will complement additional rules and guidance that the Commission is adopting concurrently to enhance protections for retail investors and is not designed to address all investor protection issues related to different business models and legal obligations of broker-dealers and investment advisers.[44]

Further to this purpose, in response to the comment letters and other feedback, we modified the instructions to reorganize and streamline the relationship summary, to enable more accurate descriptions tailored to what firms offer, and to help improve investor understanding of the disclosures provided. The instructions we are adopting are consistent with and designed to fulfill the original goals of the proposal, including the creation of relationship summaries that will highlight certain information in one place for retail investors in order to help them select or decide whether to remain with a firm or financial professional, encourage retail investors to engage in meaningful and individualized conversations with their financial professionals, and empower them to easily find additional information. Although certain prescribed generalized

---

[37] *See, e.g.,* Comment Letter of the Vanguard Group, Inc. (Aug. 7, 2018) (''Vanguard Letter'') (explaining instances in which the prescribed wording would be inaccurate or not sufficiently nuanced for some of its services); Comment Letter of the American Council of Life Insurers (Aug. 3, 2018) (''ACLI Letter'') (''[M]any of the statements mandated in the Proposed Rule are inaccurate from the perspective of a life insurer-affiliated broker-dealer); IAA Letter I (expressing concern that the proposed prescribed language describing legal standards of conduct would result in less accurate understanding and greater confusion for investors); FSI Letter I (''[S]ome of the prescribed disclosure language is highly problematic, will add to investor confusion, and would negatively impact [firms'] client relationships.''); AARP Letter (expressing concern that some of the prescribed language is too technical and likely to confuse retail investors); Comment Letter of the Insured Retirement Institute (Aug. 7, 2018) (''IRI Letter'') (expressing concern that the prescribed language would not permit descriptions of services offered outside of brokerage accounts, such as recommendations of variable annuities). One commenter asserted that prescribed wording requiring firms to compare themselves adversely with their competitors could raise First Amendment concerns. *See* Comment Letter of the Consumer Federation of America (Aug. 7, 2018) (''CFA Letter I'') (arguing that certain language requiring firms to compare their own services unfavorably to those of their competitors may raise First Amendment concerns, and that Proposed Item 5, Comparisons to be provided by standalone investment advisers and standalone broker-dealers, should be eliminated entirely); *see also infra* footnotes 77–80 and accompanying text. Although not explicitly raising First Amendment concerns, another commenter also opposed requiring firms to describe services of other types of financial professionals. *See* IAA Letter I (''In our view, it is not appropriate to require firms to include statements about business models other than their own.''). *But see* Comment Letter of AFL–CIO, Consumer Federation of America, *et. al.* (Apr. 26, 2019) (''AFL–CIO, CFA Letter'') (arguing that allowing firms more flexibility in their disclosure will result in a failure to clearly convey important information, and such information would not be comparable from firm to firm).

[38] *See, e.g.,* ACLI Letter (''Firms should have the flexibility in the Form CRS to accurately describe their business model and what their clients can expect from the relationship''); NASAA Letter (''[F]irms should have some level of flexibility in crafting their own Form CRS so that it is tailored for the different types of customers they service.''); Letter from Members of Congress (Aug. 8, 2019) (''The SEC should develop a disclosure form that ensures firms have the flexibility to provide information that the average investor will understand.''); IAA Letter I (advocating that firms be given flexibility to draft their own descriptions of their principal services and conflicts of interest); FSI Letter I (suggesting that the prescribed wording regarding the extent and frequency of monitoring be removed or customized using the firm's own wording); IRI Letter (firms need more latitude to describe their relationships and services and fees and costs, given their variability; one-size-fits-all disclosures are insufficient); Comment Letter of T. Rowe Price (Aug. 10, 2018) (''T. Rowe Letter'') (firms should have the flexibility to tailor their disclosures to make it clearer and more readable without potentially confusing investors); Vanguard Letter (suggesting that the Commission clarify that all of the prescribed disclosures may be modified to accurately describe the nature of firms' services

and conflicts of interest given their business models); Comment Letter of CUNA Mutual Group (Aug. 7, 2018).

[39] *See, e.g.,* CFA Letter I. Many of the mock-ups submitted by commenters used a question-and-answer format. *See* Comment Letter of Fidelity Brokerage Services LLC (Aug. 7, 2018) (''Fidelity Letter''); IAA Letter I; LPL Financial Letter; Comment Letter of Primerica (Aug. 7, 2018) (''Primerica Letter''); Schwab Letter I; SIFMA Letter; Wells Fargo Letter. For the purposes of this release, we view the substance and design of all mock-ups that commenters provided within their comment letters as comments on our proposed form, and the mock-ups have informed our approach to the relationship summary, as discussed below throughout.

[40] *See, e.g.,* Comment Letter of the American Securities Association (Aug. 7, 2018) (''ASA Letter''); Primerica Letter; ACLI Letter; IAA Letter I; Comment Letter of Pickard Djinis and Pisarri LLP (Aug. 14, 2018) (''Pickard Djinis and Pisarri Letter''); Comment Letter of L.A. Schnase (Jul. 30, 2018) (''Schnase Letter''); CFA Letter I; LPL Financial Letter.

[41] *See, e.g.,* Daunheimer Feedback Form (''I would like to see a list of applicable websites for discerning disciplinary websites or anything else that would additionally educate a consumer.''); Asen Feedback Form (''Might want to consider hyperlinking key words for ease of definition lookup.''); Baker Feedback Form (responding to a question on the Additional Information section, commented ''Helpful also were the website links, *i.e., sec.gov, investor.gov, BrokerCheck.Finra.org.*''); Smith2 Feedback Form (''would like to see a link included a site or sites that contain general investment information. Types of investments, risks, time horizons . . .'').

[42] *See supra* footnote 33.

[43] Several individuals submitting Feedback Forms said that more firm-specific information that could be easily compared would be helpful. *See, e.g.,* Lee1 Feedback Form (''The information should let me compare firms. . . . Make it short, more useful (so I can compare services and firms).''); Anonymous13 Feedback Form (''Firm specific info would be nice on this document.''); Bhupalam Feedback Form (''I would like to see additional information regarding specific firm rather than a general description.'').

[44] *See supra* footnote 34.

**33498**     **Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations

comparisons between brokerage and investment advisory services have been removed from the final instructions, we believe the revised instructions will result in more meaningful comparisons among firms.

The key changes of the relationship summary and instructions we are adopting include the following: [45]

• *Standardized Question-and-Answer Format and Less Prescribed Wording.* Instead of declarative headings as proposed, the final instructions for the relationship summary will require a question-and-answer format, with standardized questions serving as the headings in a prescribed order to promote consistency and comparability among different relationship summaries. The headings will be structured and machine-readable, to facilitate data aggregation and comparison. Under the standardized headings, firms will generally use their own wording to address the required topics. Thus, the final instructions contain less prescribed language, which creates more flexibility in providing accurate information to investors. Investment advisers and broker-dealers will be limited to two pages and dual registrants will be limited to four pages (or an equivalent length if in electronic format).[46]

• *Use of Graphics, Hyperlinks, and Electronic Formats.* To help retail investors easily digest the information, the instructions will specifically encourage the use of charts, graphs, tables, and other graphics or text features in order to explain or compare different aspects of the firm's offerings. If the chart, graph, table, or other graphical feature is self-explanatory and responsive to the disclosure item, additional narrative language that may be duplicative is not required. For electronic relationship summaries, the instructions encourage online tools that populate information in comparison boxes based on investor selections. The instructions permit, and in some instances require, a firm to cross-reference additional information (*e.g.,* concerning services, fees, and conflicts), and will require embedded hyperlinks in electronic versions to further facilitate layered disclosures. Firms must use text features to make the required cross-references more

noticeable and prominent in relation to other discussion text.

• *Introduction With Link to Commission Information.* The relationship summary will include a more streamlined introductory paragraph that will provide a link to *Investor.gov/CRS,* a page on the Commission's investor education website, *Investor.gov,* which offers educational information about investment advisers, broker-dealers, and individual financial professionals and other materials. In order to highlight the importance of these materials, the introduction also will note that brokerage and advisory services and fees differ and that it is important for the retail investor to understand the differences.

• *Combined Fees, Costs, Conflicts of Interest, and Standard of Conduct Section.* We are integrating the proposed fees and costs section with the sections discussing the conflicts of interest and standards of conduct. We are also expanding the discussion of fees and making several other changes to help make the disclosures clearer for retail investors. The relationship summary will cover the same broad topics as proposed, including a summary of fees and costs, a description of ways the firm makes money, certain conflicts of interest, and standards of conduct. In addition, firms will include disclosure about financial professionals' compensation.

• *Separate Disciplinary History Section.* Firms will be required to indicate under a separate heading whether or not they or any of their financial professionals have reportable disciplinary history and where investors can conduct further research on these events, instead of including this information under the Additional Information section as proposed.

• *Conversation Starters.* The proposed Key Questions to Ask have generally been integrated into the relationship summary sections either as question-and-answer headings or as additional ''conversation starters'' to provide clearer context for the questions. Retail investors can use these questions to engage in dialogue with their financial professionals about their individual circumstances. The discussion topics raised by certain other proposed key questions have been incorporated into the relationship summary through otherwise-required disclosure.

• *Elimination of Proposed Comparisons Section.* We are eliminating the proposed requirement that broker-dealers and investment advisers include a separate section

using prescribed wording that in a generalized way described how the services of investment advisers and broker-dealers, respectively, differ from the firm's services. We encourage, but do not require, dual registrants to prepare a single relationship summary that discusses both brokerage and investment advisory services. Whether dual registrants prepare a single or two separate relationship summaries to describe their brokerage and investment advisory services, they must present information on both services with equal prominence and in a manner that clearly distinguishes and facilitates comparison between the two. The material provided on *Investor.gov* offers educational information about investment advisers, broker-dealers, and individual financial professionals and other materials.

• *Delivery.* As proposed, investment advisers must deliver a relationship summary to each new or prospective client who is a retail investor before or at the time of entering into an investment advisory contract with the retail investor. In a change from the proposal, broker-dealers must deliver the relationship summary to each new or prospective customer who is a retail investor before or at the earliest of: (i) A recommendation of an account type, a securities transaction, or an investment strategy involving securities; (ii) placing an order for the retail investor; or (iii) the opening of a brokerage account for the retail investor. We also are revising the instructions to provide greater clarity on the use of electronic delivery, while generally maintaining the guidelines that were proposed.

We designed the final disclosure requirements in light of comments, input from individual investors through roundtables and on Feedback Forms, and observations reported in the RAND 2018 report and other surveys and studies, that suggest retail investors benefit from receiving certain information about a firm before the beginning of a relationship with that firm, but they prefer condensed disclosure so that they may focus on information that they perceive as salient to their needs and circumstances, and prefer having access to other ''layers'' of additional information rather than receiving a significant amount of information at once. Together, all of the required disclosures will assist a retail investor to make an informed choice regarding whether a brokerage or investment advisory relationship, as well as whether a particular broker-dealer or investment adviser, best suits his or her particular needs and

---

[45] If any of the provisions of these rules, or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application.

[46] For clarification purposes, one page is equivalent to a single-side of text on a sheet of paper, rather than two sides of the same paper.

App 51

circumstances. The relationship summary will complement additional rules and guidance that the Commission is adopting concurrently to enhance protections for retail investors.[47]

Some commenters responding to the RAND 2018 report noted that the RAND 2018 survey and qualitative interviews did not objectively test investor comprehension, and they pointed to observations from RAND 2018 interviews that suggested that some interview participants failed to understand differences in the legal standards that apply to brokerage and advisory accounts and did not understand the meaning of the word "fiduciary" for example.[48] They argued that we should conduct more usability testing before adopting Form CRS and Regulation Best Interest.[49]

[47] *See* Regulation Best Interest, Exchange Act Release No. 86031 (June 5, 2019) (adopting rule 15*l*–1 under the Exchange Act ("Regulation Best Interest")) ("Regulation Best Interest Release"). Along with adopting Regulation Best Interest, the Commission is clarifying standards of conduct for investment advisers. *See* Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Advisers Act Release No. 5248 (June 5, 2019) ("Fiduciary Release"). The Commission is also providing guidance about when a broker-dealer's advisory services are solely incidental to the conduct of the business of a broker or dealer. *See* Commission Interpretation Regarding the Solely Incidental Prong of the Broker-Dealer Exclusion to the Definition of Investment Adviser, Advisers Act Release No. 5249 (June 5, 2019) ("Solely Incidental Release").

[48] *See* CFA Letter II (noting that the testing conducted for the RAND 2018 Report is limited and does not provide more detailed information, such as transcripts of the in-depth interviews, to present fully the level of investor understanding); Comment Letter of CFA Institute (May 16, 2019) ("CFA Institute Letter II") ("The RAND Report is clear that its survey was not designed to measure objective comprehension . . . Nor did it provide respondents with alternatives that could have allowed them to express preferences for certain formats or language."). *See also* AFL–CIO Letter; Consumer Reports Letter; Comment Letter of PIABA (Dec. 7, 2018).

[49] *See, e.g.,* AFL–CIO Letter ("If the Commission chooses to maintain different standards for brokers and advisers, it must clearly delineate what the differences are . . . This would require rethinking the Form CRS and re-testing to ensure that it achieves these goals . . ."); CFA Letter II ("make the [RAND 2018] report the start, not the end, of an iterative process of testing and revision needed to develop disclosure that works . . ."); AFL–CIO, CFA Letter (stating ". . . unless the Commission retests the revised disclosure, it won't have any way to know whether the revised version solves the problems that earlier testing has identified."); Consumer Reports Letter ("SEC must test and retest Form CRS disclosures . . . and continue to publish the results of its testing before the form is made final"); CFA Institute Letter II. Others commented on the results of the RAND 2018 report but did not suggest delaying adoption of Form CRS. *See, e.g.,* Comment Letter of Charles Schwab & Co. Inc. (Dec. 7, 2018) ("Schwab Letter II") ("The Commission should acknowledge and act on consensus findings to improve the Form CRS"); Betterment Letter II (noting that the RAND 2018 report "demonstrates that Form CRS serves a valuable function"). *See also* FSI Letter II (encouraging the Commission to

We disagree. The amount of information available from the various investor surveys and investor testing described in this release, including those submitted by commenters, as well as the comment letters and other input submitted to the Commission for this rulemaking, is extensive. We considered all of this information thoroughly, leveraging our decades of experience with investor disclosures, when evaluating changes to the relationship summary from the proposal. The perceived usefulness of the relationship summary, as shown by observations in the RAND 2018 report, surveys and studies submitted by commenters, and input from individual investors at our roundtables and in Feedback Forms, demonstrates that, even as proposed, the relationship summary would benefit investors by providing information that would help investors make more informed choices when deciding among firms and account options.[50] Large majorities of participants in the RAND 2018 survey and in other surveys supported the specific topics, such as services, fees, conflicts and standards of conduct, that we require firms to address in the relationship summary.[51] Even though the RAND 2018 qualitative interviews and another interview-based study observed that interview participants could have some gaps in understanding, these studies still observed that interview participants could learn new important information from the relationship summary as proposed.[52]

"continue investor testing of Form CRS after the final rule is in place").

[50] *See supra* footnotes 22 to 30 and accompanying text. We note that the Department of Labor did not describe or reference usability testing in adopting its now vacated rule broadening the definition of fiduciary investment advice under the Employee Retirement Income Security Act of 1974 as amended ("ERISA") and the related Best Interest Contract Exemption ("BIC Exemption"). The BIC Exemption required certain disclosures to be provided to a retirement investor and included on a financial institution's public website. *See* DOL, Best Interest Contract Exemption, 81 FR 21002, 21045–52 (Apr. 8, 2016).

[51] *See supra* footnotes 23 to 24 and accompanying text; *see also* Schwab Letter (Koski), *supra* footnote 21 (reporting that retail investors say it is most important for firms to communicate about "costs I will pay for investment advice," a "description of advice services," the "obligations the firm and its representatives owe me" and any "conflicts of interest related to the advice I receive"); CCMC Letter (investor polling), *supra* footnote 21 (reporting as issues that "matter most" to investors, "explaining fees and costs," explaining conflicts of interest" and "explaining own compensation").

[52] *See* RAND 2018, *supra* footnote 13 (describing that participants in qualitative interviews had difficulty reconciling the information provided in the obligations section and conflicts of interest section and other areas of confusion, but concluding that "[p]articipants demonstrated evidence of learning new information from the

In addition, as noted above and discussed in further detail below, we are making a number of modifications designed to improve the relationship summary relative to the proposal, which are informed by these and other observations reported by RAND 2018 and other surveys and studies, as well as by investor feedback at roundtables and in Feedback Forms and the other comment letters we have received. For example, we are substantially revising our approach to disclosing standard of conduct and conflicts of interest to make this information clearer to retail investors, including (among other changes) eliminating the word "fiduciary" and requiring firms—whether broker-dealers, investment advisers, or dual registrants—to use the term "best interest" to describe their applicable standard of conduct.[53] Further, as compared to the proposal, modifications adopted in the final relationship summary instructions require less prescribed wording, and instead, firms will generally use their own wording to address required topics, which creates flexibility in providing accurate information to investors. We believe that this modification substantially limits the practicability and benefit of additional usability testing because there is no single version of the relationship summary (or a limited set of form versions) that may be used to gauge investor comprehension given firms' flexibility to tailor their relationship summary.[54]

relationship summary"); Kleimann I, *supra* footnote 19 (although study author concluded that, overall, participants had difficulty with "sorting out similarities and differences," the study reports that "nearly all participants easily identified a key difference between Brokerage Accounts and Advisory accounts as the fee structure;" "[p]articipants expected to pay for transactions in a Brokerage Account or the quarterly fee for an Advisory Account;" "most participants understood that both Brokerage Accounts and Advisory Accounts could have financial relationships with other companies that could be potential conflicts with clients' best interests" and "[nearly all participants saw the Key Questions as essential . . . straightforward and raised important questions that they themselves might not have thought to ask."); *see also* Betterment Letter I (Hotspex) *supra* footnote 18 (83% of respondents correctly identified as "true" a statement that "some investment firms have a conflict of interest because they benefit financially from recommending certain investments" when viewing a version of the standalone adviser relationship summary constructed based on the instructions set forth in the proposal).

[53] *See infra,* Section II.B.3.

[54] In this regard, the RAND 2018 report and surveys and studies submitted by commenters generally were based on sample versions of the relationship summary that we included in the proposal. Alternate designs tested by commenters generally used the all of the same topics (*e.g.,* a description of service and the relationship, fees and

Continued

**33500**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

Therefore, we believe that any anticipated benefit from continued rounds of investor usability testing does not justify the cost to investors of delaying a rulemaking designed to increase investor protection.

Accordingly, we believe that the totality of input received through comments (including Feedback Forms), outreach at roundtables and through the OIAD/RAND and RAND 2018 reports, as well as surveys and studies submitted by commenters, fully supports our consideration and adoption of the relationship summary, with modifications informed by this input as discussed more fully below. However, to help ensure that the relationship summary fulfills its intended purpose, we have directed our staff to review a sample of relationship summaries that are filed with the Commission beginning after June 30, 2020, when firms first file their relationship summaries, and to provide the Commission with the results of this review. The Commission and its staff are also reviewing educational materials provided on *Investor.gov* and intend to develop additional content in order to continue to improve the information available to investors about working with investment advisers, broker-dealers, individual financial professionals, and investing.

In the Proposing Release, we proposed certain disclosures to be included in all print or electronic retail investor communications by broker-dealers, investment advisers, and their financial professionals (the ''Affirmative Disclosures''). We have determined not to adopt the Affirmative Disclosures, as we discuss further below. In our view, the combination of the disclosure requirements in Form CRS and Regulation Best Interest should adequately address the objectives of the proposed Affirmative Disclosures.

---

costs, standard of care, conflicts, additional information and key questions) as the proposed sample versions, with changes using different versions of prescribed wording and formatting designed to be more appealing to readers. *See* Kleimann II, *supra* footnote 19 (describing alternative Form CRS design assumptions) and Betterment Letter I (Hotspex) *supra* footnote 18 (describing approach to optimizing the Form CRS). Given modifications that we are adopting to the Form CRS instructions that provide firms more flexibility to use their own wording to describe service offerings, fees and costs and their conflicts of interest and more flexibility in formatting as compared to the proposal, we are not preparing sample or illustrative versions of the relationship summary that could be used to repeat such surveys and testing, and we do not believe that we would be able to develop sample versions that would be representative given the diversity among firms in their service and product offerings.

## II. Form CRS Relationship Summary

### A. Presentation and Format

The relationship summary is designed to be a short and accessible disclosure for retail investors that helps them to compare information about firms' brokerage and/or investment advisory offerings and promotes effective communication between firms and their retail investors.[55] The proposed instructions included requirements on length, formatting, and content. The proposal also provided three examples of what a relationship summary might look like for a standalone broker-dealer, standalone investment adviser, and dual registrant. In providing feedback on the proposed sample relationship summaries, commenters on Feedback Forms and participants in the RAND 2018 survey and other surveys and studies provided by commenters indicated that the proposed relationship summary could be too dense and difficult to read.[56] They suggested using simpler terms and more white space, among other changes.[57] Commenters

---

[55] Form CRS defines ''relationship summary'' as ''[a] disclosure prepared in accordance with these Instructions that you must provide to *retail investors*'' and also references Advisers Act rule 204–5 and Exchange Act rule 17a–14. Firms that do not have any retail investors to whom they must deliver a relationship summary are not required to prepare or file one. *See* General Instructions to Form CRS, Advisers Act rule 204–5, Exchange Act rule 17a–14(a).

[56] *See* Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Questions 1 and 4) (33 commenters (35%) answered ''Somewhat'' or ''No'' in either of Question 3(a) (*Do you find the format of the Relationship Summary easy to follow?*) or Question 3(c) (*Is the Relationship Summary easy to read?*); comments responding to Question 4 (''*Are there topics in the relationship summary that are too technical or that could be improved?*''); 41 Feedback Forms (44%) indicated in response to Question 4 or another question that the relationship summary was too technical or suggested one or more topics that could be improved); *see also* RAND 2018, *supra* footnote 13 (on average, 24% of respondents described any given section as difficult or very difficult, more than 30% described the fees and costs section as difficult or very difficult; but qualitative interview discussions revealed that there were areas of confusion for participants, including differences between account types or financial professionals); Betterment Letter I (Hotspex) *supra* footnote 18 (only 22% of respondents reviewing a version of the standalone adviser relationship summary said information was easy to understand; only 18% said the format was appealing); Kleimann I, *supra* footnote 19 (finding that participants were confused). *Cf.* Cetera Letter II (Woelfel), *supra* footnote 17 (more than 75% of respondents strongly or somewhat agreed that individual topics covered by the relationship summary were described clearly). *See also* comments discussed *supra* footnote 35.

[57] Comment Letter of Front Street Consulting (Jun. 8, 2018) (stating that disclosure must be readable and understandable using plain language); Kleimann II, *supra* footnote 19 (describing design and content principles for a redesigned relationship summary, noting that ''[h]eading and white space

---

also encouraged the use of design principles that would result in a more visually appealing and accessible disclosure.[58] In addition, the IAC recommended, through a majority vote, uniform, simple, and clear summary disclosures to retail investors.[59] We have incorporated many of these suggestions into the instructions.

We are changing the instructions to require a question-and-answer format, give additional support for electronic formats, provide guidance that firms should include white space, and implement other design features to make the relationship summary easier to read.[60] We are requiring firms to use standardized headings in a prescribed order to preserve comparability, while permitting greater flexibility in other aspects of the relationship summary's wording and design to enhance the relationship summary's accuracy, usability, and effectiveness.[61] The final instructions will require limited prescribed wording compared to the

---

allow readers to have an overview of the content, see the overall structure of the content, and choose which parts most interest them . . .''); IAA Letter I (recommending flexibility for innovative use of design techniques including ''using more white space, and using visuals like icons and images''); Fidelity Letter (discussing designed relationship summary using ''key design elements that are informed by our experienced employees whose focus is on graphic design and applying design thinking techniques to customer facing products''). Schwab Letter I (Koski), *supra* footnote 21 (reporting that the ''majority of retail investors surveyed want communications that are relevant to them (91%), short and to the point (85%), and visually appealing (79%)''); Schwab Letter II (stating that combined results of RAND 2018 and its own survey indicate that the Form CRS should be shorter, organized around questions, focus on ''fees/costs'' and ''services/relationships'' and contain ''hyperlinks''); Betterment Letter I (Hotspex), *supra* footnote 18 (providing suggestions for streamlining and focusing the content requirements and improving the visual layout and format of the relationship summary to improve its effectiveness).

[58] *See, e.g.,* Betterment Letter II (''The form should better implement design principles that have been shown to facilitate visual appeal and comprehension.''); Schwab Letter I (citing to a presentation given by Kleimann Communication Group, Inc., at an IAC meeting on June 14, 2018); IAA Letter I (arguing that more visually dynamic and engaging design would make the relationship summary more effective and likely to be read).

[59] *See* IAC Form CRS Recommendation, *supra* footnote 10 (reiterating a recommendation from the IAC Broker-Dealer Fiduciary Duty Recommendations in 2013 to ''adopt a uniform, plain English disclosure document to be provided to customers and potential customers of broker-dealers and investment advisers that covers basic information about the nature of services offered, fees and compensation, conflicts of interest, and disciplinary record'' and recommending that the Commission work with a design expert and test the relationship summary for effectiveness).

[60] General Instruction 2.A. to Form CRS. (''You should include white space and implement other design features to make the *relationship summary* easy to read.'').

[61] *See, e.g.,* Items 2.B. and 3.C.(ii) of Form CRS.

App 53

proposal and will permit firms to use their own wording to describe most topics. We also are not requiring firms to discuss the sub-topics required within each section in a prescribed order, as proposed.[62] Dual registrants [63] and affiliated brokerage and investment advisory firms also will have flexibility to decide whether to prepare separate or combined relationship summaries. These changes are intended to enhance the relationship summary's clarity, usability, and design, and to promote effective communication and understanding between retail investors and their firms and financial professionals. We describe these changes in more detail below.

We are also adopting some parts of the instructions that address presentation and formatting as proposed. The instructions state that the relationship summary should be concise and direct, and firms must use plain English and take into consideration retail investors' level of financial experience, as proposed.[64] Firms also are not permitted to use multiple negatives, or legal jargon or highly technical business terms unless firms clearly explain them, as proposed. In a change from the proposal, the instructions will not permit use of legal jargon or technical terms without explaining them in plain English, even if the firm believes that reasonable retail investors will understand those terms.[65]

Several commenters suggested that the relationship summary avoid the use of jargon (*e.g.,* terms like ''asset-based fee'' and ''load'' in the fees section),[66] and several roundtable participants and participants in the RAND 2018 interviews and another study said that they did not understand certain technical terms.[67] Roundtable participants and commenters on Feedback Forms asked that the relationship summary include definitions or a glossary.[68] In addition, the IAC recommended that a document such as the relationship summary use plain English and a concise format.[69] As a result, we are instructing firms to avoid using legal jargon and highly technical terms in the relationship summary unless they are able to explain the terms in the space of the relationship summary. We believe this simpler approach obviates the need for firms to justify what they believe a reasonable retail investor would or would not understand. Firms would have the flexibility to use their own wording, including legal or highly technical terms as long as they explain them, or may prefer to use simpler terms, given the space limitations of the relationship summary. Additionally, we have added a cover page for Form CRS under the Exchange Act (17 CFR 249.640) only, displaying a currently valid OMB control number and including certain statements relating to federal information law and requirements, and the SEC's collection of information.[70]

1. Limited Prescribed Wording

The proposed instructions would have required firms to include prescribed wording throughout many sections of the relationship summary. In

particular, the fees and costs, standard of conduct, and the comparison section for standalone broker-dealers and investment advisers included a number of required statements, many that differed for broker-dealers, investment advisers, and dual registrants.[71] The introduction, conflicts of interest, and key questions sections also included some required statements.[72] In response to comments (as described more fully below) we are largely eliminating the prescribed wording and replacing those statements with instructions that generally allow firms to describe their own offerings with their own wording.

For example, the proposed instructions would have required broker-dealers to state, ''If you open a brokerage account, you will pay us a transaction-based fee, generally referred to as a commission, every time you buy or sell an investment'' and ''The fee you pay is based on the specific transaction and not the value of your account.'' [73] Broker-dealers also would have stated ''The more transactions in your account, the more fees we charge you. We therefore have an incentive to encourage you to engage in transactions.'' [74] Instead the final instructions will require broker-dealers to describe the principal fees and costs that retail investors will incur, including their transaction-based fees, and summarize how frequently the fees are assessed and the conflicts of interest they create.[75]

Many commenters requested more flexibility for firms to provide accurate descriptions of their services.[76] Some

---

[62] *See* Proposed General Instruction 1.(b) to Form CRS (''Unless otherwise noted, you must also present the required information within each item in the order listed.'').

[63] Form CRS defines ''dual registrant'' as ''A firm that is dually registered as a broker or dealer registered under section 15 of the Exchange Act and an investment adviser registered under section 203 of the Advisers Act and offers services to *retail investors* as both a broker-dealer and an investment adviser.'' General Instruction 11.C. to Form CRS. This definition varies from the one proposed in that it includes only those investment advisers registered with the SEC, rather than with the States. For the avoidance of doubt, it also includes the statutory registration provisions for broker-dealers and investment advisers.

[64] *See* General Instruction 2.A. to Form CRS (providing that firms should (i) use short sentences and paragraphs; (ii) use definite, concrete, everyday words; (iii) use active voice; (iv) avoid legal jargon or highly technical business terms unless firms clearly explain them; and (v) avoid multiple negatives. Firms must write their responses to each item as if speaking to the *retail investor,* using ''you,'' ''us,'' ''our firm,'' etc.). Delivery of the relationship summary will not necessarily satisfy the additional requirements that broker-dealers and investment advisers have under the federal securities laws and regulations or other laws or regulations. *See* General Instruction 2.D. to Form CRS; Proposed General Instruction 3 to Form CRS.

[65] General Instruction 2.A. to Form CRS. *Compare to* Proposed General Instruction 2 to Form CRS (''. . . avoid legal jargon or highly technical terms unless you clearly explain them or you believe that reasonable *retail investors* will understand them . . .'').

[66] CFA Letter I; AARP Letter; IAA Letter I.

[67] *See, e.g.,* Miami Roundtable; Houston Roundtable; Philadelphia Roundtable; RAND 2018, *supra* footnote 13 (in qualitative interviews participants asked for definitions of ''transaction-based fee,'' ''asset-based fee,'' and struggled with terms such as ''mark-up,'' ''mark-down,'' ''load,'' surrender ''charges'' and ''wrap fee''); *see also* Kleimann I, *supra* footnote 19.

[68] *See, e.g.,* Philadelphia Roundtable, at 64 (participant recommending a glossary at the end of the relationship summary); Washington, DC Roundtable, at 31 (''You might want to consider a glossary of terms.''); Feedback Forms Comment Summary, *supra* footnote 11 (summary of comments to Question 4) (10 comments asked for a definition or a better explanation of the term ''fiduciary,'' seven asked for definitions of terms such as transaction-based fee, asset-based fee or wrap fee); *see also* Anonymous 18 Feedback Form (''A glossary would be nice—not in ''legalize'' [sic] language'').

[69] *See* IAC Broker-Dealer Fiduciary Duty Recommendations, *supra* footnote 10; and IAC Form CRS Recommendation, *supra* footnote 10.

[70] Under the Advisers Act, Form CRS is Part 3 of Form ADV, which already contains a cover page.

[71] *See infra* discussion at Sections II.B.3 (fees and costs and standard of conduct) and II.B.6 (proposed items omitted in final instructions).

[72] *See infra* discussion at Sections II.B.1 (introduction) and II.B.3 (conflicts of interests) and *supra* Section II.A.4 (conversation starters).

[73] Proposed Items 2.B.1. and 4.B.1. of Form CRS.

[74] Proposed Item 4.B.5. of Form CRS.

[75] *See* Items 3.A. through 3.C. of Form CRS.

[76] *See, e.g.,* IAA Letter I; Comment Letter of Massachusetts Mutual Life Insurance Company (Aug. 7, 2018) (''MassMutual Letter''); Comment Letter of the Association for Advanced Life Underwriting (Aug. 7, 2018) (''AALU Letter''); Comment Letter of Prudential Financial, Inc. (Aug. 7, 2018) (''Prudential Letter''); Comment Letter of Mutual of America Life Insurance Company (Aug. 3, 2018) (''Mutual of America Letter''); Comment Letter of John Hancock Life Insurance Company (U.S.A.) (Aug. 3, 2018) (''John Hancock Letter''); ACLI Letter; Comment Letter of New York Life Insurance Company (Aug. 7, 2018) (''New York Life Letter''); Comment Letter of Transamerica (Aug. 7, 2018) (''Transamerica Letter''); Vanguard Letter. *See also* Betterment Letter I, *supra* footnote 18 (arguing that investor survey conducted by Hotspex showed that its more customized version of the relationship summary facilitated investor understanding). Some individuals submitting Feedback Forms also preferred more firm-specific information. *See, e.g.,* Anonymous 13 Feedback Form (''Firm-specific info would be nice on this document.''); Bhupalam Feedback Form (''I would like to see additional

Continued

argued that the mix of prescribed and firm-authored wording required by the proposed instructions would be inaccurate, contribute to investor confusion, or be ineffective for investors, particularly language that some commenters considered ''boilerplate.'' [77] Observations reported in the RAND 2018 qualitative interviews and other surveys and studies also showed that investors had difficulty understanding, were confused by, or misinterpreted some of the prescribed wording.[78] A range of commenters asserted that the proposed prescribed wording could be inaccurate or inapplicable.[79] For example, various providers of insurance products explained that references to brokerage or investment advisory accounts were not consistent with their business models and could confuse retail investors because customers generally purchase insurance products directly from the issuer, without needing to open a brokerage account.[80] One commenter expressed concern that some of the prescribed wording could constitute impermissible compelled speech that could raise First Amendment concerns.[81] That same commenter, with others, also opposed providing firms with more flexibility than proposed to implement the relationship summary, arguing that more flexibility could impair comparability.[82]

We recognize that extensive use of prescribed wording in certain contexts could add to investor confusion and may not accurately or appropriately capture information about particular firms. Accordingly, the final instructions permit firms, within the parameters of the instructions, to describe their services, investment offerings, fees, and conflicts of interest using their own wording. This approach should enable firms to reflect accurately what they offer to retail investors, should result in disclosures that are more useful to retail investors, and should mitigate concerns relating to the mix of prescribed and firm-authored wording, and the extensive use of prescribed wording, that the proposed instructions required.

Although we are allowing more flexibility so that firms can describe their offerings more accurately, firms still will be required to discuss required topics within a prescribed order, as discussed below.[83] This approach will facilitate transparency, consistency, and comparability of information across the relationship summaries of different firms, helping retail investors to focus on information that we believe would be particularly helpful in deciding among firms, financial professionals, services, and accounts—namely: Relationships and services; fees, costs, conflicts, and required standard of conduct; disciplinary history; and how to get additional information. We believe that more tailored, specific, and distinct information in the required topic areas also will better serve the educational purpose by facilitating more robust substantive comparisons across firms.

This approach addresses—and mitigates—First Amendment concerns. Generally, the instructions no longer require any specific speech.[84] Rather, they permit firms to use their own words to impart accurate information to investors. In certain circumstances, however, we are continuing to require firms to use prescribed wording. For example, the final instructions require firms to use standardized headings and conversation starters, which are in the form of questions that investors are encouraged to ask.[85] These elements are organizational (the headings) or intended to prompt a discussion by the investor (the conversation starters).[86] The final instructions also require firms to include prescribed statements describing their required standard of conduct when providing recommendations or advice.[87] Requiring firms to provide a consistent articulation of their required legal obligations in this regard will reduce and minimize investor confusion, as compared with allowing firms to state their required standard of conduct using their own wording.[88] These statements are designed to require the disclosure of purely factual information about the standard of conduct that applies to the provision of recommendations by broker-dealers and the provision of advice by investment advisers under their respective legal regimes.[89] Finally, the instructions require firms to include a prescribed, factual statement regarding the impact of fees and costs on investments, and a prescribed statement encouraging retail investors to understand what fees and costs they are paying.[90] As explained further below,

---

[77] ASA Letter (''[T]he mix of prescribed and customized language will only create more confusion and complexity, as well as legal risk for financial institutions.''); Primerica Letter (''This mix of prescribed and flexible disclosure would ultimately result in a patchwork of new disclosures that fail to comprehensively describe a particular firm's business model in a way that is accessible and digestible by retail investors.''); IAA Letter I (''Many firms would . . . be compelled to explain to prospective clients how and why their business is different from the boilerplate descriptions and why the comparisons are not applicable. The boilerplate language may thus detract from a firm's ability to explain its own services and make it harder for investors to understand those services.'').

[78] E.g., RAND 2018, supra footnote 13 (describing that, in qualitative interviews, participants noted some words or phrases that needed further definition and some misunderstood differences between account types and professionals); Kleimann I, supra footnote 19; Betterment Letter I (Hotspex) supra footnote 18 (finding that investors had difficulty understanding certain key information on the SEC sample version of standalone investment adviser relationship summary); see also Kleimann II, supra footnote 19 (investors misconstrued the legal standard in alternative versions of prescribed wording used in a redesigned version of the relationship summary); Feedback Forms Comment Summary, supra footnote 11 (summary of responses to Question 4) (41 Feedback Forms included narrative responses that indicated that one or more topics were too technical or could be improved; of these, 20 indicated that the relationship summary language was too technical, wordy, confusing or should be simplified; 23 indicated that information on fees and costs was too technical or needed to be more clear; 23 suggested that information in sections on relationships and services and obligations needed clarification, and 14 suggested clarification or more information about conflicts of interest).

[79] See, e.g., IAA Letter I; ACLI Letter; AARP Letter; SIFMA Letter; FSI Letter I; Triad Letter; Vanguard Letter.

[80] See, e.g., Comment Letter of the Committee of Annuity Insurers (Aug. 7, 2018) (''Committee of Annuity Insurers Letter'') (''The use of the term 'brokerage account' may be confusing to retail investors purchasing and owning annuities, as annuities are typically 'held' directly by an insurance company.''); ACLI Letter; IAA Letter I; FSI Letter I; Comment Letter of Lincoln Financial Group (Nov. 13, 2018) (''Lincoln Financial Group Letter'') (''Sales of variable annuities, and variable life insurance products, typically do not involve the opening of a brokerage account and are not conducted in a brokerage account.'').

[81] See CFA Letter I, supra footnote 37.

[82] See AFL–CIO, CFA Letter.

[83] See, e.g., General Instructions 1.A and 1.B., and 2.B. to Form CRS.

[84] For example, the final instructions no longer require the proposed Comparisons section or other prescribed wording that could be perceived as requiring firms to compare their owns services unfavorably to those of their competitors. See infra Section II.B.6.

[85] See infra Sections II.A.2 and II.A.4.

[86] See infra Sections II.A.2. and II.A.4.

[87] Item 3.B.(i) of Form CRS. See infra Section II.B.3.b.

[88] See infra Sections II.A.2 and II.B.3.b.

[89] See Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 249–50 (2010) (upholding against First Amendment challenge a requirement that lawyers disclose their ''legal status'' and ''the character of the assistance provided''); Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 651 (1985) (upholding required disclosure of factual information about terms of service); Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 310 (1st Cir. 2005) (upholding requirement that pharmacy benefit managers disclose conflicts of interest and financial arrangements).

[90] See Item 3.A.(iii) of Form CRS (requiring firms to state, ''You will pay fees and costs whether you make or lose money on your investments. Fees and costs will reduce any amount of money you make

the final instructions provide that if a required disclosure or conversation starter is inapplicable to a firm's business or specific wording required by the instructions is inaccurate, firms may omit or modify it.[91]

As in the proposal, the final instructions include parameters for the scope of information expected within the relationship summary, though we are modifying the requirements to clarify the scope further in light of commenter concerns. First, all information in the relationship summary must be true and may not omit any material facts necessary in order to make the disclosures, in light of the circumstances under which they were made, not misleading.[92] The proposed instructions required all information in the relationship summary to be true and prohibited firms from omitting any material facts necessary to make the disclosures required by the instructions and the applicable item not misleading, but did not include the clause "in light of the circumstances under which they were made."[93] Commenters raised concerns with respect to the applicability of this standard to a short document with strict page limits that is meant to provide only a brief summary of information.[94]

We continue to believe that firms should include only as much information as is necessary to enable a reasonable investor[95] to understand the information required by each item.[96] As discussed below, we believe that investors will benefit from receiving a relationship summary containing high-level information that they will be more likely to read and understand, with the ability to access more detailed information.[97] As a result, we recognize a firm's relationship summary by itself is a summary of the information required to inform retail investors about the services a firm provides along with its fees, costs, conflicts of interest, and standard of conduct. We also believe that the disclosure provided in the relationship summary should be responsive and relevant to the topics covered by the final instructions,[98] and not omit information that is required to be disclosed or necessary to make the required disclosure not misleading.[99]

We are sensitive to commenters' concerns, however, regarding expectations for the scope of required information within page limits. In this regard, the instructions continue to provide, as proposed, that firms may not include a disclosure in the relationship summary other than a disclosure that is required or permitted by the instructions and the applicable item,[100] and that all the information contained in the relationship summary must be true.[101]

In a change from the proposal, and to address commenters' concerns, the final instructions provide that the information contained in the relationship summary may not omit any material facts necessary in order to make the disclosures, *in light of the circumstances under which they were*

---

on your investments over time. Please make sure you understand what fees and costs you are paying."). *See also infra* footnotes 424–425 and accompanying text.

[91] *See* General Instruction 2.B to Form CRS. We are adopting this provision to ensure that firms are not compelled to include wording in their relationship summaries that is misleading or inaccurate in the context of their business models. This provision may apply in limited circumstances. For example, the headings and conversation starters prescribed by the final instructions are worded at a highly generalized level and cover selected key topics that are broadly applicable to broker-dealers and investment advisers and their relationships with retail investors, irrespective of business model (*i.e.,* relationships and services the firm offers to retail investors, fees and costs that retail investors will pay, specified conflicts of interest and standards of conduct, and disciplinary history).

[92] General Instruction 2.B. to Form CRS ("All information in your *relationship summary* must be true and may not omit any material facts necessary in order to make the disclosures required by these Instructions and the applicable Item, in light of the circumstances under which they were made, not misleading."). *Cf.* Proposed Instruction 3 to Form CRS ("All information in your *relationship summary* must be true and may not omit any material facts necessary to make the disclosures required by these Instructions and the applicable item not misleading.").

[93] Proposed General Instruction 3 to Form CRS.

[94] *See, e.g.,* LPL Financial Letter (raising concerns that the relationship summary raises the risk of liability for material omissions given its page limits and required level of detail); CCMC Letter ("The page and length limitations imposed by the proposed regulation, coupled with the required disclosure that is mandated by the proposed rules, present a substantial risk of liability for omissions that may be necessary only to ensure the disclosure meets the Commission's strict formatting

requirements."); Fidelity Letter (stating that firms "would find it very challenging to summarize their offerings within the four-page limit and other content and formatting constraints of the form as proposed, let alone to do so in a manner that provides sufficient detail to convey meaningful information to investors, and is sufficiently accurate to avoid creating liability for a misstatement").

[95] The proposed instructions referred to a "reasonable retail investor." For example, under the proposed instructions, firms would have been able to omit or modify prescribed wording or other statements required to be part of the relationship summary if such statements were inapplicable to a firm's business or would have been misleading to a "reasonable retail investor." *See* Proposed General Instruction 3 to Form CRS. The final instructions no longer make reference to a "reasonable retail investor." By eliminating the reference to a "reasonable retail investor," we are clarifying that we did not intend at the proposal, and do not intend now, to introduce a new standard under the federal securities laws, which generally refer to what a "reasonable investor" would consider important in making a decision. *See infra* footnotes 95–105 and accompanying text. References to a "reasonable retail investor" in the proposed instructions were meant to clarify how the operative Instruction or Item would apply in the context of a retail investor. Because new rule 17a–14 under the Exchange Act and new rule 204–5 under the Advisers Act require firms to deliver relationship summaries to retail investors in accordance with such rules, we do not believe such clarifications are necessary.

[96] General Instruction 2.A. to Form CRS. The instructions remind firms to use not only short sentences as proposed, but also short paragraphs. General Instruction 2.A.(i) to Form CRS.

[97] *See infra* Section II.A.3.

[98] Firms should keep in mind the applicability of the antifraud provisions of the federal securities laws, including section 206 of the Advisers Act, section 17(a) of the Securities Act, and section 10(b) of the Exchange Act and rule 10b–5 thereunder, in preparing the relationship summary, including statements made in response to the relationship summary's "conversation starters." *See infra* Section II.B.2.c.

[99] This approach is consistent with the approach the Commission has taken with respect to disclosure more broadly. *See, e.g.,* rule 408(a) under

Regulation C [17 CFR 230.408(a)] ("In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading"); Exchange Act rule 12b–20 [17 CFR 240.12b–20] ("In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading"); *see also* Commission Statement and Guidance on Public Company Cybersecurity Disclosures, Securities Act Release No. 82746 (Feb. 21, 2018) [83 FR 8166 (Feb. 26, 2018)] (stating that the "Commission considers omitted information to be material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision or that disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information available"); *TSC Industries* v. *Northway,* 426 U.S. 438, 449 (1976) (stating a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision or if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the shareholder); *Basic, Inc.* v. *Levinson,* 485 U.S. 224, 240 (1988) (stating that "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information"); *Securities and Exchange Com'n* v. *Texas Gulf Sulphur,* 258 F. Supp. 262, 279 (S.D.N.Y. 1966) (stating that "[a]n insider's liability for failure to disclose material information which he uses to his own advantage in the purchase of securities extends to purchases made on national securities exchanges as well as to purchases in 'face-to-face' transactions"); *Cochran* v. *Channing Corporation,* 211 F. Supp. 239, 242 (S.D.N.Y. 1962) (stating that the "Securities Exchange Act was enacted in part to afford protection to the ordinary purchaser or seller of securities. Fraud may be accomplished by false statements, a failure to correct a misleading impression left by statements already made or, as in the instant case, by not stating anything at all when there is a duty to come forward and speak").

[100] General Instruction 1.B. to Form CRS; *see also* Proposed General Instruction 1.(d) to Form CRS.

[101] General Instruction 2.B. and 2.C. to Form CRS; *see also* Proposed General Instruction 3 to Form CRS.

**33504** **Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations

*made,* not misleading.[102] We have added the phrase ''in light of the circumstances under which they were made'' to clarify that the content included or not included in the relationship summary should be viewed, for example, in light of the fact that the disclosure is intended to be a summary, that firms must adhere to the page limit, and that there will be links to additional information. Any information contained in the relationship summary or omitted facts will not be viewed in isolation in respect of determining whether such information would have been viewed by a reasonable investor as having significantly altered the total mix of information available.[103] As discussed below, firms will provide additional detail and context through layered disclosure. For example, the instructions require firms to include specific references or a link to additional information as part of the relationships and services and fees and conflicts sections.[104] In other instances, the instructions encourage firms to reference or link to additional information to supplement their required disclosures.[105] While this change from the proposal is drawn from other areas of the federal securities laws,[106] Form CRS is not intended to create a private right of action.

Second, firms may omit or modify required disclosures or conversation starters that are inapplicable to their business, or specific wording required by the final instructions that is inaccurate.[107] The proposed instructions permitted firms to omit or modify required disclosures that were inapplicable to their business or would be misleading to a reasonable retail investor.[108] We modified the proposed

instruction to provide a more concrete requirement allowing firms to omit or modify prescribed wording, rather than using a broader standard referencing a reasonable retail investor. This instruction is intended to ensure that no statements are misleading or inaccurate in the context of a firm's particular services or business. Rather, the objective of the Commission is to ensure that required disclosures are purely factual and provide investors with an accurate portrayal of the firm's services and operations.

Finally, given that firms will use mostly their own wording, we are adding instructions that remind firms that their responses must be factual and provide balanced descriptions to help retail investors evaluate the firm's services.[109] For example, firms may not include exaggerated or unsubstantiated claims, vague and imprecise ''boilerplate'' explanations, or disproportionate emphasis on possible investments or activities that are not made available to retail investors.[110] The relationship summary is designed to serve as disclosure, rather than marketing material, and should not unduly emphasize aspects of firms' offerings that may be favorable to investors over those that may be unfavorable.

### 2. Standard Question-and-Answer Format and Other Presentation Instructions

As with the proposed instructions, the final instructions require firms to present information under standardized headings and to respond to all the items in the final instructions in a prescribed order.[111] Instead of using declarative headings as proposed, however, the headings will be in the form of questions.[112] This change responds to feedback from surveys and studies [113] and commenters,[114] including many

submitting their own mock-ups of the relationship summary that suggested or used a question-and-answer format in their own documents. Several commenters noted that the question-and-answer format is a more effective design for consumer disclosures because it focuses on questions to which a consumer wants answers and allows a consumer to skim quickly and understand where to get more information.[115] Based on consideration of these comments, we are both incorporating the format generally and are utilizing several of the question headings suggested by commenters in mock-ups, as discussed in each item below.

In addition to the standardized headings, we continue to believe that a prescribed order of topics facilitates comparability of different firms' relationship summaries. Commenters generally supported or did not oppose the premise of a prescribed order of topics.[116] Some commenters did, however, suggest changes to the organization or inclusion of topics, either explicitly in their comment letters, implicitly by the design of their own mock-ups, or both.[117] Results of

---

[102] *Id.*

[103] *See* rule 10b–5 under the Exchange Act [17 CFR 240.10b–5]; *supra* footnote 99 and accompanying text; *see also* footnote 469 and accompanying text.

[104] *See infra* Section II.A.3.

[105] *See, e.g.,* General Instruction 3.A. to Form CRS (''You are encouraged to use charts, graphs, tables, and other graphics or text features in order to respond to the required disclosures. . . . You also may include: (i) A means of facilitating access to video or audio messages, or other forms of information (whether by hyperlink, website address, Quick Response Code (''QR code''), or other equivalent methods or technologies); (ii) mouse-over windows; (iii) pop-up boxes; (iv) chat functionality; (v) fee calculators; or (vi) other forms of electronic media, communications, or tools that designed to enhance a *retail investor's* understanding of the material in the relationship summary.'').

[106] *See supra* footnotes 99 and 103 and accompanying text.

[107] General Instruction 2.B. to Form CRS.

[108] *See* Proposed General Instruction 3 to Form CRS (''If a statement is inapplicable to your

business or would be misleading to a reasonable *retail investor,* you may omit or modify that statement.'').

[109] General Instruction 2.C. to Form CRS.

[110] General Instruction 2.C. to Form CRS.

[111] General Instruction 1.B. to Form CRS.

[112] *See generally* Items 2.A., 3.A., 3.B., 3.C, and 4.A to Form CRS.

[113] *See e.g.;* RAND 2018, *supra* footnote 13 (reporting that about 60% of survey respondents preferred a question-and-answer format over the sample relationship summary format presented in the survey). Kleimann I, *supra* footnote 19 (''Participants liked the Key Questions section, but wanted the questions to be answered within the document.'').

[114] IAA Letter I (''A [question-and-answer] format will help keep the relationship summary short and should also remove the onus of the retail investor having to ask questions. This format would encourage further conversation, particularly if the Commission requires firms to point investors to

additional information—including comparison information and other key questions—on the SEC's website.''); Schwab Letter I (citing Kleimann Communication Group, Inc., *Making Disclosures Work for Consumers* (Jun. 14, 2018), *available at https://www.sec.gov/spotlight/investor-advisory-committee-2012/iac061418-slides-by-susan-kleimann.pdf,* and contemporaneous discussions); Schwab Letter II (''Form CRS should be organized around questions''); Fidelity Letter (redesigned relationship summary with a question-and-answer format).

[115] *See* Kleimann II, *supra* footnote 19 (''Readers ask questions when they read, especially of functional documents . . . . For good design, we want to build upon this tendency by identifying the key questions investors should or are likely to ask and featuring them prominently in the text, thus easing the cognitive task for readers.); Schwab Letter I (''[Q]uestions that a consumer has . . . should be the organizing principle.''); *see also* CFA Letter I.

[116] *See, e.g.,* Trailhead Consulting Letter (supporting a standardized order of topics to facilitate comparability); Fidelity Letter (''[W]e urge the SEC to consider prescribing content and topics, but not specific language . . .'').

[117] *See, e.g.,* CFA Letter I (suggesting changes to the order of the disclosures and the design of the relationship summary); IAA Letter I (suggesting a different order of topics and elimination of the Comparisons section, including by submitting its own mock-up); Comment Letter of Charles Schwab & Co., Inc. (Feb. 26, 2019) (''Schwab Letter III'') (providing sample Form CRS instructions that permit flexibility as to the order of sub-topics under each topic). On Feedback Forms, 57 (about 60%) commenters responded ''yes'' when asked whether information was in the appropriate order; 8 commenters suggested moving the Key Questions to be first or closer to the front of the document. *See* Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Questions 3(b) and 7). A few commenters on Feedback Forms suggested moving the Additional Information

surveys and studies that assessed comprehension of the sample proposed relationship summaries demonstrated the importance of context and revealed confusion caused by the placement of some information. For example, the RAND 2018 qualitative interviews suggested that investors were confused by and had difficulty reconciling the conflicts and standard of conduct sections, which were separated by the fees and comparisons sections.[118] Another study suggested that the appearance of fee information in three separate sections and separation of the fees and conflicts sections by the comparisons section inhibited understanding of the connection between fees and conflicts.[119] As discussed further below, we are combining the proposed Fees and Costs, Conflicts of Interest, and Standard of Conduct sections into one, to address these comments.[120] In addition, in response to suggestions that we provide more flexibility for how firms describe their services so that they can more accurately convey the information, the final instructions do not require firms to present the information within each section in the order listed.[121] Therefore, firms are free to discuss the required sub-topics within each item in an order that they believe best promotes accurate and readable descriptions of their business.

The final instructions provide for page limits to promote brevity, as proposed. The proposed instructions limited the length of the relationship summary to four pages for both standalone firms and dual registrants.[122] The final instructions provide that for dual registrants that include their brokerage services and advisory services in a single relationship summary, the relationship summary must not exceed four pages in paper format, or the equivalent if delivered electronically.[123]

For broker-dealers [124] and investment advisers [125] a relationship summary in paper format must not exceed two pages, or the equivalent if delivered electronically.[126] Dual registrants that prepare separate relationship summaries for their brokerage and advisory services are limited to two pages each, or the equivalent if delivered electronically.[127] Unlike the proposed instructions, the final instructions do not prescribe paper size, font size, and margin width, providing instead that they should be reasonable.[128] For example, we believe that 8½″ x 11″ paper size, at least an 11 point font size, and a minimum of 0.75″ margins on all sides, as proposed, could be considered reasonable, but other parameters could also be reasonable. The objective of the proposed paper, font, and margin size limitations was to make the relationship summary easy to read. We expect that a visually engaging and effective design, including in electronic format, could achieve the same objective without the prescriptive limitations.

Many commenters preferred a shorter, one-to-two page document more heavily relying on layered disclosure with increased use of hyperlinks and other cross-references to more detailed disclosure.[129] Commenters also said that

investors are more likely to read a shorter document.[130] Several commenters submitted mock-ups that were shorter than four pages.[131] Others indicated that the length of Form CRS was acceptable but should not exceed four pages.[132] On the other hand, certain commenters suggested that the length of the relationship summary may be too short to appropriately describe firms' insurance services or products.[133] One commenter said that it would be challenging for dual registrants to summarize all of their offerings within the four-page limit.[134] Investor feedback from surveys, studies, roundtables, and Feedback Forms also did not show consistent results. For example, 57% of the RAND 2018 survey respondents indicated that the proposed relationship summary was too long, 41% said it was about right, and roughly 2% said it was too short.[135] In section-by-section questioning, however, the most common response from RAND 2018 survey respondents was to keep the section length as is.[136] Similarly, some roundtable participants provided feedback that the proposed length was right at the maximum, "about right," or "good," [137] whereas others would have preferred a shorter document.[138] About

section forward. *See* Durgin Feedback Form, Salkowitz Feedback Form, Starmer2 Feedback Form, Anonymous14 Feedback Form, and a few suggested changes to the order of discussion of obligations and conflicts. See Anonymous28 Feedback Form, Asen Feedback Form, Lee2 Feedback Form.

[118] *See* RAND 2018, *supra* footnote 13.

[119] *See* Kleimann I, *supra* footnote 19, at 30 (participants "had difficulty building knowledge and relating one piece to another when it was separated by physical space.").

[120] *See* Item 3 of Form CRS.

[121] *See* Proposed General Instruction 1.(b) to Form CRS ("Unless otherwise noted, you must also present the required information within each item in the order listed.").

[122] Proposed General Instruction 1.(c) to Form CRS.

[123] General Instruction 1.C. to Form CRS.

[124] Proposed Form CRS defined "standalone broker-dealer" as "a broker or dealer registered under section 15 of the Exchange Act that offers services to *retail investors* and (i) is not dually registered as an investment adviser under section 203 of the Advisers Act or (ii) is dually registered as an investment adviser under section 203 of the Advisers Act but does not offer services to *retail investors* as an investment adviser." We are not adopting this definition because we believe using the term "broker-dealer" is sufficient for the final instructions. The final instructions provide that Form CRS applies to broker-dealers registered under section 15 if the Exchange Act. *See supra* footnote 8.

[125] Proposed Form CRS defined "standalone investment adviser" as "an investment adviser registered under section 203 of the Advisers Act that offers services to *retail investors* and (i) is not dually registered as a broker or dealer under Section 15 of the Exchange Act or (ii) is dually registered as a broker or dealer under Section 15 of the Exchange Act but does not offer services to *retail investors* as a broker-dealer." We are not adopting this definition because we believe using the term "investment adviser" is sufficient for the final instructions. *See* supra footnote 8. Furthermore, the final instructions specify that Form CRS applies to investment advisers registered under section 203 of the Advisers Act.

[126] General Instruction 1.C. to Form CRS.

[127] General Instruction 1.C. to Form CRS. We discuss additional considerations and requirements for dual registrants and affiliates in Section II.A.5 below.

[128] General Instruction 1.C. to Form CRS.

[129] *See, e.g.,* Schwab Letter I ("Form CRS should simply be a short navigation aid to the existing Form ADV Part 2 disclosure" for investment advisers or "to additional information readily available on the firm's website or enclosed with the account documentation" for broker-dealers.); FSI

Letter I ("While we support the Commission's efforts to ensure concise disclosure by limiting the required Form CRS to four pages (or its electronic equivalent), we suggest an even shorter document (perhaps as short as one page) with hyperlinks to more detailed disclosures."); *see also* AARP Letter; Better Markets Letter; Comment Letter of the Teachers Insurance and Annuity Association of America (Aug. 7, 2018) ("TIAA Letter"); Bank of America Letter; CCMR Letter; LPL Financial Letter; Kleimann II, *supra* footnote 19 ("Form CRS should be as short as possible.").

[130] *See* Fidelity Letter; *see also* Schwab Letter I (Koski), *supra* footnote 21 (85% of survey participants answered that they would be more likely to read disclosure that is short and to the point with links to more information; 61% answered that they would be less likely to read a document that is longer and more comprehensive, but 31% answered that they would be more likely to read a longer and more comprehensive disclosure); Comment Letter of Glen Strong (Jul. 27, 2018).

[131] *See, e.g.,* Schwab Letter I; Fidelity Letter; IAA Letter I.

[132] *See* Cambridge Letter; Comment Letter of Morningstar, Inc. (Aug. 7, 2018) ("Morningstar Letter"); Trailhead Consulting Letter.

[133] *See, e.g.,* ACLI Letter; MassMutual Letter.

[134] *See* Fidelity Letter.

[135] RAND 2018, *supra* footnote 13.

[136] RAND 2018, *supra* footnote 13; *see also* Cetera Letter II (Woelfel), *supra* footnote 17 (when asked generally how the relationship summary could be improved, 10% of survey respondents said relationship summary could be shorter).

[137] Washington, DC Roundtable, at 18, 26.

[138] *See* Philadelphia Roundtable, at 5, 19 (noting that lengthy disclosure "actually prevents investor interest and really understanding more. If something like [the relationship summary] can replace the 200 pages and then you have access to

Continued

40% of commenters on Feedback Forms said that relationship summary was an appropriate length, while about 30% indicated a preference for a shorter document.[139]

In light of commenter and investor feedback, we have determined that the relationship summary should be no more than four pages, and that in many cases a document shorter than four pages is appropriate. As proposed, both standalone firms and dual registrants were subject to a four-page limit, even though a dual registrant may have to include more disclosures discussing its advisory business and brokerage business as compared with standalone firms. Upon further consideration of the comments advocating for a more streamlined disclosure that includes more white space, we are adopting a four-page limit for dual registrants that prepare one combined relationship summary, to permit them to capture all of the required information within twice as much space as for standalone firms. If dual registrants and affiliated [140] standalone firms choose to prepare separate relationship summaries for their brokerage and investment advisory services, each relationship summary should not exceed two pages.[141] The two-page limit will help to facilitate comparison of the dual registrant's services, as investors can easily review the separate relationship summaries side-by-side, and will encourage firms to focus on succinctly and clearly explaining the required information. Some commenters, including providers of insurance products, supported a longer relationship summary or expressed concern that four pages would not be enough to allow for a summary of all of their offerings.[142] We believe that the elimination of certain sections (such as the comparison section) [143] and most of the prescribed wording from the relationship summary, along with the flexibility firms will have under the final instructions to describe

---

services with their own wording, and to omit or modify required disclosures or conversation starters that are inapplicable to their business or specific wording that is inaccurate, should help to alleviate the concerns of those who advocated for the relationship summary to be longer.

3. Electronic and Graphical Formats, and Layered Disclosure

We are adding instructions that clarify our support for firms wishing to use electronic media in preparing the relationship summary for retail investors.[144] The proposed instructions would have permitted firms to add embedded hyperlinks within the relationship summary in order to supplement required disclosures [145] and would have required firms to use hyperlinks for any document that is cross-referenced in any electronic relationship summary.[146] The proposed instructions also permitted firms to use various graphics or text features to explain the required information but did not reference whether they should be electronic- or paper-based.[147]

Many commenters supported electronic formats, including in connection with layered disclosure.[148] One commenter endorsed electronic, including mobile, formats as inherently easier to navigate and use in a layered approach and asserted that the

---

relationship summary would be more engaging to investors, and thus more effective as a disclosure, if the Commission encouraged more creative use of electronic formats.[149] Research submitted by commenters and feedback from our investor roundtables indicated that investors preferred a more visually appealing disclosure.[150] Commenters recommended a more visually-focused and designed experience, and many mock-ups that commenters submitted used graphics and other design features extensively.[151] In addition, the IAC has recommended exploring the use of layered disclosure in certain contexts.[152] The IAC has also recommended that the Commission "continue to explore methods to encourage a transition to electronic delivery that respect investor preferences and that increase, rather than reduce, the likelihood that investors will see and read important disclosure documents." [153] Some commenters also expressed support for the IAC's recommendation relating to electronic delivery.[154]

Accordingly, we are adopting and adding provisions to the proposed

---

the 200 pages if you want them, that's a better system").

[139] *See* Feedback Forms Comment Summary (summary of responses to Question 6), *supra* footnote 11.

[140] Form CRS defines an "affiliate" as "Any persons directly or indirectly controlling or controlled by you or under common control with you." General Instruction 11.A. to Form CRS.

[141] General Instruction 1.C. to Form CRS ("*Dual registrants* and *affiliates* that prepare separate *relationship summaries* are limited to two pages for each relationship summary. . . . If delivered electronically, the relationship summary must not exceed the equivalent of two pages or four pages in paper format, as applicable.").

[142] *See supra* footnotes 133–134 and accompanying text.

[143] *See infra* Section II.B.6 (Proposed Items Omitted in Final Instructions).

---

[144] Delivery is discussed in Section II.C. Firms may deliver electronic versions of the relationship summary in accordance with the final instructions and the Commission's guidance regarding electronic delivery. *See* General Instructions 10.B. through 10.D. to Form CRS.

[145] Proposed General Instruction 1.(g) to Form CRS ("You may add embedded hyperlinks within the *relationship summary* in order to supplement required disclosures, for example, links to fee schedules, conflicts disclosures, the firm's narrative brochure required by Part 2A of Form ADV, or other regulatory disclosures.").

[146] Proposed General Instruction 1.(g) to Form CRS ("In a *relationship summary* that is posted on your website or otherwise provided electronically, you must use hyperlinks for any document that is cross-referenced in the *relationship summary* if the document is available online.").

[147] Proposed General Instruction 1.(f) to Form CRS ("You may use charts, graphs, tables, and other graphics or text features to respond to explain the required information, so long as the information: (i) Is responsive to and meets the requirements in these instructions (including space limitations); (ii) is not inaccurate or misleading; and (iii) does not, because of the nature, quantity, or manner of presentation, obscure or impede understanding of the information that must be included. When using interactive graphics or tools, you may include instructions on their use and interpretation.").

[148] *See, e.g.,* IAA Letter I ("Each key point should be made as simply and succinctly as possible, and the investor should then be pointed clearly and directly to specific additional plain English disclosure explaining the point . . . . This approach would also provide firms with the flexibility they need to use innovative design and delivery techniques.").

---

[149] *See* IAA Letter I.

[150] *See* Betterment Letter I (Hotspex), *supra* footnote 18 (reporting study authors' conclusions that survey respondents found a version of the standalone adviser relationship summary "more appealing and understandable," where Betterment revised the form to "[i]mprove visual hierarchy (*e.g.,* layout, shading, shorten and standardize paragraph lengths to improve legibility, appeal and retention of information"); Schwab Letter I (Koski), *supra* footnote 21(79% of survey respondents said they are more likely to read disclosure that is "visually appealing and did not seem like a legal document"); Washington, DC Roundtable, at 20; Atlanta Roundtable, at 35.

[151] *See, e.g.,* CFA Letter I; Fidelity Letter (citing to Stanford Law School Design Principles, *Use visual design and interactive experiences, to transform how you present legal info to lay people, available at http://www.legaltechdesign.com/communication-design*); Betterment Letter I (mock-up); SIFMA Letter; IAA Letter I; Schwab Letter I; *see also* Kleimann II, *supra* footnote 19 (describing design assumptions for a redesigned version of the relationship summary).

[152] *See* IAC Broker-Dealer Fiduciary Duty Recommendations, *supra* footnote 10 (in connection with the disclosure of disciplinary history, the Commission "should look at whether it might be beneficial to adopt a layered approach to such disclosures, with the goal of developing a more abbreviated, user-friendly document for distribution to investors").

[153] Investor Advisory Committee, *Recommendation of the Investor as Purchaser Subcommittee: Promotion of Electronic Delivery and Development of a Summary Disclosure Document for Delivery of Investment Company Shareholder Reports* (Dec. 7, 2017), *available at https://www.sec.gov/spotlight/investor-advisory-committee-2012/recommendation-promotion-of-electronic-delivery-and-development.pdf* ("IAC Electronic Delivery Recommendation").

[154] *See, e.g.,* FSI Letter I; Cambridge Letter; Comment Letter of the Institute for Portfolio Alternatives (Aug. 7, 2018) ("Institute for Portfolio Alternatives Letter").

instructions to encourage the use of electronic formatting and graphical, text, online features and layered disclosures in preparing their relationship summaries.[155] Key elements of the final instructions include the following:

• The instructions encourage (rather than just permit, as proposed) firms to use graphics or text features to respond to the required disclosures, or to make comparisons among their offerings, including by using charts, graphs, tables, text colors, and graphical cues, such as dual-column charts.[156] If the chart, graph, table, or other graphical feature is self-explanatory and responsive to the disclosure item, additional narrative language that may be duplicative is not required. For a relationship summary provided electronically, the instructions further encourage online tools that populate information in comparison boxes based on investor selections.[157]

• The instructions reference a non-exhaustive list of electronic media, communications, or tools that firms may use in their relationship summary.[158] We are including an instruction that, in a relationship summary that is posted on a firm's website or otherwise provided electronically, firms must provide a means of facilitating access (*e.g.,* hyperlinking) to any information

that is referenced in the relationship summary if the information is available online.[159] For relationship summaries delivered in paper format, firms may include URL addresses, QR codes, or other means of facilitating access to such information.[160] This instruction permits layered disclosure through paper disclosures and hybrid paper and electronic deliveries, while supporting some investors' preference for paper.

• The instructions provide guidance that firms may include instructions on the use and interpretation of interactive graphics or tools, as proposed.[161] We believe that these features can make the relationship summary more engaging, accessible, and effective in communicating to retail investors.[162]

• The instructions replace the term ''hyperlink'' with the more evergreen concept of ''a means of facilitating access,'' which will include hyperlinks as well as website addresses, QR Codes, or other equivalent methods or technologies.[163] Expanding the types of

technology referenced in the instructions will make them more relevant as new technologies continue to be developed.

A number of commenters suggested different approaches for whether we would treat the relationship summary as ''incorporating by reference'' information provided in additional disclosures or materials that are hyperlinked to or otherwise accessible from the relationship summary.[164] Some of these commenters suggested that we treat certain hyperlinked information as ''incorporated by reference.'' [165] Other commenters recommended that firms should be permitted, but not necessarily required, to incorporate in the relationship summary additional information provided in other documents.[166]

---

[155] We created a separate section in the instructions focused on electronic and graphical formats that includes these instructions. Proposed General Instruction 1.(f) to Form CRS (''You may use charts, graphs, tables, and other graphics or text features to explain the required information, so long as the information: (i) Is responsive to and meets the requirements in these instructions (including space limitations); (ii) is not inaccurate or misleading; and (iii) does not, because of the nature, quantity, or manner of presentation, obscure or impede understanding of the information that must be included. When using interactive graphics or tools, you may include instructions on their use and interpretation.'').

[156] *See* General Instruction 3.A. to Form CRS (''You are encouraged to use charts, graphs, tables, and other graphics or text features to respond to the required disclosures. You are also encouraged to use text features, text colors, and graphical cues, such as dual-column charts, to compare services, account characteristics, investments, fees, and conflicts of interest.'').

[157] *See* General Instruction 3.A. to Form CRS (''For a *relationship summary* that is posted on your website or otherwise provided electronically, we encourage online tools that populate information in comparison boxes based on investor selections.'').

[158] General Instruction 3.A. to Form CRS (''You also may include: (i) A means of facilitating access to video or audio messages, or other forms of information (whether by hyperlink, website address, Quick Response Code (''QR code''), or other equivalent methods or technologies); (ii) mouse-over windows; (iii) pop-up boxes; (iv) chat functionality; (v) fee calculators; or (vi) other forms of electronic media, communications, or tools designed to enhance a *retail investor's* understanding of the material in the *relationship summary*.'').

[159] General Instruction 3.B. to Form CRS. (''In a *relationship summary* that is posted on your website or otherwise provided electronically, you must provide a means of facilitating access to any information that is referenced in the *relationship summary* if the information is available online, including, for example, hyperlinks to fee schedules, conflicts disclosures, the firm's narrative brochure required by Part 2A of Form ADV, or other regulatory disclosures.'').

[160] General Instruction 3.B. to Form CRS. (''In a *relationship summary* that is delivered in paper format, you may include URL addresses, QR codes, or other means of facilitating access to such information.'').

[161] General Instruction 3.C. to Form CRS. Instructions that firms provide on the use and interpretation of interactive graphics or tools would not be subject to the page limitation for relationship summaries under General Instruction 1.C to Form CRS, but should be succinct, consistent with General Instruction 2.A.

[162] Similar to the proposed instructions, the final instructions include the caveat that these graphical and text features and electronic media, communications, or tools, (i) must be responsive to and meet the requirements in these instructions for the particular item in which the information is placed; and (ii) may not, because of the nature, quantity, or manner of presentation, obscure or impede understanding of the information that must be included. General Instruction 3.C. to Form CRS. *Cf.* Proposed General Instruction 1.(f) to Form CRS (''You may use charts, graphs, tables, and other graphics or text features to explain the required information, so long as the information: (i) Is responsive to and meets the requirements in these instructions (including space limitations); (ii) is not inaccurate or misleading; and (iii) does not, because of the nature, quantity, or manner of presentation, obscure or impede understanding of the information that must be included.''). We deleted the reference in the proposed instructions to ''is not inaccurate or misleading'' because it is covered by another instruction.

[163] *See, e.g.,* General Instruction 3.A. to Form CRS (''You also may include: (i) A means of facilitating access to video or audio messages, or other forms of information (whether by hyperlink, website address, Quick Response Code (''QR code''), or other equivalent methods or technologies''); General

Instruction 3.B. to Form CRS (''In a *relationship summary* that is posted on your website or otherwise provided electronically, you must provide a means of facilitating access to any information that is referenced in the *relationship summary* if the information is available online, including, for example, hyperlinks to fee schedules, conflicts disclosures, the firm's narrative brochure required by Part 2A of Form ADV, or other regulatory disclosures.).'' *Cf*. Proposed General Instruction 1.(g) to Form CRS (''In a *relationship summary* that is posted on your website or otherwise provided electronically, you must use hyperlinks for any document that is cross-referenced in the *relationship summary* if the document is available online.'').

[164] *See, e.g.,* Comment Letter of Cetera Financial Group (Aug. 7, 2018) (''Cetera Letter I''); IRI Letter; Schwab Letter I; Schwab Letter III (providing sample Form CRS instructions permitting incorporation of materials by reference); Comment Letter of The National Society of Compliance Professionals (Aug. 7, 2018) (''NSCP Letter''); Schnase Letter; LPL Financial Letter.

[165] Schwab Letter I (with respect to broker-dealers, Form CRS should navigate investors to additional information readily available on the firm's website or enclosed with account information, and the additional information would be considered incorporated by reference); NSCP Letter (firms should be permitted to incorporate by reference public disciplinary disclosure events); Schnase Letter (''Firms that follow the SEC rules in filing, posting and linking should get the full anti-fraud benefit of the information in the Firm Brochure being deemed ''delivered'' when the Relationship Summary is delivered, without having to resort to arcane and outmoded language and concepts such as ''incorporation by reference.'').

[166] *See* Cetera Letter I (suggesting that firms ''should be permitted to incorporate other information in Form CRS by reference without reproducing the specified information in its' [sic] entirety, so long as the location is reasonably accessible to the public and the other sources of information are sufficient to meet the standards of Form CRS''); IRI Letter (the Commission should ''permit (but not require) firms to use incorporation by reference to satisfy particular components of the disclosures required under Regulation Best Interest and/or Form CRS. In other words, if an investor already receives a particular piece of information in an existing disclosure document (including disclosures required under the federal securities laws, SEC or FINRA rules, ERISA, or DOL rules) the firm should be permitted to merely reference that existing document (with sufficient information for investors to locate or obtain that document.'').

As discussed above, we support the use of layered disclosure and believe that investors will benefit greatly from receiving a relationship summary containing high-level information that they will be more likely to read and understand, with the ability to access more detailed information. Layered disclosure is an approach that can balance the goal of keeping the relationship summary short and accessible with the goal of providing retail investors with fulsome and specific information. The relationship summary is intended to be a self-contained document, however, and firms should be able to meet the instructions' requirements by providing generalized and summary responses to each item, without relying on incorporation by reference to other documents providing additional information. In contrast with other disclosure obligations such as prospectuses and registration statements, a firm could not satisfy the disclosure requirements set forth in the relationship summary instructions by incorporating another document (such as the Form ADV Part 2A brochure) by reference.

At the same time, we recognize the communicative value of layered disclosure. The instructions provide, as discussed above, that firms may [167] (and in some cases must) [168] cross-reference other documents and use hyperlinks or other tools to give more details about the topic. Where firms link to content outside the relationship summary disclosure, whether on a permissive or mandatory basis, the information may not substitute for providing any narrative descriptions that the instructions require, and the additional information should be responsive and relevant to the topic covered by the instruction. Firms should be mindful that the antifraud standards under the federal securities laws apply to linked

information, as with other securities law disclosures.

All together we believe encouraging the use of electronic and graphical formatting online features, and layered disclosures will permit firms to create innovative disclosures that engage investors.

### 4. Conversation Starters

Consistent with the proposal, the relationship summary will be required to contain suggested follow-up questions for retail investors to ask their financial professional. The relationship summary, however, will not include a separate section of "Key Questions to Ask," at the end of the relationship summary, as proposed. Instead, firms will be required to integrate those "key questions" for retail investors to ask their financial professionals throughout the relationship summary as headings to items or as "conversation starters."

The proposed relationship summary would have required firms to include ten questions, as applicable to their particular business, under the heading "Key Questions to Ask" after a statement that the retail investors should ask their financial professional the key questions about a firm's investment services and accounts.[169] In addition, we proposed to allow firms to include up to four additional frequently asked questions.[170]

Most comment letters that discussed the "Key Questions to Ask" section generally did not support the proposed approach of including a separate section of up to fourteen questions at the end of the relationship summary. Commenters who proposed keeping a key questions section typically suggested significant substantive or stylistic alterations.[171] In a separate approach, many commenter mock-ups included topics and questions from "Key Questions to Ask" in a question-and-response format throughout the relationship summary.[172] Several commenters suggested that the key questions be removed from the relationship summary and placed on the Commission's website with other educational materials.[173]

Observations reported in the RAND 2018 report and other surveys and studies, and individual investor feedback at roundtables and on Feedback Forms generally indicated, that retail investors found the key questions helpful, however. In the RAND 2018 survey, the "Key Questions to Ask" section received the highest support of all sections to "keep as is" when investors were asked if they would add more detail, keep as is, shorten, or delete the section, and a majority of RAND 2018 survey respondents also indicated that they were either "very comfortable" or "somewhat comfortable" with asking each of the key questions.[174] Surveys and studies submitted by commenters also indicated that most investors who reviewed one of the proposed sample relationship summaries found the suggested questions to be useful and said they were likely to ask the questions.[175] In addition, the "Key Questions to Ask" section received the most "very useful" ratings from commenters who submitted Feedback Forms, and narrative comments on several Feedback Forms specifically indicated that the questions would encourage discussion with financial professionals.[176] Similarly, investors at

---

[167] *See, e.g.,* General Instruction 3.A. to Form CRS ("You also may include: (i) A means of facilitating access to video or audio messages, or other forms of information (whether by hyperlink, website address, Quick Response Code ("QR code"), or other equivalent methods or technologies); (ii) mouse-over windows; (iii) pop-up boxes; (iv) chat functionality; (v) fee calculators; or (vi) other forms of electronic media, communications, or tools designed to enhance a *retail investor's* understanding of the material in the *relationship summary.*").

[168] *See, e.g.,* Item 3.A.(iii) of Form CRS ("You must include specific references to more detailed information about your fees and costs that, at a minimum, include the same or equivalent information to that required by the Form ADV, Part 2A brochure (specifically Items 5.A., B., C., and D.) and Regulation Best Interest, as applicable.").

[169] *See* Proposed Item 8 of Form CRS.

[170] *See id.*

[171] *See, e.g.,* CFA Institute Letter I (suggesting interspersing questions through sections of Form CRS rather than including at the end); SIFMA Letter (suggesting that firms only be required to answer "four to five" questions to make the communication "shorter and more meaningful" to investors).

[172] *See, e.g.,* IAA Letter I; Comment Letter of the Institute for the Fiduciary Standard (Aug. 6, 2018) ("IFS Letter"); LPL Financial Letter; Schwab Letter I.

[173] *See, e.g.,* ACLI Letter; IAA Letter I; LPL Financial Letter. One commenter representing

investors argued that the Commission was better-placed to provide information on topics covered in the "Key Questions to Ask" section because financial professionals would have "room for obfuscation" in their discussions with retail investors. *See* CFA Letter I.

[174] *See* RAND 2018, *supra* footnote 13. RAND 2018 also reports that, in qualitative interviews, "[m]ost interview participants said that they liked all of the questions, that they would ask these questions in meeting with a financial service provider, and did not suggest dropping any of the questions."

[175] *See* Betterment Letter I (Hotspex) *supra* footnote 18 (82% of respondents viewing a version of the investment-adviser relationship summary found the suggested questions to be very or somewhat useful and 93% were very or somewhat likely to ask the questions); Cetera Letter II (Woelfel) *supra* footnote 17 (85% of survey participants who viewed the sample dual-registrant relationship summary found the key questions to be "very" or "somewhat" important to cover, and 84% "strongly" or "somewhat" agreed that the key questions described their topics clearly); Kleimann I, *supra* footnote 19 ("Nearly all participants saw the Key Questions as essential. They felt the questions were straight forward and raised important questions . . . Many said they would use the set of questions in their next exchange with their broker or adviser.").

[176] *See* Feedback Forms Comment Summary, *supra* footnote 11 (51 commenters (55%) responded to Question 2(g) that the Key Questions section was "very useful" and 28 (30%) responded that the Key Questions section was "useful"; in comparison, other sections were scored as "very useful" in the range of 31% to 44%; similarly, more than 75% of Feedback Forms included a narrative response to Question 7 or other response indicating that the Key Questions were useful; 11 narrative responses included specific comments agreeing that the Key Questions would encourage discussions with

Commission-held roundtables indicated that they viewed the questions as helpful.[177]

In light of comments, we believe that including questions for investors to ask their financial professionals is an important component of the relationship summary. Several commenter mock-ups showed questions throughout the relationship summary grouped by subject matter rather than at the end of the document. Investor studies showed that proximity and context are important for questions an investor may have for a financial professional.[178] In addition, some commenters' Feedback Forms requested that questions be placed earlier in the relationship summary document; one specifically suggested that we put the questions with "the appropriate section [with] each section to which it applies." [179] We have determined to follow a similar approach by replacing the Key Questions to Ask section with specified "conversation starters" throughout the document. We are also using some of the proposed questions as topic headings.

There are required questions as conversation starters in each section other than the Introduction.[180] These conversation starters are intended to cover the same topics as the proposed key questions and in many cases are substantially similar in wording to the proposed key questions.[181] For each conversation starter, firms must use text features to make the conversation

starters more noticeable and prominent in relation to the other discussion text. For example, they may use larger or different font; a text box around the heading or questions; bolded, italicized, or underlined text; or lines to offset the questions from other sections.[182] We believe the questions will be more helpful to investors when included throughout the document with formatting highlighting the conversation starters and organizing the conversation starters together with the firm's disclosures about a particular topic, providing retail investors clearer context for each question. However, if a required conversation starter is inapplicable to the firm's business, the firm may omit or modify that conversation starter.[183] With these changes, we believe that the conversation starters will better help retail investors initiate and engage in useful and informative conversations with their investment professionals.

As proposed, investment advisers that provide only automated investment advisory services or broker-dealers that provide services only online without a particular individual with whom a retail investor can discuss the conversation starters must include a section or page on their website that answers each of the conversation starter questions and must provide in the relationship summary a means of facilitating access (*e.g.,* by providing a hyperlink) to that section or page.[184] For example, a firm could include a hyperlink, QR Code, or some other equivalent methods or technologies that would enable a retail investor to access that information. One commenter requested clarification that all firms could provide retail investors with the answers to each key question in writing, and then investors could call a call center for follow-up questions.[185] All firms could choose to provide written answers to conversation starters, but the final instructions will only require written responses in these limited circumstances to ensure that retail investors receive responses when they do not have access to a financial

professional to ask questions. We continue to believe that the requirement as adopted will encourage investor engagement and make the conversation starters useful where there is no firm representative to answer the question in-person (or by telephone) for the retail investor. In addition, as proposed, if the firm provides automated investment advisory or brokerage services, but also makes a financial professional available to discuss the firm's services with a retail investor, the firm must make the financial professional available to discuss the conversation starters with the retail investor.[186]

Six of the proposed key questions will continue to have analogous "conversation starter" questions in the final Form CRS, which we discuss in each applicable section below.[187] These questions cover services, fees and costs, conflicts, disciplinary information, and information about appropriate contact persons. As described below, we revised the wording for all of these questions.

We did not replace four of the key questions with analogous "conversation starter" questions; the topics raised by these key questions will be addressed in other ways in the relationship summary. First, we have replaced the question requesting financial professionals to "do the math for me" with a different conversation starter.[188] Commenters raised specific concerns about this question for operational and recordkeeping reasons.[189] We are

---

financial professionals; and two others stated more generally that the relationship summary would encourage dialogue).

[177] *See, e.g.,* Atlanta Roundtable (three investors responded positively to a question as to whether the key questions were helpful, with no dissent to that view); Houston Roundtable (one investor responding that "the questions for me are very, very good.").

[178] *See* Kleimann I, *supra* footnote 19; Kleimann II, *supra* footnote 19 (each recommending question-and-answer format in part to place relevant information together).

[179] *See* Feedback Forms Comment Summary, *supra* footnote 1111 (summary of responses to Question 7); Hoggan Feedback Form ("Maybe you should question at the end of each section—to help frame the issue"); *see also* Hawkins Feedback Form (commenting on obligations section that "[g]iving some examples of types of questions to ask would be beneficial").

[180] *See* Items 2.D. (relationships and services); 3.A.(iv) and 3.B.(iii) (fees, costs, conflicts, and standard of conduct); 4.D.(ii) (disciplinary history); and 5.C. (additional information) of Form CRS.

[181] For example, the proposed Key Question 6 ("How will you choose investments to recommend for my account?") has been included in the final relationship summary as a conversation starter to the Relationships and Services section ("How will you choose investments to recommend to me?"). For discussion of additional conversation starter questions, *see infra* Section II.A.4 *See also* Proposed Item 8.6 of Form CRS and Item 2.D.(iv) of Form CRS.

[182] *See* General Instruction 4.A. to Form CRS.

[183] *See* General Instruction 2.B. to Form CRS.

[184] General Instruction 4.B. to Form CRS. As proposed, such advisers or broker-dealers would have provided a hyperlink in the relationship summary to the appropriate section or page. *See* Proposed Item 8 of Form CRS. In response to comments supporting electronic access more broadly, we broadened the instruction to allow for other means of facilitating access. We also changed the term "automated advice" from the proposed instructions to "automated investment advisory services" in the final instructions to underscore the ongoing nature of the investment advisory relationship.

[185] *See* LPL Financial Letter.

[186] General Instruction 4.B. to Form CRS.

[187] *See infra* Sections II.B.2 (relating to Item 2.D. of Form CRS), II.B.3.a (relating to Item 3.A.(iv) of Form CRS), II.B.3.b (relating to Item 3.B.(iii) of Form CRS); II.B.4 (relating to Item 4.D.(ii) of Form CRS), and II.B.5 (relating to Item 5.C. of Form CRS).

[188] *See* Proposed Item 8.2 of Form CRS ("Do the math for me. How much would I pay per year for an advisory account? How much for a typical brokerage account? What would make those fees more or less? What services will I receive for those fees?").

[189] *See, e.g.,* Comment Letter of Edward D. Jones and Co., L.P. (Aug. 7, 2018) ("Edward Jones Letter") ("[G]iven the range of services available, it would be very difficult for financial professionals to fully address this question at the outset of the [customer] relationship, particularly for investors selecting transaction-based services."); SIFMA Letter ("[M]ost firms do not currently have systems in place to allow the financial professionals to answer questions such as customer-specific 'Do the math for me' requests."); John Hancock Letter ("We further believe that the costs and operational hurdles associated with providing personalized fee information have been underestimated, and encourage the SEC to provide that any "do the math"-type questions may be answered through the use of examples."). In part to avoid recordkeeping requirements on behalf of a financial professional, one commenter suggested reframing the questions as reflecting questions back to an investor with a prompt to ask the representative for help if the investor was unsure as to a response to the questions. *See* Primerica Letter.

Continued

**33510    Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

instead requiring that firms include a conversation starter question prompting retail investors to ask their financial professional to help them understand how the fees and costs might affect their investments and the potential impact of fees and costs on a $10,000 investment.[190] As we note below, our intent with the proposed ''Do the math for me'' question was that it serve as a prompt to encourage retail investors to ask about the hypothetical amount they would pay per year for an account, what would make the fees more or less, and what services they would receive for those fees. The question was not intended to require firms to generate individualized cost estimates for each particular retail investor. We believe that the newly worded conversation starter makes that more clear. Additionally, the required discussion of fees, costs, and conflicts, together with the conversation starter question, will better serve as an initial basis for understanding how fees affect investment returns and the fees that they will pay than the ''Do the math for me'' key question.[191]

Two other proposed key questions regarding costs associated with an account and how firms make money [192] covered information that the relationship summary as adopted requires to be disclosed under the section on fees, costs, conflicts, and standard of conduct.[193] Specifically, firms must (i) summarize the principal fees and costs that retail investors will incur from their services (including how frequently they are assessed and the conflicts of interest they create) and (ii) describe any other fees related to their brokerage or investment advisory services in addition to those principal fees that the retail investor will incur.[194] Additionally, the new conversation starter question included in Item 3 is intended to elicit similar points of

discussion with the following wording: ''Help me understand how these fees and costs might affect my investments. If I give you $10,000 to invest, how much will go to fees and costs, and how much will be invested for me?'' Finally, unlike the proposal, the relationship summary must include a description of the ways in which the firm and its affiliates make money from brokerage or investment advisory services and investments it provides to retail investors as well as material conflicts of interest.[195] As a result of these disclosure requirements, the separate questions from the proposal are not necessary.

Finally, we are not adopting a conversation starter question analogous to the proposed key question asking ''How often will you monitor my account's performance and offer investment advice?'', because the Relationships and Services section of the adopted relationship summary requires disclosure about the services and advice or recommendations that firms offer and whether or not they monitor accounts, including the frequency and any material limitations on any such monitoring.[196]

### 5. Presentation of Relationship Summaries by Dual Registrants and Affiliated Firms

We are modifying the proposed instructions in order to encourage a dual registrant to prepare one combined relationship summary discussing both its brokerage and advisory services, but a dual registrant will be permitted to provide two separate relationship summaries, each describing one type of service.[197] The proposal would have required a dual registrant to prepare one relationship summary, presenting most of the required items under standardized headings and in a tabular format, with brokerage services described in one column and advisory services described in another.[198] We also are adding a new instruction permitting affiliates to prepare a single relationship summary describing both brokerage and investment advisory services that they offer or to prepare separate relationship summaries, one for

each type of service.[199] In comparison, the proposed instructions did not permit affiliates to deliver one combined relationship summary, but did allow them to state that they offer retail investors their affiliates' brokerage or advisory services, as applicable.[200]

We are not adopting the definitions of ''standalone broker-dealer'' and ''standalone investment adviser'' as proposed, because they are no longer necessary given the streamlining of the instructions relative to the proposal.[201] Under the final instructions, however, we are defining a dual registrant as ''[a] firm that is dually registered as a broker-dealer under section 15 of the Exchange Act and an investment adviser under section 203 of the Advisers Act and offers services to retail investors as both a broker-dealer and an investment adviser'', substantially as proposed. To clarify, a firm that is dually registered as both a broker-dealer and an investment adviser but does not offer both brokerage and investment advisory services to retail investors would not fall within the definition of dual registrant. For example, a firm that is dually registered and offers investment advisory services to retail investors, but offers brokerage services only to institutional customers, would be required to prepare, file, and deliver the relationship summary only in accordance with the obligations of an investment adviser offering services to retail investors.[202]

*Dual Registrants.* Investor studies and surveys showed mixed results in connection with the dual-column, combined relationship summary. For example, when presented with screen shots of each separate section in dual-column format, 85% of RAND 2018 survey respondents indicated that the side-by-side comparison format helped them decide whether a broker-dealer or investment adviser account would be right for them, but during qualitative interviews, some participants had difficulty with the two column

---

For additional discussion of recordkeeping, *see infra* Section II.E.

[190] *See* Item 3.A.(iv) of Form CRS.

[191] *See infra* Section II.B.3.

[192] *See* Proposed Items 8.3 (''What additional costs should I expect in connection with my account?'') and 8.4 (''Tell me how you and your firm make money in connection with my account. Do you or your firm receive any payments from anyone besides me in connection with my investments?'') of Form CRS.

[193] *See* Item 3 of Form CRS. The Item 3.C. disclosure combined with the conversation starter included therein would similarly cover information intended to be discussed in response to the fifth proposed key question (''What are the most common conflicts of interest in your advisory and brokerage accounts? Explain how you will address those conflicts when providing services to my account.''). *See infra* Section II.B.3.b.

[194] *See* Items 3.A.(i) and 3.A.(ii) of Form CRS; *see also infra* Section II.B.3.

[195] *See* Item 3.B.(ii) of Form CRS; *see also infra* Section II.B.3.

[196] *See* Item 2.B.(i) of Form CRS (''Explain whether or not you monitor the performance of *retail investors'* investments, including the frequency and any material limitations. Indicate whether or not the services described in response to this Item 2.B.(i) are offered as part of your standard services.''); *see also infra* Section II.B.2.

[197] General Instruction 5.A. to Form CRS.

[198] Proposed General Instruction 1.(e) to Form CRS.

[199] General Instruction 5.B. to Form CRS.

[200] Proposed Item 2.D. of Form CRS. This disclosure only applied in the context of an affiliate of the firm. This item was not intended to describe disclosure of a financial professional's outside business activities, such as an outside investment advisory business of a broker-dealer registered representative. *Cf.* Comment Letter of Northwestern Mutual Life Insurance Company (Aug. 7, 2018) (''Northwestern Mutual Letter'') (interpreting Proposed Item 3 to prohibit the mention of affiliate services).

[201] *See supra* footnote 8.

[202] *See also* Advisers Act Rule 204–5; Exchange Act Rule 17a–14(a); General Instructions to Form CRS (''If you do not have any *retail investors* to whom you must deliver a relationship summary, you are not required to prepare or file one.''); General Instruction 11.C to Form CRS.

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33511**

format.[203] On Feedback Forms, some indicated that they liked the side-by-side or grid presentation.[204] One Feedback Form commenter said the dual-column format was confusing, however.[205] An interview-based study also indicated that both the formatting and the language in the dual-column format in our proposed sample relationship summary contributed to investor confusion about differences between broker-dealers' and investment advisers' services.[206] Both industry representatives and commenters representing investors also expressed concerns about the proposed formatting requirements for dual registrants' relationship summaries.[207] Two commenters supported using visual formatting to help investors understand the options dual registrants provide, but argued that the proposed content or design should be changed.[208]

Several commenters suggested letting dual registrants choose whether to prepare one combined relationship summary or two separate ones.[209] Commenters argued that providing information about both brokerage and investment advisory services as proposed would confuse investors.[210] Another suggested requiring dual registrants to prepare and deliver different relationship summaries to retail investors depending on whether the investors enter into an advisory or brokerage relationship, and to highlight the availability and link to the relationship summary of the other type of service.[211] One commenter argued that dual registrants needed flexibility to maintain two separate disclosures to allow each financial professional associated with the dual registrant to provide a tailored disclosure to his/her customer, without including services that he/she is not licensed to provide.[212]

We encourage dual registrants to prepare a single disclosure, designed in a manner that facilitates comparison between their brokerage and advisory services. Informed by comments, we have determined that two separate disclosures might be appropriate, depending on the different ways firms and their financial professionals offer services and on the particular facts and circumstances. For example, financial professionals with licenses to offer services as a representative of a broker-dealer and investment adviser may offer services through a dual registrant, affiliated firms, or unaffiliated firms, or only offer one type of service notwithstanding their dual licensing.[213] Financial professionals who are not dually licensed may offer one type of service through a firm that is dually registered. Accordingly, the final instructions permit dual registrants and affiliates to prepare a single relationship summary, or alternatively, two separate ones, to describe their brokerage and investment advisory services in a way that accurately reflects their business models and will be the most helpful to retail investors. The instructions explicitly encourage preparation of a single relationship summary, however,

given that a number of investors and commenters reacted positively to this presentation.[214]

A firm preparing a single relationship summary will be required to employ design elements of its own choosing to promote comparability; however, we are not prescribing the two-column format, as proposed. We agree that making retail investors aware of a range of options is important to help them make an informed choice,[215] but we recognize the potential limits of a tabular format, as illustrated by results from some investor studies and surveys,[216] and we have concluded that firms are generally in a better position than the Commission to determine a format and design that facilitates comparison of their specific brokerage and investment advisory services. Whether a firm prepares a single relationship summary or two separate ones, the final instructions require a firm to present the information with equal prominence and in a manner that clearly distinguishes and facilitates comparison of the two types of services.[217] For example, a firm could use a tabular format; text features such as text boxes; bolded, italicized, or underlined text; or lines to clearly indicate similarities and differences in its services.

While we are providing this flexibility, we believe investors should see a range of options. Accordingly, the final instructions provide that a firm preparing two separate relationship summaries must provide a means of facilitating access to each relationship summary (*e.g.,* include cross-references or hyperlinks) and deliver both with equal prominence and at the same time to each retail investor, whether or not that retail investor qualifies for those retail services or accounts.[218] We disagree with commenters suggesting that dual registrants should have the option to deliver to retail investors a relationship summary describing only one type of service if, for example, that

---

[203] *See* RAND 2018, *supra* footnote 13, at 22; *see also id.,* at 46 ("Some participants grasped that the document was organized into two columns, each corresponding to an account type. Some others did not realize this immediately but grasped it once it was pointed out by an interviewer.").

[204] *See, e.g.,* Anonymous03 Feedback Form ("a side by side chart with u's [sic] to say which type of account offers which service"); Anonymous14 Feedback Form ("recommend chart structure"); Anonymous28 ("Presenting the differences in parallel columns gives the best chance for people new ot [sic] investing to understand what is involved"); Baker Feedback Form ("the double column format, comparing the two classes, was clear and easy to follow"); and Smith1 Feedback Form ("I like the side by side comparisons").

[205] *See* Anonymous02 Feedback Form ("Maybe a bit hard to read the columns.").

[206] *See* Kleimann I, *supra* footnote 19, at 30–31 ("Most participants tried to read the CRS by looking first at one column, usually the Broker Dealer Services, and then at the second column . . . when they turned to the second column they then tried to match the bullets . . . . Sometimes this matching was relatively easy to do, as in the Types of Relationships and Services section because the bullets aligned almost exactly. They struggled and found the misaligned bullets confusing in subsequent sections . . . Some participants simply took information from the first bullet they read or from bolded words or phrases.").

[207] *See* AARP Letter; CFA Letter I; TIAA Letter; Fidelity Letter; MassMutual Letter; LPL Financial Letter; SIFMA Letter; Comment Letter of BlackRock, Inc. (Aug. 7, 2018) ("BlackRock Letter") (expressing concern that investors may be confused if dual registrants were required to disclose all of their advisory and brokerage services in a single relationship summary); *see also* Schwab Letter II ("Dual-registrant firms recommend flexibility because of real-world concerns that the side-by-side comparison will not be effective.").

[208] *See* AARP Letter ("[a]lthough the visual formatting is helpful, the substantive information laid out within the table remains technical and is likely to be confusing to the average retail investor"); CFA Letter I (emphasizing that investors must see all available options in order to make an informed decision, and that the Commission consult with disclosure design experts toward developing a form that is most likely to result in informed investor choice.").

[209] *See* Schwab Letter III (providing sample Form CRS instructions that permit dual registrants either to prepare a single, comparative relationship summary, or two separate relationship summaries describing each type of service and providing links to each other); TIAA Letter; Fidelity Letter; MassMutual Letter; LPL Financial Letter; SIFMA Letter; BlackRock Letter.

[210] *See, e.g.,* TIAA Letter (a combined relationship summary would confuse customers of dually registered firms that provide only one type of service and would overwhelm them with information not relevant to the relationship); LPL Financial Letter; SIFMA Letter; BlackRock Letter.

[211] *See* IAA Letter I.

[212] *See* MassMutual Letter.

[213] *See, e.g.,* LPL Financial Letter.

[214] *See, e.g.,* RAND 2018, *supra* footnote 13 (reporting that 85% of survey respondents found the side-by-side comparison format to be helpful for purposes of deciding between a broker-dealer and investment adviser); *see also* CFA Letter I (stating it supported using one document to provide comparing brokerage and investment advisory services); Fidelity Letter (stating that a single Form CRS for a dual-registered firm could accomplish its objective); Schnase Letter (supporting the idea of having a unique form for dual registrants).

[215] *See supra* footnote 208 and accompanying text; *infra* footnote 1046 and accompanying text (discussing studies concerning the availability and presentation of comparative information on decision making).

[216] *See supra* footnotes 203–206 and accompanying text.

[217] General Instruction 5.A. to Form CRS.

[218] General Instruction 5.A. to Form CRS.

investor does not qualify for one of the services.[219] Retail investors should be able to learn about and compare the range of options a firm offers to retail investors, even if the financial professional does not believe that the retail investor meets the requirements for or is considering certain services at that time. For example, a retail investor may initially seek ongoing advice through an advisory account, but after learning about both brokerage and advisory services and speaking with a financial professional, may decide that a brokerage account is a better choice. Or a retail investor may not qualify for certain accounts at the time of receiving the relationship summary, *e.g.,* by not being able to meet an account opening minimum, but may qualify for them in the future, or may qualify for a particular service at one firm but not another. Furthermore, a retail investor may initially make the financial professional aware of only certain asset holdings (for example, he or she approaches a firm to rollover an IRA). On that basis, the firm may believe the investor only qualifies for certain of the firm's services. However, the investor may also have substantial other asset holdings and thus qualify for a variety of accounts that the firm offers. Knowing about the alternative brokerage and investment advisory options that a firm offers will help retail investors to compare firms' offerings and consider whether to adjust the relationship or services as investors' financial circumstances change.

*Affiliate Services.* As discussed above, the proposed instructions did not permit affiliates to prepare a combined relationship summary, but did permit firms with affiliates offering retail investors brokerage or advisory services to disclose these services.[220] Several commenters recommended that affiliates should have the same flexibility to prepare one or two relationship summaries as dual registrants.[221] We agree that this

flexibility is appropriate for affiliates and are modifying the instructions to permit, but not require, delivery of a single relationship summary. Affiliates preparing a single relationship summary will provide the same comparative benefits for investors as dual registrants doing so. As with dual registrants, some affiliated firms market their services together and have financial professionals who hold licenses through each firm. We recognize, however, that not all affiliates operate in the same way. Some affiliated firms operate independently, do not market their services together, and do not share financial professionals. The different ways in which financial professionals affiliate with firms to provide services also warrant this flexibility. For example, some commenters noted that many financial professionals are licensed representatives of a brokerage firm and are also licensed through an affiliated investment advisory firm or an unaffiliated investment advisory firm (sometimes as a sole proprietor) separately registered with the Commission or one or more States.[222] Depending on the relationship among affiliates and their financial professionals, a single relationship summary or two separate summaries may be more appropriate.[223]

Many dually licensed financial professionals offer services on behalf of two affiliates, similar to dually licensed financial professionals offering services for a dual registrant. One commenter requested that the Commission provide clarity that all references to dual registrants apply to broker-dealers and investment advisers organized under a single corporate structure as affiliated entities.[224] Consistent with our discussion above, we believe that retail investors seeking services from dually

licensed financial professionals should receive information about all of the services the financial professional offers, even if the services are through two affiliated SEC-registered firms. As a result, if two affiliated SEC-registered firms prepare separate relationship summaries, and they provide brokerage and investment advisory services through dually licensed financial professionals, the final instructions require the firms to deliver to each retail investor both firms' relationship summaries with equal prominence and at the same time, without regard to whether the particular retail investor qualifies for those retail services or accounts. To provide clarity, we have added a definition for dually licensed professionals in the final instructions that was not included in the proposal.[225] The final instructions also provide that each of the relationship summaries must cross-reference and link to the other.[226] If the affiliated firms are not providing brokerage and investment advisory services through dually licensed financial professionals, they may choose whether or not to reference each other's relationship summary and whether or not to deliver the affiliate's relationship summary with equal prominence and at the same time.[227]

Finally, we modified the instructions to explicitly permit a firm to acknowledge other financial services the firm provides in addition to its services as a broker-dealer or investment adviser registered with the SEC, such as insurance, banking, or retirement services, or investment advice pursuant to state registration or licensing.[228]

---

[219] *See* IAA Letter I; Fidelity Letter.

[220] Proposed Item 2.D. of Form CRS.

[221] *See* Fidelity Letter; LPL Financial Letter (''[D]ual-hatted financial professionals may either (i) provide brokerage and advisory services on behalf of LPL or (ii) provide brokerage services on behalf of LPL while providing advisory services on behalf of an unaffiliated RIA that is separately registered . . . . [In the latter case, an investor] would receive a dual registrant relationship summary from LPL and a standalone investment adviser relationship summary from the RIA'' without knowing which entity would be providing advisory services.''). Other commenters suggested that the instructions clarify whether the requirements for dual registrants apply to affiliated broker-dealers and investment advisers. Comment Letter of State Farm Mutual Automobile Insurance Company (Aug. 6, 2018) (''State Farm Letter'')

(''[T]he SEC did not provide a template or otherwise discuss whether affiliated broker-dealers and investment advisers can use blended or combined Form CRS''); Cambridge Letter (requesting that the Commission clarify that all references to dual registrants are applicable to broker-dealers and registered investment advisers organized under a single corporate structure as affiliated entities).

[222] *See, e.g.,* LPL Financial Letter.

[223] One commenter described arrangements in which a dual-hatted financial professional may provide brokerage services on behalf of a dual registrant and advisory services on behalf of an unaffiliated investment adviser. The commenter expressed concern that an investor may be confused if the dual registrant's and unaffiliated investment adviser's relationship summaries both describe investment advisory services. *See* LPL Financial Letter. We believe the flexibility for dual registrants and affiliated firms to prepare combined or separate relationship summaries under the final instructions should address this concern, and firms can determine which presentations are most helpful for investors.

[224] *See* Cambridge Letter.

[225] General Instruction 11.B. to Form CRS (defining ''dually licensed financial professional'' as ''A natural person who is both an associated person of a broker or dealer registered under section 15 of the Exchange Act, as defined in section 3(a)(18) of the Exchange Act, and a supervised person of an investment adviser registered under section 203 of the Advisers Act, as defined in section 202(a)(25) of the Advisers Act.'').

[226] General Instruction 5.B. to Form CRS. As discussed above, as is the case for dual registrants, affiliates preparing separate relationship summaries must deliver them to each retail investor with equal prominence and at the same time, without regard to whether the particular retail investor qualifies for those retail services or accounts. Each of the relationship summaries must reference and provide a means of facilitating access to the other. General Instruction 5.B.(ii).a. to Form CRS.

[227] General Instruction 5.B.(ii).b. to Form CRS. Firms that are unaffiliated will be treated as standalone broker-dealers and standalone investment advisers, each with an independent responsibility to create and deliver its own relationship summary in accordance with the final instructions.

[228] General Instruction 5.C. to Form CRS. This would also permit a broker-dealer that is registered with one or more states as an investment adviser to refer to such advisory services.

Firms may include a means of facilitating access (*e.g.,* cross-references or hyperlinks) to additional information about those services.[229] Some commenters encouraged the SEC to allow firms to disclose services of other affiliates, even if those services are not regulated by the SEC, such as investment advisory services offered by an affiliated thrift savings institution.[230] In response to our request for comment asking whether we should permit firms to include wording regarding other types of services and lines of businesses, several commenters submitting mock-ups of relationship summaries included language referencing banking and insurance services or products.[231] We found these comments persuasive and believe that permitting firms to reference financial services not necessarily regulated by the Commission so that retail investors can see the range of options available to them can benefit their decision-making, as discussed above.[232] This new instruction supports and expands upon the commenters' suggestions. Given that the focus of the relationship summary is on brokerage and/or advisory services, however, information pertaining to other services should not obscure or impede understanding of the information that must be disclosed in accordance with the Form CRS instructions.[233]

We believe that, together, these requirements for dually registered firms, financial professionals, and affiliates will enhance comparability while providing flexibility for them to present their services and relationships in the way the firm believes to be the clearest.

*B. Items*

The relationship summary is principally designed to provide succinct information about (i) relationships and services the firm offers to retail investors; (ii) fees and costs that retail investors will pay, conflicts of interest,

and the applicable standard of conduct; and (iii) disciplinary history. The proposed relationship summary included this information as well as additional topics that we are eliminating, as explained further below. In determining the scope of the relationship summary, we balanced the need for robust disclosures with the risk of "information overload" and reader disengagement, a theme in comment letters, investor feedback at roundtables and in the Feedback Forms, and observations reported in the RAND 2018 report and other surveys and studies.

Some of the key changes from the proposal include:

• We have modified the sections to place substantively related information generally together. We believe this will facilitate comprehension, leading to a better-informed decision-making process and selection of a firm, financial professional, account type, services, and investments.

• The final instructions simplify the introduction; highlight disciplinary history in a separate section; and integrate key questions, now characterized as "conversation starters," among the remaining sections of the relationship summary.

• After reviewing the comments and observations reported in the RAND 2018 report and other surveys and studies, we have determined to remove prescribed generalized comparisons between brokerage and investment advisory services.

1. Introduction

The relationship summary will include a standardized introductory paragraph. The instructions will require a firm to: (i) State the name of the broker-dealer or investment adviser and whether the firm is registered with the Securities and Exchange Commission as a broker-dealer, investment adviser, or both; (ii) indicate that brokerage and investment advisory services and fees differ and that it is important for the retail investor to understand the differences; and (iii) state that free and simple tools are available to research firms and financial professionals at the Commission's investor education website, *Investor.gov/CRS,* which also provides educational materials about broker-dealers, investment advisers, and investing.[234]

The introduction's instructions as adopted differ from the proposal, which

would have required prescribed wording in the introduction that differed for broker-dealers, investment advisers, and dual registrants. Specifically, the prescribed wording in the proposed introduction was intended to highlight in a generalized sense and make investors aware that broker-dealers and investment advisers are different, and that investors needed to carefully consider this choice. We received one comment specifically addressing the introduction. It stated that the prescribed wording would not capture the attention of retail investors and failed to adequately convey information regarding differences between investment advisers and broker-dealers.[235] In addition, several of the mock-ups commenters submitted included other suggestions for beginning the relationship summary, many of which had an introduction that was generally shorter and included less discussion about generalized business models than the proposed relationship summary.[236] In response to the comment and the mock-ups, a number of which we found conveyed useful information in a more concise manner than the proposed prescribed wording, we simplified and standardized the introductory paragraph, eliminating or replacing most of the prescribed wording we proposed, as discussed further below. In addition, we added a requirement to provide a link to *Investor.gov/CRS* in the Introduction to highlight the tools and educational resources available to retail investors. This dedicated page on *Investor.gov* will provide information specifically tailored to educate retail investors about financial professionals, including search tools in order to research firms and financial professionals and information about broker-dealers and investment advisers and their different services, fees, and conflicts. We believe the changes and the new page will better focus retail investors on how the relationship summary can be most helpful to them, while providing a link to resources to more general investor education information at the front of the relationship summary.

We made the following specific changes to the introduction: First, the final instructions require all firms to include certain information without prescribing the specific words that firms

---

[229] General Instruction 5.C. to Form CRS.

[230] *See* Northwestern Mutual Letter (seeking flexibility to disclose advisory services offered through an affiliated thrift because this would be in the clients' best interest); ACLI Letter (asserting that Form CRS is not flexible enough to describe in a meaningful and accurate way investment advisory services provided by insurance affiliates such as banks or thrifts).

[231] *See* ASA Letter; Primerica Letter; Comment Letter of Stifel Financial (Aug. 7, 2018) ("Stifel Letter") (referencing bank sweep accounts and also providing: "Banks and insurance brokers and agents may also provide access to financial planning and advice services, but these services are beyond the scope of this document."); Cetera Letter I (referencing bank sweep programs).

[232] *See supra* footnotes 215, 218–219, and accompanying text.

[233] *See* General Instruction 5.C. to Form CRS.

[234] *See* Item 1 of Form CRS. Firms also must include the date prominently at the beginning of the relationship summary, for example, in the header or footer of the first page or in a similar location for a relationship summary provided electronically. *See id.*

[235] *See* CFA Letter I. The commenter argued that the introduction would best be used to convey additional basic information about the differences between services offered by broker-dealers, investment advisers, and dual registrants. *See id.*

[236] *See, e.g.,* Primerica Letter; Schwab Letter I; SIFMA Letter.

must use.[237] The proposed relationship summary would have required prescribed wording that differed for standalone investment advisers, standalone broker-dealers, and dual registrants.[238] These changes correspond with the general approach throughout the final instructions of permitting more flexibility for firms to tailor the wording of their relationship summaries to enhance the relationship summary's accuracy, clarity, usability, and design.[239]

Second, we eliminated the proposed requirement that standalone investment advisers state that they do not provide brokerage services, and *vice versa*.[240] We believe this information is more succinctly conveyed by including the firm's registration status.[241] Additionally, commenters pointed out that the choice of financial services providers is not binary—there are more than two types of services offered that could apply.[242] We agree that the proposed wording could be viewed as unduly constricting and potentially misleading.

Third, we excluded the statement for dual registrants that, depending on an investor's needs and investment objectives, the firm can provide services in a brokerage account, investment advisory account, or both at the same time. We believe that this information is conveyed more effectively by the statement of a firm's registration status and the information provided elsewhere in the relationship summary, such as in the description of services that the firm provides.[243] In addition, requiring a statement of a firm's registration status at the beginning of the relationship

summary helps obviate a need for the Affirmative Disclosures under the Exchange Act and the Advisers Act proposed specifically to require a broker-dealer and an investment adviser to prominently disclose that it is registered as a broker-dealer or investment adviser, as applicable, with the Commission in print or electronic retail investor communications.[244] As discussed below, we are not adopting the Affirmative Disclosures.[245] In response to our request for comment relating to the Affirmative Disclosures,[246] several commenters stated that the proposed rules were duplicative of other disclosure obligations (*e.g.,* Form ADV, Regulation Best Interest, Form CRS)[247] and that such rules were costly and difficult to implement and supervise.[248]

Fourth, we have included an instruction that allows (but does not require) reference to FINRA or Securities Investor Protection Corporation ("SIPC") membership in a manner consistent with other rules and regulations (*e.g.,* FINRA rule 2210).[249]

We are not adopting the proposed requirements to include statements that: (i) There are different ways an investor can get help with investments; (ii) an investor should carefully consider which types of accounts and services are right for him or her; (iii) the relationship summary gives an investor a summary of the types of services the firm provides and how the investor pays; and (iv) an investor should ask for more information with a specific reference to the key questions.[250] We believe that this information is not necessary in the introduction and is better conveyed through the revised question-and-answer structure of the relationship summary and a more streamlined introduction highlighting that it is important for retail investors to understand the difference between brokerage and investment advisory services and fees and referencing *Investor.gov/CRS.*[251] The conversation

starters more directly prompt discussion between retail investors and their investment professionals than a generalized statement to ask for more information, and the conversation starters relating to the Relationships and Services item convey that an investor should carefully consider which types of accounts and services are appropriate. In addition, several commenter mock-ups demonstrated that removing the prescribed wording from each of these changes results in a shorter introduction and promotes additional white space in the relationship summary.[252] Our adopted instructions remove required text that might be unnecessary for investors, similar to introductions in mock-ups that were typically shorter with less discussion about generalized business models than the proposed relationship summary.[252] As a result, we believe these changes will enhance the relationship summary's clarity, usability, and design.

Finally, we added a requirement to provide a link to *Investor.gov/* CRS and state that free and simple search tools are available at *Investor.gov/CRS* in order to research firms and financial professionals. Firms also will state that the page provides educational materials about broker-dealers, investment advisers, and investing. These materials include information about the different services and fees that broker-dealers and investment advisers offer. We believe a focus on *Investor.gov* and specifically the *Investor.gov/CRS* page at the beginning of the relationship summary will be more helpful to retail investors than the proposed relationship summary introduction. *Investor.gov* provides various resources that can assist with investor education relating to firms and their professionals. Among other components, *Investor.gov* currently provides resources prepared by Commission staff for retail investors to:

• Review the background of their investment professional;

• Educate themselves about investment products, including the risks and unique characteristics of many products;

• Perform fee calculations;

• Review Investor Alerts and Bulletins;

• Find contact information for the Commission; and

---

[237] *See* Item 1 of Form CRS.

[238] *See* Proposed Items 1.B. (standalone broker-dealers); 1.C. (standalone investment advisers); and 1.D. (dual registrants) of Form CRS.

[239] *See supra* footnote 83 and accompanying text.

[240] In bold font, a standalone broker-dealer would have been required to state: "We are a broker-dealer and provide brokerage accounts and services rather than advisory accounts and services." Proposed Item 1.B. of Form CRS. Likewise, a standalone investment adviser would have been required to state in bold font: "We are an investment adviser and provide advisory accounts and services rather than brokerage accounts and services." Proposed Item 1.C. of Form CRS. Dual registrants would have included a similar statement in bold font: "Depending on your needs and investment objectives, we can provide you with services in a brokerage account, investment advisory account, or both at the same time." Proposed Item 1.D. of Form CRS.

[241] As noted and discussed further *infra,* the Introduction will also refer retail investors to *Investor.gov/CRS* for further information regarding broker-dealers and investment advisers.

[242] *See, e.g.,* ACLI Letter (describing the "binary approach that the SEC has taken, which is not entirely accurate for the distribution of variable annuity and variable life products").

[243] *See infra* Section II.B.2.

[244] *See* Proposing Release, *supra* footnote 5, at Section III.D.

[245] *See infra* Section III.

[246] *See* Proposing Release, *supra* footnote 5, at Section III.D.

[247] *See, e.g.,* LPL Financial Letter; SIFMA Letter; IRI Letter; Committee of Annuity Insurers Letter; Trailhead Consulting Letter; *see also infra* Section III.

[248] *See, e.g.,* LPL Financial Letter; Bank of America Letter; IRI Letter; SIFMA Letter; Comment Letter of Altruist Financial Advisors LLC (Aug. 7, 2018) ("Altruist Letter"); *see also infra* Section III.

[249] *See* Item 1.A. of Form CRS.

[250] *See* Proposed Items 1.B. (standalone broker-dealers); 1.C. (standalone investment advisers); and 1.D. (dual registrants) of Form CRS.

[251] Similarly, we eliminated the reference to suggested questions on a specified page because the

key questions are now included throughout the relationship summary.

[252] *See, e.g.,* Primerica Letter; Schwab Letter I; SIFMA Letter.

• Review educational information regarding broker-dealers and investment advisers.[253]

The *Investor.gov/CRS* page will bring together these types of educational materials about investment professionals, along with broader tools and other content specifically tailored for retail investors on *Investor.gov,* which will help them to more easily learn about different types of firms and find information about specific firms and financial professionals.

As discussed further below, we are removing discussions in the proposed relationship summary that were more generalized or educational in nature, including the comparison sections for standalone broker-dealers and investment advisers and other statements comparing these two different types of financial services and fees. Many commenters indicated that the Commission is generally better-positioned to provide investor education materials as compared to firms.[254] As a result, the revised introduction provides the *Investor.gov/ CRS* link at the beginning of the relationship summary to direct retail investors to the Commission staff's resources and highlights the importance of investor education.[255]

Investors and commenters also supported highlighting *Investor.gov* more generally. Investor feedback at roundtables generally indicated that *Investor.gov* was a useful website for retail investors and should be prominent in the relationship summary.[256] Comment letters were

supportive of the Commission providing educational materials to retail investors generally and *Investor.gov* specifically.[257] Observations in surveys and studies also indicated that many retail investors would seek information at *Investor.gov* and would trust that information because it is a government site.[258] Some investor studies, however, indicated that retail investors did not understand what information was available at *Investor.gov*.[259] Moving the link to *Investor.gov/CRS* and the related explanation to the front of the relationship summary (from the ''Additional Information'' section at the end of the relationship summary, as proposed) will address this issue by making the website more prominent and by concentrating information helpful to retail investors on one dedicated page on *Investor.gov.*

2. Relationships and Services

As proposed, after the introduction firms will be required to summarize the relationships and services that they offer to retail investors. They will use a revised heading, ''What investment services and advice can you provide me?'', which follows the new question-and-answer format.[260] Several commenters used this question or a similar heading in mock-ups they provided.[261] Generally as proposed, we

are requiring firms to provide information about specific aspects of their brokerage and investment advisory services, with modifications from the proposal to permit firms to use their own wording to cover these topics.

We proposed separate instructions for firms to describe brokerage account services and investment advisory account services. Firms would have used a mix of prescribed wording and their own wording to provide a summary overview of fees and certain required topics, including the scope of advice services, investment discretion, monitoring, and significant limitations on investments available to retail investors.[262] We received feedback from the observations in the RAND 2018 report, other surveys and studies and on Feedback Forms that relationships and services is an important area to cover,[263] and that investors learned important information from the prescribed wording on relationships and services.[264] In addition, the IAC recommended that the Commission adopt a uniform, plain English disclosure for retail investors that would include basic information ''about the nature of services offered,'' among other

---

[253] *See* Investor Bulletin: Ten Ways to Use *Investor.gov* (Mar. 8, 2017), *available at https:// www.investor.gov/additional-resources/news-alerts/ alerts-bulletins/investor-bulletin-ten-ways-use- investorgov; see also* Brokers, *available at https:// www.investor.gov/research-before-you-invest/ methods-investing/working-investment- professional/brokers;* Investment Advisers, *available at https://www.investor.gov/research- before-you-invest/methods-investing/working- investment-professional/investment-advisers.*

[254] *See supra* footnote 40 and accompanying text.

[255] Certain commenters provided mock-ups that did not include any introductory wording. *E.g.,* Fidelity Letter; IAA Letter I. In our view, these mock-ups either did not include, or, at minimum, did not appropriately highlight, important information regarding the registration status of the firm or the availability of additional information for retail investors.

[256] *See* Denver Roundtable (Investor Nine: ''Yeah, I went there [to *Investor.gov*], that's good.'' Ms. Siethoff: ''Did you think that sort of thing should be highlighted more?'' Investor Nine: ''More, yes. More''); Philadelphia Roundtable (Investor Four: ''I went to those websites [including *Investor.gov*] and I found them very useful.''). Some Feedback Form commenters also indicated that a link to *Investor.gov* or a similar educational website would be helpful. *See, e.g.,* Baker Feedback Form (''I found the document overall extremely useful and learned, most importantly, to refer to the *sec.gov* website often''); Shepard Feedback Form (''An *investing.gov*

[sic] website seems to be a useful source''); Smith2 Feedback Form (''would like to see a link included to a site or sites that contain general investment information'').

[257] *See, e.g.,* MassMutual Letter (''The SEC provides a wealth of information at *www.investor.gov* for educational purposes . . . Providing general information about broker-dealers and investment advisers in a consistent and readily-accessible [sic] space on the SEC's website would allow each firm to use the space available in Form CRS to accurately describe its brokerage and advisory services, with tailored language to reflect its business model, products and services offered and conflicts of interest.'').

[258] *See* Kleimann II, *supra* footnote 19 (''Many participants said that they would use the *investor.gov* site . . . [and] that they would put a high level of trust in whatever information would be on the site because it was a government site.''); RAND 2018, *supra* footnote 13 (finding that two-thirds of investors would be ''very likely'' or ''somewhat likely'' to click on a hyperlink for investor education materials).

[259] *See* Kleimann I, *supra* footnote 19 (''None [of the study participants] had a clear idea of the information that would be provided at *Investor.gov*.''); *see also* Kleimann II, *supra* footnote 19 (''Many participants said that they would use the *investor.gov* site to research the firm, but few knew what specific information would be at that site . . .'').

[260] Item 2.A. of Form CRS.

[261] *See, e.g.,* IAA Letter I; LPL Financial Letter; Primerica Letter ; SIFMA Letter; Wells Fargo Letter; Fidelity Letter; Schwab Letter I (mock-up). We proposed requiring the heading, ''[Types of] Relationships and Services.'' As discussed above, many commenters recommended that the relationship summary use a question-and-answer

format as a more engaging approach for retail investors.

[262] *See, e.g.,* Proposed Item 2.B. of Form CRS (''If you are a broker-dealer that offers brokerage accounts to *retail investors,* summarize the principal brokerage services that you provide to *retail investors.*''); and Proposed Item 2.C. of Form CRS (''If you are an investment adviser that offers investment advisory accounts to *retail investors,* summarize the principal investment advisory services that you provide to *retail investors.*'').

[263] *See* RAND 2018, *supra* footnote 13 (next to fees and costs, survey participants responded the relationships and services section was one of the most informative; more than 56% of survey participants said to keep the section the same length); *see also* Cetera Letter II (Woelfel) *supra* footnote 17 (85% of survey participants responded that this section was very or somewhat important); Schwab Letter I (Koski) *supra* footnote 21 (54% of survey participants selected ''a description of the investment advice services the firm will provide to me'' from a menu of 11 subjects as one of the four most important things for firms to communicate). In addition, nearly 90% of Feedback Form commenters graded this section as ''very useful'' or ''useful.'' *See* Feedback Forms Comment Summary *supra* footnote 11 (summary of responses to Question 2(a)).

[264] *See* RAND 2018, *supra* footnote 13 (in qualitative interviews, participants appeared to have ''a general understanding that this section describes two different services or accounts that a client would choose''); Kleimann I, *supra* footnote 19 (while study authors found that participants had difficulty with ''sorting out the similarities and differences,'' this study also reports that ''[n]early all participants easily identified a key difference between the Brokerage Accounts and Advisory Accounts as the fee structure either being tied to transactions or to assets. Some further identified as a key difference who had the final approval on all transactions, seeing the Brokerage Account as giving them more control on making the final decision.'').

**33516** **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

things.[265] However, some commenters expressed concern that, without more educational content, this approach would not sufficiently inform or would confuse retail investors.[266] One commenter pointed out that the proposed instructions dictated different ways for broker-dealers and investment advisers to describe similar services.[267] These commenters suggested including more explanatory wording or definitions to cover what services are typically associated with brokerage accounts and investment advisory accounts, to provide more background information to help retail investors understand the firm-specific disclosures.[268] At the same time, commenters noted that summary, prescribed wording for this section may not accurately describe the services of every broker-dealer or investment adviser.[269] Results of the RAND 2018

[265] *See* IAC Broker-Dealer Fiduciary Duty Recommendations, *supra* footnote 10; and IAC Form CRS Recommendation, *supra* footnote 10.

[266] *See* CFA Letter I ("We believe the Commission should . . . require firms to be crystal clear about the nature of the services they offer. Simply telling [investors] that the account is a brokerage account or an advisory account doesn't necessarily convey useful information."); CFA Institute Letter I ("Given the similarities to what investment advisers offer, CRS disclosure of these additional services will likely confuse investors without language clarifying that they are outside of their usual broker-dealer duties and would typically require a separate contract.").

[267] CFA Letter I.

[268] *See* CFA Letter I (suggesting prescribed wording for how typical broker-dealers and investment advisers might describe their services); CFA Institute Letter I (suggesting alternative wording for how broker-dealers might describe their services). Commenters on Feedback Forms also asked for explanatory wording and definitions. *See* Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 4) (seven commenters asked for definitions of terms such as transaction-based fee, asset-based fee or wrap fee; 10 asked for a definition or better explanation of the term "fiduciary"); *see also,* Bhupalam Feedback Form ("The definition of a broker dealer [sic] and investment advisory [sic] is not very clear."); Daunheimer Feedback Form ("For a novice investor, all terms that seasoned investors take for granted, are new to them. Consider making the language as simple as possible."); Margolis Feedback Form ("wording is very confusing and not very accurate"); Anonymous27 Feedback Form ("define better"), *but see* Baker Feedback Form ("the discussion of differences among the relationships is very useful as it describe [sic] the differences in services provided . . . and most importantly, the difference between a commission-based fee and an 'asset-value' fee"); Hawkins Feedback Form ("Summary does a good job of explaining the basis [sic] services for a brokerage vs advisory account. Some clearer examples could help."); Rohr Feedback Form ("Makes clear how a discretionary account differs from a brokerage account").

[269] *See, e.g.,* MassMutual Letter (explaining that the prescribed wording that a customer will pay a commission each time a security is bought and sold is not universally true, *e.g.,* for mutual funds and variable annuities with internal exchange programs, which allow a customer to switch from one investment to another without paying a

survey reflected these concerns and showed that almost a quarter of survey respondents (22.2%) described the relationships and services section as "difficult" or "very difficult" to understand.[270] Comments from participants in qualitative interviews reported in the RAND 2018 report, as well as comments from roundtable participants and on Feedback Forms, indicated that prescribed terms such as "transaction-based fee," "asset-based fee," "discretionary account," and "non-discretionary account" contributed to this difficulty.[271]

As discussed in Section II.A.1. above, we are sensitive to the potential inaccuracies and confusion that the prescribed wording can create. We also recognize that in some cases, providing instructions that require broker-dealers and investment advisers to describe similar services in different ways can create confusion. Accordingly, we have revised the instructions to allow firms to use more of their own wording. We also eliminated the separate instructions for brokerage account services and investment advisory account services, and instead are adopting one set of instructions that generally applies the same requirements to all firms.[272] To

commission); CFA Letter I (recognizing that a generalized description of portfolio management services, included for purposes of educating investors, does not apply to all business model among registered investment advisers).

[270] RAND 2018, *supra* footnote 13. In the RAND 2018 qualitative interviews, participants noted several phrases that raised concerns such as "additional services" and "might pay more" and identified terms that needed further definition. *Id.* Another interview-based investor study found that "[p]articipants were quite mixed in their understanding about the advice and monitoring that was offered in the two accounts" when presented with the proposed sample dual registrant relationship summary. Kleimann I, *supra* footnote 19.

[271] RAND 2018, *supra* footnote 13; *see also* Betterment Letter I (Hotspex) *supra* footnote 18 (finding that "respondents found certain terminology (*e.g.,* 'fiduciary,' 'asset-based,' 'ETF') to be unclear or lack sufficient detail"). Roundtable discussions found similar results. *See, e.g.,* Philadelphia Roundtable (participant finding "transaction-based fee" to be complex); Miami Roundtable (participant stating that "most people don't really understand" what fiduciary duty means); *see also* Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 4) (Seven Feedback Forms included narrative comments that asked for definitions of terms such as "transaction-based fee," "asset-based fee" or "wrap fee;" 10 asked for explanation or definition of the term "fiduciary"); Anonymous06 Feedback Form ("Definitions might not be understood transaction based vs asset based fee"); Baker Feedback Form ("It may be more helpful to have detailed definitions (Ex. "transaction-based fee") that, unfortunately, result in a longer document."); Bhupalam Feedback Form ("definition of a broker dealer [sic] and investment advisory [sic] is not very clear"); Starmer2 Feedback Form ("Spell out . . . best interest").

[272] *See, e.g.,* Item 2.B. of Form CRS (requiring all firms to summarize their principal services but

facilitate comparison of firms' relationships and services, however, we have retained the concept of specific sub-topics that each firm must cover in this section.[273]

Another change from the proposed instructions relates to a concern regarding how accounts were delineated. The proposed instructions would have applied based on whether or not broker-dealers and investment advisers offered brokerage accounts or investment advisory accounts to retail investors and would have included some prescribed language referencing accounts.[274] Insurance and variable annuity providers commented that this focus on accounts would not allow them to accurately describe insurance offerings and would be confusing, particularly to investors whose insurance or annuity products are held directly with an issuing insurance company.[275] We agree and have replaced references to accounts in this section with references to "services, accounts, or investments you make available to retail investors." [276]

a. Description of Services

The final instructions have an overarching requirement to state that the firm offers brokerage services, investment advisory services, or both, to retail investors, and to summarize the principal services, accounts, or investments the firm makes available to retail investors.[277] A firm also must include any material limitations on those services.[278] The final instructions require firms to include certain

requiring broker-dealers to state whether or not they offer recommendations and investment advisers to state the particular types of advisory services they offer).

[273] As discussed in Section II.A.2 above, we are not requiring that these sub-topics follow a prescribed order, so firms are able to tailor the presentation of their services, as well as include additional information about their brokerage or advisory services, so long as the description covers all applicable topics. *See supra* footnote 121 and accompanying text.

[274] *See, e.g.,* Proposed Items 2.B.2. ("If you offer accounts in which you offer recommendations to retail investors, state that the retail investor may select investments or you may recommend investments for the retail investor's account . . . .") and 2.C.4. ("If you significantly limit the types of investments available to retail investors in any accounts, include the following . . . .") of Form CRS. In addition, some of the prescribed wording included language specific to accounts. *See, e.g.,* Proposed Item 2.B.1. of Form CRS. Broker-dealers would state, "If you open a brokerage account, you will pay us a transaction-based fee, generally referred to as a commission, every time you buy or sell an investment."

[275] *E.g.,* ACLI Letter; Committee of Annuity Insurers Letter; IRI Letter; MassMutual Letter; New York Life Letter; Northwestern Mutual Letter.

[276] Item 2.B. of Form CRS.

[277] Item 2.B. of Form CRS.

[278] Item 2.B. of Form CRS.

App 69

information in their descriptions. Similar to the proposal, broker-dealers must state the particular types of principal brokerage services the firm offers to retail investors, including buying and selling securities, and whether or not they offer recommendations to retail investors (*i.e.,* to distinguish execution-only services).[279] Investment advisers must state the particular types of principal advisory services they offer to retail investors, including, for example, financial planning and wrap fee programs.[280] The final instructions do not, however, require prescribed wording to describe the particular characteristics of these services, as did the proposed instructions.[281] Commenters argued that the proposed prescribed wording may not accurately describe the services of every broker-dealer or investment adviser.[282] As discussed in Section II.A.1 above, given that investors may be confused by information that does not directly relate to the firm's offerings, we are allowing firms to use their own wording to describe their own services. Therefore, unlike the proposal, the final instructions do not prescribe specific wording for firms to describe the particular characteristics of these services.[283]

Some commenters raised concerns about investor confusion if both broker-dealers and investment advisers discuss the advice they provide in the relationship summary. To mitigate that confusion, some commenters called for an explicit statement that broker-dealers are in sales relationships.[284] In response

to these concerns, we added the explicit requirement that broker-dealers state that they buy and sell securities, in order to clarify their principal services.[285] We also have included a note in the final instructions that broker-dealers offering recommendations should consider the applicability of the Investment Advisers Act of 1940, consistent with SEC guidance.[286]

The final instructions require all firms to address the following topics in the description of their services: (i) Monitoring; (ii) investment authority; (iii) limited investment offerings; and (iv) account minimums and other requirements.[287] As discussed further below, the final instructions require firms to include much of the same substantive information as proposed, but rely less on prescribed wording and assumptions regarding typical brokerage and investment advisory accounts.[288] In response to comments, we added a new requirement for firms to disclose whether or not they have account minimums.[289] Commenters recommended that we include information about account minimums in the relationship summary.[290] In addition, a number of commenters submitting mock-ups included disclosures on account minimums in their forms.[291] We agree this information is important to investors when they are deciding on account types and services, particularly as they consider the amount of funds they are planning to invest and whether they

may incur any fees or become ineligible for certain services if their accounts fall under certain dollar thresholds. We also removed requirements to discuss fees at the beginning of this section [292] and are consolidating these requirements with other related ones in the fees, costs, conflicts, and standard of conduct section, as discussed below.[293] We also are not adopting a proposed requirement to describe any regular communications with retail investors.[294] Neither the RAND 2018 report nor other surveys and studies suggested that this information was important to investors, as compared to fees. Mock-ups submitted by commenters also did not include this disclosure, underscoring the relative importance of other topics. Given the goal of limiting the length of the relationship summary so that investors remain engaged and are not overwhelmed by the information, we decided to prioritize requiring other information in the relationship summary.

*Monitoring.* The final instructions require both broker-dealers and investment advisers to explain whether or not they monitor retail investors' investments, including the frequency and any material limitations of that monitoring, and if so, whether or not the monitoring services are part of the firm's standard services.[295] In the proposal, different instructions concerning monitoring applied to broker-dealers and investment advisers. Broker-dealers would have stated whether they monitored the performance of retail investors' accounts, and if so, how frequently they performed such monitoring, whether it constituted additional services or was part of the broker-dealer's standard services, and whether a retail investor would pay more for it.[296] Investment advisers

---

[279] Item 2.B. of Form CRS.

[280] Item 2.B. of Form CRS.

[281] *See, e.g.,* Proposed Item 2.B.2. of Form CRS (requiring broker-dealers (i) that only offer accounts in which they offer recommendations to retail investors to state that the retail investor may select investments or the broker-dealer may recommend investments for the retail investor's account, but the retail investor "will make the ultimate investment decision regarding the investment strategy and the purchase or sale of investments" and (ii) that do not offer recommendations to state that the retail investor "will select the investments" and "will make the ultimate investment decision regarding the investment strategy and the purchase or sale of investments").

[282] *See, e.g.,* MassMutual Letter (explaining that the prescribed wording that a customer will pay a commission each time a security is bought and sold is not universally true, *e.g.,* for mutual funds and variable annuities with internal exchange programs, which allow a customer to switch from one investment to another without paying a commission); CFA Letter I (recognizing that a generalized description of portfolio management services, included for purposes of educating investors, does not apply to all business models among registered investment advisers).

[283] *See generally* Items 2.B.(i) through 2.B.(v) of Form CRS.

[284] *See, e.g.,* CFA Institute Letter I; Consumers Union Letter; *see also* Kleimann II, *supra* footnote

19 (alternative wording for redesigned relationship summary described broker-dealer services as a "sales relationship").

[285] *See* Item 2.B of Form CRS ("For broker-dealers, state the particular types of principal brokerage services you offer, including buying and selling securities, and whether or not you offer recommendations to *retail investors*.").

[286] *See* Item 2.B.(ii) to Form CRS. *See* Solely Incidental Release, *supra* footnote 47.

[287] Item 2.C. of Form CRS.

[288] In the proposed instructions, assistance with developing or executing the retail investor's strategy and monitoring the performance of the retail investor's account were characterized as additional services for broker-dealers. The final instructions do not make this distinction and instead permit firms more flexibility to describe their services accurately. *See* Proposed Item 2.B.3. of Form CRS.

[289] Item 2.B.(iv) to Form CRS ("Explain whether or not you have any requirements for *retail investors* to open or maintain an account or establish a relationship, such as minimum account size or investment amount.").

[290] *See, e.g.,* NASAA Letter ("Form CRS should specify minimum account size and include information on miscellaneous fees different categories of investors can expect to pay."); Cetera Letter I (Form CRS should include "[w]hether or not the firm has established standards for the minimum or maximum dollar amount of various account types.").

[291] *See, e.g.,* Primerica Letter and Cetera Letter I.

[292] *See* Proposed Items 2.B.1. (broker-dealers) ("If you open a brokerage account, you will pay us a transaction-based fee, generally referred to as a commission, every time you buy or sell an investment."); and 2.C.1. (investment advisers) ("State the type of fee you receive as compensation if the retail investor opens an investment advisory account. For example, state if you charge an on-going asset-based fee based on the value of cash and investments in the advisory account, a fixed fee, or some other fee arrangement. Emphasize the type of fee in bold and italicized font. If you are a standalone adviser, also state how frequently you assess the fee.") of Form CRS.

[293] *See infra* footnotes 373–375 and accompanying text.

[294] *See* Proposed Items 2.B.3. (broker-dealers) and 2.C.2. (investment advisers) of Form CRS ("Briefly describe any regular communications you have with retail investors, including the frequency and method of the communications.").

[295] Item 2.B.(i) of Form CRS.

[296] Proposed Item 2.B.3. of Form CRS.

would have stated how frequently they monitor retail investors' accounts.[297]

One commenter objected to the requirement for broker-dealers to describe additional services, including monitoring, on the basis that the information would add little value.[298] On the other hand, several commenters suggested that understanding the degree to which firms monitor the performance of their investments can be important to investors.[299] One of these commenters noted that broker-dealers and investment advisers have different legal obligations to monitor accounts, and that differences would remain even under Regulation Best Interest.[300] Observations from surveys and studies indicated that investors are interested in or may benefit from clarification of monitoring services.[301] For example, an overwhelming majority of participants in the OIAD/RAND study believed that a financial professional required to act in an investor's best interest would monitor the investor's account on an on-going basis.[302] In qualitative interviews in the RAND 2018 report, participants seemed to distinguish brokerage and investment advisory accounts and assess which type of relationship was a better fit for different investors based on assumptions concerning monitoring.[303]

Other surveys and studies also showed that participants varied in their understanding of monitoring and whether they should expect firms to monitor their account.[304]

We disagree with the comment that requiring broker-dealers to describe monitoring services would add little value. As we also state in the Regulation Best Interest Release, we believe that it is important for retail customers to understand (1) the types of monitoring services (if any) a particular broker-dealer provides, and (2) whether the broker-dealer will be monitoring the particular retail customer's account.[305] We also agree with commenters that monitoring is an important distinguishing feature of different investment services and believe that retail investors should have accurate expectations of the types of monitoring firms offer. We are therefore requiring firms to explain whether or not they monitor retail investors' investments, and if so, the frequency, material limitations, and whether or not monitoring is offered as part of the firm's standard services.[306]

The proposal provided different instructions for broker-dealers and investment advisers concerning monitoring, requiring broker-dealers to discuss monitoring of account performance only if they offered it, and requiring investment advisers to disclose how frequently they monitor retail investors' accounts, as monitoring is generally part of ongoing advisory services.[307] Even with the different wording for broker-dealers and investment advisers as proposed, some participants in investor studies still assumed that the level of monitoring was the same between broker-dealers and investment advisers.[308] As

discussed above, we believe it is important for firms to describe more accurately and precisely the monitoring that they actually do for retail investors. Therefore, we are retaining, with slight modifications, the obligation to disclose monitoring services, applying the same instruction to both broker-dealers and investment advisers, and eliminating the prescribed wording. The final instructions pertain to monitoring services generally and are not limited to monitoring for account performance only; to the extent firms describe monitoring services, they must include the frequency and any material limitations on these services and whether or not they are offered as part of the firm's standard services. We believe that subjecting firms to the same requirements to describe their own monitoring services, including a specific statement that they do not provide monitoring, if that is the case, will better facilitate investor understanding of whether any monitoring is provided and if so, the scope and type of such service. This approach also may result in more comparable information so that retail investors can understand the key differences among monitoring services by different firms based on firm-specific descriptions.

*Investment Authority.* The final instructions require investment adviser firms that accept discretionary authority to describe those services and any material limitations on that authority. Broker-dealers may, but are not required, to state whether they accept limited discretionary authority. Both investment advisers that offer non-discretionary services and broker-dealers must explain that the retail investor makes the ultimate decision regarding the purchase or sale of investments.[309]

Commenters and results from the RAND 2018 qualitative interviews suggested modifications to the proposed investment authority disclosures in the relationship summary but generally supported including this topic.[310] In

---

[297] Proposed Item 2.C.2. of Form CRS.

[298] *See* Wells Fargo Letter (recommending elimination of broker-dealer description of additional services because it could take up substantial space and adds little value for the investor).

[299] *See, e.g.,* Comment Letter of the St. John's Law School Securities Arbitration Clinic (Aug. 7, 2018) (''St. John's Law Letter''); CFA Letter I (discussing investors' expectations of a fiduciary duty based on whether and to what degree a firm or financial professional provides monitoring services); Comment Letter of the Commonwealth of Massachusetts (Aug. 7, 2018) (''Massachusetts Letter'') (suggesting that the payment of ongoing compensation, such as a trail commission, indicates an ongoing relationship and should carry ongoing duties to monitor the investment); IAA Letter I (stating that, just as an adviser's duty to monitor extends to all personalized advice it provides a client, so should investors expect a similar duty from broker-dealers when providing monitoring services).

[300] *See* CFA Letter II.

[301] *See, e.g.,* RAND 2018, *supra* footnote 13 (in qualitative interviews, ''participants were sometimes unclear on how a financial professional would monitor an account'' and ''some participants were unclear on how frequently monitoring would occur'').

[302] *See* OIAD/RAND (finding that 69% of all participants in the survey, 75% of a specialized group defined as ''investors,'' and 86% of a specialized group defined as ''investment advice consumers'' believed that best interest required ongoing monitoring).

[303] *See* RAND 2018, *supra* footnote 13 (in qualitative interviews, ''some felt that brokerage accounts are better for those with investment expertise and time to dedicate to investing, whereas advisory accounts are better for those who have less expertise and/or less time to monitor investments'';

one participant was confused by a statement that the firm could provide ''additional services to assist you and monitor performance'' and wanted to know up front which services would be included and which would cost extra.).

[304] *See* Kleimann I, *supra* footnote 19 (''Participants assumed that the level of advice and monitoring provided in the two accounts would be the same. They defined monitoring as constant looking at the market and their accounts and making sure their accounts were making money''); Betterment Letter I (Hotspex) *supra* footnote 18 (among survey participants reviewing a standalone adviser relationship summary designed to follow the proposal sample, only 37% correctly identified as ''false'' a statement that broker-dealers typically monitor client's portfolios and provide advice on an ongoing basis).

[305] *See* Regulation Best Interest Release, *supra* footnote 47; *see also* Solely Incidental Release, *supra* footnote 47.

[306] Item 2.B.(i) of Form CRS.

[307] *See* Fiduciary Release, *supra* footnote 47.

[308] *See* Kleimann I, *supra* footnote 19, at 10 (''Some participants assumed that the advice and level of monitoring was the same.''); Betterment

Letter I (Hotspex) *supra* footnote 18 (among survey participants reviewing a standalone investment adviser's relationship summary designed to follow the proposal, only 37% correctly identified as ''false'' a statement that broker-dealers typically monitor client's portfolios and provide advice on an ongoing basis).

[309] Item 2.B.(ii) of Form CRS.

[310] *See* CFA Letter I (stating that it is necessary for firms to describe the various types of discretionary and/or non-discretionary accounts they offer with specificity for such information to be useful to investors in choosing among providers for financial services); CFA Institute (suggesting that investment advisers only be required to discuss the type of accounts they offer (*i.e.,* discretionary and/or nondiscretionary accounts) because discussing both—when not both are offered—would

addition, various commenters submitting their own mock-ups included disclosures on investment authority in their relationship summaries.[311] One commenter also alluded to disputes that can arise when investors misunderstand the investment authority the financial professional exercises for different accounts.[312] One investor study indicated that only a few investors understood from the proposed sample dual-registrant relationship summary that non-discretionary advisory accounts offer investors the ability to approve recommendations.[313] Some RAND 2018 interview participants indicated that further definitions of ''discretionary account'' and ''non-discretionary account'' would be helpful.[314]

We continue to believe that it is important for investors to understand whether they or the firm or financial professional ultimately makes the investment decision in the relationship or service that they are considering. Accordingly, the final instructions generally require disclosure of the same substantive information on this topic as the proposed instructions, but in a less prescriptive way. As discussed in Section II.A.1, above, we believe that allowing firms to use their own wording

to describe their discretionary and non-discretionary offerings and explaining what that means to retail investors in terms of who makes the ultimate investment decisions can lead to disclosures that are more meaningful and less confusing. We recognize that some investor feedback suggested that further definitions of ''discretionary account'' and ''non-discretionary account'' would be useful. While the final instructions do not require prescribed wording including these terms, as the proposed instructions would have required, the final instructions do require investment advisers that accept discretionary authority to use their own wording to explain similar information.[315]

The final instructions provide that investment advisers that accept discretionary authority will be required to describe these services and any material limitations on that authority.[316] Additionally, any such summary must include the specific circumstances that would trigger that discretionary authority and any material limitations.[317] Investment advisers may, for example, explain whether they seek the retail investor's approval before implementing or changing investment strategies or executing certain transactions. In comparison, the proposed instructions took a more prescriptive approach.[318] For example, the proposed instructions prescribed wording for investment advisers to include in their relationship summaries if they offer a discretionary account.[319] We believe that the more general final instruction provides investment advisers with the flexibility to describe their discretionary offerings more accurately.

For broker-dealers, the final instructions provide that they may, but are not required to, state whether they accept limited discretionary authority.[320] We have made this

disclosure optional for broker-dealers because of our understanding that these services may not be a significant part of broker-dealers' services.[321] Accordingly, describing them here may detract from disclosure of other items that better characterize the firm's business and would be more helpful to investors. If limited discretion services are a significant part of a broker-dealer's business, for example, if limited discretion services constitute material facts relating to the scope and terms of the relationship with the retail customer that need to be disclosed under Regulation Best Interest, that broker-dealer may wish to include in its relationship summary a statement that it offers limited discretion services.

Finally, both broker-dealers and investment advisers that offer non-discretionary services must explain that the retail investor makes the ultimate decision regarding the purchase or sale of investments.[322] Under the proposed instructions, firms would have been required to explain whether they offer non-discretionary services and what that means, but using prescribed wording. Investment advisers would have been required to state that they give advice and the retail investor decides what investments to buy and sell.[323] Broker-dealers would have been required to state that the retail investor will make the ultimate investment decision regarding the investment strategy and the purchase or sale of investments, in addition to other prescribed wording to distinguish execution-only accounts from those in which the broker-dealer would offer recommendations.[324] The final

---

be confusing to customers); Betterment Letter I (stating that some of the prescribed language concerning investment authority may lead to more confusion than it clarifies); RAND 2018 report, *supra* note 13 (participants in qualitative interviews stated that it would be helpful if the relationship summary provided clearer definitions of ''discretionary account'' and ''non-discretionary account''); *see also* Kleimann I, *supra* note 19 (noting that some ''identified a key difference as who had final approval on all transactions, seeing the Brokerage Account as giving them more control'' and only a few ''recognized that non-discretionary advisory accounts also offer this option.''). One Feedback Form commenter also noted that explanation of non-discretionary accounts was not clear. *See* Shaffer Feedback Form (broker-dealer recommendation and investment adviser ''non-discretionary'' account seem very similar. I was asking: ''what's the difference.''), *but see* Asen Feedback Form (''The Relationship and Services section for BDs is clear in that the investment decision is the customer's . . .''); Rohr Feedback Form (''makes clear how a discretionary account differs from a brokerage account'').

[311] *See, e.g.,* Stifel Letter; AALU Letter; Wells Fargo Letter; Cetera Letter I; LPL Financial Letter; IAA Letter I; Primerica Letter; ASA Letter.

[312] *See* St. John's Law Letter (describing an arbitration case in which investor was not informed of a change in investment authority when the account type changed).

[313] *See* Kleimann I, *supra* footnote 19 (noting that some ''identified a key difference as who had final approval on all transactions, seeing the Brokerage Account as giving them more control'' and only a few ''recognized that non-discretionary advisory accounts also offer this option.'').

[314] *See* RAND 2018, *supra* footnote 13 (participants in qualitative interviews stated that it would be helpful if the relationship summary provided clearer definitions of ''discretionary account'' and ''non-discretionary account'').

[315] Item 2.B.(ii) to Form CRS.

[316] Item 2.B.(ii) of Form CRS.

[317] Item 2.B.(ii) of Form CRS.

[318] *Compare* Item 2.B.(ii) of Form CRS *with* Proposed Item 2.C.3 of Form CRS (''State if you offer advisory accounts for which you exercise discretion (*i.e.,* discretionary accounts), accounts where you do not exercise discretion (*i.e.,* non-discretionary accounts), or both. Emphasize the type of account (discretionary and non-discretionary) in bold and italicized font.'').

[319] *See* Proposed Item 2.C.3. of Form CRS (''If you offer a discretionary account, state that it allows you to buy and sell investments in the retail investor's account, without asking the retail investor in advance.'').

[320] *Compare* Item 2.B.(ii) of Form CRS *with* Proposed Item 2.B.2, which instructed broker-dealers: ''If you offer accounts in which you offer recommendations to retail investors, state that the retail investor may select investments or you may

recommend investments for the retail investor's account, but the retail investor will make the ultimate investment decision regarding the investment strategy and the purchase or sale of investments. If you only offer accounts in which you do not offer recommendations to retail investors (*e.g.,* execution-only brokerage services), state that the retail investor will select the investments and the retail investor will make the ultimate investment decision regarding the investment strategy and the purchase or sale of investments.''

[321] *See* discussion on discretionary authority in Solely Incidental Release, *supra* footnote 47; *see also* footnotes 284–286 and accompanying text.

[322] Item 2.B.(ii) of Form CRS.

[323] *See* Proposed Instruction to Item 2.C.3. of Form CRS (''If you offer a non-discretionary account, state that you give advice and the *retail investor* decides what investments to buy and sell.'').

[324] *See* Proposed Item 2.B.2. of Form CRS (''If you offer accounts in which you offer recommendations to *retail investors,* state that the *retail investor* may select investments or you may recommend investments for the *retail investor's* account, but the *retail investor* will make the ultimate investment decision regarding the investment strategy and the purchase or sale of investments. If you only offer
Continued

**33520**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

instructions require firms to explain to retail investors that they make the ultimate investment decision in non-discretionary accounts, but do not include requirements to use prescribed wording or references to account types. This change is consistent with our general approach described above that such prescribed wording may be confusing or may not sufficiently cover the discretionary and non-discretionary services a firm may offer.[325]

*Limited Investment Offerings.* The final instructions require firms to explain whether or not they make available or offer advice only with respect to proprietary products, or a limited menu of products or types of investments. If so, they must also describe the limitations.[326] In comparison, the proposed instructions included prescribed wording for firms to include if they significantly limit the types of investments in any accounts.[327] Specifically, broker-dealers would have stated, "We offer a limited selection of investments. Other firms could offer a wider range of choices, some of which might have lower costs." [328] Investment advisers would have stated, "Our investment advice will cover a limited selection of investments. Other firms could provide advice on a wider range of choices, some of which may have lower costs." [329] The proposed instructions gave examples of what might constitute a significant limitation on the types of investments, specifically, offering only one type of asset (*e.g.,* mutual funds, exchange-traded funds, or variable annuities); mutual funds or other investments sponsored or managed by the firm or an affiliate, *i.e.,* proprietary products; or only a small number of investments.[330] If these limits applied only to certain

accounts the proposed instructions would have required firms to identify those accounts.[331]

Comments were mixed on the proposed instruction concerning limited investment offerings. Several commenters acknowledged the importance of investors understanding limitations on investments.[332] Results of RAND 2018 qualitative interviews also indicated that investors would like to understand limits on investment offerings.[333] Some commenters expressed concerns that the proposed disclosure would not be of sufficient value to investors.[334] A number of commenters, whether or not they supported generally requiring firms to discuss limitations on investments, expressed concerns that the scope of "significantly limits" in the proposed instructions or "limited selection of investments" was not sufficiently clear.[335] Furthermore, a few commenters expressed concern that the prescribed wording ("Other firms could offer a wider range of choices, some of which might have lower costs.") unduly prioritized cost over other investment product features or characteristics.[336]

We continue to believe that firms that limit product menus—such as offering only proprietary products or a specific asset class—should be required to describe those limitations in the relationship summary.[337] Other examples include limitations based on products that involve third-party arrangements, such as revenue sharing and mutual fund service fees. We agree with commenters who advocated for helping investors before entering into a relationship with a firm to understand whether a firm limits its product offerings, and to what extent.[338] In light of comments, we have determined, however, that the proposed prescribed wording may not allow all firms to describe limited investment offerings, if applicable, in a way that is accurate and helpful to investors, and are not requiring it in the final instructions.[339] Accordingly, we are revising the instructions to require firms to address whether or not they make available or offer advice only with respect to proprietary products or a limited menu of products or types of investments, and if so, to describe such limitations.[340] We believe that the final instructions address the same types of limitations on investments that the proposed instructions sought to address, but in a less prescriptive way, and allow firms to describe their investment offerings more accurately to reflect their scope of products and services.

*Account Minimums and Other Requirements.* The final instructions also include a requirement to explain whether or not the firm has any requirements for retail investors to open or maintain an account or establish a relationship, such as minimum account

accounts in which you do not offer recommendations to *retail investors* (*e.g.,* execution-only brokerage services), state that the *retail investor* will select the investments and the *retail investor* will make the ultimate investment decision regarding the investment strategy and the purchase or sale of investments.").

[325] *See, e.g.,* CFA Letter I (suggesting that Form CRS should require advisers to discuss only what they offer in terms of discretionary or nondiscretionary accounts, because discussing both types when they offer only one would confuse investors); IAA Letter I (suggesting that the proposed prescribed wording would not cover sufficiently the variety of discretionary or non-discretionary advisory services a firm may offer and offering alternative language).

[326] Item 2.C.(iii) of Form CRS.

[327] The Proposed Items stated, "If you significantly limit the types of investments available to *retail investors* in any accounts, include the following . . ." Proposed Items 2.B.4. and 2.C.4. of Form CRS.

[328] Proposed Item B.4. of Form CRS.

[329] Proposed Item C.4. of Form CRS.

[330] Proposed Items B.4. and C.4. of Form CRS.

[331] Proposed Items B.4. and C.4. of Form CRS.

[332] *See* CFA Letter I; CFA Institute Letter I; New York Life Letter; *see also* mock-ups submitted by commenters that included the "limited selection of investments" wording or substantially similar wording. *See* Fidelity Letter; IAA Letter I; IRI Letter. These mock-ups did not elaborate on what the limitations are.

[333] *See* RAND 2018, *supra* footnote 13 (from qualitative interviews, finding that "[p]articipants reacted strongly to the notion of being offered limited investment options").

[334] *See* CFA Letter I ("[W]e fear the proposed disclosure provides too little information to be of value to the investor."); CFA Institute Letter I (suggesting that the disclosure expressly state that performance may be lower due to higher costs).

[335] *See* CFA Letter I ("But simply stating they offer "limited" investments is not enough, as that will mean different things to different investors."); Prudential Letter ("It is unclear what 'significantly limits' means for firms that offer predominantly, but not exclusively, proprietary products. It is also unclear what constitutes a 'small choice of investments.' Additional examples or more prescriptive instructions regarding when firms must disclose such limitations would be helpful."); CFA Letter I ("[F]irms should have to describe how they limit the selection of investments."); Wells Fargo Letter ("This requirement appears to be overly broad as no firm can offer all investments and we therefore recommend that this be limited to those broker-dealers that only offer one type of product.").

[336] *See, e.g.,* New York Life Letter ("[T]he Commission's exclusive emphasis on cost in this prescribed sentence does not provide consumers of insurance products with clear and complete information."); Mutual of America Letter ("We believe that this focus on cost alone is not necessarily in the best interest of retail consumers, who may benefit from high-value products, such as variable annuities."); Lincoln Financial Group Letter (suggesting that either the Form CRS or Regulation Best Interest disclosure obligation should allow for descriptions of product benefits to

retail investors as well as costs). Another commenter noted that the prescribed wording about other firms' offerings could raise First Amendment concerns. *See* CFA Letter I ("[R]equiring firms to compare their own services unfavorably to those of their competitors may raise First Amendment concerns."). *See supra* footnotes 77–85 and accompanying text.

[337] The proposed instructions stated, "If you significantly limit the types of investments available to *retail investors* in any accounts, include the following . . ." Proposed Items 2.B.4. and 2.C.4. of Form CRS. In order to give firms more flexibility to describe limitations on products or investment types in the context of their business models, and to avoid potential confusion with the materiality threshold of Regulation Best Interest (which requires disclosure of all material facts relating to the type and scope of services provided to the retail customer, including any material limitations on the securities or investment strategies involving securities that may be recommended to the retail customer), we have eliminated the word "significantly" from the final instructions. Regulation Best Interest Release, *supra* footnote 47.

[338] *See* CFA Letter I; CFA Institute Letter I.

[339] *See supra* footnotes 77–85 and accompanying text.

[340] Item 2.C.(iii) of Form CRS.

size or investment amount, which is a change from the proposal.[341] In response to our request for comments on such possible requirements, commenters recommended that we include this information in the relationship summary.[342] In addition, a number of commenters submitting mock-ups included disclosures on account minimums in their forms.[343]

We agree that this is important for retail investors to understand because many firms offer a number of services that are only available to investors with higher account balances.[344] Furthermore, fee schedules may be tiered based on account balances.[345] Investors benefit from being aware of and seeing a range of options in the same context, as discussed above. We believe investors can use information about different account requirements for both current and future decision-making purposes. Thus, the final instructions require firms to address whether or not they have any requirements for retail investors to open or maintain an account or establish a relationship, such as a minimum account size or investment amount.

b. Additional Information

In a change from the proposal we are requiring firms to provide specific references to more detailed information about their services that, at a minimum, include the same or equivalent information to that required by the Form ADV, Part 2A brochure (Items 4 and 7 of Part 2A or Item 4.A and 5 of Part 2A Appendix 1) and Regulation Best Interest, as applicable.[346] Broker-dealers that do not provide recommendations subject to Regulation Best Interest (*e.g.,* execution-only broker-dealers) are not required to prepare more detailed information about their services, but to the extent they do, must include references to such information in their

relationship summaries.[347] The final instructions require firms to use text features to make this additional information more noticeable and prominent in relation to other discussion text.[348]

As with other references to additional information, firms may include hyperlinks, mouse-over windows, or other means of facilitating access to this additional information and to any additional examples or explanations of such services.[349] This allows firms to summarize their services while making available more detailed and fulsome information for retail investors, in keeping with the design of the relationship summary as a short, succinct disclosure with links to additional information, as commenters and investors asked. We believe that requiring firms to make retail investors aware of the services they offer, at a high level, and where retail investors can obtain more detailed information through layered disclosure, will best engage retail investors and help them make more informed decisions when choosing from among firms, services, or accounts.

c. Conversation Starters

Firms will include in this section of the relationship summary three prescribed conversation starters for retail investors to ask their financial professional.[350] As discussed in Section II.A.4, these questions are taken from the Key Questions to Ask section in the proposed relationship summary, which a considerable majority of investors indicated were helpful.[351] Broker-dealers and investment advisers that are not dual registrants will include, respectively, "Given my financial situation, should I choose a brokerage service? Why or why not?" or "Given my financial situation, should I choose an investment advisory service? Why or why not?" [352] Dual registrants will

include "Given my financial situation, should I choose an investment advisory service? Should I choose a brokerage service? Should I choose both types of services? Why or why not?" [353] These questions are largely the same as the first proposed Key Question but replace the terms "brokerage account" and "advisory account" with "brokerage service" and "investment advisory service," respectively.[354] This revision addresses comments that the concept of "accounts" may not align with all firms' business models and may cause investor confusion.[355] In addition, some commenters stated that it was inappropriate for the Commission to require firms to describe products and services that they do not offer and about which they may have limited or no expertise.[356] Although the proposed instructions permitted firms to modify the first Key Question to reflect the type of accounts they offer to retail investors, we are replacing it with three formulations that are explicitly tailored to firm type in order to clarify that firms are obligated to discuss only the services that they offer. Finally, we have rephrased the questions as "Should I choose [a/an brokerage/advisory] service? Why or why not?" rather than "Why should I choose [a/an brokerage/ advisory] service?" to avoid a presumption that the relevant service will always be an appropriate service for the retail investor. The questions are designed to prompt a conversation relevant to the specific retail investor's circumstances.

All firms also will include the questions "How will you choose investments to recommend to me?" and "What is your relevant experience, including your licenses, education and other qualifications? What do those qualifications mean?" [357] These questions are nearly identical to proposed Key Questions numbers six and nine except, again, for the removal of the account concept from proposed Key Question number six, and a minor revision to proposed Key Question number nine to encourage retail investors to ask a broader question regarding the financial professional's

---

[341] Item 2.C.(iv) of Form CRS.

[342] *See, e.g.,* NASAA Letter (stating that Form CRS should include a disclosure, specifying the minimum account size and include information on miscellaneous fees different categories of investors can expect to pay); *see also* Cetera Letter I (stating that firms should disclose as material conflict of interest whether or not they have established standards for the minimum or maximum dollar amount of various account types).

[343] *See, e.g.,* Primerica Letter; Cetera Letter I.

[344] *See, e.g.,* SIFMA Letter (stating that investment advisory services typically require a minimum account balance); ACLI Letter; Comment Letter of the National Association of Insurance and Financial Advisors (Aug. 2, 2018) ("NAIFA Letter").

[345] *See, e.g.,* Cetera Letter II (mock-up) (explaining tiered fee schedule).

[346] Item 2.C. of Form CRS. *See* Regulation Best Interest Release, *supra* footnote 47, at Section II.C.1.

[347] Item 2.C. of Form CRS. *See* Regulation Best Interest Release, *supra* footnote 47, at Sections II.A., II.C.1.

[348] General Instruction 4.C. to Form CRS. For example, firms could use larger or different font; a text box around the heading or questions; bolded, italicized, or underlined text; or lines to offset the information from other sections.

[349] Item 2.C. of Form CRS.

[350] Item 2.D. of Form CRS. Firms should keep in mind the applicability of the antifraud provisions of the federal securities laws, including section 206 of the Advisers Act, section 17(a) of the Securities Act, and section 10(b) of the Exchange Act and rule 10b–5 thereunder, in preparing the relationship summary, including statements made in response to the relationship summary's "conversation starters." *See supra* footnote 98 and accompanying text.

[351] *See supra* footnotes 174–178 and accompanying text.

[352] Items 2.D.(i) and 2.D.(ii) of Form CRS.

[353] Item 2.D.(iii) of Form CRS.

[354] *Cf.* Proposed Item 8.1 of Form CRS ("Given my financial situation, why should I choose an advisory account? Why should I choose a brokerage account?"). We did not receive specific comments on this question, though some commenters included it or a variation thereof in their mock-ups. *See, e.g.,* Betterment Letter I; IRI Letter.

[355] *See supra* footnote 80 and accompanying text.

[356] *E.g.,* ACLI Letter; IAA Letter I.

[357] Items 2.D.(iv) and 2.D.(v) of Form CRS.

qualifications.[358] We believe that answers to these questions will be helpful to retail investors as they make their choices. In addition, a significant majority of participants from the RAND 2018 survey indicated that they would feel comfortable asking any of the Key Questions.[359] Although fewer participants indicated that they would feel "very comfortable" asking about the financial professional's experience and qualifications, compared with the other two questions,[360] we believe that including this question serves as a useful reminder both to investors who would feel comfortable and as encouragement to those who are hesitant that asking such a question is acceptable.

*Requirements Removed from the Proposed Instructions.* The final instructions do not include several specific requirements that were proposed in this item. First, the proposal would have required firms to describe their transaction-based fees and asset-based fees in this section, in addition to the more specific fee information required in a separate fee section.[361] We learned from an investor study submitted by commenters that dispersing information on the same topic throughout several sections of the relationship summary or separating that information with an unrelated topic could confuse investors.[362] This

illustrated the importance of establishing sufficient context and increasing the salience of related information by ensuring that it is kept together in the relationship summary. We agree that fee information should be provided together, and have eliminated fee disclosures from the Relationship and Services section to locate it with other fee information in an effort to reduce investor confusion.

In addition, the final instructions do not require firms to describe regular communications with retail investors, including frequency and method, as proposed. Comments were mixed on the proposed instruction. One commenter expressed the view that proposed Form CRS suggested that firms should contact advisory clients by phone or email every quarter and disagreed with this implication. The commenter recommended that instead of mandating the form or frequency of contact with clients, the Commission should continue to give advisory clients flexibility to communicate how and when they want, as long as investment advisers are meeting their obligations under the Advisers Act.[363] Another commenter noted that misunderstandings concerning broker-dealers' duty or intention to monitor accounts can be avoided by proper communications, most importantly at the time the relationship is formed.[364] Mock-ups submitted by commenters generally did not refer to or describe communications between the firm or financial adviser and the investor.[365] The proposal was not designed to mandate the form or frequency of contact with clients. Nonetheless, given these mixed responses, our goal of keeping the relationship summary focused on a limited amount of information, and to allow more flexibility for firms to describe their services more accurately and meaningfully, firms will not be required to describe the frequency and method of their regular communications with retail investors. Firms may include this information, however, to help investors better understand the services provided.

**3. Summary of Fees, Costs, Conflicts, and Standard of Conduct**

In response to comments, feedback from investors at roundtables and on Feedback Forms, and observations reported by the RAND 2018 report and other surveys and studies, we are adopting changes to the relationship summary's required discussion of fees, costs, conflicts of interest, and standard of conduct. Commenters generally supported the Commission's goal of providing investors with reliable and straightforward information about the fees they pay, the standard of conduct applicable to financial professionals, and conflicts of interest relating to financial professional compensation.[366] Some suggested that the fee disclosure should be more prominent in the proposed relationship summary and located towards the front of the relationship summary and also suggested modifications to sections of the relationship summary addressing financial professional conflicts of interest and standards of conduct.[367]

Results of the RAND 2018 report and other surveys and studies showed that investors view information about fees and costs as one of the most important of the proposed sections of the relationship summary.[368] Investor

---

[358] Proposed Key Question number six asked "How will you choose investments to recommend for my account?" Proposed Key Question number nine asked "What is your relevant experience, including your licenses, education and other qualifications? Please explain what the abbreviations in your licenses are and what they mean." Proposed Items 8.6 and 8.9 of Form CRS.

[359] RAND 2018, *supra* footnote 13 (finding that at least two-thirds and up to 85% of survey participants indicated that they would be "somewhat comfortable" or "very comfortable" asking any of the Key Questions, including which account to choose and why, how investments would be selected for them, and what the financial professional's experience and qualifications were); *see also* Betterment Letter I (Hotspex) *supra* footnote 18 (reporting that 93% of survey participants who viewed a version of the sample standalone adviser relationship summary in the proposal indicated that they were somewhat or very likely to ask the suggested questions.).

[360] RAND 2018, *supra* footnote 13.

[361] *See* Proposed Items 2.B.1. ("Include the following (emphasis required): "If you open a brokerage account, you will pay us a *transaction-based fee,* generally referred to as a commission, every time you buy or sell an investment.") and 2.C.1. ("State the type of fee you receive as compensation if the *retail investor* opens an investment advisory account. For example, state if you charge an on-going asset-based fee based on the value of cash and investments in the advisory account, a fixed fee, or some other fee arrangement. Emphasize the type of fee in bold and italicized font. If you are a *standalone adviser,* also state how frequently you assess the fee.") of Form CRS.

[362] *See* Kleimann I, *supra* footnote 19 ("[W]hile the Brokerage Account was defined as using

transaction-based fees and the Investment Advisory Account as using asset-based fees in the first section, in the Costs and Fees section, the Investment Adviser Services column also discusses transaction fees. This 'contradictory' repetition was confusing to participants.").

[363] *See* Edward Jones Letter.

[364] *See* Schnase Letter.

[365] *But see* Cetera Letter II ("Regardless of the program chosen, your IAR is responsible for ongoing review of your account(s), regular communication with you . . . .").

[366] *See, e.g.,* CFA Institute Letter I (noting that "we support efforts to help retail investors educate themselves on the differences between broker-dealers and investment advisers—in terms of services offered, fees they charge, conflicts of interest, and importantly, the standard of care under which each operates"); Fidelity Letter ("Form CRS should . . . inform investors of the types of fees they may incur and direct them, via a link, to more detailed disclosure."); Comment Letter of the Investment Adviser Association (Dec. 4, 2018) ("IAA Letter II") (describing "fees and expenses to be paid, legal obligations, conflicts of interest" as disclosure items that are "more critical than others"); Comment Letter of the University of Miami School of Law (Aug. 2, 2018) ("Investors should be provided with clear and concise information that fully and fairly discloses the specific charges he or she will incur as a result of the particular recommendation."); NAIFA Letter (agrees that clients should receive "early in the client-advisor relationship—all of the information in the SEC's proposal" which would include: "fees and charges . . . material conflicts of interest associated with a recommendation (to the extent known at the time of disclosure); [and] standards of conduct applicable to the services offered"); *see also* AARP Letter (recommending reformatting of Form CRS to meet "critical core components" including that "standard of care should be clear, concise and defined" [and] "fee structure should be straightforward and avoid technical jargon"); CCMC Letter (in connection with investor polling, noting that investors identify explaining "fees and costs," "own compensation," and "conflicts of interest" as "issues that matter most" to investors).

[367] *See, e.g.,* mock-ups in IAA Letter I; Robinson Letter; SIFMA Letter; Fidelity Letter; Schwab Letter I.

[368] RAND 2018, *supra* footnote 13 (more than 70% of survey respondents selected the fees and costs section as one of the most informative; this

feedback at roundtables and through Feedback Forms also showed the importance of fees and cost information to investors.[369] However, the RAND 2018 survey and other surveys and studies also indicated that the proposed relationship summary presentation of fee and cost information could be difficult for investors to understand.[370] The RAND 2018 survey and other surveys and studies also suggested that investors found sections in the proposed relationship summary covering the obligations of financial professionals and conflicts disclosure less informative,[371] and indicated that investors could have difficulty understanding and synthesizing information about the obligations of financial professionals and the impact

of conflicts of interest.[372] As discussed more fully below, we considered all of this feedback, as well as comments received, in redesigning the disclosures related to the topics.

A new Item 3 will require the relationship summary to cover three areas: (i) Fees and costs; (ii) standard of conduct and conflicts of interest; and (iii) financial professional compensation and related conflicts of interest. Some of the key elements of these disclosures include:

• *Integrated sections covering fees, costs, conflicts of interest, and standard of conduct.* We have modified the proposal by combining the fees and costs section and the sections discussing conflicts of interest and standard of conduct into one Item 3 that will require three consecutive sections. These sections will help illustrate the interconnectedness of fees, costs, conflicts, and standard of conduct, and will keep these related disclosures close in proximity to each other.

• *Distinct summaries of principal fees and costs other fees and costs, and other ways the firm makes money.* We are also requiring separate sections discussing certain fees and costs, with one section discussing principal fees and costs, another section discussing other fees and costs related to the firm's services and investments, and another section discussing other ways the firm and its affiliates make money. We are not requiring firms to discuss all of the fees and costs together as proposed, to address comments and feedback that the section was complicated and overwhelming. We are also requiring a firm to include cross-references to more detailed information about the firm's fees.

• *A description of the standard of conduct with conflicts.* We are placing the description of the standard of conduct under the same heading as a summary of conflicts in order to help retail investors better understand the

relationship between the standard of conduct and conflicts.

• *Broadening the types of conflicts disclosure.* We are requiring firms to disclose information on the topics that were required in the proposal—*i.e.,* proprietary products, third-party payments (shelf space and revenue sharing arrangements), and principal trading. But we are requiring firms without these conflicts to disclose at least one material conflict. We are also requiring a firm to include cross-references to more detailed information about the firm's conflicts of interest.

• *Financial professional compensation.* We are adding a separate section that will require a firm to highlight how its financial professionals are compensated and the conflicts of interest those payments create. This disclosure will distinguish firm-level from financial professional-level conflicts.

The proposal would have included one section summarizing fees and costs, one section summarizing conflicts of interest, and one section discussing the applicable standards of conduct. The principal fees were also discussed at the beginning of the services section, and for standalone investment advisers and broker-dealers, the section discussing fees and costs and the section discussing conflicts of interest were separated by a section discussing comparisons between investment advisers and broker-dealers. Commenters suggested locating fee and conflict disclosures more closely together, and several sample relationship summaries submitted by commenters placed the fees and conflicts sections in close proximity to each other.[373] As noted, we learned from an interview-based study submitted by a commenter that investors could have trouble connecting related information when those sections were not closely located.[374] Observations in the RAND 2018 qualitative interviews and comments submitted on Feedback Forms also suggested that investors' level of understanding varied significantly with regard to the relationship between the applicable standard of conduct and conflicts, and that investors might be more confused by this relationship when the relationship summary placed these sections far apart from one

section was least likely to be selected as not informative); *see also* Cetera II Letter (Woelfel) *supra* footnote 17 (reporting that 88% of survey respondents agreed that it is very or somewhat important to cover "fees and costs associated with those services"); Schwab Letter I (Koski) *supra* footnote 21 (reporting that 63% of survey respondents ranked "costs I pay for investment advice" as one of the four most important things for firms to communicate); CCMC Letter (investor polling) *supra* footnote 21(describing "explaining fees and costs" as one of three issues that "matter most" to investors).

[369] *See, e.g.,* Houston Roundtable; Atlanta Roundtable; Philadelphia Roundtable; Miami Roundtable; Washington, DC Roundtable; Denver Roundtable; Baltimore Roundtable; CFA Letter I; *see also* Feedback Forms Comment Summary, *supra* footnote 11 (responses to Question 2(c)) (over 80% of commenters graded the section on fees and costs as "very useful" or "useful").

[370] RAND 2018, *supra* footnote 13 (40% of survey respondents rated fees and costs section difficulty as "just right" while 35% rated the fees and cost section as difficult or very difficult; in qualitative interviews, participants generally found the section to be important, but also overwhelming and had trouble with language); *see also* Kleimann I, *supra* footnote 19 ("Participants expected to pay for transactions in a Brokerage Account or the quarterly fee for an Advisory Account, but they were surprised by the proliferation of additional fees . . . commented on the introduction of many new terms and wanted definitions. . ."); Cetera Letter II (Woelfel) *supra* footnote 17 (78% of survey respondents agreed strongly or somewhat agreed that fees and costs were clearly described, well below ratings for clarity of information about services and obligations).

[371] *See* RAND 2018, *supra* footnote 13 (almost one quarter of survey respondents selected "our obligations to you" as one of the least informative sections, only one third selected the section as one of the two most informative; the conflicts of interest section was selected as one of the two most informative by only 15% of respondents and as one of the least informative by more than a third); *see also* Cetera Letter II (Woelfel), *supra* footnote 17 (largest percent of survey respondents (88%) strongly or somewhat agreed that the "our obligations to you" topic was important; smallest percent (81%) strongly or somewhat agreed that conflicts of interest was important); CCMC Letter (investor polling) *supra* footnote 21(describing "explaining fees and costs," "explaining own compensation," and "explaining conflicts of interest" as three issues that "matter most" to investors).

[372] *See* RAND 2018, *supra* footnote 13 (in qualitative interviews, some participants struggled with understanding differing obligations for different account types and reconciling information in the conflicts of interest section with the "our obligations to you" section); Kleimann I, *supra* footnote 19 ("Few participants could define "fiduciary standard"; participants explaining firms' financial relationships that could create potential conflicts "had difficulty explaining how firms earned money from these relationships . . . often absent from these explanations was a discussion of the negative impact that these practices would have on them."); Betterment Letter I (Hotspex), *supra* footnote 18 (reporting survey results indicating that some investors viewing a version of the sample proposed standalone adviser relationship summary had difficulty answering correctly questions about financial professional obligations and conflicts of interest).

[373] *See, e.g.,* LPL Financial Letter; Betterment Letter I; Primerica Letter; SIFMA Letter; Wells Fargo Letter; Schwab Letter I.

[374] *See supra* footnote 362 and accompanying text.

another.[375] We agree that it is important to illustrate the relationship between fees, conflicts, and standards of conduct. We are therefore combining in Item 3 of the final instructions the discussions on fees and costs with discussions of firms' conflicts of interest, and combining the standard of conduct discussion with the discussion of certain other conflicts of interest.

a. Description of Principal Fees and Costs and Other Fees

Similar to the proposal, firms will be required to summarize the principal fees and costs that retail investors incur with respect to their brokerage and investment advisory accounts, and the conflicts of interest they create.

As noted above, commenters generally supported the Commission's goal of providing investors with reliable and straightforward information about the fees they pay and suggested making this information more prominent and located towards the front of the relationship summary.[376] Similarly, observations in the RAND 2018 report, and other surveys and studies, and comments from investors at roundtables and in Feedback Forms, overwhelmingly supported including fee disclosure in the relationship summary and showed that investors believe that information about fees and costs is important to understanding their relationship with a financial professional.[377] The RAND 2018 survey reported, however, that survey participants were more likely to rate the proposed relationship summary section on fees and costs as ''difficult'' or ''very difficult'' to understand and would add

more detail.[378] In the RAND 2018 qualitative interviews, participants generally understood that this section would provide information on the types of fees they could possibly pay, but also found the section overwhelming with the number of various types of fees and had some difficulty with language, including certain terms.[379] Some participants also did not appear to synthesize information about fees and conflicts of interest to be able to apply it.[380] Other surveys and studies, and comments provided on Feedback Forms, also indicate that investors both want additional information about fees and costs and found this information difficult to understand.[381] Several commenters also said that information on fees and costs was not straightforward and used too much technical jargon.[382] In addition, the IAC recommended that the Commission adopt a uniform, plain English document that covers basic information about fees and compensation, among other topics.[383] The Feedback Form commenters and observations reported in the RAND 2018 report and other surveys and studies reaffirms our view that it is critical for retail investors to better understand the fees and costs incurred with their investments and

related conflicts of interest. This section has been revised to further our policy objective of helping investors better understand such fees, costs, and conflicts of interest.

*Description of Principal Fees and Costs.* First, using the heading ''What fees will I pay?'',[384] firms will summarize their principal fees and costs that retail investors will incur for brokerage or investment advisory services, including how frequently such fees are assessed and the conflicts of interest they create.[385] Broker-dealers must describe their transaction-based fees[386] and investment advisers must describe their ongoing asset-based fees, fixed fees, wrap fee program fees, or other direct fee arrangements.[387] The fees described by investment advisers should align with the type of fee(s) disclosed in response to Form ADV Part 1A, Item 5.E, but they should be summarized in a way that provides retail investors a high-level overview.[388]

Although the proposal required firms to include information about their principal fees and costs, much of the wording was prescribed. For instance, the proposed instructions included prescribed wording to describe transaction-based fees and asset-based fees and the incentives that each of those fees create.[389] The proposed instructions also required firms to use technical terms and explain their definitions (*e.g.,* ''mark-up'' or ''mark-

---

[375] *See* RAND 2018, *supra* footnote 13 (in qualitative interviews, participants struggled to reconcile information in the conflicts of interest section with obligations section). Among commenters on Feedback Forms who indicated that the relationship summary was too technical or that topics could be improved, many commented that sections addressing fees and costs, obligations and conflicts of interest needed clarification or better explanation. *See* Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 4). Some Feedback Form commenters suggested changes to the order of information about fees, conflicts and obligations or offered other comments suggesting that the order of the topics was confusing. *See* Anonymous28 Feedback Form (''Conflicts of Interest should come right after Obligations to You.''); Asen Feedback Form (''Somewhat I would prefer to see conflicts before fees''); Lee2 Feedback Form (comment responding to Question 3(b), whether order is appropriate, ''[c]onflicts seems buried too deeply''); Smith1 Feedback Form (''The transactions comment in the fees section seems like it would also fall under the conflicts of interst [sic] section'').

[376] *See supra* footnotes 366–367 and accompanying text.

[377] *See supra* footnotes 368–369 and accompanying text.

[378] *See* RAND 2018, *supra* footnote 13 (in the RAND 2018 survey about 40% rated the difficulty of the section on fees and costs as ''just right'' and 35% rated the section on fees and costs as ''difficult'' or ''very difficult''; about 30% of survey respondents suggested adding more detail).

[379] *See* RAND 2018, *supra* footnote 13 (''Participants struggled with terms in this section. . . . Words that participants flagged include 'markup,' 'markdown,' 'load,' 'surrender charges,' 'wrap fee' and 'custody.' '').

[380] *See* RAND 2018, *supra* footnote 13 (''[O]ne participant could clearly put differences in fees related to each type of account [but] when asked about which type of financial professional has an incentive to encourage investors to buy and sell securities [was] . . . incorrectly answered.'').

[381] *See* Kleimann I, *supra* footnote 19 (finding that ''[p]articipants expected to pay for transactions in a Brokerage Account or the quarterly fee for an Advisory Account, but they were surprised by the proliferation of additional fees. . . . Participants also commented on the introduction of many new terms); Cetera Letter II (Woelfel) *supra* footnote 17 (78% of survey respondents strongly or somewhat agreed that information on fees and costs was clearly presented, rating below sections describing the firm's obligations and the services that the firm provides.); Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 4) (41 comments on Feedback Forms (44%) indicated that one or more topics on the relationship summary is too technical or could be improved; 23 included comments indicating that information about fees and costs is too technical or needed to be more clear).

[382] *See e.g.,* IAA Letter I (stating that retail investors are unlikely to understand the use of ''technical terms and industry jargon'' with respect to fees in the relationship summary); *see also* AARP Letter; Fidelity Letter.

[383] *See* IAC Broker-Dealer Fiduciary Duty Recommendations, *supra* footnote 10.

[384] Item 3.A. of Form CRS.

[385] Item 3.A.(i) of Form CRS.

[386] Item 3.A.(i)(a) of Form CRS.

[387] Item 3.A.(i)(b) of Form CRS.

[388] Item 3.A.(i)(b) of Form CRS. In addition, investment advisers must include information about each type of fee they report in Form ADV that is responsive to Item 3.A. of Form CRS.

[389] Dual registrant broker-dealers, for example, were required to include the following wording on transaction based fees: ''You will pay us a fee every time you buy or sell an investment. This fee, commonly referred to as a commission, is based on the specific transaction and not the value of your account.'' Proposed Item 4.B.1. of Form CRS. Dual registrant investment advisers were required to include the following wording on asset-based fees: ''You will pay an on-going fee [at the end of each quarter] based on the value of the cash and investments in your advisory account.'' If the asset manager charged another type of fee instead of an asset-based fee, it was required to briefly describe that fee and how frequently it was assessed. Investment advisers that charged an ongoing asset-based fee would have been required to include the following: ''The more assets you have in the advisory account, including cash, the more you will pay us. We therefore have an incentive to increase the assets in your account in order to increase our fees. You pay our fee [insert frequency of fee (*e.g.,* quarterly)] even if you do not buy or sell.'' Broker-dealers would have been required to include the following: ''The more transactions in your account, the more fees we charge you. We therefore have an incentive to encourage you to engage in transactions.'' Proposed Items 4.B.5. and 4.C.8. of Form CRS.

down,'' ''load,'' and ''custody'').[390] Additionally, firms providing advice about investing in wrap fee programs were required to include several more prescribed sentences.[391] Finally, dual registrants were required to state when a retail investor may prefer a brokerage or investment advisory service from a cost perspective,[392] and wrap fee program providers had to explain when a retail investor may prefer a wrap fee program.[393] Commenters argued that in many cases the prescribed wording was confusing and not accurate.[394] For

example, several commenters indicated the proposed fee discussion was unnecessarily technical and suggested the relationship summary avoid the use of jargon (*e.g.,* terms like ''asset-based fee'' and ''load'') in this section.[395] Several roundtable participants also said that they did not understand these terms,[396] as did some participants in investor studies and surveys.[397] Other commenters noted that the wording in the proposal was too binary.[398] Another commenter argued that certain prescribed wording was obvious to retail investors and did not add value to the retail investor.[399]

In an effort to balance the goal of educating retail investors with the need to provide firms with enough flexibility to tailor the disclosure to their services and investments, we have decided to remove from the Instructions the prescribed wording we proposed about fees and costs.[400] Specifically we are replacing the prescribed wording with a requirement to describe the firm's principal fees and the conflicts of interest they create. We have also included examples in the instructions of statements that would describe certain principal fees. We have concluded, based on consideration of the comments and investor feedback, that the proposed requirements did not reflect the fees for all firms and, depending on firms' business models, could be confusing. Instead the relationship summary will focus on a high level summary of fees. Having considered comments, we believe this more flexible approach will better facilitate meaningful disclosure in the relationship summary, as well as conversations between the retail investor and his or her financial professional, and help the retail investor

decide on the types of services that are right for him or her. Additionally, we believe that certain definitions and concepts explained in the proposed relationship summary can be better explained in other ways, such as through layered disclosure that explain technical terms as appropriate for the specific firm (*e.g.,* ''hovers'').[401] Further, requiring firms to draft their own descriptions will allow them to tailor the description to their particular business models, including the fees their prospective customers and clients will most commonly incur, which will make the discussion more accurate and relevant and further help facilitate retail investors' comprehension.

In addition, we are not including the proposed prescribed wording with respect to wrap fee programs.[402] Instead, investment advisers that offer these services to retail investors should include disclosure about the relevant fees and conflicts of interest, and explain the program. We are including instructions encouraging investment advisers with wrap fee programs to explain that asset-based fees associated with the wrap fee program will include most transaction costs and fees to a broker-dealer or bank that has custody of these assets, and therefore are higher than a typical asset-based advisory fee.[403]

We also removed the proposed disclosures about which type of service or account is better for a retail investor. Specifically, the proposal would have required firms to include prescribed wording about when a retail investor may prefer paying a transaction-based fee or an asset-based fee.[404] Although

---

[390] Broker-dealers were required to state the following (emphasis required): ''With stocks or exchange-traded funds, this fee is usually a separate commission. With other investments, such as bonds, this fee might be part of the price you pay for the investment (called a '*mark-up*' or '*mark down*'). With mutual funds, this fee (typically called a '*load*') reduces the value of your investment.'' Proposed Item 4.B.2.(a) of Form CRS. Investment advisers were required to state, if applicable, that ''a retail investor will pay fees to a broker-dealer or bank that will hold the retail assets and that this is called custody.'' Proposed Item 4.C.6. of Form CRS.

[391] Investment advisers that provided advice to retail investors about investing in wrap fee programs were required to include the following (emphasis required): ''We offer advisory accounts called *wrap fee programs.* In a *wrap fee program,* the asset-based fee will include most transaction costs and fees to a broker-dealer or bank that will hold your assets (called '*custody*'), and as a result wrap fees are typically higher than non-wrap advisory fees.'' If the investment adviser offered a wrap fee program as well as another type of advisory account, it was required to include: ''For some advisory accounts, called *wrap fee programs,* the asset-based fee will include most transaction costs and custody services, and as a result wrap fees are typically higher than non-wrap advisory fees.''

[392] Dual registrants were required to include the following: ''An asset-based fee may cost more than a transaction-based fee, but you may prefer an asset-based fee if you want continuing advice or want someone to make investment decisions for you.'' Proposed Item 4.C.10. of Form CRS.

[393] Investment advisers that provided advice to retail investors about investing in wrap fee programs were required to include the following (emphasis required): ''You may prefer a wrap fee program if you prefer the certainty of a [insert frequency of the wrap fee (*e.g.,* quarterly)] fee regardless of the number of transactions you have.'' Proposed Item 4.C.11. of Form CRS.

[394] *See, e.g.,* CFA Institute Letter I (suggesting that the Commission revise the proposed wording to reflect the effect on costs in a more even-handed manner); ACLI Letter (stating that the prescriptive nature of the disclosures does not sufficiently allow for diverse business models to be explained); IAA Letter I (stating that the prescribed language comparing investment advisers to broker-dealers does not include important information and may confuse retail investors, and that the prescribed language associated with fees based on assets under management, while technically correct, misses an important point—namely that an adviser earns more when the client's portfolio performs better and earns less when the portfolio performs less well aligns the adviser's interest with the client's interest, rather than the reverse); FSI Letter I (stating that prescribing language in the relationship summary may confuse retail investors); Comment Letter of Paul Hynes (Jul. 31, 2018) (''Paul Hynes Letter'') (stating that the prescribed wording is inaccurate by suggesting that investment advisers

can sell variable annuities); ACLI Letter (stating that the Fees and Costs section is replete with required statements that may be unnecessary/misleading).

[395] CFA Letter I; AARP Letter; IAA Letter I.

[396] *See, e.g.,* Miami Roundtable; Houston Roundtable; Philadelphia Roundtable.

[397] *See* RAND 2018, *supra* footnote 13 (in qualitative interviews participants asked for definitions of ''transaction-based fee,'' asset-based fee,'' and struggled with terms such as ''mark-up,'' ''mark-down,'' ''load,'' surrender ''charges'' and ''wrap fee''); *see also* Kleimann I, *supra* footnote 19.

[398] *See, e.g.,* CFA Letter I; Margolis Feedback Form (stating that the wording assumed that a retail investor would pay either a transaction-based fee or an asset-based fee for a brokerage or advisory account, respectively, and did not capture other fee structures).

[399] *See* Wells Fargo Letter.

[400] As discussed further below, we are not eliminating all prescribed wording for this section and are requiring firms to include the following statement: ''You will pay fees and costs whether you make or lose money on your investments. Fees and costs will reduce any amount of money you make on your investments over time. Please make sure you understand what fees and costs you are paying.''

[401] Firms are also encouraged to fully explain any technical terms that they use to describe their fees. We also believe that *Investor.gov* can be a resource for this information, and the relationship summary will highlight *Investor.gov/CRS* where educational material is available.

[402] The proposal required certain prescribed wording describing wrap fee programs. *See* Proposed Item 4.C.3. of Form CRS.

[403] Item 3.A.(i)(b) of Form CRS.

[404] The proposal required standalone investment advisers and standalone broker-dealers to state that a retail investor may prefer paying ''a transaction-based fee from a cost perspective, if you do not trade often or if you plan to buy and hold investments for longer periods of time.'' or ''an asset-based fee if you want continuing advice or want someone to make investment decisions for you, even though it may cost more than a transaction-based fee.'' Proposed Items 5.A.4. and 5.B.6. of Form CRS. Dual registrant broker-dealers were required to include the following: ''From a cost perspective, you may prefer a transaction-based fee if you do not trade often or if you plan to buy and hold investments for longer periods of time.'' Proposed Item 4.B.6. of Form CRS. Dual registrant investment advisers that charged an ongoing asset-based fee were required to include the following: ''An asset-based fee may cost more than a

Continued

some commenters did not object to the proposed prescribed wording and some included it in their mock-ups,[405] several commenters raised concerns.[406] For example, one commenter argued that the required wording could be false and misleading, noting that the required statements do not take into account that transaction-based fees are not necessarily more affordable for buy-and-hold investors who do not trade often, many broker-dealers offer higher-cost investment products (*e.g.,* variable annuities, non-traded REITs, and private placements), and many investment advisers recommend investments with lower operating expenses than those sold by brokers.[407] We have concluded that the proposed required wording did not capture all of the information that, in certain circumstances, would be necessary to help retail investors reasonably assess whether a particular service and its associated fees will be better for them. Instead, the relationship summary provides information about what the firm offers and encourages discussion with conversation starters. Such a discussion—facilitated by Form CRS—is more appropriate between the financial professional and the retail investor about the firm's specific offerings and associated fees and conflicts, and the retail investor's specific circumstances.

The proposal also required firms to state whether their fees vary and are negotiable and to describe the key factors that would help a reasonable retail investor understand the fee that he or she is likely to pay for services.[408] In the RAND 2018 qualitative interviews, some participants were confused by the statement about fees being negotiable and most mock-ups commenters submitted did not include this disclosure.[409] We did not include this

requirement in the final instruction. It is important to instead focus the relationship summary on information about fees that retail investors identified as important to their assessment of firms. Given the comments and investor testing results showing that the fee section was technical and difficult to understand, we believe that the final instructions will help investors focus on the information the final instructions do require. We believe that removing information about negotiability should help achieve this objective.

In another modification from the proposal, we are requiring firms to discuss the conflicts of interest created by their principal fees and costs rather than prescribing specific wording about those conflicts. We are making this change in response to commenters, who pointed out that the conflicts of interest created by principal fees can vary in more ways than our prescribed wording contemplated.[410] Instead of prescribed wording, the final instructions include a requirement that firms explain the conflict of interest their principal fees create, as well as examples of how a firm may communicate certain conflicts of interest. These examples are the same conflicts the proposed instructions required. For instance, a broker-dealer could disclose its conflicts of interest related to transaction-based fees by stating that a retail investor would be charged more when there are more trades in his or her account and that the firm may therefore have an incentive to encourage a retail investor to trade often.[411] Investment advisers that charge an asset-based fee could disclose related conflicts of interest by stating that the more assets in a retail investor's advisory account, the more the retail investor will pay in fees, and the firm may therefore have an incentive to encourage the retail investor to increase the assets in his or her account.[412] Firms that offer variable annuity and variable life insurance products could disclose that they have a financial incentive to offer a contract that includes optional benefit features, which may entail

additional fees on top of the base fee associated with the contract, that they may encourage contract owners to select investment options with relatively higher fees, or that they may offer the contract owner a new contract in place of the one that he or she already owns. Finally, we also have included a note in the final instructions that an investment adviser receiving compensation in connection with the purchase or sale of securities should consider the applicability of the broker-dealer registration requirements of the Exchange Act and any applicable state securities statutes.[413]

*Description of Other Fees and Costs.* Firms also will be required to describe other fees and costs related to their brokerage and investment advisory services and investments, in addition to the firm's principal fees and costs, that the retail investor will pay directly or indirectly. Firms must list examples of the categories of the most common fees and costs that their retail investors will pay directly or indirectly.[414] Those fees and costs may include, for example, custodian fees, account maintenance fees, fees related to mutual funds and variable annuities, and other transactional fees and product-level fees.[415] With regard to product-level fees, in particular, firms may wish to highlight certain fees such as distribution fees, platform fees, shareholder servicing fees and sub-transfer agency fees, in order to enhance the retail investor's understanding of these fees to the extent applicable to the customer's transactions, holdings, and accounts.

We recognize that the fees and costs that a firm determines to be the most common will vary and depend on particular products and services the firm offers and the fee arrangements associated with those products and services. Generally, in making this determination, firms should consider, for example, the amount of the fee (including whether the fee varies based on options the investor may select such as optional benefits and the investment options that a contract owner may select in the context of variable annuities and variable life insurance products), the likelihood that the fee will be applicable, whether the fee is ordinarily assessed on a significant number of the firm's clients, whether the fee is associated with a product or service that the firm frequently recommends or provides, whether the fee is contingent

---

transaction-based fee, but you may prefer an asset-based fee if you want continuing advice or want someone to make investment decisions for you.'' Proposed Item 4.C.10. of Form CRS.

[405] *See, e.g.,* LPL Financial Letter I; Betterment Letter I; IRI Letter.

[406] *See supra* footnote 394.

[407] *See* CFA Letter I.

[408] Proposed Items 4.B.3. and 4.C.5 of Form CRS. The instructions included examples of such key factors (for a broker-dealer, this may be how much the retail investor buys or sells, what type of investment the retail investor buys or sells, and what kind of account the retail investor has with a firm; for an investment adviser, this may include the services the retail investor receives and the amount of assets in the retail investor's account). Investment advisers were also required to state that a retail investor could be required to pay fees when certain investments are sold (*e.g.,* surrender charges for selling variable annuities).

[409] *See* RAND 2018, *supra* footnote 13 (noting that the phrase stating that fees are negotiable and may vary concerned participants, and many noted that it made them feel as if they pay too much).

Similarly, *see* Anonymous28 Feedback Form (''If fees are negotiable, when is this done?''); *see also* mock-ups in IAA Letter I; Robinson Letter; Primerica Letter; LPL Financial Letter, SIFMA Letter; Schwab Letter I; Fidelity Letter.

[410] *See, e.g.,* Comment Letter of Invesco Advisers, Inc. (Aug. 7, 2018) (''Invesco Letter''); Committee of Annuity Insurers Letter; IAA Letter I; *see also* CFA Institute Letter I (noting that investors ''will most likely focus on the fees and costs discussion and should be alerted to the fact that in addition to different fee arrangements and structures, different practices and conflicts may also result in higher costs.'').

[411] Item 3.A.(i).a. of Form CRS.

[412] Item 3.A.(i).b. of Form CRS.

[413] *See* Item 3.A.(i).b of Form CRS. This statement is consistent with Part 2A of Form ADV.

[414] Item 3.A.(ii) of Form CRS.

[415] Item 3.A.(ii) of Form CRS.

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33527**

upon certain events the investor should be made aware of, the effect on returns, and the magnitude of the conflict of interest it may create. For example, an investment adviser should consider discussing commissions that are charged when an investment is bought or sold. A firm that commonly offers an investment that includes a surrender fee—for example, a variable annuity or variable life insurance contract is sold as a long-term investment that may entail relatively high surrender fees—should consider disclosing that a retail investor could be required to pay fees when certain investments are sold.

The proposal similarly required firms to state that retail investors will pay other fees in addition to the firm's principal fees. Like the final instructions, the proposal required disclosure of the other fees related to the services or account such as custodian fees, account maintenance fees, and account inactivity fees, and included these other fees in the same section discussing the firm's principal fees.[416] The proposal also required that all firms disclose that certain investments imposed additional fees, including fees that reduce the value of investments over time (*e.g.,* mutual funds and variable annuities) and fees paid when an investment is sold (*e.g.,* surrender charges for selling variable annuities).[417] Observations reported from RAND 2018 qualitative interviews and another study indicated that some investors could become overwhelmed with the number of various types of fees and many were surprised that so many different types of fees could apply in addition to a firm's principal fee.[418] At the same time, investors participating in surveys and studies and investors providing comments on Feedback Forms have indicated that more

information would be helpful.[419] Industry commenters, commenters representing investors, and commenters on Feedback Forms, and roundtable participants supported some disclosure regarding product-level fees, though commenters differed in the level of suggested detail on such fees.[420] For instance, one commenter stated that the relationship summary should reveal all fees and commissions for all purchases.[421] Other commenters, however, believed that a link to the prospectus should sufficiently satisfy disclosure requirements regarding mutual fund fees and expenses.[422] Another urged the Commission to provide a list of examples of transaction-based fees.[423]

We agree that understanding these fees is important so that retail investors have the necessary information to evaluate between firms, firm types (*i.e.,* investment adviser, brokerage, or dually registered), and firm services, accounts, and products so that they can select what is right for them. We continue to believe drawing retail investors' attention to these additional fees is important because they have an impact on investors' investment returns over time. Accordingly, we are requiring disclosure of these types of fees and listing examples of categories as proposed. The final instructions, however, make clear that firms can use their own wording, and only require examples of the most common fees and costs. As discussed below, firms will be

required to include cross-references to more specific information, and will be permitted to use tools to help investors learn about these fees and costs in an interactive way without overwhelming retail investors with the additional information. We believe that this approach balances providing short, understandable disclosures about additional fees and costs with investors' interest in understanding more about fees and costs.

*Additional Information.* Finally, in a change from the proposal, firms will be required to state: ''You will pay fees and costs whether you make or lose money on your investments. Fees and costs will reduce any amount of money you make on your investment over time. Please make sure you understand what fees and costs you are paying.'' [424] The first sentence replaces a statement in the proposal that some investments impose additional fees that will reduce the value of the retail investor's investment over time. Given the importance of assisting investors to understand the impact of fees and costs, we are requiring prescribed wording in this instruction. The prescribed wording discloses to investors a key term under which a service will be offered, namely the fact that the service will not be free and that the cost of using the service will exist regardless of investment performance.[425]

Firms must also include specific cross-references to more detailed information about their fees and costs.[426] The cross-reference must, at a minimum, include the same information as, or contain information equivalent to that required by, the Form ADV Part 2A brochure (specifically Items 5.A., B., C., and D.) and Regulation Best Interest, as applicable.[427] If the firm is a broker-dealer that does not provide recommendations subject to Regulation Best Interest, to the extent it prepares more detailed information about its fees, it must include specific references to such information.[428] The final instructions require firms to use text features to make this additional information more noticeable and prominent in relation to other discussion text.[429] Firms may choose to

---

[416] Proposed Items 4.B.4. and 4.C.6. of Form CRS. Specifically, the proposal required broker-dealers to state, if applicable, that a retail investor will pay other fees in addition to the firm's principal fees, including, but not limited to, custodian fees, account maintenance fees and account inactivity fees. The proposal required investment advisers to state, if applicable, that a retail investor will pay transaction-based fees when it buys and sells an investment for the retail investor and that retail investors will pay, if applicable, custodian fees, and other fees such as those for account maintenance services.

[417] Proposed Items 4.B.2.(b) and 4.C.4. of Form CRS.

[418] RAND 2018, *supra* footnote 13 (qualitative interview results); Kleimann I, *supra* footnote 19. Similarly, *see* Anonymous02 Feedback Form (''Do companies charge all these fees? Maybe use words like 'may charge' ''); Anonymous28 Feedback Form (''The section on fees might better be presented in a chart—no mention is made of front and backend loads.'').

[419] *See* RAND 2018, *supra* footnote 13 (qualitative interview results), Kleimann I, *supra* footnote 19; Kleimann II, *supra* footnote 19 (in study testing investor reaction to alternate design of relationship summary, participants continued to focus on additional fees and wanted additional information on fees); *see also* Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 5) (of 48 Feedback Forms with narrative comments suggesting additional information to be required in the relationship summary, 29 suggested that additional information about fees and costs would be helpful).

[420] *See* Fidelity Letter; CFA Letter I; *see also* Anonymous11 Feedback Form (''. . . disclose specific fees for different types of securities''); Caddess Feedback Form (''description of brokers buying one 'loaded' fund and then selling it soon after to buy a more 'suitable loaded' fund is not vivid enough.''); Fontaine Feedback Form (''More on the mutual fund loads and class shares Load''); Malone Feedback Form (''Suggest fees monthly associated with each fund by type''); Mennella Feedback Form (''In addition to paying a management fee what is the cost of the underlying investments such as mutual funds, liquid alternatives, seperately [sic] managed accounts, transaction costs, etc.?''); Houston Roundtable; Philadelphia Roundtable.

[421] Comment Letter of Tony Greiner (Jul. 14, 2018).

[422] Comment Letter of Oppenheimer Funds (Aug. 7, 2018) (''Oppenheimer Letter''); TIAA Letter.

[423] Comment Letter of the Investment Company Institute (Aug. 7, 2018) (''ICI Letter'').

[424] Item 3.A.(iii) of Form CRS.

[425] *See Zauderer* v. *Office of Disciplinary Counsel,* 471 U.S. 626, 651 (1985) (upholding required disclosure of factual information about terms of service, including that clients would still be liable to litigation costs even if their lawsuits were unsuccessful).

[426] Item 3.A.(iii) of Form CRS.

[427] Item 3.A.(iii) of Form CRS.

[428] Item 3.A.(iii) of Form CRS.

[429] General Instruction 4.C to Form CRS. For example, firms could use larger or different font; a
Continued

provide a hyperlink, or other means of facilitating access, that leads directly to the relevant Regulation Best Interest disclosure or section of Form ADV, or they may choose to create an additional page that contains the same or equivalent information.[430] For example, a firm may decide to include information on a different website.

The proposed instructions did not include a specific cross-reference to additional fee disclosure, but the proposal required a cross-reference in the Additional Information section about where the retail investor could find information about the services offered, and we requested comment on whether to require firms to include a fee schedule.[431] In the RAND 2018 survey, a potential hyperlink to information on fees, however, generated the most interest among survey participants.[432] Some industry commenters suggested that the relationship summary should permit hyperlinks to fee schedules, arguing that additional information would be helpful for retail investors, but that including the fee schedule itself would be unwieldy.[433] Another commenter, however, suggested requiring a fee schedule that includes typical breakpoints and information on likely and/or maximum fees.[434]

Given the feedback from investors that fee information is important, we believe that requiring specific references to more detailed information about fees balances the goals of the relationship

---

text box around the heading or questions; bolded, italicized, or underlined text; or lines to offset the information from other sections.

[430] While drafting these disclosures for Form CRS, investment advisers also are encouraged to consider whether they can describe the information about fees more clearly in the Form ADV brochure in a more reader-friendly format. *See also* General Instructions 3. and 4. of Form CRS (instructions applicable to electronic delivery). For further discussion of these provisions, *see supra* Section II.A.3. and footnotes 156 and 158 and accompanying text, and Section II.B.2.(b) and footnotes 348–349.

[431] Proposed Item 7.E. of Form CRS.

[432] *See* RAND 2018, *supra* footnote 13 (58% of participants selecting "very likely" and another 32% selecting "somewhat likely" to click on a hyperlink relating to fees; no other potential hyperlink generated a majority with "very likely" usage among any investor or education subgroup). Other investor studies indicated that participants wanted descriptions of the hyperlinks to be more concrete in terms of what information they would find, and that, while some participants were interested in additional information, others admitted they would not follow the links because it was extra effort, they were uninterested, or the link did not itself suggest what would be there. *See* Kleimann II, *supra* footnote 19. In addition, numerous commenters supported layered disclosure. *See supra* footnote 31 and accompanying text.

[433] *See* CFA Letter I; IAA Letter I; LPL Financial Letter.

[434] *See* Morningstar Letter.

summary, to highlight information covering several topics, with investors' interest in understanding more about fees. This approach will give retail investors information about the types of fees at a higher level and then offer more details, permitting the relationship summary to cover other important topics as well.[435] Including a fee schedule in the relationship summary could make it more difficult to also cover the other topics while maintaining short, digestible disclosures. Instead, we are not including a fee schedule in the relationship summary but are requiring cross references to balance providing a shorter document with giving retail investors easy access to more detailed information.

*Conversation Starter.* We are also adopting a conversation starter that is designed to prompt a more personalized discussion regarding the fees and costs that will impact the particular retail investor's account. A firm must include the following question for the retail investor to ask his or her financial professional: "Help me understand how these fees and costs might affect my investments. If I give you $10,000 to invest, how much will go to fees and costs, and how much will be invested for me?"[436]

As discussed above, the proposal included the following "Key Question," which was intended to serve as a conversation starter between the retail investor and the financial professional and to provide the investor an opportunity to receive a quantitative example of the impact of fees: "Do the math for me. How much would I expect to pay per year for an advisory account? How much for a typical brokerage account? What would make those fees more or less? What services will I receive for those fees?"[437] The Proposing Release discussed the option of including an example of the impact of fees in the relationship summary, and requested comment on whether we should require an example showing how sample fees and charges apply to a hypothetical advisory account and a hypothetical brokerage account, as applicable.[438] We also requested comment on what assumptions firms should make in preparing such an example and how the information should be presented.[439]

Feedback from the RAND 2018 report, other surveys and studies, roundtables, and the Feedback Forms showed that

---

[435] *See supra* Section II.A.3.

[436] Item 3.A.(iv) of Form CRS.

[437] Proposed Item 8 of Form CRS.

[438] Proposing Release, *supra* footnote 5.

[439] Proposing Release, *supra* footnote 5.

retail investors want more information about fees and the impact of those fees on their investments.[440] At some of the roundtables, for example, participants discussed the utility of adding a hypothetical example in the relationship summary to illustrate fees.[441] Commenters on Feedback Forms also asked for more specific information about the impact of fees on their investments, such as example fee calculations or ranges of fees.[442] Commenters supported including a question highlighting fees a retail investor pays.[443] Commenters, including commenters representing investors and individual investors, also overwhelmingly supported requiring

---

[440] *See e.g.,* RAND 2018, *supra* footnote 13 (noting survey results finding that the fees and costs section was "the section for which the largest share of respondents suggest adding more detail" and investors were more likely than non-investors to suggest adding more detail to the section on fees and costs (31 percent versus 25 percent), and in qualitative interviews, "participants expressed that this section is overwhelming . . . and at the same time felt more information would be helpful."); Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 5) (narrative answers on 29 Feedback Forms indicated that additional information about fees and costs would be helpful).

[441] *See* Washington, DC Roundtable (an investor stated that it would be useful for comparing understanding costs if hypothetical examples were given about how cost affects the investor's returns); Atlanta Roundtable (an investor stated that it would be helpful to know the cost of investing a hypothetical amount of money); and Philadelphia Roundtable (an investor stated that it would be helpful to see hypothetical broker and investment adviser fee arrangements for a given investment portfolio to aid in determining which arrangement may be more appropriate for the investor).

[442] *See, e.g.,* Lee1 Feedback Form ("fees should tell me the fees I can expect to pay"); Anonymous03 Feedback Form ("Create a calculator . . . where the investor fills in the amount and the fees for both scenarios are calculated"); Anonymous06 Feedback Form ("Provide monetary examples. If you invest $100, then your fees are . . ."); Anonymous24 Feedback Form (requesting "more specific examples showing specific costs"); Baker Feedback Form ("Graphic and hypothetical examples could be helpful. Mary invests $50,000 with a broker-dealer and Jane invests $50,000 with an investment adviser and present some scenarios with each . . . As fees, commissions, etc. may vary and be negotiable, a *range* of typical, usual, main-stream commission charges and asset-based fees would be helpful to alert the client to possible overcharges."); Bhupalam Feedback Form ("What would make it better is if it has samples of costs in particular with each firm a client is dealing with."); Hawkins Feedback Form ("Including some ranges as to what to expect in fees could help. Also, including information as to the impact that increased fees have on investment returns, long term, would help the average investor."); Mennella Feedback Form ("I want to know what an investment is going to cost me over my time horizon . . . .").

[443] *See* IAA Letter I; LPL Financial Letter; New York Life Letter; Primerica Letter; RAND 2018, *supra* footnote 13 (91% of participants indicated they were "very likely" or "somewhat likely" to ask a supplemental question that addressed the amount of a $1,000 investment that would go to fees and costs rather than being invested for them).

more information to help retail investors understand the fees and costs associated with their investments, particularly specific examples about how those fees could affect them.[444] Several commenters, however, objected to the inclusion of the key question addressed above because of the operational challenges present in answering such a question with respect to a particular retail investor.[445] Some argued that anticipated fees are unknown for broker-dealer customers, while others believed that it is too difficult for firms to build out systems for individualized fees.[446] Other commenters suggested eliminating this particular key question and instead requiring firms to include links to investor education materials prepared by the Commission.[447] Many commenters were concerned that this key question would impose new disclosure or recordkeeping requirements.[448]

Commenters that supported more fee disclosure had a range of suggestions as to how to include the additional information. For example, one commenter believed that if hypothetical or personal fee disclosures are included in the relationship summary, such disclosures should focus on helping investors understand the effect expenses have on an investment and should make clear that such an example is for educational purposes.[449] One individual advocated for more transparent fee information, suggesting the relationship summary provide individualized fees or a specific range of fees.[450] Another

commenter noted that, in response to a previously commissioned report revealing participants' lack of knowledge about fees as well as their desire for a better understanding of fees, a general chart or graph that depicts the effects of fees on an account would be helpful for investors.[451] Another commenter included a sample mock relationship summary with a numerical example of how the fees might impact a hypothetical account.[452]

Given the importance of fees, we want to encourage retail investors and their financial professionals to have a conversation to further discuss the particular fees and costs that would apply to the retail investor, and the impact fees and costs could have on the retail investor's investment returns over time, in order to promote investor understanding. After consideration of the comments received, we are adopting a conversation starter that is designed to elicit a more personalized discussion regarding the fees and costs that will impact the particular retail investor's account, while mitigating the concerns regarding the proposed ''Do the math for me'' question posed.[453] We believe that this conversation starter will allow financial professionals to tailor the conversation to the particular retail investor even if the financial professional does not provide precise fee information for that individual during the conversation. For instance, if the financial professional intends to recommend mutual funds to the retail investor, he or she may choose to discuss firm- and product-level fees that may apply. The financial professional should be in a position to explain the fees and costs relevant to that particular retail investor if the investor chooses a certain type of account and certain investment, even if the financial professional provides examples and estimated ranges rather than a precise prediction of how much the investor will pay. In addition, the financial professional should explain how those fees and costs will work (for example, whether they are upfront charges, taken out of the initial investment amount, taken out over time, future charges, or charged in another manner) and how the fees and costs could impact the retail investor's investment returns over time. Firms may consider including calculators, charts, graphs, tables, or

other graphics or text features to enhance an investor's understanding of these fees. Firms may also consider reviewing with their retail investors the impact of fees on the retail investor's account on a periodic basis.[454]

While we agree that examples are important to illustrate the potential impact of fees, we decline to require firms to provide a hypothetical example in the relationship summary.[455] Our intent with the proposed ''Do the math for me'' question was that it serve as a conversation starter and a prompt to encourage the retail investor to ask about the amount she would typically pay per year for the account, what would make the fees more or less, and what was included in those fees.[456] We believe that the conversation starter that is being adopted here is consistent with the proposal's intent to prompt retail investors to have a conversation with their financial professional about fees that may impact their investments and account while also addressing the concerns raised by commenters. We encourage firms to consider ways to provide more personalized disclosures to retail investors, and we will continue to consider whether to require more personalized fee disclosure, particularly as operational and technological costs fall.

b. Other Ways of Making Money, Standard of Conduct, and Conflicts of Interest

Firms will be required to include disclosure under a single heading describing their standard of conduct and a summary of certain firm-level conflicts, including the specific conflicts the proposal required.[457] The proposal required disclosure on both conflicts and the standard of conduct, but in separate sections. The final relationship summary requires discussion in one section of other firm-level revenues and conflicts of interest,

[444] *See, e.g.,* CFA Institute Letter I; CFA Letter I; Betterment Letter I; Morningstar Letter; John Hancock Letter; Comment Letter of Barbara Greenwald (Jul. 12, 2018). *See, e.g.,* Anonymous25 Feedback Form (''give examples with numbers, showing examples of hypothetical accounts''); Baker Feedback Form (''Graphic and hypothetical examples would be helpful''); Coleman Feedback Form (''Need simple examples''); Manella Feedback Form (''I want to know what an investment is going to cost me over my time horizon''); Schreiner Feedback Form (''Provide a hypothetical example with industry standard fees . . .''); *see also* Atlanta Roundtable; Houston Roundtable; Washington, DC Roundtable.

[445] *See supra* footnote 189.

[446] *See* NSCP Letter; Edward Jones Letter (noting that given the range of services available, it would be very difficult for financial professionals to fully address this question at the outset of the relationship, particularly for investors selecting transaction-based services); TIAA Letter; LPL Financial Letter; Primerica Letter; ICI Letter; SIFMA Letter (noting most firms do not currently have systems in place to allow financial professionals to answer customer-specific questions).

[447] *See* Prudential Letter.

[448] *See* Edward Jones Letter; *see also supra* Section II.A.4.

[449] *See* Invesco Letter (stating that this could be achieved by, for example, a side-by-side bar graph showing the growth of an investment gross of costs and net of costs).

[450] *See* Wahh Letter.

[451] *See* AARP Letter.

[452] *See* Betterment Letter I (Hotspex), *supra* footnote 18 (noting that investors who viewed a redesigned version of the standalone adviser relationship summary appeared to appreciate the example of how fees would impact a hypothetical account).

[453] *See supra* Section II.A.4.

[454] *See* Regulation Best Interest Release, *supra* footnote 47, at Section II.C.1.a.

[455] *See infra* Section IV.D.4 (Alternatives to the Relationship Summary) for a discussion on the inclusion of a hypothetical fee example.

[456] Proposing Release, *supra* footnote 5.

[457] Item 3.B. of Form CRS. For broker-dealers, the heading will state ''What are your legal obligations to me when providing recommendations? How else does your firm make money and what conflicts of interest do you have?''; for investment advisers, the heading will state ''What are your legal obligations to me when acting as my investment adviser? How else does your firm make money and what conflicts of interest do you have?''; and for dual registrants that prepare a single relationship summary, the heading will state ''What are your legal obligations to me when providing recommendations as my broker-dealer or when acting as my investment adviser? How else does your firm make money and what conflicts of interest do you have?''.

and the applicable standard of conduct.[458]

We are placing these disclosures together, including the related conversation starter, because we believe they will more effectively allow retail investors to understand the standards of conduct for broker-dealers and investment advisers.[459] We are also modifying the requirements for the standard of conduct and conflict of interest disclosures, as discussed in more detail below.

We continue to believe it is important to highlight the presence of conflicts and their interconnectedness with how the firm makes money. We recognize that investment advisers, broker-dealers, and their financial professionals have conflicts that affect their retail investor clients and customers and believe it is important to underscore this for retail investors.[460] Similarly, we continue to believe that it is important to provide retail investors with disclosure regarding a broker-dealer or investment adviser's legal obligations regarding the required standard of conduct in a way that is understandable for retail investors.

*Standard of Conduct.* As proposed, we are adopting a requirement that firms describe their legal standard of conduct using prescribed wording (the "standard of conduct disclosure").[461] In

a change from the proposal, however, the final instructions modify both the content of the standard of conduct disclosure[462] and its placement in the relationship summary. As discussed in more detail below, the final instructions require broker-dealers, investment advisers, and dual registrants to include a brief statement of the applicable standard of conduct.[463] In addition, as discussed above, this disclosure is required to be included in the conflicts of interest section rather than a separate standard of conduct section.

Most commenters did not object to the proposal's requirement that broker-dealers and investment advisers provide disclosure regarding their standards of conduct or that such disclosure be standardized.[464] Results of the RAND 2018 report and other investor studies and surveys indicate that retail investors view this information as helpful.[465] Similarly, commenters on Feedback Forms indicated that this information was useful.[466] In addition, the IAC recommended that investors would benefit from receiving uniform, plain-English disclosure documents with topics, such as, to the extent the Commission does not adopt a uniform fiduciary standard, "what is your legal obligation to me?"[467] Certain commenters, however, suggested that the Commission discuss generally

applicable information, including standards of conduct, in investor educational materials instead of requiring firms to do so in their relationship summaries.[468] A number of these commenters argued that this wording might unintentionally create an implied contractual relationship subject to a customer's private right of action.[469] The prescribed language describing the standard of conduct broker-dealers and investment advisers owe to their customers and clients is not intended to create a private right of action.

Many commenters, however, found that the specific wording we proposed[470] did not effectively address investor confusion concerning legal duties applicable to broker-dealers and investment advisers. Commenters indicated that the proposed wording in this section was confusing and did not clarify the applicable legal standards.[471] Some commenters argued that this section included legal jargon inaccessible to retail investors.[472] Others believed that retail investors are unlikely to understand the difference between "best interest" and "fiduciary," with some suggesting that relationship summaries more clearly define the applicable legal standards or communicate the differences between "fiduciary" and "best interest."[473] Investment advisers also expressed concern that retail investors may "wrongly" view "best interest" as a higher standard of conduct as compared to the fiduciary standard.[474]

Investor feedback through surveys and studies and in comments at roundtables and on Feedback Forms also showed some confusion. For example, some participants in investor studies and at one of the roundtables did not understand why conflicts of interest existed if broker-dealers and investment advisers were held to the standards of conduct described.[475] Investor studies and surveys showed

---

[458] *Id.*

[459] In addition, retail investors may learn more about investment advisers, broker-dealers, and investing at *Investor.gov/CRS,* which will be referenced in a relationship summary's introduction. *See* Instruction to Item 1.B. of Form CRS.

[460] *See infra* footnote 495 and accompanying text.

[461] Under the proposal, broker-dealers that offer brokerage accounts to retail investors would have been required to include the following: "[We must act in your best interest and not place our interests ahead of yours when we recommend an investment or an investment strategy involving securities.] When we provide any service to you, we must treat you fairly and comply with a number of specific obligations. Unless we agree otherwise, we are not required to monitor your portfolio or investments on an ongoing basis." The bracketed wording would have been included only if the broker-dealer offered recommendations subject to Exchange Act Rule 15*l*–1. *See* Proposed Item 3.B.(1) of Form CRS. In addition, such broker-dealers would have had to include the following: "Our interests can conflict with your interests. [When we provide recommendations, we must eliminate these conflicts or tell you about them and in some cases reduce them]." The bracketed wording would only have been included if the broker-dealer offered recommendations subject to Regulation Best Interest. *See* Proposed Item 3.B.(2) of Form CRS.

Under the proposal, investment advisers that offer investment advisory accounts to retail investors would have had to include the following: "We are held to a fiduciary standard that covers our entire investment advisory relationship with you. [For example, we are required to monitor your portfolio, investment strategy and investments on an ongoing basis.]" The bracketed wording would have been omitted if the investment adviser did not

provide ongoing advice. *See* Proposed Item 3.C.(1) of Form CRS. In addition, such investment advisers would have had to include the following: "Our interests can conflict with your interests. We must eliminate these conflicts or tell you about them in a way you can understand, so that you can decide whether or not to agree to them." *See* Proposed Item 3.C.(2) of Form CRS.

The section also required a statement that the firm's interests may conflict with a retail investor's interests and explain the firm's obligations with respect to those conflicts using prescribed wording. *See* Proposed Item 3 of Form CRS.

[462] Form CRS also includes a conversation starter regarding broker-dealers and investment advisers' standards of conduct. *See infra* footnote 495 and accompanying text.

[463] Item 3.B.(i) of Form CRS.

[464] *See, e.g.,* AARP Letter; CFA Institute Letter I; IAA Letter II.

[465] *See* RAND 2018, *supra* footnote 13 (almost one third of survey respondents selected this section as one of the two most useful; almost 60% would keep the length as is and over 15% would add detail); Cetera Letter II (Woelfel), *supra* footnote 17 (88% of survey respondents somewhat or strongly agreed "the firm's obligations to you" is a "very or somewhat important" topic); *see also* Schwab Letter I (Koski), *supra* footnote 21 ("obligations of the firm" ranked third where survey participants were asked to identify four topics as most important for a firm to communicate").

[466] Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 2(b)) (36 commenters (39%) graded the "Our Obligations to You" section of the relationship summary as "very useful" and 42 commenters (45%) graded this section as "useful").

[467] IAC Broker-Dealer Fiduciary Duty Recommendations, *supra* footnote 10.

[468] *See, e.g.,* Primerica Letter.

[469] *See* ASA Letter; Primerica Letter; Transamerica Letter (requesting a statement from the Commission that any such private right of action was not intended).

[470] *See supra* footnote 461.

[471] *See, e.g.,* AARP Letter; Betterment Letter I; CFA Letter I.

[472] *See* Comment Letter of Fisher Investments (Jul. 31, 2018) ("Fisher Letter"); *see also* Kleimann I, *supra* footnote 19; RAND 2018, *supra* footnote 13; Kleimann II, *supra* footnote 19.

[473] *See, e.g.,* AARP Letter; CFA Letter I; Comment Letter of the Financial Planning Coalition (Aug. 7, 2018) ("Financial Planning Coalition Letter").

[474] *See, e.g.,* Betterment Letter I; Fisher Letter; IAA Letter I; IAA Letter II.

[475] *See* RAND 2018, *supra* footnote 13 (in qualitative interviews, participants felt that the conflicts of interest section contradicted the "Our Obligations to You" section); Miami Roundtable.

App 83

that participants varied in their understanding of differing obligations for different account types, some viewing brokerage accounts and advisory accounts as subject to similar standards of conduct but others interpreting the section as conveying that the two account types are subject to different standards.[476] Observations reported by the RAND 2018 report, other surveys and studies and comments received on Feedback Forms demonstrated that many participants did not understand the meaning of the word ''fiduciary'' in particular.[477] Investor studies also further observed that, when presented with alternative mock-ups of a relationship summary designed to clarify this section, some investors still struggled with understanding the legal obligations of brokers and advisers.[478]

We proposed this section to address investor confusion concerning legal duties applicable to broker-dealers and investment advisers and, in combination with the key questions about the financial professional's legal obligations, to encourage a conversation between the retail investor and the financial professional about applicable standards of conduct.[479] The prescribed wording was intended to promote consistency in communicating these standards to retail investors.[480]

We continue to believe that it is appropriate for the final instructions to require broker-dealers and investment advisers to describe their standards of conduct to investors, because, as discussed above, we believe that it is important to promote retail investors' understanding of these obligations. We also agree with commenters that requiring these firms to include prescribed disclosure regarding these standards of conduct is important in achieving this goal.[481] While the final instructions generally do not require prescribed disclosure in other contexts,[482] we believe that investors should be provided with a consistent articulation of their firm's legal obligations regarding their standard of conduct and that the rationale for allowing firms flexibility to tailor their disclosure in other aspects of the relationship summary does not apply with respect to the standard of conduct. In this regard, some commenters stated that Form CRS should be an educational document, which would be a standardized document published and maintained by the Commission.[483] While the content of disclosure regarding a firm's standard of conduct should be uniform, this disclosure should appear in the relationship summary, which must be delivered to all retail investors, rather than a separate SEC-staff-created and maintained publication. In addition, prescribing language for this disclosure does not raise the same concerns that commenters raised about prescribed language generally. For example, we are permitting more flexibility in how firms describe their fees and services in response to comments that some of the prescribed wording, for example, was not necessarily applicable to their business and could make investors confused.[484]

By contrast, a legal standard of conduct, whether through an investment adviser's fiduciary duty, Regulation Best Interest, or both, will apply to all firms delivering the relationship summary that provide recommendations or investment advice, and prescribing language when describing the applicable standard. Indeed, it may be confusing to investors comparing relationship summaries among prospective firms to see the same legal standard described differently among these firms. The required statements about the legal standard of conduct are disclosures of purely factual information about the terms under which the firms' services will be made available to investors.[485]

We have determined, however, that the proposed standard of conduct disclosure may not have appropriately addressed investor confusion. While the proposal was intended to provide retail investors with simple, easily understood disclosure, we agree with commenters and results from investor studies and surveys,[486] that the relationship summary could be revised in a manner that would be more beneficial to retail investors,[487] especially in light of the similarity between broker-dealers' and investment advisers' legal obligations to retail investors with respect to their standards of conduct when providing recommendations or advice under the rules and interpretations we are adopting concurrently.[488] In this regard, we have modified the standard of conduct disclosure to include it within the conflicts of interest section of the relationship summary and to contain simplified wording that is short, plain language, and user-friendly but still describes the key components of a broker-dealer's or investment adviser's standard of conduct when providing recommendations or advice.[489]

First, we are modifying the standard of conduct disclosure so that it is required to be provided under a modified heading[490] in the conflicts of

---

[476] See RAND 2018, *supra* footnote 13; *see also* Kleimann I, *supra* footnote 19 (''Most participants did not draw a parallel between the 'best interest standard' of the Broker-Dealers and the 'fiduciary standard' of Investment Advisers. Rather, they drew a parallel between 'specific obligations' with Broker-Dealers and 'fiduciary standards' with Investment Advisers . . . [and] saw these two as similar regulatory obligations.''); Betterment Letter I (Hotspex), *supra* footnote 18 (in a survey that tested participant's comprehension after viewing a version of the proposed sample standalone adviser relationship summary, only 26% correctly identified as false a statement that broker-dealers are held to a fiduciary standard; 71% correctly identified as true that an adviser (Betterment) would be held to a fiduciary standard).

[477] See, e.g., RAND 2018, *supra* footnote 13 (''Some participants had never heard of the word, whereas others had heard it but did not know what it meant in this context. Others thought the word ''fiduciary implies acting in best interest . . .''); Kleimann I, *supra* footnote 19 (''Few participants could define 'fiduciary standard' ''); *see also* Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 4) (On 10 Feedback Forms, commenters specifically asked for a definition or better explanation of the term ''fiduciary.'').

[478] See, e.g., Kleimann II, *supra* footnote 19 (explains that, after redesign of obligations section participants still struggled to understand the implications of the fiduciary standard for advisers compared to the best interest standard for broker-dealers); Betterment Letter I (Hotspex), *supra* footnote 20 (almost one half of survey participants reviewing a version of the standalone adviser relationship summary designed by Betterment did not correctly identify as false a statement that broker-dealers are held to a fiduciary standard).

[479] See Proposing Release, *supra* footnote 5, at n.114 and accompanying text.

[480] Proposing Release, *supra* footnote 5, at n.115 and accompanying text.

[481] *But see* footnotes 468–469 and accompanying text.

[482] As discussed in more detail above, many commenters who believed that the final instructions should not require prescribed disclosure focused on other aspects of the relationship summary, such as disclosure regarding a description of a firm's services. *See supra* Section II.A.1.

[483] See, e.g., Primerica Letter.

[484] See supra Section II.A.1. One commenter noted that requiring prescribed disclosure in some circumstances may not be accurate for all business models and could mislead investors. *See* CFA Letter I.

[485] See Zauderer, 471 U.S. at 651; *Milavetz,* 559 U.S. at 250.

[486] See supra Section II.A.

[487] See, e.g., AARP Letter.

[488] See Fiduciary Release, *supra* footnote 47; Regulation Best Interest Release, *supra* footnote 47.

[489] The final instructions provide that if a required disclosure or conversation starter is inapplicable or specific wording required by the instructions is inaccurate, firms may omit or modify that disclosure or conversation starter. *See* General Instruction 2.B. to Form CRS. We note that, like the proposal, the standard of conduct disclosure distinguishes between broker-dealers that provide recommendations subject to Regulation Best Interest and broker-dealers that do not provide recommendations subject to Regulation Best Interest. *See infra* footnote 507 and accompanying text.

[490] Item 3.B. of Form CRS; *see also supra* footnote 457.

interest section.[491] While broker-dealers' and investment advisers' legal obligations regarding their standard of conduct apply not just in the context of conflicts of interest,[492] we believe that requiring this disclosure to be included in the conflicts of interest section will provide a retail investor with a greater ability to discern how a particular legal obligation regarding a standard of conduct may affect him or her by describing the application of that obligation in the context of conflicts of interest, which was a primary concern for retail investors and commenters alike.[493] In addition, this placement is supported by observations reported in the RAND 2018 qualitative interviews and another study, which indicated that some participants struggled with how to reconcile the conflicts of interest section with the legal obligations section because they were discussed separately.[494]

Second, in the conversation starter relating to this section, we are requiring firms to include the following question: "How might your conflicts of interest affect me, and how will you address them?"[495] As discussed above, we believe that including questions for investors to ask their financial professionals is an important component of the relationship summary. This question also underscores for retail investors that investment advisers and broker-dealers have conflicts that may create incentives to put their interests ahead of the interests of their retail clients and customers.[496] As a corollary, it also underscores for retail investors how investment advisers and broker-dealers address these conflicts of interest in discharging their legal obligations regarding their standards of conduct to these investors. We believe that this requirement will improve a retail investor's understanding of the standard of conduct owed by his or her financial professional by helping the investor to better understand its application to him or her.

Unlike the proposal,[497] the final instructions do not require prescribed disclosure summarizing how a firm's standard of conduct would require it to address conflicts of interest. As discussed above, commenters found the proposal's standard of conduct disclosure confusing.[498] After considering comments and observations reported in surveys and studies, we recognize that the proposed disclosures were confusing, particularly the prescribed disclosure attempting to explain concepts of full and fair disclosure, mitigation, and informed consent.[499] Accordingly, we are removing this wording to shorten the disclosure and to provide more focus on the rest of the disclosure required in this section, as we believe this should improve investor comprehension. We believe that clearly disclosing to investors that firms have an obligation to act in the best interest of a client or customer and also simultaneously have conflicts of interest is more important than describing the particular aspects of firms' general duty to disclose, mitigate, or obtain informed consent to conflicts, as applicable. Instead of this disclosure, we are requiring a conversation starter to encourage firms to discuss with retail investors how their standards of conduct require them to address conflicts of interests. In addition, we believe that the discussion prompted by the conversation starter accompanied by examples of conflicts of interest[500] will provide retail investors with specific illustrations of how a firm's standard of conduct can apply, which could encourage investors to ask more detailed questions about how firms address their conflicts.

Finally, we have modified the standard of conduct disclosure for broker-dealers and investment advisers to reduce the amount of required disclosure,[501] to focus the disclosure on the standard of conduct that applies to the provision of recommendations and advice,[502] and to require that portions of the disclosure be presented in bold and italicized font.[503] We believe that streamlining the standard of conduct disclosure and tailoring the disclosure to the type of firm providing such disclosure will clarify for retail investors the applicable legal standard of conduct to which their particular firm is subject when providing recommendations or advice or when providing broker-dealer services without recommendations.

Most commenters found the proposal's standard of conduct disclosure confusing because it included legal or technical words. For example, some commenters, and results from investor studies and surveys, indicated that many did not understand the meaning of "fiduciary" or had never heard of the word.[504] Accordingly, the modified standard of conduct disclosure both eliminates technical words, such as "fiduciary," and describes the standards of conduct of broker-dealers, investment advisers, or dual registrants using similar terminology in a plain-English manner. In particular, the final instructions use the term "best interest" to describe how broker-dealers, investment advisers, and dual registrants must act regarding their retail customers or clients when providing recommendations as a broker-dealer or acting as an investment adviser.[505] We believe that requiring firms—whether broker-dealers, investment advisers, or dual registrants—to use the term "best interest" to describe their applicable standard of conduct will clarify for retail investors their firm's legal obligation in this respect, regardless of whether that obligation arises from Regulation Best Interest or an investment adviser's fiduciary duty under the Investment Advisers Act.[506] The modified language, however, highlights a key difference in when a firm must exercise its obligation—specifically, when providing a recommendation (in the case of a broker-dealer),[507] or when acting as an

---

[491] Item 3 of Form CRS.

[492] *See* Regulation Best Interest Release, *supra* footnote 47 and Fiduciary Release, *supra* footnote 47.

[493] *See* Proposing Release, *supra* footnote 5, at Section II.B.6; *supra* footnote 475 and accompanying text.

[494] *See, e.g.,* RAND 2018, *supra* footnote 13 (noting that "[s]ome participants expressed appreciation that the firm was being transparent about its conflicts of interest, but many participants struggled with how to reconcile the information in this section with the previous 'Our Obligations to You' section."); Kleimann I, *supra* footnote 19; *see also infra* footnote 505 and accompanying text.

[495] Item 3.B.(iii) of Form CRS.

[496] *See supra* Section II.A.4.

[497] *See* Proposed Items 3.B.2. and 3.C.2. of Form CRS.

[498] *See supra* footnote 471 and accompanying text. *See also* RAND 2018, *supra* footnote 13 (noting that one "participant pointed out that the obligations section had said that any conflicts of interest would be reduced and disclosed [but] the conflicts of interest section does not mention disclosing or reducing conflicts); Kleimann II, *supra* footnote 19 ("Most participants did not understand how conflicts would be resolved . . . they read the disclosure as indicating that Brokerage Accounts were under no obligation to notify clients of a conflict . . . .").

[499] *See* Fiduciary Release, *supra* footnote 47 (discussing the concepts of full and fair disclosure, mitigation, and informed consent).

[500] Item 3.B.(ii) of Form CRS.

[501] Items 3.B.(i).a. and 3.B.(i).b. of Form CRS.

[502] Item 3.B. of Form CRS (heading).

[503] Items 3.B.(i).a., 3.B.(i).b., and 3.B.(i).c. of Form CRS.

[504] *See supra* footnote 477 and accompanying text; *see also* CFA Letter I (citing to "man on the street" interviews suggesting that average investors do not understand the term "fiduciary"); Consumer Reports Letter (commenting on the RAND 2018 report).

[505] Item 3.B.(i) of Form CRS.

[506] *See* Fiduciary Release, *supra* footnote 47; Regulation Best Interest Release, *supra* footnote 47.

[507] Item 3.B.(i).a. of Form CRS (requiring broker-dealers that provide recommendations subject to Regulation Best Interest to include (emphasis required): "*When we provide you with a recommendation,* we have to act in your best

investment adviser,[508] or either providing a recommendation or acting as an investment adviser (in the case of a dual registrant).[509] Portions of the modified standard of conduct disclosure also are required to be presented in bold and italicized font.[510] The final instructions are designed to provide retail investors with a clear understanding of when a firm's legal obligations regarding its standard of conduct is required to be discharged. In addition, with respect to broker-dealers, the modified standard of conduct disclosure, like the proposal,[511] distinguishes between broker-dealers

interest and not put our interest ahead of yours. At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the recommendations we provide you. Here are some examples to help you understand what this means,'' and broker-dealers that do not provide recommendations subject to Regulation Best Interest to include (emphasis required): ''We *do not* provide recommendations. The way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the services we provide you. Here are some examples to help you understand what this means.'').

[508] Item 3.B.(i).b. of Form CRS (requiring investment advisers to include (emphasis required): ''*When we act as your investment adviser,* we have to act in your best interest and not put our interest ahead of yours. At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the investment advice we provide you. Here are some examples to help you understand what this means.'').

[509] Item 3.B.(i).c. of Form CRS (requiring dual registrants that prepare a single relationship summary and provide recommendations subject to Regulation Best Interest to include (emphasis required): ''*When we provide you with a recommendation as your broker-dealer or act as your investment adviser,* we have to act in your best interest and not put our interest ahead of yours. At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the recommendations and investment advice we provide you. Here are some examples to help you understand what this means,'' and dual registrants that prepare a single relationship summary and do not provide recommendations subject to Regulation Best Interest to include (emphasis required): ''We *do not* provide recommendations as your broker-dealer. *When we act as your investment adviser,* we have to act in your best interest and not put our interests ahead of yours. At the same time, the way we make money creates some conflicts with your interest. You should understand and ask us about these conflicts because they can affect the services and investment advice we provide you. Here are some examples to help you understand what this means.'' Also requiring that *dual registrants* that prepare two separate *relationship summaries* follow the instructions for broker-dealers and investment advisers in Items 3.B., 3.B.(i).a. and 3.B.(i).b.).

[510] Items 3.B.(i).a. (''When we provide you with a recommendation'' and ''do not''), 3.B.(i).b. (''When we act as your investment adviser''), and 3.B.(i).c. (''When we provide you with a recommendation as your broker-dealer or act as your investment adviser,'' ''do not,'' and ''When we act as your investment adviser'') of Form CRS.

[511] *See* Proposed Item 3.B. of Form CRS.

that provide recommendations subject to Regulation Best Interest and broker-dealers that do not provide recommendations subject to Regulation Best Interest (*e.g.,* execution-only brokers). The modified standard of conduct disclosure also requires that broker-dealers, investment advisers, and dual registrants to state that conflicts of interest will remain despite the existence of these legal obligations, and to provide examples of these conflicts.[512] This change is designed to address commenters' concerns that we clarify for retail investors the interaction between broker-dealers' or investment advisers' legal obligations regarding their standards of conduct and their conflicts of interest.

*Examples of Ways the Firm Makes Money and Conflicts of Interest.* Following the standard of conduct prescribed wording, a firm must summarize the following ways in which it and its affiliates make money from brokerage or investment advisory services and investments it provides to retail investors, to the extent they are applicable to the firm.[513] The specific wording is not prescribed, but firms must include specific information to describe each of the applicable conflicts.

• *Proprietary Products:* Investments that are issued, sponsored, or managed by you or your affiliates;

• *Third-Party Payments:* Compensation received from third parties when a firm recommends or sells certain investments;

• *Revenue Sharing:* Investments where the manager or sponsor of those investments or another third party (such as an intermediary) shares with the firm revenue it earns on those investments; and

• *Principal Trading:* Investments the firm buys from a retail investor, and/or investments the firm sells to a retail investor, for or from the firm's own accounts, respectively.[514]

If none of those conflicts apply to the firm, it must summarize at least one of its material conflicts of interest that affect retail investors. Firms will be required to explain the incentives created by each of these examples.[515]

The proposal would have required a firm to discuss these same enumerated

[512] Broker-dealers that do not provide recommendations subject to Regulation Best Interest will be required to include substantially the same conflict disclosure, except that it will reflect that conflicts of interest can affect the services provided, rather than referring to recommendations. *See* Items 3.B.(i).a. and 3.B.i.(c) of Form CRS.

[513] Item 3.B.(iv) of Form CRS.

[514] Items 3.B.(iv)(a) through 3.B.(iv)(d) of Form CRS.

[515] Item 3.B.(iv) of Form CRS.

topics, to the extent they were relevant. If none of the four specified conflicts applied to a firm, the firm was not required to discuss any other conflicts that applied to its business. The proposal did not require a firm to summarize other ways its affiliates made money from the services and products the firm provides to retail investors.

We are adopting a heading that specifically asks how else the firm makes money in an effort to further highlight the firm's financial incentives and emphasize that they are intertwined with conflicts. In a departure from the proposal, the relationship summary will not include an introductory sentence explaining that the firm benefits from the services it provides to the retail investor because we believe that the new heading and required content of this item make this sentence unnecessary. We are also expanding the required conflicts disclosures to ensure that firms without any of the enumerated conflicts will still summarize at least one other material conflict of interest. Firms will include the four enumerated conflicts (if applicable) that were in the proposal, or otherwise at least one material conflict of interest, and a specific cross-reference to more detailed information about conflicts. Firms with none of the enumerated conflicts should carefully consider their operations in their entirety when selecting a material conflict to disclose to retail investors. While we think it is unlikely that a firm will not have any material conflicts to disclose, if this item is inapplicable, firms may omit or modify this disclosure.[516]

Commenters generally believed that at least some conflicts disclosure was important to include in the relationship summary, but many suggested changes to the approach, including fewer conflicts disclosures and increased use of layered disclosure.[517] Commenters generally supported requiring firms to disclose the types of conflicts of interest related to these financial incentives identified in the proposal, specifically disclosure regarding proprietary products,[518] compensation received

[516] General Instruction 2.B. of Form CRS.

[517] *See, e.g.,* IAA Letter I (suggesting leveraging disclosures made elsewhere on Part 2 of Form ADV); SIFMA Letter (suggesting leveraging disclosures that would be required by Regulation Best Interest); Fidelity Letter and Schwab Letter I (suggesting using examples of conflicts, with links to additional disclosure).

[518] *See* Fidelity Letter; Schwab Letter I; SIFMA Letter.

from third parties,[519] revenue sharing,[520] and principal trading.[521]

Investor feedback, however, was mixed. Results from the RAND 2018 survey and another survey indicated that many survey participants did not find this section to be as informative as other sections,[522] and some participants in surveys and studies indicated that this section was "difficult" or "very difficult" to understand.[523] About 75% of Feedback Form commenters rated the conflicts of interest section as either "very useful" or "useful," while narrative comments on the Feedback Forms suggested that the conflicts of interest disclosure could be clarified or otherwise improved.[524]

Several commenters suggested that we broaden the disclosures to require a firm to inform its retail investors of all of the conflicts related to its business.[525]

Commenters also supported highlighting conflicts of interest stemming from affiliates,[526] and several commenters included disclosure about affiliates in their mock-ups.[527] One industry commenter expressed concern that including solely the proposed conflicts in isolation and on a standalone basis may lead investors to think these are the only meaningful conflicts.[528] Other commenters pointed out that if only the proposed conflicts were required to be included, then some firms would not include any conflicts disclosures because their conflicts do not fall within the requisite categories.[529] Furthermore, one commenter proposed to allow firms to affirmatively state that they did not have any of these conflicts without further disclosure of the firm's other conflicts of interest.[530]

We continue to believe that the conflicts we identified in the proposal should be highlighted to retail investors in the relationship summary. Accordingly, we are including in the final instructions a requirement that firms describe these four conflicts to the extent that any of these conflicts apply to them. Like other sections in the relationship summary, this section will provide firms with more flexibility in the way in which they describe their particular conflicts so that they can tailor the summary to more accurately reflect their specific business. While we are maintaining the proposal's approach of requiring firms to provide information about certain types of conflicts applicable to them, we are not requiring firms to state as many specific details with respect to such conflicts.[531] For example, the proposed instructions would have required firms to provide specific examples of advising on

proprietary or affiliated investments or investments paying the firm a share of revenue, and we have removed such requirements from the final instructions. Instead, the relationship summary will focus on four specific ways a firm could make money from retail investors' investments to highlight that firms have conflicts of interest and encourage retail investors to ask and learn more about them.

Additionally, as some commenters pointed out, we agree that not mentioning any conflicts, or permitting the firm to affirmatively state that it has none of the enumerated conflicts, could lead retail investors to conclude that the particular firm does not have any material conflicts. Accordingly, the instructions require a firm that does not have any of the four required categories of conflicts to provide at least one example of the firm's conflicts of interest. Specially, the instructions require a firm to summarize at least one material conflict of interest that affects retail investors.[532] Firms are not expected to disclose every material conflict of interest, and should instead consider what would be most relevant for retail investors to know in deciding whether to select or retain the particular firm.

We determined to require an example of a conflict, rather than broadening the instruction to include all conflicts, as some commenters suggested. The language disclosing firms' standard of conduct and existence of conflicts includes wording to make explicit that the conflicts described in the relationship summary are examples. Firms will disclose at least one of their material conflicts of interest that impact their retail investors, and such a conflict is not limited expressly to financial conflicts. In addition, with respect to broker-dealers, this conflict disclosure (unlike the conflict disclosure obligation in Regulation Best Interest)[533] is not limited to conflicts associated with a recommendation.[534] To determine whether a conflict of interest should be disclosed, a firm could consider, for example, the benefit to the firm or its affiliate or the cost to the retail investor.

[519] See, e.g., IFS Letter; IAA Letter I; Wells Fargo Letter; Primerica Letter (suggesting including in additional layered disclosure).

[520] See Fidelity Letter (third-party revenue sharing agreements in mock-up).

[521] See mock-ups in IAA Letter I; Primerica Letter; Wells Fargo Letter.

[522] See RAND 2018, supra footnote 13 (conflicts of interest was selected as one of the two most informative sections by only 15% of survey respondents and selected as one of the two least informative by 36%); Cetera Letter II (Woelfel), supra footnote 17 (81% of survey respondents strongly or somewhat agreed that conflicts of interest is an important topic in the relationship summary, fewer than for any other topic); see also Margolis Feedback Form (stating that the conflicts of interest section is very confusing, particularly with respect to fee-sharing arrangements and referral fees).

[523] See RAND 2018, supra footnote 13 (about one third of survey respondents found this section to be difficult or very difficult to understand; in qualitative interviews, participants demonstrated misunderstanding of how this section reconciled with the "obligations to you" section and how conflicts would be resolved); Kleimann I, supra footnote 19 (interview participants had difficulty explaining how firms earned money from financial relationships that could cause conflicts and were unclear how conflicts would be resolved); Betterment Letter I (Hotspex), supra footnote 18 (noting that further improvements could be made to improve respondents understanding of differences in conflicts).

[524] Feedback Forms Comment Summary, supra footnote 11 (summary of responses to Question 2(e) and Question 4). Among the 41 Feedback Forms with narrative comments suggesting that one or more topics were too technical or could be improved, 14 included a narrative comment suggesting clarification or more information about conflicts of interest. See, e.g., Baker Feedback Form ("A sampling of possible conflict-of-interest situations is most desirable"); Bhupalam Feedback Form ("It doesn't clearly tell me whether the company will do this or not. In fact, it tells me that the company may do this and I should be fine with it."); Lee2 Feedback Form ("What can I expect and not expect about the independence and conflict-free nature of the advice"); Margolis Feedback Form ("While I agree that fee-sharing arrangements and referral fees need to be disclosed, your wording is confusing"); Schreiner Feedback Form ("highlight implications of conflicts of interest").

[525] See CFA Institute Letter I; Trailhead Consulting Letter.

[526] See Comment Letter of Jackson, Grant Investment Advisers, Inc. (Aug. 7, 2018) ("Jackson Grant Letter") (stating that other compensation (such as recommending proprietary products and products of affiliates) needs to be addressed for the investor to fully understand the potential for conflicts in any relationship).

[527] See SIFMA Letter; Wells Fargo Letter; Schwab Letter I; Comment Letter of Ron A. Rhoades, Western Kentucky University (Dec. 6, 2018) ("Rhoades Letter"); Stifel Letter (mock-up); Cetera Letter I; Betterment Letter I; ASA Letter (mock-up).

[528] IAA Letter I.

[529] See Paul Hynes Letter; Betterment Letter I (stating that their business model avoids the proposed conflicts of interest, and proposing an alternate "alignment of interest" section for the section on conflicts of interest).

[530] Betterment Letter I (indicating that the firm had none of the proposed enumerated conflicts).

[531] In addition, the IAC recommended that the Commission adopt a uniform, plain English document that covers basic information about conflicts of interest, among other topics. See IAC Broker-Dealer Fiduciary Duty Recommendations, supra footnote 10.

[532] As discussed in Section II.A.1. above, if a required disclosure is inapplicable to a firm's business, a firm would be permitted to omit or modify that disclosure. General Instruction 2.B. We believe, however, that most firms will have at least one material conflict of interest that they would need to disclose.

[533] See Regulation Best Interest Release, supra footnote 47, at Section II.C.1 (Disclosure Obligation).

[534] For instance, broker-dealers may include conflicts that affect product offerings to customers who do not obtain recommendations from the firm.

We believe that an exhaustive list of conflicts in the relationship summary would not as effectively enhance investor understanding of conflicts. More details could inundate investors with information that makes it difficult for them to focus on the fact that conflicts exist and will impact them, and they may not focus on or may not realize the importance of the specific conflicts firms are required to summarize. We also agree with comments that disclosure of all conflicts would be too cumbersome [535] and lengthy for the relationship summary's intended purpose—that is, highlighting certain aspects of a firm and its services to help retail investors to make an informed choice and to find additional information about a topic. The approach we are adopting of requiring firms to provide examples will make retail investors aware that these types of conflicts exist, but will avoid providing a laundry list of conflicts. Taking into account all of these considerations, we believe that these examples of conflicts of interest should be highlighted for the investor. We recognize that this will be a high-level summary of conflicts and generally will not be a complete description. As discussed further below, we are requiring firms to include a link to additional information on their conflicts of interest.[536] This layered disclosure will facilitate investors' ability to review additional information on conflicts while balancing the high-level nature of the relationship summary.

*Conversation Starter and Additional Information.* To promote access to information about other firm conflicts, as well as to clarify for retail investors the application of their firms' standard of conduct as discussed above, firms will include a conversation starter prompting investors to ask about conflicts and a hyperlink to additional information. Specifically, firms must include the following question as a conversation starter: "How might your conflicts of interest affect me, and how will you address them?"[537]

The proposal included a longer key question asking about the most common

conflicts of interest in the firm's advisory and brokerage accounts and how the firm will address those conflicts when providing services to the retail investor.[538] One commenter noted that this key question elicited the same information as provided elsewhere in the relationship summary.[539] We shortened the question to avoid this duplication. In addition, the firm's other conflicts will be disclosed as part of the summary of material conflicts or in the additional conflicts disclosure that firms will cross-reference. The new conversation starter is meant to complement these other disclosures and elicit more information about how specifically the firm's conflicts of interest could affect the retail investor.

Firms will also include specific cross-references to more detailed information about conflicts of interest that, at a minimum, includes the same or equivalent information to that required about a firm by the Form ADV, Part 2A brochure and/or Regulation Best Interest.[540] If a firm is a broker-dealer that does not provide recommendations subject to Regulation Best Interest, to the extent it prepares more detailed information about its conflicts, it must include specific references to such information.[541] Firms may include hyperlinks, mouse-over windows, or other means of facilitating access to this additional information and to any additional examples or explanations of such conflicts of interest.[542]

Over 60% of RAND 2018 survey respondents indicated that they would be "very likely" or "somewhat likely" to click on hyperlinks related to conflicts of interest.[543] While the proposal did not require firms to link to additional information with respect to their conflicts, several commenters suggested that the relationship summary include a link to all conflicts.[544] We believe that

using layered disclosure through cross-references to a more detailed discussion of conflicts balances the Commission's objective of concise disclosure while providing interested investors with tools to easily access additional, useful information.

Many industry commenters also suggested that Regulation Best Interest's and Form CRS's conflicts disclosures be coordinated, and that any conflict disclosure obligations under Regulation Best Interest should be satisfied upon delivery of the relationship summary.[545] We recognize that broker-dealers may need to disclose additional conflicts or disclose additional conflicts at a point in time other than at the beginning of the relationship with an investor or other times the relationship summary is required to be delivered.[546] The relationship summary will provide a high-level summary for investors so that they can engage in a conversation with their financial professional about investment advisory or brokerage services, and so that the investors can choose the type of service that best meets their needs. Furthermore, as discussed above in Section II.A (Presentation and Format),[547] we believe it is essential to limit the length of the relationship summary and keep the disclosures focused, highlighting these topic areas while encouraging questions and providing access to additional information. As a result, we believe many firms may not be able to capture all of the necessary disclosures about their conflicts in this short summary disclosure.[548] The layered disclosure approach should strike a balance between alerting investors of these conflicts while keeping with the intended purpose of the relationship summary.

Finally, some commenters argued that the relationship summary should require firms to explain how conflicts will be mitigated or minimized, or that firms should be permitted to state that

---

[535] *See, e.g.,* CFA Letter I; SIFMA Letter; Prudential Letter.

[536] Item 3.B.(iv) of Form CRS (Firms must include specific references to more detailed information about their conflicts of interest that, at a minimum, include the same or equivalent information to that required by the Form ADV, Part 2A brochure and Regulation Best Interest, as applicable, and broker-dealers that do not provide recommendations subject to Regulation Best Interest, to the extent they prepare more detailed information about their conflicts, must include specific references to such information.).

[537] Item 3.B.(iii) of Form CRS.

[538] Proposed Item 8 of Form CRS. The proposal included the following question: "What are the most common conflicts of interest in your advisory and brokerage accounts? Explain how you will address those conflicts when providing services to my account."

[539] *See* LPL Financial Letter.

[540] Item 3.B.(iv) of Form CRS.

[541] Item 3.B.(iv) of Form CRS.

[542] Item 3.B.(iv) of Form CRS. *See also* General Instructions 3. and 4. of Form CRS (instructions applicable to electronic delivery). For further discussion of these provisions, *see supra* Section II.A.3. and footnotes 156 and 158 and accompanying text, and Section II.B.2.(b) and footnotes 348–349.

[543] RAND 2018, *supra* footnote 13. *But see* Kleimann II, *supra* footnote 19 (only one interview participant said he would use the link in the conflicts of interest section).

[544] *See, e.g.,* Fidelity Letter (mock-up); IAA Letter I (mock-up); *see also* Kleimann II, *supra* footnote 19 (redesigned relationship summary suggests a link to more information about conflicts).

[545] *See, e.g.,* ACLI Letter; Cambridge Letter; Massachusetts Letter; FSI Letter I; MassMutual Letter; Schwab Letter I; SIFMA Letter; Transamerica Letter; *see also* Regulation Best Interest Release, *supra* footnote 47, at n.438 and accompanying text.

[546] *See* Regulation Best Interest Release, *supra* footnote 47.

[547] *See supra* Section II.A (Presentation and Format).

[548] For example, investment advisers must make full and fair disclosure to all clients of all material facts relating to the advisory relationship, including conflicts of interest. *See* Fiduciary Release, *supra* footnote 47; General Instruction 3 to Form ADV Part 2. Broker-dealers subject to Regulation Best Interest must also provide full and fair disclosure of material facts, including all material facts relating to conflicts of interest that are associated with the recommendation. *See* Regulation Best Interest Release, *supra* footnote 47.

**33536**    **Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations

a particular firm has fewer conflicts than other firms.[549] While we agree that firms should have increased flexibility to describe conflicts, as discussed above, we are not permitting this additional disclosure. The purpose of this section is to highlight for investors that conflicts of interest exist.

c. Payments to Financial Professionals

Finally, in a change from the proposal, we are adding an additional section to Item 3 that requires a firm to include in its relationship summary the heading "How do your financial professionals make money?"[550] A firm will summarize how its financial professionals are compensated (including cash and non-cash compensation) and the conflicts of interest those payments create.[551] For example, the firm must, to the extent applicable, disclose whether financial professionals are compensated based on factors such as: The amount of client assets they service; the time and complexity required to meet a client's needs; the product sold (*i.e.,* differential compensation); product sales commissions; or revenue the firm earns from the financial professional's advisory services or recommendations.[552]

In the Proposing Release, we asked if the relationship summary should include disclosure of compensation received by financial professionals and the related conflicts of interest such compensation might pose. Several commenters supported including disclosures related to the conflicts of interest that financial professionals' compensation arrangements create.[553] Several commenters suggested featuring financial professionals' compensation in the relationship summary, including in a separate section.[554] A number of commenters illustrated the importance

of these disclosures by including sections discussing financial professionals' compensation in their mock-ups.[555] These disclosures generally included more detailed information about how broker-dealers and investment advisers earn money from various sources, in addition to what the retail investor may pay directly.

We have concluded that disclosure of conflicts of interest related to a financial professional's compensation is useful to highlight for retail investors in the relationship summary.[556] In particular, the commenters' mock-up disclosures highlighted the benefit of separately summarizing financial professionals' compensation to help retail investors identify and assess these conflicts of interest that may affect the services they receive.[557] We believe that requiring specific information on financial professional compensation and conflicts related to that compensation will provide improved clarity from the proposal and better help retail investors understand these conflicts and how they might impact a financial professional's motivation. We also believe it is useful to specifically highlight this conflict for retail investors, as it is a different type of payment and a different type of conflict than a conflict at the firm level. We further believe that by placing this discussion directly after the discussion on fees, costs and conflicts, it will mitigate potential investor confusion. This approach is also consistent with Regulation Best Interest, which treats compensation to financial professionals and the conflicts of interest that such compensation creates as material facts that must be disclosed.[558]

4. Disciplinary History

The relationship summary will include a separate section about whether a firm or its financial professionals have reportable disciplinary history and where investors can conduct further research on these events.[559] Inclusion of a separate

disciplinary history section is a change from the proposed relationship summary, where this information was included in the Additional Information section.[560] Certain commenters suggested that we remove the requirement that firms disclose whether or not they have disciplinary history.[561] Similarly, some commenters suggested that any disciplinary information should simply direct retail investors to resources where they could review a firm's or a representative's disciplinary history, without any firm-specific information in the relationship summary.[562]

We have concluded, however, based on consideration of commenters and investor feedback received through surveys and studies, at roundtables and in Feedback Forms, to include the disciplinary history as a separate section of the relationship summary.[563] These comments emphasized the importance of disciplinary history information and advocated that it should be placed in a more prominent position than as part of the Additional Information section.[564] Commenters also generally supported firm-specific disclosure as to whether the firm has disciplinary history.[565] About 70% of commenters on Feedback Forms responded that they would seek

---

[549] *See* AARP Letter; Betterment Letter I.

[550] Item 3.C. of Form CRS.

[551] Item 3.C.(i) of Form CRS.

[552] Item 3.C.(ii) of Form CRS.

[553] *See* Proposing Release, *supra* footnote 5 (requesting comments on whether there are other considerations related to fees and compensation that we should require firms to highlight for retail investors that were not captured in the proposal); *see also* Jackson Grant Letter; Schwab Letter I; SIFMA Letter; Stifel Letter.

[554] *See, e.g.,* Schwab Letter I; SIFMA Letter; Stifel Letter; Jackson Grant Letter. One industry commenter also stated that we should focus on conflicts that result from a financial professional's financial compensation. SIFMA Letter (also stating this view is consistent with FINRA's 2013 Conflicts of Interest Report, which specifically identified financial compensation as the major source of conflicts of interest for associated persons); *see also* CCMC Letter (investor polling) *supra* footnote 21 (in connection with investor polling, noting that investors identify explaining "own compensation" as one of three "issues that matter most" to them).

[555] *See* Primerica Letter and ASA Letter (including disclosure stating that financial professional compensation is typically affected by the amount of client assets the financial professional is responsible for and the fees and commissions those assets generate); *see also* SIFMA Letter and Schwab Letter I (including disclosure on how the firm pays professionals who provide investment advice).

[556] *See* Regulation Best Interest Release, *supra* footnote 47, at Section II.C.1.b.

[557] *See, e.g.,* Primerica Letter; SIFMA Letter; Schwab Letter I.

[558] *See* Regulation Best Interest Release, *supra* footnote 47.

[559] As proposed, we used the terms "legal or disciplinary events." However, we are adopting the

terms "legal or disciplinary history" for greater precision.

[560] *See* Proposing Release, *supra* footnote 5, at nn.270–71 and accompanying text.

[561] *See, e.g.,* Wells Fargo Letter (arguing that any firm-based aspect of disciplinary disclosure is not fair to representatives of the firm without any history of wrongdoing); *see also* ACLI Letter; New York Life Letter (arguing that any firm-specific disciplinary history disclosure would prejudice large firms).

[562] *See, e.g.,* LPL Financial Letter (mock-up suggested that "[f]or free tools to research our firm, our financial advisors and other firms, including our disciplinary events . . ." investors should visit BrokerCheck or IAPD).

[563] The IAC also recommended including disciplinary history in the relationship summary. *See* IAC Broker-Dealer Fiduciary Duty Recommendations, *supra* footnote 10 ("[W]e encourage the Commission to develop an approach to disclosure of disciplinary record that makes it easier for investors to assess the significance of disclosed events, particularly for firms that may have a large number of relatively insignificant technical violations.").

[564] *See, e.g.,* CFA Letter I ("The required disclosure regarding disciplinary events does not give adequate prominence to this issue."); NASAA Letter ("The descriptor 'Additional Information' is too vague to describe the important information in this section [and] should be recast as 'Disciplinary History and Customer Rights and Remedies . . . .'"); Trailhead Consulting Letter ("Legal and Disciplinary Actions are very important for an investor to consider and should not be 'hidden' in an Additional Information section. This information deserves its own separate section."); IAA Letter.

[565] *See, e.g.,* CFA Letter I ("We believe this information is important enough to be highlighted under its own separate heading, 'Do you have a disciplinary record?'").

out additional information about a firm's disciplinary history.[566] Similarly, more than 70% of investors surveyed in the RAND 2018 report reported that they were ''very likely'' or ''somewhat likely'' to look up the disciplinary history of a financial professional.[567]

However, results from investor studies and surveys and investor comments on Feedback Forms supported the concern that the Additional Information section may not provide enough salience. For example, in the RAND 2018 survey, the Additional Information section was most often selected as one of the two least useful sections of the proposed relationship summary.[568] On Feedback Forms, commenters rated the Additional Information section as ''very useful'' or ''useful'' less often than any other section of the relationship summary.[569] One investor study suggested a reason for these mixed results, finding that participants would skip the Additional Information section, in part because they did not understand that the websites in the section would allow them to review the disciplinary history

of the investment adviser or broker-dealer that they were considering.[570] Comments on Feedback Forms similarly suggest that information about how to research a firm's disciplinary information should be presented more prominently and more simply in the relationship summary.[571] After taking comments into consideration, we believe that a separate disciplinary history section is appropriate, with a requirement that firms explicitly state whether or not they have legal or disciplinary history so that investors can find the information in the summary with ease.

The section will begin with the heading: ''Do you or your financial professionals have legal or disciplinary history?'' Firms will answer ''yes'' or ''no,'' depending upon whether they or one of their financial professionals have a triggering event enumerated in the instructions, as discussed below. The proposed relationship summary required a statement that the firm has legal and disciplinary events but did not require an affirmative statement that a firm or its financial professionals did not have disclosable events. We are requiring a ''No'' answer in the final instructions where applicable, given the importance of disciplinary history and to provide a complete answer to the question in the heading.

Regardless of whether firms report a ''Yes'' or ''No'' answer as to whether they or their financial professionals have legal or disciplinary history, the relationship summary will direct the retail investor to visit *Investor.gov/CRS* to research the firm and its financial professionals, as proposed.[572] This is

responsive to RAND 2018 survey results, which indicated that 37% of investors did not know where to research disciplinary history.[573] Directing retail investors to the search tool is also consistent with the Commission's Office of Investor Education and Advocacy initiative to encourage retail investors to do background checks on financial professionals and is intended to increase awareness of available search tools.[574] In addition to disciplinary history, the search tools also can provide useful information regarding registration and licensing and financial professional employment history.

The triggering events for a statement that a firm does have legal or disciplinary history are the same as proposed.[575] Following the heading, firms will be required to state ''Yes'' in response to the heading questions if they currently disclose or are required to disclose (i) disciplinary information per Item 11 of Part 1A or Item 9 of Part 2A of Form ADV,[576] or (ii) legal or disciplinary history per Items 11A–K of Form BD (''Uniform Application for

---

[566] *See* Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 3(e)). Some commented that, before viewing the relationship summary, they had not known that they could ask or how to check. *See, e.g.,* Anonymous02 Feedback Form (''did not know how to do that''); Anonymous03 Feedback Form (''I looked up my advisor while reading through the summary''); Anonymous26 Feedback Form (''Now I know where to go''); Anonymous29 Feedback Form (''I didn't know if asked—they had to answer''); *see also* Philadelphia Roundtable (investor participant noting that ''checking your broker's disciplinary record'' is ''something that people should do'').

[567] *See* RAND 2018, *supra* footnote 13 (''More than 40 percent of respondents reported being very likely to look up the disciplinary history based on the information provided in the Relationship Summary, and another 35 percent reported being somewhat likely to look it up. Only 5 percent reported being not at all likely to do so.''); *see also* Kleimann II, *supra* footnote 19 (study participants who viewed a redesigned form reported that they would research the company they are doing business with''); *but see* Schwab Letter I (Koski), *supra* footnote 21 (only 20% of survey participants selected ''How to find disciplinary information about a firm or its representatives'' when asked to select the four most important topics for a firm to communicate, from a list of 11 topics).

[568] *See* RAND 2018, *supra* footnote 14 (Additional Information section rated as one of the two ''least informative'' sections by 66% of respondents; only 3% selected it as one of the two ''most informative''); *see also* Cetera Letter II (Woelfel), *supra* footnote 17 (84% of survey respondents strongly or somewhat agreed that the ''how to find additional information about a broker/adviser'' and ''how to find additional information about the firm,'' fewer than for most other topics out of a series of nine topic options).

[569] Feedback Forms Comment Summary, *supra* footnote 11 (summary of responses to Question 2(f)) (Additional Information section rated as ''not useful'' or ''unsure'' by more commenters (20%) and ''very useful'' by fewer commenters (32%) relative to other sections of the relationship summary).

[570] *See* Kleimann I, *supra* footnote 19; *see also* Kleimann II, *supra* footnote 19 (noting that interview responses to links in the relationship summary ''suggest that use is dependent on perceived relevance . . . Some of that relevance can be built in with more specific descriptions of what can be found at the link.'').

[571] Some commenters on Feedback Forms suggested moving the Additional Information section forward in the relationship summary. *See* Anonymous14 Feedback Form (''Recommend add this to beginning of the pamphlet''); Durgin Feedback Form (''Additional info needs to be moved up''); Salkowitz Feedback Form (''Move this section to near the beginning''); Starmer2 Feedback Form (''put Key Questions and Additional Info up front to stimulate a conversation.''). Others commented that the presentation should be clearer. *See, e.g.,* Anonymous28 Feedback Form (''Would be better titled 'How to find out about us' or 'Other information you need to know'''); Anonymous29 Feedback Form (''plain language''); Calderon Feedback Form (''say expressly where that information is found, with linked URL's''); Shepard Feedback Form (''the easier it is to access, the better''); Baker Feedback Form (''Please explain IAPD'').

[572] Item 4.D.(i) of Form CRS. *Investor.gov* includes a search function that searches the databases Web CRD® and IARD, and this search

will direct an investor to BrokerCheck and/or IAPD, as appropriate, where the investor can research disciplinary history.

[573] *See* RAND 2018, *supra* footnote 13. By contrast, 19% of surveyed investors cited the time and effort required and 10% of surveyed investors indicated that they would not look up a firm or financial professional's disciplinary history because the information was not very important to the investor. *Id.* We believe this is also consistent with the IAC's recommendation to ''look at whether it might be beneficial to adopt a layered approach to [disciplinary history] disclosures, with the goal of developing a more abbreviated, user-friendly document for distribution to investors.'' IAC Broker-Dealer Fiduciary Duty Recommendations, *supra* footnote 10.

[574] *See https://www.investor.gov/research-before-you-invest.*

[575] *See* Proposed Item 7.B. of Form CRS. In the proposal, firms with such events would have been required to state the following: ''We have legal and disciplinary events.'' *Id.* For reasons discussed *supra,* we believe the question-and-answer formatting will make the relationship summary more useful to investors.

[576] Item 4.B. of Form CRS. Generally, investment advisers are required to disclose on Form ADV Part 2A any legal or disciplinary event, including pending or resolved criminal, civil and regulatory actions, if it occurred in the previous 10 years, that is material to a client's (or prospective client's) evaluation of the integrity of the adviser or its management personnel, and include events of the firm and its personnel. *See* Amendments to Form ADV, Investment Advisers Act Release No. 3060 (Jul. 28, 2010) [75 FR 49233 (Aug. 12, 2010)], at 22–27 (''Brochure Adopting Release''). Items 9.A., 9.B., and 9.C. provide a list of disciplinary events that are presumptively material if they occurred in the previous 10 years. However, Item 9 requires that a disciplinary event more than 10 years old be disclosed if the event is so serious that it remains material to a client's or prospective client's evaluation of the adviser and the integrity of its management.

Broker-Dealer Registration'') [577] except to the extent such information is not released to BrokerCheck pursuant to FINRA Rule 8312.[578] Regarding their financial professionals, firms will determine whether they need to include an affirmative statement based on legal and disciplinary information on Form U4,[579] Form U5,[580] or Form U6.[581] In particular, firms will be required to state ''Yes'' if they have financial professionals for whom disciplinary history is reported per Items 14 A through M on Form U4, Items 7A or 7C through F on Form U5,[582] or Form U6 except to the extent such information is not released to BrokerCheck pursuant to FINRA Rule 8312.[583] Firms that do not have disclosable events for themselves or their financial professionals in

connection with these provisions will state ''No'' in answer to the heading.[584]

As noted above, several commenters opposed the approach of requiring firms to indicate in their relationship summaries whether they or their financial professionals have disciplinary history, questioning the value of the disclosure to retail investors,[585] or citing to prejudicial or competitive concerns.[586] These firms recommended that the relationship summary include only a prompt for investors to research the disciplinary history of the firm or financial professional, directing them to *Investor.gov/CRS*.[587]

We recognize that the disciplinary history of firms and their financial professionals is already publicly available, as commenters have noted. From studies and investor feedback, however, we also understand that investors view disciplinary history as significant to their decision of whether or not to engage with a firm or a financial professional, but in many cases are unaware of the need for researching or the tools available to research whether disciplinary history exists.[588] Highlighting disciplinary

history in this way provides information to retail investors before they enter into a relationship with a particular firm and financial professional and a ''yes'' response will alert retail investors that there is disciplinary history they may want to research, review, or discuss with their financial professional.[589] As there is no required waiting period between the delivery of the relationship summary to the retail investor and the time that the retail investor may enter into a relationship with or an order placed by a firm, highlighting the disciplinary information allows the retail investor time to consider any disciplinary history before moving forward or to monitor the relationship or financial professional more closely if the retail investor decides to move forward at that time. By basing this disclosure on information that is already reported elsewhere and also requiring the relationship summary to include details about where to find more information, we give retail investors the tools to learn more about firms and financial professionals.

We are not persuaded by commenters who believed that these disclosures are unduly prejudicial or would have sufficient competitive concerns and argued that we should not require this information. Firms or financial professionals would have the opportunity to provide more information about and encourage retail investors to ask follow-up questions regarding the nature, scope, or severity of any disciplinary history, so that retail investors have the information they need to decide on a relationship. In particular, financial professionals who themselves have no disciplinary history can make clear that a ''Yes'' disclosure in response to the heading question relates to the firm and other personnel (if applicable) and not to them. While we recognize that larger firms might be more likely to respond affirmatively to this question than smaller firms, we have determined to require this disclosure because we believe that, on balance, the potential benefit to the retail investor of seeing at a glance whether a firm or its financial professionals have disciplinary history (which may encourage the investor to conduct further research or monitor the relationship or financial professional more closely) justifies requiring the disclosures notwithstanding the concerns raised by commenters,

---

[577] Item 11 of Form BD requires disclosure on the relevant Disclosure Reporting Page (''DRP'') with respect to: (A) Felony convictions, guilty pleas, ''no contest'' pleas or charges in the past ten years; (B) investment-related misdemeanor convictions, guilty pleas, ''no contest'' pleas or charges in the past ten years; (C) certain SEC or the Commodity Futures Trading Commission (''CFTC'') findings, orders or other regulatory actions; (D) other federal regulatory agency, state regulatory agency, or foreign financial regulatory authority findings, orders or other regulatory actions; (E) self-regulatory organization or commodity exchange findings or disciplinary actions; (F) revocation or suspension of certain authorizations; (G) current regulatory proceedings that could result in ''yes'' answers to items (C), (D) and (E) above; (H) domestic or foreign court investment-related injunctions, findings, settlements or related civil proceedings; (I) bankruptcy petitions or SIPC trustee appointment; (J) denial, pay out or revocation of a bond; and (K) unsatisfied judgments or liens. Some of these disclosures are only required if the relevant action occurred within the past ten years, while others must be disclosed if they occurred at any time.

[578] Under FINRA Rule 8312, FINRA limits the information that is released to BrokerCheck in certain respects. For example, pursuant to FINRA Rule 8312(d)(2), FINRA shall not release ''information reported on Registration Forms relating to regulatory investigations or proceedings if the reported regulatory investigation or proceeding was vacated or withdrawn by the instituting authority.'' We believe it is appropriate to limit disclosure in the relationship summary to disciplinary information or history that would be released to BrokerCheck.

[579] Form U4 (Uniform Application for Securities Industry Registration or Transfer) requires disclosure of registered representatives' criminal, regulatory, and civil actions similar to those reported on Form BD as well as certain customer-initiated complaints, arbitration, and civil litigation cases.

[580] Form U5 (Uniform Termination Notice for Securities Industry Registration) requires information about representatives' termination from their employers.

[581] Form U6 (Uniform Disciplinary Action Reporting Form) is used by SROs, regulators, and jurisdictions to report disciplinary actions against broker-dealers and associated persons. This form is also used by FINRA to report final arbitration awards against broker-dealers and associated persons.

[582] Item 7(b) of Form BD (Internal Review Disclosure) is not released to BrokerCheck by FINRA, pursuant to FINRA Rule 8312(d)(3).

[583] Item 4.B.(iii) of Form CRS.

[584] Item 4.C. of Form CRS.

[585] *See* NSCP Letter (''NSCP members believe that extending the disclosure of disciplinary history to be included in Form CRS would add additional administrative burden and costs outweighing any true benefit to the customer.''); Wells Fargo Letter (''such a broad statement will add no value'').

[586] *See* Wells Fargo Letter (arguing that the statement will lead clients to draw unfair conclusions about both the firm and its financial professionals); New York Life Letter (arguing that the statement prejudices larger, established firms that will usually have a small number of disclosure events to report for current or former registered representatives); ACLI Letter (same).

[587] *See* Wells Fargo Letter; New York Life Letter; ACLI Letter.

[588] *See, e.g.,* Staff of the Securities and Exchange Commission, *Study Regarding Financial Literacy Among Investors as Required by Section 917 of the Dodd-Frank Wall Street Reform and Consumer Protection Act* (Aug. 2012), at iv, v, xiv, 37, 73, 121–23 and 131–32, at nn.317–19 and accompanying text, *available at https://www.sec.gov/news/studies/2012/917-financial-literacy-study-part1.pdf* (''917 Financial Literacy Study'') ([A]bout 76.5% of the online survey respondents reported that, in selecting their current adviser, they did not use an SEC-sponsored website to find information about the adviser. 73% of respondents stated that they would check IAPD if they were made aware of its existence. Of that subset—those who reported not using an SEC-sponsored website—approximately 85.2% indicated that they did not know that such a website was available for that purpose. Of that majority (*i.e.,* a further subset)—those who were unaware of such a website—approximately 73.5% reported that they would review information about their adviser on an SEC-sponsored website if they knew it were available; *see also* RAND 2018, *supra* footnote 13 (when investors were asked why they would not look up disciplinary history, 37 percent of all respondents indicated that they did not know where to get the information, whereas 19 percent of all respondents indicated that it would take too much time or effort).

[589] *See* Miami Roundtable (investor noting that she had gone on *Investor.gov* to learn about the disciplinary history of her financial professional and noting that she was ''happy when [she] checked'' the website).

App 91

particularly given the importance that commenters placed on disciplinary history.

A few commenters suggested revisions to the specific events that would trigger a disciplinary event disclosure in the proposed relationship summary.[590] We have considered these comments but have determined to adopt the triggers as proposed. As noted in the Proposing Release, those disclosable events are those that we believe may generally assist retail investors in evaluating the integrity of a firm and its financial professionals.[591] Additionally, these triggering events are already disclosed on existing systems for other regulatory purposes. As such, there will not be additional regulatory burdens for a determination of disciplinary history for the purposes of the relationship summary.

Different requirements between other aspects of Form ADV or Form BD and the relationship summary also could cause confusion and compliance uncertainty. One commenter suggested basing the relationship summary disciplinary disclosure around a standardized set of events that would trigger disclosures specific to the relationship summary.[592] This approach may have led to advisers or broker-dealers having publicly listed disclosure events on BrokerCheck or IAPD yet answering "No" to a question of whether they or their financial professionals have legal or disciplinary history. We believe that result could have been confusing or misleading to retail investors. By contrast, the approach we adopt allows for consistency across public information as to whether or not a firm or financial professional has a disciplinary event and leverages existing disclosure reporting systems. We believe that this consistency justifies not adopting a standardized set of events triggering disclosure on the relationship summary. Furthermore, the statement encouraging retail investors to visit *Investor.gov/CRS* for more information will help retail investors to more easily learn and compare additional details from the firms themselves and from their existing disclosures.[593]

Firms also will include the following conversation starter: "As a financial professional, do you have any disciplinary history? For what type of conduct?"[594] This conversation starter is intended to take the place of a similarly worded key question.[595] However, because this item's heading asks a similar question about disciplinary history with respect to the firm, we believe that the conversation starter would be most useful specifically with respect to the financial professional. This question will allow retail investors to assess that financial professional's disciplinary history as well as engage in further discussion about those events or any events applicable to the firm. In addition, this conversation starter is designed to encourage a discussion about any differences between the firm's disciplinary history and that financial professional's history, if applicable (*e.g.,* if the financial professional has no disciplinary history while his or her firm has reportable discipline necessitating a "Yes" response to the heading question).

## 5. Additional Information

At the end of the relationship summary, firms will state where the retail investor can find additional information about their brokerage or investment advisory services, as proposed.[596] This information should be disclosed prominently at the end of the relationship summary. However, unlike the proposed relationship summary, the adopted instructions do not prescribe the different references that a broker-dealer and investment adviser must include for such direction and do not require a heading for the section.[597]

This approach is consistent with our intent to provide firms additional flexibility to provide information most useful to retail investors.[598] In addition, removing the prescribed wording from this section avoids potentially duplicative disclosure, as the Introduction now includes a statement that free and simple tools are available to research firms and financial professionals at *Investor.gov/CRS. Investor.gov* provides investors access to search for firms on BrokerCheck and IAPD, references to both of which would have been required in prescribed wording in the proposed relationship summary.[599] The flexibility is also responsive to observations reported in surveys and studies and comments from investors at roundtables and on the Feedback Forms indicating that investors found the proposed "Additional Information" section less helpful compared to other sections in the relationship summary.[600] Consistent with our layered disclosure approach, we encourage hyperlinks, QR codes, or other means of facilitating access for retail investors to obtain additional information.[601]

We also are not adopting the proposed requirement that firms include information on how retail investors should report complaints about their investments, investment accounts, or financial professionals in the relationship summary.[602] While some

---

[590] *See* CFA Institute Letter I ("For parity and comparability, we suggest requiring that the specific events that would trigger disclosure under these requirements be the same for both investment advisers and broker-dealers"); Comment Letter of the Business Law Section of the State Bar of Texas, Investment Funds Committee (Aug. 7, 2018) (advocating that an investment adviser disclose that it has a disciplinary event only based on Item 9 of Part 2A of Form ADV, rather than both Items 9 and 11).

[591] *See* Proposing Release, *supra* footnote 5, at nn.271–73 and accompanying text.

[592] *See* CFA Institute Letter I.

[593] Item 4.D. of Form CRS.

[594] Item 4.D.(ii) of Form CRS.

[595] *See* Proposed Item 8.8 of Form CRS ("Do you or your firm have a disciplinary history? For what type of conduct?"); *see also supra* Section II.A.4 (discussing removal of the "Key Questions to Ask" section).

[596] *See* Proposed Item 7.E. of Form CRS. We are also requiring a statement of where retail investors can request a copy of the relationship summary.

[597] As proposed, broker-dealers would have had to state that, to find additional information, retail investors should visit BrokerCheck, the firm's website, and the retail investor's account agreement. In addition, broker-dealers would link to a portion of their website with up-to-date information and a link to BrokerCheck. If the firm did not have a public website, the broker-dealer would have been required to include a toll-free telephone number where retail investors could request up-to-date information. *See* Proposed Item 7.E.1. of Form CRS.

Investment advisers would have had to state that, to find additional information, retail investors should see the firm's Form ADV brochure on IAPD

on *Investor.gov* and any brochure supplement the firm provides. If the adviser maintains its current Form ADV on a public website, it would have had to state the website address. If the adviser had no such website, a link to *adviserinfo.sec.gov* would have had to be provided as well as a toll-free telephone number where retail investors could request up-to-date information. *See* Proposed Item 7.E.2. of Form CRS.

[598] *See supra* footnotes 76–83 and accompanying text.

[599] *See* Item 1.A. of Form CRS. As discussed above, we are requiring firms to include the reference to *Investor.gov/CRS* in the Introduction in part to highlight to retail investors the ability to research firms and financial professionals as well as the ability to review educational materials at the website. *See supra* Section II.B.1.

[600] *See supra* footnote 568–569 and accompanying text; *see also* Philadelphia Roundtable (confusion regarding the difference between FINRA and the Commission as well as a statement that there are "too many websites" in the Additional Information section).

[601] *See supra* Section II.A.3.

[602] The proposal included the following instruction in the Additional Information section: "To report a problem to the SEC, visit *Investor.gov* or call the SEC's toll-free investor assistance line at (800) 732–0330. [To report a problem to FINRA, [ ].] If you have a problem with your investments, investment account or a financial professional, contact us in writing at [insert your primary business address]." If you are a broker-dealer or *dual registrant,* include the bracketed language. It is your responsibility to review the current

Continued

commenters supported including information on how retail investors could report complaints,[603] others disagreed with this approach[604] or suggested that it may not be information that is as critical at the beginning of a relationship.[605] Commenters submitting their own mock-ups of the relationship summary likewise took different approaches as to whether or not to include this information.[606]

We are requiring a conversation starter in this part of the relationship summary, which incorporates and adapts a key question from the proposal: ''Who is my primary contact person? Is he or she a representative of an investment adviser or a broker-dealer? Who can I talk to if I have concerns about how this person is treating me?'' [607] With required text features to highlight this conversation starter, as well as information from the Introduction to direct retail investors to *Investor.gov/CRS,* we believe that retail

investors will be able to find information on who to contact and how to report a complaint to the firm at the appropriate time, and *Investor.gov* includes links to submit questions and complaints to the Commission. In light of the mixed feedback from commenters and the changes to the form designed to enhance flexibility and usability, we are not requiring firms to include more detailed information about submitting complaints, as proposed, to enable the disclosures in the relationship summary to focus on other information about the firm and its services.

We are also requiring firms to include a telephone number where retail investors can request up-to-date information and request a copy of the relationship summary.[608] This differs from the proposal, which required only those firms that do not have a public website to include a toll-free number that retail investors may call to request documents.[609] Some of the commenter mock-ups included a telephone number even though the firms maintained a public website.[610] A commenter who recommended including a contact telephone number in the relationship summary did not specify that it must be toll-free and we received a mock-up with a placeholder for a telephone number that was not specifically toll-free.[611]

After consideration of these comments and mock-ups, we determined that all firms should include a telephone number in the relationship summary. We continue to believe it is important for retail investors to have firm contact information in the event that they would like to request disclosures and there is no public website for that firm that the investor may easily access. In addition, we anticipate that requiring all firms to include a telephone number will more readily accommodate retail investors who prefer communicating with firms over the phone and will facilitate their requests for up-to-date information and a copy of the relationship summary. If firms do not already have a toll-free telephone number, they will not be required to obtain one to comply with the requirements of the relationship summary. Firms will have the flexibility to decide whether or not the telephone number they provide in their relationship summary will be toll-free.

### 6. Proposed Items Omitted in Final Instructions

The proposal included two sections that we are not adopting as separate sections in the relationship summary.[612] As discussed above, the relationship summary will not include a separate section for ''Key Questions to Ask;'' instead, the topics covered by the proposed key questions will be integrated throughout the relationship summary as headings to items or as ''conversation starters.'' [613]

The relationship summary will also not include the Comparisons section for investment advisers and broker-dealers, as proposed. Standalone broker-dealers would have been required to include the following information, using prescribed wording, about a generalized retail investment adviser: (i) The principal type of fees; (ii) services investment advisers generally provide; (iii) the applicable legal standard of conduct; and (iv) certain incentives based on an investment adviser's asset-based fee structure. For standalone investment advisers, this section would have required them to include parallel categories of information regarding broker-dealers.[614]

Many commenters opposed including discussions comparing investment advisers and broker-dealers. Some commenters stated that it was inappropriate for the Commission to require firms to describe products and services that they do not offer and about which they may have limited or no expertise.[615] Other commenters had concerns with the prescribed wording, which they said may increase investor confusion or be misleading with prescribed wording that would not reflect the likely relationship that an investor would have with a specific firm.[616] Some commenters believed that the wording in the comparison section

telephone numbers for the SEC and FINRA no less often than annually and update as necessary.'' Proposed Item 7.D. of Form CRS.

[603] *See, e.g.,* NASAA Letter (suggesting that the Additional Information section be recast as ''Disciplinary History and Customer Rights and Remedies'' and include, among other things, a discussion of the legal rights and the remedies available to customers in the event of breach (including whether the customer will be subject to mandatory arbitration) and contact information for regulators where investors may file complaints or ask questions about disciplinary history); *see also* Philadelphia Roundtable (investor expressing that she would like to know where to file a complaint, but not realizing that the desired information was on the proposed relationship summary).

[604] *See* Wells Fargo Letter (''We also don't agree that Form CRS needs to get into details on how an investor can report a problem. Such a disclosure is outside of the overall purpose of the summary and will detract from both the readability and length of the document.'').

[605] *See* Trailhead Consulting Letter (''[T]his document is encouraged or required to be delivered prior to entering into a relationship or transaction, so hopefully problems have yet to occur. The account statements or investment adviser reports should include statements informing investors how to report a problem.''). *But see* Cetera Letter II (Woelfel) (86% of survey respondents strongly or somewhat agreed that ''how to report a problem with your investments'' was an important topic to be discussed in the relationship summary and 84% of survey respondents strongly or somewhat agreed that ''how to report a problem with a financial professional'' was an important topic; within a range of 88% to 81% of ratings for 9 different topics).

[606] *Compare, e.g.,* LPL Financial Letter (including hyperlinks to BrokerCheck and IAPD in part ''to report a problem'' in mock-up) and IAA Letter I (no reference to problems or reporting complaints in mock-up).

[607] Item 5.C. of Form CRS. In comparison, the analogous proposed key question was ''Who is the primary contact person for my account, and is he or she a representative of an investment adviser or a broker-dealer? What can you tell me about his or her legal obligations to me? If I have concerns about how this person is treating me, who can I talk to?'' Proposed Item 8.10 of Form CRS.

[608] Item 5.B. of Form CRS.

[609] *See* Proposed General Instruction 8.(a) to Form CRS.

[610] *See, e.g.,* Fidelity Letter (mock-up) and Primerica Letter (mock-up).

[611] *See* IAA Letter I and Primerica Letter (mock-up).

[612] In addition to the reasons discussed below, removing these sections also may help alleviate concerns from commenters that the proposed relationship summary was trying to ''do too much.'' *E.g.,* Schwab Letter I; SIFMA Letter; Comment Letter of UBS Global Wealth Management (Aug. 7, 2018) (''UBS Letter''); *see also* AARP Letter (suggesting that the relationship summary be shortened to avoid ''information overload''); CFA Institute Letter I (the proposed relationship summary is ''too wordy, lacks design elements that engage the reader, and, in many respects, is too nuanced for the average retail investor who is trying to understand the differences between broker-dealers and investment advisers'').

[613] *See supra* Section II.A.4.

[614] *See* Proposed Item 5 of Form CRS.

[615] *See, e.g.,* ACLI Letter.

[616] *See* IAA Letter I (arguing that the wording of the section was ''too boilerplate'' and would prohibit firms from providing useful information about what the specific investor's relationship would be with a firm).

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33541**

favored broker-dealers over investment advisers.[617] Others indicated that the comparisons should allow for discussions regarding insurance products.[618] As an alternative, some commenters suggested that the Commission include the information intended for the proposed Comparison section on the Commission's website as educational material,[619] and that firms could link to the educational material from their relationship summaries.[620] Given such concerns and suggestions, a number of mock-ups did not include a comparison section.[621]

Comments on Feedback Forms indicated that this section was less useful than other sections of the relationship summary; fewer commenters rated this section as either "very useful" or "useful" compared to the other sections of the relationship summary.[622] Many narrative comments on Feedback Forms relating to this section (even from those who graded the section as "useful") indicated that these commenters did not find this section informative and wanted more information to help them compare firms.[623] Feedback on this section from the RAND 2018 report and other surveys and studies was limited because the RAND 2018 report, and other surveys and studies, generally focused on the sample proposed dual registrant relationship summary. However, in a survey that focused on the standalone investment adviser relationship summary, most survey respondents indicated that this section was not useful in helping them to understand differences between firms.[624]

We have determined not to require a separate Comparisons section in the relationship summary for broker-dealers and investment advisers that are not dual registrants. In lieu of the separate section with prescribed wording, the final instructions include several requirements that will help facilitate comparisons among firms. First, each relationship summary will be required to provide answers to the same questions in a standard order.[625] Second, dual registrants will be required to provide either a combined relationship summary describing both brokerage and advisory services, presenting the information with equal prominence and in a manner that facilitates comparison of the two types of services or, alternatively, will be required to provide separate relationship summaries that clearly distinguish and facilitate comparison of the firm's brokerage and investment advisory services.[626] Similarly, a firm that has an affiliate providing brokerage or advisory services may choose to prepare a single relationship summary, or two separate relationship summaries, discussing the services provided by both firms, but only if the relationship summary or summaries are designed in a manner that facilitates comparison of the brokerage and investment advisory services.[627]

These changes enhance the relationship summary's usability and design and, we believe, will improve comparisons among firms by retail investors using the relationship summaries. The relationship summaries will have differentiated, firm-specific information in a comparable format as compared to the proposed approach of requiring prescribed and more generalized information. We believe this comparability and differentiation among firm relationship summaries will enhance usability for retail investors. In addition, removing the prescribed wording allows firms to describe their services and fees more accurately while simultaneously mitigating concerns commenters raised regarding potentially misleading or inappropriate prescribed wording. Investors seeking more general information about investment advisers and broker-dealers will know they can refer to educational materials that are available on the Commission's website, *Investor.gov,* and elsewhere for investor research and education, including *Investor.gov/CRS,* which the relationship summary's Introduction must reference.[628]

*C. Filing, Delivery, and Updating Requirements*

We are adopting the filing, delivery, and updating requirements with several modifications from the proposal. Firms will file copies of their relationship summaries with the Commission, will update the disclosures when the information becomes materially inaccurate, and will communicate any changes to retail investors who are existing clients or customers. The delivery requirements are designed to ensure a relationship summary is provided before or at the time a retail investor enters into a relationship with the firm and when changes are made to the services the firm provides.

We made several modifications to the proposed requirements in response to comments, in order to make it easier for retail investors to discern changes in updated relationship summaries, streamline the filing requirements, and provide greater clarity regarding several of the delivery requirements. As described further below, some of the key revisions include:

• *Broker-Dealer Initial Delivery Obligations.* Broker-dealers will be required to deliver the relationship summary before or at the earliest of: (i) A recommendation of an account type, a securities transaction, or an investment strategy involving securities; (ii) placing an order for the retail investor; or (iii) the opening of a brokerage account for the retail investor, instead of before or at the time the retail investor first engages the broker-dealer's services, as proposed. We encourage delivery of the relationship summary to new or prospective clients or customers at the first possible opportunity, including the initial point of contact.

• *Other Delivery Obligations.* Firms will deliver the relationship summary to existing retail investor clients and customers before or at the time firms open a new account that is different

---

[617] *See* CFA Letter I (arguing that "there are a number of statements . . . that many, if not most, advisers would likely object to" in the prescribed wording); IAA Letter I.

[618] *See* New York Life Letter; Northwestern Mutual Letter.

[619] *See* IAA Letter I; Schnase Letter; Pickard Djinis and Pisarri Letter.

[620] *See, e.g.,* SIFMA Letter; Schwab Letter I.

[621] *See, e.g.,* IAA Letter I; SIFMA Letter; Schwab Letter I. Other mock-ups included a "first level" disclosure that involved generalized comparisons between investment advisers and broker-dealers, with the relationship summary including firm-specific information. *See* LPL Financial Letter; Primerica Letter.

[622] Twenty-nine commenters (about 30%) on Feedback Forms rated the comparison section as "Very Useful"; 39 (about 40%) rated it as "Useful"; 17 (almost 20%) responded that they did not find this section useful or were unsure. *See* Feedback Forms Comment Summary (responses to Question 2(d), *supra* footnote 11).

[623] *See, e.g.,* Anonymous07 Feedback Form ("Any example of how you use either or both for achieving goals"); Anonymous13 Feedback Form (". . . list what is the same for both, as much is, then only list differences in separate columns. What I really want is what's the differences"); Brantley Feedback Form ("when is it best to use each type of account—maybe some examples"); Coleman Feedback Form (". . . a word that suggests when one type of relationship would be more beneficial"); Hawkins Feedback Form ("There are so many different account types and investment options. More information needed"); Murphy Feedback Form ("Too complicated to follow"); Schreiner Feedback Form ("highlight differences").

[624] *See* Betterment Letter I (Hotspex), *supra* footnote 18 (only 23% of survey respondents indicated that the disclosure on a version of the sample proposed standalone adviser relationship summary helped them to understand how other investment firms differed from Betterment).

[625] *See supra* Section II.A.2.

[626] *See supra* Section II.A.5. Additionally, and as noted above, firms that prepare two separate relationship summaries must deliver both relationship summaries to each retail investor with equal prominence and at the same time, without regard to whether the particular retail investor qualifies for those retail services or accounts. *See id.; see also* General Instruction 5.A. to Form CRS.

[627] *See* General Instruction 5.B.(i) to Form CRS.

[628] *See* Item 1.B. of Form CRS.

**33542**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

from the retail investor's existing account, as was proposed. In addition, firms will deliver the relationship summary when they recommend that the retail investor roll over assets from a retirement account, or when they recommend or provide a new service or investment outside of a formal account (*e.g.,* variable annuities or a first-time purchase of a direct-sold mutual fund through a "check and application" process). In response to commenters' concerns, these changes are intended to replace the proposed instruction that firms deliver the relationship summary when making changes to an existing account that would "materially change the nature and scope" of the firm's relationship with the retail investor with more concrete delivery triggers.

• *Highlighting Changes.* In a change from the proposal, we are adding a requirement that firms delivering updated relationship summaries to existing clients or customers also highlight the most recent changes by, for example, marking the revised text or including a summary of material changes. This additional disclosure must be filed as an exhibit to the unmarked amended relationship summary (but would not be counted toward the two-page or four-page limit, as applicable).

• *New Filing Requirements.* As proposed, we are requiring that firms file the relationship summary using a text-searchable format. However, in response to comments received, we are also requiring that the filings contain machine-readable headings to enhance the ability to compare information submitted by different firms. Also in response to comments, which we solicited on this topic, we are changing the system that broker-dealers will use to file Form CRS from EDGAR, as proposed, to Web CRD®. Dual registrants will be required to file their relationship summaries using both IARD and Web CRD®.

Finally, we are revising the definition of retail investor to align more closely with the definition of "retail customer" in Regulation Best Interest. As discussed, below, we do not believe that this results in substantive changes in the definition as proposed.

1. Definition of Retail Investor

For purposes of Form CRS, "retail investor" is defined as "a natural person, or the legal representative of such natural person, who seeks to receive or receives services primarily for personal, family or household purposes." [629] The proposal defined the

term retail investor as "a prospective or existing client or customer who is a natural person (an individual), including trusts or other similar entities that represent natural persons, even if another person is a trustee or managing agent." This definition was different from the definition of "retail customer" in proposed Regulation Best Interest [630] because the relationship summary was intended for an earlier stage of the relationship between an investor and a financial professional, and we thought it would be beneficial for all natural persons to receive information to facilitate their account choices. [631]

Many commenters recommended that we use a single definition for both "retail investor" and "retail customer" because consistent definitions would facilitate compliance and administrative efficiency. [632] Commenters were concerned that differences between the definitions could result in a requirement to deliver the relationship summary to broker-dealer customers who may not be "retail customers" for purposes of Regulation Best Interest. [633] Many commenters further recommended that the definitions of "retail investor" and "retail customer" should both be conformed to rules issued by FINRA, which use a net worth test to distinguish institutional and "retail" customers. [634] Commenters also asked us to clarify that the relationship summary need not be delivered to certain professionals retained to represent a natural person [635] and address whether

participants in workplace retirement plans will be retail investors who should receive the relationship summary. [636]

In response to comments, the final instructions adopt a definition of retail investor that is consistent with the definition of retail customer in Regulation Best Interest, but differs to reflect differences between the relationship summary delivery requirement and the obligations of broker-dealers under Regulation Best Interest, including that the relationship summary is required whether or not there is a recommendation and covers any prospective and existing clients and customers (*i.e.,* a person who "seeks to receive or receives services") of investment advisers as well as broker-dealers. [637] Specifically, under Regulation Best Interest, retail customer will be defined as "a natural person, or the legal representative of such natural person, who: (A) Receives a recommendation of any securities transaction or investment strategy involving securities from a broker, dealer, or a natural person who is an associated person of a broker or dealer; and (B) uses the recommendation primarily for personal, family, or household purposes." [638] Like the definition of retail customer in Regulation Best Interest, the definition of retail investor in the final instructions includes natural persons [639] who seek to receive or receive services "primarily for personal, family or household purposes" and the "legal representatives of such natural persons." In addition, we provide an interpretation on who would be considered to be a "legal representative" for purposes of this definition.

The proposed definition of retail investor did not include the phrase "personal, family or household purposes." No commenters addressed whether or not to include this phrase in the Form CRS definition of retail investor, other than commenting

[629] General Instruction 11.E. to Form CRS.

[630] *Compare* Proposed Exchange Act rule 15*l*–1(b)(1) (defining retail customer to mean "a person, or the legal representative of such person, who: (A) Receives a recommendation of any securities transaction or investment strategy involving securities from a broker, dealer, or a natural person who is an associated person of a broker or dealer; and (B) Uses the recommendation primarily for personal, family, or household purposes.").

[631] Proposing Release, *supra* footnote 5, at Section II, at n.29.

[632] *See* Committee of Annuity Insurers Letter ("a standardized definition . . . would be more efficient and enable firms to more easily comply"); ICI Letter ("a single definition . . . would provide important administrative efficiencies, facilitate compliance, and avoid confusion"); *see also* Bank of America Letter; CFA Letter I; Cetera Letter I; Fidelity Letter; Comment Letter of Franklin Resources, Inc. (Aug. 6, 2018); Invesco Letter; Comment Letter of Morgan Stanley Smith Barney, LLC (Aug. 7, 2018) ("Morgan Stanley Letter"); Oppenheimer Letter; Comment Letter of Raymond James Financial (Aug. 7, 2018) ("Raymond James Letter"); SIFMA Letter; TIAA Letter; Transamerica Letter.

[633] *See, e.g.,* SIFMA Letter; TIAA Letter.

[634] *See, e.g.,* SIFMA Letter (referring to FINRA Rule 2210); Cetera Letter I; Investacorp Letter; Morgan Stanley Letter; TIAA Letter; UBS Letter; Wells Fargo Letter.

[635] *E.g.,* Comment Letter of the American Bankers Association (Aug. 7, 2018) ("American Bankers Association Letter"); IAA Letter I; ICI Letter; Oppenheimer Letter; Prudential Letter; T. Rowe Letter; Wells Fargo Letter.

[636] *E.g.,* Comment Letter of Empower Retirement (Aug. 2, 2018) ("Empower Retirement Letter"); Fidelity Letter; Comment Letter of Groom Law Group (Aug. 7, 2018) ("Groom Law Letter"); IAA Letter I; ICI Letter; IRI Letter; Invesco Letter; Comment Letter of the National Association of Government Defined Contribution Plans (Aug. 7, 2018) ("NAGDA Letter"); Oppenheimer Letter; Comment Letter of SPARK Institute, Inc. (Aug. 7, 2018) ("SPARK Letter"); T. Rowe Letter.

[637] *See* Regulation Best Interest Release, *supra* footnote 47, at Section II.B.3.c.

[638] Exchange Act Rule 15*l*–1(b)(1).

[639] The proposed definition used the language "a natural person (an individual)." While the final definition excludes the parenthetical reference to "an individual," we do not intend any substantive change because a reference to a natural person typically includes any individual.

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations **33543**

generally that they supported conforming both definitions. Commenters did comment and request clarification of this aspect of the definition of ''retail customer'' in Regulation Best Interest.[640]

We believe the final definition of retail investor remains consistent with our objective to provide all natural persons with information to facilitate their understanding of their choices among firms and types of accounts. Firms will be required to deliver the relationship summary to individuals seeking brokerage and investment advisory services in connection with any of the many different reasons that an individual may seek these services, including, for example, retirement, education and other personal, family or household saving and investing objectives. The final definition of retail investor will exclude natural persons seeking these services for commercial or business purposes, such as, for example, where an employee seeks services for an employer or an individual seeks services for a small business or on behalf of another non-natural person entity such as a charitable trust. However, firms must deliver the relationship summary to natural persons who might be seeking services for a mix of personal and commercial or other non-personal purposes, such as a sole proprietor or small business owner who may engage a firm or financial professional for multiple accounts and for personal as well as business purposes. Where firms do not know whether a natural person is seeking services for something other than personal, family, or household purposes at the beginning of a relationship, they may treat that natural person as a retail investor for purposes of delivery of the relationship summary.[641]

As in the proposal, the final retail investor definition will capture natural persons without any distinction based on net worth. While a number of commenters argued that firms should not be required to deliver a relationship summary to investors that meet certain asset or net worth thresholds,[642] others

opposed narrowing the definition based on a net worth test or other test.[643] We continue to believe that the retail investor definition should not distinguish based on a net worth or other asset threshold test and that all individual investors would benefit from clear and succinct disclosure regarding key aspects of available brokerage and advisory relationships. As noted in the proposal, section 913 of the Dodd-Frank Act defines ''retail customer'' to include natural persons and legal representatives of natural persons without distinction based on assets or net worth.[644] Further, we believe that it also may be impractical to include a net worth or other test based on asset thresholds in the definition because it could be difficult for firms to determine a retail investor's net worth at the outset of the relationship when the relationship summary must be provided.

To conform definitions, the final definition of retail investor substitutes the language ''the legal representative of such natural person'' for language in the proposal referring to ''a trust or other similar entity that represents natural persons, even if another person is a trustee or managing agent of the trust.''[645] We believe this is a clarification and not a substantive change from the proposal because it retains coverage of trusts and other similar legal entities that represent natural persons, and the proposal contemplated that certain legal representatives, *e.g.,* a trustee or managing agent, would receive a relationship summary on behalf of a trust or other similar legal entity. Further, we clarify that we interpret a

''legal representative'' of a natural person to cover only non-professional legal representatives (*e.g.,* a non-professional trustee that represents the assets of a natural person and similar representatives such as executors, conservators, and persons holding a power of attorney for a natural person).[646] In referring to non-professional legal representatives, we intend to capture persons who are acting on behalf of natural persons and are not regulated financial services professionals retained by natural persons to exercise independent professional judgment. This responds to those commenters who argued that it should not be necessary to provide a relationship summary to regulated professionals in the financial services industry, such as registered investment advisers and broker-dealers, corporate fiduciaries (*e.g.,* banks, trust companies and similar financial institutions) and insurance companies, and the employees or other representatives of such advisers, broker-dealers, corporate fiduciaries and insurance companies.[647] Accordingly, non-professional legal representatives would not include such regulated financial services professionals. We agree with these commenters that delivery of the relationship summary to such regulated financial services professionals retained by natural persons to exercise independent judgment will not further our objective of facilitating retail investors' understanding of their account choices.[648] Importantly, however, this will not relieve firms or financial professionals retained to represent the assets of natural persons from their own obligations to deliver the relationship summary to clients or customers who are retail investors.

Commenters offered varying points of view about whether participants of workplace retirement plans should be treated as retail investors who receive the relationship summary. Some recommended that the definition of retail investor should include plan participants.[649] Others argued against

---

[640] *See* Regulation Best Interest Release, *supra* footnote 47, at Section II.B.3a (describing comments).

[641] As explained in Regulation Best Interest Release, *supra* footnote 47, at Section II.B.3a, we interpret ''personal, family or household purposes'' as used in the definition of retail customer to mean *any* recommendation to a natural person for his or her account, and we believe that, pursuant to the Care Obligation of Regulation Best Interest, broker-dealers are able to obtain sufficient facts to determine the purpose for which a recommendation will be used.

[642] For example, SIFMA's comments refer to FINRA Rule 2210, which treats accounts of natural

persons with $50 million or more in assets as institutional investors; SIFMA explains that these investors are ''among the wealthiest and most sophisticated customers and often have multiple professional fiduciaries and advisers, apart from their broker-dealer relationships'' and ''do not function as 'retail customers' ''; *see also* Cetera Letter I; Investacorp Letter; Morgan Stanley Letter; TIAA Letter; UBS Letter; Wells Fargo Letter. Other commenters suggested different tests of financial sophistication, *e.g.,* Advisers Act Rule 205–3 definition of ''qualified clients'' (a $2 million net worth test), *see* Comment Letter of American Investment Council (Aug. 7, 2018) (''American Investment Council Letter''); Comment Letter of Loan Syndications and Trading Association (Aug. 7, 2018); Comment Letter of the Managed Funds Association Alternative Investment Management Association (Aug. 7, 2018); or the section 2(a)(51) of the Investment Company Act definition of ''qualified purchaser'' ($5 million net worth test). *See* Fidelity Letter; Pickard Djinis and Pisarri Letter.

[643] *See, e.g.,* Morningstar Letter (''any unequal distribution of this information would be arbitrary''); *see also* AARP Letter; CFA Letter I; Trailhead Consulting Letter.

[644] Proposing Release, *supra* footnote 5, at Section II, at text accompanying nn.31–32.

[645] General Instruction 11.E. to Form CRS.

[646] *See* ICI Letter (recommending that the Commission ''make explicit in the definition of 'retail investor' that a 'legal representative' of a natural person ''means an executor, conservator, or a person holding a durable power of attorney for a natural person'').

[647] *See, e.g.,* American Bankers Association Letter; Bank of America Letter; IAA Letter I; Invesco Letter; ICI Letter; Oppenheimer Letter; Prudential Letter; T. Rowe Letter.

[648] *See, e.g.,* American Bankers Association Letter; Bank of America Letter; IAA Letter I; Invesco Letter; ICI Letter; Oppenheimer Letter; Prudential Letter; T. Rowe Letter.

[649] *See* ICI Letter; Invesco Letter; Oppenheimer Letter; Trailhead Consulting Letter; *see also* IRI

Continued

**33544**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

delivering a relationship summary to plan participants, explaining that a relationship summary would confuse participants and would duplicate other required disclosures.[650] Several commenters suggested that only plan participants that choose to retain a firm or financial professional in connection with assets in his or her plan account should receive a relationship summary.[651] Commenters also asked us to clarify whether the definition of retail investor would include participants in plans not subject to ERISA, such as governmental or other non-ERISA workplace retirement plans meeting requirements under section 403(b) or 457 of the Internal Revenue Code of 1986, as amended (''Internal Revenue Code'' or ''Code''), and individual retirement accounts (''IRAs'') (including SEPs and SIMPLE IRAs).[652]

In response to comments, we are clarifying that the relationship summary applies when retail investors seek services for their retirement accounts as well as non-retirement accounts because retirement savings is a personal, household or family purpose. Accordingly, the definition of retail investor will include a natural person seeking to select and retain a firm to provide brokerage or advisory services for his or her own retirement account, including but not limited to IRAs and individual accounts in workplace retirement plans, such as 401(k) plans and other tax-favored retirement plans.[653] For example, firms will be

required to deliver a relationship summary to plan participants seeking advice about whether to take a distribution from a 401(k) plan or other workplace retirement plan and how to invest that distribution. Similarly, a firm will be required to deliver a relationship summary to a plan participant seeking to retain the firm to provide brokerage or advisory services for the participant's individual account held in a 401(k) plan or other workplace retirement plan.[654]

However, participants in 401(k) plans and other workplace retirement plans will not be retail investors for purposes of the Form CRS delivery obligation when making certain ordinary plan elections that do not involve selecting or retaining a firm to provide brokerage or advisory services. We understand, for example, that participants in workplace retirement plans generally do not choose the firm that provides brokerage or advisory services in connection with certain ordinary plan elections, such as whether to enroll in the plan, make or increase plan contributions, or how to allocate contributions and plan account balances among a designated menu of plan investment options. We designed the relationship summary to assist investors in understanding their choices when they seek to engage a firm to provide brokerage and advisory services. Even if a financial professional or other firm representative assists a participant directly, *e.g.*, at an enrollment meeting or through a call center interaction, the participant generally would not be making the type of account or firm choice contemplated by a relationship summary because the plan's sponsor or another representative designated by the terms of the plan (*e.g.*, a trustee or other fiduciary or other responsible party) (a ''plan representative'') already has selected the

firm, has negotiated the terms of service, and remains responsible for supervising the firm.[655] We agree with commenters that delivering a relationship summary under these circumstances could be confusing to participants and duplicative of already required disclosures. Accordingly, plan participants should not be viewed as ''seeking or receiving services'' for purposes of the Form CRS definition of retail investor when they are merely electing among plan features offered by firms and financial professionals retained and supervised by a plan representative. This includes a participant's decision to invest his or her account balance through an in-plan self-directed brokerage account option or to select an in-plan managed account service option, where a plan representative retains and supervises the broker-dealer or investment advisory firm providing such services to the plan.

Finally, commenters asked us to address whether workplace retirement plans and their representatives (*e.g.*, plan sponsors, trustees, and other fiduciaries) and service providers will be retail investors entitled to receive Form CRS. In the proposal, we excluded workplace retirement plans and their representatives from the definition of retail investor.[656] Most commenters agreed with this approach; some noting that workplace retirement plans and their representatives would not benefit from receiving a Form CRS.[657] Two

---

Letter (permit delivery of Form CRS using media approved by the plan sponsor).

[650] *See* Empower Retirement Letter (noting that plans covered by ERISA ''have named fiduciaries responsible for ensuring each plan is operated in the best interest of plan participants . . . [and who] are already obligated pursuant to ERISA § 404a–5 to provide participants with detailed disclosures related to those investment choices.''); Groom Law Letter (noting that ''the decision to engage a broker-dealer for purposes of providing services to the plan is made at the plan sponsor level and not at the participant level); Comment Letter of Principal Financial Group (Aug. 7, 2018) (''Principal Letter'').

[651] *See* T. Rowe Letter (noting that Form CRS should apply ''if an individual chooses to retain a broker-dealer or advisor to provide recommendations or management regarding his or her retirement account . . . [but] ''if a plan fiduciary selects a broker-dealer or adviser to provide such services to its plan participants . . . we do not think Form CRS should apply); Prudential Letter; SPARK Letter.

[652] *See* ICI Letter; Invesco Letter; Oppenheimer Letter; T. Rowe Letter.

[653] Such IRAs include, for example, individual retirement accounts and individual retirement annuities described by section 408(a) and (b) of the Internal Revenue Code, ''simplified employee pensions'' (or (SEPs) described by section 408(k) of the Code, and simple retirement accounts described by section 408(p) of the Code (SIMPLE IRAs). In response to commenters, we also clarify that workplace retirement plans include any arrangement available at a workplace that provides

retirement benefits or allows saving for retirement, including, for example, any 401(k) plan or other plan that meets requirements for qualification under Code section 401(a), deferred compensation plans of state and local governments and tax-exempt organizations described by Code section 457, and annuity contracts and custodial accounts described by Code section 403(b). Likewise, the definition of retail investor includes natural persons seeking brokerage or advisory services for other tax-favored savings arrangements such as an Archer Medical Savings Account described by Code section 220(d), a Health Savings Accounts described by Internal Revenue Code section 223(d) and any similar tax-favored health plan saving arrangement, a Coverdell education savings account described by Code section 530 and a qualified tuition program or ''529 plan'' established pursuant to Code section 529.

[654] For example, we understand that, although not common, some 401(k) plans and other individual account plans provide participants total discretion to choose an investment adviser or broker-dealer to provide services for their individual plan account. *See, e.g.,* 29 CFR 2550.404c–1(f), Example 9.

[655] This approach differs from our approach to defining retail customer for purposes of Regulation Best Interest to recognize differences between the relationship summary requirement and the obligations of broker-dealers under Regulation Best Interest. As discussed in the Regulation Best Interest Release, *supra* footnote 47, at Section II.B.3.a, a participant receiving recommendations for the participant's individual account held in a 401(k) or other workplace retirement plan would be a retail customer for purposes of Regulation Best Interest.

[656] Proposing Release, *supra* footnote 5, at Section II.

[657] *See* IAA Letter I (''Institutional trusts such as employee benefit or pension plans . . . would not benefit from a Form CRS''); T. Rowe Letter (''. . . where a plan fiduciary selects a broker-dealer or adviser to provide such services to its plan participants . . . we do not think Form CRS should apply. ERISA and governmental plans are already subject to extensive disclosures to participants and rules related to conflicts. Consequently, a Form CRS in this context would be duplicative of existing disclosures and cause potential confusion, without providing any additional benefits''); *see also* Comment Letter of the American Retirement Association (Aug. 3, 2018) (professional investment experts retained by a plan to perform investment advisory services in a fiduciary capacity should not be included); Fidelity Letter (''establish a uniform definition . . . [that] excludes ERISA and non-ERISA employer sponsored retirement plans regardless of size, as well as their sponsors, trustees and advisers . . .''); ICI Letter (a retail investor should not include retirement plans, their sponsors or trustees or plan fiduciaries); NAGDA Letter

commenters argued that workplace retirement plans and their representatives should receive Form CRS.[658]

We understand that plan representatives of workplace retirement plans typically are not seeking or receiving services primarily for personal, family or household purposes when they consider whether to engage a broker-dealer or investment adviser to provide services to a retirement plan established, maintained and operated by an employer to provide pension or retirement savings benefits to employees. Further, the relationship summary—designed to provide succinct information relevant to individual retail investors—is not designed to facilitate account and firm choices by the representatives of these workplace retirement plans. In this regard, we understand that plan representatives typically seek brokerage and advisory services bundled together with, or that will be complimentary with, other services supporting the plan's establishment, maintenance and operation, such as plan design, recordkeeping and other administrative services, and compliance services to meet applicable requirements under the Internal Revenue Code and ERISA (or applicable state law for non-ERISA governmental plans).[659]

Accordingly, the final definition of retail investor does not include most workplace retirement plans or their plan representatives seeking services for a plan established, maintained and operated by an employer to provide pension or retirement savings benefits to employees, because such plans and their representatives are not seeking services primarily for personal, family or household purposes. We note, however, that some plan representatives may participate under their employer's workplace plan, *e.g.,* in the case of a workplace IRA or other workplace retirement plan is established and maintained by a sole proprietor or other self-employed individual that includes one or more employees in addition to the plan representative. If a plan representative who decides the services arrangements for a workplace retirement

plan is a sole proprietor or other self-employed individual who will participate in the plan, the plan representative also would be a retail investor seeking services for personal, family or household purposes and must receive a copy of the firm's relationship summary.[660]

2. Filing Requirements

As proposed, all broker-dealers and investment advisers will file their relationship summaries with the Commission, and the relationship summaries will be accessible via the Commission's public website, *Investor.gov,*[661] in addition to each firm's website. There are several reasons we are requiring the relationship summaries to be filed with the Commission. First, the public will benefit by being able to access any firm's relationship summary by using one website, *Investor.gov.* This should make it easier to make comparisons across firms. Second, some firms may not maintain a website, and therefore their relationship summaries will not otherwise be accessible to the public. Third, by having firms file their relationship summaries with the Commission, Commission staff can more easily monitor the filings for compliance. Commenters generally supported requiring broker-dealers and investment advisers to file their relationship summaries with the Commission.[662]

We are requiring that the filing be in a text-searchable format, as proposed, and in addition, the final instructions will require that the filing be structured with machine-readable headings. Two commenters advocated that the relationship summary should be filed not only in a text-searchable, but also

machine-readable, format,[663] in response to our solicitation for comment on filing formats. Both commenters stated that this would allow third parties to develop online comparison tools, making it easier for retail investors to compare firms with one another, including across key categories, such as fees.[664] We agree that requiring this formatting will enable investors and other data users, industry participants, and the Commission and Commission staff to better collect and analyze reported information and facilitate the development of tools to aggregate and compare the information. We are requiring that only the headings be machine-readable, given that firms will use their own wording in the narrative responses for each of the relationship summary items, and the responses will not be uniform. The machine-readable, structured headings could, for example, be implemented in PDF by creating a bookmark for each of the headings of the relationship summary that matches the text of the heading and that has the heading as its destination. We believe this promotes aggregation and comparison of responses to specific items across different relationship summaries but also limits the costs of preparing the relationship summary. This is consistent with the Commission's ongoing efforts to modernize our forms by taking advantage of technological advances both in the manner in which information is reported to the Commission and how it is provided to investors and other users.[665] These

(requesting clarification); Prudential Letter ("'retail investor' for purposes of Form CRS should not include retirement plan representatives''); Transamerica Letter (same).

[658] *See* Comment Letter of Fisher Investments (Dec. 13, 2018) ("many individuals overseeing retirement plans . . . would benefit from a better understanding of concepts in proposed Form CRS''); Trailhead Consulting Letter.

[659] *See, e.g.,* Groom Law Letter (describing business models of firms offering brokerage and advice services to plans together with other services); SPARK Letter (same).

[660] This is consistent with the final definition of retail customer for purposes of Regulation Best Interest, which to the extent that the plan representative who decides services arrangements is a sole proprietor or other self-employed individual who will participate in the plan, the plan representative will be a retail customer for purposes of Regulation Best Interest to the extent that the plan representative receives recommendations directly from a broker-dealer primarily for personal, family or household purposes. *See* Regulation Best Interest Release, *supra* footnote 47, at Section II.B.3a.

[661] For broker-dealers, relationship summaries will be filed through Web CRD®, and for investment advisers, relationship summaries will be filed through IARD. Investors will be able to access relationship summaries using BrokerCheck and IAPD, the public interfaces of Web CRD® and IARD, respectively, and through the Commission's *Investor.gov* website, which has a search tool that links to both BrokerCheck and IAPD.

[662] *See, e.g.,* CFA Letter I; Schnase Letter; Trailhead Consulting Letter; Institute for Portfolio Alternatives Letter.

[663] *See* CFA Letter I ("[P]ast experience regarding investors' limited use of existing databases, such as IARD and BrokerCheck, cautions against placing too much reliance on investors' accessing the documents directly. We therefore urge the Commission to require that the documents be filed, not just in a text-searchable format, but in a machine-readable format.''); Schnase Letter ("[T]he data contained in the Relationship Summary should be required to be filed in a structured data format, so the document can be utilized as a stand-alone human-readable document and serve as the source for a machine-readable data set.'').

[664] CFA Letter I ("We can envision a time when third parties could develop online tools to help investors search for a firm or account that meets their preferred parameters, much like the tools Kelly Blue Book or Edmunds provide to help car buyers narrow their selections.''); Schnase Letter ("Retail investors may not be able or inclined to build their own algorithms and spreadsheets to manipulate machine-readable data themselves, but third-party providers will likely step in when demand exists to provide investors publicly accessible comparison tools fueled by the machine-readable data made available by the SEC.'').

[665] *See, e.g.,* Inline XBRL Filing of Tagged Data, Advisers Act Release No. 10514 (Jun. 28, 2018) [83 FR 40846] (Aug. 16, 2018); Optional internet Availability of Investment Company Shareholder Reports, Investment Company Act Release No. 33115 (Jun. 5, 2018) [83 FR 29158] (Jun. 22, 2018)
Continued

instructions are not intended to require firms to prepare a relationship summary in paper format. A firm that prepares and delivers a relationship summary only in an electronic format could, for example, file a rendering of the electronic disclosures with the Commission.

In a change from the proposal, broker-dealers will file through Web CRD® instead of EDGAR. Investment advisers will file their relationship summaries through IARD in the same manner as they currently file Form ADV Parts 1A and 2A, as proposed.[666] Whether dual registrants prepare a single relationship summary or two, they will file their relationship summaries using both IARD and Web CRD®.[667] We are requiring filing of the relationship summary through Web CRD® and IARD because they are currently used by and familiar to broker-dealers and investment advisers, respectively. This should minimize the systems changes firms would need to make, because they would not need to establish new systems in order to file their relationship summaries with the Commission. One commenter supported using EDGAR for analyzing and comparing fee information.[668] Several commenters, however, generally preferred Web CRD®, arguing that Web CRD® is more accessible for broker-dealers, which already make filings through Web CRD®, and that Web CRD® data provided on BrokerCheck is more familiar to retail investors.[669] In light of

comments, we have determined that requiring broker-dealers to file their relationship summaries through Web CRD® should streamline broker-dealer filing requirements relative to requiring broker-dealers to file on EDGAR. Broker-dealers already use Web CRD® for filing their own registration records and those of their associated persons, and retail investors already can find broker-dealers' disciplinary history and other information on BrokerCheck. In addition, *Investor.gov* already has a prominent search tool on its main landing page that links to BrokerCheck and IAPD, which investors can use to search for information about firms and financial professionals. This minimizes the implementation changes needed to make relationship summaries easily accessible through *Investor.gov* because new search tools would not need to be created and existing search tools could be linked to the *Investor.gov/CRS* web page referenced in the relationship summary.

We also received comment that dual registrants should file only on one system, instead of on both EDGAR and IARD as proposed.[670] One commenter, however, implicitly supported the requirement that dual registrants file on two systems.[671] The final instructions require dual registrants to file their relationship summaries using both systems—Web CRD® and IARD.[672] This approach ensures a complete and consistent filing record for each firm and facilitates the Commission's data analysis, examinations, and other regulatory efforts. Firms offering brokerage or investment advisory services through affiliates will follow the same filing requirements as standalone firms.

For investment advisers, we are also adopting clarifications in the General Instructions to Form ADV that relate to the amending and filing of the relationship summary.[673] First, investment advisers may file an amended relationship summary as an other-than-annual amendment or by including the relationship summary as

part of an annual updating amendment, within the 30 days in which they are required to file the amendment.[674] Second, the instructions provide that advisers may, but are not required to, submit amended versions of their relationship summary as part of their annual updating amendment and include additional technical references to implement this instruction.[675] Third, we added provisions to mirror the requirements of the General Instructions to Form CRS as to when amendments and exhibits showing changes to Part 3 must be made and filed.[676] We believe that investment advisers will benefit from these clarifications. Finally, we are adopting certain amendments to the General Instructions to Form ADV to add conforming technical changes and references to the Form ADV, Part 3.[677]

3. Delivery Requirements

a. Form of Delivery

The final instructions provide, as proposed, that firms will be able to deliver the relationship summary (including updates) within the framework of the Commission's existing guidance regarding electronic delivery.[678] This framework consists of

---

("Shareholder Reports Release"); Investment Company Reporting Modernization, Investment Company Act Release No. 32314 (Dec. 8, 2017) [82 FR 58731 (Dec. 14, 2017)].

[666] General Instruction 7.A.(i) to Form CRS. Several commenters supported using IARD as the filing system for investment advisers. *See, e.g.,* Trailhead Consulting Letter; Schnase Letter. Investment advisers may file a paper copy of the Form ADV with the Commission if they apply for a hardship exemption by filing Form ADV–H.

[667] General Instruction 7.A.(i) to Form CRS. Information for investment advisers on how to file with IARD is available on the SEC's website at *www.sec.gov/iard.* Information for broker-dealers on how to file through Web CRD® is available on FINRA's website at *http://www.finra.org/industry/ web-crd/web-crd-system-links. See* General Instruction 7.A.(ii) to Form CRS.

[668] *See* Morningstar Letter (advocating for fee information to be filed in a standard table with brief examples "in the EDGAR system in a standardized data format facilitating analysis and comparison").

[669] *See* Schnase Letter ("[I]t is not clear why BDs should be filing their Relationship Summary through a different filing system than IAs (IARD, which is operated by FINRA) and through a different filing system than BDs already use for Form BD (CRD, also operated by FINRA)."); NASAA Letter ("[B]roker-dealers should file Form CRS on the WebCRD platform maintained by FINRA for its BrokerCheck reports (and which is related to IARD)."); Institute for Portfolio Alternatives Letter ("CRD and its public-facing

BrokerCheck is a system familiar to both the brokerage industry as well as investors. We believe that CRD/BrokerCheck will address potential investor confusion and streamline broker requirements.").

[670] *See, e.g.,* Prudential Letter ("The Commission should clarify that a single filing [for dual registrants], in either IARD or EDGAR, would constitute compliance with the filing requirement.").

[671] *See* Schwab Letter III (providing sample Form CRS instructions for dual registrants to file on IARD and EDGAR).

[672] General Instruction 7.A.(i) to Form CRS.

[673] *See infra* Section II.C.4 generally for a discussion of amendments to the relationship summary.

[674] *See* amended General Instruction 4 to Form ADV (revised to add the following language: "If you are registered with the SEC, you must amend Part 3 of your Form ADV within 30 days whenever any information in your relationship summary becomes materially inaccurate by filing with the SEC an additional other-than-annual amendment or by including the relationship summary as part of an annual updating amendment."). *Compare* Proposed General Instruction 4 to Form ADV ("You must amend your relationship summary and file your relationship summary amendments in accordance with the Form ADV, Part 3 (Form CRS), General Instructions, 6.").

[675] *See* amended General Instruction 4 to Form ADV (revised with language that investment advisers must update responses to all items "in Part 1A, 1B, 2A and 2B (as applicable)," and "You may, but are not required, to submit amended versions of the *relationship summary* required by Part 3 as part of your *annual updating amendment.*").

[676] *See infra* footnotes 769–774, 781–783, and accompanying text.

[677] *See* amended General Instruction 3 to Form ADV (indicating that Form ADV, as amended to add Part 3, now contains five instead of four parts); amended General Instruction 4 to Form ADV ("Part 3 requires advisers to create a relationship summary (Form CRS) containing information for retail investors. The requirements in Part 3 apply to all investment advisers registered or applying for registration with the SEC, but do not apply to exempt reporting advisers. Every adviser that has retail investors to whom it must deliver a relationship summary must include in the application for registration a relationship summary prepared in accordance with the requirements of Part 3 of Form ADV. See Advisers Act Rule 203– 1.").; amended General Instruction SEC's Collection of Information section (removing "promptly" to reflect filing requirements for relationship summary changes).

[678] *See* Use of Electronic Media by Broker-Dealers, Transfer Agents, and Investment Advisers for Delivery of Information; Additional Examples

the following elements: (i) Notice to the investor that information is available electronically; (ii) access to information comparable to that which would have been provided in paper form and that is not so burdensome that the intended recipients cannot effectively access it; and (iii) evidence to show delivery, *i.e.,* reason to believe that electronically delivered information will result in the satisfaction of the delivery requirements under the federal securities laws.[679] In the Proposing Release, we also provided proposed guidance that a firm would be able to deliver the relationship summary to new or prospective clients or customers in a manner that is consistent with how the retail investor requested information about the firm or financial professional, and that this method of initial delivery for the relationship summary would be consistent with the Commission's electronic delivery guidance.[680] We have included this provision in the final instructions to provide additional clarity and certainty on what is permissible for initial delivery of the relationship summary.[681] This approach applies only to the initial delivery of the relationship summary to new or prospective clients or customers, and not to any other delivery obligation of any other required disclosure. With respect to existing clients or customers, as proposed, firms should deliver the relationship summary in a manner consistent with the firm's existing arrangement with that client or customer and with the Commission's electronic delivery guidance. The above delivery instructions are based on the assumption that retail investors are able to access and prefer to receive communications and disclosures

through the same medium in which they request information from the firm or financial professional. If this assumption is not correct, retail investors can request a copy of the relationship summary in a format they prefer, as discussed below, and can establish their delivery preferences with the firm once they have entered into a relationship.

Numerous commenters expressed support for electronic delivery, including for modifications to the instructions to make electronic delivery a more accessible option for the relationship summary as well as other disclosures.[682] A number of commenters further advocated for the ''notice plus access'' model, in which posting the relationship summary to the firm's website, in combination with a notice to the retail investor that the relationship summary is available there, would constitute delivery.[683] Some of these commenters argued that this approach should suffice for delivery, even if the retail investor had not previously consented to electronic delivery in an affirmative way.[684] A few commenters cited to the Commission's recently adopted rule 30e–3 under the Investment Company Act[685] as a possible model for delivering the relationship summary.[686] Some of these

commenters also advocated for a more comprehensive updating of the Commission's guidance concerning electronic delivery, not just for the relationship summary but for other disclosures as well.[687] Commenters advocating for more widespread use of electronic delivery cited to arguments including the potential cost savings and improved security of delivery to investors.[688]

On the other hand, some commenters expressed reservations about a notice plus access equals delivery approach and supported the Commission's proposed approach.[689] The RAND 2018 survey and another investor survey also showed mixed results relating to electronic delivery, with many participants indicating that they would prefer to receive the disclosures in paper.[690] Similarly, the IAC has stated that nearly half of investors (49%) still prefer to receive paper disclosures through the mail, compared with only 33% who prefer to receive disclosures electronically, either through email (27%) or by accessing them online (6%).[691] Additionally, we are aware,

Under the Securities Act of 1933, Securities Exchange Act of 1934, and Investment Company Act of 1940, Exchange Act Release No. 37182 (May 9, 1996) [61 FR 24644 (May 15, 1996)] (''96 Guidance''); *see also* Use of Electronic Media, Exchange Act Release No. 42728 (Apr. 28, 2000) [65 FR 25843 (May 4, 2000)] (''2000 Guidance''); and Use of Electronic Media for Delivery Purposes, Exchange Act Release No. 36345 (Oct. 6, 1995) [60 FR 53458 (Oct. 13, 1995)] (''95 Guidance''). Recognizing the growth of different forms of electronic media, other technological developments, and the passage of time since these releases were issued, the Commission plans to revisit its existing guidance regarding electronic delivery.

[679] 96 Guidance, *supra* footnote 678.

[680] *See* Proposing Release, *supra* footnote 5, at nn.344–45 and accompanying text; *see also* 2000 Guidance, *supra* footnote 678, at 65 FR 25845–46; 96 Guidance, *supra* footnote 678, at 61 FR 24647; and 95 Guidance, *supra* footnote 678, at 60 FR 53461.

[681] General Instruction 9.B. to Form CRS (''You may deliver the relationship summary to new or prospective clients or customers in a manner that is consistent with how the *retail investor* requested information about you or your financial professional.'').

[682] *See, e.g.,* CFA Institute Letter I (''Whatever design is finalized for CRS, it should accommodate electronic delivery to investors. We also believe a design with interactive components is needed in today's electronically savvy investor base.''); TIAA Letter (''the SEC could make the disclosure requirements in . . . Form CRS more flexible, such that broker-dealers have more options with respect to the method of delivery of required disclosures. . . .''); MassMutual Letter; SIFMA Letter; SPARK Letter; Morgan Stanley Letter; Cetera Letter II; Fidelity Letter.

[683] *See, e.g.,* Primerica Letter; Cetera Letter II; Schwab Letter (advocating a notice plus access model for annual or more frequent updates to the relationship summary); Pickard Djinis and Pisarri Letter; IAA Letter I; SIFMA Letter; MassMutual Letter; Comment Letter of the Money Management Institute (Aug. 7, 2018) (''MMI Letter''); Wells Fargo Letter.

[684] *See, e.g.,* LPL Financial Letter (supporting an implicit consent model on the basis that, among other things ''It simply is not feasible to obtain an investor's affirmative consent to electronic delivery before the investor makes a final decision about the [investment relationship]''); FSI Letter I (supporting a negative consent model, rather than an opt-in approach); IAA Letter I (supporting an implied consent model).

[685] 17 CFR 270.30e–3 (internet availability of reports to shareholders); Shareholder Reports Release, *supra* footnote 665.

[686] *See, e.g.,* T. Rowe Letter (''In cases where no email address is on file with the firm, we think a notice and access protocol akin to Rule 30e–3 is appropriate.''); SPARK Letter (''The SEC has recently demonstrated a willingness to embrace electronic disclosure as the default delivery method for other disclosures and we encourage the SEC to consider whether the disclosures added by the SEC's Proposal, including Form CRS, should be able to tap into the benefits of electronic delivery.'').

[687] *See, e.g.,* LPL Financial Letter (''Modern communication practices underscore the need for the Commission to provide more flexibility to broker-dealers and investment advisers to satisfy their document delivery obligations by delivering materials to customers and clients who have *implicitly* consented to electronic delivery as well as to current customers and clients who have *affirmatively* consented to electronic delivery in a manner contemplated by the existing guidance.''); SPARK Letter (''strongly urges the SEC to permit . . . electronic delivery as the default delivery method for satisfying the disclosure requirements under [Regulation Best Interest, as well as Form CRS].''); Cetera Letter II (''We believe that adoption of Reg. BI and the Form CRS represents something of a watershed moment. . . .''); Pickard Djinis and Pisarri Letter; IAA Letter I; MMI Letter.

[688] *See, e.g.,* Cetera Letter II (asserting that electronic delivery is safer and more environmentally friendly); IRI Letter; SPARK Letter; Primerica Letter.

[689] CFA Letter I (''We greatly appreciate that, in discussing this issue, the Release specifically references the obligation to provide 'evidence to show delivery.' This should help to clarify that firms could not meet the disclosure requirement simply by making the disclosures accessible on a public website and providing notice of their availability, under an 'access equals delivery' model. . . .''); AARP Letter (''The SEC should prohibit advisers from simply providing an electronic address for disclosures. . . . A paper copy should be provided to the retail investor.'').

[690] *See supra* footnote 699.

[691] IAC Electronic Delivery Recommendation, *supra* footnote 153 (citing FINRA Investor Education Foundation, *Investors in the United States 2016* (Dec. 2016), *available at* http://www.usfinancialcapability.org/downloads/NFCS_2015_Inv_Survey_Full_Report.pdf). While the FINRA 2016 Investors Study was conducted prior to the Form CRS proposal (and does not specify what disclosure materials are contemplated in the survey, *e.g.,* shareholder reports, summary prospectuses, statutory prospectuses, account

Continued

**33548**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

based on our filing data, that a number of firms do not host public websites and would not be able to make available an updated, electronic version of their relationship summary for their retail investors at all times.[692] Some commenters noted that some retail investors may lack readily available internet access.[693]

The relationship summary is designed to be delivered when a retail investor selects a firm or financial professional and which services to receive, including updated versions upon certain events when retail investors are again making decisions about whether to invest through an advisory account or a brokerage account. These selections affect all of the retail investor's subsequent investments under that relationship. In comparison, documents such as shareholder reports and prospectuses typically relate to investment decisions on single products; once the product is purchased, reporting is most commonly delivered at regular intervals, unlike the relationship summary. We are preserving an investor's ability to receive the relationship summary in paper, by maintaining the protections provided by the Commission's electronic delivery guidance.[694]

We recognize the benefits to retail investors of receiving the relationship summary as early as possible when considering a firm or financial professional and that electronic communication can facilitate earlier delivery, provided that retail investors can readily access the form of communication used. As noted above, we have adopted the instruction that delivery of the relationship summary to new or prospective clients or customers in a manner that is consistent with how that retail investor requested information about the firm or financial professional would be consistent with the Commission's electronic delivery

guidance.[695] This approach applies only to the initial delivery of the relationship summary to new or prospective clients or customers, and not to any other delivery obligation of any other required disclosure. Moreover, to ensure that a relationship summary delivered electronically is noticeable for retail investors and not hidden among other disclosures, we are adopting a new instruction that a relationship summary delivered electronically must be presented prominently in the electronic medium and must be easily accessible for retail investors.[696] For example, a firm can use a direct link or provide the relationship summary in the body of an email or message.[697] We are also requiring firms to post the current version of the relationship summary prominently on their public website, if they have one, as proposed.[698]

We understand that, while many investors prefer receiving disclosures about investment advice in electronic format, many also value the option to receive them in paper.[699] We are adopting several additional requirements relating to relationship summaries in paper format. First, in a relationship summary that is delivered in paper format, firms may link to additional information by including URL addresses, QR codes, or other means of facilitating access to such information.[700] Second, if a relationship summary is delivered in paper format as part of a package of documents, the firm must ensure that the relationship summary is the first among any documents that are delivered at that time, substantially as proposed.[701] All

firms will be required to make a copy of the relationship summary available upon request without charge.[702] However, we are not requiring that firms make the relationship summary available in paper format. We understand that some firms' business models—for example, those of advisers providing automated investment advisory services and broker-dealers that provide services only online—are based on delivering substantially all disclosures and conducting substantially all correspondence with clients and customers electronically. We do not intend to change these practices and believe that retail investors that prefer paper communications will have the opportunity to establish relationships with firms that accommodate paper delivery.

b. Initial Delivery

The final instructions require an investment adviser registered with the SEC to deliver a relationship summary to each retail investor before or at the time the firm enters into an investment advisory contract, even if the agreement is oral, as proposed.[703] The timing for standalone investment advisers to deliver the relationship summary to new or prospective retail clients generally tracks the initial delivery requirement for Form ADV Part 2A.[704] As described further below, we are changing the instruction for broker-dealers to require delivery before or at earliest of one of three triggers.[705] In

---

statements, etc.), it presents general investor survey data regarding investor disclosure preferences.

[692] Based on IARD system data, 8.4% of investment advisers with individual clients do not report at least one public website.

[693] *See, e.g.,* Comment Letter of C. Frederick Reish (Sept. 12, 2018); SIFMA Letter (acknowledging that firms would need to provide linked disclosures to customers and prospective customers who do not have internet access); LPL Financial Letter (citing Investment Company Institute, 2015 Investment Company Fact Book, (55th ed. 2015), at 129, *available at https://www.ici.org/pdf/2015_factbook.pdf.* The study found the following with respect to internet access in mutual fund owning households: (i) Head of household age 65 or older, 14% lack access; (ii) education level of high school diploma or less, 16% lack access; and (iii) household income of less than $50,000, 16% lack access.).

[694] *See supra* footnote 678.

[695] *See* Proposing Release, *supra* footnote 5, at nn.344–45 and accompanying text; *see also* 2000 Guidance, *supra* footnote 678, at 65 FR 25845–46; 96 Guidance, *supra* footnote 678, at 61 FR 24647; and 95 Guidance, *supra* footnote 678, at 60 FR 53461.

[696] General Instruction 10.C. to Form CRS.

[697] General Instruction 10.C. to Form CRS.

[698] Advisers Act rule 204–5(b)(3) and Exchange Act rule 17a–14(c)(3); General Instruction 10.A. to Form CRS. The most recent versions of firms' relationship summaries will be accessible through *Investor.gov.* Firms will be required to include in their relationship summaries a phone number where investors can request up-to-date information and (if applicable) request a copy of the relationship summary. *See* Item 5.B. of Form CRS. Firms also could include their relationship summaries on other electronic media, such as mobile apps and other similar technologies.

[699] *See* RAND 2018, *supra* footnote 13 (when surveyed about how and when they would prefer to receive the relationship summary, "two-fifths reported that they would be most likely to view a paper document"); Schwab Letter I (Koski) *supra* footnote 21 (26% of survey participants preferred to receive disclosures about investment advice on paper; 46% preferred online or digital disclosures with the option for paper).

[700] General Instruction 3.B. to Form CRS.

[701] General Instruction 10.D. to Form CRS. *Cf.* Proposed General Instruction 8.(c) to Form CRS ("If

the relationship summary is delivered on paper and not as a standalone document, you must ensure that the relationship summary is the first among any documents that are delivered at that time.").

[702] General Instructions 1.C. to Form CRS.

[703] General Instruction 7.B.(i) to Form CRS. The final instructions for investment advisers are streamlined from the proposal, but remain substantively the same. Compare to Proposed Advisers Act rule 204–5(b)(1) and Proposed General Instruction 5.(b) to Form CRS ("You must give a relationship summary to each retail investor, if you are an investment adviser, before or at the time you enter into an investment advisory agreement with the retail investor, or if you are a broker-dealer, before or at the time the retail investor first engages your services. *See* Advisers Act rule 204–5(b)(1) and Exchange Act rule 17a–14(c)(1). You must deliver the relationship summary even if your agreement with the retail investor is oral."). We replaced the word "agreement" with "contract" to mirror the wording in the current Advisers Act rules and Form ADV instructions. *See, e.g.,* Item 5.D of Part 2.A. of Form ADV. We also clarified that the delivery requirements apply to investment advisers registered with the SEC.

[704] *See* General Instruction 1 to Part 2A of Form ADV.

[705] General Instruction 7.B.(ii) to Form CRS ("If you are a broker-dealer, you must deliver a relationship summary to each retail investor, before or at the earliest of: (i) A recommendation of an account type, a securities transaction, or an investment strategy involving securities; (ii) placing an order for the retail investor; or (iii) the opening

comparison, under the proposal, broker-dealers would have delivered the relationship summary before or at the time the retail investor first engages their services.[706] Under the final rules, dual registrants, and affiliated broker-dealers and investment advisers that jointly offer their services to retail investors, must deliver at the earlier of the initial delivery triggers for an investment adviser or a broker-dealer, including a recommendation of account type.[707] This applies whether the dual registrant or affiliated firms prepare one single relationship summary describing both brokerage and investment advisory services, or two separate relationship summaries describing each type of service.

Some commenters supported keeping the initial delivery requirements as proposed.[708] Other commenters expressed concern that under the proposal, the relationship summary would be delivered only after the investor has already made a decision about which firm to engage and which type of account to open, and recommended variations on the proposed initial delivery requirements, including mandating even earlier delivery.[709] The variations include, for

example, delivery at the point of first contact or inquiry between the retail investor and firm, whenever possible;[710] at the earlier of when a customer contacts the firm or enters into an advisory agreement or engagement of services;[711] and upon the first interaction with a prospective retail investor.[712] For dual registrants, one commenter recommended requiring delivery no later than the point at which a recommendation is made regarding which type of account to open.[713] One commenter asserted that the Commission should not permit delivery "at" the time of service but rather should always require delivery "before" the provision of service.[714] The IAC recommended providing "a uniform, plain English disclosure document . . . to customers and potential customers of broker-dealers and investment advisers at the start of the engagement, and periodically thereafter." [715]

A few commenters supported requiring a period of time between delivery of the relationship summary and the beginning of the relationship.[716] One commenter suggested allowing time for retail investors to review the relationship summary, subsequent to delivery when the firm first interacts with a retail investor.[717] A number of investors at Commission-held roundtables also supported a waiting period.[718] Other commenters, however, opposed a mandated delay between delivery of the relationship summary and engaging in services.[719]

Various commenters explained logistical and recordkeeping issues if firms were required to deliver the relationship summary at first contact or

prior to engaging a firm's services.[720] For example, one commenter stated that it would not be feasible to obtain an investor's affirmative consent to electronic delivery before the investor decides to engage the firm.[721] Tracking whether or not prospective customers had consented to electronic delivery of the relationship summary would be difficult because prospective customers who do not open accounts would not have account numbers or other unique identifiers for the firm's recordkeeping purposes.[722] Other commenters argued that keeping records of when a relationship summary was given to a prospective retail investor would be unnecessarily burdensome for firms and would likely provide *de minimis* benefits.[723] Still other commenters discussed the difficulty of defining when a customer first engages the firm's services, the terminology used in the proposal.[724]

We encourage investment advisers and broker-dealers to deliver the relationship summary far enough in advance of a prospective retail investor's final decision to engage the firm to allow for meaningful discussion between the financial professional and retail investor, including by using the conversation starters, so that the retail investor has time to understand the relationship summary and to weigh available options. We believe that prospective clients or customers would benefit from receiving the relationship summary as early as possible when deciding whether to engage the services of a firm or financial professional. In response to comments on initial delivery, including those relating specifically to broker-dealers, we are modifying the broker-dealer initial delivery requirements, as discussed below. However, we are declining to mandate a delivery requirement based on first contact or inquiry, or to impose a waiting period. First, "first contact or inquiry" may include circumstances that are not limited to the seeking of investment services, such as business

---

of a brokerage account for the retail investor."). As described below, dual registrants will continue to deliver the relationship summary at the earlier of the requirements for investment advisers or broker-dealers. General Instruction 7.B.(iii) to Form CRS ("A dual registrant must deliver the relationship summary at the earlier of the timing requirements in General Instruction 7.B.(i) or (ii).").

[706] See Proposed Exchange Act rule 17a–14(c)(1); Proposed General Instruction 5.(b) to Form CRS.

[707] General Instruction 7.B.(iii) to Form CRS ("A dual registrant must deliver the relationship summary at the earlier of the timing requirements in General Instruction 7.B.(i) or (ii).").

[708] See, e.g., Trailhead Consulting Letter; Schnase Letter (agreeing that the relationship summary should be required to be delivered along the lines proposed in the Proposing Release); SIFMA Letter ("For the initial delivery most brokerage firms likely will include [the relationship summary] with account applications or other account opening materials, while investment advisers will include it with their Form ADV.").

[709] See, e.g., CFA Letter I; CFA Institute Letter I; AARP Letter; NASAA Letter; Consumers Union Letter; Consumer Reports Letter. In the RAND 2018 survey, *supra* footnote 13, 70% of respondents reported that they would prefer to receive the relationship summary at the outset of the relationship, *i.e.,* "before or at the time you first engage the investment professional" and slightly more than 30% of respondents would prefer to receive the relationship summary "before the investment professional first recommends a transaction or investment strategy"; *see also* Schwab Letter I (Koski), *supra* footnote 21 (when asked "[w]hich of the following best describes your preference for when you would like to receive information about how a Brokerage Firm or a Registered Investment Adviser (RIA) does business with you?", 41% preferred "[a]t or before I open my account, plus any updates on an annual basis," 22% preferred "[a]vailable on an ongoing basis, such as on a firm's website," 19% preferred at "[a]t

or before I open my account only," and 17% preferred "[e]very single time I receive investment advice.").

[710] See CFA Letter I.

[711] See CFA Institute Letter I.

[712] See AARP Letter.

[713] See CFA Letter I.

[714] See NASAA Letter.

[715] See IAC Broker-Dealer Fiduciary Duty Recommendations, *supra* footnote 10.

[716] See, e.g., AARP Letter; CFA Institute Letter I; NASAA Letter.

[717] See AARP Letter.

[718] See, e.g., Houston Roundtable, at 51 (one investor suggesting a "cool-off period"); Washington, DC Roundtable, at 58 (at least two investors supporting a "lapse" of time between receipt of a relationship summary and having to sign it).

[719] Comment Letter of John Neil Conkle (Aug. 7, 2018) (arguing that a waiting period is not necessary for the relationship summary to fulfill its purpose); Edward Jones Letter (arguing that a waiting period could harm investors by preventing them from meeting IRA contribution or rollover deadlines, for example, or at a minimum cause frustration); SIFMA Letter (arguing that the relationship summary is designed to be contemporaneously read and understood).

[720] See, e.g., Edward Jones Letter (asserting that requiring firms to record the delivery of the relationship summary to prospective clients that subsequently become clients would impose a significant burden without providing meaningful benefits to investors); SIFMA Letter ("[I]t would be very burdensome and not practical in many instances to keep track of Forms CRS that are provided to retail investors who never seek to establish a relationship with a firm."); Primerica Letter; LPL Financial Letter.

[721] See LPL Financial Letter.

[722] See LPL Financial Letter.

[723] See *infra* footnote 803; *see also infra* footnotes 798–816 and accompanying text regarding recordkeeping requirements.

[724] See, e.g., Fidelity Letter; SIFMA Letter; Primerica Letter; TIAA Letter.

interactions for other purposes or social interactions, and therefore could create compliance uncertainty. Second, we believe the availability of each firm's relationship summary through *Investor.gov* and on its own website, if the firm has one, helps to address the concern that investors will not have the opportunity to review and compare relationship summaries before entering into an investment advisory contract or receiving services from a broker-dealer.[725] Third, some investors may not want to wait to begin services,[726] and those who do can always take as much time as needed to review the relationship summary and wait to sign an advisory agreement or begin receiving brokerage services at a later time. Fourth, firms will be permitted to deliver the relationship summary well before they enter into an advisory agreement or provide brokerage services, and as noted, we encourage firms to deliver the relationship summary early in the process. Finally, dual registrants, and affiliated broker-dealers and investment advisers that jointly offer their services to retail investors, must deliver their relationship summaries at the earlier of the delivery triggers for broker-dealers or investment advisers. To the extent the initial delivery requirements for a broker-dealer are earlier than the delivery requirements would be for an investment adviser, the earlier requirements will apply to an investment adviser that is a dual registrant or that offers services jointly with a broker-dealer affiliate. We believe this will provide a significant benefit to retail investors, given the substantial percentage of regulatory assets under management ("RAUM") managed by dual registrants and investment advisers with broker-dealer affiliates, relative to the total RAUM managed by investment advisers overall.[727]

To facilitate earlier delivery, as discussed above, the final instructions allow firms to deliver the relationship summary to a new or prospective client or customer in a manner that is consistent with how the retail investor requested information about the firm or financial professional, clarifying that this approach would be consistent with the SEC's electronic delivery guidance.[728] We believe this approach alleviates concerns expressed by commenters that obtaining the consent of prospective clients or customers to receive electronic delivery and maintaining records of that consent would be challenging.[729] While we recognize recordkeeping burdens relating to the delivery of the relationship summary to prospective clients—for example, we are not imposing a delivery requirement upon first contact or inquiry by a retail investor, as discussed above—we disagree that they are insurmountable and would outweigh the benefits to retail investors. As discussed further in Section II.E. below, investment advisers and broker-dealers have experience with similar recordkeeping requirements.[730] Moreover, we believe there is considerable benefit to retail investors in receiving the relationship summary before deciding to engage a firm, to allow time for questions and discussion with the financial professional, to understand the relationship summary, and to weigh available options.

Commenters suggested modifications to the proposed initial delivery requirements specifically for broker-dealers. Several commenters requested that we require broker-dealers to deliver the relationship summary at the point of first contact, inquiry, or interaction with a retail investor.[731] A number of commenters also raised questions about the meaning of "engaging the services" of a broker-dealer, noting that it was unclear when that may ultimately occur and that it is a new and undefined concept in the context of a customer

relationship with a broker-dealer.[732] Other commenters suggested that we exclude or exempt certain types of broker-dealers that provide limited services to retail investors from the requirement to deliver the relationship summary or from the requirements of Form CRS more generally.[733]

In response to these concerns, we are modifying the initial delivery requirements for broker-dealers. Instead of "at the time the retail investor first engages a broker-dealer's services," broker-dealers will be required to deliver the relationship summary to each retail investor before or at the earliest of: (i) A recommendation of an account type, a securities transaction, or an investment strategy involving securities; (ii) placing an order for the retail investor; or (iii) the opening of a brokerage account for the retail investor.[734] We believe that these more concrete initial delivery triggers for broker-dealers avoid the uncertainty of when a retail investor first engages a broker-dealer's services and include scenarios that encompass earlier delivery, in response to commenters' concerns.

As noted, the proposal would have required broker-dealers to deliver the relationship summary before or at the time the retail investor first engages the firm's services. This proposed requirement was intended to capture the earliest point in time at which a retail investor engages the services of a broker-dealer, including instances when a customer opens an account with the broker-dealer, or effects a transaction through the broker-dealer in the absence of an account, for example, by purchasing a mutual fund through the broker-dealer via "check and application". The proposed rule would not have required delivery to a retail investor to whom a broker-dealer makes a recommendation, if that retail investor did not open or have an account with

---

[725] *See* CFA Institute Letter I ("We strongly support the requirement that firms with public websites must post their CRSs on their sites in an easily accessible location and format. . . . Investors can review the disclosures provided there before deciding on a service provider and showing up for a meeting. Then when presented with the CRS 'before or at the time' of entering into an agreement or engaging a firm's services, an investor will have already had an opportunity to review the disclosures and come armed with questions.").

[726] *See, e.g.,* Edward Jones Letter (stating that some investors have a very specific timeframe for opening a new account, such as meeting an IRA contribution or rollover deadline); SIFMA Letter (stating that requiring a waiting period would frustrate a retail customer's efforts to begin his or her relationship with a financial services provider).

[727] As of December 31, 2018, 1,878 SEC-registered investment advisers report in their Form ADV an affiliate that is a broker-dealer also registered with the SEC. These 1,878 SEC-registered investment advisers manage approximately $58.48 trillion, or

approximately 70% of total RAUM managed by SEC-registered investment advisers. Furthermore, 359 SEC-registered investment advisers that are also dually-registered as broker-dealers manage approximately $5.18 trillion, or 6.12% of total RAUM. Thus, SEC-registered investment advisers that report registered broker-dealer affiliates and dual registrants together manage over 75% of RAUM. *See also infra* footnotes 855, 888–889, and accompanying text.

[728] General Instruction 10.B. to Form CRS.

[729] *See supra* footnotes 720–722 and accompanying text.

[730] *See infra* footnotes 809–810 and accompanying text.

[731] *See* CFA Institute Letter I; AARP Letter; and NASAA Letter.

[732] *See* Primerica Letter; SIFMA Letter; and Fidelity Letter.

[733] *See, e.g.,* Fidelity Letter (recommending "that the SEC exclude limited-purpose broker-dealers acting solely as mutual fund general distributors from the obligation to deliver Form CRS to direct mutual fund investors that invest on an unsolicited basis, and shareholders investing through an intermediary (such as a full service broker-dealer or bank) that has an independent obligation to deliver such information to its client" and suggesting "that the SEC explicitly exempt from the Form CRS requirement certain categories of broker-dealers, including clearing firms, principal underwriters, and distributors of mutual funds, as these firms do not have a direct relationship with the end investor based on their business models"); ICI Letter; Wells Fargo Letter; Invesco Letter; ACLI Letter; Comment Letter of Great-West Financial (Aug. 6, 2018); T. Rowe Letter and Oppenheimer Letter.

[734] *See* Exchange Act rule 17a–14(c)(1); General Instruction 6.B.(ii) to Form CRS.

the broker-dealer, or that recommendation did not lead to a transaction with that broker-dealer.[735] If the recommendation led to a transaction with the broker-dealer who made the recommendation, the retail investor would have been considered to be ''engaging the services'' of that broker-dealer at the time the customer places the order or an account is opened, whichever occurred first. Instead, in response to comments advocating for earlier delivery, the final requirement expands on the proposed initial delivery requirement and potentially pushes it earlier, to require delivery (even where a brokerage account has not been established) before or at the time a broker-dealer recommends an account type, a securities transaction, or an investment strategy involving securities without regard to whether the retail investor acts on the recommendation. We believe that revising the delivery requirement in this way will give retail investors the opportunity to consider the information included in the relationship summary earlier in the process of determining whether to establish a brokerage relationship with the broker-dealer, as well as in evaluating the recommendation.

Compared to the proposal, the final requirement also pushes earlier the time at which broker-dealers must deliver the relationship summary in instances in which the retail investor does not open an account but still engages in a securities transaction such as the ''check and application'' example described above. Under these circumstances, broker-dealers must deliver the relationship summary before or at the time an order is placed for the retail investor, instead of before or at the time the transaction is effected, as proposed. This delivery obligation would be triggered to the extent this type of transaction were unsolicited, because, as described above, if a recommendation preceded this type of transaction, delivery would have been triggered before or at the time of the recommendation.

To the extent the broker-dealer had not already made a recommendation of an account type, a securities transaction or an investment strategy involving securities, or placed an order for the retail investor, delivery would be triggered before or at the time the retail investor opens a brokerage account with the broker-dealer. As revised, we believe that the initial delivery triggers for broker-dealers avoid the uncertainty of the proposed initial delivery standard and include scenarios that encompass

earlier delivery, in response to commenters' concerns.

In response to the comments requesting exemptions or exclusions from the relationship summary obligations generally and the delivery obligations for certain broker-dealers that engage in limited activities, we are clarifying that we do not intend for the Form CRS requirements to apply to certain types of relationships between a broker-dealer and a retail investor. Pursuant to Exchange Act Rule 17a–14, the scope of the Form CRS requirement applies ''to every broker or dealer registered with the Commission pursuant to section 15 of the Act that *offers services to a retail investor*'' (emphasis added). Solely for purposes of Form CRS, we are describing here the types of relationships between a broker-dealer and a retail customer that we would not consider to be ''offer[s] [of] services to a retail investor''.

Specifically, clearing and carrying broker-dealers that are solely providing services to third party or affiliated introducing broker-dealers would not be considered to be offering services to a retail investor for purposes of Exchange Act Rule 17a–14, and would not be subject to the Form CRS requirements when acting in such capacity. As described above, the relationship summary is designed to make it easier for *retail investors* to get the facts they need when deciding among investment firms or financial professionals and the accounts and services available to them. When a retail investor is establishing or has a relationship with an introducing broker-dealer, we believe that the retail investor would benefit most from focusing on that broker-dealer's services, fees, standard of conduct, conflicts of interest and disciplinary history. In these circumstances, we believe that receiving an additional relationship summary from a clearing or carrying broker-dealer could create confusion and detract from the goals of this disclosure.

Additionally, we would not consider a broker-dealer that is serving solely as a principal underwriter to a mutual fund or variable annuity or variable life insurance contract issuer to be offering services to a retail investor for purposes of Exchange Act Rule 17a–14, when acting in such capacity. As with clearing and carrying broker-dealers, broker-dealers serving solely as principal underwriters do not typically establish the kind of relationship with retail investors that Form CRS has been designed to address. To the extent such broker-dealers interact with a retail customer in a different capacity (beyond serving as a principal underwriter to the

mutual fund or variable contract that the retail investor owns), we believe the nature of their relationship could become one where delivery of the Relationship Summary would be useful. Accordingly, Form CRS's obligations would apply in those instances.[736]

We are adopting as proposed the approach to delivery for dual registrants, whereby they must deliver the relationship summary to a new or prospective retail investor at the earlier of the delivery triggers applicable to investment advisers and broker-dealers.[737] One commenter argued that a dual registrant should be required to deliver the relationship summary at the earlier of providing an investment recommendation or the time a retail investor opens an account with the firm.[738] We believe that the broker-dealer initial delivery requirements, as adopted, accommodate this comment. Another commenter asserted that dual registrants should be required to deliver the relationship summary no later than when a recommendation is made as to the type of account to open.[739] We believe that the final initial delivery requirements accommodate this comment also. Broker-dealers will be required to deliver the relationship summary before or at the earliest of (i) a recommendation of an account type, a securities transaction, or an investment strategy involving securities, (ii) placing an order for the retail investor, or (iii) the opening of a brokerage account for the retail investor.[740] Investment advisers will be required to deliver the relationship summary before or at the time of entering into an investment advisory contract with the retail investor.[741] Dual registrants will be required to deliver the relationship summary when recommending an account type to the retail investor if it is the earliest occurrence among the initial delivery triggers for broker-dealers and investment advisers, which we believe will typically precede the opening of a brokerage account or

---

[735] Proposing Release, *supra* footnote 5.

[736] For example, we would expect the requirements of Form CRS to apply in the event the broker-dealer makes a recommendation of an account type, securities transaction or investment strategy involving securities, the retail investor places an order for the purchase of different securities, or the retail investor opens a new brokerage account with the broker-dealer.

[737] Advisers Act rule 204–5(b)(1) and Exchange Act rule 17a–14(c)(1); *see also* General Instruction 7.B.(iii) to Form CRS.

[738] *See* State Farm Letter.

[739] *See* CFA Letter I.

[740] *See* Exchange Act rule 17a–14(c)(1); General Instruction 7.B.(ii) to Form CRS.

[741] *See* Advisers Act rule 204–5(b)(1); General Instruction 7.B.(i) to Form CRS.

**33552**     **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

entering into an investment advisory contract.[742]

c. Additional Delivery Requirements to Existing Clients and Customers

We are adopting requirements for firms to re-deliver the relationship summary to existing clients and customers under certain circumstances, with some modifications from the proposal. We continue to believe that these investors will benefit from being reminded of the information contained in the relationship summary, including about the different services and fees that the firm offers, when they are again making decisions about whether to invest through an advisory account or a brokerage account. Specifically, after an initial delivery of the relationship summary to existing clients and customers who are retail investors, firms will be required to deliver the most recent version of the relationship summary to a retail investor if they (i) open a new account that is different from the retail investor's existing account(s); (ii) recommend that the retail investor roll over assets from a retirement account into a new or existing account or investment; or (iii) recommend or provide a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in an existing account, for example, the first time purchase of a direct-sold mutual fund or insurance product that is a security through a "check and application" process, *i.e.,* not held directly within an account.

In comparison, as proposed, the instructions would have required a firm to deliver a relationship summary to existing clients or customers when: (i) A new account is opened that is different from the retail investor's existing account, or (ii) changes are made to the existing account that would materially change the nature and scope of the relationship. The proposed instructions provided that whether a change was material for these purposes would depend on the specific facts and circumstances and gave as examples transfers from an investment advisory account to a brokerage account, transfers from a brokerage account to an investment advisory account, and moves of assets from one type of account to another in a transaction not in the normal, customary or already agreed course of dealing.

In the RAND 2018 survey, 50% of respondents reported that they would like to receive an updated relationship

summary "whenever there is a material change in the Relationship Summary, such as a change in fees or commission structure," about 30% would prefer to receive the relationship summary periodically and almost 40% preferred to receive the summary on request.[743] One commenter supported the additional delivery requirements to existing clients and customers as proposed, agreeing that investors are again making decisions about relationships and account types under these circumstances and would benefit from the information the relationship summary provides.[744] Another commenter recognized the value of delivering the relationship summary to existing clients and customers but recommended specific limitations to the requirements.[745] One commenter supported once a year or periodic updates and continued availability of a current version on a firm's website,[746] while another commenter opposed any requirement to provide periodic updates.[747] Several commenters argued that some or all of the additional delivery requirements are not necessary, given the prior initial delivery and online availability of relationship summaries.[748] A few commenters argued that the additional delivery requirements could confuse investors because of either an apparent duplication or difference from delivery

---

[743] RAND 2018, *supra* footnote 13.

[744] *See* CFA Letter I ("We support this proposal and agree with the Commission that, in these instances, 'retail investors are again making decisions about whether to invest through an advisory account or a brokerage account and would benefit from information about the different services and fees that the firm offers to make an informed choice.' ").

[745] *See* SIFMA Letter (arguing that a "material change" should be defined as changes from an advisory account to a brokerage account or vice versa, and not include asset movements from one type of account to another or "other material changes").

[746] *See* Schwab Letter I; Schwab Letter III.

[747] *See* CFN Letter.

[748] *See, e.g.,* LPL Financial Letter ("It is not clear what additional benefits obtain from delivering an identical copy of a document an investor has already received."); SIFMA Letter ("[W]e do not believe these additional trigger points [other than changing from one type of account to another] are necessary because customers will receive Form CRS at periodic intervals throughout the relationship, and customers will have continual online access to a firm's Form CRS via a website posting, making the need to "push out" the Form CRS at additional points unnecessary."); Institute for Portfolio Alternatives Letter ("We suggest that delivery of a new or updated Form CRS with every transaction would be excessive, impractical and without commensurate investor benefit"); UBS Letter ("If a client already has both a brokerage account and an advisory account and is transferring assets from one to another . . . the client already would have the critical disclosures applicable to both account types . . . .").

requirements of existing disclosures.[749] One commenter also stated that the proposed additional delivery requirements could overwhelm investors in a counterproductive way.[750] Furthermore, commenters requested additional guidance or examples for what would "materially change" the relationship.[751]

In addition, some commenters expressed concerns about administrative and operational burdens relating to the proposed additional delivery requirements.[752] For example, one commenter asserted that firms would be required to build entirely new operational and supervisory processes to identify asset movements divorced from any account opening process that could trigger an additional delivery requirement.[753] This commenter also argued that the review that would be required prior to effecting potentially triggering asset movements could cause delays that are detrimental to the retail

---

[749] *See, e.g.,* Comment Letter of AXA (Aug. 7, 2019) ("[E]xisting customers have already decided which firm to work with, so requiring firms to send the Relationship Summary to those customers is likely to cause customer confusion."); Pickard Djinis and Pisarri Letter ("The disharmony between the existing ADV brochure delivery requirements and the proposed requirements under Rule 204–5 are likely to confuse clients. . . ."); UBS Letter ("[R]eceiving the Form CRS again in such circumstances would likely lead to confusion rather than an improved understanding.").

[750] *See* SIFMA Letter ("Providing Form CRS to investors beyond [changes from one type of account to another] could overwhelm them with duplicative or redundant information," making it "less likely they will digest the information.").

[751] *See, e.g.,* Prudential Letter ("[M]ore guidance is needed on this point; additional examples of triggering events would provide clarity."); TIAA Letter ("SEC should identify additional instances beyond account changes that would trigger re-delivery."); Cambridge Letter (requesting further guidance on a material change to the nature and scope of the relationship and encouraging SEC to provide a broad set of examples); Institute for Portfolio Alternatives Letter ("[I]t is not clear what 'other material' changes or assets movements 'not in the normal, customary, or already agreed course of dealing' would be"); Institute for Portfolio Alternatives Letter (requesting guidance on what facts and circumstances would trigger a "material" change and require delivery of a new, or updated, Form CRS); Comment Letter of Sorrento Pacific Financial, LLC (Aug. 7, 2018).

[752] *See* SIFMA Letter; LPL Financial Letter; Institute for Portfolio Alternatives Letter; Pickard Djinis and Pisarri Letter (additional delivery requirements "would impose unjustifiable administrative burdens on advisers, the majority of whom are small businesses.").

[753] *See* SIFMA Letter (explaining that, because additional delivery triggers could be divorced from any account opening process, entirely new operational and supervisory processes would need to be designed (i) to identify potentially triggering asset movements; (ii) to review for whether a proposed asset movement is not in the normal, customary, or already agreed course of dealing; and (iii) depending on whether delivery were required, create and preserve either a record of the delivery or of the conclusion that no such delivery was required).

---

[742] *See* General Instruction 7.B.(iii) to Form CRS.

App 105

investor.[754] Similarly, another commenter explained that most of the proposed additional delivery triggers would be relatively easy to identify and address through existing processes, such as new account openings and when a brokerage account is converted to an investment advisory account and vice versa.[755] Other potential delivery triggers, however, such as investments of inheritances or proceeds of a property sale, or a significant migration from savings to investment, would present operational challenges and compliance costs.[756] These commenters recommended limiting additional delivery requirements to circumstances in which a brokerage account is converted to an investment advisory account and vice versa.[757]

We disagree that delivery of the relationship summary to existing clients and customers is unnecessary if the investor has already received one. As noted above, when investors are again making decisions about whether to choose an investment advisory or brokerage account, we believe they will benefit from being reminded that different options are available and where they can get more information to inform their choice. We are not requiring that the relationship summary be delivered at periodic intervals or at every transaction; thus we disagree with comments that the additional delivery obligations will not provide commensurate benefit to investors, or will confuse or overwhelm investors. We are therefore adopting additional delivery requirements that apply to a firm's existing clients and customers, with some modifications from those proposed.

First, as proposed (and supported by two commenters as noted above), we are adopting the requirement that a firm deliver the relationship summary when opening any new account that is different from the retail investor's existing account(s).[758] Second, in response to comments we are replacing the proposed standard of ''materially change the nature and scope of the relationship'' with two, more specific and easily identifiable, triggers that we believe would not implicate the same operational or supervisory burdens described by commenters to meet the

proposed requirement.[759] Instead, firms will be required to deliver a relationship summary to existing clients and customers when recommending that the retail investor roll over assets from a retirement account, or recommending or providing a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in an existing account, for example, the first-time purchase of a direct-sold mutual fund or insurance product (*e.g.,* variable annuities) that is a security through a ''check and application'' process, *i.e.,* not held directly within an account.[760] While these requirements will still impose operational and supervisory burdens, we believe they are more easily identified and monitored, such that firms will not need to create new systems or processes to the extent that commenters said would be necessary to comply with the proposed ''material change'' standard. These more specific triggers are intended to provide investor protection under these circumstances in a more cost-effective manner, while still addressing the objectives that the ''material changes'' language sought to address, that is, to ensure that a firm does not switch existing customers or clients into accounts or services without explaining or giving them the opportunity to consider other available options.[761] Also, as proposed, we are adopting the instruction that firms must deliver the relationship summary to a retail investor within 30 days upon the retail investor's request.[762] While some commenters requested changes to the proposed delivery requirements, they nonetheless supported requiring delivery upon request.[763]

Finally, delivery of the relationship summary will not necessarily satisfy any other disclosure obligations the firm has under the federal securities laws or other laws or regulations, as proposed. The relationship summary requirement will be in addition to, and not in lieu of, other disclosure and reporting requirements or other obligations for broker-dealers and investment advisers.[764] One commenter suggested that we require that the relationship

summary include a prominent statement that it does not replace, but rather should be read in conjunction with, Form ADV or Form BD.[765] This commenter also suggested that the relationship summary should include a hyperlink to the appropriate Form ADV or Form BD, as applicable.[766] We believe that the required links in the Additional Information section, discussed in Section II.B.5. above, addresses these comments.

Some commenters argued that investment advisers should not be required to deliver a relationship summary to retail clients because they already deliver a Form ADV Part 2A brochure.[767] We disagree. By requiring both investment advisers and broker-dealers to deliver a relationship summary that discusses at a high level both types of services and their differences in a comparable format, the relationship summary would help all retail investors compare not only among investment advisory services, but also between investment advisory and brokerage services. We do not believe that existing disclosures provide this level of transparency and comparability across investment advisers, broker-dealers, and dual registrants. Form CRS is a summary disclosure designed to provide a high-level overview of services, fees, costs, conflicts of interest, standard of conduct, and disciplinary history, to retail investors in order to help them decide whether to engage a particular firm or financial professional, including deciding whether to seek investment advisory or brokerage services. Form ADV Part 2A, in contrast, requires more detailed disclosures specific to advisory services. If a firm does not have retail investor clients or customers and is not required to deliver a relationship summary to any clients or customers, the firm will not be required to prepare or file a relationship summary, as proposed.[768]

---

[754] *See* SIFMA Letter.

[755] *See* LPL Financial Letter.

[756] *See* LPL Financial Letter (explaining that its existing systems are not designed to monitor and record dates of non-ordinary course events or to distinguish those events from routine account changes).

[757] *See* SIFMA Letter; LPL Financial Letter.

[758] General Instruction 9.A. to Form CRS.

[759] *See supra* footnotes 752–757 and accompanying text.

[760] General Instruction 9.A. to Form CRS.

[761] Recommendations of account types to existing customers and clients also are addressed in the Regulation Best Interest Release and Fiduciary Release, *supra footnote* 47.

[762] General Instruction 9.B. to Form CRS.

[763] *See* Fidelity Letter; SIFMA Letter.

[764] For example, the relationship summary would not necessarily satisfy the disclosure requirements under Regulation Best Interest. *See* Regulation Best Interest Release, *supra* footnote 47.

[765] *See* Financial Engines Letter.

[766] *See* Financial Engines Letter.

[767] Comment Letter of Registered Advisor Services (Apr. 20, 2018); Comment Letter of Franklin Templeton Investments (Aug. 6, 2018); IAA Letter I; Triad Letter; Pickard Djinis and Pisarri Letter; Prudential Letter; *see also* State Farm Letter (arguing that investment advisers should be required to include in their relationship summaries only those disclosures that are not otherwise available, provided that a representative heading or introductory statement and a hyperlink to such disclosures are provided in the Relationship Summary).

[768] *See* amended Advisers Act rule 203–1, note to paragraph (a)(1); Exchange Act rule 17a–14(a), (b). *See* introduction of General Instructions to Form CRS.

**33554**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

4. Updating Requirements

We are adopting substantially as proposed a requirement for firms to update the relationship summary within 30 days whenever the relationship summary becomes materially inaccurate.[769] Firms also must post the latest version on their website (if they have one), and electronically file the relationship summary with the Commission.[770] Although some commenters expressed different views on the requirement to communicate updated information to retail investors, as discussed below, most commenters did not object to the proposed requirements to update the relationship summary within 30 days of a material change and the associated posting and filing obligations.[771] On the other hand, one commenter advocated that firms be allowed 60 days to update the relationship summary to address operational issues, but did not describe the specific operational challenges.[772] Based on our experience with other similar filings, we believe the proposed approach is consistent with the current requirements for investment advisers to update the Form ADV Part 2A brochure,[773] and with broker-dealers' current obligations, including to update Form BD if its information is or becomes inaccurate for any reason.[774] We continue to believe that allowing 30 days for firms to make updates provides sufficient time for firms to make the necessary revisions. Therefore, we are adopting these requirements as proposed.

The proposed instructions also would have required firms, without charge to the retail investor, to communicate updated information by delivering the amended relationship summary or by communicating the information another way.[775] As noted above, commenters expressed different views regarding this approach. Some commenters advocated for posting the relationship summary on a firm's website in order to meet the communication requirement.[776] On the other hand, one commenter advocated for requiring firms to deliver updated relationship summaries whenever a change is made, rather than permitting firms to communicate the information in another way.[777] We are adopting slightly revised final instructions to eliminate the proposed wording "another way" in order to clarify that a firm may communicate the information through another disclosure, and that disclosure must be delivered to the retail investor.[778] In other words, merely providing notice of or access to another disclosure or the relationship summary would not satisfy this final instruction. For example, if an investment adviser communicated a material change to information contained in its relationship summary to a retail investor by delivering an amended Form ADV brochure or Form ADV summary of material changes that also contained the updated information, this would support a reasonable belief that the information had been communicated to the retail investor, and the investment adviser will not be required to deliver an updated relationship summary to that retail investor. This requirement provides firms the flexibility to disclose changes to the relationship summary without requiring them to incur additional delivery costs.

In another modification from the proposal, the rules as adopted will allow firms to communicate the information in an amended relationship summary to retail investors who are existing clients or customers within 60 days after the updates are required to be made, instead of 30 days as proposed.[779] Two commenters advocated that allowing 60 days for the communication would increase the likelihood that firms could deliver an updated relationship summary along with other disclosures that firms commonly deliver on a quarterly basis, rather than in a separate delivery.[780] Delivery with other disclosures is consistent with the instructions regarding the way in which relationship summary updates may be communicated. We are clarifying this, as noted above, and adopting the requirement that firms must communicate updates to the relationship summary within 60 days after the updates are required to be made.

In a further change from the proposal, firms must highlight the changes in an amended relationship summary by, for example, marking the revised text or including a summary of material changes and attaching the changes as an exhibit to the unmarked amended relationship summary.[781] The unmarked amended relationship summary and exhibit must be filed with the Commission.[782] We believe that including this exhibit is important in assisting retail investors to assess changes that may impact their accounts or their relationships with their firm or financial professional. A retail investor will be able to find the latest version of the relationship summary through Investor.gov and on the firm's website, if it has one, and firms will be required to deliver a relationship summary within 30 days upon the retail investor's request, as proposed.[783]

As discussed in the proposal, for purposes of the requirement to communicate updates to the

---

[769] Advisers Act rule 204–1(a)(2) and Exchange Act rule 17a–14(b)(3); General Instruction 8.A. to Form CRS. For investment advisers, we are also adopting amendments to the General Instructions to Form ADV to mirror this requirement and to clarify the filing type. *See* amended General Instruction 4 to Form ADV (revised to add the following language: "If you are registered with the SEC, you must amend Part 3 of your Form ADV within 30 days whenever any information in your *relationship summary* becomes materially inaccurate by filing with the SEC an additional other-than-annual amendment or by including the relationship summary as part of an *annual updating amendment*."); *see also supra* footnotes 673–677 and accompanying text.

[770] Advisers Act rules 203–1(a)(1), 204–5(b)(3) and Exchange rules 17a–14(b)(2), 17a–14(c)(3); General Instructions 8.A., 8.C., and 10.A. to Form CRS.

[771] *See, e.g.,* Trailhead Consulting Letter ("If the form is kept to a more generalized and educational nature, material changes shouldn't occur too often."); NASAA Letter; LPL Financial Letter; Prudential Letter; Primerica Letter.

[772] *See* Morgan Stanley Letter (30 days "may not be sufficient to address the related operational issues").

[773] *See, e.g.,* Advisers Act rule 204–5(b)(4); General Instruction 8 to Form CRS. Generally, an investment adviser registered with the SEC is required to amend its Form ADV promptly if information provided in its brochure becomes materially inaccurate. *See* Advisers Act rule 204–1(a)(2); General Instruction 4 to Form ADV.

[774] *See, e.g.,* Exchange Act rule 15b3–1.

[775] *See* Proposed General Instruction 6.(b) to Form CRS.

[776] *See, e.g.,* Fidelity Letter ("We also support the SEC's position that with respect to material changes of information provided in a Form CRS, firms must either provide an updated Form CRS to retail investors or communicate the changes in another way such as posting on the firm's website."); Morgan Stanley Letter; Primerica Letter.

[777] *See* NASAA Letter.

[778] General Instruction 8.B. to Form CRS ("You can make the communication by delivering the amended *relationship summary* or by communicating the information through another disclosure that is delivered to the *retail investor*.").

[779] Advisers Act rule 204–5(b)(4) and Exchange Act rule 17a–14(c)(4); Proposed General Instruction 6.(b) to Form CRS.

[780] *See* LPL Financial Letter; Morgan Stanley Letter. For example, NASD Rule 2340 requires broker-dealers to deliver account statements generally on a quarterly basis.

[781] General Instruction 8.C. to Form CRS ("Each amended *relationship summary* that is delivered to a *retail investor* who is an existing client or customer must highlight the most recent changes by, for example, marking the revised text or including a summary of material changes. The additional disclosure showing revised text or summarizing the material changes must be attached as an exhibit to the unmarked amended *relationship summary*."). As an addition to the proposal, we are also amending General Instruction 4 to Form ADV to mirror this requirement ("You must include an exhibit highlighting the most recent changes required by Form ADV, Part 3 (Form CRS), General Instruction 8.C."); *see also supra* footnotes 673–677 and accompanying text.

[782] General Instruction 8.A. to Form CRS; *see also* General Instruction 4 to Form ADV.

[783] Advisers Act rules 204–5(b)(3) and 204–5(b)(5) and Exchange Act rules 17a–14(c)(3) and 17a–14(c)(5); General Instruction 9.B. to Form CRS.

relationship summary, it is important that broker-dealers identify their existing customers who are retail investors and recognize that a customer relationship may take many forms. For example, a broker-dealer will be required to provide the relationship summary to customers who have so-called "check and application" arrangements with the broker-dealer, under which a broker-dealer directs the customer to send the application and check directly to the issuer. We continue to believe this approach will facilitate broker-dealers building upon their current compliance infrastructure in identifying existing customers [784] and will enhance investor protections to retail investors engaging the financial services of broker-dealers.

*D. Transition Provisions*

To provide adequate notice and opportunity to comply with the adopted relationship summary filing requirements, firms that are registered, or investment advisers who have an application for registration pending, with the Commission prior to June 30, 2020 will have a period of time beginning on May 1, 2020 until June 30, 2020 to file their initial relationship summaries with the Commission.[785] On and after June 30, 2020, newly registered broker-dealers will be required to file their relationship summary with the Commission by the date on which their registration with the Commission becomes effective, and the Commission will not accept any initial application for registration as an investment adviser that does not include a relationship summary that satisfies the requirements of Form ADV, Part 3: Form CRS.[786] The adopted transition period is longer than we proposed. The proposal would have required broker-dealers to comply with their relationship summary obligations beginning six months after the effective date of the new rules and rule

amendments.[787] Similarly, in the proposal, investment advisers or dual registrants would have been required to comply with the new filing requirements as part of the firm's next annual updating amendment to Form ADV that would have been required after six months after the rule's effective date.[788] The extended time to comply with the relationship summary requirements reflects our consideration of comments we received from firms and the modifications to the proposed requirements of the relationship summary.

In the proposal, we asked for comment on the proposed implementation requirements and whether the six-month period was enough time for newly registered broker-dealers and investment advisers to prepare an initial relationship summary.[789] A number of commenters requested a longer implementation period, ranging from 12 to 24 months from the effective date.[790] One commenter suggested a phased-in approach, such that requirements may be effected at different points in time.[791] Commenters cited a number of reasons for a longer implementation period, including the time needed to hire additional staff and create and deploy new disclosures, procedures, training, and technology,[792] as well as to have the opportunity to apply innovative technology and designs.[793]

We are mindful of the time needed to create the relationship summary, as well as to update a firm's policies, procedures, and systems in order to provide these new disclosures. We are, however, lengthening the time that firms will have to comply relative to the proposal after considering commenters' suggestions for a longer implementation period. We expect that approximately twelve months will be adequate for firms to conduct the requisite operational changes to their systems and to establish internal processes to satisfy their relationship summary obligations.

Some commenters expressed the view that the proposed one-time, initial

delivery to existing clients and customers is not necessary.[794] One survey reported, on the other hand, that over 90% of survey respondents with an existing financial professional relationship stated that they knew more about their relationship with the adviser after reading the proposed relationship summary.[795] We believe the information contained in the relationship summary could improve existing investors' ability to monitor and make more informed decisions related to their existing relationships with firms during their duration, including whether to terminate a relationship. For example, as discussed above in Section II.A., retail investors that may learn of account types whose minimum requirements they did not meet when they first opened their existing account, through a one-time, initial delivery to existing clients and customers. Upon seeing this range of options, existing clients and customers could seek to take advantage of cost savings or additional services offered through these other account types. We believe that existing clients and customers would benefit from this one-time delivery of the relationship summary and therefore are adopting the requirement as proposed. Firms will be required to deliver their relationship summary to new and prospective clients and customers who are retail investors as of the date by which they are first required to electronically file their relationship summary with the Commission.[796] In addition, as proposed, firms will be required, as part of the transition, to

[784] For example, broker-dealers may already have compliance infrastructure to identify customers pursuant to FINRA's suitability rule, which applies to dealings with a person (other than a broker or dealer) who opens a brokerage account at a broker-dealer or who purchases a security for which the broker-dealer receives or will receive, directly or indirectly, compensation even though the security is held at an issuer, the issuer's affiliate or custodial agent, or using another similar arrangement. *See* Guidance on FINRA's Suitability Rule, FINRA Regulatory Notice 12–55 (Dec. 2012), at Q6(a).

[785] *See* Exchange Act rule 17a–14(f), Advisers Act rules 203–1(a)(2) and 204–1(e); Instruction 7.C. to Form CRS.

[786] *See* Exchange Act rule 17a–14(f) and Advisers Act rule 203–1(a)(2); Instruction 7.C. to Form CRS.

[787] *See* Proposed Instruction 5.c. to Form CRS. *See* Advisers Act proposed rule 203–1a(2) and Exchange Act proposed rule 17a–14 (f)(1).

[788] *See id.*

[789] *See* Proposing Release.

[790] *See, e.g.,* IAA Letter I (requesting a 12 month implementation period from the effective date); CCMC Letter (requesting 18 months); IRI Letter (requesting 18–24 months); Comment Letter of HD Vest Financial Services (Aug. 7, 2018) ("HDVest Letter") (requesting 18 months); Cetera Letter I; SIFMA Letter (requesting at least 24 months from the date the final rules are approved).

[791] *See* SIFMA Letter.

[792] *See* HDVest Letter.

[793] *See* IAA Letter I.

[794] *See, e.g.,* Fidelity Letter (existing customers are already familiar with the services offered to them by their broker-dealer or investment adviser. . . but can of course access a copy posted on the firm's website); AXA Letter (delivering the relationship summary to existing customers is likely to be confusing); Cetera Letter I (firms should not be required to deliver a new or amended Form CRS to [existing] clients except in limited circumstances, such as when the client establishes a different type of account than they already have).

[795] *See* Cetera Letter II (Woelfel), *supra* footnote 17 (84% of respondents stated that they knew a lot or a little more about their financial adviser after reviewing the Form CRS than they did before; among respondents with current relationships with a broker or adviser, over 90% said they knew more); *see also* CCMC Letter (investor polling), *supra* footnote 21 (in a survey of investors with investments outside of a work sponsored 401(k), pension or personal real estate, 72% of participants responding to a question describing that new rules could require financial professionals to deliver " a standardized four page document that explains the relationship between the financial professional and clients" agreed that the new disclosure document "will boost transparency and help build stronger relationships between me and my financial professional" and 62% indicated that they were "very interested" in reading the document).

[796] *See* Advisers rule 204–5(e)(2) and Exchange Act rule 17a–14(f)(4); Instruction 7.C.iii. to Form CRS.

**33556**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

deliver their relationship summaries to all existing clients and customers who are retail investors on an initial one-time basis within 30 days after the date the firm is first required to file its relationship summary with the Commission.[797]

*E. Recordkeeping Amendments*

We are adopting amendments to the recordkeeping and record retention requirements under Advisers Act rule 204–2 and Exchange Act rules 17a–3 and 17a–4, as proposed. These rules set forth requirements for firms to make, maintain, and preserve specified books and records. Pursuant to paragraph (a)(14)(i) of Advisers Act Rule 204–2 as amended, investment advisers will be required to make and preserve a record of the dates that each relationship summary was given to any client or prospective client who subsequently becomes a client.[798] New paragraph (a)(24) of Exchange Act Rule 17a–3 as adopted will require broker-dealers to create a record of the date on which each relationship summary was provided to each retail investor, including any relationship summary provided before such retail investor opens an account.[799] In addition, paragraph (a)(14)(i) of Advisers Act rule 204–2, as amended, will require investment advisers to retain copies of each relationship summary and each amendment or revision thereto while paragraph (e)(10) of Exchange Act rule 17a–4, as amended, will require broker-dealers to maintain and preserve a copy of each version of the relationship summary as well as the records required to be made pursuant to new paragraph (a)(24) of Exchange Act rule 17a–3 as adopted by the Commission.[800] The amended rules set forth the manner in

which and the period of time for which these record must be retained.[801] These records will facilitate the Commission's ability to inspect for and enforce compliance with the relationship summary requirements.

We received no comments on the proposed manner and time period for records preservation or the requirement to maintain a copy of each version of the relationship summary and each amendment or revision to the relationship summary.[802] We are adopting these requirements as proposed. Some commenters expressed concern with the potential costs and feasibility of complying with the proposed recordkeeping requirements for broker-dealers.[803] Several commenters argued that keeping records of when a relationship summary was given to a prospective retail investor would be unnecessarily burdensome for firms and would likely provide *de minimis* benefits.[804] Some investment adviser and broker-dealer commenters stated that most firms' recordkeeping systems and procedures are not designed to maintain records relating to prospective clients and that conforming such systems and procedures to the proposed rule requirements would be burdensome and costly and would not result in an offsetting benefit.[805] Others noted they may have to retain records for an indefinite length of time because their interactions with prospective clients about engaging services often span weeks, months or years and may include numerous phone calls, meetings or other forms of contact.[806]

As an alternative, commenters suggested that firms only be required to

maintain a record of the most recent date they delivered the relationship summary to a prospective client that becomes an actual client preceding the opening of an account.[807] Commenters suggested only requiring a record that the relationship summary was delivered at account opening or when a retail investor becomes an investment advisory client.[808]

Based on our experience with similar recordkeeping requirements for the Form ADV Part 2A brochure, requiring firms to create and maintain records of the dates they provide or give a relationship summary to an existing, new, or potential retail investor will facilitate examiners' ability to inspect and examine for compliance with the relationship summary delivery and content requirements. Specifically, the dates will help examiners to identify the relationship summary disclosures that retail investors may have relied on to decide whether to engage a firm's services. Absent having these dates to examine, we believe that it would be exceedingly difficult for examiners to evaluate firms' compliance with the relationship summary delivery and content requirement. These records also may assist firms in monitoring their compliance with the relationship summary delivery requirements.

Recordkeeping obligations for the relationship summary may be less burdensome if firms' recordkeeping and compliance systems are already capable of creating and maintaining records related to communications with prospective clients. For example, investment advisers are required to keep similar records for the delivery of the Form ADV Part 2A brochure[809] and broker-dealers, especially those registered with FINRA, are subject to comparable recordkeeping requirements with respect to communications and correspondence with prospective retail investors.[810]

---

[797] *See* Advisers rule 204–5(e)(1) and Exchange Act rule 17a–14(c) and (f)(3); adopted Instruction 7.C.iv. to Form CRS.

[798] *See* amended Advisers Act rule 204–2(a)(14)(i).

[799] *See* Exchange Act rule 17a–3(a)(24).

[800] The effect of the amended and adopted rules will require both investment advisers and broker-dealers to maintain copies of all versions of the relationship summary and the dates they are provided or given to existing or prospective retail customers; *see also* General Instruction 6.A. to Form CRS (requiring firms to maintain a copy of each version of the relationship summary and make it available to the SEC staff upon request). The Commission notes that pursuant to Exchange Act rule 17a–3(e), for purposes of transactions in municipal securities by municipal securities broker-dealers, compliance with Rule G–8 of the Municipal Securities Rulemaking Board ("MSRB") will be deemed to be in compliance with the recordkeeping requirements for broker-dealers. Accordingly, for purposes of transactions in municipal securities, a broker-dealer may satisfy its recordkeeping obligations under Exchange Act rule 17a–3(a)(24), as adopted, by complying with Rule G–8 of the MSRB. *See* Exchange Act rule 17a–3(e).

[801] Investment advisers will be required to maintain and preserve these records in an easily accessible place for a period of not less than five years from the end of the fiscal year during which the last entry was made on such record, the first two years in an appropriate office of the investment adviser. *See* Advisers Act rule 204–2(e)(1). Broker-dealers will be required to maintain these records in an easily accessible place until six years after such record or relationship summary is created. *See* Exchange Act rules 17a–3(a)(24) and 17a–4(e)(10) as amended.

[802] *See* Exchange Act rule 17a–4(e)(10) as proposed to be amended and Advisers Act rule 204–2(e)(1) (which would apply to amended rule 204–2(a)(14)(i) as proposed to be amended). The recordkeeping requirements for investment advisers will mirror the current recordkeeping requirements for Form ADV Part 2. *See* Advisers Act amended rule 204–2(a)(14)(i) as proposed to be amended and rule 204–2(e)(1).

[803] *See, e.g.,* CCMC Letter; Committee of Annuity Insurers Letter; Edward Jones Letter; Morgan Stanley Letter; Primerica Letter; SIFMA Letter; IPA Letter.

[804] *See id.*

[805] *See, e.g.,* Committee of Annuity Insurers Letter; Edward Jones Letter; Morgan Stanley Letter; Primerica Letter; SIFMA Letter.

[806] *See, e.g.,* Edward Jones Letter; Primerica Letter; SIFMA Letter.

[807] *See, e.g.,* CCMC Letter; SIFMA Letter.

[808] *See, e.g.,* SIFMA Letter; Morgan Stanley; Edward Jones Letter.

[809] *See, e.g.,* Advisers Act rule 204–2.

[810] *See, e.g.,* Exchange Act rule 17a–4(b)(4) requiring broker-dealers to maintain a record of all communications sent relating to its business as such; *see also, e.g.,* FINRA Rule 2210(a)(5) (defining "retail communication" to mean "any written (including electronic) communication that is distributed or made available to more than 25 retail investors within any 30 calendar-day period."); FINRA Rule 2210(b)(4) (requiring all FINRA members to "maintain all retail communications and institutional communications for the retention period required by SEA Rule 17a–4(b) and in a format and media that comply with SEA Rule 17a–4 . . . [and] . . . all correspondence in accordance with the record-keeping requirements of [FINRA] Rules 3110.09 [on supervision, requiring FINRA members to retain the internal communications and

Several firms also requested clarification and expressed concern regarding the potential recordkeeping implications related to the ''Key Questions to Ask'' provision of the proposal.[811] Some commenters stated that requiring firms to make and maintain records of their answers to the ''Key Questions to Ask'' and of supplemental information cross-referenced in or linked from the relationship summary would result in substantial and unnecessary burdens and/or might stifle potentially beneficial discussions between firms, clients and/or prospective clients.[812] Commenters requested clarification that ''Key Questions to Ask'' are intended to promote dialog between firms and clients rather than creating any sort of recordkeeping requirement, which commenters believed could lead to less robust discussions between firms and clients.[813]

As discussed above, the ''Key Questions to Ask'' section of the relationship summary has been eliminated, but firms will be required to include ''conversation starters'' in their relationship summary.[814] We are not establishing new or separate recordkeeping obligations related to the conversation starters or the answers provided by firms in response to the conversation starters. We are also not adding separate or new recordkeeping obligations related to the use of layered disclosure in the relationship summary. Current recordkeeping rules for investment advisers and broker-dealers already impose recordkeeping and retention requirements related to a firm's disclosures and other communications with retail investors, which will include responses to conversation starters or information cross-referenced in the relationships summary.[815] Responses to conversation

starters or hyperlinked material may trigger recordkeeping requirements under other federal securities statutes and rules or the rules of self-regulatory organizations of which firms are members or registrants.[816] Further, firms may wish to develop scripts for their financial professionals in responding to conversation starters to ensure the quality and consistency of responses and then preserve the scripts for compliance purposes.

## III. Disclosures About a Firm's Regulatory Status and a Financial Professional's Association

In connection with Form CRS, we recognized that the education and information that Form CRS provides to retail investors could potentially be overwhelmed by the way in which financial professionals present themselves to potential or current retail investors, including through advertising and other communications.[817] This concern was particularly acute where such communications could be misleading in nature, or where advertising and communications precede the delivery of Form CRS and may have a disproportionate impact on shaping or influencing retail investor perceptions.[818] To mitigate these concerns, we proposed additional rules as part of the Proposing Release. One of our proposed rules required disclosure of a firm's regulatory status and a financial professional's association with a firm. Specifically, we proposed rules under the Exchange Act and the Advisers Act that would have required a broker-dealer and an investment adviser to prominently disclose that it is registered as a broker-dealer or investment adviser, as applicable, with the Commission in print or electronic retail investor communications.[819] The proposed Exchange Act rule also would have required an associated natural person of a broker or dealer to prominently disclose that he or she is an associated person of a broker-dealer registered with the Commission in print or electronic retail investor communications.[820] Similarly, the

proposed Advisers Act rule would have required a supervised person of an investment adviser registered under section 203 to prominently disclose that he or she is a supervised person of an investment adviser registered with the Commission in print or electronic retail investor communications.[821] As we discussed in the Proposing Release, we believed that requiring a firm to disclose whether it is a broker-dealer or an investment adviser in print or electronic retail investor communications would assist retail investors in determining which type of firm is more appropriate for their specific investment needs.[822] For similar reasons, we noted that because retail investors interact with a firm primarily through financial professionals, it is important that financial professionals disclose the firm type with which they are associated.[823]

Several commenters expressed general support for the proposed Affirmative Disclosures.[824] Some of these commenters believed that the rules could be beneficial in helping investors to understand the legal distinctions between broker-dealers and investment advisers.[825] Another commenter in support of the Affirmative Disclosures stated that investors would benefit more if they were also provided with readily accessible regulatory and disciplinary histories of the financial professional.[826] However, one commenter noted that while ''the required disclosure could have some modest benefit, . . . it is important not to overstate [its] likely value.'' [827]

Several commenters also opposed the Affirmative Disclosures.[828] Some commenters believed that the proposed rules were duplicative, noting that

---

correspondence of associated persons relating to the member's investment banking or securities business for the period of time and accessibility specified in SEA Rule 17a–4(b)] and 4511 [establishing general requirements for members to ''preserve books and records as required under the FINRA rules, the Exchange Act and the applicable Exchange Act rules'']).

[811] *See, e.g.,* CCMC Letter; TIAA Letter; LPL Financial Letter; IPA Letter; NSCP Letter.

[812] *See, e.g.,* Edward Jones Letter; CCMC Letter; NSCP Letter; SIFMA Letter; Morgan Stanley Letter; TIAA Letter; LPL Financial Letter.

[813] *See, e.g.,* Edward Jones Letter; CCMC Letter; TIAA Letter; LPL Financial Letter.

[814] *See supra* Section II.A.4.

[815] For example, with respect to investment advisers, if a conversation starter prompts a written communication that includes a recommendation made or proposed to be made or any advice given or proposed to be given by the investment adviser, such a communication may be subject to the recordkeeping requirements of Advisers Act rule 204–(2)(a)(7). Also, for example, broker-dealers,

under Exchange Act Rule 17a–4(b)(4), are required to maintain records of the ''[o]riginals of all communications received and copies of all communications sent (and any approvals thereof) by the member, broker or dealer (including inter-office memoranda and communications) relating to its business as such. . .''; *see also* the recordkeeping requirements of FINRA Rule 2210.

[816] *See id.*

[817] *See* Proposing Release, *supra* footnote 5, at footnotes 374–375 and accompanying text.

[818] *See id.*

[819] *See id.,* at footnotes 437–439 and accompanying text.

[820] *See id.*

[821] *See id.*

[822] *See* Proposing Release, *supra* footnote 5, at footnotes 440–441 and accompanying text.

[823] *See id.* We also proposed rules that would have restricted broker-dealers and their associated persons from using the terms ''adviser'' or ''advisor'' as part of a name or title when communicating with retail investors in certain circumstances. We are not adopting those rules, as further discussed in the Regulation Best Interest Release. *See* Regulation Best Interest Release, *supra* footnote 47.

[824] *See* CFA Letter I; CFA Institute Letter I (stating that ''[r]equiring them to call themselves what they legally are will enable investors to better understand the distinction''); Better Markets Letter.

[825] *See* CFA Institute Letter I; CFA Letter I; LPL Financial Letter.

[826] *See* Better Markets Letter.

[827] *See* CFA Letter I.

[828] Some commenters also opposed the proposed Affirmative Disclosures because investors do not understand what it means to be registered or what the legal terms mean. *See* Altruist Letter; IRI Letter. *See also* LPL Financial Letter (noting that regulatory status is not important to an investor when being casually introduced for the first time to a financial professional and receiving a business card); Bank of America Letter; SIFMA Letter.

Regulation Best Interest, Form CRS, and/or other required disclosure obligations (*e.g.,* Form ADV, FINRA Rule 2210) would inform retail investors of the capacity of a firm and its financial professionals, obviating the need for the additional rules.[829] Some of these commenters stated that Form CRS alone or in combination with FINRA Rule 2210(d)(3) (providing specific requirements for disclosure of the broker-dealer's name in retail communications and correspondence) would provide retail investors with a firm's capacity and its name, making the Affirmative Disclosures duplicative.[830]

Several commenters also opposed the Affirmative Disclosures because they believed the costs to implement and comply with the proposed rules did not justify the benefits.[831] In particular, these commenters noted a range of cost-related impacts, such as replacing new and existing business cards[832] and amending numerous electronic and print marketing materials.[833] Several commenters also noted the difficulty in implementing and supervising specific types of communication including business cards, oral communications, and voice overlay and on-screen text in televised or video presentations.[834]

After considering the comments received and the obligations we are adopting under Regulation Best Interest

and Form CRS, we have concluded that the capacity disclosure requirement in Regulation Best Interest and Form CRS are sufficient to achieve the objectives of the proposed Affirmative Disclosures. These rules enhance retail investor awareness of the firm and professional type that they are engaging or seeking to engage and would therefore assist a retail investor in choosing the type that best suits his or her financial goals.

As discussed in the Regulation Best Interest Release, as part of its disclosure obligations, a broker-dealer and its associated natural persons must disclose when they are acting as a broker-dealer when making a recommendation. This type of disclosure is designed to improve awareness among retail customers such that a retail customer can more readily identify and understand their relationship.[835] This capacity disclosure requires a broker-dealer and its financial professionals to disclose that the firm or the financial professional is acting as a broker-dealer, as a material fact relating to the scope and terms of the relationship subject to its disclosure obligation.[836] As noted in the Regulation Best Interest Release, a broker-dealer and its financial professionals must disclose the required information prior to or at the time of a recommendation but Regulation Best Interest does not mandate the form, specific time, or method of delivering disclosures pursuant to its disclosure obligation.[837] In fulfilling this obligation, a broker-dealer that is not a dual registrant generally will be able to satisfy the requirement to disclose the broker-dealer's capacity by delivering the Relationship Summary to the retail customer. For broker-dealers who are dually registered, and for associated persons who are either dually licensed or are not dually licensed and only offer broker-dealer services through a firm that is dually registered, the information contained in the Relationship Summary will not be sufficient to disclose their capacity in making a recommendation.[838] As discussed in the Regulation Best Interest Release, although some commenters expressed concerns about potential investor confusion caused by "additional" disclosure regarding a dual registrant's capacity, the disclosure obligations of Regulation Best Interest will not duplicate or confuse, but instead will provide clarifying detail on capacity to

supplement the information contained in the Relationship Summary.[839]

Additionally, as discussed above, Form CRS includes a requirement for firms to state their name and whether they are "registered with the Securities and Exchange Commission as a broker-dealer, investment adviser, or both."[840] Form CRS is required to be delivered before or at the time the financial professional enters into an investment advisory relationship or, for a broker-dealer, before or at the earliest of a certain recommendation, the execution of a securities transaction, or the opening of a brokerage account.[841] Additionally, Form CRS will need to be prominently posted on the firm's public website, if it maintains one, in a location and format that is easily accessible to retail investors[842] and must be provided to retail investors 60 days after a material change is made.[843] These requirements highlight for an investor's attention, and promote access to, the capacity information at times that we believe are crucial to a retail investor when seeking to make a choice of financial firms.

We recognize that the proposed Affirmative Disclosures would have included capacity requirements on more communications than what is required by Form CRS and capacity disclosure requirement in Regulation Best Interest. Specifically, under the Affirmative Disclosures, all forms of communications used by broker-dealers, investment advisers and their financial professionals, such as business cards, letterheads, social media profiles, and signature blocks would have included these required capacity disclosures. However, several commenters questioned whether the benefit provided by covering more communications justified the costs of implementing the requirements.[844]

---

[829] *See, e.g.,* LPL Financial Letter (stating that Form ADV, Form CRS, and Regulation Best Interest already "communicate to investors the capacity in which they are acting on behalf of the investor and the material facts related to the investor's relationship with the firm and its financial professionals."); SIFMA Letter (stating that "information regarding regulatory status is contained in Proposed Form CRS, and Proposed Form CRS is available at all times on a firm's website, in addition to periodic distribution to clients."); IRI Letter; Committee of Annuity Insurers Letter; Letter from Mari-Anne Pisarri, Pickard Djinis and Pisarri LLP ("Pickard Letter") (stating "the Commission should determine whether the existing Form ADV brochure supplement adequately informs retail investors of the registration status of the advisory representatives they deal with . . . .")

[830] *See, e.g.,* IRI Letter; Bank of America Letter; Committee of Annuity Insurers Letter. *See also* SIFMA Letter (noting that Form CRS resolves any confusion that may exist regarding whether a financial professional or firm is a broker-dealer or an investment adviser and would be available on a firm website and given periodically to investors).

[831] *See, e.g.,* LPL Financial Letter; Bank of America Letter; IRI Letter; SIFMA Letter.

[832] *See* IRI Letter. *See also* SIFMA Letter (noting also that firms would need to reprint all business cards and modify "firm technologies and electronic communications").

[833] *See* LPL Financial Letter (noting "significant financial costs").

[834] *See* Bank of America Letter; IRI Letter; SIFMA Letter; Altruist Letter. *See also* Committee of Annuity Insurers Letter (noting also that there are operational challenges in situations where marketing materials or account statements are used or distributed by a product sponsor rather than the firm itself).

[835] *See* Regulation Best Interest Release, *supra* footnote 47, at Section II.C.1.a.

[836] *See id.*

[837] *See id.*

[838] *See id.*

[839] *See id.*

[840] *See* Item 1.A. of Form CRS. *See also supra* Section II.B.1.

[841] *See* General Instruction 7.B to Form CRS. *See also supra* Section II.C.

[842] *See* General Instruction 10.A. to Form CRS. *See also supra* Section II.C.3.a.

[843] *See* General Instruction 8.B. to Form CRS. *See also supra* Section II.C.4. In addition, the most recent versions of firms' relationship summaries will be accessible through *Investor.gov. See supra* footnote 698 and accompanying text.

[844] *See, e.g.,* IRI Letter (stating that the costs to amend "tens of thousands of business cards to add the new required disclosure outweighs any intended benefit, particularly since the Form CRS already accomplishes the same objective . . ."); Committee of Annuity Insurers Letter (stating that the Affirmative Disclosure rules provide little benefit to investors and present operational challenges with respect to marketing materials created by product sponsors or issuers); LPL Financial Letter (noting that the benefits of these rules are outweighed by the "significant financial

While commenters did not provide quantitative data that would demonstrate the cost impact on firms, certain commenters did describe the scope of the impact along with the operational challenges in implementing the rule.[845] One commenter stated that ''the costs of such requirement would be significant'' as firms would need to reprint all business cards to include this disclosure and make changes to firm technology and electronic communications to make the disclosure.[846] Additionally, another commenter stated that adding a voice overlay and on-screen text for video presentations would be difficult to implement, costly, and challenging to supervise.[847]

After considering the comments received and the obligations we are adopting under Regulation Best Interest and Form CRS, we have concluded that the policy concerns underlying the Affirmative Disclosures are addressed by the rulemaking package we are adopting, particularly the disclosure

---

cost'' to amend ''numerous electronic and print marketing materials, business cards, and other retail customer communications.'')

[845] *See* IRI Letter (noting that a voice overlay and on-screen text may be difficult to implement and to effectively supervise. Additionally, firms will incur ''significant costs and resources to monitor such presentations'' for the required disclosures ''even though that same client already received the Form CRS disclosure.''); LPL Financial Letter. *See also* Bank of America Letter (''the [Affirmative Disclosure rules] will impose significant costs to implement since tens of thousands of business cards will need to be amended in order to add the new required disclosures.'')

[846] *See* SIFMA Letter (noting that ''we do not believe the regulatory status disclosure would have an obvious benefit to investors. At the same time, the costs of such a requirement would be significant.'')

[847] *See* Bank of America Letter (stating further that ''it would be virtually impossible to supervise whether [the required] disclosure was made in oral communications.''); *see also* Altruist Letter (stating that including the disclosure in oral communications would be ''awkward for a practitioner to implement.''); Committee of Annuity Insurers Letter (stating that ''it may not be feasible for a broker-dealer to include this information on marketing materials for investment products created and provided by a product sponsor.'')

obligations in Regulation Best Interest and Form CRS, as discussed above.[848] We therefore believe that the costs of the Affirmative Disclosures do not justify any incremental benefit of requiring registration status on all communications and as a result, we are not adopting the Affirmative Disclosures.

## IV. Economic Analysis

### A. Introduction

The Commission is sensitive to the economic effects, including the benefits and costs and the effects on efficiency, competition, and capital formation that will result from the new rules and amendments to existing rules. Whenever the Commission engages in rulemaking and is required to consider or determine whether an action is necessary or appropriate in the public interest, section 3(f) of the Exchange Act requires the Commission to consider whether the action would promote efficiency, competition, and capital formation, in addition to the protection of investors.[849] Further, when making rules under the Exchange Act, section 23(a)(2) of the Exchange Act requires the Commission to consider the impact such rules would have on competition.[850] Section 23(a)(2) of the Exchange Act also prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.[851]

Section 202(c) of the Advisers Act requires the Commission, when engaging in rulemaking and required to consider or determine whether an action is necessary or appropriate in the public interest, to also consider whether the action will promote efficiency, competition, and capital formation, in

---

[848] *See* Regulation Best Interest Release, *supra* footnote 47.

[849] *See* 15 U.S.C. 77b(b) and 15 U.S.C. 78c(f).

[850] *See* 15 U.S.C. 78w(a)(2).

[851] *Id.*

addition to the protection of investors.[852] The Commission provides both a qualitative assessment of the potential effects and where feasible, quantitative estimates of the potential aggregate initial and aggregate ongoing costs. In some cases, however, quantification is not feasible due to lack of relevant data, or the difficulty of predicting how market participants would act under the conditions of the proposed rules. For example, to the extent that the relationship summary will increase retail investors' understanding of the services provided to them, investors are likely to respond differently to the increased understanding. Such responses could be transferring to a different financial firm or professional, hiring a financial professional for the first time, not taking any action, deciding to invest on their own without advice, or entirely abandoning the brokerage or investment advisory market while moving their assets to other products or markets (*e.g.,* bank deposits or insurance products). Given the number and complexity of assumptions that would be required to be able to estimate how the relationship summary will affect investors' understanding and their decision-making, the Commission is not able to estimate the propensity of investors to respond in one way or another.

In the economic analysis that follows, we first examine the current regulatory and economic landscape to form a baseline for our analysis. The economic effects of the adopted changes are discussed below.

### B. Baseline

This section discusses, as it relates to this rulemaking, the current state of the broker-dealer and investment adviser markets, the current regulatory environment, and the current state of retail investor perceptions in the market.

---

[852] 15 U.S.C. 80b–2(c).

1. Providers of Financial Services [853]

a. Broker-Dealers

This rule will affect registrants in the market for broker-dealer services, including dual registrants [854] and broker-dealers offering services to retail investors that are affiliated with an investment adviser.[855] The market for broker-dealer services encompasses a small set of large and medium sized broker-dealers and thousands of smaller broker-dealers competing for niche or regional segments of the market.[856] The market for broker-dealer services includes many different markets for a variety of services, including, but not limited to, managing orders for customers and routing them to various trading venues; providing advice to customers that is in connection with and reasonably related to their primary business of effecting securities transactions; holding retail customers' funds and securities; handling clearance and settlement of trades; intermediating between retail customers and carrying/clearing brokers; dealing in corporate debt and equities, government bonds, and municipal bonds, among others; privately placing securities; and effecting transactions in mutual funds that involve transferring funds directly to the issuer. Some broker-dealers may specialize in just one narrowly defined service, while others may provide a wide variety of services.

As of December 2018, there were approximately 3,764 registered broker-dealers with over 140 million customer accounts. In total, these broker-dealers have over $4.3 trillion in total assets, which are total broker-dealer assets as reported on Form X–17a–5.[857] More than two-thirds of all brokerage assets and close to one-third of all customer accounts are held by the 17 largest broker-dealers, as shown in Table 1, Panel A.[858] Of the broker-dealers registered with the Commission as of December 2018, 359 broker-dealers are dually registered as investment advisers.[859] These firms hold over 90 million (63%) customer accounts. Approximately 539 broker-dealers (14%) report at least one type of non-securities business, including insurance, retirement planning, mergers and acquisitions, and real estate, among others.[860] Approximately 73.5% of registered broker-dealers report retail customer activity.[861]

Panel B of Table 1 is limited to the broker-dealers that report some retail investor activity. As of December 2018, there are approximately 2,766 broker-dealers that served retail investors, with over $3.8 trillion in total assets (89% of total broker-dealer assets) and almost 139 million (97%) customer accounts.[862] Of those broker-dealers serving retail investors, 318 are dually registered as investment advisers.[863]

[853] In addition to broker-dealers and Commission-registered investment advisers discussed below in the baseline, there are a number of other entities, such as state registered investment advisers, commercial banks and bank holding companies, and insurance companies, which also provide financial advice services to retail customers; however, because of unavailability of data, the Commission is unable to estimate the number of some of those other entities that are likely to provide financial advice to retail customers. A number of broker-dealers (*see infra* footnote 862) have non-securities businesses, such as insurance or tax services. As of December 2018, there are approximately 17,300 state-registered investment advisers. The Department of Labor in its Regulatory Impact Analysis identifies approximately 398 life insurance companies that could provide advice to retirement investors. *See* U.S. Department of Labor, *Regulating Advice Markets: Definition of the Term 'Fiduciary,' Conflicts of Interest, Retirement Investment Advice: Regulatory Impact Analysis for Final Rule and Exemptions* (Apr. 2016), *available at https://www.dol.gov/sites/default/files/ebsa/laws-and-regulations/rules-and-regulations/completed-rulemaking/1210-AB32-2/ria.pdf* (''Regulatory Impact Analysis'')

[854] Not all firms that are dually registered as an investment adviser and a broker-dealer offer both brokerage and advisory accounts to retail investors. For example, some dually registered firms offer advisory accounts to retail investors but offer only brokerage services, such as underwriting services, to institutional clients. For the purposes of the relationship summary, we define a dual registrant as a firm that is dually registered as a broker-dealer and an investment adviser and offers services to retail investors as both a broker-dealer and investment adviser. General Instruction 11.C to Form CRS.

[855] Some broker-dealers may be affiliated with investment advisers but are not dually registered. From Question 10 on Form BD, 2,098 (55.7%) broker-dealers report that directly or indirectly, they control, are controlled by, or are under common control with an entity that is engaged in the securities or investment advisory business. Comparatively, 2,421 (18.2%) SEC-registered investment advisers report an affiliate that is a broker-dealer in Section 7A of Schedule D of Form ADV, including 1,878 SEC-registered investment advisers that report an affiliate that is a registered broker-dealer. Approximately 77% of total regulatory assets under management of investment advisers are managed by these 2,421 SEC-registered investment advisers.

[856] *See* Risk Management Controls for Brokers or Dealers with Market Access, Securities Exchange Act Release No. 63241 (Nov. 3, 2010) [75 FR 69791 (Nov. 15, 2010)]. For simplification, we present our analysis as if the market for broker-dealer services encompasses one broad market with multiple segments, even though, in terms of competition, it could also be discussed in terms of numerous interrelated markets.

[857] Assets are estimated by Total Assets (allowable and non-allowable) from Part II of the FOCUS filings (Form X–17A–5 Part II, *available at https://www.sec.gov/files/formx-17a-5_2.pdf*) and correspond to balance sheet total assets for the broker-dealer. The Commission does not have an estimate of the total amount of customer assets for broker-dealers. We estimate broker-dealer size from the total balance sheet assets as described above.

[858] Approximately $4.27 trillion of total assets of broker-dealers (99%) are at firms with total assets in excess of $1 billion. Of the 39 dually registered broker-dealers with total assets in excess of $1 billion, total assets for these dually registered broker-dealers are $2.32 trillion (54%) of aggregate broker-dealer assets. Of the remaining 99 broker-dealers with total assets in excess of $1 billion that are not dually registered, 91 have affiliated investment advisers.

[859] Because this number does not include the number of broker-dealers who are also registered as state investment advisers, the number undercounts the full number of broker-dealers that operate in both capacities.

[860] We examined Form BD filings to identify broker-dealers reporting non-securities business. For the 539 broker-dealers reporting such business, staff analyzed the narrative descriptions of these businesses on Form BD, and identified the most common types of businesses: Insurance (202), management/financial/other consulting (99), advisory/retirement planning (71), mergers and acquisitions (70), foreign exchange/swaps/other derivatives (28), real estate/property management (30), tax services (15), and other (146). Note that a broker-dealer may have more than one line of non-securities business.

[861] The value of customer accounts is not available from FOCUS data for broker-dealers. Therefore, to obtain estimates of firm size for broker-dealers, we rely on the value of broker-dealers' total assets as obtained from FOCUS reports. Retail sales activity is identified from Form BR, which categorizes retail activity broadly (by marking the ''sales'' box) or narrowly (by marking the ''retail'' or ''institutional'' boxes as types of sales activity). We use the broad definition of sales as we preliminarily believe that many firms will just mark ''sales'' if they have both retail and institutional activity. However, this may capture some broker-dealers that do not have retail activity, although we are unable to estimate that frequency.

[862] Total assets and customer accounts for broker-dealers that serve retail customers also include institutional accounts. Data available from Form BD and FOCUS data is not sufficiently granular to identify the percentage of retail and institutional accounts at firms.

[863] Of the 31 dually registered firms in the group of retail broker-dealers with total assets in excess of $500 million, total assets for these dually registered firms are nearly $2.32 trillion (60%) of aggregate retail broker-dealer assets (Table 1, Panel B). Of the remaining 81 retail broker-dealers with total assets in excess of $500 million that are not dually registered, 69 have affiliated investment advisers.

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33561**

TABLE 1—PANEL A: REGISTERED BROKER-DEALERS AS OF DECEMBER 2018

[Cumulative broker-dealer total assets and customer accounts]

| Size of broker-dealer (total assets) | Total number of broker-dealers | Number of dually registered broker-dealers | Cumulative total assets (billion) | Cumulative number of customer accounts [864] |
|---|---|---|---|---|
| >$50 billion | 17 | 10 | $2,879 | 40,550,200 |
| $1 billion to $50 billion | 114 | 22 | 1,363 | 96,037,591 |
| $500 million to $1 billion | 35 | 7 | 23 | 397,814 |
| $100 million to $500 million | 105 | 19 | 23 | 1,603,818 |
| $10 million to $100 million | 490 | 101 | 17 | 4,277,432 |
| $1 million to $10 million | 1,021 | 130 | 3.6 | 460,748 |
| <$1 million | 1,982 | 70 | 0.5 | 5,675 |
| Total [865][866] | 3,764 | 359 | 4,309 | 143,333,278 |

TABLE 1—PANEL B: REGISTERED RETAIL BROKER-DEALERS AS OF DECEMBER 2018

[Cumulative broker-dealer total assets and customer accounts]

| Size of broker-dealer (total assets) | Total number of retail-facing broker-dealers | Number of dually registered retail-facing broker-dealers | Cumulative total assets (billion) | Cumulative number of customer accounts |
|---|---|---|---|---|
| >$50 billion | 16 | 8 | $2,806 | 40,545,792 |
| $1 billion to $50 billion | 75 | 18 | 990 | 91,991,118 |
| $500 million to $1 billion | 21 | 5 | 13 | 365,632 |
| $100 million to $500 million | 84 | 16 | 18 | 1,603,818 |
| $10 million to $100 million | 378 | 91 | 14 | 3,762,620 |
| $1 million to $10 million | 783 | 120 | 2.8 | 450,132 |
| <$1 million | 1,409 | 60 | 0.4 | 5,672 |
| Total BDs [867] | 2,766 | 318 | 3,844 | 138,724,784 |

Table [868] 2 reports information on brokerage commissions,[869] fees, and selling concessions from the fourth quarter of 2018 for all broker-dealers, including dually-registered firms.[870] We observe significant variation in sources of revenues for broker-dealers, with large broker-dealers, on average, generating substantially higher levels of commission and fee revenues than smaller broker-dealers. On average, broker-dealers, including those that are dually registered as investment advisers, earn about $5.1 million per quarter in revenue from commissions and nearly four times that amount in fees, although the Commission notes that fees encompass a variety of fees.[871] The level of revenues earned from broker-dealers for commissions and fees increases with broker-dealer size, but also tends to be more heavily weighted toward commissions for broker-dealers with less than $10 million in assets and is weighted more heavily toward fees for broker-dealers with assets in excess of $10 million. For example, for the 114

[864] Customer Accounts includes both broker-dealer and investment adviser accounts for dually-registered firms.

[865] The data is obtained from FOCUS filings as of December 2018. Note that there may be a double-counting of customer accounts among, in particular, the larger broker-dealers, as they may report introducing broker-dealer accounts as well accounts in their role as clearing broker-dealers.

[866] In addition to the approximately 143 million individual accounts at broker-dealers, there are approximately 302,000 omnibus accounts (0.2% of total accounts at broker-dealers), with total assets of $32.1 billion, across all 3,764 broker-dealers, of which approximately 99% are held at broker-dealers with greater than $1 billion in total assets. *See also infra* footnote 872. Omnibus accounts reported in FOCUS data are the accounts of non-carrying broker-dealers with carrying broker-dealers. These accounts may have securities of multiple customers (of the non-carrying firm), or securities that are proprietary assets of the non-carrying broker-dealer. We are unable to determine from the data available how many customer

accounts non-carrying broker-dealers may have. The data does not allow the Commission to parse the total assets in those accounts to determine to whom such assets belong. Therefore, our estimate may be under inclusive of all customer accounts held at broker-dealers.

[867] Total Broker-dealers includes all retail-facing broker-dealers, including those dual registrants that have both retail-facing broker-dealers and retail-facing investment advisers.

[868] *See infra* footnote 1397 for how broker-dealers who engage in retail sales activity are identified. In addition to the 318 retail-facing dually registered broker-dealers, we estimate 30 broker-dealers that are registered as investment advisers but do not have a retail-facing investment advisory business.

[869] Mark-ups or mark-downs are not included as part of the brokerage commission revenue in FOCUS data; instead, they are included in Net Gains or Losses on Principal Trades, but are not uniquely identified as a separate revenue category.

[870] Source: FOCUS data.

[871] Fees, as detailed in the FOCUS data, include fees for account supervision, investment advisory

services, and administrative services. Beyond the broad classifications of fee types included in fee revenue, we are unable to determine whether fees such as 12b–1 fees, sub-accounting, or other such service fees (*e.g.,* payments by an investment company for personal services and/or maintenance of shareholder accounts) are included. The data covers both broker-dealers and dually registered firms. FINRA's Supplemental Statement of Income, Line 13975 (Account Supervision and Investment Advisory Services) denotes that fees earned for account supervision are those fees charged by the firm for providing investment advisory services where there is no fee charged for trade execution. Investment Advisory Services generally encompass investment advisory work and execution of client transactions, such as wrap arrangements. These fees also include fees charged by broker-dealers that are also registered with the Commodity Futures Trading Commission ("CFTC"), but do not include fees earned from affiliated entities (Item A of question 9 under Revenue in the Supplemental Statement of Income).

**33562**     **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

broker-dealers with assets between $1 billion and $50 billion, average revenues from commissions are approximately $45 million, while average revenues from fees are approximately $225 million.[872]

In addition to revenue generated from commissions and fees, broker-dealers may also receive revenues from other sources, including margin interest, underwriting, research services, and third-party selling concessions, such as from sales of investment company ("IC") shares. As shown in Table 2,

Panel A, these selling concessions are generally a smaller fraction of broker-dealer revenues than either commissions or fees, except for broker-dealers with total assets between $10 million and $100 million. For these broker-dealers, revenue from third-party selling concessions is the largest category of revenues and constitutes approximately 42% of total revenues earned by these firms.

Table 2, Panel B below provides aggregate revenues by revenue type (commissions, fees, or selling

concessions from sales of IC shares) for broker-dealers delineated by whether the broker-dealer is also a dually-registered firm. Broker-dealers dually registered as investment advisers have a significantly larger fraction of their revenues from fees other than commissions or selling concessions, whereas commissions are approximately 42% of the revenues of broker-dealers that are not dually registered.

TABLE 2—PANEL A: AVERAGE BROKER-DEALER REVENUES FROM REVENUE GENERATING ACTIVITIES

| Size of broker-dealer in total assets | Number of broker-dealers | Commissions | Fees [873] [874] | Sales of IC shares |
|---|---|---|---|---|
| >$50 billion | 17 | $170,336,258 | $414,300,268 | $23,386,192 |
| $1 billion–$50 billion | 114 | 45,203,225 | 225,063,257 | 53,671,602 |
| 500 million–1 billion | 35 | 8,768,547 | 30,141,270 | 5,481,248 |
| 100 million–500 million | 105 | 12,801,889 | 33,726,336 | 16,610,013 |
| 10 million–100 million | 490 | 3,428,843 | 8,950,892 | 9,092,971 |
| 1 million–10 million | 1,021 | 996,130 | 1,037,825 | 652,905 |
| <1 million | 1,982 | 197,907 | 269,459 | 85,219 |
| Average of All Broker-Dealers | 3,764 | 5,092,808 | 21,948,551 | 4,368,823 |

TABLE 2—PANEL B: AGGREGATE TOTAL REVENUES FROM REVENUE GENERATING ACTIVITIES FOR BROKER-DEALERS BASED ON DUALLY-REGISTERED STATUS

| Broker-dealer type | Number of broker-dealers | Commissions (billion) | Fees [875] (billion) | Sales of IC shares (billion) |
|---|---|---|---|---|
| Dually Registered as IAs | 359 | $4.52 | $17.54 | $2.63 |
| Broker-Dealers | 3,405 | 4.16 | 3.25 | 2.57 |
| All | 3,764 | 8.68 | 20.79 | 5.20 |

As shown in Table 3, based on responses to Form BD, broker-dealers most commonly provided business lines include private placements of securities (62.7% of broker-dealers); retail sales of mutual funds (55.4%); acting as a broker or dealer retailing corporate equity

securities over the counter (52.0%); acting as a broker or dealer retailing corporate debt securities (47.2%); acting as a broker or dealer selling variable contracts, such as life insurance or annuities (41.0%); acting as a broker of municipal debt/bonds or U.S.

government securities (39.8% and 37.4%, respectively); acting as an underwriter or selling group participant of corporate securities (31.2%); and investment advisory services (26.4%); among others.[876]

TABLE 3—LINES OF BUSINESS AT RETAIL BROKER-DEALERS AS OF DECEMBER 2018

| Line of business | Number of broker-dealers (total) | Percent of broker-dealers (total) |
|---|---|---|
| Private Placements of Securities | 1,735 | 62.7 |
| Mutual Fund Retailer | 1,533 | 55.4 |
| Broker or Dealer Retailing: | | |
| Corporate Equity Securities OTC | 1,438 | 52.0 |
| Corporate Debt Securities | 1,306 | 47.2 |

[872] A rough estimate of total fees in this size category would be 114 broker-dealers with assets between $1 billion and $50 billion multiplied by the average fee revenue of $225 million, or $25.65 billion in total fees. Divided by the number of customer accounts, not all of which may pay fees, in this size category (96,037,591), each account would be charged on average approximately $267 in fees per quarter, or $1,068 per year.

[873] Fees, as detailed in the FOCUS data, include fees for account supervision, investment advisory services, and administrative services. The data covers both broker-dealers and dually registered firms.

[874] The data is obtained from December 2018 FOCUS reports and averaged across size groups.

[875] See id.

[876] Form BD requires applicants to identify the types of business engaged in (or to be engaged in) that accounts for 1% or more of the applicant's annual revenue from the securities or investment advisory business. Table 3 provides an overview of the types of businesses listed on Form BD, as well as the frequency of participation in those businesses by registered broker-dealers as of December 2018.

App 115

**Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations    **33563**

TABLE 3—LINES OF BUSINESS AT RETAIL BROKER-DEALERS AS OF DECEMBER 2018—Continued

| Line of business | Number of broker-dealers (total) | Percent of broker-dealers (total) |
| --- | --- | --- |
| Variable Contracts | 1,132 | 40.9 |
| Municipal Debt/Bonds—Broker | 1,101 | 39.8 |
| U.S. Government Securities Broker | 1,035 | 37.4 |
| Put and Call Broker or Dealer or Options Writer | 993 | 35.9 |
| Underwriter or Selling Group Participant—Corporate Securities | 862 | 31.2 |
| Non-Exchange Member Arranging for Transactions in Listed Securities by Exchange Member | 785 | 28.4 |
| Investment Advisory Services | 730 | 26.4 |
| Broker or Dealer Selling Tax Shelters or Limited Partnerships—Primary Market | 619 | 22.4 |
| Trading Securities for Own Account | 614 | 22.2 |
| Municipal Debt/Bonds—Dealer | 475 | 17.2 |
| U.S. Government Securities—Dealer | 339 | 12.3 |
| Solicitor of Time Deposits in a Financial Institution | 308 | 11.1 |
| Underwriter—Mutual Funds | 237 | 8.6 |
| Broker or Dealer Selling Interests in Mortgages or Other Receivables | 216 | 7.8 |
| Broker or Dealer Selling Oil and Gas Interests | 207 | 7.5 |
| Broker or Dealer Making Inter-Dealer Markets in Corporate Securities OTC | 207 | 7.5 |
| Broker or Dealer Involved in Networking, Kiosk, or Similar Arrangements (Banks, Savings Banks, Credit Unions) | 197 | 7.1 |
| Internet and Online Trading Accounts | 192 | 6.9 |
| Exchange Member Engaged in Exchange Commission Business Other than Floor Activities | 171 | 6.2 |
| Broker or Dealer Selling Tax Shelters or Limited Partnerships—Secondary Market | 164 | 5.9 |
| Commodities | 162 | 5.9 |
| Executing Broker | 107 | 3.9 |
| Day Trading Accounts | 89 | 3.2 |
| Broker or Dealer Involved in Networking, Kiosk, or Similar Arrangements (Insurance Company or Agency) | 88 | 3.2 |
| Real Estate Syndicator | 94 | 3.4 |
| Broker or Dealer Selling Securities of Non-Profit Organizations | 71 | 26 |
| Exchange Member Engaged in Floor Activities | 61 | 2.2 |
| Broker or Dealer Selling Securities of Only One Issuer or Associate Issuers | 43 | 1.6 |
| Prime Broker | 21 | 0.8 |
| Crowdfunding FINRA Rule 4518(a) | 21 | 0.8 |
| Clearing Broker in a Prime Broker | 14 | 0.5 |
| Funding Portal | 8 | 0.3 |
| Crowdfunding FINRA Rule 4518(b) | 5 | 0.2 |
| Number of Retail-Facing Broker-Dealers | 2,766 | |

*(1) Disclosures for Broker-Dealers*

As discussed above, broker-dealers register with and report information, including about their business, affiliates, and disciplinary history, to the Commission, Self-Regulatory Organizations (''SROs''), and other jurisdictions through Form BD.[877] Form BD requires information about the background of the applicant, its principals, controlling persons, and employees, as well as information about the type of business the broker-dealer proposes to engage in and all control affiliates engaged in the securities or investment advisory business.[878] Broker-dealers report whether a broker-dealer or any of its control affiliates have been subject to criminal prosecutions, regulatory actions, or civil actions in connection with any investment-related activity, as well as certain financial matters.[879] Once a broker-dealer is registered, it must keep its Form BD current by amending it promptly when the information is or becomes inaccurate for any reason.[880] In addition, firms report similar information and additional information to FINRA pursuant to FINRA Rule 4530.[881]

A significant amount of information concerning broker-dealers and their associated natural persons, including information from Form BD, Form BDW, and Forms U4, U5, and U6, is publicly available through FINRA's BrokerCheck system.[882] This information includes violations of and claims of violations of the securities and other financial laws by broker-dealers and their financial professionals; criminal or civil litigation, regulatory actions, arbitration, or customer complaints against broker-dealers and their financial professionals; and the employment history and licensing information of financial professionals associated with broker-dealers, among other things.[883]

---

[877] *See* Proposing Release, *supra* footnote 5, at Section IV.A.1.i.; *see also generally* Form BD.

[878] *See generally* Form BD.

[879] *See* Item 11 and Disclosure Reporting Pages of Form BD.

[880] *See* Exchange Act rule 15b3–1(a).

[881] *See* Proposing Release, *supra* footnote 5, at Section II.B.7. Pursuant to FINRA Rule 4530, broker-dealers are required to disclose certain information to FINRA that is not reported on Form BD (*e.g.,* customer complaints and arbitrations).

[882] FINRA Rule 8312 governs the information FINRA releases to the public via BrokerCheck. *See* Proposing Release, *supra* footnote 5, at n.280.

[883] *See* Proposing Release, *supra* footnote 5, at Section II.B.7.

Broker-dealers are subject to other disclosure obligations under the federal securities laws and SRO rules. For instance, under existing antifraud provisions of the Exchange Act, a broker-dealer has a duty to disclose material information to its customers conditional on the scope of the relationship with the customer.[884] Disclosure has also been a feature of other regulatory efforts related to financial services, including certain FINRA rules.[885]

b. Investment Advisers

As discussed above, SEC-registered investment advisers that offer services to retail investors will be subject to the final rule. In addition, although not required to comply with the final rule, state-registered investment advisers will also be affected, because the final rule will impact the competitive landscape in the market for the provision of financial advice.[886] This section first discusses SEC-registered investment advisers, followed by a discussion of state-registered investment advisers.

As of December 2018, there are approximately 13,300 investment advisers registered with the Commission. The majority of SEC-registered investment advisers report that they provide portfolio management services for individuals and small businesses.[887]

Of all SEC-registered investment advisers, 359 identify themselves as dually registered broker-dealers.[888] Further, 2,421 investment advisers (18%) report an affiliate that is a broker-dealer, including 1,878 investment advisers (14%) that report an SEC-registered broker-dealer affiliate.[889] As shown in Panel A of Table 4 below, in aggregate, investment advisers have over $84 trillion in assets under management ("AUM"). A substantial percentage of AUM at investment advisers is held by institutional clients, such as investment companies, pooled investment vehicles, and pension or profit sharing plans;

therefore, the total number of accounts for investment advisers is only 29% of the number of customer accounts for broker-dealers.

Based on staff analysis of Form ADV data as of December 2018, approximately 62% of registered investment advisers (8,235) have some portion of their business dedicated to retail investors, including both high net worth and non-high net worth individual clients,[890] as shown in Panel B of Table 4.[891] In total, these firms have approximately $41.4 trillion of assets under management.[892] Approximately 8,200 registered investment advisers (61%) serve over 32 million non-high net worth individual clients and have approximately $4.8 trillion in assets under management, while approximately 8,000 registered investment advisers (60%) serve approximately 4.8 million high net worth individual clients with $6.15 trillion in assets under management.[893]

TABLE 4—PANEL A: REGISTERED INVESTMENT ADVISERS (RIAS) AS OF DECEMBER 2018

[Cumulative RIA Assets Under Management (AUM) and Accounts]

| Size of investment adviser (AUM) | Number of RIAs | Number of dually registered RIAs | Cumulative AUM (billion) | Cumulative number of accounts |
|---|---|---|---|---|
| >$50 billion | 270 | 15 | $59,264 | 20,655,756 |
| $1 billion to $50 billion | 3,453 | 121 | 22,749 | 13,304,154 |
| $500 million to $1 billion | 1,635 | 47 | 1,151 | 1,413,099 |
| $100 million to $500 million | 5,927 | 119 | 1,397 | 5,135,070 |
| $10 million to $100 million | 1,070 | 24 | 59 | 310,031 |
| $1 million to $10 million | 162 | 3 | 0.8 | 69,664 |
| <$1 million | 782 | 30 | 0.02 | 13,976 |
| Total | 13,299 | 359 | 84,621 | 41,081,750 |

[884] A broker-dealer also may be liable if it does not disclose "material adverse facts of which it is aware." *See, e.g., Chasins* v. *Smith, Barney & Co.,* 438 F.2d 1167, 1172 (1970); *SEC* v. *Hasho,* 784 F. Supp. 1059, 1110 (S.D.N.Y. 1992); In the Matter of RichMark Capital Corp., Exchange Act Release No. 48758 (Nov. 7, 2003) ("When a securities dealer recommends stock to a customer, it is not only obligated to avoid affirmative misstatements, but also must disclose material adverse facts of which it is aware. That includes disclosure of "adverse interests" such as "economic self-interest" that could have influenced its recommendation.") (citations omitted).

[885] *See* FINRA Requests Comment on Concept Proposal to Require a Disclosure Statement for Retail Investors at or Before Commencing a Business Relationship, FINRA Regulatory Notice 10–54 (Oct. 2010). Generally, all registered broker-dealers that deal with the public must become members of FINRA, a registered national securities association, and may choose to become exchange members. *See* section 15(b)(8) of the Exchange Act and Exchange Act rule 15b9–1. FINRA is the sole national securities association registered with the SEC under section 15A of the Exchange Act.

Accordingly, for purposes of discussing a broker-dealer's regulatory requirements when providing advice, we focus on FINRA's regulation, examination, and enforcement with respect to member broker-dealers. FINRA disclosure rules include, but are not limited to, FINRA Rules 2210(d)(2) (communications with the public), 2260 (disclosures), 2230 (customer account statements and confirmations), and 2270 (day-trading risk disclosure statement).

[886] In addition to SEC-registered investment advisers, which are the focus of this section, this rule could also affect banks, trust companies, insurance companies, and other providers of financial advice.

[887] Of the approximately 13,300 SEC-registered investment advisers, 8,410 (63.24%) report in Item 5.G.(2) of Form ADV that they provide portfolio management services for individuals and/or small businesses. In addition, there are approximately 17,300 state-registered investment advisers, of which 125 are also registered with the Commission. Approximately 13,900 state-registered investment advisers are retail facing (*see* Item 5.D. of Form ADV).

[888] *See supra* footnote 861 and accompanying text.

[889] Item 7.A.1. of Form ADV.

[890] Data on individual clients obtained from Form ADV may not necessarily correspond to data on "retail customers" as defined in this rule because the data in Form ADV regarding individual clients does not involve any test of use for personal, family, or household purposes.

[891] We use the responses to Items 5.D.(a)(1), 5.D.(a)(3), 5.D.(b)(1), and 5.D.(b)(3) of Part 1A of Form ADV. If at least one of these responses was filled out as greater than 0, the firm is considered as providing business to retail investors. Part 1A of Form ADV.

[892] The aggregate AUM reported for these investment advisers that have retail investors includes both retail AUM as well as any institutional AUM also held at these advisers.

[893] Estimates are based on IARD system data as of December 31, 2018. The AUM reported here is specifically that of those non-high net worth clients. Of the 8,235 investment advisers serving retail investors, 318 are also dually registered as broker-dealers.

App 117

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33565**

TABLE 4—PANEL B: RETAIL REGISTERED INVESTMENT ADVISERS (RIAs) AS OF DECEMBER 2018

[Cumulative RIA Assets Under Management (AUM) and accounts]

| Size of investment adviser (AUM) | Number of RIAs | Number of dually registered RIAs | Cumulative AUM (billion) | Cumulative number of accounts |
|---|---|---|---|---|
| >$50 billion | 119 | 14 | $30,291 | 20,592,326 |
| $1 billion to $50 billion | 1,614 | 111 | 9,570 | 13,224,188 |
| $500 million to $1 billion | 1,007 | 44 | 700 | 1,392,842 |
| $100 million to $500 million | 4,548 | 113 | 1,026 | 5,287,584 |
| $10 million to $100 million | 706 | 23 | 40 | 308,285 |
| $1 million to $10 million | 102 | 3 | 0.5 | 69,534 |
| <$1 million | 169 | 10 | 0.02 | 13,946 |
| Total RIAs [894] | 8,235 | 318 | 41,434 | 40,887,325 |

In addition to SEC-registered investment advisers, other investment advisers are registered with state regulators.[895] As of December 2018, there are 17,268 state-registered investment advisers,[896] of which 125 are also registered with the Commission. Of the state-registered investment advisers, 204 are dually registered as broker-dealers, while approximately 4.6% (786) report a broker-dealer affiliate. In aggregate, state-registered investment advisers have approximately $334 billion in AUM. Eighty-two percent of state-registered investment advisers report that they provide portfolio management services for individuals and small businesses, compared to just 63% for Commission-registered investment advisers.

Approximately 81% of state-registered investment advisers (13,927) have some portion of their business dedicated to retail investors,[897] and in aggregate, these firms have approximately $324 billion in AUM.[898] Approximately 13,910 (81%) state-registered advisers serve 14 million non-high net worth retail clients and have approximately $137 billion in AUM, while 11,497 (67%) state-registered advisers serve approximately 170,000 high net worth retail clients with approximately $169 billion in AUM.[899]

Table 5 details the compensation structures employed by approximately 13,000 SEC-registered investment advisers. Approximately 96% are compensated through a fee-based arrangement, where a percentage of assets under management are remitted to the investment adviser from the investor for advisory services. As shown in the table below, most investment advisers rely on a combination of different compensation types, in addition to fee-based compensation, including fixed fees, hourly charges, and performance based fees. Less than 4% of investment advisers charge commissions [900] to their investors.

TABLE 5—REGISTERED INVESTMENT ADVISERS COMPENSATION BY TYPE

| Compensation type | Yes | No |
|---|---|---|
| A Percentage of Assets Under Management | 12,678 | 614 |
| Hourly Charges | 3,914 | 9,378 |
| Subscription Fees (For a Newsletter or Periodical) | 122 | 13,170 |
| Fixed Fees (Other Than Subscription Fees) | 5,800 | 7,492 |
| Commissions | 454 | 12,838 |
| Performance-Based Fees | 4,938 | 8,354 |
| Other | 1,899 | 11,393 |

As discussed above, many investment advisers participate in wrap fee programs. As of December 31, 2018, more than 8.5% of the SEC-registered investment advisers sponsor a wrap fee program and more than 13.1% act as a portfolio manager for one or more wrap

[894] Total RIAs (1) includes all retail-facing investment advisers, including those dual registrants that have retail-facing investment advisers and retail-facing broker-dealers.

[895] Item 2.A. of Part 1A of Form ADV and the Advisers Act rules 203A–1 and 203A–2 require an investment adviser to register with the SEC if it: (i) Is a large adviser that has $100 million or more of regulatory assets under management (or $90 million or more if an adviser is filing its most recent annual updating amendment and is already registered with the SEC); (ii) is a mid-sized adviser that does not meet the criteria for state registration or is not subject to examination; (iii) meets the requirements for one or more of the revised exemptive rules under section 203A; (iv) is an adviser (or subadviser) to a registered investment company; (v) is an adviser to a business development company and has at least $25 million of regulatory assets under management; or (vi) receives an order

permitting the adviser to register with the Commission. Although the statutory threshold is $100 million, the SEC raised the threshold to $110 million to provide a buffer for mid-sized advisers with assets under management close to $100 million to determine whether and when to switch between state and Commission registration. Advisers Act rule 203A–1(a).

[896] There are 70 investment advisers with latest reported regulatory assets under management in excess of $110 million but that are not listed as registered with the SEC. None of these 70 investment advisers has exempted status with the Commission. For the purposes of this rulemaking, these are considered potentially erroneous submissions

[897] We use the responses to Items 5.D.(a)(1), 5.D.(a)(3), 5.D.(b)(1), and 5.D.(b)(3) of Part 1A. If at least one of these responses was filled out as greater

than 0, the firm is considered as providing business to retail investors. Part 1A of Form ADV.

[898] The aggregate AUM reported for these investment advisers that have retail investors includes both retail AUM as well as any institutional AUM also held at these advisers.

[899] Estimates are based on IARD system data as of February 10, 2018. The AUM reported here is specifically that of those non-high net worth investors. Of the 13,927 state-registered investment advisers serving retail investors, 134 may also be dually registered as broker-dealers.

[900] Some investment advisers report on Item 5.E. of Form ADV that they receive ''commissions.'' As a form of deferred sales load, all payments of ongoing sales charges to intermediaries would constitute transaction-related compensation. Intermediaries receiving those payments should consider whether they need to register as broker-dealers under section 15 of the Exchange Act.

App 118

fee programs.[901] From the data available, we are unable to determine how many advisers provide advice about investing in wrap fee programs, because advisers providing such advice may be neither sponsors nor portfolio managers.

(1) Disclosures for Investment Advisers

As discussed more fully in the Fiduciary Release, investment advisers have a duty to provide full and fair disclosure of all material facts about the advisory relationship to their clients as well as to obtain informed consent from their clients. [902] SEC- and state-registered investment advisers are also subject to express disclosure requirements in Form ADV. Consistent with this duty and those requirements, investment advisers file Form ADV to register with the Commission or state securities authorities, as applicable, and provide an annual update to the form.[903] Part 1 of Form ADV provides information to regulators about the registrants' ownership, investors, and business, and it is made available to clients, prospective clients, and the public. Advisers also prepare a Form ADV Part 2A narrative brochure that contains information about the investment adviser's business practices, fees, conflicts of interest, and disciplinary information,[904] in addition to a Part 2B brochure supplement that includes information about the specific individuals, acting on behalf of the investment adviser, who actually provide investment advice and interact with the client.[905] The Part 2A brochure is the primary client-facing disclosure document,[906] however, Parts 1 and 2A are both made publicly available by the Commission through IAPD,[907] and advisers are generally required to deliver Part 2A and Part 2B to their clients.

c. Trends in the Relative Numbers of Providers of Financial Services

Over time, the relative number of broker-dealers and investment advisers has changed. Figure 1 presented below shows the time series trend of growth in broker-dealers and SEC-registered investment advisers between 2005 and 2018. Over the last 14 years, the number of broker-dealers has declined from over 6,000 in 2005 to less than 4,000 in 2018, while the number of investment advisers has increased from approximately 9,000 in 2005 to over 13,000 in 2018. This change in the relative numbers of broker-dealers and investment advisers over time likely affects the competition for advice, and potentially alters the choices available to retail investors regarding how to receive or pay for such advice, the nature of the advice, and the attendant conflicts of interest.

**BILLING CODE 8011–01–P**

---

[901] A wrap fee program sponsor is as a firm that sponsors, organizes, or administers the program or selects, or provides advice to clients regarding the selection of, other investment advisers in the program. *See* General Instructions to Form ADV.

[902] *See* Fiduciary Release *supra* footnote 47.

[903] *See* Advisers Act rules 203–1 and 204–1. Part 1 of Form ADV is the registration application for the Commission (and state securities authorities). Part 2 of Form ADV consists of a narrative ''brochure'' about the adviser and ''brochure supplements'' about certain advisory personnel on whom clients may rely for investment advice. *See* Brochure Adopting Release, *supra* footnote 576.

[904] Part 2A of Form ADV contains 18 mandatory disclosure items about the advisory firm, including information about an adviser's: (i) Range of fees; (ii) methods of analysis; (iii) investment strategies and risk of loss; (iv) brokerage, including trade aggregation polices and directed brokerage practices, as well as the use of soft dollars; (v) review of accounts; (vi) client referrals and other compensation; (vii) disciplinary history; and (viii) financial information, among other things. Much of the disclosure in Part 2A addresses an investment adviser's conflicts of interest with its investors, and is disclosure that the adviser, as a fiduciary, must make to investors in some manner regardless of the form requirements. *See* Brochure Adopting Release, *supra* footnote 576.

[905] Part 2B, or the ''brochure supplement,'' includes information about certain advisory personnel that provide retail client investment advice, and contains educational background, disciplinary history, and the adviser's supervision of the advisory activities of its personnel. *See* General Instruction 5 to Form ADV. Registrants are not required to file Part 2B (brochure supplement) electronically, but must preserve a copy of the supplement(s) and make the copy available upon request.

[906] *See* Brochure Adopting Release, *supra* footnote 576.

[907] *See* Investment Adviser Public Disclosure, *available at https://adviserinfo.sec.gov/.*

**Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations        **33567**

### Figure 1: Time Series of the Number of SEC-Registered Investment Advisers

### and Broker-Dealers (2005–2018)



**33568**    **Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations

An increase in the number of investment advisers and a decrease in the number of broker-dealers could have occurred for a number of reasons, including anticipation of possible regulatory changes to the industry, other regulatory restrictions,[908] technological innovation (*i.e.,* robo-advisers and online trading platforms), product proliferation (*e.g.,* index mutual funds and exchange-traded products), and industry consolidation driven by economic and market conditions, particularly among broker-dealers. Commission staff has observed the transition by broker-dealers from traditional brokerage services to also providing investment advisory services (often under an investment adviser registration, whether federal or state), and many firms have been more focused on offering fee-based accounts that provide a steady source of revenue rather than accounts that charge commissions and are dependent on transactions.[909] Broker-dealers have

indicated that the following factors have contributed to this migration: Provision of revenue stability or increase in profitability,[910] perceived lower

_____

and competition from discount brokerage firms has made fee-based products and services more attractive to providers of such products and services. Although discount brokerage firms generally provide execution-only services and do not compete directly in the advice market with full service broker-dealers and investment advisers, entry by discount brokers has contributed to lower commission rates throughout the broker-dealer industry. Further, fee-based activity generates a steady stream of revenue regardless of the customer trading activity, unlike commission-based accounts; *see also* Angela A. Hung, *et al., Investor and Industry Perspectives on Investment Advisers and Broker-Dealers,* RAND Institute for Civil Justice Technical Report (2008), *available at https://www.rand.org/content/dam/rand/pubs/technical_reports/2008/RAND_TR556.pdf* ("RAND 2008"), which discusses a shift from transaction-based to fee-based brokerage accounts prior to recent regulatory changes.

[910] Commission staff examined a sample of recent Form 10–K or Form 10–Q filings of large broker-dealers, many of which are dually registered as investment advisers, that have a large fraction of retail customer accounts to identify relevant broker-dealers. *See, e.g.,* The Jones Financial Companies, L.L.L.P., Form 10–K (Mar. 14, 2019), *available at https://www.sec.gov/Archives/edgar/data/815917/000156459019007788/ck0000815917-10k_20181231.htm*; Raymond James Financial, Inc., Form 10–K (Nov. 21, 2018), *available at https://www.sec.gov/Archives/edgar/data/720005/000072000518000083/rjf-20180930x10k.htm*; Stifle Financial Corp., Form 10–K (Feb. 20, 2019), *available at https://www.sec.gov/Archives/edgar/data/720672/000156459019003474/sf-10k_20181231.htm*; Wells Fargo & Co., 10–K (Feb. 27, 2019) *available at https://www.sec.gov/Archives/edgar/data/72971/000007297119000227/wfc-12312018x10k.htm*; and Ameriprise Financial Inc., Form 10–K (Feb. 23, 2018), *available at https://www.sec.gov/Archives/edgar/data/820027/000082002718000008/amp12312017.htm*. Discussions in Form 10–K and 10–Q filings of this sample of broker-dealers here may not be representative of other large broker-dealers or of

regulatory burden, and provisions of more services to retail customers.[911]

Further, there has been a substantial increase in the number of retail clients of investment advisers, both high net worth clients and non-high net worth clients as shown in Figure 2. Although the number of non-high net worth retail customers of investment advisers dipped between 2010 and 2012, since 2012, more than 12 million new non-high net worth retail clients have been added. With respect to assets under management, we observe a similar, albeit more pronounced pattern for non-high net worth retail clients as shown in Figure 3. For high net worth retail clients, there has been a pronounced increase in AUM since 2012, although AUM has leveled off since 2015.

_____

small to mid-size broker-dealers. Some firms have reported record profits as a result of moving clients into fee-based accounts, and cite that it provides "stability and high returns." *See* Hugh Son, *Morgan Stanley Wealth Management fees climb to all-time high,* Bloomberg (Jan. 18, 2018), *available at https://www.bloomberg.com/news/articles/2018-01-18/morgan-stanley-wealth-management-fees-hit-record-on-stock-rally*. Morgan Stanley increased the percentage of client assets in fee-based accounts from 37% in 2013 to 44% in 2017, while decreasing the dependence on transaction-based revenues from 30% to 19% over the same time period (Morgan Stanley, *Strategic Update* (Jan. 18, 2018), *available at https://www.morganstanley.com/about-us-ir/shareholder/4q2017-strategic-update.pdf*); *see also* Lisa Beilfuss & Brian Hershberg, *WSJ Wealth Adviser Briefing: The Reinvention of Morgan and Merrill, Adviser Profile,* The Wall Street Journal (Jan. 25, 2018), *available at https://blogs.wsj.com/moneybeat/2018/01/25/wsj-wealth-adviser-briefing-the-reinvention-of-morgan-and-merrill-adviser-profile/*.

[911] *See* Regulation Best Interest Release, *supra* footnote 47, at Section III.B.2.e.ii, which discusses industry trends.

_____

[908] *See* Hester Peirce, *Dwindling Numbers in the Financial Industry,* Brookings Center on Markets and Regulation Report (May 15, 2017), at 5, *available at https://www.brookings.edu/research/dwindling-numbers-in-the-financial-industry* ("Brookings Report") which notes that "SEC restrictions have increased by almost thirty percent [since 2000]," and that regulations post-2010 were driven in large part by the Dodd-Frank Act. Further, the Brookings Report observation of increased regulatory restrictions on broker-dealers only reflects CFTC or SEC regulatory actions, but does not include regulation by FINRA, SROs, National Futures Association, or the MSRB.

[909] *See id.* at 7. Beyond Commission observations, the Brookings Report also discusses the shift from broker-dealer to investment advisory business models for retail investors. Declining transaction-based revenue due to declining commission rates

**Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations    **33569**

**Figure 2: Time Series of the Number of Retail Clients of**

**Investment Advisers (2010 – 2018)**



**Figure 3: Time Series of the Retail Clients of**

**Investment Advisers Assets under Management (2010 – 2018)**



**33570** **Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations

BILLING CODE 8011–01–C

d. Registered Representatives of Broker-Dealers, Investment Advisers and Dually Registered Firms

We estimate the number of associated natural persons of broker-dealers through data obtained from Form U4, which generally is filed for individuals who are engaged in the securities or investment banking business of a broker-dealer that is a member of a SRO ("registered representatives").[912] Similarly, we approximate the number of supervised persons of registered investment advisers through the number of registered investment adviser representatives (or "registered IAR's"), who are supervised persons of investment advisers who meet the definition of investment adviser representatives in Advisers Act rule 203A–3 and are registered with one or more state securities authorities to solicit or communicate with clients.[913]

We estimate the number of registered representatives and registered IARs, including dually registered financial professionals, (together "registered financial professionals") at broker-dealers, investment advisers, and dual registrants by considering only the employees of those firms that have Series 6 or Series 7 licenses or are registered with a state as a broker-dealer agent or investment adviser representative.[914] We only consider employees at firms who have retail-facing business, as defined previously.[915] We observe in Table 6 that approximately 60% of registered financial professionals are employed by dually registered entities. The percentage varies by the size of the firm. For example, in firms with total assets between $1 billion and $50 billion, 67% of all registered financial professionals are employed by dually registered firms. Focusing on dually registered firms only, approximately 62.7% of total licensed representatives at these firms are dually registered financial professionals, approximately 36.9% are only registered representatives; and less than one percent are only registered investment adviser representatives.

TABLE 6—TOTAL REGISTERED REPRESENTATIVES AT BROKER-DEALERS, INVESTMENT ADVISERS, AND DUALLY REGISTERED FIRMS WITH RETAIL INVESTORS

| Size of firm (total assets for standalone BDs and dually registered firms; AUM for standalone IAs) | Total number of reps. | % of reps. in dually registered firms | % of reps. in standalone BD w/an IA affiliate | % of reps. in standalone BD w/o an IA affiliate | % of reps. in standalone IA w/a BD affiliate | % reps. in standalone IA w/o a BD affiliate |
|---|---|---|---|---|---|---|
| >$50 billion | 84,461 | 73 | 7 | 0 | 19 | 1 |
| $1 billion to $50 billion | 170,256 | 67 | 11 | 0 | 15 | 7 |
| $500 million to $1 billion | 29,874 | 71 | 5 | 1 | 7 | 16 |
| $100 million to $500 million | 66,924 | 51 | 27 | 0 | 4 | 18 |
| $10 million to $100 million | 106,178 | 55 | 42 | 1 | 1 | 1 |
| $1 million to $10 million | 33,790 | 35 | 54 | 11 | 0 | 0 |
| <$1 million | 12,522 | 8 | 52 | 36 | 3 | 1 |
| Total Licensed Representatives [916] | 504,005 | 60 | 23 | 2 | 9 | 6 |

In Table 7 below, we estimate the number of employees who are registered representatives, registered investment adviser representatives, or both ("dually registered representatives").[917] Similar to Table 6, we calculate these numbers using Form U4 filings. Here, we also limit the sample to employees at firms that have retail-facing businesses as discussed previously.[918]

In Table 7, approximately 25% of registered employees at registered broker-dealers or investment advisers are dually registered representatives.

However, this proportion varies significantly across size categories. For example, for firms with total assets between $1 billion and $50 billion,[919] approximately 35% of all registered employees are both registered representatives and investment adviser

---

[912] The number of associated natural persons of broker-dealers may be different from the number of registered representatives of broker-dealers because clerical/ministerial employees of broker-dealers are associated persons but are not required to register with the firm. Therefore, the registered representative number does not include such persons. However, we do not have data on the number of associated natural persons and therefore are not able to provide an estimate of the number of associated natural persons. We believe that the number of registered representatives is an appropriate approximation because they are the individuals at broker-dealers that provide advice and services to customers.

[913] See 17 CFR 275.203A–3. However, the data on numbers of registered IARs may undercount the number of supervised persons of investment advisers who provide investment advice to retail investors because not all supervised persons who provide investment advice to retail investors are required to register as IARs. For example, Commission rules exempt from IAR registration supervised persons who provide advice only to non-individual clients or to individuals that meet the definition of "qualified client." In addition, state securities authorities may impose different criteria for requiring registration as an investment adviser representative.

[914] We calculate these numbers based on Form U4 filings. Representatives of broker-dealers, investment advisers, and issuers of securities must file this form when applying to become registered in appropriate jurisdictions and with SROs. Firms and representatives have an obligation to amend and update information as changes occur. Using the examination information contained in the form, we consider an employee a financial professional if he has an approved, pending, or temporary registration status for either Series 6 or 7 (RR) or is registered as an investment adviser representative in any state or U.S. territory (IAR). We limit the firms to only those that do business with retail investors, and only to licenses specifically required for an RR or IAR.

[915] See supra footnotes 864 and 893.

[916] The classification of firms as dually registered, standalone broker-dealers, and standalone investment advisers comes from Forms BD, FOCUS, and ADV as described earlier. The number of representatives at each firm is obtained from Form U4 filings. Note that all percentages in the table have been rounded to the nearest whole percentage point.

[917] We calculate these numbers based on Form U4 filings.

[918] See supra footnotes 864 and 893.

[919] Firm size is defined as total assets from the balance sheet for broker-dealers and dually registered firms (source: FOCUS reports) and as assets under management for investment advisers (source: Form ADV). We are unable to obtain customer assets for broker-dealers, and for investment advisers. We can only obtain information from Form ADV as to whether the firm assets exceed $1 billion. We recognize that our approach of using firm assets for broker-dealers and customer assets for investment advisers does not allow for direct comparison; however, our objective is to provide measures of firm size and not to make comparisons between broker-dealers and investment advisers based on firm size. Across both broker-dealers and investment advisers, larger firms, regardless of whether we stratify on firm total assets or assets under management, have more customer accounts, are more likely to be dually registered, and have more representatives or employees per firm, than smaller broker-dealers or investment advisers.

App 123

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33571**

representatives. In contrast, for firms with total assets below $1 million, 13% of all employees are dually registered representatives.

TABLE 7—EMPLOYEES AT RETAIL FACING FIRMS WHO ARE REGISTERED REPRESENTATIVES, INVESTMENT ADVISER REPRESENTATIVES, OR BOTH

| Size of firm (total assets for standalone BDs and dually registered firms; AUM for standalone IAs) | Total number of employees | Percentage of dually registered representatives | Percentage of registered representatives only | Percentages of IARs only |
|---|---|---|---|---|
| >$50 billion | 218,539 | 19 | 16 | 1 |
| $1 billion to $50 billion | 328,842 | 35 | 12 | 4 |
| $500 million to $1 billion | 43,211 | 18 | 40 | 10 |
| $100 million to $500 million | 119,214 | 23 | 24 | 9 |
| $10 million to $100 million | 176,559 | 20 | 39 | 1 |
| $1 million to $10 million | 56,230 | 17 | 39 | 1 |
| <$1 million | 18,334 | 13 | 46 | 3 |
| Total Employees at Retail Facing Firms [920] | 960,929 | 25 | 23 | 4 |

Approximately 87% of investment adviser representatives are dual-hatted as registered representatives. This percentage is relatively unchanged from 2010. According to information provided in a FINRA comment letter in connection with the 913 Study,[921] 87.6% of registered investment adviser representatives were dually registered as registered representatives as of mid-October 2010.[922] In contrast, approximately 52% of registered representatives were dually registered as investment adviser representatives at the end of 2018.[923]

Broker-dealers and investment advisers must report certain criminal, regulatory, and civil actions and complaint information and information about certain financial matters in Forms U4 [924] and U5 [925] for their representatives. SROs, regulators and jurisdictions report disclosure events on Form U6.[926] FINRA's BrokerCheck system and IAPD discloses to the public certain information on registered representatives and investment adviser representatives, respectively, such as principal place of business, business activities, owners, and criminal prosecutions, regulatory actions, and civil actions in connection with any investment-related activity.

e. Investor Account Statistics

Investors seek financial advice and services to achieve a number of different goals, such as saving for retirement or children's college education. The OIAD/RAND survey estimates that approximately 73% of adults live in a household that invests.[927] The survey indicates that non-investors are more likely to be female, to have lower family income and educational attainment, and to be younger than investors.[928]

Approximately 35% of households that do invest do so through accounts such as broker-dealer or advisory accounts.[929]

As shown above in Figures 2 and 3, the number of retail investors and their assets under management associated with investment advisers has increased significantly, particularly since 2012. According to the Investment Company Institute ("ICI"), as of December 2016, nearly $24.2 trillion is invested in retirement accounts, of which $7.5 trillion is in IRAs.[930] A total of 43.3 million U.S. households have either an IRA or a brokerage account, of which an estimated 20.2 million U.S. households have a brokerage account and 37.7 million households have an IRA (including 72% of households that also hold a brokerage account).[931] With respect to IRA accounts, one commenter, the ICI, documents that 43 million U.S. households own either traditional or Roth IRAs and that approximately 70% are held with financial professionals, with the remainder being direct market.[932]

---

[920] *See supra* footnotes 918 and 919. Note that all percentages in the table have been rounded to the nearest whole percentage point.

[921] *See* Staff of the Securities and Exchange Commission, *Study on Investment Advisers and Broker-Dealers as Required by Section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act* (Jan. 2011), *available at* www.sec.gov/news/studies/2011/913studyfinal.pdf ("913 Study").

[922] Comment Letter of FINRA to File Number 4–606; Obligations of Brokers, Dealers and Investment Advisers (Nov. 3, 2010), at 1, *available at https://www.sec.gov/comments/4-606/4606-2836.pdf*.

[923] In order to obtain the percentage of IARs that are dually registered as registered representatives of broker-dealers, we sum the representatives at dually registered firms and those at investment advisers across size categories to obtain the aggregate number of representatives in each of the two categories. We then divide the aggregate dually registered representatives by the sum of the dually registered representatives and the IARs at investment adviser-only firms. We perform a similar calculation to obtain the percentage of registered representatives of broker-dealers that are dually registered as IARs.

[924] Form U4 requires disclosure of registered representatives' and investment adviser representatives' criminal, regulatory, and civil actions similar to those reported on Form BD or Form ADV as well as certain customer-initiated complaints, arbitration, and civil litigation cases. *See generally* Form U4.

[925] Form U5 requires information about representatives' termination from their employers.

[926] *See* FINRA, Current Uniform Registration Forms for Electronic Filing in Web CRD®, *available at http://www.finra.org/industry/web-crd/current-uniform-registration-forms-electronic-filing-web-crd.*

[927] *See* OIAD/RAND, *supra* footnote 3 (defining "investors" as persons "owning at least one type of investment account, (*e.g.,* an employer-sponsored retirement account, a non-employer sponsored retirement account such as an IRA, a college savings investment account, or some other type of investment account such as a brokerage or advisory account), or owning at least one type of investment asset (*e.g.,* mutual funds, exchange-traded funds or other funds, individual stocks, individual bonds, derivatives, and annuities)").

[928] OIAD/RAND, *supra* footnote 3.

[929] *Id.*.

[930] *See* Sarah Holden & Daniel Schrass, *The Role of IRAs in US Households' Saving for Retirement, 2016,* 23 ICI Res. Persp. 23–1 (Jan. 2017), *available at https://www.ici.org/pdf/per23-01.pdf.*

[931] The data is obtained from the Federal Reserve System's 2016 Survey of Consumer Finances ("SCF"), a triennial survey of approximately 6,200 U.S. households and imputes weights to extrapolate the results to the entire U.S. population. As noted, some survey respondent households have both a brokerage and an IRA account. *See* Board of Governors of the Federal Reserve System, *Survey of Consumer Finances* (2016), *available at https://www.federalreserve.gov/econres/scfindex.htm.* The SCF data does not directly examine the incidence of households that could use advisory accounts instead of brokerage accounts; however, some fraction of IRA accounts reported in the survey could be those held at investment advisers.

[932] *See* Sarah Holden & Daniel Schrass, *The Role of IRAs in U.S. Households' Saving for Retirement, 2018,* ICI Res. Persp. 24–10 (Dec. 2018), *available at https://www.ici.org/pdf/per24-10.pdf.*

**33572** **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

Further, ICI finds that approximately 64% of households have aggregate IRA (traditional and Roth) balances of less than $100,000, and approximately 36% of investors have balances below $25,000. As noted in one study, the growth of assets in traditional IRAs comes from rollovers from workplace retirement plans; for example, 58% of traditional IRAs consist of rollover assets, and contributions due to rollovers exceeded $460 billion in 2015 (the most recently available data).[933]

While the number of retail investors obtaining services from investment advisers and the aggregate value of associated assets under management has increased, the OIAD/RAND study also suggests that the general willingness of investors to use planning or to take financial advice regarding strategies, products, or accounts is relatively fixed over time.[934] With respect to the account assets associated with retail investors, the OIAD/RAND survey also estimates that approximately 10% of investors who have broker-dealer or advisory accounts hold more than $500,000 in assets, while approximately 47% hold $50,000 in assets or less. Altogether, many investors who have brokerage or advisory accounts trade infrequently, with approximately 31% reporting no annual transactions and an additional approximately 30% reporting three or fewer transactions per year.[935]

With respect to particular products, commenters have provided us with additional information about ownership of mutual funds and IRA account statistics. For example, ICI stated that 56 million U.S. households and nearly 100 million individual investors own mutual funds, of which 80% are held through 401(k) and other workplace retirement plans, while 63% of investors hold mutual funds outside of those plans.[936] Of those investors that own mutual funds outside of workplace retirement plans, approximately 50% rely on financial professionals, while nearly one-third purchase direct-sold funds either directly from the fund company or through a discount broker.[937]

Table 8 below provides an overview of account ownership segmented by account type (*e.g.,* IRA, brokerage, or both) and investor income category based on the SCF.[938]

TABLE 8—OWNERSHIP BY ACCOUNT TYPE IN THE U.S. BY INCOME GROUP

[As reported by the 2016 SCF]

| Income category | % Brokerage only | % IRA only | % Both brokerage and IRA |
|---|---|---|---|
| Bottom 25% | 1.2 | 7.6 | 2.4 |
| 25%–50% | 3.2 | 14. | 5.4 |
| 50%–75% | 4.1 | 21.4 | 11.4 |
| 75%–90% | 7.5 | 33.4 | 16.5 |
| Top 10% | 12.0 | 24.7 | 43.9 |
| Average | 4.4 | 18.3 | 11.6 |

With respect to the nature of the accounts held by investors and whether they are managed by financial professionals, the OIAD/RAND survey finds that 36% of its sample of participants report that they currently use a financial professional and approximately 33% receive some kind of recommendation service.[939] Of the subset of those investors who report holding a brokerage, advisory, or similar account, approximately 33% self-direct their own account, 25% have their account managed by a financial professional, and 10% have their account advised by a professional.[940] For those investors who take financial advice, the OIAD/RAND study suggests that they may differ in characteristics from other investors. Investors who take financial advice are generally older, retired, and have a higher income than other investors, but also may have lower educational attainment (*e.g.,* high school or less) than other investors.[941]

Similarly, one question in the SCF asks what sources of information households' financial decision-makers use when making decisions about savings and investments. Respondents can list up to fifteen possible sources from a preset list that includes ''Broker'' or ''Financial Planner'' as well as ''Banker,'' ''Lawyer,'' ''Accountant,'' and a list of non-professional sources.[942] Panel A of Table 8 below presents the breakdown of where households who have brokerage accounts seek advice about savings and investments. The table shows that of those respondents with brokerage accounts, 23% (4.7 million households) use advice services of broker-dealers for savings and investment decisions, while 49% (7.8 million households) take advice from a ''financial planner.'' Approximately 36% (7.2 million households) seek advice from other sources such as bankers, accountants, and lawyers. Almost 25% (5.0 million households) do not use advice from the above sources.

Panel B of Table 9 below presents the breakdown of advice received for

[933] *See id.*

[934] OIAD/RAND, *supra* footnote 3 (noting that this conclusion was limited by the methodology of comparing participants in a 2007 survey with those surveyed in 2018).

[935] OIAD/RAND, *supra* footnote 3.

[936] *See* ICI Letter; *see also* Sarah Holden, Daniel Schrass & Michael Bogdan, *Ownership of Mutual Funds, Shareholder Sentiment, and Use of the internet, 2018,* ICI Res. Persp. 24–8 (Nov. 2018), *available at https://www.ici.org/pdf/per24-08.pdf.*

[937] *See id.*

[938] *Id.* To the extent that investors have IRA accounts at banks that are not also registered as broker-dealers, our data may overestimate the numbers of IRA accounts held by retail investors that could be subject to this rulemaking.

[939] OIAD/RAND, *supra* footnote 3. In a focus group preceding the survey, focus group participants provided a number of reasons for not using a financial professional in making investments, including being unable or unwilling to pay the fees, doing their own financial research, being unsure of how to work with a professional, and being concerned about professionals selling products without attending to investors' plans and goals.

[940] *Id.*

[941] *Id.*

[942] The SCF, *supra* footnote 931, specifically asks participants ''Do you get advice from a friend, relative, lawyer, accountant, banker, broker, or financial planner? Or do you do something else?'' (*see* Federal Reserve, *Codebook for 2016 Survey of Consumer Finances* (2016), *available at https://www.federalreserve.gov/econres/files/codebk2016.txt*). Other response choices presented by the survey include ''Calling Around,'' ''Magazines,'' ''Self,'' ''Past Experience,'' ''Telemarketer,'' and ''Insurance Agent,'' as well as other choices. Respondents could also choose ''Do Not Save/Invest.'' The SCF allows for multiple responses, so these categories are not mutually exclusive. However, we would note that the list of terms in the question does not specifically include ''investment adviser.''

App 125

households who have an IRA. 15% (5.7 million households) rely on advice services of their broker-dealers and 48% (18.3 million households) obtain advice from financial planners. Approximately 41% (15.5 million households) seek advice from bankers, accountants, or lawyers, while the 25% (9.5 million households) use no advice or seek advice from other sources.

TABLE 9—PANEL A: SOURCES OF ADVICE FOR HOUSEHOLDS WHO HAVE A BROKERAGE ACCOUNT IN THE U.S. BY INCOME GROUP [943]

| Income category | % Taking advice from brokers | % Taking advice from financial planners | % Taking advice from lawyers, bankers, or accountants | % Taking no advice or from other sources |
|---|---|---|---|---|
| Bottom 25% | 20.55 | 53.89 | 35.64 | 24.30 |
| 25%–50% | 22.98 | 38.03 | 43.92 | 32.36 |
| 50%–75% | 20.75 | 52.00 | 31.42 | 23.61 |
| 75%–90% | 22.56 | 48.94 | 32.25 | 28.10 |
| Top 10% | 25.29 | 50.53 | 38.47 | 21.06 |
| Average | 23.02 | 49.02 | 35.99 | 24.94 |

TABLE 9—PANEL B: SOURCES OF ADVICE FOR HOUSEHOLDS WHO HAVE AN IRA IN THE U.S. BY INCOME GROUP [944]

| Income category | % Taking advice from brokers | % Taking advice from financial planners | % Taking advice from bankers, accountants, or lawyers | % Taking no advice or from other sources |
|---|---|---|---|---|
| Bottom 25% | 12.14 | 38.30 | 43.69 | 31.85 |
| 25%–50% | 9.79 | 43.82 | 40.67 | 32.74 |
| 50%–75% | 14.93 | 45.20 | 41.23 | 25.23 |
| 75%–90% | 14.68 | 52.14 | 41.65 | 24.26 |
| Top 10% | 21.40 | 55.40 | 40.03 | 18.56 |
| Average | 15.25 | 48.45 | 41.17 | 25.28 |

The OIAD/RAND survey notes that for survey participants who reported working with a specific individual for investment advice, 70% work with a dually registered firm, 5.4% with a broker-dealer, and 5.1% with an investment adviser.[945]

2. Investor Perceptions About the Marketplace for Financial Services and Disclosures

Our proposal discussed a number of studies providing information on investors' perceptions of the market for financial services and advice, including those conducted by Siegel & Gale [946] in 2005, RAND [947] in 2008 and CFA in 2010.[948] Commenters to the proposal provided their own studies or survey evidence conducted by third party research firms, which we have

discussed throughout the release.[949] In addition, the Commission's Office of the Investor Advocate collaborated with RAND to prepare the OIAD/RAND study,[950] which included focus groups and a survey about the retail market for investor advice. The Commission's Office of the Investor Advocate also engaged RAND to conduct investor testing of the proposed relationship summary using the dual registrant sample in the proposal. The report, RAND 2018,[951] discusses both larger sample survey results and smaller sample in-depth interview results. Finally, the proposal solicited public

feedback from individual investors on a feedback form issued with the Proposing Release.[952] Responses and data from these sources inform our understanding of how investors approach the marketplace for financial services and how investors respond to disclosures about financial services generally.

a. How Investors Select Financial Firms or Professionals

A number of surveys show that retail investors predominantly find their current financial firm or financial professional from personal referrals by family, friends, or colleagues.[953] For instance, the RAND 2008 study reported that 46% of survey respondents indicated that they located a financial professional from personal referral, although this percentage varied

---

[943] *Id.*

[944] *Id.*

[945] OIAD/RAND, *supra* footnote 3. As documented by OIAD/RAND, retail investors surveyed had difficulty in accurately identifying the type of relationship that they have with their financial professional.

[946] Proposing Release, *supra* footnote 5, at n.555.

[947] *Id.,* at n.556.

[948] *Id.,* at n.557.

[949] *See supra* footnotes 17–21.

[950] OIAD/RAND consisted of focus group discussions with 35 participants in total. OIAD/RAND caveats in its report that the participants in its focus groups were neither nationally representative nor randomly selected and that their results are anecdotal. OIAD/RAND also included a nationally representative probability based survey to allow researchers to reliably construct population estimates. OIAD/RAND, *supra* footnote 3.

[951] For RAND 2018, a sample of 1,816 individuals from the ALP Survey Panel were invited to complete the survey, and 1,460 (80.4%) actually completed the survey. 26% of respondents are categorized as non-investor. Median time spent going through the initial five screens of the relationship summary text was 4 minutes. RAND 2018, *supra* footnote 13.

[952] Proposing Release, *supra* footnote 5; *see also* Feedback Forms Comment Summary, *supra* footnote 13. More than 90 individuals answered with a response or comment relevant to at least one of the questions on the form, using an online version of the feedback form or by submitting a copy of the feedback form to the comment file in PDF format.

[953] *See* RAND 2008, *supra* footnote 912; 917 Financial Literacy Study, *supra* footnote 589.

**33574**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

depending on the type of service provided (*e.g.,* only 35% of survey participants used personal referrals for brokerage services). After personal referrals, RAND 2008 survey participants ranked professional referrals (31%), print advertisements (4%), direct mailings (3%), online advertisements (2%), and television advertisements (1%), as their source of locating individual professionals. The RAND 2008 study separately inquired about locating a financial firm,[954] in which respondents reported selecting a financial firm (of any type) based on: Referral from family or friends (29%), professional referral (18%), print advertisement (11%), online advertisements (8%), television advertisements (6%), direct mailings (2%), with a general "other" category (36%).

The 917 Financial Literacy Study provides similar responses, although it allowed survey respondents to identify multiple sources from which they obtained information that facilitated the selection of the current financial firm or financial professional.[955] In the 917 Financial Literacy Study,[956] 51% of survey participants received a referral from family, friends, or colleagues. Other sources of information or referrals came from: Referral from another financial professional (23%), online search (14%), attendance at a financial professional-hosted investment seminar (13%), advertisement (*e.g.,* television or newspaper) (11.5%), other (8%), while approximately 4% did not know or could not remember how they selected their financial firm or financial professional. Twenty-five percent of survey respondents indicated that the "name or reputation of the financial firm or financial professional" affected the selection decision.

The OIAD/RAND focus group study notes that among the factors that group participants report for not working with a financial professional was participants being unsure how they would go about working with a professional.[957]

b. Investor Confusion

As discussed in the Proposing Release and by commenters to the proposal, many sources indicate that retail investors do not understand or find confusing the distinctions between broker-dealers and investment advisers, particularly in terms of services provided and applicable standards of conduct.[958]

Studies such as those conducted by Siegel & Gale [959] in 2005, RAND [960] in 2008, and CFA in 2010,[961] discussed in the Proposing Release, support findings that retail investors are confused about the roles and titles of financial professionals. The OIAD/RAND study assessed survey and focus group participants' understanding of the types of financial services and financial professionals they used.[962] Specifically, the authors of the OIAD/RAND study asked survey participants who were investors to identify which type of financial professional they worked with (investment adviser, broker-dealer, or dually-registered firm). The authors

compared the types of financial professionals reported by the survey participants with the actual status of those financial professionals as verified on the IAPD database, and found that the verified types of financial professionals in many cases did not match the types of financial professionals that were reported by the survey participants.[963] For example, when financial professionals were verified to be dually registered, only 34% were reported by survey participants to be dually registered (and 56% were reported to be only investment advisers). In addition to the survey, the OIAD/RAND authors also asked a small focus group of participants that used financial professionals to identify which type of professional they were using, which was then verified by IAPD. Only one of the twelve participants was able to identify the correct type of financial professional unambiguously (although it was not clear if clients of verified dually-registered firms were only utilizing one type of that professional's services). The study authors concluded that this showed low awareness of the classification of investment advisers and broker-dealers.

Further, the OIAD/RAND survey asked all survey recipients whether they could identify the type of financial professional that would typically exhibit certain business practices (such as executing transactions or being paid by commission), and concluded that at least a significant minority of participants could not do so for any of the typical practices. Between 13% and 21% of survey participants incorrectly answered "none of the above" for each of the business practices offered by the survey, although those practices were aligned with either investment advisers or broker-dealers in the marketplace. Moreover, only 36% of participants were able to identify that investment advisers were typically paid by a percentage of assets, whereas 43% of participants thought that practice was typical of broker-dealers. Twenty-six percent of participants incorrectly indicated that investment advisers execute transactions for clients.[964] In

[954] The Commission notes that only one-third of the survey respondents that responded to "method to locate individual professionals" also provided information regarding locating the financial firm.

[955] *See* 917 Financial Literacy Study, *supra* footnote 589.

[956] The data used in the 917 Financial Literacy Study comes from the Siegel & Gale, Investor Research Report (Jul. 26, 2012), available at *https://www.sec.gov/news/studies/2012/917-financial-literacy-study-part3.pdf.*

[957] OIAD/RAND, *supra* footnote 3.

[958] *See generally supra* Section II.B.2 (discussing benefits of including disclosure on individualized firm services); Section II.B.6 (discussing removal of generalized comparisons between advisers and broker-dealers); *see also* Proposing Release, *supra* footnote 5 (discussing commenters in response to Chairman Clayton's 2017 request for comment and commenters to the 913 Study).

[959] Proposing Release, *supra* footnote 5, at Section IV.A.3.h. (stating that the Siegel & Gale Study found that focus group participants did not understand that the roles and legal obligations of broker-dealers differed from investment advisers' roles and legal obligations, and were further confused by different labels or titles used by advice providers (*e.g.,* financial planner, financial advisor, financial consultant, broker-dealer, or investment adviser). More specifically, participants in the Siegel & Gale Study focus groups believed that brokers executed trades and were focused on "near-term" advice, while financial advisors and consultants provided many of the same services as brokers, but also provided a greater scope of long-term planning advice (*e.g.,* portfolio allocation). "Investment adviser," on the other hand, was a term unfamiliar to many participants, but financial professionals using this label were perceived to provide similar services to financial advisors and financial consultants. Financial planners were viewed to provide services related to insurance and estate planning in addition to investment advice, and encompassed long-term financial planning including college, retirement, and other long-term savings and investment goals. The Siegel & Gale Study focus group participants assumed that financial advisors/consultants, investment advisers, and financial planners provided planning services, while brokers, financial advisors/consultants, and investment advisers provided trade execution services); *see also id.,* at n.5.

[960] Similarly, the RAND 2008 study generally concluded that investors did not understand the differences between broker-dealers and investment advisers and that common job titles contributed to investor confusion. RAND 2008, *supra* footnote 909.

[961] Infogroup/ORC, *U.S. Investors & The Fiduciary Standard,* National Opinion Survey (Sept. 15, 2010), *available at https://www.cfp.net/docs/public-policy/us_investors_opinion_survey_2010-09-16.pdf* ("CFA Survey"). The CFA Survey suggested that respondents were confused about differences between broker-dealers and investment advisers as described by the study's authors to the respondents.

[962] OIAD/RAND, *supra* footnote 3.

[963] OIAD/RAND, *supra* footnote 3. Note that the authors caveated that it was unclear if survey participants who were customers of verified dually registered firms had misidentified the type of financial professional because they only received one type of service (brokerage or advisory) from the dually registered firm.

[964] OIAD/RAND, *supra* footnote 3. The study authors also concluded that "an investor who works with an investment adviser because he or she is unaware that broker-dealers can execute transactions, and who seeks a professional solely to execute transactions on their behalf, might not

all, the study authors concluded that the survey participants' knowledge of the marketplace for financial professionals appeared to be incomplete.

The OIAD/RAND study authors draw further conclusions from their focus group study, where after being offered explanations of the differences between investment advisers and broker-dealers, some focus group participants continued not to be able to understand the distinctions between the two types of professionals. For the OIAD/RAND study authors, the focus group exercise underscored the difficulty of the topic for some investors.

Investors are also confused about financial professionals' standards of conduct and legal obligations. As discussed in the Proposing Release, the Siegel & Gale and RAND 2008 studies found that focus group participants generally did not understand legal terms, such as "fiduciary" or "best interest."[965] In addition, the RAND 2008 study noted that the confusion about titles, services, legal obligations, and compensation persisted even after a fact sheet on broker-dealers and investment advisers was provided to participants.[966]

Similarly, many survey respondents in the OIAD/RAND study had difficulty understanding the basic relational aspects of financial advice and the responsibility for taking risk in any form.[967] Thirty percent of survey respondents believed that financial professionals would get paid only if an investor made money on an investment, and another quarter of respondents indicated that they did not know if financial professionals would get paid only if an investor made money on an investment.[968] A majority of survey respondents expected that a financial professional acting in the client's best interest would monitor the account, help the client choose the lowest cost products, disclose payments they receive, and avoid taking higher compensation for selling one product over another when a similar but less costly product is available.[969] OIAD/RAND focus group discussions about the distinctions between investment advisers and broker-dealers also suggested that some focus group participants were not able to distinguish investment advisers from broker-dealers. The study's authors concluded

that comments of those focus group participants also suggest that some individuals might value having a clear distinction between professionals who do act in the client's best interest and professionals who do not act in the client's best interest.[970] Similarly, in RAND 2018 and in interview-based studies submitted by a group of commenters that test the proposed sample dual-registrant relationship summary, it was observed that investors could have difficulty understanding distinctions between the standard of conduct applicable to broker-dealers and investment advisers.[971]

With respect to investor perceptions of financial advisers' fees and potential conflicts of interest, the OIAD/RAND study revealed that "some participants seemed unconcerned with conflicts or took it as a good sign if their professional had not disclosed a conflict to them . . . In all three groups that had experience using a financial professional . . . participants reported that their professional had not disclosed any conflicts."[972] The OIAD/RAND study also found that almost a half of the investors who received investment advice in the study believed that their investment professional receives commissions. About a third believed the provider received payments from product companies (*e.g.,* mutual funds); another 20% of participants believed the provider received a bonus. Altogether, more than half of the participants believed the provider received some sort of compensation whether through commission, bonus or product payment.[973] The study concluded that "awareness of the nature of provider payments could help investors to recognize conflicts of interest . . ." and thus it could potentially improve investors' decision making. Potential investor recognition of the importance of the conflicts of interest is reflected in that 51% of the OIAD/RAND study respondents said that it was important or extremely important that the financial professional receive all compensation from the customer, and only 15% reported that it was not important at all.[974]

With respect to investor trust, one commenter discussed the results of an online survey it had initiated that found that 96% of survey respondents mostly or completely trusted their financial

professional.[975] The vast majority of survey respondents (97%) also believed that their financial professional always or mostly has their investors' best interest in mind.[976]

3. Investor Responses to Disclosures About Financial Professionals and Firms

a. Retail Investors and Financial Disclosures Generally

Commenters provided conclusions based on studies of potential limitations to the efficacy of financial disclosures, as discussed below.[977] With respect to the particular areas of disclosure that retail investors find helpful, commenters provided us with information about the usefulness of such disclosures to retail investors from surveys or assessments. We generally note that the RAND 2018 survey and other surveys that were provided by commenters gathered participants' subjective views and were not designed to objectively assess whether any sample disclosures improved participant comprehension.[978] However, the RAND 2018 qualitative interviews included some general questions to participants about comprehension and helpfulness of the sample proposed relationship summary, which provided some insight into participants' understanding of concepts introduced, as did another survey and two interview-based studies with respect to sample relationship summaries.[979] Further, the RAND 2018 report and surveys and studies submitted by commenters reported that their participants subjectively thought that they were informed from the sample disclosures that they were provided. The RAND 2018 study authors found that nearly 90% of respondents stated that the sample proposed relationship summary that they reviewed would help them make informed decisions about investment accounts and services.[980] Likewise, the RAND 2018 study authors also observed that interview participants demonstrated that they learned new information from the proposed relationship summary that they were provided. However, there was variation in understanding among participants and the interviews also revealed areas of

---

necessarily be matched with the most appropriate professional.''

[965] Proposing Release, *supra* footnote 5.

[966] RAND 2008, *supra* footnote 909.

[967] OIAD/RAND, *supra* footnote 3.

[968] OIAD/RAND, *supra* footnote 3.

[969] OIAD/RAND, *supra* footnote 3.

[970] OIAD/RAND, *supra* footnote 3.

[971] *See supra* Section II.B.3.b at footnotes 470–479 and accompanying text.

[972] OIAD/RAND, *supra* footnote 3.

[973] OIAD/RAND, *supra* footnote 3.

[974] OIAD/RAND, *supra* footnote 3.

[975] CCMC *Letter* (investor polling), *supra* footnote 21.

[976] *Id.*

[977] *See infra* Section IV.C for a discussion of this research.

[978] *See generally supra* footnote 14.

[979] *See supra* footnotes 14 and 20 and accompanying text.

[980] *See* RAND 2018, *supra* footnote 13.

confusion.[981] Similarly, the Woelfel survey authors noted that after survey respondents were given time to read a sample proposed dual registrant relationship summary, the majority, regardless of their current investments or relationship with an investment adviser or broker-dealer, believed that they knew a ''little more'' about investment advisers and broker-dealers.[982]

Several commenters suggest that generally not all investors fully read or are able to digest information from disclosures about financial professionals. One commenter reports that almost half of its survey participants said they selectively skim the disclosures and eight percent said they rarely or do not ever read them.[983] Along similar lines, commenters pointed to observations that investors may be overconfident in their ability to read and understand disclosures and that investors are unable to understand disclosures relating to compensation arrangements and conflicts of interest.[984] Similarly, the RAND 2008 study highlighted that participants' confusion about titles, services, legal obligations, and compensation persisted even after a fact sheet on broker-dealers and investment advisers was provided to participants.[985]

With respect to what type of disclosures from firms or financial professionals retail investors find helpful, commenters provided two surveys of retail investors' general views of disclosures about financial professionals in response to the Proposing Release.[986] One commenter reported results from an online survey that provides support for the idea that retail investors value at least some disclosures from financial professionals. From the a survey of 801 individuals, a majority of the survey participants (62%) said they would be interested in

reading a hypothetical standardized document provided to all new clients that explained the relationship between a financial professional and clients and thought that such a document would ''boost transparency and help build stronger relationships between me and my financial professional'' (72%).[987] Separately, with respect to what aspects of financial disclosures retail investors might find most helpful, Koski Research conducted an investor survey on behalf of another commenter and reported that the ''majority of retail investors want communications that are relevant to them (91%), short and to the point (85%), and visually appealing (79%).'' [988] The survey also reported that the top four things retail investors wanted communicated were the costs for advice, description of advice services, the obligations of the firm and its representatives, and the conflicts of interest.[989] Additionally, approximately 70% of the participants in the 917 Financial Literacy Study indicated that they would read disclosures on conflicts of interest if made available.[990]

b. Investor Perceptions About Specific Disclosures Concerning Financial Professionals

(1) Conflicts of Interest

As discussed in the Proposing Release, previous studies have found that investors consider conflicts of interest to be an important factor in disclosures from firms and financial professionals.[991] For example, in the 917 Financial Literacy Study, approximately 52.1% of survey participants indicated that an essential component of any disclosure would be their financial intermediary's conflicts of interest, while 30.7% considered information about conflicts of interest to be important, but not essential.[992] Investors also were asked to rate their level of concern about potential conflicts of interest that their adviser might have. Approximately 36% of the investors expressed concerns that their adviser might recommend investments in products for which its affiliate receives a fee or other compensation, while 57% were concerned that their

adviser would recommend investments in products for which it gets paid by other sources. In addition to conflicts directly related to compensation practices of financial professionals, some investors were concerned about conflicts related to the trading activity of these firms. For example, more than 26% of participants were concerned that an adviser might buy and sell from its own account at the same time it is recommending securities to investors; and more than 55% of investors were also concerned about their adviser's engaging in principal trading.

Among those participants in the 917 Financial Literacy Study who indicated that they would read disclosures on conflicts of interest if made available, 48% would request additional information from their adviser, 41% would increase the monitoring of their adviser, and 33% would propose to limit their exposure of specific conflicts. The majority of participants (70%) also wanted to see specific examples of conflicts and how those related to the investment advice provided.

(2) Fees

With respect to disclosures about fees, the Proposing Release also discussed the 917 Financial Literacy Study as well as the FINRA Investor Study [993] regarding the importance that investors place on disclosures about fees and compensation of financial professionals, and how those disclosures should be presented.[994] Similar to the findings regarding conflicts of interest, the 917 Financial Literacy Study found that a majority participants indicated that disclosure of the fees and compensation of investment advisers was an essential element to any disclosure.[995]

(3) Disciplinary History

As discussed in the Proposing Release, survey evidence in the 917 Financial Literacy Study indicate that knowledge of a firm's and financial professional's disciplinary history is among the most important items for retail investors deciding whether to receive financial services from a particular firm.[996] Despite this, most

---

[981] *Id.*

[982] *See* Cetera Letter II (Woelfel), *supra* footnote 17.

[983] Schwab Letter I (Koski), *supra* footnote 21.

[984] *See, e.g.,* AARP Letter. *See* also Better Markets Letter, CFA Letter I; Consumers Union Letter.

[985] *See* RAND 2008, *supra* footnote 909. The fact sheet provided to RAND 2008 study participants included information on the definition of broker and investment adviser, including a description of common job titles, legal duties and typical compensation. Participants in the focus groups indicated that they were confused over common job titles of broker-dealers and investment advisers, thought that because brokers are required to be licensed, investment advisers were not as qualified as brokers, deemed the term ''suitable'' too vague, and concluded that it would be difficult to prove whether or not an investment adviser was not acting in the client's best interest.

[986] *See* Schwab Letter I (Koski), *supra* footnote 21 and CCMC Letter (investor polling), *supra* footnote 21.

[987] *See* CCMC Letter (investor polling), *supra* footnote 21.

[988] *See* Schwab Letter I (Koski), *supra* footnote 21.

[989] *Id.* For similar evidence, *see* also CCMC Letter (investor polling), *supra* footnote 21 (reporting that issues that ''matter most'' to investors include: ''explaining fees and costs,'' explaining conflicts of interest'' and ''explaining own compensation'').

[990] 917 Financial Literacy Study, *supra* footnote 588.

[991] *See* Proposing Release, *supra* footnote 5, at Section IV.A.3.c.

[992] 917 Financial Literacy Study, *supra* footnote 588.

[993] FINRA Investor Education Foundation, *Investors in the United States 2016* (Dec. 2016), *available at http://www.usfinancialcapability.org/ downloads/NFCS_2015_Inv_Survey_Full_ Report.pdf* (''FINRA Investor Study'').

[994] *See* Proposing Release, *supra* footnote 5, at Section IV.A.3.c.

[995] 917 Financial Literacy Study, *supra* footnote 588.

[996] *See* 917 Financial Literacy Study, *supra* footnote 588, at nn.311 and 498 and accompanying text (Approximately 67.5% of the online survey respondents considered information about an adviser's disciplinary history to be absolutely

investors do not actively seek disciplinary information for their advisers and broker-dealers. For example, a FINRA survey in 2009, found that only 15% of survey respondents checked their financial professional's background, although the Commission notes that the study encompasses a wide group of advisers, such as debt counselors and tax professionals.[997] The FINRA Investor Study found that only 7% of survey respondents use FINRA's BrokerCheck and approximately 14% of survey respondents are aware of the Investment Adviser Public Disclosure (IAPD) website.[998]

*C. Broad Economic Considerations*

We are adopting a requirement for broker-dealers and investment advisers and firms that are dually registered to deliver a relationship summary to retail investors because, as discussed in the baseline,[999] many retail investors can be confused about their choices in the market for brokerage and investment advisory services. To that end, the relationship summary is meant to assist retail investors with both the process of deciding whether to engage or remain with a particular firm or financial professional and whether to establish or maintain an investment advisory or brokerage relationship. Specifically, low financial literacy, lack of knowledge about the market for financial advice, and lack of information about important aspects of the relationship between particular firms and their customers or clients,[1000] may harm retail investors by deterring them from seeking brokerage or investment advisory services even if they could potentially benefit from it,[1001] or by increasing the risk of a

mismatch between the investors' preferences and expectations and the actual brokerage or advisory services they receive from a firm or professional.[1002] To ameliorate this potential harm, the relationship summary is intended to reduce investor confusion and search costs in the process of (i) deciding whether to engage a particular firm or financial professional, (ii) whether to establish an investment advisory or brokerage relationship, and (iii) whether to terminate or switch the relationship or specific service provided. The relationship summary is expected to provide significant benefit to retail investors by focusing their attention on salient features of their potential relationship with a particular broker-dealer or investment adviser and highlighting the most important elements of this relationship in a single, succinct, and easy-to-understand document. The relationship summary also allows for comparability among broker-dealers and investment advisers by requiring disclosures on the same topics under standardized headings in a prescribed order to retail investors.[1003] As we discuss above in Section I, we do not believe that existing disclosures provide this level of transparency and comparability across investment advisers, broker-dealers, and dual registrants.

Below, we discuss in more detail the nature of the potential harm faced by retail investors from confusion about the market for brokerage and investment advisory services. We also discuss considerations involved in creating disclosures for retail investors that may reduce the potential for investor harm by increasing their knowledge about the market for brokerage and investment advisory services and facilitating their search for a firm or financial professional.[1004]

Academic studies have documented a multitude of potential benefits that accrue to retail investors as a result of seeking investment advice, including, but not limited to: Higher household savings rates, setting long-term goals and calculating retirement needs, more efficient portfolio diversification and asset allocation, increased confidence and peace of mind, facilitation of small investor participation, improvement in financial situations, and improved tax efficiency.[1005] Further, financial

---

essential, and about 20.0% deemed it important, but not essential, and "When asked how important certain factors would be to them if they were to search for comparative information on investment advisers, the majority of online survey respondents identified the fees charged and the adviser's disciplinary history as the most important factors.").

[997] FINRA Investor Education Foundation, Financial Capability in the United States: Initial Report of Research Findings from the 2009 National Survey (Dec. 1, 2009), available at *http://www.usfinancialcapability.org/downloads/NFCS_2009_Natl_Full_Report.pdf*.

[998] *See* FINRA Investor Survey, *supra* footnote 993.

[999] *See supra* Section IV.B.

[1000] Examples of such aspects of the relationship include the services and fees of particular firms, and conflicts of interest that may arise between particular firms and customers or clients.

[1001] The potential loss to investors with low financial literacy from not seeking advice is illustrated by, *e.g.,* the study by Hans-Martin von Gaudecker, *How Does Household Portfolio Diversification Vary with Financial Literacy and Financial Advice?,* 70 J. Fin. 489 (2015), which showed that investors with low financial literacy

that do not seek financial advice on average incur significantly larger losses (by more than 50 basis points) from underdiversification compared to investors who seek financial advice (irrespective of financial literacy) and investors with higher financial literacy who do not seek advice.

[1002] Studies provide results of investor misunderstanding that is consistent with some investors being at risk of entering into a mismatched relationship. For example, survey results in OIAD/RAND, *supra* footnote 3 suggest that a non-trivial subset of retail investors may misunderstand the type of their financial professional, the type of services the professional offers, and how the professional is compensated.

[1003] *See supra* discussion in Section II.A.2.

[1004] We are extending our discussion on broad economic considerations from the Proposing Release in response to concerns about the economic analysis in the Proposing Releases by commenters; *see, e.g.,* Letter from Charles Cox, Former SEC Chief Economist, *et al.* (Feb. 6, 2019), *available at https://www.sec.gov/comments/s7-07-18/s70718-4895197-*

*177769.pdf*. ("Former SEC Senior Economists Letter"). The Former SEC Senior Economists Letter raised three main concerns about the economic analysis in the proposed Regulation Best Interest and the Proposing Release: (1) The discussion of the potential problems in the customer-advisor relationship was incomplete and identified other features of the market for ongoing retail investment advice that might be problematic; (2) there was inadequate discussion and analysis of the existing economic literature on financial advice; and (3) there were questions of whether the disclosure requirements in the proposing release would provide meaningful information for customers. These concerns more directly focused on the economic analysis of the proposed Regulation Best Interest. However, concerns (1) and (3) appear to also apply to the economic analysis of the Proposing Release to some extent, and we address those concerns in this economic analysis. For instance, with respect to (1), this section provides a more in depth discussion compared to the Proposing Release of the harm that may arise when retail investors lack knowledge or are confused about the market for investment advisory and brokerage services, including a discussion of why additional disclosure may be useful to investors. With respect to (3), the discussion in this section expands on the discussion already provided in the Proposing Release on the potential limits to the effectiveness of disclosure to address the identified investor harm, but also discusses how disclosure should be designed to be effective, including how appropriately designed disclosures can help overcome some of the identified potential limitations of disclosure. The latter discussion provides a framework that informs our analysis in Section IV.D of the anticipated economic impacts of the relationship summary. In addition, the Former SEC Senior Economists Letter stated that "[w]e feel (preliminarily) that the new CRS forms would provide some helpful information. But we would far prefer for there to be evidence that the intended targets of these disclosures feel the same." Our discussion takes into account the various investor surveys and studies that were conducted after the Proposing Release that reported that large majorities of investors believed the relationship summary would help them make more informed decisions about types of accounts and services. *See, e.g.,* RAND 2018.

[1005] *See, e.g.,* Mitchell Marsden, Catherine Zick, & Robert Mayer, *The Value of Seeking Financial Advice,* 32 J. Fam. & Econ. Issues 625 (2011); Jinhee Kim, Jasook Kwon, & Elaine A. Anderson, *Factors Related to Retirement Confidence: Retirement Preparation and Workplace Financial Education,* 16 J. Fin. Counseling & Plan. (2005); Daniel Bergstresser, John Chalmers & Peter Tufano, *Assessing the Costs and Benefits of Brokers in the Mutual Fund Industry,* 22 Rev. Fin. Stud. 4129 (2009); Ralph Bluethgen, Steffen Meyer, & Andreas Hackethal, *High-Quality Financial Advice Wanted!,* Euro. Bus. Sch., Working Paper, (Feb. 2008), *available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.596.2310&rep=rep1&type=pdf*; Neal M. Stoughton, Youchang Wu, &
Continued

**33578**   **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

professionals may also explain to retail investors the informational asymmetries between product providers and their customers. Retail investors might not be able to disentangle such information asymmetries on their own. Studies also find that low financial literacy is negatively associated with the propensity to seek financial advice.[1006] These findings collectively suggest that retail investors of low level financial literacy might be harmed because they might be less likely to seek financial advice in spite of the potential benefit from it.

For a retail investor who decides to enter a relationship with a financial services provider, a low level of knowledge about the market for financial services might reduce the investor's ability to accurately identify whether any given firm or financial professional offers a type of relationship that matches his or her preferences and expectations. This, in turn, increases the risk that the firm or financial professional is a poor match for the retail investor when compared to an alternative financial services provider. A relationship that represents a poor match between an investor and a firm or financial professional can leave an investor worse-off, relative to a better match, or no match at all, because the relationship could result in a cost of services that is higher than the investor expects or a level or type of service that is different than the investor expects, such as episodic recommendations versus continuing advice.

A retail investor might search across a set of financial service providers to find a financial professional that best meets his or her needs.[1007] For an investor who is able to acquire information from the financial service providers the investor chooses to

evaluate, the more extensive a search the investor engages in, the more likely the investor will locate a good match. However, conducting such a search is costly and requires time, effort, and access to resources. Investors likely balance the benefits of evaluating each additional provider against the incremental cost of doing so, ending their search when the expected marginal cost of the search is greater than the expected marginal benefit from the search.[1008] Moreover, some investors may experience higher-level of uncertainty about the benefits or costs of a search. For example, investors who are less knowledgeable about the general differences between different types of financial professionals, the services these professionals provide, and the factors they should consider in their choice, may not fully appreciate the benefits of searching for a provider that best meets their needs. To the extent such investors perceive a search as burdensome because they underestimate the benefits of searching, they might refrain from conducting a search or conduct a less extensive search to learn about potential alternatives, thereby increasing their risk of entering a relationship with a firm or financial professional that is a poor match with their expectations and preferences or not engaging in a relationship even if one might be beneficial.[1009]

General trust (in the sense of confidence) in financial markets can help alleviate certain behavioral biases and encourage participation in, for example, the stock market.[1010] Trust at an interpersonal level may be less beneficial in certain circumstances. Research suggests that lower financial literacy among investors is positively associated with higher personal trust in their financial professionals.[1011]

However, to the extent retail investors substitute trust for knowledge in their relationship with a financial professional, overreliance on trust may induce some investors to maintain a mismatched relationship longer than they otherwise would if they had higher financial literacy and a better understanding of the costs and benefits of the financial advice they receive from the professional, as well as awareness of alternative services or providers.[1012] That is, particularly for less-knowledgeable investors, a high level of trust in a particular financial professional or firm may exacerbate the potential harm of a mismatched relationship. Similarly, some retail investors that select a firm or financial professional based on referrals from friends and family may do so solely on the basis of a high level of trust in these referring parties.[1013] This can exacerbate the potential harm of a mismatched relationship in particular for less sophisticated investors and/or for investors who relied on referrals from less financially sophisticated parties.[1014]

Further, investors may endure a mismatched relationship for a longer period of time than they would absent switching costs, including the cost of a new search and any transaction costs involved in moving assets from one firm to another. These costs lower a retail investor's incentive to look for a new firm or financial professional even if the

---

Josef Zechner, *Intermediated Investment Management,* 66 J. Fin. 947 (2011). Francis M. Kinniry, *et al., Putting a value on your value: Quantifying Vanguard Advisor's Alpha,* Vanguard Research (Sept. 2016) estimates the value to investors associated with obtaining financial advice of approximately 3% in net returns to investors, associated with suitable asset allocation, managing expense ratios, behavioral coaching, alleviating home bias, among others.

[1006] For a discussion of the academic research on the role of financial literacy in seeking financial advice *see, e.g.,* OIAD/RAND, *supra* footnote 3 at 8.

[1007] The evidence discussed in *supra* Section IV.B.2.a on how investors select a financial professional or firm suggests that a large majority of retail investors rely on personal or professional referrals, which may indicate that they evaluate very few, if any alternative providers. One potential reason for this reliance on referrals could be that investors currently perceive their search costs to be high. Another possible reason, among others, could be that investors value the information derived from other people's experiences more than other sources of information.

[1008] This assumes a sequential search process, but an analogous argument can be made if an investor instead searches by deciding ex ante on a fixed number of alternatives to evaluate, in which case the marginal decisions then relates to what this number will be. *See, e.g.,* Babur De los Santos, *et al., Testing Models of Consumer Search Using Data on Web Browsing and Purchasing Behavior,* 102 Am. Econ. Rev. 2955 (2012). We have expanded our discussion on search costs in response to main concern (1) of the Former SEC Senior Economists Letter; see *supra footnote* 1004.

[1009] This argument assumes that less knowledgeable investors can learn at least some information from engaging in an initial search or a continued search that could be used to evaluate fit (albeit imperfectly so). If less knowledgeable investors cannot learn from a search at all, the choice of a firm or financial professional becomes similar to a random draw and a search, no matter how extensive, will not decrease the risk of a mismatch.

[1010] *See, e.g.,* the literature review in discussion in OIAD/RAND, *supra* footnote 3, at 11.

[1011] *See, e.g.,* Thomas Pauls, Oscar Stolper, & Adreas Walter, *Broad-Scope Trust and Financial*

*Advice,* Working Paper (Nov. 2016), *available at https://www.researchgate.net/publication/ 314235638_Broad-scope_trust_and_financial_ advice.*

[1012] We acknowledge commenters' concerns that higher financial literacy and more disclosures alone may not fully address the risk that retail investors would rely on trust in their financial services providers over other factors, such as knowledge about financial services industry participants, practices and products. *See* CFA Letter I (''We've seen anecdotal evidence in our own personal encounters with investors of their tendency to trust their ''financial adviser'' without actually verifying how or how much they are paying or how their investments are performing. Even investors who would be considered sophisticated by any reasonable measure can exhibit a level of trust and confidence in their financial professional that isn't based on data. Any disclosures about their financial professional's services, duties, costs, and conflicts are unlikely to change those views''); AARP Letter (''Recent behavioral science studies have shown that disclosures are largely ineffective because they tend to increase conflict in advisers and make the investor more likely to trust the adviser and thus follow biased advice''); *see also* Regulation Best Interest Release, *supra* footnote 47, (discussing how that rulemaking addresses the limitations of disclosure for customers of broker-dealers).

[1013] We recognize that trust is not the only reason to rely on referrals; for example, there is informational value in other people's personal experiences.

[1014] *See supra* Section IV.B.2.a for survey evidence on the role of personal referrals in retail investors' choice of financial professionals.

current relationship turns out to be a poor match. Both overreliance on trust and the presence of switching costs increase the ex-ante value of avoiding a mismatched relationship in the first place.

Retail investors could increase their knowledge about the market for brokerage and investment advisory services, and thereby engage in a more efficient search, by accessing information and disclosures currently provided directly by firms or available in a number of existing regulatory forms and platforms. Current sources of information include, among others, Form ADV (and IAPD) and BrokerCheck.[1015] However, because existing disclosures are made on multiple and sometimes lengthy forms, and are obtained in different ways, it can be difficult for investors to grasp the most important features of the financial services from reading these materials.[1016] In addition, the information available to retail investors about broker-dealers on BrokerCheck does not include the same information that investment advisers provide in the Form ADV brochure and brochure supplement, which makes direct comparisons between broker-dealers and investment advisers more difficult.

Voluntary disclosures and educational efforts made by financial services providers such as broker-dealers and investment advisers can potentially inform investors about the specific relationships they can have with providers and the types of services providers offer, but also about the overall market for financial advice and the different types of service providers and relationships available in the market. And such voluntary disclosure could, in principle, facilitate investor search. However, financial services providers may lack incentives to voluntarily disclose salient information or make the effort needed to educate investors about the various alternatives available to them because it is costly to do so. In addition to the costs of producing disclosures and training employees to deliver disclosures,

providers may also perceive a risk that competitors would take advantage of disclosed information. Furthermore, disclosures that are not tailored to the provider and have more general educational value to retail investors have the features of a public good. If providers rely on their competitors to educate potential clients generally about the market for financial advice, there is an inefficiently low level of general educational material available to investors. Underprovision might occur even if such disclosures, were they to be provided, would increase the overall efficiency of the market for financial advice and thus benefit financial services providers as a group in the long run, for example, by sufficiently reducing confusion among the general investing public that more investors are willing to search for a financial services provider.

Additionally, some broker-dealers and investment advisers may even privately gain from a lack of knowledge among retail investors to the extent they profit from attracting and retaining customers and clients who would be a better match with another provider.[1017] For example, a customer of a broker-dealer who has a preference for active investing may actually be better off being a client of an investment adviser and paying a fixed percentage of assets per year as a fee for the advice instead of broker commissions each time she receives a recommendation that results in a transaction. However, this investor is likely a profitable customer for the broker-dealer. Similarly, a client of an investment adviser who prefers buy-and-hold investments in a few index funds could potentially be better off in a relationship with a broker-dealer, by only paying a few one-time sales charges and commissions instead of a recurring percentage fee on the assets, which is likely more profitable to the investment adviser. In both of these cases, the firm has little incentive to provide the investor with information about available advice relationships that could persuade the investor to seek advice elsewhere or to switch to a different business line.

In the presence of the frictions described above, requiring firms and financial professionals to furnish a short summary disclosure like Form CRS can benefit retail investors by reducing

information asymmetry between investors and firms and financial professionals and turning investor attention to more salient aspects of a firm and its services. In addition, as discussed above, no current required disclosure allows for comparability among broker-dealers and investment advisers by requiring disclosures on the same topics under standardized headings in a prescribed order to retail investors. A reduction in information asymmetry and improved comparability may reduce search costs for investors and increase their understanding about differences in offered relationships across firms and financial professionals, thereby reducing the risk of investors' hiring a provider that is a poor match for their needs. However, for the relationship summary to be effective for retail investors it must be understandable. Studies have found that the format and structure of disclosure may improve (or decrease) investor understanding of the disclosures being made.[1018] We discuss these studies below.

Some commenters questioned the general efficacy of disclosure in the context of investment advice to retail investors.[1019] We do not share this view. As we discussed above, we believe a short summary disclosure like Form CRS can provide benefits to retail investors. However, as we also discussed in the Proposing Release,[1020] we recognize that there may be limits to the efficacy of disclosure in some

---

[1015] *See* Proposing Release, *supra* footnote 5, at n.280. Investment advisers and broker-dealers may also provide additional information to retail investors through the firm's website and the retail investor's account agreement. Additionally, investment advisers and broker-dealers may provide information to retail investors through marketing materials (*e.g.,* brochures) and other customer communications (*e.g.,* fee schedules).

[1016] There is some evidence suggesting investors are not reading current disclosures. For example, RAND 2018 reports that 13% of surveyed investors said that they had viewed Form ADV (11% said they viewed both an ADV and broker account opening document, 2% had only reviewed Form ADV). RAND 2018, *supra* footnote 13.

[1017] *See, e.g.,* CFA Letter I (stating that "[t]he problem is that investors are being misled into relying on biased sales recommendations as if they were objective, best interest advice and that they are suffering significant financial harm as a result. Investor confusion is relevant only because it limits the tools the Commission has available to address that harm . . .").

[1018] *See,* Justine S. Hastings & Lydia Tejeda-Ashton, *Financial Literacy, Information, and Demand Elasticity: Survey and Experimental Evidence from Mexico,* NBER Working Paper 14538 (Dec. 2008) (finding that providing fee disclosures to Mexican investors in peso rather than percentage terms caused financially inexperienced investors to focus on fees); *see* Richard G. Newell & Juha Siikamaki, *Nudging Energy Efficiency Behavior,* Resources for the Future Discussion Paper 13–17 (Jul. 10, 2013) (finds that providing dollar operating costs in simplified energy efficiency labeling significantly encouraged consumers to choose higher energy efficiency appliances, while another related study presents similar evidence from payday loans).

[1019] *See, e.g.,* AARP Letter (stating that "[r]ecent behavioral science studies have shown that disclosures are largely ineffective because they tend to increase conflict in advisers and make the investor more likely to trust the adviser and thus follow biased advice"); Comment Letter of Economic Policy Institute (Aug. 7, 2018) ("EPI Letter") (stating that "Disclosure requirements can be onerous, and disclosure may not only be ineffective, but counterproductive. For example, detailed disclosures can serve to bury important information, or disclosure of conflicts can be interpreted by consumers as evidence of honesty. Disclosure can make sellers more comfortable recommending products and services that are not in buyers' best interests, and it can make clients less comfortable rejecting these recommendations at the risk of giving offense").

[1020] *See* Proposing Release, *supra* footnote 5, at Section IV.B.1.

App 132

**33580**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

circumstances. For example, the documented low level of financial sophistication of many retail investors can make it harder for them to process the implications of disclosure.[1021] Another limitation of the efficacy of disclosure documented in research is that investors may have various behavioral biases, such as anchoring [1022] and over-confidence,[1023] which could affect how the disclosed information is interpreted.[1024] This could in turn lead investors to misinterpret, under-weight, or over-weight the implications of disclosures. Limited attention problems can also impede investors' ability to effectively process the implications of some disclosures.[1025]

In addition, academic studies find that sometimes certain disclosures may result in unintended consequences. In particular, existing research has found that conflict of interest disclosures can increase the likelihood that the disclosing party would act on the conflict of interest.[1026] This bias can be caused by ''moral licensing,'' a belief that the disclosing party has already fulfilled its moral obligations in the relationship and therefore can act in any way (including to the customer's detriment), or it can be caused by ''strategic exaggeration,'' aimed at compensating the disclosing party for the anticipated loss of profit due to the disclosure. Experimental evidence also suggests that disclosure could turn some clients or customers into ''reluctant altruists.'' [1027] For example, if financial professionals disclose that they earn a referral fee if a customer enrolls in a program, the customer may implicitly feel that they are being asked to help their financial professional receive the fee. One study also found evidence that disclosure of a professional's financial interests (particularly in face-to-face interactions) can induce a ''panhandler effect,'' whereby customers may face an implicit social pressure to meet the professional's financial interests.[1028] The above literature indicates that conflicts of interest disclosures may interact with psychological biases to produce unintended effects that undermine the intended benefits of the disclosures. However, these studies also suggest certain factors that may mitigate the unintended consequences. For example, in the case of the ''panhandler effect,'' researchers have found that distancing the client or customer from the financial professional either in the decision or disclosure phase can dampen this effect.[1029]

Academic research has identified a set of characteristics that may increase the effectiveness of a disclosure document to consumers. These characteristics, discussed below, frame our analysis of the economic impacts of the proposed rule.[1030]

Studies have found that the structure or format of disclosure may improve (or decrease) investor understanding of the disclosures being made.[1031] Every disclosure document not only presents new information to retail investors but also provides a particular structure or format for this information that affects investors' evaluation of the disclosure.[1032] This ''framing effect'' could lead investors to draw different conclusions depending on how information is presented. For example, if the disciplinary history information is presented first, it could affect the way investors perceive all subsequent disclosures in the relationship summary and, possibly, discount more heavily the information provided by firms with disciplinary history relative to firms with no disciplinary history. If, instead, disciplinary history information were provided at the end of the relationship summary, the effect of the information could be moderated because it would no longer frame the other information provided to investors. Because of such framing effects, it is important that the structure of a disclosure document supports the intended purpose of the disclosure.

Because individuals can exhibit limited ability to absorb and understand the implications of the disclosed information, for example due to limited attention or low level of sophistication,[1033] more targeted and simpler disclosures may be more effective in communicating information to investors than more complex disclosures. Academic studies suggest that costs, such as increased investor confusion or reduced understanding of the key elements of the disclosure, are likely to increase as disclosure documents become longer, more convoluted, or more reliant on narrative text.[1034] Consistent with such findings, other empirical evidence suggests that disclosure simplification may benefit consumers of disclosed information.[1035] In general, academic research appears to support the notion that shorter and more focused disclosures could be more effective at increasing investors understanding than longer, more complex disclosures.

---

[1021] *See, e.g.,* L.E. Willis, *Decision making and the limits of disclosure: The problem of predatory lending: Price,* 65 Md. L. Rev. 707 (2006) (''Willis Study''). Commenters discussed similar issues, *see, e.g.,* Comment Letter of Charles Ryan (Aug. 7, 2018); CFA Letter I; American Investment Council Letter.

[1022] Anchoring bias implies undue reliance on a particular information signal at the expense of other signals. *See, e.g.,* Robert A. Prentice, *Moral Equilibrium: Stock Brokers and the Limits of Disclosure,* 2011 Wis. L. Rev. 1059, at 1083 (2011) (explaining ''people tend to anchor on the first information they receive, and then revise their judgments in the face of new information, but to an insufficient degree'').

[1023] Over-confidence bias implies over-estimation of probabilities of certain outcomes over objective probabilities. *Id.,* at 1072, explains that ''studies indicate that people tend, in mathematically impossible percentages, to believe that they are above average in driving, auditing, and teaching.''

[1024] *See, e.g.,* Jorgen Vitting Anderson, *Detecting Anchoring in Financial Markets,* 11 J. Behav. Fin. 129 (2010).

[1025] *See, e.g.,* David Hirshleifer & Siew Hong Teoh, *Limited Attention, Information Disclosure, and Financial Reporting,* 36 J. Acct. & Econ. 337 (2003) (''Hirshleifer and Teoh Study'').

[1026] *See,* Daylian M. Cain, George Loewenstein, & Don A. Moore, *The Dirt on Coming Clean: Perverse Effects of Disclosing Conflicts of Interest,* 34 J. Legal Stud. 1 (2005) (''Cain 2005 Article''); Daylian M. Cain, George Loewenstein & Don A. Moore, *When Sunlight Fails to Disinfect: Understanding the Perverse Effects of Disclosing Conflicts of Interests,* 37 J. Consumer Res. 836 (2011); Bryan K. Church & Xi (Jason) Kuang, *Conflicts of Disclosure and (Costly) Sanctions: Experimental Evidence,* 38 J. Legal Stud. 505 (2009); Christopher Tarver Robertson, *Biased Advice,* 60 Emory L.J. 653 (2011). These papers study conflicts of interest in general, experimental settings, not specialized to the provision of financial advice.

[1027] *See* Jason Dana, Daylian M. Cain, & Robyn M. Dawes, *What You Don't Know Won't Hurt Me: Costly (but Quiet) Exit in Dictator Games,* 100 Organizational Behav. & Hum. Decision Processes 193 (2006).

[1028] Sunita Sah, George Loewenstein, & Daylian M. Cain, *The Burden of Disclosure: Increased Compliance With Distrusted Advice,* 104(2) J. Personality & Soc. Psychol. 289–304 (2013).

[1029] *See id.*

[1030] *See* George Loewenstein, Cass R. Sunstein, & Russell Golman, *Disclosure: Psychology Changes Everything,* 6 Ann. Rev. Econ. 391 (2014). The paper provides a comprehensive survey of the literature relevant to disclosure regulation.

[1031] To that end, in order to facilitate more effective processing of disclosures by investors, some commenters emphasized the need to incorporate ''design thinking'' into the structure of the relationship summary. *See, e.g.,* Fidelity Letter. *See* also *supra* footnotes 58–59.

[1032] *See* Amos Tversky & Daniel Kahneman, *The Framing of Decisions and the Psychology of Choice,* 211 Sci. 453 (1981).

[1033] *See, e.g.,* Hirshleifer and Teoh Study, *supra* footnote 1025; and Willis Study, *supra* footnote 1021.

[1034] *See, e.g.,* Samuel B. Bonsall & Brian P. Miller, *The Impact of Narrative Disclosure Readability on Bond Ratings and the Cost of Debt,* 22 Rev. Acct. Stud. 608 (2017) and Alistair Lawrence, *Individual Investors and Financial Disclosure,* 56 J. Acct. & Econ. 130 (2013); *see also* CCMC Comment Letter.

[1035] *See, e.g.,* Sumit Agarwal, *et al., Regulating Consumer Financial Products: Evidence from Credit Cards,* NBER Working Paper No. 19484 (Jun. 2014), *available at https://www.nber.org/papers/w19484* (finding that a series of requirements in the Credit Card Accountability Responsibility and Disclosure Act (CARD Act), including several provisions designed to promote simplified disclosure, has produced substantial decreases in both over-limit fees and late fees, thus saving U.S. credit card users $12.6 billion annually).

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33581**

Another characteristic of effective disclosures documented in academic research is disclosure salience.[1036] Salience detection is a key feature of human cognition allowing individuals to focus their limited mental resources on a subset of the available information and causing them to over-weight this information in their decision making processes.[1037] Within the context of disclosures, information disclosed to promote greater salience, such as information presented in bold text, or at the top a page, would be more effective in attracting attention than less saliently disclosed information, such as information presented in a footnote. Limited attention among individuals also increases the importance of focusing on salient disclosure signals. Some research finds that more visible disclosure signals are associated with stronger stakeholder response to these signals.[1038] Moreover, research suggests that increasing signal salience is particularly helpful in reducing limited attention of consumers with lower education levels and financial literacy.[1039] There is also empirical evidence that visualization improves individual perception of information.[1040] For example, one experimental study shows that tabular reports lead to better decision making and graphical reports lead to faster decision making (when people are subject to time constraints).[1041] Overall these findings suggest that problems such as limited attention may be alleviated if key information in Form CRS is emphasized, is reported closer to the beginning of the document, and is visualized in some manner. This is also consistent with the recommendation of several commenters.[1042] However, it is also important to note that given a choice, registrants may opt to emphasize elements of the disclosure that are most beneficial to themselves rather than investors, while deemphasizing elements of the disclosure that are least beneficial to them. As discussed further in the economic analysis below and discussions above, the final instructions of the relationship summary include requirements that are designed to mitigate this risk. For example, the final instructions require standardized headers in a prescribed order, certain other prescribed language (including for the required conversation starters), page limits, and certain text features, which mitigate providers' incentives to behave opportunistically.

There is also a trade-off between allowing more disclosure flexibility and ensuring disclosure comparability (*e.g.,* through standardization).[1043] Greater disclosure flexibility potentially allows the disclosure to reflect more relevant information, as disclosure providers can tailor the information to firms' own specific circumstances.[1044] Although disclosure flexibility allows for disclosure of more decision-relevant information, it also allows registrants to emphasize information that is most beneficial to themselves rather than investors, while deemphasizing information that is least beneficial to the registrants. Economic incentives to present one's services in better light may drive investment advisers and broker-dealers to deemphasize information that may be relevant to retail investors.[1045] Moreover, although standardization makes it harder to tailor disclosed information to a firm's specific circumstances, it also comes with some benefits. For example, people are generally able to make more coherent and rational decisions when they have comparative information that allows them to assess relevant trade-offs.[1046] The final rules are intended to strike a balance between the relative benefits and costs of disclosure standardization versus disclosure flexibility; for example, by requiring standardized headings and a prescribed order of topics but allowing some flexibility in the firm's own wording and the order of presentation within each topic.

*D. Economic Effects of the Relationship Summary*

1. Retail Investors

a. Overall Anticipated Economic Effects of Form CRS

Overall, we expect that these final rules requiring firms to deliver a relationship summary will benefit retail investors in several ways, including by reducing information asymmetry between investors and firms (and their financial professionals), reducing search costs and facilitating easier comparisons between and among brokerage and investment advisory firms, and increasing understanding of, and confidence in, the market for financial services more generally.

First, in the specific context of a retail investor considering a firm or financial professional, the relationship summary will reduce the information asymmetry between the investor and the firm or professional by increasing transparency to that investor about a firm's services, fees, conflicts of interest, standard of conduct, and disciplinary history.[1047] Some—though not all—of this information is currently available in the marketplace. The relationship summary, however, will require all firms to provide information on these topics in one summary disclosure, which will be available on firms' websites, if they have one, at BrokerCheck and IAPD, and through *Investor.gov.* Current disclosure requirements do not provide this level of transparency and comparability for both broker-dealers and investment

---

[1036] This is a view also supported by commenters. *See, e.g.,* AARP Letter ("A good disclosure statement will highlight the information most important to the consumer.").

[1037] Daniel Kahneman, THINKING, FAST AND SLOW (2013). Susan Fiske & Shelley E. Taylor, SOCIAL COGNITION: FROM BRAINS TO CULTURE (3rd ed. 2017).

[1038] *See* Hirshleifer and Teoh Study, *supra* footnote 1025. Commenters also addressed the benefit of visible disclosure signals. For example, the Fidelity Letter refers to Stanford Law School Design Principles stating "[u]se visual design and interactive experiences, to transform how you present legal info to lay people." Also, Kleimann II states that "[f]or good design, we want to build upon this tendency by identifying the key questions investors should or are likely to ask and featuring them prominently in the text, thus easing the cognitive task for readers. . . ." Kleimann II, *supra* footnote 19.

[1039] *See, e.g.,* Victor Stango & Jonathan Zinman, *Limited and Varying Consumer Attention: Evidence from Shocks to the Salience of Bank Overdraft Fees,* 27 Rev. of Fin. Stud. 990 (2014).

[1040] *See* John Hattie, VISIBLE LEARNING. A SYNTHESIS OF OVER 800 META–ANALYSES RELATING TO ACHIEVEMENT (2008).

[1041] *See* Izak Benbasat & Albert Dexter, *An Investigation of the Effectiveness of Color and Graphical Information Presentation Under Varying Time Constraints,* 10–1 MIS Q. 59 (1986). However, one commenter noted that participants in the RAND 2018 qualitative interviews did not appear to process side-by-side tabular disclosures effectively. *See* Schwab Letter II.

[1042] *See, e.g.,* CFA Letter I; Morgan Stanley Letter.

[1043] *See* CFA Institute Letter I.

[1044] *See, e.g.,* Cambridge Letter; FSI Letter I; Mutual of America Letter; Northwestern Mutual Letter; SIFMA Letter; Vanguard Letter; Primerica Letter; TIAA Letter.

[1045] Commenters had similar concerns, *see, e.g.,* EPI Letter; Regulatory Impact Analysis, *supra* footnote 853; CFA Letter I.

[1046] *See, e.g.,* JR Kling, *et al., Comparison Friction: Experimental Evidence from Medicare Drug Plans,* 127 Q. J. Econ. 199 (2012) (finding that in a randomized field experiment, in which some

senior citizens choosing between Medicare drug plans that were randomly selected to receive a letter with personalized, standardized, comparative cost information ("the intervention group") while another group ("the comparison group") received a general letter referring them to the Medicare website; plan switching was 28% in the intervention group, but only 17% in the comparison group, and the intervention caused an average decline in predicted consumer cost of about $100 a year among letter recipients); CK Hsee, *et al., Preference Reversals Between Joint and Separate Evaluations of Options: A Review and Theoretical Analysis,* 125 Psychol. Bull. 576 (1999).

[1047] These aspects of the relationship summary are consistent with, for example, the disclosure items identified in the 917 Financial Literacy Study as essential for retail investors: adviser's fees (76%), disciplinary history (67%), adviser's conflicts of interest (53%), and adviser's methodology in providing advice (51%); *see* 917 Financial Literacy Study, *supra* footnote 588.

advisers. In addition, through the use of layered disclosure, the relationship summary will facilitate investors' access to additional, more detailed, information. The relationship summary is also the first narrative disclosure for broker-dealers' retail customers that will be filed with the Commission and widely available to the public. We believe providing this overview of information in one place will enhance the accessibility of this information for the retail investor reviewing it relative to the baseline. Moreover, some information, such as the payments to financial professionals, is not currently required to be publicly disclosed, making that information available for the first time. The relationship summary may also benefit investors by helping them separate "hard" information about services and fees from marketing communications. To the extent the relationship summary will be effective at informing retail investors,[1048] it should improve their ability to assess whether a relationship offered by a particular firm is a good match with their preferences and expectations. Moreover, a reduction in information asymmetry may also help retail investors increase the value from any given relationship they enter with a firm or financial professional by potentially increasing their ability to monitor the relationship and to make more informed decisions related to the relationship during its duration, including whether to terminate the relationship.

Second, Form CRS will provide benefits to those retail investors that want to compare more than one provider or service, including those that want to compare brokerage and advisory services, relative to the baseline. Form CRS is distinct from other required disclosures as it is a standardized disclosure to retail investors that is broadly uniform between investment advisers and broker-dealers, or that requires dual registrants to describe both brokerage and advisory services. In facilitating this comparability, the relationship summary may promote competition between financial service providers along dimensions such as fees, costs, and conflicts, in ways that improve retail investor welfare. The comparative benefits discussed above

could increase further should third-party data aggregators enter the market and use the information disclosed in relationship summaries to provide consolidated data on firms, as search and processing costs could be reduced even further for retail investors.[1049]

Third, we also believe that requiring all broker-dealers and investment advisers that serve retail investors to provide a relationship summary, along with the other initiatives we are adopting, will increase understanding of, and confidence in, the market for financial advice more generally. Specifically, because of confusion about the market for brokerage and advisory services or a general lack of confidence in the market, some retail investors are potentially discouraged from seeking a relationship with a financial provider and do not participate in the market for financial services.[1050] The relationship summary may help spread awareness and understanding about the market for financial services by increasing transparency about the services, fees, conflicts and standard of conduct of financial professionals; reducing confusion among investors generally; and increasing the general level of confidence. This general increase in understanding and confidence should, in turn, make it more likely that investors participate in the market for financial services when participation is likely to benefit them.

Some commenters suggested the general benefits to investors of the proposed relationship summary would be limited.[1051] More specifically, several commenters were concerned that retail investors may be subject to information overload from reading the relationship summary, reducing the potential benefits to investors because of the cognitive costs of digesting the information.[1052] We acknowledge that there are limits to investor cognition with respect to lengthy and detailed disclosures,[1053] however the relationship summary is shorter and more concise than disclosures currently available to investors, which should reduce the likelihood of information overload. Moreover, we have modified the relationship summary from the

proposal to further streamline and shorten it, and minimize the use of legal or technical jargon, thereby further reducing the potential that the relationship summary poses a cognitive burden for retail investors that undermines the overall benefit of the disclosure.

We also recognize that the relationship summary, as with other required disclosures, has costs.[1054] For example, as discussed above, there is a risk that disclosure of conflicts of interest can actually increase costs to investors by, for example, providing a perceived "moral license" to financial professionals to act on disclosed conflicts and encourage them to provide more conflicted advice at the expense of investors.[1055] In addition, some commenters expressed a belief that the disclosures in the proposed relationship summary, particularly due to the prescribed wording, may increase investor confusion [1056] or may "create misimpressions, and may even constitute outright misstatements, inaccuracies, or misrepresentations" in certain contexts.[1057] In consideration of these comments, the final requirements for Form CRS permit firms, within the parameters of the instructions, largely to describe their services, investment offerings, fees, and conflicts of interest using their own wording. The final requirements also incorporate many other changes in response to commenters' concerns and suggestions and insights from investor surveys and roundtables, which are intended to increase the benefits and reduce the costs to investors relative to the proposed disclosure. Additionally, as with required disclosures generally, we recognize that the relationship summary alone likely would not fully alleviate investor confusion or risk of mismatched relationships in the marketplace.

Moreover, firms may attempt to pass through some of the direct compliance costs we discuss further below to retail investors, for example, by charging higher commissions, asset-based management fees, or other fees. However, we believe such pass through of costs is likely to be limited because we expect these direct expenses to be

---

[1048] As discussed *supra,* in Sections I and II, we commissioned the RAND 2018 report and received several surveys and studies provided by commenters. *See supra* footnotes 13–21 and accompanying text. Results of the RAND 2018 survey and other surveys or studies submitted to the comment file indicate that survey and study participants indicated their subjective view that a relationship summary would be useful for retail investors; *see supra* Section I and IV.B.3.b.

[1049] The requirement that the headings should be machine-readable may facilitate such entry by third-party data aggregators.

[1050] *See, e.g.,* OIAD/RAND, *supra* footnote 3, for a review of the academic evidence on such effects.

[1051] *See, e.g.,* CFA Letter I and EPI Letter.

[1052] Such concerns are raised in, *e.g.,* AARP Letter; ACLI Letter; Rhoades Letter. Relatedly, some commenters argued that the relationship summary is duplicative of other disclosures and is unnecessary. *See, e.g., supra* footnote 33.

[1053] *See supra* footnote 1034 and accompanying text.

[1054] *See* the discussion on the limits and potential costs of disclosures to retail investors in *supra* Section IV.C.

[1055] Some commenters raised similar concerns. *See, e.g.,* CFA Letter I.

[1056] *See, e.g.,* Financial Planning Coalition Letter (expressing concern that Form CRS may exacerbate investor confusion). *See supra* footnotes 77 and 80 and accompanying text.

[1057] Committee of Annuity Insurers Letter. *See supra* footnotes 76–81 and accompanying text.

relatively small in the context of the overall size of the brokerage and investment advisory industries.[1058] Additionally, to the extent the relationship summary may promote competition between financial service providers, as discussed above, any increase in competition both among and between broker-dealers and investment advisers could reduce the pricing power of firms, and thereby reduce the ability to pass through the compliance costs associated with the relationship summary.

The magnitude of the anticipated economic effects discussed above will depend on a number of factors, including the extent to which the relationship summary will increase investors' understanding about their potential or current relationships with firms and financial professionals, and in what ways such an increase in understanding would affect their behavior. Given the number and complexity of assumptions that would be required to be able to estimate how the relationship summary will affect investors' understanding and their decision-making, and the lack of data on relevant characteristics of individual firms and their prospective and existing retail investors, the Commission is not able to meaningfully quantify the magnitude of these anticipated economic effects.

We discuss the benefits and costs to retail investors of certain elements of the relationship summary requirements below, including requirements regarding length and presentation, standardization, content (including layered content), delivery, and filing. As part of these discussions, we also discuss certain changes from the proposal and how we anticipate those changes affect the benefits and costs of the final relationship summary relative to the proposed requirements.

b. Presentation and Format

The presentation and format of the relationship summary are designed to facilitate retail investors' processing of the provided information to help them compare information about firms' relationships and services, fees and costs, specified conflicts of interest and standards of conduct, and disciplinary history, among other things. The relationship summary is also designed to promote effective communication between firms and their retail investors. Several features of the relationship

summary should reduce some of the limitations discussed above that may undermine the efficacy of disclosures, such as cognitive limitations and disclosure overload, as discussed further below.

The magnitude of the anticipated benefits and costs to retail investors discussed below will depend on a number of factors, including the extent to which the presentation and formatting requirements for the relationship summaries will help increase investors' understanding about the content of the relationship summaries, and in what ways such an increase in understanding would affect their behavior.

(1) Length and Amount of Information

Unlike many other required disclosures by financial firms, the relationship summary has a page limit. We believe that limiting the disclosure length and prescribing certain elements of the relationship summary's content could benefit investors relative to the baseline by forcing firms to provide concise and clear investor-relevant information, thereby reducing information overload and increasing the likelihood that investors will focus their attention on the relationship summary. The optimal length of the relationship summary for investors may vary from investor to investor based on individual limits to attention and ability to process a lengthier document, though investor and commenter feedback indicated many investors preferred a relationship summary no longer than, and in some cases shorter than, what was proposed.[1059] We have also reduced the page limit for standalone broker-dealers' and standalone investment advisers' relationship summaries from four to two, thereby potentially increasing the benefits of a shorter document relative to the proposal.

However, we recognize that there are potential costs to requiring a page limit.[1060] For example, as pointed out by commenters, a prescribed page limit may make it more difficult for some firms to effectively describe the nature or range of the relationships and may prompt them to exclude details that

investors might find important.[1061] To the extent the provided disclosure becomes too abbreviated it may confuse investors rather than inform them about the relationship, which could increase search costs and increase the risk of a mismatched relationship relative to the baseline. The relationship summary includes several elements to mitigate the potential costs of providing less comprehensive information by utilizing layered disclosure, which includes encouraging, and in some cases requiring, hyperlinks to additional information and other textual features, such as hovers, to provide descriptions or definitions of terms.[1062] The relationship summary also includes conversation starters that are designed to elicit more substantial conversations on certain topics. Such conversations could further mitigate the costs of less comprehensive information by encouraging the providers to elaborate on topics that investor may find confusing.

Finally, we believe that allowing only the required and permitted information will promote standardization of the information presented to retail investors, minimize information overload, and allow retail investors to focus on information that we believe is particularly helpful in deciding among firms. However, we acknowledge that the potential cost of this level of standardization is that firms will not be able to include other information that might also be helpful to investors.

(2) Organization of Information and Text Features

As discussed above, academic research has documented how individual perceptions of information can change depending on the framing of the information.[1063] The relationship summary's requirement to use standardized questions as headings should help retail investors frame the information that follows the question by establishing sufficient context and increasing salience of the information presented.[1064]

The final instructions include an instruction encouraging the use of

---

[1058] *See infra* Section IV. D.2.b.(4) for a summary of estimates of certain compliance costs developed for the purpose of the Paperwork Reduction Act analysis.

[1059] For example, 57% of RAND 2018 survey respondents indicated that the relationship summary was too long, 41% said it was about right, and roughly 2% said it was too short. RAND 2018, *supra* footnote 13. *See also supra* footnotes 129–139.

[1060] Just as reducing the maximum page length from four to two for standalone broker-dealers and investment advisers could increase the benefits relative to the proposal; this change could also increase these costs relative to the proposal.

[1061] *See supra* Section II.A.2 for examples of commenters raising this concern.

[1062] *See generally supra* Section II.A.4 for examples of graphical features encouraged by the Relationship Summary instructions.

[1063] *See supra* footnote 1032 and accompanying text.

[1064] The proposal had required headings to frame the information, but did not require they be in the form of questions. *See supra* Section II.A.2 for a discussion of comments related to the question-and-answer format, including its potential utility to investors' understanding, and our decision to require this format.

**33584**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

electronic and graphical features in the relationship summary.[1065] Additionally, the relationship summary requires the use of text features for certain information, such as the conversation starters, which should increase the salience of this particular information and increase the likelihood that investors will review it. Based on academic research on disclosure readability,[1066] we believe the use of text features, whether voluntary or required, will facilitate retail investors' absorption of the provided information. Additionally, certain electronic features, such as embedded hyperlinks and hovers, should facilitate retail investors' access to additional information if they are interested, thereby reducing their costs in locating the information.

We recognize that because we are encouraging, but not requiring, firms to use graphical and electronic features, some firms might not use text features beyond what is required, potentially reducing their use and the attendant benefits. We believe, however, that providing some flexibility in design to firms may provide a benefit to retail investors, because firms competing for retail investors likely have incentives to use graphical and electronic features to enhance the retail investor's experience. Moreover, flexibility also allows firms to continuously improve their use of graphical and electronic features as they learn over time what features are the most effective. We recognize, however, that one potential cost of allowing this flexibility is that firms may also have incentives to use certain text features to increase the salience of the portions of the disclosed information that they prefer to highlight, rather than the information that may be the most useful to investors to highlight.

The final instructions do not include certain presentation requirements that we had proposed. For example, we proposed requiring that dual registrants present their information in a single relationship summary, using a two-column format. The final instructions permit dual registrants (or affiliated broker-dealers and investment advisers) to prepare either a single relationship summary describing both brokerage and investment advisory services, or two separate relationship summaries

describing each service.[1067] Additionally, we are requiring such firms to use standardized headings in a prescribed order, and to design their relationship summary in a manner that facilitates comparison, but the final instructions do not specifically require a two-column format. We believe this modification could increase the benefits relative to the proposal to investors of the relationship summary by permitting firms to choose design elements that might facilitate comparison more effectively than a two column format. We recognize, however, that absent a specific design requirement, some firms might present this information in a manner that is less effective at facilitating investors' understanding than the proposed two-column format. We believe, however, that the potential benefits of allowing firms with differing business models to determine the design methods most effective at facilitating comparability justifies the change from a single, prescribed design element. Additionally, the final rule does not adopt the proposed restrictions on paper size, font size, or margin width, and instead requires them to be "reasonable." We believe that these modifications from the proposal will incentivize firms to design relationship summaries that most effectively and accurately communicate their disclosed information to the benefit of investors, as well as encourage firms to make interactive, electronic disclosures available.

c. Standardization

(1) Standard Question-and-Answer Format and Standard Order of Information

The final rules require that firms present information under standardized headings and respond to all the items in the final instructions in a prescribed order.[1068] We expect that requiring the same set of headings in a prescribed order for each relationship summary will facilitate retail investors' ability to compare relationship summaries across firms. In addition, the prescribed wording of the headings reduces the risk that firms would use the headings to "frame" each topic in ways that would

be less useful for retail investors' understanding of the disclosed information. As discussed above, academic research has documented how individuals' perceptions of information can change depending on the framing of the context of the information.[1069]

We expect retail investors to benefit from this standardization to the extent they review relationship summaries from more than one firm, as the standardized headings in the prescribed order will allow them to compare firms' responses.[1070] Additionally, the requirement that firms structure the headings in machine-readable format could reduce the cost of third party data aggregators to analyze relationship summaries across many firms and display comparisons of responses, ultimately reducing search costs for investors.[1071]

Because firms will be given very limited flexibility in terms of language for headings and the order of the sections,[1072] some firms may find it more difficult to effectively present the information specific to their business and circumstances they believe should be made salient to retail investors. To the extent that the headings and the specified order do not specifically promote such information for a particular firm, and this information is relevant to investment decisions, investors may potentially find the relationship summary less useful in evaluating the specific firm. To mitigate this potential cost and provide some flexibility to firms, the final rules allow firms to discuss the required sub-topics within each item in an order that firms believe best promotes accurate and readable descriptions of their business.[1073] The final rules also allow firms to omit or modify a disclosure or conversation starter that is inapplicable to their business or specific required wording that is inaccurate. The benefit of such flexibility is that it allows firms to increase saliency of and direct investor attention to the more relevant

---

[1065] For a non-exclusive list of features the instructions encourage firms to use, *see supra* Section II.A.3. Some features are exclusive to electronic versions of the disclosure, such as hovers, while others could be used as part of a paper disclosure, such as comparison boxes. The benefits and attendant costs of any electronic features will generally be limited to those retail investors that access the document electronically.

[1066] *See, e.g., supra* footnote 1034 and accompanying text.

[1067] *See generally* Section II.A.5 for a discussion of specific instructions, as well as comments received.

[1068] *See generally infra* Section II.A.2 for discussion of the specific instructions, as well as comments received. In terms of specifically adopting a question-and-answer format for the standardized headings, we believe that adopting this format is likely to increase the salience of the information under each heading and improve investors' cognitive engagement with the document, which should facilitate their understanding of the disclosed information.

[1069] *See supra* footnote 1032 and accompanying text.

[1070] *See* Morningstar Letter (commenting on the importance of standardized disclosure, that "[f]urther, it is extremely important for conflict-mitigation disclosures to be standardized. . . The Commission could require a table, as we discuss below, for the Client Relationship Summary that standardizes how all broker/dealers list their relevant fees, making the costs of opening and maintaining an account transparent and comparable").

[1071] Two commenters argued for machine-readability to allow for third party development of comparison tools. *See supra* footnotes 663 and 664.

[1072] *See supra* footnote 91.

[1073] The proposed instructions prescribed the order of information within each item. *See supra* footnote 121.

App 137

disclosures. We believe the mix of requiring standardized headings and a prescribed order of topics but allowing some flexibility in the order of presentation within each topic strikes an appropriate balance in the inevitable trade-off, discussed further below, between the relative benefits and costs of disclosure standardization versus disclosure flexibility.

The magnitude of the anticipated benefits and costs to retail investors discussed above will depend on a number of factors, including the extent to which the standardized headings and prescribed order of information will help increase investors' understanding about the content of the relationship summaries, and in what ways such an increase in understanding would affect their behavior.

(2) Prescribed Wording

The final instructions include a mixture of limited prescribed wording that firms must include and requirements for firms to draft their own descriptions that comply with instructions about topics they must address.[1074] As with any disclosure document, there are inevitable trade-offs between prescribing specific wording for firms to use (when applicable) and providing discretion to firms to use their own wording. We describe those trade-offs, as they relate to the final instructions, below.

The proposed instructions would have required prescribed wording in several items of the relationship summary, including fees and costs and a comparison section for standalone broker-dealers and investment advisers. We explained in the Proposing Release that prescribed wording for these items could benefit investors through standardization and by improving comparability across relationship summaries, while at the same time could impose costs on investors if prescribed wording does not accurately represent a firm's services.[1075] We are adopting final instructions that largely eliminate prescribed wording for most of these items and instead permit firms, within the parameters of the instructions, to respond to the relationship summary items using their own wording.[1076] We continue to prescribe wording for headings, conversation starters, and the standard of conduct, as well as a factual

disclosure concerning the impact of fees and costs on investments over time.[1077] However, firms may omit or modify required disclosures or conversation starters that are inapplicable to their business or specific wording required by the final instructions that is inaccurate.[1078] Based on feedback from commenters and observations reported by investor studies and surveys, this change will increase the benefits of the relationship summary to investors relative to the proposal. Specifically, several commenters suggested that some of the prescribed wording would not only reduce the accuracy of the information provided by firms but could also confuse investors about a firm's offerings, and we have made changes in light of those comments. We believe the final rules strike an appropriate balance between comparability between firms and the accuracy and relevance of information contained in relationship summaries, increasing potential benefits to investors relative to the proposal.

We nevertheless recognize reductions in benefits relative to the proposal stemming from this approach. It decreases the degree of standardization of the information which could impact comparability across relationship summaries, as suggested by some academic research.[1079] However, to the extent some of the prescribed language in the proposed rules would be considered ''boilerplate'' by investors or would not be applicable to a particular firm's services or business, the reduction of such prescribed wording in the final rules is not likely to come at a cost to investors (and in fact is likely to benefit investors). The risk of lower standardization and comparability also is mitigated because, while not prescribing specific wording, the final instructions require prescribed topics that all firms must include in each item. For example, in their description of services, all firms must address monitoring, investment authority, limited investment offerings, and account minimums.[1080] Moreover, increased flexibility for firms to describe their services and offerings relative to the proposal could impose costs on retail investors if it increases the potential ability of some firms to provide information in a less useful or clear way in their own words than when required to use prescribed wording.[1081]

One section proposed for standalone broker-dealers and investment advisers, which we referred to as the Comparisons section, had entirely prescribed wording.[1082] We are not adopting this proposed section. Additionally, we removed prescribed wording from the proposed introduction, which would have noted that brokerage and advisory services were distinct.[1083] On one hand, omission of the Comparisons section potentially could reduce the risk of information overload for investors. On the other hand, omitting this section might reduce benefits relative to the proposal by reducing the salience of potentially valuable comparative information available to retail investors at the point of forming a relationship, particularly if a retail investor does not review relationship summaries of multiple firms. We have taken specific measures to maintain some of the benefits we had intended to achieve in the proposed Comparisons section by using other methods to enable retail investors to continue to view comparative information and access more general educational information. For example, all firms must provide at the beginning of the document a link to *Investor.gov/CRS*, which offers educational information about investment advisers, broker-dealers, financial professionals and other information about investing in securities. In addition, dual registrants and affiliated firms that offer their brokerage and investment advisory services together are required to provide information about both types of services with equal prominence and in a manner that clearly distinguishes and facilitates comparison. This instruction applies regardless if they prepare a single relationship summary or two separate relationship summaries describing each type of service. If dual registrants prepare two separate relationship summaries, they must cross-reference or link to the other and deliver both with equal prominence and at the same time. Affiliates offering brokerage and investment advisory services together have similar presentation and delivery requirements.

The magnitude of the anticipated benefits and costs to retail investors discussed above will depend on a number of factors, including the extent

---

[1074] *See generally supra* Section II.A.1 for a discussion of these instructions, comments received on the proposal, and changes made regarding the amount of prescribed wording.

[1075] *See* Proposing Release, *supra* footnote 5, at Section IV.B.2.a.

[1076] *See generally* Section II.A.1.

[1077] *See generally* Section II.A.1. We discuss the benefit and costs of these items, including related to the prescribed wording, below, in Section IV.A.c.

[1078] *See supra* footnote 91.

[1079] *See generally supra* Section IV.C.

[1080] *See generally supra* Section II.A.3.

[1081] We also acknowledge there is a risk that some firms could use the flexibility to strategically omit

or obscure information. Such action, however, would risk liability under Form CRS or the antifraud provisions of the Advisers Act. *See, e.g.,* General Instruction 2.B. to Form CRS.

[1082] *See generally supra* Section VI for a discussion of the proposed requirements as well as comments received.

[1083] *See supra* Section I.

**33586**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

to which the specific requirements regarding wording will help increase investors understanding about the content of the relationship summaries, and in what ways such an increase in understanding would affect their behavior.

d. Content

The final instructions require firms to include specific items in the relationship summary. Below we discuss the anticipated benefits and costs to retail investors from these items.[1084] The magnitude of these anticipated benefits and costs to retail investors will depend on a number of factors, including the extent to which the specific items of disclosure will help increase investors understanding about their potential or current relationships with firms and financial professionals, and in what ways such an increase in understanding would affect their behavior.

(1) Relationship and Services

The relationship summary requires an overview of the services that the firm provides to retail investors.[1085] The topics that the firm must discuss include principal brokerage and advisory services, monitoring, investment authority, limited investment offerings, as proposed, and, new to the adopting release, account minimums and other requirements. The services firms provide to retail investors vary widely. These differences exist not only between broker-dealers and investment advisers, but also within different types of broker-dealers and investment advisers. We believe that this section will increase the transparency, saliency, and comparability of information about the types of services, accounts, and investments provided by firms, which should likewise improve matching between firms and retail investors.

We have made some changes from the proposal intended to increase the potential matching benefit. In particular, instead of using prescribed wording, firms will describe their services using their own wording. Firms must also describe account minimums, which could improve matching with the provider and may reduce investor search costs, especially for investors that fall short of required minimums so that retail investors can be aware of potential limitations on their initial or

continued eligibility for services.[1086] Because all firms must describe particular topics, we believe investors can also use this information to compare firm services if they review multiple relationship summaries. We believe the approach of firms using their own wording to describe their services will increase the benefit to investors relative to the proposal by allowing firms to provide descriptions that are a better match for their particular services. This approach also avoids the cost of firms being required to make inaccurate or confusing disclosures given their specific business models, as raised by commenters.[1087] This potential increase in benefit, however, comes with attendant potential increases in costs to the extent that firms do not present the most relevant aspects of their services or their descriptions are unclear, as discussed in the considerations regarding prescribed wording above. On balance, we believe that allowing for a description that is accurate and better matched to a firm's services likely would be more beneficial and less confusing to investors.

(2) Fees and Costs, Standard of Conduct, and Conflicts of Interest

The relationship summary requires several prescribed questions and required responses about fees, conflicts of interest, and the standard of conduct.[1088] Some of this information will be required to be provided to investors for the first time, such as an articulation of the standard of conduct. Other information, while currently available in various sources, will be presented centrally in the relationship summary, with links to more detailed, layered information about fees and conflicts. Additionally, providing retail investors with context for the more detailed information could potentially pique their interest and lead retail investors to seek more information about fees and conflicts through the required links. We believe both the information not previously required and the consolidated summary of information already available elsewhere will benefit investors by increasing salience, transparency, and comparability, and reducing information asymmetry compared to the

baseline. More specifically, including these disclosures prominently, in one place, in a digestible manner, at or before the start of a retail investor's relationship with a firm or financial professional could facilitate meaningful disclosure in the relationship summary, as well as conversations between the retail investor and his or her financial professional, and help the retail investor decide on the types of services that are right for him or her. In addition, to the extent that the specified conflicts of interest disclosures could draw retail investors' attention to conflicts, they may improve retail investors' ability to select and monitor firms and financial professionals.

The fees, costs, and conflicts disclosure also potentially has costs for investors. In particular, and as discussed above,[1089] the perception that an investor has been warned (via the disclosure) of a firm's and financial professional's potential bias may lead some financial professionals to believe that they are less obligated to provide unbiased advice. Further, the standard of conduct and conflict disclosures could make firms and financial professionals appear more trustworthy and as a result reduce the incentives for retail investors to examine additional information more carefully. Conversely, a potential cost for investors of such disclosures is that some investors may mistakenly leave the market for financial services or choose to not engage with a financial professional because they infer from the discussion of conflicts of interest and fees that a financial professional could provide bad advice or recommend products that will reduce their financial well-being. However, the placement of the prescribed standard of conduct disclosure immediately preceding the conflicts disclosure may alleviate the risk that investors will overreact to the conflicts of interest disclosure in this manner, because the standard of conducts disclosure clarifies that the firm or financial professional must act in the investor's best interest.

We received significant comments about the potential efficacy of the proposed disclosures related to fees and costs, conflicts, and the standard of conduct, and the ultimate benefit of such disclosures to investors. Likewise, feedback from investors through surveys and studies and in Feedback Forms revealed confusion about the proposed standard of conduct section in

---

[1084] *See supra* Section II.B.

[1085] *See supra* Section II for a discussion of the requirements and comments received on the proposal.

[1086] Disclosures of account minimums could also help make retail investors more focused on their future planning needs, for example, by incentivizing them to target minimal future investment levels to reach an asset value level that will make lower fees or additional services available from a particular provider.

[1087] *See, e.g., supra* footnote 269.

[1088] *See supra* Section III for a discussion of the requirements and comments received on the proposal.

[1089] *See supra* footnote 1026 and accompanying text.

particular.[1090] Results reported in investor surveys and studies also showed that the proposed conflicts section was rated one of the least useful sections, which may suggest that some investors did not understand the role of conflicts based on the disclosure as presented by the sample proposed dual registrant relationship summary.[1091] We have made several changes from the proposed relationship summary designed to increase the clarity and salience of the disclosures, thereby increasing the potential benefit and reducing the potential costs discussed above relative both to the baseline and the proposal. We also believe the changes will reduce the risk that investors will not read the section or will misinterpret it, increasing the effectiveness of these disclosures and therefore the potential benefit.

First, by integrating the section covering fees, costs, conflicts of interests, standard of conduct, and how representatives are paid,[1092] we believe retail investors may be more primed to process implications of these disclosures in a more integrated fashion due to their proximity. In particular, providing these disclosures in the same section could increase the salience of this information for investors,[1093] both relative to the proposal and the baseline, and may potentially improve investor cognitive processing of how conflicts of interest can have an impact on the services and advice provided and costs paid by investors.

Second, with respect to fees, the relationship summary requires firms to discuss under separate question headers (i) the principal fee and the incentive that it creates and (ii) other fees and costs that the investor will pay. We are requiring firms to summarize, in their own words, the principal fees and costs that retail investors will incur, including how frequently they are assessed and the conflicts of interest that they create. We think investors will be better able to process the implications of the principal fee disclosure through this requirement. Additionally, requiring firms to describe other fees and costs investors will pay, distinct from the principal fee, will clarify for investors that they pay not only a principal fee for advice, but also

additional fees and costs. This may potentially prompt investors to use the required link to learn more information, ask follow-up questions, or monitor for such fees and costs.

Third, the instructions require that the standard of conduct disclosure be placed under the same header as the summary of firm-level conflicts. The expected benefit of placing these conflicts of interest and standard of conduct disclosures together is to improve investor processing of the implications of conflicts of interest disclosure and legal obligations underlying the particular standard of conduct (*i.e.,* best interest for broker-dealers and fiduciary duty for investment advisers) as well as to prevent investor misinterpretation of these disclosures. We continue to prescribe wording for the standard of conduct, which we believe will have greater benefits than giving firms flexibility to describe the standard of conduct. Unlike other areas where we are allowing firms to use their own words, the standard of conduct, whether a fiduciary duty for an investment adviser or Regulation Best Interest for a broker-dealer, applies during the course of the adviser's relationship or where a broker-dealer makes recommendations. We also changed from the proposal the specific wording in an effort to simplify the disclosure relating to the standard of conduct and thereby increase understanding by investors. We believe reducing the length and the complexity of the prescribed wording for the standard of conduct will increase the salience and comprehension of the required standard of conduct disclosure, because a more readable and shorter disclosure is less likely to be ignored by investors due to information overload and limited attention.

While retail investors may benefit from understanding the standard of conduct that firms and financial professionals are subject to when providing investment advice or recommendations, discussing the standard of conduct in connection with conflicts of interest may benefit investors by making it clear that the standard of conduct does not mean that advice is conflict-free.

Regarding the conflicts disclosure itself, we have added a new requirement that if none of the enumerated conflicts required to be disclosed by the instructions is applicable to a firm, the firm must select at least one of its material conflicts to describe. This was designed to eliminate the potential that firms would not have to disclose any conflicts, which would have been costly to investors if it caused them to believe

that the firm had no conflicts. The relationship summary does not require disclosure of all conflicts but does require firms to include a link to additional information about their conflicts. We believe this will benefit investors relative to the baseline by providing sufficient information about certain conflicts to increase their understanding of incentives generally and potentially inducing them to review the linked information, which also minimizes the potential for information overload.

Finally, in addition to requiring firm-level conflicts, the relationship summary includes a separate question and required response about how financial professionals are compensated and the conflicts of interest those payments create. This disclosure will distinguish firm-level from financial professional-level conflicts, which we believe will benefit retail investors by helping them better understand the role of conflicts and how these conflicts might impact a financial professional's motivation when providing investment advice.

Despite the changes to presentation of fees, costs, conflicts, and standard of conduct relative to the proposal to increase clarity, we recognize the complexity of these issues. Accordingly, we recognize benefits to investors could be limited by investors' potential lack of ability to comprehend the disclosure.[1094] In the extreme, standards of conduct disclosure may also have a reverse effect of unduly enhancing investor trust in providers because investors may misperceive providers as holding themselves to a standard higher than legally required, and making investors discount the severity of the disclosed conflicts.[1095] Because firms have some flexibility to decide what additional fees and costs to describe and, in the case of a firm with none of the enumerated conflicts, which conflict to use as an example, benefits could be reduced to the extent that they choose examples that are not informative to the retail investor. Additionally, there could be a cost to investors to the extent they believe the enumerated fees and conflicts in the relationship summary are the only fees and conflicts the firm has, although we believe that the required wording that explains the

---

[1090] *See supra* footnotes 475–478 and accompanying text.

[1091] *See supra* footnotes 522–524 and accompanying text.

[1092] *See supra* discussion in Section II.A.4.

[1093] This is also consistent with some commenters' suggestions and the organization of several sample relationship summaries submitted by commenters. *See supra* footnote 373 and accompanying text.

[1094] *See supra* footnotes, 378–382, 475–478, 522–524, and accompanying text, for a discussion of comments and investor survey results on the comparative difficulty for investors to comprehend these disclosures.

[1095] *See, e.g.,* Betterment Letter I (Hotspex), *supra* footnote 18 (reporting that only 26% of participants correctly identified as false a statement that broker-dealers are held to a fiduciary standard).

**33588**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

summarized conflicts are examples, as well as the required links to more information about fees and conflicts, mitigate the risk of this misperception.

In addition, referencing academic research on the potential negative effects of conflicts of interest disclosure, several commenters expressed concerns that the proposed required disclosure of conflicts of interest in the relationship summary could lead to a ''moral license'' for financial professionals to provide even more biased advice and thus take unfair advantage of investors, or lead investors to fail to discount biased advice, trust their providers even more or make them feel pressured to remain in a potentially disadvantageous relationship, *i.e.,* the panhandler effect.[1096] Despite the changes we have made from the proposal to the required conflicts of interest disclosure in the final instructions, we acknowledge that there is still some risk for such negative unintended consequences.

(3) Disciplinary History

As proposed, the relationship summary will contain a section where firms must state in binary fashion whether or not they have disciplinary history, as well as include a reference to *Investor.gov/CRS*, where investors can conduct further search for additional information on those events.[1097] We have made a change to increase the salience of this information relative to the proposal by making a separate Disciplinary History section, including its own question and required response, rather than—as proposed—including it with other content in an Additional Information section, which should increase any benefits or costs relative to the proposal.

The primary benefit of the disciplinary history disclosure relative to the baseline is that investors will be alerted to a potential need to search and review their provider's disciplinary information and will have a mechanism to find more information about any disciplinary history. Although this information already exists publicly, clearly linking to *Investor.gov/CRS* for further information about disciplinary history at the time investors are selecting a firm or financial professional will help retail investors know where to find additional information about those events, which should reduce search costs and is an improvement relative to

the baseline.[1098] The conversation starters also will provide investors with a cue to the importance of understanding the disciplinary history and could trigger more information gathering and ultimately more effective cognitive processing of this disclosure. As a result, an investor may choose to not engage a firm or financial professional if the disciplinary history is considered to be too problematic, or, if an investor chooses to proceed with a provider that has some concerning disciplinary history, awareness of those events could provide incentives to the investor to monitor his or her account more carefully than if she were not aware.

The potential cost is that investors may overreact to the ''yes'' or ''no'' response reported in the Disciplinary History section. Investors may attribute the disciplinary history of one or few financial professionals at a firm to the entire firm, and thus choose not to select a provider that could be a good match for them (for example, a larger firm with more employees and thus a greater likelihood of disclosable events) [1099] or avoid hiring a financial professional altogether. Retail investors may also misinterpret a higher baseline rate of disciplinary history for broker-dealers than for investment advisers, given that the scope of events that trigger a disclosure event is arguably broader for broker-dealers than for investment advisers.[1100] As a result, retail investors may avoid choosing a broker-dealer, even when such a relationship would be a better match for the investors. Relatedly, investors may over-rely on lack of disclosure of disciplinary history as evidence of more ethical conduct; however, lack of such disclosures may be due to unrelated factors such as a comparatively short history of a particular firm or fewer employees (and thus less likelihood of having employees with disclosable events). However, the risk of some investors misinterpreting, or over-relying on, the disciplinary history should be mitigated to the extent firms or financial professionals provide more information about and encourage retail investors to ask follow-up questions regarding the nature, scope, or severity of any disciplinary history. On balance, we believe the benefits to investors from

including the disclosure on disciplinary history, as discussed above, justify any potential negative effects.[1101]

(4) Additional Information

The relationship summary will conclude with a section where registrants will let investors know where investors can find additional information about their services and request a copy of the relationship summary, which should benefit investors relative to the baseline by providing this general resource, in addition to the links or references provided throughout the document.[1102] In a change from the proposal, the Additional Information section eliminates the proposed requirement to provide information on how investors should report complaints about their investments, accounts, or financial professionals. Instead, we are requiring a conversation starter on whom investors should contact about their concerns. The benefit of this approach is that it improves readability of the form by reducing prescribed wording and potentially facilitates a conversation between investors and their financial professionals; the cost of this approach is that some investors will not have access to direct instructions on how to report their complaints. Finally, investors with limited or no access to internet (*e.g.,* due to costs of internet access or due to a disability) will also benefit from a requirement that firms provide a number through which retail investors can request up-to-date information or a copy of the relationship summary.

(5) Conversation Starters

Disclosures currently required by investment advisers and broker-dealers generally do not have suggested questions for investors to ask their financial professional. The relationship summary will require firms to incorporate suggested follow-up questions for the investor to ask, which the instructions refer to as ''conversation starters.'' [1103]

Conversation starters should benefit investors relative to the baseline by improving the potential to match investors with providers that provide services more suitable to the investors'

---

[1096] *See, e.g.,* Better Markets Letter; AARP Letter; Warren Letter; CFA Letter I; *see also supra* Section IV.C for a discussion of moral license.

[1097] *See supra* Section II.B.4 for a discussion of the requirements and comments received on the proposal.

[1098] *See, e.g.,* RAND 2018, *supra* footnote 13 (when investors were asked why they would not look up disciplinary history, 37% of all respondents indicated that they did not know where to get the information, whereas 19% of all respondents indicated that it would take too much time or effort).

[1099] *See supra* Section II.B.4.

[1100] *See id.*

[1101] This view is supported by survey evidence that suggests that investors consider disciplinary history to be an important factor when searching for a provider of investment advice. See *supra* footnote 996; *see also supra* footnotes 566 and 567.

[1102] *See supra* Section II.B.5 for a discussion of the requirements and comments received on the proposal.

[1103] *See supra* Section II.B.2.c for a discussion of the requirements and comments received on the proposal.

preferences and needs. We believe that this is accomplished through enabling the investor to be more engaged, potentially assisting the investor with comprehension of relevant disclosures, and assisting the investor in receiving more personalized information than the firm-level disclosure documents, such as Form ADV or documents issued by broker-dealers. That is, to the extent that these conversation starters promote more transparency and better communication between investors and financial professionals, retail investors are more likely to understand the information and select the right firm or financial professional to meet their preferences and expectations. In addition, to the extent the conversation starters help increase investors' engagement in a selected relationship it may also increase their monitoring of their relationship and more critically evaluate any advice or recommendations they receive. However, a closer personal engagement between retail investors and financial professionals may cause some investors to feel social pressure to act on the advice or recommendations of the professional due to a panhandler effect,[1104] which may attenuate some of the benefits of the conversation starters.

A potential cost associated with the conversation starters is that the particular required questions may anchor the attention of retail investors to those prescribed questions and reduce the likelihood that they would explore other potential questions that could be important to them based on their individualized circumstances. In response, we have reframed the proposed questions, which were at the end of the proposed relationship summary as "Key Questions," and instead have integrated them within the relevant information item throughout the relationship summary to reduce the risk that investors only focus on this set of questions in their discussions.[1105] Moreover, many of the conversation starter questions are broad and open-ended, which could further mitigate the risk of investors' anchoring on the content of these questions at the expense of the other disclosures in the relationship summary.

As pointed out by one commenter, unless the "Key Questions" in the relationship summary are provided to investors in advance, some retail investors may entirely ignore these questions.[1106] As discussed above, the final rules incorporate the questions as "conversation starters" directly in the different sections of the relationship summary, which should increase their salience and reduce the risk of them being ignored by investors compared to the proposal. In addition, because the relationship summaries will be available to investors online on firms' websites or through *Investor.gov/CRS*, the relationship summaries may be downloaded and accessed by some investors prior to meeting a financial professional, which would give such investors the opportunity to review the conversation starters before meeting a financial professional.

e. Filing, Delivery, and Updating Requirements

(1) Filing Requirements

The final instructions require firms to file their relationship summaries with the Commission (using IARD, Web CRD®, or both, as applicable), and make their relationship summaries available on their websites. In addition to firms' websites, firms' most recent relationship summaries will be accessible to the public through IAPD and BrokerCheck, public interfaces of IARD and Web CRD®, respectively. Investors also will be able to use the Commission's website *Investor.gov*, which has a search tool on its main landing page and at *Investor.gov/CRS* that links to BrokerCheck and IAPD. If investors prefer, they may request copies of firms' relationship summaries by calling the numbers that firms must include in their relationship summaries. We expect that making firms' relationship summaries accessible in these ways should reduce investor search costs in connection with selecting investment firms or financial professionals. We also believe that retail investors could benefit from their ability to access the relationship summaries independently through the companies' websites, BrokerCheck, IAPD, or *Investor.gov* prior to any contact with a financial professional. Such access could increase retail investors' understanding about differences between firms and financial professionals even before approaching a particular firm or financial professional, which could reduce search costs for investors early on in the search process and further reduce the risk of a mismatched relationship. The online availability of the relationship summaries will also enable investors who are currently not participating in the market to become better informed about the market for financial advice and the particular relationships provided without the need to incur the cost of actively contacting a firm or financial professional, which may ultimately encourage them to seek out a relationship with a provider.

In addition, the online availability of the relationship summaries in central locations and the machine-readable headers of the summaries will allow third-party data aggregators to more easily collect relationship summaries and facilitate the development of comparison tools for the investing public. To the extent such tools and metrics are developed, it could facilitate investors' searches by helping them narrow the set of available financial service providers to those that are most likely to provide a good match. However, the benefits to investors from the development of such tools will be mitigated by any fees charged by third-party aggregators for access to the tools.

(2) Delivery and Updating Requirements

Firms will deliver a relationship summary to each new or prospective retail investor based on the initial delivery triggers specific to investment advisers, broker-dealers, and dual registrants.[1107] Firms also must deliver the relationship summary to existing clients and customers who are retail investors in certain circumstances.[1108] For these existing clients and customers, the final rules require that firms deliver the relationship summary (including updates) in a manner consistent with the Commission's electronic delivery guidance and the firm's existing arrangement with that client or customer.[1109]

Because retail investors may face substantial switching costs when they move from one financial professional to another, the benefits associated with finding a good match may be particularly significant. Accordingly, investors' benefits should increase in accordance with their ability to understand and compare relationship summaries, which may take time. We recognize that, as some commenters noted, if a financial professional delivers the relationship summary at the time of service, retail investors may not have sufficient time to thoroughly evaluate the financial professional or may have already made a preliminary decision to engage the particular financial professional by the time they receive the relationship summary. As discussed above, however, there are

---

[1104] *See supra* footnote 1028 and accompanying text.

[1105] *See supra* Section II.A.4. for discussion on conversation starters.

[1106] *See* CFA Institute Letter I.

[1107] *See supra* Section II.C.3.b.

[1108] *See supra* Section II.C.3.c.

[1109] *See supra* Section II.C.3.a.

compliance uncertainties and other costs associated with requiring a relationship summary be delivered at first contact or requiring a waiting period, as suggested by some commenters.[1110] First contact between an investor and a financial professional may include circumstances that are not limited to the seeking of investment advice, such as business interactions for other purposes or social interactions. In addition, as noted by commenters, a waiting period may prevent investors from meeting certain deadlines.[1111] As we discuss above, the availability of relationship summaries online may mitigate the concern that retail investors will not have enough time to review them, to the extent that it provides retail investors an opportunity to compare firms before contacting them to obtain services.

We expect that the rules regarding form of delivery—electronic or paper—generally will be beneficial for retail investors relative to the baseline by enabling a form of delivery that is a good match for the particular retail investor. For retail investors who prefer electronic delivery, electronic forms of delivery should facilitate both the engagement with and the processing of the disclosed information, particularly the required and optional hyperlinks and other features. For the investors who prefer paper documents, paper delivery should result in greater likelihood of the investor paying attention to the relationship summary disclosures. We believe that maintaining the mode of delivery consistent with the way information was requested for new customers and consistent with existing arrangements for existing customers will help to further ensure that the investors will not miss and will process the information contained in the relationship summaries. Customers requesting the relationship summary in paper format may be less likely to access the additional information available through the electronic means of access discussed above, which could result in their inability to process potentially important additional information.

We also believe that existing clients and customers of broker-dealers and investment advisers that are retail investors will benefit from the requirement that firms deliver the relationship summary again if they: (i) Open a new account that is different from the retail investor's existing account(s); (ii) recommend that the retail investor roll over assets from a retirement account into a new or existing account or investment; or (iii) recommend or provide a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in an existing account, for example, the first time purchase of a direct-sold mutual fund or insurance product that is a security through a "check and application" process, *i.e.,* not held directly within an account.

This requirement should have the benefit of increasing retail investors' attention to disclosures provided in the relationship summary and the implications of new services or account options at the time of that decision. Additionally, the instructions require firms to update their relationship summaries to existing retail clients or customers if the existing relationship summary becomes materially inaccurate, which would include information that is materially outdated or materially incomplete. Firms must communicate the changes by delivering the amended relationship summary or by communicating the information through another disclosure that is delivered to the retail investor. Firms delivering the amended relationship summary must highlight the most recent changes by, for example, marking the revised text or including a summary of material changes and attaching the changes as an exhibit to the unmarked amended relationship summary. Investors should benefit from receiving updated relationship summaries under these circumstances because this information is relevant to the decision of whether to enter into new services or continue existing services, based upon whether the new or existing services match or continue to match their preferences and expectations. The requirement to attach revised text or a summary of material changes to the amended relationship summary should benefit retail investors by helping them to process the new information quickly. However, we recognize that to the extent that retail investors with established financial professional relationships tend to remain in such relationships, it may attenuate the benefits of receiving the relationship summary again.

2. Broker-Dealers and Investment Advisers (Registrants)

a. Benefits to Registrants

Beyond benefits to retail investors, we also expect broker-dealers and investment advisers potentially to benefit from the relationship summary. Some retail investors, who could benefit from obtaining advice and other services from financial professionals, currently may choose to stay out of the market for financial services because they do not understand what type of firm or financial professional they require. The relationship summary may provide a clear and concise document that may draw new investors to the market. If the relationship summary draws new retail investors to the market for financial services, both broker-dealers and investment advisers may gain new customers and clients, respectively. An increase in new retail investors could enhance revenues for firms and financial professionals, although firms and financial professionals could also bear additional costs, which are discussed below.

Moreover, the relationship summary could provide additional benefits to firms and financial professionals by improving the efficiency of the search process in the market for financial advice. For example, retail investors will be able to access and obtain relationship summaries for any number of firms online, including both broker-dealers and investment advisers. To the extent investors use this feature at the start of their search for a firm, they are more likely to opt to approach only firms that ex ante meet their preferences and expectations. Thus, broker-dealers and investment advisers may be less likely to expend time and effort meeting and discussing their business model and services with prospective customers and clients, who are seeking a different kind of relationship and that would ultimately not engage in a relationship with the firm or financial professional. Instead, firms and financial professionals can devote their efforts to acquiring customers and clients that are more likely to contract for their services. In addition, to the extent the relationship summary leads to fewer retail investors entering or remaining in a mismatched relationship that does not meet their expectations, it may benefit firms by reducing costly customer complaints and arbitrations.

While some commenters suggested that brokers have incentives to provide ineffective disclosures,[1112] academic studies show that sellers can benefit from better disclosure of product quality information to the buyers, and competitive sellers thus have incentives to disclose better information.[1113] While

---

[1110] *See supra* footnotes 720–724 and accompanying text.

[1111] *See supra* footnote 719 and accompanying text.

[1112] *See, e.g.,* CFA Letter; Warren Letter.

[1113] Steven Tadelis & Florian Zettelmeyer, *Information Disclosure as a Matching Mechanism: Theory and Evidence from a Field Experiment,* 105

App 143

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33591**

some disclosure documents may contain topics of material that investors may not understand or prioritize, the relationship summary has been designed to focus on issues already identified by retail investors to be of first-order importance with respect to their relationship with their financial professional,[1114] such as fees and costs, conflicts of interest, and disciplinary history of firms and financial professionals, among other items.[1115] Further, the relationship summary is intended to be clear, concise, and readable, while permitting firms the flexibility to provide information pertinent to their business model and services offered. Finally, firms may benefit from providing more clear and understandable disclosures to the extent it will facilitate a more efficient matching process with prospective investors. Firms could also bear potential legal liability [1116] and reputational costs as a result of providing potentially less transparent disclosures. For these reasons we believe registrants will generally have incentives to use the discretion permitted in the final instructions to design a relationship summary that is effective at informing retail investors about the nature of their business and offerings.

The magnitude of the anticipated benefits discussed above will depend on a number of factors, including the extent to which investors' will change their behavior as a result of receiving the relationship summary and how firms and financial professionals will react to such a change. Given the number and complexity of assumptions that would be required to be able to estimate how the relationship summary will affect investors' understanding and their decision-making, and the lack of data on relevant characteristics of individual firms and their prospective and existing retail investors, the Commission is not able to meaningfully quantify the magnitude of these anticipated benefits.

b. Costs to Registrants

The final rule will also impose costs on affected broker-dealers and investment advisers, including: costs associated with preparation, filing,

delivery, and firm-wide implementation of the relationship summary; costs of the associated recordkeeping rules; and as well as training, monitoring, and supervision for compliance. We expect that these costs may differ across firms depending on their type (broker-dealer or investment adviser), size, and complexity of business. We discuss these costs in more detail below. The Commission has, where possible, quantified the costs expected to result from the final rules in the analysis below. However, we are unable to quantify some of the potential costs discussed below, because of the number and complexity of assumptions that would be required to be able to estimate how the relationship summary will affect investors' understanding and choice of financial services provider and the lack of data on relevant characteristics of individual firms and their prospective and existing retail investors.

(1) Preparation, Implementation, and Content

Registrants will incur costs in connection with preparing and implementing the relationship summary. With respect to aggregate compliance costs, as discussed in more detail below, some commenters suggest these costs could be high.[1117] One commenter provided a survey of financial professionals that indicate that 79% of survey participants agree that implementation costs may be higher at first but will likely lessen over time, and 40% of firms in the same survey anticipate moderate or substantial time to implement the requirements of Form CRS (and Regulation Best Interest).[1118]

Broker-dealers currently are not required to prepare a consolidated disclosure document for their customers similar to the Form ADV, Part 2A brochure and may incur comparatively greater costs in preparing the relationship summary than investment advisers, given that investment advisers can draw on their experience with preparing and distributing Form ADV Part 2A. The Commission believes that costs of preparation would also fall differently across firms with relatively smaller or larger numbers of retail investors as customers or clients. For example, to the extent that developing the relationship summary entails a fixed

cost, firms with a relatively smaller number of retail investors as customers or clients may be at a disadvantage relative to firms with a larger number of such customers or clients since the former would amortize these costs over a smaller retail investor base.

The relationship summary requires the use of standardized headings in a prescribed order, while permitting some flexibility in other aspects of the relationship summary's wording and design within the parameters of the instructions. There is a trade-off in terms of preparation costs to registrants between requirements that prescribe specific wording and formats for disclosures and requirements that do not provide any prescribed language and format. For example, we would expect that the more extensively the relationship summary would rely on prescribed format and wording, the lower the preparation costs for providers, because there would be less need for them to devote resources to construct their own format and wording. On the other hand, the more extensively the relationship summary would rely on prescribed format and wording, the more likely it would turn into a "one-size-fits-all" document with largely boilerplate language, and firms would lose the benefit of being able to more precisely and accurately describe their own business and offerings to investors. We believe the final instructions strike an appropriate balance in this trade-off, with some higher-level prescribed format and language, such as the standardized language and order of headings, while firms generally will be able to (and have to) choose their own wording and organization of the required information under each heading.

The final instructions provide for more flexibility than the proposed instructions. We acknowledge that this change could increase certain compliance costs relative to the proposal, as firms will have to develop more of their own wording and organization of the information that is required to be included. However, the flexibility permitted by the final instructions is mainly in terms of the wording while the topics and sub-topics of information that are required to be discussed are largely proscribed. This narrows the field of subjects that firms could choose to discuss and potentially mitigates the cost increase from additional flexibility. Moreover, we believe that the expected benefits of this additional flexibility justify this cost increase. In particular, we expect this change from the proposal to benefit firms by allowing them to more

Am. Econ. Rev. 886 (2015); *see also* Tao Zhang, *et al., Information disclosure strategies for the intermediary and competitive sellers,* 271 Eur. J. Operational Res. 1156 (2018).

[1114] RAND 2018, *supra* footnote 13 (survey results re: Importance of each topic to respondents).

[1115] *See supra* Section IV.B.3.b.

[1116] *See supra* footnotes 92–105 and accompanying text (discussing the parameters for the scope of information expected within the relationship summary and the antifraud standard as applied to the relationship summary).

[1117] *See infra* Sections V.A.1 and V.D.1 for examples of commenters discussing the costs.

[1118] *See* CCMC Letter (Survey conducted by FTI Consulting of 30 individuals at 15 broker-dealers and dually-registered firms representing $23.1 trillion in assets under management and administration (AUM/AUA), and 78.54 million investment accounts).

accurately describe their services and offerings to retail investors.[1119] We also expect the additional flexibility to benefit both firms and retail investors to the extent it results in disclosures that are more engaging and useful to investors and mitigates the possibility of a mismatch. In addition, several commenters requested greater flexibility to provide accurate descriptions of their business models and services, noting the potential for liability for prescribed disclosures in the proposal that might not be accurate for a particular registrant's business.[1120] Some topics, however, will require firms to use prescribed wording, such as the headings, conversation starters, statement of their legal standard of conduct, and two statements related to fees and costs, for the reasons generally discussed in Section II.A.1.[1121]

In a change from the proposed instructions, the final instructions encourage rather than require dual registrants and affiliates to prepare one single relationship summary, but also allow them to instead prepare two separate relationship summaries.[1122] In addition, if firms prepare one combined relationship summary, the final instructions required them to employ design elements of their own choosing to promote comparability, rather than the two-column format, as prescribed in the proposed instructions. This increased flexibility in presentation relative to the proposal can benefit dual registrants and affiliates because it allows them to design disclosures more suitable to their business models. For example, a firm which generally is marketing both sides of its business to retail investors may find it less costly and/or more beneficial to provide a combined summary. However, dual registrants for which either the brokerage or investment advisory side of their business is not generally marketed to most customers or clients may find it more beneficial to provide two separate relationship summaries. If a firm chooses to prepare two distinct relationship summaries, it may incur an extra cost of preparing the second summary, but we expect firms will only elect to prepare two separate summaries if they believe the benefits of separate

summaries justify such additional preparation costs.

Beyond the more general costs discussed above from the prescribed formatting and wording requirements, some specific requirements may be costly for certain firms. For example, because the relationship summary requires information to be organized by standardized headings in a prescribed order, some firms may find it difficult to effectively present the most salient information specific to their business and services. As such, certain firms may incur costs associated with trying to fit their business model and other relevant information into the standardized headings. This is mitigated by the fact they have flexibility to present the required sub-topics of information in the order of their choosing within each subtopic and by firms' ability to omit irrelevant information. Firms and financial professionals also may bear costs in providing additional information to potential or existing investors to clarify any information that is salient to their business but does not fit into the standardized headings of the relationship summary. These costs are mitigated by firms' ability to supplement their relationship summaries with cross-references or hyperlinks to additional information.

The page limit for the relationship summary also has potential costs, particularly for firms with complex business models, even under the increased flexibility provided by the final instructions, because they would have to distill the complexity of their business into the same space as less complex firms. The use of layered disclosure, through mediums such as hyperlinks, will permit firms to provide more detailed information that may ameliorate this cost to some extent, while still adhering to the formatting requirements of the relationship summary.

Firms will also incur costs associated with the production and verification of information in the relationship summary. Although some of the information that will be summarized in the relationship summary is contained in other disclosures that firms already provide, firms will bear the cost of editing this information for the relationship summary and cross-referencing or hyperlinking to additional information. For example, to the extent that some firms do not already have in place a concise description of how fees, costs, conflicts, and standards of conduct are potentially connected, that also will allow for meeting the relationship summary's space constraints, firms will have to

expend time and effort to develop an accurate, clear, and concise description of these items, written in plain English, for insertion into the relationship summary, and cross-referencing or hyperlinking to additional information about these items. These costs may be larger for broker-dealers than for investment advisers, who can directly draw on the disclosures of fees, costs, and conflicts they have to provide to retail investors in Part 2 of Form ADV. Also, to the extent the costs of developing this section have a fixed component, the relative burden of developing this section may be higher for smaller firms. On the other hand, smaller firms are likely to have fewer types of fees, costs, and conflicts to report compared to larger firms, potentially making it less burdensome for them to summarize the required information.

In addition, the relationship summary requires ''conversation starters'' as part of each section, and the conversation starters must be highlighted through text features to improve their prominence relative to other discussion text. Firms will incur costs associated with the conversation starters, particularly with respect to preparation and training on how financial professionals provide accurate and complete responses to the ''conversation starters'' when asked. We do not have access to data and information that would allow us to estimate these costs to firms, but we expect them to be comparatively greater for firms with more complex business, a wider range of offered services and products, because training and supervision costs for such firms could be more extensive. For firms that provide automated investment advisory or brokerage services, those firms will incur burdens to prepare answers to each conversation starter question and make those available on the firm's website (while providing in the relationship summary a means of facilitating access, *e.g.,* by providing a hyperlink, to that section or page).[1123]

We also anticipate that firms will bear some costs in the production of the electronic format as well as other graphical elements, such as charts and tables, which may make important information more salient to investors. Smaller firms may disproportionately incur costs associated with electronic and graphical formatting, particularly if they do not have an existing web presence or currently produce brochures or other disclosures that make use of graphical formatting. However, because the final instructions encourage, but do

---

[1119] *See, e.g.,* SIFMA Letter requesting greater flexibility for this reason (stating that ''greater flexibility is needed to accommodate various business models, given that different firms offer different products and services'').

[1120] *See generally* footnotes 76–83 and accompanying text.

[1121] *See supra* footnotes 85–90 and accompanying text.

[1122] *See supra* Section II.A.5.

[1123] *See supra* footnote 184.

not require electronic formatting and graphical, text, and online features, firms would only bear these costs if they expected these features to provide benefits that justify these costs.

Finally, there could also be some indirect costs to firms from some of the required content in the relationship summary. In particular, to the extent that including disciplinary history information in the relationship summary increases the propensity of retail investors to consider this information when selecting firms and financial professionals, firms that affirm they have one or more reportable disciplinary events may face a loss in competitiveness compared to firms that have no event to report. This can in particular be costly for firms that have few or less serious disciplinary events that may be overlooked by investors that do not research the nature of the disciplinary history in more detail.[1124] We also recognize larger firms might be more likely to incur such competitive costs, because larger firms are more likely to have at least one reportable disciplinary event than smaller firms. Similarly, holding size constant, older firms, by virtue of having a longer business history, are more likely to have one or more reportable events than younger firms. Although we acknowledge the potential for firms to incur competitive costs from having to affirm they have reportable disciplinary history, those costs are justified by the potential benefits to investors from this disclosure, as discussed above.

(2) Filing, Delivery, and Updating Requirements

As proposed, the final instructions require firms to file their relationship summaries with the Commission and make them available on firms' publicly available websites, if they have one. The relationship summary must be filed in a text-searchable format with machine-readable headings. Further, the final instructions will require investment advisers to file their relationship summaries using IARD, as proposed; however, the final instructions—in a change from the proposal—will require broker-dealers to file through Web CRD® instead of EDGAR. This should reduce overall burdens relative to the proposal as broker-dealers already have extensive experience filing on Web CRD®, which is more accessible for broker-dealers. As proposed, dual registrants will be required to file on two systems. Instead of filing on EDGAR and IARD, as proposed, dual registrants will be

required to file using both Web CRD® and IARD. We recognize that requiring dual registrants to file using both Web CRD® and IARD may be more costly than filing through just one system; however, we believe that any such cost is justified to ensure a complete and consistent filing record for each firm and to facilitate the Commission's data analysis, examinations, and other regulatory efforts.

As discussed above, the firms that deliver relationship summaries electronically must do so within the framework of the existing Commission guidance regarding electronic delivery.[1125] With respect to initial delivery of the relationship summary to new or prospective investors, firm are required to deliver the relationship summary in a manner consistent with how the retail investor requested information, consistent with the Commission's electronic delivery guidance.[1126] Flexibility in the method of delivery, consistent with Commission guidance, could promote efficiency by allowing firms to communicate with retail investors in the same medium by which they typically communicate other information.[1127] Regardless of the method of delivery (*e.g.,* paper or electronic delivery), firms will incur costs associated with delivering the relationship summary to retail investors.

Moreover, requiring firms to make a copy of the relationship summary available upon request without charge will require firms to incur costs. For example, firms that provide a paper version of the relationship summary to retail customers that request it will incur printing and mailing costs when such requests are made. Further, firms may incur additional costs associated with systems for tracking customer delivery preferences.

Firms will also incur costs for updating and filing the relationship summary within 30 days of whenever any information becomes materially inaccurate.[1128] Firms could communicate this information by delivering the amended relationship summary or by communicating the information another way to the retail investor. For example, if an investment adviser communicated a material change to information contained in its relationship summary to a retail investor by delivering an amended Form

ADV brochure or Form ADV summary of material changes containing the updated information, the ability to disclose material changes by delivering another required disclosure containing the updated information should mitigate the cost of the requirement to communicate updated information in the relationship summary to investors. Firms could also incur costs to keep records of when the initial or updated relationship summary was delivered; however, we believe that firms will be able to leverage their current compliance infrastructures in maintaining such information.

The Commission anticipates that the costs associated with delivery for an average broker-dealer or average dual registrant will be higher than the costs for the average investment adviser. As Table 1 and Table 3 in Section IV.A.1 indicate, broker-dealers maintain a larger number of accounts than investment advisers; therefore, delivery costs for broker-dealers could exceed those of investment advisers, if the number of accounts is a good indicator of the number of retail investors.[1129] Similarly, given that the average dual registrant has more customer accounts than the average investment adviser, and that the preparation of relationship summaries and any updates for dual registrants may require more effort than for standalone broker-dealers or investment advisers, the compliance costs could be larger for those firms.

Firms will be required to deliver the relationship summary to retail investors. The final instructions have adopted a definition of retail investor that is similar to the definition of retail customer in Regulation Best Interest, but differs to reflect the differences between the relationship summary delivery requirement and the obligations of broker-dealers under Regulation Best Interest, including that the retail investor definition covers prospective as well as existing clients and customers and natural persons who seek services from investment advisers as well as broker-dealers. This definition of retail investor relative to the proposal may reduce uncertainty for broker-dealers and investment advisers about which customers should obtain relationship summaries. We do not believe this changes the scope of retail investors that will benefit collectively from the final rules.

---

[1124] Commenters raised similar concerns. *See supra* footnote 586 and accompanying text.

[1125] *See supra* Section II.B.3 and footnote 678.
[1126] *See supra* footnotes 679–681 and accompanying text.
[1127] *See supra* Section II.B.3 and footnote 680.
[1128] Along this line, firms could also incur some costs in modifying certain referenced disclosures per the parameters of General Instruction 3.B to Form CRS.

[1129] The Commission is unable to obtain from Form BD or FOCUS data information on broker-dealer numbers of customers, and instead, is only provided with the number of customer accounts. The number of customer accounts will exceed the number of customers as a customer could have multiple accounts at the same broker-dealer.

**33594**    **Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations

(3) Recordkeeping Amendments

As adopted and discussed above, firms will be required to make and preserve records of each version of their relationship summary and each amendment filed with the Commission. Firms will also be required to make and preserve a record of the dates that each relationship summary was given to any client, customer, or prospective client or customer who subsequently becomes a client or customer and such records will be maintained in the same manner, and for the same period of time, as other books and records under the applicable recordkeeping rules. As previously discussed, commenters stated that they believe the requirement to maintain records of the dates that the relationship summary was given to prospective clients or customers may impose significant and unnecessary costs and burdens.[1130] Commenters stated that firms do not have compliance and recordkeeping systems in place that could, without substantial and costly modification, maintain records of related to prospective clients or customers who might not become actual clients or customers of the firms for weeks, months or years after firms begin communicating with such individuals. As an alternative, commenters suggested that firms only be required to maintain a record of the most recent date they delivered the relationship summary to a prospective client that becomes an actual client preceding the opening of an account. Commenters suggested only requiring a record that the relationship summary was delivered at account opening or when a retail investor becomes an investment advisory client.

The inclusion of the recordkeeping requirements in the amended rules will impose costs on firms in the form of revised recordkeeping policies and procedures and possible modifications to their recordkeeping systems. The record requirements, however, may be less burdensome if their recordkeeping and compliance systems are already capable of creating and maintaining records related to communications with prospective clients. For example, investment advisers are required to keep similar records for the delivery of the Form ADV Part 2 brochure and broker-dealers are subject to comparable recordkeeping requirements with respect to communications and correspondence with prospective retail investors.[1131] Further, these recordkeeping requirements may benefit firms by assisting them in monitoring

their compliance with the relationship summary delivery requirements. Finally, these records will facilitate the Commission's ability to inspect for and enforce compliance with the relationship summary requirements.

(4) Estimates of Certain Compliance Costs

Although we are unable to quantify all costs discussed above, we quantify certain direct compliance costs based on the estimates developed for the purpose of the Paperwork Reduction Act analysis in Section V. These costs, which we discuss below, are estimated separately for investment advisers and broker-dealers that are required to prepare and file a relationship summary. We note that all aggregate cost estimates for either category of firms include the 318 dually registered firms.[1132] In addition, the costs estimates are calculated for the average investment adviser or average broker-dealer. We recognize that the actual compliance costs burdens for some firms will exceed our estimates and the burden for others will be less because firms vary in the size and complexity of their business models.

First, we quantify certain one-time costs associated with the initial preparation and filing of the relationship summary. The cost burden for an average investment adviser to initially prepare and file the proposed Form CRS for the first time is estimated to range between approximately $5,460 and $9,165, depending on the extent to which external help is used.[1133] The estimated aggregate non-amortized combined internal and external costs for all current investment advisers of initially preparing and filing the relationship summary will be approximately $65.3 million.[1134] In

addition, based on IARD system data, the Commission estimates that each year approximately 656 newly investment advisers will be required to prepare and file the relationship summary with us.[1135] The aggregate non-amortized initial preparation and filing costs of the relationship summary for these new investment advisers is estimated to be approximately $5.2 million.[1136] Similarly, for broker-dealers, the cost to an average broker-dealer for preparing Form CRS for the first time is estimated to range between approximately $10,920 and $14,625.[1137] We estimate the aggregate non-amortized aggregate combined internal and external costs to all current broker-dealers of initially preparing and filing the relationship summary will be approximately $38.8 million.[1138] We do not expect any new broker-dealer firms based on the secular decline in broker-dealer firms we have seen in recent years.[1139]

Firms will also incur one-time costs of the initial delivery of relationship summaries to their existing retail investors. We expect the non-amortized initial delivery costs to be

---

[1130] *See, e.g.,* Edward Jones Letter.
[1131] *See supra* footnote 810.

[1132] *See supra* footnote 863 and accompanying text.
[1133] The lower end estimate is based on the assessment that, without additional external help, it will take an average investment adviser 20 hours to prepare the relationship summary for the first time, *see infra* Section V.A.2.a. We assume that performance of this function will be equally allocated between a senior compliance examiner and a compliance manager at a cost of $237 and $309 per hour, (*see infra* footnote 1232 for how we arrived at these costs). Thus, the cost for one investment adviser to produce the relationship summary for the first time is estimated at $5,460 (10 hours × $237 + 10 hours × $309 = $5,460) if no external help is needed. In addition, we estimate that if the investment adviser needs external help, the average cost to an investment adviser for the most expensive type of such help (*i.e.,* compliance consulting services) would be $3,705, *see infra* footnote 1239, which brings the total cost to $9,165.
[1134] We estimate that the aggregate internal cost of initial preparation and filing of the relationship summary for existing investment advisers is $44,963,100 (= $5,460 per investment adviser ×

8,235 existing investment advisers). The aggregate external cost for existing investment advisers is estimated to be $20,371,331. *See infra* Sections V.A.2.a and V.A.2.b for more detailed descriptions of how we arrived at these estimates.

[1135] *See infra* footnote 1227 and accompanying text.

[1136] We estimate that the aggregate internal cost of initial preparation and filing of the relationship summary for expected newly registered investment advisers is $3,3,581,760 (= $5,460 per investment adviser × 656 expected new investment advisers). The aggregate external cost for expected new investment advisers is estimated to be $1,622,780. *See infra* Sections V.A.2.a and V.A.2.b for more detailed descriptions of how we arrived at these estimates.

[1137] The lower end estimate is based on the assessment that, without additional external help, it will take an average broker-dealer 40 hours to prepare the relationship summary for the first time, *see infra* Section V.D.2.a. We assume that performance of this function will be equally allocated between a senior compliance examiner and compliance manager at a cost of $237 and $309 per hour, respectively (*see infra* footnote 1365 for how we arrived at these costs). Thus, the cost for one broker-dealer to produce the relationship summary for the first time is estimated at $10,920 (20 hours × $237 + 20 hours × $309 = $10,920) if no external help is needed. In addition, we estimate that if the broker-dealer needs external help, the average cost to a broker-dealer for the most expensive type of such help (*i.e.,* compliance consulting services) would be $3,705, *see infra* footnote 1378, which brings the total cost to $14,625.

[1138] We estimate that the aggregate internal cost of initial preparation and filing of the relationship summary for existing broker-dealers is $30,204,720 (= $10,920 per broker-dealer × 2,766 existing broker-dealers). The aggregate external cost for existing broker-dealers is estimated to be $8,560,770. *See infra* Sections V.D.2.a and V.D.2.b for more detailed descriptions of how we arrived at these estimates.

[1139] *See infra* Section IV.B.c for a discussion of this decline.

App 147

approximately $4,941 for the average investment adviser. [1140] In total, we estimate that the aggregate non-amortized initial delivery costs to existing retail investors will be approximately $40.7 million for all current investment advisers,[1141] and $3.2 million for newly registered investment advisers.[1142] For the average broker dealer, we expect costs for the initial delivery to existing retail investors to be approximately $45,801.[1143] The aggregate non-amortized initial delivery cost for all current broker-dealers is estimated to be approximately $126.7 million.[1144]

Moreover, firms are required to post a current version of their relationship summary prominently on their public website (if they have one). We estimate that the initial posting will cost approximately $93 per firm (whether an investment adviser or a broker-dealer).[1145] In aggregate we expect the initial cost of posting the relationship summary to firms' websites to be approximately $686,437 for existing investment advisers,[1146] $54,682 for newly registered investment advisers,[1147] and $257,238 for broker-dealers.[1148]

In addition to the estimates of one-time costs discussed above, for the purposes of the Paperwork Reduction Act analysis, we have also developed estimates of certain expected ongoing compliance costs of the final rules. For example, firms will incur costs each year due to the requirement to re-deliver the relationship summary to existing retail investors in certain situations. We estimate that the annual average cost to re-deliver the relationship summary will

be approximately $992 for an average investment adviser and in aggregate approximately $8.8 million annually for all investment advisers.[1149] For broker-dealers, we estimate that the annual average cost to re-deliver the relationship summary will be approximately $9,222 for the average firm, and in aggregate approximately $25.5 million annually for all broker-dealers.[1150] Firms will also be required to deliver relationship summaries to new and prospective retail investors. Based on the Commission's projections of future client and customer account growth, we estimate that the annual costs to current firms of delivery to new and prospective retail investors would be between approximately $223 for an average investment adviser and $5,072 for an average broker-dealer, or approximately $1.8 million annually in aggregate for investment advisers and approximately $14.0 million annually in aggregate for broker-dealers.[1151] The difference in cost estimates between investment advisers and broker-dealers is mainly due to the fact that investment advisers serving retail investors generally have fewer clients than broker-dealers serving retail investors have customer accounts, but also because we project a lower growth rate for retail clients for investment advisers (4.5%) [1152] than for retail customer accounts for broker-dealers (11.0%).[1153] In addition, firms will also incur costs associated with making paper copies of the relationship summary available upon request. We estimate that such annual costs would be approximately $31 for the average firm (whether investment adviser or broker-dealer), and the aggregate annual costs for investment advisers and broker-dealers combined would be approximately $338,272.[1154]

In Section V, for the purposes of the Paperwork Reduction Act analysis, we also estimate the quantifiable expected ongoing costs associated with updating the relationship summary. These costs would be associated with preparing updated relationship summaries when information becomes materially

inaccurate, re-posting updated relationship summaries to a public website, and communicating changes to the relationship summary through re-delivery to existing retail investors. We estimate that the annual costs for firms to update and file amended relationship summaries will be approximately $467 for the average investment adviser, or approximately $3.8 million in aggregate for all investment advisers.[1155] For investment advisers with a public website, we estimate the average annual costs of re-posting amended relationship summaries to be approximately $53.32 per adviser, or $402,207 in aggregate for all investment advisers with public websites.[1156] Finally, we expect investment advisers will incur quantifiable costs of communicating changes to amended relationship summaries, if they choose to do so by delivery. We estimate the average annual costs of communicating changes to amended relationship summaries by delivery will be $8,450 per adviser that to choose to do so, and in aggregate approximately $34.8 million for all investment advisers that we expect to choose delivery to communicate updated information.[1157] For broker-dealers, we estimate the annual costs to update, file, and post amended relationship summaries will be approximately $608 for the average firm and approximately $1.7 million in aggregate for all broker-dealers.[1158] We estimate annual delivery costs will be approximately $ 91,602 for the average broker-dealer that will choose delivery to communicate updated information, and in aggregate approximately $126.7 million annually for all broker-dealers that we expect to choose delivery.[1159]

Finally, for the purposes of the Paperwork Reduction Act analysis, we also developed estimates of certain compliance costs associated with the recordkeeping requirements in the final rules. We estimate that the annual costs to firms related to these recordkeeping requirements will be $12.67 for an average investment adviser and approximately $104,354 in aggregate for all investment advisers. [1160] For broker-

---

[1140] *See supra* Section V.C.2.b.(1) for a description of how this is estimated.

[1141] Calculated as $4,941 per firm × 8,235 current firms = $40,689,135.

[1142] Calculated as $4,941 per firm × 656 expected new firms = $3,241,296.

[1143] Calculated as $126,684,600 (the estimated aggregate costs)/2,766 (number of broker-dealers with retail customers). *See infra* Section V.D.2.d. (1) for how the aggregate cost is estimated.

[1144] *Id.*

[1145] *See infra* sections V.C.2.a (for investment advisers) and V.D.2.a (for broker-dealers) for how the average cost per firm is estimated.

[1146] Based on IARD system data, 91.6% of investment advisers with individual clients report having at least one public website; *see infra* Section IV.B.2.a. Therefore the aggregate cost for existing investment advisers is estimated as: 91.6% × $91(average cost per firm) × 8,235 (number of existing investment advisers) = $686,437.

[1147] Assuming that the fraction of firms with at least one public website is the same for newly registered investment advisers as it is for existing investment advisers (*see id*), we estimate the aggregate costs as: 91.6% × $91(average cost per firm) × 8,235 (excepted number of new investment advisers) = $54,682.

[1148] *See infra* footnote 1370 and accompanying text.

[1149] *See infra* Section V.C.2.b.(2).

[1150] *See infra* Section V.D.2.d.(2).

[1151] *See infra* section V.C.2.c for how we estimate the costs to investment advisers, and *see infra* Section V.D.2.e for how we estimate the costs for broker-dealers.

[1152] See infra footnote 1341 and accompanying text.

[1153] See infra footnote 1415 and accompanying text.

[1154] *See infra* footnote 1339 and accompanying text for how we estimate the costs for investment advisers, and *see infra* footnote 1413 and accompanying text for how we estimate the costs for broker-dealers.

[1155] *See infra* Section V.A.2.c for how we estimate these costs.

[1156] *See infra* Section V.C.2.b.(3) for how we estimate these costs.

[1157] *Id.*

[1158] *See infra* Section V.D.2.c for how we estimate these costs.

[1159] See infra Section V.D.2.d.(3) for how we estimate these costs.

[1160] For investment advisers we estimate 0.2 additional burden hours related to the recordkeeping requirements in the final rule; *see infra* footnote 1280 and accompanying text. We expect that this incremental burden will most likely
Continued

App 148

dealers, we estimate annual recordkeeping and record retention costs to be approximately $39 for an average broker-dealer, and $107,017 in aggregate for all broker-dealers.[1161]

3. Impact on Efficiency, Competition, and Capital Formation

In addition to the specific benefits and costs discussed in the previous section, we expect that the relationship summary could produce a number of broader long-term effects on the market for financial advice. Below, we elaborate on these potential effects, in particular as they pertain to their impact on efficiency, competition, and capital formation.

a. Efficiency

The final rule requiring broker-dealers, investment advisers, and dually registered firms to produce a relationship summary could result in increased informational or allocative efficiency for retail investors by reducing the risk of matching with a firm or financial professional that is different from the investor's expectations and preferences. As discussed above, the risk of mismatch potentially imposes costs on investors, financial professionals, and firms. Investors may inadvertently, in the absence of information provided by the relationship summary, select the wrong type of financial professional or account, leading to increased costs (direct and indirect) and potentially suboptimal outcomes as it pertains to meeting the investor's financial goals. For firms and financial professionals, cultivating relationships with potential investors requires resources in terms of time and effort. If an investor and financial professional or firm is mismatched, then both sides of the relationship can incur costs. For example, the financial professional may devote time and resources to develop a relationship with a retail investor that is comparatively costly to maintain because of a mismatch between the investor's expectations and the services

offered by the professional,[1162] and the investor incurs costs associated with obtaining services that do not fit his or her needs. As such, the relationship summary may reduce the costs associated with mismatch for investors, firms, and financial professionals and increase the efficiency of the market for financial advice. We expect these efficiency gains particularly in the initial matching between investors and firms and financial professionals. For some retail investors, receipt of the relationship summary from their existing firm or financial professional could highlight that they are mismatched in their current relationship. Those investors may benefit from terminating the mismatched relationship and looking for a more appropriate match, but such gains are likely to only be realized to the extent investors anticipate the long-term benefits from a better match will be greater that the short-run switching and search costs. Moreover, these efficiency benefits may be attenuated to the extent that investors tend to stay in relationships with financial professionals once investors are committed to the relationship, even if the relationship is mismatched.

Informational efficiencies could also be enhanced with the relationship summary because key information is focused on information that has been previously identified as important to retail investors, salient and consistently disclosed across broker-dealers and investment advisers. The relationship summary will provide concise, user-friendly information which will allow retail investors to better understand the relationship that they will have with their financial professionals and will allow them to seek services commensurate with their expectations. In addition, to the extent the information asymmetry between investors and financial professionals is reduced, investors may make more informed investment decisions, or become more able to critically evaluate any investment advice they receive. Further, the use of layered disclosure and conversation starters will allow retail investors to access additional information that may be relevant to them when selecting their firm or financial professional, further reducing the risk of mismatch.

The firm-specific nature of the relationship summary required by the

final rules about a particular firm will enhance retail investors' information set about each firm, providing them with a more concise and simple document, which should alleviate potential investor confusion about the key elements of the relationship that the investor could expect to have with that firm.

However, such improved efficiency could be lower than that expected under the proposal because, unlike the proposed relationship summary, the adopted relationship summary will include less prescribed language and greater flexibility. For example, the relationship summary will not include a comparison between general broker-dealer and investment adviser standards and services.[1163] The elimination of this proposed requirement will likely reduce (relative to the proposal) the usefulness to retail investors from obtaining this general information from a single source (*e.g.,* any firm's relationship summary) and instead will require effort from investors in the form of search costs to provide an adequate comparison across firms within a given type of firm (*e.g.,* investment advisers). Moreover, for investors that may not know which type of firm is likely to best meet their preferences and expectations with respect to financial services, a less general relationship summary requires that investors that expend search costs also select the correct types of firms in order to make such a comparison. This may be difficult for some retail investors, and could increase the costs of search and the risk of mismatch. Also, allowing dual registrants the flexibility to prepare two separate relationship summaries rather than one combined document may result in some efficiency loss in terms of less direct comparability. Nonetheless, we believe that investors having access to specific and tailored information about the firms, as provided in the final rules, is more important for reducing investors search costs and risk of mismatch, thereby justifying the potential efficiency losses (relative to the proposal) discussed above.

Beyond informational efficiencies that could arise, the relationship summary also may lead to more efficient investor allocation of assets within their portfolios relative to the baseline. Some retail investors that previously avoided the market for financial services because they did not understand the material characteristics of either broker-dealers or investment advisers may be more

---

be allocated between compliance clerks and general clerks, with compliance clerks performing 17% of the function at a total cost of $70 per hours, and general clerks performing 83% of the function at total cost of $62 per hour; *see infra* footnote 1282. The average costs per investment adviser is then estimated as $(17\% \times 0.2 \text{ hours} \times \$70) + (83\% \times 0.2 \text{ hours} \times \$62) = \$12.672$. The aggregate cost is then $\$12.672 \times 8,235$ (number of investment advisers) = $\$104,354$.

[1161] *See infra* Section V.E for the estimation of recordkeeping costs (estimated at $32 annually per broker-dealer, or $87,627 in aggregate), and *see infra* section V.F.1 for the estimation of record retention costs (estimated at $7 annually per broker-dealer, or $19,390 in aggregate).

[1162] However, as discussed previously in, *e.g., supra* Section IV.B, a mismatch from the retail investors' perspective may be advantageous for firms in certain circumstances, in which case firms may not overall benefit from a decrease in the number of mismatched investors.

[1163] *See supra* Section II.B.6 for why the generalized comparison discussion was not included in the relationship summary.

likely to hire a financial professional if the costs associated with the acquisition of this information are reduced relative to the baseline. The relationship summary is a simple, concise document providing investors information about key elements of the investor-provider relationship that could incent some investors to seek the services of a financial professional. As such, for some investors that previously abstained from hiring a financial professional, portfolio efficiency could be improved, for example, through increased portfolio diversification.[1164] Furthermore, because of being provided the relationship summary, some current investors may realize that other services provided by their financial professional could be more appropriate for them. For example, an advisory client of a dual registrant may learn more about the broker-dealer services offered by the firm and realize that those services better match his or her preferences and make a switch, which may ultimately improve portfolio efficiency for the client.

However, as noted in Regulation Best Interest, certain studies suggest that for some financial professionals, the improvements to portfolio efficiency could be limited if the financial professionals are subject to the same behavioral biases, such as limited attention or anchoring, as retail investors in their portfolio allocation decisions.[1165] Further, to the extent the relationship summary makes the conflicts of interest of financial professionals more salient to retail investors relative to the baseline, there is a risk that some professionals would feel they have a ''moral license'' to act on their conflicts,[1166] which could harm the efficiency of retail investors' portfolio allocations. Despite such potential negative effects related to conflicts of interest disclosure, we believe that, on balance, retail investors will benefit from the inclusion of this disclosure in the relationship summary. In particular, the conflicts of interest disclosure should enhance investors' ability to evaluate which relationship is best for them and also help them more critically evaluate the recommendations or investment advice they receive, which should ultimately improve the efficiency of their portfolio allocations.

---

[1164] As discussed above, academic studies have identified several potential benefits to retail investors from seeking investment advice, including increased diversification; *see supra* footnote 1005 and accompanying text.

[1165] *See* Regulation Best Interest, Section III.B.3.b.

[1166] *See supra* footnote 1027 and accompanying text.

In addition, and in a modification from the Proposing Release, the headings on the relationship summary will be machine readable, which will facilitate third-party data aggregators', as well as the Commission's, analysis and comparison of certain elements of the relationship summary across firms to the benefit of retail investors. Comparability will lead to greater informational efficiency because retail investors will be better able to choose the right type of firm or financial professional and the right type of account and services, thereby increasing the likelihood that they choose what best meets their needs and reduces the likelihood of mismatch. Providers may likewise benefit from higher information acquisition efficiency because firms may be more likely to initially attract retail investors who prefer their services, thereby potentially reducing customer acquisition costs, such as time and effort spent on initial engagement with prospective customers who ultimately do not contract for their services.

b. Competition

Beyond increased efficiency for retail investors, the relationship summary may also increase competition among broker-dealers and investment advisers. Provision of the relationship summary by firms could enhance the competitiveness of broker-dealers and investment advisers by allowing retail investors to better evaluate and compare firms and financial professionals through increased transparency, and more generally increase retail investors' understanding of the market for brokerage and investment advisory services. In particular, increased transparency may allow investors to better assess the types of services available and the types of fees and costs associated with such services. Moreover, and as discussed above, the relationship summary may facilitate comparisons across firms and lead to reduced search costs for retail investors, allowing investors to match their preferences and expectations for certain financial services, possibly at lower costs relative to the baseline, and may increase competitiveness between firms to lower prices for some services. We believe the changes made to the relationship summary in the final rules have potentially strengthened such competitive effects, for example, by using less prescribed general language and instead requiring disclosure of firm-specific information about services, fees, costs, and conflicts, and by making the headings machine readable, which may encourage the development of search tools by third party providers. An

increase in competition may apply only between like firms (*i.e.,* broker-dealers only or investment advisers only) or may have intra-industry effects across broker-dealers and investment advisers.

As discussed above, increased competition both among and between broker-dealers and investment advisers could reduce the pricing power of firms, benefitting investors through lower fees. Lower fees could draw more retail investors that are not currently seeking investment advice to the market, although some retail investors may be willing to pay higher prices for other reasons, including enhanced services and firm reputation. Combined with improved informational efficiency, increased competition for retail investors resulting from information provided by the relationship summary may drive prices at the margin to competitive levels across all types of firms, depending on how price sensitive retail investors are. Alternatively, and similar to what we have today, a separating equilibrium may result where investors' demand for particular services is relatively price insensitive and they cannot be persuaded to move to a different level of service simply because of lower prices (*e.g.,* investors seeking ongoing advice may be more likely to pay higher prices for advisory services provided by investment advisers, even though a potentially lower cost option could be available through broker-dealers).

Further, lower costs of information acquisition and processing due to the content, format, and structure of the relationship summary may lead to more people entering the market for brokerage and investment advisory services and may increase overall retail investor participation. Such an increase in the number of retail investors in the market for financial services could raise demand for brokerage and investments advisory services and mitigate the potential increase in competition discussed above. However, increased levels of retail investor participation could also encourage new broker-dealer and investment adviser entrants to meet the needs of the new pool of investors, and may increase competition for investor capital through lower fees and costs.

How the competitive landscape will shift as a result of the relationship summary is difficult to determine and the effect on aggregate level of competition among and between broker-dealers and investment advisers could be limited. For example, the relationship summary may not necessarily increase the number of new broker-dealer or investment adviser

**33598**   **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

entrants to the market, but could lead to shifts of investors between broker-dealers and investment advisers to the extent that some currently engaged retail investors are mismatched, and that search and switching costs associated with correcting the mismatch do not justify the costs associated with the potential mismatch. Moreover, the incidence of mismatched relationships with retail investors could be likely for both broker-dealers and investment advisers, so competition could be relatively unaffected in the aggregate; therefore, any mismatch corrected as a result of the relationship summary may not result in a significant net loss of investors for either broker-dealers or investment advisers. In addition, to the extent currently mismatched investors are customers of dual registrants, any switch in account type (brokerage or investment advisory), as a result of the relationship summary, may take place within a dual registrant rather than between different firms, further attenuating any competitive impact.

By reporting legal or disciplinary history, the relationship summary may provide benefits to retail investors by prompting them to seek out additional information (*e.g.,* from *Investor.gov* or BrokerCheck) on their current or prospective firms and financial professionals and take that information into account when considering whom to engage for financial services. Competition between firms may be enhanced if firms and financial professionals with better disciplinary records drive out those with worse records. We note, however, that legal and disciplinary history reported in the relationship summary may bias firms towards hiring financial professionals with fewer years of experience (*i.e.,* fewer opportunities for customer complaints) and against hiring experienced financial professional with some (minor) complaints. Further, investors may also bias their choice of firm or financial professional in the same manner. One commenter stated that reporting of legal and disciplinary history ''imposes an inappropriate competitive imbalance and inaccurate picture concerning the relative number of disciplinary actions in sales organizations with large number of financial professionals.'' [1167] The expected economic impact of disciplinary reporting on competition across large and small firms, however, is generally unclear because small firms may suffer disproportional reputational penalties from more salient disciplinary history disclosure. In general, reportable

disciplinary history is less common for smaller firms than for larger firms.[1168] Thus, small firms may appear to have better disciplinary history reputation than large firms solely because of their size of operations, rather than their actual legal and regulatory compliance or the professional ethics or integrity of their employees. At the same time, investors may over-react to generally more frequent disciplinary history disclosure by larger firms and forego potentially well-matched relationship with the larger firms as a result.

Disclosing reportable legal and disciplinary history in the relationship summary may confer a small competitive advantage for investment advisers over broker-dealers because broker-dealers are more likely to have to report that they have a disciplinary history due to broader broker-dealer disclosure obligations. Reporting from Form BD with respect to broker-dealer disclosures of disciplinary actions taken by any regulatory agency or SRO show than 308 (86%) out of 318 retail-facing dual-registered broker-dealers disclosed a disciplinary action. In contrast, 1,330 (54%) out of 2,448 retail-facing standalone broker-dealers disclosed a disciplinary action. For investment advisers, Form ADV requires disclosure of any disciplinary actions taken in the past 10 years, and 284 (79%) of 318 retail-facing dual-registered investment advisers disclosed a disciplinary action. However, for standalone investment advisers, only 1,176 (15%) of 7,917 retail-facing investment advisers disclosed a disciplinary action.[1169] As broker-dealers have relatively more reportable legal and disciplinary history than investment advisers, retail investors may engage investment advisers with greater frequency than

broker-dealers as a result of the disciplinary history reporting on the relationship summary, potentially creating a competitive advantage for some investment advisers.

Although the relationship summary applies to SEC-registered broker-dealers and SEC-registered investment advisers, it could exhibit some spillover effects for other categories of firms not affected by the rule changes such as investment advisers not registered with the SEC (*e.g.,* state registered investment advisers), bank trust departments, insurance companies, and others. In particular, the relationship summary could change the size of the broker-dealer and investment adviser markets—relative to each other, as well as relative to other markets. To the extent the relationship summary reduces retail investors' confusion and makes it easier for them to choose a relationship in line with their preferences and expectations, this could attract new retail investors to the broker-dealer and investment adviser markets from firms in other markets. At the same time, it is possible that, as a result of conflicts of interest and the existence of disciplinary history being saliently disclosed in the relationship summary, some investors may be deterred from seeking services of registered investment advisers or broker-dealers and instead seek the services provided by a state registered advisor or another professional not regulated by the Commission, or forego seeking financial services altogether.

Firms' current retail investors also may consider switching to a different type of firm if the relationship summary makes the different services provided and the types of fees and costs of investment advisory and brokerage services more prominent. Such a switch could be within the market for investment advisory and brokerage services, or to a financial services provider outside this market (such as a bank or insurance company). The information disclosed in the relationship summary may also lead some investors to realize a relationship with any financial services provider may not be in their best interest, and therefore withdraw altogether from the market. The exact extent and direction of substitution among different types of providers' services is hard to predict and depends on the nature of the current mismatch between retail investor preferences and expectations and the type of services for which they have contracted, and the extent to which investors will digest and use the provided information in firms' relationship summaries.

---

[1167] *See* ACLI Letter.

[1168] For example, while only 36% of registered investment advisers with less than $1 million of AUM disclose at least one disciplinary action as of January 1, 2019, 71% of registered investment advisers with more than $50 billion of AUM disclosed at least one disciplinary action that year. Form ADV. Similarly, while 42% of broker-dealers with less than $1 million in total assets disclose at least one disciplinary action as of January 1, 2019, 100% of broker-dealers with more than $50 billion total assets disclosed at least one disciplinary action that year. Form BD.

[1169] Source: Items 11C, 11D, and 11E of Form BD and Items 11.C., 11.D. and 11.E. of Form ADV. Form BD asks if the SEC, CFTC, other federal, state, or foreign regulatory agency, or a self-regulatory organization have ever found the applicant broker-dealer or control affiliate to have (1) made a false statement or omission, (2) been involved in a violation of its regulations or statues, (3) been a cause of an investment related business having its authorization to do business denied, suspended, revoked, or restricted, or (4) have imposed upon it a civil money penalty or cease and desist order against the applicant or control affiliate. Likewise, Form ADV asks similar questions of registered investment advisers and advisory affiliates.

App 151

To the extent the relationship summary increases competition between broker-dealers and investment advisers, and between these firms and other financial services providers, it may result in development of new products and services, and general innovation by the industry at large. Competition among firms could provide incentives for firms to seek alternative ways to attract retail investors and generate profits. In the process, firms could develop new and better ways of providing services to retail investors, for example, by utilizing information technology to deliver information to retail investors at lower costs. In this way, innovation could improve retail investors' welfare as well as the profitability of financial service providers.

Another possible long-term effect of the relationship summary is that it could decrease the prevalence of third-party selling concessions in the market by requiring broker-dealers and dual registrants to include disclosure about indirect fees associated with investments that compensate the broker-dealer, including mutual fund loads. Currently, selling concessions constitute a significant part of the compensation of broker-dealers selling mutual fund products.[1170] For example, a mutual fund may provide a selling concession, in the form of a sales charge, some portion of which could be remitted to the broker-dealer that recommended the product. To the extent the relationship summary increases the transparency and salience of such selling concessions and related conflicts of interest, investors may start to avoid investing in products that provide selling concessions, encouraging broker-dealers to avoid such arrangements. To compensate for the potential loss of concession-based revenue, dually registered firms could try to switch customers from their brokerage account to their advisory accounts. As noted above, however, if the relationship summary also increases the competitiveness in the broker-dealer and investment adviser markets, the increased competitiveness would create some general downward price pressure in the market which may spillover to selling concessions.

### c. Capital Formation

As discussed above, the relationship summary may improve retail investors' understanding about, and confidence in, the market for brokerage and investment advisory services, which may increase participation in this market by investors

that previously avoided it. Such additional entry by new investors could increase the level of total capital across markets and increase the demand for new investment products and securities, which could precipitate capital formation in aggregate across the economy. Depending on the magnitude of these effects, the increased availability of funds could result in lower cost of capital for companies, which could facilitate economic growth.

However, to the extent the disclosure of certain information such as conflicts of interest or disciplinary history decreases some retail investors' level of confidence in market for brokerage and investment advisory services, or the information provided makes some investors believe that they do not benefit from a relationship with a firm or financial professional, such investors could exit this market, which could attenuate any effects on capital formation. In addition, to the extent that the market for financial services is already saturated, there may only be a redistribution between broker-dealers, investment advisers, and other financial service providers (such as state-registered investment advisers, banks, and insurance companies) as a result of retail investors becoming more informed, and any effects on capital formation would be attenuated.

### 4. Alternatives to the Relationship Summary

To reduce retail investor search costs and costs of potential mismatch between retail investors and professionals in brokerage and investment advisory services, we considered various alternative approaches to the relationship summary, including whether to adopt additional disclosure requirements. We have previously learned through public comments, investor testing, and a staff financial literacy study that industry commenters and survey participants generally supported a short disclosure document to retail investors that would address firms' nature and scope of services, fees, and material conflicts of interest.[1171] Accordingly, we proposed rules and rule amendments to require firms to provide retail investors with disclosures designed for those purposes. In our proposal, we solicited comment on alternatives to various elements of the relationship summary. As discussed in Section I above, we also conducted extensive public outreach, including investor roundtables, specific solicitation of investor comments

through the Feedback Forms, and investor testing.[1172] We considered the suggestions and recommendations received through these processes as alternative approaches in our rulemaking, many of which we discussed in greater detail in Sections I and II above. In determining the required scope and level of detail of information in the relationship summary, we balanced the need for robust disclosures with the risk of investor information overload and failure to properly process these disclosures, a recurring theme in both comment letters and investor feedback received through surveys and studies, roundtables and on Feedback Forms.

### a. Amending Existing Disclosures

The relationship summary will be a new, separate disclosure, in addition to other disclosures that firms already must provide.[1173] As noted in Section I above, some commenters argued that the relationship summary is duplicative of other disclosures, for example in Form ADV or in Form BD, and is thus unnecessary.[1174] The Commission considered amending Part 2A of Form ADV to require a brief summary at the beginning of the brochure in addition to the existing narrative elements, or changing certain existing Part 2A requirements to reduce or eliminate redundancy with parts of the relationship summary. Similarly, the Commission considered whether to amend and require delivery to retail investors of a revised Form BD to include the same information as in the relationship summary, and make that information publicly available.[1175]

After careful consideration and for the reasons discussed in Section I above, we believe that a separate summary disclosure will be more effective to help retail investors to choose from among firms and investment services than modifying existing disclosures.[1176] We believe that a short, standalone relationship summary that facilitates comparisons across different providers

---

[1170] *See supra* Table 2, Section IV.B.1.a.

[1171] *See* Proposing Release, *supra* footnote 5, at nn.13–21 and accompanying text.

[1172] *See supra* footnotes 11–21 and accompanying text.

[1173] Broker-dealers and investment advisers have disclosure and reporting obligations under state and federal laws, including, but not limited to, obligations under the Exchange Act, the Advisers Act, and the respective rules thereunder. Broker-dealers are also subject to disclosure obligations under the rules of SROs.

[1174] *See supra* footnote 33 and accompanying text.

[1175] For example, the instructions to Form BD contain a section on the explanation of terms which could be extended to include basic (registrant-specific) information on the business practices of the registrant.

[1176] *See supra* footnotes 42–44 and accompanying text.

and types of services is necessary to highlight information that is relevant to a retail investor before or at the time she is deciding to select a firm, financial professional, account type, or services. To that end, the short and succinct relationship summary includes topics that retail investors indicated would be important to them in selecting a provider. Specifically, because the relationship summary is a shorter document and designed to be more of an overview than the existing investor-facing disclosures, such as Form ADV, and is specifically targeted to help retail investors obtain certain information before deciding to enter into a relationship with a financial professional, retail investors facing that decision can process its information content more efficiently. The relationship summary facilitates layered disclosures and highlights where investors can access more detailed information, including existing documents that investors receive, which could facilitate review of those documents, such as Form ADV Part 2. The relationship summary also promotes the investor receiving more detailed information about the provider and its services, as necessary, through conversation starters. Furthermore, when compared to other disclosures that financial professionals may make on, for example, Form ADV and Form BD, the relationship summary seeks to enhance comparability across both adviser and broker-dealer provider types for retail investors.

Thus, despite some content duplication with other existing disclosure requirements and firms having to bear the cost of creating additional disclosures, we believe that retail investors will benefit from having information relevant to deciding on a firm, financial professional, and/or accounts and services in one place in a more succinct, salient and standardized fashion. Overall, we believe that the relationship summary will enable better-informed decision-making, reduce risk of mismatch, and reduced search costs by retail investors.

b. Form and Format of the Relationship Summary

Under the final instructions, firms will be required to describe, largely in their own wording, different topics related to their offerings in a question-and-answer format. In comparison, we proposed instructions providing for standardized, declarative headings for each section of the relationship summary and a mix of prescribed and firm-specific language within each section. As discussed in Section I above,

nearly all commenters and investors providing feedback at roundtables and on Feedback Forms suggested modifications to the sample relationship summary and proposed instructions, and numerous commenters submitted alternative sample relationship summaries.[1177]

*Delivery of SEC-authored form.* Commenters suggested that the SEC author a standard industry-wide disclosure to deliver to retail investors, which could then be supplemented by firm-specific documents.[1178] For example, one commenter suggested using as a potential framework the Buyers Guides developed by the National Association of Insurance Commissioners that insurance companies must deliver under certain circumstances.[1179] Commenters supporting an SEC-authored educational layer believed that the SEC was better placed than firms to discuss areas viewed to be educational in nature, such as comparisons, standard of conduct, and key questions to ask.

We have incorporated an element of these commenters' suggestion by removing the comparisons section, which many commenters viewed as educational, and adding a link at the beginning of the relationship summary to *Investor.gov/CRS* where investors can obtain educational materials. However, we believe that investors are better served by keeping certain disclosures that may be viewed as more educational in nature, such as the standard of conduct and some of the ''conversation starters'' (replacing the ''Key Questions to Ask''), in the relationship summary. We believe investors are more likely to understand how such content will affect them when presented in the context of the particular firm.

Level of Flexibility in the Disclosure

As discussed in more detail above, we considered the appropriate level of prescribed wording and topics in the disclosure. Several commenters suggested that, as an alternative to the prescriptive wording in the proposed relationship summary, we provide firms with more flexibility to craft their responses to items, with or without an SEC standardized disclosure to accompany the relationship summary or available on *Investor.gov.* We considered the relative merits of prescribed wording and formatting versus allowing firms to use their own, as well as a mix of prescribed

requirements and discretionary choices. We considered this for different topics and sub-topics in the relationship summary, as well as for the relationship summary overall. In some instances, we determined that prescribed wording would provide targeted benefits that discretionary wording could not, for example, through the use of standardized headings and a prescribed order of topics in order to maintain the benefits of comparability and utility for retail investors.[1180] For the reasons discussed in Section II, above, we also determined to prescribe wording for conversation starters, the standard of conduct, and a factual statement regarding the effect of fees over time. In the event that prescribed wording is inapplicable to a firm's business or inaccurate, the firm may omit or modify that wording. We believe that this approach will allow firms greater flexibility to tailor their relationship summary disclosures to reflect their offerings more closely and accurately. However, greater flexibility in terms of wording could also allow firms to present disclosures in a more advantageous manner to them, rather than in a manner that would maximize the benefits to investors from the disclosures. Nonetheless, we believe retail investors will benefit under this adopted approach by receiving disclosures that may be more understandable, and also more informative about a particular firms' offerings that they are considering.

c. Summary of Fees, Costs, Conflicts, and Standard of Conduct

In response to comments and investor feedback through surveys and studies, roundtable and the Feedback Forms, we are adopting changes from the proposal to the relationship summary's required discussion of fees, costs, conflicts of interest, and standard of conduct, as described above.[1181]

In connection with fee disclosure, the Commission considered many alternative approaches relating to the scope and types of fees firms must include in their relationship summaries, as well as the presentation of the fee disclosure.[1182] As discussed in Section II.A.4 above, commenters' views varied on the scope and types of fees that should be disclosed and their level of

---

[1177] *See supra* footnotes 36–40 and accompanying text.

[1178] Primerica Letter.

[1179] ACLI Letter.

[1180] *See supra* Section II.A.1.

[1181] *See supra* Section II.B.3.

[1182] *See supra* Section II.A.4. In addition, the Commission considered alternative approaches with respect to the disclosure regarding a firm's conflicts of interest and standard of conduct. A discussion of the Commission's consideration may be found in Section II.A.4.

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33601**

detail.[1183] In addition to what we had proposed and what we have adopted, the Commission considered other alternatives, such as whether to require firms to list all fees that retail investors may incur, to allow firms the flexibility to determine what fees to highlight, and variations or combinations of these approaches. The final approach is designed to balance the need to provide a comprehensive view of what fees retail investors will pay with the need to produce relevant, succinct and understandable disclosures. The final instructions do not require firms to disclose every single fee and instead permit firms to highlight examples of the categories of the most common fees that their retail investors will pay directly or indirectly.[1184] We believe this approach benefits retail investors because they will be able to compare fee information that is more closely tailored to firms' particular business practices, but also reflective of common fees that retail investors are likely to incur.

The Commission also considered alternative ways in which firms should present their fees, such as whether to require firms to link to or include a fee schedule directly in the relationship summary,[1185] or to require firms to include a hypothetical fee example.[1186] Under the final instructions, firms must summarize their principal fees and costs and other fees and also include specific cross-references to more detailed information about their fees available in other sources.[1187] The Proposing Release discussed the option of including an example of the impact of fees in the relationship summary.[1188] While some commenters supported the inclusion of various forms of additional examples of fees calculations,[1189] after careful consideration of the comment file and investor feedback received through studies and surveys, roundtables and Feedback Forms, we are declining to include a hypothetical fee example in the relationship summary. We do so in light of commenters who suggested that such an example could be operationally difficult to implement, and that it could be perceived as confusing.[1190] Specifically,

we believe the assumptions required to make a fee example relevant for investors vary for individual investors to the extent that a standardized example risks increasing investor confusion.

Instead, to help stimulate this discussion, a firm must include in the relationship summary the following conversation starter: "Help me understand how these fees and costs might affect my investments. If I give you $10,000 to invest, how much will go to fees and costs, and how much will be invested for me?" [1191] As discussed above,[1192] this represents a different wording from the corresponding "Do the Math for Me" Key Question in the proposal, but we expect it to similarly encourage the retail investor to ask about the amount they would typically pay per year for the account and what is included in those fees, while being easier and less costly to answer for firms at the outset of the relationship.

d. Filing and Delivery

In connection with filing and delivery, Commission considered alternatives relating to filing formats, filing systems, and timeframes for firms' initial relationship summary and subsequent updates. As discussed in Section II.C. above, firms will file copies of their relationship summaries with the Commission. The proposed instructions provided that firms must file their relationship summaries in a text-searchable format but did not specify one. We solicited comment on whether the relationship summary should be filed as a text-searchable PDF, similar to how Form ADV is currently filed, or other enumerated formats. We also asked about what type of format would facilitate greater comparability across forms. Two commenters advocated that the relationship summary should be filed not only in a text-searchable, but also machine-readable format, in order to facilitate development of data aggregation tools allowing for comparability of forms across providers.[1193] The Commission believes

that although a PDF submission format would not be the most ideal for comparing or aggregating data across relationship summary filings, it would likely be the easiest and least costly. A fillable form allowing the firm to enter text, similar to Form ADV Part 1, also would not be costly, but would not easily accept formatted tables or other graphical information. The final instructions, as with the proposed instructions, do not specify a particular format, but the current filing systems default firms to PDF format. In a change from the proposal, we are requiring firms to implement machine-readable headings for their filings. We agree with the commenters that suggested this change that this approach facilitates some degree of data aggregation, while imposing limited costs on registrants.

Furthermore, we requested comments on alternative filing systems for the relationship summary. In response to comment and upon further consideration, as discussed in Section II.C.2 above,[1194] we are requiring broker-dealers to file their relationship summaries through Web CRD®, instead of EDGAR, as proposed.

As discussed in Section II.C.3.a above, we also considered whether to allow more permissive use of electronic delivery. As proposed, we are affirming that the relationship summary must be delivered in accordance with the Commission's electronic delivery guidance. We are adopting an additional instruction, however, that a firm may deliver the relationship summary to new or prospective clients or customers in a manner that is consistent with how the retail investor requested information about the firm or financial professional, and that this method of initial delivery for the relationship summary would be consistent with the Commission's electronic delivery guidance.[1195] Commenters suggested different approaches to electronic delivery, such as the "notice plus access" model, and a more comprehensive updating of the Commission's electronic delivery guidance, which we considered as alternative approaches in this rulemaking. While we recognize the

---

[1183] *See supra* footnotes 420–423 and accompanying text.

[1184] *See* Item 3.A. of Form CRS.

[1185] *See supra* footnotes 426–435 and accompanying text.

[1186] *See supra* footnotes 438–435 and accompanying text.

[1187] *See* Item 3.A.(ii) of Form CRS.

[1188] Proposing Release, *supra* footnote 5.

[1189] *See, e.g.,* Wahl Letter; AARP Letter; Betterment Letter I.

[1190] NSCP Letter; Edward Jones Letter (noting that given the range of services available, it would be

very difficult for financial professionals to fully address this question at the outset of the relationship, particularly for investors selecting transaction-based services); TIAA Letter; LPL Financial Letter; Primerica Letter; ICI Letter; SIFMA Letter (noting most firms do not currently have systems in place to allow financial professionals to answer customer-specific questions).

[1191] Item 3.A.(iv) of Form CRS.

[1192] *See supra* Sections II.A.4 and II.B.3.a.

[1193] CFA Letter I ("past experience regarding investors' limited use of existing databases, such as IARD and BrokerCheck, cautions against placing too much reliance on investors' accessing the documents directly. We therefore urge the Commission to require that the documents be filed, not just in a text-searchable format, but in a

machine-readable format."); Schnase Letter ("the data contained in the Relationship Summary should be required to be filed in a structured data format, so the document can be utilized as a stand-alone human-readable document and serve as the source for a machine-readable data set").

[1194] *See supra* footnotes 666–669 and accompanying text.

[1195] *See* Proposing Release, *supra* footnote 5, at nn.344–45 and accompanying text; *see also* 2000 Guidance, *supra* footnote 678, at 65 FR 25845–46; 96 Guidance, *supra* footnote 678, at 61 FR 24647; and 95 Guidance, *supra* footnote 678, at 60 FR 53461.

potential cost savings to firms of allowing greater use of electronic delivery, we place great importance on how investors prefer to receive information. Some commenters said that investors prefer to receive electronic disclosures because they are delivered faster and can be in more engaging formats, including video and audio. On the other hand, investor surveys and investor testing show that some investors still prefer to receive paper disclosures, including in a hybrid approach of electronic disclosure with the option for paper.[1196] As discussed in greater detail in Section II.C.3.a, the adopted approach of encouraging electronic presentations that are engaging to retail investors, while preserving the option for paper, within the framework of the Commission's electronic delivery guidance and in accordance with retail investors' preferences, is appropriate for the relationship summary.

e. Transition Provisions

As discussed above, we are adopting an initial date of June 30, 2020 for all firms that are registered, or investment advisers who have an application for registration pending with, the Commission prior to June 30, 2020, to file their initial relationship summaries with the Commission. We considered tiered compliance dates for firms of different sizes. We believe that the compliance dates, as adopted, balance the time and resources needed by different firms, as well as the assets under management and the number of firms that would be covered within the different compliance periods.

**V. Paperwork Reduction Act Analysis**

The amendments that we are adopting here contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[1197] In the Proposing Release, we solicited comment on the proposed collection of information requirements. We also submitted the proposed collection of information to the Office of Management and Budget ("OMB") for review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. The titles for the collections of information we are amending are (i) "Form ADV" (OMB control number 3235–0049); (ii) "Rule 204–2 under the Investment Advisers Act of 1940" (OMB control number 3235–0278); (iii) "Rule 17a–3; Records to be Made by Certain Exchange Members, Brokers and Dealers" (OMB

control number 3235–0033) and (iv) "Rule 17a–4; Records to be Preserved by Certain Exchange Members, Brokers and Dealers" (OMB control number 3235–0279). The new collections of information we are adopting [1198] relate to (i) "Rule 204–5 under the Investment Advisers Act of 1940" (OMB control number 3235–0767); and (ii) "Form CRS and rule 17a–14 under the Exchange Act" (OMB control number 3235–0766). We are also amending 17 CFR 200.800 to display the control number assigned to information collection requirements for "Form CRS and rule 17a–14 under the Exchange Act" by OMB pursuant to the PRA. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control OMB number.

*A. Form ADV*

Form ADV (OMB Control No. 3235–0049) is currently a two-part investment adviser registration form. Part 1 of Form ADV contains information used primarily by Commission staff, and Part 2A is the client brochure. We use the information to determine eligibility for registration with us and to manage our regulatory and examination programs. Clients use certain of the information to determine whether to hire or retain an investment adviser. The collection of information is necessary to provide advisory clients, prospective clients, and the Commission with information about the investment adviser and its business, conflicts of interest and personnel. Rule 203–1 under the Advisers Act requires every person applying for investment adviser registration with the Commission to file Form ADV. Rule 204–4 under the Advisers Act requires certain investment advisers exempt from registration with the Commission ("exempt reporting advisers") to file reports with the Commission by completing a limited number of items on Form ADV. Rule 204–1 under the Advisers Act requires each registered and exempt reporting adviser to file amendments to Form ADV at least annually, and requires advisers to submit electronic filings through IARD. The paperwork burdens associated with

rules 203–1, 204–1, and 204–4 are included in the approved annual burden associated with Form ADV and thus do not entail separate collections of information. These collections of information are found at 17 CFR 275.203–1, 275.204–1, 275.204–4 and 279.1 (Form ADV itself) and are mandatory. Responses are not kept confidential.

We are adopting amendments to Form ADV to add a new Part 3, requiring registered investment advisers that offer services to retail investors to prepare and file with the Commission, post to the adviser's website (if it has one), and deliver to retail investors a relationship summary, as discussed in greater detail in Section II above. Advisers will deliver the relationship summary to both existing clients and new or prospective clients who are retail investors. As with Form ADV Parts 1 and 2, we will use the information to determine eligibility for registration with us and to manage our regulatory and examination programs. Similarly, clients can use the information required in Part 3 to determine whether to hire or retain an investment adviser as well as what types of accounts and services are appropriate for their needs.

The collection of information is necessary to provide advisory clients, prospective clients, and the Commission with information about the relationships and services the firm offers to retail investors, fees and costs that the retail investor will pay, specific conflicts of interest and standards of conduct, legal or disciplinary history, and how to obtain additional information about the firm. The amendment requiring investment advisers to deliver the relationship summary is contained in a new collection of information under new rule 204–5 under the Advisers Act, for which estimates are discussed below. We did not propose amendments to Part 1 or 2 of Form ADV.[1199]

As discussed in Sections I and II of this release, we received comments that addressed whether the relationship summary is duplicative of other disclosures and necessary for investment advisers, and whether we could minimize the burden of the proposed collections of information. One commenter specifically addressed the accuracy of our burden estimates for the proposed collection of information, suggesting that our estimates were too low because compliance professionals estimated it would take 80–500 hours to

---

[1196] *See supra* footnotes 682–689 and accompanying text.

[1197] 44 U.S.C. 3501 *et seq.*

[1198] The Commission is not adopting two other rules in the Proposing Release that would have contained collections of information. Proposed rule 211h–1 under the Advisers Act and proposed rule 15*l*–3 under the Exchange Act relate to the disclosure of Commission registration status and financial professional association. As discussed in Section I above, we have concluded that the combination of the disclosure requirements in Form CRS and Regulation Best Interest should adequately address the objectives of the proposed Affirmative Disclosures.

[1199] We are adopting technical amendments to the General Instructions of Form ADV to add references to the Part 3, but these amendments would not affect the burden of Part 1 or Part 2. *See* amended General Instructions to Form ADV.

App 155

prepare, deliver, and file the relationship summary, depending on the firm's size and business model.[1200] Another commenter said the current Form ADV requirements are a burden to smaller firms and that the currently approved burdens of 23.77 hours and $6,051 are too low.[1201] Others commented more broadly that certain costs to prepare and file the relationship summary would be higher than we estimated in the proposal.[1202] We have considered these comments and are increasing our PRA burden estimates from 5 hours to 20 hours for investment advisers to prepare and file the relationship summary. We also modified several substantive requirements to mitigate some of these estimated increased costs relative to the proposal.

1. Respondents: Investment Advisers and Exempt Reporting Advisers

The respondents to current Form ADV are investment advisers registered with the Commission or applying for registration with the Commission and exempt reporting advisers.[1203] Based on the IARD system data as of December 31, 2018, approximately 13,299 investment advisers were registered with the Commission, and 4,280 exempt reporting advisers file reports with the Commission.

As discussed above, we are adopting amendments to Form ADV that will add a new Part 3, requiring certain registered investment advisers to prepare and file a short and accessible relationship summary for retail investors. Based on IARD system data as of December 31, 2018, the Commission estimates that 8,235 investment advisers have some portion of their business dedicated to retail investors, including either individual high net worth clients or individual non-high net worth clients,[1204] which is higher relative to

the estimate in the Proposing Release.[1205]

This will leave 5,064 registered investment advisers that do not provide advice to retail investors [1206] and 4,280 exempt reporting advisers that will not be subject to Form ADV Part 3 requirements, but are included in the PRA analysis for purposes of updating the overall Form ADV information collection.[1207] We also note that these figures include the burdens for 318 registered broker-dealers that are dually registered as investment advisers as of December 31, 2018.[1208] We did not receive comments related to the methodology used for estimating the number of investment advisers that will be subject to Form ADV Part 3 requirements. We are maintaining the methodology we used in the Proposing Release and are updating our estimates to reflect the increased number of investment advisers and exempt reporting advisers since the last burden estimate.

2. Changes in Average Burden Estimates and New Burden Estimates

Based on the prior revision of Form ADV,[1209] the currently approved total aggregate annual hour burden estimate for all advisers of completing, amending, and filing Form ADV (Part 1

and Part 2) with the Commission is 363,082 hours, or a blended average of 23.77 hours per adviser,[1210] with a monetized total of $92,404,369, or $6,051 per adviser.[1211] The currently approved annual cost burden is $13,683,500. This burden estimate is based on: (i) The total annual collection of information burden for SEC-registered advisers to file and complete Form ADV (Part 1 and Part 2); and (ii) the total annual collection of information burden for exempt reporting advisers to file and complete the required items of Part 1A of Form ADV. Broken down by adviser type, the current approved total annual hour burden is 29.22 hours per SEC-registered adviser and 3.60 hours per exempt reporting adviser.[1212] The amendments will increase the current burden estimate due in part to the amendments to Form ADV to add Form ADV Part 3: Form CRS (the relationship summary) and the increased number of investment advisers and exempt reporting advisers since the last burden estimate. We did not propose amendments to Part 1 or Part 2 of Form ADV.

The amendments to Form ADV to add Part 3 will increase the information collection burden for registered investment advisers with retail investors. As discussed above in Sections I and II of this release, registered investment advisers providing services to retail investors will be required to prepare and file a relationship summary with the Commission electronically through IARD in the same manner as they currently file Form ADV Parts 1 and 2. We are also requiring that all relationship summaries be filed in a text-searchable format with machine-readable headings. These investment advisers also will be required to amend and file an updated relationship summary within 30 days whenever any information becomes materially inaccurate.

As noted above, not all investment advisers will be required to prepare and file the relationship summary. For those investment advisers, the per adviser annual hour burden for meeting their Form ADV requirements will remain the same, in particular, 29.22 hours per registered investment adviser without relationship summary obligations. Similarly, because exempt reporting advisers also will not have relationship

---

[1200] *See* NSCP Letter.

[1201] *See* Marotta Letter.

[1202] *See, e.g.,* MarketCounsel Letter. Others argued that the cost of Form CRS and Regulation Best Interest would be high. *See, e.g.,* Raymond James Letter; CCMC Letter (investor polling results); SIFMA Letter.

[1203] An exempt reporting adviser is an investment adviser that relies on the exemption from investment adviser registration provided in either section 203(l) of the Advisers Act because it is an adviser solely to one or more venture capital funds or 203(m) of the Advisers Act because it is an adviser solely to private funds and has assets under management in the United States of less than $150 million. An exempt reporting adviser is not a registered investment adviser and therefore would not be subject to the relationship summary requirements.

[1204] Proposing Release, *supra* footnote 5, at Section V.A.1. Based on responses to Item 5.D. of Form ADV, these advisers indicated that they advise either high net worth individuals or

individuals (other than high net worth individuals), which includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships in Item 5.D.(a)(1) of Form ADV or have regulatory assets attributable to either high net worth individuals or individuals other than high net worth individuals in Item 5.D.(a)(3) of Form ADV. The definition of retail investor will include the legal representatives of natural persons who seek to receive or receive services primarily for personal, family, or household purposes. As discussed in Section II.C.1 above, a legal representative of a natural person will cover only non-professional legal representatives (*e.g.,* a non-professional trustee that represents the assets of a natural person and similar representatives such as executors, conservators, and persons holding a power of attorney for a natural person). We are not able to determine, based on responses to Form ADV, exactly how many advisers provide investment advice to these types of legal representatives or trustees; however, we believe that these advisers most likely also advise individuals and are therefore included in our estimate.

[1205] We estimated in the Proposing Release that approximately 7,625 registered investment advisers of the 12,721 registered investment advisers would be subject to the relationship summary requirements, based on IARD system data as of December 31, 2017. *See* Proposing Release, *supra* footnote 5 at Section V.A.

[1206] 13,299 registered investment advisers—8,235 = 5,064 registered investment advisers not providing advice to retail investors.

[1207] Based on IARD system data.

[1208] *See supra* footnote 863.

[1209] *See* Form ADV and Investment Advisers Act Rules, Final Rule, Investment Advisers Act Release No. 4509 (Aug. 25, 2016) [81 FR 60418 (Sept. 1, 2016)] ("2016 Form ADV Paperwork Reduction Analysis").

[1210] 363,082 hours/(12,024 registered advisers + 3,248 exempt reporting advisers) = 23.77 hours.

[1211] $92,404,369 hours/(12,024 registered advisers + 3,248 exempt reporting advisers) = $6,051.

[1212] *See* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209, at 81 FR 60454.

summary obligations, the annual hour burden for exempt reporting advisers to meet their Form ADV obligations will remain the same, at 3.60 hours per exempt reporting adviser. However, although we did not propose amendments to Form ADV Part 1 and Part 2, and the per adviser information collection burden will not increase for those without the obligation to prepare and file the relationship summary, the information collection burden attributable to Parts 1 and 2 of Form ADV will increase due to an increase in the number of registered investment advisers and exempt reporting advisers since the last information collection burden estimate. We discuss below the increase in burden for Form ADV overall attributable to the adopted amendments, *i.e.,* new Form ADV Part 3: Form CRS, and the increase due to the updated number of respondents that will not be subject to the adopted amendments.

a. Initial Preparation and Filing of Relationship Summary

As discussed above in Section II, investment advisers will be required to prepare and file a relationship summary summarizing specific aspects of their investment advisory services that they offer to retail investors. Much of the required information overlaps with that required by Form ADV Part 2A and therefore should be readily available to registered investment advisers because of their existing disclosure obligations. Investment advisers also already file the Form ADV Part 2A brochure on IARD, and we have considered this factor in determining our estimate of the additional burden to prepare and file the relationship summary.

In the Proposing Release, we estimated that the initial first year burden for preparing and filing the relationship summary, for investment advisers that provide advice to retail investors, would be 5 hours per registered adviser.[1213] Some commenters said that these estimated burdens were too low,[1214] and one argued that the current burden estimates for Form ADV are too low.[1215] One commenter specifically argued that preparing, delivering, and filing the relationship summary would take from

80 to 500 hours, based on input from compliance professionals, and noted there would be additional costs that are hard to quantify, including human resources and information technology programming.[1216] Commenters also said more broadly that the relationship summary would be burdensome for investment advisers[1217] and would result in additional compliance burdens including training.[1218]

We are revising our estimate of the time that it will take each adviser to prepare and file the relationship summary in the first year from 5 hours in the proposal to 20 hours in light of these comments and the changes we are making to the proposed relationship summary.[1219] For example, as discussed in the Proposing Release, we estimated that it would take firms a shorter amount of time to prepare the relationship summary than to prepare more narrative disclosures due to the standardized nature and prescribed language of the relationship summary. As discussed above, the final instructions require less prescribed wording relative to the proposal and require firms to draft their own summaries for most of the sections. In addition and in a change from the proposal, we are now requiring that all relationship summaries be filed with machine-readable headings, as well as in a text-searchable format as proposed. We acknowledge that these changes will increase cost burdens because advisers will have to develop their own wording and design, as well as implement machine-readable headings, to comply with these requirements.

The relationship summary will also require more layered disclosures relative to the proposal and will encourage the use of electronic formatting and graphical, text, online features to facilitate access to other disclosures that provide additional detail. Although much of the information that will be summarized in the relationship summary is contained in other disclosures that firms already provide, firms will bear the cost of preparing a new relationship summary and cross-referencing or hyperlinking to additional information. The higher estimated burden estimate also reflects our acknowledgment that it will take firms longer to draft certain disclosures than we estimated in the Proposing

Release, such as answers to ''conversation starters'' that advisers providing automated investment advisory without a particular individual with whom a retail investor can discuss these questions must include on their website. We believe these factors and the other changes we made to the proposal will increase the burden to prepare a relationship summary relative to the proposal.

We are estimating the same hourly burden for investment advisers and investment advisers that are dually registered as broker-dealers because we are counting dually registered firms in the burden calculation for Form ADV and the Exchange Act rule that requires the relationship summary for broker-dealers.[1220] We recognize that the burden for some advisers will exceed our estimate, and the burden for others will be less due to the nature of their business, but we do not believe that the range could be as high as some commenters suggested.[1221] After consideration of comments and changes we made to the requirements relative to the proposal and in light of the current approved burden for Part 2 of Form ADV, which requires more disclosures than the relationship summary, we are increasing the estimated burden relative to the proposal to 20 hours in the first year.[1222] We therefore estimate that the

---

[1213] *See* Proposing Release, *supra* footnote 5, at nn.356 –367 and accompanying text.

[1214] *See, e.g.,* NSCP Letter; *see also* CCMC Letter (costs to implement the proposal were underestimated and greater than 40% of firms surveyed anticipate having to spend a moderate or substantial amount to implement Regulation Best Interest and Form CRS); SIFMA Letter (stating that implementation costs of Regulation Best Interest and Form CRS would be significant).

[1215] *See* Marotta Letter.

[1216] *See* NSCP Letter.

[1217] *See* MarketCounsel Letter.

[1218] *See* NSCP Letter (stating that a minimum of two hours of firm level training or two hours of training per independent registered representative will be required prior to implementation and delivery of the relationship summary).

[1219] *See infra* footnote 1221.

[1220] The burden estimates for dual registrants to prepare and file the relationship summary are accounted for in the burden estimates for Form ADV and under Exchange Act rule 17a–14. For example, a dual registrant that prepares an initial relationship summary that covers both its advisory business and broker-dealer business has an estimated burden of 60 hours amortized (20 hours to prepare and file relationship summary related to the advisory business + 40 hours to prepare and file relationship summary related to the broker-dealer business).

[1221] *See* NSCP Letter (estimating that the time required to prepare, deliver and file the relationship summary would be anywhere from 80 to 500 hours). In estimating the cost for the initial preparation of Form ADV Part 2, we estimated that small, medium, and large advisers would require 15, 97.5, and 1989 hours respectively to prepare Form ADV Parts 1 and 2, for investment advisers overall, and the per adviser annual hour burden for meeting their Form ADV Parts 1 and 2 requirements is 36.24 hours. *See* Brochure Adopting Release, *supra* footnote 576, at 75 FR at 49257. In comparison, as discussed above, the relationship summary is limited to two pages in length for standalone investment advisers and four pages in length for dual registrants in paper format (or equivalent in electronic format). While we recognize that different firms may require different numbers of hours to prepare and file the relationship summary, we believe that a first year average of 20 hours for investment advisers with relationship summary obligations is an appropriate estimate for purposes of calculating an aggregate burden for the industry, for purposes of the PRA analysis, particularly given our experience with the burdens for Form ADV Parts 1 and 2.

[1222] We believe that much of the information required in the relationship summary overlaps with

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33605**

total burden of preparing and filing the relationship summary will be 164,700 hours.[1223]

As with the Commission's prior Paperwork Reduction Act estimates for Form ADV, we believe that most of the paperwork burden will be incurred in advisers' initial preparation and filing of the relationship summary, and that over time this burden will decrease substantially because the paperwork burden will be limited to updating information.[1224] The estimated initial burden associated with preparing and filing the relationship summary will be amortized over the estimated period that advisers will use the relationship summary, *i.e.,* over a three-year period.[1225] The annual hour burden of preparing and filing the relationship summary will therefore be 54,900.[1226] In addition, based on IARD system data, the Commission estimates that 1,227 new investment advisers will file Form ADV with us annually; of these, 656 will be required to prepare and file the relationship summary.[1227] Therefore, the aggregate initial burden for newly registered advisers to prepare and file the relationship summary will be 13,120 [1228] and, amortized over three years, 4,373 on an annual basis.[1229] In sum, the annual hour burden for existing and newly registered investment advisers to prepare and file a relationship summary will be 59,273 hours,[1230] or approximately 6.67 hours per adviser,[1231] for an annual monetized

cost of $16,181,529, or $1,965 per adviser.[1232]

b. Estimated External Costs for Investment Advisers Preparing the Relationship Summary

The currently approved total annual collection of information burden estimate for Form ADV anticipates that there will be external costs, including (i) a one-time initial cost for outside legal and compliance consulting fees in connection with the initial preparation of Part 2 of Form ADV, and (ii) the cost for investment advisers to private funds to report the fair value of their private fund assets.[1233] We do not anticipate that the amendments to add a new Part 3 will affect the per adviser cost burden for those existing requirements but anticipate that some advisers may incur a one-time initial cost for outside legal and consulting fees in connection with the initial preparation of the relationship summary. We do not anticipate external costs to investment advisers in the form of website set-up, maintenance, or licensing fees because they will not be required to establish a website for the sole purpose of posting their relationship summary if they do not already have a website. We also do not expect other ongoing external costs for the relationship summary.

In the Proposing Release, we estimated that an external service provider would spend 3 hours helping an adviser prepare an initial relationship summary. While we received no specific comments on our estimate regarding external costs in the Proposing release, one commenter suggested that there would be additional

implementation costs such as legal advice, but that these costs are difficult to quantify.[1234] Another argued that that the current burden estimates for Form ADV did not take into consideration the time spent on learning about the complexities of what is needed to comply with similar requirements.[1235] Based on the concerns expressed by these commenters and the changes we are making to the relationship summary, we are increasing the estimate relative to the proposal from 3 to 5 hours. While we recognize that different firms may require different amounts of external assistance in preparing the relationship summary, we believe that this is an appropriate average number for estimating an aggregate amount for the industry purposes of the PRA analysis, particularly given our experience with the burdens for Form ADV.[1236]

Although advisers that will be subject to the relationship summary requirement may vary widely in terms of the size, complexity, and nature of their advisory business, we believe that the strict page limits will make it unlikely that the amount of time, and thus cost, required for outside legal and compliance review will vary substantially among those advisers who elect to obtain outside assistance.

Most of the information required in the relationship summary is readily available to investment advisers from Form ADV Part 2A, and the narrative descriptions are concise, brief, and at a summary level. As a result, we continue to anticipate, as discussed in the proposal, that only 25% of investment advisers will seek the help of outside legal services and 50% of investment advisers will seek the help of compliance consulting services in connection with the initial preparation of the relationship summary.[1237] We estimate that the initial per existing adviser cost for legal services related to

---

[1223] that required by Form ADV Part 2 and therefore should be readily available to investment advisers because of their existing disclosure obligations. Accordingly, although these new requirements will cause an increase in the information collected, the increased burden should largely be attributable to data entry and not data collection.

[1223] 20.0 hours × 8,235 investment advisers = 164,700 total aggregate initial hours.

[1224] We discuss the burden for advisers making annual updating amendments to Form ADV in Section V.A.2.c below.

[1225] *See* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209. Amortizing the 20 hour burden imposed by the relationship summary over a three-year period will result in an average annual burden of 6.67 hours per year for each of the 8,235 investment advisers with relationship summary obligations.

[1226] 20.0 hours × 8,235 investment advisers/3 = 54,900 total annual aggregate hours.

[1227] The number of new investment advisers is calculated by looking at the number of new advisers in 2017 and 2018 and then determining the number each year that serviced retail investors. (644 for 2017 + 668 for 2018)/2 = 656.

[1228] 656 new RIAs required to prepare relationship summary × 20.0 hours = 13,120 hours for new RIAs to prepare relationship summary.

[1229] 656 × 20.0 hours/3 = 4,373.

[1230] (164,700 + 13,120)/3 years = 59,273 annual hour burden for existing and new advisers to prepare and file relationship summary.

[1231] 59,273 hours/(8,235 existing advisers + 656 new advisers) = 6.67 hours per year.

[1232] 59,273 is the total aggregate initial hour burden for preparing and filing a relationship summary. We believe that performance of this function will most likely be equally allocated between a senior compliance examiner and a compliance manager. Data from the Securities Industry Financial Markets Association's Management & Professional Earnings in the Securities Industry 2013 ("SIFMA Management and Professional Earnings Report"), modified by Commission staff to account for an 1,800-hour work-year and inflation, and multiplied by 5.35 (professionals) or 2.93 (office) to account for bonuses, firm size, employee benefits, and overhead, suggest that costs for these positions are $237 and $309 per hour, respectively. (59,273 hours × 50% × $237) + (59,273 hours × 50% × $309 = $16,181,529). $16,181,529/8,235 investment advisers = $1,965 per investment adviser. The SIFMA Management and Professional Earnings Report was updated in 2019 to reflect inflation. The numbers in the report are higher than the numbers we used in the Proposing Release, and, along with the higher hourly burden, result in higher cost estimates in this release, relative to the proposal.

[1233] *See* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209, at 81 FR 60452. The estimated external costs of outside legal and consulting services for the relationship summary are in addition to the estimated hour burden discussed above.

[1234] *See* NSCP Letter.

[1235] *See* Marotta Letter.

[1236] In estimating the external cost for the initial preparation of Form ADV Part 2, we estimated that small, medium, and large advisers would require 8, 11, and 26 hours of outside assistance, respectively, to prepare Form ADV Part 2. *See* Brochure Adopting Release, *supra* footnote 576, at 75 FR at 49257. In comparison, as discussed above, the relationship summary is limited to two pages in length for standalone investment advisers and four pages in length for dual registrants in paper format (or equivalent in electronic format).

[1237] *See* Proposing Release, *supra* footnote 5 at Section V.A. We did not receive comments on these estimates. While we recognize that the instructions have changed, we continue to believe that only 25% of advisers will seek help of outside legal services and 50% of advisers will seek compliance consulting services, and that these estimates are appropriate for purposes of the PRA analysis, particularly given our experience with the external burdens for Form ADV Parts 1 and 2.

App 158

the preparation of the relationship summary will be $2,485.[1238] We estimate that the initial per existing adviser cost for compliance consulting services related to the preparation of the relationship summary will be $3,705.[1239] Thus, the incremental external cost burden for existing investment advisers is estimated to be $20,371,331, or $6,790,444 annually when amortized over a three-year period.[1240] In addition, we estimate that 1,227 new advisers will register with us annually, 656 of which will be required to prepare a relationship summary. For these 656 new advisers, we estimate that they will require $1,622,780 in external costs to prepare the relationship summary, or $540,927 amortized over three years.[1241] In summary, the annual external legal and compliance consulting cost for existing and new advisers relating to obligations to prepare the relationship summary is estimated to total $7,331,370, or $825 per adviser.[1242]

c. Amendments to the Relationship Summary and Filing of Amendments

The current approved information collection burden for Form ADV also includes the hour burden associated with annual and other amendments to Form ADV, among other requirements.

In the Proposing Release, we estimated that the relationship summary would increase the annual burden associated with Form ADV by 0.5 hours [1243] due to amendments to the relationship summary, for those advisers required to prepare and file a relationship summary. We did not receive comments regarding hour burdens associated with preparing and filing amendments to the relationship summary. As discussed in section II.C.4 above, in a change from the proposal, we are adding a requirement that firms preparing updated relationship summaries to existing clients also highlight the most recent changes by, for example, marking the revised text or including a summary of material changes.[1244] To account for this change, we are increasing the annual burden to 1 hour per year to amend and file a relationship summary.[1245]

We do not expect amendments to be frequent, but based on the historical frequency of amendments made on Form ADV Parts 1 and 2, we estimate that on average, each adviser preparing a relationship summary will likely amend and file the disclosure an average of 1.71 times per year.[1246] We therefore estimate that for making and filing amendments to their relationship summaries, advisers will incur an estimated total paperwork burden of 14,082 hours per year,[1247] or approximately 1.58 hours per adviser,[1248] for an annual monetized cost of $3,844,386, or $467 per adviser.[1249]

Although advisers will be required to amend the relationship summary within 30 days whenever any information becomes materially inaccurate, we expect that amendments will require relatively minimal wording changes, given the relationship summary's page limitation and summary nature. We believe that investment advisers will be more knowledgeable about the information to include in the amended relationship summaries than outside legal or compliance consultants and will be able to make these revisions in-house. Therefore, we do not estimate that investment advisers will need to incur ongoing external costs for the preparation and review of relationship summary amendments.

d. Incremental Increase to Form ADV Hourly and External Cost Burdens Attributable to Form ADV Part 3 Amendments

For existing and newly-registered advisers with relationship summary obligations, the additional burden attributable to amendments to Form ADV to add Part 3: Form CRS, (including the initial preparation and filing of the relationship summary and amendments thereto) totals 73,355 hours,[1250] or 8.25 hours per adviser,[1251] and a monetized cost of $20,025,915, or $2,252 per adviser.[1252] The incremental external legal and compliance cost is estimated to be $7,331,370.[1253]

[1238] External legal fees are in addition to the projected hour per adviser burden discussed above. Data from the SIFMA Management and Professional Earnings Report suggest that outside legal services cost approximately $497 per hour. $497 per hour for legal services × 5 hours per adviser = $2,485. The hourly cost estimate of $497 is based on an inflation-adjusted figure and our consultation with advisers and law firms who regularly assist them in compliance matters.

[1239] External compliance consulting fees are in addition to the projected hour per adviser burden discussed above. Data from the SIFMA Management and Professional Earnings Report, modified to account for an 1,800-hour work year and multiplied by 5.35 to account for bonuses, firm size, employee benefits, and overhead, and adjusted for inflation, suggest that outside management consulting services cost approximately $741 per hour. $741 per hour for outside consulting services × 5 hours per adviser = $3,705.

[1240] 25% × 8,235 existing advisers × $2,485 for legal services = $5,115,994 for legal services. 50% × 8,235 existing advisers × $3,705 for compliance consulting services = $15,255,338. $5,115,994 + $15,255,338 = $20,371,331 in external legal and compliance consulting costs for existing advisers. $20,371,333/3 = $6,790,444 annually.

[1241] 25% × 656 new advisers × $2,485 for legal services = $407,540. 50% × 656 new advisers × $3,705 for compliance consulting services = $1,215,240. $407,540 + $1,215,240 = $1,622,780 in external legal and compliance consulting costs for new advisers. $1,622,780/3 = $540,927 annually in external legal and compliance consulting costs for newly registered advisers.

[1242] $6,790,444 in annual external legal and compliance consulting costs for existing advisers + $540,927 annually for new advisers = $7,331,370 annually for existing and new advisers. $7,331,370/ (8,235 existing advisers + 656 new advisers) = $825 per adviser.

[1243] We have previously estimated that investment advisers would incur 0.5 hours to prepare an interim (other-than-annual) amendment to Form ADV. *See* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209, at 81 FR at 60452.

[1244] Additionally, we are requiring that the additional disclosure showing the revised text or summarizing the material changes be attached as an exhibit to the unmarked relationship summary.

[1245] We believe that the time estimated to prepare and file an amendment to the relationship summary is closer to the amount of time to prepare an interim-other-than-annual amendment to Form ADV. *See, e.g.,* Brochure Adopting Release, *supra* footnote 576, at 75 FR at 49257.

[1246] Based on IARD data as of December 31, 2018, 8,235 investment advisers with retail clients filed 14,118 other-than-annual amendments to Form ADV. 14,118 other-than-annual amendments/8,235 investment advisers = 1.71 amendments per investment adviser. We estimated in the Proposing Release that advisers with relationship summary obligations will amend and file disclosures on average of 1.8 times per year, based on IARD system data as of December 31, 2017. *See* Proposing Release, *supra* footnote 5 at Section V.A.

[1247] 8,235 investment advisers amending relationship summaries × 1.71 amendments per year × 1 hour = 14,082 hours.

[1248] 14,082 hours/(8,235 existing advisers + 656 new advisers) = 1.58 hours per year.

[1249] 14,082 is the total aggregate initial hour burden for amending relationship summaries. We

believe that performance of this function will most likely be equally allocated between a senior compliance examiner and a compliance manager. Data from the SIFMA Management and Professional Earnings Report suggest that costs for these positions are $237 and $309 per hour, respectively. (14,082 hours × 50% × $237 + 14,082 hours × 50% × $309 = $3,844,386. $3,844,386/8,235 investment advisers = $467 per investment adviser.

[1250] 59,273 hours for initial preparation and filing of the relationship summary + 14,082 hours for amendments to the relationship summary = 73,355 total aggregate annual hour burden attributable to the Form ADV amendments to add Part 3: Form CRS.

[1251] 73,355 hours/(8,235 existing advisers + 656 newly registered advisers) = 8.25 hours per adviser.

[1252] 73,355 total aggregate annual hour burden for preparing, filing, and amending a relationship summary. We believe that performance of this function will most likely be equally allocated between a senior compliance examiner and a compliance manager. Data from the SIFMA Management and Professional Earnings Report suggest that costs for these positions are $237 and $309 per hour, respectively. 73,355 hours × 50% × $237 = $8,692,568. 73,355 hours × 50% × $309 = $11,333,348. $8,692,568 + $11,333,348 = $20,025,915. $20,025,915/(8,235 existing registered advisers + 656 newly registered advisers) = $2,252 per adviser.

[1253] *See supra* footnote 1242.

3. Total Revised Burden Estimates for Form ADV

a. Revised Hourly and Monetized Value of Hourly Burdens

As discussed above, the currently approved total aggregate annual hour burden for all registered advisers completing, amending, and filing Form ADV (Part 1 and Part 2) with the Commission is 363,082 hours, or a blended average per adviser burden of 23.77 hours, with a monetized cost of $92,404,369, or $6,051 per adviser. This includes the total annual hour burden for registered advisers of 351,386 hours, or 29.22 hours per registered adviser, and 11,696 hours for exempt reporting advisers, or 3.60 hours per exempt reporting adviser. For purposes of updating the total information collection based on the amendments to Form ADV, we consider three categories of respondents, as noted above: (i) Existing and newly-registered advisers preparing and filing a relationship summary, (ii) registered advisers with no obligation to prepare and file a relationship summary, and (iii) exempt reporting advisers. One commenter said that the current Form ADV requirements are a burden to smaller firms and that the currently approved burdens for Form ADV Parts 1 and 2 are too low.[1254] We disagree. We recognize that the burden for some advisers will exceed our estimate and the burden for others will be less due to the nature of their business, but we continue to believe that on average our estimates are appropriate for purposes of the PRA analysis. For example, the current burden estimates for Form ADV Parts 1 and 2 range from 15 hours for smaller advisers to 1989 hours for larger advisers.[1255]

For existing and newly-registered advisers preparing and filing a relationship summary, including amendments to the disclosure, the total annual collection of information burden for preparing all of Form ADV, updated to reflect the amendments to Form ADV, equals 37.47 hours per adviser, with 8.25 hours attributable to the adopted amendments.[1256] On an aggregate basis, this totals 333,146 hours for existing and newly registered advisers, with a monetized value of $90,978,858.[1257]

As noted above, we estimate 5,064 of existing registered advisers will not have retail investors; therefore, they will not be obligated to prepare and file relationship summaries, so their annual per adviser hour burden will remain unchanged.[1258] To that end, using the currently approved total annual hour estimate of 29.22 hours per registered investment adviser to prepare and amend Form ADV, we estimate that the updated annual hourly burden for all existing and newly-registered investment advisers not required to prepare a relationship summary will be 164,655,[1259] with a monetized value of $44,950,816.[1260] The revised total annual collection of information burden for exempt reporting advisers, using the currently approved estimate of 3.60 hours per exempt reporting adviser, will be 16,996 hours,[1261] for a monetized cost of $4,639,908, or $983 per exempt reporting adviser.[1262]

In summary, factoring in the amendments to Form ADV to add Part 3, the revised annual aggregate burden for Form ADV for all registered advisers and exempt reporting advisers will be 514,797,[1263] for a monetized cost of $140,569,582.[1264] This results in an annual blended average per adviser burden for Form ADV of 29.28 hours[1265] and $7,996 per adviser.[1266] This is an increase of 151,715 hours,[1267] or $48,165,213[1268] in the monetized value of the hour burden, from the currently approved annual aggregate burden estimates, increases which are attributable primarily to the larger registered investment adviser and exempt reporting adviser population since the most recent approval, adjustments for inflation, and the amendments to Form ADV to add Part 3.

b. Revised Estimated External Costs for Form ADV

The currently approved total annual collection of information burden estimate for Form ADV anticipates that there will be external costs, including (i) a one-time initial cost for outside legal and compliance consulting fees in connection with the initial preparation of Part 2 of Form ADV, and (ii) the cost for investment advisers to private funds to report the fair value of their private fund assets.[1269] The currently approved annual cost burden for Form ADV is $13,683,500, $3,600,000 of which is attributable to external costs incurred by new advisers to prepare Form ADV Part 2, and $10,083,500 of which is attributable to obtaining the fair value of certain private fund assets.[1270] We do

---

[1254] *See* Marotta Letter.

[1255] *See supra* footnote 1221.

[1256] 29.22 hours + 8.25 hours for increase in burden attributable to initial preparation and filing of, and amendments to, relationship summary = 37.47 hours total.

[1257] 37.47 hours × (8,235 existing RIAs required to prepare a relationship summary + 656 newly registered RIAs required to prepare a relationship summary) = 333,146 total aggregate annual hour burden for preparing, filing and amending a relationship summary. We believe that performance of this function will most likely be equally allocated between a senior compliance examiner and a compliance manager. Data from the SIFMA Management and Professional Earnings Report suggest that costs for these positions are $237 and $309 per hour, respectively. 333,146 hours × 0.5 × $237 = $39,477,801. 333,146 hours × 0.5 × $309 = $51,471,057. $39,477,801 + $51,471,057 = $90,948,858.

[1258] 13,299 registered investment advisers—8,235 registered investment advisers with retail investors = 5,064 registered investment advisers without retail investors.

[1259] 29.22 hours × (5,064 existing and 571 newly-registered investment advisers without retail investors) = approximately 164,655 total annual hour burden for RIAs not preparing a relationship summary.

[1260] We believe that performance of this function for registered advisers will most likely be equally allocated between a senior compliance examiner and a compliance manager. Data from the SIFMA Management and Professional Earnings Report suggest that costs for these positions are $237 and $309 per hour, respectively. 164,655 hours × 50% × $237 = $19,511,618 = $19,511,618. 164,655 hours × 50% × $309 = $25,439,198. $19,511,618 + $25,439,198 = $44,950,816.

[1261] 3.60 hours × 4,280 exempt reporting advisers currently + 441 new exempt reporting advisers = 16,996 hours.

[1262] As with preparation of the Form ADV for registered advisers, we believe that performance of this function for exempt reporting advisers will most likely be equally allocated between a senior compliance examiner and a compliance manager. Data from the SIFMA Management and Professional Earnings Report suggest that costs for these positions are $237 and $309 per hour, respectively. 16,996 hours × 0.5 × $237 = $2,014,026. 16,996 hours × 0.5 × $309 = $2,625,882. $2,014,026 + $2,625,882 = $4,639,908. $4,639,908/(4,280 exempt reporting advisers currently + 441 new exempt reporting advisers) = $983 per exempt reporting adviser.

[1263] 333,146 annual hour burden for RIAs preparing relationship summary + 164,655 annual hour burden for RIAs not preparing relationship summary + 16,996 annual hour burden for exempt reporting advisers = 514,797 total updated Form ADV annual hour burden.

[1264] $90,948,858 for RIAs preparing relationship summary + $44,950,816 for RIAs not preparing relationship summary + $4,639,908 for exempt reporting advisers = $140,539,582 total updated Form ADV annual monetized hourly burden.

[1265] 514,797/(13,299 registered investment advisers + 4,280 exempt reporting advisers) = 29.28 hours per adviser.

[1266] $140,569,582/13,299 registered investment advisers + 4,280 exempt reporting advisers) = $7,995 per adviser.

[1267] 514,797 hours estimated—363,082 hours currently approved = 151,715 hour increase in aggregate annual hourly burden.

[1268] $140,569,582 monetized hourly burden—$92,404,369 = $48,135,213 increase in aggregate annual monetized hourly burden.

[1269] *See* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209, at 81 FR 60452. We do not anticipate that the amendments we are adopting to add Form ADV Part 3 will affect those per adviser cost burden estimates for outside legal and compliance consulting fees. The estimated external costs of outside legal and compliance consulting services for the relationship summary are in addition to the estimated hour burden discussed above.

[1270] *See* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209, at 81 FR at 60452– Continued

**33608**    **Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations

not expect any change in the annual external costs relating to new advisers preparing Form ADV Part 2. Due to the slightly higher number of registered advisers with private funds, however, the aggregate cost of obtaining the fair value of private fund assets is likely to be higher. We estimate that 6% of registered advisers have at least one private fund client that may not be audited. Based on IARD system data as of December 31, 2018, 4,806 registered advisers advise private funds. We therefore estimate that approximately 288 registered advisers may incur costs of $37,625 each on an annual basis, for an aggregate annual total cost of $10,836,000.[1271]

In summary, taking into account (i) a one-time initial cost for outside legal and compliance consulting fees in connection with the initial preparation of Part 2 of Form ADV, (ii) the cost for investment advisers to private funds to report the fair value of their private fund assets, and (iii) the incremental external legal or compliance costs for the preparation of the relationship summary, we estimate the annual aggregate external cost burden of the Form ADV information collection will be $21,767,370, or $1,637 per registered adviser.[1272] This represents an $8,083,870 increase from the current external costs estimate for the information collection.[1273]

*B. Rule 204–2 Under the Advisers Act*

Under section 204 of the Advisers Act, investment advisers registered or required to register with the Commission under section 203 of the Advisers Act must make and keep for prescribed periods such records (as defined in section 3(a)(37) of the Exchange Act), furnish copies thereof, and make and disseminate such reports as the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors. Rule 204–2 sets forth the requirements for maintaining and preserving specified books and records.

The amendments to rule 204–2 will require registered advisers to retain

copies of each relationship summary. Investment advisers will also be required to maintain each amendment to the relationship summary as well as to make and preserve a record of dates that each relationship summary and each amendment was delivered to any client or to any prospective client who subsequently becomes a client. These records will be required to be maintained in the same manner, and for the same period of time, as other books and records required to be maintained for the Form ADV Part 2A brochure under the Advisers Act rule 204–2(a)(14)(i), to allow regulators to access the relationship summary during an examination.[1274]

As discussed above in Section II.E several commenters suggested that our estimated burdens for the relationship summary recordkeeping obligations were too low.[1275] Some commenters argued that keeping records of when a relationship summary was given to prospective retail clients would be unnecessarily burdensome or not feasible, and was not adequately considered in the Commission's burden estimates.[1276] One of these commenters said that it would be difficult for firms to integrate pre-relationship delivery dates into their operational systems and procedures, and that there is no way to track when a disclosure is accessed on a website.[1277]

Based on our experience with similar requirements for Form ADV Part 2A brochures, we disagree with commenters that retaining records of when a relationship summary was given to prospective retail clients would be significantly more burdensome for investment advisers than our proposed estimate of 0.2 hours. While we recognize that this recordkeeping requirement will impose some additional burden on investment advisers that must prepare and deliver relationship summaries, advisers are already required to keep similar records for the delivery of the Form ADV Part 2A brochures and the currently approved burden for that requirement is 1.5 hours. Accordingly, based on our experience, advisers already maintain this information with respect to their brochures and should be able to update their systems to also include the relationship summary. We also do not expect that investment advisers will incur additional external costs to make and keep these records because we believe that advisers will create and retain them in a manner similar to their current recordkeeping practices for the Form ADV Part 2A brochure.

This collection of information is found at 17 CFR 275.204–2 and is mandatory. The Commission staff uses the collection of information in its examination and oversight program. Requiring maintenance of these disclosures as part of the firm's books and records will facilitate the Commission's ability to inspect for and enforce compliance with firms' obligations with respect to the relationship summary. The information generally is kept confidential.[1278]

The likely respondents to this collection of information are all of the approximately 13,299 advisers currently registered with the Commission. We estimate that based on updated IARD data as of December 31, 2018, 8,235 existing advisers will be subject to the amended provisions of rule 204–2 to preserve the relationship summary as a result of the adopted amendments.

1. Changes in Burden Estimates and New Burden Estimates

The currently approved annual aggregate burden for rule 204–2 is 2,199,791 hours, with a total annual aggregate monetized cost burden of approximately $130,316,112, based on an estimate of 12,024 registered advisers, or 183 hours per registered

---

53. The $10,083,500 is based on 4,469 registered advisers reporting private fund activity as of May 16, 2016.

[1271] 6% × 4,806 = 288 advisers needing to obtain the fair value of certain private fund assets. 288 advisers × $37,625 = $10,836,000.

[1272] $3,600,000 for preparation of Form ADV Part 2 + $10,836,000 for registered investment advisers to fair value their private fund assets + $7,331,370 (*see supra* footnote 1242) to prepare relationship summary = $21,767,370 in total external costs for Form ADV. $21,767,370/13,299 total registered advisers as of December 31, 2018 = $1,637 per registered adviser.

[1273] $21,767,370—$13,683,500 = $8,083,870.

[1274] Specifically, investment advisers will be required to maintain and preserve records of the relationship summary in an easily accessible place for not less than five years from the end of the fiscal year during which the last entry was made on such record, the first two years in an appropriate office of the investment adviser. *See* Advisers Act rule 204–2(e)(1).

[1275] *See, e.g.,* CCMC Letter; SIFMA Letter. *See also* NSCP Letter (estimating 80–500 hours to prepare, deliver, and file the relationship summary, including recordkeeping policies and procedures).

[1276] *See, e.g.,* CCMC Letter; SIFMA Letter; Committee of Annuity Insurers Letter; Edward Jones Letter. A few others stated that creating recordkeeping policies and procedures relating to how professionals respond to "key questions" would be burdensome and extremely difficult. *See, e.g.,* LPL Financial Letter. Although the final instructions require "conversation starter" questions that are similar to the proposed "key questions," we are not increasing the burden as urged by commenters. As discussed in Section V.A.2.a. above, we increased the burden estimates for the initial preparation of the relationship summary, acknowledging, among other things, that certain advisers that provide automated investment advisory services will incur additional burdens to develop written answers to the conversation starters and make those available on their websites with a hyperlink to the appropriate page in the relationship summary for these documents (*i.e.,* robo-advisers). However, we do not expect these advisers to incur additional recordkeeping burdens under amendments to rule 204–2 because we are not establishing new or separate recordkeeping obligations related to the conversation starters or the answers provided by firms in response to the conversation starters. *See supra* footnotes 814–816.

[1277] *See* SIFMA Letter.

[1278] *See* section 210(b) of the Advisers Act.

adviser.[1279] We estimate that the requirements to make and keep copies of each relationship summary under the amendments to rule 204–2 will result in an increase in the collection of information burden estimate by 0.2 hours [1280] for each of the estimated 8,235 registered advisers with relationship summary obligations, resulting in a total of 183.2 hours per adviser. This will yield an annual estimated aggregate burden of 1,508,652 hours under amended rule 204–2 for all registered advisers with relationship summary obligations,[1281] for a monetized cost of $95,588,191, or $11,607 per adviser.[1282] In addition, the 5,064 advisers not subject to the amendments will continue to be subject to an unchanged burden of 183 hours under rule 204–2, or a total aggregate annual hour burden of 926,712,[1283] for a monetized cost of $58,716,472, or $11,595 per adviser.[1284] The increase in the collection of information burden

estimate by 0.2 hours as a result of the amendments to rule 204–2 will therefore result in an annual monetized cost of $12 per adviser.[1285] In summary, taking into account the estimated annual burden of registered advisers that will be required to maintain records of the relationship summary, as well as the estimated annual burden of registered advisers that do not have relationship summary obligations and whose information collection burden is unchanged, the revised annual aggregate burden for all respondents to rule 204–2, under the amendments, is estimated to be 2,435,364 total hours,[1286] for a monetized cost of $154,304,663.[1287]

2. Revised Annual Burden Estimates

As noted above, the approved annual aggregate burden for rule 204–2 is currently 2,199,791 hours based on an estimate of 12,024 registered advisers, or 183 hours per registered adviser.[1288] The revised annual aggregate hourly burden for rule 204–2 will be 2,435,364 [1289] hours, represented by a monetized cost of $154,304,664,[1290] based on an estimate of 8,235 registered advisers with the relationship summary obligation and 5,064 registered advisers without, as noted above. This represents an increase of 235,573 [1291] annual aggregate hours in the hour burden and an annual increase of $23,988,552 from the currently approved total aggregate monetized cost for rule 204–2.[1292] These increases are attributable to a larger registered investment adviser population since the most recent approval and adjustments for inflation, as well as the rule 204–2 amendments relating to the relationship summary as discussed in this release.

*C. Rule 204–5 under the Advisers Act*

New rule 204–5 will require an investment adviser to deliver an electronic or paper version of the relationship summary to each retail investor before or at the time the adviser enters into an investment advisory contract with the retail investor. The

adviser also will make a one-time initial delivery of the relationship summary to all existing clients within a specified time period after the effective date of the rule. Also with respect to existing clients, the adviser will deliver the most recent relationship summary before or at the time of (i) opening any new account that is different from the retail investor's existing account(s); (ii) recommending that the retail investor roll over assets from a retirement account into a new or existing account or investment; or (iii) recommending or providing a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in the existing account.[1293] The adviser will be required to post a current version of its relationship summary prominently on its public website (if it has one), and will be required to communicate any changes in an amended relationship summary to retail investors who are existing clients within 60 days, instead of 30 days as proposed, after the amendments are required to be made and without charge.[1294] The investment adviser also must deliver a current relationship summary to each retail investor within 30 days upon request. In a change from the proposal, an adviser must make a copy of the relationship summary available upon request without charge, and where a relationship summary is delivered in paper format, the adviser may link to additional information by including URL addresses, QR codes, or other means of facilitating access to such information.[1295] The adviser must also include a telephone number where retail investors can request up-to-date information and a copy of the relationship summary.[1296]

---

[1279] *See* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209, at 81 FR at 60454–55.

[1280] In the Paperwork Reduction Act analysis for amendments to Form ADV adopted in 2016, we estimated that 1.5 hours would be required for each adviser to make and keep records relating to (i) the calculation of performance the adviser distributes to any person and (ii) all written communications received or sent relating to the adviser's performance. Because the burden of preparing the relationship summary is already included in the collection of information estimates for Form ADV, we estimate that recordkeeping burden for the relationship summary will be considerably less than 1.5 hours and estimate that 0.2 hours is appropriate.

[1281] 8,235 registered investment advisers required to prepare relationship summary × 183.2 hours = 1,508,652 hours.

[1282] As with our estimates relating to the previous amendments to Advisers Act rule 204–2 (*see* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209, at 81 FR at 60454–55), we expect that performance of this function will most likely be allocated between compliance clerks and general clerks, with compliance clerks performing 17% of the function and general clerks performing 83% of the function. Data from the SIFMA Office Salaries in the Securities Industry Report, modified to account for an 1,800-hour work year and multiplied by 2.93 to account for bonuses, firm size, employee benefits, and overhead, suggest that costs for these position are $70 and $62, respectively. (17% × 1,508,652 hours × $70) + (83% × 1,508,652 hours × $62) = $95,588,191. $95,588,191/8,235 advisers = $11,607 per adviser.

[1283] 5,064 registered investment advisers not required to prepare the relationship summary × 183 hours = 926,712.

[1284] As with our estimates relating to the previous amendments to Advisers Act rule 204–2 (*see* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209, at 81 FR at 60454–55, we expect that performance of this function will most likely be allocated between compliance clerks and general clerks, with compliance clerks performing 17% of the function and general clerks performing 83% of the function. Data from the SIFMA Office Salaries Report suggest that costs for these positions are $70 and $62, respectively. (17% × 926,712 hours × $70) + (83% × 926,712 hours × $62) = $58,716,473. $58,716,473/5,064 = $11,595 per adviser.

[1285] $11607 aggregate burden per adviser subject to relationship summary − $11,595 aggregate burden per adviser not subject to the relationship summary = $12.

[1286] 8,235 registered investment advisers required to prepare relationship summary × 183.2 hours = 1,508,652 hours. 5,064 registered investment advisers not required to prepare the relationship summary × 183 hours = 926,712 hours. 1,508,652 hours + 26,712 hours = 2,435,364 hours.

[1287] $95,588,191 + $58,716,473 = $154,304,664.

[1288] 2,199,791 hours/12,024 registered advisers = 183 hours per adviser.

[1289] *See supra* footnote 1286.

[1290] *See supra* footnote 1287.

[1291] 2,435,364 hours − 2,199,791 hours = 235,573 hours.

[1292] $154,304,664 − $130,316,112 = $23,988,552.

[1293] We are adopting these requirements instead of the proposed requirements that advisers deliver the relationship summary to existing retail investor clients before or at the time of opening a new account that is different from the retail investor's existing account or changes are made to the retail investor's existing account(s) that would ''materially change'' the nature or scope of the firm's relationship with the retail investor. *See* Proposing Release, *supra* footnote 5 at Section II.C.2.

[1294] The communication can be made by delivering the relationship summary or by communicating the information through another disclosure that is delivered to the retail investor.

[1295] Additionally, we are adopting the instruction that if a relationship summary is delivered in paper format as part of a package of documents, the firm must ensure that the relationship summary is the first among any documents that are delivered at that time, substantially as proposed. *See supra* footnote 701.

[1296] This differs from the proposal, which required only firms that do not have a public website to include a toll-free number that retail

Continued

App 162

**33610**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

As discussed further below, we received comments that our estimated burdens for delivery of the relationship summary were too low. Some of these comments focused on the administrative and operational burdens related to monitoring for changes that would ''materially change'' the nature and scope of the relationship and thereby require delivery to existing clients and customers.[1297] One commenter also argued that imposing different delivery requirements for the Form ADV, Part 2 brochure and the relationship summary would create substantial administrative burdens specifically for investment advisers.[1298] Other comments focused on the recordkeeping burdens related to the requirement to deliver the relationship summary to a new or prospective retail investor.[1299] As discussed further below, we made changes to the proposal to require more specific triggers for initial delivery and additional delivery to existing customers in order to replace the requirements in response to comments. We discuss below the specific separate delivery requirements and modifications.

New rule 204–5 contains a collection of information requirement. The collection of information is necessary to provide advisory clients, prospective clients and the Commission with information about the investment adviser and its business, conflicts of interest, and personnel. Clients will use the information contained in the relationship summary to determine whether to hire or retain an investment adviser and what type of accounts and services are appropriate for their needs. The Commission will use the information to determine eligibility for registration with us and to manage our regulatory and examination programs. This collection of information will be found at 17 CFR 275.204–5 and will be mandatory. Responses will not be kept confidential.

1. Respondents: Investment Advisers

The likely respondents to this information collection will be the approximately 8,235 investment advisers registered with the Commission that will be required to deliver a relationship summary per new rule 204–5. We also note that these figures include the 318 registered broker-dealers that are dually registered as investment advisers.[1300]

2. Initial and Annual Burdens

a. Posting of the Relationship Summary to Website

Under new rule 204–5, advisers will be required to post a current version of their relationship summary prominently on their public website (if they have one). In the Proposing Release, we estimated that each adviser will incur 0.5 hours to prepare the posted relationship summary, such as to ensure proper electronic formatting and to post the disclosure to the adviser's website, if the adviser has one.[1301] Although we did not receive any comments regarding burdens associated with posting of the relationship summary to a public website, we are increasing our estimate of the time from 0.5 to 1.5 hours based on the staff's experience.[1302] We do not anticipate that investment advisers will incur additional external costs to post the relationship summary to the adviser's website because advisers without a public website will not be required to establish or maintain one, and advisers with a public website have already incurred external costs to create and maintain their websites. Additionally, external costs for the preparation of the relationship summary are already included for the collection of information estimates for Form ADV, in Section A.2.b, above.

Based on IARD system data, 91.6% of investment advisers with individual clients report having at least one public website.[1303] Therefore, we estimate that 91.6% of the 8,235 existing and 656 newly registered investment advisers with relationship summary obligations will incur a total of 12,216 aggregate burden hours to post relationship summaries to their websites,[1304] with a monetized cost of $757,407.[1305] As with the initial preparation of the relationship summary, we amortize the estimated initial burden associated with posting the relationship summary over a three-year period.[1306] Therefore, the total annual aggregate hourly burden related to the initial posting of the relationship summary is estimated to be 4,072 hours, with a monetized cost of $252,469.[1307] We did not receive comments regarding burdens associated with posting of the relationship summary to a public website.

b. Delivery to Existing Clients

(1) One-Time Initial Delivery to Existing Clients

The burden for this new rule is based on each adviser with retail investors having, on average, an estimated 3,985 clients who are retail investors.[1308] Although advisers may either deliver the relationship summary separately, in a ''bulk delivery'' to clients, or as part of the delivery of information that advisers already provide, such as the annual Form ADV update, account statements or other periodic reports, we base our estimates here on a ''bulk delivery'' to existing clients. This is similar to the approach we took in estimating the delivery costs for amendments to rule 204–3 under the Advisers Act, which requires investment advisers to deliver their Form ADV Part 2A brochures and brochure supplements to their clients.[1309] As with the estimates for rule 204–3, we estimate that advisers will require approximately 0.02 hours to deliver the relationship summary to each client.[1310] We did not receive comments on the burdens specific to delivering the relationship summary to

---

investors may call to request documents. *See supra* footnote 609.

[1297] *See, e.g.,* Cambridge Letter; SIFMA Letter; LPL Financial Letter.

[1298] Pickard Djinis and Pisarri Letter.

[1299] *See supra* footnotes 803–808.

[1300] *See supra* footnote 863 and accompanying text.

[1301] Proposing Release, *supra* footnote, 5 at section V.C.2.a.

[1302] *See e.g.,* Optional internet Availability of Investment Company Shareholder Reports, Investment Company Act Release No. 33115 (June 5, 2018) [83 FR 29158 (Jun. 22, 2018)] (estimating that funds that already post shareholder reports on their websites will require a half hour burden per fund to comply with the annual compliance and posting requirements of rule 30e–3, and funds that do not already post shareholder reports to their websites will require one and half hours to post the required documents online). Posting of the relationship summary under rule 204–5 pertains to one document, which is similar to the shareholder report posting to which rule 30e–3 applies.

[1303] We estimated in the Proposing Release that 91.1 of investment advisers with individual clients report at least one public website, based on IARD system data as of December 31, 2017. *See* Proposing Release, *supra* footnote 5 at Section V.C.1.

[1304] 1.5 hours to prepare and post the relationship summary × 91.6% × (8,235 existing advisers + 656

newly-registered advisers with relationship summary obligations) = 12,216 hours.

[1305] Based on data from the SIFMA Office Salaries Report, we expect that requirement for investment advisers to post their relationship summaries to their websites will most likely be performed by a general clerk at an estimated cost of $62 per hour. 1.5 hours per adviser × $62 = $93 in monetized costs per adviser. $93 per adviser × 91.6% × (8,235 existing advisers + 656 newly registered advisers) = $757,407 total aggregate monetized cost.

[1306] *See* 2016 Form ADV Paperwork Reduction Analysis, *supra* footnote 1209.

[1307] 12,216 hours/3 years = 4,072 hours annually. $757,407/3 years = $252,469 in annualized monetized costs.

[1308] This estimate is based on IARD system data as of December 31, 2018.

[1309] *See* Brochure Adopting Release, *supra* footnote 576, at 75 FR at 49259.

[1310] This is the same estimate we made in the Form ADV Part 2 proposal and for which we received no comment. Brochure Adopting Release, *supra* footnote 576, at 75 FR at 49259 The burden for preparing relationship summaries is already incorporated into the burden estimate for Form ADV discussed above.

App 163

existing clients under new Rule 204–5. We estimate the total burden hours for 8,235 advisers for initial delivery of the relationship summary to existing clients to be 79.7 hours per adviser, or 708,613 total aggregate hours, for the first year after the rule is in effect,[1311] with a monetized cost of $4,941 [1312] per adviser or $43,930,431 in aggregate.[1313] Amortized over three years, the total annual hourly burden is estimated to be 26.57 hours per adviser, or 236,204 annual hours in aggregate,[1314] with annual monetized costs of $1,647 per adviser, or $14,643,477 in aggregate.[1315] We do not expect that investment advisers will incur external costs for the initial delivery of the relationship summary to existing clients because we estimate that advisers will make such deliveries along with another required delivery, such as an interim or annual update to the Form ADV Part 2A.

(2) Additional Delivery to Existing Clients

As discussed in Section II.C.3.c above, the proposed instructions would have required investment advisers to deliver the relationship summary to existing retail investor clients before or at the time firms open a new account that is different from the retail investor's existing account or changes are made to the retail investor's existing account(s) that would "materially change" the nature or scope of the firm's relationship with the retail investor. In response to comments seeking additional clarity on when the "materially change" requirement would apply, and expressing concerns that there will be additional supervisory, administrative, and operational processes required, and burdens imposed, we replaced the "materially

change" requirement with more concrete delivery triggers that firms could more easily implement based on their existing systems and processes.[1316]

Investment advisers will be required to deliver the relationship summary to existing clients before or at the time they open a new account that is different from the retail investor's existing account(s), as proposed. In addition, in a change from the proposal, delivery will be required before or at the time the adviser (i) recommends that the retail investor roll over assets from a retirement account into a new or existing account or investment, or (ii) recommends or provides a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in the existing account. We are adopting these two triggers instead of the proposed requirement to deliver the relationship summary before or at the time changes are made to the existing account that would "materially change" the nature and scope of the relationship to address commenters' requests for additional guidance or examples of what would constitute a "material change." [1317] Commenters also described administrative and operational burdens arising from this requirement and argued that our estimated burdens were too low.[1318] One commenter asserted that firms would be required to build entirely new operational and supervisory processes to identify asset movements that could trigger a delivery requirement.[1319] Another commenter noted the challenges of designing a system that distinguishes non-ordinary course events from routine account changes.[1320]

As discussed above, we replaced the "materially change" requirement with more specific triggers to be clearer about when a relationship summary must be delivered.[1321] While these specific triggers will still impose operational and supervisory burdens on firms, we believe that they are more easily identified and monitored, such that firms will not incur significant burdens as described by commenters to

implement entirely new supervisory, administrative, and operational processes needed to monitor events that cause a material change. However, recognizing that some additional processes will be necessary to implement these delivery triggers, we are increasing our burden estimate from 0.02 to 0.04 hours. We now estimate that each adviser will incur 16 hours per year to deliver the relationship summary in these types of situations, and that delivery under these circumstances will take place among 10% of an adviser's retail investors annually.[1322] We will therefore estimate a total annual aggregate hours of 142,256,[1323] with a monetized cost of $992 per adviser [1324] and $8,818,872 in aggregate.[1325]

(3) Posting of Amended Relationship Summaries to websites and Communicating Changes to Amended Relationship Summaries, Including by Delivery

Investment advisers will be required to amend their relationship summaries within 30 days when any of the information becomes materially inaccurate. Investment advisers also will be required to communicate any changes in an amended relationship summary to existing clients who are retail investors within 60 days, instead of 30 days as proposed, after the updates are required to be made and without charge. We do not expect this change to increase the PRA estimates.[1326] The communication can be made by delivering the relationship summary or through another disclosure that is

---

[1311] (0.02 hours per client × 3,985 retail clients per adviser) = 79.7 hours per adviser. 79.7 hours per adviser × (8,235 existing advisers + 656 newly registered advisers) = 708,613 total aggregate hours.

[1312] Based on data from the SIFMA Office Salaries Report, we expect that initial delivery requirement to existing clients of rule 204–5 will most likely be performed by a general clerk at an estimated cost of $62 per hour. 79.7 hours per adviser × $62 = $4,941 in monetized costs per adviser. We estimate that advisers will not incur any incremental postage costs because we estimate that they will make such deliveries with another mailing the adviser was already delivering to clients, such as interim or annual updates to the Form ADV, or will deliver the relationship summary electronically.

[1313] $4,941 in monetized costs per adviser × (8,235 existing advisers + 656 newly registered advisers) = $43,930,431 in total aggregate costs.

[1314] 79.7 initial hours per adviser/3 = 26.57 total annual hours per adviser. 708,613 initial aggregate hours/3 = 236,204 total annual aggregate hours.

[1315] $4,941 in monetized costs per adviser/3 = $1,647 annualized monetized cost per adviser. $43,930,431 initial aggregate monetized cost/3 = $14,643,477 in total annual aggregate monetized cost.

[1316] *See supra* footnotes 758–763 and accompanying text.

[1317] *See* Prudential Letter; TIAA Letter; Cambridge Letter; SIFMA Letter; LPL Financial Letter; Institute for Portfolio Alternatives Letter.

[1318] *See, e.g.,* SIFMA Letter; LPL Financial Letter.

[1319] *See* SIFMA Letter.

[1320] *See* LPL Letter.

[1321] These more specific triggers are intended to address circumstances that the proposed "materially change" sought to address. *See supra* footnote 761 and accompanying text.

[1322] 10% of 3,985 retail clients per adviser × .04 hours to deliver the relationship summary = 16 hours per adviser.

[1323] 16 hours × (8,235 existing advisers + 656 new advisers) = 142,256 total aggregate hours.

[1324] Based on data from the SIFMA Office Salaries Report, we expect that delivery requirements of rule 204–5 will most likely be performed by a general clerk at an estimated cost of $62 per hour. 16 hours per adviser × $62 = $992 per adviser. We estimate that advisers will not incur any incremental postage costs in the delivery of the relationship summary to existing clients for changes in accounts, because we estimate that advisers will make such deliveries with another mailing the adviser was already delivering to clients, such as new account agreements and other documentation normally required in such circumstances.

[1325] $992 in monetized costs per adviser × (8,235 existing advisers + 656 newly registered advisers) = $8,819,872 in total aggregate costs.

[1326] As discussed in Section V.A.2.c., we have increased the burden estimates for preparing amendments to the relationship summary, acknowledging, among other things, that firms will incur additional burdens to prepare and file amendments as a result of the instructions that firms preparing amendments highlight the most recent changes, and that additional disclosure showing the revised text be attached as an exhibit to the unmarked relationship summary.

**33612**   **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

delivered to the retail investor. This requirement is a change from the proposed requirement but is substantively similar.[1327] Commenters did not comment on the estimated burden. We have determined not to change the burden relative to the proposal.

Based on the historical frequency of amendments made on Form ADV Parts 1 and 2, we estimate that on average, each adviser preparing a relationship summary will likely amend the disclosure an average of 1.71 times per year.[1328] We are not changing the 0.5 hours estimates to post the amendments to a public website, consistent with our estimates at proposal. Using the same percentage of investment advisers reporting public websites, 91.6% of 8,235 advisers will incur a total annual burden of 0.86 hours per adviser, or 6,487 hours in aggregate,[1329] to post the amended relationship summaries to their website. This translates into an annual monetized cost of $53.32 per adviser, or $402,207 in the aggregate for existing registered advisers with relationship summary obligations.[1330]

For this requirement, we estimate that 50% of advisers will choose to deliver the relationship summary to communicate the updated information, and that the delivery will be made along with other disclosures already required to be delivered. We did not receive comments on this estimate. We believe that it is likely that the other 50% of advisers will incorporate all of the updated information in their Form ADV Part 2, like the summary of material changes or other disclosures, which

they are already obligated to deliver in order to avoid having to deliver two documents. We estimate a burden of 561,162 hours,[1331] or 136.29 hours per adviser,[1332] at a monetized cost of $34,792,044 in aggregate,[1333] or $8,450 per adviser,[1334] for the 50% of advisers that choose to deliver amended relationship summaries in order to communicate updated information.[1335]

In a change from the proposal,[1336] we are also adopting two requirements not included in the proposal. First, all firms will be required to make available a copy of the relationship summary upon request without charge. Second, in a relationship summary that is delivered in paper format, firms may link to additional information by including URL addresses, QR codes, or other means of facilitating access to such information.[1337] We believe that these new requirements will increase the burden relative to the proposal for some firms that do not currently fulfill these types of disclosure requests, including, for example, additional costs associated with tracking delivery preferences related to making copies of the relationship summary available upon request, and printing and mailing costs

for copies that are delivered in paper. We estimate that the 8,235 advisers with relationship summary obligations, on average, will require 0.5 hours each annually to comply with this requirement. Therefore, we estimate that the 8,235 advisers will incur a total of 4,118 aggregate burden hours to make copies of the relationship summary available upon request,[1338] with a monetized cost per adviser of $31, or $255,285 in aggregate monetized cost.[1339] We acknowledge that the burden may be more or less than 0.5 hours for some advisers, but we believe that, on average, 0.5 hours is an appropriate estimate for calculating an aggregate burden for the industry for this collection of information.

We do not expect investment advisers to incur external costs in delivering amended relationship summaries or communicating the information in another way because we estimate that they will make this delivery with, or as part of, other disclosures required to be delivered, such as an interim or annual update to Form ADV. We did not receive comments on this assumption in the proposal.

### c. Delivery to New Clients or Prospective New Clients

Data from the IARD system indicate that of the 13,299 advisers registered with the Commission, 8,235 have retail investors, and on average, each has 3,985 clients who are retail investors.[1340] As proposed, we estimate that the client base for investment advisers will grow by approximately 4.5% annually.[1341] Based on our experience with Form ADV Part 2, we estimate the annual hour burden for initial delivery of a relationship summary will be the same by paper or electronic format, at 0.02 hours for each

[1327] The proposed instructions would have required firms to communicate updated information by delivering the amended relationship summary or by communicating the information another way. The revised instruction will eliminate the wording ''another way'' and will clarify that the communication can be made through another disclosure that is delivered to the retail investor. *See supra* footnote 767.

[1328] We estimated in the Proposing Release that each adviser preparing a relationship summary will likely amend the disclosure an average 1.81 times based on IARD system data as of December 31, 2017. See Proposing Release, supra footnote 5 at section V.C.2.b.iii. We are updating the average number to 1.71 times per year based on IARD system data as of December 31, 2018.

[1329] 0.5 hours to post the amendment × 1.71 amendments annually = 0.86 hours per adviser annually to post amendments to the website. 0.86 × 8,235 existing advisers amending the relationship summary × 91.6% of advisers with public websites = 6,487 aggregate annual hours to post amendments of the relationship summary.

[1330] Based on data from the SIFMA Office Salaries Report, we expect that the posting requirements of rule 204–5 will most likely be performed by a general clerk at an estimated cost of $62 per hour. 0.86 hours per adviser × $62 = $53.32 per adviser. $53.32 per adviser × 91.6% × 8,235 existing advisers = $402,207 in annual monetized costs.

[1331] 8,235 advisers amending the relationship summary × 3,985 retail clients per adviser × 50% delivering the amended relationship summary to communicate updated information × 0.02 hours per delivery × 1.71 amendments annually = 561,162 hours to deliver amended relationship summaries.

[1332] 3,985 retail clients per adviser × 0.02 hours per delivery × 1.71 amendments annually = 136.29 hours per adviser.

[1333] Based on data from the SIFMA Office Salaries Report, we expect that delivery requirements of rule 204–5 will most likely be performed by a general clerk at an estimated cost of $62 per hour. 561,162 hours × $62 = $34,792,044. We estimate that advisers will not incur any incremental postage costs to deliver the relationship summary for communicating updated information by delivering the relationship summary, because we estimate that advisers will make the delivery along with other documents already required to be delivered, such as an interim or annual update to Form ADV, or will deliver the relationship summary electronically.

[1334] Based on data from the SIFMA Office Salaries Report, modified to account for an 1,800-hour work-year and multiplied by 2.93 to account for bonuses, firm size, employee benefits and overhead, we expect that delivery requirements of rule 204–5 will most likely be performed by a general clerk at an estimated cost of $62 per hour. 136.29 hours per adviser × $62 per hour = $8,450 per adviser.

[1335] For the other 50% of advisers that may choose to communicate updated information in another disclosure, we estimate no added burden because these advisers will be communicating the information in other disclosures they are already delivering like the Form ADV Part 2 brochure or summary of material changes.

[1336] *See supra* footnotes 699–701 and accompanying text.

[1337] We are adopting the instruction that if a relationship summary is delivered in paper format as part of a package of documents, it should be the first among any documents that are delivered at the same time, as proposed. *See supra* footnote 701.

[1338] 0.5 hours to make paper copies of the relationship summary available upon request × 8,235 advisers with relationship summary obligations = 4,118 hours.

[1339] Based on data from the SIFMA Office Salaries Report, we expect that the requirement for advisers to make paper copies of the relationship summary available upon request will most likely be performed by a general clerk at an estimated cost of $62 per hour. 0.5 hours per adviser × $62 = $31 in monetized costs per adviser. $31 per adviser × 8,235 advisers with relationship summary obligations = $255,285 total aggregate monetized cost.

[1340] This average is based on advisers' responses to Item 5 of Part 1A of Form ADV as of December 31, 2018.

[1341] In the Proposing Release, we determined this estimate based on IARD system data. *See* Proposing Release, *supra* footnote 5 at section V.C.c. The number of retail clients reported by RIAs changed by 6.7% between December 2015 and 2016, and by 2.3% between December 2016 and 2017. (6.7% + 2.3%)/2 = 4.5% average annual rate of change over the past two years. We did not receive comments on this estimate.

relationship summary,[1342] or 3.6 annual hours per adviser.[1343] Therefore, we estimate that the aggregate annual hour burden for initial delivery of the relationship summary to new clients will be 29,646 hours,[1344] at a monetized cost of $1,838,052, or $223 per adviser.[1345]

As in the Proposing Release, we continue to estimate that investment advisers will not incur external costs to deliver the relationship summary to new or prospective clients because they will make the delivery along with other documentation normally provided in such circumstances, such as Form ADV Part 2, or will deliver the relationship summary electronically. We did not receive comments regarding the burdens for delivering the relationship summary to prospective clients that eventually become clients.

d. Total New Initial and Annual Burdens

All together, we estimate the total collection of information burden for new rule 204–5 to be 983,945 annual aggregate hours per year,[1346] or 120 hours per respondent,[1347] for a total annual aggregate monetized cost of

$61,003,406,[1348] or $7,408 [1349] per adviser.

*D. Form CRS and Rule 17a–14 under the Exchange Act*

New rule 17a–14 under the Exchange Act [17 CFR 240.17a–14] and Form CRS [17 CFR 249.640] will require a broker-dealer that offers services to retail investors to prepare and file with the Commission, post to the broker-dealer's website (if it has one), and deliver to retail investors a relationship summary, as discussed in greater detail in Section II above. Broker-dealers will deliver the relationship summary to both existing customers and new or prospective customers who are retail investors. In a change from the proposal, broker-dealers will file the relationship summary through Web CRD® instead of EDGAR. We are also requiring that all relationship summaries be filed with machine-readable headings, in a change from the proposal, as well as in a text-searchable format as proposed.

New rule 17a–14 under the Exchange Act [17 CFR 240.17a–14] and Form CRS [17 CFR 249.640] contain a collection of information requirement. We will use the information to manage our regulatory and examination programs. Clients can use the information required in the relationship summary to determine whether to hire or retain a broker-dealer, as well as what types of accounts and services are appropriate for their needs. The collection of information is necessary to provide broker-dealer customers, prospective customers, and the Commission with information about the broker-dealer and its business, conflicts of interest and personnel. This collection of information will be found at 17 CFR 249.640 and will be mandatory. Responses will not be kept confidential.

As discussed in Sections I and II of this release, we received comments that addressed whether the relationship summary is necessary for broker-dealers, and whether we could further minimize the burden of the proposed collections of information. One

commenter specifically addressed the accuracy of our burden estimates for the proposed collections of information, suggesting that our estimates were too low because compliance professionals estimated it would take 80–500 hours to prepare, deliver, and file the relationship summary, depending on the firm's size and business model.[1350] Others commented more broadly that the implementation costs of the relationship summary would be higher than we estimated in the Proposing Release.[1351] We have considered these comments and are increasing our PRA burden estimates from 15 hours to 40 hours for broker-dealers to prepare and file the relationship summary. We also modified several substantive requirements to mitigate some of these estimated increased costs relative to the proposal.

1. Respondents: Broker-Dealers

The respondents to this information collection will be the broker-dealers registered with the Commission that will be required to prepare, file, and deliver a relationship summary in accordance with new rule 17a–14 under the Exchange Act [17 CFR 240.17a–14]. As of December 31, 2018, there were 2,766 broker-dealers registered with the Commission that reported sales to retail customer investors,[1352] and therefore likely will be required to prepare and deliver the relationship summary.[1353] We also note that these include 318 broker-dealers that are dually registered as investment advisers.[1354] We did not receive comments related to the methodology used for estimating the number of broker-dealers that will be subject to these requirements. We are maintaining the methodology we used in the Proposing Release and are updating our estimates to reflect the

---

[1342] This is the same as the estimate for the burden to deliver the brochure required by Form ADV Part 2. *See* Brochure Adopting Release, *supra* footnote 576.

[1343] 3,985 clients per adviser with retail clients × 4.5% = 179 new clients per adviser. 179 new clients per adviser × 0.02 hours per delivery = 3.6 hours per adviser for delivery of a relationship summary to new or prospective new clients.

[1344] 3.6 hours per adviser for delivery obligation to new or prospective clients × 8,235 advisers = 29,646 hours.

[1345] Based on data from the SIFMA Office Salaries Report, modified to account for an 1,800-hour work-year and multiplied by 2.93 to account for bonuses, firm size, employee benefits and overhead, we expect that delivery requirements of rule 204–5 will most likely be performed by a general clerk at an estimated cost of $62 per hour. 29,646 hours × $62 = $1,838,052. We estimate that advisers will not incur any incremental postage costs to deliver the relationship summary to new or prospective clients because we estimate that advisers will make the delivery along with other documentation normally provided in such circumstances, such as Form ADV Part 2. $1,838,052/8,235 investment advisers = $223 per adviser.

[1346] 4,072 annual hours for posting initial relationship summaries to adviser websites + 236,204 annual hours for initial delivery to existing clients + 142,256 hours for delivery to existing clients based on material changes to accounts or scope of relationship + 6,487 annual hours to post amended relationship summary to website + 561,162 hours for delivery to existing clients to communicate updated information in amended relationship summaries + 29,646 hours for delivery to new or prospective clients + 4,118 hours to make paper copies of the relationship summary available upon demand = 983,945 annual total hours for investment advisers to post and deliver the relationship summary under proposed rule 204–5.

[1347] 983,945 hours (initial and other deliveries)/ 8,235 advisers = 120 hours per adviser.

[1348] $252,469 for posting initial relationship summaries to adviser websites + $14,643,477 for initial delivery to existing clients + $8,819,872 for delivery to existing clients based on material changes to accounts or scope of relationship + $402,207 to post amended relationship summary to website + $34,792,044 for delivery to existing clients to communicate updated information in amended relationship summaries + $1,838,052 for delivery to new or prospective clients + $255,285 for making paper copies of the relationship summary available upon demand = $61,003,406 in total annual aggregate monetized cost for investment advisers to post and deliver the relationship summary under proposed rule 204–5.

[1349] $61,003,406/8,235 advisers = $7,408 per adviser.

[1350] *See* NSCP Letter.

[1351] Some commenters argued that the cost to implement Form CRS and Regulation Best Interest would be high. *See, e.g.,* Raymond James Letter; CCMC Letter (investor polling results); SIFMA Letter.

[1352] *See supra* footnote 867 and accompanying text. Retail sales activity is identified from Form BR (*see supra* footnote 861, which categorizes retail activity broadly (by marking the ''sales'' box) or narrowly (by marking the ''retail'' or ''institutional'' boxes as types of sales activity). We use the broad definition of sales as we believe that many firms will just mark ''sales'' if they have both retail and institutional activity. However, this may capture some broker-dealers that do not have retail activity, although we are unable to estimate that frequency.

[1353] For purposes of Form CRS, a ''retail investor'' will be defined as: a natural person, or the legal representative of such natural person, who seeks to receive or receives services primarily for personal, family or household purposes.

[1354] *See supra* footnote 863 and accompanying text.

number of broker-dealers since the last burden estimate.

Some of the burden for dual registrants to prepare and deliver the relationship summary and post it to a website is already accounted for in the estimated burdens for investment advisers under the amendments to Form ADV and new rule 204–5, discussed in Sections V.A.2.a and V.C.2 above. However, dually registered broker-dealers will incur burdens related to their business as an investment adviser that standalone broker-dealers will not incur, such as the requirement to file the relationship summary using both IARD and Web CRD®, and to deliver to both investment advisory clients and brokerage customers, to the extent those groups of retail investors do not overlap. In addition, dual registrants may provide different services, charge different fees, and have different conflicts on the advisory and broker-dealer sides such that the burden of preparing the relationship summary on the broker-dealer side may not be substantially reflected in the burden for preparing the relationship summary on the advisory side. Therefore, although treating dually registered broker-dealers in this way may be over-inclusive, we base our burden estimates for rule 17a–14 and the relationship summary on 2,766 broker-dealers with relationship summary obligations, including those dually registered as broker-dealers. [1355]

2. Initial and Annual Burdens

a. Initial Preparation, Filing, and Posting of Relationship Summary

As discussed above in Section II, firms will be required to prepare and file a relationship summary summarizing specific aspects of their brokerage services that they offer to retail investors. Unlike investment advisers, which already prepare Form ADV Part 2A brochures and have information readily available to prepare the relationship summary, broker-dealers will be required for the first time to prepare a disclosure that contains all the information required by the relationship summary.

In the Proposing Release, we estimated that the initial first year burden for preparing and filing the

relationship summary for broker-dealers would be 15 hours per registered broker-dealer and an additional 0.5 hours to prepare the relationship summary for posting on its website, if it has one. Several commenters said that our estimated burdens were too low. [1356] One commenter specifically argued that preparing, delivering, and filing the relationship summary would take from 80 to 500 hours, based on input from compliance professionals, and noted there would be additional costs that are hard to quantify, including human relations and information technology programming. [1357] Commenters also said the relationship summary would result in additional compliance burdens, including training. [1358]

We are revising our estimate of the time that it would take each broker-dealer to prepare and file the relationship summary in the first year from 15 to 40 hours in light of these comments and the changes we are making to the proposed relationship summary. For example, in the Proposing Release, we estimated that it would take firms a shorter amount of time to prepare the relationship summary than a more narrative disclosure due to the standardized nature and prescribed language of the relationship summary. As discussed above, the final instructions require less prescribed wording relative to the proposal and require broker-dealers to draft their own summaries for most of the sections. In addition and in a change from the proposal, we now are requiring that all relationship summaries be filed with machine-readable headings, as well as text-searchable format as proposed. We acknowledge that these changes will increase cost burdens relative to the proposal because broker-dealers have to develop their own wording and design, as well as implement machine-readable headings to comply with these requirements.

The relationship summary will also require more layered disclosures relative to the proposal and will encourage the use of electronic

formatting and graphical, text, online features to facilitate access to other disclosures that provide additional detail. Although broker-dealers are currently required to disclose certain information about their services and accounts to their retail investors, [1359] broker-dealers are not currently required to disclose in one place all of the information required by the relationship summary or to file a narrative disclosure document with the Commission comparable to investment advisers' Form ADV Part 2A. Broker-dealers will bear the cost of drafting a new relationship summary and cross-referencing or hyperlinking to additional information. The higher estimated burden estimate also reflects our acknowledgement that it will take firms longer to draft certain disclosures than we estimated in the Proposing Release, such as answers to "conversation starters" that broker-dealers providing services only online without a particular individual with whom a retail investor can discuss these questions must include on their website. We believe these factors and the changes we made to the proposal will increase the burden to prepare a relationship summary relative to the proposal.

We are also changing the filing system for broker-dealers as compared to the proposal. Broker-dealers will file Form CRS through Web CRD® instead of EDGAR as proposed, but we believe that this change will reduce the estimated burden for filing with the Commission, relative to the proposal. Broker-dealers already submit registration filings on Web CRD® so they will not incur additional costs to access the system. [1360]

We are estimating the same hourly burden for standalone broker-dealers and broker-dealers that are dually registered as investment advisers because we are counting dually registered firms in the burden calculation for the Advisers Act rule that requires the relationship summary for investment advisers. [1361] We recognize that the burden for some broker-dealers will exceed our estimate and the burden for others will be less because broker-dealers vary in the size

---

[1355] The burden estimates for dual registrants to prepare and file the relationship summary is accounted for in the burden estimates for Form ADV and under Exchange Act rule 17a–14. For example, a dual registrant that prepares an initial relationship summary that covers both its advisory business and broker-dealer business has an estimated burden of 60 hours amortized (20 hours to prepare and file relationship summary related to the advisory business + 40 hours to prepare and file relationship summary related to the broker-dealer business).

[1356] *See, e.g.,* NSCP Letter; *see also* CCMC Letter (costs to implement the proposal were underestimated and greater than 40% of firms surveyed anticipate having to spend a moderate or substantial amount to implement Regulation Best Interest and Form CRS); Raymond James Letter (noting the significant implementation costs of Regulation Best Interest and Form CRS for the industry); SIFMA Letter (stating that implementation costs of Regulation Best Interest and Form CRS would be significant).

[1357] *See* NSCP Letter.

[1358] *See* NSCP Letter (stating that a minimum of two hours of firm level training or two hours of training per independent registered representative or adviser will be required prior to Form CRS implementation).

[1359] *See, e.g.,* Exchange Act rule 10b–10 (requiring a broker-dealer effecting transactions in securities to provide written notice to the customer of certain information specific to the transaction at or before completion of the transaction, including the capacity in which the broker-dealer is acting (*i.e.,* agent or principal) and any third-party remuneration it has received or will receive).

[1360] This reduction in the filing burden is offset by the increased burden to prepare the relationship summary, resulting in a higher total burden.

[1361] *See supra* footnote 1220.

App 167

and complexity of their business models, but we do not believe that the range could be as high as suggested by some commenters.[1362] Unlike investment advisers, which already prepare Form ADV Part 2A brochures and have information readily available to prepare the relationship summary, broker-dealers will be required for the first time to prepare disclosure that contains all the information required by the relationship summary.

We recognize that the burden on some broker-dealers might be significant, especially in the initial preparation and filing of the relationship summary and thus will require additional burdens than what we estimated in the Proposing Release. Accordingly, we are increasing the estimate from 15 to 40 hours in the first year for a broker-dealer's initial preparation and filing of the relationship summary, which is higher than the estimated burden for investment advisers.[1363] We estimate that the total burden for broker-dealers to prepare and file the relationship summary will be 110,640 hours,[1364] for a monetized value of $30,204,720.[1365] The initial burden will be amortized over three years to arrive at an annual burden for broker-dealers to prepare and file the relationship summary. Therefore, the total annual aggregate hour burden for registered broker-dealers to prepare and file the relationship summary will be 36,880 hours, or 13.33 hours per broker-dealer,[1366] for an annual monetized cost of $10,068,240, or $3,640 per broker-dealer.[1367]

As proposed, broker-dealers will be required to post a current version of their relationship summary prominently on their public website (if they have one). In the Proposing Release, we estimated that each broker-dealer will incur 0.5 hours to prepare the posted relationship summary, such as to ensure proper electronic formatting and to post a current version of the relationship summary on the broker-dealer's website, if it has one. Although we did not receive any comments regarding burdens associated with posting of the relationship summary to a public website, we are increasing our estimate of the time from 0.5 to 1.5 hours based upon the staff's experience.[1368] We believe that the amount of time needed to prepare the relationship summary for posting, including ensuring proper formatting and posting it on the website, will not vary significantly from the time needed by investment advisers. We do not anticipate that broker-dealers will incur additional external costs to post the relationship summary to the broker-dealer's website because broker-dealers without a public website will not be required to establish or maintain one, and broker-dealers with a public website have already incurred external costs to create and maintain their websites. As with investment advisers, we estimate that each broker-dealer will incur 1.5 hours to prepare the relationship summary for posting to its website. We estimate that the initial burden of posting the relationship summary to their websites, if they have one, will be 4,149 hours,[1369] for a monetized value of $257,238.[1370] The initial burden will be amortized over three years to arrive at an annual burden for broker-dealers to post the relationship summary to a public website. Therefore, the total annual aggregate hour burden for broker-dealers to post the relationship summary will be 1,383 hours, or 0.5 hours per broker-dealer,[1371] for an annual monetized cost of $87,746, or $31 per broker-dealer.[1372]

To arrive at an annual burden for preparing, filing, and posting the relationship summary, as for investment advisers, the initial burden will be amortized over a three-year period for broker-dealers. Therefore, the total annual aggregate hour burden for registered broker-dealers to prepare, file, and post a relationship summary to their website, if they have one, will be 38,263 hours, or 13.83 hours per broker-dealer,[1373] for an annual monetized cost of $10,153,986, or $3,671 per broker-dealer.[1374]

b. Estimated External Costs for Initial Preparation of Relationship Summary

Under new rule 17a–14, broker-dealers will be required to prepare and file a relationship summary, as well as post it to their website if they have one. We do not anticipate external costs to broker-dealers in the form of website set-up, maintenance, or licensing fees because they will not be required to establish a website for the sole purpose of posting their relationship summary if they do not already have a website. We do anticipate that most broker-dealers will incur a one-time initial cost for outside legal and consulting fees in connection with the initial preparation of the relationship summary.

We estimated in the Proposing Release that an external service provider would spend 3 hours helping a broker-dealer prepare an initial relationship summary. While we received no specific comments on our estimate regarding external costs in the Proposing Release, one commenter suggested that there would be additional implementation costs such as legal advice, but that these costs are difficult to quantify.[1375] Based on the concerns expressed by this commenter and the changes we are making to the relationship summary, for example, requiring less prescribed wording, we are increasing the estimate relative to the proposal from 3 to 5 hours. While we recognize that different firms may require different amounts of external assistance in preparing the relationship summary, we believe that this is an appropriate average number for estimating an aggregate amount for

---

[1362] *See* NSCP Letter (estimating that the time required to prepare, deliver, and file Form CRS would be anywhere from 80 to 500 hours).

[1363] *See infra* footnote 1366. Amortizing the 40 hour burden imposed by the relationship summary over a three-year period will result in an average annual burden of 13.33 hours per year for each of the 2,766 broker-dealers with relationship summary obligations.

[1364] 2,766 × 40.0 hours/3 = 36,880 total hours.

[1365] We expect that performance of this function will most likely be equally allocated between a senior compliance examiner and a compliance manager. Data from the SIFMA Management and Professional Earnings Report suggest that costs for these positions are $237 and $309 per hour, respectively. (0.5 × 110,640 hours × $237) + (0.5 × 110,640 hours × $309) = $30,204,720.

[1366] 110,640 hours for preparing and filing/3 years = 36,880 total aggregate annual hour burden to prepare and file relationship summary. 36,880 hours/2,766 broker-dealers with retail accounts = 13.33 hours annually per broker-dealer.

[1367] $30,204,720 total initial aggregate monetized cost for preparation and filing/3 = $10,068,240 total annual monetized cost for preparation and filing the relationship summary. $10,068,240/2,766 broker-dealers subject to relationship summary obligations = $3,640 per broker-dealer.

[1368] *See supra* footnote 1302.

[1369] 1.5 hours × 2,766 broker-dealers = 4,149 hours to prepare and post relationship summary to the website.

[1370] Based on data from the SIFMA Office Salaries Report, modified to account for an 1,800-hour work-year and multiplied by 2.93 to account for bonuses, firm size, employee benefits and overhead, we expect that performance of this function will most likely be performed by a general clerk at an estimated cost of $62 per hour. 4,149 hours × $62 = $257,238 total aggregate monetized cost.

[1371] 4,149 hours for posting to website/3 years = 1,383 total aggregate annual hour burden to prepare and file relationship summary. 1,383 hours/2,766 broker-dealers with retail account = 0.5 hours annually per broker-dealer.

[1372] $257,238 total initial aggregate monetized cost for posting to website/3 = $85,746 total annual monetized cost for posting the relationship summary. $87,746/2,766 broker-dealers with retail accounts = $31 per broker-dealer.

[1373] 110,640 hours for preparing and filing + 4,149 hours for posting = 114,789 hours. 114,789/3 years = 38,263 total aggregate annual hour burden to prepare and file relationship summary. 38,263 hours/2,766 broker-dealers with retail accounts = 13.83 hours annually per broker-dealer.

[1374] $30,204,720 total initial aggregate monetized cost for preparation and filing + $257,238 for posting to the website/3 = $10,153,986 total annual monetized cost for preparation, filing and posting the relationship summary. $10,153,968/2,766 broker-dealers subject to relationship summary obligations = $3,671 per broker-dealer.

[1375] *See* NSCP Letter.

**33616**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

the industry purposes of the PRA analysis, particularly given our experience with the burdens for Form ADV.[1376]

Although broker-dealers that will be subject to the relationship summary requirement may vary widely in terms of the size, complexity, and nature of their business, we believe that the strict page limits will make it unlikely that the amount of time, and thus cost, required for outside legal and compliance review will vary substantially among those broker-dealers who elect to obtain outside assistance.

Most of the information required in the relationship summary is readily available to broker-dealers because the information required pertains largely to the broker-dealer's own business practices, and thus the information is likely more readily available to the broker-dealer than to an external legal or compliance consultant. However, because broker-dealers are drafting a narrative disclosure for the first time, we anticipate that 50% of broker-dealers will seek the help of outside legal services and 50% of broker-dealers will seek the help of compliance consulting services in connection with the initial preparation of the relationship summary. We estimate that the initial per broker-dealer cost for legal services related to the preparation of the relationship summary will be $2,485.[1377] We estimate that the initial per broker-dealer cost for compliance consulting services related to the preparation of the relationship summary will be $3,705.[1378] Accordingly, we estimate that 1,383 broker-dealers will use outside legal services, for a total initial aggregate cost burden of $3,436,755,[1379] and 1,383 broker-dealers will use outside compliance consulting services, for a total initial aggregate cost

burden of $5,124,015,[1380] resulting in a total initial aggregate cost burden among all respondents of $8,560,770, or $3,095 per broker-dealer, for outside legal and compliance consulting fees related to preparation of the relationship summary.[1381] Annually, this represents $2,853,590, or $1,032 per broker-dealer, when amortized over a three-year period.[1382]

c. Amendments to the Relationship Summary and Filing and Posting of Amendments

As with our estimates above for investment advisers, we do not expect broker-dealers to amend their relationship summaries frequently. In the Proposing Release, we estimated that broker-dealers required to prepare and file a relationship summary would require 0.5 hours to amend and file the updated relationship summary, and 0.5 hours to post it to their website. We did not receive comments regarding hour burdens associated with preparing and filing amendments to the relationship summary. As discussed in section II.C.4 above, in a change from the proposal, we are adding a requirement that broker-dealers delivering updated relationship summaries to customers also highlight the most recent changes by, for example, marking the revised text or including a summary of material changes. To account for this change, we are increasing the annual burden to 1 hour per year for preparing and filing amendments to the relationship summary. We are not changing the proposed 0.5 hours estimate to post the amendments to a public website.

Based on staff experience, we believe that many broker-dealers will update their relationship summary at a minimum once a year, after conducting an annual supervisory review, for example.[1383] We also estimate that on average, each broker-dealer preparing a relationship summary may amend the

disclosure once more during the year, due to emerging issues. Therefore, we estimate that broker-dealers will update their relationship summary, on average, twice a year. Thus, we estimate that broker-dealers will incur a total annual aggregate hourly burden of 5,532 hours per year to prepare and file amendments per year, and 2,766 hours per year to post to their websites an estimated total of 5,532 amendments per year.[1384] We therefore estimate that for making and filing amendments to their relationship summaries, broker-dealers will incur an annual aggregate monetized cost of $1,510,236, or approximately $546 per broker-dealer to prepare and file amendments,[1385] and an annual aggregate monetized cost of $171,492, or approximately $62 per broker-dealer to post the amendments.[1386] In total, the aggregate annual monetized cost for broker-dealers to make, file, and post amendments will be $1,681,728, or approximately $608 per broker dealer.[1387]

We do not expect ongoing external legal or compliance consulting costs for the relationship summary.[1388] Although broker-dealers will be required to amend the relationship summary within 30 days whenever any information becomes materially inaccurate, we expect that the amendments will require relatively minimal wording changes, given the relationship summary's page limitation and summary nature. We believe that broker-dealers will be more knowledgeable about the information to include in the amendments than outside legal or compliance consultants and will be able to make these revisions in-house. Therefore, we do not expect that broker-dealers will need to incur ongoing external costs for the

---

[1376] *See supra* footnote 1221.

[1377] External legal fees are in addition to the projected hour per broker-dealer burden discussed above. Data from the SIFMA Management and Professional Earnings Report suggest that outside legal services cost approximately $497 per hour. $497 per hour for legal services × 5 hours per broker-dealer = $2,485. The hourly cost estimate of $497 is adjusted for inflation and based on our consultation with broker-dealers and law firms who regularly assist them in compliance matters.

[1378] External compliance consulting fees are in addition to the projected hour per broker-dealer burden discussed above. Data from the SIFMA Management and Professional Earnings Report suggest that outside management consulting services cost approximately $741 per hour. $741 per hour for outside consulting services × 5 hours per broker-dealer = $3,705.

[1379] 50% × 2,766 SEC registered broker-dealers = 1,383 broker-dealers. $2,485 for legal services × 1,383 broker-dealers = $3,436,755.

[1380] 50% × 2,766 SEC registered broker-dealers = 1,383 broker-dealers. $3,705 for compliance consulting services × 1,383 broker-dealers = $5,124,015.

[1381] $3,436,755 + $5,124,015 = $8,560,770. $8,560,770/2,766 broker-dealers = $3,095 per broker-dealer.

[1382] $8,560,770 initial aggregate monetized cost/3 years = $2,853,590 annually. $3,095 initial monetized cost per broker-dealer/3 years = $1,032.

[1383] FINRA rules set an annual supervisory review as a minimum threshold for broker-dealers, for example in FINRA Rules 3110 (requiring an annual review of the businesses in which the broker-dealer engages), 3120 (requiring an annual report detailing a broker-dealer's system of supervisory controls, including compliance efforts in the areas of antifraud and sales practices); and 3130 (requiring each broker-dealer's CEO or equivalent officer to certify annually to the reasonable design of the policies and procedures for compliance with relevant regulatory requirements).

[1384] 2,766 broker-dealers amending relationship summaries × 2 amendments per year = 5,532 amendments per year. 5,532 amendments × 1 hour to amend and file = 5,532 hours. 2,766 broker-dealers × (0.5 hours to post amendments to website × 2 amendments a year) = 2,766 hours.

[1385] 5,532 total aggregate initial hour burden for amending relationship summaries. We believe that performance of this function will most likely be equally allocated between a senior compliance examiner and a compliance manager. Data from the SIFMA Management and Professional Earnings Report suggest that costs for these positions are $237 and $309 per hour, respectively. (5,532 hours × 50% × $237 + 5,532 hours × 50% × $309 = $1,510,236. $1,510,236/2,677 investment advisers = $546 per investment broker-dealer.

[1386] Based on data from the SIFMA Office Salaries Report, we expect that the posting will most likely be performed by a general clerk at an estimated cost of $62 per hour. 2,766 aggregate hours to post amendment × $62 = $171,492. $171,492/2,766 broker-dealers = $62 in annual monetized costs.

[1387] $1,510,236 to prepare and file amendment + $171,492 to post the amendments = $1,681,728. $1,681,728/2,766 = $608.

[1388] *But see* NNCP Letter.

App 169

preparation and review of relationship summary amendments.

d. Delivery of the Relationship Summary

Rule 17a–14 under the Exchange Act will require a broker-dealer to deliver the relationship summary, with respect to a retail investor that is a new or prospective customer, before or at the earliest of: (i) A recommendation of an account type, a securities transaction or an investment strategy involving securities; (ii) placing an order for the retail investor; or (iii) the opening of a brokerage account for the retail investor. Broker-dealers also will make a one-time, initial delivery of the relationship summary to all existing customers within a specified time period after the effective date of the rule. Also with respect to existing customers, broker-dealers will deliver the most recent relationship summary before or at the time of (i) opening a new account that is different from the retail investor's existing account(s); or (ii) recommending that the retail investor roll over assets from a retirement account into a new or existing account or investment; or (iii) recommending or providing a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in the existing account.

As discussed above in Section II.C.3.a, broker-dealers will be required to post a current version of the relationship summary prominently on their public websites (if they have one), and will be required to communicate any changes in an amended relationship summary to retail investors who are existing clients or customers within 60 days, instead of 30 days as proposed, after the amendments are required to be made and without charge.[1389] Broker-dealers also must deliver a current relationship summary to each retail investor within 30 days upon request. In a change from the proposal, a broker-dealer must make available a copy of the relationship summary upon request without charge, and where a relationship summary is delivered in paper format, the broker-dealer may link to additional information by including URL addresses, QR codes, or other means of facilitating access to such information.[1390] The broker-dealer must

also include a telephone number where retail investors can request up-to-date information and request a copy of the relationship summary.[1391]

As discussed further below, we received comments that our estimated burdens for delivery of the relationship summary were too low.[1392] Some of these comments were focused on the delivery burdens related to the requirement to deliver a relationship summary to existing retail investors when changes are made to the existing account that would "materially change" the nature and scope of the relationship.[1393] Other comments focused on the recordkeeping burdens related to the requirement to deliver the relationship summary to a new or prospective retail investor.[1394] As discussed further below, we made changes to the proposal to require more specific triggers for initial delivery and additional delivery to existing customers in order to replace the requirements in response to comments. We discuss below the specific separate delivery requirements and modifications.

(1) One-Time Initial Delivery to Existing Customers

We estimate the burden for broker-dealers to make a one-time initial delivery of the relationship summary to existing customers based on an estimate of the number of accounts held by these broker-dealers. Based on FOCUS data, we estimate that the 2,766 broker-dealers that report retail activity have approximately 139 million customer accounts, and that approximately 73.5%, or 102.165 million, of those accounts belong to retail customers.[1395] We estimate that, under the adopted rule, broker-dealers will send their relationship summary along with other

required disclosures, such as periodic account statements, in order to comply with initial delivery requirements for the relationship summary.

As with investment advisers, we estimate that a broker-dealer will require no more than 0.02 hours to deliver the relationship summary to each existing retail investor under rule 17a–14. We did not receive comments on the burdens specific to delivering the relationship summary to existing clients. We will therefore estimate broker-dealers to incur an aggregate initial burden of 2,043,300 hours, or approximately 739 hours per broker-dealer for the first year after the rule is in effect.[1396] We expect the aggregate monetized cost for broker-dealers to make a one-time initial delivery of relationship summaries to existing customers to be $126,684,600.[1397] Amortized over three years, the total annual hourly burden is estimated to be 681,100 hours, or approximately 246 hours per broker-dealer,[1398] with annual monetized costs of $42,228,200 and $15,267, respectively.[1399] We do not expect that broker-dealers will incur external costs for the initial delivery of the relationship summary to existing clients because we estimate that they will make such deliveries along with another required delivery, such as periodic account statements.

(2) Additional Delivery to Existing Customers

As discussed in Section II.C.3.c above, broker-dealers will be required to deliver the relationship summary to existing customers when opening a new account that is different from the retail investor's existing account(s), as proposed. In addition, in a change from the proposal, delivery will be required before or at the time the broker-dealer (i)

---

[1389] The communication can be made by delivering the relationship summary or by communicating the information through another disclosure that is delivered to the retail investor.

[1390] Additionally, we are adopting the instruction that if a relationship summary is delivered in paper format as part of a package of documents, the firm

must ensure that the relationship summary is the first among any documents that are delivered at that time, substantially as proposed. *See supra footnotes* 678–679.

[1391] This differs from the proposal, which required only firms that do not have a public website to include a toll-free number that retail investors may call to request documents. *See supra* footnote 609.

[1392] *See, e.g.,* SIFMA Letter.

[1393] *See, e.g.,* Cambridge Letter; SIFMA Letter; LPL Financial Letter.

[1394] *See infra* footnote 1427.

[1395] *See supra* footnotes 857–865 and accompanying text. 2,766 broker-dealers (including dually registered firms) report 139 million customer accounts. Approximately 73.5% of registered broker-dealers report retail customer activity; *see supra* footnote 861. Therefore, 73.5% × 139 million accounts = 102.165 million accounts. This number likely overstates the number of deliveries to be made due to the double-counting of deliveries to be made by dual registrants to a certain extent, and the fact that one customer may own more than one account.

[1396] (0.02 hours per customer account × 102.165 million customer accounts) = 2,043,300 hours. The burden for preparing updated relationship summaries is already incorporated into the burden estimate for Form CRS discussed above. 2,043,300 hours/2,766 broker-dealers = approximately 739 hours per broker-dealer.

[1397] Based on data from SIFMA's Office Salaries Report, we expect that initial delivery requirement to existing clients of rule 17a–14 will most likely be performed by a general clerk at an estimated cost of $62 per hour. 2,043,300 hours × $62 = $126,684,600. We estimate that broker-dealers will not incur any incremental postage costs because we estimate that they will make such deliveries with another mailing the broker-dealer was already delivering to clients, such as periodic account statements.

[1398] 2,043,300 initial aggregate hours/3 = 681,100 total annual aggregate hours. 739 initial hours per broker-dealer/3 = 246 total annual hours per broker-dealer.

[1399] $126,684,600 initial aggregate monetized cost/3 = $42,228,200 annual aggregate monetized cost. $42,228,200/2,766 broker-dealers = $15,267 annual monetized cost per broker-dealer.

recommends that the retail investor roll over assets from a retirement account into a new or existing account or investment, or (ii) recommends or provides a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in the existing account. We are adopting these two triggers instead of the proposed requirement to deliver the relationship summary before or at the time changes are made to the existing account that would "materially change" the nature and scope of the relationship to address commenters' requests for additional guidance or examples of what would constitute a "material change." [1400] Commenters also described administrative and operational burdens arising from this requirement and argued that our estimated burdens were too low. [1401] One commenter asserted that firms would be required to build entirely new operational and supervisory processes to identify asset movements that could trigger a delivery requirement. [1402] Another noted the challenges of designing a system that distinguishes non-ordinary course events from routine account changes. [1403]

As discussed above, we replaced the "materially change" requirement with more specific triggers to be clearer about when a relationship summary must be delivered. [1404] While these specific triggers will still impose operational and supervisory burdens on broker-dealers, we believe that they are more easily identified and monitored, such that firms will not incur significant burdens as described by commenters to implement entirely new supervisory, administrative, and operational processes needed to monitor events that cause a material change. However, recognizing that some additional processes will be necessary to implement these delivery triggers, we are increasing our burden estimate from 0.02 to 0.04 hours. We now estimate that each broker-dealer will incur 149 hours per year to deliver the relationship summary in these types of situations, and that delivery under these circumstances will take place among 10% of broker-dealer's retail investors annually. We will therefore estimate

broker-dealers to incur a total annual aggregate burden of 408,660 hours, or 148 hours per broker-dealer, [1405] at an annual aggregate monetized cost of $25,336,920, or approximately $9,160 per broker-dealer. [1406]

(3) Communicating Changes to Amended Relationship Summaries, Including by Delivery

As discussed above, broker-dealers will be required to amend their relationship summaries within 30 days when any of the information becomes materially inaccurate. They must also communicate any changes in any new version of the relationship summary to retail investors who are existing customers within 60 days, instead of 30 days as proposed, after the updates are required to be made and without charge. We do not expect this change to increase the PRA estimates. [1407] The communication can be made by delivering the relationship summary or by communicating the information through another disclosure to the retail investor. This requirement is a change from the proposed requirement but is substantively similar, and commenters did not comment on the estimated burden. [1408] We have determined not to change the burden relative to the proposal.

Consistent with our discussion on broker-dealers' amendments to the

relationship summary we are assuming that the broker-dealers with relationship summaries will amend them twice each year. We also estimate that 50% will choose to deliver the relationship summary to communicate the updated information. We did not receive comments on this estimate. As with investment advisers, we believe that it is likely that the other 50% of broker-dealers will incorporate all of the updated information in other disclosures, which they are already obligated to deliver in order to avoid having to deliver two documents. We estimate that broker-dealers will require 0.02 hours to make a delivery to each customer. [1409] Therefore, the estimated burden for those broker-dealers choosing to deliver an amended relationship summary to meet this communication requirement will be approximately 2,043,300 hours, or 739 hours per broker-dealer, [1410] translating into a monetized cost of $126,684,600 in aggregate, or $45,801 per broker-dealer. [1411]

In a change from the proposal, we are also adopting two requirements not included in the proposal. First, all firms will be required to make available a copy of the relationship summary upon request without charge. Second, in a relationship summary that is delivered in paper format, firms may link to additional information by including URL addresses, QR codes, or other means of facilitating access to such information. We believe that these new requirements will increase the burden relative to the proposal for some broker-dealers that do not currently fulfill these types of disclosure requests, including, for example, additional costs associated with tracking customer delivery

---

[1400] *See supra* footnotes 758–763 and accompanying text.

[1401] *See, e.g.,* LPL Financial Letter (stating that proposed re-delivery triggering events would not be easily identifiable and would present operational challenges and compliance costs).

[1402] *See* SIFMA Letter.

[1403] *See* LPL Financial Letter.

[1404] *See supra* footnote 761 and accompanying text.

[1405] 10% of 102.165 million customers × 0.04 hours = 408,660 hours. 408,660 hours/2,766 broker-dealers = 148 hours per broker-dealer.

[1406] Based on data from the SIFMA Office Salaries Report, modified to account for an 1,800-hour work-year and multiplied by 2.93 to account for bonuses, firm size, employee benefits and overhead, we expect that delivery requirements of rule 17a–14 will most likely be performed by a general clerk at an estimated cost of $62 per hour. 408,660 hours × $62 = $25,336,920. $25,336,920/2,766 broker-dealers = $9,160 per broker-dealer. We estimate that broker-dealers will not incur any incremental postage costs in these deliveries of the relationship summary to existing customers, because we estimate that broker-dealers will make such deliveries with another mailing the broker-dealer was already delivering to clients, such as periodic account statements, or new account agreements and other similar documentation.

[1407] As discussed in Section V.D.2.c., we have increased the burden estimates for preparing amendments to the relationship summary, acknowledging, among other things, that firms will incur additional burdens to prepare and file amendments as a result of the instructions that firms preparing amendments highlight the most recent changes, and that additional disclosure showing the revised text be attached as an exhibit to the unmarked relationship summary.

[1408] The proposed instructions would have required firms to communicate updated information by delivering the amended relationship summary or by communicating the information another way. The revised instruction will eliminate the wording "another way" and will clarify that the communication can be made through another disclosure that is delivered to the retail investor. *See supra* footnotes 775–778 and accompanying text.

[1409] For the other 50% of broker-dealers that may choose to communicate updated information in another disclosure, we estimate no added burden because these broker-dealers are communicating the information in other disclosures they are already delivering.

[1410] 2 amendments per year × 102.165 million customer accounts × 50% delivering the amended relationship summary to communicate updated information × 0.02 hours per delivery = 2,043,300 hours to deliver amended relationship summaries. 2,043,300 hours/2,766 broker-dealers = 739 hours per broker-dealer.

[1411] Based on data from the SIFMA Office Salaries Report, modified to account for an 1,800-hour work-year and multiplied by 2.93 to account for bonuses, firm size, employee benefits and overhead, we expect that delivery requirements of rule 17a–14 will most likely be performed by a general clerk at an estimated cost of $62 per hour. 2,043,300 hours × $62 = $126,684,600. $126,684,600/2,766 broker-dealers = $45,801 per broker-dealer. We estimate that broker-dealers will not incur any incremental postage costs to deliver these relationship summaries, because we estimate that advisers will make the delivery along with other documentation they normally would provide, such as account opening documents.

App 171

preferences related to making copies of the relationship summary available upon request, and printing and mailing costs for copies delivered in paper. We estimate that the 2,766 broker-dealers with relationship summary obligations, on average, will require 0.5 hours each annually to comply with this requirement. Therefore, we estimate that the 2,766 broker-dealers with relationship summary obligations will incur a total of 1,383 aggregate burden hours to make copies of the relationship summary available upon request,[1412] with a monetized cost per adviser of $31, or $85,746 in aggregate monetized cost.[1413] We acknowledge that the burden may be more or less than 0.5 hours for some broker-dealers, but we believe that, on average, 0.5 hours is an appropriate estimate for calculating an aggregate burden for the industry for this collection of information.

We do not expect broker-dealers to incur external costs in delivering amended relationship summaries or communicating the information in another way because we estimate that they will make these deliveries with, or as part of other disclosures required to be delivered. We did not receive comments on this assumption in the proposal.

e. Delivery to New Customers or Prospective New Customers

To estimate the delivery burden for broker-dealers' new or prospective new customers, as discussed above, we estimate that the 2,766 standalone broker-dealers with retail activity have approximately 102.165 million retail customer accounts.[1414] We did not receive comments on the burdens specific to delivering the relationship summary to new and prospective retail investors under rule 17a–14. Based on FOCUS data over the past five years, we estimate that broker-dealers grow their customer base and enter into new agreements with, on average, 11% more new retail investors each year.[1415] We

estimate the hour burden for initial delivery of a relationship summary will be the same by paper or electronic format, at 0.02 hours for each relationship summary, as we have estimated above. Therefore, the aggregate annual hour burden for initial delivery of the relationship summary by broker-dealers to new or prospective new customers will be 224,763 hours, or 81.3 hours per broker-dealer,[1416] at a monetized cost of $13,935,306 at an aggregate level, or $5,038 per broker-dealer.[1417]

f. Total New Initial and Annual Burdens

As discussed above, we estimate the total annual collection of information burden for new rule 17a–14 in connection with obligations relating to the relationship summary, including (i) initial preparation, filing, and posting to a website; (ii) amendments to the relationship summary for material updates and related filing and website posting burdens; (iii) one-time initial delivery to existing customers; (iv) additional delivery to existing customers; (v) delivery of amended relationship summaries; (vi) delivery to new and prospective customers; and (vii) making copies available upon request. Given these requirements, we estimate the total annual aggregate hourly burden to be approximately 3,408,533 hours per year, or 1,232 hours on a per broker-dealer basis.[1418] This translates into an aggregate annual monetized cost of $219,110,726, or

$79,216 per broker-dealer per year.[1419] In addition, we estimate that broker-dealers will incur external legal and compliance costs in the initial preparation of the relationship summary of approximately $8,560,770 in aggregate, or $3,095 per broker-dealer, translating into $2,853,590 annually, or $1,032 per broker-dealer, when amortized over a three year period.[1420]

*E. Recordkeeping Obligations Under Exchange Act Rule 17a–3* [1421]

The final requirement to make a record indicating the date that a relationship summary was provided to each retail investor, including any relationship summary provided before such retail investor opens an account, will contain a collection of information that will be found at 17 CFR 240.17a–3(a)(24) and will be mandatory. The Commission staff will use this collection of information in its examination and oversight program, and the information generally is kept confidential.[1422] The likely respondents to this collection of information requirement are the approximately 2,766 broker-dealers currently registered with the Commission that offer services to retail investors, as defined above.[1423]

Exchange Act section 17(a)(1) requires registered broker-dealers to make and keep for prescribed periods such records as the Commission deems "necessary or appropriate in the public interest, for the protection of investors or otherwise in furtherance of the purposes of" the Exchange Act." [1424] Exchange Act rules 17a–3 and 17a–4 specify minimum requirements with respect to the records

---

[1412] 0.5 hours to make paper copies of the relationship summary available upon request × 2,677 broker-dealers with relationship summary obligations = 1,383 hours.

[1413] Based on data from the SIFMA Office Salaries Report, we expect that the requirement for broker-dealers to make paper copies of the relationship summary available upon request will most likely be performed by a general clerk at an estimated cost of $62 per hour. 0.5 hours per broker-dealer × $62 = $31 in monetized costs per broker-dealer. $31 per broker-dealer × 2,766 broker-dealers with relationship summary obligations = $85,746 total aggregate monetized cost.

[1414] *See supra* footnotes 857–865 and accompanying text.

[1415] This represents the average annual rate of growth from 2014–2018 in the number of accounts for all broker-dealers reporting retail activity.

[1416] 102.165 million customer accounts × 11% increase = 11,238,150 new customers. 11,238,150 new customers × 0.02 hours per delivery = 224,763 total annual aggregate hours. 224,763/2,766 broker-dealers = 81.3 hours per broker-dealer for delivery to new customers.

[1417] Based on data from the SIFMA Office Salaries Report, modified to account for an 1,800-hour work-year and multiplied by 2.93 to account for bonuses, firm size, employee benefits and overhead, we expect that these functions will most likely be performed by a general clerk at an estimated cost of $62 per hour. 224,763 hours × $62 = $13,935,306. $13,935,306/2,766 broker-dealers = $5,038 per broker-dealer for delivery to new customers. We estimate that broker-dealers will not incur any incremental postage costs to deliver the relationship summary to new or prospective clients because we estimate that broker-dealers will make the delivery along with other documentation, such as periodic account statements.

[1418] 36,880 hours per year for initial preparation and filing of relationship summary + 4,149 hours for posting to website + 8,298 hours per year for amendments, filing, and posting of amendments + 681,100 hours for one-time initial delivery to existing customers + 408,660 hours for delivery to existing customers making material changes to their accounts + 2,043,300 hours for delivery of amendments + 224,763 hours for delivery to new customers + 1,383 hours to make paper copies available upon demand = 3,408,533 total annual aggregate hours. 3,408,533 hours/2,766 broker-dealers = 1,232 hours per broker-dealer.

[1419] $10,068,240 per year for initial preparation, filing, and posting of relationship summary + $257,238 per year for posting to website + $514,476 per year for amendments, filing, and posting of amendments + $42,228,200 for one-time initial delivery to existing customers (amortized over three years) + $25,336,920 for delivery to existing customers making material changes to their accounts + $126,684,600 for delivery of amendments + $13,935,306 for delivery to new customers + $85,746 per year to make paper copies of the relationship summary available upon demand = $219,110,726 in total annual aggregate monetized cost. $219,110,726/2,766 broker-dealers = $79,216 per broker-dealer.

[1420] $3,436,755 total external legal costs + $5,124,015 total external compliance cost = $8,560,770 total external legal and compliance costs. $8,560,770 total external legal and compliance costs/2,766 broker-dealers = $3,095 per broker-dealer. $8,560,770 total external legal and compliance costs/3 = $2,853,590 annually. $3,095/3 = $1,032 per year.

[1421] In a concurrent release, we are adopting additional burden adjustments to Exchange Act rules 17a–3 and 17a–4. *See* Regulation Best Interest Release, *supra* footnote 47.

[1422] *See* section 24(b) of the Exchange Act.

[1423] *See supra* footnotes 857–865 and accompanying text.

[1424] *See* section 17(a) of the Exchange Act.

**33620** **Federal Register**/Vol. 84, No. 134/Friday, July 12, 2019/Rules and Regulations

that broker-dealers must make, and how long those records and other documents must be maintained, respectively.

The amendments to Exchange Act rule 17a–3 will require SEC-registered broker-dealers to make a record indicating the date that a relationship summary was provided to each retail investor and to each prospective retail investor who subsequently becomes a retail investor. We are adopting these amendments as proposed. In the Proposing Release, we estimated that the adoption of new paragraph (a)(24) of rule 17a–3 would result in an incremental burden increase of 0.1 hours annually for each of the estimated 2,766 SEC-registered broker-dealers that will be required to record the dates that the initial relationship summary and each new version thereof, is provided to an existing or prospective retail investor.[1425]

As discussed above in Section II.E, several commenters suggested that our estimated burdens for the relationship summary recordkeeping obligations were too low.[1426] Some commenters argued that keeping records of when a relationship summary was given to prospective retail clients would be unnecessarily burdensome or not feasible, and was not adequately considered in the Commission's burden estimates.[1427] One of these commenters said that it would be difficult for firms to integrate pre-relationship delivery

dates into their operational systems and procedures, and that there is no way to track when a disclosure is accessed on a website.[1428]

After consideration of comments, and because broker-dealers do not currently maintain similar records like the relationship summary, we are revising our estimate of the time that it would take each broker-dealer to create the records required by new paragraph (a)(24) of rule 17a–3 as adopted from 0.1 hours to 0.5 hours. The incremental hour burden for broker-dealers to create the records required by new paragraph (a)(24) of rule 17a–3 as adopted will therefore be 1,383 hours,[1429] for a monetized cost of $87,627 in aggregate, or $32 per broker-dealer.[1430] We also do not expect that broker-dealers will incur external costs for the requirement to make records because we believe that broker-dealers will make such records in a manner similar to their current recordkeeping practices, including those that apply to communications and correspondence with retail investors.

## F. Record Retention Obligations Under Exchange Act Rule 17a–4

Exchange Act section 17(a)(1) requires registered broker-dealers to make and keep for prescribed periods such records as the Commission deems "necessary or appropriate in the public interest, for the protection of investors or otherwise in furtherance of the purposes of" the Exchange Act."[1431] Exchange Act rule 17a–4 specifies minimum requirements with respect to how long records created under Exchange Act rule 17a–3 and other documents must be kept. We are adopting amendments to rule 17a–4 as proposed that will require broker-dealers to retain copies of each version of the relationship summary provided to current or prospective retail investors, and to preserve the record of dates that each version of the relationship summary was delivered to any existing retail investor or to any new or prospective retail investor customer, pursuant to the new requirements under new paragraph (a)(24) under rule 17a–

3, as adopted, discussed above. These records as well as a copy of each version of a firm's relationship summary will be required to be maintained in an easily accessible place for at least six years after such record or relationship summary is created. This collection of information will be found at 17 CFR 240.17a–4 and will be mandatory. The Commission staff will use the collection of information in its examination and oversight program. Requiring maintenance of these disclosures as part of the broker-dealer's books and records will facilitate the Commission's ability to inspect for and enforce compliance with firms' obligations with respect to the relationship summary. The information generally is kept confidential.[1432]

The likely respondents to this collection of information requirement are the approximately 2,766 broker-dealers that report retail activity, as described above. We did not receive comments related to burdens associated with record retention obligations for broker-dealers. We do not expect that broker-dealers will incur external costs for the requirement to maintain and preserve a copy of each version of the relationship summary as well as the records required to be made pursuant to new paragraph (a)(24) of Exchange Act rule 17a–3 because broker-dealers are already required to maintain and retain similar records related to communication with retail investors.

### 1. Changes in Burden Estimates and New Burden Estimates

The approved annual aggregate burden for rule 17a–4 is currently 1,042,866 hours, with a total annual aggregate monetized cost burden of approximately $67.8 million, based on an estimate of 4,104 broker-dealers and 150 broker-dealers maintaining an internal broker-dealer system.[1433] The

---

[1425] We applied the same 0.2 hour estimate as with investment advisers, but divided equally between creating a record of the relationship summary and its deliveries and the maintenance of those records. As discussed above, we are increasing our estimates.

[1426] *See, e.g.,* CCMC Letter; SIFMA Letter; *see also* NSCP Letter (estimating 80–500 hours to prepare, deliver, and file Form CRS, including recordkeeping policies and procedures).

[1427] *See, e.g.,* CCMC Letter; SIFMA Letter; Committee of Annuity Insurers Letter; Edward Jones Letter. A few others stated that creating recordkeeping policies and procedures relating to how professionals respond to "key questions" would be burdensome and extremely difficult. *See, e.g.,* LPL Financial Letter. Although the final instructions require "conversation starter" questions that are similar to the proposed "key questions," we are not increasing the burden as urged by commenters. As discussed in Section V.D.2.a. above, we increased the burden estimates for the initial preparation of the relationship summary, acknowledging, among other things, that certain broker-dealers that provide services only online will incur additional burdens to develop written answers to the conversation starters and make those available on their websites with a hyperlink to the appropriate page in the relationship summary for these documents. However, we do not expect these broker-dealers to incur additional recordkeeping burdens under amendments to Exchange Act rule 17a–3 because we are not establishing new or separate recordkeeping obligations related to the conversation starters or the answers provided by firms in response to the conversation starters. *See supra* footnotes 814–816.

[1428] *See* SIFMA Letter.

[1429] 2,766 broker-dealers × 0.5 hours annually = 1,383 annual hours for recordkeeping.

[1430] As with our estimates relating to the proposed amendments to Advisers Act rule 204–2 (*see, e.g., supra* footnote 1284 and accompanying text), we expect that performance of this function will most likely be allocated between compliance clerks and general clerks, with compliance clerks performing 17% of the function and general clerks performing 83% of the function. Data from the SIFMA Office Salaries Report suggest that costs for these positions are $70 and $62, respectively. (17% × 1,383 hours × $70) + (83% × 1,383 hours × $62) = $87,627. $87,627/2,766 broker-dealers = $32 per broker-dealer.

[1431] *See* section 17(a) of the Exchange Act.

[1432] *See* section 24(b) of the Exchange Act.

[1433] (4,104 broker-dealers × 254 hours per broker-dealer) + (150 broker-dealers maintaining internal broker-dealer systems × 3 hours) = (1,042,416 hours + 450 hours) = 1,042,866 hours each year. The monetized cost was based on these functions being performed by a compliance clerk earning an average of $65 per hour, resulting in a total internal cost of compliance of (1,042,416 × $65) + (450 × $65) = $67,786. *See Supporting Statement for the Paperwork Reduction Act Information Collection Submission for Rule 17a–4* (Oct. 19, 2016), *available at https://www.reginfo.gov/public/do/DownloadDocument?objectID=68823501* (defining an internal broker-dealer system as "any facility that provides a mechanism for collecting, receiving, disseminating, or displaying system orders and facilitating agreement to the basic terms of a purchase or sale of a security between a customer and the sponsor, but excludes a national securities exchange, an exchange exempt from registration based on limited volume, and an alternative trading system.").

App 173

currently approved annual reporting and recordkeeping cost estimate to respondents is $20,520,000.[1434] We estimate that the adopted amendments will result in an increase in the collection of information burden estimate by 0.10 hour[1435] for each of the estimated 2,766 currently registered broker-dealers that report retail sales activity and will have relationship summary obligations.[1436] The incremental hour burden for broker-dealers will therefore be 277 hours,[1437] for a monetized cost of $19,390 in aggregate, or $7 per broker-dealer.[1438] This will yield an annual estimated aggregate burden of 702,841 hours for all broker-dealers with relationship summary obligations to comply with paragraph (e)(10) of Exchange Act rule 17a-4, as amended,[1439] for a monetized cost of approximately $49,198,870.[1440] In addition, the 998 broker-dealers not subject to the amendments[1441] will continue to be subject to an unchanged burden of 254 hours per broker-dealer, or 253,492 hours for these broker-dealers.[1442] In addition, those maintaining an internal broker-dealer system will continue to be subject to an unchanged burden of 450 hours annually, under paragraph (e)(10) of

Exchange Act rule 17a–4, as amended. In summary, taking into account the estimated annual burden of broker-dealers that will be required to maintain records of the relationship summary, as well the estimated annual burden of broker-dealers that do not have relationship summary obligations and whose information collection burden is unchanged, the revised annual aggregate burden for all broker-dealer respondents to the recordkeeping requirements under rule 17a–4 is estimated to be 956,783 total annual aggregate hours,[1443] for a monetized cost of approximately $66,974,810 million.[1444]

2. Revised Annual Burden Estimates

As noted above, the approved annual aggregate burden for rule 17a–4 is currently 1,042,866 hours, with a total annual aggregate monetized cost burden of approximately $67.8 million, based on an estimate of 4,104 broker-dealers and 150 broker-dealers maintaining an internal broker-dealer system. The revised annual aggregate hourly burden for rule 17a–4 will be 956,783[1445] hours, represented by a monetized cost of approximately $66,974,810 million,[1446] based on an estimate of 2,766 broker-dealers with the relationship summary obligation and 998 broker-dealers without, as noted above. This represents a decrease of 85,633[1447] annual aggregate hours in the hour burden and an annual decrease of approximately $811,480 from the currently approved total aggregate monetized cost for rule 17a–4.[1448] These changes are attributable to the amendments to rule 17a–4 relating to the relationship summary as discussed in this release and the decline in the number of registered broker-dealer respondents. The revised annual reporting and recordkeeping cost to respondents is estimated at approximately $18,820,000, or a reduction of $1,700,000 million from the currently approved annual reporting and recordkeeping cost burden of $20,520,000.[1449]

## VI. Final Regulatory Flexibility Analysis

The Commission has prepared the following Final Regulatory Flexibility Analysis ("FRFA") in accordance with section 4(a) of the Regulatory Flexibility Act.[1450] It relates to: (i) New rule 204–5 under the Advisers Act and amendment to Form ADV (17 CFR 279.1), to add a new Part 3: Form CRS (relationship summary); (ii) amendments to rule 203–1 under the Advisers Act; (iii) amendments to rule 204–1 under the Advisers Act; (iv) amendments to rule 204–2 under the Advisers Act; (v) new rule 17a–14 under the Exchange Act and new Form CRS (17 CFR 249.640) (relationship summary); and (vi) amendments to rules 17a–3 and 17a–4 under the Exchange Act.[1451] We prepared an Initial Regulatory Flexibility Analysis ("IRFA") in the Proposing Release.[1452]

### A. Need for and Objectives of the Amendments

Broker-dealers, investment advisers, and dually registered firms all provide important services for retail investors. As discussed above in Sections I and IV, research continues to show that retail investors are confused about services, fees, conflicts of interest, and the required standard of conduct for particular firms as well as the differences between broker-dealers and investment advisers. Lack of knowledge about important aspects of the market for financial advice, such as the services, fees, conflicts of interest, and the required standard of conduct for particular firms may harm retail investors by deterring them from seeking brokerage or investment advisory services even if they could potentially benefit from them, or by increasing the risk of a mismatch between the investors' preferences and expectations and the actual brokerage or advisory services they receive. Therefore, it is important to reduce retail investor confusion in the marketplace for brokerage and investment advisory services and to assist retail investors with the process of deciding whether to (i) establish an

---

[1434] 4,104 broker-dealers × $5,000 annual recordkeeping cost per broker-dealer = $20,520,000.

[1435] In the Proposing Release, we applied the same 0.2 hour estimate as with investment advisers, but divided that burden equally between the rule 17a–3 requirement to create a record of the dates the relationship summary was delivered to current or prospective customers and the rule 17a–4 requirement to maintain those records as well as copies of each version of the relationship summary. As discussed above, we are increasing the burden estimates for the recordkeeping requirement from 0.1 hours to 0.5 hours in light of certain comments, however, we believe, on balance, that 0.1 hour estimate for the record retention requirement is a reasonable estimate for purposes of the PRA analysis.

[1436] *See supra* footnotes 857–865.

[1437] 2,766 broker-dealers × 0.1 hours annually = 277 annual hours for record retention.

[1438] Consistent with our prior paperwork reduction analyses for rule 17a–4, we expect that performance of this function will most likely be performed by compliance clerks. Data from the SIFMA Office Salaries Report suggest that costs for these positions are $70 per hour. 277 hours × $70 = $19,390. $19,390/2,766 broker-dealers = $7 per broker-dealer.

[1439] 2,766 broker-dealers required to prepare relationship summary × (254 hours + 0.1 hour) = 702,841 hours.

[1440] Consistent with our prior paperwork reduction analyses for rule 17a–4, we expect that performance of this function will most likely be performed by compliance clerks. Data from the SIFMA Office Salaries Report suggest that costs for these positions are $70 per hour. 702,841 hours × $70 = $49,198,870.

[1441] *See supra* footnotes 858–863 and accompanying text.

[1442] 998 broker-dealers × 254 hours = 253,492 hours for broker-dealers not preparing a relationship summary.

[1443] 702,841 + 253,492 + 450 = 956,783 total aggregate hours.

[1444] Consistent with our prior paperwork reduction analyses for rule 17a–4, we expect that performance of this function will most likely be performed by compliance clerks. Data from the SIFMA Office Salaries Report suggest that costs for these positions are $70 per hour. 956,783 hours × $70 = $66,974,810.

[1445] *See supra* footnote 1443.

[1446] *See supra* footnote 1444.

[1447] 1,042,416 hours − 956,783 hours = 85,633 hours.

[1448] $67,786,290 − $66,974,810 = $811,480.

[1449] 3,764 registered broker-dealers as of December 31, 2018 × $5,000 per broker-dealer in record maintenance costs = $18,820,000. $20,520,000 − $18,820,000 = $1,700,000.

[1450] 5 U.S.C. 604(a).

[1451] The Commission is also amending 17 CFR 200.800 to display the control number assigned to information collection requirements for "Form CRS and rule 17a–14 under the Exchange Act" by OMB pursuant to the PRA. Because the Commission is not publishing the amendments to 17 CFR 200.800 in a notice of proposed rulemaking, no analysis is required under the Regulatory Flexibility Act. (*See* 5 U.S.C. 601(2) (for purposes of the Regulatory Flexibility Act, the term "rule" means any rule for which the agency publishes a general notice of proposed rulemaking).)

[1452] *See* Proposing Release, *supra* footnote 5.

**33622**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

investment advisory or brokerage relationship, (ii) engage a particular firm or financial professional, or (iii) terminate or switch a relationship or specific service. Moreover, it is important to ensure that retail investors receive the information they need to clearly understand the relationships and services a firm offers, as well as the fees, costs, conflicts, standard of conduct, and disciplinary history of firms and financial professionals they are considering, and where to find additional information, to ameliorate this potential harm.

As discussed above in Section I above, the Commission considered ways to address retail investor confusion and engaged in broad outreach to investors and other market participants to solicit feedback on the proposal, including comment letters, a ''feedback form,'' investor roundtables, and RAND investor testing.

After carefully considering the comments we received, we are adopting disclosure requirements that are designed to ameliorate the potential harm of retail investor confusion and to assist retail investors with the process of deciding whether to (i) establish an investment advisory or brokerage relationship, (ii) engage a particular firm or financial professional, or (iii) terminate or switch a relationship or specific service.

As discussed in Section II above, we are adopting new rules and rule amendments to require broker-dealers and investment advisers to deliver a relationship summary to retail investors. The relationship summary will be short with narrative information presented in a prescribed order with the following sections: (i) Introduction; (ii) relationships and services; (iii) fees, costs, conflicts, and standard of conduct; (iv) disciplinary history; and (v) where to find additional information. As discussed in Section II.C.3.c above, the relationship summary will be in addition to, and not in lieu of, current disclosure and reporting requirements for broker-dealers and investment advisers.

To promote effective communication, firms will be required to write their relationship summary in plain English and they are encouraged to use charts, graphs, tables, and other graphics or text features to respond to the required disclosures. We are limiting the length of the relationship summary to keep the disclosures focused.[1453] The purpose of

the relationship summary is to summarize information about a particular broker-dealer or investment adviser in a format that allows for comparability among firms, encourages retail investors to ask questions, and highlights additional sources of information.

As discussed in Section II above, we are adopting filing, delivery, and updating requirements for the relationship summary. We also are adopting amendments to the recordkeeping requirements under the Advisers Act rule 204–2 and Exchange Act rules 17a–3 and 17a–4 to address the new relationship summary.[1454]

All of these requirements are discussed in detail in Section II above. The costs and burdens of these requirements on small advisers and small broker-dealers are discussed below as well as in our Economic Analysis and Paperwork Reduction Act Analysis, which discuss the costs and burdens on all investment advisers and broker-dealers.[1455]

### B. Significant Issues Raised by Public Comments

The Commission is sensitive to the burdens that the new rules and rule amendments may have on small entities. In the Proposing Release, we requested comment on matters discussed in the IRFA. In particular, we sought comments on the number of small entities subject to the new relationship summary, and the new rules and rule amendments as well as the potential impacts on small entities. We sought comments on whether the proposal could have an effect on small entities that had not been considered. We also requested that commenters describe the nature of any impact on small entities and provide empirical data to support the extent of such impact.

The Commission did not receive comments specifically addressing the IRFA. However, as discussed in the Economic Analysis and Paperwork Reduction Act Analysis above, we received comments regarding the potential costs and burdens of the proposal on investment advisers and broker-dealers, including those that are small entities.[1456]

With regard to comment letters addressing small firms in particular, the Commission received comment letters concerning the impact of ongoing delivery requirements on small firms.[1457] As discussed in Sections II.C.3.c and II.C.4, firms must comply with ongoing delivery requirements to (i) particular retail investors under certain circumstances [1458] and (ii) all retail investors who are existing clients or customers when a relationship summary is updated. The commenters appeared to be discussing both types of ongoing delivery requirements. Specifically, a commenter stated that to comply with ongoing delivery requirements, firms would need to implement a process that would include additional costs for delivery, especially for small firms who are more likely to conduct such delivery in hard copy.[1459] Another commenter stated that the existing Form ADV brochure delivery requirements and the ongoing delivery requirements of the relationship summary would impose unjustifiable administrative burdens on advisers, the majority of whom the commenter considers to be small businesses.[1460] The commenter defined the term ''small business'' as an investment adviser who has ten or fewer non-clerical employees.[1461] As discussed in Section VI.C.1 below, the definition of small entities for purposes of the Advisers Act and the Regulatory Flexibility Act concerns assets under management and total assets, not the number of employees.[1462] Therefore, we are unable to assess whether the businesses the commenter is discussing fall under the definition of small entity for purposes of the Advisers Act and the Regulatory Flexibility Act.[1463] As discussed in Section VI.C.1 below, the new requirements will not affect most investment advisers that are small entities because they are generally registered with one or more state securities authorities and not with the Commission.

We agree that the ongoing delivery requirements will impose added costs, as discussed above in the Economic Analysis and Paperwork Reduction Act

---

[1453] Specifically, the relationship summary for standalone broker-dealers and standalone investment advisers must not exceed two pages in paper format (or equivalent in electronic format).

Dual registrants will have the flexibility to decide whether to prepare separate or combined relationship summaries. For dual registrants that prepare combined relationship summaries, they must not exceed four pages in paper format (or equivalent in electronic format).

[1454] 17 CFR 275.204–2; 17 CFR 240.17a–3; 17 CFR 240.17a–4.

[1455] *See supra* Sections IV and V.

[1456] *See supra* Sections IV.D.2 and V.

[1457] *See* NSCP Letter; Pickard Djinis and Pisarri Letter.

[1458] As discussed in Section II.C.3.c, firms must deliver the most recent relationship summary to a retail investor who is an existing client or customer upon certain triggers. Also, firms must deliver the relationship summary to a retail investor within 30 days upon the retail investor's request.

[1459] *See* NSCP Letter.

[1460] *See* Pickard Djinis and Pisarri Letter.

[1461] *Id.*

[1462] *See* 17 CFR 275.0–7.

[1463] *Id.*

Analysis,[1464] but the costs may not necessarily be higher for small firms. To the extent that small firms are more likely to have fewer retail investors than larger firms, the ongoing delivery requirements should impose lower variable costs on small firms than on larger firms. Therefore, the ongoing delivery requirements should impose lower variable costs on small firms, who have fewer retail investors, than on larger firms who have more retail investors. Also, firms have the flexibility to communicate any changes in the relationship summary by either delivering the relationship summary or by communicating the information through another disclosure that is delivered to the retail investor, which should mitigate the costs to all firms, including small firms.[1465] The additional hours per investment adviser and broker-dealer, the monetized cost per investment adviser and broker-dealer, and the incremental external legal and compliance cost for investment advisers and broker-dealers, attributable to ongoing delivery requirements are estimated above in the Paperwork Reduction Analysis.[1466] To the extent that the ongoing delivery requirements impose added costs to small investment advisers, we disagree that existing Form ADV brochure delivery requirements and the ongoing delivery requirements of the relationship summary would impose administrative burdens on small investment advisers that are unjustifiable. As discussed in Section II.C.3.c above, the relationship summary and the existing Form ADV brochure serve different purposes. The relationship summary is designed to provide a high-level overview to retail investors while the Form ADV brochure is designed to present more detailed disclosures.

The Commission is not adopting different ongoing delivery requirements for small entities. For the reasons discussed in Section VI.E below, establishing different compliance or reporting requirements for small investment advisers and small broker-dealers will be inappropriate under these circumstances. Moreover, retail investors considering and receiving services should receive current information from all firms, not just larger firms, to help them make a decision about continuing to receive services and to let them know when there have been changes to this information. They should also understand their available options during certain decision points when firms are required to deliver another relationship summary.[1467] Additionally, it is important and beneficial for retail investors to receive a relationship summary within 30 days upon request to ensure that retail investors receive the relationship summary as needed. As a result, we believe that the benefits to retail investors justify the potential cost of ongoing delivery.

*C. Small Entities Subject to the Rule and Rule Amendments*

The amendments will affect many, but not all, broker-dealers and investment advisers registered with the Commission, including some small entities.

1. Investment Advisers

Under Commission rules, for the purposes of the Advisers Act and the Regulatory Flexibility Act, an investment adviser generally is a small entity if it: (i) Has assets under management having a total value of less than $25 million; (ii) did not have total assets of $5 million or more on the last day of the most recent fiscal year; and (iii) does not control, is not controlled by, and is not under common control with another investment adviser that has assets under management of $25 million or more, or any person (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year.[1468] As discussed in Section V.A.1 above, the Commission estimates that based on IARD data as of December 31, 2018, approximately 8,235 investment advisers will be subject to new rule 204–5 under the Advisers Act, Form CRS (required by new Part 3 of Form ADV) (the relationship summary), the amendments to rules 203–1, 204–1, and rule 204–2 under the Advisers Act.[1469] Our new rules and amendments will not affect most investment advisers that are small entities (''small advisers'') because they are generally registered with one or more state securities authorities and not with the Commission. Under section 203A of the Advisers Act, most small advisers are prohibited from registering with the Commission and are regulated by state regulators.[1470] Based on IARD data, we estimate that as of December 31, 2018, approximately 561 SEC-registered advisers are small entities under the Regulatory Flexibility Act.[1471] Of these, 183 have individual high net worth and individual non-high net worth clients, and will therefore be subject to the new requirements under the Advisers Act.[1472]

2. Broker-Dealers

For purposes of Commission rulemaking in connection with the Regulatory Flexibility Act, a broker-dealer will be deemed a small entity if it: (i) Had total capital (net worth plus subordinated liabilities) of less than $500,000 on the date in the prior fiscal year as of which its audited financial statements were prepared pursuant to rule 17a–5(d) under the Exchange Act,[1473] or, if not required to file such statements, had total capital (net worth plus subordinated liabilities) of less than $500,000 on the last business day of the preceding fiscal year (or in the time that it has been in business, if shorter); and (ii) is not affiliated with any person (other than a natural person) that is not a small business or small organization.[1474]

As discussed in Section V.D.1 above, the Commission estimates that as of December 31, 2018, approximately 2,766 broker-dealers will be subject to the new Form CRS (relationship summary) requirements and new Exchange Act rule 17a–14, as well as

---

[1464] *See supra* Sections IV and V.

[1465] *See supra* Sections II.C.4 and IV.D.2.

[1466] *See supra* Sections V.C.2 and V.D.2.

[1467] As discussed in Section II.C.3.c, firms must deliver the most recent relationship summary to a retail investor who is an existing client or customer before or at the time the firm: (i) Opens a new account that is different from the retail investor's existing account(s); (ii) recommends that the retail investor roll over assets from a retirement account into a new or existing account or investment; or (iii) recommends or provides a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in an existing account.

[1468] *See* 17 CFR 275.0–7.

[1469] *See supra* footnote 1204 and accompanying text.

[1470] 15 U.S.C. 80b–3a.

[1471] Based on SEC-registered investment adviser responses to Items 5.F. and 12 of Form ADV.

[1472] Based on SEC-registered investment adviser responses to Items 5.D.(a)(1), 5.D.(a)(3), 5.D.(b)(1), 5.D.(b)(2), 5.F. and 12 of Form ADV. These responses indicate that the investment adviser has clients that are high net worth individuals and/or individuals (other than high net worth individuals), or that the investment adviser has regulatory assets under management attributable to clients that are high net worth individuals and/or individuals (other than high net worth individuals), and that the investment adviser is a small entity. Of these small advisers, two are dually registered as a broker-dealer and an investment adviser and may offer services to retail investors as both a broker-dealer and an investment adviser (*e.g.,* ''dual registrants'' for purposes of the relationship summary). *See supra* footnote 63. As discussed in Section II.C.2, dual registrants must file the relationship summary using both IARD and Web CRD®. In this FRFA, dual registrants are counted in both the total number of small advisers and small broker-dealers that would be subject to the new requirements. We believe that counting these firms twice is appropriate because of their additional burdens of complying with the rules with respect to both their advisory and brokerage businesses.

[1473] 17 CFR 240.17a–5(d).

[1474] *See* 17 CFR 240.0–10(c).

**33624**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

amendments to Exchange Act rules 17a–3 and 17a–4.[1475] Further, based on FOCUS Report data, the Commission estimates that as of December 31, 2018, approximately 985 broker-dealers may be deemed small entities under the Regulatory Flexibility Act. Of these, approximately 756 have retail business, and will be subject to the new requirements.[1476]

*D. Projected Reporting, Recordkeeping, and Other Compliance Requirements*

The new requirements impose certain reporting and compliance requirements on certain investment advisers and broker-dealers, including those that are small entities, requiring them to create and update relationship summaries, and comply with certain filing, delivery, and recordkeeping requirements. The new requirements are summarized in this FRFA (Section VI.A above). All of these requirements are also discussed in detail, in Section II above, and these requirements as well as the costs and burdens on investment advisers and broker-dealers, including those that are small entities, are discussed above in Sections IV and V (the Economic Analysis and Paperwork Reduction Act Analysis) and below.

1. Initial Preparation and Filing of the Relationship Summary

Requiring each firm that offers services to retail investors to prepare and file a relationship summary will impose additional costs on may firms, including some small advisers and small broker-dealers. Investment advisers must file their relationship summary as Form ADV Part 3 (Form CRS) electronically through IARD. Broker-dealers must file their relationship summary as Form CRS electronically through Web CRD®. All relationship summaries must be filed using text-searchable format with machine-readable headings.

*Investment Advisers.* Our Paperwork Reduction Analysis and Economic Analysis discuss the costs and burdens of preparing and filing the relationship summary for investment advisers, including small advisers.[1477] In addition, as discussed in our Paperwork Reduction Analysis, above, we anticipate that some advisers may incur a one-time initial cost for external legal and compliance consulting fees in connection with the initial preparation of the relationship summary.[1478]

Generally, all advisers, including small advisers that advise retail investors are currently required to prepare and distribute Part 2A of Form ADV (the firm brochure). Because advisers already provide disclosures about their services, fees, costs, conflicts, and disciplinary history in their firm brochures,[1479] they will be able to use some of this information to respond to the disclosure requirements of the relationship summary. They will, however, have to draft a completely new disclosure to comply with the new format of the relationship summary. As discussed above, approximately 183 small advisers currently registered with us will be subject to the new requirements.[1480] As discussed above in our Paperwork Reduction Act Analysis, the new initial preparation and filing requirements will impose an annual burden of approximately 6.67 annual hours per adviser, or 1,221 annual hours in aggregate for small advisers.[1481] We therefore expect the annual monetized costs to small advisers associated with these amendments to be $1,965 per adviser, or $359,595 in aggregate for small advisers.[1482] We expect the incremental external legal and compliance cost for small advisers to be estimated at $825 per adviser, or $150,975 in aggregate for small advisers.[1483]

*Broker-Dealers.* Our Paperwork Reduction Analysis and Economic Analysis discuss the costs and burdens of preparing and filing the relationship summary for broker-dealers, including small broker-dealers.[1484] In addition, as discussed in our Paperwork Reduction Analysis, above, we anticipate that some broker-dealers may incur a one-time initial cost for external legal and compliance consulting fees in connection with the initial preparation

of the relationship summary.[1485] As discussed in Sections IV.D.2 and V.D.2, broker-dealers are not currently required to deliver to their retail investors a comprehensive written document comparable to investment advisers' Form ADV Part 2A. Therefore, broker-dealers may incur comparatively greater compliance costs than investment advisers. As discussed above, approximately 756 small broker-dealers will be subject to the new requirements.[1486] As discussed above in our Paperwork Reduction Act Analysis, the new initial preparation and filing requirements will impose an annual burden of approximately 13.33 annual hours per broker-dealer, or 10,077 annual hours in aggregate for small broker-dealers.[1487] We therefore expect the annual monetized costs to small broker-dealers associated with these amendments to be $3,640 per broker-dealer, or $2,751,840 in aggregate for small broker-dealers.[1488] We expect the incremental external legal and compliance cost for small broker-dealers to be estimated at $1,032 per broker-dealer, or $780,192 in aggregate for small broker-dealers.[1489]

*Costs Generally.* The costs associated with preparing the new relationship summaries will be limited for investment advisers and broker-dealers, including small entities, for several reasons. First, the disclosure document is concise, no more than two pages for a standalone investment adviser and standalone broker-dealer and four pages for a dual registrant in length or equivalent limit if in electronic format. Second, although the relationship summary will require more narrative responses, the disclosure will still involve some degree of standardization across firms, requiring firms to use standardized headings in a prescribed order. Third, firms will be prohibited

---

[1475] *See supra* footnote 1352 and accompanying text.

[1476] *See supra* footnote 1352 (discussing how we identify retail sales activity from Form BR).

[1477] *See supra* Sections V.A and IV.D.2.

[1478] *See supra* Section V.A.

[1479] *See supra* footnote 904.

[1480] *See supra* Section VI.C.1.

[1481] *See supra* Section V.A.2. As discussed in the Paperwork Reduction Act Analysis, we expect each investment adviser to spend approximately 20 hours preparing and filing the relationship summary, which as amortized over three years is approximately 6.67 hours. 6.67 hours per adviser for preparing and filing the relationship summary × 183 small advisers = approximately 1,221 hours in aggregate for small advisers.

[1482] *See supra* Sections V.A.2. Monetized cost of $1,965 per adviser for the initial preparation and filing of the relationship summary × 183 small advisers = $359,595 monetized cost in aggregate for small advisers. As discussed in the Paperwork Reduction Act Analysis, we believe that performance of this function will most likely be equally allocated between a senior compliance examiner and a compliance manager.

[1483] *See supra* Section V.A.2.b. $825 in external legal and compliance costs per adviser × 183 small advisers = $150,975 in aggregate for small advisers.

[1484] *See supra* Sections V.D and IV.D.2.

[1485] *See supra* Section V.D.

[1486] *See supra* Section VI.C.2.

[1487] *See supra* Section V.D.2. As discussed in the Paperwork Reduction Act Analysis, we expect each broker-dealer to spend approximately 40 hours preparing and filing the relationship summary, which as amortized over three years is approximately 13.33 hours. 13.33 hours per broker-dealer for preparing and filing the relationship summary × 756 small broker-dealers = approximately 10,077 hours in aggregate for small broker-dealers.

[1488] *See supra* Section V.D.2. Monetized cost of $3,640 per broker-dealer for the initial preparation and filing of the relationship summary × 756 small broker-dealers = $2,751,840 monetized cost in aggregate for small broker-dealers. As discussed in the Paperwork Reduction Act Analysis, we believe that the performance of this function will most likely be equally allocated between a senior compliance examiner and a compliance manager.

[1489] *See supra* Section V.D.2.b. 756 small broker-dealers × $1,032 in external legal and compliance costs on average per broker-dealer = $780,192.

App 177

from including disclosures in the relationship summary other than the disclosure that is required or permitted by the Instructions and applicable items.

The compliance costs could, however, be different across firms with relatively smaller or larger numbers of retail investors as customers or clients. For example, as discussed in Section IV.D.2 above, to the extent that developing the relationship summary entails a fixed cost, firms with fewer retail investors as customers or clients may be at disadvantage relative to firms with more retail investors as customers or clients because the former would amortize these costs over a smaller retail investor base. Therefore, to the extent that small firms are more likely to have fewer retail investors than larger firms, small firms may be at a disadvantage relative to larger firms. On the other hand, smaller firms are likely to have fewer types of fees, costs, and conflicts to report compared to larger firms, potentially making it less burdensome for them to summarize the required information.

As discussed in Section IV.D.2 above, small advisers and small broker-dealers may disproportionately incur costs associated with electronic and graphical formatting, particularly if they do not have an existing web presence. However, because the final instructions encourage, but do not require electronic and graphical formatting, firms would only bear these costs if they expected these features to provide benefits that justify these costs. Similarly, small advisers and small broker dealers may disproportionally incur costs associated with the requirement to file their relationship summaries with machine-readable headings and text-searchable format. However, costs for firms, including small entities, could be minimal to the extent they implement structured headings in PDF formatted documents by creating a bookmark for each of the headings.[1490]

2. Delivery and Updating Requirements Related to the Relationship Summary

As discussed in Section II.C above, firms must follow certain delivery and updating requirements. Investment advisers must deliver a relationship summary to each retail investor before or at the time the firm enters into an investment advisory contract with the retail investor, even if the agreement is oral. Broker-dealers must deliver a relationship summary to each retail investor, before or at the earliest of: (i) A recommendation of an account type, a securities transaction, or an

investment strategy involving securities; (ii) placing an order for the retail investor; or (iii) the opening of a brokerage account for the retail investor. Dual registrants must deliver the relationship summary at the earlier of the delivery requirements for the investment adviser or broker-dealer.

As discussed in Section II.C above, firms must update, file amendments to, and re-deliver the relationship summary under certain circumstances. Specifically, firms must update the relationship summary and file it within 30 days whenever any information in the relationship summary becomes materially inaccurate. The filing must include an exhibit highlighting changes. Firms must communicate any changes in the updated relationship summary to retail investors who are existing clients or customers within 60 days after the updates are required to be made and without charge.[1491] Additionally, firms must deliver the relationship summary to a retail investor within 30 days upon the retail investor's request and re-deliver the relationship summary to existing clients and customers under certain circumstances.[1492]

As discussed in Sections II.C above, we are adopting requirements concerning electronic posting and manner of delivery. Firms must post the current version of the relationship summary prominently on their public website, if they have one. Firms must include a telephone number where retail investors can request up-to-date information and request a copy of the relationship summary. Firms must make a copy of the relationship summary available upon request without charge. If the relationship summary is delivered electronically, it must be presented prominently in the electronic medium. If the relationship summary is delivered in paper format as part of a package of documents, firms must ensure that the relationship summary is the first among any documents that are delivered at that time. The additional hours per adviser and broker-dealer, the monetized cost per adviser and broker-dealer, and the

incremental external legal and compliance cost for small entity investment advisers and broker-dealers, attributable to these requirements are estimated above in the Paperwork Reduction Analysis.[1493]

3. Recordkeeping Requirements Related to the Relationship Summary

As discussed in Section II.E above, we are adopting amendments to the recordkeeping requirements under Advisers Act rule 204–2 and Exchange Act rules 17a–3 and 17a–4 to address the new relationship summary.[1494] The amendments to Advisers Act rule 204–2 will require investment advisers who are registered or required to be registered to make and keep true, accurate and current, a copy of each relationship summary and each amendment or revision to the relationship summary, as well as a record of the dates that each relationship summary, and each amendment or revision thereto, was given to any client or to any prospective client who subsequently becomes a client. Investment advisers must maintain and preserve their respective records in an easily accessible place for a period of not less than five years from the end of the fiscal year during which the last entry was made on such record, the first two years in an appropriate office of the investment adviser.[1495] The amendments to Exchange Act rule 17a–3 will require broker-dealers to make and keep current a record of the date that each relationship summary was provided to each retail investor, including any relationship summary that was provided before such retail investor opens an account. The amendments to Exchange Act rule 17a–4 will require broker-dealers to maintain and preserve in an easily accessible place all record dates described above as well as a copy of each relationship summary until at least six years after such record or relationship summary is created.

These amendments are designed to update recordkeeping rules in light of the new relationship summary, and, for investment advisers, they mirror the current recordkeeping requirements for the Form ADV brochure and brochure supplement.[1496] As discussed in Section II.E above, the recordkeeping requirements will facilitate the Commission's ability to inspect for and enforce compliance with the

---

[1490] *See supra* Section II.C.2.

[1491] Firms can make the communication by delivering the amended relationship summary or by communicating the information through another disclosure that is delivered to the retail investor.

[1492] Specifically, firms must deliver the most recent relationship summary to a retail investor who is an existing client or customer before or at the time the firm: (i) Opens a new account that is different from the retail investor's existing account(s); (ii) recommends that the retail investor roll over assets from a retirement account into a new or existing account or investment; or (iii) recommends or provides a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in an existing account.

[1493] *See supra* Section V.

[1494] 17 CFR 275.204–2; 17 CFR 240.17a–3; 17 CFR 240.17a–4.

[1495] *See* 17 CFR 275.204–2(e)(1).

[1496] *See* 17 CFR 275.204–2(a)(14)(i) and 17 CFR 275.204–2(e)(1).

relationship summary requirements and also may facilitate firms' ability to monitor for compliance with delivery requirements.

As discussed in the Paperwork Reduction Act Analysis in Section V.B above, the amendments to Advisers Act rule 204–2 will impose an annual burden of approximately 0.2 annual hours per adviser, or 37 annual hours in aggregate for small advisers.[1497] We therefore expect the annual monetized costs to small advisers associated with these amendments to be $12 per adviser,[1498] or $2,196 in aggregate for small advisers.[1499] We do not expect investment advisers to incur any external costs with respect to the amendments to Advisers Act rule 204–2.[1500]

As discussed in the Paperwork Reduction Act Analysis in Sections V.E and V.F, the amendments to Exchange Act rules 17a–3 and 17a–4 will impose an annual burden of approximately 0.6 annual hours per broker-dealer, or 454 annual hours in the aggregate for small broker-dealers.[1501] We therefore expect the annual monetized cost to small broker-dealers associated with these amendments to be $39 per broker-dealer,[1502] or $29,484 in aggregate for small broker-dealers.[1503] We do not

expect broker-dealers to incur any external costs with respect to the amendments to Exchange Act rules 17a–3 and 17a–4.[1504]

*E. Agency Action To Minimize Effect on Small Entities*

The Regulatory Flexibility Act directs the Commission to consider significant alternatives that would accomplish the stated objective, while minimizing any significant adverse impact on small entities. We considered the following alternatives for small entities in relation to the new requirements: (i) The establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (ii) the clarification, consolidation, or simplification of compliance and reporting requirements for small entities; (iii) the use of performance rather than design standards; and (iv) an exemption from coverage of the new requirements, or any part thereof, for such small entities.[1505]

Regarding the first alternative, the Commission believes that establishing different compliance or reporting requirements for small advisers and small broker-dealers will be inappropriate under these circumstances. We considered adopting tiered compliance dates so that smaller investment advisers and smaller broker-dealers would have had more time to comply. This would have been an alternative to the proposal, which did not include such tiered compliance. However, as adopted, instead of providing more time to smaller investment advisers and smaller broker-dealers only, we are extending the compliance dates for all firms. As discussed in Section II.D above, we believe the final compliance dates provide adequate notice and opportunity for all firms to comply with the new requirements.

Because the protections of the Advisers Act and Exchange Act are intended to apply equally to retail investor clients and customers of both large and small firms, it will be inconsistent with the purposes of the

Advisers Act and the Exchange Act to specify differences for small entities under the new requirements. As discussed above, we believe that the new requirements will result in multiple benefits to all retail investors, including alerting retail investors to certain information to consider when deciding whether to (i) establish an investment advisory or brokerage relationship, (ii) engage a particular firm or financial professional, or (iii) terminate or switch a relationship or specific service.[1506] In addition, the content of the relationship summary will facilitate comparisons across firms.[1507] We believe that these benefits should apply to retail investors that engage smaller firms as well as retail investors that engage larger firms. To establish different disclosure requirements for small entities will diminish this investor protection for clients and customers of small entities.

As discussed above in Section II.C above, we are requiring that investment advisers and broker-dealers file their relationship summaries with the Commission.[1508] As discussed in Section II.C.2, there are several reasons we are requiring the relationship summaries to be filed with the Commission. First, the public will benefit by being able to use a central location to find any firm's relationship summary,[1509] which may facilitate simpler comparisons across firms. Second, some firms may not maintain a website, and therefore their relationship summaries will not otherwise be accessible to the public. Third, by having firms file the relationship summaries with the Commission, Commission staff can more easily monitor the filings for compliance. These benefits of filing are important for retail investors who are clients and customers of both large and small firms. Furthermore, almost all advisers, including small advisers, have internet access and use the internet for various purposes so using the internet to file electronically should not increase costs for those advisers.[1510] All relationship

---

[1497] 0.2 hours × 183 small advisers = 37 hours, when rounded up to the nearest hour.

[1498] As discussed in, the Paperwork Reduction Analysis, we believe the performance of this function will most likely be allocated between compliance clerks and general clerks, with compliance clerks performing 17% of the function and general clerks performing 83% of the function. *See supra* Section V.B.

[1499] $12 per adviser × 183 small advisers = approximately $2,196 in aggregate for small advisers.

[1500] *See supra* Section V.B.

[1501] As discussed in Section V.E, amendments to Exchange Act rule 17a–3 will impose a burden of approximately 0.5 annual hours per broker-dealer. As discussed in Section V.F, amendments to Exchange Act rule 17a–4 will impose a burden of approximately 0.1 annual hours per broker-dealer. Therefore, together, amendments to Exchange Act rules 17a–3 and 17a–4 will impose a burden of approximately 0.6 hours annually. 0.6 hours × 756 small broker-dealers = approximately 454 annual hours in aggregate for small broker-dealers.

[1502] $32 per broker dealer for amendments to Exchange Act rule 17a–3 + $7 per broker-dealer for amendments to Exchange Act rule 17a–4 = $39 per broker-dealer. As discussed in the Paperwork Reduction Act Analysis, we believe that the performance of the functions associated with the amendments to Exchange Act rule 17a–3 will most likely be allocated between compliance clerks and general clerks. Also as discussed in the Paperwork Reduction Act Analysis, we believe that the performance of the functions associated with the amendments to Exchange Act rule 17a–4 will be performed by compliance clerks. *See supra* Sections V.E and V.F.

[1503] $32 per broker dealer for amendments to Exchange Act rule 17a–3 + $7 per broker-dealer for amendments to Exchange Act rule 17a–4 = $39 per broker-dealer. $39 × 756 small broker-dealers = $29,484. *See supra* Sections V.E and V.F.

[1504] *See supra* Sections V.E and V.F.

[1505] As discussed in the Economic Analysis in Section IV.D.4, the Commission considered the following alternatives as they affect all firms, including small entities: (i) Requiring a new, separate disclosure versus amending existing disclosure requirements; (ii) alternatives concerning the form and format of the relationship summary; (iii) alternatives concerning the disclosures concerning the summary of fees, costs, conflicts, and standard of conduct; (iv) alternatives concerning filing and delivery; and (v) alternatives to compliance deadlines, including transition provisions.

[1506] *See supra* Sections IV and VI.A.

[1507] *See supra* Sections I and IV.

[1508] Investment advisers must file their relationship summaries with the Commission electronically through IARD in the same manner as they currently file Form ADV Parts 1 and 2. Broker-dealers must file their relationship summaries with the Commission electronically through Web CRD®. Dual registrants must file the relationship summary using both IARD and Web CRD®.

[1509] The filed relationship summaries will be accessible through the Commission's investor education website *Investor.gov. See supra* footnote 661 and accompanying text.

[1510] Electronic Filing by Investment Advisers; Proposed Amendments to Form ADV, Investment

summaries must be filed using a text-searchable format with machine-readable headings. There are several reasons we are requiring firms to file their relationship summaries with machine-readable headings and text-searchable format, including that this formatting will facilitate the aggregation and comparison of responses to specific items across different relationship summaries and is consistent with the Commission's ongoing efforts to modernize our forms by taking advantage of technological advances, both in the manner in which information is reported to the Commission and how it is provided to investors and other users, as discussed above.[1511] These benefits are important for filings by all firms and would be significantly reduced by allowing different requirements for small entities. Costs for firms, including small entities, could be minimal to the extent they implement structured headings in PDF formatted documents by creating a bookmark for each of the headings.[1512]

The requirement for investment advisers and broker-dealers to post their relationship summary on their public websites, if they have a public website, in a location and format that is easily accessible for retail investors, already incorporates the flexibility to permit different compliance and reporting requirements for small entities, if applicable. To the extent that broker-dealers and investment advisers that are small entities are less likely to have public websites and do not have them, they will not be required to post the relationship summary on their websites.[1513] In other ways, as well, the requirements incorporate flexibility for small broker-dealers and small advisers to comply with the requirements. For instance, we are requiring firms to communicate the information in an updated relationship summary to retail investors who are existing clients or customers within 60 days after the updates are required to be made and without charge.[1514] Firms can communicate this information by

delivering the amended relationship summary or by communicating the information through another disclosure that is delivered to the retail investor. This requirement provides firms the ability to disclose changes without requiring them to duplicate disclosures and incur additional costs.

We believe it will be inappropriate to establish different recordkeeping requirements for small entities, because the recordkeeping requirements will facilitate the Commission's ability to inspect for and enforce compliance with firms' obligations with respect to the relationship summary, which is important for retail investor clients and customers of both large and small firms. Also, the Commission is not adopting different ongoing delivery requirements for small entities for the reasons discussed in Section VI.B above.

Regarding the second alternative, we clarified and simplified certain requirements for all entities, as an alternative to the proposal.[1515] However, we believe the final requirements are clear and that further clarification, consolidation, or simplification of the compliance and reporting requirements separately for small entities is not necessary. For the same reasons discussed above in this section concerning the first alternative, we believe that further clarifying, consolidating, or simplifying the requirements only for small entities will be inappropriate under these circumstances.

Regarding the third alternative, we considered using performance rather than design standards. Performance standards would allow for increased flexibility in the methods firms can use to achieve the objectives of the requirements. Design standards would specify the behavior or manner of compliance that regulated entities must adopt. We revised the combination of performance and design standards of the requirements, as an alternative to the

proposal.[1516] The Commission believes that the final relationship summary and the related new rules and amendments appropriately use a combination of performance and design standards for all firms, including those that are small entities.

The Commission is adopting certain performance standards as an alternative to design standards so firms will have some flexibility in how they complete the relationship summary. Instead of requiring extensive prescribed language, as proposed, prescribed wording will be limited and, instead, firms will complete most of the relationship summary using their own words.[1517] Although this increases costs to firms, including small firms, as discussed above,[1518] firms will now have the flexibility to create disclosures that are more accurately tailored to their business, and therefore more understandable and relevant to retail investors.[1519] In addition, we are encouraging, but not requiring, firms to use charts, graphs, tables, and other graphics or text features to respond to the required disclosures.[1520] In an alternative to the proposal, which required dual registrants to file a single relationship summary, dual registrants will have the flexibility to decide whether to prepare separate or combined relationship summaries.[1521] In another alternative to the proposal, which required firms to provide a toll-free telephone number under certain circumstances, we are not requiring the telephone number to be toll-free.[1522] As discussed in Section II.B.5 above, firms must include a telephone number where retail investors can request up-to-date information and request a copy of the relationship summary. Although we are adopting a requirement to provide a telephone number, we are not requiring the telephone number to be toll-free. If firms, including small firms, do not already have a toll-free telephone number, they will not be required to obtain one to comply with the requirements of the relationship summary. Firms will have the flexibility to decide whether the telephone number

Advisers Act Release No. 1862 (Apr. 5, 2000) [65 FR 20524 (Apr. 17, 2000)], at n.304 and accompanying text. However, an adviser that is a small business may be eligible for a continuing hardship exemption for Form ADV filings, which includes the relationship summary, if it can demonstrate that filing electronically would impose an undue hardship. *See* General Instruction 17 to Form ADV.

[1511] *See supra* Section II.C.2.

[1512] *See supra* Section II.C.2.

[1513] Firms must provide a telephone number in their relationship summary that retail investors can call to obtain up-to-date information and request a copy of the relationship summary. *See supra* Section II.B.5.

[1514] *See supra* Section II.C.4.

[1515] *See supra* Sections I and II. For example, we have clarified re-delivery requirements by replacing the proposed standard of ''materially change the nature and scope of the relationship'' with two more specific and easily identifiable triggers that we believe would not implicate the same operational or supervisory burdens described by commenters to meet the proposed requirement. As another example, in a change from the proposal, we eliminated the proposed requirement that standalone broker-dealers and standalone investment advisers include a separate section using prescribed wording that generally describes how the services of investment advisers and broker-dealers, respectively, differ from the firm's services. Instead, we adopted a simpler approach so firms will be required to simply state that free and simple tools are available to research firms and financial professionals at *Investor.gov/CRS*, which also provides educational materials about broker-dealers, investment advisers, and investing.

[1516] *See supra* Sections I and II. For example, in the final requirements we require less prescribed wording, and provide more flexibility in certain formatting and filing requirements. *See supra* Sections II.A.1 (discussing limited prescribed wording) and II.A.5 (discussing more flexible formatting and filing requirements for dual registrants).

[1517] *See supra* Section II.A.1.

[1518] *See supra* Sections V.A and V.D.

[1519] *See supra* Section II.A.1.

[1520] *See supra* Section II.A.3.

[1521] *See supra* Section II.A.5.

[1522] *See supra* Section II.B.5.

they provide in their relationship summary will be toll-free.

In conjunction with the performance standards, the Commission is adopting certain design standards. For example, with respect to delivery requirements, as discussed in Section II.C.3.c above, in an alternative to the proposal, we replaced a performance standard with a design standard to clarify requirements and reduce operational and supervisory burdens. Specifically, we proposed a performance standard that would have required a firm to deliver a relationship summary to an existing client or customer when changes are made to the existing account that would "materially change the nature and scope of the relationship." This requirement would have required analysis about facts and circumstances and commenters expressed concern that it would impose operational and supervisory burdens. In response, we replaced the standard of "materially change the nature and scope of the relationship" with two, more specific and easily identifiable, triggers that we believe would not implicate the same operational or supervisory burdens described by commenters to meet the proposed requirement. Therefore, the final requirements set forth specific triggers that require re-delivery of the relationship summary in situations that the proposed "material changes" language sought to address, but are presented as a design standard rather than a performance standard and, as a result, are designed to ease burdens for all firms, including small entities.

The relationship summary includes design standards to more easily allow for comparability among firms. These requirements specify the headings and sequence of the topics; prohibit disclosure other than the disclosure that is required or permitted; limit the length of the relationship summary; and require limited prescribed language in certain sections. The Commission considered alternative performance standards such as unlimited page numbers and not prohibiting disclosure other than the disclosure that is required or permitted. However, as discussed in Section II.A.1 above, we believe that retail investors will benefit from receiving a relationship summary that contains high-level information, with the ability to access more detailed information. We also believe that the relationship summary should present information that is responsive and relevant to the topics covered by the final instructions. We believe that allowing only the mandatory or permissible information will promote consistency of information presented to investors, and allow investors to focus

on relevant information that is helpful in deciding among firms. We believe that the design standards that we are adopting will provide comparative information in a user-friendly format that helps retail investors with informed decision making.

We believe that this approach of using both performance and design standards balances the need to provide firms flexibility in making the presentation of information consistent with their particular business model while ensuring that all retail investors receive certain information in a manner that promotes comparability.

Regarding the fourth alternative, we believe that, similar to the first alternative, it would be inconsistent with the purposes of the Advisers Act and the Exchange Act to exempt small advisers and broker-dealers from the new requirements, or any part thereof. Because the protections of the Advisers Act and Exchange Act are intended to apply equally to retail investors that are clients and customers of both large and small firms, it would be inconsistent with the purposes of the Advisers Act and Exchange Act to specify differences for small entities under the final requirements. As discussed above, we believe that the new requirements will result in multiple benefits to all retail investors, including alerting retail investors to certain information to consider when deciding whether to (i) establish an investment advisory or brokerage relationship, (ii) engage a particular firm or financial professional, or (iii) terminate or switch a relationship or specific service.[1523] In addition, the content of the relationship summary will facilitate comparisons across firms.[1524] We believe that providing this information at the prescribed timeframes is appropriate and in the public interest and will improve investor protection by helping retail investors to make a more informed choice among the types of firms and services available to them. Because we view investor confusion about brokerage and advisory services as an issue for many retail investors who are clients and customers of advisers and broker-dealers, it will be inconsistent with the purpose of the relationship summary to specify different requirements for small entities.[1525]

## VII. Statutory Authority

The Commission is adopting amendments to rule 203–1 under the

Advisers Act pursuant to authority set forth in sections 203(c)(1), 204, and 211(a) of the Investment Advisers Act of 1940 [15 U.S.C. 80b–3(c)(1), 80b–4, and 80b–11(a)].

The Commission is adopting amendments to rule 204–1 under the Advisers Act pursuant to authority set forth in sections 203(c)(1) and 204 of the Investment Advisers Act of 1940 [15 U.S.C. 80b–3(c)(1) and 80b–4].

The Commission is adopting new rule 204–5 under the Advisers Act pursuant to authority set forth in sections 204, 206A, 206(4), 211(a), and 211(h) of the Investment Advisers Act of 1940 [15 U.S.C. 80b–4, 80b–6a, 80b–6(4), 80b–11(a), and 80b–11(h)], and section 913(f) of Title IX of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act").

The Commission is adopting amendments to rule 279.1, Form ADV, under section 19(a) of the Securities Act of 1933 [15 U.S.C. 77s(a)], sections 23(a) and 28(e)(2) of the Securities Exchange Act of 1934 [15 U.S.C. 78w(a) and 78bb(e)(2)], section 319(a) of the Trust Indenture Act of 1939 [15 U.S.C. 7sss(a)], section 38(a) of the Investment Company Act of 1940 [15 U.S.C. 80a–37(a)], and sections 203(c)(1), 204, 206A, 211(a) and 211(h), and of the Investment Advisers Act of 1940 [15 U.S.C. 80b–3(c)(1), 80b–4, 80b–6a, 80b–11(a) and 80b-11(h)], and section 913(f) of Title IX of the Dodd-Frank Act.

The Commission is adopting amendments to rule 204–2 under the Advisers Act pursuant to authority set forth in sections 204 and 211 of the Advisers Act [15 U.S.C. 80b–4 and 80b–11].

The Commission is adopting new rule 17a–14 under the Exchange Act, Form CRS, and amendments to rules 17a–3 and 17a–4 under the Exchange Act pursuant to the authority set forth in the Exchange Act sections 3, 10, 15, 15(c)(6), 15(l), 17, 23 and 36 thereof 15 U.S.C. 78c, 78j, 78o, 78o(c)(6), 78o(l), 78q, 78w and 78mm, and section 913(f) of Title IX of the Dodd-Frank Act.

The Commission is adopting amendments to rule 800 under the Organization; Conduct and Ethics; and Information and Requests pursuant to the authority set forth in PRA sections 3506 and 3507 [44 U.S.C. 3506, 3507].

**Text of the Rule and Form**

**List of Subjects in**

*CFR Part 200*

Administrative practice and procedure, Organization and functions (Government agencies).

---

[1523] *See supra* Sections IV and VI.A.

[1524] *See supra* Sections I and IV.

[1525] *See supra* Sections I and IV (discussing investor confusion).

*17 CFR Parts 240 and 249*

Brokers, Reporting and recordkeeping requirements, Sales practice and disclosure requirements, Securities.

*17 CFR Parts 275 and 279*

Investment advisers, Reporting and recordkeeping requirements, Securities.

For the reasons set out in the preamble, title 17, chapter II of the Code of Federal Regulations is amended as follows:

## PART 200—ORGANIZATION; CONDUCT AND ETHICS; AND INFORMATION AND REQUESTS

### Subpart N—Commission Information Collection Requirements Under the Paperwork Reduction Act: OMB Control Numbers

■ 1. The authority citation for part 200 subpart N continues to read as follows:

**Authority:** 44 U.S.C. 3506; 44 U.S.C. 3507.

■ 2. In § 200.800, the table in paragraph (b) is amended by adding an entry in numerical order by part and section number for ''Form CRS'' to read as follows:

### § 200.800  OMB control numbers assigned pursuant to the Paperwork Reduction Act.

\*    \*    \*    \*    \*

(b) \* \* \*

| Information collection requirement | | | | | 17 CFR part or section where identified and described | Current OMB control No. |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |
| Form CRS ..................................................................................................................... | | | | | 249.640 | 3235–0766 |
| \* | \* | \* | \* | \* | \* | \* |

## PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

■ 3. The general authority citation for part 240 continues to read as follows and sectional authority for 240.17a-14 is added to read as follows:

**Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c–3, 78c–5, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78*l,* 78m, 78n, 78n–1, 78*o,* 78*o*–4, 78*o*–10, 78p, 78q, 78q–1, 78s, 78u–5, 78w, 78x, 78*ll,* 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, 7201 *et seq.;* and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350; and Pub. L. 111–203, 939A, 124 Stat. 1887 (2010); and secs. 503 and 602, Pub. L. 112–106, 126 Stat. 326 (2012), unless otherwise noted.

\*    \*    \*    \*    \*

Section 240.17a–14 is also issued under Public Law 111–203, sec. 913, 124 Stat. 1376 (2010).

\*    \*    \*    \*    \*

■ 4. Section 240.17a–3 is amended by adding paragraph (a)(24) to read as follows:

### § 240.17a–3  Records to be made by certain exchange members, brokers and dealers.

(a) \* \* \*

(24) A record of the date that each Form CRS was provided to each retail investor, including any Form CRS provided before such retail investor opens an account.

\*    \*    \*    \*    \*

■ 5. Section 240.17a–4 is amended by adding paragraph (e)(10) to read as follows:

### § 240.17a–4  Records to be preserved by certain exchange members, brokers and dealers.

\*    \*    \*    \*    \*

(e) \* \* \*

(10) All records required pursuant to § 240.17a–3(a)(24), as well as a copy of each Form CRS, until at least six years after such record or Form CRS is created.

\*    \*    \*    \*    \*

■ 6. Section 240.17a–14 is added to read as follows:

### § 240.17a–14  Form CRS, for preparation, filing and delivery of Form CRS.

(a) *Scope of section.* This section shall apply to every broker or dealer registered with the Commission pursuant to section 15 of the Act that offers services to a retail investor.

(b) *Form CRS.* You must:

(1) Prepare Form CRS 17 CFR 249.640, by following the instructions in the form.

(2) File your current Form CRS electronically with the Commission through the Central Registration Depository (''Web CRD®'') operated by the Financial Industry Regulatory Authority, Inc., and thereafter, file an amended Form CRS in accordance with the instructions in Form CRS.

(3) Amend your Form CRS as required by the instructions in the form.

(c) *Delivery of Form CRS.* You must:

(1) Deliver to each retail investor your current Form CRS before or at the earliest of:

(i) A recommendation of an account type, a securities transaction; or an investment strategy involving securities;

(ii) Placing an order for the retail investor; or

(iii) The opening of a brokerage account for the retail investor.

(2) Deliver to each retail investor who is an existing customer your current Form CRS before or at the time you:

(i) Open a new account that is different from the retail investor's existing account(s);

(ii) Recommend that the retail investor roll over assets from a retirement account into a new or existing account or investment; or

(iii) Recommend or provide a new brokerage service or investment that does not necessarily involve the opening of a new account and would not be held in an existing account.

(3) Post the current Form CRS prominently on your public website, if you have one, in a location and format that is easily accessible for retail investors.

(4) Communicate any changes made to Form CRS to each retail investor who is an existing customer within 60 days after the amendments are required to be made and without charge. The communication can be made by delivering the amended Form CRS or by communicating the information through another disclosure that is delivered to the retail investor.

(5) Deliver a current Form CRS to each retail investor within 30 days upon request.

(d) *Other disclosure obligations.* Delivering a Form CRS in compliance with this section does not relieve you of any other disclosure obligations arising under the federal securities laws and regulations or other laws or regulations (including the rules of a self-regulatory organization).

(e) *Definitions.* For purposes of this section:

(1) *Current Form CRS* means the most recent version of the Form CRS.

(2) *Retail investor* means a natural person, or the legal representative of such natural person, who seeks to receive or receives services primarily for personal, family or household purposes.

(f) *Transition rule.* (1) If you are registered with the Commission prior to June 30, 2020, pursuant to Section 15 of the Act, you must file your initial Form CRS with the Commission in accordance with section (b)(2) of this section, beginning on May 1, 2020, and by no later than June 30, 2020.

(2) On or after June 30, 2020, if you file an application for registration with the Commission or have an application for registration pending with the Commission as a broker or dealer pursuant to Section 15 of the Act, you must begin to comply with this section by the date on which your registration application becomes effective pursuant to Section 15 of the Act, including by filing your Form CRS in accordance with paragraph (b)(2) of this section.

(3) Within 30 days after the date by which you are first required by paragraph (f) of this section to electronically file your initial Form CRS with the Commission, you must deliver to each of your existing customers who is a retail investor your current Form CRS.

(4) As of the date by which you are first required to electronically file your Form CRS with the Commission pursuant to this section, you must begin using your Form CRS as required to comply with paragraph (c) of this rule.

## PART 249—FORMS, SECURITIES EXCHANGE ACT OF 1934

■ 7. The authority citation for part 249 is amended by revising the general authority and adding sectional authority for 249.640 to read as follows:

**Authority:** 15 U.S.C. 78a *et seq.* and 7201 *et seq.;* 12 U.S.C. 5461 *et seq.;* 18 U.S.C. 1350; Sec. 953(b), Pub. L. 111–203, 124 Stat. 1904; Sec. 102(a)(3), Pub. L. 112–106, 126 Stat. 309 (2012); Sec. 107, Pub. L. 112–106, 126 Stat. 313 (2012), and Sec. 72001, Pub. L. 114–94, 129 Stat. 1312 (2015), unless otherwise noted.

\*    \*    \*    \*    \*

Section 249.640 is also issued under Public Law 111–203, sec. 913, 124 Stat. 1376 (2010).

\*    \*    \*    \*    \*

■ 8. Section 249.641 is added to subpart G read as follows:

### § 249.641   Form CRS, Relationship Summary for Brokers and Dealers Providing Services to Retail Investors, pursuant to § 240.17a–14 of this chapter.

This form shall be prepared and filed by brokers and dealers registered with the Securities and Exchange Commission pursuant to Section 15 of the Act that offer services to a retail investor pursuant to § 240.17a–14 of this chapter.

## PART 275—RULES AND REGULATIONS, INVESTMENT ADVISERS ACT OF 1940

■ 9. The general authority citation for part 275 continues to read as follows and sectional authorities for 275.204–5 and 275.211h–1 are added to read as follows:

**Authority:** 15 U.S.C. 80b–2(a)(11)(G), 80b–2(a)(11)(H), 80b–2(a)(17), 80b–3, 80b–4, 80b–4a, 80b–6(4), 80b–6a, and 80b–11, unless otherwise noted.

\*    \*    \*    \*    \*

Section 275.204–5 is also issued under sec. 913, Public Law 111–203, sec. 124 Stat. 1827–28 (2010).

Section 275.211h–1 is also issued under sec. 913, Public Law 111–203, sec. 124 Stat. 1827–28 (2010).

\*    \*    \*    \*    \*

■ 10. Amend § 275.203–1 by revising paragraph (a) to read as follows:

### § 275.203–1   Application for investment adviser registration.

(a) *Form ADV.* (1) To apply for registration with the Commission as an investment adviser, you must complete Form ADV (17 CFR 279.1) by following the instructions in the form and you must file Part 1A of Form ADV, the firm brochure(s) required by Part 2A of Form ADV and Form CRS required by Part 3 of Form ADV electronically with the Investment Adviser Registration Depository (IARD) unless you have received a hardship exemption under § 275.203–3. You are not required to file with the Commission the brochure supplements required by Part 2B of Form ADV.

**Note 1 to paragraph (a)(1):** Information on how to file with the IARD is available on the Commission's website at *http://www.sec.gov/iard.* If you are not required to deliver a brochure or Form CRS to any clients, you are not required to prepare or file a brochure or Form CRS, as applicable, with the Commission. If you are not required to deliver a brochure supplement to any clients for any particular supervised person, you are not required to prepare a brochure supplement for that supervised person.

(2)(i) On or after June 30, 2020, the Commission will not accept any initial application for registration as an investment adviser that does not include a Form CRS that satisfies the requirements of Part 3 of Form ADV.

(ii) Beginning on May 1, 2020, any initial application for registration as an investment adviser filed prior to June 30, 2020, must include a Form CRS that satisfies the requirements of Part 3 of Form ADV by no later than June 30, 2020.

\*    \*    \*    \*    \*

■ 11. Amend § 275.204–1 by revising paragraphs (a) and (b) and adding paragraph (e) to read as follows:

### § 275.204–1   Amendments to Form ADV.

(a) *When amendment is required.* You must amend your Form ADV (17 CFR 279.1):

(1) Parts 1 and 2:

(i) At least annually, within 90 days of the end of your fiscal year; and

(ii) More frequently, if required by the instructions to Form ADV.

(2) Part 3 at the frequency required by the instructions to Form ADV.

(b) *Electronic filing of amendments.* (1) Subject to paragraph (c) of this section, you must file all amendments to Part 1A, Part 2A, and Part 3 of Form ADV electronically with the IARD, unless you have received a continuing hardship exemption under § 275.203–3. You are not required to file with the Commission amendments to brochure supplements required by Part 2B of Form ADV.

(2) If you have received a continuing hardship exemption under § 275.203–3, you must, when you are required to amend your Form ADV, file a completed Part 1A, Part 2A and Part 3 of Form ADV on paper with the SEC by mailing it to FINRA.

\*    \*    \*    \*    \*

(e) *Transition to Filing Form CRS.* If you are registered with the Commission or have an application for registration pending with the Commission prior to June 30, 2020, you must amend your Form ADV by electronically filing with IARD your initial Form CRS that satisfies the requirements of Part 3 of Form ADV (as amended effective September 30, 2019) beginning on May 1, 2020 and by no later than June 30, 2020.

**Note 1 to paragraphs (e):** This note applies to paragraphs (a), (b), and (e) of this section. Information on how to file with the IARD is available on our website at *http://www.sec.gov/iard.* For the annual updating amendment: Summaries of material changes that are not included in the adviser's brochure must be filed with the Commission as an exhibit to Part 2A in the same electronic file; and if you are not required to prepare a brochure, a summary of material changes, an annual updating amendment to your brochure, or Form CRS you are not required to file them with the Commission. See the instructions for Part 2A and Part 3 of Form ADV.

\*    \*    \*    \*    \*

■ 12. Section 275.204–2 is amended by revising paragraph (a)(14)(i) as follows:

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33631**

**§ 275.204–2   Books and records to be maintained by investment advisers.**

(a) * * *

(14)(i) A copy of each brochure, brochure supplement and Form CRS, and each amendment or revision to the brochure, brochure supplement and Form CRS, that satisfies the requirements of Part 2 or Part 3 of Form ADV, as applicable [17 CFR 279.1]; any summary of material changes that satisfies the requirements of Part 2 of Form ADV but is not contained in the brochure; and a record of the dates that each brochure, brochure supplement and Form CRS, each amendment or revision thereto, and each summary of material changes not contained in a brochure given to any client or to any prospective client who subsequently becomes a client.

*     *     *     *     *

■ 13. Section 275.204–5 is added to read as follows:

**§ 275.204–5   Delivery of Form CRS.**

(a) *General requirements.* If you are registered under the Act as an investment adviser, you must deliver Form CRS, required by Part 3 of Form ADV [17 CFR 279.1], to each retail investor.

(b) *Delivery requirements.* You (or a supervised person acting on your behalf) must:

(1) Deliver to each retail investor your current Form CRS before or at the time you enter into an investment advisory contract with that retail investor.

(2) Deliver to each retail investor who is an existing client your current Form CRS before or at the time you:

(i) Open a new account that is different from the retail investor's existing account(s);

(ii) Recommend that the retail investor roll over assets from a retirement account into a new or existing account or investment; or

(iii) Recommend or provide a new investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in an existing account.

(3) Post the current Form CRS prominently on your website, if you have one, in a location and format that is easily accessible for retail investors.

(4) Communicate any changes made to Form CRS to each retail investor who is an existing client within 60 days after the amendments are required to be made and without charge. The communication can be made by delivering the amended Form CRS or by communicating the information through another disclosure that is delivered to the retail investor.

(5) Deliver a current Form CRS to each retail investor within 30 days upon request.

(c) *Other disclosure obligations.* Delivering Form CRS in compliance with this section does not relieve you of any other disclosure obligations you have to your retail investors under any Federal or State laws or regulations.

(d) *Definitions.* For purposes of this section:

(1) *Current Form CRS* means the most recent version of the Form CRS.

(2) *Retail investor* means a natural person, or the legal representative of such natural person, who seeks to receive or receives services primarily for personal, family or household purposes.

(3) *Supervised person* means any of your officers, partners or directors (or other persons occupying a similar status or performing similar functions) or employees, or any other person who provides investment advice on your behalf.

(e) *Transition rule.* (1) Within 30 days after the date by which you are first required by § 275.204–1(b)(3) to electronically file your Form CRS with the Commission, you must deliver to each of your existing clients who is a retail investor your current Form CRS as required by Part 3 of Form ADV.

(2) As of the date by which you are first required to electronically file your Form CRS with the Commission, you must begin using your Form CRS as required by Part 3 of Form ADV to comply with the requirements of paragraph (b) of this section.

**PART 279—FORMS PRESCRIBED UNDER THE INVESTMENT ADVISERS ACT OF 1940**

■ 14. The authority citation for part 279 is revised to read as follows:

**Authority:** The Investment Advisers Act of 1940, 15 U.S.C. 80b–1, *et seq.,* Pub. L. 111–203, 124 Stat. 1376.

**Note:** The following amendment does not appear in the Code of Federal Regulations.

■ 15. Form ADV [referenced in § 279.1] is amended by:

a. In the instructions to the form, revising the section entitled "Form ADV: General Instructions." The revised version of Form ADV: General Instructions is attached as Appendix A;

b. In the instructions to the form, adding the section entitled "Form ADV, Part 3: Instructions to Form CRS." The new version of Form ADV, Part 3: Instructions to Form CRS is attached as Appendix B.

Dated: June 5, 2019.

By the Commission.

**Vanessa A. Countryman,**

*Acting Secretary.*

**Note:** The appendices will not appear in the Code of Federal Regulations.

**Appendices**

**BILLING CODE 8011–01–P**

App 184

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0049 |
| Expires: | [Date] |
| Estimated average burden hours per response | [xx.xx] |

**APPENDIX A**

# FORM ADV (Paper Version)

- **UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND**
- **REPORT FORM BY EXEMPT REPORTING ADVISERS**

**Form ADV:  General Instructions**

Read these instructions carefully before filing Form ADV.  Failure to follow these instructions, properly complete the form, or pay all required fees may result in your application or report being delayed or rejected.

In these instructions and in Form ADV, "you" means the investment adviser (*i.e.*, the advisory firm).

If you are a "separately identifiable department or division" (SID) of a bank, "you" means the SID, rather than your bank, unless the instructions or the form provide otherwise.

If you are a *private fund* adviser filing an *umbrella registration*, "you" means the *filing adviser* and each *relying adviser*, unless the instructions or the form provide otherwise.  The information in Items 1, 2, 3 and 10 (including corresponding schedules) should be provided for the *filing adviser* only.

Terms that appear in *italics* are defined in the Glossary of Terms to Form ADV.

1.    **Where can I get more information on Form ADV, electronic filing, and the IARD?**

The SEC provides information about its rules and the Advisers Act on its website: <http://www.sec.gov/iard>.

NASAA provides information about state investment adviser laws and state rules, and how to contact a *state securities authority*, on its website:  <http://www.nasaa.org>.

FINRA provides information about the IARD and electronic filing on the IARD website: <http://www.iard.com>.

2.    **What is Form ADV used for?**

Investment advisers use Form ADV to:

- Register with the Securities and Exchange Commission
- Register with one or more *state securities authorities*

SEC 1707 ([06]-19)  File 1 of 5

- Amend those registrations;

- Report to the SEC as an *exempt reporting adviser*
- Report to one or more *state securities authorities* as an *exempt reporting adviser*
- Amend those reports; and
- Submit a final report as an *exempt reporting adviser*

### 3.    How is Form ADV organized?

Form ADV contains five parts:

- Part 1A asks a number of questions about you, your business practices, the *persons* who own and *control* you, and the *persons* who provide investment advice on your behalf.
  o All advisers registering with the SEC or any of the *state securities authorities* must complete Part 1A.
  o *Exempt reporting advisers* (that are not also registering with any *state securities authority*) must complete only the following Items of Part 1A:  1, 2, 3, 6, 7, 10, and 11, as well as corresponding schedules.  *Exempt reporting advisers* that are registering with any *state securities authority* must complete all of Form ADV.

  Part 1A also contains several supplemental schedules.  The items of Part 1A let you know which schedules you must complete.
  o Schedule A asks for information about your direct owners and executive officers.
  o Schedule B asks for information about your indirect owners.
  o Schedule C is used by paper filers to update the information required by Schedules A and B (see Instruction 18).
  o Schedule D asks for additional information for certain items in Part 1A.
  o Schedule R asks for additional information about *relying advisers*.
  o Disclosure Reporting Pages (or DRPs) are schedules that ask for details about disciplinary events involving you or your *advisory affiliates*.

- Part 1B asks additional questions required by *state securities authorities*.  Part 1B contains three additional DRPs.  If you are applying for SEC registration or are registered only with the SEC, you do not have to complete Part 1B.  (If you are filing electronically and you do not have to complete Part 1B, you will not see Part 1B).

- Part 2A requires advisers to create narrative *brochures* containing information about the advisory firm.  The requirements in Part 2A apply to all investment advisers registered with or applying for registration with the SEC, but do not apply to *exempt reporting advisers*.  Every application for registration must include a narrative brochure prepared in accordance with the requirements of Part 2A of Form ADV.  See Advisers Act Rule 203-1.

- Part 2B requires advisers to create *brochure supplements* containing information about certain *supervised persons*.  The requirements in Part 2B apply to all investment advisers

App 186

**33634**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

registered with or applying for registration with the SEC, but do not apply to *exempt reporting advisers*.

- Part 3 requires advisers to create relationship *summary* (Form CRS) containing information for *retail investors*. The requirements in Part 3 apply to all investment advisers registered or applying for registration with the SEC, but do not apply to *exempt reporting advisers*. Every adviser that has *retail investors* to whom it must deliver a *relationship summary* must include in the application for registration a *relationship summary* prepared in accordance with the requirements of Part 3 of Form ADV. See Advisers Act Rule 203-1.

4.     **When am I required to update my Form ADV?**

- SEC- and State-Registered Advisers:

  o *Annual updating amendments*: You must amend your Form ADV each year by filing an *annual updating amendment* within 90 days after the end of your fiscal year. When you submit your *annual updating amendment*, you must update your responses to all items in Part 1A, 1B, 2A and 2B (as applicable), including corresponding sections of Schedules A, B, C, and D and all sections of Schedule R for each *relying adviser*. You must submit your summary of material changes required by Item 2 of Part 2A either in the *brochure* (cover page or the page immediately thereafter) or as an exhibit to your *brochure*. You may, but are not required, to submit amended versions of the *relationship summary* required by Part 3 as part of your *annual updating amendment.*

  o Other-than-annual amendments: In addition to your *annual updating amendment*,

    ▪ If you are registered with the SEC or a *state securities authority*, you must amend Part 1A, 1B, 2A and 2B (as applicable) of your Form ADV, including corresponding sections of Schedules A, B, C, D, and R, by filing additional amendments (other-than-annual amendments) promptly, if:

      o you are adding or removing a *relying adviser* as part of your *umbrella registration;*

      o information you provided in response to Items 1 (except 1.O. and Section 1.F. of Schedule D), 3, 9 (except 9.A.(2), 9.B.(2), 9.E., and 9.F.), or 11 of Part 1A or Items 1, 2.A. through 2.F., or 2.I. of Part 1B or Sections 1 or 3 of Schedule R becomes inaccurate in any way;

      o information you provided in response to Items 4, 8, or 10 of Part 1A, or Item 2.G. of Part 1B, or Section 10 of Schedule R becomes materially inaccurate; or

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33635**

○ information you provided in your *brochure* becomes <u>materially</u> inaccurate (see note below for exceptions).

**Notes**: <u>Part 1</u>:  If you are submitting an other-than-annual amendment, you are not required to update your responses to Items 2, 5, 6, 7, 9.A.(2), 9.B.(2), 9.E., 9.F., or 12 of Part 1A, Items 2.H. or 2.J. of Part 1B, Section 1.F. of Schedule D or Section 2 of Schedule R even if your responses to those items have become inaccurate.

<u>Part 2</u>:  You must amend your *brochure supplements* (see Form ADV, Part 2B) promptly if any information in them becomes <u>materially</u> inaccurate.  If you are submitting an other-than-annual amendment to your *brochure*, you are not required to update your summary of material changes as required by Item 2.  You are not required to update your *brochure* between annual amendments solely because the amount of *client* assets you manage has changed or because your fee schedule has changed.  However, if you are updating your *brochure* for a separate reason in between annual amendments, and the amount of *client* assets you manage listed in response to Item 4.E. or your fee schedule listed in response to Item 5.A. has become materially inaccurate, you should update that item(s) as part of the interim amendment.

- <u>If you are an SEC-registered adviser</u>, you are required to file your *brochure* amendments electronically through IARD.  You are not required to file amendments to your *brochure supplements* with the SEC, but you must maintain a copy of them in your files.

- <u>If you are a state-registered adviser</u>, you are required to file your *brochure* amendments and *brochure supplement* amendments with the appropriate *state securities authorities* through IARD.

<u>Part 3</u>:  If you are registered with the SEC, you must amend Part 3 of your Form ADV within 30 days whenever any information in your *relationship summary* becomes materially inaccurate by filing with the SEC an additional *other-than-annual amendment* or by including the *relationship summary* as part of an *annual updating amendment*.  You must include an exhibit highlighting the most recent changes required by Form ADV, Part 3 (Form CRS), General Instruction 8.C.

- *Exempt reporting advisers*:

  ○ *Annual Updating Amendments*:  You must amend your Form ADV each year by filing an *annual updating amendment* within 90 days after the end of your fiscal year.  When you submit your *annual updating amendment*, you must update your responses to all required items, including corresponding sections of Schedules A, B, C, and D.

**33636** **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

o Other-than-Annual Amendments: In addition to your *annual updating amendment*, you must amend your Form ADV, including corresponding sections of Schedules A, B, C, and D, by filing additional amendments (other-than-annual amendments) <u>promptly</u> if:

▪ information you provided in response to Items 1 (except Item 1.O. and Section 1.F. of Schedule D), 3, or 11 becomes inaccurate in any way; or

▪ information you provided in response to Item 10 becomes <u>materially</u> inaccurate.

**Failure to update your Form ADV, as required by this instruction, is a violation of SEC rules or similar state rules and could lead to your registration being revoked.**

5. **What is SEC *umbrella registration* and how can I satisfy the requirements of filing an *umbrella registration*?**

An *umbrella registration* is a single registration by a *filing adviser* and one or more *relying advisers* who advise only *private funds* and certain separately managed account *clients* that are *qualified clients* and collectively conduct a single advisory business. Absent other facts suggesting that the *filing adviser* and *relying adviser*(s) conduct different businesses, *umbrella registration* is available under the following circumstances:

i. The *filing adviser* and each *relying adviser* advise only *private funds* and *clients* in separately managed accounts that are *qualified clients* and are otherwise eligible to invest in the *private funds* advised by the *filing adviser* or a *relying adviser* and whose accounts pursue investment objectives and strategies that are substantially similar or otherwise related to those *private funds*.

ii. The *filing adviser* has its *principal office and place of business* in the United States and, therefore, all of the substantive provisions of the Advisers Act and the rules thereunder apply to the *filing adviser's* and each *relying adviser's* dealings with each of its *clients*, regardless of whether any *client* of the *filing adviser* or *relying adviser* providing the advice is a *United States person*.

iii. Each *relying adviser*, its *employees* and the *persons* acting on its behalf are subject to the *filing adviser's* supervision and *control* and, therefore, each *relying adviser*, its *employees* and the *persons* acting on its behalf are "persons associated with" the *filing adviser* (as defined in section 202(a)(17) of the Advisers Act).

iv. The advisory activities of each *relying adviser* are subject to the Advisers Act and the rules thereunder, and each *relying adviser* is subject to examination by the SEC.

v. The *filing adviser* and each *relying adviser* operate under a single code of ethics adopted in accordance with SEC rule 204A-1 and a single set of written policies and procedures

adopted and implemented in accordance with SEC rule 206(4)-7 and administered by a single chief compliance officer in accordance with that rule.

To satisfy the requirements of Form ADV while using *umbrella registration* the *filing adviser* must sign, file, and update as required, a single Form ADV (Parts 1 and 2) that relates to, and includes all information concerning, the *filing adviser* and each *relying adviser* (*e.g.*, disciplinary information and ownership information), and must include this same information in any other reports or filings it must make under the Advisers Act or the rules thereunder (*e.g.*, Form PF). The *filing adviser* and each *relying adviser* must not be prohibited from registering with the SEC by section 203A of the Advisers Act (*i.e.*, the *filing adviser* and each *relying adviser* must individually qualify for SEC registration).

Unless otherwise specified, references to "you" in Form ADV refer to both the *filing adviser* and each *relying adviser*. The information in Items 1, 2, 3 and 10 (including corresponding schedules) should be provided for the *filing adviser* only. A separate Schedule R should be completed for each *relying adviser*. References to "you" in Schedule R refer to the *relying adviser* only.

A *filing adviser* applying for registration with the SEC should complete a Schedule R for each *relying adviser*. If you are a *filing adviser* registered with the SEC and would like to add or delete *relying advisers* from an *umbrella registration*, you should file an other-than-annual amendment and add or delete Schedule Rs as needed.

Note: *Umbrella registration* is not available to *exempt reporting advisers*.

6.    **Where do I sign my Form ADV application or amendment?**

You must sign the appropriate Execution Page. There are three Execution Pages at the end of the form. Your initial application, your initial report (in the case of an *exempt reporting adviser*), and all amendments to Form ADV must include at least one Execution Page.

- If you are applying for or are amending your SEC registration, or if you are reporting as an *exempt reporting adviser* or amending your report, you must sign and submit either a:

  o Domestic Investment Adviser Execution Page, if you (the advisory firm) are a resident of the United States; or
  o *Non-Resident* Investment Adviser Execution Page, if you (the advisory firm) are not a resident of the United States.

- If you are applying for or are amending your registration with a *state securities authority*, you must sign and submit the State-Registered Investment Adviser Execution Page.

7.    **Who must sign my Form ADV or amendment?**

The individual who signs the form depends upon your form of organization:

**33638**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

- For a sole proprietorship, the sole proprietor.
- For a partnership, a general partner.
- For a corporation, an authorized principal officer.
- For a "separately identifiable department or division" (SID) of a bank, a principal officer of your bank who is directly engaged in the management, direction, or supervision of your investment advisory activities.
- For all others, an authorized individual who participates in managing or directing your affairs.

The signature does not have to be notarized, and in the case of an electronic filing, should be a typed name.

**8.    How do I file my Form ADV?**

Complete Form ADV electronically using the Investment Adviser Registration Depository (IARD) if:

- You are filing with the SEC (and submitting *notice filings* to any of the *state securities authorities*), or

- You are filing with a *state securities authority* that requires or permits advisers to submit Form ADV through the IARD.

    **Note:**  SEC rules require advisers that are registered or applying for registration with the SEC, or that are reporting to the SEC as an *exempt reporting adviser*, to file electronically through the IARD system.  See SEC rules 203-1 and 204-4.

To file electronically, go to the IARD website (<www.iard.com>), which contains detailed instructions for advisers to follow when filing through the IARD.

Complete Form ADV (Paper Version) on paper if:

- You are filing with the SEC or a *state securities authority* that requires electronic filing, but you have been granted a continuing hardship exemption.  Hardship exemptions are described in Instruction 17.

- You are filing with a *state securities authority* that permits (but does not require) electronic filing and you do not file electronically.

**9.    How do I get started filing electronically?**

First, obtain a copy of the IARD Entitlement Package from the following website: <http://www.iard.com/GetStarted.asp>.  Second, request access to the IARD system for your firm by completing and submitting the IARD Entitlement Package.  The IARD Entitlement Package explains how the form may be submitted.  Mail the forms to:  FINRA Entitlement Group, 9509 Key West Avenue, Rockville, MD 20850.

App 191

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33639**

When FINRA receives your Entitlement Package, they will assign a *CRD* number (identification number for your firm) and a user I.D. code and password (identification number and system password for the individual(s) who will submit Form ADV filings for your firm).  Your firm may request an I.D. code and password for more than one individual. FINRA also will create a financial account for you from which the IARD will deduct filing fees and any state fees you are required to pay.  If you already have a *CRD* account with FINRA, it will also serve as your IARD account; a separate account will not be established.

Once you receive your *CRD* number, user I.D. code and password, and you have funded your account, you are ready to file electronically.

Questions regarding the Entitlement Process should be addressed to FINRA at 240.386.4848.

**10.    If I am applying for registration with the SEC, or amending my SEC registration, how do I make *notice filings* with the *state securities authorities*?**

If you are applying for registration with the SEC or are amending your SEC registration, one or more *state securities authorities* may require you to provide them with copies of your SEC filings.  We call these filings "*notice filings*."  Your *notice filings* will be sent electronically to the states that you check on Item 2.C. of Part 1A.  The *state securities authorities* to which you send *notice filings* may charge fees, which will be deducted from the account you establish with FINRA.  To determine which *state securities authorities* require SEC-registered advisers to submit *notice filings* and to pay fees, consult the relevant state investment adviser law or *state securities authority*.  See General Instruction 1.

If you are granted a continuing hardship exemption to file Form ADV on paper, FINRA will enter your filing into the IARD and your *notice filings* will be sent electronically to the *state securities authorities* that you check on Item 2.C. of Part 1A.

**11.    I am registered with a state.  When must I switch to SEC registration?**

If at the time of your *annual updating amendment* you meet at least one of the requirements for SEC registration in Item 2.A.(1) to (12) of Part 1A, you must apply for registration with the SEC within 90 days after you file the *annual updating amendment*.  Once you register with the SEC, you are subject to SEC regulation, regardless of whether you remain registered with one or more states.  See SEC rule 203A-1(b)(2).  Each of your *investment adviser representatives*, however, may be subject to registration in those states in which the representative has a place of business.  See Advisers Act section 203A(b)(1); SEC rule 203A-3(a).  For additional information, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business."  See General Instruction 1.

**12.    I am registered with the SEC.  When must I switch to registration with a *state securities authority*?**

**33640**     **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

If you check box 13 in Item 2.A. of Part 1A to report on your *annual updating amendment* that you are no longer eligible to register with the SEC, you must withdraw from SEC registration within 180 days after the end of your fiscal year by filing Form ADV-W. See SEC rule 203A-1(b)(2). You should consult state law or the *state securities authority* for the states in which you are "doing business" to determine if you are required to register in these states. See General Instruction 1. Until you file your Form ADV-W with the SEC, you will remain subject to SEC regulation, and you also will be subject to regulation in any states where you register. See SEC rule 203A-1(b)(2).

13. **I am an** *exempt reporting adviser*. **When must I submit my first report on Form ADV?**

- All *exempt reporting advisers*:
  You must submit your initial Form ADV filing within 60 days of relying on the exemption from registration under either section 203(l) of the Advisers Act as an adviser solely to one or more venture capital funds or section 203(m) of the Advisers Act because you act solely as an adviser to private funds and have assets under management in the United States of less than $150 million.

- Additional instruction for advisers switching from being registered to being *exempt reporting advisers*:
  If you are currently registered as an investment adviser (or have an application for registration pending) with the SEC or with a *state securities authority*, you must file a Form ADV-W to withdraw from registration in the jurisdictions where you are switching. You must submit the Form ADV-W before submitting your first report as an *exempt reporting adviser*.

14. **I am an** *exempt reporting adviser*. **Is it possible that I might be required to also register with or submit a report to a** *state securities authority*?

Yes, you may be required to register with or submit a report to one or more *state securities authorities*. If you are required to register with one or more *state securities authorities*, you must complete all of Form ADV. See General Instruction 3. If you are required to submit a report to one or more *state securities authorities*, check the box(es) in Item 2.C. of Part 1A next to the state(s) you would like to receive the report. Each of your *investment adviser representatives* may also be subject to registration requirements. For additional information about the requirements that may apply to you, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business." See General Instruction 1.

15. **What do I do if I no longer meet the definition of "***exempt reporting adviser***"?**

- Advisers Switching to SEC Registration:

  o You may no longer be an *exempt reporting adviser* and may be required to register with the SEC if you wish to continue doing business as an investment adviser. For

example, you may be relying on section 203(l) and wish to accept a *client* that is not a venture capital fund as defined in SEC rule 203(l)-1, or you may have been relying on SEC rule 203(m)-1 and reported in Section 2.B. of Schedule D to your *annual updating amendment* that you have *private fund* assets of $150 million or more.

- ▪ If you are relying on section 203(l), unless you qualify for another exemption, you would violate the Advisers Act's registration requirement if you accept a *client* that is not a venture capital fund as defined in SEC rule 203(l)-1 before the SEC approves your application for registration. You must submit your final report as an *exempt reporting adviser* and apply for SEC registration in the same filing.

- ▪ If you were relying on SEC rule 203(m)-1 and you reported in Section 2.B. of Schedule D to your *annual updating amendment* that you have *private fund* assets of $150 million or more, you must register with the SEC unless you qualify for another exemption. If you have complied with all SEC reporting requirements applicable to an *exempt reporting adviser* as such, you have up to 90 days after filing your *annual updating amendment* to apply for SEC registration, and you may continue doing business as a *private fund* adviser during this time. You must submit your final report as an *exempt reporting adviser* and apply for SEC registration in the same filing. Unless you qualify for another exemption, you would violate the Advisers Act's registration requirement if you accept a *client* that is not a *private fund* during this transition period before the SEC approves your application for registration, and you must comply with all SEC reporting requirements applicable to an *exempt reporting adviser* as such during this 90-day transition period. If you have not complied with all SEC reporting requirements applicable to an *exempt reporting adviser* as such, this 90-day transition period is not available to you. Therefore, if the transition period is not available to you, and you do not qualify for another exemption, your application for registration must be approved by the SEC before you meet or exceed SEC rule 203(m)-1's $150 million asset threshold.

- o You will be deemed in compliance with the Form ADV filing and reporting requirements until the SEC approves or denies your application. If your application is approved, you will be able to continue business as a registered adviser.

- o If you register with the SEC, you may be subject to state *notice filing* requirements. To determine these requirements, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business." See General Instruction 1.

**Note**: If you are relying on SEC rule 203(m)-1 and you accept a *client* that is not a *private fund*, you will lose the exemption provided by SEC rule 203(m)-1 immediately. To avoid this result, you should apply for SEC registration in advance so that the SEC has approved your registration before you accept a *client* that is not a *private fund*.

**33642**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

The 90-day transition period described above also applies to investment advisers with their *principal offices and places of business* outside of the United States with respect to their *clients* who are *United States persons* (*e.g.*, the adviser would not be eligible for the 90-day transition period if it accepted a *client* that is a *United States person* and is not a *private fund*).

- Advisers Not Switching to SEC Registration:

  o You may no longer be an *exempt reporting adviser* but may not be required to register with the SEC or may be prohibited from doing so. For example, you may cease to do business as an investment adviser, become eligible for an exemption that does not require reporting, or be ineligible for SEC registration. In this case, you must submit a final report as an *exempt reporting adviser* to update only Item 1 of Part 1A of Form ADV.

  o You may be subject to state registration requirements. To determine these requirements, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business." See General Instruction 1.

**16.    Are there filing fees?**

Yes. These fees go to support and maintain the IARD. The IARD filing fees are in addition to any registration or other fee that may be required by state law. You must pay an IARD filing fee for your initial application, your initial report, and each *annual updating amendment*. There is no filing fee for an other-than-annual amendment, a final report as an *exempt reporting adviser*, or Form ADV-W. The IARD filing fee schedule is published at <http://www.sec.gov/iard>; <http://www.nasaa.org>; and <http://www.iard.com>.

If you are submitting a paper filing under a continuing hardship exemption (see Instruction 17), you are required to pay an additional fee. The amount of the additional fee depends on whether you are filing Form ADV or Form ADV-W. (There is no additional fee for filings made on Form ADV-W.) The hardship filing fee schedule is available by contacting FINRA at 240.386.4848.

**17.    What if I am not able to file electronically?**

If you are required to file electronically but cannot do so, you may be eligible for one of two types of hardship exemptions from the electronic filing requirements.

- A **temporary hardship exemption** is available if you file electronically, but you encounter unexpected difficulties that prevent you from making a timely filing with the IARD, such as a computer malfunction or electrical outage. This exemption does not permit you to file on paper; instead it extends the deadline for an electronic filing for seven business days. See SEC rules 203-3(a) and 204-4(e).

App 195

- A **continuing hardship exemption** may be granted if you are a small business and you can demonstrate that filing electronically would impose an undue hardship. You are a small business, and may be eligible for a continuing hardship exemption, if you are required to answer Item 12 of Part 1A (because you have assets under management of less than $25 million) <u>and</u> you are able to respond "no" to each question in Item 12. See SEC rule 0-7.

  If you have been granted a continuing hardship exemption, you must complete and submit the paper version of Form ADV to FINRA. FINRA will enter your responses into the IARD. As discussed in General Instruction 16, FINRA will charge you a fee to reimburse it for the expense of data entry.

### 18.     I am eligible to file on paper. How do I make a paper filing?

When filing on paper, you must:

- Type all of your responses.
- Include your name (the same name you provide in response to Item 1.A. of Part 1A) and the date on every page.
- If you are amending your Form ADV:
  o complete page 1 and circle the number of any item for which you are changing your response.
  o include your SEC 801-number (if you have one), or your 802-number (if you have one), and your *CRD* number (if you have one) on every page.
  o complete the amended item in full and circle the number of the item for which you are changing your response.
  o to amend Schedule A or Schedule B, complete and submit Schedule C.

Where you submit your paper filing depends on why you are eligible to file on paper:

- If you are filing on paper because you have been granted a continuing hardship exemption, submit one manually signed Form ADV and one copy to: IARD Document Processing, FINRA, P.O. Box 9495, Gaithersburg, MD 20898-9495.

**If you complete Form ADV on paper and submit it to FINRA but you do not have a continuing hardship exemption, the submission will be returned to you.**

- If you are filing on paper because a state in which you are registered or in which you are applying for registration allows you to submit paper instead of electronic filings, submit one manually signed Form ADV and one copy to the appropriate *state securities authorities*.

### 19.     Who is required to file Form ADV-NR?

Every *non-resident* general partner and *managing agent* of <u>all</u> SEC-registered advisers and *exempt reporting advisers*, whether or not the adviser is resident in the United States, must

**33644**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

file Form ADV-NR in connection with the adviser's initial application or report. A general partner or *managing agent* of an SEC-registered adviser or *exempt reporting adviser* who becomes a *non-resident* after the adviser's initial application or report has been submitted must file Form ADV-NR within 30 days. Form ADV-NR must be filed on paper (it cannot be filed electronically).

Submit Form ADV-NR to the SEC at the following address:

Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549; Attn: OCIE Registrations Branch.

**Failure to file Form ADV-NR promptly may delay SEC consideration of your initial application.**

Federal Information Law and Requirements

Sections 203 and 204 of the Advisers Act [15 U.S.C. 80b-3 and 80b-4] authorize the SEC to collect the information required by Form ADV. The SEC collects the information for regulatory purposes, such as deciding whether to grant registration. Filing Form ADV is mandatory for advisers who are required to register with the SEC and for *exempt reporting advisers*. The SEC maintains the information submitted on this form and makes it publicly available. The SEC may return forms that do not include required information. Intentional misstatements or omissions constitute federal criminal violations under 18 U.S.C. 1001 and 15 U.S.C. 80b-17.

SEC's Collection of Information

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number. The Advisers Act authorizes the SEC to collect the information on Form ADV from investment advisers. See 15 U.S.C. 80b-3 and 80b-4. Filing the form is mandatory.

The form enables the SEC to register investment advisers and to obtain information from and about *exempt reporting advisers*. Every applicant for registration with the SEC as an adviser, and every *exempt reporting adviser*, must file the form. See 17 CFR 275.203-1 and 204-4. By accepting a form, however, the SEC does not make a finding that it has been completed or submitted correctly. The form is filed annually by every adviser, no later than 90 days after the end of its fiscal year, to amend its registration or its report. It is also filed during the year to reflect material changes. See 17 CFR 275.204-1. The SEC maintains the information on the form and makes it publicly available through the IARD.

Anyone may send the SEC comments on the accuracy of the burden estimate on page 1 of the form, as well as suggestions for reducing the burden. The Office of Management and Budget has reviewed this collection of information under 44 U.S.C. 3507.

The information contained in the form is part of a system of records subject to the Privacy Act of 1974, as amended. The SEC has published in the Federal Register the Privacy Act System of Records Notice for these records.

Federal Register / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33645**

**APPENDIX B**

<table>
<tr><td></td><td>OMB APPROVAL</td></tr>
</table>

### UNITED STATES[1]
### SECURITIES AND EXCHANGE COMMISSION

# FORM CRS

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0766 |
| Expires: | [Date] |
| Estimated average burden hours per response: | [xx.xx] |

Sections 3, 10, 15, 15(c)(6), 15(*l*), 17, 23, and 36 of the Securities Exchange Act of 1934 ("Exchange Act") and section 913(f) of Title IX of the Dodd-Frank Act authorize the Commission to require the collection of the information on Form CRS from brokers and dealers. *See* 15 U.S.C. 78c, 78j, 78o, 78o(c)(6), 78o(*l*), 78q, 78w and 78mm. Filing Form CRS is mandatory for every broker or dealer registered with the Commission pursuant to section 15 of the Exchange Act that offers services to a retail investor. *See* 17 CFR 240.17a-14. Intentional misstatements or omissions constitute federal criminal violations (*see* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a)). The Commission may use the information provided in Form CRS to manage its regulatory and examination programs. Form CRS is made publically available.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid control number. Any member of the public may direct to the Commission any comments concerning the accuracy of this burden estimate and any suggestions for reducing this burden. This collection of information has been reviewed by the Office of Management and Budget in accordance with the requirements of 44 U.S.C. 3507.

The information contained in the form is part of a system of records subject to the Privacy Act of 1974, as amended. The information may be disclosed as outlined above and in the routine uses listed in the applicable system of records notice, SEC-70, SEC's Division of Trading and Markets Records, published in the Federal Register at 83 FR 6892 (February 15, 2018).

SEC 2942 (06-19)

---

[1]     This cover page will be included for Form CRS (17 CFR 249.640) only.

 **[Form ADV, Part 3:  Instructions to Form CRS][2]**

**General Instructions**

Under rule 17a-14 under the Securities Exchange Act of 1934 and rule 204-5 under the Investment Advisers Act of 1940, broker-dealers registered under section 15 of the Exchange Act and investment advisers registered under section 203 of the Advisers Act are required to deliver to *retail investors* a *relationship summary* disclosing certain information about the firm.[3] Read all the General Instructions as well as the particular item requirements before preparing or updating the *relationship summary*.

If you do not have any *retail investors* to whom you must deliver a *relationship summary*, you are not required to prepare or file one.  See also Advisers Act rule 204-5; Exchange Act rule 17a-14(a).

1.    **Format.**

A.    The *relationship summary* must include the required items enumerated below.  The items require you to provide specific information.

B.    You must respond to each item and must provide responses in the same order as the items appear in these instructions.  You may not include disclosure in the *relationship summary* other than disclosure that is required or permitted by these Instructions and the applicable item.

C.    You must make a copy of the *relationship summary* available upon request without charge.  In paper format, the *relationship summary* for broker-dealers and investment advisers must not exceed two pages.  For *dual registrants* that include their brokerage services and investment advisory services in one *relationship summary*, it must not exceed four pages in paper format.  *Dual registrants* and *affiliates* that prepare separate *relationship summaries* are limited to two pages for each *relationship summary*.  See General Instruction 5.  You must use reasonable paper size, font size, and margins.  If delivered electronically, the relationship summary must not exceed the equivalent of two pages or four pages in paper format, as applicable.

2.    **Plain English; Fair Disclosure.**

A.    The items of the *relationship summary* are designed to promote effective communication between you and *retail investors*.  Write your *relationship summary* in plain English, taking into consideration *retail investors*' level of

---

[2]    The bracketed text will be included for Form ADV, Part 3 (17 CFR 279.1) only.

[3]    Terms that are italicized in these instructions are defined in General Instruction 11.

Federal Register / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    33647

financial experience. You should include white space and implement other design features to make the *relationship summary* easy to read. The *relationship summary* should be concise and direct. Specifically: (i) use short sentences and paragraphs; (ii) use definite, concrete, everyday words; (iii) use active voice; (iv) avoid legal jargon or highly technical business terms unless you clearly explain them; and (v) avoid multiple negatives. You must write your response to each item as if you are speaking to the *retail investor*, using "you," "us," "our firm," etc.

Note: The SEC's Office of Investor Education and Advocacy has published A Plain English Handbook. You may find the handbook helpful in writing your *relationship summary*. For a copy of this handbook, visit the SEC's website at www.sec.gov/news/extra/handbook.htm.

B.    All information in your *relationship summary* must be true and may not omit any material facts necessary in order to make the disclosures required by these Instructions and the applicable Item, in light of the circumstances under which they were made, not misleading. If a required disclosure or conversation starter is inapplicable to your business or specific wording required by these Instructions is inaccurate, you may omit or modify that disclosure or conversation starter.

C.    Responses must be factual and provide balanced descriptions to help *retail investors* evaluate your services. For example, you may not include exaggerated or unsubstantiated claims, vague and imprecise "boilerplate" explanations, or disproportionate emphasis on possible investments or activities that are not offered to *retail investors*.

D.    Broker-dealers and investment advisers have disclosure and reporting obligations under state and federal laws, including, but not limited to, obligations under the Exchange Act, the Advisers Act, and the respective rules thereunder. Broker-dealers are also subject to disclosure obligations under the rules of self-regulatory organizations. Delivery of the *relationship summary* will not necessarily satisfy the additional requirements that you have under the federal securities laws and regulations or other laws or regulations.

**3.    Electronic And Graphical Formats.**

A.    You are encouraged to use charts, graphs, tables, and other graphics or text features in order to respond to the required disclosures. You are also encouraged to use text features, text colors, and graphical cues, such as dual-column charts, to compare services, account characteristics, investments, fees, and conflicts of interest. For a *relationship summary* that is posted on your website or otherwise provided electronically, we encourage online tools that populate information in comparison boxes based on investor selections. You also may include: (i) a means of facilitating access to video or audio messages, or other forms of information (whether by hyperlink, website address, Quick Response Code ("QR code"), or other equivalent methods or technologies); (ii) mouse-over windows;

(iii) pop-up boxes; (iv) chat functionality; (v) fee calculators; or (vi) other forms of electronic media, communications, or tools designed to enhance a *retail investor's* understanding of the material in the *relationship summary*.

B.    In a *relationship summary* that is posted on your website or otherwise provided electronically, you must provide a means of facilitating access to any information that is referenced in the *relationship summary* if the information is available online, including, for example, hyperlinks to fee schedules, conflicts disclosures, the firm's narrative brochure required by Part 2A of Form ADV, or other regulatory disclosures. In a *relationship summary* that is delivered in paper format, you may include URL addresses, QR codes, or other means of facilitating access to such information.

C.    Explanatory or supplemental information included in the *relationship summary* pursuant to General Instructions 3.A. or 3.B.: (i) must be responsive to and meet the requirements in these instructions for the particular Item in which the information is placed; and (ii) may not, because of the nature, quantity, or manner of presentation, obscure or impede understanding of the information that must be included. When using interactive graphics or tools, you may include instructions on their use and interpretation.

**4.    <u>Formatting For Conversation Starters, Additional Information, and Standard of Conduct.</u>**

A.    For the "conversation starters" required by Items 2, 3, 4, and 5 below, you must use text features to make the conversation starters more noticeable and prominent in relation to other discussion text, for example, by: using larger or different font, a text box around the heading or questions; bolded, italicized or underlined text; or lines to offset the questions from the other sections.

B.    Investment advisers that provide only automated investment advisory services or broker-dealers that provide services only online without a particular individual with whom a *retail investor* can discuss these conversation starters must include a section or page on their website that answers each of the questions and must provide in the *relationship summary* a means of facilitating access to that section or page. If you provide automated investment advisory or brokerage services but also make a financial professional available to discuss your services with a *retail investor*, a financial professional must be available to discuss these conversation starters with the *retail investor*.

C.    For references to additional information regarding services, fees, and conflicts of interest required by Items 2.C., 3.A.(iii), and 3.B.(iv) below, you must use text features to make this information more noticeable and prominent in relation to other discussion text, for example, by: using larger or different font, a text box around the heading or questions, bolded, italicized or underlined text, or lines to offset the information from the other sections. A *relationship summary* provided

electronically must include a hyperlink, QR code, or other means of facilitating access that leads directly to the relevant additional information.

5.    <u>***Dual Registrants***, ***Affiliates***, **and Additional Services.**</u>

A.    If you are a *dual registrant*, you are encouraged to prepare a single *relationship summary* discussing both your brokerage and investment advisory services. Alternatively, you may prepare two separate *relationship summaries* for brokerage services and investment advisory services. Whether you prepare a single *relationship summary* or two, you must present the brokerage and investment advisory information with equal prominence and in a manner that clearly distinguishes and facilitates comparison of the two types of services. If you prepare two separate *relationship summaries*, you must reference and provide a means of facilitating access to the other, and you must deliver to each *retail investor* both *relationship summaries* with equal prominence and at the same time, without regard to whether the particular *retail investor* qualifies for those retail services or accounts.

B.    If you are a broker-dealer or investment adviser and your *affiliate* also provides brokerage or investment advisory services to *retail investors*, you may prepare a single *relationship summary* discussing the services you and your *affiliate* provide. Alternatively, you may prepare separate *relationship summaries* for your services and your *affiliate's* services.

(i)    Whether you prepare a single *relationship summary* or separate *relationship summaries*, you must design them in a manner that presents the brokerage and investment advisory information with equal prominence and clearly distinguishes and facilitates comparison of the two types of services.

(ii)    If you prepare separate *relationship summaries*:

a.    If a *dually licensed financial professional* provides brokerage and investment advisory services on behalf of you and your *affiliate*, you must deliver to each *retail investor* both your and your *affiliate's relationship summaries* with equal prominence and at the same time, without regard to whether the particular *retail investor* qualifies for those retail services or accounts. Each of the *relationship summaries* must reference and provide a means of facilitating access to the other.

b.    If General Instruction 5.B.(ii)(a) does not apply, you may choose whether or not to reference and provide a means of facilitating access to your *affiliate's relationship summary* and whether or not to deliver your and your *affiliate's relationship summaries* to each *retail investor* with equal prominence and at the same time.

**33650**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

C.    You may acknowledge other financial services that you provide in addition to your services as a broker-dealer or investment adviser registered with the SEC, such as insurance, banking, or retirement services, or investment advice pursuant to state registration or licensing. You may include references and means of facilitating access to additional information about those services. Information not pertaining to brokerage or investment advisory services may not, because of the nature, quantity, or manner of presentation, obscure or impede understanding of the information that must be included. See also General Instruction 3.C.

**6.**    **Preserving Records.**

A.    You must maintain records in accordance with Advisers Act rule 204-2(a)(14)(i) and/or Exchange Act rule 17a-4(e)(10), as applicable.

**7.**    **Initial Filing and Delivery; Transition Provisions.**

A.    **Initial filing.**

(i)    If you are an investment adviser and are required to deliver a *relationship summary* to a *retail investor*, you must file Form ADV, Part 3 (Form CRS) electronically with the Investment Adviser Registration Depository (IARD). If you are a registered broker-dealer and are required to deliver a *relationship summary* to a *retail investor*, you must file Form CRS electronically through the Central Registration Depository ("Web CRD®") operated by the Financial Industry Regulatory Authority, Inc. (FINRA). If you are a *dual registrant* and are required to deliver a *relationship summary* to one or more *retail investor* clients or customers of both your investment advisory and brokerage businesses, you must file using IARD and Web CRD®. You must file Form CRS using a text-searchable format with machine-readable headings.

(ii)    Information for investment advisers on how to file with IARD is available on the SEC's website at www.sec.gov/iard. Information for broker-dealers on how to file through Web CRD® is available on FINRA's website at http://www.finra.org/industry/web-crd/web-crd-system-links.

B.    **Initial delivery.**

(i)    *Investment Advisers*: If you are an investment adviser, you must deliver a *relationship summary* to each *retail investor* before or at the time you enter into an investment advisory contract with the *retail investor*. You must deliver the *relationship summary* even if your agreement with the *retail investor* is oral. See Advisers Act rule 204-5(b)(1).

(ii)    *Broker-Dealers*: If you are a broker-dealer, you must deliver a *relationship summary* to each *retail investor*, before or at the earliest of: (i) a recommendation of an account type, a securities transaction, or an investment strategy involving securities; (ii) placing an order for the *retail*

*investor*; or (iii) the opening of a brokerage account for the *retail investor*. See Exchange Act rule 17a-14(c)(1).

(iii)    *Dual Registrants*:  A *dual registrant* must deliver the *relationship summary* at the earlier of the timing requirements in General Instruction 7.B.(i) or (ii).

C.    **Transition provisions for initial filing and delivery after the effective date of the new Form CRS requirements.**

(i)    *Filings for Investment Advisers*

a.    If you are already registered or have an application for registration pending with the SEC as an investment adviser before June 30, 2020 you must electronically file, in accordance with Instruction 7.A. above, your initial *relationship summary* beginning on May 1, 2020 and by no later than June 30, 2020 either as: (1) an other-than-annual amendment or (2) part of your initial application or *annual updating amendment*.  See Advisers Act rules 203-1 and 204-1.

b.    If you file an application for registration with the SEC as an investment adviser on or after June 30, 2020, the Commission will not accept any initial application that does not include a *relationship summary*.  See Advisers Act rule 203-1.

(ii)    *Filings for Broker-Dealers*

a.    If you are already registered with the SEC as a broker-dealer before June 30, 2020, you must electronically file, in accordance with Instruction 7.A. above, your initial *relationship summary* beginning on May 1, 2020 and by no later than June 30, 2020. See Exchange Act rule 17a-14.

b.    If you file an application for registration or have an application pending with the SEC as a broker-dealer on or after June 30, 2020, you must file your *relationship summary* by no later than the date that your registration becomes effective. See Exchange Act rule 17a-14.

(iii)    *Delivery to New and Prospective Clients and Customers:* As of the date by which you are first required to electronically file your *relationship summary* with the SEC, you must begin to deliver your *relationship summary* to new and prospective clients and customers who are *retail investors* as required by Instruction 7.B. See Advisers Act rule 204-5 and Exchange Act rule 17a-14.

(iv)    *Delivery to Existing Clients and Customers:* Within 30 days after the date by which you are first required to electronically file your *relationship*

*summary* with the SEC, you must deliver your *relationship summary* to each of your existing clients and customers who are *retail investors*. See Advisers Act rule 204-5 and Exchange Act rule 17a-14.

8.    **Updating the *Relationship Summary* and Filing Amendments.**

A.    You must update your *relationship summary* and file it in accordance with Instruction 7.A. above within 30 days whenever any information in the *relationship summary* becomes materially inaccurate. The filing must include an exhibit highlighting changes required by Instruction 8.C. below.

B.    You must communicate any changes in the updated *relationship summary* to *retail investors* who are existing clients or customers within 60 days after the updates are required to be made and without charge.  You can make the communication by delivering the amended *relationship summary* or by communicating the information through another disclosure that is delivered to the *retail investor*.

C.    Each amended *relationship summary* that is delivered to a *retail investor* who is an existing client or customer must highlight the most recent changes by, for example, marking the revised text or including a summary of material changes. The additional disclosure showing revised text or summarizing the material changes must be attached as an exhibit to the unmarked amended *relationship summary*.

9.    **Additional Delivery Requirements to Existing Clients and Customers.**

A.    You must deliver the most recent *relationship summary* to a *retail investor* who is an existing client or customer before or at the time you: (i) open a new account that is different from the *retail investor's* existing account(s); (ii) recommend that the *retail investor* roll over assets from a retirement account into a new or existing account or investment; or (iii) recommend or provide a new brokerage or investment advisory service or investment that does not necessarily involve the opening of a new account and would not be held in an existing account, for example, the first-time purchase of a direct-sold mutual fund or insurance product that is a security through a "check and application" process, *i.e.*, not held directly within an account.

B.    You also must deliver the *relationship summary* to a *retail investor* within 30 days upon the *retail investor's* request.

10.    **Electronic Posting and Manner of Delivery.**

A.    You must post the current version of the *relationship summary* prominently on your public website, if you have one, in a location and format that is easily accessible for *retail investors*.

B.  You may deliver the *relationship summary* electronically, including updates, consistent with SEC guidance regarding electronic delivery, in particular Use of Electronic Media by Broker-Dealers, Transfer Agents, and Investment Advisers for Delivery of Information, which you can find at www.sec.gov/rules/concept/33-7288.txt.  You may deliver the *relationship summary* to new or prospective clients or customers in a manner that is consistent with how the *retail investor* requested information about you or your financial professional consistent with SEC guidance, in particular Form CRS Relationship Summary; Amendments to Form ADV, which you can find at https://www.sec.gov/rules/final/2019/34-86032.pdf.

C.  If the *relationship summary* is delivered electronically, it must be presented prominently in the electronic medium, for example, as a direct link or in the body of an email or message, and must be easily accessible for *retail investor*s.

D.  If the *relationship summary* is delivered in paper format as part of a package of documents, you must ensure that the *relationship summary* is the first among any documents that are delivered at that time.

## 11.  Definitions.

For purposes of Form CRS and these Instructions, the following terms have the meanings ascribed to them below:

A.  **Affiliate:**  Any persons directly or indirectly controlling or controlled by you or under common control with you.

B.  **Dually licensed financial professional:**  A natural person who is both an associated person of a broker-dealer registered under section 15 of the Exchange Act, as defined in section 3(a)(18) of the Exchange Act, and a supervised person of an investment adviser registered under section 203 of the Advisers Act, as defined in section 202(a)(25) of the Advisers Act.

C.  **Dual registrant:**  A firm that is dually registered as a broker-dealer under section 15 of the Exchange Act and an investment adviser under section 203 of the Advisers Act and offers services to *retail investors* as both a broker-dealer and an investment adviser.  For example, if you are dually registered and offer investment advisory services to *retail investors*, but offer brokerage services only to institutional investors, you are not a *dual registrant* for purposes of Form CRS and these Instructions.

D.  **Relationship summary:**  A written disclosure statement prepared in accordance with these Instructions that you must provide to *retail investors*.  See Advisers Act rule 204-5; Exchange Act rule 17a-14; Form CRS.

E.  **Retail investor:**  A natural person, or the legal representative of such natural person, who seeks to receive or receives services primarily for personal, family or household purposes.

**33654**        **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

**Item Instructions**

**Item 1.        Introduction**

Include the date prominently at the beginning of the *relationship summary* (*e.g.*, in the header or footer of the first page or in a similar location for a *relationship summary* provided electronically). Briefly discuss the following information in an introduction:

    A.    State your name and whether you are registered with the Securities and Exchange Commission as a broker-dealer, investment adviser, or both. Also indicate that brokerage and investment advisory services and fees differ and that it is important for the *retail investor* to understand the differences. You may also include a reference to FINRA or Securities Investor Protection Corporation membership in a manner consistent with other rules or regulations (*e.g.*, FINRA rule 2210).

    B.    State that free and simple tools are available to research firms and financial professionals at Investor.gov/CRS, which also provides educational materials about broker-dealers, investment advisers, and investing.

**Item 2.        Relationships and Services**

    A.    Use the heading: "What investment services and advice can you provide me?"

    B.    **Description of Services:** State that you offer brokerage services, investment advisory services, or both, to *retail investors*, and summarize the principal services, accounts, or investments you make available to *retail investors*, and any material limitations on such services. For broker-dealers, state the particular types of principal brokerage services you offer to *retail investors*, including buying and selling securities, and whether or not you offer recommendations to *retail investors*. For investment advisers, state the particular types of principal investment advisory services you offer to *retail investors*, including, for example, financial planning and wrap fee programs.

        In your description you must address the following:

        (i)    *Monitoring:* Explain whether or not you monitor *retail investors'* investments, including the frequency and any material limitations. If so, indicate whether or not the services described in response to this Item 2.B.(i) are offered as part of your standard services.

        (ii)    *Investment Authority*: For investment advisers that accept discretionary authority, describe those services and any material limitations on that authority. Any such summary must include the specific circumstances that would trigger this authority and any material limitations on that authority (*e.g.*, length of time). For investment advisers that offer non-discretionary services and broker-dealers, explain that the *retail investor* makes the ultimate decision regarding the purchase or sale of investments.

App 207

**Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33655**

Broker-dealers may, but are not required to state whether you accept limited discretionary authority.

Note: If you are a broker-dealer offering recommendations, you should consider the applicability of the Investment Advisers Act of 1940, consistent with SEC guidance.

(iii)    *Limited Investment Offerings*: Explain whether or not you make available or offer advice only with respect to proprietary products, or a limited menu of products or types of investments, and if so, describe these limitations.

(iv)    *Account Minimums and Other Requirements*: Explain whether or not you have any requirements for *retail investors* to open or maintain an account or establish a relationship, such as minimum account size or investment amount.

C.    **Additional Information:** Include specific references to more detailed information about your services that, at a minimum, include the same or equivalent information to that required by the Form ADV, Part 2A brochure (Items 4 and 7 of Part 2A or Items 4.A. and 5 of Part 2A Appendix 1) and Regulation Best Interest, as applicable. If you are a broker-dealer that does not provide recommendations subject to Regulation Best Interest, to the extent you prepare more detailed information about your services, you must include specific references to such information. You may include hyperlinks, mouse-over windows, or other means of facilitating access to this additional information and to any additional examples or explanations of such services.

D.    **Conversation Starters:** Include the following additional questions for a *retail investor* to ask a financial professional and start a conversation about relationships and services:

(i)    If you are a broker-dealer and not a *dual registrant*, include: "Given my financial situation, should I choose a brokerage service? Why or why not?"

(ii)    If you are an investment adviser and not a *dual registrant*, include: "Given my financial situation, should I choose an investment advisory service? Why or why not?"

(iii)    If you are a *dual registrant*, include: "Given my financial situation, should I choose an investment advisory service? Should I choose a brokerage service? Should I choose both types of services? Why or why not?"

(iv)    "How will you choose investments to recommend to me?"

(v)    "What is your relevant experience, including your licenses, education and other qualifications? What do these qualifications mean?"

App 208

**33656**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

**Item 3.**    <u>**Fees, Costs, Conflicts, and Standard of Conduct**</u>

   A.    Use the heading: "What fees will I pay?"

      (i)    *Description of Principal Fees and Costs*:  Summarize the principal fees and costs that *retail investors* will incur for your brokerage or investment advisory services, including how frequently they are assessed and the conflicts of interest they create.

         a.    Broker-dealers must describe their transaction-based fees.  With respect to addressing conflicts of interest, a broker-dealer could, for example, include a statement that a *retail investor* would be charged more when there are more trades in his or her account, and that the firm may therefore have an incentive to encourage a *retail investor* to trade often.

         b.    Investment advisers must describe their ongoing asset-based fees, fixed fees, wrap fee program fees, or other direct fee arrangement. The principal fees for investment advisory services should align with the type of fee(s) that you report in response to Form ADV Part 1A, Item 5.E.

            (1) Include information about each type of fee you report in Form ADV that is responsive to this Item 3.A.  Investment advisers with wrap fee program fees are encouraged to explain that asset-based fees associated with the wrap fee program will include most transaction costs and fees to a broker-dealer or bank that has custody of these assets, and therefore are higher than a typical asset-based advisory fee.

            (2) With respect to addressing conflicts of interest, an investment adviser that charges an asset-based fee could, for example, include a statement that the more assets there are in a *retail investor's* advisory account, the more a *retail investor* will pay in fees, and the firm may therefore have an incentive to encourage the *retail investor* to increase the assets in his or her account.

            **Note:** If you receive compensation in connection with the purchase or sale of securities, you should carefully consider the applicability of the broker-dealer registration requirements of the Securities Exchange Act of 1934 and any applicable state securities statutes.

      (ii)    *Description of Other Fees and Costs*:  Describe other fees and costs related to your brokerage or investment advisory services and investments in addition to the firm's principal fees and costs disclosed in Item 3.A.(i) that the *retail investor* will pay directly or indirectly.  List examples of the

categories of the most common fees and costs applicable to your *retail investors* (*e.g.*, custodian fees, account maintenance fees, fees related to mutual funds and variable annuities, and other transactional fees and product-level fees).

(iii) *Additional Information*:  State "You will pay fees and costs whether you make or lose money on your investments.  Fees and costs will reduce any amount of money you make on your investments over time.  Please make sure you understand what fees and costs you are paying."  You must include specific references to more detailed information about your fees and costs that, at a minimum, include the same or equivalent information to that required by the Form ADV, Part 2A brochure (specifically Items 5.A., B., C., and D.) and Regulation Best Interest, as applicable.  If you are a broker-dealer that does not provide recommendations subject to Regulation Best Interest, to the extent you prepare more detailed information about your fees and costs, you must include specific references to such information. You may include hyperlinks, mouse-over windows, or other means of facilitating access to this additional information and to any additional examples or explanations of such fees and costs included in response to Item 3.A.(i) or (ii).

(iv) *Conversation Starter*:  Include the following question for a *retail investor* to ask a financial professional and start a conversation about the impact of fees and costs on investments: "Help me understand how these fees and costs might affect my investments.  If I give you $10,000 to invest, how much will go to fees and costs, and how much will be invested for me?"

B.    If you are a broker-dealer, use the heading: "What are your legal obligations to me when providing recommendations?  How else does your firm make money and what conflicts of interest do you have?"  If you are an investment adviser, use the heading: "What are your legal obligations to me when acting as my investment adviser?  How else does your firm make money and what conflicts of interest do you have?"  If you are a *dual registrant* that prepares a single *relationship summary*, use the heading: "What are your legal obligations to me when providing recommendations as my broker-dealer or when acting as my investment adviser?  How else does your firm make money and what conflicts of interest do you have?"

(i) *Standard of Conduct*.

a.    If you are a broker-dealer that provides recommendations subject to Regulation Best Interest, include (emphasis required): "*When we provide you with a recommendation*, we have to act in your best interest and not put our interest ahead of yours.  At the same time, the way we make money creates some conflicts with your interests.  You should understand and ask us about these conflicts because

they can affect the recommendations we provide you. Here are some examples to help you understand what this means." If you are a broker-dealer that does not provide recommendations subject to Regulation Best Interest, include (emphasis required): "We *do not* provide recommendations. The way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the services we provide you. Here are some examples to help you understand what this means."

b.    If you are an investment adviser, include (emphasis required): "*When we act as your investment adviser*, we have to act in your best interest and not put our interest ahead of yours. At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the investment advice we provide you. Here are some examples to help you understand what this means."

c.    If you are a *dual registrant* that prepares a single *relationship summary* and you provide recommendations subject to Regulation Best Interest as a broker-dealer, include (emphasis required): "*When we provide you with a recommendation as your broker-dealer or act as your investment adviser*, we have to act in your best interest and not put our interest ahead of yours. At the same time, the way we make money creates some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the recommendations and investment advice we provide you. Here are some examples to help you understand what this means." If you are a *dual registrant* that prepares a single *relationship summary* and you do not provide recommendations subject to Regulation Best Interest as a broker-dealer, include (emphasis required): "We *do not* provide recommendations as your broker-dealer. *When we act as your investment adviser*, we have to act in your best interest and not put our interests ahead of yours. At the same time, the way we make money creates some conflicts with your interest. You should understand and ask us about these conflicts because they can affect the services and investment advice we provide you. Here are some examples to help you understand what this means." If you are a *dual registrant* that prepares two separate *relationship summaries*, follow the instructions for broker-dealers and investment advisers in Items 3.B., 3.B.(i).a., and 3.B.(i).b.

(ii)    *Examples of Ways You Make Money and Conflicts of Interest*: If applicable to you, summarize the following other ways in which you and your *affiliates* make money from brokerage or investment advisory

services and investments you provide to *retail investors*. If none of these conflicts applies to you, summarize at least one other material conflict of interest that affects *retail investors*. Explain the incentives created by each of these examples.

   a.    Proprietary Products: Investments that are issued, sponsored, or managed by you or your *affiliates*.

   b.    Third-Party Payments: Compensation you receive from third parties when you recommend or sell certain investments.

   c.    Revenue Sharing: Investments where the manager or sponsor of those investments or another third party (such as an intermediary) shares with you revenue it earns on those investments.

   d.    Principal Trading: Investments you buy from a *retail investor*, and/or investments you sell to a *retail investor*, for or from your own accounts, respectively.

(iii)   *Conversation Starter*: Include the following question for a *retail investor* to ask a financial professional and start a conversation about conflicts of interest: "How might your conflicts of interest affect me, and how will you address them?"

(iv)   *Additional Information*: You must include specific references to more detailed information about your conflicts of interest that, at a minimum, include the same or equivalent information to that required by the Form ADV, Part 2A brochure and Regulation Best Interest, as applicable. If you are a broker-dealer that does not provide recommendations subject to Regulation Best Interest, to the extent you prepare more detailed information about your conflicts, you must include specific references to such information. You may include hyperlinks, mouse-over windows, or other means of facilitating access to this additional information and to any additional examples or explanations of such conflicts of interest.

C.   Use the heading: "How do your financial professionals make money?"

(i)   *Description of How Financial Professionals Make Money*: Summarize how your financial professionals are compensated, including cash and non-cash compensation, and the conflicts of interest those payments create.

(ii)   *Required Topics in the Description*: Include, to the extent applicable, whether your financial professionals are compensated based on factors such as: the amount of client assets they service; the time and complexity required to meet a client's needs; the product sold (*i.e.*, differential compensation); product sales commissions; or revenue the firm earns from the financial professional's advisory services or recommendations.

**33660**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

**Item 4.**    **Disciplinary History**

    A.    Use the heading: "Do you or your financial professionals have legal or disciplinary history?"

    B.    State "Yes" if you or any of your financial professionals currently disclose, or are required to disclose, the following information:

        (i)    Disciplinary information in your Form ADV (Item 11 of Part 1A or Item 9 of Part 2A).

        (ii)    Legal or disciplinary history in your Form BD (Items 11 A–K) (except to the extent such information is not released to BrokerCheck, pursuant to FINRA Rule 8312).

        (iii)    Disclosures for any of your financial professionals in Items 14 A–M on Form U4 (Uniform Application for Securities Industry Registration or Transfer), or in Items 7A or 7C–F of Form U5 (Uniform Termination Notice for Securities Industry Registration), or on Form U6 (Uniform Disciplinary Action Reporting Form) (except to the extent such information is not released to BrokerCheck, pursuant to FINRA Rule 8312).

    C.    State "No" if neither you nor any of your financial professionals currently discloses, or is required to disclose, the information listed in Item 4.B.

    D.    Regardless of your response to Item 4.B, you must:

        (i)    *Search Tool*:  Direct the *retail investor* to visit Investor.gov/CRS for a free and simple search tool to research you and your financial professionals.

        (ii)    *Conversation Starter*:  Include the following questions for a *retail investor* to ask a financial professional and start a conversation about the financial professional's disciplinary history: "As a financial professional, do you have any disciplinary history?  For what type of conduct?"

**Item 5.**    **Additional Information**

    A.    State where the *retail investor* can find additional information about your brokerage or investment advisory services and request a copy of the *relationship summary*.  This information should be disclosed prominently at the end of the *relationship summary*.

    B.    Include a telephone number where *retail investors* can request up-to-date information and request a copy of the *relationship summary*.

    C.    **Conversation Starter:**  Include the following questions for a *retail investor* to ask a financial professional and start a conversation about the contacts and complaints: "Who is my primary contact person?  Is he or she a representative of an investment adviser or a broker-dealer?  Who can I talk to if I have concerns about how this person is treating me?"

### APPENDIX C

**Feedback Forms Comment Summary**

The Proposing Release, at Appendix F, provided investors seeking to comment on the relationship summary a form with standardized questions for providing their feedback. The Appendix F form could be completed electronically on our website. As of June 4, 2019, 93 individuals provided a relevant response or comment answering at least one question on this form (a "responsive" answer.).[1] About 50% (47) were completed electronically using the on-line version of the form on our website.[2] Other commenters (46) submitted a downloaded and completed copy of the form to the comment file in a .pdf file or submitted a completed a copy of the form at one of our investor roundtables.[3]

This Appendix reports the staff's summary of the 93 comments provided using the Appendix F form with a responsive answer to one or more questions (the "Feedback Forms"). Some questions called for a "structured" response (e.g., Question 2 asks commenters to indicate whether specific sections of the relationship summary are: "very useful," "useful," "not useful" or "unsure"). For these questions, the Feedback Forms are summarized from the structured question options. Other questions requested a narrative response and, for these questions, the Feedback Forms are summarized from the sentiment of these narrative answers.

### *Question 1: Overall do you find the Relationship Summary useful? If not, how would you change it? If so, what topics and how can they be improved?*

Question 1 requested a narrative answer. 70 (over 70%) of individuals who submitted the Feedback Forms indicated in narrative answers in Question 1 or to other questions that they found the relationship summary to be useful.

Among those who indicated that they found the document overall to be useful, many suggested ways to improve the document. For example, 41 noted that some topics are too technical or otherwise need improvement in response to Question 4 or in other comments, 48 suggested additional information in response to Question 5 or in other comments; and 27 indicated that the document should be shorter in response to Question 6 or in other comments. Also, many indicated that they did not find the relationship summary entirely easy to read and follow (33 commenters (35%) answered "Somewhat" or "No" in either of Question 3(a) (*Do you find the format of the Relationship Summary easy to follow?*) or Question 3(c) (*Is the Relationship Summary easy to read?*).

---

[1] A few individuals used the on-line version of the Appendix F form to provide comments on other topics and did not provide any responses or comments relevant to any of the form's questions. These non-responsive comment documents are not included in this summary.

[2] Feedback forms completed on line and included in this summary are at listed at Endnote 1.

[3] Feedback forms submitted to the comment file on a downloaded and completed copy of the Feedback form or at one of our investor roundtables that are included in this summary are listed at Endnote 2.

**33662**    **Federal Register** / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

9 (about 10%) indicated that they did not find the relationship summary to be useful. The remaining responses to this question did not express a clear sentiment.

***Question Q2(a): How useful is the Type of Relationship and Service section of the Relationship Summary?[4]***

| Very Useful | Useful | Not Useful | Unsure | No Response |
|---|---|---|---|---|
| 41 | 41 | 5 | 4 | 2 |
| (44%) | (44%) | (5%) | (4%) | (2%) |

***Question Q2(b): How useful is the Our Obligations to You section of the Relationship Summary?***

| Very Useful | Useful | Not Useful | Unsure | No Response |
|---|---|---|---|---|
| 36 | 42 | 7 | 4 | 4 |
| (39%) | (45%) | (8%) | (4%) | (4%) |

***Question Q2(c): How useful is the Fees and Costs section of the Relationship Summary?***

| Very Useful | Useful | Not Useful | Unsure | No Response |
|---|---|---|---|---|
| 33 | 43 | 8 | 6 | 3 |
| (35%) | (46%) | (9%) | (6%) | (3%) |

***Question Q2(d): How useful is the Comparison to different account types section of the Relationship Summary?***

| Very Useful | Useful | Not Useful | Unsure | No Response |
|---|---|---|---|---|
| 29 | 39 | 6 | 11 | 8 |
| (31%) | (42%) | (6%) | (12%) | (9%) |

---

[4] Percentages reported in tables summarized responses to Questions 2 and 3 are based on the total number of Feedback Forms.

Federal Register / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations    **33663**

*Question Q2(e): How useful is the Conflict of Interests section of the Relationship Summary?*

| Very Useful | Useful | Not Useful | Unsure | No Response |
|---|---|---|---|---|
| 39 | 30 | 10 | 10 | 4 |
| (42%) | (32%) | (11%) | (11%) | (4%) |

*Question Q2(f): How useful is the Additional Information section of the Relationship Summary?*

| Very Useful | Useful | Not Useful | Unsure | No Response |
|---|---|---|---|---|
| 30 | 35 | 10 | 10 | 8 |
| (32%) | (38%) | (11%) | (11%) | (9%) |

*Question Q2(g): How useful is the Key Questions to Ask section of the Relationship Summary?*

| Very Useful | Useful | Not Useful | Unsure | No Response |
|---|---|---|---|---|
| 51 | 28 | 7 | 3 | 4 |
| (55%) | (30%) | (8%) | (3%) | (4%) |

*Question Q3(a): Do you find the format of the Relationship Summary easy to follow?*

| Yes | Somewhat | No | No Response |
|---|---|---|---|
| 58 | 24 | 7 | 4 |
| (62%) | (26%) | (8%) | (4%) |

*Question Q3(b): Is the information in the appropriate order?*

| Yes | Somewhat | No | No Response |
|---|---|---|---|
| 57 | 26 | 7 | 3 |
| (61%) | (28%) | (8%) | (3%) |

*Question Q3(c): Is the Relationship Summary easy to read?*

| Yes | Somewhat | No | No Response |
|---|---|---|---|
| 55 | 23 | 10 | 5 |
| (59%) | (25%) | (11%) | (5%) |

App 216

**33664**    Federal Register / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations

***Question Q3(d): Should the Relationship Summary include additional information about different account types?***

|      | Yes | Somewhat | No | No Response |
|------|-----|----------|-----|-----|
|      | 49  | 9        | 29  | 6   |
|      | (53%) | (10%)  | (31%) | (6%) |

***Question Q3(e): Would you seek out additional information about a firm's disciplinary history as suggested in the Relationship Summary?***

|      | Yes | Somewhat | No | No Response |
|------|-----|----------|-----|-----|
|      | 65  | 14       | 10  | 4   |
|      | (70%) | (15%)  | (11%) | (4%) |

***Question 4: Are there topics in the Relationship Summary that are too technical or that could be improved?***

Question 4 requested a narrative answer. Narrative answers offered by 25 (more than 25% of Feedback Forms) specifically stated that the relationship summary was not too technical.

On 27 Feedback Forms (about 30%), commenters did not respond to Question 4 or offered an answer that did not address this question. Among these 27, 13 appeared to fully agree that relationship summary format was easy to follow and the relationship summary was easy to read by checking "yes" in response to Question 3(a) (*Do you find the format of the Relationship Summary easy to follow?*) and Question 3(c) (*Is the Relationship Summary easy to read?*). Overall, 45 commenters (48%) on Feedback Forms fully agreed that the relation summary is easy to read and follow by checking "yes" in response to Question 3(a) ("*Do you find the format of the Relationship Summary easy to follow*") and Question 3(c) ("*Is the Relationship Summary easy to read*?").

On 41 of the Feedback Forms (44% of 93 Feedback Forms), the narrative response to Question 4 or other comments on the Feedback Form indicated that the relationship summary was too technical or suggested one or more topics that could be improved. Across all Feedback Forms (including those with comments indicating that the relationship summary was not too technical):

- 20 Feedback Forms included comment indicating that the relationship summary language was generally too technical, wordy or confusing, or should be made simpler;
- 23 Feedback Forms included narrative comments indicating that information about fees and costs was too technical or needed to be more clear, including seven (7) that asked for definitions of terms such as transaction-based fee, asset-based fee or wrap fee;
- 23 Feedback Forms included narrative comments suggesting that information in sections covering relationships and services and the obligations of financial professionals needed clarification, including ten (10) Feedback Forms that asked for a definition or better explanation of the term "fiduciary"; and

App 217

- 14 Feedback Forms included narrative comments suggesting clarification or more information about conflicts of interest.

***Question 5: Is there additional information that we should require in the Relationship Summary, such as more specific information about the form or additional information about fees? Is that because you do not receive the information now, or because you would also like to see it presented in this summary document, or both? Is there any information that should be made more prominent?***

Question 5 requested a narrative answer. 48 of the Feedback Forms (more than 50%) included comments suggesting additional information that could be required in response to Question 5 or another question on the Feedback Form. Many (29) indicated that additional information about fees and costs would be helpful.

On 13 of the Feedback Forms (about 14%) narrative comments responding to Question 5 indicated that no additional information was needed. On the remainder of Feedback Forms (32, over 30% of Feedback Forms), there was no answer given or the answer given was not relevant to Question 5.

***Question 6: Is the Relationship Summary an appropriate length? If not, should it be longer or shorter?***

Question 6 requested a narrative answer. 37 narrative answers responding to Question 6 or another question (about 40% of 93 Feedback Forms) specifically indicated that the relationship summary's length is appropriate. 27 of the Feedback Forms (about 30%) included comments suggesting that the relationship summary should be shorter. Two commenters suggested that the form should be longer. On the remainder of Feedback Forms (27, or almost 30%), there was no answer given or the answer given was not relevant to Question 6.

***Question 7: Do you find the 'Key Questions to Ask' useful? Would the questions improve the quality of your discussion with your financial professional? If not, why not?***

Question 7 requested a narrative answer. Responses on 77 (over 75%) of Feedback Forms indicated that the Key Questions were useful ("useful" and "very useful" answers to Question 2(g) are included, if there was no answer provided to Question 7).

11 Feedback Forms (about 12%) included specific comments agreeing that the Key Questions would encourage discussions with financial professionals. Another two (2) included a comment agreeing that, in general, the relationship summary could encourage dialogue between financial professionals and clients.

Several commenters (8) suggested moving the Key Questions to the beginning or closer to the beginning of the relationship summary, or including the Key Questions within individual sections, rather than placing the key questions at the end of the document.

App 218

**Endnotes:**

[1] Feedback forms completed on-line and included in this summary: Fors Anderson, 3/17/2019, https://www.sec.gov/comments/s7-08-18/s70818-5134364-183356.htm ("Anderson Feedback Form"), Sylva Baker, 8/6/2018, https://www.sec.gov/comments/s7-08-18/s70818-4170945-172084.pdf ("Baker Feedback Form"); Linda Baumbusch, 7/29/2018, https://www.sec.gov/comments/s7-08-18/s70818-4133141-171850.htm ("Baumbusch Feedback Form"); Mahesh Bhupalam, 7/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-4069296-169437.htm ("Bhupalam Feedback Form"); Hugh Caddess, 7/23/2018, https://www.sec.gov/comments/s7-08-18/s70818-4097528-170159.htm("Caddess Feedback Form"); Paul Calderon, 7/30/2018, https://www.sec.gov/comments/s7-08-18/s70818-4140254-171938.htm("Calderon Feedback Form"); Robert Carr, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4024224-167344.htm ("Carr Feedback Form"); Rod Carroll, 7/10/2018m, https://www.sec.gov/comments/s7-08-18/s70818-4029201-167352.htm ("Carroll Feedback Form"); Charles Christine, 6/22/2018, https://www.sec.gov/comments/s7-08-18/s70818-3910620-166661.htm("Christine Feedback Form"); Lloyd Coleman, 7/17/2018, https://www.sec.gov/comments/s7-08-18/s70818-4063665-169130.htm ("Coleman Feedback Form"); Janice Daunheimer, 8/7/2018, https://www.sec.gov/comments/s7-08-18/s70818-4185205-172598.htm ("Daunheimer Feedback Form"); Juanita Fontaine, 7/21/2018, https://www.sec.gov/comments/s7-08-18/s70818-4096751-170113.htm ("Fontaine Feedback Form"); Frederick Greene, 7/13/2018, https://www.sec.gov/comments/s7-08-18/s70818-4044546-168910.htm ("Greene Feedback Form"); Chester Hawkins, 8/1/2018, https://www.sec.gov/comments/s7-08-18/s70818-4171653-172230.htm ("Hawkins Feedback Form"); Anthony Hicks, 7/20/2018, https://www.sec.gov/comments/s7-08-18/s70818-4096231-170102.htm ("Hicks Feedback Form"); Jeffrey T., 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4024265-167345.htm ("Jeffrey Feedback Form"); Mike Keeler, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4024769-167348.htm ("Keeler Feedback Form"); Duane Lee, 12/3/2018, https://www.sec.gov/comments/s7-08-18/s70818-4719639-176708.htm ("Lee2 Feedback Form"); George Macke, 6/2/2018, https://www.sec.gov/comments/s7-08-18/s70818-3768103-162690.htm ("Macke Feedback Form"); Mary Malone, 7/15/2018, https://www.sec.gov/comments/s7-08-18/s70818-4048232-168957.htm ("Malone Feedback Form"); Mary Margolis, MBR Financial, 6/28/2018, https://www.sec.gov/comments/s7-08-18/s70818-3974252-167135.htm ("Margolis Feedback Form"); Darren Markle, 7/6/2018, https://www.sec.gov/comments/s7-08-18/s70818-4008397-167254.htm ("Markle Feedback Form"); Chelsea Matvey, 7/19/2018, https://www.sec.gov/comments/s7-08-18/s70818-4078676-169821.htm ("Matvey Feedback Form"); Kevin McGuire, 7/17/2018, https://www.sec.gov/comments/s7-08-18/s70818-4063664-169164.htm ("McGuire Feedback Form"); Jennifer Mellgren, 7/22/2018, https://www.sec.gov/comments/s7-08-18/s70818-4097514-170157.htm ("Mellgren Feedback Form"); Robert Mennella, 8/22/2018, https://www.sec.gov/comments/s7-08-18/s70818-4251004-173033.htm ("Mennella Feedback Form"); Steven Miller, 7/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-4065013-169285.htm ("Miller Feedback Form"); Bob Murphy, 7/25/2018, https://www.sec.gov/comments/s7-08-18/s70818-4111730-170372.htm ("Murphy Feedback Form"); Mary Newton, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4024770-167347.htm ("Newton Feedback

Form"); Jon Panitzke, 7/23/2018, https://www.sec.gov/comments/s7-08-18/s70818-4105327-170265.htm ("Panitzke Feedback Form"); Marcus Paredes, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4024691-167346.htm ("Panitzke Feedback Form"); Huelien Pham, 7/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-4069312-169440.htm ("Pham Feedback Form"); Loizos Prodromou, 7/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-4064613-169273.htm ("Prodromou Feedback Form"); Richard Rohr, 6/22/2018, https://www.sec.gov/comments/s7-08-18/s70818-3910614-166660.htm ("Rohr Feedback Form"); Kathy Sachs, 7/23/2018, https://www.sec.gov/comments/s7-08-18/s70818-4105119-170257.htm ("Sachs Feedback Form"); Richard Salkowitz, 7/19/2018, https://www.sec.gov/comments/s7-08-18/s70818-4078450-169772.htm ("Salkowitz Feedback Form"); Dwight Sanders, 6/8/2018, https://www.sec.gov/comments/s7-08-18/s70818-3816823-162750.htm ("Sanders1Feedback Form"); Dr. Dwight Sanders, 6/30/2018, https://www.sec.gov/comments/s7-08-18/s70818-3985541-167075.htm ("Sanders2 Feedback Form"); Daniel Schuman, 7/20/2018, https://www.sec.gov/comments/s7-08-18/s70818-4096425-170103.htm ("Schuman Feedback Form"); Ron Shepherd, 6/20/2018, https://www.sec.gov/comments/s7-08-18/s70818-3900517-162957.htm ("Shepherd Feedback Form"); Pat Smith, 7/24/2018, https://www.sec.gov/comments/s7-08-18/s70818-4110731-170363.htm ("Smith1 Feedback Form"); Joe Smith, 8/6/2018, https://www.sec.gov/comments/s7-08-18/s70818-4173957-172348.htm ("Smith2 Feedback Form"); Star Identifier, 11/5/2018, https://www.sec.gov/comments/s7-08-18/s70818-4611472-176365.htm ("Star Feedback Form"); Cyril Anouar Streit, 9/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4445712-173232.htm ("Streit Feedback Form"); Jay Thompson, 7/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-4069295-169419.htm ("Thompson Feedback Form"); Brenda Winslow, 6/6/2018, https://www.sec.gov/comments/s7-08-18/s70818-3784415-162708.htm ("Winslow Feedback Form"); Mark Winsor, 7/21/2018, https://www.sec.gov/comments/s7-08-18/s70818-4096783-170118.htm ("Winsor Feedback Form").

[2] Feedback Forms filed in the comment file in .pdf format: Anonymous, 6/15/2018, https://www.sec.gov/comments/s7-08-18/s70818-3857882-162788.pdf ("Anonymous01 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3898398-162931.pdf ("Anonymous02 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3898681-162940.pdf ("Anonymous03 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3897774-162930.pdf ("Anonymous04 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3898814-162941.pdf ("Anonymous05 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3897701-162929.pdf ("Anonymous06 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899032-162942.pdf ("Anonymous07 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3897489-162926.pdf ("Anonymous08 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3898137-162934.pdf ("Anonymous09 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3898482-162937.pdf ("Anonymous10 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3897632-162927.pdf ("Anonymous11

Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3898148-162936.pdf ("Anonymous12 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3898590-162939.pdfv ("Anonymous13 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3898570-162938.pdf, ("Anonymous14 Feedback Form"); Anonymous, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3897651-162928.pdf ("Anonymous15 Feedback Form"); Anonymous, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4030385-167421.pdf ("Anonymous16 Feedback Form"); Anonymous, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4030375-167399.pdf ("Anonymous17 Feedback Form"); Anonymous, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4030330-167397.pdf ("Anonymous18 Feedback Form"); Anonymous, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4030369-167398.pdf ("Anonymous19 Feedback Form"); Anonymous, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4030378-167420.pdf ("Anonymous20 Feedback Form"); Anonymous, 7/10/2018, https://www.sec.gov/comments/s7-08-18/s70818-4030325-167411.pdf ("Anonymous21 Feedback Form"); Anonymous, 7/17/2018, https://www.sec.gov/comments/s7-08-18/s70818-4345352-173277.pdf ("Anonymous22 Feedback Form"); Anonymous, 7/17/2018, https://www.sec.gov/comments/s7-08-18/s70818-4345314-173293.pdf ("Anonymous23 Feedback Form"); Anonymous, 7/17/2018, https://www.sec.gov/comments/s7-08-18/s70818-4345453-173280.pdf ("Anonymous24 Feedback Form");  Anonymous, 7/17/2018, https://www.sec.gov/comments/s7-08-18/s70818-4345356-173278.pdf ("Anonymous25 Feedback Form"); Anonymous, 7/17/2018, https://www.sec.gov/comments/s7-08-18/s70818-4345378-173279.pdf ("Anonymous26 Feedback Form"); Anonymous, 7/17/2018, https://www.sec.gov/comments/s7-08-18/s70818-4345323-173294.pdf ("Anonymous27 Feedback Form"); Anonymous, 8/6/2018, https://www.sec.gov/comments/s7-08-18/s70818-4287928-173164.pdf ("Anonymous28 Feedback Form"); Anonymous, 9/27/2018, https://www.sec.gov/comments/s7-08-18/s70818-4447388-175712.pdf) ("Anonymous29 Feedback Form"); Leo Asen, 8/4/2018, https://www.sec.gov/comments/s7-08-18/s70818-4171811-172312.pdf ("Asen Feedback Form"); Lee Baird, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899545-162952.pdf ("Baird Feedback Form"); MT Bowling, 6/1/2018, https://www.sec.gov/comments/s7-08-18/s70818-3757598-162619.pdf ("Bowling Feedback Form"); Mike Brantley, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899574-162955.pdf ("Brantley Feedback Form"); James Davis, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899432-162948.pdf ("Davis Feedback Form"); George Durgin, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899422-162947.pdf ("Durgin Feedback Form"); Brain Hobbes, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899428-162945.pdf ("Hobbes Feedback Form"); Karean Hoggan, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899522-162951.pdf ("Hoggan Feedback Form"); Joker Jenkins, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899511-162950.pdf ("Jenkins Feedback Form"); Jennifer Lee 4/28/2018, https://www.sec.gov/comments/s7-08-18/s70818-3551103-162323.pdf ("Lee1 Feedback Form"); Angela Montellano, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3897484-162925.pdf ("Montellano Feedback Form"); Don Parsons, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899387-

162944.pdf ("Parsons Feedback Form"); David Schreiner, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899390-162946.pdf ("Schreiner Feedback Form"); Ron Seits, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899580-162956.pdf ("Seits Feedback Form"); Mark Shaffer, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899570-162954.pdf ("Shaffer Feedback Form"); Malia Starmer, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899562-162953.pdf ("Starmer1 Feedback Form"); Jason Starmer, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899436-162949.pdf ("Starmer2 Feedback Form").

[FR Doc. 2019–12376 Filed 7–11–19; 8:45 am]
**BILLING CODE 8011–01–C**

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Part 276**

**[Release No. IA–5248; File No. S7–07–18]**

**RIN 3235–AM36**

**Commission Interpretation Regarding Standard of Conduct for Investment Advisers**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Interpretation.

**SUMMARY:** The Securities and Exchange Commission (the "SEC" or the "Commission") is publishing an interpretation of the standard of conduct for investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act" or the "Act").

**DATES:** Effective July 12, 2019.

**FOR FURTHER INFORMATION CONTACT:** Olawalé Oriola, Senior Counsel; Matthew Cook, Senior Counsel; or Jennifer Songer, Branch Chief, at (202) 551–6787 or *IArules@sec.gov,* Investment Adviser Regulation Office, Division of Investment Management, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–8549.

**SUPPLEMENTARY INFORMATION:** The Commission is publishing an interpretation of the standard of conduct for investment advisers under the Advisers Act [15 U.S.C. 80b].[1]

**Table of Contents**

I. Introduction
  A. Overview of Comments
II. Investment Advisers' Fiduciary Duty
  A. Application of Duty Determined by Scope of Relationship
  B. Duty of Care
  1. Duty To Provide Advice That Is in the Best Interest of the Client
  2. Duty To Seek Best Execution
  3. Duty To Provide Advice and Monitoring Over the Course of the Relationship
  C. Duty of Loyalty
III. Economic Considerations
  A. Background
  B. Potential Economic Effects

**I. Introduction**

Under federal law, an investment adviser is a fiduciary.[2] The fiduciary duty an investment adviser owes to its client under the Advisers Act, which comprises a duty of care and a duty of loyalty, is important to the Commission's investor protection efforts. Also important to the Commission's investor protection efforts is the standard of conduct that a broker-dealer owes to a retail customer when it makes a recommendation of any securities transaction or investment strategy involving securities.[3] Both

investment advisers and broker-dealers play an important role in our capital markets and our economy more broadly. Investment advisers and broker-dealers have different types of relationships with investors, offer different services, and have different compensation models. This variety is important because it presents investors with choices regarding the types of relationships they can have, the services they can receive, and how they can pay for those services.

On April 18, 2018, the Commission proposed rules and forms intended to enhance the required standard of conduct for broker-dealers[4] and provide retail investors with clear and succinct information regarding the key aspects of their brokerage and advisory relationships.[5] In connection with the publication of these proposals, the Commission published for comment a separate proposed interpretation regarding the standard of conduct for investment advisers under the Advisers Act ("Proposed Interpretation").[6] We stated in the Proposed Interpretation, and we continue to believe, that it is appropriate and beneficial to address in one release and reaffirm—and in some cases clarify—certain aspects of the fiduciary duty that an investment adviser owes to its clients under section 206 of the Advisers Act.[7] After

---

[1] 15 U.S.C. 80b. Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified, and when we refer to rules under the Advisers Act, or any paragraph of these rules, we are referring to title 17, part 275 of the Code of Federal Regulations [17 CFR 275], in which these rules are published.

[2] *SEC* v. *Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963) ("SEC v. Capital Gains"); *see also infra* footnotes 34–44 and accompanying text; Investment Adviser Codes of Ethics, Investment Advisers Act Release No. 2256 (July 2, 2004); Compliance Programs of Investment Companies and Investment Advisers, Investment Advisers Act Release No. 2204 (Dec. 17, 2003); Electronic Filing by Investment Advisers; Proposed Amendments to Form ADV, Investment Advisers Act Release No. 1862 (Apr. 5, 2000). Investment advisers also have antifraud liability with respect to prospective clients under section 206 of the Advisers Act.

[3] *See* Regulation Best Interest, Exchange Act Release No. 34–86031 (June 5, 2019) ("Reg. BI Adoption"). This final interpretation regarding the standard of conduct for investment advisers under the Advisers Act ("Final Interpretation") interprets section 206 of the Advisers Act, which is applicable to both SEC- and state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act. This Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty. It is not, however, intended to be the exclusive resource for understanding these principles. Separately, in various circumstances, case law, statutes (such as the Employee Retirement Income Security Act of 1974 ("ERISA")), and state law impose obligations on investment advisers. In some cases, these standards may differ from the standard enforced by the Commission.

[4] Regulation Best Interest, Exchange Act Release No. 83062 (Apr. 18, 2018) ("Reg. BI Proposal").

[5] Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 4888 (Apr. 18, 2018) ("Relationship Summary Proposal").

[6] Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation, Investment Advisers Act Release No. 4889 (Apr. 18, 2018).

[7] Further, the Commission recognizes that many advisers provide impersonal investment advice. *See, e.g.,* Advisers Act rule 203A–3 (defining "impersonal investment advice" in the context of defining "investment adviser representative" as "investment advisory services provided by means of written material or oral statements that do not purport to meet the objectives or needs of specific individuals or accounts"). This Final Interpretation
Continued

OMB APPROVAL

OMB Number:          3235-0049
Expires:          October 31, 2024
Estimated average burden
hours per response          23.82

**FORM ADV (Paper Version)**
**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION**

**PART 2: Uniform Requirements for the Investment Adviser *Brochure* and *Brochure Supplements***

**General Instructions for Part 2 of Form ADV**

Under SEC and similar state rules you are required to deliver to *clients* and prospective *clients* a *brochure* disclosing information about your firm.  You also may be required to deliver a *brochure supplement* disclosing information about one or more of your *supervised persons.*  Part 2 of Form ADV sets out the minimum required disclosure that your *brochure* (Part 2A for a firm *brochure*, or Appendix 1 for a *wrap fee program brochure*) and *brochure supplements* (Part 2B) must contain.

Read all the instructions, including General Instructions for Form ADV, General Instructions for Part 2 of Form ADV, Instructions for Part 2A of Form ADV, Instructions for Part 2B of Form ADV, and (if you are preparing or updating a *wrap fee program brochure*) Instructions for Part 2A Appendix 1 of Form ADV, before preparing or updating your *brochure* or *brochure supplements*.

1.  Narrative Format.  Part 2 of Form ADV consists of a series of items that contain disclosure requirements for your firm's *brochure* and any required supplements.  The items require narrative responses.  You must respond to each item in Part 2.  You must include the heading for each item provided by Part 2 immediately preceding your response to that item and provide responses in the same order as the items appear in Part 2.  If an item does not apply to your business, you must indicate that item is not applicable.  If you have provided information in response to one item that is also responsive to another item, you may cross-reference that information in response to the other item.

2.  Plain English.  The items in Part 2 of Form ADV are designed to promote effective communication between you and your *clients*.  Write your *brochure* and supplements in plain English, taking into consideration your *clients'* level of financial sophistication.  Your *brochure* should be concise and direct. In drafting your *brochure* and *brochure supplements*, you should:  (i) use short sentences; (ii) use definite, concrete, everyday words; (iii) use active voice; (iv) use tables or bullet lists for complex material, whenever possible; (v) avoid legal jargon or highly technical business terms unless you explain them or you believe that your *clients* will understand them; and (vi) avoid multiple negatives.  Consider providing examples to illustrate a description of your practices or policies.  The brochure should discuss only conflicts the adviser has or is reasonably likely to have, and practices in which it engages or is reasonably likely to engage.  If a conflict arises or the adviser decides to engage in a practice that it has not disclosed, supplemental disclosure must be provided to clients to obtain their consent.  If you have a conflict or engage in a practice with respect to some (but not all) types or classes of clients, advice, or transactions, indicate as such rather than disclosing that you "may" have the conflict or engage in the practice.

    **Note:**  The SEC's Office of Investor Education and Advocacy has published A Plain English Handbook. You may find the handbook helpful in writing your *brochure* and supplements.  For a copy of this handbook, visit the SEC's web site at<www.sec.gov/news/extra/handbook.htm> or call 1-800-732-0330.

3.  Disclosure Obligations as a Fiduciary.  Under federal and state law, you are a fiduciary and must make full disclosure to your *clients* of all material facts relating to the advisory relationship.  As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your *clients* that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them.  To satisfy this obligation, you therefore may have to disclose to *clients* information not specifically required by Part 2 of Form ADV or in more detail than the brochure items might otherwise require.  You may disclose this additional information to *clients* in your *brochure* or by some other means.

App 223

4. <u>Full and Truthful Disclosure</u>.  All information in your *brochure* and *brochure supplements* must be true and may not omit any material facts.

5. <u>Filing</u>.  You must file your *brochure(s)* (and amendments) through the IARD system using the text-searchable Adobe Portable Document Format ("PDF").  See SEC rules 203-1 and 204-1 and similar state rules.  If you are registered or are registering with the SEC, you are not required to file your *brochure supplements* through the IARD or otherwise.  You must, however, preserve a copy of the supplements and make them available to SEC staff upon request.  See SEC rule 204-2(a)(14).  If you are registered or are registering with one or more *state securities authorities*, you must file a copy of the *brochure supplement* for each *supervised person* doing business in that state.

App 224

**Instructions for Part 2A of Form ADV:  Preparing Your Firm *Brochure***

1.  <u>To whom must we deliver a firm *brochure*</u>?  You must give a firm *brochure* to each *client*.  You must deliver the *brochure* even if your advisory agreement with the *client* is oral.  See SEC rule 204-3(b) and similar state rules.

    If you are registered with the SEC, you are not required to deliver your *brochure* to either (i) *clients* who receive only *impersonal investment advice* from you and who will pay you less than $500 per year or (ii) *clients* that are SEC-registered investment companies or business development companies (the *client* must be registered under the Investment Company Act of 1940 or be a business development company as defined in that Act, <u>and</u> the advisory contract must meet the requirements of section 15(c) of that Act).  See SEC rule 204-3(c).

    **Note:**  Even if you are not required to give a *brochure* to a *client*, as a fiduciary you may still be required to provide your *clients* with similar information, particularly material information about your conflicts of interest and about your disciplinary information.  If you are not required to give a *client* a *brochure*, you <u>may</u> make any required disclosures to that *client* by delivery of your *brochure* or through some other means.

2.  <u>When must we deliver a *brochure* to *clients*</u>?

    *   You must give a firm *brochure* to each *client* before or at the time you enter into an advisory agreement with that *client*.  See SEC rule 204-3(b) and similar state rules.

    *   Each year you must (i) deliver, within 120 days of the end of your fiscal year, to each *client* a free updated *brochure* that either includes a summary of material changes or is accompanied by a summary of material changes, or (ii) deliver to each *client* a summary of material changes that includes an offer to provide a copy of the updated *brochure* and information on how a *client* may obtain the *brochure*.  See SEC rule 204-3(b) and similar state rules.

    *   You do not have to deliver an interim amendment to *clients* unless the amendment includes information in response to Item 9 of Part 2A (disciplinary information).  An interim amendment can be in the form of a document describing the material facts relating to the amended disciplinary event.  See SEC rule 204-3(b) and similar state rules.

    **Note:**  As a fiduciary, you have an ongoing obligation to inform your *clients* of any material information that could affect the advisory relationship.  As a result, between *annual updating amendments* you must disclose material changes to such information to *clients* even if those changes do not trigger delivery of an interim amendment.  See General Instructions for Part 2 of Form ADV, Instruction 3.

3.  <u>May we deliver our *brochure* electronically</u>?  Yes.  The SEC has published interpretive guidance on delivering documents electronically, which you can find at <<u>www.sec.gov/rules/concept/33-7288.txt</u>>.

4.  <u>When must we update our *brochure*</u>?  You must update your *brochure*:  (i) each year at the time you file your *annual updating amendment*; and (ii) promptly whenever any information in the *brochure* becomes materially inaccurate.  You are not required to update your *brochure* between annual amendments solely because the amount of *client* assets you manage has changed or because your fee schedule has changed.  However, if you are updating your *brochure* for a separate reason in between annual amendments, and the amount of *client* assets you manage listed in response to Item 4.E or your fee schedule listed in response to Item 5.A has become materially inaccurate, you should update that item(s) as part of the interim amendment.  All updates to your *brochure* must be filed through the IARD system and maintained in your files.  See SEC rules 204-1 and 204- 2(a)(14) and similar state rules.

5.  <u>We are filing our *annual updating amendment*.  The last *brochure*(s) that we filed does not contain any materially inaccurate information.  Do we have to prepare a summary of material changes</u>?  No, as long as

you have not filed any interim amendments making material changes to the *brochure* that you filed with last year's *annual updating amendment*. If you do not have to prepare a summary of material changes, you do not have to deliver a summary of material changes or a *brochure* to your existing *clients* that year. See SEC rule 204-3(b). If you are a state-registered adviser, you should contact the appropriate *state securities authorities* to determine whether you must make an annual offer of the brochure.

6. <u>Do we need to include the summary of material changes that we prepare in response to Item 2 with *our annual updating amendment* filing on IARD?</u> Yes, you need to include the summary in your *annual updating amendment*. Item 2 permits you to include the summary as part of the *brochure* (on the cover page or the page immediately following the cover page) or to create a separate document containing the summary. If you include the summary as part of your *brochure,* the summary will be part of the *annual updating amendment* filing that you submit on IARD. If your summary of material changes is a separate document, you must attach the summary as an exhibit to your *brochure* and upload your *brochure* and the summary together in a single, text- searchable file in Adobe Portable Document Format on IARD for your *annual updating amendment*.

   **Note**: If you include the summary of material changes in your *brochure*, and you revise or update your *brochure* between *annual updating amendments*, you should consider whether you should update the summary as part of that other-than annual amendment to avoid confusing or misleading *clients* reading the updated *brochure*.

7. <u>We have determined that we have no *clients* to whom we must deliver a *brochure*. Must we prepare one</u>? No, but see note to Instruction 1 above.

8. <u>May we include a summary of the *brochure* at the beginning of our *brochure*</u>? Yes. Although it is not required, you may choose to include a summary of the *brochure* at the beginning of your *brochure*. Such summary, however, may not substitute for the summary of material changes required by Item 2 of Part 2A.

9. <u>We offer several advisory services. May we prepare multiple firm *brochure*s</u>? Yes. If you offer substantially different types of advisory services, you may opt to prepare separate *brochure*s so long as each *client* receives all applicable information about services and fees. Each *brochure* may omit information that does not apply to the advisory services and fees it describes. For example, your firm *brochure* sent to your *clients* who invest <u>only</u> in the United States can omit information about your advisory services and fees relating to offshore investments. See SEC rule 204-3(e) and similar state rules. If you prepare separate *brochures* you must file each *brochure* (and any amendments) through the IARD system as required in SEC rules 203-1 and 204-1 and similar state rules.

10. <u>We *sponsor* a *wrap fee program*. Is there a different *brochure* that we need to deliver to our wrap fee *clients*</u>? Yes. If you *sponsor* a *wrap fee program*, you must deliver a *wrap fee program brochure* to your wrap fee *clients*. The disclosure requirements for preparing a *wrap fee program brochure* appear in Part 2A, Appendix 1 of Form ADV. If your entire advisory business is *sponsoring wrap fee programs*, you do not need to prepare a firm *brochure* separate from your *wrap fee program brochure(s)*. See SEC rule 204-3(d) and similar state rules.

11. <u>We provide portfolio management services to *clients* in *wrap fee programs* that we do not *sponsor*. Which *brochure* must we deliver to these *clients*</u>? You must deliver your *brochure* prepared in accordance with Part 2A (not Appendix 1) to your wrap fee *clients*. You also must deliver to these *clients* any *brochure supplements* required by Part 2B of Form ADV.

12. <u>May we include information not required by an item in our *brochure*</u>? Yes. If you include information not required by an item, however, you may not include so much additional information that the required information is obscured.

13. <u>Item 18 requires us to give our *clients* an audited balance sheet. May any public accountant perform the</u>

App 226

audit? Your auditor must be independent.  Article 2 of SEC Regulation S-X sets out the general rules for auditor independence.  Please note that these requirements may be different from the rules of professional organizations.

14.  We are a new firm.  Do we need a *brochure*?  Yes.  Respond to items in Part 2A of Form ADV based on the advisory services you propose to provide and the practices, policies and procedures you propose to adopt.

15.  We are a "separately identifiable department or division" (SID) of a bank.  Must our *brochure* discuss our bank's general business practices?  No.  Information you include in your firm *brochure* (or in *brochure supplements*) should be information about you, the SID, and your business practices, rather than general information about your bank.

SEC 1707 (08-22)  File 3 of 5

App 227

**Part 2A of Form ADV:  Firm *Brochure***

Item 1        Cover Page

A.  The cover page of your *brochure* must state your name, business address, contact information, website address (if you have one), and the date of the *brochure*.

   **Note:**  If you primarily conduct advisory business under a name different from your full legal name, <u>and</u> you have disclosed your business name in Item 1.B of Part 1A of Form ADV, then you may use your business name throughout your *brochure*.

B.  Display on the cover page of your *brochure* the following statement or other clear and concise language conveying the same information, and identifying the document as a "brochure":

   **This brochure provides information about the qualifications and business practices of [your name].  If you have any questions about the contents of this brochure, please contact us at [telephone number and/or email address].  The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority.**

   **Additional information about [your name] also is available on the SEC's website at www.adviserinfo.sec.gov.**

C.  If you refer to yourself as a "registered investment adviser" or describe yourself as being "registered," include a statement that registration does not imply a certain level of skill or training.

Item 2        Material Changes

If you are amending your *brochure* for your annual update and it contains material changes from your last annual update, identify and discuss those changes on the cover page of the *brochure* or on the page immediately following the cover page, or as a separate document accompanying the *brochure*.  You must state clearly that you are discussing only material changes since the last annual update of your *brochure*, and you must provide the date of the last annual update of your *brochure*.

**Note:**     You do not have to separately provide this information to a *client* or prospective *client* who has not received a previous version of your *brochure*.

Item 3        Table of Contents

Provide a table of contents to your *brochure*.

**Note:**  Your table of contents must be detailed enough so that your *clients* can locate topics easily.  Your *brochure* must follow the same order, and contain the same headings, as the items listed in Part 2A. Item 4  Advisory Business

A.  Describe your advisory firm, including how long you have been in business.  Identify your principal owner(s).

   **Notes:**  (1) For purposes of this item, your principal owners include the *persons* you list as owning 25% or more of your firm on Schedule A of Part 1A of Form ADV (Ownership Codes C, D or E).  (2) If you are a publicly held company without a 25% shareholder, simply disclose that you are publicly held.  (3) If an individual or company owns 25% or more of your firm through subsidiaries, you must identify the individual or parent company and intermediate subsidiaries.  If you are an SEC-registered adviser, you must identify intermediate subsidiaries that are publicly held, but not other intermediate subsidiaries. If you are a state-registered adviser, you must identify all intermediate subsidiaries.

B. Describe the types of advisory services you offer. If you hold yourself out as specializing in a particular type of advisory service, such as financial planning, quantitative analysis, or market timing, explain the nature of that service in greater detail. If you provide investment advice only with respect to limited types of investments, explain the type of investment advice you offer, and disclose that your advice is limited to those types of investments.

C. Explain whether (and, if so, how) you tailor your advisory services to the individual needs of *clients*. Explain whether *clients* may impose restrictions on investing in certain securities or types of securities.

D. If you participate in *wrap fee programs* by providing portfolio management services, (1) describe the differences, if any, between how you manage wrap fee accounts and how you manage other accounts, and
(2) explain that you receive a portion of the wrap fee for your services.

E. If you manage *client* assets, disclose the amount of *client* assets you manage on a *discretionary basis* and the amount of *client* assets you manage on a non-*discretionary basis*. Disclose the date "as of" which you calculated the amounts.

**Note:** Your method for computing the amount of "*client* assets you manage" can be different from the method for computing "regulatory assets under management" required for Item 5.F in Part 1A. However, if you choose to use a different method to compute "*client* assets you manage," you must keep documentation describing the method you use. The amount you disclose may be rounded to the nearest $100,000. Your "as of" date must not be more than 90 days before the date you last updated your *brochure* in response to this Item 4.E.

Item 5        Fees and Compensation

A. Describe how you are compensated for your advisory services. Provide your fee schedule. Disclose whether the fees are negotiable.

**Note:** If you are an SEC-registered adviser, you do not need to include this information in a *brochure* that is delivered only to qualified purchasers as defined in section 2(a)(51)(A) of the Investment Company Act of 1940.

B. Describe whether you deduct fees from *clients*' assets or bill *clients* for fees incurred. If *clients* may select either method, disclose this fact. Explain how often you bill *clients* or deduct your fees.

C. Describe any other types of fees or expenses *clients* may pay in connection with your advisory services, such as custodian fees or mutual fund expenses. Disclose that *clients* will incur brokerage and other transaction costs, and direct *clients* to the section(s) of your *brochure* that discuss brokerage.

D. If your *clients* either may or must pay your fees in advance, disclose this fact. Explain how a *client* may obtain a refund of a pre-paid fee if the advisory contract is terminated before the end of the billing period. Explain how you will determine the amount of the refund.

E. If you or any of your *supervised persons* accepts compensation for the sale of securities or other investment products, including asset-based sales charges or service fees from the sale of mutual funds, disclose this  fact and respond to Items 5.E.1, 5.E.2, 5.E.3 and 5.E.4.

 1. Explain that this practice presents a conflict of interest and gives you or your *supervised persons* an incentive to recommend investment products based on the compensation received, rather than on a *client's* needs. Describe generally how you address conflicts that arise, including your

SEC 1707 (08-22)  File 3 of 5

App 229

procedures for disclosing the conflicts to *clients*. If you primarily recommend mutual funds, disclose whether you will recommend "no-load" funds.

2. Explain that *clients* have the option to purchase investment products that you recommend through other brokers or agents that are not affiliated with you.

3. If more than 50% of your revenue from advisory *clients* results from commissions and other compensation for the sale of investment products you recommend to your *clients*, including asset-based distribution fees from the sale of mutual funds, disclose that commissions provide your primary or, if applicable, your exclusive compensation.

4. If you charge advisory fees in addition to commissions or markups, disclose whether you reduce your advisory fees to offset the commissions or markups.

**Note:** If you receive compensation in connection with the purchase or sale of securities, you should carefully consider the applicability of the broker-dealer registration requirements of the Securities Exchange Act of 1934 and any applicable state securities statutes.

Item 6        *Performance-Based Fees* and Side-By-Side Management

If you or any of your *supervised persons* accepts *performance-based fees* – that is, fees based on a share of capital gains on or capital appreciation of the assets of a *client* (such as a *client* that is a hedge fund or other pooled investment vehicle) – disclose this fact. If you or any of your *supervised persons* manage both accounts that are charged a *performance-based fee* and accounts that are charged another type of fee, such as an hourly or flat fee or an asset-based fee, disclose this fact. Explain the conflicts of interest that you or your *supervised persons* face by managing these accounts at the same time, including that you or your *supervised persons* have an incentive to favor accounts for which you or your *supervised persons* receive a *performance-based fee*, and describe generally how you address these conflicts.

Item 7        Types of *Clients*

Describe the types of *clients* to whom you generally provide investment advice, such as individuals, trusts, investment companies, or pension plans. If you have any requirements for opening or maintaining an account, such as a minimum account size, disclose the requirements.

Item 8        Methods of Analysis, Investment Strategies and Risk of Loss

A. Describe the methods of analysis and investment strategies you use in formulating investment advice or managing assets. Explain that investing in securities involves risk of loss that *clients* should be prepared to bear.

B. For each significant investment strategy or method of analysis you use, explain the material risks involved. If the method of analysis or strategy involves significant or unusual risks, discuss these risks in detail. If your primary strategy involves frequent trading of securities, explain how frequent trading can affect investment performance, particularly through increased brokerage and other transaction costs and taxes.

C. If you recommend primarily a particular type of security, explain the material risks involved. If the type of security involves significant or unusual risks, discuss these risks in detail.

Item 9        Disciplinary  Information

If there are legal or disciplinary events that are material to a *client's* or prospective *client's* evaluation of your advisory business or the integrity of your management, disclose all material facts regarding those events.

SEC 1707 (08-22)  File 3 of 5

App 230

Items 9.A, 9.B, and 9.C list specific legal and disciplinary events presumed to be material for this Item. If your advisory firm or a *management person* has been *involved* in one of these events, you must disclose it under this Item for ten years following the date of the event, unless (1) the event was resolved in your or the *management person's* favor, or was reversed, suspended or vacated, or (2) you have rebutted the presumption of materiality to determine that the event is not material (see Note below). For purposes of calculating this ten-year period, the "date" of an event is the date that the final *order*, judgment, or decree was entered, or the date that any rights of appeal from preliminary *orders*, judgments or decrees lapsed.

Items 9.A, 9.B, and 9.C do not contain an exclusive list of material disciplinary events. If your advisory firm or a *management person* has been *involved* in a legal or disciplinary event that is <u>not</u> listed in Items 9.A, 9.B, or 9.C, but nonetheless is material to a *client's* or prospective *client's* evaluation of your advisory business or the integrity of its management, you must disclose the event. Similarly, even if more than ten years have passed since the date of the event, you must disclose the event if it is so serious that it remains material to a *client's* or prospective *client's* evaluation.

A. A criminal or civil action in a domestic, foreign or military court of competent jurisdiction in which your firm or a *management person*

1. was convicted of, or pled guilty or nolo contendere ("no contest") to (a) any *felony*; (b) a *misdemeanor* that *involved* investments or an *investment-related* business, fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, or extortion; or (c) a conspiracy to commit any of these offenses;

2. is the named subject of a pending criminal *proceeding* that involves an *investment-related* business, fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses;

3. was *found* to have been *involved* in a violation of an *investment-related* statute or regulation; or

4. was the subject of any *order*, judgment, or decree permanently or temporarily enjoining, or otherwise limiting, your firm or a *management person* from engaging in any *investment-related* activity, or from violating any *investment-related* statute, rule, or *order*.

B. An administrative *proceeding* before the SEC, any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority* in which your firm or a *management person*

1. was *found* to have caused an *investment-related* business to lose its authorization to do business; or

2. was *found* to have been *involved* in a violation of an *investment-related* statute or regulation and was the subject of an *order* by the agency or authority

(a) denying, suspending, or revoking the authorization of your firm or a *management person* to act in an *investment-related* business;

(b) barring or suspending your firm's or a *management person's* association with an *investment- related* business;

(c) otherwise significantly limiting your firm's or a *management person's investment-related* activities; or

(d) imposing a civil money penalty of more than $2,500 on your firm or a *management person*.

C. A *self-regulatory organization* (*SRO*) *proceeding* in which your firm or a *management person*

1. was *found* to have caused an *investment-related* business to lose its authorization to do business; or

2. was *found* to have been *involved* in a violation of the *SRO's* rules and was: (i) barred or

SEC 1707 (08-22) File 3 of 5

App 231

suspended from membership or from association with other members, or was expelled from membership;

(ii) otherwise significantly limited from *investment-related* activities; or (iii) fined more than $2,500.

**Note:** You may, under certain circumstances, rebut the presumption that a disciplinary event is material. If an event is immaterial, you are not required to disclose it. When you review a legal or disciplinary event involving your firm or a *management person* to determine whether it is appropriate to rebut the presumption of materiality, you should consider all of the following factors: (1) the proximity of the *person involved* in the disciplinary event to the advisory function; (2) the nature of the infraction that led to the disciplinary event; (3) the severity of the disciplinary sanction; and (4) the time elapsed since the date of the disciplinary event. If you conclude that the materiality presumption has been overcome, you must prepare and maintain a file memorandum of your determination in your records. See SEC rule 204-2(a)(14)(iii).

Item 10      Other Financial Industry Activities and Affiliations

A.  If you or any of your *management persons* are registered, or have an application pending to register, as a broker-dealer or a registered representative of a broker-dealer, disclose this fact.

B.  If you or any of your *management persons* are registered, or have an application pending to register, as a futures commission merchant, commodity pool operator, a commodity trading advisor, or an associated person of the foregoing entities, disclose this fact.

C.  Describe any relationship or arrangement that is material to your advisory business or to your *clients* that you or any of your *management persons* have with any *related person* listed below. Identify the *related person* and if the relationship or arrangement creates a material conflict of interest with *clients*, describe the nature of the conflict and how you address it.

1.  broker-dealer, municipal securities dealer, or government securities dealer or broker
2.  investment company or other pooled investment vehicle (including a mutual fund, closed-end investment company, unit investment trust, private investment company or "hedge fund," and offshore fund)
3.  other investment adviser or financial planner
4.  futures commission merchant, commodity pool operator, or commodity trading advisor
5.  banking or thrift institution
6.  accountant or accounting firm
7.  lawyer or law firm
8.  insurance company or agency
9.  pension consultant
10. real estate broker or dealer
11. sponsor or syndicator of limited partnerships.

D.  If you recommend or select other investment advisers for your *clients* and you receive compensation directly or indirectly from those advisers that creates a material conflict of interest, or if you have other business relationships with those advisers that create a material conflict of interest, describe these practices and discuss the material conflicts of interest these practices create and how you address them.

Item 11        Code of Ethics, Participation or Interest in *Client* Transactions and Personal Trading

A.   If you are an SEC-registered adviser, briefly describe your code of ethics adopted pursuant to SEC rule 204A-1 or similar state rules.  Explain that you will provide a copy of your code of ethics to any *client* or prospective *client* upon request.

B.   If you or a *related person* recommends to *clients*, or buys or sells for *client* accounts, securities in which you or a *related person* has a material financial interest, describe your practice and discuss the conflicts of interest it presents.  Describe generally how you address conflicts that arise.

Examples:  (1) You or a *related person*, as principal, buys securities from (or sells securities to) your *clients*; (2) you or a *related person* acts as general partner in a partnership in which you solicit *client* investments; or (3) you or a *related person* acts as an investment adviser to an investment company that you recommend to *clients*.

C.   If you or a *related person* invests in the same securities (or related securities, *e.g.*, warrants, options or futures) that you or a *related person* recommends to *clients*, describe your practice and discuss the conflicts of interest this presents and generally how you address the conflicts that arise in connection with personal trading.

D.   If you or a *related person* recommends securities to *clients*, or buys or sells securities for *client* accounts, at or about the same time that you or a *related person* buys or sells the same securities for your own (or the *related person's* own) account, describe your practice and discuss the conflicts of interest it presents. Describe generally how you address conflicts that arise.

**Note:**  The description required by Item 11.A may include information responsive to Item 11.B, C or D.  If so, it is not necessary to make repeated disclosures of the same information.  You do not have to provide disclosure in response to Item 11.B, 11.C, or 11.D with respect to securities that are not "reportable securities" under SEC rule 204A-1(e)(10) and similar state rules.

Item 12        Brokerage Practices

A.   Describe the factors that you consider in selecting or recommending broker-dealers for *client* transactions and determining the reasonableness of their compensation (*e.g.*, commissions).

1.   Research and Other Soft Dollar Benefits.  If you receive research or other products or services other than execution from a broker-dealer or a third party in connection with *client* securities transactions ("soft dollar benefits"), disclose your practices and discuss the conflicts of interest they create.

**Note:**  Your disclosure and discussion must include all soft dollar benefits you receive, including, in the case of research, both proprietary research (created or developed by the broker-dealer) and research created or developed by a third party.

a.   Explain that when you use *client* brokerage commissions (or markups or markdowns) to obtain research or other products or services, you receive a benefit because you do not have to produce or pay for the research, products or services.

b.   Disclose that you may have an incentive to select or recommend a broker-dealer based on your interest in receiving the research or other products or services, rather than on your *clients'* interest in receiving most favorable execution.

c.   If you may cause *clients* to pay commissions (or markups or markdowns) higher than those charged by other broker-dealers in return for soft dollar benefits (known as paying-up),

App 233

disclose this fact.

d.   Disclose whether you use soft dollar benefits to service all of your *clients*' accounts or only those that paid for the benefits.  Disclose whether you seek to allocate soft dollar benefits to *client* accounts proportionately to the soft dollar credits the accounts generate.

e.   Describe the types of products and services you or any of your *related persons* acquired with *client* brokerage commissions (or markups or markdowns) within your last fiscal year.

**Note:**  This description must be specific enough for your *clients* to understand the types of products or services that you are acquiring and to permit them to evaluate possible conflicts of interest.  Your description must be more detailed for products or services that do not qualify for the safe harbor in section 28(e) of the Securities Exchange Act of 1934, such as those services that do not aid in investment decision-making or trade execution.  Merely disclosing that you obtain various research reports and products is not specific enough.

f.   Explain the procedures you used during your last fiscal year to direct *client* transactions to a particular broker-dealer in return for soft dollar benefits you received.

2.   Brokerage for *Client* Referrals.  If you consider, in selecting or recommending broker-dealers, whether you or a *related person* receives *client* referrals from a broker-dealer or third party, disclose this practice and discuss the conflicts of interest it creates.

a.   Disclose that you may have an incentive to select or recommend a broker-dealer based on your interest in receiving *client* referrals, rather than on your *clients*' interest in receiving most favorable execution.

b.   Explain the procedures you used during your last fiscal year to direct *client* transactions to a particular broker-dealer in return for *client* referrals.

3.   Directed Brokerage.

a.   If you routinely recommend, request or require that a *client* direct you to execute transactions through a specified broker-dealer, describe your practice or policy.  Explain that not all advisers require their *clients* to direct brokerage.  If you and the broker-dealer are affiliates or have another economic relationship that creates a material conflict of interest, describe the relationship and discuss the conflicts of interest it presents.  Explain that by directing brokerage you may be unable to achieve most favorable execution of *client* transactions, and that this practice may cost *clients* more money.

b.   If you permit a *client* to direct brokerage, describe your practice.  If applicable, explain that you may be unable to achieve most favorable execution of *client* transactions.  Explain that directing brokerage may cost *clients* more money.  For example, in a directed brokerage account, the *client* may pay higher brokerage commissions because you may not be able to aggregate orders to reduce transaction costs, or the *client* may receive less favorable prices.

**Note:**  If your *clients* only have directed brokerage arrangements subject to most favorable execution of *client* transactions, you do not need to respond to the last sentence of Item 12.A.3.a. or to the second or third sentences of Item 12.A.3.b.

B.   Discuss whether and under what conditions you aggregate the purchase or sale of securities for various *client* accounts.  If you do not aggregate orders when you have the opportunity to do so, explain your practice and describe the costs to *clients* of not aggregating.

SEC 1707 (08-22)  File 3 of 5

App 234

Item 13    Review of Accounts

A.  Indicate whether you periodically review *client* accounts or financial plans.  If you do, describe the frequency and nature of the review, and the titles of the *supervised persons* who conduct the review.

B.  If you review *client* accounts on other than a periodic basis, describe the factors that trigger a review.

C.  Describe the content and indicate the frequency of regular reports you provide to *clients* regarding their accounts.  State whether these reports are written.

Item 14    *Client* Referrals and Other Compensation

A.  If someone who is not a *client* provides an economic benefit to you for providing investment advice or other advisory services to your *clients*, generally describe the arrangement, explain the conflicts of interest, and describe how you address the conflicts of interest.  For purposes of this Item, economic benefits include any sales awards or other prizes.

B.  If you or a *related person* directly or indirectly compensates any *person* who is not your *supervised person* for *client* referrals, describe the arrangement and the compensation.

   **Note:**  If you compensate any *person* for *client* referrals, you should consider whether SEC rule 206(4)-1 or similar state rules regarding solicitation arrangements and/or state rules requiring registration of *investment adviser representatives* apply.

Item 15    *Custody*

 If you have *custody* of *client* funds or securities and a qualified custodian sends quarterly, or more frequent, account statements directly to your *clients*, explain that *clients* will receive account statements from the broker-dealer, bank or other qualified custodian and that *clients* should carefully review those statements.  If your *clients* also receive account statements from you, your explanation must include a statement urging *clients* to compare the account statements they receive from the qualified custodian with those they receive from you.

Item 16    Investment Discretion

If you accept *discretionary authority* to manage securities accounts on behalf of *clients*, disclose this fact and describe any limitations *clients* may (or customarily do) place on this authority.  Describe the procedures you follow before you assume this authority (*e.g.,* execution of a power of attorney).

Item 17    Voting *Client* Securities

A.  If you have, or will accept, authority to vote *client* securities, briefly describe your voting policies and procedures, including those adopted pursuant to SEC rule 206(4)-6.  Describe whether (and, if so, how) your *clients* can direct your vote in a particular solicitation.  Describe how you address conflicts of interest between you and your *clients* with respect to voting their securities.  Describe how *clients* may obtain information from you about how you voted their securities.  Explain to *clients* that they may obtain a copy of your proxy voting policies and procedures upon request.

B.  If you do not have authority to vote *client* securities, disclose this fact.  Explain whether *clients* will receive their proxies or other solicitations directly from their custodian or a transfer agent or from you, and discuss whether (and, if so, how) *clients* can contact you with questions about a particular solicitation.

Item 18    Financial Information

SEC 1707 (08-22)  File 3 of 5

App 235

A. If you require or solicit prepayment of more than $1,200 in fees per *client*, six months or more in advance, include a balance sheet for your most recent fiscal year.

1. The balance sheet must be prepared in accordance with generally accepted accounting principles, audited by an independent public accountant, and accompanied by a note stating the principles used to prepare it, the basis of securities included, and any other explanations required for clarity.

2. Show parenthetically the market or fair value of securities included at cost.

3. Qualifications of the independent public accountant and any accompanying independent public accountant's report must conform to Article 2 of SEC Regulation S-X.

**Note:** If you are a sole proprietor, show investment advisory business assets and liabilities separate from other business and personal assets and liabilities. You may aggregate other business and personal assets unless advisory business liabilities exceed advisory business assets.

**Note:** If you have not completed your first fiscal year, include a balance sheet dated not more than 90 days prior to the date of your *brochure*.

**Exception:** You are not required to respond to Item 18.A of Part 2A if you also are: (i) a qualified custodian as defined in SEC rule 206(4)-2 or similar state rules; or (ii) an insurance company.

B. If you have *discretionary authority* or *custody* of *client* funds or securities, or you require or solicit prepayment of more than $1,200 in fees per *client*, six months or more in advance, disclose any financial condition that is reasonably likely to impair your ability to meet contractual commitments to *clients*.

**Note:** With respect to Items 18.A and 18.B, if you are registered or are registering with one or more of the *state securities authorities*, the dollar amount reporting threshold for including the required balance sheet and for making the required financial condition disclosures is more than $500 in fees per *client*, six months or more in advance.

C. If you have been the subject of a bankruptcy petition at any time during the past ten years, disclose this fact, the date the petition was first brought, and the current status.

**If you are registering or are registered with one or more *state securities authorities*, you must respond to the following additional Item.**

Item 19     Requirements for State-Registered Advisers

A. Identify each of your principal executive officers and *management persons*, and describe their formal education and business background. If you have supplied this information elsewhere in your Form ADV, you do not need to repeat it in response to this Item.

B. Describe any business in which you are actively engaged (other than giving investment advice) and the approximate amount of time spent on that business. If you have supplied this information elsewhere in your Form ADV, you do not need to repeat it in response to this Item.

C. In addition to the description of your fees in response to Item 5 of Part 2A, if you or a *supervised person* are compensated for advisory services with *performance-based fees*, explain how these fees will be calculated. Disclose specifically that performance-based compensation may create an incentive for the adviser to recommend an investment that may carry a higher degree of risk to the *client*.

SEC 1707 (08-22) File 3 of 5

App 236

D.   If you or a *management person* has been *involved* in one of the events listed below, disclose all material facts regarding the event.

1.   An award or otherwise being *found* liable in an arbitration claim alleging damages in excess of $2,500, *involving* any of the following:

(a)   an investment or an *investment-related* business or activity;
(b)   fraud, false statement(s), or omissions;
(c)   theft, embezzlement, or other wrongful taking of property;
(d)   bribery, forgery, counterfeiting, or extortion; or
(e)   dishonest, unfair, or unethical practices.

2.   An award or otherwise being *found* liable in a civil, *self-regulatory organization*, or administrative *proceeding involving* any of the following:

(a)   an investment or an *investment-related* business or activity;
(b)   fraud, false statement(s), or omissions;
(c)   theft, embezzlement, or other wrongful taking of property;
(d)   bribery, forgery, counterfeiting, or extortion; or
(e)   dishonest, unfair, or unethical practices.

E.   In addition to any relationship or arrangement described in response to Item 10.C. of Part 2A, describe any relationship or arrangement that you or any of your *management persons* have with any issuer of securities that is not listed in Item 10.C. of Part 2A.

SEC 1707 (08-22)  File 3 of 5

App 237

**Instructions for Part 2A Appendix 1 of Form ADV:
Preparing Your *Wrap Fee Program Brochure***

Read all the instructions, including General Instructions for Form ADV, General Instructions for Part 2 of Form ADV, Instructions for Part 2A of Form ADV, and the instructions below, before preparing or updating your *wrap fee program brochure*.

1.  Who must deliver a *wrap fee program brochure*?  If you *sponsor* a *wrap fee program*, you must give a *wrap fee program brochure* to each *client* of the *wrap fee program*.

    However, if a *wrap fee program* that you *sponsor* has multiple *sponsors* and another *sponsor* creates and delivers to your *wrap fee program clients* a *wrap fee program brochure* that includes all the information required in your *wrap brochure,* you do not have to create or deliver a separate *wrap fee program brochure.*

    A *wrap fee program brochure* takes the place of your advisory firm *brochure* required by Part 2A of Form ADV, but only for *clients* of *wrap fee programs* that you *sponsor*.  See SEC rule 204-3(d) and similar state rules.

2.  When must a *wrap fee program brochure* be delivered?

    *   You must give a *wrap fee program brochure* to each *client* of the *wrap fee program* before or at the time the *client* enters into a *wrap fee program* contract.  See SEC rule 204-3(b) and similar state rules.

    *   Each year you must (i) deliver, within 120 days of the end of your fiscal year, to each *client* a free updated *wrap fee program brochure* that either includes a summary of material changes or is accompanied by a summary of material changes, or (ii) deliver to each *client* a summary of material changes that includes an offer to provide a copy of the updated *wrap fee program brochure* and information on how a *client* may obtain the *wrap fee program brochure*.  See SEC rule 204-3(b) and similar state rules.

    *   You do not have to deliver an interim amendment to *clients* unless the amendment includes information in response to Item 9 of Part 2A (disciplinary information).  An interim amendment can be in the form of a document describing the material facts relating to the amended disciplinary event.  See SEC rule 204-3(b) and similar state rules.

    **Note:**  As a fiduciary, you have an ongoing obligation to inform your *clients* of any material information that could affect the advisory relationship.  As a result, between *annual updating amendments* you must disclose material changes to such information to *clients* even if those changes do not trigger delivery of an interim amendment.  See General Instructions for Part 2 of Form ADV, Instruction 3.

3.  When must we update our *wrap fee program brochure*?  You must update your *wrap fee program brochure*: (i) each year at the time you file your *annual updating amendment*, and (ii) promptly whenever any information in the *wrap fee program brochure* becomes materially inaccurate.  You are not required to update your *wrap fee program brochure* between annual amendments solely because your fee schedule has changed.  However, if you are updating your *wrap fee program brochure* for a separate reason in between annual amendments, and your fee schedule listed in response to Item 4.A has become materially inaccurate, you should update that item as part of the interim amendment.  All updates to your *wrap fee program brochure* must be filed through the IARD system and maintained in your files.  See SEC rules 204-1 and 204-2(a)(14) and similar state rules.

4.  May we deliver our *wrap fee program brochure* electronically?  Yes.  The SEC has published interpretive guidance on delivering documents electronically, which you can find at <www.sec.gov/rules/concept/33- 7288.txt>.

5.  What if we *sponsor* more than one *wrap fee program*?  You may prepare a single *wrap fee program brochure* describing all the *wrap fee programs* you *sponsor*, or you may prepare separate *wrap fee program brochure*s that describe one or more of your *wrap fee programs*.  If you prepare separate *brochures*, each *brochure* must state that you *sponsor* other *wrap fee programs* and must explain how the *client* can obtain *brochure*s for the other programs.

App 238

6. <u>We provide portfolio management services under a *wrap fee program* that we *sponsor*. Must we deliver both <u>our *wrap fee program brochure* and our firm *brochure* to our *wrap fee program clients*</u>?</u>  No, just the *wrap fee program brochure*.  If you or your *supervised persons* provide portfolio management services under a *wrap fee program* that you also *sponsor*, your *wrap fee program brochure* must describe the investments and investment strategies you (or your *supervised persons*) will use as portfolio managers.  This requirement appears in Item
6.C of this Appendix.

7. <u>We provide other advisory services outside of our *wrap fee programs*.  May we combine our *wrap fee program brochure* into our firm *brochure* for *clients* receiving these other services?</u>  No.  Your *wrap fee program brochure* must address only the *wrap fee program*s you *sponsor*.  See SEC rule 204-3(d)(1) and similar state rules.

8. <u>Must we also deliver *brochure supplements* to *wrap fee program clients*?</u>  Yes.  A *wrap fee program brochure* does <u>not</u> take the place of any supplements required by Part 2B of Form ADV.

SEC 1707 (08-22)  File 3 of 5

App 239

**Part 2A Appendix 1 of Form ADV:** *Wrap Fee Program Brochure*

Item 1        Cover Page

    A.  The cover page of your *wrap fee program brochure* must state your name, business address, contact information, web site address (if you have one), and the date of the *wrap fee program brochure*.

       **Note:**  If you primarily conduct advisory business under a name different from your full legal name, <u>and</u> you have disclosed your business name in Item 1.B of Part 1A of Form ADV, then you may use your business name throughout your *wrap fee program brochure*.

    B.  Display on the cover page of your *wrap fee program brochure* the following (or other clear and concise language conveying the same information) and identifying the document as a "wrap fee program brochure":

       **This wrap fee program brochure provides information about the qualifications and business practices of [your name].  If you have any questions about the contents of this brochure, please contact us at [telephone number and/or email address].  The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority.**

       **Additional information about [your name] also is available on the SEC's website at <u>www.adviserinfo.sec.gov</u>.**

    D.  If you refer to yourself as a "registered investment adviser" or describe yourself as being "registered," include a statement that registration does not imply a certain level of skill or training.

Item 2        Material Changes

If you are amending your *wrap fee program brochure* for your annual update and it contains material changes from your last annual update, identify and discuss those changes on the page immediately following the cover page of the *wrap fee program brochure* or as a separate document accompanying the *brochure*.  You must clearly state that you are discussing only material changes since the last annual update of the *wrap fee program brochure*, and must provide the date of the last annual update to the *wrap fee program brochure*.

**Notes:**  You do not have to provide this information to a *client* or prospective *client* who has not received a previous version of your *wrap fee program brochure*.

Item 3        Table of Contents

Provide a table of contents to your *wrap fee program brochure*.

**Note:**  Your table of contents must be detailed enough so that your *clients* can locate topics easily.  Your *wrap fee program brochure* must follow the same order, and contain the same headings, as the items listed in this Appendix 1.

Item 4        Services, Fees and Compensation

    A.  Describe the services, including the types of portfolio management services, provided under each program. Indicate the wrap fee charged for each program or, if fees vary according to a schedule, provide your fee schedule.  Indicate whether fees are negotiable and identify the portion of the total fee, or the range of fees, paid to portfolio managers.

SEC 1707 (08-22)  File 3 of 5

App 240

B.  Explain that the program may cost the *client* more or less than purchasing such services separately and describe the factors that bear upon the relative cost of the program, such as the cost of the services if provided separately and the trading activity in the *client's* account.

C.  Describe any fees that the *client* may pay in addition to the wrap fee, and describe the circumstances under which *clients* may pay these fees, including, if applicable, mutual fund expenses and mark-ups, mark- downs, or spreads paid to market makers.

D.  If the *person* recommending the *wrap fee program* to the *client* receives compensation as a result of the *client's* participation in the program, disclose this fact.  Explain, if applicable, that the amount of this compensation may be more than what the *person* would receive if the *client* participated in your other programs or paid separately for investment advice, brokerage, and other services.  Explain that the *person*, therefore, may have a financial incentive to recommend the *wrap fee program* over other programs or services.

Item 5       Account Requirements and Types of *Clients*

If a *wrap fee program* imposes any requirements to open or maintain an account, such as a minimum account size, disclose these requirements.  If there is a minimum amount for assets placed with each portfolio manager as well as a minimum account size for participation in the *wrap fee program*, disclose and explain these requirements.  To the extent applicable to your *wrap fee program clients*, describe the types of *clients* to whom you generally provide investment advice, such as individuals, trusts, investment companies, or pension plans.

Item 6       Portfolio Manager Selection and Evaluation

A.  Describe how you select and review portfolio managers, your basis for recommending or selecting portfolio managers for particular *clients*, and your criteria for replacing or recommending the replacement of portfolio managers for the program and for particular *clients*.

   1.  Describe any standards you use to calculate portfolio manager performance, such as industry standards or standards used solely by you.

   2.  Indicate whether you review, or whether any third-party reviews, performance information to determine or verify its accuracy or its compliance with presentation standards.  If so, briefly describe the nature of the review and the name of any third party conducting the review.

   3.  If applicable, explain that neither you nor a third-party reviews portfolio manager performance information, and/or that performance information may not be calculated on a uniform and consistent basis.

B.  Disclose whether any of your *related persons* act as a portfolio manager for a *wrap fee program* described in the *wrap fee program brochure*.  Explain the conflicts of interest that you face because of this arrangement and describe how you address these conflicts of interest.  Disclose whether *related person* portfolio managers are subject to the same selection and review as the other portfolio managers that participate in the *wrap fee program*.  If they are not, describe how you select and review *related person* portfolio managers.

C.  If you, or any of your *supervised persons* covered under your investment adviser registration, act as a portfolio manager for a *wrap fee program* described in the *wrap fee program brochure*, respond to Items 4.B, 4.C, 4.D (Advisory Business), 6 (*Performance-Based Fees* and Side-By-Side Management), 8.A (Methods of Analysis, Investment Strategies and Risk of Loss) and 17 (Voting *Client* Securities) of Part 2A of Form ADV.

Item 7       *Client* Information Provided to Portfolio Managers

Describe the information about *clients* that you communicate to the *clients*' portfolio managers, and how often or

SEC 1707 (08-22)  File 3 of 5

App 241

under what circumstances you provide updated information.

Item 8          *Client* Contact with Portfolio Managers

Explain any restrictions placed on *clients*' ability to contact and consult with their portfolio

managers. Item 9          Additional Information

    A.   Respond to Item 9 (Disciplinary Information) and Item 10 (Other Financial Industry Activities and Affiliations) of Part 2A of Form ADV.

    B.   Respond to Items 11 (Code of Ethics, Participation or Interest in *Client* Transactions and Personal Trading), 13 (Review of Accounts), 14 (*Client* Referrals and Other Compensation), and 18 (Financial Information) of Part 2A of Form ADV, as applicable to your wrap fee *clients*.

**If you are registered or are registering with one or more *state securities authorities*, you must respond to the following additional Item.**

Item 10          Requirements for State-Registered Advisers Respond to Item 19.E of Part 2A of Form ADV.

**Instructions for Part 2B of Form ADV:  Preparing a *Brochure Supplement***

1.  <u>For which *supervised persons* must we prepare a *brochure supplement*?</u>  As an initial matter, if you have no *clients* to whom you must deliver a *brochure supplement* (see Instruction 2 below), then you need not prepare <u>any</u> *brochure supplements*.  Otherwise, you must prepare a *brochure supplement* for the following *supervised persons*:

    (i)    Any *supervised person* who formulates investment advice for a *client* and has direct *client* contact; and

    (ii)   Any *supervised person* who has *discretionary authority* over a *client's* assets, even if the *supervised person* has no direct *client* contact.  See SEC rule 204-3(b)(2) and similar state rules.

    **Note:**  No supplement is required for a *supervised person* who has no direct *client* contact and has *discretionary authority* over a *client's* assets <u>only</u> as part of a team.  In addition, if discretionary advice is provided by a team comprised of more than five *supervised persons*, *brochure supplements* need only be provided for the five *supervised persons* with the most significant responsibility for the day-to-day discretionary advice provided to the *client*.  See SEC rule 204-3(b) and similar state rules.

2.  <u>To whom must we deliver *brochure supplements*?  Are there any exceptions?</u>

    You must deliver to a *client* the *brochure supplements* for each *supervised person* who provides advisory services to that *client*.  However, there are three categories of *clients* to whom you are not required to deliver *supplements*.  See SEC rule 204-3(c) and similar state rules.

    First, you are not required to deliver supplements to *clients* to whom you are not required to deliver a firm *brochure* (or a *wrap fee program brochure*).

    Second, you are not required to deliver supplements to *clients* who receive only *impersonal investment advice*, even if they receive a firm *brochure*.

    Third, you are not required to deliver supplements to *clients* who are individuals who would be "qualified clients" of your firm under SEC rule 205-3(d)(1)(iii).  Those *persons* are:

    (i)    Any executive officers, directors, trustees, general partners, or *persons* serving in a similar capacity, of your firm; or

    (ii)   Any employees of your firm (other than employees performing solely clerical, secretarial or administrative functions) who, in connection with their regular functions or duties, participate in the investment activities of your firm and have been performing such functions or duties for at least 12 months.

3.  <u>When must we deliver a supplement to a *client*?</u>

*   You must deliver the supplement for a *supervised person* before or at the time that *supervised person* begins to provide advisory services to a *client*.

*   You also must deliver to *clients* any update to the supplement that amends information in response to Item 3 of Part 2B (disciplinary information).  Such an amendment can be in the form of a "sticker" that identifies the information that has become inaccurate and provides the new information and the date of the sticker.

    **Note:**  As a fiduciary, you have a continuing obligation to inform your *clients* of any material information that could affect the advisory relationship.  As a result, between *annual updating amendments* you must disclose material changes to *clients* even if those changes do not trigger delivery of an updated supplement.

    You may have a *supervised person* deliver supplements (including his own) on your behalf.  Furthermore, if you are an SEC-registered adviser, you not required to file *brochure supplements* or updates, but you must maintain copies of them.  See Instruction 5 of SEC General Instructions for Part 2 of Form ADV.

SEC 1707 (08-22)  File 3 of 5

4.  When must we update *brochure supplements*?  You must update *brochure supplements* promptly whenever any information in them becomes materially inaccurate.

5.  May we deliver *brochure supplements* electronically?  Yes.  You may deliver supplements using electronic media.  The SEC has published interpretive guidance on delivering documents electronically, which you can find at <www.sec.gov/rules/concept/33-7288.txt>.  If you deliver a supplement electronically, you  may disclose in that supplement that the *supervised person* has a disciplinary event and provide a hyperlink to either the BrokerCheck or the IAPD systems.

6.  Must *brochure supplements* be separate documents?  No.  If your firm *brochure* includes all the information required in a *brochure supplement*, you do not need a separate supplement.  Smaller firms with just a few *supervised persons* may find it easier to include all supplement information in their firm *brochure*, while larger firms may prefer to use a firm *brochure* and separate supplements.  If supplement information is included in the firm *brochure*, however, the supplements must be included at the end of the brochure.  In addition, each supplement must follow the same order as the supplement items listed in Part 2B, and contain the same headings.

    You may prepare supplements for groups of *supervised persons*.  A group supplement, or a firm *brochure* presenting supplement information about *supervised persons*, must present information in a separate section for each *supervised person*.

7.  Must an adviser who is a sole proprietor provide his own *brochure supplement* to *clients*?  No, if that information is included in the firm *brochure*.

8.  May we include information not required by an item in a *brochure supplement*?  Yes.  If you include information not required by an item, however, you may not include so much additional information that the required information is obscured.

9.  Are we required to file the *brochure supplements*?  If you are registered or are registering with the SEC, you are not required to file your *brochure supplements*, but you are required to maintain copies of all supplements and amendments to supplements in your files.  See SEC rule 204-2(a)(14)(i).  If you are registered or are registering with one or more *state securities authorities*, you must file through IARD a copy of the *brochure supplement* for each *supervised person* doing business in that state.

**Part 2B of Form ADV:**  *Brochure Supplement*

Item 1        Cover Page

    A.  Include the following on the cover page of the supplement:

        1.  The *supervised person's* name, business address and telephone number (if different from yours).
        2.  Your firm's name, business address and telephone number.  If your firm *brochure* uses a business name for your firm, use the same business name for the firm in the supplement.
        3.  The date of the supplement.

    B.  Display on the cover page statements containing the following or other clear and concise language conveying the same information, and identifying the document as a "brochure supplement:"

**This brochure supplement provides information about [name of *supervised person*] that supplements the [name of advisory firm] brochure.  You should have received a copy of that brochure.  Please contact [service center or name and/or title of your contact *person*] if you did not receive [name of advisory firm]'s brochure or if you have any questions about the contents of this supplement.**

**Additional information about [name of *supervised person*] is available on the SEC's website at <u>www.adviserinfo.sec.gov</u>.**

**Note:**  You do not have to include this statement directing *clients* to the public website unless the *supervised person* is an *investment adviser representative* required to register with *state securities authorities*.  The above information must be on the cover page of the supplement but need not be the only information on the cover page of the supplement.  If other information is included on the cover page of the supplement, the above information must be on the top of the first page of the supplement.

Item 2        Educational Background and Business Experience

Disclose the *supervised person's* name, age (or year of birth), formal education after high school, and business background (including an identification of the specific positions held) for the preceding five years.  If the *supervised person* has no high school education, no formal education after high school, or no business background, disclose this fact.  You may list any professional designations held by the *supervised person*, but if you do so, you must provide a sufficient explanation of the minimum qualifications required for each designation to allow *clients* to understand the value of the designation.

Item 3        Disciplinary  Information

If there are legal or disciplinary events material to a *client's* or prospective *client's* evaluation of the *supervised person*, disclose all material facts regarding those events.

    Items 3.A, 3.B, 3.C, and 3.D below list specific legal and disciplinary events presumed to be material for this Item.  If the *supervised person* has been *involved* in one of these events, you must disclose it under this Item for ten years following the date of the event, unless (1) the event was resolved in the *supervised person's* favor, or was reversed, suspended or vacated, or (2) you have rebutted the presumption of materiality to determine that the event is not material (see Note below).  For purposes of calculating this ten-year period, the "date" of an event is the date the final *order*, judgment, or decree was entered, or the date any rights of appeal from preliminary *order*s, judgments or decrees lapsed.

    Items 3.A, 3.B, 3.C, and 3.D do not contain an exclusive list of material disciplinary events.  If the *supervised person* has been *involved* in a legal or disciplinary event that is <u>not</u> listed in Items 3.A, 3.B, 3.C, or 3.D but <u>is</u> material to a *client's* or prospective *client's* evaluation of the *supervised person's* integrity, you must disclose

App 245

the event.  Similarly, even if more than ten years have passed since the date of the event, you must disclose the event if it is so serious that it remains currently material to a *client's* or prospective *client's* evaluation. If you deliver a supplement electronically and if a particular disclosure required below for the *supervised person* is provided through either the Financial Industry Regulatory Authority's (FINRA) BrokerCheck system or the IAPD, you may satisfy that particular disclosure obligation by including in that supplement (i) a statement that the *supervised person* has a disciplinary history, the details of which can be found on FINRA's BrokerCheck system or the IAPD, and (ii) a hyperlink to the relevant system with a brief explanation of how the *client* can access the disciplinary history.  The BrokerCheck link is www.finra.org/brokercheck; the IAPD link is www.adviserinfo.sec.gov.

A.  A criminal or civil action in a domestic, foreign or military court of competent jurisdiction in which the *supervised person*

   1.  was convicted of, or pled guilty or nolo contendere ("no contest") to (a) any *felony*; (b) a *misdemeanor* that *involved* investments or an *investment-related* business, fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, or extortion; or (c) a conspiracy to commit any of these offenses;

   2.  is the named subject of a pending criminal *proceeding* that involves an *investment-related* business, fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses;

   3.  was *found* to have been *involved* in a violation of an *investment-related* statute or regulation; or

   4.  was the subject of any *order*, judgment, or decree permanently or temporarily enjoining, or otherwise limiting, the *supervised person* from engaging in any *investment-related* activity, or from violating any *investment-related* statute, rule, or *order*.

B.  An administrative *proceeding* before the SEC, any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority* in which the *supervised person*

   1.  was *found* to have caused an *investment-related* business to lose its authorization to do business; or

   2.  was *found* to have been *involved* in a violation of an *investment-related* statute or regulation and was the subject of an *order* by the agency or authority

   (a) denying, suspending, or revoking the authorization of the *supervised person* to act in an *investment-related* business;

   (b)  barring or suspending the *supervised person's* association with an *investment-related* business;

   (c)  otherwise significantly limiting the *supervised person's investment-related* activities; or

   (d)  imposing a civil money penalty of more than $2,500 on the *supervised person*.

C.  A *self-regulatory organization* (*SRO*) *proceeding* in which the *supervised person*

   1.  was *found* to have caused an *investment-related* business to lose its authorization to do business; or

   2.  was *found* to have been *involved* in a violation of the *SRO's* rules and was: (i) barred or suspended from membership or from association with other members, or was expelled from membership; (ii) otherwise significantly limited from *investment-related* activities; or (iii) fined more than $2,500.

D.  Any other hearing or formal adjudication in which a professional attainment, designation, or license of the *supervised person* was revoked or suspended because of a violation of rules relating to professional conduct.  If the *supervised person* resigned (or otherwise relinquished the attainment, designation, or

SEC 1707 (08-22)  File 3 of 5

App 246

license) in anticipation of such a hearing or formal adjudication (and the adviser knows, or should have known, of such resignation or relinquishment), disclose the event.

**Note:** You may, under certain circumstances, rebut the presumption that a disciplinary event is material. If an event is immaterial, you are not required to disclose it. When you review a legal or disciplinary event involving the *supervised person* to determine whether it is appropriate to rebut the presumption of materiality, you should consider all of the following factors: (1) the proximity of the *supervised person* to the advisory function; (2) the nature of the infraction that led to the disciplinary event; (3) the severity of the disciplinary sanction; and (4) the time elapsed since the date of the disciplinary event. If you conclude that the materiality presumption has been overcome, you must prepare and maintain a file memorandum of your determination in your records. See SEC rule 204-2(a)(14)(iii) and similar state rules.

Item 4          Other Business Activities

A.  If the *supervised person* is actively engaged in any *investment-related* business or occupation, including if the *supervised person* is registered, or has an application pending to register, as a broker-dealer, registered representative of a broker-dealer, futures commission merchant ("FCM"), commodity pool operator ("CPO"), commodity trading advisor ("CTA"), or an associated *person* of an FCM, CPO, or CTA, disclose this fact and describe the business relationship, if any, between the advisory business and the other business.

   1.  If a relationship between the advisory business and the *supervised person's* other financial industry activities creates a material conflict of interest with *clients*, describe the nature of the conflict and generally how you address it.

   2.  If the *supervised person* receives commissions, bonuses or other compensation based on the sale of securities or other investment products, including as a broker-dealer or registered representative, and including distribution or service ("trail") fees from the sale of mutual funds, disclose this fact. If this compensation is not cash, explain what type of compensation the *supervised person* receives. Explain that this practice gives the *supervised person* an incentive to recommend investment products based on the compensation received, rather than on the *client's* needs.

B.  If the *supervised person* is actively engaged in any business or occupation for compensation not discussed in response to Item 4.A, above, and the other business activity or activities provide a substantial source of the *supervised person's* income or involve a substantial amount of the *supervised person's* time, disclose this fact and describe the nature of that business. If the other business activities represent less than 10 percent of the *supervised person's* time and income, you may presume that they are not substantial.

Item 5          Additional Compensation

If someone who is not a *client* provides an economic benefit to the *supervised person* for providing advisory services, generally describe the arrangement. For purposes of this Item, economic benefits include sales awards and other prizes, but do <u>not</u> include the *supervised person's* regular salary. Any bonus that is based, at least in part, on the number or amount of sales, *client* referrals, or new accounts should be considered an economic benefit, but other regular bonuses should not.

Item 6          Supervision

Explain how you *supervise* the *supervised person*, including how you monitor the advice the *supervised person* provides to *clients*. Provide the name, title and telephone number of the *person* responsible for supervising the *supervised person's* advisory activities on behalf of your firm.

**If you are registered or are registering with one or more *state securities authorities*, you must respond to the following additional Item.**

SEC 1707 (08-22)  File 3 of 5

App 247

Item 7    Requirements for State-Registered Advisers

A.  In addition to the events listed in Item 3 of Part 2B, if the *supervised person* has been *involved* in one of the events listed below, disclose all material facts regarding the event.

1.  An award or otherwise being *found* liable in an arbitration claim alleging damages in excess of $2,500, *involving* any of the following:

    (a)  an investment or an *investment-related* business or activity;
    (b)  fraud, false statement(s), or omissions;
    (c)  theft, embezzlement, or other wrongful taking of property;
    (d)  bribery, forgery, counterfeiting, or extortion; or
    (e)  dishonest, unfair, or unethical practices.

2.  An award or otherwise being *found* liable in a civil, *self-regulatory organization*, or administrative *proceeding involving* any of the following:

    (a)  an investment or an *investment-related* business or activity;
    (b)  fraud, false statement(s), or omissions;
    (c)  theft, embezzlement, or other wrongful taking of property;
    (d)  bribery, forgery, counterfeiting, or extortion; or
    (e)  dishonest, unfair, or unethical practices.

B.  If the *supervised person* has been the subject of a bankruptcy petition, disclose that fact, the date the petition was first brought, and the current status.

SEC 1707 (08-22) File 3 of 5

App 248

# Study on Investment Advisers and Broker-Dealers

**As Required by Section 913 of the
Dodd-Frank Wall Street Reform
and Consumer Protection Act**



**This is a Study of the Staff of the
U.S. Securities and Exchange Commission**

_____
**January 2011**

**This is a study by the Staff of the U.S. Securities and Exchange Commission.  The Commission has expressed no view regarding the analysis, findings, or conclusions contained herein.**

App 249

**Executive Summary**

**Background**

Retail investors seek guidance from broker-dealers and investment advisers to manage their investments and to meet their own and their families' financial goals. These investors rely on broker-dealers and investment advisers for investment advice and expect that advice to be given in the investors' best interest. The regulatory regime that governs the provision of investment advice to retail investors is essential to assuring the integrity of that advice and to matching legal obligations with the expectations and needs of investors.

Broker-dealers and investment advisers are regulated extensively, but the regulatory regimes differ, and broker-dealers and investment advisers are subject to different standards under federal law when providing investment advice about securities. Retail investors generally are not aware of these differences or their legal implications. Many investors are also confused by the different standards of care that apply to investment advisers and broker-dealers. That investor confusion has been a source of concern for regulators and Congress.

Section 913 of Title IX of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") requires the U.S. Securities and Exchange Commission (the "Commission") to conduct a study (the "Study") to evaluate:

- The effectiveness of existing legal or regulatory standards of care (imposed by the Commission, a national securities association, and other federal or state authorities) for providing personalized investment advice and recommendations about securities to retail customers; and

- Whether there are legal or regulatory gaps, shortcomings, or overlaps in legal or regulatory standards in the protection of retail customers relating to the standards of care for providing personalized investment advice about securities to retail customers that should be addressed by rule or statute.

Section 913 also includes 14 items that must be considered in conducting the Study. The considerations address the following areas, among others:

- Whether retail customers understand or are confused by the differences in the standards of care that apply to broker-dealers and investment advisers;

- The regulatory, examination, and enforcement resources to enforce standards of care;

- The potential impact on retail customers if regulatory requirements change, including their access to the range of products and services offered by broker-dealers;

i

App 250

- The potential impact of eliminating the broker-dealer exclusion from the definition of "investment adviser" under the Investment Advisers Act of 1940 (the "Advisers Act"); and

- The potential additional costs to retail customers, broker-dealers, and investment advisers from potential changes in regulatory requirements.

As required by Section 913, the Study describes the considerations, analysis and public and industry input that the Staff considered in making its recommendations, and it includes an analysis of differences in legal and regulatory standards in the protection of retail customers relating to the standards of care for broker-dealers, investment advisers and their associated persons for providing personalized investment advice about securities to retail customers.

The Commission established a cross-Divisional staff task force (the "Staff") to bring a multi-disciplinary approach to the Study. The Commission also solicited comments and data as part of the Study and received over 3,500 comment letters. The Staff reviewed all of the comment letters, and appreciates commenters' thoughtful efforts to inform the Staff and to raise complex issues for consideration. The Staff also met with interested parties representing investors, broker-dealers, investment advisers, other representatives of the financial services industry, academics, state securities regulators, the North American Securities Administrator Association ("NASAA"), and the Financial Industry Regulatory Authority ("FINRA"), which serves as a self-regulatory organization ("SRO") for broker-dealers.

This Study outlines the Staff's findings and makes recommendations to the Commission for potential new rulemaking, guidance, and other policy changes. These recommendations are intended to make consistent the standards of conduct applying when retail customers receive personalized investment advice about securities from broker-dealers or investment advisers. The Staff therefore recommends establishing a uniform fiduciary standard for investment advisers and broker-dealers when providing investment advice about securities to retail customers that is consistent with the standard that currently applies to investment advisers. The recommendations also include suggestions for considering harmonization of the broker-dealer and investment adviser regulatory regimes, with a view toward enhancing their effectiveness in the retail marketplace.

The views expressed in this Study are those of the Staff and do not necessarily reflect the views of the Commission or the individual Commissioners. This Study was approved for release by the Commission.

ii

App 251

**Current State of the Investment Adviser and Broker-Dealer Industries**

*Investment Advisers*:  Over 11,000 investment advisers are registered with the Commission.  As of September 30, 2010, Commission-registered advisers managed more than $38 trillion for more than 14 million clients.  In addition, there are more than 275,000 state-registered investment adviser representatives and more than 15,000 state-registered investment advisers.  Approximately 5% of Commission-registered investment advisers are also registered as broker-dealers, and 22% have a related person that is a broker-dealer.  Additionally, approximately 88% of investment adviser representatives are also registered representatives of broker-dealers.  A majority of Commission-registered investment advisers reported that over half of their assets under management related to the accounts of individual clients.  Most investment advisers charge their clients fees based on the percentage of assets under management, while others may charge hourly or fixed rates.

*Broker-Dealers*:  The Commission and FINRA oversee approximately 5,100 broker-dealers.  As of the end of 2009, FINRA-registered broker-dealers held over 109 million retail and institutional accounts.  Approximately 18% of FINRA-registered broker-dealers also are registered as investment advisers with the Commission or a state. Most broker-dealers receive transaction-based compensation.

**Regulation of Investment Advisers and Broker-Dealers**

The regulatory schemes for investment advisers and broker-dealers are designed to protect investors through different approaches.  Investment advisers are fiduciaries to their clients, and the regulation under the Advisers Act generally is principles-based.  The regulation of broker-dealers governs how broker-dealers operate, for the most part, through the Commission's antifraud authority in the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), specific Exchange Act rules, and SRO rules based on Exchange Act principles, including (among others) principles of fairness and transparency.   Certain differences in the regulation of broker-dealers and advisers reflect differences, current and historical, in their functions, while others may reflect differences in the regulatory regime, particularly when investment advisers and broker-dealers are engaging in the same or substantially similar activity. The recommendations listed in the Study are designed to address gaps in the regulatory regime, as well as differences in approach that are no longer warranted, as they relate to providing personalized investment advice about securities to retail customers.

*Investment Advisers*:  An investment adviser is a fiduciary whose duty is to serve the best interests of its clients, including an obligation not to subordinate clients' interests to its own.  Included in the fiduciary standard are the duties of loyalty and care.  An adviser that has a material conflict of interest must either eliminate that conflict or fully disclose to its clients all material facts relating to the conflict.

In addition, the Advisers Act expressly prohibits an adviser, acting as principal for its own account, from effecting any sale or purchase of any security for the account of a

client, without disclosing certain information to the client in writing before the completion of the transaction and obtaining the client's consent.

The states also regulate the activities of many investment advisers. Most smaller investment advisers are registered and regulated at the state level. Investment adviser representatives of state- and federally-registered advisers commonly are subject to state registration, licensing or qualification requirements.

*Broker-Dealers*: Broker-dealers that do business with the public generally must become members of FINRA. Under the antifraud provisions of the federal securities laws and SRO rules, including SRO rules relating to just and equitable principles of trade and high standards of commercial honor, broker-dealers are required to deal fairly with their customers. While broker-dealers are generally not subject to a fiduciary duty under the federal securities laws, courts have found broker-dealers to have a fiduciary duty under certain circumstances. Moreover, broker-dealers are subject to statutory, Commission and SRO requirements that are designed to promote business conduct that protects customers from abusive practices, including practices that may be unethical but may not necessarily be fraudulent. The federal securities laws and rules and SRO rules address broker-dealer conflicts in one of three ways: express prohibition; mitigation; or disclosure.

An important aspect of a broker-dealer's duty of fair dealing is the suitability obligation, which generally requires a broker-dealer to make recommendations that are consistent with the interests of its customer. Broker-dealers also are required under certain circumstances, such as when making a recommendation, to disclose material conflicts of interest to their customers, in some cases at the time of the completion of the transaction. The federal securities laws and FINRA rules restrict broker-dealers from participating in certain transactions that may present particularly acute potential conflicts of interest. At the state level, broker-dealers and their agents must register with or be licensed by the states in which they conduct their business.

**Examination and Enforcement Resources**

The Commission's Office of Compliance Inspections and Examinations ("OCIE") examines Commission-registered investment advisers using a risk-based approach. Due, among other things, to an increase in the number of Commission-registered advisers, a decrease in the number of OCIE staff, and a greater focus on more complex examinations, the number and frequency of examinations of these advisers by OCIE has decreased in recent years. The Commission recently released a study required by Dodd-Frank Act Section 914 that discusses possible approaches for improving the frequency of investment adviser examinations.

FINRA has primary responsibility for examining broker-dealers. The Commission staff also examines broker-dealers, particularly when a risk has been identified or when evaluating the examination work of an SRO, including FINRA, but generally does not examine broker-dealers on a routine basis. The states are responsible

iv

App 253

for examining state-registered investment advisers, and they work with FINRA and the Commission on broker-dealer examinations.

The Commission has broad statutory authority under the federal securities laws to investigate violations of the federal securities laws and SRO rules. The Commission's Division of Enforcement investigates potential securities law violations, recommends that the Commission bring civil actions or institute administrative proceedings, and prosecutes these cases on behalf of the Commission. Examples of enforcement actions involving investment advisers include failures to disclose material conflicts of interest, misrepresentations, and other frauds. For broker-dealers, examples include abusive sales practices, failures to disclose material conflicts of interest, misrepresentations, failures to have a reasonable basis for recommending securities, other frauds, failures to reasonably supervise representatives. The Commission may seek remedial sanctions such as censures, suspensions, injunctions and limitations on business, and violators may be required to pay disgorgement and civil penalties.

**Retail Investor Perceptions**

Many retail investors and investor advocates submitted comments stating that retail investors do not understand the differences between investment advisers and broker-dealers or the standards of care applicable to broker-dealers and investment advisers. Many find the standards of care confusing, and are uncertain about the meaning of the various titles and designations used by investment advisers and broker-dealers. Many expect that both investment advisers and broker-dealers are obligated to act in the investors' best interests. The Commission has sponsored studies of investor understanding of the roles, duties and obligations of investment advisers and broker-dealers that similarly reflect confusion by retail investors regarding the roles, titles, and legal obligations of investment advisers and broker-dealers, although the studies found that investors generally were satisfied with their financial professionals. Several of the recommendations listed below are designed to address investor confusion and provide for a stronger and more consistent regulatory regime for broker-dealers and investment advisers providing personalized investment advice about securities to retail investors.

**Recommendations**

Based on its review of the broker-dealer and investment adviser industries, the regulatory landscape, issues raised by commenters, and other considerations required by Dodd-Frank Act Section 913, the Staff prepared recommendations that are listed below. The recommendations are designed to increase investor protection and decrease investor confusion in the most practicable, least burdensome way for investors, broker-dealers and investment advisers.

**Uniform Fiduciary Standard**: Consistent with Congress's grant of authority in Section 913, the Staff recommends the consideration of rulemakings that would apply expressly and uniformly to both broker-dealers and investment advisers, when providing personalized investment advice about securities to retail customers, a fiduciary standard

v

App 254

no less stringent than currently applied to investment advisers under Advisers Act Sections 206(1) and (2). In particular, the Staff recommends that the Commission exercise its rulemaking authority under Dodd-Frank Act Section 913(g), which permits the Commission to promulgate rules to provide that:

> the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers (and such other customers as the Commission may by rule provide), shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice.

The standard outlined above is referred to in the Study as the "uniform fiduciary standard."

The Staff notes that Section 913 explicitly provides that the receipt of commission-based compensation, or other standard compensation, for the sale of securities does not, in and of itself, violate the uniform fiduciary standard of conduct applied to a broker-dealer. Section 913 also provides that the uniform fiduciary standard does not necessarily require broker-dealers to have a continuing duty of care or loyalty to a retail customer after providing personalized investment advice.

The following recommendations suggest a path toward implementing a uniform fiduciary standard for investment advisers and broker-dealers when providing personalized investment advice about securities to retail customers:

- *Standard of Conduct:* The Commission should exercise its rulemaking authority to implement the uniform fiduciary standard of conduct for broker-dealers and investment advisers when providing personalized investment advice about securities to retail customers. Specifically, the Staff recommends that the uniform fiduciary standard of conduct established by the Commission should provide that:

> > the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers (and such other customers as the Commission may by rule provide), shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice.

*Implementing the Uniform Fiduciary Standard*: The Commission should engage in rulemaking and/or issue interpretive guidance addressing the components of the uniform fiduciary standard: the duties of loyalty and care. In doing so, the Commission should identify specific examples of potentially relevant and common material conflicts of interest in order to facilitate a smooth transition to the new standard by broker-dealers and consistent interpretations by broker-dealers and investment advisers. The Staff is of the view that the existing guidance and precedent under the Advisers Act regarding

fiduciary duty, as developed primarily through Commission interpretive pronouncements under the antifraud provisions of the Advisers Act, and through case law and numerous enforcement actions, will continue to apply.

- *Duty of Loyalty:* A uniform standard of conduct will obligate both investment advisers and broker-dealers to eliminate or disclose conflicts of interest. The Commission should prohibit certain conflicts and facilitate the provision of uniform, simple and clear disclosures to retail investors about the terms of their relationships with broker-dealers and investment advisers, including any material conflicts of interest.

  - The Commission should consider which disclosures might be provided most effectively (a) in a general relationship guide akin to the new Form ADV Part 2A that advisers deliver at the time of entry into the retail customer relationship, and (b) in more specific disclosures at the time of providing investment advice (e.g., about certain transactions that the Commission believes raise particular customer protection concerns).

  - The Commission also should consider the utility and feasibility of a summary relationship disclosure document containing key information on a firm's services, fees, and conflicts and the scope of its services (e.g., whether its advice and related duties are limited in time or are ongoing).

  - The Commission should consider whether rulemaking would be appropriate to prohibit certain conflicts, to require firms to mitigate conflicts through specific action, or to impose specific disclosure and consent requirements.

- *Principal Trading*: The Commission should address through interpretive guidance and/or rulemaking how broker-dealers should fulfill the uniform fiduciary standard when engaging in principal trading.

- *Duty of Care*: The Commission should consider specifying uniform standards for the duty of care owed to retail investors, through rulemaking and/or interpretive guidance. Minimum baseline professionalism standards could include, for example, specifying what basis a broker-dealer or investment adviser should have in making a recommendation to an investor.

- *Personalized Investment Advice About Securities:* The Commission should engage in rulemaking and/or issue interpretive guidance to explain what it means to provide "personalized investment advice about securities."

- *Investor Education:* The Commission should consider additional investor education outreach as an important complement to the uniform fiduciary standard.

vii

App 256

The Staff believes that the uniform fiduciary standard and related disclosure requirements may offer several benefits, including the following:

- Heightened investor protection;

- Heightened investor awareness;

- It is flexible and can accommodate different existing business models and fee structures;

- It would preserve investor choice;

- It should not decrease investors' access to existing products or services or service providers;

- Both investment advisers and broker-dealers would continue to be subject to all of their existing duties under applicable law; and

- Most importantly, it would require that investors receive investment advice that is given in their best interest, under a uniform standard, regardless of the regulatory label (broker-dealer or investment adviser) of the professional providing the advice.

The Staff also believes that to fully protect the interests of retail investors, the Commission should couple the fiduciary duty with effective oversight. Dodd-Frank Act Section 913 includes a provision requiring the Commission to enforce violations of the uniform fiduciary standard consistently against investment advisers and broker-dealers. This should provide additional protection to retail investors.

**Harmonization of Regulation**: The Staff believes that a harmonization of regulation—where such harmonization adds meaningful investor protection—would offer several advantages, including that it would provide retail investors the same or substantially similar protections when obtaining the same or substantially similar services from investment advisers and broker-dealers. The following recommendations address certain other areas where investment adviser and broker-dealer laws and regulations differ, and where the Commission should consider whether laws and regulations that apply to these functions should be harmonized for the benefit of retail investors:

- *Advertising and Other Communications*: The Commission should consider articulating consistent substantive advertising and customer communication rules and/or guidance for broker-dealers and investment advisers regarding the content of advertisements and other customer communications for similar services. In addition, the Commission should consider, at a minimum, harmonizing internal pre-use review requirements for investment adviser and broker-dealer advertisements or requiring investment advisers to designate employees to review and approve advertisements.

viii

App 257

- *Use of Finders and Solicitors:* The Commission should review the use of finders and solicitors by investment advisers and broker-dealers and consider whether to provide additional guidance or harmonize existing regulatory requirements to address the status of finders and solicitors and their respective relevant disclosure requirements to assure that retail customers better understand the conflicts associated with the solicitor's and finder's receipt of compensation for sending a retail customer to an adviser or broker-dealer.

- *Supervision:* The Commission should review supervisory requirements for investment advisers and broker-dealers, with a focus on whether any harmonization would facilitate the examination and oversight of these entities (e.g., whether detailed supervisory structures would not be appropriate for a firm with a small number of employees) and consider whether to provide any additional guidance or engage in rulemaking.

- *Licensing and Registration of Firms:* The Commission should consider whether the disclosure requirements in Form ADV and Form BD should be harmonized where they address similar issues, so that regulators and retail investors have access to comparable information. The Commission also should consider whether investment advisers should be subject to a substantive review prior to registration.

- *Licensing and Continuing Education Requirements for Persons Associated with Broker-Dealers and Investment Advisers:* The Commission could consider requiring investment adviser representatives to be subject to federal continuing education and licensing requirements.

- *Books and Records:* The Commission should consider whether to modify the Advisers Act books and records requirements, including by adding a general requirement to retain all communications and agreements (including electronic information and communications and agreements) related to an adviser's "business as such," consistent with the standard applicable to broker-dealers.

The Staff understands and is sensitive to the fact that, in addition to the benefits they would provide, changes in legal or regulatory standards related to providing personalized investment advice to retail investors could lead to increased costs for investors, investment advisers, broker-dealers, and their associated persons. The Study considers a number of potential costs, expenses and impacts of various potential regulatory changes.

Dodd-Frank Act Section 913 required the Staff to consider the potential impact of: (a) eliminating the broker-dealer exclusion from the definition of "investment adviser" in the Advisers Act; and (b) applying the duty of care and other requirements of the Advisers Act to broker-dealers. The Staff believes that these alternatives would not provide the Commission with a flexible, practical approach to addressing what standard

App 258

should apply to broker-dealers and investment advisers when they are performing the same functions for retail investors.

*    *    *

In the end, the Staff's recommendations were guided by an effort to establish a standard to provide for the integrity of advice given to retail investors and to recommend a harmonized regulatory regime for investment advisers and broker-dealers when providing the same or substantially similar services, to better protect retail investors. The Staff developed its recommendations with a view toward minimizing cost and disruption and assuring that retail investors continue to have access to various investment products and choice among compensation schemes to pay for advice.

x

# Table of Contents

I. **Introduction**..................................................................................................... 1

    A.    Study's Mandate ........................................................................1

    B.    Study's Scope...............................................................................4

II. **Overview of the Current Business and Regulatory Landscape........................ 5**

    A.    Current Business Landscape for Investment Advisers and Broker-Dealers ..6

        1.    Investment Advisers.......................................................... 6

        2.    Broker-Dealers.................................................................. 8

        3.    Dual Registrants............................................................... 12

    B.    Commission and Self Regulatory Organization ("SRO") Regulation of Investment Advisers and Broker-Dealers .................................................. 13

        1.    Investment Advisers.......................................................... 14

        2.    Broker-Dealers.................................................................. 46

    C.    State and Other Regulation of Investment Advisers and Broker-Dealers... 84

        1.    Investment Advisers.......................................................... 84

        2.    Broker-Dealers.................................................................. 89

III. **Retail Investor Perceptions and Confusion Regarding Financial Service Provider Obligations and Standard of Conduct ............................................. 93**

    A.    Investor and Investor Advocate Comments ................................. 94

    B.    Commission-sponsored Studies................................................... 95

    C.    CFA Survey.............................................................................. 99

    D.    Conclusion................................................................................ 101

IV. **Analysis and Recommendations ..................................................................... 101**

    A.    General Differences in Investment Adviser and Broker-Dealer Regulation 102

    B.    Standards of Conduct................................................................. 106

    C.    Implementing the Uniform Fiduciary Standard ........................................ 110

        1.    Duty of Loyalty.......................................................... 112

        2.    Duty of Care.............................................................. 120

1

3.     Personalized Investment Advice About Securities ..................... 123

4.     Investor Education ................................................................. 128

D.     Harmonization of Regulation .................................................. 129

1.     Advertising and the Use of Finders and Solicitors ..................... 130

2.     Remedies............................................................................... 133

3.     Supervision .......................................................................... 135

4.     Licensing and Registration of Firms......................................... 136

5.     Licensing and Continuing Education Requirements for Persons Associated with Broker-Dealers and Investment Advisers ........ 138

7.     Books and Records ................................................................ 139

E.     Alternatives to the Uniform Fiduciary Standard........................................ 139

1.     Repealing the Broker-Dealer Exclusion ................................... 139

2.     Imposition of the Standard of Conduct and Other Requirements of the Advisers Act.................................................................. 140

3.     Potential Drawbacks of Both Approaches ................................. 140

**V.     Cost Analysis ........................................................................................... 143**

A.     Introduction ........................................................................... 143

B.     Potential Costs Associated with the Elimination of the Broker-Dealer Exclusion .................................................................................. 146

1.     Costs to Broker-Dealers........................................................... 146

2.     Costs to Investment Advisers.................................................... 151

3.     Costs to Retail Investors, including Loss of Investor Choice..... 151

C.     Potential Costs Associated with Staff Recommendation to Consider Rules Applying a Standard of Conduct No Less Stringent than Advisers Act Sections 206(1) and 206(2) to Broker-Dealers, Investment Advisers and their Respective Associated Persons. ......................................... 155

1.     Costs to Broker-Dealers........................................................... 156

2.     Costs to Investment Advisers.................................................... 159

3.     Costs to Retail Investors, including Loss of Investor Choice..... 159

D.     Potential Costs Associated with the Application of Additional Harmonized Standards Beyond those Associated with sub-Section C ......................... 163

1.     Costs to Broker-Dealers........................................................... 163

2.     Costs to Investment Advisers.................................................... 164

3.     Costs to Retail Investors, including Loss of Investor Choice..... 165

**VI.     Conclusion .............................................................................................. 165**

2

**Appendix A: Regulatory, Examination and Enforcement Resources Devoted to Enforcing Standards of Care for Providing Personalized Investment Advice and Recommendations.......................................................................... A-1**

    I.      Commission and SRO Regulatory, Examination and Enforcement Resources ................................................................................................ A-1

            A.      Recent Commission Developments to Enhance Effectiveness of Examinations.................................................................... A-1

            B.      Examinations of Investment Advisers and Broker-Dealers........ A-2

            C.      Commission Enforcement.......................................................... A-17

            D.      FINRA Enforcement.................................................................. A-21

    II.     State Regulatory, Examination and Enforcement Resources .................. A-22

            A.      Overview of State Examinations ............................................... A-22

            B.      Investment Adviser Examinations ............................................. A-23

             C.      Broker-Dealer Examinations ..................................................... A-25

             D.      Investment Adviser and Broker-Dealer Examination Outcomes ................................................................................... A-26

**Appendix B: Groups, Entities and Individuals Who Met with the Staff ................. B-1**

## I.     Introduction

### A.     Study's Mandate

On July 21, 2010, President Obama signed the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act").[1]   Dodd-Frank Act of Title IX of Section 913 ("Dodd-Frank Section 913") requires the Commission to conduct a study regarding the obligations of brokers, dealers, and investment advisers ("Study").

Specifically, Dodd-Frank Act Section 913(b) requires the evaluation of the effectiveness of existing legal or regulatory standards of care for brokers, dealers, investment advisers, and persons associated with brokers, dealers, and  investment advisers for providing personalized investment advice and recommendations about securities to retail customers imposed by the Commission and a national securities association (i.e., the Financial Industry Regulatory Authority ("FINRA")), and other Federal and State legal or regulatory standards.  In addition, the Study must evaluate whether there are legal or regulatory gaps, shortcomings, or overlaps in legal or regulatory standards in the protection of retail customers relating to the standards of care for brokers, dealers, investment advisers, and persons associated with brokers, dealers, and investment advisers for providing personalized investment advice about securities to retail customers that should be addressed by rule or statute.  Dodd-Frank Act Section 913(g) defines a "retail customer" as "a natural person, or the legal representative of a natural person, who – (A) receives personalized investment advice about securities from a broker, dealer, or investment adviser, and (B) uses such advice primarily for personal, family or household purposes."

Dodd-Frank Act Section 913(c) specifies 14 issues that the Commission must consider in conducting the Study.  These issues are:

- The effectiveness of existing legal or regulatory standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice and recommendations about securities to retail customers imposed by the Commission and a national securities association, and other Federal and State legal or regulatory standards;

- Whether there are legal or regulatory gaps, shortcomings, or overlaps in legal or regulatory standards in the protection of retail customers relating to the standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice about securities to retail customers that should be addressed by rule or statute;

---

[1]       Pub. L. No. 111-203, 124 Stat. 1376 (2010).

- Whether retail customers understand that there are different standards of care applicable to brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers in the provision of personalized investment advice about securities to retail customers;

- Whether the existence of different standards of care applicable to brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers is a source of confusion for retail customers regarding the quality of personalized investment advice that retail customers receive;

- The regulatory, examination, and enforcement resources devoted to, and activities of, the Commission, the States, and a national securities association to enforce the standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers when providing personalized investment advice and recommendations about securities to retail customers, including—

    (A)    the effectiveness of the examinations of brokers, dealers, and investment advisers in determining compliance with regulations;

    (B)    the frequency of the examinations; and

    (C)    the length of time of the examinations;

- The substantive differences in the regulation of brokers, dealers, and investment advisers, when providing personalized investment advice and recommendations about securities to retail customers;

- The specific instances related to the provision of personalized investment advice about securities in which—

    (A)    the regulation and oversight of investment advisers provide greater protection to retail customers than the regulation and oversight of brokers and dealers; and

    (B)    the regulation and oversight of brokers and dealers provide greater protection to retail customers than the regulation and oversight of investment advisers;

- The existing legal or regulatory standards of state securities regulators and other regulators intended to protect retail customers;

- The potential impact on retail customers, including the potential impact on access of retail customers to the range of products and services offered by brokers and dealers, of imposing upon brokers, dealers, and persons associated with brokers or

2

dealers—

    (A)    the standard of care applied under the Investment Advisers Act of 1940 ("Advisers Act") for providing personalized investment advice about securities to retail customers of investment advisers, as interpreted by the Commission and the courts; and

    (B)    other requirements of the Advisers Act;

- The potential impact of eliminating the broker and dealer exclusion from the definition of "investment adviser" under Advisers Act Section 202(a)(11)(C), in terms of—

    (A)    the impact and potential benefits and harm to retail customers that could result from such a change, including any potential impact on access to personalized investment advice and recommendations about securities to retail customers or the availability of such advice and recommendations;

    (B)    the number of additional entities and individuals that would be required to register under, or become subject to, the Advisers Act, and the additional requirements to which brokers, dealers, and persons associated with brokers and dealers would become subject, including—

        (i) any potential additional associated person licensing, registration, and examination requirements; and

        (ii) the additional costs, if any, to the additional entities and individuals; and

    (C)    the impact on Commission and State resources to—

        (i) conduct examinations of registered investment advisers and the representatives of registered investment advisers, including the impact on the examination cycle; and

        (ii) enforce the standard of care and other applicable requirements imposed under the Advisers Act;

- The varying level of services provided by brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers to retail customers and the varying scope and terms of retail customer relationships of brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers with such retail customers;

3

App 265

- The potential impact upon retail customers that could result from potential changes in the regulatory requirements or legal standards of care affecting brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers relating to their obligations to retail customers regarding the provision of investment advice, including any potential impact on—

  (A)    protection from fraud;

  (B)    access to personalized investment advice, and recommendations about securities to retail customers; or

  (C)    the availability of such advice and recommendations;

- The potential additional costs and expenses to—

  (A)    retail customers regarding, and the potential impact on the profitability of, their investment decisions; and

  (B)    brokers, dealers, and investment advisers resulting from potential changes in the regulatory requirements or legal standards affecting brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers relating to their obligations, including duty of care, to retail customers; and

- Any other considerations that the Commission considers necessary and appropriate in determining whether to conduct a rulemaking, following the study, to address the legal or regulatory standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice and recommendations about securities to retail customers.

These considerations are addressed in more detail in the relevant portions of the Study below.   Finally, the Commission is required by Dodd-Frank Act Section 913(d) to submit a report on the Study to the Committee on Banking, Housing and Urban Affairs of the Senate and the Committee of Financial Services of the House of Representatives.  The report must describe the findings, conclusions and recommendations from the Study.  The views expressed in this Study are those of the Staff and do not necessarily reflect the views of the Commission or the individual Commissioners.

## B.    Study's Scope

Dodd-Frank Act Section 913(e) directs the Commission to seek and consider public input in preparing the Study.  On July 27, 2010, the Commission published a request for

4

App 266

public comments and data to inform the Study.[2]  The comment period closed on August 30, 2010.  The Commission received more than 3,000 individualized comments, including comments from investors, financial professionals, industry groups, academics, and other regulators.  The Commission also received over 500 comments that comprised seven types of form letters.  The Commission staff has carefully considered the views of these commenters and has incorporated them in the Study, as appropriate.

Given the array of issues to be considered in the Study, including issues related to investment advisers, broker-dealers, investor disclosures, costs, and examination and enforcement responsibilities and resources, a cross-Divisional staff task force was formed to bring a multi-disciplinary approach to the Study ("Staff").  Staff participants include representatives from the:

Division of Investment Management;
Division of Risk, Strategy, and Financial Innovation;
Division of Trading and Markets;
Office of Compliance Inspections and Examinations;
Office of the General Counsel; and
Office of Investor Education and Advocacy.

To help further inform the Study and consistent with the Commission's public outreach on these issues, the Staff met with interested parties representing a variety of perspectives beginning in August 2010 (see Appendix B).  The Staff met with outside groups constituting a range of industry perspectives, from wirehouses to financial planners.  In addition, the Staff met with FINRA, state securities regulators (i.e., the North American Securities Administrator Association ("NASAA")), and organizations (e.g., the Consumer Federation of America, the Committee for a Fiduciary Standard and the Public Investors Arbitration Bar Association). The Staff also requested assistance from state securities regulators and FINRA with the aspects of the study involving their efforts, such as examinations and enforcement.

## II.    Overview of the Current Business and Regulatory Landscape

Investment advisers and broker-dealers offer a variety of services and products to their retail clients and customers, with the scope and terms of the relationship and the associated compensation reflecting the services and products offered.  The following section summarizes the size and scope of the investment advisory and brokerage businesses, including dual registrants, focusing particularly on the various services and products provided by investment advisers and broker-dealers to retail clients and customers, and the scope and terms of advisory or brokerage relationships with retail clients and customers.

---

[2]    Study Regarding Obligations of Brokers, Dealers, and Investment Advisers, Exchange Act Release No. 62577 (July 27, 2010).

5

### A.    Current Business Landscape for Investment Advisers and Broker-Dealers

### 1.    Investment Advisers

Investment advisers provide a wide range of investment advisory services and play an important role in helping individuals and institutions make significant financial decisions.  From individuals and families seeking to plan for retirement or save for college to large institutions managing billions of dollars, clients seek the services of investment advisers to help them evaluate their investment needs, plan for their future, develop and implement investment strategies, and cope with the ever-growing complexities of the financial markets.  Today, the more than 11,000 advisers registered with the Commission manage more than $38 trillion for more than 14 million individual and institutional clients.[3]  In addition, there are more than 275,000 investment adviser representatives registered in the applicable states and more than 15,000 state-registered investment advisers.[4]

The majority of Commission-registered investment advisers manage client portfolios.[5]  For example, approximately 75% of Commission-registered investment

---

[3]    Unless otherwise specified, the statistics in Section II.A.1 are based on data derived from Commission-registered investment advisers' responses to questions on Part 1A of Form ADV reported through the Investment Adviser Registration Depository ("IARD") as of September 30, 2010.  This does not include state-registered investment advisers.  We note that these figures will change due to the reallocation of federal and state responsibilities for registered investment advisers provided by Title IV of the Dodd-Frank Act.  See, e.g., Study on Enhancing Investment Adviser Examinations (Jan. 2011) (the "Section 914 Study").  See also Commissioner Elisse B. Walter,  Statement on Study Enhancing Investment Adviser Examinations (Required by Section 914 of Title IX of the Dodd-Frank Wall Street Reform and Consumer Protection Act) (Jan. 2010) , available at http://www.sec.gov/news/speech/2011/spch011911ebw.pdf  ("Commissioner Walter Statement").  See also Rules Implementing Amendments to the Investment Advisers Act of 1940, Investment Advisers Act Release No. 3110 (Nov. 19, 2010) ("Release 3110").  The number of investment advisers has increased by 38.5% since 2004, when there were 8,581 registered investment advisers; and the amount of assets under management of registered investment advisers also has increased, by 58.9% since 2004, when assets totaled $24.1 trillion.  Section 914 Study at 8 – 9.

[4]    See Sections II.C.1 and II.C.2 of the Study, infra, for a discussion of the federal and state registration requirements for investment advisers and investment adviser representatives.

[5]    Form ADV (Uniform Application for Investment Adviser Registration) requires applicants to, among other things, identify the types of clients and advisory service provided.  The types of clients listed in Part 1A, Item 5.D of Form ADV are individuals (other than high net worth individuals); high net worth individuals (as that term is defined in the Glossary to Form ADV); banking or thrift institutions; investment companies (including mutual funds); pension and profit sharing plans (other than plan participants); other pooled investment vehicles (e.g., hedge funds); charitable organizations; corporations or other businesses not previously listed; state or municipal government entities; and any other type of clients.  The ten types of advisory activities listed in Part 1A, Item 5.G of Form ADV include financial planning services; portfolio management for individuals and/or small businesses; portfolio management for investment companies; portfolio management for business or institutional clients (other than investment companies); pension

advisers managed the portfolios of individuals and small businesses. Commission-registered investment advisers also reported that approximately 91.2% of their assets under management were in discretionary accounts, while 8.8% were in non-discretionary accounts.[6]  Approximately 63.9% of Commission-registered investment advisers reported that 51% or more of their assets under management related to the accounts of individual clients (other than high net worth individuals).

Investment advisers also manage the portfolios of pooled investment vehicles such as hedge funds and other private funds, pension funds and registered investment companies. Investment advisers also provide financial planning and pension consulting services, or may select investment advisers for others. In addition, investment advisers sponsor wrap fee programs and may act as portfolio managers in wrap fee programs.[7]  Some investment advisers publish periodicals or newsletters, or provide securities ratings or pricing services. Many investment advisers also engage in other non-advisory businesses, such as insurance broker or agent, or as a registered broker-dealer or registered representative of a broker-dealer.[8]  Most investment advisers charge clients fees for investment advisory services based on the percentage of assets under management (over 95%).[9]  Others may charge hourly or fixed rates. Few investment advisers reported receiving commission-based compensation (8.9% of Commission-registered investment advisers). The majority of Commission-registered investment advisers (51.2%) reported that they have six or fewer non-clerical employees, and 91% reported that they have 50 or fewer employees.

---

consulting services; selection of other advisers; publication of periodicals or newsletters; security ratings or pricing services; market timing services; and any other advisory service.

[6]  These figures do not distinguish between the types of clients (i.e., individual or institutional).

[7]  Form ADV's Glossary defines a "wrap fee program" as "any advisory program under which a specified fee or fees not based directly upon transactions in a client's account is charged for investment advisory services (which may include portfolio management or advice concerning the selection of other investment advisers) and the execution of client transactions." Part 1A, Item 5.I of Form ADV requires applicants to identify whether they participate in a wrap fee program, and if so, whether they sponsor the program or act as a portfolio manager to the program.

[8]  Part 1A, Item 6 of Form ADV requires an investment adviser applicant to disclose, among other things, whether it is actively engaged in business as a broker-dealer; registered representative of a broker-dealer; futures commission merchant, commodity pool operator, or commodity trading advisor; real estate broker, dealer, or agent; insurance broker or agent; bank (including a separately identifiable department or division of a bank); other financial product salesperson; or any other business (other than giving investment advice).

[9]  Part 1A, Item 5.E of Form ADV requires applicants to disclose whether they are compensated for their investment advisory services by a percentage of assets under management; hourly charges; subscription fees (for a newsletter or periodical); fixed fees (other than subscription fees); commissions; performance-based fees; or any other fees.

## 2.    Broker-Dealers

Like investment advisers, broker-dealers provide services that play an important role in helping retail and institutional investors make significant financial decisions.  As intermediaries, they connect investors to investments, which range from common stock and mutual funds to complex financial products, and in doing so, enhance the overall liquidity and efficiency of the financial markets.  As of the end of 2009, broker-dealers held approximately 110 million customer accounts.[10]  Currently, the Commission oversees approximately 5,100 broker-dealers[11] with over 600,000 registered representatives[12] engaging in a variety of business activities, which may or may not include the provision of personalized investment advice or recommendations about securities to retail customers.[13]  Of the 5,100 registered broker-dealer firms, 985 have indicated on Form BD that they engage in, or expect to engage in, investment advisory services constituting one percent or more of their annual revenue.[14]

---

[10]    See letter from Angela Goelzer, FINRA, dated Jan. 11, 2011 ("FINRA January Letter") (noting that as of December 31, 2009, there were 109.5 million retail and institutional accounts held at FINRA registered broker-dealers).

[11]    Unless otherwise specified, the statistics in Section II.A.2 are based on data derived from broker-dealers' responses to questions on the Uniform Application for Broker-Dealer Registration ("Form BD") reported through the Central Registration Depository ("CRD") as of September 30, 2010. Of this number, approximately 4,600 are FINRA member firms with approximately 163,000 branch offices.  FINRA Statistics, available at http://www.finra.org/Newsroom/Statistics.

[12]    These figures are based on data derived from the BrokerCheck system as of September 30, 2010. See also FINRA, 2009 Annual Financial Report, at 2, available at: http://www.finra.org/web/groups/corporate/@corp/@about/@ar/documents/corporate/p122204.pdf.  The number of FINRA member firms has decreased by 10.4% since 2005, from 5,111 to 4,578 in 2010.  The number of registered representatives has decreased by 3.8% since 2005, from 655,832 to 630,692 in 2010.  FINRA Statistics, available at http://www.finra.org/Newsroom/Statistics/, and NASD 2005 Year in Review at 7, available at http://www.finra.org/web/groups/corporate/@corp/@about/@ar/documents/corporate/p016705.pdf .

[13]    Form BD requires applicants to identify the types of business engaged in (or to be engaged in) that accounts for 1% or more of the applicant's annual revenue from the securities or investment advisory business.  The 29 types of business listed on Form BD include, among others: engaging in stock exchange floor activities; making inter-dealer markets in corporate securities over-the-counter; retailing corporate equity securities over-the-counter; acting as an underwriter or selling group participant; acting as a mutual fund underwriter or sponsor; retailing mutual funds; acting as a U.S. government securities dealer or broker; acting as a municipal securities dealer or broker; selling variable life insurance or annuities; selling securities of only one issuer or associate issuers (other than mutual funds); providing investment advisory services; trading securities for own account; engaging in private placements of securities; and any other business.

[14]    These figures are based on data derived from broker-dealers' responses to questions on Form BD reported through the CRD as of September 30, 2010.  Form BD does not define "investment advisory business."  Rather, it is up to the applicant to determine and disclose.  "Investment advisory business" could be any investment advisory activity, regardless of whether it requires registration as an adviser (at the federal or state level), that amounts to 1% or more of the applicant's annual revenue.  According to FINRA, as of September 30, 2010, 1,734 or approximately 37%, of its 4,648 registered firms had affiliates that engaged in investment advisory

8

App 270

The products and services offered by broker-dealers fall into two broad categories: brokerage services and dealer services.  Generally, a broker is one who acts as an agent for someone else, while a dealer is one who acts as principal for its own account.[15]  A person can act as principal by selling securities out of inventory, or act in a riskless principal capacity.[16]  A person can be both a broker and a dealer.

Broker-dealers may offer a variety of brokerage (i.e., agency) services and products to retail customers including, but not limited to: providing execution-only services (e.g., discount brokerage);[17] providing custody and trade execution to a customer who has selected an independent financial adviser; executing trades placed by investment advisers in a wrap fee programs; offering margin accounts;  providing generalized research, advice, and education; [18] operating a call center (e.g., responding to a customer request for stock quotes, information about an issuer or industry, and then placing a trade at the customer's request);[19] providing asset allocation services with recommendations about asset classes, specific sectors, or specific securities; providing customer-specific research and analysis; [20]

---

activities.  Of these 1,734 firms, approximately 83% were not dually registered as investment advisers, and approximately 17% were dually registered.  In addition to the 1,734 firms, there were 553 firms that were dually registered but did not report having an investment advisory affiliate.  FINRA January Letter, supra note 10.

[15]     See discussion in Section II.B below.

[16]     A riskless principal transaction is generally defined as one in which a broker or dealer, after receiving an order to buy (or sell) a security from a customer, purchases (or sells) the security to offset a contemporaneous sale to (or purchase from) the customer.  See Exchange Act Rule 10b-10(a)(2)(ii).

[17]     See, e.g., letter from R. Scott Henderson, Deputy General Counsel, Global Wealth & Investment Management, Bank of America, dated Aug. 30, 2010 ("BOA Letter"); letter from David M. Carroll, Senior Executive Vice President of Wealth, Brokerage and Retirement, Wells Fargo & Co., dated Aug. 30, 2010 ("Wells Fargo Letter").

[18]     Examples of generalized research, advice and education include: issuing sell-side research reports; providing third-party or proprietary securities research to a customer (e.g., online research pages or "electronic libraries" of research, reports, news, quotes, and charts that customers can obtain or request); providing self-directed tools to allow customers to sort through a broad range of stocks and industry sectors; and providing subscription services to e-mails or other communications that alert customers to news affecting the securities in the customers' portfolios or on the customers' "watch list."  See, e.g., NASD Notice to Members 01-23 (Suitability Rule and Online Communications).

[19]     See, e.g., letter from Christopher P. Gilkerson, Senior Vice President & Deputy General Counsel, Charles Schwab & Co., Inc., dated Aug. 30, 2010 ("Schwab Letter").

[20]     Examples of customer-specific research and analysis include: sending customer-specific electronic communications to a targeted customer or targeted group of customers encouraging the particular customer(s) to buy a security; sending customers an e-mail stating that customers should invest in a particular sector and providing a list of "buy" or "sell" recommendations; and providing a portfolio analysis tool that generates buy or sell recommendations of specific securities.  See, e.g., NASD Notice to Members 01-23 (Suitability Rule and Online Communications).

exercising limited trading discretion over customer accounts;[21] providing transaction-specific recommendations to buy or sell securities in a non-discretionary account for commissions;[22] providing discretionary portfolio management for commissions; providing financial planning for commissions or no fee;[23] and providing comprehensive (or private) wealth management for commissions.[24]

Broker-dealers also may offer a variety of dealer (i.e., principal) services and products to retail customers, including, but not limited to: selling securities (such as bonds) out of inventory; buying securities from customers; selling proprietary products (e.g., products such as affiliated mutual funds, structured products, private equity and other alternative investments); selling initial and follow-on public offerings; selling other underwritten offerings; acting as principal in Individual Retirement Accounts; acting as a market maker; and otherwise acting as a dealer.[25] Broker-dealers may offer solely proprietary products, a limited range of products, or a diverse range of products.[26]

In addition to these broker and dealer activities, broker-dealers often provide ancillary services, such as lending, bill paying, cash sweeps, and debit cards.[27] Broker-dealers may also refer investors to affiliates for non-securities related financial offerings, such as mortgages, insurance, credit cards or bank deposits.[28]

Broker-dealers currently offer customers a variety of pricing and compensation structures for the products and services offered.[29] Generally, the compensation in a broker-

---

[21]  See, e.g., letter from Sarah A. Miller, Senior Vice President, American Bankers Association ("ABA"), and Executive Director and General Counsel, ABA Securities Association ("ABASA"), dated Aug. 30, 2010 ("ABA & ABASA Letter").

[22]  See, e.g., Schwab Letter, supra note 19.

[23]  Id.

[24]  Examples of comprehensive (or private) wealth management include: life event planning; retirement planning; college planning; tax management; life insurance; estate planning; and charitable giving.

[25]  See Guide to Broker-Dealer Registration, (April 2008), available at: http://www.sec.gov/divisions/marketreg/bdguide.html ("Guide to Broker-Dealer Registration"); BOA Letter, supra note 17; letter from Ira D. Hammerman, Senior Managing Director and General Counsel, Securities Industry and Financial Markets Association, dated Aug. 30, 2010 ("SIFMA Letter"); Wells Fargo Letter, supra note 17.

[26]  See, e.g., letter from Michael Koffler and Clifford E. Kirsch, Sutherland, Asbill & Brennan LLP, on behalf of the Committee of Annuity Insurers, dated Aug. 30, 2010 ("CAI Letter").

[27]  See, e.g., SIFMA Letter, supra note 25; BOA Letter, supra note 17.

[28]  See, e.g., Wells Fargo Letter, supra note 17.

[29]  See, e.g., BOA Letter, supra note 17; SIFMA Letter, supra note 25.

App 272

dealer relationship is transaction-based and is earned through commissions, mark-ups, mark-downs, sales loads or similar fees on specific transactions, where advice is provided that is solely incidental to the transaction.[30] A brokerage relationship may involve incidental advice with transaction-based compensation, or no advice and, therefore no charge, for advice.[31]

As noted above, this wide spectrum of services and products provided by broker-dealers may or may not involve the provision of personalized investment advice or recommendations about securities to retail customers.[32] Moreover, there are variations in the level and the extent of the advice and recommendations provided and the compensation structure that applies.[33]

Broker-dealers provide brokerage products and services to a broad range of retail customers. For example, retail customers may include inexperienced retail investors seeking more basic brokerage services and recommendations, as well as retail investors with aggressive investment objectives or unique situations that are seeking sophisticated investment strategies (e.g., concentrated positions, hedging, options, and other complex strategies).[34] Retail customers may have multiple relationships and accounts with the same broker-dealer, with varying levels of service provided to each account.[35] For example, a retail customer may have a brokerage account that includes the provision of investment advice and recommendations for commissions, and also a self-directed brokerage account that does not include such advice or recommendations, with a single broker-dealer.[36]

Most broker-dealers are small in size. As of the end of December 2010, approximately 53% of all FINRA-registered broker-dealers employ 10 or fewer registered individuals (i.e., registered representatives or registered principals).[37] Approximately 29% of FINRA-registered broker-dealers employ 10-50 registered individuals, approximately

---

[30]    See, e.g., letter from John Ivan, Senior Vice President and General Counsel, Janney Montgomery Scott, dated Aug. 30, 2010 ("Janney Letter"); Schwab Letter, supra note 19; SIFMA Letter, supra note 25.

[31]    See, e.g., Wells Fargo Letter, supra note 17.

[32]    As addressed in more detail in Section IV.C.3, commenters provided a variety of views on which broker-dealer services and products involved personalized investment advice or recommendations for retail customers, and the extent to which a new standard of conduct should apply to such products.

[33]    See, e.g., Schwab Letter, supra note 19.

[34]    See, e.g., SIFMA Letter, supra note 25; BOA Letter, supra note 17.

[35]    See, e.g., ABA & ABASA Letter, supra note 21.

[36]    See, e.g., ABA & ABASA Letter, supra note 21.

[37]    See FINRA January Letter, supra note 10.

11

9% employ 51-150 registered individuals, and the remaining 9% employ over 151 registered individuals.[38]

### 3.    Dual Registrants

As indicated above, many financial services firms may offer both investment advisory and broker-dealer services.[39]  For example, approximately 5% of Commission-registered investment advisers reported that they also were registered as a broker-dealer, and 22% of Commission-registered investment advisers reported that they had a related person that was a broker-dealer.[40] In addition, as of mid-October 2010, 842 firms registered with FINRA as a broker-dealer, or approximately 18% of broker-dealers registered with FINRA, were also registered as an investment adviser with either the Commission or a state.[41]   Further, as of the end of September 2010, approximately 37% of FINRA-registered broker-dealers had an affiliate engaged in investment advisory activities.[42]

Many of these financial services firms' personnel may also be dually registered as investment adviser representatives and registered representatives.  As of mid-October 2010, approximately 88% of investment adviser representatives were also registered representatives of a FINRA registered broker-dealer.[43]

Dual registration often allows these firms to provide a variety of services not available through entities that are solely registered as investment advisers or broker-dealers. For example, one firm noted that dual registrants may "provide under one roof a combination of immediate execution, liquidity, research-driven guidance, a wide choice of products, securities tailored to individual client needs, and other services" that go beyond what non-dually registered investment advisers and broker-dealers offer.[44]

---

[38]    See FINRA January Letter, supra note 10.

[39]    See, e.g., Schwab Letter, supra note 19; SIFMA Letter, supra note 25; BOA Letter, supra note 17; letter from John Junek, Executive VP and General Counsel, Ameriprise Financial, Inc., dated Aug. 30, 2010 ("Ameriprise Letter"); Robert J. McCann, CEO, UBS Financial Services, Inc., dated Aug. 30, 2010 ("UBS Letter"); and letter from Charles D. Johnston, President, Morgan Stanley Smith Barney LLC, dated Aug. 30, 2010 ("Morgan Stanley Letter").

[40]    See Section 914 Study and Commissioner Walter Statement, supra note 3.

[41]    See letter from Angela C. Goelzer, FINRA, dated Nov. 3, 2010 ("FINRA November Letter").  As of September 30, 2010, 856 firms overseen by FINRA were dually registered.  See FINRA January Letter, supra note 10.

[42]    See FINRA January Letter, supra note 10.  Of these firms, approximately 83% were not dually registered as investment advisers, and approximately 17% were dually registered.  In addition to the 1,734 firms, there were 553 firms that were dually registered but did not report having an investment advisory affiliate.  FINRA January Letter, supra note 10.

[43]    FINRA November Letter, supra note 41.

[44]    See, e.g., UBS Letter, supra note 39.

12

A number of large financial service firms noted that some of their clients and customers maintained multiple types of accounts and relationships with them, such as a self-directed brokerage account, a brokerage account in which personalized advice is provided, and a fee-based investment advisory account.[45]  Firms report that retail investors maintain these multiple accounts for a number of reasons, including: (1) using the brokerage account to hold concentrated positions (such as the stock of their employer) or other securities (e.g., municipal or corporate bonds) for which they do not want ongoing investment advice or for which they do not want to pay an ongoing, asset-based fee (because, for example, they intend to buy and hold the security); (2) using the brokerage account to access products and services offered by a firm on a principal basis, including proprietary products;[46] or (3) taking advantage of the differing forms of compensation paid for maintaining a brokerage or an advisory account.[47]  Therefore, retail investors may have a portfolio consisting of multiple accounts subject to investment adviser or broker-dealer regulation, and they may receive advice from "dual-hatted" personnel that are also subject to investment adviser and broker-dealer regulation.   While these multiple accounts may, depending on the circumstances, benefit investors, they also can present conflicts that need to be managed by the dual registrants.[48]

### B.    Commission and Self Regulatory Organization ("SRO") Regulation of Investment Advisers and Broker-Dealers

Investment advisers and broker-dealers must adhere to high standards of conduct in their interactions with investors.  These standards of conduct are imposed by the federal securities laws and, in the case of broker-dealers, also by SRO rules.  The following section provides an overview of the existing legal and regulatory framework developed by the Commission, SRO, state and other regulation to govern the activities of investment advisers and broker-dealers, especially when they provide personalized investment advice and recommendations about securities to retail investors.  This section discusses, among other things, regulations applicable to investment advisers and broker-dealers when they provide personalized investment advice about securities, including, but not limited to, duty of fair dealing, fiduciary duty, ethical standards of conduct, suitability, disclosure obligations, principal trading, and advertising.  It also discusses additional topics such as recordkeeping, supervision and compliance, and investor remedies.

---

[45]    See, e.g., BOA Letter, supra note 17 ("It is not uncommon for clients to decide that they want some of their assets to be guided by advice and to self-direct other assets, and to maintain two or more accounts with the same financial services provider.  More specifically, a client may want to maintain a discretionary investment advisory account, a brokerage account in which investment advice is provided, and a brokerage account for unsolicited trade executions."); Schwab Letter, supra note 19 (noting that the majority of households that have one account enrolled in a fee-based advisory program also have a self-directed brokerage account at Schwab).

[46]    See, e.g., Morgan Stanley Letter, supra note 39.

[47]    See, e.g., UBS Letter, supra note 39.

[48]    See, e.g., In the Matter of Valentine Capital Asset Management, Inc., Investment Advisers Act Release No. 3090 (Sept. 29, 2010) (settled order) ("Release 3090").

13

In addition to this section, Appendix A discusses the effectiveness of the regulatory, examination, and enforcement resources of the Commission, FINRA, and the states devoted to enforcing the standards of care for investment advisers and broker-dealers when providing personalized investment advice about securities to retail investors.  In particular, this appendix discusses the effectiveness of the examinations of broker-dealers and investment advisers in determining compliance with regulations, including ongoing efforts and recent initiatives by OCIE, FINRA, and the states.  It also provides data about the frequency and length of investment adviser and broker-dealer examinations, and discusses the typical outcomes resulting from examinations, such as deficiency letters and referrals to the Division of Enforcement, FINRA, or the states, as appropriate.  The appendix also discusses the enforcement resources and programs of the Commission, FINRA, and the states, and provides examples of recent initiatives and ongoing efforts designed to enforce the standards of care.

The following discussion is intended to provide a general overview of certain significant federal and SRO requirements and standards of conduct applicable to investment advisers and broker-dealers, and does not address every aspect of investment adviser or broker-dealer regulation.  Accordingly, this overview is not meant to serve and should not be interpreted as a comprehensive treatise on the regulation of investment advisers and broker-dealers.  It also does not create any new, or supersede any existing, positions of the Commission or the Commission staff.

### 1.    Investment Advisers

### a)    Overview of Commission Regulation

The Advisers Act is the last in a series of federal statutes intended to eliminate abuses in the securities industry that Congress believed contributed to the stock market crash of 1929 and the Depression of the 1930s.  The Advisers Act resulted from a comprehensive congressionally-mandated study conducted by the Commission of investment companies, investment counsel, and investment advisory services.  Ultimately, the report concluded that the activities of investment advisers and advisory services "patently present various problems which usually accompany the handling of large liquid funds of the public."[49]  The Commission's report stressed the need to improve the professionalism of the industry, both by eliminating tipsters and other scam artists and by emphasizing the importance of unbiased advice, which spokespersons for investment counsel saw as distinguishing their profession from investment bankers and brokers.[50]  The general objective "was to protect the public and investors against malpractices by persons paid for advising others about securities."[51]

---

[49]    H.R. Doc. No. 477, 76th Cong., 2d Sess. (1939).

[50]    See Investment Trusts and Investment Companies: Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477 at 27-30 (1939).

[51]    S. Rep. No. 1760, 86th Cong., 2d Sess. 1 (1960).

Many money managers, investment consultants, and financial planners are regulated as "investment advisers" under the Advisers Act or similar state statutes. Investment adviser employees that provide personalized investment advice are regulated as "investment adviser representatives" under state statutes and are also subject to supervision by the investment adviser, as discussed below.[52]

Advisers Act Section 202(a)(11) defines "investment adviser" to mean:

any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

As a general matter, a person would be an investment adviser within the meaning of the Advisers Act if that person:

(1)    Provides advice, or issues reports or analyses, regarding securities;

(2)    Is in the business of providing such services; and

(3)    Provides such services for compensation.[53]

The staff has interpreted each of these elements broadly.[54]

The Advisers Act excludes, among other service providers, certain brokers and dealers, and banks and bank holding companies (except if the bank or bank holding company advises a registered investment company) from the definition of investment adviser, even though the service provider may satisfy all three elements of the definition.[55] A person excluded from the definition of investment adviser is not subject to any provisions of the Advisers Act. We focus here on the exclusion available to brokers and dealers.

The Advisers Act excludes from the investment adviser definition any broker or dealer: (i) whose performance of its investment advisory services is "solely incidental" to

---

[52]    In general, states that register and regulate investment adviser representatives require that the representatives register on Form U4 and pay a fee. See Section II.C.1, infra.

[53]    See Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services, Investment Advisers Act Release No. 1092 (Oct. 8, 1987) ("Release 1092").

[54]    Id.

[55]    See Advisers Act Section 202(a)(11)(A)-(G) for a list of those excluded from the definition of investment adviser.

15

the conduct of its business as a broker or dealer; and (ii) who receives no "special compensation" for its advisory services. To rely on the exclusion, a broker-dealer must satisfy both of these elements.[56]

Generally, the "solely incidental" element amounts to a recognition that broker-dealers commonly give a certain amount of advice to their customers in the course of their regular business as broker-dealers and that "it would be inappropriate to bring them within the scope of the [Advisers Act] merely because of this aspect of their business."[57] On the other hand, "special compensation" "amounts to an equally clear recognition that a broker or dealer who is specially compensated for the rendering of advice should be considered an investment adviser and not be excluded from the purview of the [Advisers] Act merely because he is also engaged in effecting market transactions in securities."[58] Finally, the Commission staff has taken the position that a registered representative of a broker-dealer is entitled to rely on the broker-dealer exclusion if he or she is providing investment advisory services to a customer within the scope of his or her employment with the broker-dealer.[59]

Registration

Generally, a person or firm that falls within the definition of "investment adviser" (and is not eligible to rely on one of the exclusions) must register under the Advisers Act, unless it: (i) qualifies to rely on an exemption from the Advisers Act's registration requirement;[60] or (ii) is prohibited from registering under the Advisers Act, as discussed

---

[56]     See Advisers Act Section 202(a)(11)(C). In 2005, the Commission adopted Advisers Act Rule 202(a)(11)-1, the principal purpose of which was to deem broker-dealers offering "fee-based brokerage accounts" as not being subject to the Advisers Act. See Certain Broker-Dealers Deemed Not to be Investment Advisers, Investment Advisers Act Release No. 2376 (Apr. 12, 2005) ("Release 2376"). Fee-based brokerage accounts are similar to traditional full-service brokerage accounts, which provide a package of services, including execution, incidental investment advice, and custody. The primary difference between the two types of accounts is that a customer in a fee-based brokerage account pays a fee based upon the amount of assets on account (an asset-based fee), whereas a customer in a traditional full-service brokerage account pays a commission (or a mark-up or mark-down) for each transaction.

On March 30, 2007, the U.S. Court of Appeals for the District of Columbia Circuit (the "Court"), in Financial Planning Association v. SEC, 482 F.3d 481 (D.C. Cir. 2007), vacated the original Advisers Act Rule 202(a)(11)-1 on the grounds that the Commission did not have the authority to exclude broker-dealers offering fee-based brokerage accounts from the definition of "investment adviser."

[57]     Opinion of the General Counsel Relating to Section 202(a)(11)(C) of the Investment Advisers Act of 1940, Investment Advisers Act Release No. 2 (Oct. 28, 1940).

[58]     Id.

[59]     See Release 1092, supra note 53.

[60]     See Advisers Act Sections 203(b), 203(l) and 203(m). The registration exemptions include, for example, foreign private advisers, venture capital fund advisers, private fund advisers with less than $150 million in assets under management in the United States, advisers to small business

16

App 278

immediately below.  An unregistered investment adviser is subject to the Advisers Act's antifraud provisions but is not subject to most of the other requirements of the Advisers Act.[61]

Advisers Act Section 203A *prohibits* investment advisers with less than $25 million of assets under management from registering under the Advisers Act[62] (the Dodd-Frank Act raised this amount to $100 million as of July 21, 2011)[63] if they are required to be regulated in a state or states in which they maintain a principal office and place of business (the Dodd-Frank Act amended Section 203A to provide that investment advisers must also be subject to inspection and examination by their home state).[64]

---

investment companies, intrastate advisers, advisers to insurance companies, charitable organizations and plans and certain commodity trading advisors.  Note that some of these exemptions recently were added as part of the Dodd-Frank Act (i.e., Dodd-Frank Act Section 403 (relating to private fund and foreign advisers and certain intrastate advisers) and Dodd-Frank Act Section 407 (relating to venture capital advisers).  See also Exemptions for Advisers to Venture Capital Funds, Private Fund Advisers with Less Than $150 Million in Assets Under Management, and Foreign Private Advisers, Investment Advisers Act Release No. 3111 (Nov. 19, 2010).

[61]  See, e.g., S. Rep. No. 1760, 86th Cong., 2d Sess. 7 (1960), which specifies that the antifraud provisions in Section 206 apply to registered and unregistered investment advisers.

[62]  "Assets under management" is defined in Advisers Act Section 203A(a)(2) as the securities portfolios for which the adviser provides continuous and regular supervision or management services.  See also Instructions to Item 5b of Form ADV, Part 1A.

[63]  See Dodd-Frank Act Section 410 and Advisers Act Section 203A.  See Release 3110, supra note 3.

[64]  Advisers Act Section 203A was added by the National Securities Markets Improvement Act of 1996 ("NSMIA").  A state may not require an investment adviser to register if the adviser (i) does not have a place of business in the state and (ii) has fewer than six clients who are state residents during the past twelve months.  See Advisers Act Section 222(d).  Advisers Act Section 203A(b)(1) also prohibits a state from imposing registration or licensing requirements on an investment adviser that is excluded from the definition of investment adviser by Section 202(a)(11).  Currently, Wyoming does not have a statutory requirement for investment adviser registration.

There are several exceptions to this general prohibition.  See Advisers Act Section 203A.  For example, investment advisers to registered investment companies must always register with the Commission, regardless of asset size.  Other advisers that may register voluntarily under the Advisers Act include: pension consultants that provide services to pension funds with over $50 million in assets; newly formed advisers that expect to qualify for registration under the Advisers Act within 120 days of registration; certain affiliated advisers that are in a control relationship with a registered adviser, provided that they have the same principal office and place of business; certain internet advisers; and multi-state advisers that would otherwise be regulated by at least 30 states (the Dodd-Frank Act amends this to 15 states for mid-sized advisers as of July 21, 2011, and the Commission has proposed a similar amendment to Advisers Act Rule 203A-2).  See also Advisers Act Rule 203A-2.  See also Release 3110, supra note 63.

17

*The Registration Process: Form ADV*

Advisers use Form ADV to apply for registration with the Commission (Part 1A) or with state securities authorities (Part 1B), and must keep Form ADV current by filing periodic amendments as long as they are registered.[65]  Form ADV has two parts (Part 1 and Part 2) and is filed electronically through the IARD;[66] each part (except for the brochure supplement, as discussed below) is available to investors on the Investment Adviser Public Disclosure website ("IAPD").[67]

Part 1 (A and B) of Form ADV provides federal and state regulators with information to process registrations and to manage their regulatory and examination programs.  It requires applicants to disclose information about their disciplinary history, type of services provided and other aspects of their business.[68]  An investment adviser must update Part 1 of its Form ADV at least annually (within 90 days of their fiscal year end), or more often under certain circumstances (e.g., certain disciplinary actions or changes to an adviser's services or contact information).[69]

The Commission recently amended Part 2 substantially.[70]  Part 2 contains two sub-parts, Part 2A and Part 2B.  Part 2A contains the requirements for the disclosure "brochure" that advisers must provide to prospective clients initially and to existing clients annually, and Part 2B contains information about the advisory personnel providing

---

[65]    See Advisers Act Rules 203-1 and 204-1.  Form ADV also is used by state securities regulators to register investment advisers.  Advisers may withdraw from registration by filing a Form ADV-W. See Advisers Act Section 203(h).  Form ADV-W requires an adviser to provide certain basic information regarding matters such as custody of client assets, money owed to clients, assignment of advisory contracts and the adviser's financial condition, all of which are at ensuring an orderly wind down of the adviser's business.

[66]    The IARD is operated by FINRA.  NSMIA led to a joint agreement among the Commission, state regulators and the NASD to develop the IARD.  See Section II.C.1 infra for more info.

[67]    The IAPD is available on the Commission's website, at http://www.adviserinfo.sec.gov.  The Commission recently adopted amendments to Part 2 to require, among other things, that registrants file it electronically.  Investment advisers are required to submit Form ADV Part 2 as part of their next annual updating amendment, or upon initial registration.  See Amendments to Form ADV, Investment Advisers Act Release No. 3060 (July 28, 2010) ("Release 3060").  The Commission has brought enforcement actions against advisers alleging that the advisers failed to properly update the Form.  See, e.g., In the Matter of C&G Asset Management, Inc., Investment Advisers Act Release No. 1536 (Nov. 9, 1995) (settled order).

[68]    The Commission is required to grant registration or institute a proceeding to determine whether registration should be denied within 45 days of the complete Form ADV filing.  Advisers Act Section 203(c)(2).

[69]    See Advisers Act Rule 204-1.

[70]    See Release 3060, supra note 67.

clients with investment advice.[71]  Part 2A contains 18 disclosure items about the advisory firm that must be included in an adviser's brochure (the "firm brochure").  Much of the disclosure in Part 2A addresses an investment adviser's conflicts of interest with its clients, and is disclosure that the adviser, as a fiduciary, must make to clients in some manner regardless of the form requirements.[72]  For example, Part 2A requires information about the adviser's:

- Range of fees;

- Methods of analysis;

- Investment strategies and risk of loss;

- Brokerage, including trade aggregation policies and directed brokerage practices, as well as use of soft dollars;

- Review of accounts;

- Client referrals and other compensation;

- Disciplinary history; and

- Financial information, among other things.[73]

Part 2B is the "brochure supplement," which includes information about certain advisory personnel on whom clients may rely for investment advice, including their

---

[71]  The Commission's recent amendments to Part 2 included a requirement that Commission-registered investment advisers provide prospective and existing clients with a narrative brochure written in plain English.  See Release 3060, supra note 67.  All investment advisers registered with the Commission as of December 31, 2010, and having a fiscal year ending on December 31, 2010 through April 30, 2011, have until July 31, 2011, to begin delivering brochure supplements to new and prospective clients. These advisers have until September 30, 2011 to deliver brochure supplements to existing clients.  Existing registered investment advisers with fiscal years ending after April 30, 2011 must deliver brochure supplements to existing clients within 60 days of filing the annual updating amendment.

All newly registered investment advisers filing their applications for registration from January 1, 2011 through April 30, 2011, have until May 1, 2011 to begin delivering brochure supplements to new and prospective clients. These advisers have until July 1, 2011 to deliver brochure supplements to existing clients.  Newly registered investment advisers filing applications for registration after April 30, 2011 must deliver brochure supplements to clients upon registration.

[72]  See Release 3060, supra note 67, at 9.

[73]  See Part 2A of Form ADV.

educational background, disciplinary history, and the adviser's supervision of the advisory activities of its personnel.[74]

A Commission-registered investment adviser must provide its prospective clients with a current firm brochure before or at the time it enters into an advisory contract with them.[75] Advisers must annually provide to each client to whom they must deliver a firm brochure either: (i) a copy of the current (updated) firm brochure that includes or is accompanied by the summary of material changes that have occurred since their last brochure to clients; or (ii) a summary of material changes that have occurred since their last brochure to clients that includes an offer to provide a copy of the current firm brochure.[76] Each adviser must make this annual delivery no later than 120 days after the end of its fiscal year.[77] Advisers may deliver: (i) the firm brochure and a summary of material changes; or (ii) a summary of material changes, along with an offer to provide the firm brochure to clients electronically in accordance with the Commission's guidelines regarding electronic delivery of information.[78]

---

[74]     See Instruction 5 of General Instructions for Form ADV. Registrants are not required to file Part 2B electronically, but must preserve a copy of the supplement(s) and make them available upon request.

[75]     See Advisers Act Rule 204-3. The rule does not require advisers to deliver brochures to certain advisory clients receiving only impersonal investment advice for which the adviser charges less than $500 per year, or to clients that are investment companies registered under the Investment Company Act of 1940 ("Investment Company Act") or business development companies provided that the advisory contract with such a company meets the requirements of Investment Company Act Section 15(c), which requires a board of directors to request, and the adviser to furnish, information to enable the board to evaluate the terms of the proposed advisory contract. Finally, an adviser does not have to prepare (or file with the Commission) a brochure if it does not have any clients to whom a brochure must be delivered. See Instruction 7 for Part 2A of Form ADV.

[76]     See Advisers Act Rule 204-3(b) and Instruction 2 of Part 2A of Form ADV. The offer also must be accompanied by a website address (if available) and a telephone number and e-mail address (if available) for obtaining the complete brochure pursuant to the Instructions for Part 2, as well as the website address for obtaining information about the adviser through the IAPD. Advisers Act Rule 204-2 also requires the adviser choosing this approach to preserve a copy of the summary of material changes, so that the Commission's examination staff has access to such separately provided summaries. See Advisers Act Rule 204-2(a)(14)(i).

[77]     See Advisers Act Rule 204-3(b) and Instruction 2 for Part 2A of Form ADV.

[78]     See Release 3060, supra note 67. Use of Electronic Media by Broker-Dealers, Transfer Agents, and Investment Advisers for Delivery of Information, Investment Advisers Act Release No. 1562 (May 9, 1996).

An adviser that does not include, and therefore file, its summary of material changes as part of its firm brochure (on the cover page or the page immediately following the cover) must file its summary as an exhibit, included with its firm brochure when it files its annual updating amendment with the Commission, so that the summary of material changes is available to the public through the IAPD website. See Instruction 6 for Part 2A of Form ADV. The adviser must upload its firm brochure and the summary (as an exhibit) together in a single, text-searchable file in Adobe Portable Document Format (PDF) on IARD. See Instruction 6 for Part 2A of Form ADV.

20

Use of Solicitors

Advisers Act Rule 206(4)-3 regulates a Commission-registered investment adviser's use of persons to solicit clients and prospective clients for advisory services. The Commission adopted Advisers Act Rule 206(4)-3 in recognition of the inherent conflicts of interest that can be present in arrangements in which an individual receives cash compensation, even on a fully disclosed basis, for referring others to an investment adviser.[79] Advisers Act Rule 206(4)-3 makes it unlawful for any investment adviser that is required to be registered with the Commission to pay a cash fee to a person who solicits clients for the adviser unless, among other things, the investment adviser and the solicitor enter into a written agreement requiring the solicitor to provide certain disclosure to prospective clients. The adviser has an obligation under Rule 206(4)-3 to make a bona fide effort to ascertain whether the solicitor has complied with the agreement, and has a reasonable basis for believing that the solicitor has so complied. The adviser must receive from the prospective client, prior to, or at the time of, entering into any written or oral investment advisory contract with such client, a signed and dated acknowledgment of receipt of the investment adviser's written disclosure statement and the solicitor's written disclosure document.[80] A solicitor cannot be subject to a statutory disqualification.[81] Thus, investment advisers cannot pay cash fees to solicitors unless they meet conditions designed to address the conflicts of interest concerns that are raised by these payments.

### b)    Regulation Related to the Provision of Personalized Investment Advice to Advisory Clients

Legal Obligations towards Advisory Clients

The Supreme Court has construed Advisers Act Section 206(1) and (2) as establishing a federal fiduciary standard governing the conduct of advisers.[82] The

---

[79]    See, e.g., Requirements Governing Payments of Cash Referral Fees by Investment Advisers, Investment Advisers Act Release No. 615 (Feb. 2, 1978) (proposing Advisers Act Rule 206(4)-3) and Investment Advisers Act Release No. 688 (July 12, 1979) (adopting Advisers Act Rule 206(4)-3).

[80]    Id. (contains a discussion of an adviser's obligation to supervise cash solicitors acting on its behalf).

[81]    For example, the solicitor cannot be subject to a Commission order under Advisers Act Section 203(f), convicted within the past 10 years of certain felonies or misdemeanors set forth in Advisers Act Sections 203(e)(2)(A)-(D), found by the Commission to have engaged or been convicted of engaging in certain violative conduct set forth in Advisers Act Section 203(e), or be subject to an order, judgment or decree described in Advisers Act Section 203(e)(3).

[82]    SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194 (1963). See also Transamerica Mortgage Advisors, Inc., 444 U.S. 11, 17 (1979) ("[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations.").

App 283

adviser's fiduciary duty is enforceable under Advisers Act Sections 206(1) and (2),[83] which prohibit an adviser from "employ[ing] any device, scheme, or artifice to defraud any client or prospective client" and from engaging in "any transaction, practice or course of business which operates as a fraud or deceit on any client or prospective client."

Under the Advisers Act, an adviser is a fiduciary.  This fiduciary standard applies to the investment adviser's entire relationship with its clients and prospective clients, imposes upon investment advisers the "affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation to 'employ reasonable care to avoid misleading'" their clients and prospective clients.[84]

Fundamental to the federal fiduciary standard are the duties of loyalty and care.[85] The duty of loyalty requires an adviser to serve the best interests of its clients, which includes an obligation not to subordinate the clients' interests to its own.[86]  An adviser's duty of care requires it to "make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information."[87]

The Commission, the staff, and the courts have articulated guidance on these duties over time through rules, interpretive statements, and orders issued in enforcement actions.  This guidance has addressed, among other things, disclosure of conflicts of interest, suitability and reasonable basis for investment advice, and principal trading and cross trading.

### *Disclosure of Conflicts of Interest*

As part of its fiduciary duty, an adviser must fully disclose to its clients all material information that is intended "to eliminate, or at least expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested."[88]  The Commission has brought enforcement actions alleging advisers' failures to disclose their conflicts of interest.[89]  Under the

---

[83]     See Transamerica, 444 U.S., supra note 82.

[84]     See Capital Gains, 375 U.S., supra note 82 at 191-192.

[85]     See, e.g., Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003 ("Release 2106").

[86]     Id.  See also e.g., Release 3060, supra note 67.

[87]     See Concept Release on the U.S. Proxy System, Investment Advisers Act Release No. 3052 (July 14, 2010) ("Release 3052") at 119.

[88]     Capital Gains, supra note 82.

[89]     See, e.g., In the Matter of Ronald Speaker, et al., Investment Advisers Act Release No. 1605 (Jan. 13, 1997) (settled order); and In the Matter of Kidder Peabody & Co., Inc., et al., Advisers Act Release No. 232 (Oct. 16, 1968) (settled order) ("Release 232").  The Commission also has brought enforcement actions alleging that an adviser failed to disclose conflicts of interest.  See, e.g., Release 3090, supra note 48; In the Matter of Fidelity Management Research Company,

22

App 284

antifraud provisions of the Advisers Act, an investment adviser must disclose material facts to its clients and prospective clients whenever the failure to do so would defraud or operate as a fraud or deceit upon any such person.[90]  The adviser's fiduciary duty of disclosure is a broad one, and delivery of the adviser's brochure alone may not fully satisfy the adviser's disclosure obligations.[91]

The duty to disclose material facts applies to conflicts of interest—or potential conflicts of interest—that arise during an adviser's relationship with a client.  Therefore, the type of required disclosure will depend on the facts and circumstances.  As a general matter, an adviser must disclose all material facts regarding the conflict so that the client can make an informed decision whether to enter into or continue an advisory relationship with the adviser.[92]  For example, if an adviser selects or recommends other advisers for clients, it must disclose any compensation arrangements or other business relationships between the advisory firms, along with the conflicts created, and explain how it addresses these conflicts.[93]  In addition, the Commission has brought numerous enforcement

---

Investment Advisers Act Release No. 2713 (Mar. 5, 2008) (settled order); Monetta Financial Services, Inc. v. SEC, 390 F.3d 952 (2d Cir. 2004); In the Matter of Jamison, Eaton & Wood, Inc., Investment Advisers Act Release No. 2129 (May 15, 2003) (settled order); In the Matter of Deutsche Asset Management, Inc., Investment Advisers Act Release No. 2160 (Aug. 19, 2003) (settled order); In the Matter of Joan Conan, Investment Advisers Act Release No. 1446 (Sept. 30, 1994) (settled order); In the Matter of Kemper Financial Services, Inc., Investment Advisers Act Release No. 1494 (June 6, 1995) (settled order); and In the Matter of Mark Bailey & Co., et al., Investment Advisers Act Release No. 1105 (Feb. 24, 1988) (settled order) ("Release 1105").

See also General Instruction 3 to Part 2 of Form ADV: "Under federal and state law, you are a fiduciary and must make full disclosure to your *clients* of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your *clients* that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them.  To satisfy this obligation, you therefore may have to disclose to *clients* information not specifically required by Part 2 of Form ADV or in more detail than the brochure items might otherwise require.  You may disclose this additional information to *clients* in your *brochure* or by some other means."

[90]  See Capital Gains, supra note 82.  The recent amendments to Part 2 of Form ADV require advisers to respond to a number of disclosure items about conflicts of interest.  For example, Item 10 of Part 2A requires an adviser to disclose other financial industry activities and affiliations, any material conflicts of interest that these relationships create and how the adviser addresses these conflicts.  See Release 3060, supra note 67.

[91]  See Instruction 3 of General Instructions for Part 2 of Form ADV; Advisers Act Rule 204-3(f). See also Release 3060, supra note 67.

[92]  See Release 3060, supra note 67 ("the disclosure clients and prospective clients receive is critical to their ability to make an informed decision about whether to engage an adviser and, having engaged the adviser, to manage that relationship.")

[93]  See Item 10 of Form Part 2A.  The Commission has brought enforcement actions charging advisers with alleged failures to make such disclosures.  See, e.g., In the Matter of Morgan Stanley

23

App 285

actions alleging that the advisers unfairly allocated client trades to preferred clients without making adequate disclosure.[94]

Advisers also must disclose their policies and practices with respect to their receipt of research and other "soft dollar" benefits in connection with client securities transactions.[95]  The Commission has brought enforcement actions against advisers that allegedly recommended to clients, or bought or sold for clients, securities in which the adviser or a related person had an undisclosed material financial interest.[96]

### Principal and Cross Trading Requirements

Advisers are restricted by Advisers Act Section 206(3) when entering into principal and agency-cross trades with their clients.  Advisers Act Section 206(3) is intended to address the potential for self-dealing that could arise when an investment adviser acts as principal in transactions with clients, such as through price manipulation

---

& Co., Incorporated, Investment Advisers Act Release No. 2904 (July 20, 2009) (settled order); In the Matter of Yanni Partners, Inc., et al., Investment Advisers Act Release No. 2642 (Sept. 5, 2007) (settled order).

[94]   See, e.g., In the Matter of Nevis Capital Management, LLC, Investment Advisers Act Release No. 2214 (Feb. 9, 2004) (settled order); In the Matter of The Dreyfus Corporation, et al., Investment Advisers Act Release No. 1870 (May 10, 2000) (settled order); In the Matter of Account Management Corporation, Investment Advisers Act Release No. 1529 (Sept. 29, 1995) (settled order).  The Commission also has brought numerous enforcement actions against advisers that allegedly unfairly allocated trades to their own accounts and allocated less favorable or unprofitable trades to their clients' accounts.  See, e.g., In the Matter of Nicholas-Applegate Capital Management, Investment Advisers Act Release No. 1741 (Aug. 12, 1998) (settled order); In the Matter of Timothy J. Lyons, Investment Advisers Act Release No. 1882 (June 20, 2000) (settled order) and SEC v. Lyons, 57 S.E.C. 99 (2003); and SEC v. Alan Brian Bond, et al., Litigation Release No. 18923 (Civil Action No. 99-12092 (S.D.N.Y.) (Oct. 7, 2004).

[95]   See Item 12 of Form ADV Part 2A.  Advisers often seek research and other products or services from external sources, and particularly from broker-dealers.  Although advisers may use their own assets—such as revenues derived from their advisory fees —to purchase such research and services, advisers typically pay for research and other services with a portion of the brokerage commissions paid by clients, a practice referred to as "soft dollars."  The use of soft dollars creates a conflict of interest for an investment adviser because the adviser is obtaining brokerage and research services with client commissions instead of purchasing those services with its own funds. See Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934, Exchange Act Release No. 54165 (July 18, 2006) ("2006 Soft Dollar Release").  The 2006 Soft Dollar Release superseded parts (but not all) of the 1986 Soft Dollar Release.  In particular, the 2006 Soft Dollar Release does not replace Section IV of the 1986 Release, cited infra, which discusses an investment adviser's disclosure obligations.

[96]   The Commission has brought enforcement actions against advisers alleging that the advisers did not adequately disclose soft dollar arrangements and related conflicts.  See, e.g., In the Matter of Schultze Asset Management LLC, Investment Advisers Act Release No. 2633 (Aug. 15, 2007) (settled order); In the Matter of Rudney Associates, Inc., Investment Advisers Act Release No. 2300 (Sept. 21, 2004) (settled order).

or the dumping of unwanted securities into client accounts.[97]  Section 206(3) makes it unlawful for an adviser, acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to the transaction.[98]  The Commission staff has taken the position that the adviser must disclose not only the capacity in which the adviser is acting, but also any compensation that the adviser receives for its role in such transaction.[99]

---

[97]    See Investment Trusts and Investment Companies: Hearings on S. 3580 Before the Subcomm. of the Comm. on Banking and Currency, 76th Cong., 3d Sess. 320-22 (1940).

[98]    Section 206(3) provides that the prohibitions do not apply to any transaction with a customer of a broker-dealer if the broker-dealer is not acting as an investment adviser in relation to the transaction.  The Commission has applied Section 206(3) not only to principal transactions engaged in or effected by any adviser, but also when an adviser causes a client to enter into a principal transaction that is effected by a broker-dealer that controls, is controlled by, or is under common control with, the adviser (a "control affiliate").  See Interpretation of Section 206(3) of the Advisers Act of 1940, Investment Advisers Act Release No. 1732, at n.3 (July 17, 1998) ("Release 1732").  The Commission has brought enforcement actions alleging violations of Section 206(3) against investment advisers that have effected principal transactions, including "riskless principal transactions," through control affiliates without complying with the disclosure and consent requirements of Section 206(3).  See, e.g., In the Matter of Rothschild Investment Corporation, Investment Advisers Act Release No. 1714 (Apr. 13, 1998) (settled order); In the Matter of Stern Fisher Edwards Inc., Investment Advisers Act Release No. 1803 (June 18, 1999) (settled order); In the Matter of ABN AMRO-NSM International Funds Management, B.V., Investment Advisers Act Release No. 1767 (Sept. 30, 1998) (settled order); In the Matter of Calamos Asset Management, Investment Advisers Act Release No. 1589 (Oct. 16, 1996) (settled order); and In the Matter of Concord Investment Co., Investment Advisers Act Release No. 1585 (Sept. 27, 1996) (settled order).

   The Commission staff has stated that whether Section 206(3) applies to transactions between an adviser's client and an unregistered pool investment vehicle in which the adviser has an ownership interest depends upon all of the facts and circumstances.  The Commission staff also has stated that a transaction between a client account and a pooled investment vehicle of which the investment adviser and/or its controlling persons, in the aggregate, own 25% or less should not implicate Advisers Act Section 206(3).  See Gardner Russo & Gardner, SEC Staff No-Action Letter (June 7, 2006).

   The Commission has brought enforcement actions asserting violations of Section 206(3) by advisers and their principals when the advisers effected transactions between their advisory clients and accounts in which the principals of the advisers held significant ownership interests.  See SEC v. Beacon Hill Asset Management, LLC, Litigation Release No. 18950 (Oct. 28, 2004); and In the Matter of Gintel Asset Management, Investment Advisers Act Release No. 2079 (Nov. 8, 2002) (settled order).

[99]    See, e.g., Release 1092, supra note 53 and Opinion of Director of Trading and Exchange Division, Investment Advisers Act Release No. 40 (Feb. 5, 1945) ("Release 40").

25

App 287

For purposes of Section 206(3), the Commission interprets "before the completion of the transaction" to mean by settlement of the transaction.[100]  But in order for post-execution, pre-settlement consent to comply with Section 206(3), the adviser must provide both sufficient disclosure for a client to make an informed decision, and the opportunity for the client to withhold consent.[101]  While the disclosure must be in writing, Section 206(3) does not require that the client's consent be in writing.  Written disclosure must be provided and consent must be obtained separately for each transaction, i.e., a blanket consent for transactions is not sufficient.[102]

Compliance with the disclosure and consent provisions of Advisers Act Section 206(3) provision alone does not satisfy an adviser's fiduciary obligations with respect to a principal trade.  The Commission has stated that Section 206(3) must be read together with Advisers Act Sections 206(1) and (2) to require that the adviser disclose additional facts necessary to alert the client to the adviser's potential conflict of interest in the principal trade.[103]

The Commission has adopted less rigorous requirements for engaging in agency-cross trades (i.e., where the adviser is also a broker-dealer and executes the client's orders by crossing the orders with orders of non-advisory clients) by relaxing the prior disclosure and consent requirement for each such trade.[104]  At times it may benefit the client for an adviser to engage in an agency-cross trade.  For example, agency-cross trades can save brokerage commissions and other transaction costs.  Advisers Act Rule 206(3)-2 permits these agency-cross transactions without requiring the adviser to provide transaction-by-transaction disclosure to the client if, among other things:

---

[100]    See Release 1732, supra note 98.

[101]    Id.

[102]    See Release 40, supra note 99.  The Commission has brought enforcement actions against investment advisers for allegedly violating Advisers Act Section 206(3) when they entered into principal transactions with their clients using only prior blanket disclosures and consents.  See, e.g., In the Matter of Stephens, Inc., Investment Advisers Act Release No. 1666 (Sept. 16, 1997) (settled order); In the Matter of Clariden Asset Management (New York) Inc., Investment Advisers Act Release No. 1504 (July 10, 1995) (settled order).

Under Advisers Act Rule 206(3)-1, the notice and consent provisions of Section 206(3) do not apply to any transaction in which the broker-dealer is acting as investment adviser solely (1) by means of publicly distributed written materials or publicly made oral statements; (2) by means of written materials or oral statements which do not purport to meet the needs of specific individuals or accounts; (3) through the issuance of certain statistical information; or (4) any combination of the foregoing services.  See also Temporary Rule Advisers Act 206(3)-3T which provides an alternative means of compliance with Section 206(3) for advisers that also are registered broker-dealers.

[103]    See Release 1732, supra note 98.

[104]    See Release 1732, supra note 98 (stating that an adviser is not "acting as broker" within the meaning of Advisers Act Section 206(3) if the adviser receives no compensation (other than its advisory fee) for effecting a particular agency transaction between advisory clients).

26

App 288

- the client has executed a written consent after receiving full disclosure of the conflicts involved, which must be renewed each year;

- the adviser (or any other person relying on Rule 206(3)-2) provides a written confirmation to the client at or before the completion of each transaction providing, among other things, the source and amount of any remuneration it received;

- the adviser (or any other person relying on Rule 206(3)-2) provides the client with an annual summary of all agency cross transactions; and

- the disclosure document and each confirmation conspicuously disclose that consent may be revoked at any time.[105]

The rule does not apply to a transaction when the adviser or the adviser and any person controlling, controlled by, or under common control with the adviser recommended the transaction to both the purchaser and seller.  The rule does not relieve advisers from the duty to act in the best interests of their clients, including the duty to seek to obtain best price and execution for any transaction.[106]

Effecting cross-trades between clients (where a third-party broker is used) is not specifically addressed by the Advisers Act, but the Commission has brought enforcement actions against investment advisers alleging that the advisers failed to seek best execution in securities transactions for certain advisory clients because of an undisclosed trading practice involving cross trades between client accounts.[107]  Cross trades involve potential conflicts of interest (because the adviser could favor one client over another; the adviser's duty of loyalty requires it to act in the best interests of each client).  The Commission has brought enforcement actions alleging an adviser's failure to fulfill this obligation.[108]

### Suitability and Reasonable Basis

Investment advisers owe their clients the duty to provide only suitable investment advice.[109]  To fulfill the obligation, an adviser must make a reasonable determination that

---

[105]    Advisers Act Rule 206(3)-2.

[106]    See Agency Cross Transactions for Advisory Clients, Investment Advisers Act Release No. 589 (June 1, 1977) (adopting Rule 206(3)-2).

[107]    See, e.g., In the Matter of Renberg Capital Management, Inc., et al., Investment Advisers Act Release No. 2064 (Oct. 1, 2002) (settled order) ("Release 2064").

[108]    See, e.g., In the Matter of David A. King, et al, Investment Advisers Act Release No. 1391 (Nov. 9, 1993) (settled order).

[109]    See Status of Investment Advisory Programs under the Investment Company Act of 1940, Investment Company Act Release No. 22579 (Mar. 24, 1997) (in the context of adopting a final rule providing for a non-exclusive safe harbor from the definition of investment company for

27

the investment advice provided is suitable for the client based on the client's financial situation and investment objectives.

In addition, as a fiduciary, an investment adviser has "a duty of care requiring it to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information."[110]   The investment adviser must disclose its investment process to clients.  For example, Item 8 of Form ADV Part 2A requires an investment adviser to describe its methods of analysis and investment strategies, among other things.  This item also requires that an adviser explain the material risks involved for each significant investment strategy or method of analysis it uses and particular type of security it recommends, with more detail if those risks are significant or unusual.[111]

### Best Execution

Investment advisers have an obligation to seek best execution of clients' securities transactions where they have the responsibility to select broker-dealers to execute client trades (typically in the case of discretionary accounts).[112]  In meeting this obligation, an adviser must seek to obtain the execution of transactions for each of its clients in such a manner that the client's total cost or proceeds in each transaction are the most favorable under the circumstances.[113]

When seeking best execution, an adviser should consider the full range and quality of a broker's services when selecting broker-dealers to execute client trades,

---

certain investment advisory programs), citing to Suitability of Investment Advice Provided by Investment Advisers, Investment Advisers Act Release No. 1406 (Mar. 16, 1994) (proposing a rule under the Advisers Act Section 206(4)'s antifraud provisions that would expressly require advisers to give clients only suitable advice; the rule would have codified existing suitability obligations of advisers) ("Release 1406").

[110]   See Release 3052, supra note 87.

[111]   The Commission has brought enforcement actions alleging omissions and misrepresentations regarding investment strategies. See, e.g., In the Matter of George F. Fahey, Investment Advisers Act Release No. 2196 (Nov. 24, 2003) (settled order); and In the Matter of Gary L. Hamby, et al., Investment Advisers Act Release No. 1668 (Sept. 22, 1997) (settled order).

[112]   See Advisers Act Rule 206(3)-2(c) (acknowledging adviser's duty of best execution of client transactions).  See also 2006 Soft Dollar Release, supra note 95 (stating that investment advisers have "best execution obligations").  See also Release 3060, supra note 67.

[113]   See 1986 Soft Dollars Release, cited infra.  The Commission has brought enforcement actions alleging failure to seek best execution.  See, e.g., In the Matter of Value Line, Inc. et al., Investment Advisers Act Release No. 3100 (Nov. 2, 2010) (settled order); In the Matter of Fidelity Management Research Company, Investment Advisers Act Release No. 2713 (Mar. 5, 2008) (settled order); Release 2064, supra note 107; In the Matter of Portfolio Advisory Services, LLC, Investment Advisers Act Release No. 2038 (June 20, 2002) (settled order); In the Matter of Sage Advisory Services LLC, Investment Advisers Act Release No. 1954 (July 27, 2001) (settled order); In the Matter of Fleet Investment Advisors, Inc., Investment Advisers Act Release No. 1821 (Sept. 9, 1999) ("Release 1821"); Release 232, supra note 89.

28

including, among other things, the broker's execution capability, commission rate, financial responsibility, responsiveness to the adviser, and the value of any research provided.[114] An investment adviser should "periodically and systematically" evaluate the execution it is receiving for clients.[115]

The Advisers Act does not prohibit advisers from using an affiliated broker to execute client trades or from directing brokerage to certain brokers. However, the adviser's use of such an affiliate involves a conflict of interest that must be disclosed to the adviser's client.[116] To this end, Item 12 of Part 2A of Form ADV also requires an adviser to describe any relationship with a broker-dealer to which the brokerage may be directed that creates a material conflict of interest.[117]

-     Aggregation of Orders

Clients engaging an adviser can benefit when the adviser aggregates trades to obtain volume discounts on execution costs.[118] The staff takes the position that an adviser, when directing orders for the purchase or sale of securities, may aggregate or "bunch" those orders on behalf of two or more of its accounts, so long as the bunching is done for the purpose of achieving best execution, and no client is advantaged or disadvantaged by the bunching.[119] Item 12 of Part 2A of Form ADV requires the adviser to describe whether and under what conditions it aggregates trades; if the adviser does not aggregate trades when it has the opportunity to do so, the adviser must explain in the brochure that clients may therefore pay higher brokerage costs.

*Advertising*

Advertising by investment advisers is subject both to the general antifraud provisions in Advisers Act Sections 206(1) and (2) and to specific prohibitions and

---

[114]    See Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, Exchange Act Release No. 23170 (Apr. 23, 1986) ("1986 Soft Dollar Release").

[115]    Id.

[116]    See 1986 Soft Dollar Release, supra note 114. The Commission has brought enforcement actions charging advisers with defrauding their clients for failing to disclose that they directed their brokerage commissions in return for client referrals. See, e.g., In the Matter of Jamison, Eaton & Wood, Inc., Investment Advisers Act Release No. 2129 (May 15, 2003) (settled order); In the Matter of Duff & Phelps Investment Management Co., Inc., Investment Advisers Act Release No. 1984 (Sept. 28, 2001) (settled order); Release 1821, supra note 113; In the Matter of MPI Investment Management, et al., Investment Advisers Act Release No. 1876 (June 12, 2000) (settled order); and Release 1105, supra note 89.

[117]    See Item 12.A.3.a of Part 2A.

[118]    See Release 3060, supra note 67.

[119]    See SMC Capital, Inc., SEC Staff No-Action Letter (Sept. 5, 1995).

29

App 291

restrictions under Advisers Act Rule 206(4)-1.  Rule 206(4)-1 generally prohibits any investment adviser that is registered or required to be registered under the Advisers Act from using any advertisement that contains any untrue statement of a material fact or is otherwise false or misleading. [120]

As the Commission stated in adopting Advisers Act Rule 206(4)-1, "when considering the provisions of the rule it should be borne in mind that investment advisers are professionals and should adhere to a stricter standard of conduct than that applicable to merchants, securities are "intricate merchandise," and clients or prospective clients of investment advisers are frequently unskilled and unsophisticated in investment matters."[121]  While investment advisers are prohibited under Advisers Act Sections 206(1) and (2) from making any communications to clients that are misleading, the prohibitions in Rule 206(4)-1 apply only to "advertisements" by advisers, which the Commission defines generally as written (including electronic) or broadcast communications to more than one person that offer advisory services.[122]

The Commission staff considers an advertisement containing performance information misleading if it implies, or if a reader would infer from it, something about an adviser's competence or possible future investment results that would be unwarranted if the reader knew all of the facts.[123]  The staff has provided extensive guidance

---

[120]    Advisers Act Rule 206(4)-1.  The Commission has brought enforcement actions against advisers for false or misleading advertising.  See, e.g., In the Matter of Warwick Capital Management, Investment Advisers Act Release Nos. 2694 (Jan. 16, 2008) and 2530 (July 6, 2006) ("Warwick Capital"); In the Matter of First Command Financial Planning, Inc., Securities Act Release No. 8513 (Dec. 15, 2004) (settled order); In the Matter of Justin S. Mazzon d/b/a American Blue Chip Investment Management, Investment Advisers Act Release No. 2145 (July 14, 2003) (settled order); In the Matter of LBS Capital Management, Inc., Investment Advisers Act Release No. 1644 (July 18, 1997) (settled order); SEC v. C.R. Richmond & Co., 565 F.2d 1101, 1104 (9th Cir. 1977).

[121]    Adoption of Rule 206(4)-1 under the Investment Advisers Act of 1940, Investment Advisers Act Release No. 121 (Nov. 2, 1961) ("Release 121").

[122]    Advisers Act Rule 206(4)-1(b) defines advertisement for purposes of the rule as

> [a]ny notice circular, letter or other written communication addressed to more than one person, or any notice or other announcement in any publication or by radio or television, which offers (1) any analysis, report or publication concerning securities, or which is to be used in making any determination as to when to buy or sell any security, or which security to buy or sell, or (2) any graph, chart, formula or other device to be used in making any determination as to when to buy or sell any security, or which security to buy or sell, or (3) any other investment advisory service with regard to securities.

A communication covered by the rule may be made to new clients or to existing clients where the purpose is to induce them to renew their advisory contract or subscription.  See Spear & Staff, 42 S.E.C. 549 (1965).

[123]    See, e.g., Clover Capital Management, Inc., SEC Staff No-Action Letter (Oct. 28, 1986).

30

concerning the circumstances under which adviser investment performance information would or would not be considered misleading.[124] Advisers registered with the Commission must maintain records substantiating any performance claimed in an advertisement or other communication that goes to ten or more persons.[125]

In addition to that general prohibition, Advisers Act Rule 206(4)-1 also contains specific provisions that prohibit such an investment adviser from directly or indirectly, publishing, circulating or distributing an advertisement that:

- Refers to any testimonial concerning an investment adviser or its services;[126]

- Refers to past specific recommendations made by the adviser, which were or would have been profitable to any person, except under specified circumstances;[127]

- Represents that any graph, chart, formula or other device can, in and of itself, be used to determine which securities to buy or sell or when to buy or sell them, without disclosing the limitations thereof and the difficulties with respect to its use; or[128]

- Refers to any report, analysis, or service as free, unless it actually is free and without condition or obligation.[129]

---

[124]    See, e.g., Horizon Asset Management, SEC Staff No-Action Letter (Sept. 13, 1996); J.P. Morgan Investment Management Inc., SEC Staff No-Action Letter (May 7, 1996).

[125]    Advisers Act Rule 204-2(a)(16).  See, e.g., Warwick Capital, supra note 120.

[126]    Advisers Act Rule 206(4)-1(a)(1).  The Commission staff has stated that testimonials include any statement of a client's experience with, or endorsement of, an adviser.  See DALBAR, Inc., SEC Staff No-Action Letter (Mar. 24, 1998).  In addition, the Commission staff has taken the position that an advertisement containing a partial client list was not a testimonial within the meaning of Rule 206(4)-1(a)(1), and agreed not to recommend enforcement action under Advisers Act Section 206(4) and Advisers Act Rule 206(4)-1(a)(5) if an adviser distributed an advertisement that contained a partial client list if the selection criteria were objective and unrelated to the performance of the clients' accounts, and the advertisement contained certain disclosure and a disclaimer.  See, e.g., Cambiar Investors, Inc., SEC Staff No-Action Letter (Aug. 28, 1997).

[127]    Advisers Act Rule 206(4)-1(a)(2).  The rule requires that if the adviser refers to past specific recommendations, it must set out a list of all recommendations made by the adviser during the preceding year that contain certain information specified in the rule.  The Commission staff has taken the view that in certain circumstances, advisers could provide reports to prospective and existing clients that identified some, but not all, past specific recommendations under conditions designed to ensure that the reports did not raise the dangers that Advisers Act Rule 206(4)-1(a)(2) was designed to prevent.  See, e.g., The TCW Group Inc., SEC Staff No-Action Letter (Nov. 7, 2008) and Franklin Management, Inc., SEC Staff No-Action Letter (Dec. 10, 1998).

[128]    Advisers Act Rule 206(4)-1(a)(3).

[129]    Advisers Act Rule 206(4)-1(a)(4).

31

The use of testimonials is prohibited because of the Commission's concern that they will create a misleading inference that all of the adviser's clients will experience such favorable results.[130]  Similarly, the limitations on references to past recommendations are aimed at preventing the adviser from selectively emphasizing profitable recommendations and therefore misleading potential clients.[131]

Additional Substantive Requirements

Advisers Act Section 206 generally prohibits an investment adviser (whether registered or exempt from registration) from engaging in fraudulent, deceptive, or manipulative activities.  Advisers Act Section 206(4) provides the Commission with rulemaking authority to define such activities and prescribe reasonable means to prevent them.  The following sections provide additional examples of investment adviser regulation intended to promote the adviser's fiduciary duties and to protect advisory clients, including examples of specific rules adopted under Advisers Act Section 206(4) (e.g., custody, compliance, and proxy voting).

In addition, the following sections also discuss other Advisers Act requirements, including recordkeeping, supervision, disclosure of disciplinary history, contractual requirements, and remedies.

*Recordkeeping*

Advisers that are registered or required to be registered under the Advisers Act are subject to recordkeeping requirements.  Generally, Advisers Act Rule 204-2 requires an adviser to maintain business accounting records as well as various specified records that relate to its advisory business.  For example, advisers must maintain, among other things, the following:

- General and auxiliary ledgers reflecting asset, liability, reserve, capital, income and expense accounts;

- A memorandum of any order given and instructions received by the adviser from clients for the purchase, sale, delivery or receipt of securities

---

[130]    See Release 121, supra note 121 (adopting Rule 206(4)-1, stating "the Commission finds that such advertisements are misleading; by their very nature they emphasize the comments and activities favorable to the investment adviser and ignore those which are unfavorable.  This is true even when the testimonials are unsolicited and are printed in full.").

[131]    Id., stating: "the Commission believes that material of this nature, which may refer only to recommendations which were or would have been profitable and ignore those which were or would have been unprofitable, is inherently misleading and deceptive, and consequently the rule prohibits this type of advertising unless all recommendations for a minimum specified period are included."

(including terms and conditions of any order, who recommended and placed the order, the account and date of entry and who executed the order);

- Trial balances, financial statements, any internal audit papers relating to adviser's business;

- Original or copies of certain communications sent to or received by the adviser (including responses to requests for detailed investment advice, placement or execution of securities orders, receipt or delivery of securities or funds);

- A list of and documents relating to the adviser's discretionary client accounts (including powers of attorney or grants of authority);

- Copies of publications and recommendations the adviser distributed to 10 or more persons and a record of the factual basis and reasons for the recommendation; and

- A record of certain securities transactions in which the adviser or advisory representatives have a direct or indirect beneficial ownership interest.

Additional records must be maintained in certain circumstances (e.g., if an investment adviser has custody of client assets or exercises proxy voting authority with respect to client securities).[132]  Generally, all required books and records must be maintained and preserved in an adviser's office for two years after the last entry date and three additional years in an easily accessible place.[133]  Records may be stored on micrographic or electronic storage media, subject to certain conditions ensuring safekeeping and accessibility.[134]

Advisers Act Section 204 provides that all records of an investment adviser (other than investment advisers that are specifically exempted from registration under Advisers Act Section 203(b)) are subject at any time, or from time to time, to such reasonable periodic, special, or other examinations by representatives of the Commission as the Commission deems necessary or appropriate in the public interest or for the protection of investors.

---

[132]    See Advisers Act Rule 204-2(b) and Rule 204-2(c)(2), respectively.

[133]    See Advisers Act Rule 204-2(e)(1).

[134]    See Advisers Act Rule 204-2(g).

33

*Custody of Client Assets*

Advisers Act Rule 206(4)-2 regulates the custody practices of investment advisers registered or required to be registered under the Advisers Act.  Rule 206(4)-2 requires advisers that have custody of client funds or securities to implement controls designed to protect those client assets from being lost, misused, misappropriated or subject to the advisers' financial reverses, such as insolvency. Unlike banks and broker-dealers, investment advisers typically do not maintain physical custody of client funds or securities but rather may have custody because they have the authority to obtain client assets, such as by deducting advisory fees from a client account, writing checks or withdrawing funds on behalf of a client, or by acting in a capacity, such as general partner of a limited partnership, that gives an adviser or its supervised person the authority to withdraw funds or securities from the limited partnership's account.[135]

An adviser has custody of client funds or securities if it "hold[s], directly or indirectly, client funds or securities, or [has] any authority to obtain possession of them in connection with advisory services [it provides] to clients."  Custody includes:

- Possession of client funds or securities;

- Any arrangement under which an adviser is permitted or authorized to withdraw client funds or securities (such as check-writing authority or the ability to deduct fees from client assets); and

- Any capacity that gives an adviser or its supervised person legal ownership of or access to client funds or securities (such as acting as general partner, managing member or trustee).[136]

An adviser also has custody of any client securities or funds that are directly or indirectly held by a "related person" in connection with advisory services provided by the adviser to its clients.[137]  A related person is defined by the rule as a person directly or indirectly controlling or controlled by the adviser and any person under common control with the adviser. [138]

A registered adviser with custody of client funds or securities is required to take a number of steps designed to safeguard those client assets.[139]  The adviser must maintain

---

[135]    See Advisers Act Rule 206(4)-2(d)(2)(iii).

[136]    See Advisers Act Rule 206(4)-2(d)(2).

[137]    Id.

[138]    See Advisers Act Rule 206(4)-2(d)(7).  For advisers that are part of multi-service financial organizations, for example, such related person custodians may include broker-dealers and banks.

[139]    See Advisers Act Rule 206(4)-2.  See Custody of Funds or Securities of Clients by Investment Advisers, Investment Advisers Act Release No. 2968 (Dec. 30, 2009) ("Release 2968").  See also Commission Guidance Regarding Independent Public Accountants Engagements Performed

34

App 296

client funds and securities with "qualified custodians," such as a bank or a broker-dealer, and make due inquiry to ensure that the qualified custodian sends account statements directly to the clients.[140]  The adviser must promptly notify its clients as to where and how the funds or securities will be maintained, when the account is opened and following any changes to this information.[141]

Generally, all advisers with custody of client assets must undergo an annual surprise examination by an independent public accountant to verify client assets.[142]  In addition, if the adviser itself maintains, or if it has custody because a related person maintains, client assets as a qualified custodian, it must obtain, or receive from a related person, a report of the internal controls relating to the custody of those assets from an independent public accountant that is registered with and subject to regular inspection by the Public Company Accounting Oversight Board.[143]

### *Supervision and Compliance*

Under the Advisers Act, an investment adviser is subject to liability for failure reasonably to supervise persons subject to its supervision, with a view to preventing violations of the federal securities laws and their rules and regulations.  An adviser will not be deemed to have failed reasonably to supervise if (i) the adviser had established procedures, and a system for applying such procedures, reasonably designed to prevent and detect such violations insofar as practicable, and (ii) the adviser reasonably discharged its supervisory duties and obligations, and had no reasonable cause to believe that the procedures and system were not being complied with.[144]  Similarly, an associated person may be held liable for failure to supervise under the same circumstances.[145]  The Commission has brought enforcement actions against investment advisers and associated persons alleging a failure to supervise.[146]

---

Pursuant to Rule 206(4)-2 under the Advisers Act, Investment Advisers Act Release No. 2969 (Dec. 30, 2009).

140     Advisers Act Rule 206(4)-2(a)(1).

141     Advisers Act Rule 206(4)-2(a)(2).  The adviser need not give a notice if the client opens the account with a custodian himself.  If the adviser sends account statements to the client, it must include a legend in the notice urging clients to compare the account statements they receive from the custodian with those they receive from the adviser.

142     Advisers Act Rule 206(4)-2(a)(4).

143     Advisers Act Rule 206(4)-2(a)(6).

144     Advisers Act Section 203(e)(6).

145     Advisers Act Section 203(f).

146     See, e.g., Shearson Lehman Brothers, Inc., Investment Advisers Act Release No. 1038 (Sept. 24, 1986) (settled order); In the Matter of Robert T. Littell, Investment Advisers Act Release No. 2203 (Dec. 15, 2003) (settled order); and In the Matter of Western Asset Management Co., Investment Advisers Act Release No. 1980 (Sept. 28, 2001) (settled order).

Each adviser that is registered or required to be registered under the Advisers Act is required by Advisers Act Rule 206(4)-7 to establish an internal compliance program that addresses the adviser's performance of its fiduciary and substantive obligations under the Advisers Act.  The rule requires each adviser to also adopt and implement written policies and procedures reasonably designed to prevent the adviser and its personnel from violating the Advisers Act.   Advisers Act Rule 206(4)-7 requires each adviser to review the effectiveness of the policies and procedures at least annually.  The rule requires an adviser to designate a chief compliance officer ("CCO").  The Commission has stated that the CCO should be knowledgeable about the Advisers Act and have the authority to develop and enforce appropriate compliance policies and procedures for the adviser.[147] The Commission has stated that an adviser's policies and procedures, at a minimum, should address the following issues to the extent relevant to that adviser:

- Portfolio management processes, including allocation of investment opportunities among clients and consistency of portfolios with clients' investment objectives, disclosures by the adviser, and applicable regulatory restrictions;

- Trading practices, including procedures by which the adviser satisfies its best execution obligation, uses client brokerage to obtain research and other services ("soft dollar arrangements"), and allocates aggregated trades among clients;

- Proprietary trading of the adviser and personal trading activities of supervised persons;

- The accuracy of disclosures made to investors, clients, and regulators, including account statements and advertisements;

- Safeguarding of client assets from conversion or inappropriate use by advisory personnel;

- The accurate creation of required records and their maintenance in a manner that secures them from unauthorized alteration or use and protects them from untimely destruction;

- Marketing advisory services, including the use of solicitors;

- Processes to value client holdings and assess fees based on those valuations;

- Safeguards for the privacy protection of client records and information; and

---

[147]    See Compliance Programs of Investment Advisers and Investment Companies; Investment Advisers Act Release No. 2204 (Dec. 17, 2003) ("Release 2204") (adopting Advisers Act Rule 206(4)-7).

App 298

- Business continuity plans.[148]

  - Code of Ethics and Personal Securities Transactions

Each investment adviser that is registered with the Commission or required to be registered with the Commission must also adopt a written code of ethics.[149] At a minimum, the adviser's code of ethics must address the following areas:

- *Standards of Conduct.* Set forth a minimum standard of conduct for all supervised persons, which must reflect the adviser's and its supervised persons' fiduciary obligations;

- *Compliance with Federal Securities Laws.* Require supervised persons to comply with federal securities laws;

- *Personal Securities Transactions.* Require each access person[150] to report his or her securities holdings at the time that the person becomes an access person and at least once annually thereafter and to make a report at least once quarterly of all personal securities transactions in reportable securities to the adviser's CCO or other designated person;

- *Pre-approval of Certain Securities Transactions.* Require the CCO or other designated person(s) to pre-approve investments by the access persons in IPOs or limited offerings;

- *Reporting Violations.* Require all supervised persons to promptly report any violations of the code to the adviser's CCO or other designated person(s); and

- *Distribution and Acknowledgment.* Require the adviser to provide each supervised person with a copy of the code, and any amendments, and to obtain a written acknowledgment from each supervised person of his or her receipt of a copy of the code.

---

[148]    Id.

[149]    Advisers Act Section 204A, and Advisers Act Rule 204A-1.

[150]    Advisers Act Rule 204A-1(e)(1) defines "access person." Generally, an access person is a supervised person who has access to non-public information regarding clients' securities purchases or sales of securities. If an investment adviser's primary business is providing investment advice, all of the adviser's directors, officers, and partners are also presumed to be access persons.

37

App 299

Under Advisers Act Rule 204-2, the adviser is also required to keep copies of the code, records of violations of the code and of any actions taken against violators of the code, and copies of each supervised person's acknowledgement of receipt of a copy of the code.[151]  An adviser must describe its code of ethics in Item 11 of Part 2A of its Form ADV and must offer to provide clients with a copy of its code of ethics upon request.

*Disclosure of Disciplinary History and Material Financial Condition to Clients*

Advisers must disclose information about the disciplinary history of the firm and its personnel in Part 1A, Item 11 of Form ADV.  This information is available to the public through the IAPD.  Item 9 of Part 2A of Form ADV requires that an adviser disclose in its firm brochure material facts about any legal or disciplinary event that is material to a client's (or prospective client's) evaluation of the adviser or the integrity of its management personnel.[152] Item 3 of the brochure supplement (Part 2B of Form ADV) requires similar disclosure relating to the advisory personnel's integrity.[153]

Item 18 of Part 2A requires disclosure of specified financial information about an adviser under certain circumstances.  Specifically, an adviser that requires prepayment of fees of more than $1,200 in fees per client and six month or more in advance must give clients an audited balance sheet showing the adviser's assets and liabilities at the end of its most recent fiscal year.  The item also requires an adviser to disclose any financial condition reasonably likely to impair the adviser's ability to meet contractual commitments to clients if the adviser has discretionary authority over client assets, has custody of client funds or securities, or requires or solicits prepayment of more than $1,200 in fees per client and six months or more in advance.  The Commission has stated that disclosure may be required where a judgment or arbitration award was sufficiently large that payment of it would create such a financial condition.[154]   Item 18 requires an adviser that has been the subject of a bankruptcy petition during the past ten years to disclose that fact to clients.

The Commission has stated that advisers that are not required to deliver a firm brochure (e.g., they have clients to whom they provide impersonal advice) are required by their fiduciary duty to disclose all material information relating to their disciplinary

---

[151]    See Advisers Act Rule 204-2(a)(12)-(13).

[152]    See Release 3060, supra note 67 at note 103.  These requirements incorporate into the brochure the client disclosure regarding disciplinary information previously required by Advisers Act Rule 206(4)-4 (now rescinded).

[153]    The list parallels the list of legal and disciplinary events in Item 9 of Part 2A that must be disclosed in the firm brochure and which are derived from the prior disclosure requirements set out in Advisers Act Rule 206(4)-4.

[154]    See Release 3060, supra note 67 at 43-44 ("Under these circumstances, clients are exposed to the risk that their assets may not be properly managed — and prepaid fees may not be returned — if, for example, the adviser becomes insolvent and ceases to do business.")

38

history and their abilities to meet their contractual obligations.  Failure to do so may violate, among other things, Advisers Act Sections 206(1) and/or (2).[155]

*Proxy Voting*

The Commission adopted Advisers Act Rule 206(4)-6 to address the adviser's fiduciary duties to its clients when the adviser has authority to vote their proxies.  In adopting the rule, the Commission stated:

Under the Advisers Act, an adviser, as a fiduciary, owes each of its clients duties of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting.  The duty of care requires an adviser with proxy voting authority to monitor corporate events and to vote the proxies.[156]

To satisfy its duty of loyalty, the adviser must cast the proxy votes in a manner consistent with the best interest of its client and must not subordinate client interests to its own.

Specifically, Advisers Act Rule 206(4)-6 requires an adviser that is registered with the Commission or required to be registered with the Commission and that has voting authority over client securities to:

- Adopt and implement written policies and procedures that are reasonably designed to ensure that the adviser votes proxies in the clients' best interests,[157] and that must specifically address conflicts of interest that may arise between the adviser and its clients;

- Describe its voting policies and procedures to clients, deliver a copy of the policies and procedures to clients upon request, and inform clients how they can obtain information on how the adviser voted their securities; and

- Keep certain records relating to voting of client securities.

---

[155]    See Release 3060, supra note 67 at note 103.

[156]    See Release 2106, supra note 85, citing to Capital Gains, supra note 82.

[157]    The Commission stated that "an adviser should have procedures in place designed to ensure that it fulfills its duties of monitoring corporate actions and voting client proxies.  However, an adviser that fails to vote every proxy would not necessarily violate its fiduciary obligations. There may even be times when refraining from voting a proxy is in the client's best interest, such as when the adviser determines that the cost of voting the proxy exceeds the expected benefit to the client. An adviser may not, however, ignore or be negligent in fulfilling the obligation it has assumed to vote client proxies."  See Release 2106, supra note 85.

The Commission has brought enforcement actions against advisers alleging that they failed to disclose to clients the advisers' proxy-related conflicts.[158]

### Contractual Requirements

- Fees

Advisers are required to disclose to clients how they are compensated for their services.  Part 2A of Form ADV, Item 5 requires that an adviser describe in its firm brochure how it is compensated for its advisory services, provide a fee schedule, and disclose whether fees are negotiable.[159]  An adviser must disclose whether it bills clients or deducts fees directly from clients' accounts, and how often it assesses fees (or bills clients).[160]  The item also requires each adviser to describe the types of other costs, such as brokerage, custody fees and fund expenses, that clients may pay in connection with the advisory services provided to them by the adviser.[161]  An adviser charging fees in advance must explain how it calculates and refunds prepaid fees when a client contract terminates.[162]  The Commission staff has taken the view that as part of their fiduciary duties, advisers must charge fees that are fair and reasonable, and when an adviser's fee is higher than others, an adviser must disclose this.[163]

---

[158]     See In the Matter of Deutsche Asset Management, Inc., Investment Advisers Act Release No. 2160 (Aug. 19, 2003) (settled order) and In the Matter of INTECH Investment Management, Investment Advisers Act Release No. 2872 (May 7, 2009) (settled order).

[159]     See Item 5.A of Part 2A.

[160]     See Item 5.B of Part 2A.

[161]     See Item 5.C of Part 2A.

[162]     See Item 5.D of Part 2A. Item 18 of Part 2A also requires the disclosure of certain financial information about an adviser that requires prepayment of fees of more than $1,200 per client and six months or more in advance.

[163]     See, e.g., Shareholder Service Corp., SEC Staff No-Action Letter (Feb. 3, 1989) stating:

> With respect to Section 206 and fees in general, the staff believes that an investment adviser who charges a fee for his services larger than that normally charged by other advisers (taking into consideration factors such as the size, location, and nature of the advisory businesses to be compared) has a duty to disclose to his clients that the same or similar services may be available at a lower fee.  Beyond that disclosure obligation, the staff generally believes that whether a particular fee violates section 206 depends upon whether the fee is reasonable in relation to the services provided, which necessarily involves examining the facts and circumstances surrounding a particular adviser/client relationship.  Among the factors to be considered are (1) the customary fees charged by other advisers for comparable services, (2) whether the same services could be obtained by the client directly without the adviser's assistance and cost, and (3) whether the adviser has a reasonable belief that his services would generate gains in excess of the fee charged.

App 302

Item 5 of Part 2A of Form ADV also requires an adviser that receives compensation attributable to the sale of a security or other investment product (e.g., brokerage commissions), or whose personnel receive such compensation, to disclose this practice and the conflict of interest it creates, and to describe how the adviser addresses this conflict.[164] Such an adviser also must disclose that the client may purchase the same security or investment product from a broker that is not affiliated with the adviser.[165]

Generally, investment advisers that are registered or required to be registered with the Commission are prohibited by Advisers Act Section 205(a)(1) from entering into a contract with any client that provides for compensation based on a share of the capital gains or appreciation of a client's funds, i.e., a performance fee.[166]  Section 205(a)(1) is

---

See also H&H Investments, SEC Staff No-Action Letter (Sept. 17, 1981) (adviser charged fee of 6% per month (72% per year), implying that H & H has a reasonable belief that it can produce gains in excess of 6% per month. The staff believed that in the absence of a reasonable basis for such a belief, which should be disclosed to potential clients, H & H's fee would violate Advisers Act Section 206).

[164]    See Item 5.E of Part 2A. Because of this conflict of interest, the Commission has brought enforcement actions under the antifraud provisions of the Advisers Act charging advisers with failures to disclose receipt of transaction-based compensation.  See, e.g., In the Matter of Financial Design Associates, Inc., Investment Advisers Act Release No. 2654 (Sept. 25, 2007) (settled order); In the Matter of IMS, CPAs & Associates, Investment Advisers Act Release No. 1994 (Nov. 5, 2001) (petitioners' appeal denied in Vernazza v. SEC, 327 F.3d 851 (9th Cir. 2003)).

As discussed in Section II.B.2 infra, the Exchange Act generally requires brokers and dealers to register with the Commission and become members of at least one self-regulatory organization. Exchange Act Sections 15(a) and 15(b)(8), Exchange Act Section 3(a)(4)(A) generally defines a "broker" as any person engaged in the business of effecting transactions in securities for the account of others.   The Commission staff has taken the position that a person's receipt of transaction-based compensation in connection with effecting transactions in securities for the account of others is a hallmark of broker-dealer activity.  See Letter from Catherine McGuire, Chief Counsel, Division of Market Regulation, to Thomas D. Giachetti, Stark & Stark, regarding 1st Global, Inc. (May 7, 2001) (reiterating the staff's position that "the receipt of securities commissions or other transaction related [sic] compensation is a key factor in determining whether a person or an entity is acting as a broker-dealer. Absent an exemption, an entity that receives commissions or other transaction-related compensation in connection with securities-based activities that fall within the definition of 'broker' or 'dealer' ... generally is required to register as a broker-dealer." (internal citations omitted)).  Investment advisers receiving transaction-based compensation would also need to consider whether they are obligated to register as broker-dealers under Exchange Act Section 15 or whether they can avail themselves of an exception or exemption from registration.

[165]    See Item 5.E.2 of Part 2A. In addition to the requirement in Item 5.E.2 of Part 2A, an adviser that receives more than half of its revenue from commissions and other sales-based compensation must explain that commissions are the firm's primary (or, if applicable, exclusive) form of compensation. See Item 5.E.3 of Part 2A. An adviser that charges advisory fees in addition to commissions or markups to an individual client must disclose whether it reduces its fees to offset the commissions or markups. See Item 5.E.4 of Part 2A.

[166]    Advisers Act Section 205(a)(1).  The Commission staff has taken the position that Section 205(a)(1)'s prohibition of investment advisory contracts that contain performance fees extends to

41

App 303

designed, among other things, to eliminate "profit sharing contracts [that] are nothing more than 'heads I win, tails you lose' arrangements,"[167] and that "encourage advisers to take undue risks with the funds of clients,"[168] to speculate, or to overtrade.[169]  There are several exceptions to the prohibition, mostly applicable to advisory contracts with institutions and high net worth clients.[170]

Registered advisers also are required to provide certain disclosures to their clients if they charge performance-based fees.  Item 6 of Part 2A of Form ADV requires an adviser that charges performance-based fees or that has a supervised person who manages an account that pays such fees to disclose this fact in its firm brochure.   If such an adviser also manages accounts that are not charged a performance fee, the item also requires the adviser to discuss the conflicts of interest that arise from its (or its supervised person's) simultaneous management of these accounts, and to describe generally how the adviser addresses those conflicts.

- Assignment

Any advisory contract entered into by an adviser that is registered or required to be registered with the Commission must provide in substance that it may not be assigned without consent of the client.[171]  An assignment generally includes any direct or indirect transfer of an advisory contract by an adviser or any transfer of a controlling block of an

---

investment advisory contracts that provide for "contingent fees."  Contingent Advisory Compensation Arrangements, Investment Advisers Act Release No. 721 (May 16, 1980).  A contingent fee is "an advisory fee [that] will be waived or refunded, in whole or in part, if a client's account does not meet a specified level of performance" or that is contingent on the investment performance of the funds of advisory clients.  Dodd-Frank Act Section 928 amended Advisers Act Section 205(a)(1) to make it applicable only to advisers that are registered or required to be registered with the Commission and thus make it inapplicable to state-registered investment advisers.

[167]   S. Rep. No. 1775, 76th Cong., 3d Sess. 22 (1940).

[168]   H.R. Rep. No. 2639, 76th Cong., 3d Sess. 29 (1940). The section was designed to eliminate the possibility of an investment adviser entering into a contract in which he or she "does not participate in the losses, but participates only in the profits." Investment Trusts and Investment Companies; Hearings on S. 3580 Before a Subcomm. of the Senate Comm. on Banking and Currency, 76th Cong., 3d Sess. 320 (1940) (statement of David Schenker, Chief Counsel of the Commission's Investment Trust Study).

[169]   See Securities and Exchange Commission, Investment Counsel, Investment Management, Investment Supervisor and Investment Advisory Services, H.R. Doc. 477, 76th Cong., 2nd Sess. at 30 (1939).

[170]   These exceptions include, among others, fulcrum fees, and performance fee arrangements of business development companies, an issuer that would be an investment company but for Investment Company Act Section 3(c)(7), and non-U.S. clients.  See Advisers Act Section 205(b)(2)-(5).

[171]   Advisers Act Section 205(a)(2).

42

App 304

adviser's outstanding voting securities.[172]  The legislative history indicates that the assignment provision was meant to address concerns about fiduciaries trafficking in investment advisory contracts.[173]

- Hedge and Indemnification Clauses

Advisers Act Section 215(a) voids any provision of a contract that purports to waive compliance with any provision of the Advisers Act.  The Commission staff has taken the position that an adviser that includes any such provision (such as a provision disclaiming liability for ordinary negligence or a "hedge clause") in a contract that makes the client believe that he or she has given up legal rights and is foreclosed from a remedy that he or she might otherwise either have at common law or under Commission statutes is void under Advisers Act Section 215(a) and violates Advisers Act Sections 206(1) and (2).[174]  The Commission staff has stated that the issue of whether an adviser that uses a hedge clause would violate the Advisers Act turns on "the form and content of the particular hedge clause (e.g., its accuracy), any oral or written communications between the investment adviser and the client about the hedge clause, and the particular circumstances of the client."[175]  The Commission has brought enforcement actions against advisers alleging that the advisers included hedge clauses that violated Advisers Act Sections 206(1) and (2) in client contracts.[176]

Historically, the staff expressed the concern that mandatory pre-dispute arbitration clauses in investment advisory contracts might mislead clients to believe that they have waived rights available under the Advisers Act that, by law, are not waivable.[177]  The

---

[172]     Advisers Act Section 202(a)(1).  A transaction that does not result in a change of actual control or management of the adviser (e.g., a corporate reorganization or certain public mergers of the adviser's parent company) would not be deemed to be an assignment for these purposes.  See Advisers Act Rule 202(a)(1)-1.

[173]     See, e.g., Investment Company Act of 1940 and Investment Advisers Act of 1940, S. Rep. No. 1775, 76th Cong., 3d Sess. 22 (1940); and Investment Trusts and Investment Companies: Hearings on S. 3580 Before a Subcomm. of the Senate Comm. on Banking and Currency, 76th Cong., 3d Sess. 253 (1940).

[174]     See Opinion of the General Counsel, Investment Advisers Act Release No. 58 (Apr. 10, 1951) ("While the language of these hedge clauses varies considerably, in substance they state generally that the information furnished is obtained from sources believed to be reliable but that no assurance can be given as to its accuracy.  Occasionally language is added to the effect that no liability is assumed with respect to such information.").

[175]     See Heitman Capital Management, LLC, SEC Staff No-Action Letter (Feb. 12, 2007).  Historically, the staff has taken the position that would, for example, preclude an adviser from purporting to limit its culpability to acts involving gross negligence or willful malfeasance, even if the hedge clause explicitly provides that rights under federal or state law cannot be relinquished.

[176]     See, e.g., In the Matter of Brian J. Sheen, Investment Advisers Act Release No. 1561 (Apr. 30, 1996) (settled order); In the Matter of Olympian Financial Services, Inc., Investment Advisers Act Release No. 659 (Jan 16, 1979) (settled order).

[177]     See McEldowney Financial Services, SEC Staff No-Action Letter (Oct. 17, 1986).

43

App 305

staff expressed the view that an investment advisory contract containing an arbitration clause should disclose that the clause does not constitute a waiver of any right provided in the Advisers Act, including the right to choose the forum, whether arbitration or adjudication, in which to seek resolution of disputes.[178]  Those positions, however, largely predated Supreme Court decisions upholding pre-dispute arbitration clauses under the federal securities laws, and a subsequent federal district court opinion citing those decisions upheld the validity of a pre-dispute arbitration clause in an advisory client agreement.[179]  Advisers Act Section 205(f), added by the Dodd-Frank Act, authorizes the Commission to prohibit or restrict mandatory pre-dispute arbitration provisions in client agreements, but the Commission has not proposed or adopted such a rule at this time.[180]

- Termination Penalties

The Commission has stated that an advisory client has a right at any time to terminate the advisory relationship.[181]  The Commission has also brought enforcement actions regarding the right of advisory clients to receive a refund of any prepaid advisory fees that the adviser has not yet earned.[182]

*Remedies*

Advisory clients generally have no private right of action for damages and other monetary relief against an investment adviser under Advisers Act Section 206.[183]  Rather, advisory clients have only a limited private right of action under Advisers Act Section 215 to void an investment adviser's contract and obtain restitution of fees paid.[184]

---

[178]   Id.

[179]   Bakas v. Ameriprise Financial Services, Inc., 651 F. Supp. 997 (D. Minn. 2009).

[180]   See Advisers Act Section 205(f), providing that "[t]he Commission, by rule, may prohibit, or impose conditions or limitations on the use of, agreements that require customers or clients of any investment adviser to arbitrate any future dispute between them arising under the federal securities laws, the rules and regulations thereunder, or the rules of a self-regulatory organization if it finds that such prohibition, imposition of conditions, or limitations are in the public interest and for the protection of  investors."

[181]   See also Electronic Filing by Investment Advisers Proposing Amendments to Form ADV, Advisers Act Release No. 1862 (Apr. 5, 2000) (in a proposing release, the Commission stated that advisers must refund prepaid unearned advisory fees).

[182]   See, e.g., In the Matter of J. Baker Tuttle Corp., Initial Decision Release No. 13 (Jan. 8, 1990) and In the Matter of Monitored Assets Corp., Investment Advisers Act Release No. 1195 (Aug. 28, 1989) (settled order).

[183]   Transamerica, supra note 78.

[184]   Id.

Accordingly, clients cannot sue their adviser in federal court for damages based on a violation of the Advisers Act.[185]

A client may privately enforce claims against an investment adviser under the Exchange Act. If the client has a fraud claim in connection with the purchase or sale of a security, the client may make bring an action under Exchange Act Section 10(b) and Exchange Act Rule 10b-5. In order to be successful, the client will have to prove scienter (i.e., acting with a mental state embracing intent to deceive, manipulate or defraud), reliance and damages.[186] Rule 10b-5 has been used successfully by such clients in private actions regarding scalping, failure to disclose conflicts of interests, misrepresentation and suitability violations.[187]

Other remedies a client has against prohibited action by an investment adviser depend on applicable state law. A client could make a state common law claim that the adviser has violated its fiduciary duty,[188] was negligent[189] or committed fraud.[190] In addition to these claims, a number of states have adopted statutes regulating investment advisers that provide private rights of action for fraud.[191] All states have a securities

---

[185] But see Dodd-Frank Act Section 929Z(a), providing that the "Comptroller General of the United States shall conduct a study on the impact of authorizing a private right of action against any person who aids or abets another person in violation of the securities laws."

[186] In 1976, the Supreme Court expressly reserved the question whether reckless behavior is sufficient for civil liability under Rule 10b-5. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, n. 12 (1976). The Court has not subsequently addressed this question. "Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 n.3 (2007) (citing Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 343 (4th Cir. 2003) (collecting cases)).

[187] See, e.g., Zweig v. Hearst Corp., 594 F.2d 1261 (9th Cir. 1970); Laird v. Integrated Resources, Inc., 897 F.2d 826 (5th Cir. 1990); Carl v. Galuska, 785 F. Supp. 1283 (N.D.Ill. 1992); and Levine v. Futransky, 636 F. Supp. 899 (N.D.Ill. 1986). See also note 236 infra discussing scalping in more detail.

[188] See, e.g., Carl v. Galuska, 785 F. Supp. 1283 (N.D.Ill. 1992); Duniway v. Barton, 237 P.2d 930 (Sup. Ct. Or. 1951); Stokes v. Hensen, 217 Cal. App. 3d 187, 265 Cal. Rptr. 836 (1990); Johnson v. John Hancock Funds, 217 S.W.3d 414 (2006); State of New Mexico v. Colonial Penn Insurance Co.., 812 P.2d 777 (1991); Levin v. Kilborn, 756 A.2d 169 (2000).

[189] See, e.g., Garrett v. Snedigar, 359 S.E.2d 283, 286-88 (S.C. App. 1987) and Talansky v. Schulman, 2 A.D.3d 355, 770 N.Y.S.2d 48 (2003).

[190] See, e.g., Lazzaro v. Holladay, 443 N.E.2d 1347 (Mass. App. Ct. 1983) and Ohio Bureau of Workers' Compensation v. MDL Active Duration Fund, 476 F. Supp. 2d 809 (2007).

[191] See Investment Adviser Industry Reform, Hearings before the House Subcommittee on Telecommunications and Finance, No. 102-128 (June 10, 1992) (statement of Lewis W. Brothers, President, North American Securities Administrators Association) at 140. See, e.g., Lehn v. Dailey, 2002 WL 449842 (Conn. Super. 2002).

statute with antifraud provisions in connection with the purchase or sale of a security. State law claims may at times provide for broader liability than federal law provides, such as aiding and abetting liability in cases of fraud.[192]  State law fraud claims also do not always require a showing of scienter.[193]  Clients often will not be able to make a class action lawsuit claim, however, as most such claims have been preempted by the Securities Litigation Uniform Standards Act of 1998.[194]  In addition, clients may also elect to arbitrate their disputes.

### 2.    Broker-Dealers

#### a)    Overview of Commission and SRO Regulation

Exchange Act Section 15(a) generally requires brokers or dealers[195] that effect securities transactions, or that induce or attempt to induce the purchase or sale of securities, to register with the Commission, absent an exception or exemption.  In addition, broker-dealers are required to become members of at least one SRO,[196] and

---

[192]    See, e.g., Cal. Corp. Code §25403 (b) (extending liability to any "person that knowingly provides substantial assistance to another person in violation of any provision of this division or any rule or order thereunder").

[193]    See Thomas Lee Hazen, LAW OF SECURITIES REGULATION (2009) at Sec. 8.1.  See, e.g., Kittilson v. Ford, 608 P.2d 264, 265 (Wash. 1980).

[194]    15 U.S.C. §78bb(f)(1).  In Merrill Lynch, Pierce, Fenner & Smith v. Dabit, 547 U.S. 71 (2006), the Supreme Court held that state law plaintiff class action claims alleging a breach of fiduciary duty and misrepresentation or omission of a material fact in connection with the purchase or sale of a publicly traded security are preempted by the Securities Litigation Uniform Standards Act of 1998.

[195]    The Exchange Act generally defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others," and a "dealer" as "any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise." Exchange Act Section (3)(a)(4)(A) and Section (3)(a)(5)(A).

Broker-dealers that effect transactions in securities futures products are subject to registration both with the Commission under the Exchange Act and with the Commodity Futures Trading Commission ("CFTC") under the Commodity Exchange Act.  However, broker-dealers that are registered under the Exchange Act, may avail themselves of a notice registration procedure to register with the CFTC for the limited purpose of trading securities futures products, and such broker-dealers are exempted from many of the provisions of the Commodity Exchange Act and the rules thereunder and are not required to become a member of any registered futures association.  See Commodity Exchange Act Section 4f(a)(2) and (a)(4).

[196]    Exchange Act Section 15(b)(8) and Exchange Act Rule 15b9-1. The Commission and the SROs conduct examinations of broker-dealers to evaluate compliance with federal securities laws and with standards of integrity, competence, and financial soundness, and may discipline broker-dealers and associated persons that fail to comply with applicable requirements.  See infra Appendix A for more detailed discussion of the role of SROs, including the Commission's oversight of SROs.

App 308

(with few exceptions) the Securities Investor Protection Corporation ("SIPC").[197] Generally, all registered broker-dealers that deal with the public must become members of FINRA, a registered national securities association, and may choose to become exchange members.[198] Broker-dealers must also comply with applicable state registration and qualification requirements, as discussed in more detail in Section II.C.2 below.

Registration

Persons applying for broker-dealer registration must complete and file Form BD (Uniform Application for Broker-Dealer Registration), with the Central Registration Depository system ("CRD"), which is administered by FINRA and used by the SEC, the SROs and the states.[199]  In general, Form BD requires information about the background of the applicant, its principals, controlling persons, and employees.  Form BD requires information about the type of business in which the applicant proposes to engage, and the identity of the applicant's direct and indirect owners, and other control persons, as well as all affiliates engaged in the securities or investment advisory business.[200]  Form BD also requires the applicant to disclose whether it or any of its control affiliates has been subject to criminal prosecutions, regulatory actions, or civil actions in connection with any investment-related activity.[201]  The applicant also must disclose information about branch offices, arrangements with third parties to hold records/funds, and its financial

---

[197]    See the Securities Investor Protection Act ("SIPA"), 15 U.S.C. 78aaa et seq.

[198]    Exchange Act Section 15(b)(8) and Exchange Act Rule 15b9-1.  FINRA was created on July 30, 2007 as a result of a merger between the National Association of Securities Dealers ("NASD"), a national securities association established to regulate broker-dealers in the over-the-counter market, and the member regulation, enforcement and arbitration functions of the New York Stock Exchange ("NYSE").   FINRA is the sole national securities association registered with the SEC under Section 15A of the Exchange Act.  See Order Approving Proposed Rule Change to Amend the By-Laws of NASD to Implement Governance and Related Changes to Accommodate the Consolidation of the Member Firm Regulatory Functions of NASD and NYSE Regulation, Inc., Exchange Act Release No. 56145  (July 26, 2007).  Accordingly, this Study focuses on FINRA's regulation, examination and enforcement with respect to member broker-dealers, and not that of the exchanges.  The extent of FINRA's jurisdiction over member firms is discussed briefly in Appendix A.

FINRA is currently in the process of establishing a consolidated FINRA rulebook that will consist solely of FINRA Rules.  See FINRA Rules, available at: http://www.finra.org/Industry/Regulation/FINRARules/.  Until the completion of the consolidated rulebook, the FINRA rulebook consists of: (1) NASD Rules; (2) Incorporated NYSE Rules; and (3) new consolidated FINRA Rules.  Id.  While the NASD and FINRA rules generally apply to all FINRA members, the Incorporated NYSE Rules apply only to those FINRA members that are also members of NYSE.  Id.  All FINRA members are subject to the FINRA By-Laws and Schedules to the By-Laws.  Id.  Accordingly, certain of the SRO rules discussed in this Study are FINRA rules, whereas others are NASD or NYSE rules.

[199]    See Exchange Act Rule 15b1-1.

[200]    See generally Form BD.  See also Item 12, Schedules A, B and C,

[201]    See Item 11 and Disclosure Reporting Pages, Form BD.

47

capacity. [202]  Once registered, a broker-dealer must keep its Form BD current by amending it promptly when changes occur.[203]

As noted above, a broker-dealer may not commence business until it satisfies the membership requirements of an SRO, which is typically FINRA for registered broker-dealers that deal with the public.  Generally, the FINRA membership process includes: a membership application (including among other things, a business plan and a description of: the nature and source of capital with supporting documentation; the financial controls to be employed; the supervisory system and copies of certain procedures); a membership interview; compliance with applicable state licensing; establishment of a supervisory system; and a membership agreement.[204]  FINRA can limit members to particular types of business for which they have an infrastructure in place to comply with the securities laws.[205]

FINRA's process for evaluating membership applications aims to fully evaluate relevant aspects of applicants and to identify potential weaknesses in their internal systems, thereby helping to ensure that successful applicants would be capable of conducting their business in compliance with applicable regulation.[206]  In evaluating a membership application, FINRA will consider, as a whole, the applicant's business plan, information and documents submitted by the applicant, information provided during the membership interview, as well as information obtained by the staff, taking into account a variety of requirements, including among others: (1) the capability to comply with industry rules, regulations, and laws, which includes observing high standards of commercial honor and just and equitable principles of trade; (2) the capability of maintaining a level of net capital in excess of the minimum net capital requirements set

---

[202]   Specifically, the applicant must disclose whether it or any control affiliate has been subject to a bankruptcy petition, has had a trustee appointed under SIPA, has been denied a bond, or has any unsatisfied judgments or liens. Items 11I, J and K, Form BD.

[203]   Exchange Act Rule 15b3-1(a).

[204]   See NASD Rules 1013 (New Member Application and Interview) and 1014 (Department Decision).  Between January 1, 2008 and December 31, 2010, of 607 new membership applications submitted, FINRA denied 5, rejected 12 (e.g., due to applications not being substantially complete), granted registration to 22 with restrictions imposed, and granted registration without restriction to 494.  Of the 607 applications, 58 were withdrawn by applicants and 16 application submissions lapsed.  FINRA January Letter, supra note 10.

[205]   See NASD Rule 1014(b).

[206]   See FINRA Regulatory Notice 10-01, "Membership Application Proceedings: Proposed Consolidated FINRA Rules Governing FINRA's Membership Application Proceedings" (Jan. 2010) ("[FINRA's Membership Application Process ("MAP")] is a fluid, probing exercise that seeks to evaluate all relevant facts and circumstances regarding each applicant. In particular, the MAP seeks to identify potential weaknesses in an applicant's supervisory, operational and financial controls. The MAP's ultimate goal is to ensure that each applicant is capable of conducting its business in compliance with applicable rules and regulations and that its business practices are consistent with just and equitable principles of trade as required by FINRA rules.").

48

App 310

forth in Exchange Act Rule 15c3-1 adequate to support the intended business operations on a continuing basis; (3) the existence of financial controls to ensure compliance with the federal securities laws, the rules and regulations thereunder, and FINRA Rules; (4) the consistency of the compliance, supervisory, operational, and internal control practices and standards with industry practices; (5) the adequacy of the supervisory system; (6) the adequacy of the recordkeeping system; (7) compliance with continuing education requirements; and (8) whether FINRA possesses information indicating that the applicant may circumvent, evade, or otherwise avoid compliance with the federal securities laws, the rules and regulations thereunder, or FINRA rules.[207] Often this leads to business restrictions designed to foster compliance with these laws.[208] Further, a broker-dealer must provide written notice to, and receive approval from, FINRA to remove or modify business restrictions.[209] Similarly, broker-dealers must also file with FINRA an application for approval of a material change in business operations.[210]

In addition, a broker-dealer generally must register each natural person who is an associated person,[211] other than those persons whose functions are solely clerical or ministerial,[212] with one or more SROs using a Form U4 via CRD.[213] An associated person who effects or participates in effecting securities transactions also must meet qualification requirements, which include passing a securities qualification exam and complying with continuing education requirements.[214]

---

[207]    See NASD Rule 1014(a).

[208]    See NASD Rule 1014(b).

[209]    See NASD Rule 1014(f).

[210]    See NASD Rule 1017.

[211]    The Exchange Act defines an "associated person" of a broker-dealer as any partner, officer, director, or branch manager or employee of a broker-dealer, any person performing similar functions, or any person controlling, or controlled by, or under common control with, the broker-dealer. See Exchange Act Section 3(a)(18).

[212]    Id.

[213]    See Exchange Act Section 15(b)(1) and (b)(2), and Exchange Act Rule 15b-7-1. See also NASD IM-1000-3 Failure to Register Personnel; NASD Rule 1013 ("New Member Application and Interview"), NASD Rule 1021 ("Registration Requirements"); NASD Rule 1031 ("Registration Requirements"); NASD Rule 1041 ("Registration Requirements for Assistant Representatives"). The Form U4 is used to register individuals and to disclose their employment and disciplinary histories. A registered representative must keep his or her Form U4 current by amending it promptly when changes occur.

[214]    See NASD Rule 1021 ("Registration Requirements"); NASD Rule 1031 ("Registration Requirements"); NASD Rule 1041 ("Registration Requirements for Assistant Representatives"); NASD Rule 1120 ("Continuing Education Requirements"). See also infra Section II.B.2 for a more detailed discussion of competency standards applicable to associated persons of broker-dealers.

Use of Finders

For purposes of broker-dealer regulation, the term "finder" is generally understood to mean an intermediary who "finds" potential investors for issuers seeking to sell securities.[215] Generally, the issuer compensates the finder for each investment by paying him or her a placement or finder's fee tied to the amount of the investment.[216]

As discussed above, receipt of transaction-based compensation in exchange for effecting transactions in securities (including soliciting investors) generally requires registration as a broker-dealer.[217] Registration is designed to ensure that persons who have a "salesman's stake" in a securities transaction are subject to the same ethical obligations governing broker-dealers and their associated persons.[218] It also provides a means to identify and protect investors against individuals who have been suspended or barred from the securities industry, or fired by firms for misconduct.

### b) Regulation Related to the Provision of Personalized Investment Advice and Recommendations to Retail Customers

Under the antifraud provisions of the federal securities laws and SRO rules, including SRO rules addressing just and equitable principles of trade, broker-dealers are required to deal fairly with their customers. This fundamental obligation implies certain duties and prescribes certain conduct, which have been articulated by the Commission, the SROs, and the courts over time through rules, interpretive statements, opinions, and orders issued in enforcement actions. A broker-dealer's obligations to meet minimum business conduct requirements cannot be satisfied through disclosure to the customer: in other words, a customer cannot waive or contract away these obligations.[219]

---

215    See Strengthening the Commission's Requirements Regarding Auditor Independence, Exchange Act Release No. 47265 at n.82 (Feb. 5, 2003), cited in Task Force on Private Placement Broker-Dealers, ABA Section of Business Law, Report and Recommendations of the Task Force on Private Placement Broker-Dealers, 60 Bus. Law. 959 (May 2005).

216    Id.

217    In the Matter of Ram Capital Resources, LLC, et al., Exchange Act Release No. 60149 (June 19, 2009) (settled order) (The Commission found respondents who, among other things, solicited investors to invest in PIPE offerings, helped structure PIPE offerings, and negotiated the terms of PIPE offerings, in exchange for payments based on a percentage of the gross amount successfully invested in such offerings, acted as brokers without being registered with the Commission in violation of Exchange Act Section 15(a)).

218    See Exchange Act Rule 3a4-1 Adopting Release ("Compensation based on transactions in securities can induce high pressure sales tactics and other problems of investor protection which require application of broker-dealer regulation under the Act.").

219    See Exchange Act Section 29. Dodd-Frank Act Section 929T amended Exchange Act Section 29(a) to make it applicable to any waivers relating to rules not of an exchange, but of an SRO.

50

While applicable statutes and regulations do not uniformly impose fiduciary obligations on a broker-dealer, broker-dealers may have a fiduciary duty under certain circumstances.  This duty may arise under state common law, which varies by state.  Generally, broker-dealers that exercise discretion or control over customer assets, or have a relationship of trust and confidence with their customers, owe customers a fiduciary duty similar to that of investment advisers.  Broker-dealers are also subject to a variety of requirements under the federal securities laws and SRO rules that enhance their business conduct obligations, as discussed below.

Business Conduct Obligations

Broker-dealers are subject to a comprehensive set of statutory, Commission and SRO requirements that are designed to promote business conduct that, among other things, protects investors from abusive practices, including practices that are not necessarily fraudulent.  These business conduct obligations cannot be waived or contracted away by customers.[220]

*Duty of Fair Dealing*

Broker-dealers are required to deal fairly with their customers.  This duty is derived from the antifraud provisions of the federal securities laws.[221]  Under the so-called "shingle" theory, by virtue of engaging in the brokerage profession (e.g., hanging out the broker-dealer's business sign, or "shingle"), a broker-dealer makes an implicit representation to those persons with whom it transacts business that it will deal fairly with them, consistent with the standards of the profession.[222]  This essential representation implies certain duties and proscribes certain conduct, which has been articulated by the Commission and courts over time through interpretive statements and enforcement actions.[223]  Actions taken by the broker-dealer that are not fair to the customer must be disclosed in order to make this implied representation of fairness not misleading.[224]

---

[220]    Id.

[221]    See Report of the Special Study of Securities Markets of the Securities and Exchange Commission, H.R. Doc. No. 88-95, at 238 (1st Sess. 1963); In the Matters of Richard N. Cea, et al., Exchange Act Release No. 8662 at 18 (Aug. 6, 1969) ("Release 8662") (involving excessive trading and recommendations of speculative securities without a reasonable basis); In the Matter of Mac Robbins & Co. Inc., Exchange Act Release No. 6846 (July 11, 1962).

[222]    Charles Hughes & Co. v. SEC, 139 F.2d 434 (2d Cir. 1943), cert. denied, 321 U.S. 786 (1944) (although not expressly referencing the "shingle theory," held that broker-dealer was under a "special duty, in view of its expert knowledge and proffered advice, not to take advantage of its customers' ignorance of market conditions"; failure to disclose substantial mark-ups on OTC securities sold to unsophisticated customers thus constituted fraud).

[223]    See Guide to Broker-Dealer Registration, supra note 25.

[224]    See, e.g., Charles Hughes, supra note 222 at 437 (failure to reveal excessive mark-up was an omission to state a material fact and a fraudulent device).

Broker-dealers are also required under SRO rules to deal fairly with customers and to "observe high standards of commercial honor and just and equitable principles of trade."[225] Among other things, this obligation includes having a reasonable basis for recommendations in light of a customer's financial situation to the extent known to the broker (suitability),[226] engaging in fair and balanced communications with the public,[227] providing timely and adequate confirmation of transactions,[228] providing account statements,[229] disclosing conflicts of interest,[230] receiving fair compensation both in agency and principal transactions,[231] and giving customers the opportunity for redress of disputes through arbitration.[232]  Some of these duties are discussed in more detail below.

Further, the Commission has sustained a number of FINRA disciplinary actions utilizing FINRA's authority to enforce "just and equitable principles of trade" to sanction member firms and associated persons for a broad range of unlawful or unethical activities, including those that do not implicate "securities."  For example, the Commission has sustained FINRA disciplinary actions involving conduct related to

---

[225] See, e.g., FINRA Rule 2010 ("Standards of Commercial Honor and Principles of Trade"); NASD Interpretive Material ("IM") 2310-2 ("Fair Dealing with Customers") ("Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing.  Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of [FINRA's] Rules, with particular emphasis on the requirement to deal fairly with the public.").

[226] See, e.g., NASD Rule 2310 ("Recommendations to Customers (Suitability)").  A broker-dealer member is required to make reasonable efforts to obtain such information.  Id.

[227] See, e.g., NASD Rule 2210(d) ("Communications with the Public").

[228] See, e.g., MSRB Rule G-15 (confirmation of transactions); NASD Rule 2230 ("Confirmations").  See also Exchange Act Rule 10b-10 (confirmation of transactions);

[229] See, e.g., NASD Rules 2340 ("Customer Account Statements").  See also Exchange Act Rule 15c3-2 (account statements); Exchange Act Rule 10b-16 (disclosure of credit terms in margin transactions); Rule 606 of Regulation NMS (disclosure of order routing information).  These disclosure requirements, together with the trade confirmation, allow a customer to keep track of his or her assets held at the broker-dealer as well as provide customers with information regarding best execution, order-handling, and the broker-dealer's own financial condition, so that the customer has the necessary information to determine whether he or she should continue to do business with the broker-dealer.

[230] See, e.g., NASD Rule 2720 ("Public Offerings of Securities With Conflicts of Interest"); NASD Rule 3040 ("Private Securities Transactions of an Associated Person").

[231] See, e.g., NASD Rule 2440 ("Fair Prices and Commissions"); NASD IM-2440-1 )("Mark-Up Policy"); FINRA Rule 5110(c).  Similarly, a broker-dealer's charges and fees for services performed must be "reasonable" and "not unfairly discriminatory between customers."  See NASD Rule 2430.

[232] FINRA IM 12000 ("Failure to Act Under Provisions of Code of Arbitration Procedures for Customer Disputes").

insurance applications[233] and premiums,[234] tax shelters,[235] the general entrepreneurial activity of member firms,[236] a registered representative's forgery of an executive's signature,[237] a member firm employee's improper use of a co-worker's credit card,[238] a registered representative and associated person's request and receipt of reimbursement for expenses not incurred,[239] and a registered representative's misuse of a member firm's charitable donation matching gifts program.[240]

The antifraud provisions of the Exchange Act also broadly prohibit misstatements or misleading omissions of material facts, and fraudulent or manipulative acts and practices, in connection with the purchase or sale of securities.[241] One provision, Exchange Act Section 15(c), prohibits any broker or dealer from effecting any transaction in or inducing or attempting to induce the purchase or sale of any security by means of any manipulative, deceptive, or other fraudulent device or contrivance. Under this prohibition, broker-dealers are precluded from making material omissions or misrepresentations and from any act, practice, or course of business that constitutes a manipulative, deceptive, or other fraudulent device or contrivance.[242]

---

[233]    In the Matter of the Application of Thomas E. Jackson, Exchange Act Release No. 11476 (Jun. 16, 1975).

[234]    In the Matter of the Application of Ernest A. Cipriani, Jr., Exchange Act Release No. 33675 (Feb. 24, 1994).

[235]    In the Matter of the Application of Daniel C. Adams, Exchange Act Release No. 19915 (Jun. 27, 1983).

[236]    In the Matter of the Application of DWS Securities, et al., Exchange Act Release No. 33193 (Nov. 12, 1993).

[237]    In the Matter of the Application of Mark F. Mizenko, Exchange Act Release No. 52600 (Oct. 15, 2005); In the Matter of Eliezer Gurfel, Exchange Act Release No. 41229 (Mar. 30, 1999).

[238]    In the Matter of the Application of Daniel D. Manoff, Exchange Act Release No. 46708 (Oct. 23, 2002).

[239]    In the Matter of the Application of Leonard John Ialeggio, Exchange Act Release No. 37910 (Oct. 31, 1996).

[240]    In the Matter of the Application of James A. Goetz, Exchange Act Release No. 39796 (Mar. 25, 1998).

[241]    Exchange Act Sections 10(b) and 15(c). See also Exchange Act Section 9(a). Broker-dealers may also be held liable under Section 17(a) of the Securities Act of 1933 if "in the offer or sale" of any securities, the broker-dealer (1) employs any device, scheme, or artifice to defraud, (2) obtains money or property by means of any untrue statement of a material fact or any omission to state a material fact, or (3) engages in any practice which operates as a fraud or deceit upon the purchaser. Section 17(a) requires scienter under Section 17(a)(1), but not under Section 17(a)(2) or Section 17(a)(3). See Aaron v. SEC, 446 U.S. 680 (1980).

[242]    See also Exchange Act Rules 10b-3, 15c1-2, and 15c1-3. These rules and Exchange Act Section 15(c) mirror Section 10(b) and Rule 10b-5 thereunder, but expressly apply to broker-dealers.

*Fiduciary Duty*

While broker-dealers are generally not subject to a fiduciary duty under the federal securities laws, courts have found broker-dealers to have a fiduciary duty under certain circumstances.[243]  Generally, courts have held that broker-dealers that exercise discretion or control over customer assets, or have a relationship of trust and confidence with their customers, owe customers a fiduciary duty.[244]  In addition, even for

---

[243]      See Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 906 F.2d 1206, 1215 (8th Cir. 1990).

[244]      See, e.g., U.S. v. Skelly, 442 F.3d 94, 98 (2d Cir. 2006) (fiduciary duty found "most commonly" where "a broker has discretionary authority over the customer's account"); United States v. Szur, 289 F.3d 200, 211 (2d Cir. 2002) ("Although it is true that there 'is no general fiduciary duty inherent in an ordinary broker/customer relationship,' a relationship of trust and confidence does exist between a broker and a customer with respect to those matters that have been entrusted to the broker.") (citations omitted); Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 461 F. Supp. 951, 953-954 (E.D. Mich. 1978), aff'd, 647 F.2d 165 (6th Cir. 1981) (recognizing that a broker who has de facto control over non-discretionary account generally owes customer duties of a fiduciary nature; looking to customer's sophistication, and the degree of trust and confidence in the relationship, among other things, to determine duties owed); Assoc. Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc., 3 F.3d 208, 212 (7th Cir. 1993) (broker is not fiduciary "with respect to accounts over which the customer has the final say"); MidAmerica Fed. Savings & Loan Ass'n v. Shearson/American Express Inc., 886 F.2d 1249, 1257 (10th Cir. 1989) (fiduciary relationship exists under Oklahoma law "where trust and confidence are placed by one person in the integrity and fidelity of another"); Arleen W. Hughes, Exchange Act Release No. 4048 (Feb. 18, 1948) (Commission Opinion), aff'd sub nom. Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949) ("Release 4048") (noting that fiduciary requirements generally are not imposed upon broker-dealers who render investment advice as an incident to their brokerage unless they have placed themselves in a position of trust and confidence); Paine Webber, Jackson & Curtis, Inc. v. Adams, 718 P.2d 508 (Colo. 1986) (evidence ''that a customer has placed trust and confidence in the broker'' by giving practical control of account can be ''indicative of the existence of a fiduciary relationship''); SEC v. Ridenour, 913 F.2d. 515 (8th Cir. 1990) (bond dealer owed fiduciary duty to customers with whom he had established a relationship of trust and confidence); Cheryl Goss Weiss, A Review of the Historic Foundations of Broker-Dealer Liability for Breach of Fiduciary Duty, 23 J. Corp. L. 65 (1997).

Cf. De Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293 (2d Cir. 2002) (finding that absent "special circumstances" (i.e., circumstances that render the client dependent – a client with impaired faculties, or one who has a closer than arms-length relationship with the broker, or one who is so lacking in sophistication that de facto control of the account is deemed to rest in the broker-dealer), a broker-dealer does not have a duty to give on-going advice between transactions in non-discretionary account, even if he volunteered advice at times; "[I]t is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis. The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments.  A nondiscretionary customer by definition keeps control over the account and has full responsibility for trading decisions. On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale. The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention.") (citations omitted).

nondiscretionary accounts, broker-dealers may have fiduciary duties with respect to the limited matters entrusted to their discretion.[245]

*Conflicts of Interest: Disclosure*

Generally, under the antifraud provisions, a broker-dealer's duty to disclose material information to its customer is based upon the scope of the relationship with the customer, which is fact intensive.[246] Where a broker-dealer processes its customer's orders, but does not recommend securities or solicit customers, then the material information that the broker-dealer is required to disclose to its customer is narrow, encompassing only the information related to the consummation of the transaction.[247] In such circumstances, the broker-dealer generally does not have to provide information regarding the security or the broker-dealer's economic self-interest in the security.[248] However, when recommending a security, a broker-dealer may be liable if it does not "give honest and complete information."[249]  A broker-dealer also may be liable if it does not disclose "material adverse facts of which it is aware."[250]  For example, in making

---

[245]    See Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 536 (2d Cir. 1999) ("The cases that have recognized the fiduciary relationship as evolving simply from the broker-client relationship have limited the scope of the fiduciary duty to the narrow task of consummating the transaction requested.  Simply put, 'the fiduciary obligation that arises between a broker and a customer as a matter of New York common law is limited to matters relevant to the affairs entrusted to the broker.'") (citations omitted).

[246]    See, e.g., Conway v. Icahn & Co., Inc., 16 F.3d 504, 510 (2d Cir. 1994) ("A broker, as agent, has a duty to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it.").

[247]    See, e.g., Press, 166 F.3d at 536.

[248]    See, e.g., Carras v. Burns, 516 F.2d 251, 257 (4th Cir. 1975) (broker-dealer not required to volunteer advice where "acting only as a broker"); Canizaro v. Kohlmeyer & Co., 370 F. Supp. 282, 289 (E.D. La. 1974), aff'd, 512 F.2d 484 (5th Cir. 1975) (broker-dealer that "merely received and executed a purchase order, has a minimal duty, if any at all, to investigate the purchase and disclose material facts to a customer"); Walston & Co. v. Miller, 410 P.2d 658, 661 (Ariz. 1966) ("The agency relationship between customer and broker normally terminates with the execution of the order because the broker's duties, unlike those of an investment advisor or those of a manager of a discretionary account, are only to fulfill the mechanical, ministerial requirements of the purchase and sale of the security or future contract on the market.").

[249]    See, e.g., De Kwiatkowski , 306 F.3d 1293, 1302, supra note 244 (broker-dealer "is obliged to give honest and complete information when recommending a purchase or sale"); Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 803 F.2d 454, 459-61 (9th Cir. 1986) (vacating directed verdict for broker-dealer where evidence showed broker-dealer may have violated Exchange Act by failing to disclose material facts relating to risk to his unsophisticated customer and may effectively have exercised control over account); SEC v. R.A. Holman & Co., 366 F.2d 456, 458 (2d Cir. 1966) (salespersons failed to disclose that company had significant losses).

[250]    See, e.g., Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1172 (2d Cir. 1970); SEC v. Hasho, 784 F. Supp. 1059, 1110 (S.D.N.Y. 1992); In the Matter of Richmark Capital Corp., Exchange Act Release No. 48758 (Nov. 7, 2003) (Commission opinion) ("Release 48758") ("When a securities

recommendations, courts have found broker-dealers should have disclosed: acting as a market maker for the recommended security;[251] trading as principal with respect to the recommended security;[252] revenue sharing with respect to a recommended mutual fund;[253] and "scalping" a recommended security.[254] In addition, if a broker-dealer recommends mutual funds with different classes, it must disclose the various class expenses and fees and how they will impact the expected return on investment.[255]

---

dealer recommends stock to a customer, it is not only obligated to avoid affirmative misstatements, but also must disclose material adverse facts of which it is aware. That includes disclosure of "adverse interests" such as "economic self interest" that could have influenced its recommendation.") (citations omitted).

[251] See Chasins, 438 F.2d at 1172, supra note 250 (applying shingle theory, court found broker-dealer impliedly represented that it would disclose market making capacity).

[252] If a broker-dealer recommends a security to a customer, and proposes to sell such security from the broker-dealer's own account, then the broker-dealer must disclose all material facts. See Release 4048, supra note 244 (where broker-dealer acts as principal, it must disclose cost of securities and the best price obtainable on the open market). See also Exchange Act Rule 10b-10.

[253] Revenue sharing occurs when a broker-dealer is paid by a mutual fund in exchange for promoting the funds to the broker-dealer's customers. When a broker-dealer makes a recommendation of a mutual fund as to which it receives revenue sharing payments, it must disclose the revenue sharing arrangement to the customer because it is information about the potential bias of the investment advice. See In re AIG Advisor Group, 2007 WL 1213395, at 7-9 (E.D.N.Y. Apr. 25, 2007), aff'd, 390 Fed. Appx. 495 (2d Cir. 2009) (where broker-dealer received payments in form of revenue sharing and directed brokerage from mutual funds in exchange for recommending the funds to customers, omissions concerning such conflicts of interest are not immaterial as a matter of law).

[254] Scalping has been defined as the practice "whereby the owner of a security recommends that security for investment and then immediately sells it at a profit upon the rise in the market price which follows the recommendation." SEC v. Hutton, 1998 WL 34078092, at 7 (D.D.C. Sept. 14, 1998). Failure to disclose such activity is a violation of Exchange Act Rule 10b-5. See Release 48758, supra note 250 (by recommending that customers purchase security without disclosing its own concurrent sales, broker-dealer omitted material information, which prevented customers from making informed investment decisions).

[255] See, e.g., In the Matter of Michael Flanagan, et al., Exchange Act Release No. 4997983 (July 7, 2004) (denying application for an award of fees and expenses under the Equal Access to Justice Act), (finding that although not supported by the facts of the case, the legal theory that respondents committed fraud by failing to disclose fully the difference between Class A and Class B shares of mutual funds has substantial justification); In the Matter of J. Michael Scarborough, Exchange Act Release No. 49982 (July 8, 2004) (settled order) (respondent failed to disclose that Class A shares generally produce higher returns than Class B shares when purchased in amounts of $100,000 or more).

Merely providing the customer with a prospectus may not discharge this duty. See, e.g., In the Matter of IFG Network Securities, Inc., et al., Exchange Act Release No. 54127 (July 11, 2006) (failure to make full disclosure as to the differences in cost structures between the two classes of stock made his recommendations to invest in Class B shares misleading). But see Benzon v. Morgan Stanley Distribs., Inc., 420 F.3d 598, 606-9 (6th Cir. 2005) (given that all information necessary to compare different class shares was in prospectus, alleged omissions—e.g., that over certain levels, investments in Class B shares would always result in lower returns than Class A shares—were not material).

Moreover, Exchange Act Rule 10b-10 requires a broker-dealer effecting customer transactions in securities (other than U.S. savings bonds or municipal securities[256]) to provide written notification to the customer, at or before completion of the transaction,[257] disclosing information specific to the transaction, including whether the broker-dealer is acting as agent or principal and its compensation, as well as any third-party remuneration it has received or will receive.[258] Among other things, this information allows customers to verify the terms of their transactions and provides disclosure on potential conflicts of interest.[259]

Exchange Act Rules 15c1-5 and 15c1-6 also require a broker-dealer to disclose in writing to the customer if it has any control, affiliation, or interest in a security it is offering or the issuer of such security.[260]

---

[256]    MSRB Rule G-15 requires similar disclosures from municipal securities brokers and dealers.

[257]    While broker-dealers typically send customer confirmations the day after trade date, generally a confirmation must be sent to the customer by settlement of the transaction, which may be no later than three business days after the date of the contract to purchase or sell a security. See Securities Transaction Settlement, Exchange Act Release No. 33023 (Oct. 13, 1998); Exchange Act Rule 10b-10(d)(2) (defining "completion of the transaction" by reference to Rule 15c1-1); Rule 15c1-1(b) (generally defining "completion of the transaction" the time when: (1) a customer is required to deliver the security being sold; (ii) a customer is required to pay for the security being purchased; or (iii) a broker-dealer makes a bookkeeping entry showing a transfer of the security from the customer's account or payment by the customer of the purchase price); Rule 15c6-1 (generally requiring all contracts for the purchase or sale of a security to provide for the payment of funds or delivery of securities no later than the third business day after the date of the contract, unless otherwise expressly agreed to by the parties).

[258]    See Exchange Act Rule 10b-10. Compliance with Rule 10b-10 is not a safe harbor from the antifraud provisions. Rule 10b-10, Preliminary Note; see, e.g., In the Matter of Edward D. Jones & Co., L.P., Exchange Act Release No. 50910 (Dec. 22, 2004) (settled order) (failure to disclose nature and extent of conflict of interest violates Securities Act Section 17(a)(2)); In the Matter of Morgan Stanley DW, Inc., Exchange Act Release No. 48789 (Nov. 17, 2003) (settled order) (same).

[259]    In addition, prior to effecting a penny stock transaction, a broker-dealer generally is required to provide certain disclosures, including the aggregate amount of any compensation received by the broker-dealer in connection with such transaction; and the aggregate amount of cash compensation that any associated person of the broker-dealer has received or will receive from any source in connection with the transaction. See Exchange Act Rules 15g-4 and 15g-5.

[260]    With respect to Rule 15c1-5, the disclosure of control or affiliation must be made before entering into any contract for the purchase or sale of the security, and if this disclosure is not done in writing, it must be supplemented by giving or sending a written disclosure before completion of the transaction (i.e., no later than three business days after the date of the contract to purchase or sell a security). See Exchange Act Rules 15c1-1, 15c1-5, and 15c6-1. Similarly, Rule 15c1-6 requires written disclosure of the broker-dealer's interest in a security it is offering at or before the completion of the transaction. SROs require similar disclosures. See, e.g., NASD Rules 2240 and 2250; MSRB Rule G-22; NYSE Rule 312(f).

App 319

The Commission and the SROs have also adopted rules designed to address conflicts of interest that can arise when security analysts recommend equity securities in research reports and public appearances.[261] By requiring certain certifications and disclosures, these rules are intended to promote the integrity of research reports and investor confidence in those reports and analyst public appearances.

*Conflicts of Interest: Prohibited or Restricted Conduct*

The federal securities laws and FINRA rules restrict broker-dealers from participating in certain transactions that may present particularly acute potential conflicts of interest. For example, FINRA rules generally prohibit a member with certain "conflicts of interest"[262] from participating in a public offering,[263] unless certain requirements are met.[264] FINRA members also may not provide gifts or gratuities to an employee of another person to influence the award of the employer's securities business.[265] FINRA rules also generally prohibit a member's registered representatives from borrowing money from or lending money to any customer, unless the firm has

---

[261]    See Regulation Analyst Certification, or Regulation AC. See also NASD Rule 2711 and NYSE Rule 472.

[262]    Such a "conflict of interest" exists if, at the time of a member's participation in an entity's public offering, any of the following four conditions applies: (1) the securities are to be issued by the member; (2) the issuer controls, is controlled by or is under common control with the member or the member's associated persons; (3) at least five percent of the net offering proceeds, not including underwriting compensation, are intended to be: (i) used to reduce or retire the balance of a loan or credit facility extended by the member, its affiliates and its associated persons, in the aggregate; or (ii) otherwise directed to the member, its affiliates and associated persons, in the aggregate; or (4) as a result of the public offering and any transactions contemplated at the time of the public offering: (i) the member will be an affiliate of the issuer; (ii) the member will become publicly owned; or (iii) the issuer will become a member or form a broker-dealer subsidiary. FINRA Rule 5121(f)(5).

[263]    Generally, a member is considered to "participate in a public offering" for purposes of FINRA Rule 5121 if it participates "in the distribution of a public offering as an underwriter, member of the underwriting syndicate or selling group, or otherwise assist[s] in the distribution of the public offering (i.e., not when a member firm acts solely as a finder, consultant or adviser, given these capacities generally do not involve managing or distributing a public offering)." Regulatory Notice 09-49, "SEC Approves Amendments to Modernize and Simplify NASD Rule 3720 Relating to Public Offerings in Which a Member with a Conflict of Interest Participates."

[264]    See FINRA Rule 5121. Specifically, the rule requires prominent disclosure of the nature of the conflict in the prospectus, offering circular or similar document for the public offering, and in certain circumstances, the participation of a qualified independent underwriter. FINRA Rule 5121(a). Further, no member that has a conflict of interest may sell to a discretionary account any security with respect to which the conflict exists, unless the member has received specific written approval of the transaction from the account holder and retains documentation of the approval in its records. FINRA Rule 5121(c).

[265]    See FINRA Rule 3220.

App 320

written procedures allowing such borrowing or lending arrangements and certain other conditions are met.[266]

Moreover, the Commission's Regulation M generally precludes persons having an interest in an offering (such as an underwriter or broker-dealer and other distribution participants) from engaging in specified market activities during a securities distribution.[267] These rules are intended to prevent such persons from artificially influencing or manipulating the market price for the offered security in order to facilitate a distribution.[268]

In addition, under Exchange Act Section 11(a), any member of a national securities exchange generally cannot effect transactions on such exchange for its own accounts, the accounts of its associated persons, or accounts that it or its associated persons exercise investment discretion, except under certain conditions.[269]

Exchange Act Section 11(d)(1) prohibits any person that is both a broker and a dealer from extending credit on "new issue" securities if the broker-dealer participated in the distribution of the new issue securities within the preceding 30 days. This prohibition addresses sales practice abuses deriving from conflicts of interests by preventing broker-dealers from disposing of undesirable "sticky issues" by extending easy credit terms to customers, or using easy credit terms to create the appearance of high demand for an offering to facilitate distribution.

Furthermore, Exchange Act Section 15(f) requires broker-dealers to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the firm or its associated persons from misusing material non-public information (i.e., insider trading).

### *Suitability*

As noted above, a central aspect of a broker-dealer's duty of fair dealing is the suitability obligation, which generally requires a broker-dealer to make recommendations that are consistent with the best interests of his customer.[270] The concept of suitability has been interpreted as an obligation under the antifraud provisions of the federal securities laws[271] and also appears in specific SRO rules.[272]

---

[266]    See FINRA Rule 3240.

[267]    See Regulation M, Exchange Act Release No. 38067 (Apr. 1, 1997).

[268]    Id.

[269]    Exceptions from this general prohibition include transactions by market makers, bona fide hedge transactions, bona fide arbitrage transactions, transactions made to offset transactions made in error, transactions routed through other members, and transactions that yield to other orders. See Exchange Act Section 11(a)(1)(A)-(H).

[270]    See, e.g., In the Matter of the Application of Raghavan Sathianathan, Exchange Act Release No. 54722 at 21 (Nov. 8, 2006) ("NASD Conduct Rule 2310 requires that, in recommending a

59

App 321

- Recommendation

The determination of whether a broker-dealer has made a recommendation that triggers a suitability obligation is based on the facts and circumstances of the particular situation and, therefore, whether a recommendation has taken place is not susceptible to a bright line definition. Factors considered in determining whether a recommendation has taken place include whether the communication is a "call to action" and "reasonably could influence" the customer to enter into a particular transaction or engage in a particular trading strategy.[273] The more individually tailored the communication to a specific customer or a targeted group of customers about a security or group of securities, the greater likelihood that the communication may be viewed as a "recommendation."[274]

---

transaction to a customer, a registered representative 'shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.' As we have frequently stated, a broker's recommendations must be consistent with his customers' best interests.") (citations omitted). See also In the Matter of the Application of Dane S. Faber, Exchange Act Release No. 49216 at 23-24 (Feb. 10, 2004) ("Before recommending a transaction, NASD Conduct Rule 2310 requires that a registered representative have reasonable grounds for believing, on the basis of information furnished by the customer, and after reasonable inquiry concerning the customer's investment objectives, financial situation, and needs, that the recommended transaction is not unsuitable for the customer. A broker's recommendations must be consistent with his customer's best interests, and he or she must abstain from making recommendations that are inconsistent with the customer's financial situation."); In the Matters of Powell & McGowan, Inc., Exchange Act Release No. 7302 (Apr. 24, 1964) (a broker has "an obligation not to recommend a course of action clearly contrary to the best interests of the customer").

[271] See Hanly v. SEC, 415 F.2d 589, 596 (2d Cir. 1969). See also Municipal Securities Disclosure, Exchange Act Release No. 26100, at n. 75 (Sept. 22, 1988).

[272] FINRA members' general suitability obligations are set out in NASD Rule 2310, "Recommendations to Customers (Suitability)," and NASD IMs, specifically, IM 2310-1 ("Possible Application of SEC Rules 15g-1 through 15g-9"), 2310-2 ("Fair Dealing with Customers"), and 2310-3 ("Suitability Obligations to Institutional Customers"), as applicable. As noted herein, broker-dealers have additional specific suitability obligations with respect to certain types of products or transactions.

On November 17, 2010, the Commission, through delegated authority, approved changes to FINRA's suitability and know your customer rules. The rule changes are a part of FINRA's continuing process of consolidating the NASD and NYSE rules into a consolidated FINRA rulebook. FINRA's rule changes retain the core features of the current "know your customer" and suitability obligations, while modifying both rules to strengthen and clarify them. The implementation date for the new rule will be no later than 270 days following publication of the Regulatory Notice announcing Commission approval. See FINRA Regulatory Notice 11-12 (Jan. 2011).

[273] See, e.g.. Michael Frederick Siegel, 2007 NASD Discip. LEXIS 20 (May 11, 2007), aff'd, Exchange Act Release No. 58737 (Oct. 6, 2008) (finding that registered representative did not have a reasonable basis for making a recommendation); aff'd in relevant part, Siegel v. SEC, 592 F.3d 147, 150, 158 (D.C. Cir. Jan. 12, 2010); cert. denied, 130 S. Ct. 3333 (May 24, 2010)

App 322

- Suitability Obligation

The antifraud provisions of the federal securities laws and the implied obligation of fair dealing thereunder prohibit broker-dealers from, among other things, making unsuitable recommendations and require broker-dealers to investigate an issuer before recommending the issuer's securities to a customer.[275] The fair dealing obligation also requires a broker-dealer to reasonably believe that its securities recommendations are suitable for its customer in light of the customer's financial needs, objectives and circumstances (customer-specific suitability).[276]

To establish a violation of the antifraud provisions of Securities Act Section 17(a); Exchange Act Section 10(b) and Rule 10b-5 thereunder, the Commission must establish that the broker's unsuitable recommendation was a misrepresentation (or material omission) made with scienter (i.e., with a mental state embracing intent to deceive, manipulate or defraud).[277] Scienter can be knowing misconduct as well as reckless misconduct – conduct that is "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care…to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"[278]

---

(registered representative's conduct constituted a "recommendation" because it was a "call to action" that reasonably influenced investors to invest).

[274]   Cf. FINRA Rule 2111 (effective Oct. 7, 2011). See also FINRA Notice to Members 01-23 at n. 16 ("Although . . . a broker/dealer cannot disclaim away its suitability obligation, informing customers that generalized information provided is not based on the customer¹s particular financial situation or needs may help clarify that the information provided is not meant to be a 'recommendation' to the customer. Whether the communication is in fact a 'recommendation' still depends on the content, context, and presentation of the communication.").

[275]   See Hanly, 415 F.2d 589, supra note 271. See also Exchange Act Release No. 26100, supra note 271.

[276]   See Release 8662, supra note 221; F.J. Kaufman and Co., Exchange Act Release No. 27535 (Dec. 13, 1989) ("Release 27535").

[277]   See Santa Fe Indus., Inc. v. Green, 430 U.S. 462 (1977) (holding that a breach of a fiduciary duty in connection with a securities transaction, without misrepresentation, is not a fraud for purposes of Exchange Act Section 10(b) and Rule 10b-5 thereunder). Santa Fe indicates that an unsuitable recommendation cannot serve as the basis for a fraud claim, unless the recommendation also entails an element of deception. Securities Act Section 17(a) requires scienter under Section 17(a)(1), but not under Section 17(a)(2) or Section 17(a)(3). See Aaron, 446 U.S., supra note 241.

Commission actions against broker-dealers for making unsuitable recommendations generally are brought under Securities Act Section 17(a), Exchange Act Section 10(b) and Rule l0b-5 thereunder. See, e.g., Clark v. John Lamula Investors, Inc., 583 F.2d 594 (2d Cir. 1978); In the Matter of William C. Piontek, Exchange Act Release No. 48903 (Dec. 11, 2003) (finding violations of Securities Act Section 17(a), Exchange Act Section 10(b) and Exchange Act Rule 10b-5 where associated person engaged in unauthorized trading and unsuitable recommendations

61

In contrast, FINRA and other SRO rules do not require proof of scienter to establish a suitability violation.[279] As noted above, while the suitability obligation under the federal securities laws arises from the antifraud provisions, the SRO rules are grounded in concepts of ethics, professionalism, fair dealing, and just and equitable principles of trade, which gives SROs more authority in dealing with suitability issues.[280] Obtaining a customer's consent to an unsuitable transaction does not relieve a broker-dealer of his obligation to make only suitable recommendations under the SRO rules.[281]

A violation of the suitability requirements under the antifraud provisions can also give rise to a private cause of action and civil liability under Exchange Act Section 10(b) and Exchange Act Rule 10b-5.[282] Although the SROs' suitability rules do not similarly

---

and trading in customers' accounts); In the Matter of Sandra K. Simpson, et al., Exchange Act Release No. 45923 (May 14, 2002) (finding violations of Securities Act Section 17(a), Exchange Act Section 10(b) and Rule l0b-5 thereunder where registered representative engaged in, among other things, unsuitable and excessive trading, churning, and abusive mutual fund sales practices); In the Matter of Stephen Stout, Exchange Act Release No. 43410 (Oct. 4, 2000) (finding violations of Securities Act Section 17(a), Exchange Act Section 10(b) and Rule l0b-5 thereunder where registered representative engaged in unsuitable and unauthorized trading and made fraudulent statements and omitted material facts).

[278]    See Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 47 (2d Cir. 1978) (holding that scienter can be reckless conduct). See also Ernst & Ernst, 425 US 185, supra note 186. Scienter is not required under Securities Act Section 17(a)(2) and (3). See Aaron, supra note 241.

[279]    See, e.g., In the Matter of the Application of Jack H. Stein, Exchange Act Release No. 47335 (Feb. 10, 2003) ("Scienter is not an element for finding a violation of the NASD suitability rule."); In the Matter of John M. Reynolds, Exchange Act Release No. 30036 (Dec. 4, 1991) ("Release 30036") (scienter unnecessary to establish excessive trading under NASD rules).

[280]    When adopted, the SRO rules, particularly the NASD rule, were regarded primarily as ethical rules, stemming from concepts of "fair dealing" and notions of ''just and equitable principles of trade." Robert Mundheim, Professional Responsibilities of Broker-Dealers: The Suitability Doctrine, 1965 Duke L.J. 445-47; Stuart D. Root, Suitability—The Sophisticated Investor—and Modern Portfolio Management, 1991 Colum. Bus. L. Rev. 287, 290-300.

[281]    See, e.g., In the Matter of the Application of Clinton Hugh Holland, Jr., Exchange Act Release No. 36621 at 10 (Dec. 21, 1995) ("Even if we conclude that Bradley understood Holland's recommendations and decided to follow them, that does not relieve Holland of his obligation to make reasonable recommendations."), aff'd, 105 F.3d 665 (9th Cir. 1997) (table format); Release 30036, supra note 279 (regardless of whether customer wanted to engage in aggressive and speculative trading, representative was obligated to abstain from making recommendations that were inconsistent with the customer's financial condition); In the Matter of the Application of Eugene J. Erdos, Exchange Act Release No. 20376 at 10 (Nov. 16, 1983) (citing In the Matter of Philips & Company, Exchange Act Release 5294 at 8 (Apr. 9, 1956) ("[W]hether or not [the customer] considered the transactions in her account suitable is not the test for determining the propriety of [the registered representative's] conduct. The proper test is whether [the representative] 'fulfilled the obligation he assumed when he undertook to counsel [the customer], of making only such recommendations as would be consistent with [the customer's] financial situation and needs.'")).

[282]    See, e.g., Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031 (2d Cir. 1993); O'Connor v.

62

give rise to a private cause of action, violations of the rules can be addressed through arbitration proceedings.[283]

In general, three approaches to suitability have developed under the case law, including FINRA and Commission enforcement actions – "reasonable basis" suitability, "customer-specific" suitability, and "quantitative" suitability.  Under reasonable basis suitability, a broker-dealer has an affirmative duty to have an "adequate and reasonable basis" for any security or strategy recommendation that it makes.[284] A broker-dealer, therefore, has the obligation to investigate and have adequate information about the security or strategy it is recommending.  Under customer-specific suitability, a broker-dealer must make recommendations based on a customer's financial situation and needs as well as other security holdings, to the extent known.[285] This requirement is construed

---

R.F. Lafferty & Co., 965 F.2d 893, 896-900 (10th Cir. 1992); Vucinich v. Paine Webber, Jackson & Curtis, Inc., 803 F.2d 454 (9th Cir. 1986).

[283]  Under FINRA rules, customers of broker-dealers can compel broker-dealers to arbitrate disputes. See Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes.  See also infra discussion of arbitration and mediation of customer disputes with broker-dealers.

[284]  See Release 27535, supra note 276 (finding that the broker's recommendations violated suitability requirements because the broker did not have a reasonable basis for the strategy he recommended, wholly apart from any considerations relating to the particular customer's portfolio). See also Hanly, 415 F.2d at 597, supra note 271; In the Matters of Walston & Co., Exchange Act Release No. 8165 (Sept. 22, 1967) (settled order); Michael F. Siegel, 2007 NASD Discip. LEXIS 20 (2007).

See also Regulatory Notice 09-25, "Proposed Consolidated FINRA Rules Governing Suitability and Know-Your-Customer Obligations" (and FINRA Rule 2111.05 (effective Oct. 7, 2011) ("The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least *some* investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy.  A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule.")

[285]  See Release 8662, supra note 221; Release 27535, supra note  276; NASD Rule 2310 (requiring that members "have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs"); Regulatory Notice 09-25, "Proposed Consolidated FINRA Rules Governing Suitability and Know-Your-Customer Obligations"; FINRA Rule 2111.05 (effective Oct. 7, 2011) (noting that "the customer-specific obligation requires that a member or associated person have a reasonable basis to believe that the recommendation is suitable for a particular customer based on that customer's investment profile.").

Factors relevant to analyzing customer-specific suitability include not only information about the customer (see infra Section II.b), but also characteristics of the securities and strategy recommended.  Factors relating to the securities and investment strategy include, but are not limited to, the nature of the securities, the concentration of securities in the customer's portfolio,

63

to impose a duty of inquiry on broker-dealers to obtain relevant information from customers relating to their financial situations[286] and to keep such information current.[287] Under quantitative suitability, a broker-dealer that has actual or de facto control over a customer account must have a reasonable basis for believing that the number of recommended transactions within a certain period, even if suitable when viewed in isolation, is not excessive and unsuitable for the customer when taken together in light of the customer's investment profile.[288]  Activities such as excessive trading,[289] churning,[290]

the use of margin, and the frequency of trading.  See In the Matter of the Application of Luis Miguel Cespedes, Exchange Act Release No. 59404 (Feb. 13, 2009); In Cormac Niall Maughan, NYSE Disc. Action 2004-978 (Jun. 30, 2004); Dep't of Enforcement v. Stein, NASD Disc. Dec., 2001 WL 156957 (2001); In re Harold S. Glenzer, NYSE Disc. Action 94-57D (Oct. 13, 1994).

[286]     See NASD Rule 2310.

> Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning: (1) the customer's financial status; (2) the customer's tax status; (3) the customer's investment objectives; and (4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

> Id.  See also Regulatory Notice 09-25, "Proposed Consolidated FINRA Rules Governing Suitability and Know-Your-Customer Obligations;" FINRA Rule 2111(a) (effective Oct. 7, 2011). ("A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.").

> See also In the Matter of the Application of Gerald M. Greenberg, et al., Exchange Act Release 6320 (July 21, 1960) (holding that a broker cannot avoid the duty to make suitable recommendations simply by avoiding knowledge of the customer's financial situation entirely).

> Under the FINRA rules, a broker-dealer's suitability obligations are different for institutional customers than for non-institutional customers.  NASD IM-2310-3[FINRA Rule 2111(b)] (effective Oct. 7, 2011) sets out factors that are relevant to the scope of a broker-dealer's suitability obligations in making recommendations to an institutional customer.

[287]     Exchange Act Rule 17a-3(a)(17)(i) requires, subject to certain exceptions, broker-dealers to update customer records, including investment objectives, at least every 36 months from the last recommendation.

[288]     See Regulatory Notice 09-25, "Proposed Consolidated FINRA Rules Governing Suitability and Know-Your-Customer Obligations"; FINRA Rule 2111.05 (effective Oct. 7, 2011).

[289]     In the Matter of the Application of Rafael Pinchas, Exchange Act Release No. 41816, at 11-12, (Sept. 1, 1999) ("Release 41816").  See also In the Matter of the Application of Clyde J. Bruff, Exchange Act Release No. 40583 (Oct. 21, 1998) (excessive trading is itself a form of unsuitability); In the Matter of the Application of Donald A. Roche, Exchange Act Release No.

64

and switching[291] have been found to violate the quantitative suitability obligation under the SRO suitability rules and federal antifraud provisions.

Specific disclosure, due diligence, and suitability requirements apply to certain securities products, including penny stocks,[292] options,[293] mutual fund share classes,[294] debt securities and bond funds,[295] municipal securities,[296] hedge funds,[297] direct

---

38742 (June 17, 1997) ("Release 38742") (excessive trading is a type of violation of "broad" suitability rules promulgated by SROs). A broker-dealer with discretionary power over a customer's account may also violate Exchange Act Rule 15c1-7 for excessive trading in the customer's account. See Exchange Act Rule 15c1-7.

[290] Churning occurs when a broker-dealer buys and sells securities for a customer's account, without regard to the customer's investment interests, for the purpose of generating commissions. See, e.g. Release 38742, supra note 289 (quoting Miley v. Oppenheimer & Co., 637 F.2d 318, 324 (5th Cir. 1981). Churning violates the antifraud provisions of the federal securities laws. Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5 thereunder. See Release 38742 at 12 (describing the elements of churning and holding that churning violates the antifraud provisions).

[291] "Switching" involves transactions in which shares of a particular security are redeemed and all or part of the proceeds are used to purchase shares of another security with the primary effect of benefiting the broker rather than the customer. See, e.g., In the Matter of the Application of Scott Epstein, Exchange Act Release No. 59328 (Jan. 30, 2009), aff'd Epstein v. S.E.C., 2010 WL 4739749 (3rd Cir. 2010) (finding that a registered representative violated NASD Rules 2310(a), 2310(b), IM-2310-2, and 2110 because he did not have reasonable grounds for recommending mutual fund switches and put his own interests ahead of the interests of his customers); In the Matter of Leslie E. Rossello, Exchange Act Release No. 43650 (Dec. 1, 2000) (settled order) (finding that a registered representative violated Securities Act Section 17(a), and Exchange Act Section 10(b) and Rule 10b-5 thereunder when she induced mutual fund switches for her benefit rather than that of her customers); In the Matter of the Application of Charles E. Marland & Co., Inc., Exchange Act Release No. 11065 at 9 (Oct. 21, 1974) (recommending that mutual fund switching creates rebuttable presumption of unsuitability); In the Matter of the Application of Thomas Arthur Stewart, Exchange Act Release No. 3720 (Aug. 6, 1945) (finding that the broker violated NASD's suitability rule because it had a lack of reasonable grounds for recommending switching shares of mutual funds).

[292] See, e.g., Exchange Act Rules 15g-1 through 15g-7, 15g-9 and 15c2-11(b), and Schedule 15G; FINRA Rule 2114. "Recommendations to Customers in OTC Equity Securities;" NASD IM 2310-2(b)(1), Recommending Low-priced, Speculative Securities; NASD NtM 96-32, Members Reminded to Use Best Practices When Dealing in Speculative Securities (May 1996).

[293] See, e.g., Exchange Act Rule 9b-1; FINRA Rule 2360, "Options."

[294] See, e.g., NASD Rule 2310; NASD Notice to Members 95-80, NASD Further Explains Members' Obligations and Responsibilities Regarding Mutual Funds Sales Practices (Sept. 26, 1995).

[295] See, e.g., NASD Rule 2310; NASD Notice to Members 04-30, NASD Reminds Firms of Sales Practice Obligations In Sale of Bonds and Bond Funds (Apr. 2004); FINRA Regulatory Notice 08-81, FINRA Reminds Firms of Their Sales Practice Obligations with Regard to the Sale of Securities in a High Yield Environment (Dec. 2008).

[296] See, e.g., MSRB Rule G-19.

participation programs,[298] variable insurance products,[299] and non-traditional products, such as structured products and leveraged and inverse exchange-traded funds.[300] Moreover, considerations related to suitability may be raised with regard to specific types of accounts such as discretionary, day trading, or margin accounts.

*Fair Prices, Commissions and Charges*

SRO rules generally require broker-dealer prices for securities and compensation for services to be fair and reasonable taking into consideration all relevant circumstances.[301] Generally, this requirement prohibits a member from entering into any transaction with a customer in any security at any price not reasonably related to the current market price of the security or to charge a commission that is not reasonable.[302] Recognizing that what may be "fair" (or reasonable) in one transaction could be "unfair" (or unreasonable) in another, FINRA has provided guidance on what may constitute a "fair" mark-up.[303]

---

[297]    See, e.g., NASD Rule 2310; NASD Notice to Members 03-07, NASD Reminds Members of Obligations When Selling Hedge Funds (Feb. 2003).

[298]    See, e.g., FINRA Rule 2310, "Direct Participation Programs."

[299]    See, e.g., FINRA Rule 2330, "Members' Responsibilities Regarding Deferred Variable Annuities;" NASD Notice to Members 00-44, The NASD Reminds Members of Their Responsibilities Regarding the Sale of Variable Life Insurance (July 2000); NASD Notice to Members 99-35, The NASD Reminds Members of Their Responsibilities Regarding the Sales of Variable Annuities (May 1999).

[300]    See, e.g., FINRA Rule 2370, "Securities Futures"; NASD Rule 2210; FINRA Regulatory Notice 09-31, Non-Traditional ETFs [exchange-traded funds] (June 2009); NASD Notice to Members 05-59, NASD Provides Guidance Concerning the Sale of Structured Products (Sept. 2005); NASD Notice to Members 03-71, Non-Conventional Investments (Nov. 2003).

[301]    See NASD Rule 2440 (Fair Prices and Commissions), IM-2440-1 (Mark-Up Policy), and IM-2440-2 (Mark-Up Policy for Debt Securities). Specifically, when acting as principal, a member is required to buy from or sell to his customer a security at a price which is fair, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense involved, and the fact that he is entitled to a profit. NASD Rule 2440.  Similarly, when acting as agent, the broker-dealer shall not charge his customer more than a fair commission or service charge, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense of executing the order and the value of any service he may have rendered by reason of his experience in and knowledge of such security and the market therefor.  Id.

[302]    IM-2440-1 (Mark-Up Policy).

[303]    See IM-2440-1(c) (Mark-Up Policy).  Although referred to as the "Mark-Up Policy," it applies to both principal transactions as well as agency transactions, and in the case of the latter, the commission charged the customer must be fair in light of all relevant circumstances.  Id.  The Mark-Up Policy incorporates what is known as the "5 Percent Policy," which states that markups or markdowns should generally not exceed 5 percent of the prevailing market price for equity securities. See IM-2440-1; Notice to Members 92-16, "NASD Policies and Procedures for Markups/Markdowns in Equity Securities" ("NTM 92-16"). This "5 Percent Policy" is a guide and not a rule:  a mark-up of 5 percent or less may be unfair or unreasonable, similarly, a mark-up of

App 328

Moreover, the courts and the Commission have held that under the antifraud provisions of the federal securities laws, broker-dealers must charge prices reasonably related to the prevailing market price.[304] The Commission has consistently held that undisclosed markups of equities of more than 10% above the prevailing market price are fraudulent.[305] Markups of less than 10% may also be fraudulent in certain circumstances.[306] For example, appropriate markups on debt securities are generally much lower, with the Commission even finding markups below 4 or 5% to be excessive and fraudulent.[307]

over 5 percent could be fair or reasonable.  IM-2440-1(a).  See also NTM 92-16.  A determination of the "fairness" of mark-ups must be based on a consideration of all relevant factors, of which the percentage of mark-up is only one.  IM-2440-1(a).  Specifically, the Mark Up Policy identifies the following factors that should be considered in determining the fairness of a mark up: (1) the type of security involved; (2) the availability of the security in the market; (3) the price of the security (e.g., the percentage of mark-up or rate of commission generally increases as the price of the security decreases); (4) the amount of money involved in a transaction (e.g., a transaction involving a small amount of money may have a higher percentage of mark-up to cover the expenses of handling); (5) disclosure to the customer of the commission or mark-up; (6) the pattern of a member's mark-ups; and (7) the nature of the member's business.  IM-2440-1(b); NTM 92-16.

[304]   See Charles Hughes, supra note 222 (broker-dealer impliedly represents that price is reasonably related to the prevailing market price); In the Matter of Duker & Duker, Exchange Act Release No. 2350 (Dec. 19, 1939).  See also In the Matter of the Application of A.S. Goldmen & Co., Inc., Exchange Act Release No. 44328 (May 21, 2001) ("Release 44328") ("The prices that a broker-dealer charges retail customers for securities must be reasonably related to the prevailing market price of the security. . . . The prevailing market price typically is the current inter-dealer price, that is, the price at which dealers trade with one another.  Where an integrated dealer . . . so dominates and controls the market for a security that it effectively can set wholesale prices, however, the best evidence of the security's market price is the firm's contemporaneous cost in acquiring the security, rather than the inter-dealer price. If there are no contemporaneous purchases from other dealers, purchases from retail customers may be used to determine prevailing market price, subject to an imputed markdown being added to the purchase price.") (citations omitted).

[305]   See Alstead, Dempsey & Co., Exchange Act Release No. 20825 (Apr. 5, 1984) at 2.  See also Release 44328, supra note 304 ("We further have held that markups of more than 10 percent over the prevailing market price are evidence of scienter and have held such markups to be fraudulent.") (citations omitted).

[306]   See, e.g., Release 44328, supra note 304 (finding that all of the alleged markups over five percent of the integrated broker-dealer's contemporaneous cost to be excessive).

[307]   See, e.g., In re Anderson, 48352, 80 S.E.C. 2567 (SEC Opinion) (Aug. 15, 2003) ("We have observed 'that a significantly lower markup is customarily charged in the sale of debt securities than in transactions of the same size involving common stock."  It is well-settled, for example, that markups and markdowns on municipal securities may be excessive although they are substantially below 5%. Indeed, we previously have observed that 'markups on municipal securities are often as low as one or two percent in frequently traded issues…. In 1988, we noted that the then 'common industry practice' was 'to charge a mark-up over the prevailing inter-dealer market price of between 1/32% and 3 1/2% (including minimum charges) for principal sales to customers of conventional or 'straight' Treasuries.' Markdowns generally are lower than markups.") (citations omitted).  See also In the Matter of Paul George Chironis, Exchange Act

67

Broker-dealers are also prohibited under FINRA rules from charging unfair or unreasonable underwriting compensation in connection with the distribution of securities, and must disclose all items of underwriting compensation in the prospectus or similar document.[308] Similarly, under FINRA rules, a broker-dealer's charges and fees for services performed (including miscellaneous services such as collection of moneys due for principal, dividends, or interest; exchange or transfer of securities; appraisals, safe-keeping or custody of securities, and other services) must be "reasonable" and "not unfairly discriminatory between customers."[309]  As noted above, charging an unfair commission would also violate a broker-dealer's obligation to observe just and equitable principles of trade pursuant to FINRA rules. [310]

FINRA rules also establish restrictions on the use of non-cash compensation in connection with the sale and distribution of mutual funds, variable annuities, direct participation program securities, public offerings of debt and equity securities, and real estate investment trust programs.[311]  These rules generally limit the manner in which members can pay for or accept non-cash compensation and detail the types of non-cash compensation that are permissible.

---

Release No. 63661 (Jan. 6, 2010) (finding markups of 3.68% and markdowns of 1.92% for mortgage backed securities were excessive, and hence violated the antifraud provisions of the federal securities laws, given the highly liquid market for these securities and the minimal work required).

[308]  See FINRA Rule 5110(c). The following factors shall be considered in determining the currently effective guideline on the maximum amount of underwriting compensation considered to be fair and reasonable: (1) the offering proceeds; (2) the amount of risk assumed by the underwriter and related persons, which is determined by (i) whether the offering is being underwritten on a "firm commitment" or "best efforts" basis and (ii) whether the offering is an initial or secondary offering; and (3) the type of securities being offered.   FINRA Rule 5110(c)(2)(D).  The maximum amount of compensation that is considered fair and reasonable generally varies directly with the amount of risk to be assumed by participating members and inversely with the dollar amount of the offering proceeds.  FINRA Rule 5110(c)(2)(E).  This disclosure includes information about the firm but does not break out compensation to the registered representative recommending the security.

[309]  NASD Rule 2430.  Other FINRA rules similarly prohibit discriminatory pricing. See NASD Rule 2410 ("No member shall offer any security or confirm any purchase or sale of any security, from or to any person not actually engaged in the investment banking or securities business at any price which shows a concession, discount, or other allowance, but shall offer such security and confirm such purchase or sale at a net dollar or basis price."); NASD Rule 2420 (generally providing that "[n]o member shall deal with any non-member broker or dealer except at the same prices, for the same commissions or fees, and on the same terms and conditions as are by such member accorded to the general public.")

[310]  See NASD Rule 2010 and IM-2440-1.

[311]  See FINRA Rules 2310, 2320, and 5110, and NASD Rule 2830.

As noted above, Exchange Act Rule 10b-10 generally requires that a customer confirmation disclose the broker-dealer's commission, if acting as agent, or its markup, if acting as principal.

### Duty of Best Execution

Under the antifraud provisions of the federal securities laws and SRO rules, broker-dealers also have a legal duty to seek to obtain best execution of customer orders.[312] The duty of best execution requires broker-dealers to seek to execute customers' trades at the most favorable terms reasonably available under the circumstances.[313] Traditionally, price has been the predominant factor in determining whether a broker-dealer satisfied its best execution obligations.[314] The Commission has stated that broker-dealers should also consider at least six additional factors: (1) the size of the order; (2) the speed of execution available on competing markets; (3) the trading characteristics of the security; (4) the availability of accurate information comparing markets and the technology to process the data; (5) the availability of access to competing markets; and (6) the cost of such access.[315]

---

[312] See, e.g., Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266, 269-270 (3d Cir.), cert. denied, 525 U.S. 811 (1998); Certain Market Making Activities on Nasdaq, Exchange Act Release No. 40900 (Jan. 11, 1999) (citing Sinclair v. SEC, 444 F.2d 399 (2d. Cir. 1971); Release 4048, supra note 244. See also Order Execution Obligations, Exchange Act Release No. 37619A (Sept. 6, 1996), ("Order Handling Rules Release"). See also Regulation NMS, Exchange Act Release No. 51808 (June 9, 2005) ("Regulation NMS Release"); NASD Rule 2320 ("Best Execution and Interpositioning").

[313] See Regulation NMS Release. For a discussion of the duty of best execution, see Exchange Act Release No. 37619A (Sept. 6, 1996) at 162-3. See also SEC, Division of Market Regulation, Market 2000: An Examination of Current Equity Market Developments (Jan. 1994) at Study V, V-1, V-2, 1994 SEC 136, and sources cited therein.

[314] The Commission has stated that "[i]n its purest form, best execution can be thought of as executing a customer's order so that the customer's total cost or proceeds are the most favorable under the circumstances." Exchange Act Release No. 34902 (Oct. 27, 1994). See also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266, 270 ("the broker-dealer is expected to use reasonable efforts to maximize the economic benefit to the client in each transaction").

[315] See, e.g., SEC, Second Report on Bank Securities Activities, at 97-98, n.233, as reprinted in H.R. Rep. No. 145, 95 Cong., 1st Sess. 233 (Comm. Print 1977). See also NASD Rule 2320(a), which provides:

> In any transaction for or with a customer or a customer of another broker-dealer, a member and persons associated with a member shall use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions. Among the factors that will be considered in determining whether a member has used "reasonable diligence" are:
>
> (A) the character of the market for the security, e.g., price, volatility, relative liquidity, and pressure on available communications;
> (B) the size and type of transaction;
> (C) the number of markets checked;

App 331

The duty of best execution applies whether a broker-dealer is acting as an agent or a principal.[316] When engaging in transactions directly with customers on a principal basis, a broker-dealer violates Exchange Act Rule 10b-5 when it knowingly or recklessly sells a security to a customer at a price not reasonably related to the prevailing market price and charges excessive markups (as discussed above), without disclosing the fact to the customer.[317]

### Communications with the Public

Broker-dealers must ensure that their communications with the public are not misleading under the antifraud provisions of the federal securities laws.[318] In addition, FINRA has detailed rules that address broker-dealers' communications with the public[319]

---

> (D) accessibility of the quotation; and
> (E) the terms and conditions of the order which result in the transaction, as communicated to the member and persons associated with the member.

[316]  See In the Matter of the Application of E.F. Hutton & Co., Exchange Act Release No. 25887 (July 6, 1988); Opper v. Hancock, 250 F. Supp. 688, 674-675 (S.D.N.Y.), aff'd 367 F.2d 157 (2d Cir. 1966); NASD Rule 2320(e).

[317]  See, e.g., Grandon v. Merrill Lynch & Co., 147 F.3d 184, 189-90 (2d Cir. 1998).

[318]  The antifraud provisions of the Exchange Act prohibit misstatements or misleading omissions of material facts, and fraudulent or manipulative acts and practices, in connection with the purchase or sale of securities. Exchange Act Sections 10(b) and 15(c). See also Exchange Act Section 9(a). Broker-dealers may also be held liable under Securities Act Section 17(a) if "in the offer or sale" of any securities, the broker-dealer (1) employs any device, scheme, or artifice to defraud, (2) obtains money or property by means of any untrue statement of a material fact or any omission to state a material fact, or (3) engages in any practice which operates as a fraud or deceit upon the purchaser. Violations of clauses (2) or (3) do not require proof of scienter. See Aaron v. S.E.C., 446 U.S. 680 (1980).

[319]  Generally, with respect to FINRA rules, "communications with the public" include: (1) advertisements (i.e.. any material, other than an independently prepared reprint and institutional sales material, that is published, or used in any electronic or other public media, including any website, newspaper, magazine or other periodical, radio, television, telephone or tape recording, videotape display, signs or billboards, motion pictures, or telephone directories (other than routine listings)); (2) sales literature (i.e., any written or electronic communication, other than an advertisement, independently prepared reprint, institutional sales material and correspondence, that is generally distributed or made generally available to customers or the public, including circulars, research reports, performance reports or summaries, form letters, telemarketing scripts, seminar texts, reprints (that are not independently prepared reprints) or excerpts of any other advertisement, sales literature or published article, and press releases concerning a member's products or services; (3) correspondence (i.e., any written letter or electronic mail message and any market letter distributed by a member to: (A) one or more of its existing retail customers; and (B) fewer than 25 prospective retail customers within any 30 calendar-day period); (4) institutional sales material (i.e., any communication that is distributed or made available only to institutional investors); (5) public appearances (i.e., participation in a seminar, forum (including an interactive electronic forum), radio or television interview, or other public appearance or public speaking activity; and (6) independently prepared reprints (generally, any reprint or excerpt of any article

and specifically require broker-dealer communications to be based on principles of fair dealing and good faith and to be fair and balanced.[320]  For example, pursuant to FINRA rules, communications with the public must include material facts and qualifications, must not exaggerate or include false or misleading statements, must not predict or project performance, imply that past performance will recur, or make exaggerated or unwarranted claims, opinions or forecasts.[321]  FINRA rules also establish disclosure requirements for advertisements and sales literature.[322]

In certain circumstances, FINRA rules require that communications with the public be approved by a registered principal of the broker-dealer before distribution to the public.  Generally, a registered principal must approve each advertisement, item of sales literature and independently prepared reprint prior to the earlier of its use or filing with FINRA.[323]

Moreover, FINRA rules require that certain broker-dealer communications with the public must be filed with FINRA for approval.[324]  Broker-dealers are generally required to obtain FINRA pre-approval for advertisements for their first year of advertising.[325]  Additionally, FINRA must preapprove certain broker-dealer communications with the public if they relate to: (1) registered investment companies (including mutual funds, variable contracts, continuously offered closed-end funds and unit investment trusts) that include or incorporate performance rankings or performance comparisons; (2) collateralized mortgage obligations; (3) security futures; or (4) bond mutual funds that include bond mutual fund volatility ratings.[326]  Further, if after reviewing a member's advertising or sales literature FINRA determines that the member has departed from the standards of Rule 2210, FINRA may require the member to file all, or a portion of its,  advertising or sales literature with FINRA for a period of time to be determined by FINRA.[327]

---

issued by a publisher and any report concerning an investment company registered under the Investment Company Act, subject to certain conditions).  NASD Rule 2210(a).

[320]    NASD Rule 2210(d)(1)(A).

[321]    See NASD Rule 2210(d)(1).

[322]    NASD Rule 2210(d)(2).

[323]    NASD Rule 2210(b)(1)(A).

[324]    NASD Rule 2210(c)(8) exempts from the rule's filing requirements and spot-check procedures discussed herein institutional sales material (i.e., any communication that is distributed or made available only to institutional investors).

[325]    See NASD Rule 2210(c)(5)(A).

[326]    NASD Rule 2210(c)(4).

[327]    See NASD Rule 2210(c)(5)(B).

App 333

Other communications, while not subject to FINRA preapproval, must be filed with FINRA. Specifically, within 10 business days of first use or publication, a broker-dealer generally must file the following with FINRA: (1) advertisements and sales literature concerning registered investment companies (including mutual funds, variable contracts, continuously offered closed-end funds, and unit investment trusts); (2) advertisements and sales literature concerning public direct participation programs; (3) advertisements concerning government securities; and (4) any template for written reports produced by, or advertisements and sales literature concerning, an investment analysis tool.[328] Furthermore, FINRA may subject a member's written and electronic communications with the public to a spot-check procedure.[329]

In 2008, FINRA reviewed more than 99,000 communications, including through spot checks, and completed 476 investigations involving 2,378 separate communications.[330]

Pursuant to Exchange Act rules, all communications with the public must be maintained in the broker-dealer's records.[331]

Additional Substantive Requirements

Broker-dealers are also subject to a variety of additional requirements under the federal securities laws and SRO rules that enhance the business conduct obligations discussed above. The following is a brief overview of some of these requirements.

### Books and Records

Commission and SRO books and records rules help to ensure that regulators can access information so that examiners can evaluate the financial and operational condition of the firm, including examining the broker-dealer for compliance with financial responsibility, sales practice and other obligations. Exchange Act Section 17(a)(1) requires registered broker-dealers to make and keep for prescribed periods such records as the Commission deems "necessary or appropriate in the public interest, for the protection of investors." The books and records requirements for broker-dealers are comprehensive.

Exchange Act Rules 17a-3 and 17a-4 specify minimum requirements with respect to the records that broker-dealers must make, and how long those records and other documents must be kept. Specifically, Exchange Act Rule 17a-3 delineates the minimum

---

[328] NASD Rule 2210(c)(2).

[329] See NASD Rule 2210(c)(7).

[330] See Rick Ketchum, Chairman & Chief Executive Officer, FINRA, Testimony Before the Committee on Financial Services U.S. House of Representatives (Oct. 6, 2009), available at: http://www.finra.org/Newsroom/Speeches/Ketchum/P120108. See also FINRA Statistics, available at http://www.finra.org/Newsroom/Statistics/index.htm.

[331] Exchange Act Rule 17a-4(b)(4).

books and records a broker-dealer should maintain, including approximately 22 specific types of records.  For example, Rule 17a-3 requires broker-dealers to make and keep current customer account records, copies of customer confirmations and records of customer complaints.

Exchange Act Rule 17a-4 specifies the manner in which the records required to be made under Rule 17a-3 must be maintained, and also identifies additional records that must be maintained for prescribed time periods.  For example, Rule 17a-4 requires a broker-dealer to maintain all communications received and copies of all communications sent that relate to the broker-dealer's "business as such" for three years (the first two years in an easily accessible place), and certain other records must be retained for longer periods.

### Financial Responsibility

Broker-dealers must meet certain financial responsibility requirements, including maintaining minimum amounts of liquid assets ("net capital"); safeguarding customer funds and securities held by the broker as required by the "customer protection rule"; complying with customer margin requirements; filing periodic reports, including quarterly and annual financial statements; notifying the Commission and the appropriate SRO of operational or financial difficulties, and in some cases filing reports regarding those problems; and maintaining certain books and records.[332]  The principal purposes of the broker-dealer net capital rule are to protect customers and other market participants from broker-dealer failures and to enable those firms that fall below the minimum net capital requirements to liquidate in an orderly fashion without the need for a formal proceeding or financial assistance from SIPC.  The minimum capital requirement changes depending on the nature and amount of business conducted by the broker-dealer.  If a broker-dealer falls below its minimum net capital requirement, it must immediately cease conducting a securities business.  The vast majority of customer accounts are held by broker-dealers with capital in excess of $100 million, and in some cases, several billion dollars.  As noted above, broker-dealers (with few exceptions) are also required to be members of SIPC which protects their customers from loss of their cash and securities up to specified limits if the broker-dealer becomes insolvent.[333]  Generally, all broker-

---

[332]    See, e.g., Exchange Act Rules 15c3-1 (the "net capital rule") and 15c3-3 (the "customer protection rule"); Exchange Act Section 7(a) (prohibiting broker-dealers from, directly or indirectly, extending or maintaining credit or arranging for the extension or maintenance to or for any customer in contravention of the rules and regulations prescribed by the Board of Governors of the Federal Reserve System ("FRB") and without collateral or on any collateral other than in accordance with the rules promulgated by the FRB); 12 CFR 220.1–220.12 (FRB's Regulation T); Incorporated Rule NYSE Rule 431 (Margin Requirements);  NASD Rule 2520 ("Margin Requirements"); Exchange Act Rules 17a-3, 17a-4, 17a-5, 17a-11, and 17a-13.

[333]    The SIPC trustee will first return to customers securities registered in a customer's name.  The broker-dealer's remaining customer assets are then divided on a pro rata basis with funds shared in proportion to the size of each customer's claim.  If sufficient funds are not available in the broker-dealer's customer accounts to satisfy claims within these limits, the reserve funds of SIPC are used to supplement the distribution, up to a ceiling of $500,000 per customer, including a maximum of $250,000 for cash claims.  SIPA does not protect against market losses in the value of securities.

dealers that are required to do business with the public are also required to obtain a fidelity bond from a reputable insurance company.[334]

*Supervision and Compliance*

The Exchange Act authorizes the Commission to sanction a broker-dealer or any associated person that fails to reasonably supervise another person subject to the firm's or the person's supervision that commits a violation of the federal securities laws.[335] The Exchange Act provides an affirmative defense against a charge of failure to supervise where reasonable procedures and systems for applying the procedures have been established and effectively implemented without reason to believe those procedures and systems are not being complied with.[336] The Commission's policy regarding failure to supervise is well-established and emphasizes that it is the responsibility of broker-dealers and their supervisory personnel to supervise their employees.[337] Failure to supervise liability is a critical component of the federal regulatory scheme for broker-dealers.[338]

Generally, broker-dealers must establish policies and procedures (and systems for implementing and monitoring compliance with such procedures) that are reasonably designed to prevent and detect violations of the federal securities laws and regulations, as well as applicable SRO rules.[339] However, establishing policies and procedures alone is not sufficient to discharge supervisory responsibility.[340] It is also necessary to implement measures to monitor compliance with those policies and procedures.[341] Specifically, a

---

It protects the value of the securities held by the broker-dealer as of the time that a SIPC trustee is appointed

[334]    NASD Rule 3020, "Fidelity Bonds."

[335]    Exchange Act Sections 15(b)(4)(E) and (b)(6)(A).

[336]    Exchange Act Sections 15(b)(4)(E) and (b)(6)(A).

[337]    See In the Matter of John H. Gutfreund, et al., Exchange Act Release No. 31554 (settled order) (report pursuant to Exchange Act Section 21(a)); In the Matter of Donald T. Sheldon, Exchange Act Release No. 31475 (Nov. 18, 1992) ("Release 31475").

[338]    Release 31475, supra note 337.

[339]    See, e.g., Exchange Act Sections 15(b)(4)(E) and (b)(6)(A); In the Matter of Bearcat, Inc., Exchange Act Release No. 49375 (Mar. 8, 2004); In re Kirkpatrick, Pettis, Smith, Polican Inc., et al., Exchange Act Release No. 48748 (Nov. 5, 2003) (settled order); NASD Rule 3010 and 3012; NASD Notice to Members 99-45, NASD Provides Guidance on Supervisory Responsibilities (June 1999); NASD Notice to Members 98-38, NASD Reminds Members of Supervisory and Inspection Obligations (May 1998); NASD Notice to Members 86-65, Compliance with the NASD Rules of Fair Practice (Sept. 1986). See also Incorporated NYSE Rule 342.

[340]    See In the Matter of John A. Carley, et al., Securities Act Release No. 8888 (Jan. 31, 2008).

[341]    See In the Matter of the Application of Stuart K. Patrick, Exchange Act Release No. 32314 (May 17, 1993); In the Matter of the Application of Richard F. Kresge, Exchange Act Release No. 55988 (June 29, 2007).

74

broker-dealer must have an appropriate system of follow-up and review if red flags are detected.

In addition to satisfying supervisory obligations mandated by the Exchange Act, NASD Rule 3010 requires firms to establish and maintain a supervisory system for their business activities and to supervise the activities of their registered representatives, principals and other associated persons for purposes of achieving compliance with applicable securities laws and NASD rules.[342] This supervisory system must include, among other things, the establishment, maintenance and enforcement of policies and procedures reasonably designed to achieve compliance with applicable securities laws and regulations and NASD rules.[343] Explicit delineation of the supervisory hierarchy, including the designation of a direct supervisor for each representative and the assignment of specific supervisory responsibilities to the supervisor, is also a required part of a broker-dealer's supervisory system.[344] The broker-dealer must also establish policies and procedures for identifying circumstances that warrant additional or heightened supervision (e.g., a registered representative with a disciplinary history in a remote office) and providing for such additional or heightened supervision.[345] NASD Rule 3010 further requires a firm to conduct at least an annual review of the businesses in which it engages, and also details mandatory inspection cycles that each member must have in place for its supervisory branch offices, non-supervisory branch offices, and unregistered locations.[346]

In addition, NASD Rule 3012 requires each member firm to (i) have a system of supervisory control policies and procedures to test and verify that the member's supervisory procedures are reasonably designed to achieve compliance with applicable securities laws and NASD rules, and (ii) where necessary, amend or create additional supervisory procedures.[347]

---

[342]   NASD Rule 3010 has not yet transferred to the FINRA rulebook.

[343]   NASD Rule 3010(a)(1) and (b)(1).

[344]   See NASD Rule 3010(a).

[345]   See NASD Rule 3010(b)(2) and (c)(3); NASD IM 3010-1 ("Standards for Reasonable Review"); 98-38; NASD Notice to Members 98-38, "NASD Reminds Members Of Supervisory And Inspection Obligations" (May 1998). See also NASD Rule 3012(a)(2)(C).

[346]   Specifically, firms must inspect: (1) at least annually, every office of supervisory jurisdiction and any branch office that supervises one or more non-branch locations; (2) at least every three years, every branch office that does not supervise one or more non-branch locations; and (3) on a regular periodic schedule, every non-branch location.  NASD Rule 3010(c).

[347]   NASD Rule 3012 also requires the designation and identification of one or more principals who shall establish, maintain, and enforce a system of such supervisory control policies and procedures.  At least annually, the designated principal(s) must submit to senior management a report detailing the member's system of supervisory controls, the summary of the test results and significant identified exceptions, and any additional or amended supervisory procedures created in response to the test results.

75

Furthermore, FINRA rules require broker-dealers to designate one or more principals to serve as CCO.[348] At least annually, the CCO must meet with the broker-dealer's chief executive officer ("CEO") to discuss the compliance program, and the CEO must certify that, among other things, the firm has in place processes to establish, maintain, review, modify and test policies and procedures reasonably designed to achieve compliance with applicable FINRA rules, MSRB rules and federal securities laws and regulations.[349]

- Outside Business Activities and Private Securities Transactions

FINRA rules also generally require supervision of outside business activities and private securities transactions by associated persons of members.[350] Specifically, FINRA Rule 3270 prohibits any registered person from being an employee, independent contractor, sole proprietor, officer, director or partner of another person, or being compensated, or having the reasonable expectation of compensation, from another person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he or she has provided prior written notice to the firm in the form specified by the firm.

FINRA Rule 3270 requires that, upon receipt of a written notice, a firm must consider whether the proposed activity will: (1) interfere with or otherwise compromise the registered person's responsibilities to the firm and/or the firm's customers or (2) be viewed by customers or the public as part of the firm's business based upon, among other factors, the nature of the proposed activity and the manner in which it will be offered. Additionally, based on the firm's review of such factors, the firm must evaluate the advisability of imposing specific conditions or limitations on a registered person's outside business activity, including where circumstances warrant, prohibiting the activity.[351] A firm also must evaluate the proposed activity to determine whether the activity properly is characterized as an outside business activity or whether it should be treated as an outside securities activity subject to the requirements of NASD Rule 3040.[352]

NASD Rule 3040 requires an associated person to provide notice of participation in private securities transactions to the member firms with which he is associated. If the

---

[348] FINRA Rule 3130(a).

[349] See FINRA Rule 3130(b) and (c).

[350] See FINRA Rule 3270; NASD Rule 3040. In addition, private securities transactions of an associated person may be subject to an analysis under Exchange Act Section 10(b) and Rule 10b-5, as well as the broker-dealer supervisory provisions of Section 15(f) and Section 15(b)(4)(E), and other relevant statutory or regulatory provisions.

[351] FINRA Rule 3270.

[352] FINRA Rule 3270.

76

App 338

associated person has received or may receive selling compensation for that transaction, the member firm may approve or disapprove the associated person's participation in the transaction.[353]  It has long been established that NASD Rule 3040 encompasses investment advisory activity to the extent the associated person participates in the execution of a securities transaction.[354]  For example, according to FINRA, preparation of a financial plan away from a firm would be an outside business activity subject to FINRA Rule 3270, and not a private securities transaction subject to NASD Rule 3040.[355]

*Employee Competency and Regulatory Standards*

As part of the broker-dealer registration process, associated persons of an applicant who effect or participate in effecting securities transactions must satisfy certain qualification requirements set forth in FINRA rules, which include passing one or more examinations administered by FINRA to demonstrate competence in the areas in which they will work.[356]

Pursuant to FINRA rules, registered persons are also required to comply with continuing education requirements.[357]  The continuing education program consists of two parts—a regulatory element and a firm element—that have been approved by the SEC and that focus on current compliance, regulatory, ethical and sales-practice standards.[358]  FINRA administers the industry-wide regulatory element of the program in the second year of registration and every three years thereafter.[359]  Furthermore, each broker-dealer is required to implement an ongoing in-house education program to keep employees up to date on job and product-related subjects.[360]

Individuals who have engaged in specified "bad acts" are subject to a "statutory disqualification" and must undergo a regulatory review before being permitted to become associated with a broker-dealer or being granted membership in an SRO. [361]  This

---

[353]    NASD Rule 3040(c).

[354]    See NASD Notice to Members 94-44, Board Approves Clarification On Applicability Of Article III, Section 40 Of Rules Of Fair Practice To Investment Advisory Activities Of Registered Representatives.

[355]    See NASD Notice to Members 96-33, NASD Clarifies Rules Governing RR/IAs.

[356]    See generally NASD Rule 1000 Series. See also Exchange Act Section 15A(g)(3)(B)(i).

[357]    NASD 1120. See also Exchange Act Section 15A(g)(3)(B)(i).

[358]    NASD Rule 1120.

[359]    NASD Rule 1120(a)(1).

[360]    NASD Rule 1120(b).

[361]    See Exchange Act Section 3(a)(39).  A wide range of disciplinary events subjects a person to statutory disqualification, including convictions for any felony or certain enumerated misdemeanors within the last ten years; temporary or permanent injunctions from violating the

App 339

process, which encompasses reviews first by the appropriate SRO and subsequently by the Commission,[362] is designed to subject individuals who present a higher risk of doing harm to investors to heightened scrutiny prior to allowing them to enter the business and to ensure that such individuals are subject to appropriate safeguards (e.g., enhanced supervision or limitations on the scope of their activities) if they are permitted to enter the business.

### *Customer Complaints and Disclosure of Disciplinary Information*

Broker-dealers must maintain (1) a record for each written customer complaint received regarding an associated person, including the disposition of the complaint, and (2) a record indicating that each customer has been provided with a notice with the address and telephone number to which complaints may be directed.[363]    SRO rules require broker-dealers to document and respond to all customer complaints.[364]    Pursuant to SRO rules, broker-dealers also must report to the SROs certain specified events related to customer complaints, as well as statistical and summary information on customer complaints.[365] The information reported by broker-dealers provides the SROs with important regulatory information that assists with the timely identification of potential sales practice and operational problems.

In addition, Forms BD and U4, are also used to disclose certain disciplinary and complaint information regarding the applicant.[366]  This information is made publicly available through FINRA's BrokerCheck system.

---

securities laws issued by a court of competent jurisdiction; or bars from association with a broker-dealer by the Commission, the CFTC, or an SRO.

[362]    Those persons who are subject to statutory disqualification, but wish to enter or re-enter the industry, must apply to the SRO under procedures adopted pursuant to the Exchange Act.  If the SRO determines that it would be in the public interest to permit the individual to work as proposed with one of its members, it formally notifies the Commission.  See Exchange Act Sections 6(c)(2) and 15A(g)(2) and Exchange Act Rule 19h-1.   The Commission then has the opportunity to review the SRO's determination, and if necessary, to direct that the SRO not permit the proposed association.

[363]    Exchange Act Rule 17a-3(a)(18).

[364]    See e.g., Incorporated NYSE Rule 401A.

[365]    See NASD Rule 3070; Incorporated NYSE Rule 351(d).  On November 5, 2010, the Commission, through delegated authority, approved changes to adopt NASD Rule 3070 as FINRA Rule 4530 (Reporting Requirements) in the consolidated FINRA rulebook, subject to certain amendments, and to delete paragraphs (a) through (d) of Incorporated NYSE Rule 351 (Reporting Requirements) and Incorporated NYSE Rules 351.10 and 351.13.  See Exchange Act Release No. 34–63260 (Nov. 5, 2010).

[366]    Broker-dealers and registered representatives must keep their respective Form BD or Form U4 current by amending it promptly when changes occur.  See Form BD Instructions; Form U4 Instructions.

For example, Form BD requires the applicant to disclose whether it or any of its control affiliates has been subject to criminal prosecutions, regulatory actions, or civil actions in connection with any investment-related activity. Certain of these disciplinary events must be disclosed regardless of when they occurred,[367] whereas others are required to be disclosed if they occurred within the previous ten years.[368] The applicant must disclose any of the disciplinary events specified on Form BD.[369]

Form U4 requires disclosure of disciplinary actions[370] and other sanctions that are deemed "statutory disqualifications."[371] These disclosures must be made regardless of when they have occurred.[372] Form U4 also requires disclosure of certain customer-initiated complaints, arbitration, and civil litigation claims.[373] For example, with respect to customer complaints, Form U4 requires disclosure of settled customer complaints involving sales practice violations (subject to a minimum settlement amount), customer complaints involving sales practice violations made within the past 24 months (subject to a minimum on damages sought), and complaints alleging involvement in forgery, theft,

---

[367]    Form BD provides a comprehensive listing of the disciplinary events that must be disclosed regardless of when they occurred. See Items 11A through 11H of Form BD. Among other things, such events generally include a finding by: (1) a regulatory authority or an SRO that the applicant or control affiliate has made a false statement or omission; or (2) a regulatory authority, an SRO or a court that the applicant or control affiliate was involved in a violation of investment-related statutes, regulations, or SRO rules, as applicable. See Items 11C through 11E, and 11H of Form BD. "Involved" is defined as "doing an act or aiding, abetting, counseling, commanding, inducing, conspiring with or failing reasonably to supervise another in doing an act." See Form BD, "Explanation of Terms."

[368]    Form BD provides a comprehensive listing of such events. See Items 11A through 11H of Form BD. This listing generally includes whether the applicant or a control affiliate have been convicted of, pled guilty or *nolo contendere* to, or charged with any felony or to a misdemeanor involving investments or an investment-related business, any fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or conspiracy to commit any of these misdemeanors. See Items 11B of Form BD.

[369]    Cf. Item 9 of Part 2A of Form ADV (explaining four factors that an adviser should consider in determining whether a disciplinary event is material); Advisers Act Rule 204-2(a)(14)(iii) (Requiring an investment adviser to maintain as part of its books and records a memorandum describing any legal or disciplinary event listed in Item 9 of Part 2A and presumed to be material, involving the investment adviser or any of its supervised persons, and that is not disclosed. The memorandum must explain the investment adviser's determination that the presumption of materiality is overcome, and must discuss the factors described in Item 9 of Part 2A of Form ADV.)

[370]    Generally, the disciplinary actions that must be disclosed on Form U4 mirror those required to be disclosed by a broker-dealer applicant on Form BD. See Item 14A through Item 14H of Form U4.

[371]    Exchange Act Section 3(a)(39) defines a "statutory disqualification."

[372]    See Item 14A through Item 14J of Form U4.

[373]    See Item 14I of Form U4.

misappropriation or conversion of funds or securities.[374]  Moreover, the disclosures relating to arbitration and civil litigation claims include pending, resolved and settled claims (subject to applicable minimum thresholds).[375]  Certain of these customer complaints and claims must be disclosed regardless of when they occurred, whereas others need only be disclosed if they occurred within the previous 24 months.[376]

*Remedies*

- Arbitration and Mediation

SRO rules require members and their associated persons to arbitrate any eligible dispute upon demand by a customer, even in the absence of a pre-dispute arbitration agreement.[377]  SRO rules do not require customers to arbitrate these disputes, but as a practical matter, most investors who have brokerage accounts have signed an agreement, as a condition to opening the account, which requires them to resolve any disputes with their broker through arbitration rather than the courts.[378]  If no arbitration agreement is in place, and the customer does not elect arbitration, firms are subject to redress in court by default.

The Commission is authorized to oversee the arbitration programs of the SROs, including FINRA, through inspections of the SRO facilities[379] and review of SRO

---

[374]     See Item 14I of Form U4.

[375]     See Item 14I of Form U4.

[376]     See Item 14A through Item 14I of Form U4.

[377]     See, e.g., Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes.

[378]     In 1987, the U.S. Supreme Court decided Shearson/American Express, Inc. v. McMahon, 482 U.S. 222 (1987), which determined that customers who sign pre-dispute arbitration agreements with their brokers may be compelled to arbitrate claims arising under the Exchange Act.  The Supreme Court has also decided that pre-dispute arbitration agreements are binding with respect to investors' claims under the Securities Act of 1933.  Rodriquez de Quijas v. Shearson/American Express, 490 U.S. 477 (1989).  The Supreme Court upheld the primacy of arbitration agreements with respect to state law claims in Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213 (1985).  The standard arbitration agreement covers all disputes arising under federal law, state law, and SRO rules.

Dodd-Frank Act Section 921 gives the Commission discretionary authority to limit agreements providing for mandatory arbitration of any future dispute between the parties.  The authority covers broker-dealers, municipal securities dealers, and investment advisers.

[379]     The staff conducts inspections to identify areas where procedures should be strengthened, and to encourage remedial steps either through changes in administration or through the development of rule changes.  The staff also evaluates whether the SROs are following and enforcing applicable rules.  Typically, the staff briefs the Commission on its findings and is authorized by the Commission to send to the SROs the staff's views contained in the inspection reports.  See Appendix A, Section I.B for further discussion of the Commission's oversight of FINRA.

arbitration rules pursuant to Exchange Act Section 19. [380]  Exchange Act 15(o), added by the Dodd-Frank Act, authorizes the Commission to prohibit or restrict mandatory pre-dispute arbitration provision in customer agreements, but to date the Commission has not proposed or adopted such a rule. [381]

In arbitration, customers may pursue alleged violations of Exchange Act Section 10(b) and Rule 10b-5 with respect to disclosure, customer communications (including advertisements), or alleged suitability violations, as well as alleged violations of other SRO rules.  Customers may also assert a claim that does not constitute a private right of action under the federal securities laws or SRO rules.  Many claimants allege violations of SRO rules, either as a separate cause of action or as part of another cause of action such as negligence, breach of fiduciary duty, or failure to supervise. [382]  By way of example, in 2009, 7,137 arbitration cases were filed with FINRA and 4,571 cases were closed. [383]  The FINRA arbitration cases served in 2009 involved the following types of controversies, in order of frequency: breach of fiduciary duty (4,206); misrepresentation (3,408); negligence (3,405); breach of contract (2,802); failure to supervise (2,691); unsuitability (2,473); omission of facts (2,453); unauthorized trading (478); churning (306); and margin calls (128). [384]

Pursuant to FINRA rules, broker-dealers are generally required to pay monetary awards within 30 days of receipt  of the award. [385]  FINRA may suspend or cancel the membership of any member, or suspend any associated or formerly associated person from association with any member, for failure to comply with an arbitration award or

---

[380]  Exchange Act Section 19(b) requires the Commission to review and approve most SRO rules – including arbitration rules – before they can be put into effect.  See Appendix A for further discussion of the Commission's oversight of FINRA's rulemaking.

[381]  See Exchange Act 15(o), providing that "[t]he Commission, by rule, may prohibit, or impose conditions or limitations on the use of, agreements that require customers or clients of any broker, dealer, or municipal securities dealer to arbitrate any future dispute between them arising under the Federal securities laws, the rules and regulations thereunder, or the rules of a self-regulatory organization if it finds that such prohibition, imposition of conditions, or limitations are in the public interest and for the protection of investors.''

[382]  Arbitration panels are not bound by precedent, and they are not required to write or publish opinions.  See FINRA Rule 12904(g); Exchange Act Release No. 59358, n. 13 (February 4, 2009).  See also Pace Law School Investor Rights Clinic, Investor's Guide to Securities Industry Disputes at 11, 23 available at: http://www.finra.org/web/groups/foundation/@foundation/documents/foundation/p119054.pdf.

[383]  See FINRA Dispute Resolution Statistics, available at: http://www.finra.org/ArbitrationMediation/AboutFINRADR/Statistics/index.htm.

[384]  See FINRA Dispute Resolution Statistics, available at: http://www.finra.org/ArbitrationMediation/AboutFINRADR/Statistics/index.htm.  Note that each case filed can be coded to contain up to four controversy types. Therefore, the numbers reflected in this listing cannot be totaled to determine the number of cases served in a year.  Id.

[385]  See FINRA Rule 12904(j).

App 343

with a written and executed settlement agreement obtained in connection with an arbitration or mediation.[386]  Moreover, failure to honor an award, or comply with a written and executed settlement agreement, obtained in connection with an arbitration proceeding may be deemed inconsistent with just and equitable principles of trade and thus expose the broker-dealer to sanctions for violating FINRA Rule 2010.[387]

Customers may also pursue the resolution of a securities dispute through mediation.  Pursuant to FINRA rules, mediation is conducted on a voluntary basis and is not binding on the parties.[388]  Between January and October 2010, 732 FINRA mediation cases were in agreement and 750 cases were closed.[389]

The Commission's oversight of securities arbitration is directed at ensuring that the process is, among other things, designed to promote just and equitable principles of trade and to protect investors and the public interest.[390]

- Other Customer Remedies

If there is no valid pre-dispute arbitration agreement,[391] customers may bring actions against broker-dealers in court in connection with disclosure, customer communications (including advertisements), or suitability violations under Exchange Act Section 10(b) and Rule 10b-5.  Courts have consistently recognized an implied private right of action under these provisions.[392]  Customers also may bring actions against broker-dealers for claims arising under state law, including those arising from breaches of fiduciary duties under state law.[393]

---

[386]     See NASD By-Laws, Art. VI, Sec. 3(b); NASD By-Laws, Art. V., Sec. 4(b); NASD Notice to Members 04-57, "NASD Extends Jurisdiction to Suspend Formerly Associated Persons Who Fail to Pay Arbitration Awards" (Aug. 2004).

[387]     See FINRA IM-12000.

[388]     See FINRA Manual, Code of Mediation Procedure, Rule 14000 et seq.

[389]     See FINRA Dispute Resolution Statistics, available at:
http://www.finra.org/ArbitrationMediation/AboutFINRADR/Statistics/index.htm.

[390]     See Exchange Act Section 6(b)(5) (with respect to exchange rules); Exchange Act Section 15A(b)(6) (with respect to securities association rules).

[391]     Most investors who have brokerage accounts have signed a pre-dispute arbitration agreement as a condition to opening the account.  See supra note 378 and accompanying text.

[392]     See, e.g., Ernst, supra note 186; Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 744 (1975); Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co., 404 U.S. 6, 13, n. 9 (1971).

[393]     See supra note 245.

82

In addition, Exchange Act Sections 9(e), 16(b), and 18 provide express civil liability for manipulation of securities registered on exchanges, short-term insider trading and false filings.

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), which was enacted to address perceived abuses in the securities litigation process, among other things, has imposed enhanced pleading requirements for fraud actions under the securities laws.[394]

Courts are divided over whether SRO rules give rise to private rights of action in court.[395]  A violation of an SRO rule may, however, be relevant in a dispute in determining whether a broker-dealer acted reasonably and in accord with the prevailing standards of the industry,[396] or whether the broker has committed fraud.[397]  In addition, the violation of an SRO rule may be used as evidence of liability in an action claiming under negligence or breach of fiduciary duty.[398]

Customers also may have contract rescission rights in certain circumstances. Exchange Act Section 29(b) provides, in pertinent part, that every contract made in violation of the Exchange Act or of any rule or regulation adopted under the Exchange Act (with certain exceptions) shall be void.

The Securities Act of 1933 ("Securities Act") also provides a venue for civil liability and rescission rights.  For example, pursuant to Securities Act Section 12(a)(1) any  person that "[o]ffers or sells a security in violation of Section 5 (i.e., offers or sells unregistered securities without an available exemption) is liable to his or her purchaser for rescission or damages (subject to the loss causation provisions found in Section 12(b)). Similarly, Securities Act Section 12(a)(2) generally provides that any person who offers or sells a security, by "means of a prospectus or oral communication" that includes a material misstatement or omission, is liable to the purchaser for rescission or damages (subject to the loss causation provisions found in Securities Act Section 12(b)).

---

[394]    Public Law No: 104-67, 109 Stat. 737.

[395]    See, e.g., Hempel v. Blunt, Ellis & Loewi, Inc., 123 F.R.D. 313, 318-319 (E.D. Wis. 1988) (holding that, where the rule was designed for the direct protection of investors, and conduct was "tantamount to fraud," SRO suitability rules gave rise to private right of action).  But see Gilman v. Shearson/American Express, Inc., 577 F. Supp. 492 (D.N.H. 1983) (denying private right of action under NYSE and NASD suitability rules).

[396]    See Miley v. Oppenheimer & Co., 637 F.2d 318, 333 (5th Cir.) reh'g denied, 642 F.2d 1210 (5th Cir. 1981).

[397]    See Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 200 (3d Cir. 1990).

[398]    See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng, 697 F. Supp. 1224, 1227 (D.D.C. 1988); Rupert v. Clayton Brokerage Co., 737 P.2d 1106, 1110-1112 (Colo. 1987).

### C.    State and Other Regulation of Investment Advisers and Broker-Dealers

In addition to the federal securities laws and SRO rules, state and other regulation may also apply to the provision of investment advice and recommendations about securities to retail customers.[399]

### 1.    Investment Advisers

#### a)    Overview of State Regulation Intended to Protect Clients

The states regulate the activities of investment advisers in a number of ways. First, as previously discussed, under Advisers Act Section 203A, most small advisers are prohibited from registering with the Commission and are registered and regulated by state regulators.[400]  Second, states may impose registration, licensing or qualification requirements on "investment adviser representatives" who have a place of business within the state.[401]  States also retain authority over Commission-registered investment advisers under state investment adviser statutes to investigate and bring enforcement actions with respect to fraud or deceit against an investment adviser and an investment adviser's associated persons, which is discussed in more detail below.  Finally, as described further below, the states are responsible for examining state-registered investment advisers and their investment adviser representatives.[402]

State Registration and Regulation of Investment Advisers

As stated previously, Advisers Act Section 203A prohibits investment advisers with less than $25 million of assets under management from registering under the Advisers Act.  The Dodd-Frank Act raised this to $100 million as of July 21, 2011.  The Dodd-Frank Act also amended Section 203A to provide that investment advisers must also be subject to inspection and examination by their home state).[403]

---

[399]    The sections relating to state regulation provide a general overview of investment adviser and broker-dealer regulation, as applicable, in the 50 U.S. states and the District of Columbia (each a "state").  It generally does not cover the laws and regulations of Guam, Puerto Rico, or the U.S. Virgin Islands.

[400]    See Section II.A.1, supra.

[401]    States may also require investment advisers to make notice filings of documents filed with the Commission, and to pay filing, registration, and licensing fees.  See NSMIA Section 307(a).

[402]    State examinations are discussed in Appendix A, infra.

[403]    States may not require an investment adviser to register if it (i) does not have a place of business in the state and (ii) has fewer than six clients who are state residents during the past twelve months.  See Advisers Act Section 222(d).  Section 203A(b)(1) also prohibits a state from imposing registration or licensing requirements on an investment adviser that is excluded from the definition of investment adviser by Section 202(a)(11).  Currently, Wyoming does not have a statutory requirement for investment adviser registration.

The state registration process[404] is substantially similar to the federal registration process, as states require investment advisers to complete Form ADV (Parts 1 and 2) and file it electronically through the IARD system.[405]  Some states also require investment advisers to file additional documents, such as sample client agreements, articles of incorporation or other similar organizational documents, proof of errors and omission coverage, and information about the advisers' financial condition.[406]

States generally impose requirements upon state-registered investment advisers that are similar to those under the Advisers Act, although the requirements are not uniform among the states.  There are some instances in which state regulation differs from federal regulation.  For example, states generally require state-registered investment advisers to: be bonded if they have custody of or discretion over client funds or securities;[407] maintain minimum net capital;[408] and file financial information with the

---

[404]    While an analysis of each state's registration requirements is beyond the scope of this Report, states exempt an investment adviser from registration if the adviser did not have a place of business in the state during the last twelve months and does not have more than five clients that are resident in that state, as required by Advisers Act Section 222(d).  Most states also exempt an investment adviser from registering if its only clients are financial institutions, such as investment companies as defined in the Investment Company Act, other investment advisers, broker-dealers, banks, trust companies, savings and loan associations, insurance companies, employee benefit plans with assets of not less than $1 million, and government agencies or instrumentalities, and other institutional investors that the state may define by rule or order.  See, e.g., Alabama (Ala. Code, Art. 1 §8-6-3), Alaska (Alaska Stat. §45.55.030 (c)), California (Cal. Corp. Code §25202(b)); Colorado (Col. Rev. Stat. §11-51-402); Connecticut (Conn. Gen. Stat. §36b-6(e)) (note, however, that the exemption does not apply to advisers who take part in wrap fee programs); Delaware (Del. Code Ann. Tit. 6; §7313(c)(2)); Indiana (Ind. Code §23-2-1-8(c)(2)). But see Texas (7 TAC §139.22) (exempting advisers to high net worth families from registration, where the advisers do not hold themselves out to the public as investment advisers).

[405]    See State Securities Regulators Report on Regulatory Effectiveness and Resources with Respect to Broker-Dealers and Investment Advisers (Sept. 24, 2010) ("NASAA Report") at 6 ("state regulators use the IARD to process Investment Advisers' registration/licenses").  As stated in Section II.C.1, the IARD was developed as part of a joint effort by the Commission, the states, and the NASD.

[406]    Id. at 7. See also NASAA Model Rule USA 2002 403(a) (2002). See, e.g., Arkansas (available at http://www.securities.arkansas.gov/page/354/broker-dealer-investment-advisor) and Nebraska (available at http://www.ndbf.ne.gov/forms/iareg.pdf).  Maryland requires applicants to submit copies of all brochures and a sample copy of the adviser's advisory contract. See Md. Reg. Code tit. 02 §0.51(A)(3).

[407]    See NASAA Model Rule USA 2002 411(e)-1, Bonding Requirements for Investment Advisers. See, e.g., Maryland (Md. Corps. & Ass'ns Code Ann. 11-410(a)(3)); Massachusetts (Mass. Gen. L. ch 110A; § 202(d)).  Mass Regs. Code tit. 950, §12.205(a)(1) and Mass. Regs. Code tit. 950, §12.205(5)(b)); Oregon (Or. Rev. Stat. §59.175(4)); Or. Admin. R. 441-175-110(4)).  But see Nebraska (Neb. Rev. Stat. §8-1103(4)(b)(v) (no bonding requirements exist currently, although the state administrator may authorize such requirements).

[408]    See NASAA Model Rule USA 2002 411(a)-1, Minimum Financial Requirements for Investment Advisers (requiring investment advisers to maintain a minimum net worth ranging from $10,000 to $35,000, depending on whether the adviser has custody or discretionary authority over client

85

App 347

states.[409]  Some states may require an investment adviser or its supervisory or control individual (if the investment adviser is a firm) to pass an exam, which may be waived if the investment adviser holds a certain designation or has passed the exam within two years of its investment adviser registration application.[410]  Some states also have adopted rules specifically prohibiting investment advisers from engaging in certain conduct, such as recommending securities without a reasonable basis to believe that the recommendation is suitable for the client, excessive trading, borrowing money or securities from a client, or lending money to a client (subject to certain exceptions, such as when the client is a broker-dealer or a financial institution engaged in the business of loaning funds).[411]

*Regulation of Investment Adviser Representatives*

States generally impose registration, licensing, or qualification requirements on investment adviser representatives who have a place of business in the state, regardless of whether the investment adviser is registered with the Commission or with the states.[412]

---

funds or securities).  See, e.g., Maryland (MD. Corps. & Ass'ns Code Ann. §11-409(A)(2) and Md. Regs. Code tit. 02, §5.14); Massachusetts (Mass. Regs. Code. Tit. 950 §12.205(5)(a)(2); Nebraska (Nev. Rev. Stat. §8-1103(4)(b)(v); Neb. Admin. R. & Regs.7-008.01A and 7-008.01B). But see states where the statutes permit the state administrator to set a net capital requirement, but there are no current requirements, e.g. Maine (Me. Rev. Stat. Ann. tit. 32 § 10310(2)); Michigan (Mich. Comp. Laws §451.602(f)) and Minnesota (Minn. Stat. §80A.05(4)).

[409]  See NASAA Model Rule USA 2002 411(b)-1, Financial Reporting Requirements for Investment Advisers (requiring investment advisers with custody or discretionary authority to file audited or unaudited balance sheets, as the case may be, at the end of the investment adviser's most recent fiscal year).

[410]  See NASAA Model Rule USA 2002 412(e)-1, Examination Requirements (acceptable designations are: Certified Financial Planner awarded by the Certified Financial Planners Board of Standards; Chartered Financial Consultant or Masters of Science and Financial Services awarded by the American College, Bryn Mawr, Pennsylvania; Chartered Financial Analyst awarded by the Institute of Chartered Financial Analysts; Personal Financial Specialist awarded by the American Institute of Certified Public Accountants; or Chartered Investment Counsel awarded by the Investment Adviser Association).  See, e.g., Alabama (Ala. Code §8-6-3(f)(1) and Ala. Admin. Code R. 830-X-3-.08(4)(a) and (b)); Florida (Fla. Stat. §517.12(8); Fla. Admin. Code Ann. R. 3E-600.005(3); Fla. Admin. Code Ann. R. 3E-600.005(4); Fla. Admin. Code Ann. R. 3E-600-005(5)); Georgia (Ga. Code Ann. §10-5-3(e); Ga. Comp. R. & Regs. R. 590-4-8-.07); Illinois (815 Ill. Comp. Stat. §5/8(d)(9)); Ill. Admin. Code tit. 14, §130.842(c)); Oklahoma (Okla. Sec. Comm'n Admin. R-660:10-7-13(b); Pennsylvania (Pa. Stat. Ann. Tit. 70, § 1-303(c); 64 Pa. Code §303.032(a)); and Rhode Island (R.I. Gen. Laws §7-11-207(b)).

[411]  See NASAA Model Rule USA 2002 502(b), Prohibited Conduct in Providing Investment Advice. See, e.g., Colorado (Colo. R. 51-4.8(IA); Hawaii (Haw. Admin. R §16-39-4070); Iowa (Iowa State Reg. 191-50.38(502)); Kansas (Kan. Admin. Regs. 81-14-5); and Mississippi (MS ADC Sec'y of State Rule 62).

[412]  Advisers Act Rule 203A-3 defines an "investment adviser representative" of an investment adviser as a supervised person of the investment adviser (i) who has more than five clients who are natural persons (other than qualified clients, as that term is defined in Advisers Act Rule 205-(3)(d)(1)), and (ii) more than ten percent of whose clients are natural persons (other than qualified clients, as

86

In general, states that register and regulate investment adviser representatives require that they register on Form U4 and pay a fee.  Most states also require the investment adviser representative to pass the same exams or hold the same designations as they require for investment advisers.[413]

### b)     Other Federal and State Regulation Intended to Protect Advisory Clients

ERISA Regulation

Some investment advisers also may be regulated as fiduciaries under the Employee Retirement Income Security Act of 1974 ("ERISA").[414]  While the requirements of ERISA are beyond the scope of the Study, generally investment advisers

---

that term is defined in Advisers Act Rule 205-(3)(d)(1)). Rule 203A-3 also provides that, for purposes of defining an investment adviser representative, a supervised person is not an investment adviser representative if the supervised person (i) does not on a regular basis solicit, meet with, or otherwise communicate with clients of the investment adviser, or (ii) provides only impersonal investment advice, which means investment advisory services provided by means of written material or oral statements that do not purport to meet the objectives or needs of specific individuals or accounts.  The rule defines a "place of business" of an investment adviser representative as (i) an office at which the investment adviser representative regularly provides investment advisory services, solicits, meets with, or otherwise communicates with clients, and (ii) any other location that is held out to the general public as a location at which the investment adviser representative provides investment advisory services, solicits, meets with, or otherwise communicates with clients.

413     See NASAA Rule USA 2002 404(a), Application for Investment Adviser Representative Registration and NASAA Model Rule USA 2002 412(e)-1, Examination Requirements.  See, e.g., Alabama (Ala. Code §8-6-3(f)(1) and Ala. Admin. Code R. 830-X-3-.08(4)(a) and (b)); Florida (Fla. Stat. §517.12(8); Fla. Admin. Code Ann. R. 3E-600.005(3); Fla. Admin. Code Ann. R. 3E-600.005(4) and Fla. Admin. Code Ann. R. 3E-600-005(5)); Georgia (Ga. Code Ann. §10-5-3(e) and Ga. Comp. R. & Regs. R. 590-4-8-.07); Illinois (815 Ill. Comp. Stat. §5/8(d)(9) and Ill. Admin. Code tit. 14, §130.842(c)); Oklahoma (Okla. Sec. Comm'n Admin. R-660:10-7-13(b)); Pennsylvania (Pa. Stat. Ann. Tit. 70, §1-303(c) and 64 Pa. Code §303.032(a)); Rhode Island (R.I. Gen. Laws §7-11-207(b)).

414     Some commenters have expressed concerns that any changes to the investment adviser or broker-dealer standards of care may have an impact on ERISA-regulated plans.  See, e.g., UBS Letter, supra note 39 (stating that "because the law applicable to retirement accounts often restrict services and products that the fiduciary may provide, extending new standards outside the securities context could inadvertently prevent clients from accessing the services and products that they currently have in these accounts"); BOA Letter, supra note 17 ("We encourage the SEC to make clear that any new, harmonized standard of care does not necessarily implicate principal trading and other restrictions that may accompany certain types of fiduciaries (e.g., ERISA)"); and letter from Carl B. Wilkerson, Vice President & Chief Counsel, Securities & Litigation, American Council of Life Insurers, dated Aug. 30, 2010 ("ACLI Letter") ("Accordingly,  if any harmonized standard of care rules are promulgated, it is important that the SEC specifically establish that any such rules are not intended to confer fiduciary status on a [broker-dealer], [investment adviser] or their associated persons").   See Section IV infra, stating that the Study does not have any direct bearing on other persons who may be characterized as fiduciaries in other areas of the law, including ERISA fiduciaries or financial institutions such as banks and trust companies.

87

may be ERISA fiduciaries if they: exercise authority or control over the management or disposition of employee benefit plans that are covered by ERISA (a "plan"); provide investment advice for a fee with respect to plan assets, or have authority or responsibility to do so; or have discretionary responsibility or authority to administer a plan.[415]  In general, an ERISA fiduciary must act with the care, skill, prudence, and diligence under the circumstances then prevailing that a reasonably prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.[416]  ERISA requires, among other things, that a fiduciary must diversify a plan's investments so as minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.[417]  ERISA also prohibits a number of transactions, particular those involving conflicts of interest between the plan and certain parties in interest.[418]

Bank and Trust Company Regulation

Advisers Act Section 202(a)(11)(A) excludes banks and bank holding companies that do not advise investment companies from the definition of investment adviser. For purposes of this exclusion, a "bank" is defined in Advisers Act Section 202(a)(2) to include nationally chartered banks, federal savings associations, and members of the Federal Reserve System and state chartered banks if their activities are similar to those engaged in by national banks and if they are regulated by state or federal banking authorities.  Section 202(a)(2) also defines a "bank" as a trust company where the substantial portion of its business consists of receiving deposits or exercising fiduciary powers similar to those permitted to national banks under the authority of the Comptroller of the Currency, and which is supervised and examined by State or Federal authority having supervision over banks or savings associations, and which is not operated for the purpose of evading the provisions of the Advisers Act.[419]  To the extent

---

[415]    In addition to employee benefit plans, IRAs and Keoghs may be treated as benefit plans under the Internal Revenue Code and are therefore subject to similar requirements.  See Internal Revenue Code Section 4975(e).  The Department of Labor recently proposed a rule under ERISA that would broadly define the circumstances under which a person is considered to be a "fiduciary" for ERISA purposes by reason of giving investment advice to an employee benefit plan or a plan's participants.  See "Definition of the Term "Fiduciary," 75 Fed. Reg. 65,263 (proposed Oct. 22, 2010) (to be codified at 29 CFR pt. 2510).

[416]    ERISA Section 404(a).

[417]    Id.

[418]    ERISA Section 406 (note that the Department of Labor has issued a number of exemptions to certain of the prohibited transactions enumerated under the section.  For example, Prohibited Transaction Exemption 75-1, Part II, in general permits plans to engage in principal transactions involving securities with U.S. registered broker-dealers if certain conditions are satisfied.  The "qualified professional asset manager" exemption permits securities transactions between plans and parties in interest.).

[419]    Non-U.S. banks, credit unions and SIDs (discussed below) are not entitled to rely on the Section 202(a)(11)(A) exclusion.  For purposes of this exclusion, a "bank" is defined in Advisers Act Section 202(a)(2) to include nationally chartered banks, federal savings associations, and members

App 350

that banks and trust companies offer investment advisory services that may overlap with those of Commission- and state-registered investment advisers, there may be differences in the applicable regulation and standards of care.[420]

## 2.    Broker-Dealers

### a)    Overview of State Regulation Intended to Protect Retail Customers

The federal securities laws grant the Commission non-exclusive jurisdiction over securities broker-dealers.  Accordingly, and as noted in Section II.B.2 above, a broker-dealer generally must register with the Commission and an SRO,[421] and comply with all applicable state requirements, including registration requirements.  While state laws vary, all states require broker-dealers and their agents[422] to register with or be licensed by the

---

of the Federal Reserve System and state chartered banks if their activities are similar to those engaged in by national banks and if they are regulated by state or federal banking authorities.  A "bank holding company" eligible for this exclusion is generally defined in the Bank Holding Company Act of 1956 as a company that "controls" a bank or bank holding company (through direct or indirect ownership or power to vote 25 percent or more of a class of voting securities or through power to control the election of directors).  Banks or bank holding companies that advise registered investment companies must register as an investment adviser.  However, where the bank advises the investment company through a "separately identifiable department or division" (a "SID"), which is a unit supervised by officers designated by the bank's board to run the investment company advisory activities and which maintains separate records from the bank, only the SID is deemed to be an investment adviser and is required to register.  The staff has taken the position that the exclusion is generally not available to non-bank affiliates or subsidiaries of excluded banks or excluded bank holding companies (see, e.g., First Commerce Investors, Inc., SEC Staff No-Action Letter (Jan. 31, 1991); New England Merchants National Bank, SEC Staff No-Action Letter (Dec. 12, 1989); New England Merchant National Bank, SEC Staff No-Action Letter (June 1, 1974)); or foreign banks (see Kingland Capital, SEC Staff No-Action Letter (Mar. 29, 1991)).

[420]    12 CFR Part 9 sets forth the standards that apply to the fiduciary activities of national banks. This part applies to all national banks and federal branches of foreign banks that act in a fiduciary capacity.  While Part 9 reflects common fiduciary principles and its provisions are not specific to a particular state law or a type of fiduciary instrument, certain parts are linked to other fiduciary laws. See also "*Personal Fiduciary Services, Comptroller's Handbook*" at http://www.occ.gov/static/publications/handbook/Pfsfinal.pdf.

[421]    A broker-dealer that conducts all of its business in one state does not have to register with the Commission. See Exchange Act Section 15(a)(1).  The Commission staff interprets this intrastate exception from registration narrowly.  See Guide to Broker-Dealer Registration, supra note 25.  To qualify, all aspects of all transactions must be done within the borders of one state.  Id.  This means that, without Commission registration, a broker-dealer cannot participate in any transaction executed on a national securities exchange or Nasdaq.  Id.  Also, information posted on the Internet that is accessible by persons in another state would be considered an interstate offer of securities or investment services that would require Federal broker-dealer registration.  Id.  An intrastate broker-dealer remains subject to the registration requirements of the state in which it conducts business.  Id.

[422]    The Uniform Securities Act defines an "agent" as "any person other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect purchases of sales of

89

securities regulators of the states in which they conduct their business.[423]  As noted above, most states allow broker-dealer registration by the filing of Form BD with CRD,[424] and agent registration is typically accomplished by the filing of the Form U4 with CRD.[425]  Although filing of a Form BD or U4 with CRD may satisfy a state's filing requirement, it does not necessarily result in automatic registration in all states.[426]  Some states may also require applicants to file additional documents, including financial statements and statement of prior sales activities.[427]  In addition, many states review a filing before registration may become effective.[428]

The Exchange Act includes two limited exemptions from the state registration requirements for associated persons.  Specifically, Exchange Act Section 15(h)(1) provides that no state law may prohibit an associated person from effecting a transaction on behalf of an existing customer when the customer is temporarily in another state or while the associated person's state application for state registration is pending, provided that such associated person is not ineligible to register in that state, is registered with FINRA and at least one state, and is associated with a broker-dealer registered in that state.

Most jurisdictions also require agents to take a uniform examination, usually the Uniform Securities Agent State Law Examination (Series 63) or the Uniform Combined State Law Examination (Series 66), and/or a products examination for the type of activity

---

securities. . . .  A partner, officer or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions, is an agent only if he otherwise comes within the definition." Unif. Sec. Act § 401(b) (1956).  Some state statutes use the terms "salesman," Sales person," or "sales representative" rather than the word "agent."  Joseph C. Long, Blue Sky Law, §8:19 (2010).  Most states have generally excluded clerical and ministerial personnel from the definition of agent.  See id. at § 8:28.

[423]   See NASAA Report, supra note 405.

[424]   See CCH Blue Sky Law Reporter ¶ 6531; Joseph C. Long, Blue Sky Law, §8:2 (2010).

[425]   CCH Blue Sky Law Reporter ¶ 34; ¶ 6531.

[426]   See Joseph C. Long, Blue Sky Law, §8:2 (2010).

[427]   See NASAA Report, supra note 405 at 6.

[428]   See Joseph C. Long, Blue Sky Law, §8:2 (2010); letter from Denise Voigt Crawford, President, and David Massey, President Elect, North American Securities Administrators Administration, Inc., dated Aug. 30, 2010 ("NASAA Letter") ("The examination process at the state level typically begins before an entity ever becomes a registrant.  State securities regulators . . . review information submitted by applicants to determine whether the applicant satisfies the state's registration requirements.  This examination includes an evaluation of the applicant's history as disclosed on the Form[s] BD. . . .); and NASAA Report, supra note 405 at 7 ("Before a Broker-Dealer [or] its agents . . . can do business in a state, their registration/licensing is subjected to a thorough examination.  State securities regulators review all registration forms for Broker-Dealer [and] agent . . . applicants".).

in which the applicant will engage.[429] State law may also subject agents to continuing education requirements.

Most states impose bonding, net capital, custody, financial statement reporting, and recordkeeping requirements on broker-dealers.[430] However, the Exchange Act prohibits states from establishing capital, custody, margin, financial responsibility, recordkeeping, bonding or financial operational reporting requirements for broker-dealers registered under the Exchange Act that differ from or are in addition to those established under the Exchange Act.[431] Accordingly, the states' requirements conform to federal law.[432]

Similar to federal requirements, many states require broker-dealers and their agents to observe high standards of commercial honor and just and equitable principles of trade in the conduct of business, and/or prohibit a variety of enumerated unethical or fraudulent practices including, among others: making unsuitable recommendations; churning a customer's account; selling (or purchasing) a security to (or from) a customer with an excessively high mark-up (or mark-down); unauthorized trading; effecting any transaction in, or inducing the purchase or sale of, any security by means of any manipulative or deceptive device, practice, plan, program, design or contrivance.[433] State laws also generally impose on a broker-dealer a duty to supervise its employees.[434]

State securities regulators also conduct examinations of broker-dealers for compliance with applicable state laws and regulations, particularly their branch and remote offices.[435] States monitor for compliance through a variety of means including, among other things, annual questionnaires and on-site and off-site examinations.[436] Given the complementary exam programs at the Commission and FINRA, state examinations of

---

[429]    CCH Blue Sky Law Reporter ¶ 6531.

[430]    CCH Blue Sky Law Reporter ¶ 6531.

[431]    See Exchange Act Section 15(h)(1).

[432]    NASAA Letter, supra note 428.

[433]    See, e.g., Arkansas (003.14.2 Ark. Code R. §308.01); California (Cal. Corp. Code §§25216, 25218; Cal. Code Regs. tit. 10, §§260.218, 260.218.1-.2; Delaware (Del Admin. Code §609); District of Columbia (D.C. Mun. Regs. tit. 17, §1819); Florida (Fla. Admin. Code. Ann. r. 69W-600.013); Georgia (Ga. Comp. R. & Regs. 590-4-2-.14); New Jersey (N.J. Stat. Ann. §49:3-58(a)(2)(vii); N.J. Admin. Code §13:47A-6.3); Pennsylvania (64 Pa. Code §305.019). See also NASAA, Dishonest or Unethical Business Practices of Broker-Dealers and Agents (May 23, 1983).

[434]    Joseph C. Long, Blue Sky Law, §8:8 (2010).

[435]    See NASAA Letter, supra note 428.

[436]    See NASAA Letter, supra note 428.

91

App 353

broker-dealers are often "for-cause" or address special circumstances.[437]  A more detailed discussion of state examinations is included in Appendix A.

### b)    Other Regulation Intended to Protect Retail Customers

ERISA

As noted above, while the requirements of ERISA are beyond the scope of this Study, broker-dealers generally are not considered ERISA "fiduciaries," as traditional recommendations by broker-dealers would not usually constitute "investment advice" for ERISA purposes.[438]  Moreover, the Department of Labor's ERISA regulations contain a "safe harbor" from the definition of "fiduciary" for the execution of securities trades by a broker-dealer pursuant to the specific instructions of an independent fiduciary of an ERISA plan.[439]  However, a broker-dealer may be deemed to be an ERISA fiduciary when it exercises discretion beyond that permitted under the regulations.[440]  To the extent a broker-dealer is deemed to be an ERISA fiduciary, the various ERISA requirements would apply.[441]

---

[437]    See NASAA Report, supra note 405 at 3.

[438]    ERISA Section 3(21)(A) generally provides that a person is a "fiduciary" with respect to a plan to if they (1) exercise any discretionary authority in the management or administration of the plan, or any authority or control respecting management or disposition of plan assets or (2) render investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so.  The Department of Labor's current regulations generally provide that a person shall be deemed to be rendering "investment advice" within the meaning of ERISA Section 3(21)(A) only when such person renders advice to the plan as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property, and either (1) has discretionary authority or control with respect to investing plan assets or (2) provides such advice on a regular basis pursuant to a mutual agreement, arrangement or understanding  that such advice will serve as the primary basis for investment decisions with respect to plan assets and is individualized to meet the particular needs of the plan . See 29 CFR 2510.3-21(c).

As stated above in note 415, supra, the Department of Labor recently proposed a rule under ERISA that would broadly define the circumstances under which a person (including a broker-dealer and an investment adviser) is considered to be a "fiduciary" for ERISA purposes by reason of giving investment advice to an employee benefit plan or a plan's participants.  See "Definition of the Term "Fiduciary," 75 Fed. Reg. 65,263 (proposed Oct. 22, 2010) (to be codified at 29 CFR pt. 2510).

[439]    29 CFR 2510.3-21(d)(1).  In particular, to qualify for the safe harbor from the definition of a "fiduciary," the instructions must specify: (1) the security to be purchased or sold; (2) the price range within which such security is to be purchased or sold; (3) a time span during which such security may be purchased or sold ( not to exceed five business days); and (4) the minimum or maximum quantity (or dollar value) of such security that may be purchased or sold within such price range. Id.

[440]    See 29 CFR 2510.3-21.

[441]    See supra note 388.

92

Bank and Trust Company Regulation

Historically, banks were completely excluded from the definitions of broker and dealer in Exchange Act Sections 3(a)(4) and (5).[442]  The Gramm-Leach-Bliley Act of 1999 ("GLB Act") amended those sections to replace the bank exclusions with narrower product- and transaction-specific exceptions for certain bank securities activities.  The Commission and the Board of Governors of the Federal Reserve System (the "Board") jointly adopted rules known as "Regulation R" implementing the bank broker exceptions in Exchange Act Section 3(a)(4)(B).[443]  The rules define the scope of securities activities that banks may conduct without registering with the Commission as securities brokers and implement the most significant GLB Act "broker" exceptions for banks.  Specifically, the rules implement the statutory exceptions that allow a bank, subject to certain conditions, to continue to conduct securities transactions for its customers as part of the bank's trust and fiduciary, custodial and deposit "sweep" functions, and to refer customers to a securities broker-dealer pursuant to a networking arrangement with the broker-dealer.[444]

The regulation of those bank securities activities excepted from the definition of "broker" and "dealer" by the GLB Act is determined by the appropriate banking regulator, and is beyond the scope of this Study.[445]  To the extent that banks engage in broker or dealer activities but are not required to be registered with the Commission, there may be differences in the applicable regulation and standards of care that are outside the scope of the Commission's rulemaking and interpretive authority.

## III.    Retail Investor Perceptions and Confusion Regarding Financial Service Provider Obligations and Standard of Conduct

Americans seek investment advice, products, and services to help achieve a variety of goals, such as retirement planning, estate and insurance planning, educational needs, and the operation of small businesses.  Baby boomers control roughly $13 trillion

---

[442]    "Bank" is defined in Exchange Act Section 3(a)(6).  The term "bank," however, is limited by section 3(a)(6) of the Exchange Act to banks directly regulated by U.S. state or federal bank regulators.  The Commission has stated that the determination whether any particular financial institution meets the requirements of Section 3(a)(6) is the responsibility of the financial institution and its counsel.  See Exchange Act Release No. 27017 at note 16 (July 11, 1989).

[443]    The broker exceptions for a bank in, including the trust and fiduciary exception, apply to each bank individually and are not available to a nonbank entity, including a nonbank subsidiary or affiliate of a bank.  See Exchange Act Release No. 56501 (Sept. 24, 2007).

[444]    See Exchange Act Section 3(a)(4)(B) and Section 3(a)(5)(C).  Banks have fewer exceptions from the definition of "dealer" than "broker;" the GLB Act provided 11 broker and 4 dealer exceptions.

[445]    For example, bank employees have engaged in making referrals of retail customers under existing Banking Agency guidance as well as the Commission rules and interpretations.  See Banking Agencies' Interagency Statement on Retail Sales of Nondeposit Investment Products (Feb. 15, 1994).

in household investable assets, or over 50 percent of total U.S. household investment assets, and nearly one in every six Americans will be 65 or older by the year 2020.[446] However, although retail investors look to investment advisers and broker-dealers to help achieve their financial goals, there is robust recent evidence that many retail investors do not understand or are confused by the different standards of care applicable to investment advisers and broker-dealers and their respective associated persons, although they were generally satisfied with their financial professional. This evidence includes investor and investor advocate comments submitted as part of the Commission's request for public comment on the Study, Commission-sponsored studies, and the results of surveys submitted to the Commission as part of the comments to the Study.

## A.    Investor and Investor Advocate Comments

Through the public comment process, many investors stated that they did not understand the standards of care applicable to investment advisers and broker-dealers, found the standards of care confusing, and in particular, were uncertain about the meaning of the multiple titles used by investment advisers and broker-dealers.[447] For example, many noted that they did not understand the difference between an investment adviser and a broker-dealer, much less any potential difference in the standards of care.[448]

---

446    Protecting Senior Investors: Compliance, Supervisory and Other Practices used by Financial Services Firms in Serving Senior Investors, Securities and Exchange Commission Office of Compliance Inspections and Examinations, North American Securities Administrators Association, and Financial Industry Regulatory Authority (Sept. 22, 2008).

447    See, e.g., letter from Bert Oshiro, dated Aug. 29, 2010 ("Years ago, I was pretty sure who I was dealing with based on their titles… Today it's a totally different story. All kinds of products such as securities, insurance, fee based products, bank accounts, loans, health insurance, auto/homeowners insurance, etc. are sold by people calling themselves: financial advisors; financial consultants; investment advisors; investment consultants; financial planners; asset managers; financial services advisors; [and] registered representatives… It has come to the point that I really don't know who I'm dealing with."); letter from Larry J. Massung, dated Aug. 29, 2010 ("I believe there is considerable confusion within the general public with the fiduciary duty, responsibilities, and titles of brokers, dealers and investment advisors"); and letter from Cecylia Escarcega, dated Aug. 30, 2010 ("Personally, I find the titles confusing because the broker, dealer or investment advisor typically does not tell me what their role is and the scope of their fiduciary duty to me as an investor").

448    See, e.g., letter from Elizabeth Marion, dated Aug. 31, 2010 ("Until I read in Sunday's San Diego Union Tribune, I had NO IDEA the amazing differences between investment advisors, brokers dealers"); letter from Melissa Murphy, dated Aug. 29, 2010 ("My opinion on the average investor's view of brokers, dealers and investment advisors is that most have no idea as to the differences between the terms. However, changing the names will not fix that, and will be confusing to those who do understand the current terminology."); letter from L. Topper, dated Aug. 30, 2010 ("I would like to be included in your study as one who does not know the difference between brokers, dealers and investment advisers and these titles are confusing"); letter from Velma E. Bunne, dated Aug. 29, 2010 ("I don't think the average person who is not connected with a financial house or institution knows exactly to what extent brokers, dealers and investment advisors are currently regulated."); letter from Carolyn Peterson, dated Aug. 29, 2010 ("I didn't know the difference for the broker, adviser, and dealer, even though we have investments in the stock market"); letter from Nina Rusko, dated Aug. 29, 2010 ("The titles of brokers, dealers, investment advisers don't really explain how they differ one from another. I have

94

App 356

Many commenters also stated that financial professionals should act in the best interests of the investor.[449] This lack of investor understanding and general investor confusion regarding the roles of broker-dealers and investment advisers and the different standards of care applicable is reiterated in the comments submitted by investor advocate groups.[450]

## B.  Commission-sponsored Studies

The retail investor confusion noted in the above comments is also reflected in two Commission-sponsored studies regarding investor understanding of the roles, duties and obligations of investment advisers and broker-dealers.

### 1.  Siegel & Gale, LLC and Gelb Consulting Group, Inc. Study

In 2004, the Commission retained Siegel & Gale, LLC and Gelb Consulting Group, Inc. ("SGG") to conduct focus group testing to determine, among other things, how investors differentiate the roles, legal obligations, and compensation between investment advisers and broker-dealers.[451]  SGG conducted four focus groups tests.[452]

no idea what kind of rules/standards there are for each of them and how that differs. It would be much easier for consumers who are choosing someone to help them if brokers, dealers and advisers of any kind had to follow the same rules and standards."); and letter from Linda Ewen, dated Aug. 29, 2010 ("I don't know the difference between a broker and an investment advisor. How do I know if the person I trust with my financial future is one or the other?").

[449]  See, e.g., letter from James D. Ferguson, dated Aug. 29, 2010 ("I do not find the distinction between brokers and investment advisors to be clear at all.  As an individual investor I expect that either one of them have my best interests at heart"); letter from Thomas E. Lin, dated Aug. 24, 2010 ("I believe anyone that gives professional advice to clients regarding investments needs to be acting in the best interest of the client. This is not only fair but right"); letter from Elizabeth E. Dean, dated Aug. 30, 2010 ("In my opinion, broker-dealers and financial advisors should all be held to the same standard-namely, working in the best interest of their clients.  I was not even aware that broker-dealers might be working in their own best interest rather than mine"); letter from Al Hughes, Jr., dated Aug. 30, 2010 ("I feel broker-dealers and their agents should be held to the same standards as investment advisors. The broker and agent should put the interests of the client first on every transaction"); letter from Joseph F. Melock, Jr., dated Aug. 29, 2010 ("I believe that "stock brokers/financial adviser" should be held to a fiduciary standard. They recommend stocks, bonds and mutual in which they have an interest of some degree, and not always in the best interest of the client. If their duty were to change they would truly be what they call themselves."); letter from Diane Burke, dated Aug. 28, 2010 ("I would appreciate to have all financial advisors operate to a 'best interest of the client' fiduciary standard.  Any recommendation made by all financial advisors to the client should be based on the client's needs."); letter from David Certner, Legislative Counsel and Legislative Policy Director, American Association of Retired Persons, dated Aug. 30, 2010 ("AARP Letter") ("Investors deserve a regulatory policy that both enables them to make an informed choice among different types of investment professionals and ensures that all who are engaged in providing personalized investment advice act in their clients best interest.").

[450]  See, e.g. AARP Letter, supra note 449; letter from Barbara Roper, Director of Investor Protection, Consumer Federation of America, dated Aug. 30, 2010 ("CFA Letter").

[451]  See Siegel & Gale, LLC/Gelb Consulting Group, Inc., Results of Investor Focus Group Interviews About Proposed Brokerage Account Disclosures (Mar. 5, 2005) ("SGG Report"). The SGG Report is available at http://www.sec.gov/rules/proposed/s72599/focusgrp031005.pdf

Focus-group participants were asked to list the types of services provided by financial services professionals and to indicate which type of professional provided that service, recognizing that different professionals might perform similar or overlapping services. The participants were asked to perform a similar task using a list of specific services and obligations.  In general, both groups did not understand that the roles and legal obligations of investment advisers and broker-dealers were different.  In particular, they were confused by the different titles (e.g., financial planner, financial advisor, financial consultant, broker-dealer, and investment adviser), and did not understand terms such as "fiduciary."[453]

The SGG focus group testing sampled the views of a few dozen investors.  Thus, while relevant to our knowledge of investor confusion about investment adviser and broker-dealer standards of care, the small sizes of the samples cannot be reliably projected to the general population.

### 2.    RAND Report

In 2006, the Commission retained RAND to conduct a study of broker-dealers and investment advisers for the purpose of examining, among other things, whether investors understood the duties and obligations owed by investment advisers and broker-dealers to their clients and customers, respectively.[454]  RAND carried out the study by, among other things, analyzing the business practices of thousands of investment advisers and broker-dealers based on their regulatory filings and conducting interviews with stakeholders (including members of the investment adviser and broker-dealer industries).[455]  It also conducted a large-scale survey on household investment behavior

---

[452]    Two focus groups met in Memphis and two groups met in Baltimore for ninety-minute sessions. Each focus group had eight or nine participants.  Focus-group participants had varying degrees of financial sophistication, but each participant: made investment decisions either solely or jointly; graduated high school, attended some college or graduated college (those with graduate degrees were excluded from the study); received investment advice from a financial services professional regarding stocks, bonds, mutual funds, or 529 plans in the past six months; managed investments primarily through a financial services professional; did not have more than 50% of their assets in no-load mutual funds; and passed an articulateness screener.

[453]    For example, one participant stated: "I don't know the difference.  I mean I've got a guy that gives me advice.  I don't know what he is." (Baltimore).  SGG Report, supra note 451 at 2.

[454]    See Angela A. Hung, et al., RAND Institute for Civil Justice, Investor and Industry Perspectives on Investment Advisers and Broker-Dealers at xvi (2008) ("RAND Report").

[455]    RAND relied on Form ADV data from the IARD, Form BD data from the CRD, and Focus report filings, Parts II and IIA (since amended and are now Parts 2 and 2A), made by broker-dealers, available during 2001-2006.  RAND conducted 26 interviews with representatives from interested parties.  The interviews included seven financial service industry groups representing investment advisers, broker-dealers, and financial planners; five consumer protection, education, or research groups; nine interviews with federal and state regulators; and five academic participants.  The remaining interviews were with individuals.  RAND also conducted an additional 34 interviews with financial professionals from investment advisory and brokerage firms.

96

and preferences, experience with financial service providers, and understanding of the different types of financial service providers.

### a) Firm Analysis

RAND concluded that it was difficult for it to identify the business practices of investment advisers and broker-dealers with any certainty. Some of the difficulties stemmed from the complex affiliations and relationships of firms that offered multiple services. In addition, some investment adviser-only firms had employees who were registered representatives of a broker-dealer. Despite these challenges, RAND found that the financial services industry was "extremely heterogeneous" in terms of firm size, services offered, activities of affiliated firms and other factors.[456] RAND reported that the more numerous smaller firms tended to provide a more limited and focused range of either investment advisory or brokerage services, and the larger firms tended to engage in a much broader range of products and services, offering both investment advisory and brokerage services. RAND noted that the differences in the services provided by financial firms and their affiliations could be difficult for investors to understand, as information was not presented uniformly, with some firms providing so much information that it would be difficult for an investor to process, and others providing scant information. RAND's interviews with investment adviser and broker-dealer firms found that the firms believed that investors tended to trust a particular firm, without necessarily understanding of the firm's services and responsibilities.

### b) Investor Survey

Both RAND's and the firms' beliefs about investor understanding were confirmed in RAND's investor survey. A total of 654 households completed the survey.[457] The household investor survey included questions on investment experience, beliefs about differences between investment advisers and broker-dealers, and experience with financial service providers. RAND characterized about two-thirds of the household survey respondents as experienced investors and one-third as inexperienced.[458] RAND also conducted six focus groups with investors in Alexandra, Virginia, and Fort Wayne,

---

[456]   RAND Report, supra note 454 at 117.

[457]   RAND Report, supra note 454 at 88. The households were selected from the American Life Panel ("ALP"). The ALP was an internet panel of more than 1,000 respondents aged 18 and older who responded to monthly surveys from the University of Michigan's Survey Research Center. RAND noted that ALP households tended to have more education and income than the U.S. population as a whole. As a result, RAND cautioned that its survey results likely overstated the levels of financial knowledge, literacy, and experience of the U.S. population. Id.

[458]   RAND deemed investors to be "experienced" if they held investments outside of retirement accounts, had formal training in finance or investing, or held investments only in retirement accounts but answered positively to questions gauging their financial understandings, such as the nature and causes of increases in their investments. RAND deemed investors to be "inexperienced" if they did not meet the "experienced" criteria.

97

Indiana.  Each location included two groups of experienced investors and one group of inexperienced investors.

RAND presented the household survey participants with a number of specific services and duties (such as executing stock trades, the duty to disclose conflicts of interest, and to act in the investors' best interest) and asked the participants to identify whether investment advisers, financial advisors, financial consultants, or broker-dealers offered the service or were required to adhere to the specific duty.

To gauge the focus-group participants' initial understanding of the differences between investment advisers and broker-dealers, RAND administered a short questionnaire before the detailed discussion.  The questionnaire was similar to the survey questions, and elicited a similar response: participants were more likely to say that brokers (rather than investment advisers) executed securities transactions and earned commissions, and they viewed financial advisors and financial consultants as being more similar to investment advisers than to brokers in terms of services and duties.

RAND's survey respondents and focus-group participants reported that they did not understand the differences between investment advisers and broker-dealers, although they were generally satisfied with the services they received from their financial professional.  Participants noted that the common job titles for investment advisers and broker-dealers were too similar and therefore confusing (e.g., advisor, financial advisor, or financial consultant).  Focus-group participants shed further light on this confusion when they commented that the interchangeable titles and "we do it all" advertisements made it difficult to discern broker-dealers from investment advisers.[459]  Some participants said that they knew which type of investment professional they had, but most did not.  The participants' confusion persisted even when RAND provided participants with fact sheets on investment advisers and brokers that included a description of their common job titles, legal duties, and typical compensation.

Similarly, RAND also found that not only did the focus-group participants not understand the differences between investment advisers and broker-dealers, they could not identify correctly the legal duties owed to investors with respect to the services and functions investment advisers and brokers performed.  The primary view of investors was that the financial professional – regardless of whether the person was an investment adviser or a broker-dealer – was acting in the investor's best interest.  RAND also found that some focus-group participants did not understand the term "fiduciary" and did not

---

[459]    RAND found some key differences between these responses from focus-group participants and responses from household survey respondents.  Focus-group participants were more likely to report that both investment advisers and brokers are required to act in the investor's best interest (64 percent and 63 percent, respectively) than did ALP respondents (49 percent and 42 percent, respectively). Furthermore, focus-group participants were more likely than survey respondents to report that brokers are required to disclose any conflicts of interest. In fact, focus-group participants were more likely to report that brokers, rather than investment advisers, must disclose conflicts, whereas household survey respondents were more likely to report that investment advisers must disclose conflicts.  RAND Report, supra note 454  at 109.

98

know whether a fiduciary standard was a higher standard than a suitability standard. In addition, other participants did not think that the legal requirements for either investment advisers or brokers were stringent enough. Several participants mentioned that, if an investment adviser made a costly mistake with a client's money, they thought that it would be extremely difficult to prove that the adviser was not acting in what he or she perceived to be the client's best interest. Other participants thought that "suitable" was too vague a term and that it was not clear how the broker would determine suitability. Moreover, the focus-group participants expressed doubt that the standards of care for investment advisers and broker-dealers were different in practice. Many participants also noted that investment advisers had to disclose conflicts of interest while brokers did not, and also were interested in the fact that broker-dealers must pass an examination and hold a license, while investment advisers did not.

RAND also found differences between the experienced and inexperienced focus-group participants. In particular, the inexperienced focus-group participants noted that they did not understand the terminology used by the financial services industry. They also felt uncomfortable asking questions about or generally talking about money, and tended to avoid the topic. The inexperienced focus-group participants believed that financial information should be presented more in terms of practical concepts. Some participants struggled with basic financial distinctions, such as the differences between stocks and mutual funds.

### c)    RAND's Conclusion

Based on its analysis and survey results, RAND concluded that the financial services market had become more complex over the last few decades in response to market demands for new products and services and the regulatory environment. In addition, financial services firms began to use a variety of titles to describe their personnel, such as "financial advisor," "financial consultant" and "advisor." As a result, the distinctions between investment advisers and broker-dealers have become blurred, and participants had difficulty determining whether a financial professional was an investment adviser or a broker-dealer and instead believed that investment advisers and broker-dealers offered the same services and were subject to the same duties, although generally investors were satisfied with their financial professional.

### C.    CFA Survey

More recently, some industry advocates and certain industry groups submitted the results of a survey that they conducted ("CFA Survey"), which again suggests that investors do not understand the differences between investment advisers, broker-dealers and financial planners and are not knowledgeable about the different standards of conduct

99

App 361

that apply to the advice or recommendations made by such financial services providers.[460]

The CFA Survey was conducted by telephone August 19-23, 2010, and sampled 2,012 adults. The CFA Survey asked a number of questions designed to elicit participants' views on the differences between investment advisers and broker-dealers, and the standard of conduct applicable to them. For example, the CFA Survey asked participants whether the primary service of broker-dealers was:

- "to buy and sell and they give only limited advice;" (29% selected this option);

- "to offer advice;" (34% selected this option); or

- "advice and transaction assistance are equally important services" (27% selected this option).

With respect to the standard of conduct of investment advisers and broker-dealers, the CFA Survey asked "if a stockbroker and an investment adviser provide the same kind of investment advisory services, do you think they should have to follow the same investor protection rules?" to which 91% of survey participants responded affirmatively. The CFA Survey also asked that whether participants agreed with the statement that "when you receive investment advice from a financial professional, the person providing the advice should put your interests ahead of theirs and should have to tell you upfront about any fees or commissions they earn and any conflicts of interest that potentially could influence that advice" (85% of participants strongly agreed, 12% somewhat agreed, 1% somewhat disagreed or strongly disagreed).[461] The CFA Survey also found that a majority of investors surveyed incorrectly believed that stockbrokers and "financial advisors" are held to a fiduciary duty (66% and 76% of investors surveyed, respectively),

---

[460]     See letter from Barbara Roper, Director of Investor Protection, Consumer Federation of America, et al., dated Sept. 15, 2010 (submitting the results of a national opinion survey regarding U.S. investors and the fiduciary standard conducted by ORC/Infogroup for the Consumer Federation of America, AARP, the North American Securities Administrators Association, the Certified Financial Planner Board of Standards, Inc., the Investment Adviser Association, the Financial Planning Association and the National Association of Personal Financial Advisors ("CFA Survey")). In addition to the CFA Survey, Dr. Robert N. Mayer and Dr. Cathleen D. Zick of the University of Utah submitted the results of their survey conducted in October 2009. They asked 3,010 employees of the University of Utah the following question: "Do any of the following designations [certified financial planner, licensed/registered investment advisor, licensed/registered broker-dealer agent, and personal financial advisor] indicate that the advisor pledges to put your financial interests before his or hers?" The choices were "Yes," "No," or "Don't Know." They acknowledged that there was some debate as to whether each of the four types of financial services professionals was obligated to put their financial interests before the client or customer, but they pointed out that only about two-fifths of respondents were confident enough to offer a definitive (and sometimes incorrect) answer. See letter from Dr. Robert N. Mayer and Dr. Cathleen D. Zick, University of Utah, dated Aug. 26, 2010.

[461]     CFA Survey, supra note 460 at 19.

while most investors surveyed understand that the fiduciary standard is in place for "financial planners" and "investment advisers" (75% and 77% of investors surveyed, respectively).

### D.    Conclusion

The foregoing comments, studies, and surveys indicate that, despite the extensive regulation of both investment advisers and broker-dealers, retail customers do not understand and are confused by the roles played by investment advisers and broker-dealers, and more importantly, the standards of care applicable to investment advisers and broker-dealers when providing personalized investment advice and recommendations about securities. This lack of understanding is compounded by the fact that retail customers may not necessarily have the sophistication, information, or access needed to represent themselves effectively in today's market and to pursue their financial goals. Retail investors are relying on their financial professional to assist them with some of the most important decisions of their lives. Investors have a reasonable expectation that the advice that they are receiving is in their best interest. They should not have to parse through legal distinctions to determine whether the advice they receive was provided in accordance with their expectations.

Therefore, in light of this confusion and lack of understanding, it is important that retail investors be protected uniformly when receiving personalized investment advice or recommendations about securities regardless of whether they choose to work with an investment adviser or a broker-dealer. It also is important that the personalized securities advice to retail investors be given in their best interests, without regard to the financial or other interest of the financial professional, in accordance with a fiduciary standard. Under a uniform fiduciary standard, retail investors can be made more confident in the integrity of the advice they receive as they invest for their own and their families' critical financial goals. At the same time, it is necessary to ensure that any uniform standard allows and ensures retail investors to continue to have access to the various fee structures, account options, and types of advice that investment advisers and broker-dealers provide.

## IV.    Analysis and Recommendations

This section analyzes the overlaps, shortcomings and gaps between the two regulatory regimes governing personalized investment advice about securities to retail investors by broker-dealers and investment advisers and identifies areas where the Staff recommends changes by rule or statute. This section makes two core sets of recommendations.

First, the Staff recommends that the Commission engage in rulemaking specifying a uniform fiduciary standard of conduct that is no less stringent than currently applied to investment advisers under Advisers Act Sections 206(1) and (2) that would apply to broker-dealers and investment advisers when they provide personalized investment advice about securities to retail customers. Accompanying that core recommendation are more

App 363

detailed recommendations addressing the implementation of the uniform fiduciary standard.

Second, the Staff recommends that regulatory protections related to personalized investment advice about securities to retail customers should be harmonized to the extent that harmonization appears likely to add meaningful investor protection. The discussion accompanying this recommendation identifies selected relevant areas where broker-dealer and investment adviser regulation differ, and where the Staff recommends the consideration of rules, interpretive guidance, or statutory changes that would produce such harmonization.

Finally, this section discusses alternatives to the uniform fiduciary standard that the Staff considered but does not recommend, including repeal of the broker-dealer exclusion in the Advisers Act. The Staff believes that these alternatives would entail significant costs that would not be justified by any potential benefits of these alternatives, as discussed separately in the Cost Analysis in Section V.

### A.    General Differences in Investment Adviser and Broker-Dealer Regulation

Investment advisers and broker-dealers are subject to extensive regulation and oversight designed to protect clients and customers, whether retail or other. Both regulatory regimes require investment advisers and broker-dealers to adhere to high standards of conduct in their interactions with retail investors, which are intended to encourage both broker-dealers and investment advisers to act in the interests of their investors and minimize conflicts of interests when providing personalized investment advice or recommendations. The two regulatory schemes currently seek to protect investors through different approaches.[462]

The broker-dealer regulatory regime has been characterized as predominantly a rules-based approach.[463] It governs, among other things, the way in which broker-dealers

---

[462]    See letter from David G. Tittsworth, Executive Director, Investment Adviser Association, dated Aug. 30, 2010 ("IAA Letter") ("The current regulatory landscape reflects the different purposes of the two main statutes regulating investment advisers and broker-dealers…").

[463]    Exchange Act Section 19 generally provides the Commission fifteen calendar days from the date an SRO posts its rule change proposal on a public website to publish the proposal in the Federal Register. If the Commission fails to affirmatively act within the allotted time, the proposed rule will be deemed published as of the date on which the SRO posted its proposal on the website. In practice, however, Commission staff considers each proposed SRO rule filing before either approving or disapproving the rule by delegated authority or recommending the Commission either approve or disapprove the rule, or institute proceedings to determine whether to disapprove. See Exchange Act Section 19(b); see also Appendix A. FINRA has described that in consolidating rules of the NYSE and of the NASD, it has considered taking "a principles-based and tiered approach to the app lication of rules according to firm size and business model, as well as recognizing possible distinctions in application between retail and institutional customers." FINRA, Information Notice (Rulebook Consolidation Process) (Mar. 12, 2008). See also Self-Regulatory Organizations; National Association of Securities Dealers, Inc.; Order Approving

operate, focusing in large measure on applying rules embodying principles of fairness and transparency to relationships between broker-dealers and customers.[464]  Accordingly, the Exchange Act, the rules thereunder, SRO rules, as well as judicial and Commission interpretations of the foregoing, govern a wide variety of brokerage activity related to effecting securities transactions, including advising customers, executing orders on the most favorable terms, arranging for delivery and payment, maintaining custody of customer funds and securities, and delivering required disclosures such as confirmations and account statements.[465]  Exchange Act rules are generally designed to prevent fraud, and underpin broker-dealers' obligations to their customers, while sales practices obligations are largely imposed by SRO rules and are designed to address unethical behavior that may not necessarily be fraudulent. The federal securities laws and SRO rules address broker-dealer conflicts in one of three ways: express prohibition;[466] mitigation;[467] or disclosure.[468]

---

Proposed Rule Change To Amend the By-Laws of NASD To Implement Governance and Related Changes To Accommodate the Consolidation of the Member Firm Regulatory Functions of NASD and NYSE Regulation, Inc., Exchange Act Release No. 56145 (July 26, 2007) ("In the Commission's view, the consolidation of NASD and NYSE member firm regulation is intended to help reduce unnecessary regulatory costs while, at the same time, increase regulatory effectiveness and further investor protection.  The Commission notes that the Transaction holds the potential to reduce unnecessary regulatory costs because New SRO firms would deal with only one group of examiners and one enforcement staff for member firm regulation.").

[464]     See, e.g., Guide to Broker-Dealer Registration, supra note 25.

[465]     See Exchange Act Release No. 27018 (July 18, 1989).  See also IAA Letter, supra note 462.

[466]     For example, and as described in Section II.B.2, FINRA rules establish restrictions on the use of non-cash compensation in connection with the sale and distribution of mutual funds, variable annuities, direct participation program securities, public offerings of debt and equity securities, and real estate investment trust programs.  These rules generally limit the manner in which members can pay for or accept non-cash compensation and detail the types of non-cash compensation that are permissible.  See FINRA Rules 2310, 2320, and 5110, and NASD Rule 2830.

[467]     For example, a broker-dealer may recommend a security even when a conflict of interest is present, but that recommendation must be suitable.  As discussed infra Section II.B.2, under the antifraud provisions of the federal securities laws, a broker dealer is required to make only suitable recommendations, and when recommending a security, has a duty to disclose any material adverse facts or material conflicts of interests. See Hanly, 415 F.2d 589, supra note 271; Chasins, supra note 250; Hasho, supra note 250 .

[468]     For example, when engaging in transactions directly with customers on a principal basis, a broker-dealer violates Exchange Act Rule 10b-5 when it knowingly or recklessly sells a security to a customer at a price not reasonably related to the prevailing market price and charges excessive markups (as discussed above), without disclosing the fact to the customer.  See, e.g., Grandon v. Merrill Lynch & Co., 147 F.3d 184, 189-90 (2d Cir. 1998).  See also Exchange Act Rule 10b-10 (requiring a broker-dealer effecting transactions in securities to provide written notice to the customer of certain information specific to the transaction at or before completion of the transaction, including the capacity in which the broker-dealer is acting (i.e., agent or principal) and any third party remuneration it has received or will receive).

By contrast, the Advisers Act has been described as a more principles-based approach.[469]  Although some Advisers Act provisions and rules impose specific requirements and prohibitions, the Advisers Act governs an adviser's standard of conduct in providing advice to its clients through the fiduciary duty recognized under Advisers Act Section 206(1) and (2).  Under that duty, an adviser must eliminate, or at least disclose, all conflicts of interest that might incline an adviser to render advice that is not disinterested.[470]

Differences in the regulation of broker-dealers and investment advisers are a consequence of the historically different functions and activities of investment advisers and broker-dealers and different governing statutes.  Some differences in regulation (e.g., rules regarding underwriting or market making) primarily reflect the different functions and business activities of investment advisers and broker-dealers, whereas other differences may reflect statutory differences, particularly when differences occur when broker-dealers and investment advisers are engaging in the same activity (i.e., providing personalized investment advice or recommendations about securities to retail investors).  While the former may not result in substantive differences in investor protection and may allow for diversity of products or services and investor choice, the latter, to the extent they exist, could be exploited by the industry through regulatory arbitrage and, in any event, may need to be addressed in order to improve the effectiveness of both regimes by providing more consistent protections to investors and reducing investor confusion.

Many commenters addressed what they believed to be current gaps, shortcomings or overlaps in existing investment adviser and broker-dealer regulation and suggested several potential areas of regulatory harmonization or improvement.  These suggestions include, among others, the following general areas: disclosure;[471] registration, licensing,

---

[469]     See, e.g., IAA Letter, supra note 462.

[470]     See Capital Gains, supra note 82.  See also IAA Letter, supra note 462.

[471]     See, e.g., ACLI Letter, supra note 414; letter from Kevin R. Keller, Chief Executive Officer, Certified Financial Planner Board of Standards, Inc., Marvin W. Tuttle, Jr., Executive Director/Chief Executive Officer, Financial Planners Association, and Ellen Turf, Chief Executive Officer, National Association of Personal Financial Advisors, dated Aug. 30, 2010 (collectively, "Financial Planning Coalition Letter"); letter from Karrie McMillan, General Counsel, Investment Company Institute, dated Aug. 30, 2010 ("ICI Letter"); letter from Dale E. Brown, President and Chief Executive Officer, Financial Services Institute, dated Aug. 30, 2010 ("FSI Letter"); letter from Jason Berkowitz, Director and Counsel, Regulatory Affairs, The Hartford Financial Services Group, Inc., dated Aug. 30, 2010 ("Hartford Letter"); letter from Stephanie L. Brown, Managing Director and General Counsel, LPL Financial Corp., dated Aug. 30, 2010 ("LPL Letter"); letter from Cheryl L. Tobin, Assistant Vice President & Insurance Counsel, Pacific Life, dated Aug. 30, 2010 ("Pacific Life Letter"); letter from Colleen Van Dyke, Vice President, State Farm VP Management Corp., dated Aug. 27, 2010 ("SFVPMC Letter"); letter from Patrick H. McEvoy, President and Chief Executive Officer, Woodbury Financial Services, Inc., dated Aug., 30, 2010 ("Woodbury Letter"); ABA & ABASA Letter, supra note 21; Ameriprise Letter, supra note 39; CAI Letter, supra note 26; letter from Marc Menchel, Executive Vice President and General Counsel, FINRA, dated Aug. 25, 2010 ("FINRA Letter"); IAA Letter, supra note 462; Schwab Letter, supra note 19.

104

competency and continuing education;[472] obligation to act in the "best interest" of the customer;[473] suitability;[474] oversight and examination;[475] the lack of an investment adviser SRO;[476] the lack of appropriate Commission resources to support an investment adviser examination program;[477] supervision;[478] advertising;[479] books and records;[480] financial responsibility;[481] and investor remedies through a private right of action[482] or arbitration.[483]  This section addresses, among others, these points.

The differences and similarities between the two regulatory regimes raise topics of great importance.  This section, however, is not intended to provide an exhaustive

---

[472]    See, e.g., letter from August 30, 2010 by David J. Stertzer, Chief Executive Officer, Association for Advanced Life Underwriting, dated Aug. 30, 2010 ("AALU Letter"); BOA Letter, supra note 17; FSI Letter, supra note 471; Hartford Letter, supra note 471; LPL Letter, supra note 471; UBS Letter, supra note 39; Woodbury Letter, supra note 471.

[473]    See, e.g., Schwab Letter, supra note 19.

[474]    See, e.g., FSI Letter, supra note 471; LPL Letter, supra note 471; UBS Letter, supra note 39.

[475]    See, e.g., AALU Letter, supra note 472; BOA Letter, supra note 17; Financial Planning Coalition Letter, supra note 471; FINRA Letter, supra note 471; FSI Letter, supra note 471; Hartford Letter, supra note 471; LPL Letter, supra note 471; UBS Letter, supra note 39.

[476]    See, e.g., letter from Brendan Daly, Legal and Compliance Counsel, Commonwealth Financial Network, dated Aug. 30, 2010 ("Commonwealth Letter"); FINRA Letter, supra note 471; FSI Letter, supra note 471.   See also Section 914 Study and Commissioner Walter Statement, supra note 3.

[477]    See IAA Letter, supra note 462 (recommending bolstering Commission resources to ensure that investment advisers are subject to an effective inspection program) and letter from Richard H. Baker, President and CEO, Managed Funds Association (Sept. 22, 2010) (supporting appropriate fees on investment advisers to help ensure that OCIE has the resources they need to conduct examinations of the investment adviser industry).

[478]    See, e.g., AALU Letter, supra note 472; CAI Letter, supra note 26.

[479]    See, e.g., FINRA Letter, supra note 471; FSI Letter, supra note 471; LPL Letter, supra note 471; UBS Letter, supra note 39.

[480]    See, e.g., FSI Letter, supra note 471; LPL Letter, supra note 471.

[481]    See, e.g., BOA Letter, supra note 17; FSI Letter, supra note 471; LPL Letter, supra note 471; UBS Letter, supra note 39.

[482]    See, e.g., letter from by Scott R. Shewan, President, Public Investors Bar Association, dated Sept. 3, 2010 ("PIABA Letter").

[483]    See, e.g., letter from Barbara Black, Charles Hartsock Professor of Law and Director of the Corporate Law Center, University of Cincinnati College of Law, dated Aug. 16, 2010 ("Black Letter"); FSI Letter, supra note 471; Financial Planning Coalition Letter, supra note 471; Hartford Letter, supra note 471; Woodbury Letter, supra note 471.

---

treatise or to articulate new staff positions in either area of regulation and should be read against the background of the detailed descriptions of each regulatory regime in Section II.B. Rather, the discussion below focuses on identifying, in accordance with the mandate in Dodd-Frank Act Section 913, selected differences in the standard of conduct and specific other areas that the Staff recommends that the Commission consider addressing through rulemaking, interpretive guidance, or recommendations for legislative change.

### B.    Standards of Conduct

The overall legal standards of conduct for broker-dealers and investment advisers have differing and complex histories. Both sets of standards evolved in large part under the general antifraud provisions of the respective federal securities laws, but with differing applications and differing results to different industries. On the broker-dealer side, the standard has developed substantially through a number of specific Commission and FINRA rules, disclosure requirements, interpretations by the Commission and its staff and FINRA, as well as case law, numerous SRO disciplinary actions, and Commission enforcement actions. On the adviser side, the standard has developed primarily through Commission and staff interpretive pronouncements under the antifraud provisions of the Advisers Act, and through case law and numerous enforcement actions.[484]

A core difference, observed by many commentators and commenters, is that investment advisers are fiduciaries under the federal securities laws, while broker-dealers generally are not.[485] The Commission has stated that the fiduciary duty of investment advisers includes a duty of loyalty and a duty of care (encompassing, among other things, a duty of suitability), with the duty of loyalty requiring investment advisers to act in the best interests of clients and to avoid or disclose conflicts. The standard of conduct for broker-dealers has been characterized as primarily to deal fairly with customers and to observe high standards of commercial honor and just and equitable principles of trade, and they also are subject to a number of specific obligations, including a duty of suitability, as well as requirements to disclose certain conflicts. In practice, with broker-dealers, required disclosures of conflicts have been more limited than with advisers and apply at different points in the customer relationship.[486]

---

[484]    See Section II.B.1, supra.

[485]    While broker-dealers are generally not subject to a fiduciary duty under the federal securities laws, courts have found broker-dealers to have a fiduciary duty under certain circumstances. See Section II.B.2 for a discussion of the circumstances under which a broker-dealer may be held to a fiduciary duty.

[486]    See supra Section II.B.2 for a discussion of a broker-dealer's obligation to disclose conflicts of interests.

The Staff believes that these differences in the standard of conduct are significant and are not well understood by retail customers, as the RAND Report and many commenters observed. The Staff believes that investors generally expect that an investment professional is acting in their best interests and that they should not have to parse the title on a business card or other information to assess whether the professional has their best interests at heart.[487] Therefore, in the interests of increasing investor protection and reducing investor confusion, the Staff recommends that both broker-dealers and investment advisers should be held to a uniform fiduciary standard in providing personalized investment advice about securities to retail customers that is no less stringent than the existing fiduciary standard of investment advisers under Advisers Act Sections 206(1) and (2). The Staff believes that the uniform fiduciary standard would be consistent with the standard and precedent that apply to investment advisers.

Many commenters supported a uniform standard of conduct in some form for investment advisers and broker-dealers providing personalized investment advice about securities to retail customers. These commenters include investors' advocates,[488] trade groups,[489] state regulators,[490] government officials,[491] a self-regulatory organization,[492] industry representatives (including investment advisers, broker-dealers, and dually registered firms),[493] coalition groups,[494] academics,[495] investors[496] and other individuals.[497]

---

[487]    See, e.g., Section III supra, discussing investors' confusion with respect to whether their financial services firm is a broker-dealer or an investment adviser.

[488]    See, e.g., AARP Letter, supra note 449 (adopt a fiduciary duty for any financial professional providing investment advice to retail investors); CFA Letter, supra note 450 (supports requiring broker-dealers to meet the same fiduciary standard (i.e., Advisers Act obligations) to which all other investment advisers are held when they provide personalized investment advice and recommend securities); PIABA Letter, supra note 482.

[489]    See, e.g., ABA & ABASA, supra note 21; letter from The Committee for the Fiduciary Standard, dated Aug. 20, 2010; Financial Planning Coalition Letter, supra note 471 (supporting the establishment of a strong and uniform fiduciary standard of conduct, consistent with the standard currently applied to investment advisers under the Advisers Act, for all financial professionals who provide personalized investment advice to retail customers); FSI Letter, supra note 471; IAA Letter, supra note 462 (supporting the fiduciary duty standard under the Advisers Act); ICI Letter, supra note 471; letter from William T. Baldwin, et al, National Association of Personal Financial Advisors, dated Aug. 30, 2010 ("NAPFA Letter"); SIFMA Letter, supra note 25.

[490]    See, e.g.. letter from William F. Galvin, Secretary of the Commonwealth, Commonwealth of Massachusetts, dated Aug. 31, 2010; NASAA Letter, supra note 428 (advocating that the standard should be the fiduciary duty currently applicable to investment advisers under the Advisers Act).

[491]    See, e.g., letter from U.S. Senators Daniel K. Akaka and Robert Menendez, dated Aug. 30, 2010.

[492]    See FINRA Letter, supra note 471.

[493]    See, e.g., Ameriprise Letter, supra note 39; BOA Letter, supra note 17 (supporting a "new, fiduciary standard of care" that requires financial professionals to act in an individual investor's best interest when providing personalized investment advice); Hartford Letter, supra note 471;

In light of the concerns noted above, and consistent with Congress's grant of authority in Section 913, the Staff recommends that the Commission propose rules that would apply expressly and uniformly to both broker-dealers and investment advisers, when providing investment advice about securities to retail customers,[498] a fiduciary standard no less stringent than currently applied to investment advisers under Advisers Act Sections 206(1) and (2).  In particular, the Staff recommends that the Commission exercise its rulemaking authority under Dodd-Frank Act Section 913(g), which permits the Commission to promulgate rules to provide that:

---

Janney Letter, supra note 30 ("Janney therefore welcomes any new uniform standard of conduct that provides clarity to customers and promotes investor protection."); LPL Letter, supra note 471 (supporting a uniform standard of conduct based on fiduciary principles under the law of agency, in particular requiring firms to act loyally for the client's benefit in all matters connected with relationship, using the same care, competence and diligence that a prudent person would exercise in similar circumstances."); Morgan Stanley Letter, supra note 39; Schwab Letter, supra note 19; letter from Adym W. Rygmyr Associate General Counsel, TIAA-CREF Individual & Institutional Services, LLC, dated Aug. 27, 2010 ("TC Services Letter"); Wells Fargo Letter, supra note 17 ("The fiduciary duty adopted for broker-dealers when providing personalized investment advice regarding securities to retail clients resulting in transactions for compensation should be based primarily on the existing standard developed under the Investment Advisers Act of 1940 (the "Advisers Act"), which generally provides that investment management professionals be loyal to clients and act in clients' best interests."); Woodbury Letter, supra note 471.

[494]    See, e.g., letter from Alex Grodin, Americans for Financial Reform, dated Aug. 30, 2010.

[495]    See, e.g., letter from James J. Angel, Associate Professor of Finance, Georgetown University McDonough School of Business, dated Oct. 24, 2010 ("If the product sold is that of advice, then the appropriate standard should be that of a fiduciary and that advice should be in the best interest of the client.  Anything else is fraud, because the seller is delivering a service different from what the consumer thinks he or she is buying."); Black Letter, supra note 483 (supporting a uniform standard of conduct and competence based on professionalism).

[496]    See, e.g., letter from Robert J. Ziner, dated Aug. 27, 2010; letter from Mel Turner, dated Aug. 29, 2010; letter from Joel E. Fried, dated Aug. 29, 2010; letter from Ralph W. Geuder, dated Aug. 29. 2010; letter from Donald A. Flory, dated Aug. 29, 2010; letter from Frank J Udvarhely, dated Aug. 29, 2010.

[497]    See, e.g., letter from Tony Camp, dated Aug. 30, 2010; letter from Rita A. Lehr, dated Aug. 31, 2010; letter from Frank Hoefert, Certified Financial Analyst, dated Aug. 30, 2010; letter from Roxanne E. Flesza, President of Financial Resources Management Corp., dated Aug. 30, 2010; letter from Jennifer C. Ragborg, dated Aug. 30, 2010; letter from Ron Rhoades, Director of Research, Chief Compliance Officer, Joseph Capital Management, dated Aug. 30, 2010 (arguing for the uniform imposition of the bona fide fiduciary standard of conduct currently found in the Advisers Act).

[498]    The Exchange Act uses the the word "customer" and the Advisers Act uses the word "client" to designate the investors served by broker-dealers and investment advisers, respectively.  This discussion generally refers to both categories of investors as retail customers, using the defined term under Dodd-Frank Act Section 913.

the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers (and such other customers as the Commission may by rule provide), shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice.

The standard outlined above is referred to in the Study as the "uniform fiduciary standard."

The uniform fiduciary standard would apply to broker-dealers and investment advisers under the new authority in Exchange Act Sections 15(k) and Advisers Act Section 211(g).  Therefore, the recommended uniform fiduciary standard and the related discussion below would not have any direct bearing on other persons who may be characterized as fiduciaries in other areas of the law, including ERISA fiduciaries or financial institutions such as banks and trust companies.[499]  The Staff also contemplates that the uniform fiduciary standard would be an overlay on top of the existing investment adviser and broker-dealer regimes and would supplement them, and not supplant them.[500]

The Staff considered a number of alternative approaches to the uniform fiduciary standard.[501]  The Staff ultimately concluded that the uniform fiduciary standard, as outlined above and described in further detail below, would be the most appropriate standard. It addresses investor confusion and promotes integrity of advice by applying the same fiduciary standard to the provision of personalized investment advice about securities, whether that advice is provided by a broker-dealer or investment adviser.  At the same time, it balances concerns about the impact of regulatory change on investor access to low-cost products and services by not per se eliminating particular products, services, or compensation schemes.

*Recommendation:  The Commission should engage in rulemaking to implement the uniform fiduciary standard of conduct for broker-dealers and investment advisers when providing personalized investment advice about securities to retail customers. Specifically, the Staff recommends that the uniform fiduciary standard of conduct established by the Commission should provide that:*

*the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail*

---

[499]    See, e.g., UBS Letter, supra note 39; BOA Letter, supra note 17.

[500]    Therefore, investment advisers and broker-dealers would continue to be subject to their current regulatory requirements, and the Commission could consider as part of implementing the uniform fiduciary standard whether to impose additional requirements, through rulemaking and/or guidance, as discussed below.

[501]    For example, as further discussed below, the Staff considered whether to recommend eliminating the broker-dealer exclusion from the definition of "investment adviser" under Advisers Act Section 202(a)(11).

109

*customers (and such other customers as the Commission may by rule provide), shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice.*

### C.    Implementing the Uniform Fiduciary Standard

The description of the standard as fiduciary is by itself only a general characterization. Justice Cardozo wrote in a famous Supreme Court decision: "But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry."[502] The discussion below seeks to provide that "further inquiry" in the context of advisers and broker-dealers. The discussion describes the details of the uniform fiduciary standard that the staff recommends the Commission specify in any rulemaking and/or interpretive guidance.

The uniform fiduciary standard would require broker-dealers and investment advisers to act in the best interest of retail customers without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice. Commenters have raised questions about the definition of "best interest."[503] Many commenters called for specific and clear rules and guidance about the extent to which, and when, any uniform fiduciary standard would apply,[504] and commenters offered different definitions of the "best interest" standard.

Dodd-Frank Act Section 913(g) provides that any rules that the Commission promulgates under the uniform fiduciary standard "shall provide that such standard of conduct shall be no less stringent that the standard applicable to investment advisers under Section 206(1) and (2) of [the Advisers] Act when providing personalized investment advice about securities…."[505] The Staff interprets the uniform fiduciary standard to include

---

[502]    SEC v. Chenery Corp., 318 U.S. 80, 84-85 (1943).

[503]    See, e.g., letter from Andrew McMahon, Chairman of the Board, AXA Advisors, LLC, and Senior Executive Vice President, AXA Equitable Life Insurance Company, dated Aug. 30, 2010 ("AXA Letter"); letter from Joan Hinchman, Executive Director, President and Chief Executive Officer, National Society of Compliance Professionals, dated Aug. 30, 2010 ("NSCP Letter").

[504]    See, e.g., ABA & ABASA Letter, supra note 21; ACLI Letter, supra note 414; AXA Letter, supra note 503; FSI Letter, supra note 471; ICI Letter, supra note 471; letter from Nicole S. Jones, General Counsel, Lincoln Financial Group, dated Aug. 30, 2010; NSCP Letter, supra note 503; SIFMA Letter, supra note 25; UBS Letter, supra note 39. Cf. NAPFA Letter, supra note 489 (stating that the fiduciary standard as it currently exists under the Advisers Act is clear and well-established).

[505]    See Dodd-Frank Act Section 913(g)(1) and 913(g)(2). Further, Section 913(g) provides that "[i]n accordance with such rules, any material conflicts of interests shall be disclosed and may be consented to by the customer." Id.

110

App 372

at a minimum, the duties of loyalty and care as interpreted and developed under Sections Advisers Act Section 206(1) and 206(2).[506]

The Staff is of the view that the existing guidance and precedent[507] under the Advisers Act regarding fiduciary duty, as developed primarily through Commission interpretive pronouncements under the antifraud provisions of the Advisers Act, and through case law and numerous enforcement actions, will continue to apply to investment advisers and be extended to broker-dealers, as applicable, under the uniform fiduciary standard.

In addition, the Staff believes that rulemaking and/or interpretive guidance regarding the uniform fiduciary standard would be useful to both investment advisers and broker-dealers, but that such rulemaking and/or interpretive guidance would be especially beneficial for broker-dealers, who may not be as familiar with the application of the uniform fiduciary standard to advice-giving activities. Therefore, any Commission rulemaking or guidance relating to the uniform fiduciary standard should particularly focus on assisting broker-dealers with complying with the minimum requirements of the uniform fiduciary standard and what it means to generally operate under the uniform fiduciary standard.

Clarification will be particularly important in applying the obligation to eliminate or at least disclose all material conflicts of interest, as contemplated by the Dodd-Frank Act.[508] With investment advisers, the Commission and Staff have identified numerous conflicts of interest over time through interpretive guidance, rulemakings, enforcement actions and no-action letters.[509] The Staff believes that the Commission should help broker-dealers similarly identify their conflicts of interest as specifically as possible so as to facilitate broker-dealers' smooth transition to compliance with the uniform fiduciary standard.[510] Similarly, the Commission should continue to help advisers further identify their conflicts of interest.

---

[506] See also the Section 913(g) amendments to the Exchange Act, adding Section 15(h)(1) to the Exchange Act, providing in part that "Nothing in this section shall require a broker or dealer or registered representative to have a continuing duty of care or loyalty to the customer after providing personalized investment advice about securities." and thereby indicating that Congress intended that the duties of care and loyalty be included and enforced under the uniform fiduciary standard.

[507] See, e.g., Capital Gains, supra note 82. See also Release 232 and Release 1105, supra note 89.

[508] See Dodd-Frank Act Section 913(g)(1) and 913(g)(2) ("[I]n accordance with such rules [establishing the standard of conduct], any material conflicts of interests shall be disclosed and may be consented to by the customer."

[509] See, e.g., Release 3060, supra note 67 (revising the adviser brochure requirements and listing throughout examples of material conflicts of interest).

[510] See, e.g., IAA Letter, supra note 462 (identifying examples of broker-dealer conflicts potentially affecting advice to retail customers).

The implementation of a uniform standard of conduct would be most effective only if the standard is applied uniformly. Dodd-Frank Act Section 913(h) amended the Exchange Act by adding new Section 15(m), which provides, in part, that the enforcement authority of the Commission for violations of the standard of conduct applicable to a broker or dealer providing personalized investment advice about securities to retail customers shall include the enforcement authority of the Commission with respect to violations of the standard of conduct applicable to an investment adviser under the Advisers Act, including the authority to impose sanctions for such violations. Exchange Act Section 15(m) also provides that the Commission shall seek to prosecute and sanction violators of the standard of conduct under the Exchange Act to the same extent as it prosecutes and sanctions violators of the standard of conduct applicable to an adviser under the Advisers Act. Dodd-Frank Act Section 913(h) made mirror amendments to the Advisers Act, adding new Section 211(i). Thus, we contemplate that any rules implementing the uniform fiduciary standard would provide, at a minimum, for violations of the standard not involving scienter to the same extent as the Commission currently enforces antifraud violations involving a breach of fiduciary duty under Advisers Act Section 206(2).[511]

*Recommendation: The Commission should engage in rulemaking and/or issue interpretive guidance on the components of the uniform fiduciary standard: the duties of loyalty and care. In doing so, the Commission should identify specific examples of potentially relevant material conflicts of interest in order to facilitate a smooth transition to the new standard by broker-dealers and consistent interpretations by broker-dealers and investment advisers. The existing guidance and precedent under the Advisers Act regarding fiduciary duty, as developed primarily through Commission interpretive pronouncements under the antifraud provisions of the Advisers Act, and through case law and numerous enforcement actions, will continue to apply.*

### 1.     Duty of Loyalty

A fundamental aspect of the fiduciary standard recognized under the Advisers Act is the duty of loyalty. This duty prohibits an adviser from putting its interests ahead of its clients.[512] Dodd-Frank Act Section 913(g) addresses the duty of loyalty in that it provides that, "[i]n accordance with such rules [that the Commission may promulgate with respect to the uniform fiduciary standard]…any material conflicts of interest shall be disclosed and may be consented to by the customer." The uniform fiduciary standard, by incorporating Advisers Act Section 206(1) and 206(2), would require an investment

---

[511]     SEC v. Steadman, 967 F.2d 636, 643 (D.C. Cir. 1992) (citing Capital Gains, at 191-192, supra note 82). Such rules could enable the Commission to enforce the uniform fiduciary duty of broker-dealers and investment advisers providing personalized investment advice about securities in contexts not involving fraud .

[512]     See, e.g., Release 3060, supra note 67.

112

adviser or broker-dealer to eliminate, or provide full and fair disclosure about its material conflicts of interest.[513]

While the duty of loyalty requires a firm to eliminate or disclose material conflicts of interest, it does not mandate the absolute elimination of any particular conflicts, absent another requirement to do so. Thus, Dodd-Frank Act Section 913(g) expressly provides that the receipt of commission-based compensation, or other standard compensation, for the sale of securities does not, in and of itself, violate the uniform fiduciary standard as applied to a broker-dealer.[514] It also provides that the uniform fiduciary standard shall not require broker-dealers to have a continuing duty of care or loyalty to a retail customer after providing personalized investment advice. Moreover, as discussed below, while the uniform fiduciary standard would affect certain aspects of principal trading, it would not in itself impose the principal trade provisions of Advisers Act Section 206(3) on broker-dealers. In addition, Dodd-Frank Act Section 913 provides that offering only proprietary products by a broker-dealer shall not, in and of itself, violate the uniform fiduciary standard, but may be subject to disclosure and consent requirements.

These provisions and others should address a number of concerns from broker-dealers that the standard of conduct should be "business model-neutral,"[515] i.e., that the standard should not prohibit, mandate or promote particular types of products or business models. They also make clear that the implementation of the uniform fiduciary standard should preserve investor choice among such services and products and how to pay for these services and products (e.g., by preserving commission-based accounts, episodic advice, principal trading and the ability to offer only proprietary products to customers).[516]

---

[513]  See Capital Gains, supra note 82; Release 4048, supra note 244. The regulatory approaches to disclosures for investment advisers and broker-dealers are discussed in detail in Section II.B.

[514]  See Dodd-Frank Act Section 913(g) amendments to the Exchange Act and the Advisers Act, adding Exchange Act Section 15(k)(1) and Advisers Act Section 211(g)(1). The amendments to the Advisers Act contain a similar provision with respect to the receipt of compensation "based on commission or fee" by a "broker, dealer or investment adviser." Id. The Staff reiterates, however, that as discussed infra, to the extent an investment adviser is receiving commissions or other transaction-based compensation, it would need to consider the need to register as a broker-dealer under the Exchange Act, unless an exception or exemption from registration applies. See Section II.B., supra.

[515]  See, e.g., AXA Letter, supra note 503; ACLI Letter, supra note 414; Hartford Letter, supra note 471; Lincoln Letter, supra note 504; SIFMA Letter, supra note 25.

[516]  See, e.g., ABA & ABASA Letter, supra note 21; ACLI Letter, supra note 414; AXA Letter, supra note 503; BOA Letter, supra note 17; letter from Richard M. Whiting, Executive Director and General Counsel, The Financial Services Roundtable, dated Aug. 30, 2010; FSI Letter, supra note 471; Hartford Letter, supra note 471; ICI Letter, supra note 471; Janney, supra note 30; Lincoln Letter, supra note 504; NSCP Letter, supra note 503; SIFMA, supra note 25; UBS, supra note 39; Wells Fargo Letter, supra note 17; Woodbury Letter, supra note 471.

### a)     Disclosure

At the level of the firm, investment advisers and broker-dealers currently are subject to different disclosure requirements.  Notably, investment advisers must provide clients and prospective clients with a current firm brochure before or at the time an adviser enters into an advisory contract with the client.[517]  The firm brochure (Part 2A of Form ADV) is required to contain information about the investment adviser's services, certain conflicts of interest, and other information including its range of fees, methods of analysis, investment strategies and their risk of loss, brokerage (including trade aggregation policies and directed brokerage practices, as well as the use of soft dollars), review of accounts, client referrals and other compensation, and the adviser's disciplinary and financial information.

Broker-dealers also must make a variety of disclosures, but the extent, form and timing of the disclosures are different.  They are not subject to a comparable requirement for a general disclosure of conflicts at the time the relationship is established, as well as other information contained in the investment adviser brochure. [518]  Instead, when recommending a security, they generally are required to disclose (though not in writing) any material adverse facts or material conflicts of interest, including any economic self-interest, so that customers may evaluate their overlapping motivations.[519]  Broker-dealers also are required to make certain specific disclosures, such as whether they are acting as market makers for a recommended security,[520] or if they have any other control, affiliation or interest in the security.[521]  In executing customer trades, broker-dealers must

---

[517]     See Release 3060, supra note 67 and Advisers Act Rule 204-3.  However, investment advisers are not limited to the disclosure requirements of Form ADV, and should disclose all material facts and conflicts of interest consistent with their fiduciary obligations.  See Release 3060, id.

Recently, FINRA requested comment on a concept proposal to require the provision of a disclosure statement for retail investors at or before commencing a business relationship that would include many items of information analogous to what is required in Form ADV Part 2. FINRA, Regulatory Notice 10-54, "Disclosure of Services, Conflicts and Duties" (Oct. 2010). Specifically, the proposal would require member firms to provide to a retail customer, at or prior to commencing a business relationship, a written statement describing, among other things: the types of accounts and services it provides; the scope of services provided and products offered to retail customers and the fees associated with each brokerage account and service offered; the conflicts associated with such services (e.g., financial or other incentives that the firm or its registered representatives have to recommend certain products, investment strategies or services) and conflicts that may arise and how the firm manages such conflicts; and any limitations on the duties otherwise owed to retail customers (e.g., not assuring the ongoing suitability of an investment or a portfolio of investments nor the propriety of unsolicited orders, and may execute transactions on a principal basis (absent instructions to act only in an agency capacity)).

[519]     See discussion infra Section II.B and accompanying text.

[520]     See Chasins, supra note 250 (applying shingle theory, court found broker-dealer impliedly represents that it will disclose market making capacity).

[521]     See Exchange Act Rules 15c1-5 and 15c1-6 and SRO rules (e.g., NASD Rules 2240 and 2250; MSRB Rule G-22; and NYSE Rule 312(f)).

114

provide customers with specific disclosure in confirmation statements at or before the completion of the transaction, including the price at which the trade was executed, the capacity in which a broker acted (i.e., as principal or agent), and the compensation it received, including any compensation it received from third parties.[522]

At the level of the representative or associated person, there are also differences in the information provided or available to retail customers. Investment advisers must provide clients with a brochure supplement (Part 2B of Form ADV), which includes information about certain advisory personnel upon whom clients rely for investment advice, including educational background, supervision, disciplinary history, and certain conflicts. In addition, basic information about adviser personnel who have registered with one or more states as investment adviser representatives is available through the IAPD. Information about persons associated with broker-dealers is available online through FINRA's BrokerCheck website; that information is not as extensive as the information provided in the adviser brochure supplement and more comparable to that available in the IAPD. Dodd-Frank Act Section 919B separately requires a study "of ways to improve the access of investors to registration information (including disciplinary actions, regulatory, judicial, and arbitration proceedings, and other information)" about broker-dealers, investment advisers and their associated persons.

Commenters frequently cited disclosure as an area where the Commission could consider improvement and harmonization of existing requirements.[523] Commenters generally suggested that "key information" that should be provided to investors includes: the services and products provided (including any limits on the range of products offered); the duties and obligations of the broker-dealer or investment adviser; any limitations on the nature and anticipated duration of the relationship; any material conflicts of interest, including descriptions of the types of fees, costs, and incentives associated with the products and services offered and how associated persons are compensated; and any disciplinary history.[524]

---

[522]   See Exchange Act Rule 10b-10 and related discussion in Section II.B.2. As discussed in Section II.B supra, Rule 10b-10 is not a safe harbor from the antifraud provisions. It is important to note, however, that the disclosure is made after the investment decision.

[523]   See, e.g., ABA & ABASA Letter, supra note 21; ACLI Letter, supra note 414; Ameriprise Letter, supra note 39; CAI Letter, supra note 26; Financial Planning Coalition Letter, supra note 471; FINRA Letter, supra note 471; FSI Letter, supra note 471; Hartford Letter, supra note 471; IAA Letter, supra note 462; ICI Letter, supra note 471; LPL Letter, supra note 471; Pacific Life, supra note 471; Schwab Letter, supra note 19; SFVPMC Letter, supra note 471; supra note 471. But see letter from Knut A. Rostad, The Committee for a Fiduciary Standard, dated Dec. 21, 2010 ("Reliance on casual disclosures, alone, is the opposite of reliance on the fiduciary professional's recommendation, and negates the very purpose of the fiduciary standard.").

[524]   See, e.g., ACLI Letter, supra note 414; Financial Planning Coalition Letter, supra note 471; IAA Letter, supra note 462; ICI Letter, supra note 471; letter from Thomas C. Blank, General Counsel, Association of Independent Trust Companies, Inc., dated Aug. 30, 2010.

App 377

For the uniform fiduciary standard to be effective, investors need to understand any material conflicts of interest of their investment adviser or broker-dealer. The Staff also believes that other information about the scope of their relationships with their investment advisers or broker-dealers would be helpful to retail customers. Dodd-Frank Act Section 913(g) recognizes the importance of such disclosure, and directs the Commission to "facilitate the provision of simple and clear disclosures to investors regarding the terms of their relationships with broker-dealers and investment advisers, including any material conflicts of interest."[525]

Therefore, the Staff recommends that the Commission consider developing a uniform approach to disclosure that would provide retail customers of both broker-dealers and investment advisers with relevant key pieces of information at the outset of the advisory or brokerage relationship and at appropriate times thereafter. This presumably would include extending to broker-dealers a requirement of a general relationship disclosure document analogous to Form ADV Part 2 at or prior to account opening.

Moreover, as discussed above, retail customers do not always understand the roles of investment advisers and broker-dealers,[526] and may be confused by financial or legal terms.[527] In addition, too much information can overwhelm retail customers, and may lead them to miss important information or ignore disclosure altogether.[528] Therefore, the Staff recommends that the Commission consider as part of any uniform disclosure document how to communicate key information in a simple, clear and concise way.[529] In particular, the Staff recommends that the Commission explore the utility and feasibility of a summary disclosure document that would describe in clear, summary form, a firm's services (including the extent to which its advice is limited in time or is continuous and ongoing), charges, and conflicts of interest.

Another important issue to consider is the timing of customer disclosure. The Staff believes that retail customers would benefit from receiving certain disclosures, such

---

[525]    Section 913(g) also provides that "[i]n accordance with such rules, any material conflicts of interests shall be disclosed and may be consented to by the customer."

[526]    For example, customers may believe that their financial services provider is monitoring their accounts (like investment advisers with discretionary authority), when the provider may not generally do so unless specifically contracted.

[527]    See, e.g., the RAND Report, supra note 454.

[528]    See Office of Investor Education and Assistance, U.S. Securities and Exchange Commission, A Plain English Handbook: How to Create Clear SEC Disclosure Documents (Aug. 1998) (discussing the importance of clear, simple wording in disclosure documents so as not to overwhelm an investor). As part of its recommendations, the Staff recommends considering additional investor education outreach as an important complement to the uniform fiduciary standard. See Section IV.C.4 below.

[529]    See, e.g., ABA and ABASA Letter, supra note 21; ACLI Letter, supra note 414; CAI Letter, supra note 26; FSI Letter, supra note 471; Schwab Letter, supra note 19; SIFMA Letter, supra note 25.

116

App 378

as information about the firm's conflicts of interest, fees, scope of services, and disciplinary information, before or at the time of entering into a customer relationship, with annual updating disclosures thereafter (as is the case with Form ADV Part 2A). Other disclosures about a product, risks, compensation or any specific conflicts could be more effective at the point when personalized investment advice is given.

Some commenters were concerned that investment advisers and broker-dealers might seek to "disclose away" conflicts of interest under the uniform fiduciary standard.[530]  The uniform fiduciary standard, because it must be "no less stringent than" Advisers Act Sections 206(1) and 206(2), would ensure that the basic protections regarding conflicts of interest currently available under the Advisers Act would be preserved and would not be watered down.[531]  The Staff believes that it is the firm's responsibility—not the customers'—to reasonably ensure that any material conflicts of interest are fully, fairly and clearly disclosed so that investors may fully understand them.[532]  To this end, however, the Commission could consider whether rulemaking would be appropriate to prohibit certain conflicts, or where it might be appropriate to impose specific disclosure and consent requirements (e.g., in writing and in a specific format, and at a specific time) in order to better assure that retail customers were fully informed and can understand any material conflicts.

*Recommendation:  The Commission should facilitate the provision of uniform, simple and clear disclosures to retail customers about the terms of their relationships with broker-dealers and investment advisers, including any material conflicts of interest. The Commission should consider the disclosures that should be provided (a) in a general relationship guide akin to the new Form ADV Part 2A that advisers deliver at the time of entry into the retail customer relationship, and (b) in more specific disclosures at the time of providing investment advice (e.g., about certain transactions that the Commission believes raise particular customer protection concerns).  The Commission also should consider the utility and feasibility of a summary disclosure document containing key information on a firm's services, fees, and conflicts and the*

---

[530]    See CFA Letter, supra note 450.  See also Financial Planning Coalition Letter, supra note 471; NAPFA Letter, supra note 489; letter from Ron A. Rhoades, dated Dec. 20, 2010; letter from Knut Rostad, Chairman, The Committee for the Fiduciary Standard, dated Dec. 21, 2010.

[531]    See Instruction 3 of General Instructions to Part 2 of Form ADV, explaining that advisers must provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest the adviser has and the business practices in which it engages, and can give his or her informed consent to the transaction or practice that gives rise to the conflict or to reject the transaction or practice.

[532]    Cf. letter from Ron A. Rhoades dated Dec. 20, 2010 ("The burden is upon the investment adviser to reasonably ensure client understanding") ("Rhoades Letter 2"); Financial Planning Coalition Letter, supra note 471 ("It is not sufficient for a firm or an investment professional to make full disclosure of potential conflicts of interest with respect to such products [e.g., collateralized debt obligations and structured products]. The firm and the investment professional must make a reasonable judgment that the client is fully able to understand and evaluate the product and the potential conflicts of interest that it presents.").

117

*scope of its services (e.g., whether its advice and related duties are limited in time or are ongoing).  The Commission should consider whether rulemaking would be appropriate to prohibit certain conflicts, to require firms to mitigate conflicts through specific action, or to impose specific disclosure and consent requirements.*

### b)    Principal Trading

Principal trading raises concerns because of the risks of price manipulation or the placing of unwanted securities into client accounts (i.e., "dumping").  Engaging in principal trading with customers or clients represents a clear conflict for any fiduciary.  Advisers Act Section 206(3) prohibits an adviser from engaging in a principal trade with an advisory client, unless it discloses to the client in writing before completion of the transaction the capacity in which the adviser is acting and obtains the consent of the client to the transaction.[533]  The Commission has interpreted the reference to "the transaction" to require separate disclosure and consent for each transaction.[534]  To this end, an investment adviser must provide written disclosure to a client and obtain the client's consent at or prior to the completion of each transaction.[535]  As the Commission has stated, "[i]n adopting Section 206(3), Congress recognized the potential for [abuses such as price manipulation or the placing of unwanted securities into client accounts], but did not prohibit advisers entirely from engaging in all principal and agency transactions with clients.  Rather, Congress chose to address these particular conflicts of interest by

---

[533]    On December 28, 2010, the Commission amended Advisers Act Rule 206(3)-3T, a temporary rule that establishes an alternative means for investment advisers that are registered with the Commission as broker-dealers to meet the requirements of Advisers Act Section 206(3) when they act in a principal capacity in transactions with certain of their advisory clients.  Temporary Rule Regarding Principal Trades with Certain Advisory Clients, Investment Advisers Act Release No. 3128 (Dec. 28, 2010) ("Release 3128").   The amendment extended the date on which Rule 206(3)-3T will sunset from December 31, 2010 to December 31, 2012.  The Commission stated in the adopting release that "firms' compliance with the substantive provisions of rule 206(3)-3T provides sufficient protection to advisory clients to warrant the rules continued operation while we conduct the study mandated by section 913 of Title IX of the Dodd-Frank Act and consider more broadly the regulatory requirements applicable to broker-dealers and investment advisers."  Release 3128 at 4.  The Commission also noted that, as part of its broader consideration of regulatory requirements applicable to broker-dealers and investment advisers, it "intend[s] to carefully consider principal trading by advisers, including whether rule 206(3)-3T should be substantively modified, supplanted, or permitted to expire."  Release 3128 at 5.

[534]    See Release 40, supra note 99 ("[T]he requirements of written disclosure and of consent contained in this clause must be satisfied before the completion of each separate transaction. A blanket disclosure and consent in a general agreement between investment adviser and client would not suffice.").

[535]    Release 1732, supra note 98 ("Implicit in the phrase 'before the completion of such transaction' is the recognition that a securities transaction involves various stages before it is 'complete.' The phrase 'completion of such transaction' on its face would appear to be the point at which all aspects of a securities transaction have come to an end. That ending point of a transaction is when the actual exchange of securities and payment occurs, which is known as 'settlement.'").

118

imposing a disclosure and client consent requirement in Section 206(3) of the Advisers Act."[536]

By contrast, broker-dealers may engage in principal transactions with customers, subject to a number of requirements, including that they disclose their capacity in the transactions (typically on the confirmation statement),[537] seek to obtain best execution for principal transactions when a broker-dealer accepts an order from a customer,[538] make only suitable recommendations, and charge customers fair and reasonable prices and commissions.[539]  There is no specific requirement for written disclosure or explicit consent for each principal transaction.[540]

Dodd-Frank Act Section 913(g) requires that the standard of conduct applicable to broker-dealers should be "no less stringent" than Advisers Act Section 206(1) and (2), and does not refer to Advisers Act Section 206(3).  The omission of a reference to Section 206(3) appears to reflect a Congressional intent not to mandate the application of that provision to broker-dealers when providing personalized investment advice about securities to retail investors (though granting the Commission the authority to impose such restrictions).  Many commenters have expressed concerns about how principal trading would be regulated under the uniform fiduciary standard.[541]   In particular, broker-dealers and dual registrants noted that some types of securities, such as municipal and corporate bonds, new issues, and proprietary products, are typically traded and initially offered on a principal basis.[542]

---

[536]    See Release 1732, supra note 98 at text accompanying note 5.  Commenters have suggested a number of changes to the Advisers Act principal trading regime.  See, e.g., IAA Letter, supra note 462 ("We recognize that there may be facts and circumstances under which it is appropriate for the SEC to provide relief pursuant to its broad exemptive authority under Advisers Act section 206A. Regardless of whether the specific prophylactic provisions of section 206(3) apply, however, as fiduciaries, broker-dealers would be required to provide full and fair disclosure regarding the practice to clients, adopt policies and procedures to address the conflict, and ensure that a principal trade is fair and in the best interest of clients" (citations omitted)).  But see letter from Ellen Turf, CEO, NAPFA, letter dated Dec. 20, 2010 (expressing concerns about the Commission's extension of Rule 206(3)-3T).

[537]    See Exchange Act Rule 10b-10.

[538]    See, e.g., Regulation NMS Release; NASD Rule 2320 ("Best Execution and Interpositioning").  See also discussion of a broker-dealer's best execution obligations, infra Section II.B.

[539]    See NASD Rule 2440 (Fair Prices and Commissions), IM-2440-1 (Mark-Up Policy), and IM-2440-2 (Mark-Up Policy for Debt Securities).  See also discussion of a broker-dealer's obligations with respect to fair prices, commissions, and charges, infra Section II.B.

[540]    See note 533 supra, for a discussion of the principal trading rules applicable to dual registrants.

[541]    See, e.g., ABA & ABASA Letter, supra note 21; BOA Letter, supra note 17; FINRA Letter, supra note 471; Janney Letter, supra note 30; SIFMA Letter, supra note 25; and Wells Fargo Letter, supra note 17.

[542]    See, e.g., BOA Letter, supra note 17; SIFMA Letter, supra note 25; Wells Fargo Letter, supra note 17.

Principal trades by broker-dealers raise the same potential conflicts of interest as such trades by investment advisers and thus implicate the duty of loyalty included in the uniform fiduciary standard. Therefore, under the uniform fiduciary standard, a broker-dealer should be required, at a minimum, to disclose its conflicts of interest related to principal transactions, including its capacity as principal, but it would not necessarily be required to follow the specific notice and consent procedures of Advisers Act Section 206(3). Of course, when engaging in principal transactions, broker-dealers would remain subject to obligations relating to suitability, best execution, and fair and reasonable pricing and compensation.[543]

The Staff recommends that the Commission address through guidance or rulemaking how broker-dealers would fulfill the uniform fiduciary standard when engaging in principal trades. We understand that this issue is particularly consequential with respect to fixed income securities, including municipal bonds. The Commission could at the same time consider whether any changes should be made to the principal trading requirements that apply to investment advisers.[544] For example, the Commission could consider the type of information (and when it is provided) that would be most useful to investors to help them understand what a principal trade means and the potential risks and benefits. The Staff believes, however, that the uniform fiduciary standard would require broker-dealers and investment advisers provide sufficiently specific facts so that investors are able to understand the conflicts of interest. In this regard, the Staff believes that requests for consent embedded in voluminous advisory agreements or other account opening agreements would impede the provision of such consent.

 *Recommendation:  The Commission should address through guidance and/or rulemaking how broker-dealers should fulfill the uniform fiduciary standard when engaging in principal trading.*

### 2.    Duty of Care

As discussed above, another fundamental aspect of the fiduciary standard recognized under the Advisers Act is the duty of care.[545] An investment adviser's duty of care requires it to "make a reasonable investigation to determine that it is not basing its

---

[543]    See Section II.B for a discussion of a broker-dealer's disclosure obligations.

[544]    At that time, the Staff believes that the Commission should also consider addressing potential conflicts of internalization and other practices that may be analogous to "agency cross" trades, which Advisers Act Section 206(3) prohibits along with principal trades. These are trades in which an adviser, "acting as a broker for a person other than such client" knowingly effects a sale or purchase of a security for the account of a client. The Commission's exemption for certain agency cross trades in Advisers Act Rule 206(3)-2 reflects a policy determination that certain, limited agency cross trades do not raise the same potential conflict concerns as principal trades.

[545]    See, e.g., Release 2106, supra note 85.

App 382

recommendations on materially inaccurate or incomplete information."[546]  The duty of care also obligates investment advisers to seek best execution of clients' securities transactions when they have the responsibility to select broker-dealers to execute client trades (typically in the case of discretionary accounts).[547]   A broker-dealer is subject to explicit rules and guidance that establish minimum, unwaivable obligations to:  (1) reasonably believe that its securities recommendations are suitable for its customer in light of the customer's financial needs, objectives and circumstances, and comply with specific disclosure, due diligence, and suitability requirements for certain securities products;[548] (2) seek to execute customers' trades at the most favorable terms reasonably available under the circumstances;[549] and (3) charge only prices for securities and compensation for services that are fair and reasonable taking into consideration all relevant circumstances.[550]

A number of commenters (particularly investment advisers) stated that the duty of care obligations under the Advisers Act are clear and well-established.[551]  A number of other commenters (particularly broker-dealers) have argued that the duty of care is far more developed for broker-dealers (e.g., the professional standards of conduct developed by FINRA), and that the investment advisers' duty of care is ambiguous.[552] They argued that the lack of detailed rules regarding professional standards of conduct demonstrates a

---

[546]    See Release 3052, supra note 87.

[547]    See Advisers Act Rule 206(3)-2(c) (acknowledging adviser's duty of best execution of client transactions).  See 2006 Soft Dollar Release, supra note 95 (stating that investment advisers have "best execution obligations").  See also Release 3060, supra note 67.

[548]    See discussion of a broker-dealer's suitability obligations, supra Section II.B.

[549]    See discussion of a broker-dealer's fair price, commissions and charges obligations, infra Section II.B.

[550]    See discussion of a broker-dealer's best execution obligations, infra Section II.B.

[551]    See, e.g., NAPFA Letter, supra note 489.

[552]    See, e.g., Pacific Life Letter, supra note 471; UBS Letter, supra note 39; Lincoln Letter, supra note 504; AALU Letter, supra note 472; FSI Letter, supra note 471; letter from Bob Rusbuldt, President and Chief Executive Officer, Independent Insurance Agents & Brokers of America, Inc., dated Aug. 30, 2010 ("IIABA Letter"); Letter from Susan B. Waters, Chief Executive Officer, National Association of Insurance and Financial Advisors, dated Aug. 30, 2010 ("NAIFA Letter"); and NSCP Letter, supra note 503. One commenter suggested the following professional standards of conduct be implemented for investment advisers and broker-dealers: prohibition against unauthorized trading; duty of best execution; duty to convey accurate information; suitability; duty to warn (i.e., if a security or strategy entails greater risks than the investor should assume, given his or her financial situation); and duty to monitor when the investment adviser or broker-dealer provides advice on an ongoing basis, including monitoring the account, reassessing  periodically the investor's investment objectives and strategy, and, when appropriate, recommending modifications to the investor's portfolio. See Black Letter, supra note 483.  But see Dodd-Frank Act Section 913(g), providing that "[n]othing in this section shall require a broker or dealer or registered representative to have a continuing duty of care or loyalty to the customer after providing personalized investment advice about securities."

gap in the regulation of investment advisers and broker-dealers.[553]  Other commenters argued that the Advisers Act is intended to flexibly accommodate the varying structures, sizes, and natures of advisory businesses, and that detailed proscribed rules are inconsistent with the dynamic nature of fiduciary duty.[554]

The Staff believes that the Commission, through rulemaking, guidance, or both, should specify the minimum professional obligations of investment advisers and broker-dealers under the duty of care.  In evaluating the regulation of investment advisers and broker-dealers, the Staff believes that it could be useful to develop rules or guidance on the minimum requirements that are fundamental to a duty of care under the uniform fiduciary standard.

Professional standards under the duty of care could be developed regarding the nature and level of review and analysis that broker-dealers and investment advisers should undertake when making recommendations or otherwise providing advice to retail customers.  The Commission could articulate and harmonize any such standards, by referring to and expanding upon, as appropriate, the explicit minimum standards of conduct relating to the duty of care currently applicable to broker-dealers (e.g., suitability (including product-specific suitability), best execution, and fair pricing and compensation requirements) under Commission and SRO rules.[555]

---

[553]    See, e.g., ACLI Letter, supra note 414 ("To the extent that the SEC determines that there are gaps with respect to the detailed conduct rules already in place, the SEC should look to specifically address such gaps, as opposed to simply turning, as noted above, to a broad and vague fiduciary standard as some have suggested."); NSCP Letter, supra note 503; Lincoln Letter, supra note 504; letter from Randy F. Wallake, Vice Chair and President, Securian Financial Group, Inc., dated Aug. 27, 2010 ("Securian Letter").

[554]    See, e.g., IAA Letter; supra note 462 (citing to various Commission releases to demonstrate the Commission's approach over the years); Investment Adviser Codes of Ethics, Investment Advisers Act Release No. 2256 (July 9, 2004) ("proposal left advisers with substantial flexibility to design individualized codes that would best fit the structure, size and nature of their advisory businesses"); Release 2204, supra note 147 ("Commenters agreed with our assessment that funds and advisers are too varied in their operations for the rules to impose of a single set of universally applicable required elements"); Release 2106, supra note 85 ("Investment advisers registered with us are so varied that a 'one-size-fits-all' approach is unworkable"); ICI Letter, supra note 471; NAPFA Letter, supra note 489 ("While specific rules have been and may be adopted under same, the fiduciary standard must be free to adapt so as to address new forms of improper conduct that seek to get around specific rules."). See also CFA Letter, supra note 450 (arguing that a fiduciary duty is facts and circumstances based, and that it would be impossible to write a rule to cover all the different eventualities that might arise, but noting that this does not mean that neither guidance nor rules could be developed in support of a fiduciary duty).

[555]    In considering whether and how to develop investment advisers' duty of care, some commenters have pointed to the detailed rules imposed on broker-dealers as a useful framework.  See, e.g., Pacific Life Letter, supra note 471; UBS Letter, supra note 39; Lincoln Letter, supra note 504; AALU Letter, supra note 472; FSI Letter, supra note 471; IIABA Letter, supra note 552; NAIFA Letter, supra note 552; and NSCP Letter, supra note 503.

122

App 384

Any such rules or guidance could take into account long-held Advisers Act fiduciary principles, such as the duty to provide suitable investment advice (e.g., with respect to specific recommendations and the client's portfolio as a whole) and to seek best execution.[556] Detailed guidance in this area has not been a traditional focus of the investment adviser regulatory regime.

The Staff recognizes commenters' concerns regarding the difficulties of establishing professional standards of conduct that have enough flexibility to function effectively in a dynamic market to be relevant and to deter new fraudulent schemes. Accordingly, the Staff recommends that any rulemaking or guidance explicitly provide that it establishes only *minimum* expectations for the appropriate standard of conduct and does not establish a safe harbor or otherwise prevent the Commission from applying a higher standard of conduct based on specific facts and circumstances.

*Recommendation:  The Commission should consider specifying uniform standards for the duty of care owed to retail customers, through rulemaking and/or interpretive guidance.  Minimum baseline professionalism standards could include, for example, specifying what basis a broker-dealer or investment adviser should have in making a recommendation to a retail customer.*

### 3.    Personalized Investment Advice About Securities

Section 913 does not define the term "personalized investment advice."  However, if the uniform fiduciary standard were applied to broker-dealers and investment advisers under Section 913, it would be critical for these firms to understand when it applies, i.e., when providing investment advice about securities to retail customers.

Although the Advisers Act does not separately define "investment advice," it does define the term "investment adviser,"[557] which is fundamental to the scope of the Advisers Act.  The Commission and staff have interpreted the term in detail on several occasions.[558]  The Commission also has defined some services that investment advisers may provide as "impersonal investment advice," which means "investment advisory services provided by means of written material or oral statements that do not purport to meet the objectives or needs of specific individuals or accounts."[559]  The determination of whether a particular communication rises to the level of investment advice or "impersonal investment advice" depends on the facts and circumstances.

---

[556]    See supra note 109 (proposed by the Commission but not adopted).

[557]    The term "investment adviser" is defined as a person who "engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities."  Advisers Act Section 202(a)(11).

[558]    See, e.g., Release 1092, supra note 53.

[559]    Advisers Act Rules 203A-3 and 206(3)-1.

123

The broker-dealer regulatory regime does not use the term investment advice and focuses instead on whether a broker-dealer has made a "recommendation."[560] Whether a recommendation has been made is a facts-and-circumstances determination to be made on a case-by-case basis that is not susceptible to a bright-line definition.[561] The content, context, and presentation of the particular communication or set of communications are all relevant factors.[562] Generally, communications that constitute a "call to action" or that "reasonably could influence" the customer to enter into a particular transaction or engage in a particular trading strategy are likely to be considered recommendations.[563] The more individually tailored the communication is to a particular customer or a targeted group of customers, the more likely it will be viewed as a recommendation.[564]

Examples—and not an exhaustive list—of communications that are generally viewed as constituting a recommendation include:

- Customer specific communications to a targeted customer or targeted group of customers encouraging the particular customer(s) to purchase a security or engage in a particular trading strategy;

- Communications stating that customers should be invested in stocks from a particular sector and urging customers to purchase one or more stocks from a list of "buy" recommendations;

- Portfolio analysis tools that generate a specific list of "buy" or "sell" recommendations for a customer based on information the customer has inputted regarding his investment goals and other personalized information;

- Technology that analyzes a customer's financial or online activity and sends specific investment suggestions that the customer buy or sell a security;[565] and

- Securities bought, sold, or exchanged in a discretionary account are considered implicitly recommended.[566]

---

[560]    See, e.g., NASD Rule 2310; FINRA Rule 2111 (effective Oct. 7, 2011).

[561]    See NASD Notice to Members 01-23, "Suitability Rule and Online Communications."

[562]    Id.

[563]    See infra Section II.B.

[564]    See NASD Notice to Members 01-23, "Suitability Rule and Online Communications." See also Michael F. Siegel, 2007 NASD Discip. LEXIS 20 (NAC May 11, 2007) (finding that registered representative's communications with customers in which he, among other things, called specific securities a "good investment" and encouraged investors to consider investing in those securities and explained why they should do so in an influential manner amounted to a "call to action").

[565]    NASD Notice to Members 01-23, "Suitability Rule and Online Communications."

Examples of communications that generally would not constitute a "recommendation" under existing broker-dealer regulation (depending on the surrounding facts and circumstances), may include:

- General financial and investment information such as (i) basic investment concepts, such as risk and return, diversification, dollar cost averaging, compounded return, and tax deferred investment, (ii) historic differences in the return of asset classes (e.g., equities, bonds, or cash) based on standard market indices, (iii) effects of inflation, (iv) estimates of future retirement income needs, and (v) assessment of a customer's investment profile.;[567]

- Descriptive information about an employer-sponsored retirement or benefit plan, participation in the plan, the benefits of plan participation, and the investment options available under the plan;

- Asset allocation models that:  (i) are based on generally accepted investment theory;  (ii) be accompanied by disclosures of all material facts and assumptions that may affect a reasonable investor's assessment of the asset allocation model or any report generated by such model; and (iii) comply with applicable FINRA interpretive material allowing investment analysis tools; [568] and

- Interactive investment materials that incorporate the above.[569]

Several commenters proposed definitions of "personalized investment advice," and also suggested exclusions from this definition.  For example, SIFMA proposed the following definition of "personalized investment advice," which is largely consistent with the FINRA definition of "recommendation":

> investment recommendations that are provided to address the objectives or needs of a specific retail customer after taking into account the retail customer's specific circumstances.[570]

Other commenters suggested that "personalized investment advice" could include:

---

[566]    See, e.g., Release 41816, supra note 289 at 20, n. 22; In the Matter of the Application of Paul C. Kettler, Exchange Act 31354 at  5, n.11 (Oct. 26, 1992).

[567]    See NASD IM-2210-6, "Requirements for the Use of Investment Analysis Tools."

[569]    See FINRA 2111.03 (effective Oct. 7, 2011).  See also NASD Notice to Members 01-23, "Suitability Rule and Online Communications."

[570]    See SIFMA Letter, supra note 25.

- discretionary authority to make investment decisions in a customer's account, or an investment recommendation to a customer about one or more securities based on that customer's individual circumstances;[571] and

- activities that fall outside of the parameters set for "impersonal advisory services," as defined under Advisers Act Rule 203A-3.[572]

Commenters also provided a variety of suggestions regarding the products and services that should be excluded from the definition of "personalized investment advice" (and thereby exempt from any fiduciary standard), which the Commission could consider in developing the definition.  The products and services that commenters recommended be excluded from the definition include: brokerage services (such as market making, underwriting, trade executions, and exercising limited time and price discretion);[573] ancillary account features or services (e.g., debit card, cash sweep, margin lending);[574] general advice and education (e.g., generalized securities research, investment tools and calculators, and target asset allocations);[575] discount brokerage accounts and on-line services;[576] limited purpose accounts that do not include personalized investment advice;[577] services provided by clearing firms to correspondent firms and their customers;[578] account and retail customer relationship maintenance (e.g., periodic contact to remind customer to rebalance assets to match allocations established at the time of contract purchase, absent efforts to recommend change the allocations percentages);[579]

---

[571]     See Schwab Letter, supra note 19.

[572]     See, e.g., letter from Blaine F. Aikin, Chief Executive Officer, and Kristina A. Fausti, Director of Legal and Regulatory Affairs, fi360, dated Aug. 30, 2010 ("fi360 Letter").

[573]     See, e.g., ABA & ABASA Letter, supra note 21; Ameriprise Letter, supra note 39; BOA Letter, supra note 17; Hartford Letter, supra note 471; Woodbury Letter, supra note 471.

[574]     See, e.g., Ameriprise Letter, supra note 39; BOA Letter, supra note 17; SIFMA Letter, supra note 25.

[575]     See, e.g., ABA & ABASA Letter, supra note 21; ACLI Letter, supra note 414; Ameriprise Letter, supra note 39; BOA Letter, supra note 17; Financial Planning Coalition Letter, supra note 471; Hartford Letter, supra note 471; ICI Letter, supra note 471; Schwab Letter, supra note 19; SIFMA Letter, supra note 25; Wells Fargo Letter, supra note 17; Woodbury Letter, supra note 471.

[576]     See, e.g., BOA Letter, supra note 17; Wells Fargo Letter, supra note 17.

[577]     See, e.g., Wells Fargo Letter, supra note 17.

[578]     See, e.g., Wells Fargo Letter, supra note 17.

[579]     See, e.g., ACLI Letter, supra note 414; CAI Letter, supra note 26.

needs analysis (e.g., meetings to determine customers' current and any new investment objectives and financial needs);[580] and unsolicited or customer-directed transactions.[581]

The phrases "personalized investment advice" and "recommendations" relate to existing terms of art in both the broker-dealer and investment adviser regimes. This usage suggests that the phrase "personalized investment advice about securities" in the uniform fiduciary standard could be read in a way that is consistent with the scope and interpretive history of both statutes. The Staff recommends that the Commission engage in rulemaking and/or issue interpretive guidance to define and/or interpret "personalized investment advice about securities" to provide clarity to broker-dealers, investment advisers, and retail investors. The Staff believes that such a definition *at a minimum* should encompass the making of a "recommendation," as developed under applicable broker-dealer regulation, and should not include "impersonal investment advice" as developed under the Advisers Act. Beyond that, the Staff believes that the term also could include any other actions or communications that would be considered investment advice about securities under the Advisers Act (such as comparisons of securities or asset allocation strategies), *except for* "impersonal investment advice" as developed under the Advisers Act.

*Recommendation: The Commission should engage in rulemaking and/or issue interpretive guidance to explain what it means to provide "personalized investment advice about securities."*

### (a)    Retail Customers

Dodd-Frank Act Section 913(g) amends the Advisers Act to add a definition of the term "retail customer."[582] Commenters raised some questions about applicability of the definition in certain specific scenarios. We recommend that the Commission engage in rulemaking or issue interpretive guidance on such points if it adopts and implements the uniform fiduciary standard. At that point, among other issues, the Staff recommends that the Commission specify that personalized investment advice provided to retail customers includes both advice to a specific retail customer on a one-on-one basis and to advice to a group of retail customers under circumstances in which members of the group reasonably would believe that the advice is intended for them.[583] The Commission could consider whether the uniform fiduciary standard should also be extended to persons other than retail customers that may also benefit from the additional investor protections that would be provided by the standard.[584]

---

[580]    See, e.g., ACLI Letter, supra note 414. See also IAA Letter, supra note 462 (call centers providing factual information in response to customer inquiries).

[581]    See, e.g., BOA Letter, supra note 17; ICI Letter, supra note 471; Schwab Letter, supra note 19; SIFMA Letter, supra note 25; Wells Fargo Letter, supra note 17.

[582]    New Section 211(g)(2) defines "retail customer" as: "a natural person, or the legal representative of such natural person, who– (A) receives personalized investment advice about securities from a broker-dealer or investment adviser; and (B) uses such advice primarily for persona, family, or household purposes." The definition does not differentiate among investors on the basis of their wealth or investment experience.

### 4.      Investor Education

As discussed above, many retail investors do not understand and are confused by the roles played by investment advisers and broker-dealers and the impact of the different regulatory regimes that apply to each.  This lack of understanding is compounded by the fact that many retail investors may not have the time, information, market sophistication, or access needed to represent themselves effectively in today's complex capital markets when pursuing their financial goals.[585]  Consistent with a number of commenters, the Staff believes that investor education can be helpful in addressing these concerns.[586]

To that end, the Commission should continue its ongoing program to improve the financial literacy of retail investors.[587]  The Staff believes that these investor education

---

[583]     See NASD Notice to Members 01-23, "Suitability Rule and Online Communications."  The Staff also is concerned about communications with prospective customers.  To the extent that prospective customers are not "retail customers," the Staff notes that the Commission's antifraud authority under both Advisers Act Sections 206(1) and (2) and Exchange Act Section 10(b) extends to fraudulent recommendations or other communications made to both existing and prospective clients and customers, thus providing significant protection against potential abuses in seminars and other marketing activities to prospective retail customers.

[584]     Exchange Act Section 15(k)(1) and Advisers Act Section 211(g)(1) authorize the Commission to extend the uniform fiduciary standard to "such other customers as the Commission may by rule provide…."

[585]     See *Financial Capability in the United States*, FINRA Investor Education Foundation, 2009 at 4. (http://www.finrafoundation.org/resources/research/p120478)

[586]     See, e.g., letter from Faith Bautista and Mia Martinez, Mabuhay Alliance dated Aug. 18, 2010 ("we urge that a Broker, Dealer and Investment Advisor Financial Literacy/Education Fund be established [for] community groups serving vulnerable communities"); Glenna R. Bohling, letter dated Aug. 31, 2010 ("[there is a] great need for financial education for the general population"); Susan Seltzer, The Derivatives Project, letter dated Dec. 30, 2010 ("Highlight the difference between a stockbroker and a SEC registered investment advisor on the SEC website and incorporate basics of cost-effective retirement investing today").  But see NAPFA Letter, supra note 489 ("While financial literacy programs are often touted as the "cure" for enabling consumers to make better financial decisions, a more reasoned review of the academic evidence suggests the ineffectiveness of financial literacy education"); CFA Letter, supra note 450 ("While not so extensive as to be conclusive, research also suggests that investors' lack of understanding cannot be dispelled through disclosures or investor education.").

[587]     See *SEC Strategic Plan for Fiscal years 2010- 2015*.  Strategic Goal 3.  The Commission's Office of Investor Education and Advocacy ("OIEA") has a robust outreach and education program that uses a multi-pronged approach to reach retail investors.  That approach includes: targeting specific populations such as seniors, young investors, the military, teachers, and affinity groups; working through national financial literacy coalitions and grassroots organizations; and creating plain English publications disseminated widely both online and in hard copy.  OIEA also publishes regularly investor alerts and bulletins to keep retail investors informed about current issues or actions that may affect them.   In 2010, these educational programs reached over 25 thousand individual investors in person through presentations and conference exhibits.  In addition, OIEA distributed approximately 330,000 publications and reached 10 million taxpayers through an IRS

programs could be enhanced in a number of ways to help investors better understand the uniform fiduciary standard and to make better-informed decisions when selecting a financial professional.   First, the staff could, where needed, design improved curriculum materials to assist retail investors, sponsor investor education workshops, and work in partnership with non-profit and community organizations to implement financial literacy programs designed to, among other things, help investors understand the uniform fiduciary standard and its application to personalized financial advice about securities. To design the most effective messaging and educational tools, public opinion research could be used to further understand how and why investors choose financial professionals, and the best way to interest investors or potential investors in gaining the information they need to make informed decisions.

To be most effective, the increased educational initiatives would need the scale and scope to reach large numbers of investors and future investors.  Such programming has the potential to use substantial Commission resources and time; therefore, it likely would require additional Commission resources to implement effectively.

*Recommendation:  The Commission should consider additional investor education outreach as an important complement to the uniform fiduciary standard.*

### D.     Harmonization of Regulation

The recommendations outlined above provide several potential areas for harmonization of the regulation of investment advisers and broker-dealers, particularly as they relate to standards of care and conduct when providing personalized investment advice about securities to retail customers.  Outlined below are other areas in which investment adviser and broker-dealer regulations differ, and the Staff recommends that the Commission consider whether the regulations that apply to those functions should be harmonized.  The Commission could consider these issues as part of the implementation of the uniform fiduciary standard or as separate initiatives.  In addition, Dodd-Frank Act Section 913(h)(2) provides that the Commission shall "examine and, where appropriate, promulgate rules prohibiting or restricting certain sales practices, conflicts of interest and compensation schemes for brokers, dealers and investment advisers that the Commission deems contrary to the public interest and the protection of investors."

In addition to considering the adoption of the uniform fiduciary standard, the Staff recommends that, when broker-dealers and investment advisers are performing the same or substantially similar functions, the regulatory protections should be the same or substantially similar; that is, that harmonization should be considered to the extent that such harmonization appears likely to add meaningful investor protection.

The Staff believes that all investors deserve the same protections regardless of where they choose to obtain investment advice.  Currently, investors have different levels

---

mailing.  Currently, OIEA is relaunching its retail investor oriented web site, www.Investor.gov, to be a centralized source of unbiased and understandable investment information.

129

of protection depending on the registration status (i.e., investment adviser or broker-dealer) and whether the investor has a brokerage or an advisory account.  Under the present system, investors not only must consider what investments to make, but also the level of protection that they want to enjoy (assuming the investor understands the different levels of protection).  Investors may even face these decisions when seeking the same advice from the same institution and the same professional, depending on whether they have a brokerage or advisory relationship. This creates unnecessary risk and complexity for investors by placing the burden on them to understand regulatory differences and to make rational economic decisions in the face of those differences.   To this end, such harmonization should take into account the best elements of each regime.  The Staff believes that where investment advisers and broker-dealers perform the same or substantially similar functions, they should be subject to the same or substantially similar regulation.

Commenters have noted a number of differences in current investment adviser and broker-dealer regulation that could be harmonized to improve retail investor protection.  The following is not intended to be a comprehensive or exclusive listing of potential areas of harmonization; there may be other requirements, not addressed below, that the Commission also might wish to harmonize.  The potential areas of harmonization are listed below generally in the order in which they implicate broker-dealer and investment adviser activity with retail investors.  In making recommendations, the Staff focused on the elements of each regulatory regime that it believes are most effective in protecting retail investors.

In addition as discussed above, although broker-dealers and Commission-registered investment advisers are subject to different financial responsibility requirements, the Staff is not making a recommendation at this time on this subject.

### 1.    Advertising and the Use of Finders and Solicitors

### a)    Advertising and Other Communications

The regulation of advertising is particularly important because of the impact it has on retail investors.  In particular, the RAND Study noted that the rise of "do it all" advertisements helped contribute to investor confusion about the roles and duties of investment advisers and broker-dealers.[588]  Advertising, by which the Staff refers to print, radio, and television advertisements as well as communications with prospective retail customers (such as mailings, seminars, and presentations to investors), is subject to different regulation under the Advisers Act and the Exchange Act and FINRA rules.  Some commenters believe that these differences in regulation may constitute a gap in regulation.[589]

---

[588]    RAND Report, supra note 454 at xix.

[589]    See, e.g., FINRA Letter, supra note 471; FSI Letter, supra note 471; LPL Letter, supra note 471; and UBS Letter, supra note 39; PIABA, SEC IA-BD Study Group Meeting Notebook, Nov. 30, 2010.

One of the most significant differences between investment adviser and broker-dealer regulation is that, under certain circumstances, a registered principal of the broker-dealer must approve a communication before distributing it to the public, and certain communications must be filed with FINRA for approval.[590] There are no similar pre-use review and regulatory approval requirements for investment adviser communications.[591]

Both investment advisers and broker-dealers are subject to general prohibitions of misleading or otherwise inappropriate communications[592] and to specific content restrictions. While the general prohibitions are broadly similar, the specific content restrictions differ. For example, investment advisers are prohibited in advertisements from using testimonials and restricted in using past specific recommendations.[593] While broker-dealers are not subject to prohibitions on testimonials, they are subject to other restrictions relating to testimonials and using past recommendations.[594] In addition, under the general antifraud provisions of the Advisers Act, extensive guidance has developed about the circumstances under which adviser investment performance information would or would not be considered misleading.[595] The body of interpretive or other guidance on broker-dealer use of performance is less detailed and extensive, reflecting the fact that in practice broker-dealers present performance data much less

---

[590]     See NASD Rule 2010(c)(4). FINRA must preapprove certain communications relating to registered investment companies, collateralized mortgage obligations, security futures, or bond mutual funds including bond mutual fund volatility ratings. Id. In addition, broker-dealers generally must file with FINRA within 10 days of first use or publication certain communications with the public regarding registered investment companies, direct participation programs, and government securities, and templates concerning an investment analysis tool, among others). See NASD Rule 2210(c)(2).

[591]     As discussed in Section II.B above, the Commission has brought enforcement actions against advisers for false or misleading advertising.

[592]     See, e.g., Exchange Act Sections 10(b) and 15(c) and Rule 10b-5 thereunder, and Advisers Act Section 206(4) for the general prohibitions.

[593]     See Advisers Act Rule 206(4)-1.

[594]     FINRA rules require that if any testimonial in a communication with the public concerns a technical aspect of investing, the person making the testimonial must have the knowledge and experience to form a valid opinion. See FINRA Rule 2210(d)(1)(E). Furthermore, FINRA rules mandate that advertisements or sales literature providing any testimonial concerning the investment advice or investment performance of a member or its products include prominent disclosure of certain information relating to the testimonial. FINRA Rule 2210(d)(2). FINRA also restricts a member's ability use material referring to past recommendations. See IM-2210-1(6)(C).

[595]     For example, broker-dealers are subject to specific rules and guidance relating to performance information (e.g., prohibitions against hypothetical or back-tested performance presentations in communications with the public). See NASD Rules 2210 and 2211. See also FINRA Interpretive Letter (Oct. 2, 2003).

often.  Broker-dealers are subject to other specific rules regarding the content of communications with the public.[596]

The Staff believes that, with the significant impact that advertising and other firm communications have on retail investors, at a minimum, it could be beneficial for investment advisers to designate employees (such as members of the firm's compliance department) to review and approve communications before they are distributed to the public.[597]

Any harmonization of advertising requirements would need to be done by an SRO (with respect to broker-dealer requirements) or the Commission, either through rulemaking or guidance.

***Recommendation:  The Commission should consider articulating consistent substantive advertising and customer communication rules and/or guidance for broker-dealers and investment advisers regarding the content of advertisements and other customer communications for similar services.  In addition, the Commission should consider, at a minimum, harmonizing internal pre-use review requirements for investment adviser and broker-dealer advertisements or requiring investment advisers to designate employees to review and approve advertisements.***

### a)    Use of Finders and Solicitors

A retail investor may retain the services of an investment adviser or broker-dealer based on information from a solicitor or finder who is paid by the investment adviser or broker-dealer.[598]  The regulation of solicitors differs for investment advisers and broker-dealers.  Receipt of transaction-based compensation in exchange for effecting transactions in securities (including soliciting investors) generally requires registration as a broker-dealer.[599]  Under Advisers Act regulations, a solicitor is not required to register as an investment adviser unless it otherwise meets the definition of investment adviser.  The Advisers Act regulation focuses instead on disclosure to clients of material conflicts: an investment adviser and a solicitor must enter into a written agreement (including the nature of the relationship between the investment adviser and the solicitor and the terms of any compensation agreement) requiring the solicitor to provide certain up-front

---

[596]    See FINRA Rule 2210.

[597]    Many investment advisers may currently require review and approval of advertisements pursuant to compliance policies and procedures that are required by Advisers Act Rule 206(4)-7.  The Staff also has recommended that the Commission consider whether to extend to investment advisers a more detailed supervisory regime with a focus on the supervisory oversight of retail client services.  See Section IV.D.3, infra.

[598]    This discussion will use the word solicitor to refer to both solicitors used by investment advisers and finders used by broker-dealers.

[599]    See also infra Section II.B.

disclosure to prospective clients.[600]  In addition, the adviser also has an obligation to supervise the solicitation activities of solicitors, and the adviser must treat the solicitor as an associated person to the extent the solicitor acts as such for the adviser.[601]  The Commission received a limited number of comments on this issue in connection with the Study.  The Staff believes that the Commission should consider reviewing the use of solicitors by investment advisers and broker-dealers to determine whether guidance or amendments to existing rules are appropriate, including whether to harmonize the approach to regulating solicitors.

*Recommendation:  The Commission should review the use of finders and solicitors by investment advisers and broker-dealers and consider whether to provide additional guidance or harmonize existing regulatory requirements to address the status of finders and solicitors and disclosure requirements to assure that retail customers better understand the conflicts associated with the solicitor's and finder's receipt of compensation for sending a retail customer to an adviser or broker-dealer.*

### 2.    Remedies

There are certain key differences in the rights of customers against broker-dealers and clients against investment advisers.  Notably, broker-dealer customers typically are required by contract with their broker-dealers to arbitrate any eligible dispute against a broker-dealer and its associated persons upon demand through the FINRA arbitration forum;[602] and FINRA rules require broker-dealers to arbitrate with their customers (whether or not there is a pre-dispute arbitration clause) and prescribe the content and format of pre-dispute arbitration clauses in customer agreements.  By contrast, advisory clients may elect to have disputes arbitrated either through a pre-dispute or post-dispute agreement regarding a resolution forum, but there are no regulatory requirements for the content and format of arbitration clauses in advisory agreements (although in practice, advisers whose agreements include such clauses generally follow the FINRA model) and the procedures and fees that will be applied to such forum.[603]  Broker-dealer customers have private rights of action for damages under certain provisions of the Exchange Act.  By contrast, advisory clients have a very limited private right of action under the Advisers Act that enables clients to seek to void an investment adviser's contract and obtain restitution of fees paid.[604]  Both broker-dealer customers and advisory clients have private rights of action for damages under Exchange Act Section 10(b) and Rule 10b-5 or applicable state law.

---

[600]    See Advisers Act Rule 206(4)-3.

[601]    See Advisers Act Rule 206(4)-3; Rules Implementing Amendments to the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1633 (May 15, 1997).

[602]    See Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes.

[603]    See, e.g., the American Arbitration Association and JAMS.

[604]    See Transamerica, supra note 82.

Several commenters noted that the lack of a specialized arbitration forum for all investors may constitute a gap in regulation.[605]  Such commenters stated that a specialized arbitration forum has a number of benefits for investors, including: (1) the ability to make decisions based on equity that are not necessarily required by law;[606] (2) it is generally less costly and more cost effective, efficient, and accessible (relaxed rules of evidence and fewer barriers to entry) than litigation;[607] (3) it is tailored to the industry staffed with individuals that are knowledgeable about the industry, its products and best practices.[608]

Nevertheless, during the Dodd-Frank Act legislative process, concerns were raised regarding mandatory-pre-dispute arbitration, including costs and limited grounds for appeal, among others.[609]  Dodd-Frank Act Section 921 amends the Exchange Act and the Advisers Act to provide the Commission with the authority to promulgate rules that prohibit or impose conditions or limitations on the use of agreements that require customers to arbitrate disputes, if it finds that such prohibition, imposition of conditions, or limitations, would be in the public interest and for the protection of investors.

Broker-dealers generally are required to by FINRA rules to pay monetary awards within 30 days of receipt.[610]  FINRA may suspend or cancel the membership of any member, or suspend any associated or formerly associated person from association with any member, for failure to comply with an arbitration award or with a written and executed settlement agreement obtained in connection with an arbitration or mediation.[611]  Investment advisers are not subject to such sanctions, and legislation might be required for the Commission to impose them.

While the Staff notes the differences between the arbitration practices for investment advisers and broker-dealers and the concerns raised by commenters, it does

---

[605]    See, e.g., Black Letter, supra note 483; FSI Letter, supra note 471; Woodbury Letter, supra note 471.

[606]    See, e.g.,, Black Letter, supra note 483; FSI Letter, supra note 471.

[607]    See, e.g., FSI Letter supra note 471; Woodbury Letter, supra note 471.

[608]    See, e.g., Woodbury Letter, supra note 471.

[609]    Report of the Senate Committee on Banking, Housing, and Urban Affairs on S. 3217, S.Rep. No. 111-176, at 110 ("There have been concerns over the past several years that mandatory pre-dispute arbitration is unfair to the investors.").

[610]    See FINRA Rule 12904(j).

[611]    See NASD By-Laws, Art. VI, Sec. 3(b); NASD By-Laws, Art. V., Sec. 4(b); NASD Notice to Members 04-57, "NASD Extends Jurisdiction to Suspend Formerly Associated Persons Who Fail to Pay Arbitration Awards" (Aug. 2004).  From 2005 to 2009, FINRA has annually suspended up to 5 firms and between 321 and 363 individuals; during the same years, it has annually expelled 15 to 20 firms and barred 263 to 282 individuals.  See http://www.finra.org/Newsroom/Statistics/

not recommend that the Commission take any action relating to arbitration as part of these recommendations, because Section 921 provides the Commission the opportunity to review this issue in greater detail.

### 3. Supervision

While both broker-dealers and investment advisers are required to supervise persons that act on their behalf, broker-dealers generally are subject to more specific supervisory requirements. Because abusive sales practices can stem from and persist under ineffective supervisory systems and control procedures, ensuring the adequacy of supervisory systems is an important tool in protecting investors as well as the integrity of the securities markets. In particular, the Exchange Act requires broker-dealers to supervise their associated persons.[612] Further, SRO rules explicitly require broker-dealers to, among other things: (1) establish a supervisory system that includes the designation of a supervisory hierarchy, including the assignment of a direct supervisor for each registered representative;[613] (2) conduct periodic inspections of its supervisory branch offices, non-supervisory branch offices, and unregistered locations;[614] and (3) supervise the outside business activities and private securities transactions of associated persons.[615]

In contrast, the personal securities trading provisions of the Advisers Act code of ethics rule (Advisers Act Rule 204A-1) are more extensive in certain respects than the requirement that broker-dealers supervise private securities transactions. Otherwise, the requirements for advisers are mostly more general and implicit: advisers and their officers are liable if they fail to supervise associated persons; and the Staff's interpretations of the Advisers Act compliance rule embody an expectation that an adviser's compliance processes will include provisions for effective supervision.

Although some industry commenters, as well as FINRA, suggested that the Commission address the difference in supervisory structure by harmonizing the supervision requirements applicable to investment advisers and broker-dealers, the Commission received a limited number of comments on this topic in connection with the Study.[616] The Staff believes that the Commission should consider reviewing supervisory requirements. In reviewing these requirements, the Commission could consider whether a single set of universally applicable requirements would be appropriate. Alternatively, the Commission could consider whether supervisory structure requirements should be scaled based on the size (e.g., number of employees) and nature of a broker-dealer or an investment adviser.

---

[612]    See Exchange Act Section 15(b)(4)(E).

[613]    See FINRA Rule 3010.

[614]    See FINRA Rule 3010(c).

[615]    See FINRA Rules 3270 and 3040. See Section II.B, infra, for a more detailed discussion of supervisory requirements applicable to investment advisers and broker-dealers.

[616]    See, e.g., AALU Letter, supra note 472; CAI Letter, supra note 26; FINRA Letter, supra note 471.

*Recommendation:  The Commission should review supervisory requirements for investment advisers and broker-dealers, with a focus on whether any harmonization would facilitate the examination and oversight of these entities (e.g., whether detailed supervisory structures would not be appropriate for a firm with a small number of employees), and consider whether to provide any additional guidance or engage in rulemaking.*

### 4.      Licensing and Registration of Firms

Investment advisers register on Form ADV Part 1, and broker-dealers register on Form BD.  The two forms are similar in many respects, and Form ADV originally was modeled on Form BD.  Commenters have suggested that the registration processes should be unified and streamlined by requiring both investment advisers and broker-dealers to register on a unified form.[617]

Developing a uniform registration form in theory could reduce some regulatory burdens by allowing dual registrants to use a single form to register both as broker-dealers and investment advisers.  However, about 611 firms are dually registered with the Commission, and most of those that are dual registrants are very large firms in terms of assets and number of employees.[618]  Accordingly, only a relatively small number of firms would benefit from the reduced regulatory burdens, and the requirement to complete a new, unified form could increase firms' regulatory burdens, at least on a one-time basis. Finally, a uniform registration form, while potentially simplifying the process for dual registrants (although firms would likely incur costs as they transition to a new form), likely would not enhance investor protection or ameliorate investor confusion and likely would create some level of confusion and increase the burden of compliance for all firms that are not dual registrants.  The Staff recommends that, where Form ADV and Form BD ask for the same (or very similar) information, the Forms' requirements should be made as uniform as feasible.[619]  This would enable comparison by regulators and investors.

In addition to completing Form BD, broker-dealers must satisfy the membership requirements of FINRA (or another SRO) before commencing business.  FINRA's process for evaluating membership applications aims to fully evaluate relevant aspects of applicants and to identify potential weaknesses in their internal systems, thereby helping to ensure that successful applicants would be capable of conducting their business in

---

[617]     See, e.g., LPL Letter, supra note 471.

[618]     See Section II.A, supra, for data on dual registrants.

[619]     See also infra Section IV.C.1.a, discussing the Staff's recommendation that the Commission consider rulemaking to develop a uniform approach to disclosure that would provide retail customers of both broker-dealers and investment advisers with relevant key pieces of information at the outset of the advisory or brokerage relationship and at appropriate times thereafter, which would presumably include extending to broker-dealers a requirement of a general relationship disclosure document analogous to Form ADV Part 2.

compliance with applicable regulation.[620]  The FINRA membership process includes: a membership application (including among other things, a business plan and a description of: the nature and source of capital with supporting documentation; the financial controls to be employed; the supervisory system and copies of certain procedures); a membership interview; compliance with applicable state licensing; establishment of a supervisory system; and a membership agreement.  In evaluating a membership application, FINRA will consider, as a whole, the applicant's business plan, information and documents submitted by the applicant, information provided during the membership interview, and other information obtained by the Staff, taking into account a variety of standards, including whether (1) the applicant and its associated persons are capable of complying with the federal securities laws, the rules and regulations thereunder, and FINRA rules, including observing high standards of commercial honor and just and equitable principles of trade and (2) whether the applicant has the operational and financial capacity to comply with the federal securities laws, the rules and regulations thereunder, and FINRA rules.[621]   Investment advisers are not subject to this type of review by the Commission, but certain states informed the Staff that they perform a more qualitative review of investment advisers prior to granting them registration.

The Commission could consider whether to engage in a more substantive review of an investment adviser's application. The Staff believes that a more substantive review of investment adviser applications for registration could improve investor protection as it could help prevent firms that are unprepared to meet the obligations they will be assuming under the federal securities laws from entering the advisory business. However, without additional resources, the Staff believes that it would not be feasible at this time for the Commission to engage in a more substantive review of investment adviser applications.

***Recommendation:  The Commission should consider whether the disclosure requirements in Form ADV and Form BD should be harmonized where they address similar issues, so that regulators and retail customers have access to comparable information.  The Commission also should consider whether investment advisers should be subject to a substantive review prior to registration.***

---

[620]  See FINRA Regulatory Notice 10-01, "Membership Application Proceedings: Proposed Consolidated FINRA Rules Governing FINRA's Membership Application Proceedings (Jan. 2010) ("[FINRA's Membership Application Process ("MAP")] is a fluid, probing exercise that seeks to evaluate all relevant facts and circumstances regarding each applicant. In particular, the MAP seeks to identify potential weaknesses in an applicant's supervisory, operational and financial controls. The MAP's ultimate goal is to ensure that each applicant is capable of conducting its business in compliance with applicable rules and regulations, and that its business practices are consistent with just and equitable principles of trade as required by FINRA rules.").

[621]  See NASD Rule 1014(a).  For a more detailed discussion of FINRA's application review process see Section II.B.

### 5.    Licensing and Continuing Education Requirements for Persons Associated with Broker-Dealers and Investment Advisers

Associated persons of broker-dealers generally are required to be registered with FINRA (other than persons whose functions are solely clerical or ministerial) and must disclose their employment and disciplinary histories and keep that information current.[622] Associated persons who effect securities transactions also must meet qualification requirements, which include passing a securities qualification exam, and must fulfill continuing education requirements.[623] Some commenters have stated that these requirements help to ensure that financial professionals are subject to minimum and ongoing competency requirements, and thus create a useful barrier to entering and remaining in the profession.

There is no federal or SRO licensing requirement for investment adviser personnel.   However, investment adviser representatives who are required to be licensed by the states generally must pass certain securities exams or hold certain designations (such as a Certified Financial Analyst).

Some commenters have pointed out the lack of federal or SRO requirements for personnel of Commission-registered investment advisers regarding licensing, registration, and continuing education as a gap in current investment adviser regulation that should be addressed under the Advisers Act.[624]

The lack of a continuing education requirement and uniform federal licensing requirement for investment adviser representatives may be a gap,[625] but establishing such requirements for investment adviser representatives may raise certain challenges for the Commission, given the current lack of infrastructure and resources to administer an education and testing program.  The Staff notes, however, if these requirements were imposed, a private organization could develop the program.

*Recommendation:    The Staff recommends that the Commission could consider requiring investment adviser representatives to be subject to federal continuing education and licensing requirements.*

---

[622]    See generally NASD Rule 1000 Series.

[623]    See NASD Rule 1120.

[624]    See, e.g., AALU Letter, supra note 472; BOA Letter, supra note 17; FSI Letter, supra note 471; Hartford Letter, supra note 471; LPL Letter, supra note 471; UBS Letter, supra note 39; Woodbury Letter, supra note 471.  Investment adviser personnel of Commission-registered investment advisers may be subject to state licensing requirements, as discussed more fully in Section II.C,1 supra.

[625]    Id.

### 7.    Books and Records

Differences also exist in the books and records requirements applicable to broker-dealers and investment advisers.  While many differences reflect distinctions in their overall business activities, others do not.  More generally, the rules for broker-dealers require the retention of all communications received and sent, as well as all written agreements (or copies thereof), relating to a firm's "business as such,"[626] whereas the rules for advisers require only the retention of materials falling in specific enumerated categories, meaning that many important records relating to an adviser's business may not be available for internal supervision and compliance oversight or for inspection by Commission staff.  These differences limit the effectiveness of internal supervision and compliance structures and the ability of regulators to access information and verify the entity's compliance with applicable requirements.   This could have the effect of diminishing the level of investor protection that results from regulatory examination programs.  A number of brokerage industry commenters also suggested that the recordkeeping requirements be harmonized to require broker-dealers and investment advisers to maintain similar records for the same time periods.[627]

*Recommendation:  The Commission should consider whether to modify the Advisers Act books and records requirements, including considering a general requirement to retain all communications and agreements (including electronic communications and agreements) related to an adviser's "business as such," consistent with the standard applicable to broker-dealers.*

### E.    Alternatives to the Uniform Fiduciary Standard

### 1.    Repealing the Broker-Dealer Exclusion

A broker-dealer is currently excluded from the definition of "investment adviser" under the Advisers Act if it provides investment advice that is "solely incidental to the conduct of his business as a broker or dealer" and "receives no special compensation therefor" (the "broker-dealer exclusion").[628]  If the broker-dealer exclusion were repealed, any broker-dealer that provided investment advice would need to consider whether it had to register as an investment adviser with a state or the Commission.

Repealing the broker-dealer exclusion could have certain benefits.  For example, financial services could be divided into two categories: a) investment advice (regulated under the Advisers Act), and b) brokerage activities (e.g., execution and dealer activities) (regulated under the Exchange Act). [629]  It could help reduce investor confusion about the

---

[626]    See Exchange Act Rule 17a-4(b)(4) and (b)(7).

[627]    See, e.g., FSI Letter, supra note 471; LPL Letter, supra note 471.

[628]    Advisers Act Section 202(a)(11)(C).

[629]    One industry commenter claimed that removing the broker-dealer exclusion would "completely" eliminate any differences or gaps in the standard of conduct applicable to broker-dealers and investment advisers when providing personalized investment advice or recommendations.  However,

different regulatory regimes that apply to broker-dealers and investment advisers, and it might superficially simplify the Commission's task in regulating these two types of securities professionals.[630] However, the Staff believes that any benefits of eliminating the broker-dealer exclusion would not be justified by the potential negative outcomes, as discussed in more detail below.

### 2.    Imposition of the Standard of Conduct and Other Requirements of the Advisers Act

Dodd-Frank Act Section 913(c)(9) also requires the Study to consider the potential impact of imposing on broker-dealers the standard of care applied under the Advisers Act for providing personalized investment advice about securities, and other requirements of the Advisers Act.[631] Like the elimination of the broker-dealer exclusion, this approach might simplify the Commission's regulation of investment advice by uniformly imposing the Advisers Act requirements on broker-dealers (rather than developing a more tailored approach). In addition, it would avoid imposing any additional investment adviser registration costs on broker-dealers. Nevertheless, as with the broker-dealer exclusion, the Staff believes that any potential benefits of this option would not be justified by the potential drawbacks, as discussed below.

### 3.    Potential Drawbacks of Both Approaches

Unlike the uniform fiduciary standard, both of these approaches could result in the imposition of the entire investment adviser regulatory regime on a broker-dealer, without considering whether it would be disruptive (in the case of the broker-dealer exclusion) and/or duplicative (in the case of both the broker-dealer exclusion and the application of Advisers Act regulation on the broker-dealer). If a broker-dealer were required to register as an investment adviser with a state, rather than the Commission, the broker-dealer could find itself subject to federal regulation with respect to its brokerage activities, and state (and possibly also federal) regulation with respect to its advisory activities.

The Staff believes that the additional potential drawbacks to both of these approaches include the following, as discussed below: (1) they could prevent the

---

the commenter ultimately rejected the broker-dealer exclusion as a viable option, as discussed below. See, e.g., IAA Letter, supra note 462. See also PIABA Letter, supra note 482.

[630]    However, if broker-dealers were required to register with the Commission under the Advisers Act, the Commission would be tasked with examining these new registrants. Absent additional funding or an investment adviser SRO, this might create a significant burden on the Commission, because the SROs typically perform inspections of broker-dealers.

[631]    There is some ambiguity as to which Advisers Act standards Congress intended to be applied to broker-dealers pursuant to this alternative. At its most expansive, the effect of this option could result in the application of the entire Advisers Act to broker-dealers and registered representatives that provide investment advice, with the exclusion of the Advisers Act's registration requirements. At its most narrow, this option would impose fiduciary duty upon broker-dealers. For purposes of this analysis, the Staff interprets it in its broadest sense.

Commission from evaluating the existing regulatory regimes and applying the best elements of each to advisers and broker-dealers; (2) they might result in fewer investor choices; and (3) they would likely be more costly for investors and the industry, as discussed in Section V below. Generally, these drawbacks would result from, among other things, the fact that both approaches could involve the wholesale application of the requirements of the Advisers Act to broker-dealers, without limiting such application solely to the provision of investment advice.

Several commenters (including investor advocates and industry commenters) did not support either option. Specifically, an investor advocate noted that "[n]o one that we are aware of is seriously contemplating advocating this approach [of eliminating the broker-dealer exclusion]…if investors are to receive the benefits of a fiduciary duty for brokers, it is up to the Commission to provide it through its rulemaking process."[632] Similarly, an investment adviser industry commenter noted that while it originally supported such a change, it believed that the Commission could achieve a similar result by imposing by rule a fiduciary duty that requires broker-dealers to act in the best interests of their clients when providing personalized investment advice.[633]

### a)    Inability to Take the Best from Each Regulatory Regime

Repealing the broker-dealer exclusion or imposing the requirements of the Advisers Act on broker-dealers may not allow the Commission to take the best of each regulatory regime and apply it to broker-dealers and investment advisers performing the same functions. The Staff believes, therefore, that the uniform fiduciary standard would be a more thoughtful, flexible and practical approach in uniformly regulating investment advisers and broker-dealers that provide the same services.

A number of commenters made arguments that reinforced the benefits of a thoughtful approach to the harmonization of regulation governing personalized investment advice and recommendations about securities to retail customers. For example, commenters argued that neither of these approaches – repealing the broker-dealer exclusion or imposing the Advisers Act standard of conduct and other requirements on broker-dealers - would achieve the harmonization of standards relating to the provision of investment advice to retail customers that they think the Dodd-Frank Act intended.[634] Notably, many commenters stated that there are benefits to the current regulation of investment advisers

---

[632]    See, e.g., CFA Letter, supra note 450 (further noting that "given the limited timeframe under which the Commission is operating, we believe that time would best be spent analyzing issues that are directly relevant to actions the Commission is likely to take. We therefore recommend that the Commission spend the minimum time and effort necessary to satisfy this aspect of the study.").

[633]    See, e.g., IAA Letter, supra note 462.

[634]    See, e.g., Pacific Life Letter, supra note 471 ("Simply eliminating the broker-dealer [exclusion] from the definition of "investment adviser" under section 202(a)(11)(C) of the Investment Advisers Act of 1940 would not achieve the harmonization of standards sought by the Dodd-Frank Act.").

and broker-dealers that should be maintained and extended to the provision of investment advice or recommendations about securities by both investment advisers and broker-dealers.[635]

Broker-dealer commenters point out that another failure of the wholesale application of Advisers Act, as opposed to harmonization of broker-dealer and investment adviser regulation, is that the Advisers Act requirements would apply not only to a broker-dealer's provision of personalized investment advice, but would also extend to other brokerage activity that does not involve the provision of such advice and that may already be subject to extensive regulation under the Exchange Act.[636]

In addition, brokerage industry commenters also argued that either of these options would subject broker-dealers that are not dually-registered currently to duplicative regulation, that would not enhance investor protection and would only increase firms' costs.[637] Specifically, commenters point to the following areas where duplication would arise: registration and licensing;[638] disclosures;[639] books and records requirements;[640] and policies and procedures requirements.[641] Brokerage industry commenters were also very concerned about the potential negative consequences of applying the principal trading

---

[635] See, e.g., BOA Letter, supra note 17 (citing to a number of regulatory protections that attach to a brokerage relationship, but not present in an advisory relationship, including licensing and continuing education requirements for registered representatives; fidelity bond requirements, and frequent examination); IAA Letter, supra note 462 (acknowledging that "[s]ome in the broker-dealer community have argued that certain broker-dealer requirements are more protective of retail investors and should be applied to investment advisers" and that the IAA is "open to constructive dialogue with the Commission to enhance investment adviser regulation where appropriate." ); LPL Letter, supra note 471 (noting that, on one hand, the required disclosure of conflicts of interest and the delivery of a brochure to potential clients describing services, investment skills, regulatory record, pricing for services and conflicts of interest is a strength of the investment adviser regime that may be extended to broker-dealers, and that the existence of detailed supervisory requirements and suitability guidelines, and examination by an SRO are vital to the brokerage regulatory regime); UBS Letter, supra note 39 ("[T]he current debate largely ignores the disparity in regulation of broker-dealers and investment advisers, and focuses on the one difference that advisers have chosen to highlight – the existence of a fiduciary duty. . . .The Commission's efforts at harmonization should also focus on current gaps in the regulation of investment advisers.").

[636] See, e.g., Schwab Letter, supra note 19; SIFMA Letter, supra note 25.

[637] See, e.g., NAIFA Letter, supra note 552.

[638] See, e.g., NAIFA Letter, supra note 552; TC Services Letter, supra note 493. The Staff notes that the duplicative registration and licensing requirements would only occur with respect to the elimination of broker-dealer exclusion, and would not necessarily result from the imposition of the Advisers Act standard of conduct or other requirements of the Advisers Act.

[639] See, e.g., NAIFA Letter, supra note 552.

[640] See, e.g., TC Services Letter, supra note 493.

[641] See, e.g., TC Services Letter, supra note 493.

restrictions in Advisers Act Section 206(3) to their activities. The potential consequences are discussed in the Cost Analysis in Section V.

Accordingly, the Staff believes the uniform fiduciary standard would provide investor protection, while also providing the flexibility in how to address the implementation issues, including those associated with principal trading for broker-dealers and investment advisers. In addition, the Staff has recommended that the Commission pursue increased harmonization of the broker-dealer and investment adviser regulatory regimes, with the focus on the elements that are most effective in regulating the relationship between broker-dealers or investment advisers and their retail customers and clients.

### b)    Loss of Investor Choice

The Staff also is concerned that eliminating the broker-dealer exclusion or imposing the requirements of the Advisers Act would have a more adverse impact on retail investor choice of products and services, and how investors pay for those products and services, than adopting the uniform fiduciary standard. These potential consequences are discussed in the Cost Analysis below.

## V.    Cost Analysis

### A.    Introduction

The Staff is sensitive to the costs that could be incurred by investors, broker-dealers, investment advisers, and their associated persons due to any change in legal or regulatory standards related to providing personalized investment advice to retail investors. Section 913 requires this Study to consider a number of potential costs, expenses and impacts of various regulatory changes. In particular, Section 913(c)(13) requires this Study to consider the potential additional costs and expenses to: (a) retail customers regarding, and the potential impact on the profitability of, their investment decisions; and (b) brokers, dealers, and investment advisers resulting from potential changes in the regulatory requirements or legal standards affecting brokers, dealers, investment advisers, and their associated persons relating to their obligations, including duty of care, to retail customers. Relatedly, Section 913(c)(9) requires the Study to consider the potential impact on retail customers, including the potential impact on their access to the range of products and services offered by broker-dealers, of imposing on broker-dealers the standard of conduct applied under the Advisers Act for providing personalized investment advice about securities to retail customers of investment advisers, and other requirements of the Advisers Act. Section 913(c)(10) requires consideration of any additional costs to brokers, dealers and associated persons that could result from the elimination of the broker-dealer exclusion.

As discussed above, the primary recommendation of the Study is that the Commission should consider proposing rules that would require broker-dealers and investment advisers to operate under a uniform fiduciary standard of conduct when

143

providing personalized investment advice about securities to retail investors. The Staff also recommends that the Commission consider whether certain regulatory requirements should be harmonized in conjunction with implementing the uniform fiduciary standard of conduct. As discussed above, the Staff does not recommend eliminating the broker-dealer exclusion.

Certain recommendations would require rulemaking by the Commission. The rulemaking process would provide the opportunity for the Commission to request comment on potential costs and benefits associated with the rulemaking, and would assist the Commission's goals (and the goals of Section 913) to preserve retail investor choice, as part of the Commission's mandate to protect investors with respect to, among other things, availability of accounts, products, services, and relationships with investment advisers and broker-dealers,[642] and not inadvertently eliminate or otherwise impede (for example, through higher costs that investors are unwilling to bear) retail investor access to such accounts, products, services and relationships.

The costs associated with possible regulatory outcomes are difficult to quantify.[643] Data relating to costs as well as profitability of investments were not provided by commenters. For example, data comparing the costs and profitability to retail customers of broker-dealers and investment advisers, for comparable products and services, provided by commenters. Data comparing the profitability to broker-dealers and investment advisers when providing comparable products and services, which would have been helpful in analyzing the costs on broker-dealers and investment advisers, also were not provided by commenters. Although these data would have been instructive to the Staff, the data would not necessarily have been determinative because the recommendation to adopt a uniform fiduciary standard is intended to address the integrity of personalized investment advice to retail investors and is based on a desire to promote full, fair and clear disclosure of relevant conflicts.

Generally, commenters did not quantify particular costs or even give a range of costs that they would incur for the various potential outcomes. While some commenters

---

[642]    See, e.g., ABA & ABASA Letter, supra note 21; ACLI Letter, supra note 414; AXA Letter, supra note 503; BOA Letter, supra note 17; letter from Richard M. Whiting, Executive Director and General Counsel, The Financial Services Roundtable, dated Aug. 30, 2010 ("Financial Services Roundtable Letter"); FSI Letter, supra note 471; Hartford Letter, supra note 471; ICI Letter, supra note 471; Janney Letter, supra note 30; Lincoln Letter, supra note 504; NSCP Letter, supra note 503; SIFMA Letter, supra note 25; UBS Letter, supra note 39; Wells Fargo Letter, supra note 17; Woodbury Letter, supra note 471.

[643]    In general, however, imposition of a new standard of conduct on broker-dealers has a potential for additional costs on broker-dealers. In addition, the harmonization recommendations have the potential to increase costs on advisers. See Oliver Wyman, Securities Industry and Financial Markets Association, Standard of Care Harmonization: Impact Assessment for SEC, dated Oct. 2010 ("OW/SIFMA Study"). See also Deloitte LLP, Firm Behaviour and Incremental Compliance Costs: Research for the Financial Services Authority, dated May 14, 2009, and Oxera, Retail Distribution Review Proposals: Impact on Market Structure and Competition, Prepared for the Financial Services Authority, dated Mar. 2010 (together, "FSA Reports").

144

App 406

that addressed the impact of regulatory changes predicted that certain outcomes could occur, the commenters did not forecast what any particular regulated entity would do, nor can the Staff predict how entities would change their practices in response to regulatory changes. The Staff also cannot estimate how many entities might opt for particular outcomes. The response of entities would depend on an interplay of factors such as the complexity of customer needs, the degree of customer engagement, entity resources, the current registration type of the entity, the extent to which broker-dealers have conflicts to be mitigated, eliminated or discharged, and competitive forces within the industry.[644] Finally, any ultimate and net costs on broker-dealers and investment advisers, which could be passed on retail customers, would depend not only on the specific rules that may be adopted and how the Commission might choose to define "personalized investment advice" but also on various factors, including, but not limited to, whether the intermediary in question is dually registered,[645] the extent of the intermediary's existing resources, and the size and business model of the intermediary.[646]

In addition, many commenters who addressed cost issues discussed only the potential for substantial costs associated with eliminating the broker-dealer exclusion, including the costs associated with converting retail commission-based accounts to fee-based advisory accounts. Most commenters did not address the costs associated with the approach recommended in the Study of extending a uniform fiduciary standard of conduct to broker-dealers and investment advisers when providing personalized investment advice about securities to retail investors. To the extent commenters provided information about costs, their thoughts are addressed in this Section.

The cost analysis begins with a discussion below in sub-Section B of the costs of eliminating the broker-dealer exclusion. The Staff believes that this option, although not recommended, would present overall the greatest and most identifiable costs to both the broker-dealer industry and retail customers. Next, sub-Section C addresses the costs the Staff believes are most likely to be incurred if its recommendation of a uniform fiduciary standard of conduct were applied to broker-dealers and investment advisers. Finally, sub-Section D of the analysis discusses costs related to additional harmonization of the

---

[644]    For example, the FSA found that smaller firms and firms with less revenue were more likely to either exit the market or alter the types of services provided, in response to new regulations including, *inter alia*, an enhancement in professional standards and establishment of a professional standards board. FSA Reports, id.

[645]    Generally, to the extent requirements of the investment adviser regime are imposed on broker-dealers, or vice versa, the Staff believes costs applicable to dually registered entities would be less than those applicable to the registrant type on which the requirements would be imposed. This is because dual registrants already comply with the requirements of both regimes and could apply their existing policies and procedures to each account as applicable.

[646]    According to Cerulli Associates, wirehouse and regional broker-dealers tend to devote less time to administrative tasks, more time to investment management activities, and a relatively equal proportion of their time to client-facing activities, when compared to bank broker-dealers, insurance broker-dealers and independent broker-dealers; as such, costs which would impact administrative tasks, for instance, would likely have more of an impact on the latter channels of broker-dealers. Cerulli Associates, Inc., Cerulli Quantitative Update: Advisor Metrics 2010, Exhibit 2.15 at 63.

regulatory regimes, beyond the parameters of the recommended uniform fiduciary standard.

Throughout this analysis, potential outcomes are discussed, such as changes in registration and conversion of customer accounts; the Staff does not believe that these outcomes would be mandated based on the uniform fiduciary standard of conduct outlined in the recommendations.  These outcomes would be elective on the part of registrants, based on their particular business strategies, and how they decide to respond to regulatory changes.  The Staff therefore believes that not all of the costs outlined under each of the three options would necessarily apply; where possible, the Staff has expressed its view on the likelihood of particular outcomes.  Moreover, the Staff highlights that the net cost impact on intermediaries and retail customers alike would depend on the interplay of the various factors and potential outcomes set out below, as well as other factors beyond the scope of this Study, such as market forces and competition.

### B.    Potential Costs Associated with the Elimination of the Broker-Dealer Exclusion

#### 1.    Costs to Broker-Dealers

Eliminating the broker-dealer exclusion from the definition of investment adviser (Advisers Act Section 202(a)(11)(C)) would likely result in broker-dealers that provide investment advice having to register as investment advisers (either with the Commission or the states) and consequently incurring the associated regulatory costs, assuming they would wish to continue providing investment advice.  Ultimately, however, the costs applicable to broker-dealers would depend on how they respond to an elimination of the exclusion.  While the Staff is not recommending elimination of the broker-dealer exclusion, it has identified the following potential outcomes and associated costs of this option.

##### a)    Potential Outcome 1: Broker-dealers might deregister, register as investment advisers, and in the process, convert their brokerage accounts into advisory accounts (subject to advisory fees).

Broker-dealers providing investment advice could choose to deregister as broker-dealers and only register as investment advisers.[647] The Staff anticipates that this option would be more likely for broker-dealers that perform limited broker-dealer functions, such as introducing brokers, than for broker-dealers who provide a greater range of

---

[647]    Pursuant to the Dodd-Frank Act, investment advisers with under $100 million in assets under management would only be required to register at the state level, and so would incur costs to comply with applicable state investment adviser regulation but would not be subject to all of the requirements for federally registered investment advisers (such as certain rules promulgated under Advisers Act Section 206(4)).

broker-dealer services.[648] At least one commenter posited that elimination of the broker-dealer exclusion would "generate a spike in registration under the Advisers Act…impos[ing] additional regulatory costs and burdens on those new investment advisers."[649]

Broker-dealers that choose to deregister would have one-time costs associated with withdrawing from broker-dealer registration, including costs associated with completing and filing Form BDW.  However, firms that deregister as broker-dealers would also eliminate ongoing compliance costs associated with complying with certain provisions of the Exchange Act, including: maintaining minimum net capital;[650] preparing and maintaining books and records (such as a stock record and trade confirmations for customers);[651] preparing periodic financial reports, annual financial statements and related audit fees;[652] paying SIPC and FINRA membership fees and other fees; complying with FINRA sales practice and other rules (such as complying with fidelity bond requirements and product-specific suitability obligations); requiring principal review of customer communications; complying with FINRA review of advertising; complying with fair pricing requirements; and being subject to FINRA and Commission examinations for compliance with the Exchange Act and SRO rules.  Firms that deregister and register anew as investment advisers would instead become subject to the regulatory and compliance costs of being registered investment advisers, under the Advisers Act or the applicable state laws.

Deregistering would also lower ongoing compliance costs related to a broker-dealer's associated persons who would no longer be required to register as registered

---

[648]    For a fuller discussion of broker-dealer services, refer to sub-Section B.1.c, below.  It is worth noting that firms that register as new investment advisers and deregister as broker-dealers would likely charge asset-based fees for their services rather than transaction-based fees, the receipt of which generally requires registration as a broker-dealer.  Such registration would require that certain services the entity may have provided previously, which only broker-dealers can provide (such as execution and custody), would need to be provided by another entity; accordingly, both the costs and revenues associated with such operations would no longer apply to the newly registered investment adviser.

[649]    See FINRA Letter, supra note 471 (stating that the elimination of the broker-dealer exclusion would "generate a spike in registration under the Advisers Act by current broker-dealers and their associated persons … impos[ing] additional regulatory costs and burdens on those new investment advisers, including additional state licensing, registration and examination requirements on some individuals.").  See also IAA Letter, supra note 462 ("[T]here may be as many as approximately 230 [citing the Rand Report] additional broker-dealers that would be required to register under the Advisers Act or with the states if the broker-dealer exclusion was eliminated.... There would be some additional costs associated with SEC and state registrations.").  See sub-Section B.4. below for a further discussion of the impact on Commission and State resources.

[650]    Exchange Act Rule 15c3-1.

[651]    Exchange Act Rules 17a-3 and 17a-4.

[652]    Exchange Act Rules 17A-5(c) and 17A-5(d).

147

representatives, but this reduction could be offset by the costs of such persons then registering as investment adviser representatives.[653]

Firms that choose to register as investment advisers would incur the one-time costs of such registration. The registration process could result in costs for, among other things, the following procedural steps: (i) preparing and filing[654] Form ADV (including Part 2);[655] (ii) preparing and filing updates (yearly, or more frequently if material changes);[656] (iii) distributing client disclosures (as part of Form ADV Part 2, including the brochure supplement);[657] (iv) registering with states, as applicable;[658] and (v) identification and licensing (including any qualification exam) of investment adviser representatives in the states in which they do business. They would also be subject to other one-time administrative costs such as those associated with preparing new letterhead, revising compliance training, making public notices of the change in registration, revising employee contracts, and responding to customer inquiries.

Firms registered under the Advisers Act would incur ongoing costs associated with complying with that Act, including requirements and restrictions relating to custody, advertising, best execution, soft dollars, proxy voting, codes of ethics, cash solicitation (if they used solicitors), and principal trading.[659] In addition, firms registering as investment

---

[653] Specifically, firms would no longer have costs associated with: mandated training and passing FINRA qualification tests for firm personnel; conducting continuing education; and training associated persons for compliance with specific SRO sales practice rules. Instead, firms would have costs associated with state licensing of investment adviser representatives and training associated persons.

[654] The filing fees range from $40 to $225 for the initial fee. See Approval of Investment Adviser Registration Depository Filing Fees, Investment Advisers Act Release No. 3119 (Dec. 2, 2010) ("Release 3119").

[655] The Commission previously estimated that, for the average filer, the initial burden for preparing Form ADV would be 36.24 hours, in addition to one-time initial costs of outside legal fees, of $3,506.43, and of compliance consulting fees, of $3,621.91. Release 3060, supra note 67 at 83 and 85. The Commission also estimated that it would take an average filer 6.5 hours per year to prepare annual and interim amendments, which would be ongoing costs. Id. at 86 – 87.

[656] The annual updating amendment fees range from $40 to $225. See Release 3119, supra note 654.

[657] The Commission previously estimated that it would take an average filer 0.02 hours per customer to distribute this disclosure, and 0.1 hours per customer to distribute related interim updates. Based upon these estimates, the Commission estimated further that the average investment adviser would spend 33.1 hours per year complying with the delivery requirements of Form ADV. In addition, it noted that large filers may spend 200 hours per year to design and implement systems to track compliance with the delivery requirements of Form ADV. Release 3060, supra note 67 at 93 – 95.

[658] Broker-dealers who may be required to register as investment advisers in multiple states may face added costs, and may elect to rely on the "Multi-state Adviser Exemption" in Advisers Act Rule 203(A)-2(e). Such election itself would impose costs associated with keeping records that demonstrate the entity would be required to register with 15 or more states.

[659] See generally discussion in sub-Section B.1 above.

148

App 410

advisers may have to transfer assets to a qualified custodian, establish new brokerage relationships to execute trades, regularly reconcile accounts, and generate new appropriate documentation. In general, converting brokerage customer relationships to advisory relationships could entail significant time and expenditure on the part of the registrant, relating to, e.g., reviewing existing customer relationship documents, distributing notices, establishing new contracts with existing customers (e.g., repapering current customer agreements), and obtaining customer consents. It is possible that the registrant converting such accounts might lose some of its customers to competing broker-dealers that do not engage in such conversions. Moreover, on-going costs for newly registered investment advisers would include, among other things, modifying their supervisory and compliance structure to enforce compliance with the Advisers Act, including establishing written policies and procedures (such as a written code of ethics and tailored compliance policies and procedures), developing or acquiring new technology (as applicable) and hiring or retraining staff.[660]

It is worth noting that these costs could be offset by the savings associated with withdrawing from broker-dealer registration. And furthermore, to the extent the regulatory regimes governing broker-dealers and investment advisers were harmonized, over time the cost differential between being a broker-dealer and being an investment adviser would diminish, and possibly limit the costs of switching between the two roles.

### b) Potential Outcome 2: Dual Registrants might convert their advised brokerage accounts to advisory accounts.

Broker-dealers that are currently dually registered as investment advisers and whose registered representatives are also investment adviser representatives might maintain broker-dealer registration, but convert some or all of their brokerage accounts to advisory accounts. Certain types of limited service accounts, such as execution-only accounts, would be less likely than other types of accounts to be converted. Dual registrants would incur the cost of applying Advisers Act requirements to the relevant accounts; however, being dually registered, such entities would not incur initial costs to the same extent as an entity registering as an investment adviser for the first time.[661] That said, such entities might need to modify the terms of their relationships with the relevant customers, which could nevertheless result in costs associated with modifying contracts, disclosure, and internal policies and procedures. Once the accounts were converted, the

---

[660] See SFVPMC Letter, supra note 471 (stating that the repeal of the broker-dealer exclusion "would impose significant new costs on existing broker-dealer firms that would have to register as investment advisers, design new compliance and supervisory systems and procure investment advisory representative licenses for their existing sales forces.")

[661] In 2009, approximately 17% of broker-dealers were dually registered as investment advisers. See 2009 Special Committee Report at n.88. See also RAND Report, supra note 454 at 44 (noting that a review of IARD at the end of 2006 indicated that approximately 10% of broker-dealers reported that they were dually registered, and another 7 percent were state registered investment advisers). By mid-October 2010, approximately 18.4% of registered broker-dealer firms were dually registered investment advisers. See FINRA November Letter, supra note 41.

149

ongoing costs applicable to such accounts would derive from the currently applicable requirements of the Advisers Act, discussed above.

Other examples of costs that could be incurred in connection with converting accounts include: initially generating new appropriate documentation[662] (e.g., drafting new contracts, consents, and information memoranda to customers/clients, including the ongoing costs of distributing these forms and following up on their status); and, potentially transferring assets to a qualified custodian and performing account reconciliation.[663]

### c)     Potential Outcome 3: Broker-Dealers may unbundle their services and provide them separately through affiliates or third parties.

Broker-dealers might choose to unbundle their services and provide some of the component services through affiliates or third parties.  A brokerage relationship involves several component functions: finding customers; providing advice to those customers; executing orders; providing clearance and settlement of the transaction; custodying the securities; and providing disclosure and recordkeeping services, such as customer confirmations and customer account statements.  As such, costs to broker-dealers might depend on whether these services were provided by one entity or whether they were divided among service providers.  For example, a broker-dealer or investment adviser can provide advice to an investor, but an investment adviser (unless dually registered) cannot execute an order.  A broker can self-clear securities transactions, or contract with a clearing broker to clear transactions.  In addition, a broker can custody securities itself or contract with a third party such as a bank to custody securities.  Finally, a broker-dealer can disclose account information directly to investors, through an affiliate, or through a third party service provider.

Brokers could decide to divide some or all of these functions, such that one entity is responsible for providing personalized investment advice, and affiliates or third parties provide other services, such as trade execution and custody.  Investment adviser representatives could also be broker-dealer employees as well as employees of a bank and an insurance agent depending on the holding company's business model.  To the extent broker-dealers may transfer advised accounts or personnel to affiliated banks, they may incur the costs associated with deregistering, described above.  Providing advice and associated order handling and back-office functions through an affiliated bank would generate administrative costs, and ongoing costs associated with complying with Regulation R under the Exchange Act.[664]  In general, compliance with Regulation R, and

---

[662]     See Release 2376, supra note 56 at 89.

[663]     See discussion of custody (Advisers Act Rule 206(4)-2) in sub-Section II.B.1.

[664]     For example, the bank could elect to rely on exceptions or exemptions from registration as a broker-dealer for trust or fiduciary activities or in connection with certain custody activities. Depending on which exception or exemption the bank relied, it would become subject to certain

150

any federal and/or state banking regulations to which the bank affiliate is not otherwise already subject, may result in additional costs.

### d) Potential Outcome 4: Broker-dealers no longer buy or sell securities as principal from or to retail customers.

If the broker-dealer exclusion were eliminated, broker-dealers, as well as investment advisers affiliated with broker-dealers, might decide to no longer sell securities as principal to retail clients.[665]  If so, they might lose the customers who seek that service to advisers that are not affiliated with broker-dealers, and also might lose underwriting revenue to the extent that underwriters were selected by some issuers because they could distribute not only to institutional customers but also to retail customers.  Such loss in revenue could potentially manifest itself in increased costs to customers for other services and loss of investor choice, as discussed below in sub-Section B.3.  For a further discussion relating to principal trading, see sub-Section C.3.a below.

### 2. Costs to Investment Advisers

The Staff does not expect that eliminating the broker-dealer exclusion would result in any direct costs to investment advisers.

### 3. Costs to Retail Investors, including Loss of Investor Choice

Eliminating the broker-dealer exclusion could generate direct costs to investors if firms changed their pricing structures or eliminated certain account features in response. For instance, to the extent that accounts were converted from commission-based accounts to fee-based[666] accounts, investors would become susceptible to higher costs in certain

---

requirements, such as the compensation condition to the trust and fiduciary activities exception from broker-dealer registration, and may need to develop systems to ensure compliance with such requirements.  Exchange Act Rules 721-723 under Regulation R.

[665]   Retail investors comprise a substantial proportion of investors holding securities, such as corporate and municipal debt securities, that are typically kept in broker-dealer inventories and sold through principal trades.  For instance, SIFMA and Oliver Wyman highlighted the key role that broker-dealers play in the municipal bond market to retail investors, by noting that approximately 70% of municipal securities and 40% of corporate and foreign bonds are held by retail investors, with half of those securities held individually and the other half held in the form of pooled investments.  See OW/SIFMA Study, supra note 643 at 18–19 (relying on Federal Reserve data), and note 694, infra.

[666]   For example, fees could be asset-based, fees for plans, hourly fees, and annual or retainer fees.  In general, wirehouses and dually registered broker-dealers are more likely to receive fee-based compensation than transaction-based compensation, when compared to bank broker-dealers, independent broker-dealers, insurance broker-dealers and regional broker-dealers.  See Cerulli Associates, Inc., Cerulli Quantitative Update: Advisor Metrics 2010, exhibit 2.13 at 61.  Note that

App 413

circumstances, depending on how the broker-dealers elected to re-price their services.[667] Generally, investors pay broker-dealers either an "all-in" fee for a bundle of account services or pay for services separately. An "all-in" fee may be an asset-based fee, or commissions (including sales loads that may be supplemented by Rule 12b-1 fees) and mark-ups and mark-downs, or a combination of such fees. Investors also may pay separately for services such as, advice, trade execution, and custody. To the extent that accounts were converted or transferred from brokerage accounts (e.g., to investment advisory accounts or to managed agency accounts at affiliated banks), investors could incur additional direct costs from a changed pricing structure, whether the pricing structure remains as an "all-in" fee or whether investors pay separately for services.

If, in response to the elimination of the broker-dealer exclusion, broker-dealers elected to convert their brokerage accounts from commission-based accounts to fee-based accounts, certain retail customers might face increased costs, and consequently the profitability of their investment decisions could be eroded,[668] especially accounts that are not actively traded, e.g., fee-based accounts that trade so infrequently that they would have incurred lower costs for the investor had the accounts been commission-based. This practice is commonly referred to as "reverse churning" or "underutilization."[669]

investors that pay asset-under-management fees for receiving investment advice should already be doing so in advisory accounts.

[667]   "It has been recognized that a commission-based, rather than fee-based, system of charges may pose a conflict as such a fee structure gives a retail securities broker an incentive to 'churn' a customer's account. By contrast, investment advisers' services are generally fee-based. It has also been recognized, in the broker-dealer context, that fee-based charges for a 'buy and hold' investor could result in considerably higher fees for such an investor over time, which is certainly not in the client's best interest." NSCP Letter, supra note 503.

[668]   "[A] 1% increase in annual fees reduces an investor's return by approximately 18% over 20 years." Enhanced Disclosure and New Prospectus Delivery Option for Open-End Investment Companies, Investment Company Act Release No. 28064 at note 46 (Nov. 21, 2007). See OW/SIFMA Study, supra note 643 at 26 (indicating that, given certain assumptions, "[t]he shift to a fee-based model would reduce cumulative returns to 'small investors' (with $200K in assets) by $20K over the next 20 years").

[669]   FINRA, NASD and NYSE have brought a number of disciplinary actions against broker-dealers for reverse churning. See, e.g., NYSE Regulation Fines A.G. Edwards & Sons $900,000 for Charging Customers Excessive Account Fees and Other Violations, Aug. 7, 2006, available at http://www.nyse.com/press/1154686574106.html, (censuring and fining a broker-dealer for "improperly maintaining customers in non-managed fee-based accounts and charging customers excessive fees, in light of the trading activity in those accounts."). See also NASD Fines Raymond James $750,000 for Fee-Based Account Violations, in NASD NTM Disciplinary Actions, May 2005, available at http://www.finra.org/web/groups/industry/@ip/@enf/@da/documents/disciplinaryactions/p014114.pdf (censuring and fining a broker-dealer for "fail[ing] to establish and maintain a supervisory system, including written procedures, reasonably designed to review and monitor their fee-based brokerage business"). See also NSCP Letter, supra note 503 ("It has been recognized that a commission-based, rather than fee-based, system of charges may pose a conflict as such a fee structure gives a retail securities broker an incentive to 'churn' a customer's account. By contrast, investment advisers' services are generally fee-based. It has also been recognized, in the broker-dealer context, that fee-based charges for a 'buy and hold' investor could result in considerably

152

Ultimately, reverse churning reduces the profitability of affected accounts to the customers. Between 2004 and 2009, FINRA disciplined ten firms in connection with reverse churning, imposing over $7 million in fines and ordering over $9.5 million be paid in restitution to investors.[670] Conversely, conversion to fee-based accounts could result in lower costs and corresponding increased profitability for retail investors who trade often.

Commenters stated that conversion to fee-based accounts would increase costs to retail investors and limit their choice in services currently available, as the cost of services becomes prohibitively high.[671] At least two commenters also stated that broker-dealers might pass along their costs associated with registering as investment advisers to their customers, and reduce investor access to certain products and services.[672] One commenter also argued that subjecting broker-dealers to the principal trading restrictions

---

higher fees for such an investor over time, which is certainly not in the client's best interest."). As a result, rules were enacted requiring broker-dealers to manage and monitor accounts to prevent this practice (i.e., to ensure that relatively inactive accounts are held as commission-based accounts rather than fee-based accounts).

[670] These violations were detected by FINRA in the course of both enforcement sweeps and non-sweep fee-based matters. The disciplinary actions were based upon violations of NASD Rules 3010 (Supervision), 2110 (Standards of Commercial Honor and Conduct, since superseded by FINRA Rule 2010), 2430 (Charges for Services Performed), and 2210 (Communications with the Public). The sanctions totaled $7,357,000 in fines in addition to, in certain cases, undertakings and suspension. The restitution payments totaled approximately $9,546,0078.56, plus interest in all but one case. Letter from Kathleen A. O'Mara, FINRA, to Kristen Lever, U.S. Securities and Exchange Commission, re: Dodd-Frank Wall Street Reform and Consumer Protection Act, dated Dec. 6, 2010.

[671] Securian Letter, supra note 553 ("Existing business models that currently offer customers a choice between a lower cost transaction-based relationship with a broker-dealer and a higher cost continuous-service relationship with an investment adviser may also be disrupted if broker-dealers and their costs of doing business are pushed closer to the investment adviser model. Such disruptions would not only raise costs and rob customers of choices they enjoy today, but many low and middle-income customers may lose even the opportunity to realize the intended 'benefit' of a new fiduciary standard if the cost of service becomes prohibitively high relative to their levels of income."). It is worth noting, however, that to the extent some broker-dealers may alter their business models to be closer to the investment advisory model, other broker-dealers may not, and may still offer relatively lower cost services to investors that are akin to transaction-based services. Accordingly, it is possible that across the industry, overall investor choice may not diminish.

[672] See SFVPMC Letter, supra note 471 (predicting that "additional costs would squeeze already thin margins for broker-dealers that serve the non-affluent market, and perhaps make product offerings less available to a market that traditionally has been underserved. Repeal of the broker-dealer exclusion could also result in increased regulatory costs being passed on to customers."). See also Commonwealth Letter, supra note 476 (stating that "the time and costs associated with the registration process [resulting from elimination of the broker-dealer exclusion] would be overly burdensome and unnecessary. Furthermore, the ongoing costs of maintaining the required licenses and registrations would necessarily be passed on to investors.").

153

App 415

that currently apply to investment advisers would have the ultimate effect of increasing trading costs to retail investors on an ongoing basis.[673]

A number of industry commenters argued that the elimination of the broker-dealer exclusion or the imposition of the standard of conduct under the Advisers Act and other requirements could lead to a reduction in investor choice in products and services, how investors pay for such products or services, or both.[674] At least one commenter claimed that either of these alternatives (without the creation of exemptions) could result in an inability of broker-dealers to offer certain products and services, including: cash sweep services; discount and unsolicited brokerage services; underwriting; proprietary product sales; principal trading; and incidental advice in connection with non-discretionary accounts for commissions.[675] In particular, some brokerage industry commenters stated that if the broker-dealer exception were repealed, firms might choose to cease offering financial services to less affluent retail customers, because it would not be economically viable to offer services to such customers if firms had to register as investment advisers, design new compliance systems, and incur other costs as a result.[676] Other commenters noted that the elimination of the broker-dealer exclusion could reduce the research services available, as broker-dealers may become concerned that such research might constitute personalized investment advice requiring registration with the Commission or with the states.[677] Commenters also suggested that subjecting registered representatives to the Advisers Act would limit retail investor access to services and products that are offered through a commission-based compensation model.[678]

While some commenters anticipated that such loss of investor choice would particularly impact less affluent investors, others noted that such investors are already

---

[673]   See FINRA Letter, supra note 471 ("[B]roker-dealers provide an important liquidity function by buying and selling securities from their own account. The Advisers Act prohibits an investment adviser from acting as principal for his own account without disclosing to such client in writing the capacity in which he is acting before completion of the transaction and obtaining the consent of the client to the transaction. Thus, if the Commission imposes on broker-dealers the identical investment adviser application of a fiduciary duty to retail customers, it would force broker-dealers to either cease providing investment advice to retail customers or forego one of the defining aspects of the broker-dealers model that significantly contributes to market liquidity and efficiency. Both of those repercussions inure to the detriment of retail customers: the former would reduce competition for financial services and might deprive customers of continued association with the financial professional or firm of their choice; the latter could reduce market liquidity and increase volatility and raise trading costs to retail customers.").

[674]   See, e.g., FSI Letter, supra note 471; NAIFA Letter, supra note 552; Schwab Letter, supra note 19; Wells Fargo Letter, supra note 17.

[675]   See, e.g., LPL Letter, supra note 471.

[676]   See, e.g., Commonwealth Letter, supra note 476; SFVPMC Letter, supra note 471.

[677]   See, e.g., FINRA Letter, supra note 471. But see, infra, the Staff's recommendation with respect to personalized investment advice.

[678]   See, e.g., NAIFA Letter, supra note 552.

154

App 416

served by investment advisers, who have a wide and diverse client base.[679] Commenters also pointed to the experience of financial planners, who initially resisted application of the Advisers Act fiduciary duty to their sales of financial products and securities, but who continue to be able to offer their products and services under the Advisers Act.[680] Commenters noted that simply because some broker-dealers may choose to cease offering certain services and products if subjected to the Advisers Act does not necessarily mean that access to those services would be reduced, as the products and services would still be available from other sources.[681] Conversely, to the extent there is a reduction in broker-dealers willing to offer certain products and services, costs could increase.[682]

### 4.      Impact on Commission and State Resources

Any increases in the number of investment adviser registrants resulting from the elimination of the broker-dealer exclusion would add strain to the Commission and state resources dedicated to the examination of investment advisers and representatives of registered investment advisers, and to related enforcement efforts.[683]

### C.      Potential Costs Associated with Staff Recommendation to Consider Rules Applying a Standard of Conduct No Less Stringent than Advisers Act Sections 206(1) and 206(2) to Broker-Dealers, Investment Advisers and their Respective Associated Persons.

If, as this Study recommends, the Commission exercises its authority under Section 913 to apply a uniform fiduciary standard to broker-dealers that is no less stringent than Advisers Act Sections 206(1) and 206(2), broker-dealers offering and maintaining brokerage accounts would incur additional costs associated with complying

---

[679]    See, e.g., Financial Planning Coalition Letter, supra note 471.

[680]    See, e.g., AARP Letter, supra note 449; CFA Letter, supra note 450.  See also letter from Steven Doster, Certified Financial Planner, dated Aug. 26, 2010 ("Adhering to the fiduciary standard of care does not limit my ability to provide my clients with appropriate services. Providing financial advice with fiduciary accountability does not reduce services to middle-class people. It insures that the services consumers receive will be in their best interests – not in the best interests of the financial intermediary or his or her company.").

[681]    See, e.g., CFA Letter, supra note 450.

[682]    See, e.g., LPL Letter, supra note 471 ("[Elimination of the broker-dealer exclusion] also could limit customer choices, as discount brokerage services and incidental brokerage transactions could become scarce and more expensive.").

[683]    The Section 914 Study addresses the costs associated with Commission and state resources and takes into account, for the short term, a reduction in the number of federally registered investment advisers as a result of the implementation of Dodd Frank Act Section 410.  The Section 914 Study does not take into account any increase in the number of federally registered investment advisers that would result from elimination of the broker-dealer exclusion, which would otherwise augment the assessments of costs and impact on Commission and State resources as stated therein.  See Section 914 Study and Commissioner Walter Statement, supra note 3.

App 417

with that standard with respect to brokerage accounts for which they provide personalized investment advice about securities.[684]  However, the extent of these costs would depend on the rules that were ultimately adopted, as well as on the way broker-dealers and investment advisers decide to respond to such a standard, and the extent to which any increased costs might be passed on to retail customers.  Several commenters expressed a view that imposing a fiduciary standard would generally increase administrative and compliance costs to broker-dealers.[685] As the uniform fiduciary duty is implemented over time, it may be that administrative and compliance costs to broker-dealers are diminished.  The Staff has identified certain potential responses, or outcomes, and their associated costs, as set forth below.

### 1.    Costs to Broker-Dealers

#### a)    Potential Outcome 1: Broker-dealers may continue to offer and maintain brokerage accounts subject to the new standard of conduct.

The Staff believes it is less likely that many broker-dealers would implement major changes to their businesses in response to the imposition of the uniform fiduciary standard recommended in this Study than they would in response to the elimination of the broker-dealer exclusion, as discussed above in sub-Section B.  The Staff believes this is because the adoption of a uniform fiduciary standard would not represent as fundamental a change for broker-dealers as would the elimination of the broker-dealer exclusion.  As such, one potential outcome is that broker-dealers might continue to offer and maintain brokerage accounts that would become subject to the new standard.  At least one commenter highlighted anticipated costs of complying with a new standard of conduct, including initial costs of amending disclosures, preparing new account documentation, and amending training and policies and procedures, which in turn could increase ongoing costs relating to certain "back-office" functions, such as modification of supervision and

---

[684]    It is worth noting that some commenters questioned whether costs to broker-dealers would really increase upon imposition of any new standard of conduct, or elimination of the broker-dealer exclusion discussed above.  But see, fi360 Letter, supra note 572 ("[I]n relation to claims that compliance burdens and costs would increase, have brokers provided actual numbers and statistics to back their claims? For advisers that have served as fiduciaries, what is it that has made their business sustainable and what practices have they employed to manage the costs associated with compliance?").   On the other hand, at least one commenter stated that costs would be imposed not only for complying with a new standard, but also with demonstrating such compliance.  See OW/SIFMA Study, supra note 643.

[685]    See NAIFA Letter, supra note 552 (stating that the "imposition of an ambiguous fiduciary obligation would likely require many NAIFA members to increase significantly the time and resources they devote to regulatory compliance…. [L]ayering on an additional standard of care on broker-dealers would do little to discourage improper conduct.  Instead, its consequences would be largely concentrated on well-intentioned financial professionals, increasing their administrative costs….").

156

surveillance reports.[686]  In connection with compliance, some broker-dealers might choose to hire additional staff and amend internal supervisory structures.

In addition, in complying with a new standard, broker-dealers initially would incur costs in order to conduct an assessment of their business practices, review any conflicts of interest, and determine what changes, if any, were needed to their customer agreements and disclosures and other business practices.[687]  Several commenters concurred stating that any change in the standard of conduct would significantly increase costs to broker-dealers.[688]  For example, one commenter predicted that the imposition of a new standard of conduct would result in increased compliance costs associated with reviewing existing customer relationships, and agreeing on new investment plans or obtaining consent to continue existing strategies for customers.[689]  Other commenters expressed concern with potential increased litigation expenses associated with the imposition of a fiduciary standard of conduct.[690]  However, FINRA reported that breach of fiduciary duty allegations currently are the most frequent cause in arbitrations.[691]

---

[686]     Hartford Letter, supra note 471 ("Any transition to address all of the items outlined in the proposal for revised standards will result in significant costs and change in the form of disclosures, new account paperwork/applications, training and policies and procedures. It is conceivable that many of the changes contemplated will have significant implications for back-office systems (e.g., modification of supervision and surveillance reports, commission systems, etc.). These changes could also directly or indirectly affect the potential exposure of insurance companies that distribute their products through broker-dealers. The SEC must adequately consider these costs in relation to the benefits of any proposed rules.").

[687]     For instance, absent further Commission guidance, broker-dealers that continue to engage in principal trading under the new standard of conduct recommended by the Staff would be required to disclose the conflicts of interest related to such principal transaction, including their capacity as principal, even though they would not be subject to the specific procedural requirements set forth in Advisers Act Section 206(3).

[688]     See, e.g., IIABA Letter, supra note 552 ("Altering the existing standard…[will cause m]any broker-dealers and registered representatives…[to] simply cease their securities-related operations given the uncertainty associated with such an amorphous and subjective standard, higher compliance and insurance costs, and well-founded fears about increased liability exposure.").

[689]     OW/SIFMA Study, supra note 643 at 27.

[690]     NAIFA Letter, supra note 552 (Stating that "eliminating the broker-dealer exclusion would also force NAIFA members to protect themselves against what will undoubtedly be a substantial increase in frivolous litigation. A broker-dealer fiduciary duty may lead to costs that substantially exceed those of litigation under Section 36(b) [of the Investment Company Act], particularly because the standard is not precisely defined.  Such costs would be catastrophic for [NAIFA] members, and would likely force many of them to shut down their operations.").  The NAIFA Letter also makes an analogy in the same discussion to the imposition of a fiduciary duty on mutual fund investment advisers (Section 36(b) of the Investment Company Act) which has resulted in "hundreds of cases [being brought,] imposing billions of dollars in costs without a single plaintiff victory at trial."

[691]     FINRA reported that breach of fiduciary duty has been the most frequent cause of action among all its arbitration cases served in 2009.  See supra note 384.

Similarly, a number of commenters have indicated that application of a fiduciary standard to broker-dealers would increase insurance costs for broker-dealers (and ultimately their customers).[692]  None of the commenters quantified the costs or gave a range of costs that they would incur under a fiduciary standard of conduct.  In general, to the extent costs were to increase for broker-dealers, and assuming their brokerage accounts in question remained commission-based and the trading frequencies in those accounts did not change, one would expect the profitability to the broker-dealer of such commission-based accounts to decrease.

**b)**  **Potential Outcome 2: Broker-dealers might deregister and register as investment advisers and, in the process, convert their brokerage accounts into advisory accounts (subject to advisory fees).**

It is possible that broker-dealers providing investment advice may choose to deregister as broker-dealers and only register as investment advisers.  The costs associated with this potential outcome are discussed above in sub-Section B.1.a.

In addition, some commenters specifically addressed the potential for converting accounts from commission-based accounts to fee-based accounts.[693]  They stated that such conversion would result from changes in broker-dealer business models upon any imposition of a new standard of care on broker-dealers.  The ultimate cost impact of this would depend on the actual fees and commissions, the relative extent to which the accounts in question had been actively trading, and any increased costs associated with providing advice for a fee (i.e., the advice model could change and its costs would change as well).  That said, to the extent that in newly converted fee-based accounts "fee layering" (whereby fees are charged based both on the value of the assets as well as account fees (e.g., administration and custodial fees) becomes prevalent, especially for less actively traded accounts, such conversion from commission-based accounts might increase revenues for broker-dealers, thereby offsetting, partially or entirely, any cost increases otherwise resulting from imposition of the new standard of conduct.

---

[692]  See, e.g., Commonwealth Letter, supra note 476 ("Adopting a uniform standard of care…would open the floodgates of litigation, increasing errors and omissions insurance premiums for brokers and dealers.  These costs would necessarily be passed on to investors in the form of higher fees or commissions….[S]mall retail investors – who arguably have the greatest need for sound investment recommendations – will have decreased access to financial professionals who are willing to expend the time and incur the added cost, and they will find themselves abandoned.").  See also 2005 Adopting Release, note 210 at 20444 (The Commission reported in 2005 that one commenter had indicated that underwriting errors and omissions ("E&O") insurance claims "against broker-dealers were twice as frequent and twice as severe as comparable claims against investment advisers.").

[693]  See letters from Robert E. Thompson, CLU, ChFC, NAIFA, and Gregory V. Cismoski, dated Aug. 12, 2010 ("Driving every registered representative to fee-only compensation will not necessarily result in better, unbiased advice for the consumer.").

**c)      Potential Outcome 3: Dual registrants might convert their advised brokerage accounts to advisory accounts.**

Broker-dealers that are already dually-registered could choose to convert their advised brokerage accounts to advisory accounts. The costs associated with this potential outcome are discussed above in sub-Section B.1.b.

**d)      Potential Outcome 4: Broker-Dealers might unbundle their services and provide them separately through affiliates or third parties.**

Broker-dealers might choose to unbundle their services and provide some of the component services through affiliates or third parties. The costs associated with this potential outcome are discussed above in sub-Section B.1.c.

### 2.      Costs to Investment Advisers

Application of the new standard is unlikely to result in any direct costs to investment advisers, especially in light of the fact that the recommended standard that would be applied to both broker-dealers and investment advisers would be consistent with standards already applicable to investment advisers under Advisers Act Section 206(1) and 206(2). That said, any additional requirements that might be imposed on investment advisers in light of the existing regulatory gaps might result in additional costs for them; such costs are discussed below in sub-Section D.

### 3.      Costs to Retail Investors, including Loss of Investor Choice

**a)      Intermediaries might pass along costs to retail investors and/or reduce services and products they offer to retail investors.**

The cost to retail investors of applying a new standard would depend on the specific obligations imposed under that standard, and would largely depend on the extent to which costs on intermediaries are passed on to them. Even the level of costs on intermediaries would be expected to vary widely across the industry, based on the particular business models and other facts and circumstances applicable to each entity. As such, some intermediaries might experience relatively less in terms of additional costs (if any) upon imposition of a new standard of conduct, which could give those intermediaries a competitive advantage over other intermediaries. For example, any self-imposed restrictions on selling securities out of firm inventory, as chosen by the broker-dealer with the aim of avoiding conflicts of interests and adhering to a new standard, may increase costs to retail investors. If, as a result of such restriction, firms decide not to sell securities as principal, that can potentially lower the quality of execution of transactions. As a result of any new conflicts of interest restriction, broker-dealers may stop trading on a principal basis in certain securities, such as bonds that are not exchange traded,

159

App 421

potentially depriving investors of the best possible execution.  While that may have less of an impact for certain securities (e.g., highly liquid securities such as exchange-traded equities) the debt market is a dealer market and the costs associated with purchasing certain securities, particularly less liquid securities, as agent, may increase execution costs for some investors, namely those customers of broker-dealers who otherwise had maintained inventories of such securities.[694]

Several commenters expressed concerns that a new standard of conduct or new regulatory requirements might significantly increase costs for broker-dealers, which would then be passed on to retail investors.[695]  In turn, costs passed on to retail investors would have the effect of eroding the profitability of their investments.[696] For example, some commenters indicated that litigation would increase under a new standard of conduct, that this, in turn, going forward would increase the cost of insurance for the firm, and that such a cost would be passed on to the firm's customers.[697]  None of the commenters provided any quantification of such anticipated costs.  To the extent that a particular relationship between a broker-dealer and a customer changed as a result of imposition of the new standard of conduct, it is possible that a retail investor's profitability might increase.  However, the extent of any impact of the new standard may have on retail investor profitability would be determined by a number of factors, including the costs associated with the standard.

Commenters speculated that, ultimately, the increase in costs to broker-dealers could cause many to decide to no longer offer certain products and services to retail

---

[694]     According to FINRA, excluding convertible bonds and equity CUSIPs, 84% of investment grade corporate bond trades in the secondary market are principal trades, and in terms of par value traded, 98% of investment grade corporate bonds  in the secondary market are traded as principal. FINRA, TRACE Fact Book 2010 Quarterly Table for the third quarter, available at http://www.finra.org/Industry/ContentLicensing/TRACE/P085342.  According to the MSRB, in 2010 approximately 90.8% of municipal bond trades were effected on a principal basis (with the remainder being effected on an agency basis).  Letter from Marcelo Vieira, MSRB, to Matthew Kozora, U.S. Securities and Exchange Commission, dated Jan. 11, 2011.

[695]     See, e.g., Commonwealth Letter, supra note 476; FSI Letter, supra note 471; Hartford Letter, supra note 471; Morgan Stanley Letter, supra note 39; Securian Letter, supra note 553; Woodbury Letter, supra note 471.

[696]     See OW/SIFMA Study, supra note 643 at 26 (purporting that, assuming broker-dealers will change their business models from a commission-based model to a fee-based model in response to a new standard of conduct, and also given certain assumptions about and categorizations of retail customers, cumulative returns to retail customers with $200,000 in assets would reduce by $20,000 over the next 20 years). But see letter from Barbara Roper, Consumer Federation of America, dated Nov. 2, 2010 ("CFA Letter 2") (criticizing the Oliver Wyman/SIFMA Study for basing its assertions as to costs on an unfounded assumption that broker-dealers would respond to a new standard of conduct by no longer charging commissions; and for basing its estimates of additional costs that would apply under a new standard of care on requirements that already apply to broker-dealers under the current regulatory regime).

[697]     See Commonwealth Letter, supra note 476; Release 2376, supra note 56.

customers (e.g., due to risk of litigation under a new fiduciary standard, or due to restrictions on principal trading), or would only offer them at increased prices, thereby limiting retail customers' access to the currently available range of products and services.[698]  One commenter went further to state that the imposition of specific rules in connection with a best interest standard would ultimately increase costs to retail investors for even basic services.[699]  Other commenters countered that the costs and impact on investor choice would be *de minimis*.[700]

The Staff believes that its recommended uniform fiduciary standard recognizes the value of preserving investor choice with respect to the variety of products and services involving the provision of investment advice and how investors may pay for them. Furthermore, the recommended uniform fiduciary standard would be limited to activities that specifically involve the provision of "personalized investment advice," and therefore would not result in a broad application of Advisers Act requirements to broker-dealer services that do not involve the provision of personalized investment advice.[701]  The Staff believes that the recommended uniform fiduciary standard would not require that broker-dealers limit, nor would it necessarily result in broker-dealers limiting, the range of products and services they currently offered to retail investors.

---

[698]  See IIABA Letter, supra note 552 ("Many middle class Americans – especially those unwilling or unable to pay upfront fees for guidance – will effectively lose access to competent financial guidance and certain investment products and services.").  See also OW/SIFMA Study, supra note 643 at 29 (stating that under a new fiduciary standard of conduct, the availability of services currently provided by broker-dealers, including sale of municipal and corporate bonds, would become limited due to capacity constraints on the industry brought about by increased costs).

[699]  See Schwab Letter, supra note 19 ( "[B]eyond the baseline requirement of a best interest standard, specific prescriptive rules attempting to govern the duty of care would run a serious risk of either being over-inclusive or under-inclusive in terms of application to the vast range of advice services available to retail customers today…. Over-inclusiveness would essentially alter the contract between the customer and firm, in some cases likely driving driving [sic] driving-up the cost of providing basic non-discretionary advice services. This includes the potential cost in defending a minority of misplaced claims alleging violation of a fiduciary duty for failing to supervise or monitor an account, despite a contractual arrangement between the firm and customer which limits the broker's role given the small commission or fee the customer pays").

[700]  See CFA Letter, supra note 450 ("[S]ome industry members have argued against imposition of a fiduciary duty on the grounds that it would increase investor costs.  They have offered no evidence to support this contention, however, which is based in part on a false assumption that such a requirement would inevitably lead to adoption of fee-based compensation and which ignores the potential benefits of a fiduciary duty in disciplining excessive costs."); NASAA Letter, supra note 428 ("The states believe that if there is any concomitant increase in compliance costs incurred as the result of subjecting Broker-Dealers to a fiduciary duty standard, it will be *de minimis*. The direct benefits to investors from adopting this standard will greatly exceed any foreseeable costs".).  See also CFA Letter 2, supra note 696 (criticizing the OW/SIFMA Study for making an unfounded assumption that imposition of a fiduciary standard would impose the same restrictions on principal trading as those currently found in the Adviser Act, and that such restrictions would cause customers to lose access to products primarily sold on a principal basis, such as municipal and corporate bonds).

[701]  See, e.g., CFA Letter, supra note 450; Financial Planning Coalition Letter, supra note 471.

In connection with its consideration of potential loss of investor choice, the Staff also considered whether potentially underserved portions of the retail investor population, such as those located in rural areas, might be adversely affected by any of the options considered under Section 913. The Staff believes that for the same reasons stated in the aforementioned paragraph the recommended uniform fiduciary standard would in and of itself, not adversely impact such populations' access to financial products and services.

Certain commenters noted that the application of a new standard that is vague, because of its lack of clarity, would result in overall increased costs to retail investors, possibly to the extent that the price for such products and services would become prohibitively expensive to middle class retail investors.[702] However, given that the Staff recommends that the new standard be conveyed through rulemaking and supplemented with Commission or Staff guidance to assist broker-dealers and investment advisers in applying the standard, this concern would be addressed by proposed Commission action going forward.

One possible way that costs could increase is if broker-dealers whose customers want advice and who currently provide the full range of brokerage services outlined above in sub-Section B.1.c for a single commission (or mark-up) and perhaps minor account level fees, simply converted these accounts to investment adviser status and cease to provide execution services to retail investors who sought advice. If that were the case, custody costs to the retail investors would be higher. Advice costs charged, at least initially upon conversion (and absent the investor researching competitors' prices), would also be higher for those investors who buy and hold, because either an hourly or asset-based fee would likely exceed the current commission or mark-up on a retail trade.

In sum, to the extent that broker-dealers respond to a new standard by choosing from among a range of business models, such as converting brokerage accounts to advisory accounts, or converting them from commission-based to fee-based accounts, certain costs might be incurred, and ultimately passed on to retail investors in the form of higher fees or lost access to services and products. Any increase in costs to retail investors detracts from the profitability of their investments.

---

[702]    See Hartford Letter, supra note 471 ("If an unclear standard is substituted for a clear one, an inevitable effect will be reduced efficiency among financial service providers. This will result from several overlapping factors. One is increased litigation. The result of that will result in increased financial costs of doing business and excessive costs of time expended in self-defense (just as was experienced in the U.K). These increased costs will cause providers to exit the field, especially providers who serve the middle markets. . .persons with between $1,000 and $250,000 to invest."). See also NAIFA Letter, supra note 552 (stating that the "imposition of an ambiguous fiduciary obligation would likely require many NAIFA members to increase significantly the time and resources they devote to regulatory compliance…. [L]ayering on an additional standard of care on broker-dealers would do little to discourage improper conduct. Instead, its consequences would be largely concentrated on well-intentioned financial professionals, increasing their administrative costs….").

**D.     Potential Costs Associated with the Application of Additional Harmonized Standards Beyond those Associated with sub-Section C**

To the extent that additional standards were harmonized beyond those set out in the Staff's recommended uniform fiduciary standard, it is likely that there would be additional costs on broker-dealers and investment advisers, as applicable, and on retail customers.  Ultimately, the costs associated with additional harmonized standards would depend on various factors, including which and how many standards are harmonized, whether the harmonization had an overall greater impact on broker-dealers or on investment advisers, how broker-dealers and investment advisers decide to respond to such harmonization (e.g., by pursuing any of the potential outcomes described above, or others not contemplated in this Study), and the extent to which any increased costs on intermediaries (i.e., broker-dealers and investment advisers) were passed on to retail customers.

**1.     Costs to Broker-Dealers**

If broker-dealers did not deregister or transfer accounts but rather choose to remain registered and regulated as broker-dealers (as described above in sub-Section C.1.a), there would still be costs related to the harmonization of regulations governing broker-dealers and investment advisers, which several commenters addressed.[703]  The costs associated with the inclusion of obligations beyond those encompassed in a "no less stringent" standard would depend on which obligations would ultimately comprise the standard.

For instance, commenters noted that the following specific compliance obligations, if harmonized, could impose ongoing costs on broker-dealers: applying a revised principal trading rule; and harmonizing customer disclosures (e.g., at account opening).[704]  That said, in general, harmonization of the two regulatory regimes over time would mitigate or reverse any cost differentials between broker-dealers and investment advisers, and their respective customers.  Commenters were also concerned about expenses associated with harmonizing remedies to retail investors, such as establishing a private right of action.[705]

---

[703]     Note however that at least one commenter highlighted cost as a reason to harmonize the regulation of broker-dealers and investment advisers.  See Schwab Letter, supra note 19 ("Applying two comprehensive regulatory schemes to the same conduct will result in unnecessary costs and increased confusion to retail customers, and likely would diminish retail customer access to products and services that they enjoy today.").

[704]     The level of initial and ongoing costs relating to harmonization of disclosure requirements would depend on the frequency, timing, content and level of detail required by the harmonized disclosure requirement.

[705]     See, e.g., PIABA Letter, supra note 482.

### 2.    Costs to Investment Advisers

Commenters suggested that additional harmonization could involve the harmonization of competency and continuing education requirements,[706] which if it were based on the broker-dealer business conduct requirements, would increase both initial and ongoing costs to investment advisers.  Such costs might not be significant, however, because investment adviser representatives generally already are subject to competency and continuing education requirements in some states.

Other areas for harmonization, which would likely impose some level of additional costs on investment advisers, include available remedies, registration, and requirements on advertising, supervision, financial responsibility, licensing, and books and records.  Commenters specified compliance obligations that, if fully harmonized to conform with the standards now applicable to broker-dealers, would impose additional ongoing costs on investment advisers, including, among others: additional supervisory requirements;[707] additional advertising regulation;[708] additional books and records requirements;[709] and applying certain financial responsibility requirements (such as fidelity bond requirements).[710]  The associated additional costs would typically involve at least one-time costs to adjust to the harmonized requirements, and to some extent additional on-going compliance costs.

Several commenters stated that harmonization could lead to the imposition of an SRO for investment advisers.[711] Any such SRO membership would subject advisers to additional expenses, including but not limited to membership fees.  One commenter specifically cited cost as one of the reasons why an SRO for investment advisers should be opposed.[712] For a further discussion of this issue, please refer to the Section 914 Study.[713]

---

[706]    See, e.g., AALU Letter, supra note 472; BOA Letter, supra note 17; FSI Letter, supra note 471; Hartford Letter, supra note 471; LPL Letter, supra note 471]; UBS Letter, supra note 39; Woodbury Letter, supra note 471.

[707]    See, e.g., AALU Letter, supra note 472; CAI Letter, supra note 26.

[708]    See, e.g., FINRA Letter, supra note 471; FSI Letter, supra note 471; LPL Letter, supra note 471; UBS Letter, supra note 39.

[709]    See, e.g., FSI Letter, supra note 471; LPL Letter, supra note 471.

[710]    See, e.g., BOA Letter, supra note 17; FSI Letter, supra note 471; LPL Letter, supra note 471; UBS Letter, supra note 39.

[711]    See, e.g., Commonwealth Letter, supra note 476; FINRA Letter, supra note 471; FSI Letter, supra note 471.  Dodd-Frank Act Section 914 requires the Commission to study, among other things, the extent to which having Congress authorize the Commission to appoint one or more SROs would augment the Commission's efforts in overseeing investment advisers.  See also Section 914 Study and Commissioner Walter Statement, supra note 3.

[712]    See IAA Letter, supra note 462.  See also Section 914 Study and Commissioner Walter Statement, supra note 3.

### 3.    Costs to Retail Investors, including Loss of Investor Choice

The costs to retail investors of additional harmonization of the broker-dealer and investment adviser regulatory regimes would ultimately depend on a number of factors, including exactly which requirements were harmonized, how those requirements are harmonized, how the relevant intermediaries responded to such harmonization, and the extent to which any increased costs on intermediaries were passed on to their retail customers. [714]

Generally speaking, to the extent the harmonization of a regulatory requirement essentially involves imposing a requirement currently applicable to intermediaries of one regime to intermediaries in the other, costs for the retail customers of the latter regime would likely increase.  That said, such costs would likely be reduced to the extent the intermediary in question were dually registered or otherwise already has processes in place to ensure compliance with the harmonized requirement, or a comparable requirement.  Commenters generally did not address whether or how additional harmonization of the broker-dealer and investment adviser regulatory regimes would impact investor choice.

## VI.    Conclusion

Despite the extensive regulation of both investment advisers and broker-dealers, retail customers do not understand and are confused by the roles played by investment advisers and broker-dealers, and more importantly, the standards of care applicable to investment advisers and broker-dealers when providing personalized investment advice and recommendations about securities.  Retail customers should not have to parse through legal distinctions to determine whether the advice they receive was provided in accordance with their expectations.  Instead, retail customers should be protected uniformly when receiving personalized investment advice or recommendations about securities regardless of whether they choose to work with an investment adviser or a broker-dealer.  At the same time, it is necessary that such protection allows retail customers to continue to have access to the various fee structures, account options, and types of advice that investment advisers and broker-dealers provide.

Therefore, this Study recommends that the Commission exercise its rulemaking authority to adopt and implement, with appropriate guidance, the uniform fiduciary standard of conduct for broker-dealers and investment advisers when providing personalized investment advice about securities to retail customers.  In addition, the Study recommends that when broker-dealers and investment advisers are performing the same or substantially similar functions, the Commission should consider whether to

---

[713]    See Section 914 Study and Commissioner Walter Statement, supra note 3.

[714]    Commenters have suggested that costs associated with harmonization, such as the ongoing costs of investment advisers complying with suitability and other SRO rules, would likely be passed on to retail investors.  See, e.g., FSI Letter supra note 471 and LPL Letter supra note 471.

harmonize the regulatory protections applicable to such functions.  Such harmonization should take into account the best elements of each regime and provide meaningful investor protection.

The Staff's recommendations were guided by an effort to establish a uniform standard that provides for the integrity of personalized investment advice given to retail investors.  At the same time, the Staff's recommendations are intended to minimize cost and disruption and assure that retail investors continue to have access to various investment products and choice among compensation schemes to pay for advice.

The views expressed in this Study are those of the Staff and do not necessarily reflect the views of the Commission or the individual Commissioners.

App 428

**<u>Appendix A</u>: Regulatory, Examination and Enforcement Resources Devoted to Enforcing Standards of Care for Providing Personalized Investment Advice and Recommendations**

**I.    Commission and SRO Regulatory, Examination and Enforcement Resources**

**A.    Recent Commission Developments to Enhance Effectiveness of Examinations**

During the past year, OCIE has instituted several changes to its examination program and has plans for significant additional strategic initiatives, all to increase the effectiveness and efficiency of the national exam program.[1] In March, OCIE launched an intensive nationwide self-assessment process. OCIE reviewed the examination program by looking at the five components of: strategy; structure; people; process; and technology. Since July, OCIE has moved quickly to implement additional reforms from the nationwide self-assessment.[2] Although success of these reforms depends greatly on the funding and resources made available to OCIE, the following enhancements speak to the increased focus on empowering examiners, inter- and intra-office coordination, internal oversight, and conducting risk-based examinations:

- *Governance Structure*. OCIE implemented a new governance structure, which now includes senior leaders from the Regional Offices, who manage both the Enforcement and Examinations programs in each Regional Office. The redesigned governance structure is intended to improve the lines of communication and accountability.

- *Specialization.* OCIE has hired senior specialized examiners with diverse skill sets to expand its knowledge base and improve its ability to assess risk, conduct examinations, detect and investigate wrongdoing, and focus its priorities. Additionally, OCIE has created five new specialist working groups that will be centers of excellence in critical areas and will help build examiner knowledge base, train examiners, develop exam modules, and focus risk-based exam strategies.

- *Conducting Risk-Based Examinations.* OCIE continues to refine its techniques to identify the areas of highest risk, and to deploy examiners against these risks, in order to improve compliance, prevent fraud, monitor

---

[1] The effectiveness of OCIE's examination program has been the subject of recent reports by the Commission's Inspector General ("IG") and the General Accountability Office ("GAO"). <u>See</u>, <u>e.g.</u>, GAO Report, Steps Being Taken to Make Exams More Risk-Based (Aug. 2007); IG Report, Review of the Commission's Processes for Selecting Investment Advisers and Investment Companies for Exams (Nov. 19, 2009); IG Report: Review and Analysis of OCIE Examinations of Bernard L. Madoff Investor Securities, LLC (Sept. 29, 2009).

[2] The Section 914 Study and Commissioner Walter Statement, <u>supra</u> note 3 in Section II.A of the Study, contains additional information about OCIE's processes and resources.

A-1

App 429

risk and inform policy-making.  In addition, OCIE works closely with the Division of Risk, Strategy, and Financial Innovation to enhance its risk assessment analytics and modeling, and coordinates several risk-based initiatives with the Division of Enforcement.

- *Coordinating Broker-Dealer and Investment Adviser Examinations.*  OCIE has instituted several measures to coordinate broker-dealer and investment adviser examinations, including opportunities for examiners to cross-train.

To maintain an effective deterrent presence, the examination program needs to be adequately staffed to address increasingly complex financial products and transactions and the enormous size of the markets.  The following additional transformations to the national exam program should further the program's effectiveness:

- establishing a new "open architecture" structure for staffing exams that will enable management to reach across disciplines and specialties to better match the skills of examination teams to the business models and risk areas of registrants;

- redesigning OCIE's exam team structure to redeploy the expertise and experience of managers from office administration to on-site exams in the field;

- staffing the newly created specialization working groups described above;

- creating an environment for open, candid communication and personal accountability for quality, in order to build on OCIE's core strengths;

- placing continuous, focused attention on technology, which is essential to a healthy examination program; and

- developing and testing standardized examination tools across the national exam program.

### B.    Examinations of Investment Advisers and Broker-Dealers

Investment Advisers

The Commission, through OCIE staff located in headquarters and 11 Regional Offices, examines Commission-registered investment advisers' books, records and activities.  Staff examinations are designed to: (1) improve compliance; (2) prevent fraud; (3) monitor risk; and (4) inform regulatory policy.  Consistent with these objectives, the results of OCIE's examinations are utilized by various offices and divisions within the Commission.  For example, OCIE exam information may:  inform rule-making initiatives

A-2

App 430

undertaken by the Division of Investment Management;[3] assist the Division of Risk, Strategy and Financial Innovation to identify and monitor risks; and identify misconduct to be pursued by the Division of Enforcement.

OCIE's investment adviser examination program utilizes a risk-based process, identifying higher risk Commission-registered investment advisers for examination consideration and focusing examination resources on certain higher risk activities at selected investment advisers. OCIE's risk-based approach to identifying examination candidates is an evolving process that is constantly refined as OCIE obtains information about registered investment advisers. Typically, higher risk investment advisers are identified based on: (1) information contained in regulatory filings; (2) assessments made during past examinations; and/or (3) other criteria and available information (including, for example, news/media coverage, localized knowledge of advisers from examination staff and tips, complaints or referrals).

OCIE generally conducts three types of examinations: (1) examinations of higher-risk investment advisers;[4] (2) cause examinations resulting from tips, complaints and referrals; and (3) special purpose reviews such as risk-targeted examination sweeps and risk assessment reviews. Risk-targeted examination sweeps are generally limited in scope and focus on specific areas of concern within the financial services industry and examine a broad sample of regulated entities regarding those areas.[5]

OCIE also has a role in examining the operations of dual registrants and Commission-registered investment advisers that are affiliated with broker-dealers.[6] The broker-dealer operations of these firms are examined primarily by FINRA, although OCIE also, but less frequently, examines broker-dealer operations of these firms. FINRA does not, however, have express statutory authority to enforce compliance with the Advisers Act by dual registrants or investment advisers affiliated with a broker-dealer. Therefore, the advisory operations of these Commission-registered firms are examined exclusively by OCIE according to the process described above.

---

[3]    For example, OCIE conducted examinations regarding compliance with Advisers Act Rule 206(3)-3T. The staff's observations are discussed in this proposing release (See Advisers Act Release No. 3118 (December 1, 2010)).

[4]    Examiners typically will focus on the following high-risk areas: conflicts of interest; portfolio management; valuation; performance, advertising; and asset verification.

[5]    Similarly, risk assessment reviews are limited scope examinations of an investment adviser's general business activities and a targeted set of the adviser's books and records that help OCIE better assess the risk profile of an investment adviser.

[6]    While dual registrants comprise a small percentage of Commission-registered investment advisers, a significant number of these firms, including many larger Commission-registered investment advisers, have an affiliated broker-dealer. According to data from the IARD, as of October 1, 2010, there were 611 dual registrants and 2,636 Commission-registered investment advisers that had an affiliated broker-dealer. That represents 5% and 22% of all Commission-registered investment advisers, respectively.

*Examination Data*

The number and frequency of examinations of Commission-registered investment advisers is a function of factors, including the number of Commission-registered investment advisers and the number of OCIE staff.[7] As the number of Commission-registered investment advisers has increased and the number of OCIE staff has decreased over the past six years, there has been a decrease in the number and frequency of examinations of Commission-registered investment advisers.

The number of Commission-registered investment advisers has grown significantly over the past six years. Between October 1, 2004 and September 30, 2010, the number of Commission-registered investment advisers increased 38.5%, from 8,581 advisers to 11,888 advisers.[8] That represents an average annual growth rate of 5.7%. The assets managed by Commission-registered investment advisers have grown even faster than the number of Commission-registered investment advisers. Over the past six years, assets managed by these advisers grew 58.9%, from $24.1 trillion to $38.3 trillion. This represents an average annual growth rate of 9.1%.

The growth of the investment advisory industry over the past six years has not been matched by a corresponding growth in Commission resources committed to examining Commission-registered investment advisers, but rather, there has been a decline in Commission resources. Specifically, between October 1, 2004 and September 30, 2010, the number of OCIE staff dedicated[9] to examining Commission-registered investment advisers decreased from 3.6%, from 477 staff to 460 staff, falling as low as 425 staff at certain points during the period September 30, 2007 to September 30, 2008.[10]

Other relevant metrics highlight the growth of Commission-registered investment advisers relative to the resources committed to examining them. For example, the ratio of the number of Commission-registered investment advisers to the number of OCIE staff

---

[7]    See Section 914 Study and Commissioner Walter Statement, supra note 3 in Section II.A of the Study, for more information about OCIE's examinations of investment advisers.

[8]    All statistics presented in the Study concerning the number of Commission-registered investment advisers and their assets under management are from the IARD.

[9]    Unless stated otherwise, all references to OCIE staff in the Study are to staff who are dedicated to the examination of both registered investment advisers and registered investment companies. OCIE does not have staff who solely are dedicated to examining registered investment advisers. OCIE staff include examiners, accountants, supervisors, attorneys, information technology staff, training staff and support staff. All references to a number of staff include adjustments for part-time employees (for example, a part-time employee that works 20 hours per week counts as 0.5 staff).

[10]   Based on data from the Commission's internal reporting systems. Unless stated otherwise, all data concerning the number and frequency of investment adviser examinations and the number of OCIE staff are based on data from the Commission's internal reporting systems.

A-4

committed to examining such firms, which is a proxy for the relative changes in the resources available to examine investment advisers, increased 43.3% over the past six years, from 18.0 to 25.8.[11]  Viewed based on assets managed, rather than based on the number of Commission-registered investment advisers, the ratio increased 65% over that period, from $50.6 billion to $83.2 billion per examiner.

As the number of Commission-registered investment advisers and the assets managed by them have increased and the number of OCIE staff committed to examining Commission-registered investment advisers has decreased over the past six years, the number of examinations of Commission-registered investment advisers has decreased. The number of examinations of Commission-registered investment advisers conducted each year between 2004 and 2010 decreased 29.8%, from 1,543 examinations in 2004 to 1,083 examinations in 2010.

The table below shows the number of Commission-registered investment advisers examinations completed by the Commission since 2004.

| Year | Investment Adviser Examinations[12] |
| --- | --- |
| 2010 | 1,083 |
| 2009 | 1,244 |
| 2008 | 1,521 |
| 2007 | 1,379 |
| 2006 | 1,346 |
| 2005 | 1,530 |
| 2004 | 1,543 |

The percentage of Commission-registered investment advisers examined each year has also decreased over the past six years.  While 18% of Commission-registered investment advisers were examined in 2004, only 9% of Commission-registered investment advisers were examined in 2010.[13]  At the rate that Commission-registered investment advisers were examined in 2010, the average registered adviser could expect to be examined approximately once every 11 years, compared to approximately once every six years in 2004.[14]  The decrease in both the number and frequency of

---

[11]     An increase in the ratios means that there are proportionately fewer resources committed to examining Commission-registered investment advisers.

[12]     Information is reported by fiscal year (October 1 – September 30).

[13]     With respect to the intervening years, 17% of Commission-registered investment advisers were examined in 2005, 14% of Commission-registered investment advisers were examined in 2006, 13% of Commission-registered investment advisers were examined in 2007, 13% of Commission-registered investment advisers were examined in 2008 and 11% of Commission-registered investment advisers were examined in 2009.

[14]     Currently, Commission-registered investment advisers are not examined on a cyclical basis.

A-5

App 433

examinations is attributable, in part, to the growth in the number of Commission-registered investment advisers and the decline in the number of OCIE staff.

*Examination Outcomes*

An examination typically has one of three possible outcomes, which are not mutually exclusive.  The outcomes are: (1) issue a letter to the registrant indicating that no deficiencies were identified; (2) issue a deficiency letter to the registrant describing the deficiencies and requesting the registrant to implement appropriate corrective actions, and submitting a written response describing the actions; or (3) refer the deficiencies to Enforcement, another regional office, or other regulator (e.g., a state regulatory agency or an SRO).

For any given year, the vast majority of examinations conclude with a deficiency letter which summarizes OCIE staff's findings and requests corrective action.  In most cases, Commission-registered investment advisers will voluntarily correct the issues the noted by OCIE staff.  This approach encourages compliance without costly and protracted enforcement action.  Enforcement referrals allow examination staff to refer egregious violations of federal securities laws so the Commission can take action to prevent investors from being harmed.

Broker-Dealers

A broker-dealer that does business with the public is primarily overseen by the Commission and by FINRA.  The Commission and the SROs conduct examinations of broker-dealers to ensure compliance with federal securities laws and with standards of integrity, competence, and financial soundness, and may discipline broker-dealers and associated persons that fail to comply with applicable requirements.

*SRO Examination*

The SROs examine broker-dealers for compliance with the federal securities laws and their own rules by their members and the associated persons of their members.[15]  The SROs examine every broker-dealer on cycles varying from annually to once every four years, depending on the type of firm.  The disciplinary procedures employed by the SROs are subject to Commission oversight under the Exchange Act.  If a broker-dealer is a member of more than one SRO, the Commission designates one SRO to examine the

---

[15]  The authority of SROs to examine broker-dealers and their associated persons is derived from several sources. For example, under Exchange Act Section 19(g)(1), every SRO shall enforce compliance with the Exchange Act, Exchange Act rules, and its own rules by its members and associated persons of members, unless the SEC relieves it of the obligation.  The Commission construes Section 19(g)(1) as requiring SROs to "examine for" compliance.  See, e.g., Exchange Act Release No. 59218 (Jan. 8, 2009) ("Section 19(g)(1) . . . requires every self-regulatory organization . . . to examine for, and enforce compliance by, its members and persons associated with its members . . . .").

A-6

App 434

broker-dealer for compliance with financial responsibility rules, thereby eliminating duplication.[16]

FINRA is the designated examining authority for all securities firms doing business with the public, and has primary responsibility for the regulatory oversight of a broker-dealer's activity.[17]  FINRA oversees approximately 4,600 brokerage firms, approximately 163,000 branch offices and over 630,000 registered securities representatives.[18]  In light of the extent of FINRA's oversight of broker-dealers, particularly with respect to retail customers, this Study focuses specifically on FINRA's regulatory, examination and enforcement resources.

- Overview of FINRA Jurisdiction

Generally, FINRA's authority is limited to enforcing compliance by its members and their associated persons with the Exchange Act and rules thereunder, MSRB rules, and FINRA rules.[19]  In addition, Exchange Act Section 15A(b)(6) precludes the rules of the association from being designed to regulate matters not related to the purposes of Exchange Act or the administration of the association; Section 19(b)(2) of the Exchange Act requires each of FINRA's rule and rule amendments to be approved by the Commission, unless the rule change is effective upon filing, based on a finding that the proposed rule change is consistent with the requirements of the Exchange Act.[20]

---

[16]    See Exchange Act Section 17(d)(1)(A) and Rule 17d-1 thereunder.  In addition, the Commission has the authority under Exchange Act Section 17(d)(1)(B), and Rule 17d-2 thereunder, to allocate among SROs the authority to adopt rules with respect to matters as to which, in the absence of such allocation, such SROs share authority under the Exchange Act.

The Commodity Futures Modernization Act contains provisions to facilitate coordination of examinations of market participants involved with security futures products.

[17]    See FINRA Letter, supra note 471 in Section IV of the Study.

[18]    FINRA Statistics, available at http://www.finra.org/Newsroom/Statistics/.   As of September 30, 2010, there were 636,529 registered representatives overseen by FINRA.  See FINRA January Letter, supra note 10.  The number of FINRA member firms has decreased by 10.4% since 2005, from 5,111 to 4,578 in 2010.  The number or registered representatives has decreased by 3.8% since 2005, from 655,832 to 630,692 in 2010.  FINRA Statistics, available at http://www.finra.org/Newsroom/Statistics/, and NASD 2005 Year in Review at 7, available at http://www.finra.org/web/groups/corporate/@corp/@about/@ar/documents/corporate/p016705.pdf .

[19]    See Exchange Act Sections 15A(b)(2) and 19(g)(1).

[20]    Exchange Act Section 19(b) requires the Commission to review and approve most SRO rules before they can be put into effect.  Proposed rules are published to give the public notice and an opportunity to comment.  Most SRO rule filings are handled by the Division of Trading and Markets pursuant to delegated authority.  See 17 CFR 200.30-3(a)(12) (delegating authority to the Director of the Division of Trading and Markets) "to publish notices of proposed rule changes filed by self-regulatory organizations and to approve such rule changes" pursuant to Exchange Act Rule 19b-4).

FINRA does not, however, have express statutory authority to enforce compliance with the Advisers Act by the investment adviser operations of the dual registrants or investment adviser affiliates of broker-dealers.[21]  FINRA has stated that it "is not authorized to enforce compliance with the Investment Advisers Act" and that such authority "is granted solely to the SEC and to the states."[22]

---

Exchange Act Section 19(b)(3)(A) provides that a proposed rule change shall take effect upon filing with the Commission if it is designated by the SRO as: (1) constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing rule of the SRO; (2) establishing or changing a due, fee or other charge imposed by the SRO on any person, whether or not the person is a member of the SRO; or (3) concerned solely with the administration of the SRO or other matters which the Commission has specified by rule as being outside the requirements of Section 19b(2).  Nevertheless, even if an SRO rule is effective upon filing, the Commission summarily may temporarily suspend the change in the rules and institute proceedings under Section 19(b)(2)(B) to determine whether the proposed rule should be approved or disapproved, if the Commission believes such action is necessary or appropriate in the public interest or otherwise in furtherance of the purposes of the Exchange Act.

[21]  Exchange Act Section 19(g) directs an SRO to enforce compliance with its own rules, the Exchange Act, and the rules and regulations thereunder.  See also Section 914 Study and Commissioner Walter Statement, supra note 3 in Section II.A of the Study.

[22]  See Testimony by Stephen I. Luparello, Interim CEO, FINRA, Before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, Committee on Financial Services, U.S. House of Representatives, Feb.4, 2009 (noting that "Congress limited our authority to the enforcement of the Securities Exchange Act of 1934, the rules of the Municipal Securities Rulemaking Board and FINRA rules.  Under our fragmented system, broker-dealers are regulated under the Securities Exchange Act and investment advisers are regulated under the Investment Advisers Act of 1940.").  See also Charles A. Bowsher, et al., Report of the 2009 Special Review Committee on FINRA's Examination Program In Light of the Stanford and Madoff Schemes (Sept. 2009) ("2009 Special Review Committee Report"), available at: http://www.finra.org/web/groups/corporate/@corp/documents/corporate/p120078.pdf. at 65 ("FINRA lacks jurisdiction to regulate a significant percentage of the financial institutions, products and transactions in our country.  Of particular relevance for purposes of this review, FINRA lacks the authority to inspect for or enforce compliance with the Investment Advisers Act.").

Among other requirements, Exchange Act Section 15A(b)(6) requires the rules of an association be designed to promote just and equitable principles of trade.  As noted above, the Commission has held that FINRA's authority under Rule 2010 relating to "just and equitable principles of trade" permits FINRA to sanction member firms and associated persons for a variety of unlawful or unethical activities, including those that do not implicate "securities."   See supra Section II.B of the Study under "Fair Dealing."

- FINRA Examination of Broker-Dealers

FINRA has examination staff of more than 1,000 employees[23] to oversee and examine its  over 4,500 member firms. [24]

| Year | FINRA Member Firms [25] |
|------|-------------------------|
| 2010 | 4,578 |
| 2009 | 4,720 |
| 2008 | 4,895 |
| 2007 | 5,005 |

FINRA conducts onsite "cycle" or "routine" exams on cycles ranging from every one, two, three or four years, depending on FINRA's annual risk assessment of the member firm.[26]  The risk assessment allows FINRA to concentrate its resources on the firms it believes pose the most significant harm to investors, and considers a number of factors, including: a firm's business activities, methods of operation, types of products offered, compliance profile and financial condition.[27]  Firms that are determined to be of greatest risk are examined every year.[28]  FINRA also conducts initial examinations of its new member broker dealers within six months of registration with the SEC, as required by SEC Rule 15b2-2.  FINRA assigns a separate risk-based cycle to member firms for sales practice reviews and for financial operations reviews, with the majority of firms on

---

[23]     FINRA Letter, supra note 471 in Section IV of the Study.  FINRA's examination staffing level has remained consistent between 2007 and 2010:  1,097 employees in 2007; 1,067 employees in 2008; 1,045.5 employees in 2009; and 1,059 employees in 2010.  See letter from Helen Moore, Vice President – Regulatory Operations, FINRA, dated October 20, 2010 ("FINRA October Letter").

[24]     Specifically, there were 5,005 member firms registered with FINRA in 2007, 4,895 in 2008, 4,720 in 2009 and 4,578 in 2010.  See FINRA Statistics, available at: http://www.finra.org/Newsroom/Statistics/index.htm (last visited Jan. 13, 2011).

[25]     See FINRA Statistics, available at:  http://www.finra.org/Newsroom/Statistics/index.htm (last visited Jan. 13, 2011).

[26]     2009 Special Review Committee Report, supra note 22 at 10.  See also FINRA Letter, supra note 471 in Section IV of the Study.  FINRA added the three year exam cycle to its existing one, two and four year cycles in 2010.  See FINRA October Letter, supra note 23.

[27]     FINRA Letter, supra note 471 in Section IV of the Study; 2009 Special Review Committee Report, supra note 22, at 10.

[28]     2009 Special Review Committee Report, supra note 22 at 10.

A-9

App 437

a four year cycle for each review.[29]  In 2008, 2009 and 2010, FINRA's sales practice review cycles included the following number of member firms:[30]

| Year | 1 Year Cycle | 2 Year Cycle | 3 Year Cycle | 4 Year Cycle |
|------|------|------|------|------|
| 2010 | 167 | 1,315 | 835 | 2,351 |
| 2009 | 103 | 1,921 | | 3,264 |
| | 91 | 840 | | 4,122 |

Also between 2008 and 2010, FINRA's financial operation review cycles included the following number of member firms:[31]

| Year | 1 Year Cycle | 2 Year Cycle | 3 Year Cycle | 4 Year Cycle |
|------|------|------|------|------|
| 2010 | 285 | 1,263 | | 2,294 |
| | 296 | 1,601 | | 3,478 |
| 2008 | 207 | 807 | | 4,039 |

---

[29]    FINRA October Letter, supra note 23; E-mail from Glenn Verdi, Counsel – Regulatory Operations, FINRA (Jan. 11, 2011, EDT 15:47) ("FINRA January E-mail").

[30]    See id.

[31]    Id.

A-10

On average, FINRA conducts 2,100 cycle exams each year.[32]  Specifically, FINRA conducted 2,276 cycle exams in 2008, 2,351 in 2009 and 2,151 in 2010.[33]  FINRA exam staff completed cycle exams in an average 125 days in 2008, 145 days in 2009 and 174 days in 2010.[34]  The cycle exams completed between 2008 and October 20, 2010, resulted in the following number of informal and formal disciplinary actions, which range from deficiency letters to enforcement actions and can result in censure and fines as well as suspension or expulsion from FINRA membership or association:[35]

| Year | Cycle Exams Resulting in Informal Disciplinary Action | Cycle Exams Resulting in Formal Disciplinary Action |
|---|---|---|
| 2010 | 1,064 | |
| | 1,827 | 130 |
| 2008 | 1,726 | 136 |

Of the cycle exams that resulted in formal disciplinary actions between 2008 and October 20, 2010, the following sanctions were levied against the member firm and/or associated person:[36]

| Year | Firms Expelled | Suspensions | Individuals Barred | Fines |
|---|---|---|---|---|
| 2010 | 2 | 16 | 8 | |
| | 1 | 26 | 8 | 129 |
| 2008 | 0 | 28 | 4 | 163 |

FINRA also conducts "cause" or "targeted" examinations based on customer complaints, anonymous tips, and referrals from the Commission, market surveillance staff and arbitrations.[37]  FINRA conducts approximately 5,000 cause exams each year.[38]

---

[32]    2009 Special Review Committee Report, supra note 22, at 10.

[33]    See FINRA October Letter, supra note 23; FINRA January E-mail, supra note 29.  The number of firms for which a cycle exam was completed in 2008, 2009 and 2010 (through October 20, 2010), represented 46%, 50% and 26% of FINRA's member firm population, respectively.  Id.

[34]    Id.  The 2010 figure represents that average number of days FINRA staff took to complete cycle exams in the twelve months ending August 31, 2010.  Id.

[35]    Id.  Informal disciplinary action includes Cautionary Actions and Compliance Conferences.  Id. Formal disciplinary action includes Letters of Acceptance, Waiver and Consent, Formal Complaints, Minor Rule Violations, and Orders Accepting Offers of Settlement and Non-Summary Proceedings.  Id.

[36]    Id.

[37]    FINRA Letter, supra note 471 in Section IV of the Study; 2009 Special Review Committee Report, supra note 22, at 10.

A-11

In 2008, 2009 and 2010, FINRA completed 5,656, 7,002 and 6,387 cause exams, respectively.[39] FINRA exam staff completed cause exams in an average 175 days in 2008, 198 days in 2009 and 231 days in 2010.[40] The cause exams completed between 2008 and October 20, 2010, resulted in the following number of informal and formal disciplinary actions:[41]

| Year | Cause Exams Resulting in Informal Disciplinary Action | Cause Exams Resulting in Formal Disciplinary Action |
|---|---|---|
| 2010 | 615 | 425 |
| 2009 | 1,228 | 736 |
| 2008 | 1,271 | 677 |

Of the cause exams that resulted in formal disciplinary actions between 2008 and October 20, 2010, the following sanctions were levied against the member firm and/or associated person:[42]

| Year | Firms Expelled | Suspensions | Individuals Barred | Fines |
|---|---|---|---|---|
| 2010 | 1 | 211 | 159 | 176 |
| 2009 | 3 | 305 | 273 | 320 |
| 2008 | 2 | 296 | 289 | 288 |

As a result of all cycle and cause exams completed between 2008 and 2010 that resulted in formal disciplinary action, FINRA billed the following total amount of fines and ordered the following total amount of restitution in each respective year:[43]

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| Fines | $33,282,834 | $49,650,540 | $25,819,625 |
| Restitution | $3,422,298 | $8,347,493 | $3,646,715 |

As noted above, FINRA states that it recently enhanced its examination programs with respect to investment adviser activity at member firms to the extent FINRA has

---

[38]    2009 Special Review Committee Report, supra note 16.

[39]    See FINRA October Letter, supra note 23, and FINRA January E-mail, supra note 29.

[40]    Id. The 2010 figure represents that average number of days FINRA staff took to complete cause exams in the twelve months ending August 31, 2010. Id.

[41]    Id.

[42]    Id.

[43]    Id. The 2010 figure represents that amount of fines billed and restitution ordered in the twelve month period ending August 31, 2010. Id.

A-12

jurisdiction.[44]  Such enhancements include identifying indications of problematic behavior with the opening of investment advisory accounts at broker-dealers and verifying compliance with custody requirements when firms have a higher level of control over customer assets, such as when acting as both adviser and broker to customers.[45]

In addition, FINRA recently made several other enhancements to its examination program.[46]  Specifically, FINRA created several new examination elements corresponding to high-risk areas identified at dual registrants, including the following: Ownership and Affiliate Background and Apparent Conflicts of Interest, which expands review and verification regarding broker-dealer ownership, affiliate relationships and conflicts of interest; Feeder Funds, which examines the relationships between broker-dealers and their affiliates with feeder funds; and Financial Statement and Filings Analysis, which examines statements and filings for potentially fraudulent activity.[47]  FINRA is also reviewing its rules to identify changes that could assist in FINRA detecting potentially fraudulent activity and to identify possible enhancements to the registration process.[48]  Furthermore, FINRA expanded its regulatory review of arbitration matters to include not only customer-related statements of claim, but also employer-employee statements of claim.[49]  Finally, FINRA created the Office of the Whistleblower ("OWB"), which encourages reporting of information about potentially illegal or unethical activity and expedites review of those high-risk tips.[50]  From its inception until August 17, 2009, FINRA's OWB received over 100 tips, which have resulted in fifteen referrals to other regulators as well as several on-going FINRA investigations.[51]

### *Commission Examination of Broker-Dealers*

While the Commission staff examines broker-dealers, particularly when a risk has been identified (as described below) or when evaluating the examination work of an SRO, the Commission does not examine broker-dealers on a routine basis.

---

[44]    FINRA Letter, supra note 471 in Section IV of the Study.

[45]    FINRA Letter, supra note 471 in Section IV of the Study.

[46]    See Testimony of Daniel M. Sibears, Executive Vice President, Member Regulation, FINRA, available at:  http://www.finra.org/Newsroom/Speeches/Sibears/P119812 (posting testimony before the Senate Committee on Banking, Housing and Urban Affairs on August 17, 2009).

[47]    Id.

[48]    Id.

[49]    Id.  FINRA's regulatory review of arbitration matters also now includes review of any claims filed after the original statement of claim, including amended claims and claims filed by other parties involved in the matter.  Id.

[50]    Id.

[51]    Id.  Four of the matters referred to the Commission have resulted in publicly disclosed regulatory actions.  Id.

A-13

The Commission generally focuses its limited resources in the broker-dealer examination program on firms with the greatest potential for significant financial risk and risk of material violations of securities laws. The leading type of examination in recent years is the cause examination, primarily based on a tip or complaint. In addition to cause examinations, Commission examiners also conduct special risk-focused examinations that may involve several firms reviewing the same focused risk area to determine if a compliance problem may be widespread or to identify trends in the securities industry. For example, some recent so called sweep examinations have evaluated options order routing and execution; sales of variable insurance products; and securities firms providing "free lunch" sales seminars to senior investors. The Commission examination program currently has a cyclical examination of the largest 30 broker-dealers during which a more comprehensive review of risk management internal controls is conducted; this includes reviews of market, credit, operational, and legal and compliance risks, as well as funding and liquidity and asset verification. Given the growth in the volume of securities transactions, internationalization of the securities markets, the introduction of new financial products, and obligations regarding anti-money laundering compliance, a firm's system of internal controls and risk management has taken on an even greater level of importance. These examinations include review and testing of a firm's internal controls and risk management policies, as well as its compliance procedures.

Finally, the Commission examination program conducts a limited number of examinations, known as oversight examinations, which are intended to evaluate whether the SROs are effectively monitoring, regulating, and disciplining their members. In general, the examinations may be focused on identified priorities or high risk areas. Some of these may include: financial and operational risks; new or complex products (e.g., variable annuities, structured products, life settlements, microcap securities); controls at recently merged/acquired firms; risk management issues (mismatched durations, valuation of complex securities, stress testing, risk limits); protection of customer assets; fraud and insider trading.

- Examination Data

The number and frequency of examinations of Commission-registered broker-dealers is a function of both the number of Commission-registered broker-dealers and the number of OCIE staff. The number of Commission-registered broker-dealers increased slightly from 2007 to 2008 but since then has decreased slightly from 2008 to 2010. The following chart shows this increase and subsequent decline.

| Year | Broker Dealer Population[52] |
|------|------------------------------|
| 2010 | 5,357 |
| 2009 | 5,559 |
| 2008 | 5,748 |
| 2007 | 5,095 |

---

[52]    The broker-dealer population numbers were aggregated from Form BD.

A-14

App 442

The examination staff population has stayed relatively constant with the lowest number of staff being 365 in 2008 and the highest number of staff being 405 in 2006.

| Year | Broker-Dealer Examination Staff |
|------|--------------------------------|
| 2010 | 380 |
| 2009 | 376 |
| 2008 | 365 |
| 2007 | 392 |
| 2006 | 405 |

Due to more and more complex examinations the number of examinations performed by the broker-dealer exam staff has decreased in recent years due to the need to review more complex issues, making the exams more lengthy and intricate. The decrease is also attributable to other changes in the Commission's examination program. For example, OCIE has devoted more resources to cause examinations and special risk-focused examinations. In addition, OCIE is performing additional procedures, such as enhanced asset verification to detect fraud based on misappropriation of investor assets, during examinations.

| Year | Broker-Dealer Examinations[53] |
|------|-------------------------------|
| 2010 | 490 |
| 2009 | 662 |
| 2008 | 772 |
| 2007 | 675 |
| 2006 | 764 |

- Examination Outcomes

In general, most examinations conclude with the Commission exam staff sending a letter summarizing the staff's findings, including any deficiencies and weaknesses. Similar to the investment adviser examination program, the examination outcomes are: (1) issue a letter to the registrant indicating that no deficiencies were identified; (2) issue a deficiency letter to the registrant describing the deficiencies and requesting that the registrant implement appropriate corrective actions, and submitting a written response describing the actions; or (3) refer the deficiencies to Enforcement, another regional office, or other regulator (e.g., a state regulatory agency or an SRO). In recent years, approximately 94% of examinations conclude with a deficiency letter which summarizes OCIE staff's findings and requests corrective action. The broker-dealer will voluntarily

---

[53] Information is reported by fiscal year (October 1 – September 30). Statistics concerning the number of examinations of Commission-registered broker-dealers are from OCIE's internal examination tracking system.

A-15

correct the compliance problems detected by the Commission staff. This approach encourages compliance without costly and protracted enforcement action.

Commission Oversight of SROs

Under the Exchange Act, the Commission must evaluate whether the SROs require their members to comply with the federal securities laws and rules of the SROs. The Commission, through OCIE and the Division of Trading and Markets, inspects SROs' regulatory programs to evaluate whether the SROs are effectively monitoring for violations of SRO rules and the Exchange Act by broker-dealers and properly citing broker-dealers for violations.

In addition to the many inspections of the SRO regulatory programs that the Commission staff conducts each year, the Commission staff continually evaluates the quality of the SRO regulatory work through general assessments based on information required to be submitted by SROs, numerous meetings where information is presented in response to Commission staff inquiries, evaluation of SRO examinations through the oversight examinations, and other general oversight work.

Under Exchange Act Section 19(h), the Commission can bring an action against an SRO for failure to adequately regulate its members. For example, the Commission has used this authority to bring actions for failure to enforce compliance with the securities laws against, among others, the NYSE,[54] the American Stock Exchange,[55] the Boston Stock Exchange,[56] the National Stock Exchange,[57] and the Philadelphia Stock Exchange.[58] The Commission also has prepared reports pursuant to Exchange Act Section 21(a) regarding SROs.[59]

---

[54] See In the Matter of New York Stock Exchange, Inc., Exchange Act Release No. 51524 (Apr. 12, 2005).

[55] See In the Matter of American Stock Exchange LLC, Exchange Act Release No. 55507 (Mar. 22, 2007).

[56] See In the Matter of Boston Stock Exchange Inc. and James B. Crofwell, Exchange Act Release No. 56352 (Sept. 5, 2007).

[57] See In the Matter In the Matter of National Stock Exchange and David Colker, Exchange Act Release No. 51714 (May 19, 2005).

[58] See In the Matter of Philadelphia Stock Exchange, Inc., Exchange Act Release No. 53919 (June 1, 2006).

[59] See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 Regarding The Nasdaq Stock Market, Inc., as Overseen By Its Parent, The National Association of Securities Dealers, Inc., Exchange Act Release No. 51163 (Feb. 9, 2005); In the Matter of National Association of Securities Dealers, Inc., Report Pursuant to Section 21(a) of the Securities Exchange Act of 1934 Regarding the NASD and NASDAQ Market, Exchange Act Release No. 37542 (Aug. 8, 1996).

### C.    Commission Enforcement

The Commission is authorized to bring injunctive actions in federal district court against any person, including investment advisers and broker-dealers, for violation of the federal securities laws.[60]  In an injunctive action, the Commission may seek disgorgement plus prejudgment interest, civil monetary penalties, penny stock bars, an accounting, and other remedial sanctions against individuals and entities that have violated or aided and abetted violations of the federal securities laws.

The Commission may also institute administrative proceedings against investment advisers, broker-dealers and their respective associated persons for violations of the federal securities laws.  Under Advisers Act Sections 203(e) and 203(k) and Exchange Act Sections 15(b)(4) and 21C, the Commission may institute administrative proceedings to seek remedial sanctions against an investment adviser or a broker-dealer, respectively, based on an allegation that an entity has been found to have willfully violated, aided and abetted, or failed reasonably to supervise any person who violated, or aided and abetted, a violation of the federal securities laws.[61]  The Commission may impose remedial sanctions such as censure, revocation of registration, suspension for 12 months or less or bar,[62] or placing limitations on the activities, functions, or operations of the broker-dealer or investment adviser.  The Commission may also order the party to cease and desist from committing or causing federal securities law violations, and may impose orders for disgorgement plus prejudgment interest, accounting, and penalties.[63]

Criminal Prosecution

Under Advisers Act Section 217 and Exchange Act Section 21(d), the Commission is authorized to refer any matter to the Department of Justice, which

---

[60]    See Advisers Act Section 209(d); Investment Company Act Section 42(d); Securities Act Section 20(b); Exchange Act Section 21(d).

[61]    Dodd-Frank Act Section 929O amended Section 20(e) to state that aiding and abetting violations encompass both knowing and reckless assistance ("any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided").  Dodd-Frank Act Section 929M added provisions to Securities Act Section 15 and Investment Company Act Section 48 that makes it a violation to aid and abet another person who violates a provision under the Securities Act ("any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this Act, or of any rule or regulation issued under this Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.")

[62]    The Commission may grant barred individuals a right to reapply to become an associated person after a period of time.

[63]    Pursuant to Securities Act Section 8A, the Commission also is authorized to institute administrative cease-and-desist proceedings against any person, including an investment adviser or a broker-dealer, for committing or causing violations of the Securities Act.

A-17

determines whether criminal prosecution would be appropriate.  It is a criminal offense to willfully violate any provision of the Advisers Act, Securities Act or the Exchange Act, or to willfully make false statements in any application, report, or document filed with the Commission.[64]  Under Exchange Act Section 32(a), a court may impose criminal penalties of up to $25 million on any non-natural person, such as a broker-dealer, that has been convicted of willfully violating any provision of the Exchange Act (other than Section 30A – the Foreign Corrupt Practices Act) or any rule thereunder.  Advisers Act Section 217 provides that any person convicted of willfully violating the Advisers Act or any rule, regulation or order thereunder may be fined up to $10,000 and imprisoned for up to five years.  Criminal actions against an adviser or a broker-dealer are prosecuted by the Department of Justice.

The Division of Enforcement

        The Commission has broad statutory authority under the federal securities laws to investigate whether violations of the federal securities laws have occurred or are about to occur.  Enforcement, the Commission's largest Division, assists in executing the Commission's law enforcement function by investigating potential securities law violations, by recommending that the Commission bring civil actions in federal court or institute administrative proceedings before an administrative law judge, and by prosecuting these cases on behalf of the Commission.  As an adjunct to the Commission's civil enforcement authority, Enforcement works closely with criminal law enforcement agencies in the United States and around the world, who bring parallel or related criminal cases when appropriate.  In FY2010, for example, prosecutors filed indictments, informations, or contempt actions in 139 Commission-related criminal cases.

        Enforcement obtains evidence of possible violations of the federal securities laws from many sources, including Division surveillance, monitoring, and risk analysis, investor tips and complaints, other divisions and offices of the Commission (such as referrals from OCIE), the SROs and other securities industry sources, foreign authorities, and media reports.[65]  In recent years, Enforcement has brought approximately 600 enforcement actions each year against individuals and entities accused of violating the federal securities laws.  As shown in more detail in the chart below, the mix and types of actions vary from year to year, based upon, among other factors, market conditions, changes in financial instruments being used, and Commission or Division priorities.  In general, violations involving broker-dealers could include:  market manipulation; abusive sales practices, such as recommending unsuitable securities, churning, and unauthorized trading in customer accounts; misrepresentations; failures to perform due diligence prior to recommending securities; insider trading; compliance and internal controls violations; violations of various recordkeeping requirements; and failures reasonably to supervise representatives.  Cases involving investment advisers could include:  failures to disclose

---

[64]        Advisers Act 203(e); Securities Act Section 24; Exchange Act Section 32(a).

[65]        For example, in fiscal year 2010, 21.9% of investigations came from internally-generated referrals or prospects.

A-18

conflicts of interest, misrepresentations, breaches of fiduciary duty, insider trading; valuation issues; compliance and internal controls violations; violations of various recordkeeping requirements; and failures reasonably to supervise.  Typically, actions primarily involving broker-dealers represent 9% to 22% of total Enforcement actions brought each year, and actions primarily involving investment advisers represent 11% to 16% of total Enforcement actions brought each year, as shown more fully in the chart below.

**Number of Enforcement Actions Filed By Primary Classification**
**(with number of defendants and respondents noted parenthetically)[66]**

| FY | Total Actions | Broker-Dealer | Broker-dealer Percentage | Investment Adviser | Investment Adviser Percentage |
|---|---|---|---|---|---|
| 2010 | 681 (1817) | 70 (95) | 10% | 107 (221) | 16% |
| 2009 | 664 (1787) | 109 (182) | 16% | 76 (227) | 11% |
| 2008 | 671 (1635) | 60 (89) | 9% | 79 (161) | 12% |
| 2007 | 656 (1449) | 89 (179) | 14% | 72 (135) | 11% |
| 2006 | 574 (1163) | 75 (107) | 13% | 87 (161) | 15% |
| 2005 | 630 (1286) | 94 (175) | 15% | 95 (159) | 15% |
| 2004 | 639 (1454) | 141 (245) | 22% | 76 (138) | 12% |

Enforcement regularly obtains orders on behalf of the Commission in judicial and administrative proceedings requiring securities violators to disgorge ill-gotten gain and to pay civil penalties.  The chart below shows the amount of disgorgement and civil penalties ordered over the past several years.

**Money Ordered in All Commission Judicial and Administrative Proceedings**

| FY | Disgorgement | Penalties | Total |
|---|---|---|---|
| 2010 | $ 1.82 billion | $ 1.03 billion | $ 2.846 billion |
| 2009 | $ 2.09 billion | $ 345 million | $ 2.442 billion |
| 2008 | $ 774 million | $ 256 million | $ 1.03 billion |
| 2007 | $ 1.093 billion | $ 507 million | $ 1.6 billion |
| 2006 | $ 2.3 billion | $ 975 million | $ 3.275 billion |
| 2005 | $ 1.6 billion | $ 1.5 billion | $ 3.1 billion |
| 2004 | $ 1.9 billion | $ 1.2 billion | $ 3.1 billion |

---

[66]   Each action is included in only one category, even though many actions involve multiple allegations and may fall under more than one category.  For example, there may be actions that are not primarily classified as "Broker-Dealer" or "Investment Adviser" that may include broker-dealer or investment adviser misconduct.

A-19

*Staffing and Recent Developments*

During the past year and a half, the Division of Enforcement has undergone a dramatic reorganization and restructuring. The Division undertook a top-to-bottom self-assessment of its operations and processes and as a result, implemented a series of sweeping reforms designed to optimize the use of resources, gather and utilize expertise across the Division and the Commission, bring cases more swiftly and more efficiently, and increase strategic analysis and proactive investigations.[67]

As of the end of fiscal year 2010, the Division of Enforcement had 1,201 individuals, including 804 attorneys, 117 accountants, 85 paralegals, and 165 support staff, all led by 30 senior leaders. Following is a summary of Enforcement full time employees ("FTEs") over the past several years.

| Fiscal Year | Total Enforcement Staffing (FTEs) |
|---|---|
| 2009 | 1,179 |
| 2008 | 1,148 |
| 2007 | 1,111 |
| 2006 | 1,157 |
| 2005 | 1,232 |
| 2004 | 1,144 |

To maintain an effective deterrent presence, the enforcement program needs to be adequately staffed to address increasingly complex financial products and transactions and the enormous size of the markets. In addition, the enforcement program needs to be able to take prompt action to halt violations and try to recover funds. Additional positions will complement the enforcement program's current reorganization efforts by:

- expanding and focusing the investigations function, so Enforcement can strengthen its efforts to identify areas appropriate for enhanced investigative efforts;

- staffing the newly created Office of Market Intelligence;

- strengthening the litigation function in order to succeed in an increased number of trials;

---

[67]  See Robert Khuzami, Director of the Division of Enforcement, U.S. Securities and Exchange Commission, Testimony Concerning Investigating and Prosecuting Fraud after the Fraud Enforcement and Recovery Act Before the United States Senate Committee on the Judiciary (Sept. 22, 2010), for more information on the Division of Enforcement's recent efforts.

- increasing staffing in the Office of Collections and Distributions, which is responsible for collecting penalties and disgorgements and returning funds to harmed investors whenever possible; and

- expanding staff in the Division's information technology group.

### D.    FINRA Enforcement

FINRA has the authority to bring a disciplinary action against any member firm or associated person for failure to comply with the federal securities laws, the rules of the MSRB, and FINRA Rules.[68]  FINRA is authorized[69] to impose sanctions on a member or person associated with a member for violations of such rules and regulations, including: cautionary actions (for minor offenses), censure, fine, suspension for a definite period, or a period contingent on the performance of a particular act, expulsion of a member or suspension or bar of a person associated with a member, temporary or permanent cease-and-desist order against a member or a person associated with a member, and any other fitting sanction.[70]  FINRA often requires firms to provide restitution to harmed investors and imposes other conditions on a broker-dealer to prevent repeated wrongdoing.[71] FINRA disciplinary actions are subject to review by the Commission.

In 2009, FINRA brought over 993 disciplinary actions.[72]  FINRA levied fines against firms and individuals totaling nearly $50 million, and ordered firms and individuals to return more than $8.2 million in restitution to investors.[73]  FINRA also expelled 20 firms, barred 383 individuals from the industry, and suspended 363 others.[74]

This data is consistent with disciplinary actions taken by FINRA (and the NASD and NYSE) between 2004 and 2008.  For each year during this period, disciplinary actions by these entities on average resulted in the collection of approximately $97.4 million in fines against firms and individuals, and restitution for investors of approximately $105 million.[75]  These included actions related to the sale of auction rate securities that resulted in over $28 million in fines and over $1 billion returned to

---

[68]    See, e.g., FINRA Bylaws of the Corporation, Article XIII, Section 1.

[69]    See, e.g., FINRA Bylaws of the Corporation, Article XIII, Section 1; FINRA Rule 8310.

[70]    See, e.g., FINRA Letter, supra note 471 in Section IV of the Study.

[71]    FINRA Letter, supra note 471 in Section IV of the Study.

[72]    FINRA Letter, supra note 471 in Section IV of the Study.

[73]    FINRA Letter, supra note 471 in Section IV of the Study.

[74]    FINRA Letter, supra note 471 in Section IV of the Study.

[75]    2009 Special Review Committee Report, supra note 22, at 9.

A-21

investors.[76]  Additionally, in each of these years, an average of 21 firms were expelled, 443 registered representatives barred, and 396 others suspended.[77]  FINRA also receives approximately 25,000 complaints, tips and similar items each year.[78]

If the SROs find evidence of violations outside of their jurisdiction, they make referrals to the Commission or another appropriate regulator.  SRO disciplinary procedures are subject to Commission oversight.

## II.    State Regulatory, Examination and Enforcement Resources

As previously discussed above, the states regulate the activities of investment advisers and broker-dealers in a number of ways.  The following section discusses states' examination and enforcement programs relating to investment advisers and broker-dealers.  The information and data in this section are derived from the analysis provided by NASAA regarding the effectiveness of state regulatory resources and examinations.[79] NASAA compiled its report through questionnaires and interviews prepared and conducted from August 30, 2010 to September 7, 2010.[80]  The data in the NASAA Report is reported in the aggregate and not on a state-by-state basis.

### A.    Overview of State Examinations

The states are responsible for examining state-registered investment advisers and investment adviser representatives.  For broker-dealer examinations, NASAA reported that the states collaborate with the Commission and FINRA to help ensure that registrants are regularly examined for both basic compliance and antifraud purposes.[81]  NASAA reported that the examination process at the state level typically begins before an entity becomes a registrant.[82]  In particular, NASAA stated that state securities regulators review information submitted by applicants to determine whether the applicant satisfies the state's registration requirements.  This examination includes an evaluation of the

---

[76]    See 2009 Special Review Committee Report, supra note 22, at 9.

[77]    2009 Special Review Committee Report, supra note 22, at 9.

[78]    2009 Special Review Committee Report, supra note 22, at 9.

[79]    See NASAA Report, supra note 405 in Section II.C.1 of the Study.

[80]    NASAA Report, supra note 405 in Section II.C.1 of the Study, at 2.

[81]    NASAA Report, supra note 405 in Section II.C.1 of the Study at 3.  However, NASAA has expressed concerns that state exam collaboration and coordination with FINRA has not been as effective as desired, given FINRA's concerns that their actions as a private entity may be attributed to the states pursuant to the "State Actor Doctrine."  See NASAA Report, supra note 405 in Section II.C.1 of the Study.  For a discussion of the state actor doctrine, see Division of Enforcement, U.S. Securities Exchange Commission, Enforcement Manual at 49 (Jan. 2010), available at http://www.sec.gov/divisions/enforce/enforcementmanual.pdf.

[82]    Id.

A-22

applicant's history as disclosed on the Forms BD and ADV and the applicant's performance on competency exams written by the states.[83]   NASAA found that the states also review and monitor registrant activity to assess whether the firms remain qualified to do business in their state.[84]

NASAA reported that states monitor ongoing compliance in a variety of ways including, but not limited to, post-registration reviews, annual questionnaires, and both on- and off-site examinations.[85]   NASAA found that for investment advisers, state routine exams commonly occurred within a three-to-five year examination cycle.[86] NASAA reported that the frequency of exams of broker-dealer were similarly frequent, but given complementary examination programs at the Commission and FINRA, state examinations in this area are often "for-cause" or address special circumstances.[87]

NASAA reported that nationwide, state securities regulators employ a total licensing and examination staff of over 400 professionals, including examiners, auditors, accountants, attorneys and support staff.[88]   While approximately 25% of states have staff members who are cross-trained to perform both pre-licensing reviews and post-registration examinations, the states reported to NASAA that 120 staff members are assigned primarily to application and pre-license review and analysis.[89]   The states also reported that they employ an additional 230 field examiners and auditors dedicated to the assessment of compliance at investment advisers and broker-dealers, and reported another 60 administrative assistants, support staff, financial analysts, staff economists and attorneys who support both the registration and examination functions.[90]

## B.    Investment Adviser Examinations

As previously discussed in Section II.B.1, most small advisers (those with fewer than $25 million under management (raised to $100 million under management as of July 21, 2011)) are prohibited from registering with the Commission and are registered and

---

[83]    Id.

[84]    Id.

[85]    Id.

[86]    Id.

[87]    Id.  An examination that is precipitated by an investor complaint, an industry tip, peer regulator referral, or other method is most commonly referred to by the states as a "for-cause" examination. NASAA Report, supra note 405 in Section II.C.1 of the Study at 9.

[88]    NASAA Report, supra note 405 in Section II.C.1 of the Study, at 11.

[89]    Id.

[90]    NASAA Report, supra note 405 in Section II.C.1 of the Study, at 12.

A-23

regulated by state regulators.[91]  NASAA reported that the methods utilized by the states to conduct examinations ranged from standard annual questionnaires to formal court-petitioned inspections.[92]  NASAA found that the number of registration and examination professionals working for state regulators produced a ratio of one full-time licensing/exam staff member for approximately every 37 state-registered investment advisers.[93]  NASAA also found that virtually all states (94%) conduct investment adviser examinations on-site at the investment adviser's principal place of business on a "routine" or non-cause basis.  These examinations are often initiated within the first two years of a firm's registration.  NASAA reported that follow-up examinations are conducted thereafter on a frequent basis to reinforce strong compliance practices and are designed to prevent, rather than react to, fraud and abuse.[94]

The table below shows the number of on-site investment adviser examinations completed by the states since 2006.

| Year | Investment Adviser Examinations[95] |
|---|---|
| 2010 | 2,463 (YTD – August 2010) |
| 2009 | 2,378 |
| 2008 | 2,389 |
| 2007 | 2,136 |
| 2006 | 2,054 |

NASAA reported that these annual investment adviser examination numbers were consistent with the states' average examination cycle of three to five years.[96]  NASAA noted in some of the most populous states, states demonstrate a relatively high number of examinations.  In particular, one state reported 257 examinations of investment advisers in 2009, representing 41% of that state's registered investment adviser firms.[97]  This same state reported examinations of nearly 50% of all state-registered investment adviser firms every year from 2006 to 2008.[98]  Another state reported 1,014 examinations in five

---

[91]    See Advisers Act Section 203A and Section II.B.1, supra.

[92]    NASAA reported that at least 47 states monitor compliance through examinations or audits of state-registered investment advisers.  NASAA Report, supra note 405 in Section II.C.1 of the Study, at 7.

[93]    NASAA Report, supra note 405 in Section II.C.1 of the Study, at 12.

[94]    Id.

[95]    Information in this chart is derived from the NASAA Report, supra note 405 in Section II.C.1 of the Study, at 21.

[96]    NASAA Report supra note 405 in Section II.C.1 of the Study, at 21.

[97]    Id.  The NASAA Report did not identify the state.

[98]    Id.

A-24

years, an average of 203 examinations every year.[99]  NASAA found that the vast majority (89%) of state routine examinations were completed on a formal cyclical basis, while a minority (11%) were performed on a random or ad hoc basis.[100]  NASAA found that all states that adhered to a formal examination cycle audited their entire investment adviser registrant populations in six years or less.[101]

NASAA found that because the volume of data analyzed by state examiners during an examination was significant, the overall process was time-intensive. While the exact time it took to complete an examination depended upon the size and complexity of the firm being examined, NASAA reported that an average examination normally took two weeks, which included one to two full days on-site at the investment adviser's principal place of business.[102]  NASAA also reported that states typically issued an audit report several weeks later that documented their findings.[103]  NASAA stated that any examination that produced findings of fraud, abuse or other violations of the securities laws was quickly referred to state enforcement staff for further investigation and/or prosecution.[104]

### C.    Broker-Dealer Examinations

NASAA noted that state regulators implement a long-standing and uniform broker-dealer examination program encompassing the fifty states via routine examinations as well as risk-based selection methodologies.[105]  NASAA found that these examinations, like those for investment advisers, are generally on-site, routine examinations, conducted periodically and on a "non-cause" basis.[106]

---

[99]    Id.

[100]    NASAA Report, supra note 405 in Section II.C.1 of the Study, at 8.

[101]    Id.

[102]    NASAA Report, supra note 405 in Section II.C.1 of the Study, at 9.

[103]    Id.

[104]    Id.

[105]    Id.

[106]    NASAA stated that "because states are generally examining Broker-Dealer firms concurrent with FINRA and Commission examinations, state resources are often best spent on these risk-based exams.").  NASAA Report, supra note 405 in Section II.C.1 of the Study, at 10.

A-25

The table below shows the number of broker-dealer examinations completed by the states since 2006.

| Year | Broker-Dealer Examinations[107] |
|------|---------------------------------|
| 2010 | 1,525 (YTD – August 2010) |
| 2009 | 1,774 |
| 2008 | 1,651 |
| 2007 | 1,537 |
| 2006 | 1,527 |

While many of these examinations are conducted within a state's routine audit cycle, NASAA reported that the states' broker-dealer examination program includes a "for-cause" component.[108]  NASAA stated that in 34% of the states that conduct Broker-Dealer examinations, either most or all of such audits are "for cause."[109]  NASAA also found that 46% the states conduct most or all of their broker-dealer examinations on a routine basis.[110]  An additional 9% of states reported that their broker-dealer examinations are split evenly between routine and for-cause circumstances.[111] Regardless of the initial examination approach, NASAA stated that any broker-dealer examination that uncovers dishonest or unethical behavior, or fraud, was referred to enforcement staff for investigation and/or prosecution.[112]

### D.      Investment Adviser and Broker-Dealer Examination Outcomes

NASAA reported that states often issue a letter notifying a firm of the state's requirements and its failure to comply with them (a "deficiency letter").[113]  NASAA found that virtually every state confirmed issuing deficiency letters, and in 2009 for

---

[107]      Information in this chart is derived from the NASAA Report, supra note 405 in Section II.C.1 of the Study, at 22.

[108]      NASAA Report, supra note 405 in Section II.C.1 of the Study, at 22.  According to NASAA, states generally examine broker-dealer firms concurrent with FINRA and Commission examinations; therefore, NASAA believed that state resources are often best spent on these risk-based exams.  NASAA noted that states also endeavor to reach small, remotely located offices where violations of the securities laws frequently occur.  See NASAA Report at 10.

[109]      NASAA Report, supra note 405 in Section II.C.1 of the Study, at 10.

[110]      Id.

[111]      Id.

[112]      Id.

[113]      NASAA Report, supra note 405 in Section II.C.1 of the Study, at 23.

A-26

App 454

instance, the states sent 5,176 deficiency letters as a result of their examinations.[114] NASAA reported that examinations will often trigger several deficiency letters, particularly if minor violations are sequentially discovered.  A few states reported that 100% of their exams lead to a deficiency letter.[115]  NASAA reported that most reporting states indicated that 100% of their deficiency letters resulted in satisfactory cures and compliance.[116]  In 2009, state preregistration analysis or examination deficiency letters and resulting discussions with applicants or registrants led to 1,557 withdrawals of registrations.[117]

---

[114]    Id.  The NASAA Report did not distinguish between actions taken with respect to investment advisers or with respect to broker-dealers (such as deficiency letters or revocations of registrations).  Accordingly, the data in this section relates to both investment advisers and broker-dealers.

[115]    Id.

[116]    Id.

[117]    Id.

A-27

**<u>Appendix B</u>: Groups, Entities and Individuals Who Met with the Staff**

- American Council of Life Insurers
- Ameriprise Financial
- Association for Advanced Life Underwriting
- Association of Institutional Investors
- Bond Dealers of America
- Charles Schwab
- Committee for the Fiduciary Standard, Professor Daylian Cain of the Yale School of Management, and Professor Tamar Frankel of the Boston University School of Law
- Consumer Federation of America and Fund Democracy
- Edward Jones
- Financial Planning Coalition
- Financial Services Institute
- FINRA
- Investment Adviser Association
- Morgan Stanley Smith Barney
- North American Securities Administration Association
- Primerica
- Public Investors Arbitration Bar Association
- Securities Industry and Financial Markets Association and Oliver Wyman
- State Farm
- TD Ameritrade
- TIAA-CREF
- UBS
- Wells Fargo Advisors

B-1

App 456

<table>
<tr><td colspan="2">OMB APPROVAL</td></tr>
<tr><td>OMB Number:</td><td>3235-0049</td></tr>
<tr><td>Expires:</td><td>July 31, 2027</td></tr>
<tr><td colspan="2">Estimated average burden</td></tr>
<tr><td>hours per response</td><td>10.72</td></tr>
</table>

# FORM ADV (Paper Version)

- **UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND**
- **REPORT FORM BY EXEMPT REPORTING ADVISERS**

**Form ADV: General Instructions**

Read these instructions carefully before filing Form ADV. Failure to follow these instructions, properly complete the form, or pay all required fees may result in your application or report being delayed or rejected.

In these instructions and in Form ADV, "you" means the investment adviser (*i.e.*, the advisory firm).

If you are a "separately identifiable department or division" (SID) of a bank, "you" means the SID, rather than your bank, unless the instructions or the form provide otherwise.

If you are a *private fund* adviser filing an *umbrella registration*, "you" means the *filing adviser* and each *relying adviser*, unless the instructions or the form provide otherwise. The information in Items 1, 2, 3 and 10 (including corresponding schedules) should be provided for the *filing adviser* only.

Terms that appear in *italics* are defined in the Glossary of Terms to Form ADV.

1.      **Where can I get more information on Form ADV, electronic filing, and the IARD?**

The SEC provides information about its rules and the Advisers Act on its website: <http://www.sec.gov/iard>.

NASAA provides information about state investment adviser laws and state rules, and how to contact a *state securities authority*, on its website: <http://www.nasaa.org>.

FINRA provides information about the IARD and electronic filing on the IARD website: <http://www.iard.com>.

2.      **What is Form ADV used for?**

Investment advisers use Form ADV to:

- Register with the Securities and Exchange Commission
- Register with one or more *state securities authorities*

SEC 1707 (07-24) File 1 of 5

1

App 457

- Amend those registrations
- Report to the SEC as an *exempt reporting adviser*
- Report to one or more *state securities authorities* as an *exempt reporting adviser*
- Amend those reports; and
- Submit a final report as an *exempt reporting adviser*

**3.      How is Form ADV organized?**

Form ADV contains five parts:

- Part 1A asks a number of questions about you, your business practices, the *persons* who own and *control* you, and the *persons* who provide investment advice on your behalf.
  - All advisers registering with the SEC or any of the *state securities authorities* must complete Part 1A.
  - *Exempt reporting advisers* (that are not also registering with any *state securities authority*) must complete only the following Items of Part 1A: 1, 2, 3, 6, 7, 10, and 11, as well as corresponding schedules. *Exempt reporting advisers* that are registering with any *state securities authority* must complete all of Form ADV.

  Part 1A also contains several supplemental schedules. The items of Part 1A let you know which schedules you must complete.

  - Schedule A asks for information about your direct owners and executive officers.
  - Schedule B asks for information about your indirect owners.
  - Schedule C is used by paper filers to update the information required by Schedules A and B (see Instruction 18).
  - Schedule D asks for additional information for certain items in Part 1A.
  - Schedule R asks for additional information about *relying advisers*.
  - Disclosure Reporting Pages (or DRPs) are schedules that ask for details about disciplinary events involving you or your *advisory affiliates*.

- Part 1B asks additional questions required by *state securities authorities*.  Part 1B contains three additional DRPs.  If you are applying for SEC registration or are registered only with the SEC, you do not have to complete Part 1B. (If you are filing electronically and you do not have to complete Part 1B, you will not see Part 1B).

- Part 2A requires advisers to create narrative *brochures* containing information about the advisory firm. The requirements in Part 2A apply to all investment advisers registered with or applying for registration with the SEC, but do not apply to *exempt reporting advisers*.  Every application for registration must include a narrative brochure prepared in accordance with the requirements of Part 2A of Form ADV. See Advisers Act Rule 203-1.

- Part 2B requires advisers to create *brochure supplements* containing information about certain *supervised persons*.  The requirements in Part 2B apply to all investment advisers registered with or applying for registration with the SEC, but do not apply to *exempt reporting advisers*.

- Part 3 requires advisers to create relationship *summary* (Form CRS) containing information for *retail investors*. The requirements in Part 3 apply to all investment

SEC 1707 (07-24)  File 1 of 5

2

App 458

advisers registered or applying for registration with the SEC, but do not apply to *exempt reporting advisers*. Every adviser that has *retail investors* to whom it must deliver a *relationship summary* must include in the application for registration a *relationship summary* prepared in accordance with the requirements of Part 3 of Form ADV. See Advisers Act Rule 203-1.

**4.    When am I required to update my Form ADV?**

- SEC- and State-Registered Advisers:

  o *Annual updating amendments*: You must amend your Form ADV each year by filing an *annual updating amendment* within 90 days after the end of your fiscal year. When you submit your *annual updating amendment*, you must update your responses to all items in Part 1A, 1B, 2A and 2B (as applicable), including corresponding sections of Schedules A, B, C, and D and all sections of Schedule R for each *relying adviser*. You must submit your summary of material changes required by Item 2 of Part 2A either in the *brochure* (cover page or the page immediately thereafter) or as an exhibit to your *brochure*. You may, but are not required, to submit amended versions of the *relationship summary* required by Part 3 as part of your *annual updating amendment.*

  o Other-than-annual amendments:  In addition to your *annual updating amendment*,

    ▪ If you are registered with the SEC or a *state securities authority*, you must amend Part 1A, 1B, 2A and 2B (as applicable) of your Form ADV, including corresponding sections of Schedules A, B, C, D, and R, by filing additional amendments (other-than-annual amendments) promptly, if:

      o you are adding or removing a *relying adviser* as part of your *umbrella registration;*

      o information you provided in response to Items 1 (except 1.O. and Section 1.F. of Schedule D), 3, 9 (except 9.A.(2), 9.B.(2), 9.E., and 9.F.), or 11 of Part 1A or Items 1, 2.A. through 2.F., or 2.I. of Part 1B or Sections 1 or 3 of Schedule R becomes inaccurate in any way;

      o information you provided in response to Items 4, 8, or 10 of Part 1A, or Item 2.G. of Part 1B, or Section 4 of Schedule R becomes materially inaccurate; or information you provided in your *brochure* becomes materially inaccurate (see note below for exceptions).

    **Notes**: Part 1: If you are submitting an other-than-annual amendment, you are not required to update your responses to Items 2, 5, 6, 7, 9.A.(2), 9.B.(2), 9.E., 9.F., or 12 of Part 1A, Items 2.H. or 2.J. of Part 1B, Section 1.F. of Schedule D or Section 2 of Schedule R even if your responses to those items have become inaccurate.

    Part 2:  You must amend your *brochure supplements* (see Form ADV, Part

SEC 1707 (07-24)  File 1 of 5

3

2B) promptly if any information in them becomes <u>materially</u> inaccurate. If you are submitting an other-than-annual amendment to your *brochure*, you are not required to update your summary of material changes as required by Item 2. You are not required to update your *brochure* between annual amendments solely because the amount of *client* assets you manage has changed or because your fee schedule has changed. However, if you are updating your *brochure* for a separate reason in between annual amendments, and the amount of *client* assets you manage listed in response to Item 4.E. or your fee schedule listed in response to Item 5.A. has become materially inaccurate, you should update that item(s) as part of the interim amendment.

- <u>If you are an SEC-registered adviser</u>, you are required to file your *brochure* amendments electronically through IARD. You are not required to file amendments to your *brochure supplements* with the SEC, but you must maintain a copy of them in your files.

- <u>If you are a state-registered adviser</u>, you are required to file your *brochure* amendments and *brochure supplement* amendments with the appropriate *state securities authorities* through IARD.

<u>Part 3</u>: If you are registered with the SEC, you must amend Part 3 of your Form ADV within 30 days whenever any information in your *relationship summary* becomes materially inaccurate by filing with the SEC an additional *other-than-annual amendment* or by including the *relationship summary* as part of an *annual updating amendment*. You must include an exhibit highlighting the most recent changes required by Form ADV, Part 3 (Form CRS), General Instruction 8.C.

- *Exempt reporting advisers*:

  o *Annual Updating Amendments*: You must amend your Form ADV each year by filing an *annual updating amendment* within 90 days after the end of your fiscal year. When you submit your *annual updating amendment*, you must update your responses to all required items, including corresponding sections of Schedules A, B, C, and D.
  o <u>Other-than-Annual Amendments</u>: In addition to your *annual updating amendment*, you must amend your Form ADV, including corresponding sections of Schedules A, B, C, and D, by filing additional amendments (other-than-annual amendments) <u>promptly</u> if:

    ▪ information you provided in response to Items 1 (except Item 1.O. and Section 1.F. of Schedule D), 3, or 11 becomes inaccurate in any way; or

    ▪ information you provided in response to Item 10 becomes <u>materially</u> inaccurate.

**Failure to update your Form ADV, as required by this instruction, is a violation of SEC rules or similar state rules and could lead to your registration being revoked.**

**5.     What is SEC *umbrella registration* and how can I satisfy the requirements of filing an *umbrella registration*?**

An *umbrella registration* is a single registration by a *filing adviser* and one or more *relying advisers* who advise only *private funds* and certain separately managed account *clients* that are *qualified clients* and collectively conduct a single advisory business.  Absent other facts suggesting that the *filing adviser* and *relying adviser*(s) conduct different businesses, *umbrella registration* is available under the following circumstances:

i.   The *filing adviser* and each *relying adviser* advise only *private funds* and *clients* in separately managed accounts that are *qualified clients* and are otherwise eligible to invest in the *private funds* advised by the *filing adviser* or a *relying adviser* and whose accounts pursue investment objectives and strategies that are substantially similar or otherwise related to those *private funds*.

ii.  The *filing adviser* has its *principal office and place of business* in the United States and, therefore, all of the substantive provisions of the Advisers Act and the rules thereunder apply to the *filing adviser's* and each *relying adviser's* dealings with each of its *clients*, regardless of whether any *client* of the *filing adviser* or *relying adviser* providing the advice is a *United States person*.

iii. Each *relying adviser*, its *employees* and the *persons* acting on its behalf are subject to the *filing adviser's* supervision and *control* and, therefore, each *relying adviser*, its *employees* and the *persons* acting on its behalf are "persons associated with" the *filing adviser* (as defined in section 202(a)(17) of the Advisers Act).

iv.  The advisory activities of each *relying adviser* are subject to the Advisers Act and the rules thereunder, and each *relying adviser* is subject to examination by the SEC.

v.   The *filing adviser* and each *relying adviser* operate under a single code of ethics adopted in accordance with SEC rule 204A-1 and a single set of written policies and procedures adopted and implemented in accordance with SEC rule 206(4)-7 and administered by a single chief compliance officer in accordance with that rule.

To satisfy the requirements of Form ADV while using *umbrella registration* the *filing adviser* must sign, file, and update as required, a single Form ADV (Parts 1 and 2) that relates to, and includes all information concerning, the *filing adviser* and each *relying adviser* (*e.g.*, disciplinary information and ownership information), and must include this same information in any other reports or filings it must make under the Advisers Act or the rules thereunder (*e.g.*, Form PF).  The *filing adviser* and each *relying adviser* must not be prohibited from registering with the SEC by section 203A of the Advisers Act (*i.e.*, the *filing adviser* and each *relying adviser* must individually qualify for SEC registration).

Unless otherwise specified, references to "you" in Form ADV refer to both the *filing adviser* and each *relying adviser*. The information in Items 1, 2, 3 and 10 (including corresponding schedules) should be provided for the *filing adviser* only. A separate Schedule R should be completed for each *relying adviser*. References to "you" in Schedule R refer to the *relying*

*adviser* only.

A *filing adviser* applying for registration with the SEC should complete a Schedule R for each *relying adviser*. If you are a *filing adviser* registered with the SEC and would like to add or delete *relying advisers* from an *umbrella registration*, you should file an other-than-annual amendment and add or delete Schedule Rs as needed.

Note: *Umbrella registration* is not available to *exempt reporting advisers*.

6.     **Where do I sign my Form ADV application or amendment?**

You must sign the appropriate Execution Page.  There are three Execution Pages at the end of the form. Your initial application, your initial report (in the case of an *exempt reporting adviser*), and all amendments to Form ADV must include at least one Execution Page.

- If you are applying for or are amending your SEC registration, or if you are reporting as an *exempt reporting adviser* or amending your report, you must sign and submit either a:

  o   Domestic Investment Adviser Execution Page, if you (the advisory firm) are a resident of the United States; or
  o   *Non-Resident* Investment Adviser Execution Page, if you (the advisory firm) are not a resident of the United States.

- If you are applying for or are amending your registration with a *state securities authority*, you must sign and submit the State-Registered Investment Adviser Execution Page.

7.     **Who must sign my Form ADV or amendment?**

The individual who signs the form depends upon your form of organization:

- For a sole proprietorship, the sole proprietor.
- For a partnership, a general partner.
- For a corporation, an authorized principal officer.
- For a "separately identifiable department or division" (SID) of a bank, a principal officer of your bank who is directly engaged in the management, direction, or supervision of your investment advisory activities.
- For all others, an authorized individual who participates in managing or directing your affairs.

The signature does not have to be notarized, and in the case of an electronic filing, should be a typed name.

8.     **How do I file my Form ADV?**

Complete Form ADV electronically using the Investment Adviser Registration Depository (IARD) if:

SEC 1707 (07-24)  File 1 of 5

6

App 462

- You are filing with the SEC (and submitting *notice filings* to any of the *state securities authorities*), or

- You are filing with a *state securities authority* that requires or permits advisers to submit Form ADV through the IARD.

  **Note:** SEC rules require advisers that are registered or applying for registration with the SEC, or that are reporting to the SEC as an *exempt reporting adviser*, to file electronically through the IARD system. See SEC rules 203-1 and 204-4.

To file electronically, go to the IARD website (<www.iard.com>), which contains detailed instructions for advisers to follow when filing through the IARD.

Complete Form ADV (Paper Version) on paper if:

- You are filing with the SEC or a *state securities authority* that requires electronic filing, but you have been granted a continuing hardship exemption. Hardship exemptions are described in Instruction 17.

- You are filing with a *state securities authority* that permits (but does not require) electronic filing and you do not file electronically.

**9.      How do I get started filing electronically?**

First, obtain a copy of the IARD Entitlement Package from the following website: <http://www.iard.com/GetStarted.asp>. Second, request access to the IARD system for your firm by completing and submitting the IARD Entitlement Package. The IARD Entitlement Package explains how the form may be submitted. Mail the forms to: FINRA Entitlement Group, 9509 Key West Avenue, Rockville, MD 20850.

When FINRA receives your Entitlement Package, they will assign a *CRD* number (identification number for your firm) and a user I.D. code and password (identification number and system password for the individual(s) who will submit Form ADV filings for your firm). Your firm may request an I.D. code and password for more than one individual. FINRA also will create a financial account for you from which the IARD will deduct filing fees and any state fees you are required to pay. If you already have a *CRD* account with FINRA, it will also serve as your IARD account; a separate account will not be established.

Once you receive your *CRD* number, user I.D. code and password, and you have funded your account, you are ready to file electronically.

Questions regarding the Entitlement Process should be addressed to FINRA at 240.386.4848.

**10.     If I am applying for registration with the SEC, or amending my SEC registration, how do I make *notice filings* with the *state securities authorities*?**

If you are applying for registration with the SEC or are amending your SEC registration, one or more *state securities authorities* may require you to provide them with copies of your SEC

App 463

filings.  We call these filings "*notice filings*."  Your *notice filings* will be sent electronically to the states that you check on Item 2.C. of Part 1A. The *state securities authorities* to which you send *notice filings* may charge fees, which will be deducted from the account you establish with FINRA. To determine which *state securities authorities* require SEC-registered advisers to submit *notice filings* and to pay fees, consult the relevant state investment adviser law or *state securities authority*.  See General Instruction 1.

If you are granted a continuing hardship exemption to file Form ADV on paper, FINRA will enter your filing into the IARD and your *notice filings* will be sent electronically to the *state securities authorities* that you check on Item 2.C. of Part 1A.

**11.      I am registered with a state.  When must I switch to SEC registration?**

If at the time of your *annual updating amendment* you meet at least one of the requirements for SEC registration in Item 2.A.(1) to (12) of Part 1A, you must apply for registration with the SEC within 90 days after you file the *annual updating amendment*. Once you register with the SEC, you are subject to SEC regulation, regardless of whether you remain registered with one or more states. See SEC rule 203A-1(b)(2). Each of your *investment adviser representatives*, however, may be subject to registration in those states in which the representative has a place of business.  See Advisers Act section 203A(b)(1); SEC rule 203A-3(a). For additional information, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business."  See General Instruction 1.

**12.      I am registered with the SEC. When must I switch to registration with a *state securities authority*?**

If you check box 13 in Item 2.A. of Part 1A to report on your *annual updating amendment* that you are no longer eligible to register with the SEC, you must withdraw from SEC registration within 180 days after the end of your fiscal year by filing Form ADV-W. See SEC rule 203A-1(b)(2). You should consult state law or the *state securities authority* for the states in which you are "doing business" to determine if you are required to register in these states. See General Instruction 1. Until you file your Form ADV-W with the SEC, you will remain subject to SEC regulation, and you also will be subject to regulation in any states where you register.  See SEC rule 203A-1(b)(2).

**13.      I am an *exempt reporting adviser*. When must I submit my first report on Form ADV?**

- All *exempt reporting advisers*:
  You must submit your initial Form ADV filing within 60 days of relying on the exemption from registration under either section 203(l) of the Advisers Act as an adviser solely to one or more venture capital funds or section 203(m) of the Advisers Act because you act solely as an adviser to private funds and have assets under management in the United States of less than $150 million.

- Additional instruction for advisers switching from being registered to being *exempt reporting advisers*:

If you are currently registered as an investment adviser (or have an application for registration pending) with the SEC or with a *state securities authority*, you must file a Form ADV-W to withdraw from registration in the jurisdictions where you are switching. You must submit the Form ADV-W <u>before</u> submitting your first report as an *exempt reporting adviser*.

14.    **I am an *exempt reporting adviser*. Is it possible that I might be required to also register with or submit a report to a *state securities authority*?**

Yes, you may be required to register with or submit a report to one or more *state securities authorities*. If you are required to register with one or more *state securities authorities*, you must complete all of Form ADV. See General Instruction 3. If you are required to submit a report to one or more *state securities authorities*, check the box(es) in Item 2.C. of Part 1A next to the state(s) you would like to receive the report. Each of your *investment adviser representatives* may also be subject to registration requirements. For additional information about the requirements that may apply to you, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business." See General Instruction 1.

15.    **What do I do if I no longer meet the definition of "*exempt reporting adviser*"?**

- <u>Advisers Switching to SEC Registration</u>:

  o   You may no longer be an *exempt reporting adviser* and may be required to register with the SEC if you wish to continue doing business as an investment adviser. For example, you may be relying on section 203(l) and wish to accept a *client* that is not a venture capital fund as defined in SEC rule 203(l)-1, or you may have been relying on SEC rule 203(m)-1 and reported in Section 2.B. of Schedule D to your *annual updating amendment* that you have *private fund* assets of $150 million or more.

    ▪   If you are relying on section 203(l), unless you qualify for another exemption, you would violate the Advisers Act's registration requirement if you accept a *client* that is not a venture capital fund as defined in SEC rule 203(l)-1 before the SEC approves your application for registration. You must submit your final report as an *exempt reporting adviser* and apply for SEC registration in the same filing.

    ▪   If you were relying on SEC rule 203(m)-1 and you reported in Section 2.B. of Schedule D to your *annual updating amendment* that you have *private fund* assets of $150 million or more, you must register with the SEC unless you qualify for another exemption. If you have complied with all SEC reporting requirements applicable to an *exempt reporting adviser* as such, you have up to 90 days after filing your *annual updating amendment* to apply for SEC registration, and you may continue doing business as a *private fund* adviser during this time. You must submit your final report as an *exempt reporting adviser* and apply for SEC registration in the same filing. Unless you qualify for another exemption, you would violate the Advisers Act's registration requirement if you accept a *client* that is not a *private fund* during this

transition period before the SEC approves your application for registration, and you must comply with all SEC reporting requirements applicable to an *exempt reporting adviser* as such during this 90-day transition period. If you have not complied with all SEC reporting requirements applicable to an *exempt reporting adviser* as such, this 90-day transition period is not available to you. Therefore, if the transition period is not available to you, and you do not qualify for another exemption, your application for registration must be approved by the SEC before you meet or exceed SEC rule 203(m)-1's $150 million asset threshold.

o   You will be deemed in compliance with the Form ADV <u>filing</u> and <u>reporting</u> requirements until the SEC approves or denies your application. If your application is approved, you will be able to continue business as a registered adviser.

o   If you register with the SEC, you may be subject to state *notice filing* requirements. To determine these requirements, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business." See General Instruction 1.

**Note**: If you are relying on SEC rule 203(m)-1 and you accept a *client* that is not a *private fund*, you will lose the exemption provided by SEC rule 203(m)-1 immediately. To avoid this result, you should apply for SEC registration in advance so that the SEC has approved your registration <u>before</u> you accept a *client* that is not a *private fund*.

The 90-day transition period described above also applies to investment advisers with their *principal offices and places of business* outside of the United States with respect to their *clients* who are *United States persons* (*e.g.*, the adviser would not be eligible for the 90-day transition period if it accepted a *client* that is a *United States person* and is not a *private fund*).

- Advisers Not Switching to SEC Registration:

o   You may no longer be an *exempt reporting adviser* but may not be required to register with the SEC or may be prohibited from doing so. For example, you may cease to do business as an investment adviser, become eligible for an exemption that does not require reporting, or be ineligible for SEC registration. In this case, you must submit a final report as an *exempt reporting adviser* to update only Item 1 of Part 1A of Form ADV.

o   You may be subject to state registration requirements. To determine these requirements, consult the investment adviser laws or the *state securities authority* for the particular state in which you are "doing business."  See General Instruction 1.

**16.    Are there filing fees?**

Yes. These fees go to support and maintain the IARD. The IARD filing fees are in addition to any registration or other fee that may be required by state law. You must pay an IARD filing fee for your initial application, your initial report, and each *annual updating*

SEC 1707 (07-24)  File 1 of 5

10

App 466

*amendment*. There is no filing fee for an other-than-annual amendment, a final report as an *exempt reporting adviser*, or Form ADV-W.  The IARD filing fee schedule is published at <http://www.sec.gov/iard>; <http://www.nasaa.org>; and <http://www.iard.com>.

If you are submitting a paper filing under a continuing hardship exemption (see Instruction 17), you are required to pay an additional fee. The amount of the additional fee depends on whether you are filing Form ADV or Form ADV-W. (There is no additional fee for filings made on Form ADV-W.) The hardship filing fee schedule is available by contacting FINRA at 240.386.4848.

**17.    What if I am not able to file electronically?**

If you are required to file electronically but cannot do so, you may be eligible for one of two types of hardship exemptions from the electronic filing requirements.

- A **temporary hardship exemption** is available if you file electronically, but you encounter unexpected difficulties that prevent you from making a timely filing with the IARD, such as a computer malfunction or electrical outage. This exemption does <u>not</u> permit you to file on paper; instead it extends the deadline for an electronic filing for seven business days.  See SEC rules 203-3(a) and 204-4(e).

- A **continuing hardship exemption** may be granted if you are a small business and you can demonstrate that filing electronically would impose an undue hardship. You are a small business, and may be eligible for a continuing hardship exemption, if you are required to answer Item 12 of Part 1A (because you have assets under management of less than $25 million) <u>and</u> you are able to respond "no" to each question in Item 12.  See SEC rule 0-7.

    If you have been granted a continuing hardship exemption, you must complete and submit the paper version of Form ADV to FINRA. FINRA will enter your responses into the IARD. As discussed in General Instruction 16, FINRA will charge you a fee to reimburse it for the expense of data entry.

**18.    I am eligible to file on paper.  How do I make a paper filing?**

When filing on paper, you must:

- Type all of your responses.
- Include your name (the same name you provide in response to Item 1.A. of Part 1A) and the date on every page.
- If you are amending your Form ADV:
    o complete page 1 and circle the number of any item for which you are changing your response.
    o include your SEC 801-number (if you have one), or your 802-number (if you have one), and your *CRD* number (if you have one) on every page.
    o complete the amended item in full and circle the number of the item for which you are changing your response.
    o to amend Schedule A or Schedule B, complete and submit Schedule C.

Where you submit your paper filing depends on why you are eligible to file on paper:

- If you are filing on paper because you have been granted a continuing hardship exemption, submit one manually signed Form ADV and one copy to: IARD Document Processing, FINRA, P.O. Box 9495, Gaithersburg, MD 20898-9495.

  **If you complete Form ADV on paper and submit it to FINRA but you do not have a continuing hardship exemption, the submission will be returned to you.**

- If you are filing on paper because a state in which you are registered or in which you are applying for registration allows you to submit paper instead of electronic filings, submit one manually signed Form ADV and one copy to the appropriate *state securities authorities*.

**19.     Who is required to file Form ADV-NR?**

Every *non-resident* general partner and *managing agent* of all SEC-registered advisers and *exempt reporting advisers*, whether or not the adviser is a resident in the United States, must file Form ADV-NR in connection with the adviser's initial application or report. A general partner or *managing agent* of an SEC-registered adviser or *exempt reporting adviser* who becomes a *non-resident* after the adviser's initial application or report has been submitted must file Form ADV-NR within 30 days. Absent a temporary hardship, Form ADV-NR must be filed electronically through IARD.

**Failure to file Form ADV-NR promptly may delay SEC consideration of your initial application.**

**20.     How is Form ADV-NR filed?**

Form ADV-NR is filed electronically with the Investment Adviser Registration Depository (IARD). Information for how to file with IARD is available on the SEC's website at <www.sec.gov/iard> and on <www.iard.com>.

<u>Federal Information Law and Requirements</u>

Sections 203 and 204 of the Advisers Act [15 U.S.C. §§ 80b-3 and 80b-4] authorize the SEC to collect the information required by Form ADV. The SEC collects the information for regulatory purposes, such as deciding whether to grant registration. Filing Form ADV is mandatory for advisers who are required to register with the SEC and for *exempt reporting advisers*. The SEC maintains the information submitted on this form and makes it publicly available. The SEC may return forms that do not include required information. Intentional misstatements or omissions constitute federal criminal violations under 18 U.S.C. § 1001 and 15 U.S.C. § 80b-17.

<u>SEC's Collection of Information</u>

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of

SEC 1707 (07-24)  File 1 of 5

12

App 468

information unless it displays a currently valid control number. The Advisers Act authorizes the SEC to collect the information on Form ADV from investment advisers. See 15 U.S.C. §§ 80b-3 and 80b-4.  Filing the form is mandatory.

The form enables the SEC to register investment advisers and to obtain information from and about *exempt reporting advisers*.  Every applicant for registration with the SEC as an adviser, and every *exempt reporting adviser*, must file the form. See 17 C.F.R. §§ 275.203-1 and 204-4. By accepting a form, however, the SEC does not make a finding that it has been completed or submitted correctly. The form is filed annually by every adviser, no later than 90 days after the end of its fiscal year, to amend its registration or its report. It is also filed during the year to reflect material changes. See 17 C.F.R. § 275.204-1. The SEC maintains the information on the form and makes it publicly available through the IARD.

Anyone may send the SEC comments on the accuracy of the burden estimate on page 1 of the form, as well as suggestions for reducing the burden.  The Office of Management and Budget has reviewed this collection of information under 44 U.S.C. § 3507.

The information contained in the form is part of a system of records subject to the Privacy Act of 1974, as amended. The SEC has published in the Federal Register the Privacy Act System of Records Notice for these records.

SEC 1707 (07-24)  File 1 of 5

13

App 469

# FORM ADV (Paper Version)

- **UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND**
- **REPORT BY EXEMPT REPORTING ADVISERS**

**Form ADV: Instructions for Part 1A**

These instructions explain how to complete certain items in Part 1A of Form ADV.

1. **Item 1: Identifying Information**

**Separately Identifiable Department or Division of a Bank.** If you are a "separately identifiable department or division" (SID) of a bank, answer Item 1.A. with the full legal name of your bank, and answer Item 1.B. with your own name (the name of the department or division) and all names under which you conduct your advisory business. In addition, your *principal office and place of business* in Item 1.F. should be the principal office at which you conduct your advisory business. In response to Item 1.I., the website addresses and social media information you list on Schedule D should be those that provide information about your own activities, rather than general information about your bank.

2. **Item 2: SEC Registration and SEC Report by *Exempt Reporting Advisers***

If you are registered or applying for registration with the SEC, you must indicate in Item 2.A. why you are eligible to register with the SEC by checking <u>at least one</u> of the boxes.

   a. **Item 2.A.(1): Adviser with Regulatory Assets Under Management of $100 Million or More.** You may check box 1 <u>only</u> if your response to Item 5.F.(2)(c) is $100 million or more, or you are filing an *annual updating amendment* with the SEC and your response to Item 5.F.(2)(c) is $90 million or more. While you <u>may</u> register with the SEC if your regulatory assets under management are at least $100 million but less than $110 million, you <u>must</u> apply for registration with the SEC if your regulatory assets under management are $110 million or more. If you are a SEC-registered adviser, you <u>may</u> remain registered with the SEC if your regulatory assets under management are $90 million or more. See SEC rule 203A-1(a). Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management.

   If you are a state-registered adviser and you report on your *annual updating amendment* that your regulatory assets under management increased to $100 million or more, you <u>may</u> register with the SEC. If your regulatory assets under management increased to $110 million or more, you <u>must</u> apply for registration with the SEC within 90 days after you file that *annual updating amendment*. See SEC rule 203A-1(b)(1) and Form ADV General Instruction 11.

   b. **Item 2.A.(2): Mid-Sized Adviser.** You may check box 2 <u>only</u> if your response to Item 5.F.(2)(c) is $25 million or more but less than $100 million, <u>and</u> you satisfy one of the requirements below. Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management.

SEC 1707 (07-24)  File 1 of 5

14

App 470

You must register with the SEC if you <u>meet at least one</u> of the following requirements:

- You are not required to be registered as an investment adviser with the *state securities authority* of the state where you maintain your *principal office and place of business* pursuant to that state's investment adviser laws. If you are exempt from registration with that state or are excluded from the definition of investment adviser in that state, you <u>must</u> register with the SEC.  You should consult the investment adviser laws or the *state securities authority* for the particular state in which you maintain your *principal office and place of business* to determine if you are required to register in that state.  See General Instruction 1.

- You are not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*. To determine whether such *state securities authority* does not conduct such examinations, see: https://www.sec.gov/divisions/investment/midsizedadviserinfo.htm

See section 203A(a)(2) of the Advisers Act.

c. **Item 2.A.(5): Adviser to an Investment Company.** You may check box 5 <u>only</u> if you currently provide advisory services under an investment advisory contract to an investment company registered under the Investment Company Act of 1940 and the investment company is operational (i.e., has assets and shareholders, other than just the organizing shareholders).  See sections 203A(a)(1)(B) and 203A(a)(2)(A) of the Advisers Act. Advising investors about the merits of investing in mutual funds or recommending particular mutual funds does not make you eligible to check this box.

d. **Item 2.A.(6): Adviser to a Business Development Company.** You may check box 6 <u>only</u> if your response to Item 5.F.(2)(c) is $25 million or more of regulatory assets under management, and you currently provide advisory services under an investment advisory contract to a company that has elected to be a business development company pursuant to section 54 of the Investment Company Act of 1940, that has not withdrawn the election, and that is operational (i.e., has assets and shareholders, other than just the organizing shareholders). See section 203A(a)(2)(A) of the Advisers Act. Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management.

e. **Item 2.A.(7):  Pension Consultant.**  You may check box 7 <u>only</u> if you are eligible for the pension consultant exemption from the prohibition on SEC registration.

- You are eligible for this exemption if you provided investment advice to employee benefit plans, governmental plans, or church plans with respect to assets having an aggregate value of $200 million or more during the 12-month period that ended within 90 days of filing this Form ADV.  You are <u>not</u> eligible for this exemption if you only advise plan participants on allocating their investments within their pension plans.  See SEC rule 203A-2(a).

- To calculate the value of assets for purposes of this exemption, aggregate the assets of

the plans for which you provided advisory services at the end of the 12-month period. If you provided advisory services to other plans during the 12-month period, but your employment or contract terminated before the end of the 12-month period, you also may include the value of those assets.

f.  **Item 2.A.(8): Related Adviser.** You may check box 8 <u>only</u> if you are eligible for the related adviser exemption from the prohibition on SEC registration. See SEC rule 203A-2(b). You are eligible for this exemption if you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC, <u>and</u> you have the same *principal office and place of business* as that other investment adviser.  Note that you may not rely on the SEC registration of an Internet adviser under rule 203A-2(e) in establishing eligibility for this exemption. See SEC rule 203A-2(e)(1)(iii).  If you check box 8, you also must complete Section 2.A.(8) of Schedule D.

g.  **Item 2.A.(9):  Adviser Expecting to be Eligible for Registration within 120 Days.** You may check box 9 <u>only</u> if you are eligible for the exemption from the prohibition on SEC registration available to advisers expecting to be eligible for SEC registration within 120 days, such as a newly formed adviser. See SEC rule 203A-2(c). You are eligible for this exemption if immediately before you file your application for registration with the SEC:

   •  you were not registered or required to be registered with the SEC or a *state securities authority*; <u>and</u>

   •  you have a reasonable expectation that you will be eligible to register with the SEC within 120 days after the date that your registration with the SEC becomes effective.

   If you check box 9, you also must complete Section 2.A.(9) of Schedule D.

   You must file an amendment to Part 1A of your Form ADV that updates your response to Item 2.A. within 120 days after the SEC declares your registration effective.  You may not check box 9 on your amendment; since this exemption is available only if you are not registered, you may not "re-rely" on this exemption. If you indicate on that amendment (by checking box 13) that you are not eligible to register with the SEC, you also must file a Form ADV-W to withdraw your SEC registration no later than 120 days after your registration was declared effective. You should contact the appropriate *state securities authority* to determine how long it may take to become state-registered sufficiently in advance of when you are required to file Form ADV-W to withdraw from SEC registration.

   *Note*: If you expect to be eligible for SEC registration because of the amount of your regulatory assets under management, that amount must be $100 million or more no later than 120 days after your registration is declared effective.

h.  **Item 2.A.(10): Multi-State Adviser.** You may check box 10 <u>only</u> if you are eligible for the multi-state adviser exemption from the prohibition on SEC registration. See SEC rule 203A-2(d). You are eligible for this exemption if you are required to register as an investment adviser with the *state securities authorities* of 15 or more states. If you check

box 10, you must complete Section 2.A.(10) of Schedule D. You must complete Section 2.A.(10) of Schedule D in each *annual updating amendment* you submit.

If you check box 10, you also must:
- create and maintain a list of the states in which, but for this exemption, you would be required to register;
- update this list each time you submit an *annual updating amendment* in which you continue to represent that you are eligible for this exemption; and
- maintain the list in an easily accessible place for a period of not less than five years from each date on which you indicate that you are eligible for the exemption.

If, at the time you file your *annual updating amendment*, you are required to register in less than 15 states and you are not otherwise eligible to register with the SEC, you must check box 13 in Item 2.A. You also must file a Form ADV-W to withdraw your SEC registration.  See Part 1A Instruction 2.j.

i. **Item 2.A.(11): Internet Adviser.** You may check box 11 only if you are eligible for the Internet adviser exemption from the prohibition on SEC registration. See SEC rule 203A-2(e). If you check box 11, you must complete Section 2.A.(11) of Schedule D. You are eligible for this exemption if:

- You provide investment advice to all of your clients exclusively through an *operational interactive website* at all times during which you rely on rule 203A-2(e). Other forms of online or Internet investment advice do not qualify for this exemption;
- You maintain a record demonstrating that you provide investment advice to your *clients* exclusively through an *operational interactive website* in accordance with these limits.

j. **Item 2.A.(13):  Adviser No Longer Eligible to Remain Registered with the SEC.** You <u>must</u> check box 13 if:

- you are registered with the SEC;
- you are filing an *annual updating amendment* to Form ADV in which you indicate in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $90 million; <u>and</u>
- you are not eligible to check any other box (other than box 13) in Item 2.A. (and are therefore no longer eligible to remain registered with the SEC).

You must withdraw from SEC registration within 180 days after the end of your fiscal year by filing Form ADV-W.  Until you file your Form ADV-W, you will remain subject to SEC regulation, and you also will be subject to regulation in the states in which you register.  See SEC rule 203A-1(b)(2).

k. **Item 2.B.: Reporting by *Exempt Reporting Advisers*.** You may check box 2.B.(1) <u>only</u> if you qualify for the exemption from SEC registration as an adviser solely to one or more venture capital funds. See SEC rule 203(l)-1. You may check box 2.B.(2) <u>only</u> if

you qualify for the exemption from SEC registration because you act solely as an adviser to *private funds* and have assets under management in the United States of less than $150 million. See SEC rule 203(m)-1. You may check both boxes to indicate that you qualify for both exemptions. You should check box 2.B.(3) if you act solely as an adviser to *private funds* but you are no longer eligible to check box 2.B.(2) because you have assets under management in the United States of $150 million or more.  If you check box 2.B.(2) or (3), you also must complete Section 2.B. of Schedule D.

3.  **Item 3: Form of Organization**

If you are a "separately identifiable department or division" (SID) of a bank, answer Item 3.A. by checking "other." In the space provided, specify that you are a "SID of" and indicate the form of organization of your bank. Answer Items 3.B. and 3.C. with information about your bank.

4.  **Item 4:  Successions**

a.  **Succession of an SEC-Registered Adviser.**  If you (1) have taken over the business of an investment adviser <u>or</u> (2) have changed your structure or legal status (e.g., form of organization or state of incorporation), a new organization has been created, which has registration obligations under the Advisers Act. There are different ways to fulfill these obligations. You may rely on the registration provisions discussed in the General Instructions, or you may be able to rely on special registration provisions for "successors" to SEC-registered advisers, which may ease the transition to the successor adviser's registration.

To determine if you may rely on these provisions, review "Registration of Successors to Broker-Dealers and Investment Advisers," Investment Advisers Act Release No. 1357 (Dec. 28, 1992). If you have taken over an adviser, follow Part 1A Instruction 4.a.(1), Succession by Application. If you have changed your structure or legal status, follow Part 1A, Instruction 4.a.(2), Succession by Amendment. If either (1) you are a "separately identifiable department or division" (SID) of a bank that is currently registered as an investment adviser, and you are taking over your bank's advisory business; or (2) you are a SID currently registered as an investment adviser, and your bank is taking over your advisory business, then follow Part 1A Instruction 4.a.(1), Succession by Application.

(1) **Succession by Application.**  If you are not registered with the SEC as an adviser, and you are acquiring or assuming substantially all of the assets and liabilities of the advisory business of an SEC-registered adviser, file a new application for registration on Form ADV. You will receive new registration numbers. You must file the new application within 30 days after the succession. On the application, make sure you check "yes" to Item 4.A., enter the date of the succession in Item 4.B., and complete Section 4 of Schedule D.

Until the SEC declares your new registration effective, you may rely on the registration of the adviser you are acquiring, but only if the adviser you are acquiring

is no longer conducting advisory activities. Once your new registration is effective, a Form ADV-W must be filed with the SEC to withdraw the registration of the acquired adviser.

(2) **Succession by Amendment.** If you are a new investment adviser formed solely as a result of a change in form of organization, a reorganization, or a change in the composition of a partnership, and there has been no practical change in *control* or management, you may amend the registration of the registered investment adviser to reflect these changes rather than file a new application. You will keep the same registration numbers, and you should not file a Form ADV-W. On the amendment, make sure you check "yes" to Item 4.A., enter the date of the succession in Item 4.B., and complete Section 4 of Schedule D. You must submit the amendment within 30 days after the change or reorganization.

b. **Succession of a State-Registered Adviser.** If you (1) have taken over the business of an investment adviser or (2) have changed your structure or legal status (e.g., form of organization or state of incorporation), a new organization has been created, which has registration obligations under state investment adviser laws.  There may be different ways to fulfill these obligations. You should contact each state in which you are registered to determine that state's requirements for successor registration. See Form ADV General Instruction 1.

5. **Item 5:  Information About Your Advisory Business**

a. **Newly-Formed Advisers:** Several questions in Item 5 that ask about your advisory business assume that you have been operating your advisory business for some time. Your response to these questions should reflect your current advisory business (i.e., at the time you file your Form ADV), with the following exceptions:

- base your response to Item 5.E. on the types of compensation you expect to accept;
- base your response to Item 5.G. and Item 5.J. on the types of advisory services you expect to provide during the next year; and
- skip Item 5.H.

b. **Item 5.F.: Calculating Your Regulatory Assets Under Management.** In determining the amount of your regulatory assets under management, include the securities portfolios for which you provide continuous and regular supervisory or management services as of the date of filing this Form ADV.

(1) **Securities Portfolios.** An account is a securities portfolio if at least 50% of the total value of the account consists of securities. For purposes of this 50% test, you may treat cash and cash equivalents (i.e., bank deposits, certificates of deposit, bankers acceptances, and similar bank instruments) as securities.  You must include securities portfolios that are:

(a)  your family or proprietary accounts;

SEC 1707 (07-24)  File 1 of 5

19

App 475

(b) accounts for which you receive no compensation for your services; and

(c) accounts of *clients* who are not *United States persons*.

For purposes of this definition, treat all of the assets of a *private fund* as a securities portfolio, regardless of the nature of such assets. For accounts of *private funds*, moreover, include in the securities portfolio any uncalled commitment pursuant to which a *person* is obligated to acquire an interest in, or make a capital contribution to, the *private fund*.

(2) **Value of Portfolio.** Include the entire value of each securities portfolio for which you provide continuous and regular supervisory or management services. If you provide continuous and regular supervisory or management services for only a portion of a securities portfolio, include as regulatory assets under management only that portion of the securities portfolio for which you provide such services. Exclude, for example, the portion of an account:

(a) under management by another *person*; or

(b) that consists of real estate or businesses whose operations you "manage" on behalf of a *client* but not as an investment.

Do not deduct any outstanding indebtedness or other accrued but unpaid liabilities.

(3) **Continuous and Regular Supervisory or Management Services.**

**General Criteria.** You provide continuous and regular supervisory or management services with respect to an account if:

(a) you have *discretionary authority* over and provide ongoing supervisory or management services with respect to the account; or

(b) you do not have *discretionary authority* over the account, but you have ongoing responsibility to select or make recommendations, based upon the needs of the *client*, as to specific securities or other investments the account may purchase or sell and, if such recommendations are accepted by the *client*, you are responsible for arranging or effecting the purchase or sale.

**Factors.** You should consider the following factors in evaluating whether you provide continuous and regular supervisory or management services to an account.

(a) **Terms of the advisory contract.** If you agree in an advisory contract to provide ongoing management services, this suggests that you provide these services for the account. Other provisions in the contract, or your actual management practices, however, may suggest otherwise.

(b) **Form of compensation.** If you are compensated based on the average value of the *client's* assets you manage over a specified period of time, that suggests that

you provide continuous and regular supervisory or management services for the account. If you receive compensation in a manner similar to either of the following, that suggests you <u>do not</u> provide continuous and regular supervisory or management services for the account

    (i)   you are compensated based upon the time spent with a *client* during a *client* visit; or

    (ii)  you are paid a retainer based on a percentage of assets covered by a financial plan.

(c) **Management practices.** The extent to which you actively manage assets or provide advice bears on whether the services you provide are continuous and regular supervisory or management services. The fact that you make infrequent trades (e.g., based on a "buy and hold" strategy) does not mean your services are not "continuous and regular."

**Examples.** You <u>may</u> provide continuous and regular supervisory or management services for an account if you:

(a) have *discretionary authority* to allocate *client* assets among various mutual funds;

(b) do not have *discretionary authority*, but provide the same allocation services, and satisfy the criteria set forth in Instruction 5.b.(3);

(c) allocate assets among other managers (a "manager of managers"), but only if you have *discretionary authority* to hire and fire managers and reallocate assets among them; or

(d) you are a broker-dealer and treat the account as a brokerage account, but only if you have *discretionary authority* over the account.

You <u>do not</u> provide continuous and regular supervisory or management services for an account if you:

(a) provide market timing recommendations (i.e., to buy or sell), but have no ongoing management responsibilities;

(b) provide only *impersonal investment advice* (e.g., market newsletters);

(c) make an initial asset allocation, without continuous and regular monitoring and reallocation; or

(d) provide advice on an intermittent or periodic basis (such as upon *client* request, in response to a market event, or on a specific date (e.g., the account is reviewed and adjusted quarterly)).

SEC 1707 (07-24)  File 1 of 5

App 477

(4) **Value of Regulatory Assets Under Management.** Determine your regulatory assets under management based on the current market value of the assets as determined within 90 days prior to the date of filing this Form ADV. Determine market value using the same method you used to report account values to *clients* or to calculate fees for investment advisory services.

In the case of a *private fund*, determine the current market value (or fair value) of the *private fund's* assets and the contractual amount of any uncalled commitment pursuant to which a *person* is obligated to acquire an interest in, or make a capital contribution to, the *private* fund.

(5) **Example.** This is an example of the method of determining whether an account of a *client* other than a *private fund* may be included as regulatory assets under management.

The *client's* portfolio consists of the following:

| | |
|---|---|
| $6,000,000 | stocks and bonds |
| $1,000,000 | cash and cash equivalents |
| $3,000,000 | non-securities (collectibles, commodities, real estate, etc.) |
| $10,000,000 | Total Assets |

**First, is the account a securities portfolio?** The account is a securities portfolio because securities as well as cash and cash equivalents (which you have chosen to include as securities) ($6,000,000 + $1,000,000 = $7,000,000) comprise at least 50% of the value of the account (here, 70%). (See Instruction 5.b.(1)).

**Second, does the account receive continuous and regular supervisory or management services?** The entire account is managed on a *discretionary basis* and is provided ongoing supervisory and management services, and therefore receives continuous and regular supervisory or management services. (See Instruction 5.b.(3)).

**Third, what is the entire value of the account?** The entire value of the account ($10,000,000) is included in the calculation of the adviser's total regulatory assets under management.

**6. Item 7: Financial Industry Affiliations and Private Fund Reporting**

Item 7.A. and Section 7.A. of Schedule D ask questions about you and your *related persons'* financial industry affiliations. If you are filing an *umbrella registration*, you should not check Item 7.A.(2) with respect to your *relying advisers*, and you do not have to complete Section 7.A. in Schedule D for your *relying advisers*. You should complete Schedule R with respect to your *relying advisers*. Item 7.B. and Section 7.B. of Schedule D ask questions about the *private funds* that you advise. You are required to complete a Section 7.B.(1) of Schedule D for each *private fund* that you advise, except in certain circumstances described under Item 7.B. and below.

a.   If your *principal office and place of business* is outside the United States, for purposes of

Item 7 and Section 7.B. of Schedule D you may disregard any *private fund* that, during your last fiscal year, was not a *United States person*, was not offered in the United States, and was not beneficially owned by any *United States person*.

b. When filing Section 7.B.(1) of Schedule D for a *private fund*, you must acquire an identification number for the fund by logging onto the IARD website and using the private fund identification number generator. You must continue to use the same identification number whenever you amend Section 7.B.(1) for that fund. If you file a Section 7.B.(1) for a *private fund* for which an identification number has already been acquired by another adviser, you must not acquire a new identification number, but must instead utilize the existing number. If you choose to complete a single Section 7.B.(1) for a master-feeder arrangement under Instruction 6.d. below, you must acquire an identification number also for each feeder fund.

c. If any *private fund* has issued two or more series (or classes) of equity interests whose values are determined with respect to separate portfolios of securities and other assets, then each such series (or class) should be regarded as a separate *private fund*. In Section 7.B.(1) and 7.B.(2) of Schedule D, next to the name of the *private fund*, list the name and identification number of the specific series (or class) for which you are filing the sections. This only applies with respect to series (or classes) that you manage as if they were separate funds and not a fund's side pockets or similar arrangements.

d. In the case of a master-feeder arrangement (see questions 6-7 of Section 7.B.(1) of Schedule D), instead of completing a Section 7.B.(1) for each of the master fund and each feeder fund, you may complete a single Section 7.B.(1) for the master-feeder arrangement under the name of the master fund if the answers to questions 8, 10, 21 and 23 through 28 are the same for all of the feeder funds (or, in the case of questions 24 and 25, if the feeder funds do not use a prime broker or custodian). If you choose to complete a single Section 7.B.(1), you should disregard the feeder funds, except for the following:

   (1) **Question 11:** State the gross assets for the master-feeder arrangement as a whole.

   (2) **Question 12:** List the lowest minimum investment commitment applicable to any of the master fund and the feeder funds.

   (3) **Questions 13-16:** Answer by aggregating all investors in the master-feeder arrangement (but do not count the feeder funds themselves as investors).

   (4) **Questions 19-20:** For purposes of these questions, the *private fund* means any of the master fund or the feeder funds. In answering the questions, moreover, disregard the feeder funds' investment in the master fund.

   (5) **Question 22:** List all of the Form D SEC file numbers of any of the master fund and feeder funds.

e. Additional Instructions:

   (1) **Question 9: Investment in Registered Investment Companies:** For purposes of

SEC 1707 (07-24) File 1 of 5

23

this question, disregard any open-end management investment company regulated as a money market fund under rule 2a-7 under the Investment Company Act if the *private fund* invests in such a company in reliance on rule 12d1-1 under the same Act.

(2) **Question 10: Type of *Private Fund*:** For purposes of this question, the following definitions apply:

"Hedge fund" means any *private fund* (other than a securitized asset fund):

(a) with respect to which one or more investment advisers (or *related persons* of investment advisers) may be paid a performance fee or allocation calculated by taking into account unrealized gains (other than a fee or allocation the calculation of which may take into account unrealized gains solely for the purpose of reducing such fee or allocation to reflect net unrealized losses);

(b) that may borrow an amount in excess of one-half of its net asset value (including any committed capital) or may have gross notional exposure in excess of twice its net asset value (including any committed capital); or

(c) that may sell securities or other assets short or enter into similar transactions (other than for the purpose of hedging currency exposure or managing duration).

A commodity pool is categorized as a hedge fund solely for purposes of this question. For purposes of this definition, do not net long and short positions. Include any borrowings or notional exposure of another *person* that are guaranteed by the *private fund* or that the *private fund* may otherwise be obligated to satisfy.

"Liquidity fund" means any *private fund* that seeks to generate income by investing in a portfolio of short-term obligations in order to maintain a stable net asset value per unit or minimize principal volatility for investors.

"Private equity fund" means any *private fund* that is not a hedge fund, liquidity fund, real estate fund, securitized asset fund, or venture capital fund and does not provide investors with redemption rights in the ordinary course.

"Real estate fund" means any *private fund* that is not a hedge fund, that does not provide investors with redemption rights in the ordinary course, and that invests primarily in real estate and real estate related assets.

"Securitized asset fund" means any *private fund* whose primary purpose is to issue asset backed securities and whose investors are primarily debt-holders.

"Venture capital fund" means any *private fund* meeting the definition of venture capital fund in rule 203(l)-1 under the Advisers Act.

"Other *private fund*" means any *private fund* that is not a hedge fund, liquidity fund, private equity fund, real estate fund, securitized asset fund, or venture

capital fund.

    (3) **Question 11: Gross Assets.** Report the assets of the *private fund* that you would include in calculating your regulatory assets under management according to Instruction 5.b. above.

    (4) **Questions 19-20: Other *clients'* investments:** For purposes of these questions, disregard any feeder fund's investment in its master fund. (See questions 6-7 for the definition of "master fund" and "feeder fund").

**7.  Item 10:  *Control Persons***

If you are a "separately identifiable department or division" (SID) of a bank, identify on Schedule A your bank's executive officers who are directly engaged in managing, directing, or supervising your investment advisory activities, and list any other *persons* designated by your bank's board of directors as responsible for the day-to-day conduct of your investment advisory activities, including supervising *employees* performing investment advisory activities.

**8.  Additional Information**

If you believe your response to an item in Form ADV Part 1A requires further explanation, or if you wish to provide additional information, you may do so on Schedule D, in the Miscellaneous section.  Completion of this section is optional.

**GLOSSARY OF TERMS**

1. **Advertisement:** (i) Any direct or indirect communication an investment adviser makes to more than one *person*, or to one or more *persons* if the communication includes *hypothetical performance*, that offers the investment adviser's investment advisory services with regard to securities to prospective *clients* or investors in a *private fund* advised by the investment adviser or offers new investment advisory services with regard to securities to current *clients* or investors in a *private fund* advised by the investment adviser, but does not include: (A) extemporaneous, live, oral communications; (B) information contained in a statutory or regulatory notice, filing, or other required communication, provided that such information is reasonably designed to satisfy the requirements of such notice, filing, or other required communication; or (C) a communication that includes *hypothetical performance* that is provided: (1) in response to an unsolicited request for such information from a prospective or current *client* or investor in a *private fund* advised by the investment adviser; or (2) to a prospective or current investor in a *private fund* advised by the investment adviser in a one-on-one communication; and (ii) any *endorsement* or *testimonial* for which an investment adviser provides compensation, directly or indirectly, but does not include any information contained in a statutory or regulatory notice, filing, or other required communication, provided that such information is reasonably designed to satisfy the requirements of such notice, filing, or other required communication. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

2. **Advisory Affiliate:** Your advisory affiliates are (1) all of your officers, partners, or directors (or any *person* performing similar functions); (2) all *persons* directly or indirectly *controlling* or *controlled* by you; and (3) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions).

   If you are a "separately identifiable department or division" (SID) of a bank, your *advisory affiliates* are: (1) all of your bank's *employees* who perform your investment advisory activities (other than clerical or administrative *employees*); (2) all *persons* designated by your bank's board of directors as responsible for the day-to-day conduct of your investment advisory activities (including supervising the *employees* who perform investment advisory activities); (3) all *persons* who directly or indirectly *control* your bank, and all *persons* whom you *control* in connection with your investment advisory activities; and (4) all other *persons* who directly manage any of your investment advisory activities (including directing, supervising or performing your advisory activities), all *persons* who directly or indirectly *control* those management functions, and all *persons* whom you *control* in connection with those management functions. *[Used in: Part 1A, Items 7, 11, DRPs; Part 1B, Item 2]*

3. **Annual Updating Amendment:** Within 90 days after your firm's fiscal year end, your firm must file an "annual updating amendment," which is an amendment to your firm's Form ADV that reaffirms the eligibility information contained in Item 2 of Part 1A and updates the responses to any other item for which the information is no longer accurate. *[Used in: General Instructions; Part 1A, Instructions, Introductory Text, Item 2; Part 2A, Instructions, Appendix 1 Instructions; Part 2B, Instructions]*

4. **Borrowings:** Borrowings include secured borrowings and unsecured borrowings,

26

App 482

collectively. Secured borrowings are obligations for borrowed money in respect of which the borrower has posted collateral or other credit support and should include any reverse repos (i.e., any sale of securities coupled with an agreement to repurchase the same (or similar) securities at a later date at an agreed price). Unsecured borrowings are obligations for borrowed money in respect of which the borrower has not posted collateral or other credit support. *[Used in:  Part 1A, Instructions, Item 5, Schedule D]*

5.  **Brochure:** A written disclosure statement that you must provide to *clients* and prospective *clients*. See SEC rule 204-3; Form ADV, Part 2A. *[Used in: General Instructions; Used throughout Part 2]*

6.  **Brochure Supplement:** A written disclosure statement containing information about certain of your *supervised persons* that your firm is required by Part 2B of Form ADV to provide to *clients* and prospective *clients*.  See SEC rule 204-3; Form ADV, Part 2B.  *[Used in: General Instructions; Used throughout Part 2]*

7.  **Charged:** Being accused of a crime in a formal complaint, information, or indictment (or equivalent formal charge). *[Used in:  Part 1A, Item 11; DRPs]*

8.  **Client:** Any of your firm's investment advisory clients. This term includes clients from which your firm receives no compensation, such as family members of your *supervised persons*.  If your firm also provides other services (e.g., accounting services), this term does not include clients that are not investment advisory clients. *[Used throughout Form ADV and Form ADV-W]*

9.  **Commodity Derivative:**  Exposures to commodities that you do not hold physically, whether held synthetically or through derivatives (whether cash or physically settled). *[Used in:  Part 1A, Schedule D]*

10.  **Control:**  The power, directly or indirectly, to direct the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise.

   - Each of your firm's officers, partners, or directors exercising executive responsibility (or *persons* having similar status or functions) is presumed to control your firm.

   - A *person* is presumed to control a corporation if the *person*: (i) directly or indirectly has the right to vote 25 percent or more of a class of the corporation's voting securities; or (ii) has the power to sell or direct the sale of 25 percent or more of a class of the corporation's voting securities.

   - A *person* is presumed to control a partnership if the *person* has the right to receive upon dissolution, or has contributed, 25 percent or more of the capital of the partnership.

   - A *person* is presumed to control a limited liability company ("LLC") if the *person*: (i) directly or indirectly has the right to vote 25 percent or more of a class of the interests of the LLC; (ii) has the right to receive upon dissolution, or has contributed, 25 percent or more of the capital of the LLC; or (iii) is an elected manager of the LLC.

   - A *person* is presumed to control a trust if the *person* is a trustee or *managing agent* of

27

the trust.

*[Used in:  General Instructions; Part 1A, Instructions, Items 2, 7, 10, 11, 12, Schedules A, B, C, D, R; DRPs]*

11. **Credit Derivative:** Single name credit default swap, including loan credit default swap, credit default swap referencing a standardized basket of credit entities, including credit default swap indices and indices referencing leveraged loans, and credit default swap referencing bespoke basket or tranche of collateralized debt obligations and collateralized loan obligations (including cash flow and synthetic) other than mortgage backed securities. *[Used in:  Part 1A, Schedule D]*

12. **Custody:** Holding, directly or indirectly, *client* funds or securities, or having any authority to obtain possession of them. You have custody if a *related person* holds, directly or indirectly, *client* funds or securities, or has any authority to obtain possession of them, in connection with advisory services you provide to *clients*.  Custody includes:

   - Possession of *client* funds or securities (but not of checks drawn by *clients* and made payable to third parties) unless you receive them inadvertently and you return them to the sender promptly, but in any case within three business days of receiving them;

   - Any arrangement (including a general power of attorney) under which you are authorized or permitted to withdraw *client* funds or securities maintained with a custodian upon your instruction to the custodian; and

   - Any capacity (such as general partner of a limited partnership, managing member of a limited liability company or a comparable position for another type of pooled investment vehicle, or trustee of a trust) that gives you or your *supervised person* legal ownership of or access to *client* funds or securities.

   *[Used in:  Part 1A, Item 9; Part 1B, Instructions, Item 2; Part 2A, Items 15, 18]*

13. **Digital Investment Advisory Service:** Investment advice to *clients* that is generated by the *operational interactive website's* software-based models, algorithms, or applications based on personal information each *client* supplies through the *operational interactive website*.

14. **Discretionary Authority or Discretionary Basis:**  Your firm has discretionary authority or manages assets on a discretionary basis if it has the authority to decide which securities to purchase and sell for the *client*. Your firm also has discretionary authority if it has the authority to decide which investment advisers to retain on behalf of the *client*. *[Used in: Part 1A, Instructions, Item 8; Part 1B, Instructions; Part 2A, Items 4, 16, 18; Part 2B, Instructions]*

15. **Employee:** This term includes an independent contractor who performs advisory functions on your behalf. *[Used in:  Part 1A, Instructions, Items 1, 5, 11; Part 2B, Instructions]*

28

16. **Endorsement:** Any statement by a person other than a current *client* or investor in a *private fund* advised by the investment adviser that: (i) indicates approval, support, or recommendation of the investment adviser or its *supervised persons* or describes that indirectly solicits any current or prospective *client* or investor to be a *client* of, or an investor in a *private fund* advised by, the investment adviser; or (iii) refers any current or prospective *client* of, or an investor in a *private fund* advised by, the investment adviser. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

17. **Enjoined:** This term includes being subject to a mandatory injunction, prohibitory injunction, preliminary injunction, or a temporary restraining *order*. *[Used in: Part 1A, Item 11; DRPs]*

18. **Equity Derivative:** Includes both listed equity derivative and derivative exposure to unlisted securities. Listed equity derivative includes all synthetic or derivative exposure to equities, including preferred equities, listed on a regulated exchange. Listed equity derivative also includes a single stock future, equity index future, dividend swap, total return swap (contract for difference), warrant and right. Derivative exposure to unlisted equities includes all synthetic or derivative exposure to equities, including preferred equities that are not listed on a regulated exchange. Derivative exposure to unlisted securities also includes a single stock future, equity index future, dividend swap, total return swap (contract for difference), warrant and right. *[Used in: Part 1A, Schedule D]*

19. **Exempt Reporting Adviser:** An investment adviser that qualifies for the exemption from registration under section 203(l) of the Advisers Act because it is an adviser solely to one or more venture capital funds, or under rule 203(m)-1 of the Advisers Act because it is an adviser solely to *private funds* and has assets under management in the United States of less than $150 million. *[Used in: Throughout Part 1A; General Instructions; Form ADV-H; Form ADV-NR]*

20. **Felony:** For jurisdictions that do not differentiate between a felony and a *misdemeanor*, a felony is an offense punishable by a sentence of at least one year imprisonment and/or a fine of at least $1,000. The term also includes a general court martial. *[Used in: Part 1A, Item 11; DRPs; Part 2A, Item 9; Part 2B, Item 3]*

21. **Filing Adviser:** An investment adviser eligible to register with the SEC that files (and amends) a single *umbrella registration* on behalf of itself and each of its *relying advisers*. *[Used in: General Instructions; Part 1A, Items 1, 2, 3, 10 and 11; Schedule R]*

22. **FINRA CRD** or **CRD:** The Web Central Registration Depository ("CRD") system operated by FINRA for the registration of broker-dealers and broker-dealer representatives. *[Used in: General Instructions; Part 1A, Item 1, Schedules A, B, C, D, R, DRPs; Form ADV-W, Item 1]*

23. **Foreign Exchange Derivative:** Any derivative whose underlying asset is a currency other than U.S. dollars or is an exchange rate. Cross-currency interest rate swaps should be included in foreign exchange derivatives and excluded from *interest rate derivatives*. *[Used in: Part 1A, Schedule D]*

29

App 485

24. **Foreign Financial Regulatory Authority:** This term includes (1) a foreign securities authority; (2) another governmental body or foreign equivalent of a *self-regulatory organization* empowered by a foreign government to administer or enforce its laws relating to the regulation of *investment-related* activities; and (3) a foreign membership organization, a function of which is to regulate the participation of its members in the activities listed above. *[Used in:  Part 1A, Items 1, 11, DRPs; Part 2A, Item 9; Part 2B, Item 3]*

25. **Found:** This term includes adverse final actions, including consent decrees in which the respondent has neither admitted nor denied the findings, but does not include agreements, deficiency letters, examination reports, memoranda of understanding, letters of caution, admonishments, and similar informal resolutions of matters. *[Used in: Part 1A, Item 11; Part 1B, Item 2; Part 2A, Item 9; Part 2B, Item 3]*

26. **Government Entity:** Any state or political subdivision of a state, including (i) any agency, authority, or instrumentality of the state or political subdivision; (ii) a plan or pool of assets *controlled* by the state or political subdivision or any agency, authority, or instrumentality thereof; and (iii) any officer, agent, or employee of the state or political subdivision or any agency, authority, or instrumentality thereof, acting in their official capacity. *[Used in: Part 1A, Item 5]*

27. **Gross Notional Value:** The gross nominal or notional value of all transactions that have been entered into but not yet settled as of the reporting date. For contracts with variable nominal or notional principal amounts, the basis for reporting is the nominal or notional principal amounts as of the reporting date.  For options, use delta adjusted notional value. *[Used in:  Part 1A, Schedule D]*

28. **High Net Worth Individual:** An individual who is a *qualified client* or who is a "qualified purchaser" as defined in section 2(a)(51)(A) of the Investment Company Act of 1940. *[Used in:  Part 1A, Item 5]*

29. **Home State:**  If your firm is registered with a *state securities authority*, your firm's "home state" is the state where it maintains its *principal office and place of business*. *[Used in: Part 1B, Instructions]*

30. **Hypothetical Performance:** Performance results that were not actually achieved by any portfolio of the investment adviser. (i) *Hypothetical performance* includes, but is not limited to: (A) performance derived from model portfolios; (B) performance that is backtested by the application of a strategy to data from prior time periods when the strategy was not actually used during those time periods; and (C) targeted or projected performance returns with respect to any portfolio or to the investment services offered in the *advertisement*; however: (ii) *Hypothetical performance* does not include: (A) an interactive analysis tool where a *client* or investor, or prospective *client*, or investor, uses the tool to produce simulations and statistical analyses that present the likelihood of various investment outcomes if certain investments are made or certain investment strategies or styles are undertaken, thereby serving as an additional resource to investors in the evaluation of the potential risks and returns of investment choices; provided that the investment adviser: (1)

30

App 486

provides a description of the criteria and methodology used, including the investment analysis tool's limitations and key assumptions; (2) explains that the results may vary with each use and over time; (3) if applicable, describes the universe of investments considered in the analysis, explains how the tool determines which investments to select, discloses if the tool favors certain investments and, if so, explains the reason for the selectivity, and states that other investments not considered may have characteristics similar or superior to those being analyzed; and (4) discloses that the tool generates outcomes that are hypothetical in nature; or (B) *predecessor performance* that is displayed in compliance with rule 206(4)-1(d)(7). *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

31. **Impersonal Investment Advice:** Investment advisory services that do not purport to meet the objectives or needs of specific individuals or accounts. *[Used in: Part 1A, Instructions; Part 2A, Instructions; Part 2B, Instructions]*

32. **Independent Public Accountant:** A public accountant that meets the standards of independence described in rule 2-01(b) and (c) of Regulation S-X (17 CFR 210.2-01(b) and (c)). *[Used in: Part 1A, Item 9; Schedule D]*

33. **Interest Rate Derivative:** Any derivative whose underlying asset is the obligation to pay or the right to receive a given amount of money accruing interest at a given rate. Cross-currency interest rate swaps should be included in *foreign exchange derivatives* and excluded from interest rate derivatives. This information must be presented in terms of 10-year bond equivalents. *[Used in: Part 1A, Schedule D]*

34. **Investment Adviser Representative:** Any of your firm's *supervised persons* (*except* those that provide only *impersonal investment advice*) is an investment adviser representative, if

- the *supervised person* regularly solicits, meets with, or otherwise communicates with your firm's *clients*,

- the *supervised person* has more than five *clients* who are natural persons and not *high net worth individuals*, and

- more than ten percent of the *supervised person's clients* are natural persons and not *high net worth individuals*.

NOTE: If your firm is registered with the *state securities authorities* and not the SEC, your firm may be subject to a different state definition of "investment adviser representative." Investment adviser representatives of SEC-registered advisers may be required to register in each state in which they have a place of business.

*[Used in: General Instructions; Part 1A, Item 5; Part 2B, Item 1]*

35. **Investment-Related:** Activities that pertain to securities, commodities, banking,

31

insurance, or real estate (including, but not limited to, acting as or being associated with an investment adviser, broker-dealer, municipal securities dealer, government securities broker or dealer, issuer, investment company, futures sponsor, bank, or savings association). *[Used in: Part 1A, Items 7, 11, Schedule D, DRPs; Part 1B, Item 2; Part 2A, Items 9 and 19; Part 2B, Items 3, 4 and 7]*

36. **Involved:** Engaging in any act or omission, aiding, abetting, counseling, commanding, inducing, conspiring with or failing reasonably to supervise another in doing an act. *[Used in: Part 1A, Item 11; Part 2A, Items 9 and 10; Part 2B, Items 3 and 7]*

37. **Legal Entity Identifier:** A "legal entity identifier" assigned by a utility endorsed by the Global LEI Regulatory Oversight Committee (ROC) or accredited by the Global LEI Foundation (GLEIF). *[Used in: Part 1A, Item 1, Schedules D and R]*

38. **Management Persons:** Anyone with the power to exercise, directly or indirectly, a *controlling* influence over your firm's management or policies, or to determine the general investment advice given to the *clients* of your firm.

    Generally, all of the following are management persons:

    - Your firm's principal executive officers, such as your chief executive officer, chief financial officer, chief operations officer, chief legal officer, and chief compliance officer; your directors, general partners, or trustees; and other individuals with similar status or performing similar functions;

    - The members of your firm's investment committee or group that determines general investment advice to be given to *clients*; and

    - If your firm does not have an investment committee or group, the individuals who determine general investment advice provided to *clients* (if there are more than five people, you may limit your firm's response to their supervisors).

*[Used in: Part 1B, Item 2; Part 2A, Items 9, 10 and 19]*

39. **Managing Agent:** A managing agent of an investment adviser is any *person*, including a trustee, who directs or manages (or who participates in directing or managing) the affairs of any unincorporated organization or association that is not a partnership. *[Used in: General Instructions; Form ADV-NR; Form ADV-W, Item 8]*

40. **Minor Rule Violation:** A violation of a *self-regulatory organization* rule that has been designated as "minor" pursuant to a plan approved by the SEC. A rule violation may be designated as "minor" under a plan if the sanction imposed consists of a fine of $2,500 or less, and if the sanctioned *person* does not contest the fine. (Check with the appropriate *self-regulatory organization* to determine if a particular rule violation has been designated as "minor" for these purposes.) *[Used in: Part 1A, Item 11]*

32

41. **Misdemeanor:** For jurisdictions that do not differentiate between a *felony* and a misdemeanor, a misdemeanor is an offense punishable by a sentence of less than one year imprisonment and/or a fine of less than $1,000. The term also includes a special court martial. *[Used in: Part 1A, Item 11; DRPs; Part 2A, Item 9; Part 2B, Item 3]*

42. **Non-Resident:** (a) an individual who resides in any place not subject to the jurisdiction of the United States; (b) a corporation incorporated in or that has its *principal office and place of business* in any place not subject to the jurisdiction of the United States; and (c) a partnership or other unincorporated organization or association that is formed in or has its *principal office and place of business* in any place not subject to the jurisdiction of the United States. *[Used in: General Instructions; Form ADV-NR]*

43. **Notice Filing:** SEC-registered advisers may have to provide *state securities authorities* with copies of documents that are filed with the SEC. These filings are referred to as "notice filings." *[Used in: General Instructions; Part 1A, Item 2; Execution Page(s); Form ADV-W]*

44. **Operational Interactive Website:** A website, mobile application, or similar digital platform through which the investment adviser provides *digital investment advisory services* on an ongoing basis to more than one *client* (except during temporary technological outages of a de minimis duration).

45. **Order:** A written directive issued pursuant to statutory authority and procedures, including an order of denial, exemption, suspension, or revocation. Unless included in an order, this term does not include special stipulations, undertakings, or agreements relating to payments, limitations on activity or other restrictions. *[Used in: Part 1A, Items 2 and 11, Schedules D and R; DRPs; Part 2A, Item 9; Part 2B, Item 3]*

46. **Other Derivative:** Any derivative that is not a *commodity derivative*, *credit derivative*, *equity derivative*, *foreign exchange derivative* or *interest rate derivative*. *[Used in: Part 1A, Schedule D]*

47. **Parallel Managed Account:** With respect to any registered investment company or series thereof or business development company, a parallel managed account is any managed account or other pool of assets that you advise and that pursues substantially the same investment objective and strategy and invests side by side in substantially the same positions as the identified investment company or series thereof or business development company that you advise. *[Used in: Part 1A, Schedule D]*

48. **Performance-Based Fee:** An investment advisory fee based on a share of capital gains on, or capital appreciation of, *client* assets. A fee that is based upon a percentage of assets that you manage is not a performance-based fee. *[Used in: Part 1A, Item 5; Part 2A, Items 6 and 19]*

49. **Person:** A natural person (an individual) or a company. A company includes any partnership, corporation, trust, limited liability company ("LLC"), limited liability partnership ("LLP"), sole proprietorship, or other organization. *[Used throughout Form*

33

App 489

*ADV and Form ADV-W]*

50. **Predecessor Performance:** Investment performance achieved by a group of investments consisting of an account or a *private fund* that was not advised at all times during the period shown by the investment adviser advertising the performance. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

51. **Principal Office and Place of Business:** Your firm's executive office from which your firm's officers, partners, or managers direct, *control*, and coordinate the activities of your firm. *[Used in: Part 1A, Instructions, Items 1 and 2; Schedules D and R; Form ADV-W, Item 1]*

52. **Private Fund:** An issuer that would be an investment company as defined in section 3 of the Investment Company Act of 1940 but for section 3(c)(1) or 3(c)(7) of that Act. *[Used in: General Instructions; Part 1A, Instructions, Items 2, 5, 7, and 9; Part 1A, Schedule D]*

53. **Proceeding:** This term includes a formal administrative or civil action initiated by a governmental agency, *self-regulatory organization* or *foreign financial regulatory authority*; a *felony* criminal indictment or information (or equivalent formal charge); or a *misdemeanor* criminal information (or equivalent formal charge). This term does not include other civil litigation, investigations, or arrests or similar charges effected in the absence of a formal criminal indictment or information (or equivalent formal charge). *[Used in: Part 1A, Item 11, DRPs; Part 1B, Item 2; Part 2A, Item 9; Part 2B, Item 3]*

54. **Qualified Client:** A *client* that satisfies the definition of qualified client in SEC rule 205-3. *[Used in: General Instructions; Part 1A, Schedule D]*

55. **Related Person:** Any *advisory affiliate* and any *person* that is under common *control* with your firm. *[Used in: Part 1A, Items 7, 8 and 9; Schedule D; Form ADV-W, Item 3; Part 2A, Items 10, 11, 12 and 14; Part 2A, Appendix 1, Item 6]*

56. **Relying Adviser:** An investment adviser eligible to register with the SEC that relies on a *filing adviser* to file (and amend) a single *umbrella registration* on its behalf. *[Used in: General Instructions; Part 1A, Items 1, 7 and 11; Schedules D and R]*

57. **Self-Regulatory Organization** or **SRO:** Any national securities or commodities exchange, registered securities association, or registered clearing agency. For example, the Chicago Board of Trade ("CBOT"), FINRA and New York Stock Exchange ("NYSE") are self-regulatory organizations. *[Used in: Part 1A, Item 11; DRPs; Part 1B, Item 2; Part 2A, Items 9 and 19; Part 2B, Items 3 and 7]*

58. **Sovereign Bonds:** Any notes, bonds and debentures issued by a national government (including central government, other governments and central banks but excluding U.S. state and local governments), whether denominated in a local or foreign currency. *[Used in: Part 1A, Schedule D]*

34

59. **Sponsor:** A sponsor of a *wrap fee program* sponsors, organizes, or administers the program or selects, or provides advice to *clients* regarding the selection of, other investment advisers in the program. *[Used in: Part 1A, Item 5, Schedule D; Part 2A, Instructions, Appendix 1 Instructions]*

60. **State Securities Authority:** The securities commissioner or commission (or any agency, office or officer performing like functions) of any state of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States. *[Used throughout Form ADV]*

61. **Supervised Person:** Any of your officers, partners, directors (or other *persons* occupying a similar status or performing similar functions), or *employees*, or any other *person* who provides investment advice on your behalf and is subject to your supervision or *control*. *[Used throughout Part 2]*

62. **Testimonial**: Any statement by a current *client* or investor in a *private fund* advised by the investment adviser: (i) about the *client* or investor's experience with the investment adviser or its *supervised persons* (ii) that directly or indirectly solicits any current or prospective *client* or investor to be a client of, or an investor in a *private fund* advised by, the investment adviser; or (iii) that refers any current or prospective *client* or investor to be a *client* of, or an investor in a *private fund* advised by, the investment adviser. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

63. **Third-party Rating**:  A rating or ranking of an investment adviser provided by a *person* who is not a *related person* and such *person* provides such ratings or rankings in the ordinary course of its business. *[Used in: Part 1A, Item 5][Effective May 4, 2021, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]*

64. **Umbrella Registration:** A single registration by a *filing adviser* and one or more *relying advisers* who collectively conduct a single advisory business and that meet the conditions set forth in General Instruction 5. *[Used in: General Instructions; Part 1A, Items 1, 2, 3, 7, 10 and 11, Schedules D and R]*

65. **United States person:** This term has the same meaning as in rule 203(m)-1 under the Advisers Act, which includes any natural person that is resident in the United States. *[Used in: Part 1A, Instructions, Item 5; Schedule D]*

66. **Wrap Brochure or Wrap Fee Program Brochure:** The written disclosure statement that *sponsors* of *wrap fee programs* must provide to each of their *wrap fee program clients*. *[Used in: Part 2, General Instructions; Used throughout Part 2A, Appendix 1]*

67. **Wrap Fee Program:** Any advisory program under which a specified fee or fees not based

35

directly upon transactions in a ***client's*** account is charged for investment advisory services (which may include portfolio management or advice concerning the selection of other investment advisers) and the execution of ***client*** transactions. [*Used in: Part 1, Item 5; Schedule D; Part 2A, Instructions, Item 4, used throughout Appendix 1; Part 2B, Instructions*]

36

## FORM ADV (Paper Version)

- **UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION**
  **AND**
- **REPORT BY EXEMPT REPORTING ADVISERS**

## PART 1A

WARNING:     Complete this form truthfully.  False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments.  See Form ADV General Instruction 4.

Check the box that indicates what you would like to do (check all that apply):

SEC or State Registration:
☐  Submit an initial application to register as an investment adviser with the SEC.
☐  Submit an initial application to register as an investment adviser with one or more states.
☐  Submit an *annual updating amendment* to your registration for your fiscal year ended_____.
☐  Submit an other-than-annual amendment to your registration.

SEC or State Report by *Exempt Reporting Advisers*:
☐  Submit an initial report to the SEC.
☐  Submit a report to one or more *state securities authorities*.
☐  Submit an *annual updating amendment* to your report for your fiscal year ended_____.
☐  Submit an other-than-annual amendment to your report.
☐  Submit a final report.

## Item 1         Identifying Information

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only.  General Instruction 5 provides information to assist you with filing an *umbrella registration*.

    A.  Your full legal name (if you are a sole proprietor, your last, first, and middle names):

        _____

    B.  (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.

        _____

App 493

*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

(2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐.

*If you check this box, complete a Schedule R for each relying adviser.*

C.  If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of ☐ your legal name or ☐ your primary business name:

_____

D.  (1) If you are registered with the SEC as an investment adviser, your SEC file number: 801-_____.

(2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number: 802-_____.

(3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:_____.

E.  (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number:_____.

(2) If you have additional *CRD* Numbers, your additional *CRD* numbers:_____.

*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

F.  *Principal Office and Place of Business*

(1) Address (do not use a P.O. Box):

_____
(number and street)

_____
(city)                    (state/country)           (zip +4/postal code)

If this address is a private residence, check this box:          ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list*

2

App 494

*all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

(2) Days of week that you normally conduct business at your *principal office and place of business*:

□ Monday - Friday      □ Other: _____

Normal business hours at this location: _____

(3) Telephone number at this location: _____
                 (area code)     (telephone number)

(4) Facsimile number at this location, if any: _____
                 (area code)     (facsimile number)

(5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?_____

G. Mailing address, if different from your *principal office and place of business* address:

_____
(number and street)

_____
(city)           (state/country)       (zip+4/postal code)

If this address is a private residence, check this box:    □

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

_____
(number and street)

_____
(city)           (state/country)       (zip+4/postal code)

I. Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)?

3

Yes ☐     No ☐

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J.  Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

_____
(name)

_____
(other titles, if any)

_____        _____
(area code)    (telephone number)          (area code)     (facsimile number, if any)

_____
(number and street)

_____
(city)                    (state/country)          (zip+4/postal code)

_____
(electronic mail (e-mail) address, if Chief Compliance Officer has one)

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):_____.

4

K.  Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

_____
(name)

_____
(titles)

_____          _____
(area code)    (telephone number)        (area code)    (facsimile number, if any)

_____
(number and street)

_____
(city)                    (state/country)        (zip+4/postal code)

_____
(electronic mail (e-mail) address, if contact person has one)

L.  Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?

Yes    ☐        No    ☐

*If "yes," complete Section 1.L. of Schedule D.*

M.  Are you registered with a *foreign financial regulatory authority*?    Yes ☐        No ☐

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

N.  Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934?

Yes    ☐        No    ☐

O.  Did you have $1 billion or more in assets on the last day of your most recent fiscal year?

Yes    ☐        No    ☐

If yes, what is the approximate amount of your assets:

5

App 497

$1 billion to less than $10 billion     ☐

$10 billion to less than $50 billion     ☐

$50 billion or more     ☐

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

    P.   Provide your *Legal Entity Identifier* if you have one:_____.

      A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

## Item 2

## SEC Registration

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

    A.   To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

      You (the adviser):

    ☐  (1)   are a **large advisory firm** that either:

        (a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

        (b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

    ☐  (2)   are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

6

(a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

(b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

*Click **HERE** for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.*

☐ (3)    Reserved;

☐ (4)    have your *principal office and place of business* **outside the United States**;

☐ (5)    are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐ (6)    are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐ (7)    are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐ (8)    are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

*If you check this box, complete Section 2.A.(8) of Schedule D.*

☐ (9)    are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days**;

*If you check this box, complete Section 2.A.(9) of Schedule D.*

☐ (10) are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

*If you check this box, complete Section 2.A.(10) of Schedule D.*

☐ (11) are an **Internet adviser** relying on rule 203A-2(e);

*If you check this box, complete Section 2.A. (11) of Schedule D.*

7

App 499

☐ (12) have **received an SEC** *order* exempting you from the prohibition against registration with the SEC;

*If you check this box, complete Section 2.A.(12) of Schedule D.*

☐ (13) are **no longer eligible** to remain registered with the SEC.

## SEC Reporting by *Exempt Reporting Advisers*

B.  Complete this Item 2.B. only if you are reporting to the SEC as an *exempt reporting adviser*. Check all that apply.  You:

☐ (1)   qualify for the exemption from registration as an adviser solely to one or more venture capital funds, as defined in rule 203(l)-1;

☐ (2)   qualify for the exemption from registration because you act solely as an adviser to *private funds* and have assets under management, as defined in rule 203(m)-1, in the United States of less than $150 million;

☐ (3)   act solely as an adviser to *private funds* but you are no longer eligible to check box 2.B.(2) because you have assets under management, as defined in rule 203(m)-1, in the United States of $150 million or more.

*If you check box (2) or (3), complete Section 2.B. of Schedule D.*

## *State Securities Authority Notice Filings* and State Reporting by *Exempt Reporting Advisers*

C.  Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ☐ AL | ☐ CT | ☐ HI | ☐ KY | ☐ MN | ☐ NH | ☐ OH | ☐ SC | ☐ VI |
| ☐ AK | ☐ DE | ☐ ID | ☐ LA | ☐ MS | ☐ NJ | ☐ OK | ☐ SD | ☐ VA |
| ☐ AZ | ☐ DC | ☐ IL | ☐ ME | ☐ MO | ☐ NM | ☐ OR | ☐ TN | ☐ WA |
| ☐ AR | ☐ FL | ☐ IN | ☐ MD | ☐ MT | ☐ NY | ☐ PA | ☐ TX | ☐ WV |
| ☐ CA | ☐ GA | ☐ IA | ☐ MA | ☐ NE | ☐ NC | ☐ PR | ☐ UT | ☐ WI |
| ☐ WY | ☐ CO | ☐ GU | ☐ KS | ☐ MI | ☐ NV | ☐ ND | ☐ RI | ☐ VT |

8

App 500

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

## Item 3    Form of Organization

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A.  How are you organized?

☐ Corporation    ☐ Sole Proprietorship    ☐ Limited Liability Partnership (LLP)
☐ Partnership    ☐ Limited Liability Company (LLC) ☐ Limited Partnership (LP)
☐ Other (specify):_____

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B.  In what month does your fiscal year end each year?    _____

C.  Under the laws of what state or country are you organized?    _____

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed.  If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

## Item 4    Successions

A.  Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (*e.g.*, form of organization or state of incorporation)?

☐ Yes        ☐ No

*If "yes," complete Item 4.B. and Section 4 of Schedule D.*

B.  Date of Succession:    _____
                              (mm/dd/yyyy)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again.  Instead, check "No."  See Part 1A Instruction 4.*

## Item 5    Information About Your Advisory Business

App 501

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

### *Employees*

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4) and (5).*

A.  Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.

_____

B.  (1) Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

_____

(2) Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

_____

(3) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

_____

(4) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

_____

(5) Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

_____

(6) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

_____

*In your response to Item 5.B.(6), do not count any of your employees and count a firm only once - do not count each of the firm's employees that solicit on your behalf.*

App 502

*Clients*

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C. (1) To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year? _____

(2) Approximately what percentage of your *clients* are non-*United States persons*? _____%

D. *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*
*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (d)(1) or (d)(3) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the client to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| Type of *Client* | (1) Number of *Client(s)* | (2) Fewer than 5 *Clients* | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | | | |

11

| Type of *Client* | (1) Number of *Client(s)* | (2) Fewer than 5 *Clients* | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (b) *High net worth individuals* | | | |
| (c) Banking or thrift institutions | | | |
| (d) Investment companies | | | |
| (e) Business development companies | | | |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | | | |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | | | |
| (h) Charitable organizations | | | |
| (i) State or municipal *government entities* (including government pension plans) | | | |
| (j) Other investment advisers | | | |
| (k) Insurance companies | | | |
| (l) Sovereign wealth funds and foreign official institutions | | | |
| (m) Corporations or other businesses not listed above | | | |
| (n) Other: | | | |

12

## Compensation Arrangements

E.  You are compensated for your investment advisory services by (check all that apply):

☐ (1) A percentage of assets under your management
☐ (2) Hourly charges
☐ (3) Subscription fees (for a newsletter or periodical)
☐ (4) Fixed fees (other than subscription fees)
☐ (5) Commissions
☐ (6) *Performance-based fees*
☐ (7) Other (specify): _____

## Regulatory Assets Under Management

F.  (1) Do you provide continuous and regular supervisory or management services to securities portfolios?    ☐ Yes    ☐ No

(2) If yes, what is the amount of your regulatory assets under management and total number of accounts?

|  | U.S. Dollar Amount | Total Number of Accounts |
|---|---|---|
| Discretionary: | (a) $_____.00 | (d) _____ |
| Non-Discretionary: | (b) $_____.00 | (e) _____ |
| Total: | (c) $_____.00 | (f) _____ |

*Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

(3) What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*? _____

## Advisory Activities

G.  What type(s) of advisory services do you provide?  Check all that apply.

☐ (1)    Financial planning services
☐ (2)    Portfolio management for individuals and/or small businesses
☐ (3)    Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
☐ (4)    Portfolio management for pooled investment vehicles (other than investment

13

companies)
☐ (5)  Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
☐ (6)  Pension consulting services
☐ (7)  Selection of other advisers (including *private fund* managers)
☐ (8)  Publication of periodicals or newsletters
☐ (9)  Security ratings or pricing services
☐ (10)  Market timing services
☐ (11)  Educational seminars/workshops
☐ (12)  Other (specify): _____

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in Section 5.G.(3) of Schedule D.*

H.  If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?
☐ 0   ☐ 1-10   ☐ 11-25   ☐ 26-50   ☐ 51-100    ☐ 101-250    ☐ 251-500
☐ More than 500    If more than 500, how many?_____(round to the nearest 500)

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

I.  (1) Do you participate in a *wrap fee program*?        ☐ Yes    ☐ No

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

(a) *sponsor* to a *wrap fee program*                                    $_____

(b) portfolio manager for a *wrap fee program*?                          $_____

(c) *sponsor* to and portfolio manager for the same wrap fee program?  $_____

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in Section 5.I.(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

14

App 506

J.  (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments?
☐ Yes        ☐ No

(2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management?
☐ Yes        ☐ No

K.  Separately Managed Account *Clients*

(1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)?
☐ Yes        ☐ No

*If yes, complete Section 5.K.(1) of Schedule D.*

(2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise?        ☐ Yes        ☐ No

*If yes, complete Section 5.K.(2) of Schedule D.*

(3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise?        ☐ Yes        ☐ No

*If yes, complete Section 5.K.(2) of Schedule D.*

(4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? ☐ Yes        ☐ No

*If yes, complete Section 5.K.(3) of Schedule D for each custodian.*

[Effective May 4, 2021, Item 5.L. appears as follows, pursuant to Investment Adviser Marketing, Investment Advisers Act Release No. 5653 (Dec. 22, 2020) [86 FR 13024 (Mar. 5, 2021)].]

L.  Marketing Activities

(1) Do any of your *advertisements* include:

(a) Performance results?        ☐ Yes        ☐ No

(b) A reference to specific investment advice provided by you (as that phrase is usedin rule 206(4)-1(a)(5))?        ☐ Yes        ☐ No

(c) *Testimonials* (other than those that satisfy rule 206(4)-1(b)(4)(ii))?

15

App 507

☐ Yes        ☐ No

(d) *Endorsements* (other than those that satisfy rule 206(4)-1(b)(4)(ii))?
☐ Yes        ☐ No

(e) *Third-party ratings*?        ☐ Yes        ☐ No

(2) If you answer "yes" to L(1)(c), (d), or (e) above, do you pay or otherwise provide cash

or non-cash compensation, directly or indirectly, in connection with the use of

*testimonials, endorsements,* or *third-party ratings*?    ☐ Yes        ☐ No

(3) Do any of your *advertisements* include *hypothetical performance*?
☐ Yes        ☐ No

(4) Do any of your *advertisements* include *predecessor performance*?
☐ Yes        ☐ No

## Item 6        Other Business Activities

In this Item, we request information about your firm's other business activities.

A.  You are actively engaged in business as a (check all that apply):

☐ (1)    broker-dealer (registered or unregistered)
☐ (2)    registered representative of a broker-dealer
☐ (3)    commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (4)    futures commission merchant
☐ (5)    real estate broker, dealer, or agent
☐ (6)    insurance broker or agent
☐ (7)    bank (including a separately identifiable department or division of a bank)
☐ (8)    trust company
☐ (9)    registered municipal advisor
☐ (10) registered security-based swap dealer
☐ (11) major security-based swap participant
☐ (12) accountant or accounting firm
☐ (13) lawyer or law firm
☐ (14) other financial product salesperson (specify):_____

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

16

App 508

B. (1) Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)?  ☐ Yes  ☐ No

   (2) If yes, is this other business your primary business?  ☐ Yes  ☐ No

   *If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

   (3) Do you sell products or provide services other than investment advice to your advisory *clients*?  ☐ Yes  ☐ No

   *If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

## Item 7    Financial Industry Affiliations and *Private Fund* Reporting

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A. This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

   You have a *related person* that is a (check all that apply):

   ☐ (1)  broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
   ☐ (2)  other investment adviser (including financial planners)
   ☐ (3)  registered municipal advisor
   ☐ (4)  registered security-based swap dealer
   ☐ (5)  major security-based swap participant
   ☐ (6)  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
   ☐ (7)  futures commission merchant
   ☐ (8)  banking or thrift institution
   ☐ (9)  trust company
   ☐ (10) accountant or accounting firm
   ☐ (11) lawyer or law firm
   ☐ (12) insurance company or agency
   ☐ (13) pension consultant
   ☐ (14) real estate broker or dealer
   ☐ (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
   ☐ (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

17

App 509

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

B.  Are you an adviser to any *private fund*?          ☐ Yes          ☐ No

18

App 510

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

## Item 8    Participation or Interest in *Client* Transactions

In this Item, we request information about your participation and interest in your *clients'* transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

### Proprietary Interest in *Client* Transactions

A.  Do you or any *related person*:

|  | Yes | No |
|---|---|---|
| (1) buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? | ☐ | ☐ |
| (2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | ☐ | ☐ |
| (3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? | ☐ | ☐ |

### Sales Interest in *Client* Transactions

B.  Do you or any *related person*:

|  | Yes | No |
|---|---|---|
| (1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory | | |

19

App 511

*client* securities are sold to or bought from the brokerage customer (agency cross transactions)? ☐ ☐

(2) recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? ☐ ☐

(3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? ☐ ☐

<u>Investment or Brokerage Discretion</u>

C.  Do you or any *related person* have *discretionary authority* to determine the: <u>Yes</u> <u>No</u>

(1) securities to be bought or sold for a *client's* account? ☐ ☐

(2) amount of securities to be bought or sold for a *client's* account? ☐ ☐

(3) broker or dealer to be used for a purchase or sale of securities for a *client's* account? ☐ ☐

(4) commission rates to be paid to a broker or dealer for a *client's* securities transactions? ☐ ☐

D.  If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*? ☐ ☐

E.  Do you or any *related person* recommend brokers or dealers to *clients*? ☐ ☐

F.  If you answer "yes" to E. above, are any of the brokers or dealers *related persons*? ☐ ☐

G. (1) Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions? ☐ ☐

(2) If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934? ☐ ☐

H. (1) Do you or any *related person*, directly or indirectly, compensate

20

App 512

any *person* that is not an *employee* for *client* referrals?  ☐  ☐

(2) Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)?  ☐  ☐

I.  Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals?  ☐  ☐

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

## Item 9      Custody

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

A.  (1) Do you have *custody* of any advisory *clients'*:                    <u>Yes</u>      <u>No</u>

    (a)  cash or bank accounts ?                    ☐      ☐
    (b)  securities?                                         ☐      ☐

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

U.S. Dollar Amount                    Total Number of *Clients*

(a) $_____                    (b) _____

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2).*

*If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

B.  (1) In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*:

|  | Yes | No |
|---|---|---|
| (a) cash or bank accounts? | ☐ | ☐ |
| (b) securities? | ☐ | ☐ |

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody:*

U.S. Dollar Amount                    Total Number of *Clients*

(a) $_____            (b) _____

C.  If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

☐ (1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage.

☐ (2) An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements are distributed to the investors in the pools.

☐ (3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities.

☐ (4) An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities.

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

22

App 514

D. Do you or your *related person*(s) act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?

| | Yes | No |
|---|---|---|
| (1) you act as a qualified custodian | ☐ | ☐ |
| (2) your *related person(s)* act as qualified custodian(s) | ☐ | ☐ |

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced: _____

F. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons*, act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?

_____

## Item 10   Control Persons

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you.  If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners.  If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

A. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies?        ☐ Yes        ☐ No

*If yes, complete Section 10.A. of Schedule D.*

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

## Item 11   Disclosure Information

In this Item, we ask for information about your disciplinary history and the disciplinary history

23

App 515

of all your *advisory affiliates*.  We use this information to determine whether to grant your

24

application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a).  For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

|  | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ☐ | ☐ |

For "yes" answers to the following questions, complete a Criminal Action DRP:

|  | Yes | No |
|---|---|---|
| A. In the past ten years, have you or any *advisory affiliate*: | | |
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ☐ | ☐ |
| (2) been *charged* with any *felony*? | ☐ | ☐ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

B. In the past ten years, have you or any *advisory affiliate*:

(1) been convicted of or pled guilty or nolo contendere ("no contest")
in a domestic, foreign, or military court to a *misdemeanor* involving:

25

App 517

investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? ☐ ☐

(2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? ☐ ☐

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

For "yes" answers to the following questions, complete a Regulatory Action DRP:

|  | Yes | No |
|---|---|---|
| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ☐ | ☐ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ☐ | ☐ |
| (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ☐ | ☐ |
| (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ☐ | ☐ |
| (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ☐ | ☐ |
| D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | | |
| (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ☐ | ☐ |
| (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ☐ | ☐ |
| (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ☐ | ☐ |

26

App 518

(4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? ☐ ☐

(5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? ☐ ☐

E. Has any *self-regulatory organization* or commodities exchange ever:

(1) *found* you or any *advisory affiliate* to have made a false statement or omission? ☐ ☐

(2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a *"minor rule violation"* under a plan approved by the SEC)? ☐ ☐

(3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? ☐ ☐

(4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? ☐ ☐

F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? ☐ ☐

G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? ☐ ☐

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

| | Yes | No |
|---|---|---|

H. (1) Has any domestic or foreign court:

(a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? ☐ ☐

(b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? ☐ ☐

27

App 519

(c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*? ☐ ☐

(2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)? ☐ ☐

## Item 12   Small Businesses

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC <u>and</u> you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).

- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise.  Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

<u>Yes</u>     <u>No</u>

A.  Did you have total assets of $5 million or more on the last day of your most recent fiscal year? ☐ ☐

*If "yes," you do not need to answer Items 12.B. and 12.C.*

B.  Do you:

(1) *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? ☐ ☐

28

App 520

App 521

       (2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? ☐ ☐

C. Are you:

       (1) *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? ☐ ☐

       (2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? ☐ ☐

# FORM ADV
Schedule A

## Direct Owners and Executive Officers

1.  Complete Schedule A only if you are submitting an initial application or report.  Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.

2.  Direct Owners and Executive Officers.  List below the names of:

    (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer (Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director and any other individuals with similar status or functions;

    (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);

    Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

    (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;

    (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

    (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

3.  Do you have any indirect owners to be reported on Schedule B?     ☐ Yes     ☐ No

4.  In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:

| | | |
|---|---|---|
| NA - less than 5% | C - 25% but less than 50% | |
| A - 5% but less than 10% | D - 50% but less than 75% | |
| B - 10% but less than 25% | E - 75% or more | |

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.
   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.
   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| | | | | | | PR | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

App 523

# FORM ADV
Schedule B

## Indirect Owners

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners.  Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

32

App 524

6. Ownership codes are:    C - 25% but less than 50%    D - 50% but less than 75%
                                     E - 75% or more                  F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.
   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.
   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired<br><br>MM/YYYY | Ownership Code | *Control Person*<br><br>PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
|  |  |  |  | | |  | | |  |
|  |  |  |  | | |  | | |  |
|  |  |  |  | | |  | | |  |
|  |  |  |  | | |  | | |  |
|  |  |  |  | | |  | | |  |

33

App 525

# FORM ADV
Schedule C

## Amendments to Schedules A and B

1.  Use Schedule C only to amend information requested on either Schedule A or Schedule B. Refer to Schedule A and Schedule B for specific instructions for completing this Schedule C. Complete each column.

2.  In the Type of Amendment column, indicate "A" (addition), "D" (deletion), or "C" (change in information about the same *person*).

3.  Ownership codes are:
    NA - less than 5%        D - 50% but less than 75%
    A - 5% but less than 10%    E - 75% or more
    B - 10% but less than 25%    G - Other (general partner, trustee, or
    C - 25% but less than 50%            elected member)

4.  List below all changes to Schedule A (Direct Owners and Executive Officers):

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Type of Amendment | Title or Status | Date Title or Status Acquired | Ownership Code | *Control Person* | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| | | | | MM/YYYY | | PR | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

34

5. List below all changes to Schedule B (Indirect Owners):

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE /I | Type of Amendment | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* PR | *CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No.* |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

35

App 527

# FORM ADV
## Schedule D

---

Certain items in Part 1A of Form ADV require additional information on Schedule D.  Use this Schedule D to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

---

This is an  ☐  INITIAL  or   ☐  AMENDED    Schedule D

---

SECTION 1.B.          Other Business Names

List your other business names and the jurisdictions in which you use them. You must complete a separate Schedule D Section 1.B. for each business name.

Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

Name_____          Jurisdictions _____

---

SECTION 1.F.          Other Offices

Complete the following information for each office, other than your *principal office and place of business*, at which you conduct investment advisory business. You must complete a separate Schedule D Section 1.F. for each location. If you are applying for SEC registration, if you are registered only with the SEC, or if you are an *exempt reporting adviser*, list only the largest twenty-five offices (in terms of numbers of *employees*).

Check only one box:  ☐ Add      ☐ Delete

_____
(number and street)

_____
   (city)                            (state/country)            (zip+4/postal code)

If this address is a private residence, check this box:        ☐

_____          _____
(area code)     (telephone number)          (area code)     (facsimile number, if any)

If this office location is also required to be registered with FINRA or a *state securities authority* as a branch office location for a broker-dealer or investment adviser on the Uniform Branch Office Registration Form (Form BR), please provide the *CRD* Branch Number here:_____

36

App 528

How many *employees* perform investment advisory functions from this office location? _____

Are other business activities conducted at this office location?  (check all that apply)

☐ (1) Broker-dealer (registered or unregistered)

☐ (2) Bank (including a separately identifiable department or division of a bank)

☐ (3) Insurance broker or agent

☐ (4) Commodity pool operator or commodity trading advisor (whether registered or exempt from registration)

☐ (5) Registered municipal advisor

☐ (6) Accountant or accounting firm

☐ (7) Lawyer or law firm

Describe any other *investment-related* business activities conducted from this office location:

_____

SECTION 1.I.           Website Addresses

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Check only one box: ☐ Add    ☐ Delete

Address of Website/Account on Publicly Available Social Media Platform:

_____

SECTION 1.L.           Location of Books and Records

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*.  You must complete a separate Schedule D, Section 1.L. for each location.

Check only one box:  ☐ Add         ☐ Delete      ☐ Amend

Name of entity where books and records are kept:_____

37

_____
(number and street)

_____
(city)                          (state/country)          (zip+4/postal code)

If this address is a private residence, check this box:     ☐

_____     _____
(area code)     (telephone number)        (area code)     (facsimile number, if any)

This is (check one):        ☐ one of your branch offices or affiliates.
                            ☐ a third-party unaffiliated recordkeeper.
                            ☐ other.
Briefly describe the books and records kept at this location. _____
_____

SECTION 1.M.          Registration with *Foreign Financial Regulatory Authorities*

List the name and country, in English, of each *foreign financial regulatory authority* with which you are registered. You must complete a separate Schedule D Section 1.M. for each *foreign financial regulatory authority* with whom you are registered.

Check only one box:  ☐ Add     ☐ Delete

Name of *Foreign Financial Regulatory Authority* _____
Name of Country _____

SECTION 2.A.(8)      Related Adviser

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser _____
*CRD* Number of Registered Investment Adviser _____
SEC Number of Registered Investment Adviser 801-_____

SECTION 2.A.(9)      Investment Adviser Expecting to be Eligible for Commission Registration
                     within 120 Days

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration.  By checking the

38

App 530

appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

---

SECTION 2.A.(10)    Multi-State Adviser

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration.  By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

---

SECTION 2.A.(11)    Internet Adviser

If you are relying on rule 203A-2(e), the Internet adviser exemption from the prohibition on registration, you are required to make a representation about your eligibility for SEC registration. By checking the appropriate box, you will be deemed to have made the required representation.

If you are applying for registration as an investment adviser with the SEC or changing your existing Item 2 response regarding your eligibility for SEC registration, you must make this representation:

☐ I will provide investment advice on an ongoing basis to more than one client

39

exclusively through an *operational interactive website*.

If you are filing an annual updating amendment to your existing registration and are continuing to rely on the Internet adviser exemption for SEC registration, you must make this representation:

☐   I have provided and will continue to provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

SECTION 2.A.(12)     SEC Exemptive *Order*

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:  803-_____       Date of *order*: _____
                                                                    (mm/dd/yyyy)

SECTION 2.B.          *Private Fund* Assets

40

App 532

If you check Item 2.B.(2) or (3), what is the amount of the *private fund* assets that you manage? _____.

NOTE: "*Private fund* assets" has the same meaning here as it has under rule 203(m)-1.  If you are an investment adviser with its *principal office and place of business* outside the United States only include *private fund* assets that you manage at a place of business in the United States.

| | |
|---|---|
| SECTION 4 | Successions |

Complete the following information if you are succeeding to the business of a currently registered investment adviser, including a change of your structure or legal status (*e.g.*, form of organization or state of incorporation). If you acquired more than one firm in the succession you are reporting on this Form ADV, you must complete a separate Schedule D Section 4 for each acquired firm.  See Part 1A Instruction 4.

Name of Acquired Firm _____

Acquired Firm's SEC File No. (if any) 801-_____Acquired Firm's *CRD* Number _____

| | |
|---|---|
| SECTION 5.G.(3) | Advisers to Registered Investment Companies and Business Development Companies |

If you check Item 5.G.(3), what is the SEC file number (811 or 814 number) of each of the registered investment companies and business development companies to which you act as an adviser pursuant to an advisory contract? You must complete a separate Schedule D Section 5.G.(3) for each registered investment company and business development company to which you act as an adviser.

Check only one box:  ☐ Add     ☐ Delete

SEC File Number 811- or 814-_____

Provide the regulatory assets under management of all *parallel managed accounts* related to a registered investment company (or series thereof) or business development company that you advise.  $_____

| | |
|---|---|
| SECTION 5.I.(2) | *Wrap Fee Programs* |

If you are a portfolio manager for one or more *wrap fee programs*, list the name of each program and its *sponsor*. You must complete a separate Schedule D Section 5.I.(2) for each *wrap fee program* for which you are a portfolio manager.

Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

Name of *Wrap Fee Program* _____

41

App 533

Name of *Sponsor* _____

*Sponsor's* SEC File Number (if any) (*e.g.*, 801-, 8-, 866-, 802-) _____

*Sponsor's CRD* Number (if any): _____

SECTION 5.K.(1)     Separately Managed Accounts

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a).  If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | Mid-year | End of year |
|---|---|---|
| (i) Exchange-Traded Equity Securities | _____% | |
| (ii) Non Exchange-Traded Equity Securities | | |

42

| Asset Type | Mid-year | End of year |
|---|---|---|
| (iii) U.S. Government/Agency Bonds | | |
| (iv) U.S. State and Local Bonds | | |
| (v) *Sovereign Bonds* | | |
| (vi) Investment Grade Corporate Bonds | | |
| (vii) Non-Investment Grade Corporate Bonds | | |
| (viii) Derivatives | | |
| (ix) Securities Issued by Registered Investment Companies or Business Development Companies | | |
| (x) Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | | |
| (xi) Cash and Cash Equivalents | | |
| (xii) Other | | |

Generally describe any assets included in "Other"_____

(b)

| Asset Type | End of year |
|---|---|
| (i) Exchange-Traded Equity Securities | _____% |
| (ii) Non Exchange-Traded Equity Securities | |
| (iii) U.S. Government/Agency Bonds | |
| (iv) U.S. State and Local Bonds | |
| (v) *Sovereign Bonds* | |
| (vi) Investment Grade Corporate Bonds | |
| (vii) Non-Investment Grade Corporate Bonds | |
| (viii) Derivatives | |

43

App 535

| Asset Type | End of year |
|---|---|
| (ix) Securities Issued by Registered Investment Companies or Business Development Companies | |
| (x) Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | |
| (xi) Cash and Cash Equivalents | |
| (xii) Other | |

Generally describe any assets included in "Other" _____

_____

SECTION 5.K.(2)     Separately Managed Accounts - Use of *Borrowings* and Derivatives

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a)

In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

44

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| **Gross Notional Exposure** | **1** **Regula-tory Assets Under Manage-ment** | **2** *Borrow-ings* | | | **3** **Derivative   Exposures** | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Deriv-ative* | (d) *Equity Derivative* | (e) *Commo-dity Derivative* | (f) *Other Deriv-ative* |
| **Less than 10%** | | | | | | | | |
| **10-149%** | | | | | | | | |
| **150% or more** | | | | | | | | |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

_____
_____
_____

(ii) End of Year

45

App 537

| Gross Notional Exposure | 1 Regulatory Assets Under Management | 2 Borrowings | 3 Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) Interest Rate Derivative | (b) Foreign Exchange Derivative | (c) Credit Derivative | (d) Equity Derivative | (e) Commodity Derivative | (f) Other Derivative |
| Less than 10% | | | | | | | | |
| 10-149% | | | | | | | | |
| 150% or more | | | | | | | | |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

_____

_____

_____

(b)

In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | 1<br>Regulatory Assets Under Management | 2<br>*Borrowings* |
|---|---|---|
| Less than 10% | | |
| 10-149% | | |
| 150% or more | | |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

_____

_____

_____

SECTION 5.K.(3)     Custodians for Separately Managed Accounts

Complete a separate Schedule D Section 5.K.(3) for each custodian that holds ten percent or more of your aggregate separately managed account regulatory assets under management.

(a) Legal name of custodian: _____

(b) Primary business name of custodian: _____

(c) The location(s) of the custodian's office(s) responsible for *custody* of the assets (city, state and country): _____

(d) Is the custodian a *related person* of your firm?   ☐ Yes    ☐ No

(e) If the custodian is a broker-dealer, provide its SEC registration number (if any) 8-_____

(f) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any) _____

(g) What amount of your regulatory assets under management attributable to separately managed accounts is held at the custodian? _____

SECTION 6.A.     Names of Your Other Businesses

If you are actively engaged in other business using a different name, provide that name and the other line(s) of business.

☐ Add       ☐ Delete     ☐ Amend

Other Business Name: _____

47

App 539

Other line(s) of business in which you engage using this name: (check all that apply)

☐ (1)   broker-dealer (registered or unregistered)
☐ (2)   registered representative of a broker-dealer
☐ (3)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (4)   futures commission merchant
☐ (5)   real estate broker, dealer, or agent
☐ (6)   insurance broker or agent
☐ (7)   bank (including a separately identifiable department or division of a bank)
☐ (8)   trust company
☐ (9)   registered municipal advisor
☐ (10) registered security-based swap dealer
☐ (11) major security-based swap participant
☐ (12) accountant or accounting firm
☐ (13) lawyer or law firm
☐ (14) other financial product salesperson (specify): _____

---

SECTION 6.B.(2)        Description of Primary Business

Describe your primary business (not your investment advisory business):

_____
_____
_____

If you engage in that business under a different name, provide that name:

_____
_____
_____

---

SECTION 6.B.(3)        Description of Other Products and Services

Describe other products or services you sell to your *client*.  You may omit products and services that you listed in Section 6.B.(2) above.

_____
_____

If you engage in that business under a different name, provide that name:

_____
_____
_____

---

SECTION 7.A.        Financial Industry Affiliations

Complete a separate Schedule D Section 7.A. for each *related person* listed in Item 7.A.

48

App 540

Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

1.  Legal Name of *Related Person*: _____

2.  Primary Business Name of *Related Person*: _____

3.  *Related Person's* SEC File Number (if any) (*e.g.*, 801-, 8-, 866-, 802-) _____

4.          *Related Person's*  (a) *CRD* Number (if any): _____
                     (b) CIK Number(s) (if any):_____

5.  *Related Person* is:  (check all that apply)

   ☐ (a)   broker-dealer, municipal securities dealer, or government securities broker or
            dealer
   ☐ (b)   other investment adviser (including financial planners)
   ☐ (c)   registered municipal advisor
   ☐ (d)   registered security-based swap dealer
   ☐ (e)   major security-based swap participant
   ☐ (f)   commodity pool operator or commodity trading advisor (whether registered or
            exempt from registration)
   ☐ (g)   futures commission merchant
   ☐ (h)   banking or thrift institution
   ☐ (i)   trust company
   ☐ (j)   accountant or accounting firm
   ☐ (k)   lawyer or law firm
   ☐ (l)   insurance company or agency
   ☐ (m)  pension consultant
   ☐ (n)   real estate broker or dealer
   ☐ (o)   sponsor or syndicator of limited partnerships (or equivalent), excluding pooled
            investment vehicles
   ☐ (p)   sponsor, general partner, managing member (or equivalent) of pooled
            investment vehicles

6.  Do you *control* or are you *controlled* by the *related person*?        ☐ Yes    ☐ No

7.  Are you and the *related person* under common *control*?        ☐ Yes    ☐ No

8.          (a) Does the *related person* act as a qualified custodian for your *clients*
                in connection with advisory services you provide to *clients*?    ☐ Yes    ☐ No

   (b) If you are registering or registered with the SEC and you have answered "yes" to
        question 8.(a) above, have you overcome the presumption that you are not operationally
        independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not
        required to obtain a surprise examination for your *clients'* funds or securities

49

App 541

that are maintained at the *related person*?            ☐ Yes   ☐ No

(c) If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:

_____
(number and street)

_____
(city)   (state/country)     (zip+4/postal code)

9.  (a) If the *related person* is an investment adviser, is it exempt from registration?            ☐ Yes   ☐ No

(b) If the answer is yes, under what exemption? _____

10. (a) Is the *related person* registered with a *foreign financial regulatory authority*?            ☐ Yes   ☐ No

(b) If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered. _____

11. Do you and the *related person* share any *supervised persons*?            ☐ Yes   ☐ No

12. Do you and the *related person* share the same physical location?            ☐ Yes   ☐ No

---

SECTION 7.B.(1)      *Private Fund* Reporting

Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

A.  PRIVATE FUND

**Information About the *Private Fund***

1.  (a) Name of the *private fund*: _____

(b) *Private fund* identification number: _____

2.  Under the laws of what state or country is the *private fund* organized:_____

3.  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

(a) Check only one box:  ☐ Add        ☐ Delete      ☐ Amend
_____

50

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

_____

4.   The *private fund* (check all that apply; you must check at least one):

☐  (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☐  (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.   List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

Check only one box:  ☐  Add      ☐  Delete    ☐  Amend

English Name of *Foreign Financial Regulatory Authority* _____

Name of Country _____

6.   (a)  Is this a "master fund" in a master-feeder arrangement?     ☐  Yes    ☐  No

(b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

Check only one box:  ☐  Add      ☐  Delete    ☐  Amend

Name of *private fund*:_____

*Private fund* identification number:_____

(c)  Is this a "feeder fund" in a master-feeder arrangement?     ☐  Yes    ☐  No

(d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Check only one box:  ☐  Add      ☐  Delete    ☐  Amend

Name of *private fund*:_____

*Private fund* identification number:_____

51

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

(a) Name of the *private fund*:_____

(b) *Private fund* identification number:_____

(c) Under the laws of what state or country is the private fund organized:_____

(d) Name(s) of the General Partner, Manager, Trustee or Directors (or *persons* serving in a similar capacity):

    (1) Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

    _____

    (2) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*:

    _____

(e) The *private fund* (check all that apply; you must check at least one):

    ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

    ☐ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

(f)    List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

English Name of *Foreign Financial Regulatory Authority* _____

Name of Country _____

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund

52

("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

8.  (a) Is this *private fund* a "fund of funds"?     ☐ Yes     ☐ No

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b) If yes, does the *private fund* invest in funds managed by you or by a *related person*?
☐ Yes     ☐ No

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?     ☐ Yes     ☐ No

10.  What type of fund is the *private fund*?

☐ hedge fund     ☐ liquidity fund     ☐ private equity fund     ☐ real estate fund

☐ securitized asset fund     ☐ venture capital fund   ☐ Other *private fund*:_____

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*: $_____

## Ownership

12.  Minimum investment commitment required of an investor in the *private fund*: $_____

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:_____

14.  What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:_____%

15.  (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:_____%

App 545

(b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*?     ☐ Yes     ☐ No

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:_____%

## Your Advisory Services

17. (a)  Are you a subadviser to this *private fund*?     ☐ Yes     ☐ No

   (b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank. _____

18. (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? ☐ Yes     ☐ No

   (b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

     Check only one box:  ☐ Add     ☐ Delete     ☐ Amend

     Name of Adviser: _____

     Adviser's SEC File Number:_____

19. Are your *clients* solicited to invest in the *private fund*?     ☐ Yes     ☐ No
    *NOTE:  For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?_____%

## Private Offering

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?     ☐ Yes     ☐ No

22. If yes, provide the *private fund's* Form D file number (if any):

    Check only one box:  ☒ Add     ☐ Delete     ☐ Amend

    021-_____

54

B.  SERVICE PROVIDERS

☐  Check this box if you are filing this Form ADV through the IARD system and want the IARD system to create a new Schedule D, Section 7.B.(1) with the same service provider information you have given here in Questions 23 - 28 for a new *private fund* for which you are required to complete Section 7.B.(1). If you check the box, the system will pre-fill those fields for you, but you will be able to manually edit the information after it is pre-filled and before you submit your filing.

**<u>Auditors</u>**

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?                                    ☐ Yes    ☐ No

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?    ☐ Yes    ☐ No

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

Check only one box:  ☐ Add       ☐ Delete     ☐ Amend

(b) Name of the auditing firm: _____

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country): _____

(d) Is the auditing firm an *independent public accountant*?    ☐ Yes    ☐ No

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?    ☐ Yes    ☐ No

If yes, Public Company Accounting Oversight Board-Assigned Number: _____

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?    ☐ Yes    ☐ No

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?    ☐ Yes    ☐ No

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last <u>*annual*</u> *updating amendment* contain unqualified opinions?    ☐ Yes    ☐ No    ☐Report Not Yet Received

55

App 547

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

24. (a) Does the *private fund* use one or more prime brokers?    ☐ Yes    ☐ No

      If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

      Check only one box:    ☐ Add        ☐ Delete        ☐ Amend

      (b) Name of the prime broker:_____

      (c) If the prime broker is registered with the SEC, its registration number:  8-_____

      (d) Location of prime broker's office used principally by the *private fund* (city, state and country): _____

      (e) Does this prime broker act as custodian for some or all of the *private fund's* assets?    ☐ Yes    ☐ No

## Custodian

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?    ☐ Yes    ☐ No

      If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

      Check only one box:    ☐ Add        ☐ Delete        ☐ Amend

      (b) Legal name of custodian:_____

      (c) Primary business name of custodian: _____

      (d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country): _____

      (e) Is the custodian a *related person* of your firm?    ☐ Yes    ☐ No

      (f) If the custodian is a broker-dealer, provide its SEC registration number (if any): 8-_____

App 548

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any) _____

## Administrator

26. (a) Does the *private fund* use an administrator other than your firm?    ☐ Yes    ☐ No

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

(b) Name of administrator: _____

(c) Location of administrator (city, state and country): _____

(d) Is the administrator a *related person* of your firm?      ☐ Yes    ☐ No

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?

☐ Yes (provided to all investors)    ☐ Some (provided to some but not all investors)    ☐ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."
_____.

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

_____%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?    ☐ Yes    ☐ No

57

App 549

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer, you must complete questions (b) through (g) separately for each marketer.

Check only one box:  ☐ Add      ☐ Delete      ☐ Amend

(b) Is the marketer a *related person* of your firm?          ☐ Yes    ☐ No

(c) Name of the marketer: _____

(d) If the marketer is registered with the SEC, its file number (*e.g.*, 801-, 8-, or 866-): _____ and *CRD* Number (if any) _____

(e) Location of the marketer's office used principally by the *private fund* (city, state and country): _____

(f) Does the marketer market the *private fund* through one or more websites?          ☐ Yes    ☐ No

(g) If the answer to question 28.(f) is "yes," list the website address(es): _____

---

SECTION 7.B.(2)      *Private Fund* Reporting

(1) Name of the *private fund*: _____

(2) *Private fund* identification number: _____

(3) Name and SEC File number of adviser that provides information about this *private fund* in Section 7.B.(1) of Schedule D of its Form ADV filing:_____, 801-_____or 802-_____

(4) Are your *clients* solicited to invest in this *private fund*?          ☐ Yes    ☐ No

In answering this question, disregard feeder funds' investment in a master fund. For purposes of this question, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

---

SECTION 9.C.        *Independent Public Accountant*

58

You must complete the following information for each *independent public accountant* engaged to perform a surprise examination, perform an audit of a pooled investment vehicle that you manage, or prepare an internal control report.  You must complete a separate Schedule D Section 9.C. for each *independent public accountant*.

Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

(1)  Name of the *independent public accountant*: _____

(2)  The location of the *independent public accountant's* office responsible for the services provided:

_____
(number and street)


_____
         (city)                              (state/country)      (zip+4/postal code)

(3)  Is the *independent public accountant* registered with the Public
Company Accounting Oversight Board?                     ☐  Yes     ☐ No

If "yes," Public Company Accounting Oversight Board-Assigned Number:_____

(4)  If "yes" to (3) above, is the *independent public accountant* subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?                     ☐  Yes     ☐ No

(5)  The *independent public accountant* is engaged to:

   A.  ☐ audit a pooled investment vehicle
   B.  ☐ perform a surprise examination of *clients'* assets
   C.  ☐ prepare an internal control report

(6)  Since your last *annual updating amendment*, did all of the reports prepared by the *independent public accountant* that audited the pooled investment vehicle or that examined internal controls contain unqualified opinions?
                          ☐  Yes      ☐  No     ☐Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the accountant's report is available.*

_____
SECTION 10.A.        *Control Persons*

You must complete a separate Schedule D Section 10.A. for each *control person* not named in Item 1.A. or Schedules A, B, or C that directly or indirectly *controls* your management or policies.

59

App 551

Check only one box:  ☐ Add      ☐ Delete    ☐ Amend

(1) Firm or Organization Name: _____

(2) *CRD* Number (if any): _____ Effective Date: _____
                                                                mm/dd/yyyy

   Termination Date: _____
                          mm/dd/yyyy

(3) Business Address:

_____
                            (number and street)

_____
        (city)                        (state/country)      (zip+4/postal code)
If this address is a private residence, check this box:      ☐

(4) Individual Name (if applicable) (Last, First, Middle):

_____

(5) *CRD* Number (if any): _____ Effective Date: _____
                                                                mm/dd/yyyy
   Termination Date: _____
                          mm/dd/yyyy

(6) Business Address:


_____
                            (number and street)

_____
        (city)                        (state/country)      (zip+4/postal code)
If this address is a private residence, check this box:      ☐

(7) Briefly describe the nature of the *control*:

_____

_____

_____


_____
SECTION 10.B.      *Control Person* Public Reporting Companies

If any *person* named in Schedules A, B, or C, or in Section 10.A. of Schedule D is a public
reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please

60

App 552

provide the following information (you must complete a separate Schedule D Section 10.B. for each public reporting company):

(1) Full legal name of the public reporting company:  _____

(2) The public reporting company's CIK number (Central Index Key number that the SEC assigns to each reporting company):  _____

_____

Miscellaneous

You may use the space below to explain a response to an Item or to provide any other information.

_____
_____
_____
_____
_____
_____
_____
_____

61

App 553

# FORM ADV
## Schedule R

Check the box that indicates what you would like to do:

<u>Submit a new Schedule R</u>

☐  Submit an initial Schedule R

<u>Amend a Schedule R</u>

☐  Amend an existing Schedule R

<u>Delete a Schedule R</u>

☐  Delete an existing Schedule R for a *relying adviser* that is no longer eligible for SEC registration

☐  Delete an existing Schedule R for a *relying adviser* that is no longer relying on this *umbrella registration*

SECTION 1        Identifying Information

Responses to this Section tell us who you (the *relying adviser*) are, where you are doing business, and how we can contact you.

A.  Your full legal name:

    _____

B.  Name under which you primarily conduct your advisory business, if different from Section 1.A. above or Item 1.A. of the *filing adviser's* Form ADV Part 1A.

    _____

C.  List any other business names and the jurisdictions in which you use them. Complete this question for each other business name.  ☐    Add        ☐  Delete     ☐  Amend

    Name:_____Jurisdiction:_____

    *You do not have to include the names or jurisdictions of the filing adviser or other relying adviser(s) in response to this Section 1.C.*

62

D.  If you currently have, or ever had, a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system (other than the *filing adviser's CRD* number), your *CRD* number:_____.

*If you do not have a CRD number, skip this Section 1.D. Do not provide the CRD number of one of your officers, employees, or affiliates (including the filing adviser).*

E.  *Principal Office and Place of Business*

☐  Same as the *filing adviser*.

(1)  Address (do not use a P.O. Box):

_____

(number and street)

_____

(city)                    (state/country)          (zip +4/postal code)

If this address is a private residence, check this box:          ☐

(2)  Days of week that you normally conduct business at your *principal office and place of business*:

☐  Monday - Friday          ☐ Other: _____

Normal business hours at this location:     _____

(3)  Telephone number at this location:     _____

(area code)      (telephone number)

(4)  Facsimile number at this location, if any:_____

(area code)      (facsimile number)

F.  Mailing address, if different from your *principal office and place of business* address:

☐  Same as the *filing adviser*.

_____

(number and street)

_____

(city)                         (state/country)          (zip+4/postal code)

If this address is a private residence, check this box:          ☐

63

G.  Provide your *Legal Entity Identifier* if you have one: _____

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

H.  If you have Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers: _____

SECTION 2

SEC Registration

Responses to this Section help us (and you) determine whether you are eligible to register with the SEC.

A.  To be a *relying adviser*, you must be independently eligible to register (or remain registered) with the SEC.  You must check **at least one** of the Sections 2.A.(1) through 2.A.(8), below. Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

You (the *relying adviser*):

☐ (1)    are a **large advisory firm** that either:

(a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

(b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐ (2)    are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

(a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

(b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

☐ (3)    Reserved;

☐ (4)    have your *principal office and place of business* **outside the United States**;

64

App 556

☐ (5)    are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

☐ (6)    are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days**;

If you check this box, you must make both of the representations below:

☐    I am not registered or required to be registered with the SEC or a state securities authority and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐    By submitting this Form ADV to the SEC, the *filing adviser* undertakes to file an amendment to this *umbrella registration* to remove this Schedule R if, on the 120th day after this application for *umbrella registration* with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

☐ (7)    are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

If this is your initial filing as a relying adviser, you must make both of these representations:

☐    I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐    The *filing adviser* undertakes to file an amendment to this *umbrella registration* to remove this Schedule R if, at the time of the *annual updating amendment*, I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐    Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

65

App 557

☐ (8)  have **received an SEC *order*** exempting you from the prohibition against registration with the SEC. If you check this box, provide the following information:

Application Number:  803-_____ Date of *order*: _____

(mm/dd/yyyy)

☐ (9)  are **no longer eligible** to remain registered with the SEC.

SECTION 3    Form of Organization

A.  How are you organized?

☐ Corporation    ☐ Sole Proprietorship    ☐ Limited Liability Partnership (LLP)
☐ Partnership    ☐ Limited Liability Company (LLC) ☐ Limited Partnership (LP)
☐ Other (specify):_____

B.  In what month does your fiscal year end each year?    _____

C.  Under the laws of what state or country are you organized?  _____

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed.*

SECTION 4     *Control Persons*

In this Section 4, we ask you to identify each other *person* that, directly or indirectly, *controls* you.

A.  Direct Owners and Executive Officers

(1) Section 4.A. asks for information about your direct owners and executive officers.

(2) Direct Owners and Executive Officers.  List below the names of:

(a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, director and any other individuals with similar status or functions;

(b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);

Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Section 4.A., a *person* beneficially owns any securities:  (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling,

66

App 558

mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

(c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;

(d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

(e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

(3) Do you have any indirect owners to be reported in Section 4.B. below?    ☐ Yes    ☐ No

(4) In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

(5) Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

(6) Ownership codes are:    NA - less than 5%        C - 25% but less than 50%
                            A - 5% but less than 10%    D - 50% but less than 75%
                            B - 10% but less than 25%   E - 75% or more

(7) (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.
    (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.
    (c) Complete each column.

Check this box if you are filing this Form ADV through the IARD system and want the IARD system to pre-fill the chart below with the same direct owners and executive officers you have provided in Schedule A for your *filing adviser*. If you check the box, the system will pre-fill these fields for you, but you will be able to manually edit the information after it is pre-filled and before you submit your filing.    ☐

67

App 559

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired | Ownership Code | *Control Person* | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|
| | | | MM/YY YY | | PR | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

B.  Indirect Owners

(1)  Section 4.B. asks for information about your indirect owners; you must first complete Section 4.A., which asks for information about your direct owners.

(2)  Indirect Owners. With respect to each owner listed in Section 4.A. (except individual owners), list below:

   (a)  in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Section, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b)  in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c)  in the case of an owner that is a trust, the trust and each trustee; and

   (d)  in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

68

App 560

(3) Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

(4) In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

(5) Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

(6) Ownership codes are:     C - 25% but less than 50%     D - 50% but less than 75%
                             E - 75% or more                F - Other (general partner, trustee, or
                                                            elected manager)

(7) (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.
    (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.
    (c) Complete each column.

Check this box if you are filing this Form ADV through the IARD system and want the IARD system to pre-fill the chart below with the same indirect owners you have provided in Schedule B for your *filing adviser*. If you check the box, the system will pre-fill these fields for you, but you will be able to manually edit the information after it is pre-filled and before you submit your filing.     ☐

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/ FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired  MM/ YYYY | Ownership Code | *Control Person*  PR | *CRD* No.  If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

69

App 561

C. Does any *person* not named in Section 1.A., Section 4.A., or Section 4.B. directly or indirectly, *control* your management or policies?    □ Yes    □ No

If yes, you must complete the information below for each *control person* not named in Section 1.A., Section 4.A., or Section 4.B. that directly or indirectly *controls* your management or policies.

Check only one box:    □ Add    □ Delete    □ Amend

(1) Firm or Organization Name: _____

(2) *CRD* Number (if any): _____ Effective Date: _____
                                                                        mm/dd/yyyy

   Termination Date: _____
                             mm/dd/yyyy

(3) Business Address:

   _____
                             (number and street)


   _____
         (city)                           (state/country)         (zip+4/postal code)

If this address is a private residence, check this box:    □

(4) Individual Name (if applicable) (Last, First, Middle):

   _____

(5) *CRD* Number (if any): _____ Effective Date: _____
                                                                        mm/dd/yyyy

   Termination Date: _____
                             mm/dd/yyyy

(6) Business Address:

   _____
                             (number and street)


   _____
         (city)                           (state/country)         (zip+4/postal code)

If this address is a private residence, check this box:    □


(7) Briefly describe the nature of the *control*:

70

App 562

_____

_____

_____

D.  If any *person* named in Section 4.A., Section 4.B., or Section 4.C. is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, complete the information below (you must complete this information for each public reporting company).

Check only one box:  ☐ Add        ☐ Delete      ☐ Amend

(1) Full legal name of the public reporting company:_____

(2) The public reporting company's CIK number (Central Index Key number that the SEC assigns to each reporting company): _____

71

# CRIMINAL DISCLOSURE REPORTING PAGE (ADV)

*GENERAL INSTRUCTIONS*

This Disclosure Reporting Page (DRP ADV) is an ☐ INITIAL *OR* ☐ AMENDED response used to report details for affirmative responses to Items 11.A. or 11.B. of Form ADV.

Check item(s) being responded to:    ☐ 11.A(1)    ☐ 11.A(2)    ☐ 11.B(1)    ☐ 11.B(2)

Use a separate DRP for each event or *proceeding*. The same event or *proceeding* may be reported for more than one *person* or entity using one DRP. File with a completed Execution Page.

Multiple counts of the same charge arising out of the same event(s) should be reported on the same DRP. Unrelated criminal actions, including separate cases arising out of the same event, must be reported on separate DRPs. Use this DRP to report all charges arising out of the same event. One event may result in more than one affirmative answer to the items listed above.

PART I

A.  The *person(s)* or entity(ies) for whom this DRP is being filed is (are):
    ☐ You (the advisory firm)
    ☐ You and one or more of your *advisory affiliates*
    ☐ One or more of your *advisory affiliates*

If this DRP is being filed for an *advisory affiliate*, give the full name of the *advisory affiliate* below (for individuals, Last name, First name, Middle name).

If the *advisory affiliate* has a *CRD* number, provide that number. If not, indicate "non-registered" by checking the appropriate box.

Your Name                                          Your *CRD* Number

_____            _____


ADV DRP - *ADVISORY AFFILIATE*

*CRD* Number                          This *advisory affiliate* is  ☐ a firm    ☐ an individual
                                      Registered:              ☐ Yes     ☐ No

_____

Name (For individuals, Last, First, Middle)

_____

72

☐ This DRP should be removed from the ADV record because the *advisory affiliate(s)* is no longer associated with the adviser.

☐ This DRP should be removed from the ADV record because: (1) the event or *proceeding* occurred more than ten years ago or (2) the adviser is registered or applying for registration with the SEC or reporting as an *exempt reporting adviser* with the SEC and the event was resolved in the adviser's or *advisory affiliate's* favor.

☐ This DRP should be removed from the ADV record because it was filed in error, such as due to a clerical or data-entry mistake. Explain the circumstances:

_____

_____

_____

B. If the *advisory affiliate* is registered through the IARD system or *CRD* system, has the *advisory affiliate* submitted a DRP (with Form ADV, BD or U-4) to the IARD or *CRD* for the event? If the answer is "Yes," no other information on this DRP must be provided.
   ☐ Yes     ☐ No

NOTE:     The completion of this form does not relieve the *advisory affiliate* of its obligation to update its IARD or *CRD* records.

PART II

1. If charge(s) were brought against an organization over which you or an *advisory affiliate* exercise(d) *control*: Enter organization name, whether or not the organization was an *investment-related* business and your or the *advisory affiliate's* position, title, or relationship.

_____

2. Formal Charge(s) were brought in: (include name of Federal, Military, State or Foreign Court, Location of Court - City or County <u>and</u> State or Country, Docket/Case number).

_____

3. Event Disclosure Detail (Use this for both organizational and individual charges.)

   A. Date First *Charged* (MM/DD/YYYY): _____ ☐ Exact  ☐ Explanation

If not exact, provide explanation: _____

App 565

B.  Event Disclosure Detail (include Charge(s)/Charge Description(s), and for each charge provide: (1) number of counts, (2) *felony* or *misdemeanor*, (3) plea for each charge, and (4) product type if charge is *investment-related*.

_____

_____

_____

C.  Did any of the Charge(s) within the Event involve a *felony*?    ☐ Yes    ☐ No

D.  Current status of the Event?    ☐ Pending    ☐ On Appeal    ☐ Final

E.  Event Status Date (complete unless status is Pending) (MM/DD/YYYY):  _____

☐ Exact    ☐ Explanation

If not exact, provide explanation: _____

4.  Disposition Disclosure Detail: Include for each charge (a) Disposition Type (e.g., convicted, acquitted, dismissed, pretrial, etc.), (b) Date, (c) Sentence/Penalty, (d) Duration (if sentence-suspension, probation, etc.), (e) Start Date of Penalty, (f) Penalty/Fine Amount, and (g) Date Paid.

_____

_____

_____

_____

_____

5.  Provide a brief summary of circumstances leading to the charge(s) as well as the disposition. Include the relevant dates when the conduct which was the subject of the charge(s) occurred. (Your response must fit within the space provided.)

App 566

75

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

*GENERAL INSTRUCTIONS*

This Disclosure Reporting Page (DRP ADV) is an ☐ INITIAL *OR* ☐ AMENDED response used to report details for affirmative responses to Items 11.C., 11.D., 11.E., 11.F. or 11.G. of Form ADV.

Check item(s) being responded to:

|        |        |        |        |        |
|--------|--------|--------|--------|--------|
| 11.C(1) | 11.C(2) | 11.C(3) | 11.C(4) | 11.C(5) |
| 11.D(1) | 11.D(2) | 11.D(3) | 11.D(4) | 11.D(5) |
| 11.E(1) | 11.E(2) | 11.E(3) | 11.E(4) |        |
| 11.F.   | 11.G.   |        |        |        |

Use a separate DRP for each event or *proceeding*. The same event or *proceeding* may be reported for more than one *person* or entity using one DRP.  File with a completed Execution Page.

One event may result in more than one affirmative answer to Items 11.C., 11.D., 11.E., 11.F. or 11.G. Use only one DRP to report details related to the same event. If an event gives rise to actions by more than one regulator, provide details for each action on a separate DRP.

PART I

A.  The *person(s)* or entity(ies) for whom this DRP is being filed is (are):
☐  You (the advisory firm)
☐  You and one or more of your *advisory affiliates*
☐  One or more of your *advisory affiliates*

If this DRP is being filed for an *advisory affiliate*, give the full name of the *advisory affiliate* below (for individuals, Last name, First name, Middle name).

If the *advisory affiliate* has a *CRD* number, provide that number.  If not, indicate "non-registered" by checking the appropriate box.

Your Name                                      Your *CRD* Number

_____        _____

ADV DRP - *ADVISORY AFFILIATE*

CRD Number                    This *advisory affiliate* is ☐a firm    ☐an individual
                              Registered:              ☐Yes     ☐No

_____

Name (For individuals, Last, First, Middle)

76

App 568

_____

☐ This DRP should be removed from the ADV record because the *advisory affiliate*(s) is no longer associated with the adviser.

☐ This DRP should be removed from the ADV record because: (1) the event or *proceeding* occurred more than ten years ago or (2) the adviser is registered or applying for registration with the SEC or reporting as an *exempt reporting adviser* with the SEC and the event was resolved in the adviser's or *advisory affiliate's* favor.

If you are registered or registering with a *state securities authority*, you may remove a DRP for an event you reported only in response to Item 11.D(4), and only if that event occurred more than ten years ago. If you are registered or registering with the SEC, you may remove a DRP for any event listed in Item 11 that occurred more than ten years ago.

☐ This DRP should be removed from the ADV record because it was filed in error, such as due to a clerical or data-entry mistake.  Explain the circumstances:

_____

_____

B.  If the *advisory affiliate* is registered through the IARD system or *CRD* system, has the *advisory affiliate* submitted a DRP (with Form ADV, BD or U-4) to the IARD or *CRD* for the event? If the answer is "Yes," no other information on this DRP must be provided.
☐ Yes    ☐ No

NOTE:    The completion of this form does not relieve the *advisory affiliate* of its obligation to update its IARD or *CRD* records.

PART II

1.  Regulatory Action initiated by:
☐ SEC    ☐ Other Federal    ☐ State               Foreign
                                    ☐ *SRO*      ☐

(Full name of regulator, *foreign financial regulatory authority*, federal, state or *SRO*)

_____

2.  Principal Sanction (check appropriate item):

☐ Civil and Administrative Penalty(ies)/Fine(s)    ☐ Disgorgement    ☐ Restitution
☐ Bar                                              ☐ Expulsion       ☐ Revocation
☐ Cease and Desist                                 ☐ Injunction      ☐ Suspension
☐ Censure                                          ☐ Prohibition     ☐ Undertaking

77

App 569

☐ Denial                                ☐ Reprimand        ☐ Other_____

Other Sanctions:

_____

_____

_____

3.  Date Initiated (MM/DD/YYYY):_____    ☐ Exact     ☐ Explanation

    If not exact, provide explanation: _____

4.  Docket/Case Number: _____

5.  *Advisory Affiliate* Employing Firm when activity occurred which led to the regulatory action (if applicable):

    _____

6.  Principal Product Type (check appropriate item):

| | | |
|---|---|---|
| ☐Annuity(ies) - Fixed | ☐Derivative(s) | ☐Investment Contract(s) |
| ☐Annuity(ies) - Variable | ☐Direct Investment(s) - DPP and LP Interest(s) | ☐Money Market Fund(s) |
| ☐CD(s) | ☐Equity - OTC | ☐Mutual Fund(s) |
| ☐Commodity Option(s) | ☐Equity Listed (Common & Preferred Stock) | ☐No Product |
| ☐Debt - Asset Backed | ☐Futures - Commodity | ☐Options |
| ☐Debt - Corporate | ☐Futures - Financial | ☐Penny Stock(s) |
| ☐Debt - Government | ☐Index Option(s) | ☐Unit Investment Trust(s) |
| ☐Debt - Municipal | ☐Insurance | ☐Other |

Other Product Types:

_____

_____

7.  Describe the allegations related to this regulatory action (your response must fit within the space provided):

_____

_____

78

App 570

_____

_____

_____

8.  Current status?     ☐ Pending          ☐ On Appeal          ☐ Final

9.  If on appeal, regulatory action appealed to (SEC, *SRO*, Federal or State Court) and Date
    Appeal Filed:

_____

If Final or On Appeal, complete all items below.  For Pending Actions, complete Item 13 only.

10. How was matter resolved (check appropriate item):

☐Acceptance, Waiver & Consent (AWC)    ☐Dismissed          ☐Vacated
☐Consent                                ☐*Order*             ☐Withdrawn
☐Decision                               ☐Settled             ☐Other_____
☐Decision & *Order* of Offer of Settlement  ☐Stipulation and Consent

11. Resolution Date (MM/DD/YYYY):_____     ☐ Exact   ☐ Explanation

If not exact, provide explanation:_____

12. Resolution Detail:

   A.  Were any of the following Sanctions *Ordered* (check all appropriate items)?

   ☐  Monetary/Fine          ☐  Revocation/Expulsion/Denial     ☐ Disgorgement/Restitution

       Amount:  $_____ ☐  Censure      ☐  Cease and Desist/Injunction  ☐  Bar

   ☐  Suspension

   B.  Other Sanctions *Ordered*:

_____

_____

_____

Sanction detail: if suspended, *enjoined* or barred, provide duration including start date and capacities affected (General Securities Principal, Financial Operations Principal, etc.). If requalification by exam/retraining was a condition of the sanction, provide length of time given to requalify/retrain, type of exam required and whether condition has been satisfied.  If disposition resulted in a fine, penalty, restitution, disgorgement or monetary compensation, provide total amount, portion levied against you or an *advisory affiliate*, date paid and if any portion of penalty was waived:

_____
_____
_____
_____

13. Provide a brief summary of details related to the action status and (or) disposition and include relevant terms, conditions and dates (your response must fit within the space provided).

_____

_____

_____

_____

_____

_____

_____

_____

_____

80

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

*GENERAL INSTRUCTIONS*

This Disclosure Reporting Page (DRP ADV) is an ☐ INITIAL ***OR*** ☐ AMENDED response used to report details for affirmative responses to Item 11.H. of Part 1A and Item 2.F. of Part 1B of Form ADV.

Check Part 1A item(s) being responded to: 11.H(1)(a)   11.H(1)(b)   11.H(1)(c)
11.H(2)
Check Part 1B item(s) being responded to: 2.F(1)   2.F(2)   2.F(3)
2.F(4)   2.F(5)

Use a separate DRP for each event or *proceeding*. The same event or *proceeding* may be reported for more than one *person* or entity using one DRP. File with a completed Execution Page.

One event may result in more than one affirmative answer to Item 11.H. of Part 1A or Item 2.F. of Part 1B. Use only one DRP to report details related to the same event. Unrelated civil judicial actions must be reported on separate DRPs.

PART I

A. The *person(s)* or entity(ies) for whom this DRP is being filed is (are):
  ☐ You (the advisory firm)
  ☐ You and one or more of your *advisory affiliates*
  ☐ One or more of your *advisory affiliates*

If this DRP is being filed for an *advisory affiliate*, give the full name of the *advisory affiliate* below (for individuals, Last name, First name, Middle name).

If the *advisory affiliate* has a *CRD* number, provide that number. If not, indicate "non-registered" by checking the appropriate box.

Your Name                                         Your *CRD* Number

_____          _____

ADV DRP - *ADVISORY AFFILIATE*

*CRD* Number                    This *advisory affiliate* is  ☐a firm   ☐an individual
                                Registered:                   ☐Yes     ☐No

_____

Name (For individuals, Last, First, Middle)

81

App 573

☐ This DRP should be removed from the ADV record because the *advisory affiliate*(s) is no longer associated with the adviser.

☐ This DRP should be removed from the ADV record because: (1) the event or *proceeding* occurred more than ten years ago or (2) the adviser is registered or applying for registration with the SEC or reporting as an *exempt reporting adviser* with the SEC and the event was resolved in the adviser's or *advisory affiliate's* favor.

If you are registered or registering with a *state securities authority*, you may remove a DRP for an event you reported only in response to Item 11.H.(1)(a), and only if that event occurred more than ten years ago. If you are registered or registering with the SEC, you may remove a DRP for any event listed in Item 11 that occurred more than ten years ago.

☐ This DRP should be removed from the ADV record because it was filed in error, such as due to a clerical or data-entry mistake. Explain the circumstances:

_____

_____

_____

B. If the *advisory affiliate* is registered through the IARD system or *CRD* system, has the *advisory affiliate* submitted a DRP (with Form ADV, BD or U-4) to the IARD or *CRD* for the event? If the answer is "Yes," no other information on this DRP must be provided.
   ☐ Yes     ☐ No

   NOTE:     The completion of this form does not relieve the *advisory affiliate* of its obligation to update its IARD or *CRD* records.

PART II

1. Court Action initiated by: (Name of regulator, *foreign financial regulatory authority*, *SRO*, commodities exchange, agency, firm, private plaintiff, etc.)

_____

2. Principal Relief Sought (check appropriate item):

☐ Cease and Desist     ☐ Disgorgement     ☐ Money Damages     ☐ Restraining Order
                                              (Private/Civil
                                              Complaint)
☐ Civil Penalty(ies)   ☐ Injunction         ☐ Restitution        ☐ Other_____
   /Fine(s)

82

App 574

Other Relief Sought:

_____

_____

3.   Filing Date of Court Action (MM/DD/YYYY):_____ ☐ Exact  ☐ Explanation

     If not exact, provide explanation: _____

4.   Principal Product Type (check appropriate item):

☐Annuity(ies) - Fixed          ☐Derivative(s)                    ☐Investment Contract(s)
☐Annuity(ies) - Variable       ☐Direct Investment(s) -           ☐Money Market Fund(s)
                                  DPP and LP Interest(s)
☐CD(s)                         ☐Equity - OTC                    ☐Mutual Fund(s)
☐Commodity Option(s)           ☐Equity Listed (Common &         ☐No Product
                                  Preferred Stock)
☐Debt - Asset Backed           ☐Futures - Commodity             ☐Options
☐Debt - Corporate              ☐Futures - Financial             ☐Penny Stock(s)
☐Debt - Government             ☐Index Option(s)                 ☐Unit Investment Trust(s)
☐Debt - Municipal              ☐Insurance                       ☐Other

Other Product Types:

_____

5.   Formal Action was brought in (include name of Federal, State or Foreign Court, Location of
     Court - City or County and State or Country, Docket/Case Number):

     _____

6.   *Advisory Affiliate* Employing Firm when activity occurred which led to the civil judicial
     action (if applicable):

     _____

7.   Describe the allegations related to this civil action (your response must fit within the space
     provided):

     _____

     _____

     _____

App 575

_____

_____

8.  Current status?    ☐ Pending       ☐ On Appeal       ☐ Final

9.  If on appeal, action appealed to (provide name of court) and Date Appeal Filed
    (MM/DD/YYYY):

    _____

10. If pending, date notice/process was served (MM/DD/YYYY): _____   ☐ Exact
    ☐ Explanation

    If not exact, provide explanation: _____

If Final or On Appeal, complete all items below.  For Pending Actions, complete Item 14 only.

11. How was matter resolved (check appropriate item):

☐ Consent              ☐ Judgment Rendered     ☐ Settled
☐ Dismissed            ☐ Opinion               ☐ Withdrawn      ☐ Other_____

12. Resolution Date (MM/DD/YYYY):_____   ☐ Exact   ☐ Explanation

If not exact, provide explanation:_____

13. Resolution Detail:

    A.  Were any of the following Sanctions *Ordered* or Relief Granted (check appropriate
        items)?

    ☐  Monetary/Fine          ☐  Revocation/Expulsion/Denial     ☐  Disgorgement/Restitution

        Amount:  $_____  ☐  Censure      ☐  Cease and Desist/Injunction  ☐  Bar

    ☐  Suspension

    B.  Other Sanctions:

    _____

    _____

84

App 576

85

C.  Sanction detail: if suspended, *enjoined* or barred, provide duration including start date and capacities affected (General Securities Principal, Financial Operations Principal, etc.). If requalification by exam/retraining was a condition of the sanction, provide length of time given to requalify/retrain, type of exam required and whether condition has been satisfied. If disposition resulted in a fine, penalty, restitution, disgorgement, or monetary compensation, provide total amount, portion levied against you or an *advisory affiliate*, date paid and if any portion of penalty was waived:

_____

_____

_____

_____

14. Provide a brief summary of circumstances related to the action(s), allegation(s), disposition(s) and/or finding(s) disclosed above (your response must fit within the space provided).

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

App 578