IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KARRA CRAWFORD,

Plaintiff,

v.

ADVISER COMPLIANCE ASSOCIATES, LLC dba ACA GROUP, a District of Columbia limited liability company, FARIBA RONNASI, an individual, ELITE WEALTH MANAGEMENT, INC., a Washington profit corporation, LATTICE CAPITAL MANAGEMENT, LLC, a Washington limited liability company, ALI REZA MEMARAN-DADGAR aka ALLAN DADGAR, an individual, and ROBERT VAL LYBBERT, an individual,

Defendants.

Case No. 3:25-cv-02242-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge:**

Plaintiff Karra Crawford ("Crawford") filed this action against Defendant Adviser Compliance Associates, LLC ("ACA"), alleging claims for breach of fiduciary duty, negligent

misrepresentation, negligence, fraud, and violations of Oregon's Unfair Trade Practices Act ("UTPA") and Securities Law. (Compl., ECF No. 1-1.) ACA provided outsourced chief compliance officer ("CCO") services to two registered investment advisers, Defendants Elite Wealth Management, Inc. ("Elite") and Lattice Capital Management, LLC ("Lattice"), together with three of their "supervised person" employees, Defendants Fariba Ronnasi ("Ronnasi"), Ali Reza Memaran-Dadgar ("Dadgar"), and Robert Val Lybbert ("Lybbert") (together, the "Elite Defendants"), for approximately four months in 2023. (*Id.*) The Court has jurisdiction over Crawford's claims pursuant to 28 U.S.C. §§ 1332 and 1367. Crawford's claims against the Elite Defendants are currently in arbitration.

Now before the Court is ACA's motion to dismiss Crawford's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Def.'s Mot. Dismiss ("Def.'s Mot."), ECF No. 7.) For the following reasons, the Court GRANTS IN PART and DENIES IN PART ACA's motion.

## BACKGROUND

Crawford invested $1.635 million with the Elite Defendants in the "Dynamic Alpha Fund" (the "Alpha Fund") in November 2021 following Ronnasi's solicitation. (Compl. ¶¶ 2-5, 48; *see also id.* ¶ 64, noting that Crawford moved an additional $28,880 into the Alpha Fund in December 2021.) Unbeknownst to Crawford, Ronnasi was later charged with theft in June 2023, after she engaged in a scheme to order clothes online from TJ Maxx, report that she did not receive the clothes to obtain credit, and then return the clothes to a store. (*Id.* ¶¶ 70-76.[1])

---

[1] The Court takes judicial notice of the relevant King County (Washington) Superior Court records, which reflect that Ronnasi was eventually convicted of third degree malicious mischief, a gross misdemeanor, on May 9, 2025 and ordered to pay $18,552 in restitution and a $500 fine. (*See* 5/9/25 Judgment, *Washington v. Ronnasi*, No. 23-1-O4492-1 SEA (King Cnty.

Thereafter, Ronnasi and Dadgar contacted ACA to obtain outsourced CCO services for Elite and Lattice. (*Id.* ¶ 92; *see also id.* ¶ 86, noting that an outsourced CCO's role includes "[o]verse[ing] and coordinat[ing] regulatory filings, including Form ADV and any necessary updates or amendments"). ACA employee Mark Hansen initially served as Elite and Lattice's CCO and was later replaced by ACA employee John Douglas MacKinnon in August 2023. (*Id.* ¶¶ 106, 151.)

In a July 27, 2023, email from Lattice to Alpha Fund investors about a management fee increase, Lattice did not disclose Ronnasi's pending theft charge. (*Id.* ¶¶ 125, 129-30.) The email included a "Confidential Offering Circular" private placement memorandum ("PPM") for the Alpha Fund dated August 1, 2023 (the "August 2023 PPM"). (*Id.* ¶ 130.) The August 2023 PPM disclosed that Dadgar would become Elite's chief executive officer ("CEO") and president on October 1, 2023 and that Ronnasi would serve as Elite's chief operating officer and the CEO of "D&R Family Office." (*Id.* ¶ 131.) The PPM referenced Lattice's "Form ADV," a required Securities and Exchange Commission ("SEC") disclosure form (*see* 17 C.F.R. § 275.204-1), but did not attach the document.[2] (Compl. ¶¶ 142-45.) Crawford alleges that the omission was part of a "cover-up" of Ronnasi's pending theft charge. (*Id.* ¶ 145.) Crawford further alleges, on information and belief, that ACA was involved in concealing Ronnasi's pending theft charge because Hansen "drafted, assisted in drafting, and/or reviewed" the August 2023 PPM and was copied on Lattice's July 27, 2023 email. (*Id.* ¶¶ 125, 133.)

///

Superior Ct.), *https://kingcounty.gov/en/dept/dja/courts-jails-legal-system/case-records/records-access* (last accessed Aug. 25, 2026).)

[2] Crawford does not allege whether the Elite Defendants filed an amended Form ADV with the Investment Adviser Registration Depository (*see* 17 C.F.R. § 275.204-1) disclosing Ronnasi's pending theft charge. (*See generally* Compl.)

Crawford acknowledges that ACA has represented that the Elite Defendants "actively hid" Ronnasi's pending theft charge from ACA and that ACA terminated its role with Elite and Lattice "in the autumn of 2023" upon discovering the undisclosed theft charge. (*Id.* ¶¶ 160-61.)

Crawford does not allege that she purchased any securities from the Elite Defendants while ACA was providing outsourced CCO services, but Crawford later invested more money with Lattice in February 2024 and again in May 2024. (*Id.* ¶¶ 168-69, 175.) Crawford alleges that the August 2023 PPM was the last PPM that she received for the Alpha Fund before making these additional investments. (*Id.* ¶¶ 170, 176.)

In August 2024, Lattice informed Crawford that the Alpha Fund had lost "approximately 37.6% of its value as of August 6, 2024." (*Id.* ¶ 181.) After Lattice restructured the fund into the "Dynamic Absolute Return Fund" and provided assurances, Crawford remained invested. (*Id.* ¶¶ 190, 203.) In April 2025, Lattice notified Crawford it had decided to close the restructured fund in the wake of "unprecedented volatility in April 2025" that resulted in a "roughly -85.3% loss" in April 2025. (*Id.* ¶ 205.)

Crawford now alleges that ACA failed to fulfill its duties as CCO for Elite and Lattice in 2023. (*Id.* ¶ 159.) Crawford's primary theory of liability is that ACA knew or should have known but failed to disclose Ronnasi's pending theft charge and the resulting organizational changes at Elite and Lattice. (*Id.* ¶ 153; *see also id.* ¶ 203, "Not knowing about Ronnasi's criminal conduct or the sustained efforts to cover it up, and thus not having reason to believe that she was being taken advantage of, Crawford again fell victim to the false and misleading statements and stayed invested in the [restructured] [Dynamic] Absolute Return Fund."). Crawford also alleges that ACA did not investigate Ronnasi's investment recommendations and failed to alert Crawford

that her investments in the Alpha Fund were a mismatch with her conservative investment objectives as a retiree. (*Id.* ¶¶ 109-10.)

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although "[t]he plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Thus, "where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

When evaluating a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *See Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000); *but see Twombly*, 550 U.S. at 555 (holding that courts are "not bound to accept as true a legal conclusion couched as a factual allegation"). "In dismissing for failure to state a claim under Rule 12(b)(6), a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 960 (9th Cir. 2020) (simplified).

///

## DISCUSSION

ACA moves to dismiss Crawford's claims for breach of fiduciary duty, negligence, negligent misrepresentation, common law fraud, and violations of the UTPA and Oregon's Securities Law. (Def.'s Mot. at 10-40; *see also* Pl.'s Resp. Def.'s Mot. Dismiss ("Pl.'s Resp."), ECF No. 17; Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply").)

### I. BREACH OF FIDUCIARY DUTY (FOURTH CLAIM, COUNT TWO)

Crawford alleges that ACA owed her fiduciary duties and breached those duties by, *inter alia*, failing to disclose Ronnasi's theft charge. (Compl. ¶¶ 347-50, 353-54, 356-57.)

To state a breach of fiduciary duty claim under Oregon law, a plaintiff must first allege "the existence of a fiduciary relationship between the parties[.]" *Giuliano v. Anchorage Advisors, LLC*, 19 F. Supp. 3d 1087, 1103 (D. Or. 2014). The Oregon Supreme Court has held that no fiduciary "duties are implied unless the parties are in a 'special relationship[.]'" *Bennett v. Farmers Ins. Co. of Or.*, 26 P.3d 785, 798 (Or. 2001) (quoting *Conway v. Pac. Univ.*, 924 P.2d 818, 822 (Or. 1996)); *see also Conway*, 924 P.2d at 822 ("[T]he parties must be in a 'special relationship,' in which the party sought to be held liable had some obligation to pursue the interests of the other party."). "Accordingly, unless [the] plaintiff's relationship with [the] defendant qualifies as the type of 'special relationship' that gives rise to either duty alleged, no breach of duty can have occurred." *Bennett*, 26 P.3d at 798.

To evaluate the relationship in question, "[t]he focus is not on the subject matter of the relationship . . . [but] instead is on whether the nature of the parties' relationship itself allowed one party to exercise control in the first party's best interests." *Bennett*, 26 P.3d at 799. "[T]he law implies a tort duty only when th[e] relationship is of the type that, by its nature, allows one party to exercise judgment on the other party's behalf." *Id.*; *see also Dailey v. Univ. of Portland*,

569 P.3d 1027, 1035 (Or. Ct. App. 2025) ("In *Conway*, the [Oregon Supreme C]ourt noted that an attribute of a special relationship is that 'one party has relinquished control over the subject matter of the relationship to the other party and has placed its potential monetary liability in the other's hands'" (quoting *Conway*, 924 P.2d at 824)); *Spada Props., Inc. v. Unified Grocers, Inc.*, 121 F. Supp. 3d 1070, 1090-91 (D. Or. 2015) ("The Oregon Supreme Court's opinions in both *Conway* and *Bennett* establish that a special relationship giving rise to a fiduciary duty exists only 'when one party is acting, at least in part, to further the economic interests of the other party.'" (quoting *Conway*, 924 P.2d at 822)).

Such relationships include "certain professional relationships in which one party has a professional obligation to protect the interests of the other party," *Conway*, 924 P.2d at 822 (citing *Onita Pac. Corp. v. Trs. of Bronson*, 843 P.2d 890, 896-97 (Or. 1992) (en banc)), or contractual relationships that create a "status upon which the general law predicates a duty independent of the terms of the contract." *Id.* (quoting *Georgetown Realty v. Home Ins. Co.,* 831 P.2d 7, 11 (Or. 1992)). Applicable statutory or regulatory materials may inform the existence of a duty. *Cf. Dailey*, 569 P.3d at 1032-33 (evaluating the plaintiff's argument that state regulations "establish[ed] a standard of care that is separate from and higher than the standard of care that ordinarily applies in negligence actions"). "Whether the relationship is one that gives rise to an enhanced duty is a question of law." *Lewis-Williamson v. Grange Mut. Ins. Co.*, 39 P.3d 947, 949 (Or. Ct. App. 2002) (citations omitted).

Crawford alleges that ACA "was part of Elite and Lattice and owed the same fiduciary duties to Crawford that Elite and Lattice owed to Crawford." (Compl. ¶¶ 348-49.) Despite this allegation, Crawford acknowledges in her complaint that ACA is, in fact, a "securities

compliance firm"—separate from Elite and Lattice—"that provided outsourced chief compliance officer services to Elite and Lattice." (*Id.* ¶¶ 3, 9.)

That factual distinction is important because the Supreme Court has recognized that it is the Investment Advisers Act of 1940 (the "Investment Advisers Act") that imposes a fiduciary relationship between a registered investment adviser and its clients. *See Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 190, 194 (1963) ("The Investment Advisers Act of 1940 [] reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship[.]") (simplified). There is no dispute here that Elite and Lattice are registered investment advisers (Compl. ¶¶ 2, 12-13) and that ACA, as a standalone entity, is not. *See* 15 U.S.C. § 80b-2 ("'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities[.]"). Thus, because ACA is neither an investment adviser nor "part of" an investment adviser, the Investment Advisers Act does not create a fiduciary or special relationship between ACA and its clients' investors.

Crawford instead points the Court to the combination of the SEC's "Compliance Rule" (*see* 17 C.F.R. § 275.206(4)-7) and "Ethics Rule" (17 C.F.R. § 275.204A-1) promulgated pursuant to the Investment Advisers Act as the source of ACA's duties here. (Pl.'s Resp. at 7, 10.) However, these rules merely require investment advisers to designate a CCO and define the CCO's obligations to investment advisers and funds. *See* 17 C.F.R. § 275.206(4)-7 ("If you are an investment adviser registered [under] the Investment Advisers Act of 1940, it shall be unlawful . . . for you to provide investment advice to clients unless you: (a) Adopt and

implement written policies and procedures reasonably designed to prevent violation, by you and your supervised persons, of the Act and the rules that the Commission has adopted under the Act; . . . (c) Designate an individual (who is a supervised person) responsible for administering the policies and procedures that you adopt under paragraph (a) of this section.") (simplified); 17 C.F.R. § 275.204A-1 (requiring that registered investment advisers adopt a code of ethics requiring that supervised persons report any ethics code violations to the CCO); *see also* Compliance Programs of Investment Companies and Investment Advisers, 68 Fed. Reg. 74714-01, 74714 (Dec. 24, 2003) (noting at the time of rule adoption that "[t]hese rules are designed to protect investors" within the context of "ensuring that all funds and advisers have internal programs to enhance compliance with the federal securities laws"); Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Release No. IA-5248, 84 Fed. Reg. 33669-01, 33679-81 (June 5, 2019) (interpreting the standard of conduct for investment advisers under the Investment Advisers Act and noting that "[t]he Advisers Act establishes a federal fiduciary duty for investment advisers" and "[t]his fiduciary duty is based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act"). Neither the SEC's rules, nor its related guidance, prohibit investment advisers from hiring a vendor to fulfill the CCO's duties or reference a CCO's fiduciary duties to investors.

Although Crawford is correct that the SEC necessarily adopted these rules to protect investors like her, she cites no support for her argument that the SEC's intent to protect investors, standing alone, creates a fiduciary duty or special relationship between an outsourced CCO and the investment adviser's clients as a matter of law. *Cf. Conway*, 924 P.2d at 825 ("[The plaintiff] contends that the handbook provisions that required [the defendant university] to provide its employees with information related to their job security demonstrate that the university was

required to act to further [the plaintiff]'s economic interests, thereby giving rise to a duty of care under *Onita*. Even if we agreed that those handbook provisions, in some way, obligated the university to act in [the plaintiff]'s economic interest, we disagree that those provisions create the type of relationship that gives rise to a duty[.] As we already have concluded, nothing in those provisions demonstrates that the university had a special responsibility to exercise independent judgment in [the plaintiff]'s behalf.").

Indeed, neither Congress nor the SEC has articulated any such duty or special relationship but instead have established a regulatory scheme wherein the CCO's role is independent from the influence of the investment adviser's or funds' officers and employees and the CCO reports directly to a fund's board of directors—not to clients. *See, e.g.*, 17 C.F.R. § 270.38a-1(a)(4) (requiring funds to employ a CCO, acting independently of officers, directors, and employees, to administer policies and procedures and monitor compliance with SEC rules); *id.* at § 270.38a-1(a)(4)(iv) (requiring the CCO to meet separately with the fund's independent directors); *id.* at § 270.38a-1(c) ("No officer, director, or employee of the fund, its investment adviser, or principal underwriter, or any person acting under such person's direction may directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence the fund's [CCO] in the performance of his or her duties under this section."). Crawford provides no authority—from the SEC or otherwise—that an outsourced CCO owes the same fiduciary duties to investors as a registered investment adviser. On this record, the Court finds that neither the Investment Advisers Act nor SEC regulations created a fiduciary relationship between ACA and Crawford.[3] *See Onita*, 843 P.2d at 896-97, 899; *Moyer v. Columbia St. Bank*, 505 P.3d 26, 38-39

---

[3] In light of the lack of a fiduciary relationship with an outsourced CCO, investors have opted to bring shareholder derivative actions against outsourced CCOs on behalf of the investment adviser or fund. *See, e.g., In re Regions Morgan Keegan Sec., Derivative, ERISA*

(Or. Ct. App. 2021) (holding that to the extent a defendant owes a duty to a non-client third-party plaintiff, the defendant must have made a "sufficiently specific" promise "beyond a general promise by defendant to use [the defendant's] professional skills to carry out the assigned project" to assist the client in delivering a "specific result" to the plaintiff); *cf. Lutz v. Chitwood*, 337 B.R. 160, 172-73 (S.D. Ohio 2005) (declining to find a "fiduciary duty on the part of a brokerage firm's [c]ompliance [p]rincipal to the firm's customers with whom the [c]ompliance [p]rincipal had no direct dealings . . . . based on [the employee's] obligation to ensure compliance by members of his firm with applicable securities rules and regulations and other procedures").[4]

Furthermore, Crawford has not otherwise established that ACA's role as an outsourced CCO "allowed [it] to exercise control" over Crawford's investments nor "exercise judgment" on Crawford's behalf to give rise to a special relationship under Oregon common law. *Bennett*, 26 P.3d at 799; *see also Spada Props.*, 121 F. Supp. 3d at 1093 (finding "as a matter of law that [the d]efendant did not have a fiduciary or special relationship with [the plaintiff]" where the plaintiff

---

*Litig.*, 742 F. Supp. 2d 917, 919-20 (W.D. Tenn. 2010) (bringing breach of fiduciary duty, negligence, and other claims on behalf of investment funds against officers, directors, auditing firm, and outside firm that "provided an employee to serve as the Funds' chief compliance officer" and alleging that the funds made risky investments contrary to its published investment strategies). Of course, the SEC may also bring civil enforcement actions against outsourced CCOs. *See, e.g.*, *In the Matter of David I. Osunkwo*, SEC Docket (CCH) 11050195 (Aug. 15, 2017) (imposing remedial sanctions and a cease-and-desist order against outsourced CCO after he caused registered investment advisers to file an inaccurate Form ADV). In other words, outsourced CCOs are held accountable by other means.

[4] The Court need not reach the question of whether or when an investment adviser's in-house CCO owes a fiduciary duty to investors. The out-of-district case on which Crawford primarily relies in its response—*Stanley v. Schmidt*, 369 F. Supp. 3d 297, 304 (D. Mass. 2019)—addressed an investment adviser's in-house CCO, not an outsourced firm as here.

"fail[ed] to show that the relationship between [the d]efendant and [the plaintiff] was such that Defendant agreed to act 'for the benefit' of [the plaintiff]").

Crawford points to no other source of a fiduciary duty and the Court concludes that ACA did not owe fiduciary duties to Crawford as a client of ACA's clients. Accordingly, the Court finds that Crawford fails to state a claim for breach of fiduciary duty against ACA. Nevertheless, ACA did not move to dismiss Crawford's allegations of joint liability for acting in concert with the Elite Defendants' alleged breach of fiduciary duty (Compl. ¶ 354) and therefore Crawford's breach of fiduciary claim premised on joint liability may proceed. (*See* Def.'s Reply at 6 n.6, "The Response is correct that ACA did not move against Crawford's claim against ACA for joint liability for breach of duty[.]")

## II. NEGLIGENT MISPREPRESENTATION (THIRD CLAIM, COUNT TWO) AND NEGLIGENCE (SIXTH CLAIM, COUNT TWO)

Crawford alleges that ACA negligently failed to disclose Ronnasi's theft charge (Compl. ¶¶ 299-311) and failed to exercise reasonable care in connection with its failure to disclose Ronnasi's theft charge. (*Id.* ¶¶ 418-35.)

To state a negligent misrepresentation claim under Oregon law, Crawford must plead the existence of a "special relationship" with ACA. *See Conway*, 924 P.2d at 822 ("In other words, for the duty to avoid making negligent misrepresentations to arise, the parties must be in a 'special relationship," in which the party sought to be held liable had some obligation to pursue the interests of the other party."). Further, the "economic loss rule" requires that to recover a purely economic loss on a negligence claim, the plaintiff must establish that the defendant had a special relationship with the plaintiff beyond the common law of negligence. *See Harris v. Suniga*, 180 P.3d 12, 15-16 (Or. 2008) ("'[O]ne ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property.' For a plaintiff to

recover in those circumstances, the plaintiff would have to show '[s]ome source of duty outside the common law of negligence,' such as a special relationship or status that imposed a duty on the defendant beyond the common-law negligence standard." (first quoting *Hale v. Groce*, 744 P.2d 1289, 1290 (Or. 1987); and then quoting *Onita*, 843 P.2d at 896)); *Dailey*, 569 P.3d at 1036 ("We conclude that neither the regulations on which plaintiff relies nor the common law cases he cites give rise to a special relationship in this case that would permit plaintiff to recover economic or emotional distress damages [on a negligence claim].").

For the same reasons discussed above, Crawford has not plausibly alleged that ACA had a special relationship with Crawford and therefore Crawford fails to state a negligent representation or negligence claim against ACA. *See Eldred v. Or. Anesthesiology Grp., P. C.*, 587 P.3d 364, 370 (Or. Ct. App. 2026) (holding that "the trial court did not err in applying the economic loss doctrine . . . and then granting defendant's motion to dismiss plaintiff's negligence and negligence per se claims").

## III. FRAUD (SECOND CLAIM COUNT TWO)

Crawford alleges that ACA, Hansen, and MacKinnon knew about, had a duty to inform Crawford of, and knowingly failed to disclose Ronnasi's theft charge and the resulting role changes at Elite and Lattice. (Compl. ¶¶ 252-54.) ACA moves to dismiss Crawford's fraud claim on the ground that she did not plead fraud with particularity as Rule 9(b) requires, did not allege any actionable misrepresentations or omissions, did not establish ACA's duty to disclose, and did not plead facts to support joint liability. (Def.'s Mot. at 14-21.)

Under Oregon law, a fraud claim has five "essential elements." *Strawn v. Farmers Ins. Co. of Or.*, 258 P.3d 1199, 1209 (Or.), *adhered to on reconsideration*, 256 P.3d 100 (Or. 2011); *see also Knepper v. Brown*, 195 P.3d 383, 387 & n.5 (Or. 2008) (recognizing that the Oregon

Supreme Court's "past cases have referred to . . . nine elements of a claim for tortious fraud" but its "more recent cases have employed a more abbreviated list of [five] elements" (first citing *U.S. Nat'l Bank of Or. v. Fought*, 630 P.2d 337, 348 (Or. 1981); and then citing *Riley Hill Gen. Contractor v. Tandy Corp.*, 737 P.2d 595 (Or. 1987))). Those five elements are: (1) "the defendant made a material misrepresentation that was false;" (2) "the defendant did so knowing that the representation was false;" (3) "the defendant intended the plaintiff to rely on the misrepresentation;" (4) "the plaintiff justifiably relied on the misrepresentation;" and (5) "the plaintiff was damaged as a result of that reliance." *Strawn*, 258 P.3d at 1209 (citing *Handy v. Beck*, 581 P.2d 68, 71 (Or. 1978)).

Whether or not ACA had a duty to disclose or acted in concert with the other defendants here, the Court finds that Crawford has failed to plead a plausible theory of loss causation to state a fraud claim. Specifically, Crawford has not alleged facts to tie ACA's failure to disclose Ronnasi's theft charge in 2023 and the resulting organizational changes with the investment losses Crawford suffered due to market volatility in 2024 and 2025.

The Oregon Supreme Court evaluates the "proximate cause" element of a common law fraud claim by applying its foreseeability test articulated in *Fazzolari* and *Buchler*. *See Knepper*, 195 P.3d at 387 ("The question, then, is whether th[e] notion of proximate cause or proximate injury is equivalent to the concept of 'reasonable foreseeability,' as we have used that phrase in cases like *Fazzolari* and *Buchler*. We are persuaded that it is."); *see also Fazzolari By & Through Fazzolari v. Portland Sch. Dist. No. 1J*, 734 P.2d 1326, 1337 (Or. 1987) ("The scope of [negligence] does not exclude precautions against risks of crime or torts merely because a third person inflicts the injury. Another person's crime was once thought to lie beyond a defendant's responsibility on grounds of 'proximate cause,' but more recent decisions have dealt with the

behavior of others, lawful or otherwise, as part of the general analysis of foreseeable risks.") (citations omitted); *Buchler v. State By & Through Or. Corr. Div.*, 853 P.2d 798, 804-05 (Or. 1993) ("[M]ere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it."). Even construing the alleged facts in the light most favorable to Crawford, the causal chain Crawford alleges in support of her fraud claim is too attenuated to establish reasonable foreseeability here.

Crawford's alleged loss causation theory is that if ACA had disclosed Ronnasi's theft charge to investors in 2023, Crawford would have viewed Ronnasi as untrustworthy, would have withdrawn her money from the Alpha Fund at some point before August 2024, and would have avoided the market losses she incurred thereafter. (*See* Compl. ¶¶ 203, 257; Pl.'s Resp. at 17-18, 23.) Crawford's factual allegations do not sufficiently connect the investment losses she suffered to ACA's failure to disclose to overcome the lack of foreseeability of the intervening events that actually caused Crawford's losses—specifically, the market volatility spikes in August 2024 and April 2025. (*See* Compl. ¶¶ 5-6.)

It is important to discuss what Crawford does not allege here. Crawford does not allege that ACA's failure to disclose Ronnasi's theft charge or resulting reorganization caused Ronnasi to solicit Crawford to invest in the funds or to adopt the trading strategy that rendered the funds vulnerable to the later volatility events. (*See* Def.'s Mot. at 13.) Nor does Crawford allege that Ronnasi's dishonesty, theft charge, or lack of disclosures relating thereto caused the funds to lose value. As ACA correctly points out, there is "an essential difference in type between a loss caused by market movements (as alleged here), and one caused by an adviser running a Ponzi

scheme or embezzling client funds (not alleged here).” (*Id.* at 10.) Neither the pending theft charge itself nor the lack of disclosure was the harm-producing force here.

Rather, Crawford’s fraud theory relies on her allegations that had ACA disclosed the pending theft charge in 2023, she would have avoided the eventual market volatility losses in 2024 and 2025 because she would have made an intervening decision to exit the Alpha Fund.[5] (Compl. ¶¶ 166-67.) However, Crawford’s allegations—which the Court accepts as true—underscore that her eventual investment losses bear no direct causal connection to ACA’s failure to uncover or disclose Ronnasi’s alleged misconduct. Crawford’s allegations at best plausibly support that ACA’s failure to disclose caused Crawford to remain invested in the fund, not that it caused the drop in fund value the following year, which Crawford acknowledges was caused by market volatility. As a result, the Court finds that the risk of investment losses in 2024 and 2025 due to market volatility was not a reasonably foreseeable consequence of ACA’s failure to disclose Ronnasi’s pending theft charge in 2023. *See Or. Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 83 P.3d 322, 330 (Or. 2004) (“[D]efendant’s conduct caused the delay in the offering that led to an ‘unintended adverse result.’ However, the intervening action of market forces on the price of plaintiff’s stock was the ‘harm-producing force,’ and [the] defendant’s actions did not ‘cause’ the decline in the stock price so as to support liability for that decline. As a matter of law, the risk of a decline in plaintiff’s stock price in June 1996 was not a reasonably foreseeable consequence of [the] defendant’s [accounting errors] in 1994 and early 1995.”).

Crawford argues that the foreseeability “question is simply whether it is foreseeable that negligently carrying out CCO duties could result in securities law violations and clients losing

[5] Crawford acknowledges that she chose not to exit the Alpha Fund after Ronnasi notified her in August 2024 that the fund had lost 37.8% of its value. (Compl. ¶¶ 181, 190, 203.)

money." (Pl.'s Resp. at 18.) But Crawford's foreseeability theory relies on an overly generalized risk description. The Oregon Supreme Court has instructed that "describing the type of harm at risk too generally—such as stating that criminals commit crimes or that escaped prisoners may commit crimes while at large—makes criminal acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity." *Chapman v. Mayfield*, 361 P.3d 566, 575 (Or. 2015) (en banc) (simplified). "Such a conception would sweep too broadly because mere facilitation of an unintended adverse result, . . . does not cause the harm so as to support liability for it." *See id.* (simplified); *see also Buchler*, 853 P.2d at 806 ("Whatever may be the utility of a generalized foreseeability principle—or its alter ego, the general duty principle—in preventing harm to society's members by modifying conduct so that harm is avoided, the current state of tort law does not reach so far as plaintiffs would have it reach in this case. As a matter of law, the harm that actually occurred did not result from any risk of harm to others that was unreasonably created by [the defendant].").

Indeed, the risk of financial loss is inherent in every investment and Crawford points to no authority that Oregon law recognizes so general a view of foreseeability to hold ACA liable here. *See Buchler*, 853 P.2d at 804-05; *see also Cook v. Sch. Dist. UH3J*, 731 P.2d 443, 444-45 (Or. Ct. App. 1987) ("General conclusory allegations that defendants knew or should have known that there was a substantial risk [], in the absence of ultimate facts upon which the allegation is based, are insufficient to withstand a motion to dismiss. The trial court properly dismissed the complaint for failure to state a claim.") (citation omitted).

For these reasons, Crawford has not alleged facts to establish a viable theory of loss causation and she fails to state a fraud claim against ACA.

///

## IV. UTPA (FIFTH CLAIM, COUNT ONE)

Crawford alleges a claim under the Oregon UTPA based on four of its subsections. (Compl. ¶¶ 365-80, alleging violations of OR. REV. STAT. § 646.608(1)(b), (c), (k), (s).)

First, the Court finds that Crawford cannot state a UTPA claim based on subsections (b) or (s) because those subsections expressly apply only to "real estate, goods or services." OR. REV. STAT. § 646.608(1)(b), (s) ("A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: (b) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services. . . . [or] (s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for real estate, goods or services.").

Crawford alleges that the UTPA applies to investment advisory services because people "customarily" invest money "for personal, family, or household purposes" and she invested her money in the funds for those purposes. (Compl. ¶¶ 367-78.) Although investment returns can certainly be used for "personal, family or household purposes," Oregon courts have consistently held that an investment, even for personal purposes, is not the equivalent of the purchase of a good, service, or real estate for personal use under the UTPA. *See, e.g.*, *Cullen v. Inv. Strategies, Inc.*, 911 P.2d 936, 940-41 (Or. Ct. App. 1996) (emphasizing that "money is a medium, not an article, of commerce" and therefore not "goods or services" under the UTPA) (citation omitted);[6] *see also Goren on Behalf of Est. of Goren v. SMA Hub, Inc.*, No. 3:24-cv-00580-JR, 2025 WL 3485722, at *19 (D. Or. Dec. 4, 2025) (explaining that "as a matter of law," the UTPA does not

[6] The Oregon legislature has since added loan services to the UPTA (*see* OR. REV. STAT. § 646.607(6)(a)), but notably has not added investment services.

apply to investment property or business banking services); *cf.* *Roach v. Mead*, 722 P.2d 1229, 1235 (Or. 1986) ("The legal services plaintiff received concerned the investment of money and were not manifestly for personal use.").

Crawford's invocation of a "common-sense understanding" that "ordinary Oregonians engage financial advisors to help them protect their financial future for personal—not commercial—purposes" (Pl.'s Resp. at 30) is not consistent with Oregon courts' interpretation of the UTPA. *See* *Searle v. Exley Exp., Inc.*, 564 P.2d 1054, 1056 (Or. 1977) ("Certainly it was not intended that the [UTPA] was to be applied solely on a subjective basis by inquiring in each case as to whether the purchaser was motivated in making the purchase by a desire to satisfy some personal, family or household objective. Rather, the statute purports to describe transactions involving the purchase of goods and services which customarily are entered into with the objective of satisfying some personal, family or household purpose. Obviously included would be the purchase of a sack of potatoes, furniture for a home, a wedding gown, an engagement ring or a set of golf clubs. In all of these the purpose of the purchase is to serve some personal, family or household need.").

Crawford insists that the remaining two UTPA provisions on which she relies are not restricted to real estate, goods or services. (*See* Pl.'s Resp. at 29-30, citing § 646.608(1)(c), (k)). These subsections apply to "credit availability or the nature of the transaction or obligation incurred" (§ 646.608(1)(k)) and "affiliation, connection, or association with, or certification by, another" (§ 646.608(1)(c)). However, courts in this district have consistently—and persuasively—held to the contrary, finding that it is improper to read sections of the UTPA that do not expressly mention goods or services "in isolation" to support the "impression that a person may bring an action under the UTPA that does not involve goods or services." *F.D.S.*

*Marine, LLC v. Shaver Transp. Co.*, No. 00-1245-ST, 2001 WL 34045718, at *1 (D. Or. May 25, 2001); *see also Immigr. Sols., Inc. v. Stiffler*, No. 2:21-cv-01186-HL, 2022 WL 462083, at *4 & n.2 (D. Or. Feb. 15, 2022) (granting the defendant's motion to dismiss UTPA claim regardless of which UTPA provisions the plaintiff relied on where "the characterization of the property as an 'investment' property eliminates the possibility of a claim under the UTPA"), *aff'd*, No. 22-35163, 2023 WL 5567151 (9th Cir. Aug. 29, 2023); *Hernandez v. BAC Home Loan Servicing, LP*, No. 3:12-cv-00106-MO, 2012 WL 1941745, at *3 & n.2 (D. Or. May 23, 2012) (recognizing that the UTPA applies only to "real estate, goods, or services" and the addition of "loans and extensions of credit" by amendment) (citation omitted). Crawford does not cite any cases in which Oregon courts have applied the UTPA to investments in securities.[7] (*See generally* Pl.'s Resp. at 29-34.)

For these reasons, Crawford fails to state a UTPA claim against ACA.

## V. OREGON SECURITIES LAW (FIRST CLAIM, COUNT TWO)

Crawford also asserts a claim against ACA under the Oregon Securities Law, OR. REV. STAT. § 59.115(1)(b) & (3), in connection with the Elite Defendants' solicitation and sale of Alpha Fund securities to Crawford in 2024. (Compl. ¶¶ 226-42.)

ACA moves to dismiss Crawford's claim because her "allegations regarding the underlying sale of securities . . . are based upon information and belief." (Def.'s Mot. at 22.) Courts "need not accept" as true "[f]actual allegations on information and belief that are not

[7] *See Pearson v. Philip Morris, Inc.*, 306 P.3d 665, 688 n.14 (Or. Ct. App. 2013) (en banc) ("As plaintiffs acknowledge, securities actions are governed by Oregon and federal statutes other than the UTPA."), *rev'd on other grounds*, 361 P.3d 3 (2015); *see also Rogers v. Cisco Sys., Inc.*, 268 F. Supp. 2d 1305, 1315 & n.20 (N.D. Fla. 2003) ("Numerous other courts have held that various state unfair trade practices acts do not apply to securities transactions.") (collecting several cases).

peculiarly within the possession and control of the defendant and are merely conclusory or are 'naked assertions devoid of further factual enhancement.'" *Covelli v. Avamere Home Health Care LLC*, No. 3:19-cv-486-JR, 2021 WL 1147144, at *4 (D. Or. Mar. 25, 2021) (citation omitted).

Oregon's Securities Law allows private actions against a seller of securities, as well as a nonseller "who participates or materially aids in the sale." OR. REV. STAT. § 59.115(3) ("[E]very person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller[.]"). "Oregon courts interpret the Oregon Securities Law liberally 'to afford the greatest possible protection to the public.'" *Ciuffitelli for Tr. of Ciuffitelli Revocable Tr. v. Deloitte & Touche LLP*, No. 3:16-cv-580-AC, 2017 WL 2927481, at *8 (D. Or. Apr. 10, 2017) (quoting *Foelker v. Kwalke*, 568 P.2d 1369, 1372 (Or. 1977) (en banc)), *findings and recommendation adopted*, 2017 WL 2927150 (D. Or. July 5, 2017).

The Court finds that Crawford's allegations in support of her Oregon Securities Law claim against ACA are not conclusory. *See Covelli*, 2021 WL 1147144, at *4 (noting that "information and belief" allegations are only problematic if they are conclusory). Crawford alleges that ACA drafted or assisted with drafting the August 2023 PPM on which she relied to invest an additional $13,500 in early 2024, and that the August 2023 PPM omitted material facts about Ronnasi's theft charge, materially misrepresented the reorganization of Elite and Lattice, and failed to attach a current Form ADV. (Compl. ¶¶ 226-42.) These allegations are sufficient to state a plausible secondary liability claim against ACA under the Oregon Securities Law.[8] *See*

[8] The Court notes that it is unclear if Crawford's "information and belief" allegations refer to whether she received and executed certain documents or whether she received and executed those documents *in Oregon*. (*See, e.g.*, Compl. ¶ 234, "Upon information and belief, Crawford received the 'Supplement to Subscription Agreement' documents for each of the 2024 investments *in Oregon* and executed those documents *in Oregon*." (emphasis added).) Crawford

*Ciuffitelli*, 2017 WL 2927481, at *10 ("A prima facie case of participant or material aider liability does not require any allegation of wrongdoing by the non-seller, let alone allegations of fraud. Even where the allegedly unlawful securities sale involves fraud, participation and material aid merely entails a connection to the unlawful transaction.") (citations omitted); *Elston v. Toma*, No. CV 01-1124-BR, 2004 WL 1048132, at *8 (D. Or. Apr. 15, 2004) (finding that the plaintiff "ha[d] alleged sufficient facts to support a claim that [the defendant] participated or materially aided [a broker-dealer] in the sale of securities to Plaintiff" under the Oregon Securities Law); *White v. Itc Corp*, No. 85-2004-FR, 1986 WL 31586, at *11 (D. Or. Aug. 5, 1986) ("Plaintiffs have alleged that the sales by [the defendant] failed to comply with the Oregon Securities Law in that the registration was void because of a misrepresentation. The court finds this adequate to state a claim."); *see also Esha Rsch., LLC v. RLH Assets, LLC*, No. 3:25-cv-00880-AB, 2026 WL 1121951, at *10 (D. Or. Apr. 24, 2026) (denying motion to dismiss despite the plaintiff's reliance in part on "information and belief" allegations (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993))).

The Court denies ACA's motion to dismiss Crawford's claim on this basis and ACA advances no other arguments in support of dismissal.[9]

///

---

should clarify in any amended complaint which specific allegations she pleads on "information and belief." In addition, to the extent ACA has now produced discovery that clearly contradicts any of Crawford's "information and belief" allegations, as ACA suggests (Def.'s Reply at 19), Crawford will have an opportunity to update any such allegations in her amended complaint.

[9] ACA briefly argues in a footnote that Crawford has insufficiently alleged "participation" for "secondary liability" of ACA or Hansen. (Def.'s Mot. at 22 n.15.) ACA's argument is largely undeveloped and the allegation it challenges as insufficient (*see, e.g.*, Compl. ¶ 125) is but one allegation of ACA's involvement among others in the complaint. The Court likewise denies ACA's motion to dismiss on this basis.

## CONCLUSION

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART ACA's motion to dismiss (ECF No. 7). The Court DISMISSES Crawford's claims for negligence, negligent misrepresentation, common law fraud, and violations of the Oregon Unfair Trade Practices Act, and DISMISSES IN PART Crawford's breach of fiduciary claim. Crawford may file an amended complaint within fourteen days if Crawford is able to cure the pleading deficiencies addressed herein. If Crawford does not file an amended complaint, she may proceed against ACA on her breach of fiduciary duty claim based on joint liability and her Oregon Securities Law claim.

**IT IS SO ORDERED.**

DATED this 25th day of August 2026.

Stacie F. Beckerman

HON. STACIE F. BECKERMAN
United States Magistrate Judge